No. 2014-7022

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

LLOYD J. PHILLIPS,

Appellant,

vs.

ERIC K. SHINSEKI,
Secretary of Veterans Affairs

Appellee.

APPEAL FROM COURT OF APPEALS FOR VETERANS CLAIMS
IN No. 12-1373

BRIEF OF APPELLANT LLOYD J. PHILLIPS

NON-CONFIDENTIAL

J. Myers Morton
MORTON & MORTON, PLLC
One Morton Place
1518 N Broadway
Knoxville, Tennessee 37917
(865) 523-2000

Attorney for Appellant

January 14, 2014

## <u>UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT</u>

LLOYD J. PHILLIPS,      )
                               )
           Appellant,    )
                               )
v.                       )     Docket No. 14-7022
                               )
ERIC K. SHINSEKI,       )
Secretary of Veterans Affairs,   )
                               )
          Appellee.    )

## <u>CERTIFICATE OF INTEREST</u>

Counsel for appellant, Lloyd J. Phillips, certifies the following:

1.    The full name of every party represented by me is Lloyd J. Phillips.

2.    The name of the  real party in interest represented by me is Lloyd J. Phillips.

3.    All parent corporations and any publicly held companies that own 10

percent or more of the stock of the party represented by me are: None

4.    The names of all law firms and the partners or associates that appeared for

the party or amicus now represented by me in the trial court or agency or are

expected to appear in this court are: J. Myers Morton, Morton & Morton,

PLLC, One Morton Place, 1518 N. Broadway, Knoxville, Tennessee,

37917.

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

STATEMENT OF RELATED CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A. Prior To Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B. Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1. *USS Mauna Kea*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2. Vietnam/Danang Harbor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        3. Stressors/Loss of Life. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        4. Stressors/Ammunition Ship. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        5. Stressors/Taiwan Straits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        6. Stressors/Nuclear Weapons. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        7. Stressors/500 Pound Bombs. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        8. End of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

C. After Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D. Medical Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

COURSE OF ADMINISTRATIVE PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . 12

A. June 1995. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

B. June 1999. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

C. May 2003. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

D. August 2004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

E. June 2005. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

F. February 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

G. March 2009. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

H. May 14, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I. December 22, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

J. March 2012. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

K.  Back To November 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

L.  August 5, 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

A.  Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.  Law and Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

iv

D.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

E.  Relief Sought. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

<u>**Cases:**</u>

Cushman v. Shinseki, 576 F.3.3d 1290, (2008). . . . . . . . . . . . . . . . . . . . . . . . . 2,27,28

Evans v. Shinseki, 25 Vet.App. 7, (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Fletcher v. Derwinski, 1 Vet.App. 394 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Gilbert v. Derwinski, 1 Vet.App. 49, (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Henderson v. Shinseki, 131 S.Ct. 1197 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

In re Bailey, 182 F.3d 860 (Fed.Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Kouvaris v. Shinseki, 22 Vet.App. 377, (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Liteky v. United States, 510 U.S. 540 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . 24,25

Morris v. West, 11 Vet.App. 174 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Mullane v. Cent.Hanover Tr. Co., 339 U.S. 306 (1950). . . . . . . . . . . . . . . . . . . . . 28

Prenzler v. Derwinski, 928 F2d 392 (Fed.Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . 2

Richard v. West, 161 F.3d 719 (Fed.Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Shinseki v. Sanders, 556 U.S. 396, (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Wong Yang Sung v. McGrath, 339 U.S. 22 (1950). . . . . . . . . . . . . . . . . . . . . . . . . 26

Walters v. National Assn. of Radiation Survivors 473 U.S. 305 (1985). . . . . . . . . 27

## **Veterans Administration Proceedings**

*Lloyd J. Phillips v. Eric K. Shinseki*, Docket No. 12-1373 . . . . . . . . . . . . . . . . . . . . 1

*Lawrence D. McDonald v. Erick K. Shinseki*, Docket No. 11-0224 . . . . . . 23,24,29

## **Statutes**

5 U.S.C. § 1001 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
38 U.S.C. § 1131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
38 U.S.C. § 5103A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
38 U.S.C. § 5107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
38 U.S.C. § 7292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## **Constitution**

Article II, Section 3 of the Constitution of the United States of America . . . . . . . . 26

Fifth Amendment to the Constitution of the United States of America . . . . . . . . . 28

## STATEMENT OF RELATED CASES

This is an appeal from the United States Court of Appeals For Veterans Claims in the matter *Lloyd J. Phillips v. Eric K. Shinseki*, Docket No. 12-1373. There is no other pending appeal in or from the same civil action or proceeding in the lower court or body that was previously before this or any other appellate court. It is unclear to appellant; however, there may be pending proceedings before the Department of Veterans Administration in which this veteran is attempting to be awarded and obtain decorations and medals.

## JURISDICTIONAL STATEMENT

The Court of Appeals for Veterans Claims on August 5, 2013, by single judge memorandum decision, dismissed appellant's appeal for service connected PTSD.  The Court of Appeals for Veterans Claims on October 2, 2013, granted appellant's motion for panel decision and adopted the single-judge memorandum opinion as its own.  The order is final, and this appeal was taken pursuant 38 U.S.C. § 7292(a).  (Joint Appendix 1-10; 11,12) (hereafter "JA-__ )

As described on page 1296, in *Cushman v. Shinseki*, 576 F.3d 1290, (2008), this Court holds:

> "...III. DUE PROCESS
> This court reviews legal determinations of the Veterans Court *de novo*. Prenzler v. Derwinski, 928 F.2d 392, 393 (Fed. Cir. 1991). If the decision of the Veterans Court is not in accordance with law, this court has authority to modify, reverse, or remand the case as appropriate. 38 U.S.C. § 7292(e)(1).
> This court has jurisdiction to interpret constitutional provisions 'to the extent presented and necessary to a decision,' id. § 7292(c), and authority to 'decide all relevant questions of law, including interpreting constitutional and statutory provisions.' Id. § 7292(d)(1). This court has jurisdiction and authority to consider a free-standing constitutional issue independently from the CUE framework typically applicable to appellate review of veterans' claims. See In re Bailey, 182 F.3d 860, 869-70 (Fed. Cir. 1999)..."

## STATEMENT OF THE ISSUE

Is a veteran suffering from PTSD entitled to a fair hearing to determine if his PTSD was connected to his service?

## STATEMENT OF THE CASE

This veteran experienced stressors for 4 long years while serving on an ammunition ship the Navy. He also witnessed tragic loss of life.  (JA13-33 at 19, 44-52)

He was diagnosed with PTSD, and Dr. C. Keith Hulse opines:

"...I hope that the above information will help to clarify my assessment that Mr. Phillps suffers from a severe and disabling case of post-traumatic stress disorder, which is a direct consequence of his service in the United States Navy, during the beginnings of the Vietnam conflict. It is my opinion that Mr. Phillips is disabled from any and all competitive employment by this disorder..." (JA 34-42 at 41)

"...He has the one of the clearest cases of service-connected post traumatic stress disorder I have ever seen..." (JA 43, 34-42)

He has been suffering for 50 years, and his VA claim for service connection has been pending with the VA for at least 18 years. The VA claims process has ended with an apparently disgruntled administrative law judge who is unable to view the matter objectively, is calling this veteran a liar as a pretext to uphold his decisions, and is unable to properly provide this veteran with a fair hearing.

## STATEMENT OF THE FACTS

### A. Prior To Service

Appellant was born June 4, 1940, and he was healthy before service. (JA-13,53-55,56,72,73)

### B. Service

Appellant enlisted on or about July 11, 1958, and was fit for service. (JA-56,57,59,60,61)

4

Appellant was trained and was a boat mechanic, interior communications electrician and learned to maintain and repair everything on all large ships. (JA-13, 14,22,24,26,28,58,62,63,64-68)

## 1. *USS Mauna Kea*

Appellant served aboard the *USS Mauna Kea*, for 3 years. The ship was an ammunition ship and oil tanker. (JA-13-30,67,68,69,70,71)

The *Mauna Kea* loaded weapons and fuel onto a dozen ships. (JA-74)

The *Mauna Kea* would be out to sea replenishing ships, including aircraft carriers and destroyers, for 7 to 8 months at a time.   (JA-13-33 at 14)

It was dangerous. Weapons were loaded onto ships while both ships were underway. There is a picture of the *USS Midway* approaching the *Mauna Kea*. (JA-30,70)

The *Mauna Kea* had to maintain a speed of 26 knots while transferring ammunition. The seas were rough, and any mistake could lead to an explosion that would destroy every ship in the vicinity. (JA-17)

## 2. Vietnam/Danang Harbor

The *Mauna Kea* also replenished forces in Vietnam.  (JA-19,86,88-96,105-108)

For instance, one deck log entry reflects, among other things:

"09-12. Steaming as before. Maneuvering at various courses and speeds to enter Danang Harbor. 0809 Anchored in Danag Bay, South Vietnam, in 35 feet of water, mud bottom,..." (JA-92)

The deck log reflects, among other things:

5

"...We proceeded up the river to unload supply for the first ...Marines & Army to land. They was suppose to be building road & bridges. I was on HE-22 Mauna Kea Ammunition ship. We anchor a couple of miles from the beach. We were on a sea & anchor watch all the time we spent in Vietnam..." (JA-105,106)

A shipmate stated "...1963 ran ammo up river to DaNang to Army..." (JA-108)

Another stated:

"...We loaded up a LCM at Subic Bay and then we would pull into the Bay in South Viet Nam which later they built the big Da Nang base at, there we would unload the LCM and load it up with ammunition and go up the river to the Special Forces base. We would pull back at sea at nite and then come back the next day and do the same procedure..." (JA-107)

### 3. Stessors/Loss of Life

Appellant described several incidents:

"...One incident was the little boat with the man.  I was on deck working on the sound power telephone...It was very early in the morning, just after dawn, but before the sun rose.  I had just fixed it and turned around, and I noticed a man on a small boat on the port side.

His small boat was the port side while our ship was turning to the port 1 or 2 degrees.  He had both hands up.  I did not have time to throw him a life ring that was hanging on the bulk head.  He just went down the side of the ship with this hands up.  At some point, he was trying to push his boat away from the ship.

He was looking right at me.

He went under the stern of the ship.  When we had passed on by he was gone.

When the ship came in, we were slowing down a bit.  A wave follows us and he was just a few feet off the side of the ship and the wave took him down.  He went down with his small boat.

6

I am the only one that saw him. None of the watchmen or anybody else noticed him. Noone said anything on the telephone.

We were at general quarters. We had had no sleep for a long time. I ran down to the next level, and I listened to all the telephone systems to see if anyone reported it. Noone reported. I did not report it. In no particular order, another incident involved a small boat with a couple of children, including a little, small baby. It was in the day time, the sun was out and people were all over the deck. I can see the little city on the shore. We were at anchor. A couple of boats were in the water. The army was supposed to be bringing a barge or 2 out to the ship where we were anchored to unload ammo onto the barges to take up the river.

There was a big mistake because the barges were not there. The whole situation was extremely stressful. One hand grenade from a small boat would have vaporized us.

Our ship was sitting there like a sitting duck. I was doing my job checking the steering system, checking emergency diesel on the fantail, checking communications, checking fire alarm systems, etc. I went up to the main deck.

The air was fresh. I was looking out from the stern of ship where flag is. I looked toward the starboard side, and I saw a little boat come around. This little boat came right on the port side, and this young woman was looking up at me. She was 18 to 20 years old. She had a very small baby on deck and a small child running around. She was trying to talk to me. If she had bomb, she could have blown up our ship.

The child and baby on that ship tugged at my heart. We had a habit of helping orphans in Japan by giving clothes, and I gave up my paycheck. When I saw this small boat, I was reminded of the orphans, and I was trying to figure out how to help this woman. I was trying to figure out what I could throw down to them.

At that time, the deck officer or ensign came running screaming and hollering. He ordered me to get the hose, and I did. I handed the deck hand the hose, and I turned the water on. As the deck officer was training the hose down on the boat, he ordered me below.

I went below, and I stayed there for hours. I listened to the phone system to see what happened, but noone said anything about it.

7

Later, late that evening, couple of guys came down into the galley, and they told me "They went down like a rock". I never told anybody about this until I told Dr. Hulse recently.

I felt responsible for all the deaths..." (JA-105,106109-114)

One sailor confirmed more than 1 incident.

"...**Yes we did have some incidents with fishing boats on those trips into VN**..." (Emphasis supplied.) (JA-107)

Appellant stated the incidents were not probably included in the deck logs.

(JA-109)

### 4.  Stessor/Ammunition Ship

Appellant describes incredible stress while serving on the Mauna Kea.  (JA-14,16)

"...We would be out to sea replenishing ships for 7 to 8 months at a time.  We replenished all ships, including air craft carriers and destroyers.

It is difficult to describe how extremely dangerous it was working on this ammunition resupply ship. One spark, one mistake or one dropped bomb would vaporize me. We were constantly aware of the risk, and living in such a state of absolute fear that my life was about to end instantly 24 hours a day for 7 days a week for over a year took its toll on me..."  (JA-16)

Appellant described the pressure he was under.  (JA-111)

Appellant was the only one who could get the USS Mauna Kea underway.

He was the only one who understood and was able to get all the underway circuit

on line.  He was also the only one who could get the compass working. (JA-109)

Appellant was constantly aware of the risk, and living in such a state of

absolute fear that his life was about to end instantly 24 hours a day for 7 days a

8

week for months at a time. (JA-16)

While serving on the *Mauna Kea*, appellant was aware that ammunition ships exploded. Accounts in the record are horrendous. (JA-14,15,17, 44-52)

The *Mauna Kea* was not allowed into ports, and was required to stay out at sea. Appellant was trained a ship explosion at sea would cause a tidal wave. Ships hurried away once resupplied. Appellant lived with a constant fear that he could be blown to pieces.  (JA-17)

Additionally, appellant was not allowed to transfer away from the *Mauna Kea*.

> "...Sept 1959 to July 1962-USS Mauna Kea AE-22 Ammunition ship works in inter-communication in all departments of the ship. My duty station for sea-anchor & general quarters was in the emergency diesel room. They did not use the sound power phone at this station, because the loud noise would drown out all the phone stations on the ship. After several months I went to sick-bay for dizziness & loud noises in my ears. The corpsmen wrote a medical excuse to the officer in charge that I should not stand-duty in the emergency diesel-room & the corpsmen continue to give me some pills & **told me to put in for transfer two or three times a year the officer in charge said I was in a critical field and could not be transfered**..."  (Emphasis supplied.) (JA-115,116)

> "Stress-Beingon the USS Mauna Kea AE-22 which is an [ammunition] ship Sept 1959 to May 29, 1962. **I requested transfer two or three times a year**. I was in the Formosa Straits-1959,1960,1961, & 1962. These were hostile waters in this period of time. Captain H.D. Hilton was commanding officer on this trip Nov 17, 1960 to June 1961 on his watch these incidents happen during this period of time in Southeastern Asia waters. The 7 Fleet & Austrial carriers was standing off shore 15 miles beyond this point we were subject to attack..." (Emphasis supplied.) (JA-117)

Appellant respectfully urges that serving on an ammunition ship was stressful.  Serving on an ammunition ship for 3 years caused PTSD.  (JA-14)

### 5. **Stressor/Taiwan Straits**

The *Mauna Kea* was in the Taiwan Straits, and the communist Chinese were aware of the ammunition ship's presence. While in the straits one night, shells shot from the mainland toward Taiwan could be seen flying above the ship. (JA-62,63,117)

### 6. **Stressor/Nuclear Weapons**

On occasion, ammunition the *Mauna Kea* carried included nuclear missiles (ie. "special weapons"). One time there was a problem in transferring the missile. (JA-19,108,118)

> "...Contrary to deck logs, ammunition we carried included nuclear missiles. In one instance, we were loading a nuclear missile onto a DLG ship when a band around the missile caused a very difficult and stressful problem that was ultimately resolved..." (JA-19)

### 7. **Stressor/500 Pound Bombs**

On another occasion, 500 pound bombs broke lose while loaded on the ship in a storm and rolled around the ship. This was confirmed or corroborated. (JA-19)

Appellant discovered out-dated and old 200 and 500 pound bombs. (JA-19)

### 8. **End of Service**

Appellant was fit "...for active duty at sea and/or foreign shore..." and re-enlistment. (JA-56,57,120)

Appellant declined and was honorably discharged. (JA-121)

Appellant "...[b]egan feeling depressed while in Navy..." (JA-122)

Appellant suffered through these stressors from July 1958 to July 1962. (JA-121)

10

## C. After Service

Appellant was ruined.  His PTSD suffering is exhaustively described in the record. (JA-19,21,53,54,55,109,114,123,124-144)

Family described this veteran before and after he returned home. (JA-53,54, 55,72,73)

> "...When I go to bed at 2:00 or 3:00 a.m. every night, the *USS Mauna Kea* is the last thing on my mind.  *__Every__* single morning at 4:00 or 5:00 a.m of my life, I wake up on the *USS Mauna Kea* looking at the gyro compass making sure we are on course.  I cannot get off that ship..." (JA-114)

## D. Medical Evidence

> "...He has the one of the clearest cases of service-connected post traumatic stress disorder I have ever seen..."  (JA-43)

There appears to be no dispute that this veteran suffers greatly from and has been diagnosed with PTSD.  (JA-34-43,124-135,145-159)

Appellant references Dr. Hulse's September 26, 2002, report as if set forth herein verbatim. (JA-34-88)

Dr. Hulse's exhaustive report ends with:

> "...I hope that the above information will help to clarify my assessment that Mr. Phillps suffers from a severe and disabling case of post-traumatic stress disorder, which is a direct consequence of his service in the United States Navy, during the beginnings of the Vietnam conflict. It is my opinion that Mr. Phillips is disabled from any and all competitive employment by this disorder..." (JA-88)

The Board acknowledges the "comprehensive" analysis and diagnosis of PTSD. (JA-165)

> "...In this regard, it is once again important to note that if the Board believed the Veteran's recollection of events, the Board would grant

11

service connection for PTSD notwithstanding the fact that none of the stressors have been confirmed by a credible source. The critical question is whether the Veteran is telling the VA, and the Court, the truth..." (JA-173)

## COURSE OF ADMINISTRATIVE PROCEEDINGS

### A. June 1995

Appellant filed his claim for PTSD, among other things, in June of 1995.

(JA-182-185) His claim for PTSD has been pending for more than **18 years**.

### B. June 1999 (JA-186-196)

The Board remanded to, among other things, confirm stressors. The Board

also stated:

> "...Although the appellant did not timely responded this request, he has related other stressors at various times including, *inter alia*, a handwritten statement received in June 1995. **He claims to have served onboard the U.S.S. Mauna Kea (AE-22) from at sometime between November 1961 and February 1962**. During this time, he states members of his crew had turned a water hose on Vietnamese civilians sinking their boat. However, his service personnel file (201 file) is not associated with the claims file, and review of the record does not show that the U.S. Armed Services Center for the Research of Unit Records (USASCRUR)) has been requested to verify the stressful event reported by the veteran..." (Emphasis supplied.) (JA-190)

### C. May 2003 (JA-197,198)

The claim was remanded to determine if this veteran wanted a hearing. (JA-198)

### D. August 2004 (JA-199-201)

The claim was remanded in order to have a hearing. (JA-200)

### E. June 2005 (JA-202-218)

12

After the claim had been pending for almost 9 years, Administrative Law Judge Crowley for the first time denied appellant's claims. (JA-202-218)

***The*** basic reason for denying the claim was that the *USS Mauna Kea* never entered any Vietnam waterway during the relevant period. (JA-219-230 at 225; 202-218)

> "...FINDINGS OF FACT
> 1. The veteran did not engage in combat with the enemy, and an in-service stressor has not been otherwise confirmed or verified.
> 2. Currently diagnosed PTSD was first demonstrated many years after service and it is not etiologically related to any in-service occurrence or event..." (JA-203)

The Court of Appeals for Veterans Claims subsequently described Judge Crowley's decision as:

> "...The crux of the Board's denial of the appellant's claim for PTSD was its determination that there was no evidence that the USS Mauna Kea entered any Vietnam waterway during the relevant period..." (JA-218)

Judge Crowley determined this veteran was not credible. (JA-207-210,216)

Judge Crowley acknowledged "...PTSD has been diagnosed..." (JA-208)

Judge Crowder decided "...there can be no service connection..." and any further adjudication would "...serve no useful purpose..." (JA-210,211,217)

Judge Crowley denied all claims. (JA-218)

### F.  **February 2008**  (JA-219-230)

Appellant appealed Judge Crowley's decision denying his claims, and in February 2008, the Court of Appeals for Veterans Claims, under docket number 05-3095, vacated Judge Crowley's decision and remanded the claim. (JA-219-230)

13

The Court's order included:

"...The Court agrees with the appellant that the Board erred in determining that the VA satisfied its duty to assist in this case and that there are outstanding relevant deck logs that should have been obtained. **The crux of the Board's denial of the appellant's claim for PTSD was its determination that there was no evidence that the USS Mauna Kea entered any Vietnam waterway** during the relevant period,...the Board should have ensured that VA assisted the appellant by attempting to find out from USASCRUR whether the U.S.S. Mauna Kea had, during the relevant period, traveled near the coast of Vietnam. **The Board erred in determining that the information provided by the USASCRUR was `very negative evidence against the veteran's claim' and that this evidence 'tends to dispute the veteran's recollection of the alleged stressors in service.'...On remand, the Board must** ensure that VA **sends another request** to USASCRUR requesting any information, including ship history, regarding the locations of the U.S.S. Mauna Kea and its operations for the period November 1, 1961, through February 28,1962,...VA should ensure that the USASCRUR provides copies of the deck logs for the limited period in question. In readjudicating the claim on remand, **the Board should adequately discuss and take into account whether the alleged incidents that form the basis of the appellant's stressors (e.g., the drowning of Vietnamese civilians by the ship's water hoses) are of the type that are likely to appear in the deck logs**. In addition, **the Board should adequately support** any determinations regarding the credibility; of the lay evidence..."  (Emphasis supplied.) (JA-225,226)

### G.    March 2009 (JA-230-236)

Post Court vacation and remand, Judge Crowley remanded this veteran's claim for service connected PTSD.  (JA-230-236)

### H.    May 14, 2010 (JA-237-239)

Appellant notified the Board that the November 1961 to February 1962 search window for deck logs was incorrect, and that the search for deck records should be much broader.  (JA-237-239)

14

## I.  December 22, 2010  (JA-240,241)

On or about **December 22, 2010**, the "JSRRC Coordinator" stated:

"...Per the BVA remand we requested the November through February 1962 deck logs. **While that request was still pending Mr. Morton sent correspondence stating that the dates requested were incorrect**. **We then submitted an additional request for deck logs. After satisfying both parties'  (BVA remand and Attorney) timeframes, the deck logs were reviewed for any indication of the veteran's stressor**. Numerous times in the evidence of record it has been stated that the stressor occurred in or around February 1962. The veteran's deck logs state that in February 1962 the USS Mauna Kea was in the waters around the Mariana Islands (Guam). Therefore, after not finding any mention of said stressor a request was submitted to JSRRC for February 1962, in or around the Mariana Islands..." (Emphasis supplied.) (JA-240,241)

Significantly, while no entries of the specific stressors were noted in the deck logs, this post Court remand search did finally uncover confirmation and *corroborate* that this veteran was aboard the *Mauna Kea* in Vietnam. (JA-86-97)

## J.  March 2012

In March 2012 Judge Crowley again dismissed this veteran's PTSD claim. (JA-163,181)

Judge Crowley noted his previous denial had been vacated and remanded. (JA-162)

"...1. The Veteran did not engage in combat with the enemy, and an in-service stressor has not been otherwise confirmed or verified..." (JA-163)

"...The Veteran's claim has remained denied since 1995 in part for lack of credible supporting evidence that the claimed in-service stressor occurred..."  (JA-164)

After obtaining corroboration that the *USS Mauna Kea* was in Vietnam

15

waters, the "crux" of Judge Crowley's decision shifted and, unlike his previous decision, was no longer concerned that there was no evidence that the *USS Mauna Kea* entered any Vietnam waterway.  Now, Judge Crowley reasoned the loss of life or other stressors were never corroborated and never occurred because this veteran was deliberately fabricating stories. (JA-163,165-177)

> "...Beyond the above, the board must note a **singularly important fact**: The Veteran' s alleged **stressors are constantly changing**, with new stressors (not cited in the past) as the basis for the Veteran's PTSD being raised regularly. It is important to note that the Board routinely grants claims even in situations where there is no evidence of an injury or stressor in service, if the Veteran's statements are found to be credible..." (Emphasis supplied.) (JA-167)

Judge Crowley generated artificial misrepresentations.

> "...In a December 1998 statement, the Veteran described his Vietnam service as consisting of off-loading ammunition onto barges off the coast of Vietnam.
>
> **Apparently realizing that his ship, the U.S.S. Mauna Kea, was a rather large vessel that would have had difficulty traveling a river** in Vietnam, in a February 2003 statement, the Veteran said that what he meant by "a river" was that he could see land, and that the events he had previously described as having occurred in "a river" most likely occurred in the Gulf of Tonkin or Mekong Delta region, rather than an actual "river".
> The Board finds that this statement is entirely inconsistent with his prior statement that his ship ran through a barricade of fishing nets and small boats, probably causing loss of life..." (Emphasis supplied.) (JA-166)

The board also falsely emphasized that appellant through his "representative", the undersigned, mislead the Court of Appeals for Veterans Claims, and as a result, counsel was personally responsible for years of Board delays.

16

"...*the Veteran's representative has made strident statements* in 2011 that the Veteran's stressor events occurred after February 1962. Both the engine failure and loose bomb incidents occurred prior to that date. The volume of noise from the ship's guns near the Veteran's duty station does not appear to be related to the Veteran's PTSD claim..." (Emphasis supplied.) (JA-167)

Judge Crowley falsely asserted:

"...This issue was remanded by the U.S. Court of Appeals for Veterans Claims (Court) in 2008 in part to satisfy the duty to assist in obtaining service department records. **The Veteran's representative argued**, and the Court agreed, that the Board erred in determining that the VA satisfied its duty to assist in this case and **that there are outstanding relevant deck logs that should have been obtained for the period of the relevant period, November 1961 through February 1962.** The Court's February 2008 decision stated that: [t]he crux of the Board's denial of the appellant's claim for PTSD was its determination that there was no evidence that the USS Mauna Kea entered any Vietnam waterway during. [] This was the basis for the Board's assignment of little probative weight to the October 2002 report from Dr. Hulse that diagnosed PTSD from the alleged incident involving the boat with the woman and children. [] In light of the statement of the appellant's shipmate aboard the USS Mauna Kea, who noted that they had delivered ammunition off the coast of Saigon, Vietnam, and the appellant's statements that the ship traveled off the coast of Vietnam, the Board should have ensured that VA assisted the appellant by attempting to find out from USASCRUR **whether the U.S.S. Mauna Kea had, during the relevant period, traveled near the coast of Vietnam**.
The Court excluded from the search window the period from December 28, 1961, to January 26, 1962, as the Veteran's personnel records indicated that he was on leave..." (Emphasis supplied.) (JA-168,169)

(The Court of Appeals for Veterans Claims actually traced the December 28, 1961, to January 26, 1962, search window for deck logs to "...appellant's statements to VA and the Board decision...", not to the undersigned counsel. (JA-35,36,225,226, 202-211,104,190,242)

"...The Board must, respectfully, point out that the Veteran's current

representative was also his representative before the Court. The representative obtained a remand from the Court for identifying this supposed error in the duty to assist for not seeking records for the November 1961 to February 1962 period. **If the representative believed, as he does now, that a search of the November 1961 to February 1962 period was useless, he should not have asked the Court for such relief . The representative's inconsistent litigation positions have resulted in an unnecessary delay lasting years in this case**...” (Emphasis supplied.) (JA-170)

First, the undersigned “representative” does not believe he ever asked the

Court for such relief.

Secondly, appellant himself notified the Board that the November 1961 to

February 1962 search window was incorrect, and that the search for deck records

should be much broader.  (JA-237-239)

Additionally, as a result, corroboration was actually uncovered from this

expanded search for deg logs.

“...While the case was on remand, the RO also obtained information in 2010 from the National Archives and Records Administration, showing that the U.S.S. **Mauna Kea did make a May 1962 supply trip to Da Nang, Vietnam**. The RO requested all deck logs showing travel to Vietnam in April and May 1962. Only one trip to the Vietnam area was found, early May 1962...”  (Emphasis supplied.) (JA-170)

Judge Crowley also condemns fellow *USS Mauna Kea* sailors themselves as

not credible.

 “...the Board finds it inconceivable that a United States Navy vessel would not record such significant events as the Veteran has cited above. In this case, the Board respectfully contends that the evidence obtained by the VA provides **highly probative evidence against the Veteran's accounts, and those of his fellow sailors**, about many of the alleged stressors in service, undermining his credibility with the Board regarding all of his stressors in service...”  (Emphasis supplied.) (JA-171)

18

Veterans Law Judge Crowley was also critical of appellant's and fellow *USS Mauna Kea* sailors' descriptions of the *Mauna Kea* on a "river" in Vietnam.  (JA-165,167,172,173)

Appellant described the *Mauna Kea* on a "river" (JA-35,108,105,106), while other descriptions use the words "off the coast", "Mekong Delta" or "harbor". (JA-170,209,221,222,223,243,244)

A fellow *USS Mauna Kea* sailor use the word "river". (JA-107)

Deck logs describe "Maneuvering" and entering Danang Harbor and "mud bottom," and maneuvering to "clear the harbor." (JA-92)

Judge Crowley proposes appellant has been caught in a fabrication.

"...The stressor described in detail by Dr. Hulse, in November 1995, reportedly occurred when ***the Veteran's ship had been sent alone up a hostile 'river' in Vietnam***. During this time, the Veteran reportedly saw a small fishing boat with a woman and children in it, which had come close behind the ammunition ship. An alarm was sounded, the executive officer gave orders to repel the boarders, and the veteran, under orders, turned on a fire hose, which the executive officer personally used to sink the boat, drowning the passengers.

This stressor, ***or a variation*** thereof, was also described in several subsequent reports from Dr. Hulse, in VA examination reports, and in written statements submitted by the Veteran..." (Emphasis supplied.) (JA-165)

"...In a December 1998 statement, the Veteran described his Vietnam service as consisting of off-loading ammunition onto barges ***off the coast of Vietnam***.

**Apparently realizing that his ship, the U.S.S. Mauna Kea, was a rather large vessel that would have had difficulty traveling a river** in Vietnam, in a February 2003 statement, the Veteran said that what he meant by 'a river' was that he could see land, and that the events he had previously described as having occurred in 'a river' most likely occurred in the Gulf of Tonkin or Mekong Delta region, rather than an

actual 'river'.  The Board finds that this statement is entirely inconsistent with his prior statement that his ship ran through a barricade of fishing nets and small boats, probably causing loss of life..." (Emphasis supplied.) (JA-166)

Everybody there called it a "river".  Judge Crowley again describes this veteran as being discredited, and he also calls a fellow *USS Mauna Kea* sailor "not credible."

"...J.G.'s statement does not credibly provide support for the Veteran's claimed stressors. First, J.G. recalls only two trips to Vietnam, one in 1962 and one in 1963. The Veteran separated from service in 1962. Whatever the details of the 1963 trip, the Veteran cannot be found to have service-connected PTSD as a result..."  (JA-171)
      Second, the Mauna Kea's decklogs for May 1962 have been obtained, as mentioned above. There is not only no mention of a LCM. The trip record indicates that the Mauna Kea steamed directly to Da Nang harbor, maneuvering in and anchoring at 0809 on Thursday, May 3, 1962. The ship offloaded ammunition to a barge. The ship completed the operation, lifted anchor and was underway from Da Nang by 1042 the same morning. The ship cleared the harbor and began steaming directly to a new rendezvous with the 7th Fleet (***never going near a "river" in Vietnam***). The Mauna Kea did not return to Da Nang the next day. As J.G. reported only one trip to Vietnam in 1962, there is no reason to assume another trip to Da Nang occurred in that time. **The decklog records are, as is obvious, in direct contradiction to J.G.' s account**. If J.G. is describing the 1963 trip, the Veteran was not present for it. If J.G. is describing the 1962 trip, his statement as to 1962 is not credible...The Board assigns no probative value to J.G.'s September 2008 statement and, more importantly, finds the problems associated with the account only provide more evidence that the **Veteran is providing the VA, and the Court, false accounts in order to support his claim**, undermining all claimed stressors..."   (Emphasis supplied.) (JA-171,172)

Judge Crowley is presuming appellant is not telling the truth and rationalizing falsehoods for appellant.

Judge Crowley finds this veteran is not telling the truth to the Board and to

the Court of Appeals for Veteran's Claims.

> "...In this regard, it is once again important to note that if the Board believed the Veteran's recollection of events, the Board would grant service connection for PTSD notwithstanding the fact that none of the stressors have been confirmed by a credible source. ___*The critical question is whether the Veteran is telling the VA, and the Court, the truth.*___

Finally, the Board has reviewed a December 2009 statement from the Veteran. In it, he claims *to severe flashbacks following a mass shooting at Fort Hood*. He reports that *he now remembers* being the victim of an in-service personal assault by another servicemember. The Veteran claims that he never told anyone about the assault because the servicemember had ten years service and he did not want to cause any trouble.

The Board finds this statement incredible for two reasons: First, the Veteran has been seen repeatedly for PTSD and there has never been mention of a personal assault. The Veteran's claimed stressors have consistently pertained to the ship's *alleged* movements near Vietnam and in interactions with small craft in the area. There is no indication that his PTSD may be the result of anything other than the stressors recounted above..." (Emphasis supplied.) (JA-173)

Judge Crowley again discusses appellant's dishonesty.

> "...Second, **the Veteran's claim for PTSD is now over 16 years old and the subject of extensive litigation**. The Veteran has reported this stressor only after more than a decade of failing to achieve his goal of service connection for PTSD. The Veteran's statements that he never told anyone about the assault prevents meaningful stressor research. The Board finds that the Veteran has not credibly reported an in-service personal assault and this **late effort to create yet another stressor** only provides more factual evidence against the most important finding in this case: **the Veteran is, unfortunately, fabricating stressors and not telling the VA, or the Court, the truth**. The fact that he would recall such an event, at this time, provides particularly compelling factual evidence regarding the Veteran's overall veracity..." (JA-173,174)

Judge Crowley curtly disregards family lay witnesses' testimony as

irrelevant "...to the substance of the stressors..."  (JA-172)

Judge Crowley provides a final summation of this veteran's credibility.

"...In sum, and in light of the fact that this case has been to the Court (with specific instructions by the Court for the Board to provide clear reasons and bases for its decision regarding the issue of credibility) the Board believes it must be clear regarding its findings: the Board finds that the Veteran is not a combat veteran, that his stressors are not supported by credible evidence, and significant highly probative evidence in this case clearly reveals that **the Veteran is fabricating all his stressors**. While the Mauna Kea did offload ammunition onto a barge in May 1962 off the coast of Vietnam, this is not in accordance with the Veteran's stressor event identified by Dr. Hulse. Neither the official records nor the buddy statement corroborate the specific stressor events described by the Veteran, and which have resulted in a diagnosis of PTSD, and, as a whole, provide evidence against this claim as it provides a basis to finding that the **Veteran is not credible** regarding his stressors in service (for reasons noted above). Other claimed stressors of record are non-corroborated and/or have not been medically related to a PTSD diagnosis. The Veteran's **changing statements only provide more factual negative evidence against this claim**. As such, service connection for PTSD is not warranted. As such, the Board finds that the preponderance of the evidence is against the Veteran's PTSD claim. Consequently, the benefit-of-the-doubt rule does not apply, and the claim must be denied. 38 U.S.C.A. § 5107(b) (West 2002); Gilbert v. Derwinski, 1 Vet.App. 49,55 (1990)..."  (JA-174)

Nothing could ever change the outcome.

"...The Board concludes that additional notice is not warranted in the unique circumstances of this case. **Simply stated, there is simply no rational basis to remand this case (once again) to attempt to provide more notice to the Veteran regarding as stressor event that it is clear, based on the 16 years of litigation in this case, never occurred. A fifth remand is clearly found to be not required in this unique situation**.
The Board also concludes the duty to assist has been satisfied..." (Emphasis supplied.)  (JA-178,179)

"...The February 2008 Court opinion which returned the PTSD issue to the Board also indicates that the Board relied on inadequate VA examinations.  The Court determined that the VA examinations appeared to rely on the DSM-III, rather than DSM-IV, in indicating that the stressor events were not outside the range of usual human

22

experience that would be markedly distressing to almost anyone. The DSM-IV revised the stressor criteria to an individualized two part test...The Court instructed that the reports should be returned to the examiners for clarification.

If VA provides a claimant with an examination in a service connection claim, the examination must be adequate...The rule of adequacy is not without limit...The Board has found that the Veteran's stressors have not been supported by credible evidence and, in fact, significant evidence of record supports a finding that the stressor cited by the Veteran did not occur. Without credible supporting evidence, or a stressor which could provide the basis to find PTSD, VA's duty to provide an examination is not triggered...Further **remand for clarification of the VA examinations would not change the outcome of this case**. Even an examination that found PTSD would not provide a basis to grant this claim for reasons cited above. Such remands are to be avoided...The Board concludes that the duty to assist is satisfied..." (Citations omitted.) (Emphasis supplied.) (JA-178,179)

At the end of this same Board decision, Judge Crowley inconsistently

accepts appellant's evidence in support of a his claim for service connected.

"...**While the Board has noted serious concerns regarding the Veteran's trustworthiness**, further evaluation or litigation of this issue, requiring another remand of this case (this case has been remanded four times) and further delays in the adjudication of this case, does not serve the interests of the Veteran or the VA. Consequently, the benefit-of-the-doubt applies, and the claim must be granted..." (Citations omitted.) (JA-177)

The board's "ORDER" was to deny PTSD and grant vertigo. (JA-181)

## K. Back To November 2008

In *Lawrence D. McDonald v. Erick K. Skinseki*, Docket Number 11-0224, a

separate and ordinarily unrelated proceeding, the Court of Appeals for Veterans

Claims vacated a Board decision and remanded Mr. McDonald's claim for the 3rd

time back to the Board pursuant to the terms of a Joint Motion for Remand (JMR)

filed therein.  (See the Court's Order as Exhibit 1 to Appellant's Motion For

Judicial Notice filed contemporaneously herewith.)

On page 11, that decision, the Court of Appeals for Veterans Claims held:

"...The Court recognizes the complexity of this case and appreciates the effort Judge Crowley has expended in preparing three decisions. However, the above-quoted portions of the decision here on appeal indicate that **Judge Crowley is no longer able to view the matter objectively and to provide Mr. McDonald with the veteran-friendly review to which he is entitled**. *See Evans v. Shinseki,* 25 Vet.App. 7, 14 (2011) (stating that the VA system is "veteran-friendly" and "non-adversarial"); *Kouvaris v. Shinseki,* 22 Vet.App. 377, 381 (2009) (noting that the veterans benefits system is a "veteran-friendly" system). **Thus, on remand, the Court requires VA to provide review by a different Board member in the same capacity**. *Cf. Fletcher v. Derwinski,* 1 Vet.App. 394, 397 (1991) ("A remand is meant to entail a critical examination of the justification for the decision. The Court expects that the [Board] will reexamine the evidence of record, seek any other evidence the Board feels is necessary, and issue a timely, well-supported decision in this case.")..." (Emphasis supplied.)

(See Exhibit 1 to Appellant's Motion for Judicial Notice filed contemporaneously

herewith.)

## L.     August 5, 2013

Appellant appealed the Board's March 2012, decision denying his claim.

On or about August 5, 2013, the Court of Appeals for Veterans Claims, starting on

page 7 of the opinion, among other things, decided:

"...As to the appellant's contention that the Board member was somehow prejudiced against him, the appellant has not identified anything in the Board's decision that indicates any sort of bias or prejudgment. Rather, the appellant appears to believe that the Board member was biased because he reached a decision unfavorable to the appellant.  But the fact that an adjudicator renders a decision unfavorable to a claimant does not mean that the adjudicator is biased. See Liteky v. United States 510 U.S. 540, 555 (1994) ('[J]udicial

24

rulings alone...can only in the rareset circumstances evidence the degree of favoritism or antagonism are required' to show partiality or bias 'when no extrajudicial source is involved.') ; Morris v. West, 11 Vet.App. 174, 175 (1998) (per curiam order) (stating that even when a claimant 'sincerely believe [s] that he has a grievance,' that is not enough to show partiality or bias). The Court understands that the appellant believes himself to be entitled to benefits and understands his frustration at having his claim denied. But the Court can find nothing, either in the text of the Board decision itself or in the record as a whole, that would indicate that the Board member denied his claim out of some improper motive.

     To the extent that the appellant argues that the Board's reasoning reflects bias against his claim, particularly because of attacks upon the appellant's credibility, the appellant simply has not established that the Board's factual conclusions, including its ultimate determination to deny service connection, are clearly erroneous.  The Board found that the appellant's claimed stressor was not sufficiently corroborated by the deck logs or his buddy's statement. The Court finds no error in that determination. Regardless of whether the Board was mistaken in its statements regarding whether the appellant's ship was in a 'river' near Vietnam or whether he caused delay in the proceedings as the appellant asserts (App.Br. 22-28), the Board provided other reasons for denying the claim, specifically, '[n]either the official records nor the buddy statement corroborate the specific stressor events described by the veteran, and which have resulted in a diagnosis of PTSD.' R at 16.

     The Court holds that the Board's factual determination that the appellant's claimed in-service stressor pertaining to the small crafts in the waters off of Vietnam was not sufficiently corroborated is supported by a plausible basis in the record, viewed as a whole..." (JA-7)

At the end of the Court's 10 page opinion, the Board decision is affirmed.

The Court also overruled appellant's motion for a panel review by adopting the single judge opinion.

## ARGUMENT

### A.  Summary

The Administrative Law Judge in this case was unable to view the matter

objectively and to provide this veteran with the veteran-friendly review to which he is entitled.

## B.  Standard of Review

The standard of review for Constitutional issues is *de novo*.

## C.  Law and Argument

Article II, Section 3, of The Constitution of the United States of America states the Secretary will "...take Care that the Laws be faithfully executed..."

One of those laws is 38 U.S.C. § 1131.  It is titled "Basic entitlement", and it includes:

> "For disability resulting from personal injury suffered...in line of duty...in the active... naval...service...**the United States will pay** to any veteran thus disabled ...compensation as provided in this subchapter..." (Emphasis supplied.)

In <u>Wong Yang Sung v. McGrath, Attorney General, *et al.*</u>, 339 U.S. 22 (1950), the U.S. Supreme Court on page 42, was reviewing the Administrative Procedure Act, 5 U.S.C. § 1001 et seq., and referenced "several administrative evils sought to be cured or minimized."

On page 44, the Court quotes a study and implies the law requires someone the object of a federal administrative agencies' decisionmaking powers should have a fair hearing.

> "...'**A genuinely impartial hearing, conducted with critical detachment**, is psychologically improbable if not impossible, when the presiding officer has at once the responsibility of appraising the strength of the case and of seeking to make it as strong as possible. Nor is complete divorce between investigation and hearing possible so long as the presiding inspector has the duty himself of assembling and presenting the results of the investigation'.."

In *Shinseki v. Sanders*, 556 U.S. 396, 129 S.Ct. 1696 (2009), the Court, on

page 412, holds:

> "...Second, we recognize that Congress has expressed special
> solicitude for the veterans' cause. See post, at 1709 (SOUTER, J.,
> dissenting). A veteran, after all, has performed an especially important
> service for the Nation, often at the risk of his or her own life. And
> Congress has made clear that the VA is not an ordinary agency.
> Rather, the VA has a statutory duty to help the veteran develop his or
> her benefits claim. See Veterans Claims Assistance Act of 2000, 38
> U.S.C. § 5103A. Moreover, the adjudicatory process is not truly
> adversarial, and the veteran is often unrepresented during the claims
> proceedings. See Walters v. National Assn. of Radiation Survivors,
> 473 U.S. 305, 311, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985). These
> facts might lead a reviewing court to consider harmful in a veteran's
> case error that it might consider harmless in other circumstances. But
> that is not the question before us. And we need not here decide
> whether, or to what extent, that may be so.

Likewise, Judge Crowley ignored the Supreme Court's mandate in

<u>Henderson v. Shinseki</u> 131 S.Ct. 1197 (2011), on pages 1200, and 1205, in which

the Court holds:

> "...The VA's adjudicatory `process is designed to function throughout
> with a high degree of informality and solicitude for the claimant.'...A
> veteran faces no time limit for filing a claim, and once a claim is filed,
> the VA's process for adjudicating it at the regional office and the
> Board is *ex parte* and nonadversarial..." (Citations omitted.)

> "...`The solicitude of Congress for veterans is of long standing.'..."
> (Citations omitted.)"

> "...And that solicitude is plainly reflected in the VJRA, as well as in
> subsequent laws that `place a thumb on the scale in the veteran's favor
> in the course of administrative and judicial review of VA
> decisions,'..."  (Citations omitted.)

In *Cushman v. Shinseki*, 576 F.3d 1290, (2008), this Court holds a veteran is

entitled to fair hearings.  Starting on page 1296, the Court holds:

27

"The Due Process Clause of the Fifth Amendment guarantees that an individual will not be deprived of life, liberty, or property without due process of law. U.S. Const. amend. V. Due process of law has been interpreted to include notice and a **fair opportunity to be heard**. See Mullane v. Cent. Hanover Tr. Co., 339 U.S. 306, 313, 70 S. Ct. 652, 94 L. Ed. 865 (1950). To raise a due process question, the claimant must demonstrate a property interest entitled to such protections. Richard v. West, 161 F.3d 719, 723 (Fed. Cir. 1998).

### D.   Conclusion

Not only did this Judge call this veteran and the undersigned counsel dishonest and swindlers, he in effect called fellow *Mauna Kea* sailors/ eyewitnesses, a doctor and family members swindlers, conspirators, incompetent, dishonest or unbelievable.

The "crux" of Judge Crowley's first denial was that the *Mauna Kea* was never in Vietnamese waters.

Only with years of ***this veteran's persistence*** were the deck logs found that showed the *USS Mauna Kea* was in Vietnamese waters with this veteran aboard. (JA-237-239)

The deck logs proved Judge Crowley wrong, and Judge Crowley's justification for denying the claim shifted to impugning all those with evidence in support of the claim.

Because this veteran and lawyer are relying upon medical advice, diagnosis and opinions given, to call all these people liars, swindlers or conspirators in order to completely disregard the evidence shows a bias or state of mind that precludes a fair hearing.

It is not the first time Judge Crowley has be found to be unable to provide a

fair hearing.

> "...However, the above-quoted portions of the decision here on appeal indicate that **Judge Crowley is no longer able to view the matter objectively and to provide Mr. McDonald with the veteran-friendly review to which he is entitled**..."

In the *McDonald* case, the Court of Appeals for Veterans Claims paid attention.

This case produces a question if the Court of Appeals for Veterans Claims is worried about a stampede of appeals if Judge Crowley's decisions denying service connected claims are brought before it.

### E.   Relief Sought

Appellant respectfully urges the Court to allow him the same relief afforded Mr. McDonald in *Lawrence D. McDonald v. Erick K. Skinseki*, Docket Number 11-0224, to wit: (1) to vacate the Court of Appeals for Veterans Claims decisions dated August 5, 2013, and October 2, 2013, affirming Judge Crowley's Board decision which denied Appellant's claim for service connected PTSD; (2) order Judge Crowley's March 9, 2013, Board decision vacated; and (3) remand Appellant's claim for service connected PTSD to the Department of Veterans Affairs to provide review by a different Board member in the same capacity.

The Single Judge Opinion and Order Overruling Panel Review are attached in the addendum as Exhibits A and B. (JA-1-10,11,12)

The Single Judge Memorandum Decision admonishing Judge Crowley is attached in the addendum as Exhibit C.  (JA-245-256)

Respectfully submitted this 14th day of January, 2014.

/s/ J. Myers Morton  TNBAR# 013357
Attorney for appellant

MORTON & MORTON, PLLC
1518 N. Broadway
Knoxville, TN 37917
(865) 523-2000

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.    This brief complies with the type-volume limitation of Federal Rule of
      Appellate Procedure 32(a)(7)(B) or FRAP. 28.1(e)

      ☒    The brief contains 8,334 words according to a word count by the
            word-processing system used to produce this brief, excluding the parts
            of the brief exempted by Federal Rule of Appellate Procedure
            32(a)(7)(B)(iii), or

      ☐    The brief uses a monospaced typeface and contains _____ lines of text,
            excluding the parts of the brief exempted by Federal Rule of Appellate
            Procedure 32(a)(7)(B)(iii).

2.    This brief complies with typeface requirements of Federal Rule of
      Appellate Procedure 32(a)(5) or FRAP. 28.1(e) and the type style
      requirements of Federal Rule of Appellate Procedure 32(a)(6).

      ☒    The brief has been prepared in a proportionally spaced typeface using
            Word Perfect in 14 font size and Times New Roman.

      ☐    This brief has been prepared in a monospaced typeface using
            _____ with _____.


                              /s/ J. Myers Morton
                              J. Myers Morton
                              Attorney for appellant
                              January 14, 2014

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing brief has been furnished to Loren Misha Preheim, Department of Justice, Commercial Litigation Branch, Civil Division, P.O. Box 480, Ben Franklin Station, Washington, D.C., 20044, by sending same via US Priority Mail and Via Email misha.preheim@usdoj.gov; David J. Barrans, Department of Veterans Affairs, Office of General Counsel, Room 1101, 810 Vermont Avenue, N.W., Washington, D.C., 20420 via US Priority Mail and Via Email david.barrans@va.gov; Amanda Blackmon, Department of Veterans Affairs, Office of General Counsel, Room 1122, 810 Vermont Avenue, N.W., Washington, D.C., 20420 via US Priority Mail and Via Email amanda.blackmon@va.gov; and Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044 via US Priority Mail and Via email c-natcourts.appeals@usdoj.gov.

This 14th day of January, 2014.

/s/ J. Myers Morton
Attorneys for Appellant

MORTON & MORTON, PLLC
1518 N. Broadway Street
Knoxville, Tennessee 37917
(865) 523-2000

32

# APPENDIX

United States Court of Appeals for Veterans Claims Order dated August 5, 2013, under Docket Number 12-1373.

United States Court of Appeals for Veterans Claims Order dated October 2, 2013, under Docket Number 12-1373.

United States Court of Appeals for Veterans Claims Order dated May 14, 2012, under Docket Number 11-0224.

/s/J.Myers Morton
Attorneys for Appellant

MORTON & MORTON, PLLC
1518 N. Broadway Street
Knoxville, Tennessee 37917
(865) 523-2000

*Designated for electronic publication only*

# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 12-1373

LLOYD J. PHILLIPS, APPELLANT,

V.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

Before MOORMAN, *Judge*.

## MEMORANDUM DECISION

*Note: Pursuant to U.S. Vet. App. R. 30(a),
this action may not be cited as precedent.*

MOORMAN, *Judge*: The appellant, veteran Lloyd J. Phillips, through counsel seeks review of a March 9, 2012, decision of the Board of Veterans' Appeals (Board) denying entitlement to service connection for post-traumatic stress disorder (PTSD). Record (R.) at 3-23.[1] Both parties filed briefs, and the appellant filed a reply brief. This appeal is timely, and the Court has jurisdiction to review the Board decision pursuant to 38 U.S.C. § 7252(a). A single judge may conduct this review. *See Frankel v. Derwinski*, 1 Vet.App. 23, 25-26 (1990). For the reasons that follow, the Court will affirm the March 9, 2012, Board decision.

## I. BACKGROUND

This matter was previously before the Court (Docket No. 05-3095) based on an appeal of a June 29, 2005, Board decision denying the PTSD claim based on the lack of verification or corroboration of an in-service stressor required for non-combat veterans. R. at 555. The Board in 2005 noted that the appellant's claimed stressor was related to certain incidents occurring on coastal

---

[1] In its decision, the Board also granted service connection for vertigo, finding that it had manifested during service and was the result of noise exposure. R. at 5.

Vietnam waters while he was aboard the U.S.S. *Mauna Kea*. R. at 558-59. The Board found that information from the U.S. Armed Services Center for Research of Unit Records (USASCRUR) "does not verify that the [U.S.S.] Mauna Kea entered any inland Vietnam waterways during this period [(i.e., November 1959 to July 1962)] (or, indeed, coastal Vietnam waters)." R. at 559, 560 (again finding "no verification of the [U.S.S.] Mauna Kea's presence in Vietnam waterways").

On February 27, 2008, this Court issued a decision vacating the 2005 Board decision and remanding for further development, specifically requiring VA to assist the appellant in corroborating his asserted stressor by requesting further information from the USASCRUR, including the ship's history and deck logs. R. at 370-81 (*Phillips v. Peake*, No. 05-3095, 2008 WL 637642, at *1-6 (Feb. 27, 2008) (unpub. Mem. Dec.)). The Court noted the appellant's description of the in-service stressor:

  Later that same month [(in June 1995)], a VA regional office (RO) requested that he submit details as to his claimed in-service stressors. Mr. Phillips responded that he was stationed on the U.S.S. *Mauna Kea* and that, in November 1961 or February 1962, the ship had orders to leave the Philippines and go to Vietnam. His ship headed up-river to supply the U.S. Marines and Army in Vietnam. After they had anchored a couple of miles from the beach and he came on deck, he spotted a woman and two small children in a boat toward the stern of the ship. They were trying to talk to him when his commanding officer ordered him to "get the water hose." Mr. Phillips stated that he gave the hose to the officer and was then ordered to go below deck. Subsequently, a deck hand told him that the officer had sunk the boat carrying the Vietnamese woman and children. He claimed that he continued to think about this incident since his service.

R. at 371 (citations to the record on appeal in Docket No. 05-3095 omitted).

Based on the appellant's statements to VA and the Board decision, the Court noted that the relevant period for the deck logs was November 1, 1961, through February 28, 1962, with the exclusion of a 30-day period (from December 28, 1961, through January 26, 1962) when the appellant was on leave from his duty aboard the ship. R. at 377; *see* R. at 554-63 (2005 Board decision), 1167-71 (appellant's statement, which was received by VA in November 2002, noting that "in Dec[ember] 1961 or Jan[uary] 1962 we had orders to leave Manila [and] go to Vietnam" and again describing the incident of the small boat with a woman and young children that was alongside his ship), 1419 (June 1999 Board decision), 1680 (leave record); *see also* R. at 82-83 (statements

attributed to the appellant in a 2002 medical opinion from Dr. Hulse noting that the incidents with the small boats in Vietnam occurred *prior* to a 20-day vacation in January 1962).

More than one year later, in March 2009, the Board remanded the PTSD claim pursuant to this Court's decision. R. at 337-42. On remand, the appellant submitted to VA a December 2008 letter from his private clinical psychologist, Dr. Keith Hulse, confirming that "it is more likely than not that Mr. Phillip's PTSD and/other similar disorders were caused by the experiences described in the documents you provided to me attached to your letter" and referred to an attached copy of his 2002 medical opinion for his reasoning. R. at 81-88. In the attached 2002 medical opinion, Dr. Hulse provided a comprehensive discussion of Mr. Phillips's diagnosed PTSD, including a point-by-point analysis of the diagnostic criteria for PTSD based upon the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) (DSM-IV). R. at 82-88. Dr. Hulse concluded that Mr. Phillips's "severe and disabling case of [PTSD] . . . is a direct consequence of his service in the United States Navy, during the beginnings of the Vietnam conflict." R. at 88. Dr. Hulse identified one of the traumatic events as the claimed sinking of the boat with its occupants that occurred while Mr. Phillips's ship was inland and up a large river that he believed to be a mile wide in the waters of Vietnam, which he believed to be the Mekong Delta. R. at 82-83. It was this "traumatic event" that is identified in the medical opinion as being the one that is "persistently reexperienced" by the appellant in his thoughts and dreams. R. at 83.

Also on remand, in a July 2009 letter to the Board, the appellant's counsel stated that the U.S.S. *Mauna Kea* "was an ammunition and fuel resupply ship that in and of itself was sufficiently stressful to have caused PTSD." R. at 323. In addition, the appellant, apparently for the first time, also noted that the asserted stressors occurred *after* February 1962. *See*, *e.g.,* R. at 250-58 (April 2010 letter from appellant's counsel to the Board enclosing a supplemental statement from the appellant). The statement was received by the RO in April 2010. The appellant stated:

> [T]he incidents wherein the boats were sunk and lives lost occurred after February 1962. They happened during the spring of 1962, possibly between April 1962 through May 1962. . . . We went from the Philippines to Vietnam. I believe it had to be in late April, or early May we arrived in Danang or Vietnamese waters.

R. at 252.

3

The appellant also stated that he was the only person on the ammunition ship responsible "for making sure the phone and communication systems worked," that he was "under intense pressure to perform, all the time worried about being vaporized" because of the ammunition on board the ship. R. at 254. He further described two incidents of small boats sinking: First, a man, who had both hands up in the air, was on the port side of the ship, was looking at the appellant, and then "went under the stern of the ship" and "[w]hen we had passed on by he was gone, . . . He went down with his small boat." R. at 254. He further stated that he did not hear anyone report this incident and he did not report it. *Id*. at 256. Second, he again described the incident involving the young woman and her children on a small boat and his involvement of handing a water hose to the deck officer and learning afterward from "a couple of guys [who] came down into the galley" and "told [him that] 'They went down like a rock'. I never told anybody about this until I told Dr. Hulse recently." R. at 256.

In May 2010, the RO sent letters to the Modern Military Branch of the National Archives for copies of ship logs or any evidence that the U.S.S. *Mauna Kea* was off the coast, or in any waterway, of Vietnam from (1) November 1, 1961, through December 22, 1961; (2) January 27, 1962, through February 28, 1962; and (3) April 1962 to May 1962. R. at 773, 782. In July and September 2010, the RO received responses from the National Archives and Records Administration (NARA), including copies of the ship's deck logs, including (1) cover pages of deck logs for November and December 1961 and for January, February, and May 1962, which show the location of the ship at the beginning and end of each month; and (2) the deck logs for May 1 through May 7, 1962. R. at 770-79, 781-804.

In the March 2012 decision on appeal, the Board denied entitlement to VA benefits based on service connection for PTSD because the Board found that the appellant's asserted stressors had not been corroborated. R. at 5. This appeal followed.

## II. ANALYSIS

The appellant's arguments on appeal are difficult to decipher and are underdeveloped. He essentially argues that the Board unfairly treated him and his claim and that the Board member was prejudiced against him. Appellant's (App.) Brief (Br.) at 21. He appears to challenge the Board

4

member's finding that he was not credible and argues that the Board improperly provided a medical opinion and an inadequate statement of reasons or bases for its decision. *Id.* at 22-29. He contends that "[a]ll of the evidence corroborates this veteran's claims." *Id*. at 30. The appellant seeks reversal of the Board's decision and an award of benefits, or in the alternative, that the Board decision be vacated and the matter remanded with instructions that the Board member not be involved in adjudicating the claim. *Id*. at 30.

The Secretary maintains that the appellant has not shown that the Board member was biased against the appellant or that the Board decision was arbitrary, capricious, or otherwise an abuse of discretion. Secretary's Br. at 11-23. The Secretary also contends that the appellant has not shown that the Board erred in its evaluation of the evidence, including its credibility determinations, or in providing reasons or bases for its decision. *Id*. at 24-30.

Establishing service connection specifically for PTSD generally requires: (1) evidence of a current diagnosis of PTSD conforming to the DSM-IV; (2) credible supporting evidence that a claimed in-service stressor occurred (corroboration); and (3) competent evidence of a causal nexus between the current symptomatology and the in-service stressor. 38 C.F.R. §§ 3.304(f) (2013), 4.125(a) (2013); *see Cohen v. Brown*, 10 Vet.App. 128, 138 (1997). "Where a current diagnosis of PTSD exists, the sufficiency of the claimed in-service stressor is presumed," but the second service-connection element requires "credible evidence that the claimed in-service stressor actually occurred." *Sizemore v. Principi*, 18 Vet.App. 264, 269 (2004) (citations and emphasis omitted); *see Cohen*, 10 Vet.App. at 145.[2]

---

[2] Although there are some circumstances in which a veteran's lay testimony alone may suffice to establish the occurrence of the claimed in-service stressor, *see* 38 C.F.R. § 3.304(f), the appellant does not argue that this is such a case. For example, the appellant does not argue that (1) he engaged in combat and that that his stressors are related to that combat, 38 C.F.R. § 3.304(f)(2), or (2) that his stressor "is related to [a] fear of hostile military or terrorist activity and a VA psychiatrist or psychologist, or a psychiatrist or psychologist with whom VA has contracted, confirms that the claimed stressor is adequate to support a diagnosis of [PTSD] . . .[and meeting additional requirements under this subsection, including the definition of 'fear of hostile military or terrorist activity']," 38 C.F.R. § 3.304(f)(3). Specifically, the Court notes that § 3.304(f)(3) is based on a VA Final Rule that was promulgated on July 13, 2010, while the instant PTSD claim was pending at VA on remand from this Court. 75 Fed. Reg. 39,843 (July 13, 2010). As noted above, the appellant, who is represented by counsel, does not argue that this regulation applies to the appellant's circumstances. Indeed, as noted by the appellant, "much space in [his] brief has been dedicated to repeating much of [veteran law judge] Crowley's comments [in the Board decision]." App. Br. at 21.

Whether there is corroborative evidence of a claimed in-service stressor is a factual
determination that is reviewed by the Court under the "clearly erroneous" standard. *Sizemore*,
18 Vet.App. at 270. "'A finding is "clearly erroneous" when although there is evidence to support
it, the reviewing court on the entire evidence is left with the definite and firm conviction that a
mistake has been committed.'" *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990) (quoting *United
States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948)). When applying this standard, if the Court
determines, after reviewing the record in its entirety, that the Board's finding of fact is supported by
a plausible basis, "'the [Court] may not reverse it even though convinced that had it been sitting as
trier of fact, it would have weighed the evidence differently.'" *Id*. (quoting *Anderson v. City of
Bessemer City*, 470 U.S. 564, 573-74 (1985)).

The Board must provide a statement of the reasons or bases for its determination, adequate
to enable an appellant to understand the precise basis for its decision, as well as to facilitate review
in this Court. 38 U.S.C. § 7104(d)(1); *Allday v. Brown*, 7 Vet.App. 517, 527 (1995); *Gilbert*,
1 Vet.App. at 56-57. To comply with this requirement, the Board must analyze the credibility and
probative value of the evidence, account for the evidence it finds persuasive or unpersuasive, and
provide the reasons for its rejection of any material evidence favorable to the claimant. *Caluza* v.
Brown, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table).

Here, the Board made the following determinations:

[T]he Board finds that the Veteran is not a combat veteran, that his stressors are not
supported by credible evidence, and significantly highly probative evidence in this
case clearly reveals that the Veteran is fabricating all his stressors. While the *Mauna
Kea* did offload ammunition onto a barge in May 1962 off the coast of Vietnam, this
is not in accordance with the Veteran's stressor event identified by Dr. Hulse.
Neither the official records nor the buddy statement corroborate the specific stressor
events described by the Veteran, and which have resulted in a diagnosis of PTSD,
and, as a whole, provide evidence against this claim as it provides a basis for finding
that the Veteran is not credible regarding his stressors in service (for reasons noted
above). Other claimed stressors of record are non-corroborated and/or have not been
medically related to a PTSD diagnosis. The Veteran's changing statements only
provide more factual negative evidence against this claim.

R. at 16.

Although the Board found that the appellant had consistently claimed that his stressor "pertained to the ship's alleged movements near Vietnam and in interactions with small craft in the area," the Board determined that the appellant was not credible because (1) the evidence did not corroborate the claimed stressors relating to the small boats in the area; and (2) the appellant made two statements regarding boats in the "river" that were "entirely inconsistent" with each other. R. at 8, 13-14. In addition, the Board found that the appellant was not credible because the appellant's "alleged stressors are constantly changing, with new stressors (not cited in the past) as the basis for [his] PTSD being raised regularly." R. at 9. The Board explained that the appellant reported in December 2009 that an in-service personal assault by another servicemember occurred "only after more than a decade of failing to achieve his goal of service connection for PTSD." R. at 15-16. In this regard, the Board noted that the appellant had been seen repeatedly for PTSD and "there has never been mention of a personal assault." R. at 15.

As to the appellant's contention that the Board member was somehow prejudiced against him, the appellant has not identified anything in the Board's decision that indicates any sort of bias or prejudgment. Rather, the appellant appears to believe that the Board member was biased because he reached a decision unfavorable to the appellant. But the fact that an adjudicator renders a decision unfavorable to a claimant does not mean that the adjudicator is biased. *See Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial rulings alone . . . can only in the rarest circumstances evidence the degree of favoritism or *antagonism required" to show partiality or bias "when no extrajudicial source is involved."); Morris v. West*, 11 Vet.App. 174, 175 (1998) (per curiam order) (stating that even when a claimant "sincerely believe [s] that he has a grievance," that is not enough to show partiality or bias). The Court understands that the appellant believes himself to be entitled to benefits and understands his frustration at having his claim denied. But the Court can find nothing, either in the text of the Board decision itself or in the record as a whole, that would indicate that the Board member denied his claim out of some improper motive.

To the extent that the appellant argues that the Board's reasoning reflects bias against his claim, particularly because of attacks upon the appellant's credibility, the appellant simply has not established that the Board's factual conclusions, including its ultimate determination to deny service connection, are clearly erroneous. The Board found that the appellant's claimed stressor was not

7

sufficiently corroborated by the deck logs or his buddy's statement. The Court finds no error in that determination. Regardless of whether the Board was mistaken in its statements regarding whether the appellant's ship was in a "river" near Vietnam[3] or whether he caused delay in the proceedings, as the appellant asserts (App. Br. 22-28), the Board provided other reasons for denying the claim, specifically, "[n]either the official records nor the buddy statement corroborate the *specific* stressor events described by the veteran, and which have resulted in a diagnosis of PTSD." R. at 16.

The Court holds that the Board's factual determination that the appellant's claimed in-service stressor pertaining to the small crafts in the waters off of Vietnam was not sufficiently corroborated is supported by a plausible basis in the record, viewed as a whole. According to the response from NARA following this Court's 2008 remand, the U.S.S. *Mauna Kea* was not at or near Vietnam from November 1, 1961, through December 22, 1961, and from January 27, 1962, through February 28, 1962. NARA provided a breakdown of where the ship was during those two periods, which included steaming from Pearl Harbor, Hawaii, to Guam from February 7-18, 1962, and being anchored at Guam from February 18-28, 1962. R. at 770. The February 18, 1962, deck logs, which had previously been provided to the RO in May 2001, document that a small craft was alongside the starboard side of the ship near Guam, two civilians were brought aboard the ship, and the small craft was towed from the stern. R. at 1644, 1703.

Copies of the ship's deck logs for May1-2, 1962, showed the ship steaming from Subic Bay, Philippine Islands, to Da Nang Bay, South Vietnam, and entering Da Nang Harbor on May 2. R. at 786-89. On May 2, at 08-12 (i.e., 8:12 AM), the ship anchored in Da Nang Bay and commenced off-loading ammunition. R. at 789. Later that same day, at 18-20 (i.e., 6:20 PM), the ship made preparations "for leaving port" and was "[u]nderway for sea . . . [and m]aneuvering to clear the anchor." R. at 789. At 19-08 (i.e., 7:08 PM), the ship "[s]ecured the special sea detail." *Id.* Another entry on the deck logs for May 2 stated: "20-24 Steaming as before. 2126 c/c 030 ° to avoid a contact. . . ." R. at 789. No further description was provided as to what was meant by "contact" –

---

[3] In a March 2003 statement, Mr. Phillips maintained that his ship was in Vietnam. R. at 774. He stated: "When I say 'in Vietnam,' I mean certainly in the area. I have previously spoken of my ship being 'on a river.' My definition of 'river' is being able to see land, as opposed to being on the ocean or open sea. Probably, the episodes I have earlier written about occurred in the Gulf of Tonkin or Mekong Delta areas, instead of actually going up the river. . . . My ship was in these waters off the coast of Vietnam, China Sea, and Formosa Straits."

whether it was a small craft or a large barge or something else. The next day, on May 3 at 00-04 (i.e., 12:04 AM), the ship was "[s]teaming independently off Danang, South Vietnamese . . . ." and, later that morning at 07:30, "the special sea and anchor detail" was set. R. at 792. Within the day, the ship was steaming and "maneuvering at various courses and speeds to enter Danang Harbor" and again anchored in Danang Bay. R. at 792. The ship received a barge to offload ammunition and "[s]ecured off-loading ammunition." *Id*. At 10:42, the ship got "[u]nderway from Danang, South Vietnam to new rendezvous in accordance with [the 7th Fleet] . . .[and maneuvered] to clear harbor." *Id*. Deck logs for May 4 reflect that the ship was "steaming" from Da Nang to Subic Bay "via rendezvous." R. at 792-93. The ship continued steaming until it "[j]oined rendezvous" at 12:16 PM on May 5. R. at 795-96. The ship rendevoused with other U.S. ships and then, on May 6 at 12:16 PM, after further steaming, anchored in Subic Bay. R. at 798-99.

The Board incorrectly noted in its decision that the deck logs showed that the U.S.S. *Mauna Kea* anchored only *once* in DaNang Harbor, on May 3, 1962. R. at 13. As noted above, the ship first anchored in DaNang on May 2, then left during the night, and *returned the next day on May 3*. Consistent with the deck logs, a 2008 statement from a shipmate of the appellant, J.G., provided the following information:

> We made 2 trips into the DaNang area, one in 1962 and one 1963 while I was on the USS Mauna Kea. Both should have been between April and August. I was a FTG 2 assigned to the 3rd Div (gunnery) which was in charge of all munitions cargo that we carried. We loaded up a LCM [(Landing Craft Mechanized)] at Subic Bay and then we would pull into the Bay in South Viet Nam which later they built the big Da Nang base at, there we would unload the LCM and load it up with ammunition and go up the river to the Special Forces base. We would pull back at sea at nite and then come back the next day and do the same procedure. Yes we did have some incidents with fishing boats on those trips into VN.
>
> . . . .

R. at 66. The Board consequently also erred in finding that "[t]he deck logs are, as is obvious, in direct contradiction to J.G.'s account" and in assigning it "no probative value" based on whether the ship had returned to DaNang on a second day. R. at 13.

These Board errors, however, are not prejudicial to the appellant in the resolution of the claim because neither the deck logs nor J.G.'s 2008 statement corroborate the specific stressor of a small

9

boat being sunk by the U.S.S. *Mauna Kea*. They corroborate only the appellant's statements as to the location of the ship, not to the traumatic event that was the basis for the diagnosis of PTSD. Although corroboration of every detail is not required and corroboration can, in some circumstances, be implied by the evidence, there must still be independent evidence that the stressful event occurred. *See Pentecost v. Principi*, 16 Vet.App. 124, 128 (2002) (holding personal exposure to stressful event implied by evidence establishing that veteran was stationed with a unit in Vietnam that experienced enemy rocket attacks); *Suozzi v. Brown*, 10 Vet.App. 307, 310 (1997) (holding that, for purposes of reopening a claim, evidence establishing that the veteran's unit in Vietnam experienced casualties resulting from enemy attack gave rise to a "valid inference" that a veteran who was "a company clerk would assist in the casualty identification" and "implies his personal exposure").

Finally, the appellant argues that the Board failed to provide an adequate statement of reasons or bases for discounting "stressors other than loss of life stressors" and for finding that the appellant's stressors would have been recorded in the deck logs had they occurred. App. Br. at 29-30. Given the Court's above discussion, and the Board's analysis of those matters, the Court is not persuaded by the appellant's contentions and concludes that the Board provided an adequate statement of reasons or bases for its determinations. *See Hilkert v. West*, 12 Vet.App. 145, 151 (1999) (en banc) ("An appellant bears the burden of persuasion on appeals to this Court."), *aff'd per curiam*, 232 F.3d 908 (Fed. Cir. 2000) (table); *Berger v. Brown*, 10 Vet.App. 166, 169 (1997) ("[T]he appellant . . . always bears the burden of persuasion on appeals to this Court."); R. at 8-16.

## IV. CONCLUSION

Upon consideration of the foregoing analysis, the record on appeal, and the parties' pleadings, the March 9, 2012, Board decision is AFFIRMED.

DATED: August 5, 2013

Copies to:

J. Myers Morton, Esq.

VA General Counsel (027)

10

*Designated for electronic publication only*
*NON-PRECEDENTIAL*

## UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 12-1373

LLOYD J. PHILLIPS,                                    APPELLANT,

v.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS,              APPELLEE.

Before KASOLD, *Chief Judge,* and MOORMAN and PIETSCH, *Judges.*

## O R D E R

*Note: Pursuant to U.S. Vet. App. R. 30(a),*
*this action may not be cited as precedent.*

In a single-judge memorandum decision dated August 5, 2013, the Court affirmed the March 9, 2012, decision of the Board of Veterans' Appeals that denied the appellant's claim of entitlement to service connection for post-traumatic stress disorder. On August 15, 2013, the appellant filed a motion for a panel decision. The motion for decision by a panel will be granted.

Based on review of the pleadings and the record on appeal, it is the decision of the panel that the appellant fails to demonstrate that 1) the single-judge memorandum decision overlooked or misunderstood a fact or point of law prejudicial to the outcome of the appeal, 2) there is any conflict with precedential decisions of the Court, or 3) the appeal otherwise raises an issue warranting a precedential decision. U.S. VET. APP. R. 35(e); *see also Frankel v. Derwinski*, 1 Vet.App. 23, 25-26 (1990).

Absent further motion by the parties or order by the Court, judgment will enter on the underlying single-judge decision in accordance with Rules 35 and 36 of the Court's Rules of Practice and Procedure.

Upon consideration of the foregoing, it is

ORDERED, by the panel, that the motion for panel decision is granted. It is further

ORDERED, by the panel, that the single-judge memorandum decision remains the decision of the Court.

DATED: October 2, 2013                                      PER CURIAM.

Copies to:

J. Myers Morton, Esq.

VA General Counsel (027)

*Designated for electronic publication only*

## UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

NO. 11-0224

LAWRENCE MCDONALD, APPELLANT,

v.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

Before DAVIS, *Judge*.

### MEMORANDUM DECISION

*Note: Pursuant to U.S. Vet. App. R. 30(a),*
*this action may not be cited as precedent.*

DAVIS, *Judge*: U.S. Marine Corps veteran Lawrence McDonald appeals through counsel from a January 13, 2011, Board of Veterans' Appeals (Board) decision that denied entitlement to service connection for post-traumatic stress disorder (PTSD) as a result of sexual trauma. For the reasons stated below, the Court will set aside the Board's decision and remand the matter for readjudication consistent with this decision.

### I. BACKGROUND

Mr. McDonald served on active duty from December 1967 to January 1969. He attended basic training at Camp Pendleton, California. Service medical records (SMRs) document that he experienced severe headaches, abdominal pains, constipation, and bleeding hemorrhoids in service. Medical tests were unable to point to a cause for his complaints, and he was referred for psychological evaluation. In September 1968, Mr. McDonald requested a change of military occupational speciality (MOS) to a position that required limited field duty, such as a clerk. The cited reason was "emotionally unstable personality with hypochondosis." Record (R.) at 1730. In December 1968, a medical board recommended that Mr. McDonald be discharged, stating that he was "unsuitable for service." R. at 1721.

On November 19, 2002, Mr. McDonald filed a claim for disability benefits for PTSD. He alleged a number of in-service stressors, including that he was beaten and sexually assaulted by his drill sergeant during basic training at Camp Pendleton.

The Board decision here on appeal represents the third occasion on which the administrative law judge John J. Crowley has considered Mr. McDonald's claim. Judge Crowley issued a decision for the Board in September 2007 that Mr. McDonald appealed to the Court. The parties prepared a joint motion for remand (JMR) that the Court granted in November 2008, agreeing that the Board had provided an inadequate statement of reasons or bases for whether a medical examination was necessary to decide the PTSD claim. Judge Crowley issued another decision for the Board in July 2009 that Mr. McDonald again appealed to the Court. The parties again prepared a JMR that the Court granted in March 2010. In the JMR they agreed that the Board had provided an inadequate statement of reasons or bases for its determination that a VA medical opinion was not warranted, and its determination that Mr. McDonald's request for change of MOS was not evidence of his claimed in-service stressor, but rather it was related to his impending transfer to Vietnam.

In the Board decision here on appeal, the Board determined that Mr. McDonald "is fabricating his stressors in service" and that he "is not a reliable historian." R. at 34. The Board further stated that Mr. McDonald's "allegations are not credible in any aspect concerning the alleged stressors." *Id.* The Board reviewed an opinion from treating therapist Roger Girard, which it found "meaningless for purposes of this appeal." R. at 29. An opinion from Dr. Jonathan Mangold was deemed to have "no evidentiary value." R. at 33. And letters from Mr. McDonald's mother and siblings describing his behavior when he left for service as different from his behavior when he returned did "not lend any support to corroborating an in-service stressor productive of PTSD" because they did not include accounts of Mr. McDonald's childhood problems of bed wetting and pulling his own hair. R. at 20.

## II. ANALYSIS

### A. 38 C.F.R. § 3.304(f)(5)

Service connection for PTSD requires (1) medical evidence diagnosing the condition in accordance with 38 C.F.R. § 4.125(a); (2) "a link, established by medical evidence, between current

symptoms and an in-service stressor"; and (3) "credible supporting evidence that the claimed in-service stressor occurred." 38 C.F.R. § 3.304(f) (2011). The Secretary, recognizing that "veterans face unique problems documenting their claimed stressor in personal assault cases," has "'provided for special evidentiary-development procedures' in those cases." *Bradford v. Nicholson,* 20 Vet.App. 200, 204 (2006) (quoting *Patton v. West,* 12 Vet.App. 272, 280 (1999)). These special procedures permit "evidence from sources other than the veteran's service records [to] corroborate the veteran's account of the stressor incident." 38 C.F.R. § 3.304(f)(5). The regulation continues:

> Examples of such evidence include, but are not limited to: records from law enforcement authorities, rape crisis centers, mental health counseling centers, hospitals, or physicians; . . . and statements from family members, roommates, fellow service members, or clergy. Evidence of behavior changes following the claimed assault is one type of relevant evidence that may be found in these sources. Examples of behavior changes that may constitute credible evidence of the stressor include, but are not limited to: a request for a transfer to another military duty assignment; deterioration in work performance; substance abuse; episodes of depression, panic attacks, or anxiety without an identifiable cause; or unexplained economic or social behavior changes.

*Id.*

The Board conceded a diagnosis of PTSD and evaluated Mr. McDonald's claim under § 3.304(f)(5) because his claimed stressors include allegations of in-service personal assault. Under § 3.304(f)(5), the relevant inquiry for the Board is whether there is credible evidence from sources outside the veteran's statements that corroborate his account of the claimed stressor. Mr. McDonald asserts that there is credible evidence to meet the requirements of the regulation and points to behavior changes documented in his service records, behavior changes documented by his family members's letters, his requested change of MOS, and his in-service medical problems that were attributed to "psychogenic factors" and a "nervous condition." R. at 1754-55. Mr. McDonald argues that the Board misapplied the regulation and "scrutiniz[ed] each piece of corroborating evidence individually to determine whether that evidence proved that the veteran was, in fact, assaulted." Appellant's Brief at 9. Mr. McDonald argues that rather than lowering the evidentiary bar, as the regulation intended, the Board in its misapplication "raised the bar the veteran was required to meet, requiring the veteran to produce proof in his service records to demonstrate that the personal trauma occurred." *Id.*

3

Mr. McDonald's arguments are well taken. The Board indeed went out of its way to clearly explain away each piece of evidence. It attributed Mr. McDonald's in-service behavior changes to alleged preexisting anxiety problems, based on Mr. McDonald's statements that he had problems with bed wetting and hair pulling that seem to have resolved prior to service. *See* R. at 1722 (medical board report stating: "He said he was extremely nervous as a child and had to see his family doctor because of pulling out his hair" and noting that bed wetting ended when he was around age seven or eight); 1741 (SMR recording: "Prior to active service he has a [history] of hair pulling as a child and even into high school"); 1821-22 (letter to congressional representative stating that he had a nervous condition "in grade school" and that the resulting bald spots "have diminished through treatment"). It also attributed his MOS change request both to his desire to avoid deployment to Vietnam and to his inability to deal with the stresses of physical exertion. However, the record indicates that Mr. McDonald stated that while he did not want to go to Vietnam, he was willing to do so. *See* R. at 1755 (psychiatric note indicating that Mr. McDonald does not like going to Vietnam but will go for his country), 1822. Additionally, § 3.304(f)(5) accounts for the fact that a request for a change in MOS is evidence of behavior change following a personal assault, 65 Fed. Reg. 61,132 (Oct. 16, 2000), and might be useful information to a professional who attempts to corroborate the claimed stressor, 67 Fed. Reg. 10,330 (Mar. 7, 2002). Therefore it appears that the Board inappropriately analyzed the evidence under § 3.304(f)(5).

## B. Credibility Findings

Mr. McDonald also argues that the Board improperly determined that his statements and the statements of his family members are not credible. The Board is obligated to determine the credibility of lay evidence. *See Buchanan v. Nicholson,* 451 F.3d 1331, 1337 (Fed. Cir. 2006). In conducting this analysis, the Board can consider possible bias and conflicting statements. *Id.* When considering documents submitted by a veteran, the Board may also consider "internal consistency, facial plausibility, and consistency with other evidence submitted on behalf of the veteran." *Caluza v. Brown,* 7 Vet.App. 498, 511 (1995) (discussing documents and the requirement of "satisfactory" evidence under 38 U.S.C. § 1154(b)).

Mr. McDonald notes that "the Board may not consider the absence of evidence as substantive negative evidence," *Buczynski v. Shinseki,* 24 Vet.App. 221, 224 (2011), yet the Board specifically

considered that "there is no service department record documenting that the Veteran was sexually assaulted in service" (R. at 14) and that "military physicians did not document on any occasion bruising, swelling, etc. which would clearly be associated with the type of severe beating alleged" (R. at 18). While the Board may not rely on the absence of evidence as substantive negative evidence, the Board may consider consistency with other evidence as it makes credibility determinations. *See Caluza, supra.* Because Mr. McDonald offers this argument as it relates to the Board's finding that he is not credible, the Court determines that the Board did not err.

However, the Board made it clear that it found "the Veteran's whole story . . . and in-service experiences [] completely lacking credibility and [] false," and therefore rejected it "in full." R. at 40. There is, therefore, no indication that the Board considered that some of Mr. McDonald's claimed stressor might be legitimate while others might be fabricated or exaggerated.

Mr. McDonald in November 2002 proffered up to nine claimed stressors, some of which appear rather far fetched on their face. *See* R. at 1456-62, 1530-33, 1549-76. Dr. Mangold, who reviewed Mr. McDonald's file, stated that patients in distress often exaggerate their symptoms, and that Mr. McDonald likely did so as well. R. at 61. And the Board was aware that, at the time of the Board decision, Mr. McDonald was incarcerated because of an incompetency finding. *See* R. at 26. Yet despite this notice that Mr. McDonald may have exaggerated his symptoms and may have been incompetent, the Board apparently did not consider that some of the alleged stressors may have been exaggerated. Instead, the Board seems to have considered the claimed stressors collectively and used the extreme nature of some of the claimed stressors as a basis for determining that Mr. McDonald fabricated all his stressors and therefore was not sexually assaulted in service. For this reason, the Board erred in its credibility determination regarding Mr. McDonald and his claimed stressors.

The Board also made credibility determinations regarding letters submitted by Mr. McDonald's mother, brother, and sister. The letters, summarized broadly, state that, before leaving for the military, Mr. McDonald was a happy, positive, engaging person who laughed and smiled, and was outgoing and personable, but that when he returned he was a "very different person" who was withdrawn, quiet, depressed, stressed, lonely, negative, and sad. *See* R. at 1201, 1316-17, 1326-28.

In discussing these family members' statements, the Board stated:

5

[T]he Veteran's own statements in service as well as the medical opinion in service undermines the credibility and/or reliability of the Veteran's lay witnesses who do not recall the Veteran as having any emotional disturbances prior to his entry into service.

On this point, the Board notes that these lay witnesses are attempting to recall events more than 30 years ago. Thus, their capacity to remember events clearly are subject to the vagaries of memory with the passage of time.

Furthermore, there is a complete contradiction between the Veteran's very specific and detailed recollections of pre-service troubles involving "pulling out his hair,"[] nervousness, sleepwalking . . . and the lay witness recollections of the Veteran being full of laughter and smiling, undermining their credibility.

The Board does not doubt that, at times, the Veteran had laughed and smiled before service. However, the lay witness recollections of no pre-service troubles at all clearly are at variance with the Veteran's own specific statements that are deemed exceptionally trustworthy, as they were offered to military examiners in the context of seeking appropriate treatment at the time.

R. at 19-20.

The family members' statements describe the changes they witnessed in Mr. McDonald upon his return from service. As a means of illustrating that change, the family members included a few adjectives and illustrations to describe Mr. McDonald's personality or behavior prior to service. But they certainly do not document his academic, social, and medical history prior to service. Therefore their failure to mention his hair pulling, bed wetting, and sleep walking that resolved in grade school, or at the latest by high school, is not a glaring omission that undermines the credibility of the witnesses. The Board's negative-credibility finding regarding the family members' lay statements is clear error, and remand is required.

## C. VA Medical Examination

Mr. McDonald also argues that VA failed to obtain a VA medical examination to evaluate his claim. This Court has held that in disability compensation claims

the Secretary must provide a VA medical examination when there is (1) competent evidence of a current disability or persistent or recurrent symptoms of a disability, and (2) evidence establishing that an event, injury, or disease occurred in service or establishing certain diseases manifesting during an applicable presumptive period for which the claimant qualifies, and (3) an indication that the disability or persistent or recurrent symptoms of a disability may be associated with the veteran's service or

6

with another service-connected disability, but (4) insufficient competent medical evidence on file for the Secretary to make a decision on the claim.

*McLendon v. Nicholson,* 20 Vet.App. 79, 81 (2006); *see* 38 U.S.C. § 5103A(d)(2).

The Board determined that a VA medical examination was not warranted, stating that an examination could not provide a basis to grant the claim because Mr. McDonald's claimed stressors did not occur. As part of this analysis regarding whether a VA examination was warranted, the Board reiterated that Mr. McDonald's "whole story regarding his emotional difficulties, . . . reasons for an MOS change and in-service experiences are completely lacking credibility and are false. . . . Overall, the Veteran's allegations and testimony regarding the alleged in-service events [are] rejected in full." R. at 40.

This analysis reflects the Board's improper application of § 3.304(f)(5) and improper credibility determinations, as set forth above. Because they form the basis for the Board's determination that a VA medical examination was not warranted, that determination must be set aside and that matter must be readjudicated on remand.

## D. Dr. Mangold's Opinion

Mr. McDonald next argues that the Board improperly rejected Dr. Mangold's opinion. The Board "fully rejected" Dr. Mangold's opinion because it was "based on a factual history" provided by Mr. McDonald that the Board rejected as false. R. at 40. Mr. McDonald argues that Dr. Mangold's opinion clearly indicates that he relied on more than Mr. McDonald's statements in forming his opinion, and considered statements from his family members as well as Mr. McDonald's service records.

Dr. Mangold's opinion does indicate that he reviewed statements from Mr. McDonald's mother and sister, and that he reviewed SMRs and other service records contained in Mr. McDonald's claims file. *See* R. at 53-62. Consequently, the Board erred in rejecting Dr. Mangold's opinion because it found the opinion was based on the statements of Mr. McDonald, which the Board had previously improperly rejected as not credible. However, the Board rejected the statements from Mr. McDonald's mother and sister as incredible, although it did so erroneously. Therefore, on remand, the Board must reassess the probative value of Dr. Mangold's opinion after it properly considers the credibility of the lay statements.

7

E. Medical Determinations by Board

Next, Mr. McDonald argues that the Board improperly made medical determinations. According to *Colvin v. Derwinski,* 1 Vet.App. 171, 172 (1991), the Board "must consider only independent medical evidence to support their findings rather than provide their own medical judgment in the guise of a Board opinion." Thus, where the Board reaches a medical conclusion, it must cite medical evidence of record or recognized medical treatises to support the conclusion. *Id.* at 175.

Here, the Board noted that the normal results of in-service sigmoidoscopy[1] and barium enema, which were conducted after the alleged sexual assault, provided "strong evidence against the claim." R. at 17. But, as Mr. McDonald argues, there is no medical evidence of record that indicates either test would reveal that a sexual assault had or had not occurred. Mr. McDonald's argument is well taken. Absent medical evidence or a medical treatise to support the Board's conclusion, the conclusion violates *Colvin.*

The Board also found that Mr. McDonald's symptoms of depression and anxiety were the result of a motor vehicle accident in October 1999, and were "not due to any psychiatric disorder, PTSD, or military sexual trauma." R. at 24. Mr. McDonald argues that this statement also violates *Colvin* because it is a medical conclusion that is not supported by medical evidence. Mr. McDonald further argues that the evidence of record contradicts the Board's conclusions. He notes that a psychological report prepared for the Office of Social Security notes Mr. McDonald's statement that he received treatment for anxiety prior to the accident, and the medical report from the date of the accident indicates Mr. McDonald had a history of panic attacks. *See* R. at 773, 925.

Therefore, at a minium, the Board failed to account for the favorable evidence of record and its statement of reasons or bases is inadequate. *See* 38 U.S.C. § 7104(d)(1); *Caluza v. Brown,* 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table) (for a statement of reasons or bases to be adequate, the Board must analyze the credibility and probative value of the evidence, account for the evidence that it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant). In addition, because it

---

[1] A "sigmoidoscope" is "a rigid or flexible endoscope with appropriate illumination for examining the sigmoid colon." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1708 (31st ed. 2012).

8

appears that the Board's conclusion–that Mr. McDonald's symptoms of depression and anxiety were caused by a 1999 motor vehicle accident–is a medical conclusion, it violates *Colvin*.

## F.  Presumption of Soundness

Mr. McDonald also argues that the Board erred in declining to apply the presumption of soundness to his claim.  The presumption requires VA to consider every veteran "to have been in sound condition when examined, accepted, and enrolled for service, except as to defects, infirmities, or disorders noted at the time of the examination, acceptance, and enrollment."  38 U.S.C. § 1111; *see also* 38 C.F.R. § 3.304(b).  Therefore, when no preexisting medical condition is noted upon entry into service, a veteran is presumed to have been sound in every respect.  *See Wagner v. Principi,* 370 F.3d 1089, 1096 (Fed. Cir. 2004); *Bagby v. Derwinski,* 1 Vet.App. 225, 227 (1991).  Once the presumption applies, it may be rebutted if VA satisfies its burden to present clear and unmistakable evidence that the veteran's disability was both preexisting and not aggravated by service.  *Wagner,* 370 F.3d at 1096; *Bagby,* 1 Vet.App. at 227.  "The government may show a lack of aggravation by establishing that there was no increase in disability during service or that any 'increase in disability [was] due to the natural progress of the' preexisting condition."  *Wagner,* 370 F.3d at 1096.

Mr. McDonald's induction medical reports indicate a history of broken bones, mumps, appendectomy, tonsillectomy, bed wetting that ended at age seven, and burned fingers.  R. at 1713-16.  Mr. McDonald was presumed to be sound at induction except for the items noted at the time of induction.  Because the induction medical reports do not indicate psychiatric problems or nervous troubles, the presumption of soundness applies to these disabilities and the government must overcome the disability by presenting clear and unmistakable evidence that any disability was both preexisting and not aggravated by service.  *See Wagner* and *Bagby*, both *supra.*

The Board reasoned that the presumption of soundness did not apply because the Board was not determining whether PTSD existed prior to service, but was instead determining whether Mr. McDonald's anxiety symptoms could "provide 'marker' evidence" and verify the alleged stressor. R. at 21.  But the Board's very reasoning presumes Mr. McDonald was not sound prior to service, which is contrary to the information contained on his induction medical reports and the statutory instructions regarding how they are to be interpreted.  Therefore the Board erred in declining to apply the presumption of soundness.

9

### G. Remedy

#### 1. Remand or Reversal

The Court has considered whether reversal, rather than remand, is the appropriate remedy. Reversal is the appropriate remedy when the only permissible view of the evidence is contrary to the Board's decision. *See Gutierrez v. Principi*, 19 Vet.App. 1, 10 (2004); *Johnson v. Brown,* 9 Vet.App. 7, 10 (1996). "Where the Board has incorrectly applied the law, failed to provide an adequate statement of reasons or bases for its determinations, or where the record is otherwise inadequate, remand is generally the appropriate remedy." *Washington v. Nicholson*, 19 Vet.App. 362, 371 (2005) (citing *Tucker v. West,* 11 Vet.App. 369, 374 (1998)).

Mr. McDonald has alleged approximately nine in-service stressor events, some of which seem rather far-fetched on their face. This, combined with Dr. Mangold's statement that Mr. McDonald may have exaggerated his symptoms (R. at 61), and Mr. McDonald's incarceration because of an incompetency finding (R. at 26), indicates that perhaps some of the stressors may have been exaggerated or fabricated.

But, as stated above, there is also a possibility that some of the alleged stressors may be legitimate. There is evidence from medical professionals indicating that Mr. McDonald has PTSD and that he was personally assaulted in service, and Mr. McDonald's family members state that he was markedly different after service. When combined with the SMRs and the other service records, a factfinder can conclude that one or more of the stressors occurred and that service connection for PTSD is warranted.

What seems clear is that this is not a case where there is only one permissible view of the evidence. Therefore, reversal is not warranted. Remand is the appropriate remedy.

#### 2. New Administrative Law Judge

Finally, Mr. McDonald asks that, on remand, readjudication be conducted by an administrative law judge "other than the [one] who has made the prior determinations in this case." Appellant's Brief at 26. He quotes passages from the Board decision and asserts that they indicate the Board member has "abdicated his responsibilities to make the factual findings in this case." *Id.*

The Board member, Judge Crowley, who was apparently frustrated by the parties' agreement that neither of the previous Board decisions contained adequate reasons or bases, issued a 40-page Board decision for one claim. Therein, he wrote:

> Should the parties to [any future] JMR deem this analysis deficient, they are requested to identify how the Board's finding is not plausible and, given the facts of this case, reverse any "non-plausible" findings rather than return the case on another JMR. In short, the parties should make the findings of fact for the Board as the Board can find no further justifying rationale that could be provided.

R. at 37. Elsewhere, he wrote:

> [I]f the parties to this appeal disagree with the Board's decision and determine that another JMR is necessary, the Board requests more specific instructions to avoid any further delay in final adjudication in this case. In particular, the parties are requested to specifically identify which Board findings are not supported by a plausible basis, to reverse the particular finding or findings at issue, and then provide, in specific detail, what further actions are requested. If any opinion is ordered, then the parties should clearly identify the accepted facts and the question being asked of an examiner (at this time, the Board would have no question to ask an examiner as the Board has found that the Veteran's alleged stressors in service did not occur).

R. at 40-41.

The Court recognizes the complexity of this case and appreciates the effort Judge Crowley has expended in preparing three decisions. However, the above-quoted portions of the decision here on appeal indicate that Judge Crowley is no longer able to view the matter objectively and to provide Mr. McDonald with the veteran-friendly review to which he is entitled. *See Evans v. Shinseki,* 25 Vet.App. 7, 14 (2011) (stating that the VA system is "veteran-friendly" and "non-adversarial"); *Kouvaris v. Shinseki,* 22 Vet.App. 377, 381 (2009) (noting that the veterans benefits system is a "veteran-friendly" system). Thus, on remand, the Court requires VA to provide review by a different Board member in the same capacity. *Cf. Fletcher v. Derwinski,* 1 Vet.App. 394, 397 (1991) ("A remand is meant to entail a critical examination of the justification for the decision. The Court expects that the [Board] will reexamine the evidence of record, seek any other evidence the Board feels is necessary, and issue a timely, well-supported decision in this case.").

11

## III. CONCLUSION

On consideration of the foregoing, the Court SETS ASIDE the Board's January 13, 2011, decision and REMANDS the matter for readjudication consistent with this decision. On remand, the readjudication must not be conducted by the Board member who previously adjudicated the claim.

In pursuing his case on remand, Mr. McDonald will be free to submit additional evidence and argument in support of his claim, and the Board is required to consider any such evidence and argument. *See Kay v. Principi,* 16 Vet.App. 529, 534 (2002). A final decision by the Board following the remand herein ordered will constitute a new decision that, if adverse, may be appealed to this Court upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the Board's new final decision is mailed to Mr. McDonald. *See Marsh v. West,* 11 Vet.App. 468, 472 (1998).

DATED: May 14, 2012

Copies to:

Matthew D. Hill, Esq.

VA General Counsel (027)

12

*Designated for electronic publication only*

## UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 12-1373

LLOYD J. PHILLIPS, APPELLANT,

V.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

Before MOORMAN, *Judge*.

## MEMORANDUM DECISION

*Note: Pursuant to U.S. Vet. App. R. 30(a),*
*this action may not be cited as precedent.*

MOORMAN, *Judge*: The appellant, veteran Lloyd J. Phillips, through counsel seeks review of a March 9, 2012, decision of the Board of Veterans' Appeals (Board) denying entitlement to service connection for post-traumatic stress disorder (PTSD). Record (R.) at 3-23.[1] Both parties filed briefs, and the appellant filed a reply brief. This appeal is timely, and the Court has jurisdiction to review the Board decision pursuant to 38 U.S.C. § 7252(a). A single judge may conduct this review. *See Frankel v. Derwinski*, 1 Vet.App. 23, 25-26 (1990). For the reasons that follow, the Court will affirm the March 9, 2012, Board decision.

## I. BACKGROUND

This matter was previously before the Court (Docket No. 05-3095) based on an appeal of a June 29, 2005, Board decision denying the PTSD claim based on the lack of verification or corroboration of an in-service stressor required for non-combat veterans. R. at 555. The Board in 2005 noted that the appellant's claimed stressor was related to certain incidents occurring on coastal

---

[1]In its decision, the Board also granted service connection for vertigo, finding that it had manifested during service and was the result of noise exposure. R. at 5.

Vietnam waters while he was aboard the U.S.S. *Mauna Kea*. R. at 558-59. The Board found that information from the U.S. Armed Services Center for Research of Unit Records (USASCRUR) "does not verify that the [U.S.S.] Mauna Kea entered any inland Vietnam waterways during this period [(i.e., November 1959 to July 1962)] (or, indeed, coastal Vietnam waters)." R. at 559, 560 (again finding "no verification of the [U.S.S.] Mauna Kea's presence in Vietnam waterways").

On February 27, 2008, this Court issued a decision vacating the 2005 Board decision and remanding for further development, specifically requiring VA to assist the appellant in corroborating his asserted stressor by requesting further information from the USASCRUR, including the ship's history and deck logs. R. at 370-81 (*Phillips v. Peake*, No. 05-3095, 2008 WL 637642, at *1-6 (Feb. 27, 2008) (unpub. Mem. Dec.)). The Court noted the appellant's description of the in-service stressor:

> Later that same month [(in June 1995)], a VA regional office (RO) requested that he submit details as to his claimed in-service stressors. Mr. Phillips responded that he was stationed on the U.S.S. *Mauna Kea* and that, in November 1961 or February 1962, the ship had orders to leave the Philippines and go to Vietnam. His ship headed up-river to supply the U.S. Marines and Army in Vietnam. After they had anchored a couple of miles from the beach and he came on deck, he spotted a woman and two small children in a boat toward the stern of the ship. They were trying to talk to him when his commanding officer ordered him to "get the water hose." Mr. Phillips stated that he gave the hose to the officer and was then ordered to go below deck. Subsequently, a deck hand told him that the officer had sunk the boat carrying the Vietnamese woman and children. He claimed that he continued to think about this incident since his service.

R. at 371 (citations to the record on appeal in Docket No. 05-3095 omitted).

Based on the appellant's statements to VA and the Board decision, the Court noted that the relevant period for the deck logs was November 1, 1961, through February 28, 1962, with the exclusion of a 30-day period (from December 28, 1961, through January 26, 1962) when the appellant was on leave from his duty aboard the ship. R. at 377; *see* R. at 554-63 (2005 Board decision), 1167-71 (appellant's statement, which was received by VA in November 2002, noting that "in Dec[ember] 1961 or Jan[uary] 1962 we had orders to leave Manila [and] go to Vietnam" and again describing the incident of the small boat with a woman and young children that was alongside his ship), 1419 (June 1999 Board decision), 1680 (leave record); *see also* R. at 82-83 (statements

attributed to the appellant in a 2002 medical opinion from Dr. Hulse noting that the incidents with the small boats in Vietnam occurred *prior* to a 20-day vacation in January 1962).

More than one year later, in March 2009, the Board remanded the PTSD claim pursuant to this Court's decision. R. at 337-42. On remand, the appellant submitted to VA a December 2008 letter from his private clinical psychologist, Dr. Keith Hulse, confirming that "it is more likely than not that Mr. Phillip's PTSD and/other similar disorders were caused by the experiences described in the documents you provided to me attached to your letter" and referred to an attached copy of his 2002 medical opinion for his reasoning. R. at 81-88. In the attached 2002 medical opinion, Dr. Hulse provided a comprehensive discussion of Mr. Phillips's diagnosed PTSD, including a point-by-point analysis of the diagnostic criteria for PTSD based upon the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) (DSM-IV). R. at 82-88. Dr. Hulse concluded that Mr. Phillips's "severe and disabling case of [PTSD] . . . is a direct consequence of his service in the United States Navy, during the beginnings of the Vietnam conflict." R. at 88. Dr. Hulse identified one of the traumatic events as the claimed sinking of the boat with its occupants that occurred while Mr. Phillips's ship was inland and up a large river that he believed to be a mile wide in the waters of Vietnam, which he believed to be the Mekong Delta. R. at 82-83. It was this "traumatic event" that is identified in the medical opinion as being the one that is "persistently reexperienced" by the appellant in his thoughts and dreams. R. at 83.

Also on remand, in a July 2009 letter to the Board, the appellant's counsel stated that the U.S.S. *Mauna Kea* "was an ammunition and fuel resupply ship that in and of itself was sufficiently stressful to have caused PTSD." R. at 323. In addition, the appellant, apparently for the first time, also noted that the asserted stressors occurred *after* February 1962. *See*, *e.g.,* R. at 250-58 (April 2010 letter from appellant's counsel to the Board enclosing a supplemental statement from the appellant). The statement was received by the RO in April 2010. The appellant stated:

> [T]he incidents wherein the boats were sunk and lives lost occurred after February 1962. They happened during the spring of 1962, possibly between April 1962 through May 1962. . . . We went from the Philippines to Vietnam. I believe it had to be in late April, or early May we arrived in Danang or Vietnamese waters.

R. at 252.

3

The appellant also stated that he was the only person on the ammunition ship responsible "for making sure the phone and communication systems worked," that he was "under intense pressure to perform, all the time worried about being vaporized" because of the ammunition on board the ship. R. at 254. He further described two incidents of small boats sinking: First, a man, who had both hands up in the air, was on the port side of the ship, was looking at the appellant, and then "went under the stern of the ship" and "[w]hen we had passed on by he was gone, . . . He went down with his small boat." R. at 254. He further stated that he did not hear anyone report this incident and he did not report it. *Id*. at 256. Second, he again described the incident involving the young woman and her children on a small boat and his involvement of handing a water hose to the deck officer and learning afterward from "a couple of guys [who] came down into the galley" and "told [him that] 'They went down like a rock'. I never told anybody about this until I told Dr. Hulse recently." R. at 256.

In May 2010, the RO sent letters to the Modern Military Branch of the National Archives for copies of ship logs or any evidence that the U.S.S. *Mauna Kea* was off the coast, or in any waterway, of Vietnam from (1) November 1, 1961, through December 22, 1961; (2) January 27, 1962, through February 28, 1962; and (3) April 1962 to May 1962. R. at 773, 782. In July and September 2010, the RO received responses from the National Archives and Records Administration (NARA), including copies of the ship's deck logs, including (1) cover pages of deck logs for November and December 1961 and for January, February, and May 1962, which show the location of the ship at the beginning and end of each month; and (2) the deck logs for May 1 through May 7, 1962. R. at 770-79, 781-804.

In the March 2012 decision on appeal, the Board denied entitlement to VA benefits based on service connection for PTSD because the Board found that the appellant's asserted stressors had not been corroborated. R. at 5. This appeal followed.

## II. ANALYSIS

The appellant's arguments on appeal are difficult to decipher and are underdeveloped. He essentially argues that the Board unfairly treated him and his claim and that the Board member was prejudiced against him. Appellant's (App.) Brief (Br.) at 21. He appears to challenge the Board

4

member's finding that he was not credible and argues that the Board improperly provided a medical opinion and an inadequate statement of reasons or bases for its decision. *Id.* at 22-29. He contends that "[a]ll of the evidence corroborates this veteran's claims." *Id.* at 30. The appellant seeks reversal of the Board's decision and an award of benefits, or in the alternative, that the Board decision be vacated and the matter remanded with instructions that the Board member not be involved in adjudicating the claim. *Id.* at 30.

The Secretary maintains that the appellant has not shown that the Board member was biased against the appellant or that the Board decision was arbitrary, capricious, or otherwise an abuse of discretion. Secretary's Br. at 11-23. The Secretary also contends that the appellant has not shown that the Board erred in its evaluation of the evidence, including its credibility determinations, or in providing reasons or bases for its decision. *Id.* at 24-30.

Establishing service connection specifically for PTSD generally requires: (1) evidence of a current diagnosis of PTSD conforming to the DSM-IV; (2) credible supporting evidence that a claimed in-service stressor occurred (corroboration); and (3) competent evidence of a causal nexus between the current symptomatology and the in-service stressor. 38 C.F.R. §§ 3.304(f) (2013), 4.125(a) (2013); *see Cohen v. Brown*, 10 Vet.App. 128, 138 (1997). "Where a current diagnosis of PTSD exists, the sufficiency of the claimed in-service stressor is presumed," but the second service-connection element requires "credible evidence that the claimed in-service stressor actually occurred." *Sizemore v. Principi*, 18 Vet.App. 264, 269 (2004) (citations and emphasis omitted); *see Cohen*, 10 Vet.App. at 145.[2]

---

[2] Although there are some circumstances in which a veteran's lay testimony alone may suffice to establish the occurrence of the claimed in-service stressor, *see* 38 C.F.R. § 3.304(f), the appellant does not argue that this is such a case. For example, the appellant does not argue that (1) he engaged in combat and that that his stressors are related to that combat, 38 C.F.R. § 3.304(f)(2), or (2) that his stressor "is related to [a] fear of hostile military or terrorist activity and a VA psychiatrist or psychologist, or a psychiatrist or psychologist with whom VA has contracted, confirms that the claimed stressor is adequate to support a diagnosis of [PTSD] . . .[and meeting additional requirements under this subsection, including the definition of 'fear of hostile military or terrorist activity']," 38 C.F.R. § 3.304(f)(3). Specifically, the Court notes that § 3.304(f)(3) is based on a VA Final Rule that was promulgated on July 13, 2010, while the instant PTSD claim was pending at VA on remand from this Court. 75 Fed. Reg. 39,843 (July 13, 2010). As noted above, the appellant, who is represented by counsel, does not argue that this regulation applies to the appellant's circumstances. Indeed, as noted by the appellant, "much space in [his] brief has been dedicated to repeating much of [veteran law judge] Crowley's comments [in the Board decision]." App. Br. at 21.

5

Whether there is corroborative evidence of a claimed in-service stressor is a factual determination that is reviewed by the Court under the "clearly erroneous" standard. *Sizemore*, 18 Vet.App. at 270. "'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990) (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948)). When applying this standard, if the Court determines, after reviewing the record in its entirety, that the Board's finding of fact is supported by a plausible basis, "'the [Court] may not reverse it even though convinced that had it been sitting as trier of fact, it would have weighed the evidence differently.'" *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985)).

The Board must provide a statement of the reasons or bases for its determination, adequate to enable an appellant to understand the precise basis for its decision, as well as to facilitate review in this Court. 38 U.S.C. § 7104(d)(1); *Allday v. Brown*, 7 Vet.App. 517, 527 (1995); *Gilbert*, 1 Vet.App. at 56-57. To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence it finds persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. *Caluza* v. Brown, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table).

Here, the Board made the following determinations:

[T]he Board finds that the Veteran is not a combat veteran, that his stressors are not supported by credible evidence, and significantly highly probative evidence in this case clearly reveals that the Veteran is fabricating all his stressors. While the *Mauna Kea* did offload ammunition onto a barge in May 1962 off the coast of Vietnam, this is not in accordance with the Veteran's stressor event identified by Dr. Hulse. Neither the official records nor the buddy statement corroborate the specific stressor events described by the Veteran, and which have resulted in a diagnosis of PTSD, and, as a whole, provide evidence against this claim as it provides a basis for finding that the Veteran is not credible regarding his stressors in service (for reasons noted above). Other claimed stressors of record are non-corroborated and/or have not been medically related to a PTSD diagnosis. The Veteran's changing statements only provide more factual negative evidence against this claim.

R. at 16.

6

Although the Board found that the appellant had consistently claimed that his stressor "pertained to the ship's alleged movements near Vietnam and in interactions with small craft in the area," the Board determined that the appellant was not credible because (1) the evidence did not corroborate the claimed stressors relating to the small boats in the area; and (2) the appellant made two statements regarding boats in the "river" that were "entirely inconsistent" with each other. R. at 8, 13-14. In addition, the Board found that the appellant was not credible because the appellant's "alleged stressors are constantly changing, with new stressors (not cited in the past) as the basis for [his] PTSD being raised regularly." R. at 9. The Board explained that the appellant reported in December 2009 that an in-service personal assault by another servicemember occurred "only after more than a decade of failing to achieve his goal of service connection for PTSD." R. at 15-16. In this regard, the Board noted that the appellant had been seen repeatedly for PTSD and "there has never been mention of a personal assault." R. at 15.

As to the appellant's contention that the Board member was somehow prejudiced against him, the appellant has not identified anything in the Board's decision that indicates any sort of bias or prejudgment. Rather, the appellant appears to believe that the Board member was biased because he reached a decision unfavorable to the appellant. But the fact that an adjudicator renders a decision unfavorable to a claimant does not mean that the adjudicator is biased. *See Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial rulings alone . . . can only in the rarest circumstances evidence the degree of favoritism or *antagonism required" to show partiality or bias "when no extrajudicial source is involved."); Morris v. West*, 11 Vet.App. 174, 175 (1998) (per curiam order) (stating that even when a claimant "sincerely believe [s] that he has a grievance," that is not enough to show partiality or bias). The Court understands that the appellant believes himself to be entitled to benefits and understands his frustration at having his claim denied. But the Court can find nothing, either in the text of the Board decision itself or in the record as a whole, that would indicate that the Board member denied his claim out of some improper motive.

To the extent that the appellant argues that the Board's reasoning reflects bias against his claim, particularly because of attacks upon the appellant's credibility, the appellant simply has not established that the Board's factual conclusions, including its ultimate determination to deny service connection, are clearly erroneous. The Board found that the appellant's claimed stressor was not

7

sufficiently corroborated by the deck logs or his buddy's statement. The Court finds no error in that determination. Regardless of whether the Board was mistaken in its statements regarding whether the appellant's ship was in a "river" near Vietnam[3] or whether he caused delay in the proceedings, as the appellant asserts (App. Br. 22-28), the Board provided other reasons for denying the claim, specifically, "[n]either the official records nor the buddy statement corroborate the *specific* stressor events described by the veteran, and which have resulted in a diagnosis of PTSD." R. at 16.

The Court holds that the Board's factual determination that the appellant's claimed in-service stressor pertaining to the small crafts in the waters off of Vietnam was not sufficiently corroborated is supported by a plausible basis in the record, viewed as a whole. According to the response from NARA following this Court's 2008 remand, the U.S.S. *Mauna Kea* was not at or near Vietnam from November 1, 1961, through December 22, 1961, and from January 27, 1962, through February 28, 1962. NARA provided a breakdown of where the ship was during those two periods, which included steaming from Pearl Harbor, Hawaii, to Guam from February 7-18, 1962, and being anchored at Guam from February 18-28, 1962. R. at 770. The February 18, 1962, deck logs, which had previously been provided to the RO in May 2001, document that a small craft was alongside the starboard side of the ship near Guam, two civilians were brought aboard the ship, and the small craft was towed from the stern. R. at 1644, 1703.

Copies of the ship's deck logs for May1-2, 1962, showed the ship steaming from Subic Bay, Philippine Islands, to Da Nang Bay, South Vietnam, and entering Da Nang Harbor on May 2. R. at 786-89. On May 2, at 08-12 (i.e., 8:12 AM), the ship anchored in Da Nang Bay and commenced off-loading ammunition. R. at 789. Later that same day, at 18-20 (i.e., 6:20 PM), the ship made preparations "for leaving port" and was "[u]nderway for sea . . . [and m]aneuvering to clear the anchor." R. at 789. At 19-08 (i.e., 7:08 PM), the ship "[s]ecured the special sea detail." *Id.* Another entry on the deck logs for May 2 stated: "20-24 Steaming as before. 2126 c/c 030 ° to avoid a contact. . . ." R. at 789. No further description was provided as to what was meant by "contact" –

---

[3] In a March 2003 statement, Mr. Phillips maintained that his ship was in Vietnam. R. at 774. He stated: "When I say 'in Vietnam,' I mean certainly in the area. I have previously spoken of my ship being 'on a river.' My definition of 'river' is being able to see land, as opposed to being on the ocean or open sea. Probably, the episodes I have earlier written about occurred in the Gulf of Tonkin or Mekong Delta areas, instead of actually going up the river. . . . My ship was in these waters off the coast of Vietnam, China Sea, and Formosa Straits."

whether it was a small craft or a large barge or something else. The next day, on May 3 at 00-04 (i.e., 12:04 AM), the ship was "[s]teaming independently off Danang, South Vietnamese . . . ." and, later that morning at 07:30, "the special sea and anchor detail" was set. R. at 792. Within the day, the ship was steaming and "maneuvering at various courses and speeds to enter Danang Harbor" and again anchored in Danang Bay. R. at 792. The ship received a barge to offload ammunition and "[s]ecured off-loading ammunition." *Id*. At 10:42, the ship got "[u]nderway from Danang, South Vietnam to new rendezvous in accordance with [the 7th Fleet] . . .[and maneuvered] to clear harbor." *Id*. Deck logs for May 4 reflect that the ship was "steaming" from Da Nang to Subic Bay "via rendezvous." R. at 792-93. The ship continued steaming until it "[j]oined rendezvous" at 12:16 PM on May 5. R. at 795-96. The ship rendevoused with other U.S. ships and then, on May 6 at 12:16 PM, after further steaming, anchored in Subic Bay. R. at 798-99.

The Board incorrectly noted in its decision that the deck logs showed that the U.S.S. *Mauna Kea* anchored only *once* in DaNang Harbor, on May 3, 1962. R. at 13. As noted above, the ship first anchored in DaNang on May 2, then left during the night, and *returned the next day on May 3*. Consistent with the deck logs, a 2008 statement from a shipmate of the appellant, J.G., provided the following information:

> We made 2 trips into the DaNang area, one in 1962 and one 1963 while I was on the USS Mauna Kea. Both should have been between April and August. I was a FTG 2 assigned to the 3rd Div (gunnery) which was in charge of all munitions cargo that we carried. We loaded up a LCM [(Landing Craft Mechanized)] at Subic Bay and then we would pull into the Bay in South Viet Nam which later they built the big Da Nang base at, there we would unload the LCM and load it up with ammunition and go up the river to the Special Forces base. We would pull back at sea at nite and then come back the next day and do the same procedure. Yes we did have some incidents with fishing boats on those trips into VN.
>
> . . . .

R. at 66. The Board consequently also erred in finding that "[t]he deck logs are, as is obvious, in direct contradiction to J.G.'s account" and in assigning it "no probative value" based on whether the ship had returned to DaNang on a second day. R. at 13.

These Board errors, however, are not prejudicial to the appellant in the resolution of the claim because neither the deck logs nor J.G.'s 2008 statement corroborate the specific stressor of a small

boat being sunk by the U.S.S. *Mauna Kea*. They corroborate only the appellant's statements as to the location of the ship, not to the traumatic event that was the basis for the diagnosis of PTSD. Although corroboration of every detail is not required and corroboration can, in some circumstances, be implied by the evidence, there must still be independent evidence that the stressful event occurred. *See Pentecost v. Principi*, 16 Vet.App. 124, 128 (2002) (holding personal exposure to stressful event implied by evidence establishing that veteran was stationed with a unit in Vietnam that experienced enemy rocket attacks); *Suozzi v. Brown*, 10 Vet.App. 307, 310 (1997) (holding that, for purposes of reopening a claim, evidence establishing that the veteran's unit in Vietnam experienced casualties resulting from enemy attack gave rise to a "valid inference" that a veteran who was "a company clerk would assist in the casualty identification" and "implies his personal exposure").

Finally, the appellant argues that the Board failed to provide an adequate statement of reasons or bases for discounting "stressors other than loss of life stressors" and for finding that the appellant's stressors would have been recorded in the deck logs had they occurred. App. Br. at 29-30. Given the Court's above discussion, and the Board's analysis of those matters, the Court is not persuaded by the appellant's contentions and concludes that the Board provided an adequate statement of reasons or bases for its determinations. *See Hilkert v. West*, 12 Vet.App. 145, 151 (1999) (en banc) ("An appellant bears the burden of persuasion on appeals to this Court."), *aff'd per curiam*, 232 F.3d 908 (Fed. Cir. 2000) (table); *Berger v. Brown*, 10 Vet.App. 166, 169 (1997) ("[T]he appellant . . . always bears the burden of persuasion on appeals to this Court."); R. at 8-16.

## IV. CONCLUSION

Upon consideration of the foregoing analysis, the record on appeal, and the parties' pleadings, the March 9, 2012, Board decision is AFFIRMED.

DATED: August 5, 2013

Copies to:

J. Myers Morton, Esq.

VA General Counsel (027)

10

*Designated for electronic publication only*
*NON-PRECEDENTIAL*

**UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS**

No. 12-1373

LLOYD J. PHILLIPS, APPELLANT,

v.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

Before KASOLD, *Chief Judge,* and MOORMAN and PIETSCH, *Judges.*

**O R D E R**

*Note: Pursuant to U.S. Vet. App. R. 30(a),*
*this action may not be cited as precedent.*

In a single-judge memorandum decision dated August 5, 2013, the Court affirmed the March 9, 2012, decision of the Board of Veterans' Appeals that denied the appellant's claim of entitlement to service connection for post-traumatic stress disorder. On August 15, 2013, the appellant filed a motion for a panel decision. The motion for decision by a panel will be granted.

Based on review of the pleadings and the record on appeal, it is the decision of the panel that the appellant fails to demonstrate that 1) the single-judge memorandum decision overlooked or misunderstood a fact or point of law prejudicial to the outcome of the appeal, 2) there is any conflict with precedential decisions of the Court, or 3) the appeal otherwise raises an issue warranting a precedential decision. U.S. VET. APP. R. 35(e); *see also Frankel v. Derwinski*, 1 Vet.App. 23, 25-26 (1990).

Absent further motion by the parties or order by the Court, judgment will enter on the underlying single-judge decision in accordance with Rules 35 and 36 of the Court's Rules of Practice and Procedure.

Upon consideration of the foregoing, it is

ORDERED, by the panel, that the motion for panel decision is granted. It is further

ORDERED, by the panel, that the single-judge memorandum decision remains the decision of the Court.

DATED: October 2, 2013                                   PER CURIAM.

Copies to:

J. Myers Morton, Esq.

VA General Counsel (027)

2

*Designated for electronic publication only*

## UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

NO. 11-0224

LAWRENCE MCDONALD, APPELLANT,

v.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

Before DAVIS, *Judge.*

### MEMORANDUM DECISION

*Note: Pursuant to U.S. Vet. App. R. 30(a),*
*this action may not be cited as precedent.*

DAVIS, *Judge*: U.S. Marine Corps veteran Lawrence McDonald appeals through counsel from a January 13, 2011, Board of Veterans' Appeals (Board) decision that denied entitlement to service connection for post-traumatic stress disorder (PTSD) as a result of sexual trauma. For the reasons stated below, the Court will set aside the Board's decision and remand the matter for readjudication consistent with this decision.

### I. BACKGROUND

Mr. McDonald served on active duty from December 1967 to January 1969. He attended basic training at Camp Pendleton, California. Service medical records (SMRs) document that he experienced severe headaches, abdominal pains, constipation, and bleeding hemorrhoids in service. Medical tests were unable to point to a cause for his complaints, and he was referred for psychological evaluation. In September 1968, Mr. McDonald requested a change of military occupational speciality (MOS) to a position that required limited field duty, such as a clerk. The cited reason was "emotionally unstable personality with hypochondosis." Record (R.) at 1730. In December 1968, a medical board recommended that Mr. McDonald be discharged, stating that he was "unsuitable for service." R. at 1721.

On November 19, 2002, Mr. McDonald filed a claim for disability benefits for PTSD. He alleged a number of in-service stressors, including that he was beaten and sexually assaulted by his drill sergeant during basic training at Camp Pendleton.

The Board decision here on appeal represents the third occasion on which the administrative law judge John J. Crowley has considered Mr. McDonald's claim. Judge Crowley issued a decision for the Board in September 2007 that Mr. McDonald appealed to the Court. The parties prepared a joint motion for remand (JMR) that the Court granted in November 2008, agreeing that the Board had provided an inadequate statement of reasons or bases for whether a medical examination was necessary to decide the PTSD claim. Judge Crowley issued another decision for the Board in July 2009 that Mr. McDonald again appealed to the Court. The parties again prepared a JMR that the Court granted in March 2010. In the JMR they agreed that the Board had provided an inadequate statement of reasons or bases for its determination that a VA medical opinion was not warranted, and its determination that Mr. McDonald's request for change of MOS was not evidence of his claimed in-service stressor, but rather it was related to his impending transfer to Vietnam.

In the Board decision here on appeal, the Board determined that Mr. McDonald "is fabricating his stressors in service" and that he "is not a reliable historian." R. at 34. The Board further stated that Mr. McDonald's "allegations are not credible in any aspect concerning the alleged stressors." *Id.* The Board reviewed an opinion from treating therapist Roger Girard, which it found "meaningless for purposes of this appeal." R. at 29. An opinion from Dr. Jonathan Mangold was deemed to have "no evidentiary value." R. at 33. And letters from Mr. McDonald's mother and siblings describing his behavior when he left for service as different from his behavior when he returned did "not lend any support to corroborating an in-service stressor productive of PTSD" because they did not include accounts of Mr. McDonald's childhood problems of bed wetting and pulling his own hair. R. at 20.

## II. ANALYSIS

### A. 38 C.F.R. § 3.304(f)(5)

Service connection for PTSD requires (1) medical evidence diagnosing the condition in accordance with 38 C.F.R. § 4.125(a); (2) "a link, established by medical evidence, between current

2

symptoms and an in-service stressor"; and (3) "credible supporting evidence that the claimed in-service stressor occurred." 38 C.F.R. § 3.304(f) (2011). The Secretary, recognizing that "veterans face unique problems documenting their claimed stressor in personal assault cases," has "'provided for special evidentiary-development procedures' in those cases." *Bradford v. Nicholson,* 20 Vet.App. 200, 204 (2006) (quoting *Patton v. West,* 12 Vet.App. 272, 280 (1999)). These special procedures permit "evidence from sources other than the veteran's service records [to] corroborate the veteran's account of the stressor incident." 38 C.F.R. § 3.304(f)(5). The regulation continues:

> Examples of such evidence include, but are not limited to: records from law enforcement authorities, rape crisis centers, mental health counseling centers, hospitals, or physicians; . . . and statements from family members, roommates, fellow service members, or clergy. Evidence of behavior changes following the claimed assault is one type of relevant evidence that may be found in these sources. Examples of behavior changes that may constitute credible evidence of the stressor include, but are not limited to: a request for a transfer to another military duty assignment; deterioration in work performance; substance abuse; episodes of depression, panic attacks, or anxiety without an identifiable cause; or unexplained economic or social behavior changes.

*Id.*

The Board conceded a diagnosis of PTSD and evaluated Mr. McDonald's claim under § 3.304(f)(5) because his claimed stressors include allegations of in-service personal assault. Under § 3.304(f)(5), the relevant inquiry for the Board is whether there is credible evidence from sources outside the veteran's statements that corroborate his account of the claimed stressor. Mr. McDonald asserts that there is credible evidence to meet the requirements of the regulation and points to behavior changes documented in his service records, behavior changes documented by his family members's letters, his requested change of MOS, and his in-service medical problems that were attributed to "psychogenic factors" and a "nervous condition." R. at 1754-55. Mr. McDonald argues that the Board misapplied the regulation and "scrutiniz[ed] each piece of corroborating evidence individually to determine whether that evidence proved that the veteran was, in fact, assaulted." Appellant's Brief at 9. Mr. McDonald argues that rather than lowering the evidentiary bar, as the regulation intended, the Board in its misapplication "raised the bar the veteran was required to meet, requiring the veteran to produce proof in his service records to demonstrate that the personal trauma occurred." *Id.*

3

Mr. McDonald's arguments are well taken. The Board indeed went out of its way to clearly explain away each piece of evidence. It attributed Mr. McDonald's in-service behavior changes to alleged preexisting anxiety problems, based on Mr. McDonald's statements that he had problems with bed wetting and hair pulling that seem to have resolved prior to service. *See* R. at 1722 (medical board report stating: "He said he was extremely nervous as a child and had to see his family doctor because of pulling out his hair" and noting that bed wetting ended when he was around age seven or eight); 1741 (SMR recording: "Prior to active service he has a [history] of hair pulling as a child and even into high school"); 1821-22 (letter to congressional representative stating that he had a nervous condition "in grade school" and that the resulting bald spots "have diminished through treatment"). It also attributed his MOS change request both to his desire to avoid deployment to Vietnam and to his inability to deal with the stresses of physical exertion. However, the record indicates that Mr. McDonald stated that while he did not want to go to Vietnam, he was willing to do so. *See* R. at 1755 (psychiatric note indicating that Mr. McDonald does not like going to Vietnam but will go for his country), 1822. Additionally, § 3.304(f)(5) accounts for the fact that a request for a change in MOS is evidence of behavior change following a personal assault, 65 Fed. Reg. 61,132 (Oct. 16, 2000), and might be useful information to a professional who attempts to corroborate the claimed stressor, 67 Fed. Reg. 10,330 (Mar. 7, 2002). Therefore it appears that the Board inappropriately analyzed the evidence under § 3.304(f)(5).

## B. Credibility Findings

Mr. McDonald also argues that the Board improperly determined that his statements and the statements of his family members are not credible. The Board is obligated to determine the credibility of lay evidence. *See Buchanan v. Nicholson,* 451 F.3d 1331, 1337 (Fed. Cir. 2006). In conducting this analysis, the Board can consider possible bias and conflicting statements. *Id.* When considering documents submitted by a veteran, the Board may also consider "internal consistency, facial plausibility, and consistency with other evidence submitted on behalf of the veteran." *Caluza v. Brown,* 7 Vet.App. 498, 511 (1995) (discussing documents and the requirement of "satisfactory" evidence under 38 U.S.C. § 1154(b)).

Mr. McDonald notes that "the Board may not consider the absence of evidence as substantive negative evidence," *Buczynski v. Shinseki,* 24 Vet.App. 221, 224 (2011), yet the Board specifically

4

considered that "there is no service department record documenting that the Veteran was sexually assaulted in service" (R. at 14) and that "military physicians did not document on any occasion bruising, swelling, etc. which would clearly be associated with the type of severe beating alleged" (R. at 18). While the Board may not rely on the absence of evidence as substantive negative evidence, the Board may consider consistency with other evidence as it makes credibility determinations. *See Caluza, supra.* Because Mr. McDonald offers this argument as it relates to the Board's finding that he is not credible, the Court determines that the Board did not err.

However, the Board made it clear that it found "the Veteran's whole story . . . and in-service experiences [] completely lacking credibility and [] false," and therefore rejected it "in full." R. at 40. There is, therefore, no indication that the Board considered that some of Mr. McDonald's claimed stressor might be legitimate while others might be fabricated or exaggerated.

Mr. McDonald in November 2002 proffered up to nine claimed stressors, some of which appear rather far fetched on their face. *See* R. at 1456-62, 1530-33, 1549-76. Dr. Mangold, who reviewed Mr. McDonald's file, stated that patients in distress often exaggerate their symptoms, and that Mr. McDonald likely did so as well. R. at 61. And the Board was aware that, at the time of the Board decision, Mr. McDonald was incarcerated because of an incompetency finding. *See* R. at 26. Yet despite this notice that Mr. McDonald may have exaggerated his symptoms and may have been incompetent, the Board apparently did not consider that some of the alleged stressors may have been exaggerated. Instead, the Board seems to have considered the claimed stressors collectively and used the extreme nature of some of the claimed stressors as a basis for determining that Mr. McDonald fabricated all his stressors and therefore was not sexually assaulted in service. For this reason, the Board erred in its credibility determination regarding Mr. McDonald and his claimed stressors.

The Board also made credibility determinations regarding letters submitted by Mr. McDonald's mother, brother, and sister. The letters, summarized broadly, state that, before leaving for the military, Mr. McDonald was a happy, positive, engaging person who laughed and smiled, and was outgoing and personable, but that when he returned he was a "very different person" who was withdrawn, quiet, depressed, stressed, lonely, negative, and sad. *See* R. at 1201, 1316-17, 1326-28.

In discussing these family members' statements, the Board stated:

5

[T]he Veteran's own statements in service as well as the medical opinion in service undermines the credibility and/or reliability of the Veteran's lay witnesses who do not recall the Veteran as having any emotional disturbances prior to his entry into service.

On this point, the Board notes that these lay witnesses are attempting to recall events more than 30 years ago. Thus, their capacity to remember events clearly are subject to the vagaries of memory with the passage of time.

Furthermore, there is a complete contradiction between the Veteran's very specific and detailed recollections of pre-service troubles involving "pulling out his hair,"[] nervousness, sleepwalking . . . and the lay witness recollections of the Veteran being full of laughter and smiling, undermining their credibility.

The Board does not doubt that, at times, the Veteran had laughed and smiled before service. However, the lay witness recollections of no pre-service troubles at all clearly are at variance with the Veteran's own specific statements that are deemed exceptionally trustworthy, as they were offered to military examiners in the context of seeking appropriate treatment at the time.

R. at 19-20.

The family members' statements describe the changes they witnessed in Mr. McDonald upon his return from service. As a means of illustrating that change, the family members included a few adjectives and illustrations to describe Mr. McDonald's personality or behavior prior to service. But they certainly do not document his academic, social, and medical history prior to service. Therefore their failure to mention his hair pulling, bed wetting, and sleep walking that resolved in grade school, or at the latest by high school, is not a glaring omission that undermines the credibility of the witnesses. The Board's negative-credibility finding regarding the family members' lay statements is clear error, and remand is required.

## C. VA Medical Examination

Mr. McDonald also argues that VA failed to obtain a VA medical examination to evaluate his claim. This Court has held that in disability compensation claims

the Secretary must provide a VA medical examination when there is (1) competent evidence of a current disability or persistent or recurrent symptoms of a disability, and (2) evidence establishing that an event, injury, or disease occurred in service or establishing certain diseases manifesting during an applicable presumptive period for which the claimant qualifies, and (3) an indication that the disability or persistent or recurrent symptoms of a disability may be associated with the veteran's service or

6

with another service-connected disability, but (4) insufficient competent medical evidence on file for the Secretary to make a decision on the claim.

*McLendon v. Nicholson,* 20 Vet.App. 79, 81 (2006); *see* 38 U.S.C. § 5103A(d)(2).

The Board determined that a VA medical examination was not warranted, stating that an examination could not provide a basis to grant the claim because Mr. McDonald's claimed stressors did not occur. As part of this analysis regarding whether a VA examination was warranted, the Board reiterated that Mr. McDonald's "whole story regarding his emotional difficulties, . . . reasons for an MOS change and in-service experiences are completely lacking credibility and are false. . . . Overall, the Veteran's allegations and testimony regarding the alleged in-service events [are] rejected in full." R. at 40.

This analysis reflects the Board's improper application of § 3.304(f)(5) and improper credibility determinations, as set forth above. Because they form the basis for the Board's determination that a VA medical examination was not warranted, that determination must be set aside and that matter must be readjudicated on remand.

### D. Dr. Mangold's Opinion

Mr. McDonald next argues that the Board improperly rejected Dr. Mangold's opinion. The Board "fully rejected" Dr. Mangold's opinion because it was "based on a factual history" provided by Mr. McDonald that the Board rejected as false. R. at 40. Mr. McDonald argues that Dr. Mangold's opinion clearly indicates that he relied on more than Mr. McDonald's statements in forming his opinion, and considered statements from his family members as well as Mr. McDonald's service records.

Dr. Mangold's opinion does indicate that he reviewed statements from Mr. McDonald's mother and sister, and that he reviewed SMRs and other service records contained in Mr. McDonald's claims file. *See* R. at 53-62. Consequently, the Board erred in rejecting Dr. Mangold's opinion because it found the opinion was based on the statements of Mr. McDonald, which the Board had previously improperly rejected as not credible. However, the Board rejected the statements from Mr. McDonald's mother and sister as incredible, although it did so erroneously. Therefore, on remand, the Board must reassess the probative value of Dr. Mangold's opinion after it properly considers the credibility of the lay statements.

7

E. Medical Determinations by Board

Next, Mr. McDonald argues that the Board improperly made medical determinations. According to *Colvin v. Derwinski,* 1 Vet.App. 171, 172 (1991), the Board "must consider only independent medical evidence to support their findings rather than provide their own medical judgment in the guise of a Board opinion." Thus, where the Board reaches a medical conclusion, it must cite medical evidence of record or recognized medical treatises to support the conclusion. *Id.* at 175.

Here, the Board noted that the normal results of in-service sigmoidoscopy[1] and barium enema, which were conducted after the alleged sexual assault, provided "strong evidence against the claim." R. at 17. But, as Mr. McDonald argues, there is no medical evidence of record that indicates either test would reveal that a sexual assault had or had not occurred. Mr. McDonald's argument is well taken. Absent medical evidence or a medical treatise to support the Board's conclusion, the conclusion violates *Colvin.*

The Board also found that Mr. McDonald's symptoms of depression and anxiety were the result of a motor vehicle accident in October 1999, and were "not due to any psychiatric disorder, PTSD, or military sexual trauma." R. at 24. Mr. McDonald argues that this statement also violates *Colvin* because it is a medical conclusion that is not supported by medical evidence. Mr. McDonald further argues that the evidence of record contradicts the Board's conclusions. He notes that a psychological report prepared for the Office of Social Security notes Mr. McDonald's statement that he received treatment for anxiety prior to the accident, and the medical report from the date of the accident indicates Mr. McDonald had a history of panic attacks. *See* R. at 773, 925.

Therefore, at a minium, the Board failed to account for the favorable evidence of record and its statement of reasons or bases is inadequate. *See* 38 U.S.C. § 7104(d)(1); *Caluza v. Brown,* 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table) (for a statement of reasons or bases to be adequate, the Board must analyze the credibility and probative value of the evidence, account for the evidence that it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant). In addition, because it

---

[1] A "sigmoidoscope" is "a rigid or flexible endoscope with appropriate illumination for examining the sigmoid colon." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1708 (31st ed. 2012).

8

appears that the Board's conclusion–that Mr. McDonald's symptoms of depression and anxiety were caused by a 1999 motor vehicle accident–is a medical conclusion, it violates *Colvin*.

## F.  Presumption of Soundness

Mr. McDonald also argues that the Board erred in declining to apply the presumption of soundness to his claim. The presumption requires VA to consider every veteran "to have been in sound condition when examined, accepted, and enrolled for service, except as to defects, infirmities, or disorders noted at the time of the examination, acceptance, and enrollment." 38 U.S.C. § 1111; *see also* 38 C.F.R. § 3.304(b). Therefore, when no preexisting medical condition is noted upon entry into service, a veteran is presumed to have been sound in every respect. *See Wagner v. Principi,* 370 F.3d 1089, 1096 (Fed. Cir. 2004); *Bagby v. Derwinski,* 1 Vet.App. 225, 227 (1991). Once the presumption applies, it may be rebutted if VA satisfies its burden to present clear and unmistakable evidence that the veteran's disability was both preexisting and not aggravated by service. *Wagner,* 370 F.3d at 1096; *Bagby,* 1 Vet.App. at 227. "The government may show a lack of aggravation by establishing that there was no increase in disability during service or that any 'increase in disability [was] due to the natural progress of the' preexisting condition." *Wagner,* 370 F.3d at 1096.

Mr. McDonald's induction medical reports indicate a history of broken bones, mumps, appendectomy, tonsillectomy, bed wetting that ended at age seven, and burned fingers. R. at 1713-16. Mr. McDonald was presumed to be sound at induction except for the items noted at the time of induction. Because the induction medical reports do not indicate psychiatric problems or nervous troubles, the presumption of soundness applies to these disabilities and the government must overcome the disability by presenting clear and unmistakable evidence that any disability was both preexisting and not aggravated by service. *See Wagner* and *Bagby*, both *supra.*

The Board reasoned that the presumption of soundness did not apply because the Board was not determining whether PTSD existed prior to service, but was instead determining whether Mr. McDonald's anxiety symptoms could "provide 'marker' evidence" and verify the alleged stressor. R. at 21. But the Board's very reasoning presumes Mr. McDonald was not sound prior to service, which is contrary to the information contained on his induction medical reports and the statutory instructions regarding how they are to be interpreted. Therefore the Board erred in declining to apply the presumption of soundness.

9

## G. Remedy

### 1. Remand or Reversal

The Court has considered whether reversal, rather than remand, is the appropriate remedy. Reversal is the appropriate remedy when the only permissible view of the evidence is contrary to the Board's decision. *See Gutierrez v. Principi*, 19 Vet.App. 1, 10 (2004); *Johnson v. Brown,* 9 Vet.App. 7, 10 (1996). "Where the Board has incorrectly applied the law, failed to provide an adequate statement of reasons or bases for its determinations, or where the record is otherwise inadequate, remand is generally the appropriate remedy." *Washington v. Nicholson*, 19 Vet.App. 362, 371 (2005) (citing *Tucker v. West,* 11 Vet.App. 369, 374 (1998)).

Mr. McDonald has alleged approximately nine in-service stressor events, some of which seem rather far-fetched on their face. This, combined with Dr. Mangold's statement that Mr. McDonald may have exaggerated his symptoms (R. at 61), and Mr. McDonald's incarceration because of an incompetency finding (R. at 26), indicates that perhaps some of the stressors may have been exaggerated or fabricated.

But, as stated above, there is also a possibility that some of the alleged stressors may be legitimate. There is evidence from medical professionals indicating that Mr. McDonald has PTSD and that he was personally assaulted in service, and Mr. McDonald's family members state that he was markedly different after service. When combined with the SMRs and the other service records, a factfinder can conclude that one or more of the stressors occurred and that service connection for PTSD is warranted.

What seems clear is that this is not a case where there is only one permissible view of the evidence. Therefore, reversal is not warranted. Remand is the appropriate remedy.

### 2. New Administrative Law Judge

Finally, Mr. McDonald asks that, on remand, readjudication be conducted by an administrative law judge "other than the [one] who has made the prior determinations in this case." Appellant's Brief at 26. He quotes passages from the Board decision and asserts that they indicate the Board member has "abdicated his responsibilities to make the factual findings in this case." *Id.*

The Board member, Judge Crowley, who was apparently frustrated by the parties' agreement that neither of the previous Board decisions contained adequate reasons or bases, issued a 40-page Board decision for one claim. Therein, he wrote:

> Should the parties to [any future] JMR deem this analysis deficient, they are requested to identify how the Board's finding is not plausible and, given the facts of this case, reverse any "non-plausible" findings rather than return the case on another JMR. In short, the parties should make the findings of fact for the Board as the Board can find no further justifying rationale that could be provided.

R. at 37. Elsewhere, he wrote:

> [I]f the parties to this appeal disagree with the Board's decision and determine that another JMR is necessary, the Board requests more specific instructions to avoid any further delay in final adjudication in this case. In particular, the parties are requested to specifically identify which Board findings are not supported by a plausible basis, to reverse the particular finding or findings at issue, and then provide, in specific detail, what further actions are requested. If any opinion is ordered, then the parties should clearly identify the accepted facts and the question being asked of an examiner (at this time, the Board would have no question to ask an examiner as the Board has found that the Veteran's alleged stressors in service did not occur).

R. at 40-41.

The Court recognizes the complexity of this case and appreciates the effort Judge Crowley has expended in preparing three decisions. However, the above-quoted portions of the decision here on appeal indicate that Judge Crowley is no longer able to view the matter objectively and to provide Mr. McDonald with the veteran-friendly review to which he is entitled. *See Evans v. Shinseki,* 25 Vet.App. 7, 14 (2011) (stating that the VA system is "veteran-friendly" and "non-adversarial"); *Kouvaris v. Shinseki,* 22 Vet.App. 377, 381 (2009) (noting that the veterans benefits system is a "veteran-friendly" system). Thus, on remand, the Court requires VA to provide review by a different Board member in the same capacity. *Cf. Fletcher v. Derwinski,* 1 Vet.App. 394, 397 (1991) ("A remand is meant to entail a critical examination of the justification for the decision. The Court expects that the [Board] will reexamine the evidence of record, seek any other evidence the Board feels is necessary, and issue a timely, well-supported decision in this case.").

11

## III. CONCLUSION

On consideration of the foregoing, the Court SETS ASIDE the Board's January 13, 2011, decision and REMANDS the matter for readjudication consistent with this decision.  On remand, the readjudication must not be conducted by the Board member who previously adjudicated the claim.

In pursuing his case on remand, Mr. McDonald will be free to submit additional evidence and argument in support of his claim, and the Board is required to consider any such evidence and argument.  *See Kay v. Principi,* 16 Vet.App. 529, 534 (2002).  A final decision by the Board following the remand herein ordered will constitute a new decision that, if adverse, may be appealed to this Court upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the Board's new final decision is mailed to Mr. McDonald.  *See Marsh v. West,* 11 Vet.App. 468, 472 (1998).

DATED: May 14, 2012

Copies to:

Matthew D. Hill, Esq.

VA General Counsel (027)

12