**2014-1348**
**(Reexamination No. 95/000,333)**

IN THE
# UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

FORHEALTH TECHNOLOGIES, INC.,
aka FHT, INC.,

*Appellant,*

v.

INTELLIGENT HOSPITAL SYSTEMS, LTD.,

*Appellee.*

**Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board.**

**BRIEF OF APPELLEE
INTELLIGENT HOSPITAL SYSTEMS, LTD.**

GREG H. GARDELLA
KEVIN B. LAURENCE
OBLON, SPIVAK, MCCLELLAND,
    MAIER & NEUSTADT, L.L.P.
1940 Duke Street
Alexandria, VA 22314
TELEPHONE:    (703) 413-3000
FACSIMILE:    (703) 413-2220

*Attorneys for Appellee*

# CERTIFICATE OF INTEREST

Counsel for the Appellee Intelligent Hospital Systems, Ltd. certifies the following:

1.     The full name of every party or amicus represented by me is:

## Intelligent Hospital Systems, Ltd.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

### None

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

### None

4.     The names of all law firms and partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

## Greg H. Gardella and Kevin B. Laurence

## Oblon, Spivak, McClelland, Maier & Neustadt, L.L.P.


June 26, 2014                              /s/ Kevin B. Laurence
Date                                              Kevin B. Laurence

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES .................................................1

STATEMENT OF JURISDICTION....................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE...............................................................2

STATEMENT OF FACTS ......................................................................3

    I.    The '212 Patent ..........................................................................3

    II.    The Applied Prior Art ................................................................6

        A.    Spaulding et al. (U.S. Patent No. 5,337,919) ............................6

        B.    Halvorson (U.S. Patent No. 4,847,764) ....................................9

        C.    Dillon (U.S. Patent No. 6,161,141) .........................................10

        D.    Official Notice (Ortiz et al. – U.S. Patent No. 5,884,457).......12

SUMMARY OF THE ARGUMENT ...................................................12

ARGUMENT ........................................................................................13

    I.    The Board Correctly Construed Claims 3 and 20, Affording the Claims a Construction Consistent with The Evidence of Record. ......................13

        A.    The Board Properly Construed the "Manufacturing/Manufacture" Limitations in Independent Claims 3 and 20.................................14

1. Standard of Review ...................................................................15

2. The Board's Application of the "Broadest Reasonable Interpretation" Standard to Amended Claims 3 and 20 .............................15

3. Doctrine of Prosecution Disclaimer .......................................19

4. Declaration Evidence ...........................................................23

II.    The Board's Decision is Supported By "Substantial Evidence" Such That a "Reasonable Mind Might Accept" The Conclusion .................................26

A.    The Board's Analysis of Spaulding and the Secondary References is Supported by Substantial Evidence .............................................27

1. The Substantial Evidence Supporting the Board's Analysis of Spaulding ...........................................................................28

2. The Substantial Evidence Supporting the Board's Analysis of the Secondary References ..................................................................33

3. The Board's Decision Regarding Unpatentability of Claims 3 and 20 is Correct ........................................................................33

4. The Board's Decision Regarding Unpatentability of Claims 3 and 20 is Correct Even Under Appellant's Erroneous Claim Construction .......36

CONCLUSION .....................................................................38

# TABLE OF AUTHORITIES

## Cases

*Becton Dickinson & Co. v. C.R. Bard, Inc.*,
  922 F.2d 792 (Fed. Cir. 1990)......................................................................13

*Biogen Idec., Inc. v. GlaxoSmithKline LLC*,
  713 F.3d 1090 (Fed. Cir. 2013)...................................................................19

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938).....................................................................................26

*Demarini Sports, Inc. v. Worth, Inc.*,
  239 F.3d 1314 (Fed. Cir. 2001)...................................................................20

*Epistar Corp. v. Int'l Trade Comm'n*,
  566 F.3d 1321 (Fed. Cir. 2009)...................................................................21

*In re Giannelli*,
  739 F.3d 1375, 1379 (Fed. Cir. 2014) ........................................................26

*In re Keller*,
  642 F.2d 413 (CCPA 1981) .........................................................................34

*In re Merck & Co., Inc.*,
  800 F.2d 1091 (Fed. Cir. 1986)...................................................................34

*In re Morris*,
  127 F.3d 1048 (Fed. Cir. 1997)............................................................. 15, 26

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*,
  887 F.2d 1050 (Fed. Cir. 1989)...................................................................22

*Liebel-Flarsheim Co. v. Medrad Inc.*,
  358 F.3d 898 (Fed. Cir. 2004)......................................................................24

*Northern Telecom Ltd. v. Samsung Elecs. Co., Ltd.*,
  215 F.3d 1281 (Fed. Cir. 2000)...................................................................20

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)..........................................................20

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Circ. 2005)............................................ 15, 17, 20

*Rambus Inc. v. Infineon Techs. AG*,
   318 F.3d 1081 (Fed. Cir, 2003)..........................................................22

*Rolls-Royce, PLC v. United Techs. Corp.*,
   603 F. 3d 1325 (Fed. Cir. 2010)..........................................................26

*Standard Oil Co. v. Am Cyanamid Co.*,
   774 F.2d 448 (Fed. Cir. 1985)............................................................20

*Starhome GmbH v. AT&T Mobility LLC*,
   743 F.3d 849 (Fed. Cir. 2014)............................................................17

*Storage Tech. Corp. v. Cisco Sys. Inc.*,
   329 F.3d 823 (Fed. Cir. 2003)................................................ 18, 20, 22

*Superguide Corp. v. DirecTV Enterprises, Inc.*,
   358 F.3d 870 (Fed. Cir. 2004)............................................................24

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*,
   234 F.3d 1370 (Fed. Cir. 2000)..........................................................20

## Statutes

28 U.S.C. § 1295(a)(4)(A) ....................................................................1

35 U.S.C. § 134(c) ...............................................................................1

## Regulations

37 CFR § 41.67(c)(1)(vii) ...................................................................26

## STATEMENT OF RELATED CASES

Counsel is unaware of any other appeal in or from the same civil action or proceeding in the lower court or body that was previously before this or any other appellate court.  There are also no cases known to counsel pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

(a)  The statutory basis for jurisdiction of the Patent Trial and Appeal Board ("the Board") from an appeal by the Third Party Requester in an *inter partes* reexamination proceeding is 35 U.S.C. § 134(c).

(b)  The statutory basis for jurisdiction of this Court to hear this appeal is 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1.     Was the Board correct to construe claims 3 and 20 of U.S. Patent No. 7,096,212 ("the '212 patent") in a manner consistent with the specification, prosecution history and evidence of record?

2.     Based on this proper claim construction, did the Board correctly determine that claims 3 and 20 of the '212 patent are unpatentable?

1

## STATEMENT OF THE CASE

Appellant ForHealth Technologies, Inc. ("Appellant") appeals from a decision by the Board in *Inter Partes* Reexamination Control No. 95/000,333, correctly affirming the Examiner's decision that claims 2-5, 7-14, and 16-60 of the '212 patent are obvious.

On January 11, 2008, Intelligent Hospital Systems, Ltd. ("third party requester" or "TPR") filed a request for *inter partes* reexamination of the '212 patent, A1407-34, setting forth the proposed ground of rejection that the Spaulding reference anticipates claims 1-4, 6, 15, 20-24 and 29 of the '212 patent under 35 U.S.C. § 102(b), and renders the remaining claims obvious, either alone or in combination with the Rieker (U.S. Patent No. 5,832,447) and/or the Dillon reference, under 35 U.S.C. § 103(a). A1419.

On March 7, 2008, reexamination was ordered and a non-final Office Action was mailed. A1329-82.

After prosecution, the Examiner erroneously determined that claims 3-5 and 7-14 were confirmed and new claims 2 and 15-58 were patentable, issuing a Right of Appeal Notice on December 2, 2009. A1108-40.

TPR timely filed a Notice of Appeal on January 4, 2010. A1102-07.

After reviewing the parties' briefing, the Board reversed the Examiner's decision not to reject claims 2-5, 7-18, 46 and 50-56, and entered new grounds of rejection as to claims 19, 20, 47-49, 57 and 58.  A677-718.

In response, Appellant filed a Request to Re-Open Prosecution on May 21, 2012, with amended claims 2, 3, 7, 16 and 18-30 and new claims 31-60.  A638-676.

After prosecution, a final Board decision was mailed on November 22, 2013, A1-31, where the Board correctly affirmed the Examiner's obviousness rejections of claims 2-5, 7-14 and 16-60 and affirmed the Examiner's determinations not to adopt the proposed obviousness rejections of claims 8, 23-29, 31-45, 57, and 58 and 35 U.S.C. §112, first and second paragraph, rejections of claims 2-5, 7-14 and 16-60.  A31.  This decision is the subject of the current appeal.

## STATEMENT OF FACTS

### I.   THE '212 PATENT

The '212 patent, A32-40, assigned to ForHealth Technologies, Inc. ("FHT"), is generally directed to an automatic prescription/medication dispensing system with a software interface that enables trapping, parsing, testing for suitability for automated handling by a medication preparation system, and releasing for printing and manual handling only those portions of a serial data stream that are not

3

suitable for automated handling, and to a method of using the interface. A32, Abstract.

As illustrated in Figure 1 below, the software interface in the automatic prescription/medication dispensing system includes a listener software module (LSM). A36, 2:18-21. The LSM listens to a serial port of an order entry system for drug label data. If the start of a label is detected, the LSM writes the label data to a database together with metadata including the name of the LSM, a marker indicating whether the record requires parsing and more. A37, 4:37-52.



# Figure 1

The software interface also includes a parser software module (PSM). A36, 2:21-25. The PSM queries the database to identify the data that requires parsing. A38, 5:24-42. For the data identified, the PSM retrieves and parses it according to the configuration rules of the LSM. *Id.* at 5:43-64. The PSM then performs a checksum test to see whether the label data was received correctly from the order entry system. *Id.* at 6:15-24. If the checksum is valid, the PSM populates a data

structure with the parsed data.  *Id.* at 6:25-37.  After the data structure is populated,

the PSM tests the drug order against an order database to see whether it is suitable

for handling by the automated medication preparation system.  If the drug cannot

be handled by the automated system, the drug order is forwarded to a label printer

for printing and manual handling.  Otherwise, the populated data structure is

forwarded to the automated preparation system for handling.

In some applications, the data structure can first be routed to a scheduler for

queue handling in accordance with a prescribed priority.  *Id.* at 6:38 – 7:1.

The LSM and PSM can be included on the same machine (*see* Figure 1

above) or can be resident in different machines, as shown in Figure 4 below.  A37,

4:6-10.



# Figure 4

## II.    THE APPLIED PRIOR ART

### A.    Spaulding et al. (U.S. Patent No. 5,337,919)

Spaulding, A41-63, teaches an automatic prescription dispensing system similar to that of the '212 patent.  The Spaulding system includes a housing 2 with several dispenser units 5, several vial supply assemblies 3 at one end of the housing, and a filled vial offload carousel 4 at an opposite end.  (*See* Fig. 1 below).  A41, Abstract; A53, 8:20-27.  A readout or display panel 31 can be arranged on a front wall 23 of the housing 2 to provide status indications regarding operation of the system 1.  As examples, the display panel 31 may provide system operation errors, exhaustion of pills in the dispensers 5, count/weight discrepancies, and lack of an available location on the carousel 4 to deposit a filled vial 11.  A54, 9:32-38.



The automated dispensing system also includes a host interface 16 and a system controller 7 (*see* Fig. 30 below). A53, 8:20-33. Fig. 30 depicts the topology of the print stream monitoring system.



The Spaulding system includes a pharmacy host computer 10 that stores prescription data such as drug name, quantity, dosage instructions, prescribing physician, and recipient. A53, 8:44:50. The host computer 10 is connected to a prescription label printer 14 through a printer port 15 and the host interface 16. A49, 3:51-58. The host interface 16 intercepts the prescription label data received from the host computer 10 and conveys it to the controller 7. A53-4, 8:63 – 9:11. The controller 7, in turn, extracts the drug name and quantity from the label print data, and searches the data base 17 stored in its memory to determine if one of the dispenser units 5 is loaded with the desired drug. A53-4, 8:63-9:2. If the drug name is in the data base 17, the controller 7 first directs the vial manipulator assembly 6 to select a proper vial from the vial supply assembly and, next, causes the dispenser unit 5 to fill the vial with proper quantity of

7

medication. A52, 6:62-66. The prescription label data is then conveyed

through the interface 16 to the label printer 14 to print a label for the filled vial

11. A54, 9:8-11. Otherwise, the controller 7 sends an error message, alerting

the pharmacist that the prescription must be filled manually. A56, 14:56-60.

Spaulding's Fig. 29 illustrates the overall program logic or program 174

by which the system controller 7 operates:



Fig.29.

As described above, in the flow chart, the system monitors a printer port

(step 175) and then analyzes the printer port output data to determine whether the

specified drug matches an entry in the database of drugs that can be automatically filled (step 176).  A56, 14:51-56.  Portions of the prescription data (*e.g.*, drug name and amount) are extracted and compared to a database (step 176) to determine whether the dispenser unit has the drugs required to automatically prepare the prescription (step 177).  *Id.* at 14:53-60.  If the dispenser can prepare the prescription, the Spaulding system takes steps to automatically fill the prescription into a vial (steps 179-184).  A56-7, 14:68 – 15:15.  For prescriptions that are not automatically prepared, the Spaulding system generates a message (178) which indicates that the prescription must be manually prepared.  A56, 14:56-60.

### B.  Halvorson (U.S. Patent No. 4,847,764)

Halvorson, A85-123, discloses a system for dispensing medications in a health care institution which includes a computer system connected to control a plurality of remote medication dispensers.  A85, Abstract.  Fig. 1 below illustrates one embodiment of Halvorson's medication dispensing system, which includes a central computer 10 that is connected to remote video displays, a plurality of printers 21, and keyboard entry units 20 used for information entry (*e.g.*, patient information, all medication orders, inventory data and patient orders).  A99, 3:15-27.  The printers 21 are placed in strategic locations to provide hardcopy information to institution personnel, such as inventory control reports, patient

records, medication labels and other administrative reports.  The printers 21 are

multiplexed into the dispenser interfaces 32.  *Id.* at 3:23-31.



## C.    Dillon (U.S. Patent No. 6,161,141)

Dillon, A64-84, is directed to a network system with TCP/IP protocol

spoofing.  The system includes a personal computer that sends messages into a

TCP/IP network using a conventional dial-up link and downloads data from the

TCP/IP network using a high-speed one-way satellite link.  A64, Abstract.  Dillon

discloses that the Internet is an example of a TCP/IP network which had over 10

million users at the time of Dillon's invention.  A76, 1:14-48.  Dillon teaches that

"[a]s is well-known in the art, communication over the Internet . . . is achieved

through a group (suite) of protocols called Transmission Control Protocol / Internet

Protocol (TCP/IP)."  A77, 3:36-38.  Dillon further describes a normal IP data

packet containing certain information (*e.g.*, the source address) that enables the

destination system to identify where the data comes from and to send a

confirmation back to the source system when the data is received successfully.

A82, 13:50-59.

In particular, Dillon's Fig. 3 below shows a normal IP data packet

containing a source IP address and a destination IP address.

## FIG. 3.

310

NORMAL IP PACKET

| VERS | HLEN | SERVICE TYPE | TOTAL PACKET LENGTH | |
|---|---|---|---|---|
| IDENTIFICATION NUMBER | | | FLAGS | FRAGMENT OFFSET |
| TIME TO LIVE | | PROTOCOL | HEADER CHECKSUM | |
| SOURCE IP ADDRESS | | | | |
| DESTINATION IP ADDRESS | | | | |
| IP OPTIONS ( IF ANY ) | | | PADDING | |
| DATA | | | | |

BIT 0                                                                                                    BIT 32

Dillon further teaches that when using the conventional TCP/IP protocol,

confirmation messages are sent back to the source system once the destination

system receives the data packet.  *Id.*  Specifically, the application server sends a

predetermined number of data packets in accordance with a predetermined window

size, and then waits to receive ACKs (*i.e.*, acknowledgements or confirmations)

over the communication link before sending additional data packets.  *Id.*  The

11

purpose is to limit the number of data packets that must be re-sent if no ACK is received and to provide flow control (to prevent sending packets faster than they can be received). *Id.* Packets that have not been ACK'ed are stored in a memory and can be re-sent if no ACK is received. *Id.*

### D.    Official Notice (Ortiz et al. – U.S. Patent No. 5,884,457)

In addition to other elements that are well known in the art that the Board took Official Notice of, the Board refers to Ortiz, A124-146, which teaches a method for automatically producing a plurality of prefilled, sterile delivery devices with a desired quantity of fluid. A124, Abstract. The disclosed method includes the steps of automatically feeding a plurality of the sterile delivery devices along a predetermined path; removing the tips from the dispensing nozzles of the sterile delivery devices, filling the hollow barrels of the sterile delivery devices through the dispensing nozzles with a desired quantity of fluid; and closing and sealing the dispensing nozzles of the sterile delivery devices after the filling step to provide sealed sterile delivery devices with sterile fluid contents. A139, 4:25-33.

### SUMMARY OF THE ARGUMENT

The Board correctly affirmed the Examiner's decision that claims 2-5, 7-14, and 16-60 of the '212 patent are obvious, and Appellant launched the current appeal in a last-ditch effort to save its patent. Notably, Appellant narrowly focuses their brief on independent claims 3 and 20, and tellingly does not appeal the

Board's ruling with respect to claims 2, 4, 5, 7-14, 16-19 and 21-60 of the '212 patent, thus conceding their unpatentability. This Court has stated that "an issue not raised by appellant in its opening brief . . . is waived." *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990).

Contrary to Appellant's baseless arguments, the Board correctly construed the terms "manufacturing" and "manufacture" in claims 3 and 20, respectively, consistent with their plain and ordinary meaning. Despite its best efforts, Appellant can neither find a safe refuge in the doctrine of disclaimer nor artificially narrow the meaning of these terms in order to escape the prior art.

Predicated on an appropriate claim construction and proper consideration of the references in combination, the Examiner's obviousness analysis was both legally and factually sound. Thus, this Court must affirm the Board's decision that claims 3 and 20 are obvious, and remand is not necessary.

## ARGUMENT

### I. THE BOARD CORRECTLY CONSTRUED CLAIMS 3 AND 20, AFFORDING THE CLAIMS A CONSTRUCTION CONSISTENT WITH THE EVIDENCE OF RECORD.

Responding to the sound reasoning of the Board's initial decision of April 20, 2012, and recognizing their claims were unpatentable, Appellant filed a Request to Re-Open Prosecution, amending, among other claims, independent

claims 3 and 20. A638-676. By amending their claims, Appellant essentially admitted that the Board's rejections were correct.

Specifically, claim 3 was amended to recite, in part, that the medication preparation system is used for "manufacturing syringes for delivery and administration to each respective patient." A639-40. Claim 20 was similarly amended to clarify that the orders suitable for the automated medication preparation system be forwarded "for manufacture of syringes for delivery to each respective patient." A643-44. The dispute centers on construction of the terms "manufacturing/manufacture." Consistent with the evidence of record, the Board's decision correctly construed the "manufacturing/manufacture" limitations in claims 3 and 20 in accordance with their plain and ordinary meaning.

### A. The Board Properly Construed the "Manufacturing/Manufacture" Limitations in Independent Claims 3 and 20

At this juncture, Appellant pleas for this Court to interpret the claims differently from what is expressly written and confirmed by the Board, alleging the Board's decision was "predicated on an overly broad interpretation of the claims at issue," Appellant's Brief at 2, and "the decision of obviousness must be reversed because it is based on an erroneous construction of the claim terms," Appellant's Brief at 15. At least for reasons discussed below, the Board's decision was

14

predicated on a proper construction of the claims at issue, consistent with the evidence of record.

### 1. Standard of Review

It is well settled law that the U.S. Patent and Trademark Office ("USPTO") applies a different claim interpretation standard during the examination and reexamination process than the courts apply when construing the claims of an issued patent. *In re Morris*, 127 F.3d 1048, 1055 (Fed. Cir. 1997). Examiners at the USPTO give the words in claims their "broadest reasonable meaning" consistent with the specification, as they would be understood by a person of ordinary skill in the art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). When this Court reviews USPTO claim constructions, it uses the deferential "reasonableness" standard. *In re Morris*, 127 F.3d at 1055.

### 2. The Board's Application of the "Broadest Reasonable Interpretation" Standard to Amended Claims 3 and 20

In response to the Board's decision of April 20, 2012 setting forth new grounds of rejection, Appellant presented amendments in claims 3 and 20 directed, in part, toward the medication preparation system being used for manufacturing syringes for delivery and administration to each respective patient. Amended claim 3 recites, in part,

> using the medication preparation system, ***manufacturing syringes*** for delivery and administration to each respective patient . . . [,] the medication data determined as suitable for the medication preparation

system are manufactured by the medication preparation system for administration from the syringe to patients (emphasis added).

Similarly, amended claim 20 recites, in part,

orders determined as suitable to the automated medication preparation system for ***manufacture of syringes*** for delivery to each respective patient . . . [,] the orders determined as suitable for the automated medication preparation system are manufactured by the automated medication reparation system for administration from the syringe to patients" (emphasis added).

A639-40, 43, 44.

Though not explicitly stated, it appears that the Board gave the terms "manufacturing/manufacture" their plain and ordinary meaning without providing a specific definition.

Appellant's proffered construction requires that "manufacturing/ manufacture" be construed to mean that a label is applied to the syringe during the manufacturing process. Despite this dramatically narrower meaning, Appellant alleges that "Patent Owner's position is entirely consistent with the broadest reasonable interpretation standard." Appellant's Brief at 27. However, at least for reasons outlined below, this assertion is without merit. Rather, it is the Board's construction of these terms as having their plain and ordinary meaning that is consistent with the broadest reasonable interpretation standard.

First, the phrases "manufacturing syringes" and "manufacture of syringes" recited in claims 3 and 20, respectively, appear nowhere in the '212 patent. A32-

40. Appellant cites to col. 3, lines 33-37 and 39-41 for alleged support. A37. Upon closely reviewing these sections of the '212 patent, the only phrase remotely close to that which is claimed is "manufactures orders for syringes." *Id.* Appellant is blatantly attempting to combine isolated words in their description to create new claim language. Accordingly, the specification lends no guidance as to the proper scope or construction that should be afforded to the limitations of claims 3 and 20 under the broadest reasonable interpretation standard.

Thus, turning next to a dictionary definition, the plain and ordinary meaning of the terms "manufacturing/manufacture" simply suggests the making or producing of anything by manual labor or by machinery.[1] This Court has "made clear that dictionaries and treatises can often be useful in claim construction, particularly insofar as they help the court to better understand the underlying technology and the way in which one of skill in the art might use the claim terms." *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014) (citing *Phillips*, 415 F.3d at 1318) (internal quotation marks omitted). Based on the definition provided above, for the Appellant to assert that "the phrase 'manufacturing syringes for delivery and administration to each respective patient' is understood, implicitly by persons having ordinary skill in the art as *producing labeled syringes*," (emphasis added), Appellant's Brief at 26, is anything but

---

[1] *http://dictionary.reference.com/browse/manufacturing* (last visited June 25, 2014).

17

reasonable. The limitation of the syringes being manufactured with labels applied is at most "implicit" in some situations, not a *necessary* part of the proper construction of the claims. The broadest reasonable interpretation standard precludes the Appellant from reading limitations into their claims. This Court has previously held that "while proper claim construction requires an examination of the written description and relevant prosecution history to determine the meaning of claim limitations, additional limitations may not be read into the claims." *Storage Tech. Corp. v. Cisco Sys. Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003).

Appellant attempts to camouflage their strained construction by highlighting their forthrightness with the Examiner regarding the disclosure of the '212 patent. Namely, Appellant is proud they "unabashedly explained to the Examiner in its Request to Re-Open Prosecution that the phrase 'applies a label' does not appear within the text of the '212 patent in so many words."[2] Appellant's Brief at 20. Appellant goes on to assert that "this feature [applying a label] was inherently part of the disclosure and implicitly intended to be within the meaning of 'manufacturing' a syringe 'for distribution and administration to each respective patient' because automated syringe medicated preparation systems such as the PARxD IV system apply labels to the syringes they produce." Appellant's Brief at

---

[2] Appellant's admission actually confirms that a person of ordinary skill in the art reading the '212 patent would never have thought that the feature of "manufacturing" a syringe requires applying a label.

20-21.  Appellant, however, had a fair opportunity to narrow their claims based on the written support in the specification, and made a tactical decision not to expressly state the limitations which they consider to be "implicit."  Appellant, instead, attempts to validate their strained claim construction and justify their inherency argument by citing to the doctrine of prosecution disclaimer and highlighting the testimony of their declarants, which the Examiner, and similarly the Board, found was not dispositive.  "[T]he respective declarations . . . refer only to the system [PARxD IV] described in the '212 Patent and not to the individual claims of the '212 Patent."  A189.

### 3.  Doctrine of Prosecution Disclaimer

Ordinarily, claim terms in a patent "are generally given their ordinary and customary meaning.  But a term's ordinary meaning must be considered in the context of all the intrinsic evidence, including the claims, specification, and prosecution history . . . When the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered."  *Biogen Idec., Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1094-95 (Fed. Cir. 2013) (internal citations omitted).  Further, "the prosecution history can often inform the meaning of the claim language by demonstrating . . . whether the inventor limited the invention in the course of prosecution making the claim scope

19

narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.  In other words, the doctrine of prosecution disclaimer functions such that a claim limitation cannot be construed to cover subject matter that had been disclaimed in order to obtain issuance of a patent. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1332-24 (Fed. Cir. 2003) (citing, *inter alia*, *Standard Oil Co. v. Am Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) ("Such representations include amendments to the claims and arguments made to convince the examiner that the claimed invention meets the statutory requirements of novelty, utility, and nonobviousness")).

However, prosecution disclaimer only takes effect when the alleged disclaimer is unambiguous, clear, and unmistakable. *Id*. at 1324-26. *See, e.g., Northern Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281, 1293-95 (Fed. Cir. 2000) (remarks describing the applied references as "concerned with a totally different process" were not specific enough as to how the references were different); *Demarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1326-27 (Fed. Cir. 2001) (no disclaimer inferred from Examiner's silence or Applicant's lack of argument); *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000) (no express disclaimer where Patentee remarked on the advantages of "co-extrusion," but, by claim differentiation, the scope of claim 1 would be presumed to extend beyond co-extrusion); and *Storage Tech. Corp.,* 329 F.3d at 833 (when read in context and in light of the broader written description,

alleged disclaiming remarks were not a clear and unambiguous disavowal of claim scope).

Appellant repeatedly relies upon the doctrine of prosecution history disavowal and alleges "[o]nce that doctrine is applied, the claims at issue define patentably over the prior art rejections adopted by the Board." Appellant's Brief at 2. However, Appellant misapplies this doctrine, as it is only applicable in situations where the patentee actually narrows and relinquishes the full ordinary and customary meaning of the claim term. *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009). In this case, the statements and alleged intrinsic evidence Appellant is relying upon do not rise to the level of a disclaimer, because neither the Examiner's Determination of August 16, 2012 nor the Board's decision of the November 22, 2013 hinged upon a special claim construction afforded to the terms "manufacturing/manufacture." A1-31, 183-257.

As discussed above, based on a dictionary definition, the "full ordinary and customary meaning" of the terms "manufacturing/manufacture" is the making or producing of anything by manual labor or by machinery, and Appellant attempts to limit this meaning to include producing labeled syringes without actually amending the claims. This attempt is contrary to long-established precedent. Similar to the facts of this case, in *Storage Tech. Corp.*, patent applicants provided some statements which appeared to limit claim scope, but this Court found that "it

21

cannot do so absent some claim language." 329 F.3d at 832. Further, although the prosecution history statement generally described the features of the claimed invention, it also erroneously suggested that the independent claims had to include a certain feature. "The applicants' inaccurate statement cannot override the claim language itself, which controls the bounds of the claim." *See Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1089 (Fed. Cir. 2003) (holding that general statement introducing new limitations does not limit scope of claims not amended to include the new limitations); *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1054 (Fed. Cir. 1989) (holding that erroneous statement made during prosecution does not limit claim scope because 'the claims themselves control')." *Id.*

As an example, a clear and unmistakable disavowal on the part of Appellant would have been a statement to the effect that the term "manufacturing" is the making or producing of anything by machinery only, in turn, rejecting or disavowing a portion of the "full ordinary and customary meaning" which includes making or producing of anything by manual labor. Alternatively, another example of an unambiguous disclaimer would have been defining a specific type of machine that has to be used in the making or producing of syringes.

Based on a review of the evidence of record, since Appellant cannot find a safe refuge in the doctrine of disclaimer, this Court should find that the Board was

correct in leaving the terms "manufacturing/manufacture" to their plain and ordinary meaning without an explicit construction.

### 4. Declaration Evidence

Appellant further attempts to substantiate their strained claim construction of the term "manufacturing syringes for delivery and administration to each respective patient," recited in claim 3, for example, by emphasizing the testimony of two of their declarants:  Mr. William J. Blair ("Blair"), A587-91, and Mr. Dennis Tribble ("Tribble"), A596-601.  Specifically, the declarations focus on the PARxD IV machine and how it was allegedly "known to persons having ordinary skill in the art as having a dedicated printer for applying labels."  Appellant's Brief at 22-23.  However, as previously concluded by both the Examiner and the Board, the declarations fail to provide any information relevant to the patentability of the *pending claims* because they are not commensurate with the scope of the claims and do not provide any reasons why the cited art does not render the claims obvious.  Specifically, the Examiner asserted that, "the respective declarations . . . refer only to the system described in the '212 Patent and not to the individual claims of the '212 Patent . . . [A]ll of the declarations fail to provide any facts relevant to the analysis of the cited references in the Decision in comparison with the appealed claims."  A189.  Similarly, the Board decided that "the Patent Owner's . . . declarations too narrowly focus the issue at hand.  While it certainly is

credible that the commercially used machines, including the PARxD IV, would be configured to apply a label to a prepared vial for reasons of safety, it is by no means the only configuration possible or required." A17.

Furthermore, even if the PARxD IV is considered a representative embodiment of the invention of the '212 patent, features of "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). *See also Liebel-Flarsheim Co. v. Medrad Inc.*, 358 F.3d 898 (Fed. Cir. 2004) (describing instances where courts expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment). The same logic applies to any of Appellant's arguments directed at other automated syringe manufacturing systems having their own label application subsystems. *See, e.g.*, Appellant's Brief at 24.

To highlight some of the weaknesses and flaws of the declaration evidence, both Mr. Blair's and Mr. Tribble's opinions are irrelevant as to the patentability of the pending claims. For example, Mr. Blair's declaration asserts that "a person of ordinary skill in the art would understand that an automated syringe-preparation system . . . would include a printer as part of the automated system." A589. Similarly, the Tribble declaration states "[t]he PARxD IV system included its

own, dedicated printer for printing syringe labels. If the PARxD IV system received information for a syringe it could make it would print a label using its own printer, and if 'PARxD receives information on a syringe it cannot make, it will pass that label through to another networked printer.'" A597. However, none of the claims, especially claims 3 and 20 at issue, require two distinct printers; one included in the medication preparation system and another separate printer. Accordingly, in light of both the Examiner and Board's assessment of the testimonial evidence discussed above, this Court too should not give much credence and weight to the Blair and Tribble declarations in assessing the reasonableness of the Board's construction of the claim terms.

In conclusion, despite the Appellant's accusation that "[t]he Board erred by not giving credence to the narrower construction which binds the Patent Owner," Appellant's Brief at 30, and "the Board treated the amended language of the independent claims more broadly, disregarding the interpretation which is applicable to the amended claim features," Appellant's Brief at 16, at least for the reasons discussed above, the Board's decision must be affirmed. The Board's constructions are consistent with the claim language, the written description, and the prosecution history of the '212 patent, as well as this Court's precedent. That is, under the deferential "reasonableness" standard, the Board's claim construction as to claims 3 and 20 are, at the very least, reasonable interpretations of the claim

terms "manufacturing syringes for delivery and administration to each respective

patient" and "manufacture of syringes for delivery to each respective patient."  As

such, they should stand because "[t]his court will uphold any reasonable

interpretation of disputed claim language by the PTO." *Rolls-Royce, PLC v.*

*United Techs. Corp.,* 603 F. 3d 1325, 1330 (Fed. Cir. 2010) (*citing In re Morris,*

127 F.3d at 1055).

## II.   THE BOARD'S DECISION IS SUPPORTED BY "SUBSTANTIAL EVIDENCE" SUCH THAT A "REASONABLE MIND MIGHT ACCEPT" THE CONCLUSION

In the Board's decision of November 22, 2013, it correctly affirmed the

Examiner's obviousness rejections of claim 3 as unpatentable over Spaulding in

view of Dillon, Halvorson, and what was known in the art, and claim 20 as

unpatentable over Spaulding in view of Halvorson and what was known in the art.

A194-200, 231-4.  The Board's analysis is supported by substantial evidence such

that a reasonable mind might accept the evidence to support the finding, and thus,

must be affirmed.  *In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014) (citing

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Recognizing that their claims are unpatentable, Appellant argues that this

Court should ignore the rejections issued by the Board.[3]  Appellant's analysis of

---

[3] As an initial matter, we note that Appellant groups claims 3 and 20 together and argues that the Examiner's rejection of these claims is incorrect.  Accordingly, claims 3 and 20 (and any claims dependent thereon) must be deemed to stand or fall together.  37 CFR § 41.67(c)(1)(vii), states,

the evidence that supports the Board's conclusion is flawed because the teachings of Spaulding are mischaracterized, and the combined teachings of Spaulding with the secondary references are wholly ignored.

Furthermore, Appellant's amended claims do not offer any novel elements beyond what was well known in the art, rendering them obvious, just as they were in the Board's initial decision of April 20, 2012, A677-718, and subsequent decision of November 22, 2013, A1-31.  In fact, even if claims 3 and 20 are construed according to the interpretation advanced by Appellant, such claims remain obvious and unpatentable over the prior art of record based on the Board's previous findings.

## A.   The Board's Analysis of Spaulding and the Secondary References is Supported by Substantial Evidence

The Board's decision of November 22, 2013 details the evidence underlying its determination that claims 3 and 20 would have been obvious.  With respect to claim 3, the Board stated that it adopted the Examiner's reasoning, and that this

---

[n]otwithstanding any other provision of this paragraph, the failure of appellant to separately argue claims which appellant has grouped together shall constitute a waiver of any argument that the Board must consider the patentability of any grouped claim separately.

Thus, at least for similar reasons, it is entirely proper for this Court to consider only the broader claim 3 in evaluating the patentability of claims 3 and 20 (and any claims dependent thereon).

27

reasoning was not inconsistent with the Board's prior decision of April 20, 2012.

A13. In the Examiner's Determination, the Examiner provided a detailed analysis

of the rejection of claim 3 based on a combination of Spaulding in view of Dillon,

Halvorson, and what was known in the art. A194-A201. The Board also adopted

the Examiner's reasoning with respect to claim 20 as set forth at page 47 of the

Examiner's Determination. A23. In addition, the Board provided an independent

detailed analysis of Spaulding.

### 1. The Substantial Evidence Supporting the Board's Analysis of Spaulding

In explaining Spaulding's relevance to the obviousness of claims 3 and 20,

the Board summarized the teachings of Spaulding:

> Spaulding describes medication data specifying a dose to be delivered to a patient in a vial. A pharmacy host computer tracks prescriptions and inventory. The computer can cause a label to be printed on a printer connected to a serial port. A system controller intercepts prescription data from the label print, extracts the pertinent drug information, and then searches the database for the drug. If the drug is in inventory, the controller selects a vial, dispenses pills, and awaits another prescription. The label data are conveyed to the label printer to cause the printer to print a label for a filled vial. If the drug name is not in the database, the controller sends an error message to a display panel. A data structure is used to hold the extracted drug name and prescription quantity.

> The Spaulding error messages which are displayed on a display are a filtered output of those unsuitable for automated handling.

A13. The teaching in Spaulding regarding error messages is important

because claims 3 and 20 require "a filtered output stream consisting of only those

28

jobs that require manual handling." Spaulding states with regard to Fig. 29 that "[a]t branch 177, if the drug name is not found in the date base 17, the program branches to step 178 wherein an error message is sent to the system output, such as the display panel 31, and the program returns to step 175. A56,14:56-60. The error message is discussed by MIT Engineering Professor, Dr. David L. Trumper in his declaration (A340-48) submitted on behalf of TPR:

> 15.    The label printer (14) prints labels for the prescriptions identified in the received print stream. (Id. at column 9, lines 10-11.) The error message is sent (step 178) to the system output, such as the display panel 31. (Id. at column 14, lines 47-60 and Fig. 29.)

> 16.    This separation of the manually filled drug orders from all the drug orders received by Spaulding's system (Fig. 29, step 177) is a filtering operation.  The controller 7 of Spaulding filters the drug orders between those that can be filled by the automated system (Spaulding's dispenser apparatus 20) and those that are unsuitable for automated handling (Fig. 29, step 177), which are displayed on display panel 31.

A343. The Board cited to these two paragraphs from the Trumper Declaration to support their conclusion that

> Like the "filtered output stream" sent to the printer in the instantly claimed invention, the display of Spaulding also shows a filtered output of special handling prescriptions for the pharmacist. Whether printed on a screen or printed on a label from a networked printer, both have a filtered output. (*See*, *e.g.* Trumper Declaration, paragraphs 15, 16, 33 and 34).  We agree that this would have been a rudimentary design choice for one of ordinary skill in the art. As a consequence, we are unpersuaded by the Patent Owner's contention regarding the Spaulding reference's lack of filtering output.

A18.  Appellant attempts to counter this view by first asserting that the pharmacy host computer sends the label data stream in its entirety, without filtering, through the host interface to a single printer.  Appellant's Brief at 32.  As noted by the Board, "[t]he implication raised by this argument is that Spaulding does not filter the parsed output from the printer data and, accordingly, cannot be used properly in the rejection to render the claim obvious."  A14.  In support of its view, Appellant points to the one-way arrow in Fig. 30 between the host interface 16 and the dispenser system controller 7 as being significant and asserts that it unambiguously shows that the prescription data is only sent in one direction.  However, this position is not accurate.  In the first communication from the Patent Office, the Examiner stated that:

> one of ordinary skill in the art understands that the label data intercepted by the host interface would generally be bidirectional (e.g., to permit error messages to be routed from the label printer back to the computer that originally sent the prescription).

A1353.  The Board stated that "Figure 30 does not include the completely described routine of Figure 29 for displaying error messages to the pharmacist."

A19.  Dr. Trumper also pointed out that Spaulding discloses the use of a standard printer interface protocol, which is bidirectional.  In particular, Dr. Trumper stated:

> 20.    With reference to Fig. 30, Spaulding discloses "the pharmacy host computer 10 is normally connected to a prescription label printer 14 by a host [printer] port 1," where "the printer port usually adheres to a standard printer interface protocol, such as for serial printers, parallel printers (Centronics), or the like."  (Co1.8, lines 44-62) "This

30

> allows the pharmacy computer 10 to be used with any of a large
> number of commercially available printers 14." (See id.) Because the
> system uses a standard printer interface protocol, and because
> standard printer interface protocols use bidirectional communication
> between the computer and the printer, Spaulding discloses a
> bidirectional communication path between the computer and printer.
> Messages over bidirectional communication paths include both a
> source address and a target address.

A344. In addition to the foregoing, Spaulding's teaching regarding error messages clearly refutes Appellant's specious assertion that Spaulding discloses a system in which the prescription data is sent from the pharmacy host computer through the printer port in its entirety to the label printer without any filtering.

In a far too literal reading of the disclosure of Spaulding, Appellant further incorrectly asserts that that there is no contradictory disclosure in Spaulding that teaches the printer 14 prints less than all of the labels. Appellant's Brief at 32. However, the Board noted that "Professor Trumper has observed that Spaulding does not state that the label printer 14 prints all of the labels for the manually filled and automatically filled prescriptions. (Trumper Declaration, paragraph 18)." A19. In rejecting the assertion by the Appellant that Spaulding forwards all labels to the printer, the Board agreed with this statement by Dr. Trumper and further stated that Spaulding describes "a circumstance in which the label printer prints labels for *filled* vials only." A19 (emphasis in original). The Board further concluded

> [w]hile the description is not perfectly clear, the temporal nature of column 8, line 63 through column 9, line 11 of Spaulding indicates the host interface 16 first 'intercepts' the prescription label data, then analyzes them. Once that occurs, the prescription label data are then conveyed through the interface to the label printer to print a label for the filled vial. On balance, one of ordinary skill in the art could theoretically read this as describing either situation, but we find a preponderance of the evidence of record supports a description of printing the filled vial labels only, while the error messages go the system output.

A19. Assuming, *arguendo*, that Spaulding's printer did print all of the labels, claims 3 and 20 do not exclude a system that includes one printer that prints all the labels and another printer that prints the labels for those medications requiring manual handling by using the filtered output stream that results from Spaulding's step 177 in Fig. 29. As concluded by the Board, "the correct analysis of the issue is that put forth by the Examiner – that Spaulding teaches that the pharmacist will receive a message of those orders requiring special handling, and one of ordinary skill in the art would turn to conventional message delivery mechanisms. Among them are a visual display (Examiner's Determination, page 13, item 'F') or other networks such as Dillon's well known TCP/IP network (*Id.*) to a networked pharmacy printer (Halvorson)." A17.

As such, there is substantial evidence supporting the Board's conclusion that Spaulding is particularly relevant to the obviousness of claims 3 and 20 of the '212 patent, and the Board's decision must be affirmed.

### 2. The Substantial Evidence Supporting the Board's Analysis of the Secondary References

As noted above, the Board stated its reliance on the Examiner's analysis. A13 and A23. The Examiner provided a detailed analysis of the rejection of claim 3 based on Spaulding in view of Dillon, Halvorson, and what was known in the art. A194-A201. The Examiner also provided a detailed analysis of the rejection of claim 20 based on Spaulding in view of Halvorson, and what was known in the art as evidenced by Ortiz. A194-A201. The Board also summarized the teachings of Dillon, Halvorson, and what was known in the art as

> Dillon is relied upon for its teaching of a bidirectional TCP/IP network such as the internet to enable Spaulding to be used in a network environment; Halvorsen for printing a released output stream at a printer; and lastly, the Examiner found it to be known commonly that medication can be delivered in a syringe. (Examiner's Determination, pages 10-18, generally).

A14. Appellant has not asserted that the Board's analyses of the secondary references are not supported by "substantial evidence," and thus implicitly concedes that the Board's findings regarding the secondary references are supported by substantial evidence such that a reasonable mind might accept the evidence to support the findings. Thus, the Board's decision must be affirmed.

### 3. The Board's Decision Regarding Unpatentability of Claims 3 and 20 is Correct

Appellant argues against the Board's determination of obviousness by inappropriately attacking the primary reference in isolation. The secondary

33

references are only mentioned twice in passing, in a futile attempt to brush aside these secondary references. In the first mention, Appellant asserts that "Spaulding does not teach or suggest each and every limitation of independent claims 3 and 20 and the secondary references cited by the Board do not cure this deficiency of Spaulding." Appellant's Brief at 30. At the conclusion of its arguments, Appellant again makes a general, conclusory statement that "the Board sought to further modify Spaulding in view of Halverson and Dillon to include a new, second printer." Appellant's Brief at 45.

As Appellant has not argued the significance of these references in combination, Appellant has not challenged the substantial evidence presented regarding the combined teachings of Spaulding with the respective secondary references relied on to reject claims 3 and 20, set forth by the Board. As such, Appellant has not challenged the Board's conclusions regarding the obviousness of these claims based on the combined teachings. Rather, Appellant has attacked Spaulding in isolation without regard to the teachings of the combined references, and this attack must be dismissed. "Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references." *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981)). Thus, a

reference must be read, not in isolation, but for what it fairly teaches in combination with the prior art as a whole. *Id.*

Appellant's exclusive focus on Spaulding renders Appellant's arguments regarding obviousness baseless. For example, Appellant asserts that "Spaulding teaches that the controller 7 extracts only the drug name and quantity from the label data to send to the dispenser system and so the dispenser system 1 would lack the necessary data to print an acceptable label." Appellant's Brief at 37. Because Spaulding relates to pills, it is not necessary to identify a dose as recited in claims 3 and 20. However, the Examiner took Official Notice that a dose of medication delivered in a syringe was well known to one of ordinary skill in the art as evidenced by Ortiz. A234.

More importantly, the discussion about the directional arrows in Fig. 30 of Spaulding is rendered moot when considered in light of the teachings in Dillon of a bidirectional TCP/IP network such as the internet to enable Spaulding to be used in a network environment and the teachings in Halvorson to networked pharmacy printers. On the same basis, the Appellant's argument that printing occurs only at printer 14 of Spaulding also becomes moot because the display panel 31 of Spaulding can be replaced by a printer. *See* A17. Another example of the flawed reasoning resulting from the isolated analysis of Spaulding relates to Appellant's assertion that Appellee allegedly "admitted that Spaulding discloses a system in

which <u>all</u> the labels are printed by the printer 14" – a comment made exclusively with regard to Spaulding, rather than the references in combination.[4]  Appellant's Brief at 35.  When considering the combined references, it would be a rudimentary design choice for one of ordinary skill in the art to use a printer instead of a computer to display an error message, as concluded by the Board, which stated "[w]hether printed on a screen or printed on a label from a networked printer, both a have a filtered output."  A18.  The combination of Spaulding, Dillon, Halvorson, and what was well known in the art provides substantial evidence of the obviousness of claims 3 and 20, as the limitations set forth by each of the claims are met by the respective combinations applied by the Board.  As such, the Board's decision must be affirmed.

### 4. The Board's Decision Regarding Unpatentability of Claims 3 and 20 is Correct Even Under Appellant's Erroneous Claim Construction

Even if claim 3, and similarly claim 20, is construed according to Appellant's strained construction, it remains obvious and unpatentable over the prior art of record based on the Board's previous findings.  Appellant broadly alleges that "none of the art nor their combination teaches or suggests the feature of syringes manufactured by an automated medication preparation system, as argued during prosecution, so as to have a label applied to it so that it can be

---

[4] *See* A1231 for Appellee's complete comments, including circumstances where additional printers could be used.

delivered and administered to respective patients." Appellant's Brief at 29. This is incorrect. Pursuant to the claim interpretation advanced by Appellant, the step of manufacturing a syringe for administration to a patient includes (1) printing and (2) applying a label to the filled syringes. As discussed above, Appellant admits that Spaulding satisfies the first element, that is, printing a label. With respect to the second element, actually applying a label to the filled syringes, we defer to the "generally accepted pharmacy" standard advanced by Appellant. Appellant states that

> [a]n amendment to recite '*applying a label*' is not required to establish that the claims implicitly define the manufacture of a dose by the medication preparation system that includes a label and otherwise complies with generally accepted pharmacy requirements.

Appellant's Brief at 21. Further, Appellant alleges that

> it can be appreciated that generally accepted pharmacy standards pervade the industry such that there is no need to point out to the skilled reader all points of pertinence for the teaching to be understandable from reading the document.

Appellant's Brief at 24. Accordingly, based on Appellant's rationale above, a skilled artisan would readily recognize that the label in Spaulding which is printed on printer 14, is inherently applied to a filled vial for administration to a patient. In fact, in their Request to Re-Open Prosecution, Appellant advanced a similar reasoning, stating:

the notion of a . . . labeled syringe is widely accepted in the pharmacy field as inherent requirements for a dose manufactured for delivery and administration to a patient.

A661. Similarly, Blair explained in his declaration that

labeling a syringe that has been manufactured by an automated system [is] . . . part of the inherent teaching of the '212 patent.

A589. As such, even if claim 3 is construed according to Appellant's strained construction, such claim remains obvious and unpatentable over the prior art of record based on the Board's previous findings.

## CONCLUSION

For the foregoing reasons, Appellee asks that this Court affirm the Board's decision that claims 3 and 20 of the '212 patent would have been obvious. Appellee also asks that the Board's decision that claims 2, 4, 5, 7-14, 16-19 and 21-60 are unpatentable be affirmed, since Appellant did not challenge this finding on appeal.

Respectfully submitted,

June 26, 2014

  /s/ Kevin B. Laurence
Greg H. Gardella
Kevin B. Laurence
OBLON, SPIVAK, McCLELLAND,
  MAIER & NEUSTADT, L.L.P.
1940 Duke Street
Alexandria, Virginia 22314
(703) 413-3000

*Attorneys for Appellee*
*Intelligent Hospital Systems, Ltd.*

38

## **CERTIFICATE OF COMPLIANCE WITH FED.R. APP. P. 32(a)(7)(B)**

Counsel for Intelligent Hospital Systems, Ltd. Certifies that the body of this brief, beginning with the "Statement of Related Cases" on page 1 and ending with the last line of the "Conclusion" on page 38, contains 8252 words as computed by Word® 2010, in compliance with Rule 32(a)(7)(B)(ii) of the Federal Rules of Appellate Procedure.

/s/ Kevin B. Laurence
Kevin B. Laurence
*Counsel for Intelligent Hospital Systems, Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing BRIEF OF APPELLEE INTELLIGENT

HOSPITAL SYSTEMS, LTD. was served by email and ECF, this 26th day of

June, 2014 on counsel for Appellant ForHealth Technologies, Inc., AKA FHT, Inc.

David Leason
Leason Ellis LLP
One Barker Avenue, Fifth Floor
White Plains, NY 10601
leason@leasonellis.com
Tel: 914-288-0022
Fax: 914-288-0023

/s/ Kevin B. Laurence
Greg H. Gardella
Kevin B. Laurence
OBLON, SPIVAK, McCLELLAND,
 MAIER & NEUSTADT, L.L.P.
1940 Duke Street
Alexandria, Virginia  22314
(703) 413-3000

*Attorneys for Appellee*
*Intelligent Hospital Systems, Ltd.*