FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Summit Data Systems LLC         v. NetApp Inc.

No. _____

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
**Appellant**_____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:
**Summit Data Systems LLC**

_____

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:
**N/A**

_____

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:
**Summitt Data Systems is 100% owned, indirectly, by Acacia Research Corporation, trading on the NASDAQ Exchange under the ticker symbol ACTG.**

_____

4. ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:
**See attached sheet**

_____

Nov. 5, 2014
_____
Date

_____
Signature of counsel

Robert P. Greenspoon
_____
Printed name of counsel

Please Note: All questions must be answered
cc: _____

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:


Flachsbart & Greenspoon: Robert Greenspoon

Smith, Katzenstein & Jenkins: Neal Belgam, Robert Beste

Morris, Manning & Martin: Bryan Harrison, David Rabin, Michael Burling, Robert Hoskyn, Andrew McNeil

Proctor Heyman: : Neal Belgam, Melissa Brochwitz Donimirski, Samuel Hirzel, II

2015-1103

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

SUMMIT DATA SYSTEMS LLC,

Plaintiff-Appellant,

v.

NETAPP INC.,

Defendant-Appellee

Appeal from the United States District Court for the District of Delaware in Case No. 1:10-cv-00749-GMS, Judge Gregory M. Sleet.

---

**APPELLANT SUMMIT DATA SYSTEMS LLC'S OPPOSED MOTION TO <u>SUPPLEMENT THE RECORD</u>**

Plaintiff-Appellant Summit Data Systems LLC ("Summit") respectfully moves to supplement the record with the addition of a single page of deposition testimony. Defendant-Appellee NetApp Inc. ("NetApp") intentionally omitted the page from the record below. Without the deponent's answer to the question left hanging at the bottom of the page that it <u>did</u> include, however, the record is both incomplete and misleading. Namely, the decision on appeal treats the issues as if the deponent answered the dangling question other than how he did. In the interests of justice, and providing this Court with sufficient context to fully consider the issues on appeal, Summit's motion should be granted.

## I.     <u>BACKGROUND</u>

This is an appeal from an exceptional case finding under 35 U.S.C. § 285

and the award of attorneys' fees and costs. In ruling on NetApp's motion on this issue (ECF No. 239 (redacted - public version)), the district court based its decision on the existence of a license between Summit and a third party, RPX Corporation ("RPX"), which Summit and NetApp now agree passed through limited rights to NetApp (to the extent that its otherwise-infringing instrumentalities utilize a Microsoft-based "initiator"). A relevant issue was whether Summit knew before suit that such passthrough of rights occurred. The district court apparently concluded "yes." *See* Memorandum Opinion and Order, ECF No. 260, at 6 (filed under seal but subsequently released to the public) (attached hereto as Exhibit A).

However, earlier in the case, during discovery, NetApp learned that the opposite was true. On April 13, 2012, with the RPX agreement in hand, NetApp and its codefendant EMC took the Rule 30(b)(6) deposition of Summit through its designee, Mr. Dooyong Lee. EMC's examination (with NetApp watching) included a detailed exploration of the RPX agreement. NetApp attached excerpts from Mr. Lee's deposition to its briefing below. Of most relevance, NetApp attached pages 66 through 68 of the deposition transcript. *See* Excerpts to the Confidential Deposition Transcript of Dooyong Lee, attached as Exhibit 3 to Declaration of Edward R. Reines in Support of NetApp, Inc.'s Opening Brief in Support of Its Motion for Attorneys' Fees and Costs, ECF No. 238-3. (After appeal, Summit withdrew confidentiality designations from these pages). NetApp

did not attach page 69. Those pages are all attached as Exhibit B to this motion for the Court's consideration.

At the end of page 68, the transcript contains the following dangling question: "Just so I have a [sic] understanding of what you said earlier, an RPX member would be licensed to the patents listed in Exhibit A, including the patents in suit in this case; is that correct?" The witness did not answer this question until the following page, where he stated: "I'm not sure if it's a blanket license to all of RPX members that -- again, without looking at the specific provisions, but it's hard for me to just generalize and tell you that that's what it – that's what it covers." Again, NetApp's fee briefing intentionally omitted this answer, as Summit recently learned while conferring to avert the need for this motion. *See* E-mail correspondence between the undersigned and counsel for NetApp, Byron Beebe, attached hereto as Exhibit C.

## II.    LEGAL STANDARD

Under the Federal Rules of Appellate Procedure, all questions as to the form and content of the record, aside from inadvertent omissions and misstatements, must be presented to the court of appeals. Fed. R. App. P. 10(e). Federal courts of appeal have the discretion to use their inherent equitable powers to supplement the record as justice requires. *See Dickerson v. State of Alabama*, 667 F.2d 1364, 1367 (11th Cir. 1982) (supplementing record with evidence not reviewed by the

court below because the evidence was necessary for the proper resolution of the case and remand to consider additional facts would be contrary to both the interests of justice and the efficient use of judicial resources); *see also Turk v. United States*, 429 F.2d 1327, 1329 (8th Cir. 1970) (citations omitted) (in the interests of justice, granting motion to supplement record with evidence from transcript not presented to district court or otherwise part of record on appeal).

## III.    <u>ARGUMENT</u>

The appellate record here is misleading and incomplete. In its Opening Brief in Support of its Motion for Attorneys' Fees and Costs (ECF No. 240 (redacted - public version) (attached hereto as Exhibit D)), NetApp argued that Summit was aware of the existence of a license defense from the time the complaint was filed. *See e.g.*, *id.* at 1 ("This situation results entirely from Acacia's [Summit's parent corporation] blatant attempt to double dip by seeking litigation settlements for *already*-licensed products . . . .") (emphasis in original). In support of this proposition, NetApp attached as an Exhibit page 68 of Mr. Lee's testimony. Of most relevance, the portion provided to the district court includes the following exchange:

> Q.    Do you recognize those to be the patents marked as Exhibits 9 and 10, i.e., the patents in suit in this case?
>
> A.    Yes, they are the same.
>
> Q.    So at least those two patents are the subject of the agreements

between SDS [Summit] and RPX; is that right?

A.    Yes.

Q.    Just so I have a [sic] understanding of what you said earlier, an RPX member would be licensed to the patents listed in Exhibit A, including the patents in suit in this case; is that correct?

Ex. B, at 2.

But this presents a misleading picture. Though at first it appeared that the next page—containing Mr. Lee's answers to this critical line of questioning—was inadvertently omitted, counsel for NetApp has since confirmed that the following relevant statements were omitted intentionally.

A.    Are you asking whether this document grants RPX members licenses under at least those two patents?

Q.    Yes.

A.    *I'm not sure* if it's a blanket license to all of RPX members that -- again, without looking at the specific provisions, but it's hard for me to just generalize and tell you that that's what it – that's what it covers.

Q.    Generally speaking, though, it's your understanding that RPX members are licensed under patents that RPX either owns or otherwise controls?

A.    They are either licensed or RPX has options to license their members or select members, however they operate. But generally some variation thereof is my understanding.

*Id.* (emphasis added). As shown, in response to questioning, Mr. Lee indicated that he was not aware whether the RPX agreement automatically sprung sublicense rights to RPX membership, and referred counsel to the document itself because

5

such was often not the case with RPX agreements.

The district court relied on the cited portions of Mr. Lee's deposition in ruling on NetApp's Motion for Attorneys' Fees and Costs. *See* Ex. A, at 2. The district court reasoned that "[t]he Licensing Agreement between Summit and RPX covered the asserted patents and provided licenses to forty-three member companies, including, notably, Microsoft." *Id.* Further, the district court stated:

> Summit argues the Licensing Agreement was "facially ambiguous" because NetApp was named as an Option Company, eligible for a sublicense. The court dismisses this argument. Summit did not appear to find the License Agreement ambiguous when it readily concurred in its email that "no product sold by NetApp can be used in an infringing manner when the end user employs Microsoft's initiator software."

*Id.* at 6-7 (internal citations omitted).

Thus, the district court based its ruling in part on Summit's license agreement with RPX, and its own (incorrect) inferences as to whether Summit knew from the face of the document that its claims against NetApp might be subject to a partial license defense through the use of Microsoft "initiators."

Mr. Lee's answers to these questions are highly relevant to the issues before this Court, and the record should be supplemented to include them in the interests of justice. Specifically, page 69 of Mr. Lee's deposition transcript confirms that Summit did know know, at first, that its license to RPX granted passthrough rights that affected its claims against NetApp. As Summit will demonstrate in its later

principal brief, those rights (to Microsoft and thus to some extent to NetApp) did not spring until a particular condition subsequent occurred.

## IV.    <u>CONCLUSION</u>

Without this missing page, the record is incomplete and misleading. It should be supplemented to assist in this Court's disposition of the issues and ensure proper resolution of this case. Moreover, it would be manifestly unjust to allow NetApp to cite only half of a line of questioning and intentionally omit those portions that undercut its argument.

For the foregoing reasons, Appellant Summit Data Systems respectfully requests that the Court supplement the record to include page 69 of the deposition of Mr. Dooyong Lee.[1]

Dated: December 22, 2014                    Respectfully submitted,

                                            /s/ Robert P. Greenspoon
                                            Robert P. Greenspoon
                                            FLACHSBART & GREENSPOON, LLC
                                            333 North Michigan Avenue
                                            Chicago, Illinois 60601
                                            (312) 551-9500

                                            ATTORNEY FOR APPELLANT

---

[1] In the event this motion has not been resolved by the filing of Summit's principal brief, Summit will clearly indicate what part of its brief relies on page 69, and thus should be disregarded within its argument should this motion be denied.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that copies of the foregoing MOTION TO SUPPLEMENT THE RECORD were served upon the below-listed counsel on December 22, 14, via the Court's CM/ECF system:

Jack B. Blumenfeld
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com

Edward R. Reines
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com

Byron C. Beebe
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
byron.beebe@weil.com

/s/ Robert P. Greenspoon
Robert P. Greenspoon
FLACHSBART & GREENSPOON, LLC
333 North Michigan Avenue
Chicago, Illinois 60601
(312) 551-9500

ATTORNEYS FOR APPELLANT

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUMMIT DATA SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 10-749-GMS |
| | ) | |
| EMC CORPORATION, BUFFALO. | ) | **FILED UNDER SEAL** |
| TECHNOLOGY (USA), INC., D-LINK | ) | |
| SYSTEMS, INC., HITACHI DATA | ) | |
| SYSTEMS CORPORATION, NETAPP, | ) | |
| INC., NETGEAR INC., and QNAP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

## I.    INTRODUCTION

Plaintiff Summit Data Systems, LLC ("Summit") brought a patent infringement claim against defendant NetApp, Inc. ("NetApp") and eight other defendants alleging infringement of U.S. Patent Nos. 7,392,291 and 7,428,581 (collectively, "the asserted patents").[1] (D.I. 1.) After settling its claims and dismissing the other defendants, Summit voluntarily dismissed its remaining claims against NetApp with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2). (D.I. 234.) Before the court is NetApp's motion for attorneys' fees and costs pursuant to 35 U.S.C. § 285. (D.I. 236.) For the following reasons, the court will grant NetApp's motion and order Summit to pay attorneys' fees and costs.

---

[1] Summit also brought claims against Buffalo Technology, Inc. ("Buffalo"), D-Link Systems, Inc. ("D-Link"), EMC Corporation ("EMC"), Fujitsu America, Inc. ("Fujitsu"), Hitachi Data Systems Corporation ("Hitachi"), Infortrend Corp. ("Infortrend"), Netgear, Inc. ("Netgear"), and Qnap, Inc. ("Qnap"). (D.I. 79.) NetApp is the only remaining defendant in this action.

## II.    BACKGROUND

Acacia Research Group ("Acacia") purchased the asserted patents in February 2010.[2] (D.I. 238, Ex. 6.) Acacia is a publicly traded patent licensing company, commonly referred to as a non-practicing entity. (*Id.* Ex. 5.) Summit is a wholly owned subsidiary of Acacia and now holds title to the asserted patents. (*Id.* Ex. 3 at 13, 66.) According to Summit, its "predecessor-in-interest"—*i.e.*, Acacia—determined that several products on the market practiced one or more claims of the asserted patents. (D.I. 242 at 3.) In particular, Acacia believed that a NetApp server product, when used to form a network with a host computer running a Microsoft operating system, practiced the asserted claims. (D.I. 242 at 3-4.) After acquiring the asserted patents for itself, Summit engaged in a similar analysis and reached the same conclusion. (*Id.* at 4 n.1)

On June 28, 2010, Summit entered into an agreement ("Licensing Agreement") with RPX, a computer industry "patent aggregator" that obtains patent licenses for the benefit of its member companies. (D.I. 237, Ex. 3 at 67; Ex. 8.) By being an RPX member, companies gain access to the large number of patents held or licensed by RPX. The Licensing Agreement between Summit and RPX covered the asserted patents and provided licenses to forty-three member companies, including, notably, Microsoft. (*Id.* Ex. 8.) The Licensing Agreement also provided for a "Patent License Option," allowing RPX to exercise an option at a later time to sublicense the patents to specified "Option Companies." (*Id.*) NetApp was one of four named Option Companies. (*Id.*) At no point, however, did RPX exercise the option for NetApp.

On September 1, 2010, Summit filed this action against NetApp and seven other defendants alleging infringement of the asserted patents. (D.I. 1.) The asserted patents, both titled "Architecture for Providing Block-Level Access over a Computer Network," relate to data

---

[2] Although Acacia has held different names, for simplicity, the court will refer to the entity simply as Acacia, as its history does not materially affect the background facts.

storage systems consisting of a host computer connected by a network to a storage server. (D.I. 1; D.I. 237 at 5.) The innovation claimed in the patents is the concurrent use of multiple logical connections between the host computer and the storage server. (D.I. 237 at 5.) The accused products are storage servers that operate within the claimed network systems; because the accused products only perform a portion of the claimed system, they cannot practice the asserted claims alone, making this an issue of induced infringement. (*Id.*) Only an end-user with a host computer practicing all the claimed elements directly infringes.

Shortly after Summit filed suit, Fujitsu and Netgear both avoided litigation by joining the Licensing Agreement, which provided them with a sublicense for the asserted patents. (D.I. 66; D.I. 134; D.I. 288.) After claim construction proceedings, Summit negotiated settlements with the remaining defendants. Summit dismissed Hitachi for $60,000 (D.I. 238, Ex. 12), D-Link for $170,000 (*Id.* Ex. 13), and Buffalo for $150,000 (*Id.* Ex. 14.) After fact discovery, Summit dismissed Infortrend for $125,000 (*Id.* Ex. 15) and Qnap for $75,000 (*Id.* Ex. 16.)

On April 2, 2012, Summit for the first time disclosed the existence of the Licensing Agreement through discovery. (D.I. 242 at 5.) On October 5, 2012, NetApp informed Summit that the Licensing Agreement, according to its plain terms, licensed the asserted patents to Microsoft. (D.I. 238, Ex. 20.) As such, "no product sold by NetApp can be used in an infringing manner when the end user employs Microsoft's initiator software." (*Id.*) On October 10, 2012, Summit conceded that the Licensing Agreement precluded NetApp's infringement liability for products employing the Microsoft software: "We concur in your interpretation of the license agreement . . . ." (*Id.* Ex. 9.)

On November 9, 2012, Summit dismissed its claims against EMC with prejudice on the condition that EMC would not seek attorney's fees. (D.I. 222.) Summit also moved to dismiss

3

NetApp with prejudice "with each party to bear its own costs and attorneys' fees." (D.I. 228.) NetApp objected to Summit's motion, wishing to seek attorneys' fees under 35 U.S.C. § 285. The court subsequently granted Summit's motion to dismiss its claims against NetApp with prejudice and allowed NetApp to seek attorneys' fees. (D.I. 234.) NetApp then filed the present motion for attorneys' fees on January 29, 2013. (D.I. 236.)

## III.    STANDARD OF REVIEW

Section 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The Supreme Court recently commented on § 285 and loosened the preexisting standard for what makes a case "exceptional." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014). Under the previous standard outlined by the Federal Circuit, exceptionality could only be established in "two limited circumstances: 'when there has been some material inappropriate conduct,' or when the litigation is both 'brought in subjective bad faith' and 'objectively baseless.'" *Id.* at 1752 (quoting *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (2005)). The prevailing party also had to prove exceptionality by clear and convincing evidence. *Brooks Furniture*, 393 F.3d at 1382. In *Octane Fitness*, however, the Court rejected the Federal Circuit's "rigid" approach, stating that it "impermissibly encumbers the statutory grant of discretion to district courts." [3] *Octane Fitness*, 134 S. Ct. at 1755.

In place of the strict formulation laid out by the Federal Circuit in *Brooks Furniture*, the Supreme Court imposed a rule offering broad discretion to district courts:

---

[3] The parties' briefing was submitted prior the Supreme Court's ruling in *Octane Fitness*, and they therefore apply the old *Brooks Furniture* standard. The court applies the new rule but notes that NetApp likely would have succeeded in its motion under the more restrictive approach as well.

4

> We hold, then, that an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Id.* at 1756.

The Court drew from a copyright case to present a non-exclusive list of factors for the district courts to consider, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 1756 n.6 (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994)). "[A] case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.* at 1757.

The Supreme Court also rejected the *Brooks Furniture* "clear and convincing evidence" burden. *Id.* at 1758. "[N]othing in § 285 justifies such a high standard of proof. Section 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less such a high one. Indeed, patent-infringement litigation has always been governed by a preponderance of the evidence standard . . . ." *Id.*

## IV.    DISCUSSION

The parties do not dispute that NetApp is a prevailing party as required by § 285. The award of attorneys' fees therefore turns on whether this case is exceptional. In light of the totality of the circumstances, the court finds that it is exceptional. *See id.* at 1756.

From the outset, Summit rested its entire theory of infringement on the premise that NetApp products, when used in conjunction with Microsoft initiator software, infringed the asserted patents. Indeed, one of Acacia's motivations for acquiring the asserted patents in the

first place appears to have been its belief that NetApp's product practiced the asserted claims. (D.I. 242 at 3–4.) Throughout litigation, Summit has never been able to identify an alternative theory of infringement that did not require NetApp's products interacting with Microsoft software. (D.I. 238, Ex. 23 at 109–10).

Summit forfeited its right to pursue this theory of infringement against NetApp when it entered into the Licensing Agreement with RPX, which provided Microsoft with a license to the asserted patents. With Microsoft holding a license, direct infringement by a host computer running Microsoft's initiator software was impossible. Consequently, there could be no induced infringement claim against NetApp in this system. *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014) ("[W]here there has been no direct infringement, there can be no inducement of infringement under § 271(b).")

Nonetheless, Summit brought suit against NetApp barely two months after executing the Licensing Agreement, despite having no other evidence that NetApp's product could infringe the asserted patents in a system not running the Microsoft software. It then took Summit eighteen months to disclose the existence of the Licensing Agreement to NetApp. Throughout this entire time, Summit was still pursuing its theory of infringement against NetApp for a system employing the Microsoft software. Yet, Summit's expert testified that he was unable to determine whether NetApp products in systems running Linux or UNIX, instead of Microsoft, would infringe the asserted patents because he "didn't have time." (D.I. 238, Ex. 23 at 109–10.)

These facts alone (notwithstanding additional contentions NetApp puts forth)[4] support a finding that the case "stands out from others" and is exceptional under § 285. *See Octane Fitness*, 134 S. Ct. at 1756. Summit defends against this label on several grounds. First, Summit

---

[4] NetApp argues that Summit's infringement position was untenable in light of the stipulated claim construction and also that Summit failed to allege scienter as required for induced infringement claims. (D.I. 237 at 13–15.) The court finds it unnecessary to address whether these alleged flaws in Summit's case make it exceptional.

6

argues the Licensing Agreement was "facially ambiguous" because NetApp was named as an Option Company, eligible for a sublicense. (D.I. 242 at 7–8.) The court dismisses this argument. Summit did not appear to find the License Agreement ambiguous when it readily concurred in its email that "no product sold by NetApp can be used in an infringing manner when the end user employs Microsoft's initiator software." (D.I. 238, Ex. 9.) Moreover, Summit and Acacia are in the business of patent licensing. At best, their argument states they were careless in reading their own multi-million dollar License Agreement before embarking on a lawsuit spanning several years and costing the parties and the court countless resources.

Summit's remaining contentions can be addressed together. Summit argues that license and patent exhaustion are affirmative defenses that NetApp had the burden of proving. (D.I. 242 at 12.) Moreover, Summit argues that, given the market size, it would be "reasonable to assume" that NetApp infringes the asserted patents in some other configuration with a non-RPX member. (D.I. 242 at 11–13; D.I. 238, Ex. 21 at 7.) Although Summit states the correct rule of law, these arguments miss the point. From the moment it licensed the asserted patents to RPX and Microsoft, Summit had no basis for alleging infringement against NetApp. For over two years, Summit nonetheless proceeded on an infringement theory that rested on Microsoft's software being a necessary component. Summit cannot rely on reasonable assumptions and guesses that NetApp infringes the asserted patents in one way or another. And NetApp need not establish an affirmative defense when Summit's sole theory of infringement was unfounded.

Finally, the court finds Summit's practice of extracting settlements worth a fraction of what the case would cost to litigate supports a finding of exceptionality. No settlement with any of the other defendants was for more than $175,000. (D.I. 238, Exs. 12–16.) In EMC's case, Summit cut its losses and dismissed all claims with prejudice in exchange for EMC's release of

7

its statutory right to seek attorney's fees. The Federal Circuit has looked to "nuisance value settlements" to determine whether a case is exceptional.[5] *See Eon-Net LP v. Flagstar Bancorp*, 653 F.2d 1314, 1327–28 (Fed. Cir. 2011). In *Eon-Net*, the Federal Circuit upheld the district court's determination that a case was exceptional where a non-practicing entity plaintiff sought to extract nuisance value settlements from numerous defendants, for values less than ten percent what it would cost the defendants to litigate. *Id.* The Federal Circuit focused on the high costs for defendants to defend, the burden of complying with discovery, and the minimal risk to non-practicing entities because they have no actual products at stake. *Id.*

The court finds the reasoning in *Eon-Net* applicable here. Although Summit contends that its settlements were calculated according to the value of accused product sales, the court in *Eon-Net* faced a similar settlement payment schedule and found the focus is still on the relative costs to litigate. *Id.* Non-practicing entities like Summit and Acacia are entitled to enforce their patent rights through litigation and seek settlements and licenses. "But the appetite for licensing revenue cannot overpower a litigant's and its counsel's obligation to file cases reasonably based in law and fact and to litigate those cases in good faith." *Id.* at 1328.

The facts of this case demonstrate that Summit pursued an action against NetApp without any basis for infringement, delayed disclosing the existence of the Licensing Agreement for eighteen months, extracted settlements from co-defendants worth a fraction of what it would actually cost them to defend the lawsuit, and then voluntarily dismissed its claims with prejudice prior to the court issuing a ruling on the merits.[6] Even assuming that Summit was not acting deceptively—"double dipping" as NetApp contends—the court still finds that the factors noted

---

[5] "Subjective bad faith" and the "unreasonable manner in which the case was litigated" are both relevant factors under *Octane Fitness*, as they were under *Brooks Furniture*. *See Octane Fitness*, 134 S. Ct. at 1756 & n.6.

[6] Of course plaintiffs are free to perform their own cost-benefit analyses, and Summit's decision to voluntarily dismiss its case prior to summary judgment does not, alone, make the case exceptional. When taken together with the additional circumstances, however, Summit's conduct appears much less defensible.

in *Octane Fitness* point toward this being an exceptional case. *See Octane Fitness*, 134 S. Ct. at 1756 & n.6. The claims were frivolous—Microsoft's initiator software licensed, so no system employing it could infringe the asserted patents. Summit's motivation was to extract quick settlements that were dwarfed by the costs to litigate. Summit was objectively unreasonable in bringing a lawsuit against NetApp mere months after executing the Licensing Agreement that effectively eliminated its theory of infringement. Finally, the court is convinced that an award of attorneys' fees in this case is necessary to deter this sort of reckless and wasteful litigation in the future.

In light of the totality of the circumstances, the court finds this case to be exceptional and exercises its discretion to award attorneys' fees in favor of NetApp, pursuant to 35 U.S.C. § 285. Summit has not challenged NetApp's calculation of fees, amounting to $1,395,514.62 plus any additional expenses incurred in filing the present motion.

## V.    CONCLUSION

The totality of the circumstances supports the determination that this case is exceptional. Pursuant to 35 U.S.C. § 285, the court grants NetApp's motion for attorneys' fees and cost and orders Summit to pay $1,395,514.62 plus any additional expenses incurred in filing this motion.

Dated: September 25, 2014

UNITED STATES DISTRICT JUDGE

# Exhibit B

Confidential

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
 2

                                 )
 3    SUMMIT DATA SYSTEMS, LLC,   )
                                 )
 4       Plaintiff,              )
                                 )
 5                               ) CIVIL ACTION
      VS.                        )
 6                               ) NO.: 10-CV-749-GMS
                                 )
 7    EMC CORPORATION, BUFFALO    )
      TECHNOLOGY (USA), INC.,    )
 8    D-LINK SYSTEMS, INC.,      )
      HITACHI DATA SYSTEMS       )
 9    CORPORATION, INFORTREND    )
      CORPORATION, NETAPP,       )
10    INC., NETGEAR INC., AND    )
      QNAP, INC.,                )
11                               )
         Defendants.            )
12
13    **********************************************************
             CONFIDENTIAL ORAL AND VIDEOTAPED DEPOSITION OF
14                        DOOYONG LEE
                       APRIL 13, 2012
15    **********************************************************
16         ORAL AND VIDEOTAPED DEPOSITION OF DOOYONG LEE,
17    produced as a witness at the instance of the Defendant EMC
18    Corporation, and duly sworn, was taken in the above-styled
19    and numbered cause on Friday, April 13, 2012, from
20    9:11 a.m. to 3:29 p.m., before Tamara K. Chapman, CSR in
21    and for the State of Texas, reported by machine shorthand,
22    at the offices of Andrews & Kurth, 1717 Main Street,
23    Dallas, Texas, pursuant to the Federal Rules of Civil
24    Procedure and the provisions stated on the record or attached.
25    Job Number: 48339
```

Confidential

Page 66

1    And:  The organization identified as being the
2 company governing Summit Data Systems, LLC is Acacia
3 Patents Acquisition, LLC.
4    Do you see that?
5    A.  Yes.
6    Q.  That was accurate?  Was that accurate at the
7 time?
8    A.  Yeah.  I mean, if -- if that means Acacia Patent
9 Acquisition, LLC is the owner effectively of Summit Data
10 Systems, yes.
11    Q.  Okay.  And, now that would be replaced by Acacia
12 Research Group; is that correct?
13    A.  Yes.
14    (Exhibit 17 was marked.)
15    Q.  (BY MS. HOANG)  Marked as Lee Exhibit 17,
16 SDSL0001590 through -1593.  Do you recognize Exhibit 17?
17    A.  Yes.
18    Q.  Do you recognize this to be an assignment of the
19 patents listed in Exhibit A from Acacia Patent Acquisition
20 to Summit Data Systems, LLC in consideration for $1?
21    A.  Yes.
22    Q.  Okay.
23    MS. HOANG:  I'm going to need to pull some
24 documents, so why don't we go off the record for a little
25 bit.

Page 67

1    MR. HARRISON:  Sure.
2    THE VIDEOGRAPHER:  We're off the record at
3 11:04 a.m.
4    (Break.)
5    THE VIDEOGRAPHER:  We're back on record at
6 11:12 a.m.
7    (Exhibit 18 was marked.)
8    Q.  (BY MS. HOANG)  Marked as Lee Exhibit 18,
9 SDSL0001645 through -1684.  Do you recognize Exhibit 18,
10 Mr. Lee?
11    A.  Yes.
12    Q.  What is your understanding of what Exhibit 18 is?
13    A.  It's a patent license and license option
14 agreement between Summit Data and RPX Corporation.
15    Q.  What's your understanding of who or what RPX is?
16    A.  It's a patent aggregator where they would
17 generally aggregate patents for the benefit of their
18 members who effectively by becoming a member get a license
19 or some kind of covenant not to sue under the patents
20 owned or controlled by RPX.
21    Q.  And the patent license and license option
22 agreement of Lee Exhibit 18 -- first of all, do you agree
23 that it covers the patents listed in Exhibit A of this
24 document?
25    A.  I believe so, yes.

Page 68

1    Q.  And are the patents listed in Exhibit A of this
2 document the same as the patents listed in Exhibit A of
3 Lee Exhibit 11?
4    A.  Well, without comparing line by line, I can't
5 tell you, but from the context of this document I believe
6 that it's meant to be the same.
7    Q.  We'll just narrow it down to two, then.  If you
8 could turn to 1663.  A little more than halfway down on
9 that chart?
10    A.  Yes.
11    Q.  You'll see Patent Nos. 7,392,291 --
12    A.  Yes.
13    Q.  -- and 7,428,581.
14    A.  Yes.
15    Q.  Do you recognize those to be the patents marked
16 as Exhibits 9 and 10, i.e., the patents in suit in this
17 case?
18    A.  Yes, they are the same.
19    Q.  So at least those two patents are the subject of
20 the agreements between SDS and RPX; is that right?
21    A.  Yes.
22    Q.  Just so I have an understanding of what you said
23 earlier, an RPX member would be licensed to the patents
24 listed in Exhibit A, including the patents in suit in this
25 case; is that correct?

Page 69

1    A.  Are you asking whether this document grants RPX
2 members licenses under at least those two patents?
3    Q.  Yes.
4    A.  I'm not sure if it's a blanket license to all of
5 RPX members that -- again, without looking at the specific
6 provisions, but it's hard for me to just generalize and
7 tell you that that's what it -- that's what it covers.
8    Q.  Generally speaking, though, it's your
9 understanding that RPX members are licensed under patents
10 that RPX either owns or otherwise controls?
11    A.  They are either licensed or RPX has options to
12 license their members or select members, however they
13 operate.  But generally some variation thereof is my
14 understanding.
15    Q.  Okay.  Is this agreement still in effect as far
16 as you're aware?
17    A.  Yes.  As far as I know, yes.
18    Q.  Can you take a look at Page 1646.  It's basically
19 the second page.  Do you see a definition called "Excluded
20 Entities"?
21    A.  Yes.
22    Q.  And it lists some number of companies.  Do you
23 see that?
24    A.  Yes.
25    Q.  And over on the very next page, there is a

# Exhibit C

**Subject:** RE: NetApp/Summit - Confidential portions of the record on appeal

**Date:** Friday, December 19, 2014 at 5:04:48 PM Central Standard Time

**From:** Beebe, Byron

**To:** Robert Greenspoon

**CC:** Reines, Edward, Bryan G. Harrison, Travis Campbell

Rob –

I have attached a draft stipulation to unseal portions of the record.  Please let us know if we have your and your local counsel's authorization to finalize and file.  On the appendix issue, unless the page was part of the record before the Court, which your response does not show, we do not agree to including the page in the appendix on appeal.

Sincerely,
Byron

---

**From:** Robert Greenspoon [mailto:rpg@fg-law.com]
**Sent:** Thursday, December 18, 2014 3:08 PM
**To:** Beebe, Byron
**Cc:** Reines, Edward; Bryan G. Harrison; Travis Campbell
**Subject:** Re: NetApp/Summit - Confidential portions of the record on appeal

Byron,

You might have overlooked the reasons already stated:

"Page 68 is included, but ends with a relevant question, which is not answered until page 69."

"It is relevant because his answer to the dangling question, on the next page omitted in NetApp's filings, relates to the question of whether Summit knew that the RPX agreement automatically granted licenses to RPX members."

Thanks again for taking this under consideration. Please let me know, either way.

Regards,
Rob

---

FLACHSBART & GREENSPOON, LLC
333 NORTH MICHIGAN AVENUE, 27TH FLOOR
CHICAGO, ILLINOIS 60601
PHONE: 312-551-9500
FAX: 312-551-9501
www.fg-law.com

---

**From:** <Beebe>, Byron <byron.beebe@weil.com>
**Date:** Thursday, December 18, 2014 4:51 PM
**To:** Robert Greenspoon <rpg@fg-law.com>
**Cc:** "Reines, Edward" <edward.reines@weil.com>, "Bryan G. Harrison" <bgh@mmmlaw.com>, Travis Campbell <tc@fg-law.com>
**Subject:** RE: NetApp/Summit - Confidential portions of the record on appeal

Rob –

As I mentioned previously, that page was not part of the record before the trial court.  If you believe it was properly before the Court, please explain why.  Otherwise, we do not agree to supplement the record on appeal.  Our local counsel is reviewing our agreement to unseal portions of the record.  I'll send that to you once I have their sign-off.

Sincerely,
Byron

---

**From:** Robert Greenspoon [mailto:rpg@fg-law.com]
**Sent:** Thursday, December 18, 2014 11:27 AM
**To:** Beebe, Byron
**Cc:** Reines, Edward; Bryan G. Harrison; Travis Campbell
**Subject:** Re: NetApp/Summit - Confidential portions of the record on appeal

Byron,

I did not receive a response to my request from 6 days ago. We are preparing the appendix pool now. Do we have NetApp's consent, or will we require a motion?

Thank you.

Rob

---

**FLACHSBART & GREENSPOON, LLC**
333 NORTH MICHIGAN AVENUE, 27TH FLOOR
CHICAGO, ILLINOIS 60601
PHONE: 312-551-9500
FAX: 312-551-9501
www.fg-law.com

---

**From:** Robert Greenspoon <rpg@fg-law.com>
**Date:** Friday, December 12, 2014 4:31 PM
**To:** "Beebe, Byron" <byron.beebe@weil.com>, Katy Carlyle <kmc@fg-law.com>
**Cc:** "Reines, Edward" <edward.reines@weil.com>, "Bryan G. Harrison" <bgh@mmmlaw.com>
**Subject:** Re: NetApp/Summit - Confidential portions of the record on appeal

I think it was clear, but I should have said page 69 in my email just now.

Thanks for your patience.

---

**From:** Robert Greenspoon <rpg@fg-law.com>
**Date:** Friday, December 12, 2014 4:15 PM
**To:** "Beebe, Byron" <byron.beebe@weil.com>, Katy Carlyle <kmc@fg-law.com>
**Cc:** "Reines, Edward" <edward.reines@weil.com>, "Bryan G. Harrison" <bgh@mmmlaw.com>
**Subject:** Re: NetApp/Summit - Confidential portions of the record on appeal

Byron,

Thank you for pointing that out. I agree now that all of ECF#237 may be de-designated.

Regarding Mr. Lee's testimony, I now understand that not including page 68 for the district court to review was intentional. It is relevant because his answer to the dangling question, on the next page omitted in NetApp's filings, relates to the question of whether Summit knew that the RPX agreement automatically granted licenses to RPX members. Since we have provided this clarification, please let me know if we may have your consent.

Many thanks,
Rob

Flachsbart & Greenspoon, LLC
333 North Michigan Avenue, 27th Floor
Chicago, Illinois 60601
Phone: 312-551-9500
Fax: 312-551-9501
www.fg-law.com

**From:** <Beebe>, Byron <byron.beebe@weil.com>
**Date:** Friday, December 12, 2014 4:07 PM
**To:** Robert Greenspoon <rpg@fg-law.com>, Katy Carlyle <kmc@fg-law.com>
**Cc:** "Reines, Edward" <edward.reines@weil.com>, "Bryan G. Harrison" <bgh@mmmlaw.com>
**Subject:** RE: NetApp/Summit - Confidential portions of the record on appeal

Rob –

The settlement figures in docket 237 that you mention are all specifically referred to in the Court's public Memorandum (see page 3). We don't believe those can remain sealed. And page 69 of the Lee deposition is neither cited nor referred to in the briefing. We didn't include it in the exhibits because it wasn't relevant. We don't believe it would be appropriate to add to the trial court record for appeal.

We can draft the stipulation for the district court once we agree on the scope of documents to unseal.

Sincerely,
Byron

**From:** Robert Greenspoon [mailto:rpg@fg-law.com]
**Sent:** Friday, December 12, 2014 10:35 AM
**To:** Beebe, Byron; Katy Carlyle
**Cc:** Reines, Edward; Bryan G. Harrison
**Subject:** Re: NetApp/Summit - Confidential portions of the record on appeal

Dear Byron:

We concur except as follows.

In ECF#237, the last three lines of page 7 to the first four lines of page 8 should remain redacted. In the same document, the fifth line from the bottom of page 17 should remain redacted.

Please let me know if you would like to prepare the applicable stipulation / certification.

On a related point, we noticed that NetApp inadvertently omitted a page from the district court record: page 69 of the deposition of Summit through its designee Dooyong Lee. Page 68 is included, but ends with a relevant question, which is not answered until page 69. If you review ECF#238 and go to page 225 of the pdf file (Ex. 3), you will see. Since the remainder of the record pages from this deposition will become unsealed, we propose that page 69 go into the record unsealed as well.

Please let me know if NetApp will agree to a stipulation allowing the addition of this one page to the record. If not, please let me know when you are available to meet and confer.

Thank you.

Regards,
Rob Greenspoon

---

**Flachsbart & Greenspoon, LLC**
333 North Michigan Avenue, 27th Floor
Chicago, Illinois 60601
Phone: 312-551-9500
Fax: 312-551-9501
www.fg-law.com

---

**From:** <Beebe>, Byron <byron.beebe@weil.com>
**Date:** Friday, December 12, 2014 9:29 AM
**To:** Robert Greenspoon <rpg@fg-law.com>, Katy Carlyle <kmc@fg-law.com>
**Cc:** "Reines, Edward" <edward.reines@weil.com>
**Subject:** NetApp/Summit - Confidential portions of the record on appeal

Counsel,

As part of our obligations under Federal Circuit Rule 11(d), we have reviewed the record to determine whether any portion subject to the protective order in this case may be unsealed. The Court's Order publicly disclosed certain settlement amounts and information about Summit's RPX license which we believe should now be unsealed. In addition, it appears that multiple submissions to the District Court should not be kept under seal. As a preliminary list, we believe the following documents and exhibits should be unsealed:

| Docket/Ex. Number | Portion to unseal |
|---|---|
| 223 | All |
| 223 Ex. A | Pages 1 and 5-7 |
| 223 Exs. B & C | All |
| 236 | All |
| 237 | All |
| 238 | All |
| 238 Exs. 3, 9, and 20 | All |
| 238 Ex. 21 | Pages 1 and 5-7 |
| 242 | Page 8 (block text redaction from Shin Decl Ex. C); Page 16 |

| | (first 2 redactions only) |
|---|---|
| 243 Exs. D-G | All |
| 246 | All |
| 258 | All except for redactions to footnote 1 |

Please let us know your position on unsealing these portions of the record.

Sincerely,



**Byron Beebe**

Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
Byron.Beebe@weil.com
+1 650 802 3060 Direct
+1 650 802 3100 Fax

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# Exhibit D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUMMIT DATA SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10-749 (GMS) |
| | ) | |
| EMC CORPORATION, BUFFALO | ) | |
| TECHNOLOGY (USA), INC., D-LINK | ) | REDACTED - PUBLIC VERSION |
| SYSTEMS, INC., HITACHI DATA | ) | |
| SYSTEMS CORPORATION, | ) | |
| INFORTREND CORPORATION, NETAPP, | ) | |
| INC., NETGEAR, INC. and QNAP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## NETAPP, INC.'S OPENING BRIEF IN SUPPORT OF ITS
## MOTION FOR ATTORNEYS' FEES AND COSTS

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
mflynn@mnat.com

OF COUNSEL:

Edward R. Reines
Byron C. Beebe
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

*Attorneys for Defendant NetApp, Inc.*

Originally Filed: January 29, 2013
Redacted Version Filed: February 5, 2013

# TABLE OF CONTENTS

Page

I. NATURE AND STAGE OF THE PROCEEDINGS ........................................................1

II. SUMMARY OF ARGUMENT ...................................................................................1

III. STATEMENT OF FACTS .......................................................................................4

    A.     Prior To Filing This Case, Acacia Enters Into A Broad License With RPX Covering Dozens Of Companies ...........................................................................5

    B.     Attempting To Double-Dip, Acacia Sues Storage Equipment Makers And Later Discloses The RPX License ...........................................................................6

    C.     Even Leaving Aside Its Licensing Exhaustion Problem, Acacia's Infringement Theory Is Meritless From The Start ....................................................6

    D.     Acacia Settles Claims  For Nuisance Value ...............................................................7

    E.     Acacia's Infringement Theories Are Proven To Be Baseless...............................8

        1.     Acacia Concedes The Accused Products Are Licensed .............................8

        2.     Acacia Fails To Identify Any Unlicensed Systems That Allegedly Infringe.........................................................................................................9

        3.     Acacia's Expert Admits He Made A Big Mistake.......................................9

        4.     Acacia Attempts To Back Out Of The Litigation And Hide Its Conduct .................................................................................................10

IV. THIS IS AN EXCEPTIONAL CASE AND NETAPP SHOULD BE REIMBURSED ITS ATTORNEYS' FEES ....................................................................10

    A.     NetApp Is The Prevailing Party..............................................................................11

    B.     This Case Is Objectively Baseless ...........................................................................11

        1.     Acacia Had No Basis To Allege Infringement ..........................................11

        2.     Acacia Advanced Fatally Flawed Infringement Positions.........................13

        3.     Acacia Refused To Defend Its Litigation Positions On The Merits ..........15

    C.     Acacia's Subjective Bad Faith In Pursuing Its Claims Makes This Case Exceptional ..............................................................................................................15

        1.     Acacia Knew Or Should Have Known That Its Positions Were Unreasonable..............................................................................................16

        2.     Acacia Exploited The High Cost Of Defending Patent Claims.................17

V. NETAPP'S FEES ARE REASONABLE AND SHOULD BE AWARDED....................18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Acco Brands, Inc. v. ABA Locks Manufacturers Co.,*
    501 F.3d 1307 (Fed. Cir. 2007).................................................................16

*Eon-Net LP v. Flagstar Bancorp,*
    653 F.3d 1314 (Fed. Cir. 2011)........................................................15, 17, 18

*GlobalTech Appliances, Inc. v. SEB,*
    131 S.Ct. 2060 (2011)..........................................................................14

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.,*
    687 F.3d 1300 (Fed. Cir. 2012)..............................................10, 11, 15, 16

*Inland Steel Co. v. LTV Steel Co.,*
    364 F.3d 1318 (Fed. Cir. 2004).................................................................11

*MarcTec, LLC v. Johnson & Johnson,*
    664 F.3d 907 (Fed. Cir. 2012)....................................................10, 14, 17

*Mathis v. Spears,*
    857 F.2d 749 (Fed. Cir. 1988).................................................................18

*Met-Coil Sys. Corp. v. Korners Unlimited, Inc.,*
    803 F.2d 684 (Fed. Cir. 1986).................................................................11

*Micromesh Technology Corp. v. American Recreation Products, Inc.,*
    2007 WL 2501783 (N.D. Cal., Aug. 30, 2007) ..........................................5

*Ohio Willow Wood Co. v. Thermo-Ply, Inc.,*
    629 F.3d 1374 (Fed. Cir. 2011) (Moore, J., concurring) .........................7

*PSC Inc. v. Symbol Techs., Inc.,*
    26 F.Supp.2d 505 (W.D.N.Y. 1998) .......................................................16

*Raylon, LLC v. Complus Data Innovations, Inc.,*
    700 F.3d 1361 (Fed. Cir. 2012)................................................10, 14, 15

*Takeda Chemical Industries, Ltd. v. Mylan Labs., Inc.,*
    549 F.3d 1381 (Fed. Cir. 2008).................................................................19

*Teleconference Sys. v. Proctor & Gamble Pharm., Inc.,*
    676 F.Supp.2d 321 (D.Del. 2009) ............................................................4

**Statutes**

35 U.S.C. § 285 .................................................................................................................1, 10, 18

**Other Authorities**

Federal Rule of Civil Procedure 11 ...............................................................................10

Federal Rule of Civil Procedure 54(d) ............................................................................1

LR 54.1(c) .........................................................................................................................11

I.    **NATURE AND STAGE OF THE PROCEEDINGS**

Pursuant to 35 U.S.C. § 285 and Federal Rule of Civil Procedure 54(d), and pursuant to this Court's January 17, 2013 Order authorizing the filing of this motion (D.I. 235), defendant NetApp, Inc. ("NetApp") moves for a declaration that this is an exceptional case and an award of attorneys' fees and costs against plaintiff Summit Data Systems ("Summit"), a subsidiary and agent of Acacia Research Group (collectively "Acacia"[1]).  Acacia dismissed its patent infringement claims with prejudice in the face of NetApp's request for leave to file a motion for summary judgment.   (D.I. 230, 235).

II.   **SUMMARY OF ARGUMENT**

This is an exceptional case in which Acacia abused the legal system and inflicted undue litigation expenses upon NetApp, among others.  Those expenses should be reimbursed.  This situation results entirely from Acacia's blatant attempt to double dip by seeking litigation settlements for *already*-licensed products and to insulate its meritless claims from scrutiny by a pattern of squeezing defendants into nuisance settlements.

Before it filed this suit, Acacia licensed the patents-in-suit in one mass license to 43 major computer companies through an intermediary, RPX.  The plain terms of the RPX license ensure that every computer system that includes, for example, Microsoft software **REDACTED**

**REDACTED**                 is licensed – not to mention the products of 40 other major companies such as           **REDACTED**            The full roster of licensees are attached to this brief as Appendix A.  When Acacia served its expert report, after substantial discovery and nearly two years of litigation, it based its infringement theory on use of a Microsoft feature that

---

[1]      Because Summit is merely an Acacia vehicle for enforcement of the patents-in-suit, Acacia and Summit are referred to collectively as "Acacia", unless there is a specific need to separately refer to Summit as a distinct (albeit controlled) entity.

supposedly implemented the inventive feature of multiple logical connections.  When NetApp pointed out that the Microsoft technology was licensed, Acacia admitted that it was wrong to accuse computer systems with Microsoft products, but said that it would address the issue in its rebuttal report.  The subsequent expert report did not include evidence of any unlicensed system, however, as Acacia's own expert subsequently admitted.  There simply is no unlicensed system with allegedly infringing technology that has been identified – despite a full opportunity for Acacia to perform discovery.

Acacia tries to explain its improper double-dipping attempt with two excuses.  First, it claims that the scope of the RPX license resulted from some unexplained "mutual mistake" between it and RPX.  This is implausible, particularly because this multi-million dollar license was drafted and heavily negotiated by two public companies whose core expertise includes drafting licenses.  Even after admitting the scope of the RPX license, Acacia continued to maintain this suit until it was faced with NetApp's summary judgment request, inflicting additional inexcusable litigation expense on NetApp.  Second, Acacia argues that the burden is on NetApp to show that the allegedly infringing systems in its expert reports are licensed.  Even if that were correct, there are no actual systems identified in Acacia's expert report other than those with Microsoft software – which is admittedly licensed.

In addition, Acacia never had a viable infringement claim against NetApp.  The claims of the patents-in-suit require that the storage system does *not* use a "central file manager." Acacia originally denied there was any such limitation, but ultimately acknowledged it during the claim construction process.  NetApp's products unquestionably *use* a central file manager. Perhaps worse, there is absolutely no evidence that NetApp acted with the wrongful intent required for Acacia to prove inducement of infringement (the only claim in the case).  Given the

absence of merit to this case, there could not have been culpable purpose and none has been shown.

So why would Acacia assert these patents against so many companies if they were already licensed and not infringed?  Because Acacia knows that if it offers nuisance value settlements, in general, defendants facing the high cost of patent litigation will settle.   And that is what it did here, settling with six of the defendants for less than **REDACTED**   but bringing in nearly **REDACTED**   After two companies (NetApp and EMC) called Acacia's bluff by taking the matter all the way to expert discovery, when Acacia would have to prove its case to the Court, Acacia offered to dismiss the claims with prejudice at no cost as long as these last two parties would waive their right to seek fees and costs.   With litigation costs escalating as the case moved towards the trial phase, EMC ultimately succumbed to this offer.   NetApp did not. After NetApp submitted its summary judgment showing to this Court, Acacia chose not to respond, but unilaterally dismissed its case with prejudice, implicitly acknowledging its lack of merit.

Given the huge caseload of this Court, it would not be reasonable to expect it to systematically weed out meritless cases in the early stages through summary judgment.  This creates an environment where parties with meritless claims can use the cost of defense to pressure nuisance settlements.  To discourage such misuse of this Court, a party such as NetApp should be reimbursed for its litigation expense when it refuses to accede to meritless claims and a nuisance value settlement strategy by pursuing a meritless case to the summary judgment phase. Otherwise, there is little to keep the system in balance and to prevent parties such as Acacia from exploiting this Court's processes.

In sum, this is an exceptional case and NetApp should be reimbursed for the unnecessary litigation expenses it incurred standing up to Acacia.

## III.  STATEMENT OF FACTS

Acacia Research Group created Summit shortly before it initiated this case.  Summit was formed as a tool for the express purpose of extracting, through litigation, licensing revenue on the Acacia patents bought from a failed company, AMCC.  *See* Ex. 3[2] (April 13, 2012, 30(b)(6) Deposition of Dooyong Lee at 13:15-20); Ex. 4 (July 13,  2012 email from B. Harrison to B. Beebe).

Acacia operates through its made-for-litigation subsidiaries, such as Summit, tasked with monetizing Acacia patents, often through litigation – most of which settles outside of court.  Ex. 5 (2011 Acacia 10K at 4).  Acacia runs its subsidiaries out of its headquarters.  *See, e.g., Teleconference Sys. v. Proctor & Gamble Pharm., Inc.*, 676 F.Supp.2d 321, 332 (D.Del. 2009) ("Acacia, the patent and licensing company that collaborated with Margalla to enforce Margalla's patent against Cisco and its customers, is based in Newport Beach, California. Further, discovery has revealed that **plaintiff's senior officers are located in Acacia's California office, and that plaintiff's business is run out of the office**.") (emphasis supplied).  Acacia is a sophisticated licensing and litigation machine.  It has over 200 separate patent portfolios.  And it has executed over 1000 license agreements. Ex. 5 at 4. Reliance on heavy-handed litigation and below cost-of-defense settlements as a business model has resulted in problems for Acacia, however.  For example, it has been found that Acacia will engage in inadequate pre-suit investigations, rely upon one-size-fits-all infringement charts, and hide its lack of investigation behind improper claims of privilege.  These actions and Acacia's "shake-down approach to licensing

---

[2] Exhibits are to the Declaration of Edward Reines submitted herewith.

negotiations" have resulted in sanctions. *Micromesh Technology Corp. v. American Recreation Products, Inc.*, 2007 WL 2501783 at *3-8 (N.D. Cal., Aug. 30, 2007) (finding case exceptional and awarding attorneys' fees against an Acacia subsidiary).

Acacia asserted two patents here: United States patents 7,392,291 and 7,428,581 (collectively the "asserted patents"). These patents relate to storage systems including a host computer and storage server, connected by a network and operating over multiple logical connections. The supposed innovation is the concurrent use of multiple logical connections between the host and storage server. The accused NetApp products are allegedly storage servers in the claimed networks and thus could not practice the asserted claims alone, making this purely an induced infringement case.

### A. Prior To Filing This Case, Acacia Enters Into A Broad License With RPX Covering Dozens Of Companies

Acacia bought the asserted patents in February 2010. Ex. 6 (SDSL000024). In March, Acacia licensed those patents to REDACTED . In June, Acacia licensed them on a massive scale to RPX. Ex. 7 (SDSL0005146); Ex. 8 (SDSL0001645). RPX is an entity that obtains patent licenses for its membership, which includes much of the computer industry. The RPX agreement granted licenses to 43 companies, including Microsoft, REDACTED Ex. 8 at SDSL0001679; Ex. 3 (Lee Deposition at 67:12-20). These licenses expressly included all forms of indirect infringement involving any product of the licensed company. Ex. 8 at SDSL0001646. Thus, when one of the 43 RPX companies makes a product that is used in a network practicing the asserted patents, the entire system is licensed, as Acacia readily admits. Indeed, Acacia admitted that, under the RPX license, Microsoft products were licensed - making all the networks which included Microsoft products fully licensed. Ex. 9 (October 10, 2012 email from B. Harrison to B. Beebe).

Accordingly, prior to filing suit, Acacia had already broadly licensed the asserted patents

in a manner that would cover essentially all storage networks.   To be fully licensed, a storage

network would only need to include Microsoft software,                **REDACTED**

**REDACTED**   (*or* a component from one of the other 40 companies specified in the RPX license).

### B.   Attempting To Double-Dip, Acacia Sues Storage Equipment Makers And Later Discloses The RPX License

On September 1, 2010, after it had broadly licensed its patent, Acacia filed a complaint

against eight makers of storage equipment Buffalo Technology (USA), Inc. ("Buffalo"), D-Link

Systems, Inc. ("D-Link"), EMC Corporation, ("EMC"), Fujitsu America, Inc. ("Fujitsu"),

Infortrend Corporation ("Infortrend"), Netgear, Inc. ("Netgear"), Qnap, Inc., ("Qnap"), and

NetApp. (D.I. 1).   Acacia calculated that it could sue the storage device makers and collect

below cost of defense settlements, notwithstanding that the networks in which their equipment

would be used were already licensed under the confidential RPX agreement.   Although Acacia

brought the case in September 2010, it did not disclose the RPX settlement to the defendants

until April 2012.  It was marked as confidential under the Protective Order.

### C.   Even Leaving Aside Its Licensing Exhaustion Problem, Acacia's Infringement Theory Is Meritless From The Start

From the start, a central dispute in this case was whether the patents-in-suit could cover

storage devices that use a "central file manager."   NetApp's devices are famous for their

proprietary WAFL central file manager.  Accordingly, one of the parties' core claim construction

disputes involved whether the key claim term "storage server" was limited to servers that *did not*

*use* a central file manager or whether, as Acacia proposed, there was no such limitation at all.

(D.I. 127 at 2 ("'storage server': 'a device or computer system that receives, stores, and provides

data'")).  Acacia disputed that any limitations on the storage server were required.  (D.I. 130 at

3).  During the claim construction process, however, Acacia finally agreed that the storage server

6

must operate "without the use of a central file manager" and the Court adopted that construction. (D.I. 152 at 2).

Conceding that a storage server must operate *without* the use of a central file manager doomed Acacia's infringement case against NetApp. As NetApp explained in requesting leave to move for summary judgment, Acacia's infringement expert conceded, as he had to, that NetApp's filers have a central file manager in WAFL and that this proprietary central file manager is used identically in all data storage situations. (D.I. 223 at 4). Further, Acacia's expert conceded that no system implementing "NAS" capabilities, as all NetApp filers do, qualifies as a storage server under the court's construction. (D.I. 223 at 4).

Acacia was aware of this problem from much earlier in the case. In April 2012, NetApp reminded Acacia that no NetApp product operated without the use of a central file manager. Ex. 10 (April 4, 2012 email from B. Beebe to B. Harrison). And in May, NetApp reminded Acacia that the Court's construction "exclude[s] all NetApp products." Ex. 11 (May 14, 2012 email from B. Beebe to B. Harrison). Acacia never responded to either of these notices.

### D.  Acacia Settles Claims For Nuisance Value

After claim construction, but before producing any documents, Acacia began aggressively entering into nuisance value settlements. The high cost of patent litigation is well known. *Ohio Willow Wood Co. v. Thermo-Ply, Inc.*, 629 F.3d 1374, 1376-77 (Fed. Cir. 2011) (Moore, J., concurring) ("Patent litigations are among the longest, most time-consuming types of civil actions. . . . Moreover, the costs of patent litigation are enormous with an average patent case costing upwards of $3 million for each side.").

Acacia dismissed Hitachi for REDACTED (D.I. 149; Ex. 12 (SDSL0001714), D-Link for REDACTED (D.I. 151; Ex. 13 (SDSL0001701), and Buffalo for REDACTED (D.I. 167; Ex. 14 (SDSL0001690). Two additional defendants held out until near the close of fact discovery.

Acacia dismissed Infortrend then for ~~REDACTED~~ (D.I. 206; Ex. 15 (SDSL0005170) and Qnap for **REDACTED** (D.I. 213; Ex. 16 (SDSL0012249). By expert discovery, only NetApp and EMC remained.[3] Each of the other defendants had been dismissed for less than ~~REDACTED~~ or for free by joining RPX, far less than any reasonable cost of litigation.

As the case proceeded toward trial, EMC, which apparently refused to pay any nuisance money, was dismissed from the case for free on the condition that it would not seek fees and costs. (D.I. 232 at 2 n.1; D.I. 222). NetApp was offered the same deal, but refused because it was determined to seek reimbursement of its fees and costs.

### E. Acacia's Infringement Theories Are Proven To Be Baseless

Acacia served its opening expert report on infringement on August 31, 2012. For the first time in this case, Acacia meaningfully identified its infringement theory. Acacia's expert claimed that NetApp induced infringement by encouraging the use of systems "using the iSCSI protocol and MCS form of multiple connections." Ex. 19 (August 31, 2012 Report of Myron Zimmerman at 21). This was the first time Microsoft's MCS technology was identified as the accused functionality and the first time Acacia identified any functionality related to the creation of multiple logical connections. Importantly, Microsoft's MCS software feature was the only accused technology identified by Acacia. Ex. 19 (August 31, 2012 Report of Myron Zimmerman at 11).

#### 1. Acacia Concedes The Accused Products Are Licensed

Upon receipt of Acacia's expert report, NetApp immediately objected that Acacia was attempting to double dip by collecting royalties on already licensed products. Ex. 20 (October 5, 2012 email from B. Beebe to B. Harrison). NetApp identified the Microsoft license under the

---

[3] Defendants Fujitsu and Netgear both avoided litigation by joining RPX, thereby paying nothing directly to Acacia. Ex. 17 (SDSL0001631); Ex. 18 (SDSL00001628).

RPX agreement and explained that no product sold by NetApp can infringe when using Microsoft software because Acacia's rights are exhausted and impliedly licensed based on Microsoft's RPX license. Ex. 20. Acacia acknowledged this problem, stating that "[w]e concur in your interpretation of the license agreement" and promising that the issue would be addressed in "future expert report(s)." Ex. 9 (October 10, 2012 email from B. Harrison to B. Beebe).

        2.    <u>Acacia Fails To Identify Any Unlicensed Systems That Allegedly Infringe</u>

Acacia's "future expert reports" failed to identify a single unlicensed system. In a seven-page supplemental report, Acacia spent only two pages addressing its mistake in accusing licensed systems. In its scramble to claim that someone, somewhere infringes the asserted patents using a NetApp filer, Acacia pointed to its infringement contentions, containing the results of its supposed pre-suit investigation. Ex. 21 (October 12, 2012 Report of Myron Zimmerman at 5). Acacia's supplemental report failed to note that the host computer in the infringement contentions was again running Microsoft Windows, and was thus also licensed. Ex. 22 (April 12, 2012 Responses and Objections to NetApp, Inc.'s First Set of Interrogatories (Nos. 1-6)); Ex. 23 (November 14, 2012 Deposition of Myron Zimmerman at 26:5-12).

No actual infringing system was identified, and no use of software, other than the Microsoft Initiator for utilizing MCS, was ever alleged to infringe with evidence.

        3.    <u>Acacia's Expert Admits He Made A Big Mistake</u>

Acacia's expert admitted at his deposition that he made a "big mistake" by not inquiring into the licensing issues that precluded infringement. Ex. 23 (Zimmerman Deposition at 86:9-14). And, despite Acacia's hand-waving claims that someone must infringe, its expert admitted that, even after being notified of the Microsoft license, he made no attempt to analyze any other system for infringement. Ex. 23 (Zimmerman Deposition at 103:10-20; 109:16-24).

9

4. <u>Acacia Attempts To Back Out Of The Litigation And Hide Its Conduct</u>

Knowing that its expert could not defend its positions, Acacia attempted to back out of the litigation. As noted, Acacia walked away from its claims against EMC, dismissing them with prejudice on November 9, 2012, shortly before the deposition of its expert. (D.I. 222).

NetApp, refusing to abandon its fee claim, sought leave to move for summary judgment pursuant to the Court's scheduling order. (D.I. 223). When Acacia's response to NetApp's request to file for summary judgment came due, on December 14, 2012, Acacia had no answer. Instead it moved to dismiss its own infringement claims with prejudice, but it silently included an unsupported provision in its form of order that NetApp would be precluded from seeking fees and costs. (D.I. 228). NetApp promptly responded, informing the Court of what Acacia was attempting to do. (D.I. 229). In a telephonic hearing on January 10, 2013, the Court resolved the issue, clearly confirming that Acacia's claims would be dismissed with prejudice and that NetApp would have its statutory right to seek its fees and costs.

## IV.   THIS IS AN EXCEPTIONAL CASE AND NETAPP SHOULD BE REIMBURSED ITS ATTORNEYS' FEES

Pursuant to 35 U.S.C. § 285, a "court in exceptional cases may award reasonable attorney fees to the prevailing party." A case is exceptional where there is litigation misconduct or where it is shown both that "(1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1370 (Fed. Cir. 2012). Examples include cases with "misconduct during the litigation, vexatious or unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like infractions." *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 916 (Fed. Cir. 2012).

A case is objectively unreasonable when "no reasonable litigant could reasonably expect success on the merits." *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1309

10

(Fed. Cir. 2012). It is subjectively unreasonable when the "lack of objective foundation for the claim 'was either known or so obvious that it should have been known.'" *Id.* Both inquiries consider the full scope of the litigation, not just what was known at the time of filing, to determine whether the case as a whole is exceptional. *Id.* at 1310-11.

As demonstrated below, this case is exceptional such that the prevailing party, NetApp, should be reimbursed for its fees and costs. Acacia's case is baseless for two independent reasons. First, Acacia was unable to identify even one unlicensed accused system. Second, Acacia never had a viable infringement theory. In addition, Acacia's attempt to double-dip and to extract nuisance value settlements confirms this case was litigated in bad faith.

### A.    NetApp Is The Prevailing Party

Acacia's patent infringement claim against NetApp has been dismissed with prejudice at its request, with the condition that NetApp is authorized by this Court to file this motion seeking fees and costs. (D.I. 235). *See Inland Steel Co. v. LTV Steel Co.*, 364 F.3d 1318, 1320-21 (Fed. Cir. 2004). This Court's Local Rules confirm NetApp's "prevailing party" status, explaining that the "defendant is the prevailing party upon a dismissal or summary judgment or other termination of the case without judgment for the plaintiff on the merits." D.Del. LR 54.1(c).

### B.    This Case Is Objectively Baseless

This case has been objectively baseless from the moment it was filed. Despite two years of litigation, extensive discovery, and multiple expert reports, Acacia has not identified a single system to accuse that was not licensed before this litigation began, nor has it had a viable infringement theory.

#### 1.    Acacia Had No Basis To Allege Infringement

It is axiomatic that to prove induced infringement, there must be at least one example of direct infringement. *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed.

11

Cir. 1986) ("Absent direct infringement of the patent claims, there can be neither contributory infringement nor inducement of infringement.") (citations omitted). Acacia's infringement contentions, consisting of the complete results of its pre-suit investigation, relied on a system using a host computer running *Microsoft* software. Ex. 23 (Zimmerman Deposition at 88:16-21). Likewise, Acacia's expert reports accused only systems running *Microsoft* software. Ex. 23 (Zimmerman Deposition at 71:21-24); Ex. 19 (August 31, 2012 Report of Myron Zimmerman at 11, 21). These systems were licensed before Acacia filed suit.

Despite these facts, Acacia's expert admitted in deposition that he never investigated whether any other system practiced the asserted patents, even after being informed that his entire theory of infringement was predicated on licensed activity. Ex. 23 (Zimmerman Deposition at 103:10-20; 109:16-24). Acacia's expert also admitted that he made a "big mistake" by asserting that licensed systems infringed in his original report and failing to ask if others were licensed. Ex. 23 (Zimmerman Deposition at 86:9-14 ("Q Did you ask Summit, did you say are there any other licenses I need to worry about since I already made a big mistake? A I should have. Q But you didn't do that, did you? A Right.")) Because so many network components were licensed, Summit's expert also admitted he was **unable to find any infringing system** involving NetApp equipment:

> Q But you're definitely not aware of any actual system that -- for which NetApp induced infringement, any actual configuration?
> A I have not run tests myself.
> Q But forget the run tests. All your analysis, with all the discovery that you get in a federal case, anything on the Internet, you've never been able to find one system in NetApp that is an infringing system?
> A I have not done that analysis.

Ex. 23 (Zimmerman Deposition at 109:16-24; *see also* 103:10-20 (admitting there is no evidence

regarding UNIX and Linux systems).  When pressed on why he failed to identify an infringing

system, Summit's expert claimed as an excuse that he ran out of time:

> Q And then the reason why you couldn't put in an opinion on UNIX or Linux that
> had the evidentiary support in your reply was it came up at the last minute and
> you just didn't have time? I think that's what you said.
> A Yeah, I did -- I did not perform that analysis.
> Q And that's because you didn't have time?
> A It was -- yeah, I didn't have time.

Ex. 23 (Zimmerman Deposition at 110:7-15).  To attempt to backfill, Acacia has half-heartedly

suggested there may be some system somewhere, running UNIX or Linux, that does not include

equipment from the 40 plus RPX licensees.  As the testimony from Acacia's expert above

proves, he had no such UNIX or Linux opinion.  Moreover, Acacia hid the factual testing

evidence underlying its infringement contentions as privileged and withheld its theories

generally until filing its expert reports.  Ex. 24 (June 6, 2012 Deposition of Fahim Aftab at

111:2-10).  At the time it filed this lawsuit, Acacia was aware of no infringing use and, despite

substantial discovery, never found one.  Its pre-suit investigation was thus improper and its

litigation conduct vexatious.

### 2.   Acacia Advanced Fatally Flawed Infringement Positions

NetApp's products are well-known for their WAFL file system, which is a central file

manager.  Although Acacia initially denied that the claims were limited to systems which do not

use a central file manager, during the claim construction process, it abandoned that unsupported

position.  Specifically, Acacia conceded that a "storage server" must "operate without the use of

a central file manager." (D.I. 152 at 2).  Acacia's technical expert conceded that none of

NetApp's filers operated without the use of a central file manager.; Ex. 23 (Zimmerman

Deposition at 39:22-40:2) ("Q Okay.  I am – right now I'm just talking about the NAS

implementation you don't dispute that WAFL includes a central file manager, in the NAS aspect? A Correct."); 43:5-14 ("Q And you understand that in terms of how the NetApp accused products work, that they use WAFL whether they're in a SAN mode or a NAS mode? A They're using the same underlying capability, yes. Q Right. And they're using – when you say 'the same underlying capability,' they're using root inode, inode files, regular file and direct blocks, regular file data blocks? A Correct.")). Yet Acacia pressed on by straining to re-construe the settled claim term in order to argue that the storage server can somehow be segregated into practicing and non-practicing halves. It did so even though its expert never identified any teaching in the patents, or actual, existing NetApp software that would support this theory. Ex. 21 (October 12, 2012 Report of Myron Zimmerman at 3-4). The pursuit of objectively baseless infringement claims, through improper claim construction arguments and unreliable expert testimony, marks an exceptional case. *MarcTec*, 664 F.3d at 918-19. Moreover, Acacia's concession as to the meaning of the claim term confirms that "no reasonable litigant could believe [Acacia's argument] would succeed." *Raylon*, 700 F.3d at 1368.

On top of this, Acacia had no way to prove that NetApp possessed the necessary bad intent required to prove inducement; especially given the baseless nature of the infringement theory. *GlobalTech Appliances, Inc. v. SEB*, 131 S.Ct. 2060, 2068 (2011) ("Accordingly, we now hold that induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement."). Acacia argues that NetApp's purpose to cause patent infringement can be demonstrated merely by providing customers with user documents prepared before knowing the patents that, if followed, may result in infringement. (D.I. 232 at 8-9). This position simply ignores the holding in *GlobalTech* that there must be a culpable purpose to encourage the breaking of the patent law that exceeds recklessness. *GlobalTech*, 131 S.Ct. at

14

2070. Acacia has not cited and cannot find any evidence to support its claim of induced infringement.

### 3. Acacia Refused To Defend Its Litigation Positions On The Merits

As soon as permitted by the Court's Scheduling Order, NetApp requested leave to seek summary judgment on three issues: (1) Acacia's efforts to obtain damages on previously licensed products; (2) its failure to demonstrate infringement under the Court's construction of "storage server;" and (3) its inability to show the bad purpose necessary to prove induced infringement. (D.I. 223). Obligated to explain to this Court the basis for its positions, Acacia instead conceded its case by moving to dismiss its claims with prejudice, rather than responding to the summary judgment request. (D.I. 228). Acacia abdicated its chance to respond on the merits, which on this record effectively concedes that its position was meritless

### C. Acacia's Subjective Bad Faith In Pursuing Its Claims Makes This Case Exceptional

Acacia's conduct exemplifies bad faith litigation. Bad faith exists when the unreasonableness of the asserted claims is "either known or so obvious that it should have been known" by the patentee. *Highmark*, 687 F.3d at 1312. It has been described as "closely aligned with a finding of unfairness" and noted that "it is unreasonable minds that go to extraordinary lengths to conjure and advance through various stages of a legal proceeding unsupported arguments that are also inconsistent with established precedent in order to accuse non-infringing devices." *Raylon*, 700 F.3d at 1374 (Reyna, J., concurring). And it exists when a party is found "exploiting the high cost to defend complex litigation to extract a nuisance value settlement." *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1327 (Fed. Cir. 2011).

1.  Acacia Knew Or Should Have Known That Its Positions Were
    Unreasonable

Acacia knew of the RPX license, having negotiated and signed the agreement. Yet, Acacia accused and collected settlements on licensed products. And it accused NetApp of infringement by use of licensed Microsoft software. Acacia is a sophisticated public company. A central function of its business is to negotiate and draft exactly these kinds of agreements. Acacia implausibly suggests that there was some unidentified "mutual mistake" that caused it not to know the scope of the license it had granted to RPX's membership. (DI 232 at 2). As demonstrated above, Acacia's expert had two opportunities to identify an infringing system, but failed to do so. The willful collection of settlement payments on licensed products and decision to proceed in light of such obvious facts demonstrates bad faith and renders this case exceptional. *Highmark*, 687 F.3d at 1312-13; *PSC Inc. v. Symbol Techs., Inc.*, 26 F.Supp.2d 505, 511 (W.D.N.Y. 1998) (finding attempts to collect double royalties constitute patent misuse).

Acacia has attempted to justify its actions by arguing that the Microsoft license covers "slightly less than 50% of the market" and thus "does not leave . . . Summit with no basis upon which to proceed to trial." (D.I. 232 at 2). Putting aside that Acacia licensed not only Microsoft, but 42 other companies, and that Acacia never identified a single instance of direct infringement, its argument resolves to the claim that a broad market survey shows there must be infringement. This argument has been rejected both substantively, *Acco Brands, Inc. v. ABA Locks Manufacturers Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007), and as an excuse for an objectively unreasonable position. *Highmark*, 687 F.3d at 1313. Moreover, Acacia's expert admitted that he could not identify any unlicensed system. Ex. 23 (Zimmerman Deposition at 84:10-23) ("Q Right. So basically you have no idea whether there's a NetApp system out there that's an infringing configuration, isn't that right, if you're going to be honest about it? A Well, I've –

16

MR. HOSKYN: Object to form. THE WITNESS – not done any analysis so I'm not sure how to answer that."); 109:16-24 (Q But you're definitely not aware of any actual system that – for which NetApp induced infringement, any actual configuration? A I have not run tests myself. Q But forget the run tests. All your analysis, with all the discovery that you get in a federal case, anything on the Internet, you've never been able to find one system in NetApp that is an infringing system? A I have not done that analysis.").

In addition to engaging in improper licensing activities, Acacia pursued an infringement theory it knew to be unreasonable. After originally contending that the use of a central file manager was not relevant to the meaning of a "storage server," Summit ultimately stipulated to a construction that precluded it from proving infringement. (D.I. 152 at 2). Yet, even after it was informed that NetApp's well-known use of WAFL in all of its products excluded them from infringing, Summit refused to acknowledge the flaws in its case, choosing instead to argue a new and unsupported analysis of the construction. (D.I. 232 at 7); *MarcTec*, 664 F.3d at 920 (finding litigation misconduct based in part on the plaintiff's "decision to advance frivolous and unsupported allegations of infringement premised on mischaracterizations of the claim constructions adopted by the trial court").

Finally, although Acacia styled this an inducement case, it never had proof of the necessary bad purpose -- nor any reason to believe it would be able to prove it.

### 2. Acacia Exploited The High Cost Of Defending Patent Claims

Acacia's settlements in this case ranged between **REDACTED** EMC was dismissed on Acacia's heavy-handed condition that EMC drop its request for reimbursement of fees and costs. Acacia's tactics caused NetApp to spend over $1,000,000 in its defense while Acacia regularly settled for less than *REDACTED* of the likely litigation costs. Such nuisance settlements are a signpost of the exact conduct found by the Federal Circuit to evidence bad

17

faith. *Eon-Net*, 653 F.3d at 1327 ("Thus, those low settlement offers – less than ten percent of the cost that [the defendant] expended to defend suit – effectively ensured that [the plaintiff's] baseless infringement allegations remained unexposed, allowing [plaintiff] to continue to collect additional nuisance value settlements.").

Indeed, this case shares many similarities with *Eon-Net*, where the Federal Court found that regular settlements for nuisance value showed bad faith. Here, as there, Acacia is a non-practicing entity, immune to most counterclaims and bearing little business risk in litigation. *Id.* at 1327-28. Here, as there, Acacia imposed disproportionate costs on NetApp by expanding the scope of discovery with little reciprocal risk. *Id.* at 1327. And here, as there, Acacia runs volume operations, filing against many defendants and settling for small sums. *Id.* at 1327. Thus, this case, with its untenable merits and small settlements, has the same "indicia of extortion" found in *Eon-Net* which warrants relief. *Id.* at 1326.

## V. NETAPP'S FEES ARE REASONABLE AND SHOULD BE AWARDED

"The methodology of assessing a reasonable award under 35 U.S.C. § 285 is within the discretion of the district court." *Mathis v. Spears*, 857 F.2d 749, 754 (Fed. Cir. 1988) (*citing Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1068 (Fed. Cir. 1983)). Where a prevailing party "has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation." Id. at 755 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) (internal quotation marks omitted)).

In this case, as detailed above, NetApp has uncovered a flawed and baseless litigation that should never have been filed and certainly never should have required a request for summary judgment to conclude. Indeed, this case has the indicia of an exceptional case: a non-practicing entity that litigates for nuisance value settlements; denial of critical facts that should terminate the litigation but are ignored, thus driving up litigation costs; improper licensing

18

activities through double-dipping on previously licensed products; and attempts to hide these actions.

NetApp therefore requests the Court enter an order requiring Acacia to reimburse NetApp for its reasonable attorneys' fees in the amount of $1,160,621.95, plus those fees incurred and paid by NetApp through the conclusion of this motion. Decl. of E. Reines at ¶ 5-6, 10-15. Because Acacia's litigation was unfounded from the start, the full scope of NetApp's fees was necessarily and reasonably incurred in the defense of this action and this case was handled with appropriate diligence and concern for costs and efficiencies. Decl. of E. Reines at ¶ 8. In addition, the billing rates charged are reasonable for patent litigation counsel in Delaware and nationally. Decl. of E. Reines at ¶ 16. In fact, due to the efforts of the joint defense group, the total fees incurred on behalf of NetApp are significantly below the average fees necessary to litigate a case of this nature through expert discovery over the course of more than two years. Decl. of E. Reines at ¶ 8.

In addition, NetApp incurred $234,892.67 in expert costs. Decl. of E. Reines at ¶ 7. Such costs may be awarded pursuant to the Court's inherent authority when there has been an abuse of the judicial process. *Takeda Chemical Industries, Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008) (explaining that "courts may use sanctions in cases involving bad faith that cannot be otherwise reached by rules or statutes"). In light of Summit's conduct in this matter, the award of these costs is appropriate to fully compensate NetApp for the undue expense of litigating a baseless and vexatious case.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B Blumenfeld*

_____

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
mflynn@mnat.com

*Attorneys for Defendant NetApp, Inc.*

OF COUNSEL:

Edward R. Reines
Byron C. Beebe
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

January 29, 2013

6975613

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 5, 2013, I caused the foregoing to be

electronically filed with the Clerk of the Court using CM/ECF, which will send notification of

such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on

February 5, 2013, upon the following in the manner indicated:

Neal C. Belgam, Esquire                          *VIA ELECTRONIC MAIL*
Melissa N. Donimirski, Esquire
PROCTOR HEYMAN, LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
*Attorneys for Plaintiff*

Bryan G. Harrison, Esquire                       *VIA ELECTRONIC MAIL*
John P. Fry, Esquire
W. Andrew McNeil, Esquire
MORRIS, MANNING & MARTIN, LLP
1600 Peachtree Road, N.E.
Atlanta, GA 30326
*Attorneys for Plaintiff*

/s/ *Michael J. Flynn*

_____
Michael J. Flynn (#5333)