2013–1446

---

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

Essociate, Inc.,

*Plaintiff–Appellant,*

*v.*

Azoogle.com, Inc., Epic Media Group, Inc.,
and Social Assets, LLC (doing business as Kinetic Social),

*Defendants–Appellees.*

---

Appeal from the United States District Court for the Western District of
Wisconsin in case no. 11-cv-0727, Senior Judge Barbara B. Crabb

---

## CORRECTED BRIEF FOR PLAINTIFF–APPELLANT
## ESSOCIATE, INC.

Derek A. Newman
Derek Linke
John Du Wors
Keith Scully
Newman Du Wors LLP
1201 Third Avenue, Suite 1600
Seattle, Washington 98101
(206) 274-2800

*Attorneys for Plaintiff–Appellant
Essociate, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Plaintiff–Appellant Essociate, Inc. certifies as follows:

1.     The full name of every party we represent is: Essociate, Inc.

2.     The names of the real party in interest if the party named in the caption is not the real party in interest: not applicable

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are: none

4.     The names of all law firms and the partners and associates that have appeared for the party in the lower tribunal or are expected to appear in this Court are: Newman Du Wors LLP, Derek A. Newman, John Du Wors, Derek Linke, and Keith Scully.

Dated: September 30, 2013

Respectfully submitted,

/s/ Derek Linke
DEREK A. NEWMAN
DEREK LINKE
JOHN DU WORS
KEITH SCULLY
NEWMAN DU WORS LLP
1201 Third Avenue, Suite 1600
Seattle, Washington 98101
(206) 274-2800

*Attorneys for Plaintiff–Appellant Essociate, Inc.*

# TABLE OF CONTENTS

Certificate of Interest ........................................................................ i

Table of Contents ............................................................................. ii

Table of Authorities .......................................................................... v

Statement of Related Cases .............................................................. 1

Jurisdictional Statement ................................................................... 1

Statement of Issues .......................................................................... 2

Statement of Case ............................................................................ 3

Statement of Facts ........................................................................... 4

    A.   Online affiliate-networking technology ............................. 4

    B.   The '660 Patent ................................................................. 6

    C.   The accused Epic Direct System ..................................... 10

    D.   Essociate operates a competing online affiliate network ............... 13

    E.   The district court's claim-construction order ................. 15

        1.   "source Webmaster unique identifier" and "target Webmaster unique identifier" ................................. 15

        2.   Claim preamble and "Virtual Affiliates" ................. 16

        3.   "target Merchant affiliate system" and "existing target affiliate system" ....................................... 17

        4.   "correlate" / "correlating" step ............................... 17

F.    The district court's order granting summary judgment of
       noninfringement............................................................................ 20

Summary of Argument ........................................................................... 25

Standards of Review .............................................................................. 26

Argument ................................................................................................ 27

I.    The district court erred by reading limitations into the
       "correlating" step that are neither supported by the claim language
       nor consistent with the specification. ...................................... 27

II.   The district court erred in granting summary judgment of
       noninfringement. ....................................................................... 32

       A.    Essociate produced sufficient evidence showing that Epic
              performed the "configuring" step. .................................... 33

       B.    Essociate produced sufficient evidence showing that Epic
              performed the "correlating" step. ..................................... 39

III.  The district court erred in excluding the Landau declaration as
       untimely expert opinion because it improperly applied the legal
       standard for expert disclosures when Landau's testimony was based
       on personal knowledge............................................................. 42

Conclusion .............................................................................................. 43

Certificate of Service ............................................................................. 45

Certificate of Compliance....................................................................... 46

# ADDENDUM

Judgment, Essociate, Inc. v. Azoogle.com, Inc. et al., .............................A0001

Order .................................................................................................A0002-32

U.S. Patent No. 6,804,660 ...............................................................A0033-56

*Essociate, Inc. v. Blue Whaler Investments, Ltd.*, No. 10-cv-2107-JVS (C.D. Cal. Feb. 6, 2012)

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................. 26

*ATD Corp. v. Lydall, Inc.*,
    159 F.3d 534 (Fed. Cir. 1998) ................................................. 26

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
    334 F.3d 1294 (Fed. Cir. 2003) ............................................... 28

*Cybor Corp. v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) (en banc) .............................. 26

*Essociate, Inc. v. Blue Whaler Investments, Ltd.*,
    No. 10-cv-2107-JVS (C.D. Cal. Feb. 6, 2012) ........................ 30

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) ............................................... 30

*Frolow v. Wilson Sporting Goods Co.*,
    710 F.3d 1303 (Fed. Cir. 2013) ...............................................32

*Helmsderfer v. Bobrick Washroom Equipment, Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008) ............................................... 28

*ICU Med., Inc. v. Alaris Med. Sys.*,
    558 F.3d 1368 (Fed. Cir. 2009) ............................................... 26

*IMS Tech., Inc. v. Haas Automation, Inc.*,
    206 F.3d 1422 (Fed. Cir. 2000) .........................................26, 27

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ..................................................................27

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996) ........ 28

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................32

*Michalic v. Cleveland Tankers, Inc.*,
364 U.S. 325 (1960) ................................................................33

*Moleculon Research Corp. v. CBS, Inc.*,
793 F.2d 1261 (Fed. Cir. 1986) .............................................32

*Phillips v. AWH Corp.*,
415 F.3d 1301 (Fed. Cir. 2005) .............................................28

*Smith v. Ford Motor Co.*,
215 F.3d 713 (7th Cir. 2000) .................................................26

*Teleflex, Inc. v. Ficosa North America Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) .............................................28

*Toshiba Corp. v. Imation Corp.*,
681 F.3d 1358 (Fed. Cir. 2012) .......................................32, 37

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ...............................................28

## Rules

Fed. R. App. 4(a) ......................................................................1

Fed. R. Civ. P. 56(c) ...............................................................26

Fed. R. Evid. 602 ....................................................................42

# STATEMENT OF RELATED CASES

There has been no other appeal in or from the same civil action in this Court or any other appellate court. Counsel is not aware of any case pending in this Court or any other court that will be directly affected by this Court's decision in the pending appeal.

# JURISDICTIONAL STATEMENT

(A)   The district court had subject-matter jurisdiction under 28 U.S.C. § 1338(a) because Essociate's complaint included a claim for patent infringement under 35 U.S.C. § 281.

(B)   This Court has jurisdiction under 28 U.S.C. § 1295(a)(1) because this appeal is from a final judgment of a district court in a civil action for patent infringement under 35 U.S.C. § 281.

(C)   This appeal was timely filed in accordance with 28 U.S.C. § 2107(a) and Rule 4(a) of the Federal Rules of Appellate Procedure because the final judgment of the district court was entered on May 20, 2013, A0001, and the notice of appeal was filed on June 10, 2013. A1946.

(D)   This appeal is from a final judgment that disposes of all parties' claims in the district court. A0002; A0001.

## STATEMENT OF ISSUES

1. The court must construe claim terms according to plain language and consistent with the specification. The district court construed the "correlating" step without respect to the plain language and inconsistent with the specification. Did the district court err in its construction of the "correlating" step?

2. At summary judgment, the court must not weigh evidence and must draw all facts and reasonable inferences in favor of the non-moving party. Essociate provided evidence that Epic's system performed the "configuring" and "correlating" steps of the patent, which Epic denied. The district court weighed the evidence, accepted Epic's denials as true, and failed to draw reasonable inferences in Essociate's favor. Did the district court err in granting summary judgment of noninfringement?

3. A fact witness may testify to any fact within the witness's personal knowledge. An expert witness testifies about material requiring special knowledge or training, and formulates an opinion. Landau testified about facts within his personal knowledge. Did the district court err in excluding Landau's factual testimony as expert opinion?

## STATEMENT OF CASE

On October 21, 2011, Essociate sued Epic for infringement of U.S. Patent No. 6,804,660 which discloses and claims an improvement in online affiliate systems. A0033-56; A0073-79. Epic filed an answer and counterclaims for noninfringement, invalidity, and unenforceability. A0064.

On September 26, 2012, Essociate amended its complaint to include claims against Social Assets, LLC doing business as Kinetic Social and Does 1–10 to impose liability for Epic's infringement under the doctrines of successor liability, alter ego liability, and fraudulent transfer. A0080-89.

On February 1, 2013, Epic moved for summary judgment on its noninfringement, invalidity, equitable estoppel, and laches defenses, and on Essociate's claims against Social Assets, LLC. A0068. On May 17, 2013, the district court granted Epic's motion for summary judgment of noninfringement as to asserted claims 1, 3, 6, 10, 13, 14, 15, and 28. A0032. The Court construed the following terms: "Virtual Affiliates," "source webmaster unique identifier," "target webmaster unique identifier," "target Merchant affiliate system," and "existing target affiliate system." A0015-22. The district court also provided a construction of the entire "correlating"

step. A0022-24. Finally, the district court dismissed Epic's counterclaims for invalidity and unenforceability without prejudice. A0032.

On May 20, 2013, the court entered judgment in favor of Epic. A0001. On June 10, 2013, Essociate timely appealed. A1946.

## STATEMENT OF FACTS

### A.   Online affiliate-networking technology

Essociate's U.S. Patent No. 6,804,660 claims and discloses a novel "System, Method, and Article of Manufacture for Internet Based Affiliate Pooling" in the field of online affiliate marketing. In online affiliate marketing, a merchant promotes goods or services by paying website operators (known as "webmasters" or "affiliates") to refer customers to the merchant's website. The basic components of online affiliate marketing are (1) an online merchant; (2) affiliates who operate websites that consumers (known as "visitors") access; (3) an advertisement that the merchant provides to be placed on an affiliate's website that redirects a visitor to the merchant's website if the visitor clicks the advertisement; and (4) a financial incentive for affiliates to send visitors to the merchant's website. A0005; A1887-88. When a visitor is redirected to a merchant's site, the merchant is said to have received "traffic" from the affiliate/webmaster.

The merchant must have the ability to determine where its traffic is coming from—*i.e.* which webmaster—so it can compensate the right affiliate. A0044[1:60–2:7]. Merchants use systems based on URLs[1] which allow them to track traffic and to compensate webmasters for referrals of traffic and/or transactions. A0044[2:7–17].

The specification of the '660 Patent describes two prior-art forms of affiliate systems used by merchants, affiliate hub systems and merchant affiliate systems. A0044-45[2:24–3:63]. An affiliate hub system is an intermediary third-party "hub" that connects affiliates and merchants. The hub tracks traffic to the merchant's site and allows webmasters to join the merchant's affiliate program by signing up with the hub. A0045 [3:17–67]. And a merchant affiliate system is an affiliate system that a single merchant— such as Amazon.com—operates on its own. A0044-45 [2:28–3:16]. Under a merchant affiliate system, webmasters join the merchant's affiliate program directly with the merchant. A0044-45 [2:28–3:16].

---

[1] URL refers to a Uniform Resource Locator, "A unique address which fully specifies the location of a file or other resource on the Internet." A0046 [6:51–53].

## B. The '660 Patent

The '660 Patent discloses and claims an improvement on the prior art for affording "virtual affiliates" with access to an existing affiliate system. A0045 [3:66–67]. "Virtual affiliates" are affiliates of one affiliate system, the "affiliate pool of source webmasters" or "source system," which can send traffic to an existing merchant affiliate system without actually joining that system. A0047 [7:49–50]; A0054 [21:49–50].

The invention requires that each webmaster in the source pool be assigned a unique identifier, known as a "source webmaster unique identifier." A0047 [7:64–66]; A0054 [21:47–50]. When a consumer visiting the webmaster's website clicks an advertisement for a merchant, the user's web browser sends a request to the source system, in the form of a URL that includes the assigned source webmaster unique identifier. A0047 [7:67–8:3]; A0054 [21:58–64].

The source system "correlates" that source webmaster unique identifier to another unique identifier, known as a "target webmaster unique identifier," functional within the requested merchant's affiliate system. A0054 [21:47–50]. The source system generates and returns to the consumer a URL for the target system that includes the target webmaster unique

identifier. A0054 [21:66–22: 7]. To reach the merchant's website, the consumer's web browser is automatically directed to the returned URL. A0054 [21:66–22:7].

In one embodiment, the source system configures participating merchant systems and participating webmasters to use the invention by setting configuration information to "ensure that the Merchant affiliate system is able to recognize that a given segment of traffic originates from some Webmaster from a source affiliate pool, and that the Merchant affiliate system is able to relay back to the Virtual Affiliate system information regarding all completed transactions referred from the affiliate pool." A0047 [8:32–48].

The configuration information may include "guidelines that ensure that the Merchant affiliate system is able to recognize" traffic as originating from a webmaster in the source system such as a "specified URL syntax" that "is recognized by the Merchant affiliate system". A0047 [8:32–48].

In a configured virtual affiliate system, the source system provides a properly formatted URL to a source webmaster containing the assigned source webmaster unique identifier. A0048 [10:10–14]. (In the accused Epic Direct System this URL is called the "jump link.") The webmaster may place the link on its website. A0048 [10:14–15]. A website visitor may click the link

to transmit a request "for a Merchant whose products or services are being advertised." A0048 [10:16–19; 10:33–37].

The specification discloses a "correlation operation" in which the source system receives the transmitted request for a merchant and "correlates and processes the request." A0048 [10:44–47]. In so doing, the source system determines the source webmaster unique identifier of the referring webmaster and which merchant is the target of the request. A0048 [10:48–49; 10:63–65]. The source system correlates the source webmaster unique identifier to a unique identifier for the merchant's affiliate system. A0048 [10:65–67].

The specification discloses several techniques for correlation. For example, the source system may use a "lookup table" to match an existing target webmaster unique identifier with the appropriate source webmaster unique identifier. A0049 [11:1–8].

Another disclosed correlation method is the "hybrid-string" technique. That technique involves correlating a source webmaster unique identifier to a target webmaster unique identifier in the form of a "hybrid string of characters" that includes the source webmaster unique identifier and may include other information functional within the target system. A0049 [11:13–15].

Then, the source system hands off the traffic to the target affiliate system

using the specified "URL syntax such that the Merchant's tracking

mechanism can take over." A0049 [11:38–45]. The merchant's system may

perform tracking using any number of methods, including "use of referring

URL's, unique ID numbers, user IP's, cookies, or session variables." A0049

[11:46–50].

Claim 1 is representative of the other independent claims, and includes a

preamble and four steps:

> 1. A method for providing Virtual Affiliates to an existing target
> affiliate system, the method comprising the operations of:
>
> **configuring** an existing target affiliate system to receive referrals
> from a first plurality of Webmasters in an affiliate pool of source
> Webmasters such that the target Merchant affiliate system
> recognizes a transaction as originating from a source Webmaster
> in an affiliate pooling system, including the step of:
>
>> assigning a source Webmaster unique identifier for each of
>> said first plurality of Webmasters each operating at least one
>> web site;
>
> **receiving a user request** for a target Merchant affiliate system
> URL from a web site operated by a particular referring
> Webmaster of the first plurality of Webmasters, wherein the user
> request includes the source Webmaster unique identifier for the
> particular referring Webmaster, and wherein the target Merchant
> affiliate system includes a unique identification system for its
> own affiliated Webmasters;

**correlating** the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system

**generating a URL** for the requested Merchant affiliate system, wherein the URL includes the correlated target Webmaster Merchant unique identifier, whereby the URL can be utilized to access the requested Merchant affiliate system, and further provide identification of the source Webmaster for requisite tracking.

Dependent claims 3, 6, 10, 13, and 14 add additional functions to the steps of claim 1. Independent claim 15 claims a computer program which describes the use of code segments to execute the method described in claim 1, and claim 28 is a means-plus-function claim for executing the method described in claim 1.

## C. The accused Epic Direct System

Defendant Azoogle.com, Inc. operated an affiliate network, called Azoogle Ads, beginning in about 2000. A0004. In 2008, Azoogle.com changed its name to Epic Media Group, Inc. and renamed its affiliate network the "Epic Direct System." *Id.*

The Epic Direct System consisted of Epic's affiliated webmasters and merchants who served as Epic's customers. A0006. Through the system, the affiliated webmasters are able to promote offers for the merchants and receive a commission for completed offers. A0006-07.

To enable affiliate advertising through the Epic Direct system, a merchant first contracts with Epic to make an offer available for Epic's virtual affiliates to promote. A0007. The merchant must have a "landing page" for each offer. A landing page is the web page on the merchant's website where a visitor would ultimately be directed after clicking on an advertisement on the affiliate's site. *Id.* The merchant determines its own format and content of the landing page and its associated URL. *Id.*

Before arriving at the landing page, the visitor must click on a "jump link" that Epic creates for each virtual affiliate. A0007. To promote a merchant's offer, the Epic virtual affiliate must place the jump link on its website as part of the merchant's advertisement. *Id.*

Each jump link that Epic provides is in the form http://x.azjmp.com/[CODE]. Epic fills the value field [CODE] with a unique id specific to that jump link which includes "pertinent information such as the affiliate id, the offer id, and the traffic type." A0154. The unique id included in the jump link allows Epic to identify the Epic affiliate's id when a visitor clicks that link. A0141.

When a visitor sees a merchant's ad on an Epic affiliate's website and clicks on it, the visitor's browser is directed to the jump link. Activating the

jump link causes Epic's system to immediately send the visitor to the URL for the merchant's landing page: "When a user clicks-thru an Affiliate link, the user will first hit the Epic server where our system will immediately decode the link and redirect the user to the appropriate Advertiser offer landing page." A0154.

In discovery, Epic provided advertising offers from merchants with existing affiliate systems. A0009; *see* A1892. When a merchant with an affiliate system contracted with Epic to make an offer available to Epic's affiliates, the merchant would provide Epic a format for a landing-page URL to which Epic should redirect traffic from Epic's affiliates. A0151-54; A0137. The landing page URL is part of the merchant's affiliate system. A1892. The landing page URL would contain a field with a static value composed of a code identifying Epic as the affiliate pool referring traffic to the merchant's affiliate network. A0155; A0137-38.

A merchant affiliate system that wanted to participate in Epic's system would provide Epic instructions to configure landing page URLs for the merchant's offer. The URL included one of several different preset variables, or "macros." A0154-55; A0137-38. Those macros included: "affiliate_id", "affiliate_id-sub_id", and "click_hash". A0155. Epic's Rule 30(b)(6)

witness and its internal documentation explained that the merchant would use this information for its own tracking purposes. A0137-38.

Epic's system includes a database of landing page URLs that Epic configured at the merchant's instruction. Each URL includes the merchant's specified value fields, and the macro the merchant required to be included in each value field. The "affiliate_id", "affiliate_id-sub_id", and "click_hash" macros may be included in a landing page URL by using, respectively, the strings "%%AFFILIATE_ID%%", "%%AFFILIATE-SUB%%", "%%CLICK-HASH%%". A0155; A0146. When included in a landing page URL, any of those values permit unique identification of the originating Epic webmaster. *Id.*

## D. Essociate operates a competing online affiliate network

Essociate operates an online affiliate network at essociate.com. A webmaster in Essociate's system may obtain and display ads for merchants— just like the Epic affiliates using Epic's system. A1888. And like Epic's "jump link," the ads Essociate provides its affiliates each include a unique code identifying that Essociate affiliate. *Id.* When a visitor clicks the link, Essociate receives the user's request, and just like Epic, generates a landing page URL

with the information and format specified by the merchant and redirects the
visitor to the merchant's system using that URL. *Id.*

Some Essociate merchants operate their own merchant affiliate systems,
including SpeedDate.com, AsSeenOnPC.com, and iBallers.com. A1890.
Those merchants provided Essociate specific instructions about how to
configure landing-page URLs for the merchant's system so that the merchant
can track traffic originating from Essociate's webmasters. A1895.
SpeedDate.com assigned Essociate a unique affiliate ID, "CD223", and
instructed it to use the following landing page URL structure:
http://affiliates.speeddate.com/z/4/CD223/&subid1=[FIELD]&subid2=[FI
ELD] . A1890; A1898-99. That URL includes Essociate's unique ID
identifying Essociate itself, "CD223," and includes functional Sub-ID value
fields (labeled as &subid1= and &subid2=) to identify Essociate's affiliated
webmaster. A1890-91. Other merchant affiliate systems, including
AsSeenOnPC and iBallers, also provided Essociate with unique identifiers and
instructions on how to configure landing page URLs to function within their
respective merchant affiliate systems. A1891; A1900-07.

The Epic Direct System included over 1,200 landing-page URLs for

SpeedDate.com, AsSeenOnPC, and iBallers which were structured identically

to the URLs that Essociate used. A0146-47; A1890.

### E.    The district court's claim-construction order

The parties requested that the district court construe "source

Webmaster unique identifier," "target Webmaster unique identifier,"

"Virtual Affiliates," "target Merchant affiliate system", "existing target

affiliate system," and "correlate." A0115-21; A1911-19. The district court

consolidated claim construction with summary judgment and construed only

those terms it determined were necessary to resolve the parties' summary

judgment disputes. A0013.

### 1.    "source Webmaster unique identifier" and "target Webmaster unique identifier"

The district court found "substantial agreement" between the parties

about the terms "source Webmaster unique identifier" and "target

Webmaster unique identifier." A0022. It construed "source Webmaster

unique identifier" to be "a unique code assigned to a webmaster within the

affiliate pool of source webmasters". *Id.* And it construed "target Webmaster

unique identifier" to be "a unique identifying code assigned to a webmaster in

the source affiliate pool that is functional in the target merchant's affiliate system and that corresponds to the unique identification system of the target merchant's affiliate system". *Id.*

## 2. Claim preamble and "Virtual Affiliates"

The district court construed the claim preamble, which is the only place "Virtual Affiliates" appears in the claims, as limiting in nature "because it defines the environment in which the claimed method, program and system operates or function and provides essential structure and meaning to the specific steps set forth in the body of the claims." A0017. The "background and specification of the '660 patent make it clear that the claimed invention is a method, program and system for providing virtual affiliates access to an existing target affiliate system." *Id.*

It specifically construed "Virtual Affiliates" to be "affiliates of one affiliate system, referred to in the patent as the 'affiliate pool of source Webmasters' which can send traffic to an existing system, the 'target system' without actually joining the target affiliate network." A0005 (citing A0047 [7:49–50]; A0054 [21:49–50].

### 3. "target Merchant affiliate system" and "existing target affiliate system"

The district court noted the parties' agreement that the terms "target Merchant affiliate system" and "existing target affiliate system" are "synonymous in the context of the claims" but rejected both proposed constructions. A0020.

The court started with parties' agreed definition that "a merchant affiliate system" is "a system through which a merchant can receive traffic from a group of webmasters." A0020. But held that a target Merchant affiliate system "must (1) have its own affiliates and have a unique identification system for those affiliates; and (2) must recognize and track transactions as originating from particular source webmasters." A0021 (citing A0054 [21:50–51, 63-65; 22:7–8]).

### 4. "correlate" / "correlating" step

The district court declined the parties' request that it construe "correlate" and rejected their proposed constructions. A0021. It did so because neither definition "resolves the dispute between the parties" which it characterized as "whether a system performs the 'correlating' step if it merely 'passes on' the source webmaster unique identifier to a merchant affiliate system that can use the source webmaster unique identifier for some

purpose." A0022-23. Accordingly, the district court instead evaluated the scope of the entire correlating step: "correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification of the requested merchant affiliate system." A0054 [21:66–22:2].

The district court accurately described Epic's position: that passing on the source ID is not enough to qualify as "correlating." A0023; A0120. But Essociate never contended that "merely passing on the source webmaster unique identifier" satisfied the correlating step. While Essociate did not have an opportunity to address this issue in the context of a construction of the entire claim step, its infringement position did not rely on this supposed position. Rather, Essociate claims that Epic performed the "hybrid-string" correlation technique disclosed in the '660 Patent. A1922.

Nonetheless, the district court evaluated the meaning of the "correlating" step as a whole and found that while it was unable to "determine the whole range of actions that would or would not satisfy the correlating step…it requires more than simply passing on the source webmaster unique identifier." A0023-24. It identified two bases for this determination: (1) "Plaintiff essentially conceded this point in its validity

arguments"; and (2) "any other conclusion would render the correlating step meaningless." A0024.

The court's first basis referred to Essociate's position that an earlier affiliate system developed by the '660 Patent inventors did not perform the "correlating" step. But the court misstated Essociate's actual position: that the earlier system did not perform the "correlating" step because it did not involve a "target webmaster unique identifier functional in the target affiliate system" with which a "source webmaster unique identifier" could be correlated. A1920. Specifically, there was no correlation possible because there was no value field in the merchant's landing-page URL into which a source identifier (or any other identifier) could be inserted. Thus under that earlier system, merchants had no technological ability to track the virtual affiliate who sent traffic.

The district court's second basis for its limiting construction of the "correlating" step, is that "any other conclusion would render the correlating step meaningless." A0023-24. In support, the court cited one of the embodiments disclosed in the '660 patent specification describing one example of how correlation may occur. A0024. The court then noted that the correlating step exists to facilitate the "hand off of an ID code that is

functional within the merchant's own tracking system." A0024. The court concluded that "simply passing along the ID that was assigned to a webmaster by the affiliating pooling system does not satisfy those requirements." *Id.*

### F. The district court's order granting summary judgment of noninfringement.

Epic moved for summary judgment of noninfringement of every asserted claim on the grounds that it did not perform the configuring step or the correlating step. A0130-133.

The district court granted Epic's motion on three grounds: (1) that Essociate failed to show that Epic provided "Virtual Affiliates" to existing merchant affiliates; (2) that Essociate failed to show that Epic performed the configuring step; and (3) that Essociate failed to show that Epic performed the correlating step.

First, the district court held that Essociate failed to show that the Epic Direct System "provided a method by which virtual affiliates access an existing merchant affiliate system," which it characterized as a "threshold requirement." A0025. The district court held that Essociate was required to show that "Epic Direct provides webmasters a method for accessing

established merchant affiliate systems of which the webmasters are not affiliates." A0026.

The district court did not consider Essociate's evidence of the operation of the SpeedDate.com merchant affiliate system and other merchant affiliate networks. A0027. And it excluded the declaration testimony of Michael Landau about the operation of Essociate's affiliate system in connection with merchant affiliate systems on the basis that it was "untimely expert opinion." *Id.*

Instead, the district court relied on Epic's "evidence showing that Epic Direct does not work with existing merchant affiliate systems to provide access for virtual affiliates but acts as an affiliate hub that contracts with merchants directly." A0026. It further noted that "Epic tracks all of its affiliates' transactions using the cookie and pixel method of transaction tracking and does not rely on merchant affiliate systems to track referrals." *Id.* But there is nothing in the record indicating that the patented technology is incompatible with "cookie-and-pixel" tracking. The district court did not address the testimony by Essociate's expert, Dr. George Edwards, describing how the Epic system uses both tracking methods together. A0108.

The district court relied on Epic's "evidence showing that the SpeedDate.com transaction identified as infringing by plaintiff did not involve SpeedDate.com's affiliate system." It found that Epic's "2009 insertion order documenting the relationship between Epic and SpeedDate.com" showed that SpeedDate.com agreed to pay Epic for referrals and indicated Epic would use cookie and pixel method of transaction tracking, which it inferred meant that "Epic would not rely on SpeedDate.com's own merchant affiliate system to track referrals." A0026.

Second, the district court held that Essociate could not show that Epic performed the "configuring" step because it lacked evidence establishing that any offer in Epic's offer_urls table related to an existing merchant affiliate system. A0028. For example, the court held that Essociate "submitted no evidence showing that the URLs 'configured' the SpeedDate.com system to recognize a transaction as coming from an affiliate in the Epic system." *Id.*

Third, the district court held that Essociate could not show that Epic performed the "correlating" step. A0029. It held that Essociate cited only the SpeedDate.com example in support of its position that Epic performed this step and relied on Epic's characterization of SpeedDate.com as being engaged "directly as a merchant in the Epic system." A0028-29.

Additionally, the court held that even if it assumed that Epic did "engage SpeedDate.com's affiliate network," Essociate did not show that there is a target Webmaster unique identifier in the example transaction. A0029. The district court noted Essociate's contention that target Webmaster unique identifier appeared in the string <a=53&c=1&s1=48192=s2=12268> found in the SpeedDate.com landing-page URL. It found that Essociate "has not shown that this string of variables meets the definition." A0029. The district court did not address Essociate's hybrid-string infringement evidence and corresponding expert testimony or consider its evidence relating to the operation of the SpeedDate.com merchant affiliate system.

The court held that Essociate's example SpeedDate.com target Webmaster unique identifier <a=53&c=1&s1=48192=s2=12268> "is not a unique code assigned to each webmaster in the Epic Direct System." A0029. The district court did not explain its basis for requiring a target Webmaster unique identifier to be assigned to all of Epic's affiliates—as opposed to just those Epic affiliates who wanted to display SpeedDate.com advertisements. *Id.*

The district court accepted as true Epic's position that "it is not clear to what the first and second variables in the string correspond" (*i.e.*, a=53&c=1).

And while the court noted that "SpeedDate.com chose them for its own purposes," it did not consider Essociate's evidence about those purposes: the format and syntax of the URL structure SpeedDate.com provided to Essociate and to Epic in order for them to refer traffic to its merchant affiliate system. A0029.

Finally, the district court concluded its analysis of the "correlating" step by referencing its previous discussion of the claim scope: "As discussed above, the 'correlating' step requires more than simply passing an unmodified affiliate ID and other preset variables to the target merchant affiliate system." A0030. Without any explanation, the district court's infringement analysis of the "correlating" step applies a different construction of the "correlating" step than the one it previously identified: "more than simply passing on the source webmaster unique identifier" by further narrowing correlating to also exclude matching the source webmaster unique identifier to "other preset variables" and then passing on this new hybrid string.

Upon concluding that Epic was entitled to summary judgment of noninfringement, the district court held that it it was not plainly evident that the '660 patent was invalid or unenforceable and that it would therefore be a

poor use of judicial resources to explore those issues. A0031. Accordingly, it dismissed those counterclaims without prejudice. *Id.*

## SUMMARY OF ARGUMENT

At summary judgment, Essociate is entitled to all facts and reasonable inferences. The trial court erred in dismissing Essociate's claims against Epic by ignoring facts and inferences drawn from Essociate's testimony regarding the operation of certain affiliate networks and the sample offers evaluated by Essociate's expert, admissions by Epic's own employees and found in Epic's internal network documentation, and expert testimony analyzing Epic's system.

Although the district court also erred in its claim construction, those errors were not dispositive. Even under the erroneous construction, Essociate should have prevailed because Essociate presented evidence indicating that Epic performed each step of the '660 Patent. Essociate respectfully requests that this Court reverse the district court's order granting summary judgment of noninfringement. And this Court should also construe the meaning of the term "correlate" so the parties have the benefit of the Court's guidance on remand.

## STANDARDS OF REVIEW

1.      A district court's claim construction is reviewed de novo. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454-55 (Fed. Cir. 1998) (en banc).

2.      This Court applies the law of the appropriate regional circuit in reviewing evidentiary rulings. *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 548 (Fed. Cir. 1998). Under Seventh Circuit law, this Court reviews de novo whether the district court applied the appropriate legal standard. *Smith v. Ford Motor Co.*, 215 F.3d 713, 717 (7th Cir. 2000). Only if the appropriate legal standard was followed does the Court review the district court's decision for an abuse of discretion. *Id.*

3.      This Court reviews a district court's summary-judgment decision without deference. *ICU Med., Inc. v. Alaris Med. Sys.*, 558 F.3d 1368, 1374 (Fed. Cir. 2009). Summary judgment is properly granted only when, drawing all reasonable inferences in the nonmovant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A determination of noninfringement is a question of fact. *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000). On appeal from a grant of summary judgment of noninfringement, this Court determines

whether, after resolving reasonable factual inferences in favor of the patentee, the district court correctly concluded that no reasonable jury could find infringement. *Id.*

## ARGUMENT

I.   **The district court erred by reading limitations into the "correlating" step that are neither supported by the claim language nor consistent with the specification.**

The "correlating" step provides:

> **correlating** the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system

A0054 [21:66–22:2]. The district court improperly narrowed the plain claim language to "require[] more than simply passing on the source webmaster unique identifier." A0023. While the district court's error should not have determined the outcome of the case, Essociate asks that this Court correct the district court's error.

The claim language defines the scope of a patented invention. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996). Any claim construction analysis must begin with, and remain centered upon, the plain language of the claims, because the patentee chose that language to "particularly point out and distinctly claim the subject matter which the patentee regards as his

invention." *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003) (internal cites omitted); *Helmsderfer v. Bobrick Washroom Equipment, Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("The patentee chooses the language and accordingly the scope of his claims.").

If—and only if—the plain meaning of the claim language is ambiguous, the Court may also look to other intrinsic evidence such as the specification and prosecution history of the asserted patent. *See, e.g., Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). But while the written description and prosecution history can be helpful in determining the meaning of claim language, they do not define a patentee's right to exclude: that is the "function and purpose of claims." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).

When the language at issue is straightforward, construction may involve "little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1301, 1314 (Fed. Cir. 2005). The Court recognizes "a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (internal cites omitted).

The district court did not need to construe the "correlating" step as a whole because the plain language is clear. The claim step consists of the word "correlating" used in connection with other terms which have been separately construed: "source webmaster unique identifier" and "target Webmaster unique identifier."

The word "correlate" is used in its plain meaning in the '660 Patent "to create or recognize a relationship":

> From the request, the affiliate pooling system knows which Merchant is the target of the request, such that the Webmaster's unique ID for the affiliate pooling system (source webmaster ID) can then be **correlated** to a unique ID for the Merchant's affiliate system (target webmaster ID).

A0048 [10:63–67] (emphasis added). "**Recognition** of the source system can occur via an identifier (source system identifier) in the URL request that is received by the affiliate pooling system." A0048 [10:57–59].

The words in the claim are sufficient to define the term because they are not ambiguous, and are supported by the specification. *See* A0048 [10:57–59, 63–67]; *See Vitronics*, 90 F.3d at 1582 ("[W]e look to the words of the claims themselves...to define the scope of the patented invention"); *Phillips*, 415 F.3d at 1312-13 ("We have frequently stated that the words of a claim are 'generally given their ordinary and customary meaning.'") (internal citations omitted).

Additionally, Essociate's proposed construction of "correlate" to mean "creating or recognizing a relationship between" was adopted in a previous claim construction because it is supported by plain meaning and intrinsic evidence. *Essociate, Inc. v. Blue Whaler Investments, Ltd.* ("Blue Whaler"), No. 10-cv-2107-JVS (C.D. Cal. Feb. 6, 2012). This Court may accord "reasoned deference" to prior claim constructions in assessing disputed claim terms. *See, e.g., Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting that "in the interests of uniformity and correctness," the Federal Circuit "consults the claim analysis of different district courts on the identical terms in the context of the same patent.").

Essociate's construction allows for the possibility that a merchant affiliate system might request a target webmaster unique identifier that is the same as a source webmaster unique identifier. The specification specifically addresses how to perform correlation with "webmaster identifiers that are different from the target Merchant affiliate system's identifiers…" indicating that sometimes they may be the same.

The district court cited two reasons for holding otherwise. First, the court found that "Plaintiff [through inventor Landau] essentially conceded this point in its validity arguments." A0024. But none of the support

identified by the court indicates this is the case. The court described Landau's testimony as providing that "his original system did not perform the 'correlating' step because it merely 'substituted' a source affiliate ID (the source webmaster unique identifier) for a placeholder or variable in the URL that was sent to the merchant affiliate system." A0023. But that was not his testimony—he testified that that original system "did not use correlation because the… affiliate ID was not correlated to a 'target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system'. " A1893. That distinction does not relate to whether the source and target webmaster unique IDs are the same or different.

Second, the district court concluded that "any other conclusion would render the correlating step meaningless." A0023-24. It explained that the specification "states repeatedly that correlation occurs between unique codes assigned to source webmasters and unique codes functional in the target merchant system." *Id.* But neither the claim language nor the specification require that the two sets of unique codes be different: it merely requires that the source system create or recognize a relationship between the incoming source webmaster unique identifier and the outgoing target webmaster unique

identifier, as requested by the target merchant affiliate system—even if that relationship is simply including the same information. Indeed, correlation becomes simpler when the source and target systems utilize common data.

## II.   The district court erred in granting summary judgment of noninfringement.

Essociate alleges direct infringement, under which it "must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012) (internal citations omitted). Essociate must prove only one example of direct infringement to defeat summary judgment. *Id.* Essociate presented evidence of over 1200 examples of Epic's direct infringement.

In reviewing the evidence, a court must discern whether "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Frolow v. Wilson Sporting Goods Co.*, 710 F.3d 1303, 1310 (Fed. Cir. 2013) (emphasis in original), *citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A patentee may prove direct infringement by either direct or circumstantial evidence. *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261 (Fed. Cir. 1986) (noting "it is hornbook law

that direct evidence of a fact is not necessary"); *see also Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."). Infringement can be demonstrated by combining expert opinion with factual testimony. *Id.*

Epic moved for summary judgment of noninfringement of every asserted claim on the grounds that it did not perform the "configuring" step or the "correlating" step. A0130-33. It did not move for summary judgment of noninfringement based on the "receiving a user request" or "generating a URL" steps. Accordingly, the district court did not address those steps in its order.

## A. Essociate produced sufficient evidence showing that Epic performed the "configuring" step.

Summary judgment of noninfringement was inappropriate because there is a genuine issue of material fact as to whether the Epic Direct system performed the "configuring step." The "configuring" step provides:

> configuring an existing target affiliate system to receive referrals from a first plurality of Webmasters in an affiliate pool of source Webmasters such that the target Merchant affiliate system recognizes a transaction as originating from a source Webmaster in an affiliate pooling system, including the step of: assigning a

source Webmaster unique identifier for each of said first plurality
of Webmasters each operating at least one web site.

A0054 [21:48–57].

Epic's offer_urls table includes at least 1200 landing page URLs
Epic configured in order to refer traffic from Epic's webmasters to existing
merchant affiliate systems. Essociate knows this because it also configured
those merchant affiliate systems to receive referrals from Essociate's
webmasters using the same URL syntax. A1890–92. Further, Essociate's
expert opined that Epic performed this step. A0103-04.

Epic created its Advertiser Cheat Sheet to instruct customer service
representatives what to tell Epic advertisers (including merchant affiliate
systems) about the information Epic needed about the merchant's system in
order to set up an offer that Epic could provide to its affiliates:

> Provide us with correct landing page URL and instruction on
> how we should pass our AFFILIATE-SUB attribute to you via
> the URL string.

A0148. The cheat sheet further describes the configuration step claimed in
the '660 Patent: merchants were required to "capture and store our
AFFILIATE-SUB" in order to "match it to your unique ID (i.e. order id or
transaction id) for the associated conversion." *Id.* Similarly, the more-detailed
Advertiser Implementation Guide—provided by Epic to its customer service

representatives for assisting merchants with setting up new offers—admits that Epic designates "landing page URLs and any variable that Advertisers may want [Epic] to pass to their website (for their internal tracking purposes)." A0151.

Epic further conceded it performed this step in its motion for summary judgment:

> [S]ome merchants request that the affiliate ID or other information is passed along to them for their own purposes. Some merchants would like to determine which affiliates are most productive, or which affiliates are sending low-quality traffic.

A0125. And the district court held that some of Epic's merchants operated their own merchant affiliate systems. A0009.

For example, SpeedDate.com was an online merchant which operated its own affiliate system. An affiliate system with its own webmasters—like either Essociate or Epic—could configure the SpeedDate.com affiliate system to receive referrals from the affiliate network's webmasters. Specifically, SpeedDate.com specified a syntax for landing page URLs that included an identifier for the source system's (*e.g.* Epic or Essociate) referring webmaster. A1890-91; A1898-99; *see* A0152. And Epic assigned a "source Webmaster

unique identifier" in the form of a unique numeric identifier to each of its webmasters, including the affiliate in the SpeedDate.com example. A0141.

To show Epic infringed, Essociate submitted evidence concerning the example SpeedDate.com offer. In the SpeedDate.com example, Essociate demonstrated that Epic configured the landing page URL provided by SpeedDate.com to include information requested by SpeedDate, and that it did so at SpeedDate's request for SpeedDate's tracking purposes. A0152 (Epic merchants would request inclusion of an affiliate identifier "for their internal tracking or reconciliation purposes."); A0137-38.

This is configuring: Epic "configured an existing target affiliate system [SpeedDate.com] to receive referrals from a first plurality of webmasters [Epic's affiliates that chose to promote SpeedDate.com's offer] in an affiliate pool of source Webmasters [all of Epic's affiliates] such that the target Merchant affiliate system recognizes a transaction as originating from a source Webmaster in an affiliate pooling system [by including the information SpeedDate.com requested for tracking purposes]."

Yet the district court held that Essociate could not show that Epic performed the "configuring" step because it lacked evidence establishing that any offer in Epic's offer_urls table related to an existing merchant affiliate

system. A0028. Absent evidence that Epic sent traffic to an existing merchant affiliate system, the district court concluded that Essociate could not show that Epic had "configured" such a system or that it had even satisfied the "threshold requirement" of providing "virtual affiliates access [to] an existing merchant system." *Id.*

The district court found that some of Epic's merchants have their own merchant affiliate systems through which they can track transactions. A0009. Furthermore, Essociate submitted testimony from Landau that some of the offers in the offer_urls table—such as SpeedDate.com, iBallers, and AsSeenOnPC—were for merchant affiliate systems. A1890-91; A1899-1907.

Landau also testified that with their landing-page URLs, those merchants had the ability to recognize and track referrals from particular webmasters. A1890-91; A1898-99; A1905-07. Landau's testimony was based on his own personal experience and knowledge of these merchants' systems. Based on this evidence a reasonable jury could conclude that Epic performed the "configuring" step for a target merchant affiliate system, at least with respect to those offers. Summary judgment was improper. *See Toshiba Corp.*, 681 F.3d at 1364 (a single example of infringement is sufficient to survive summary judgment).

The district court disregarded this evidence entirely and instead drew improper inferences in Epic's favor. For example, the district court accepted as true Epic's "evidence showing that Epic Direct does not work with existing merchant affiliate systems to provide access for virtual affiliates but acts as an affiliate hub that contracts with merchants directly." A0026.

The district court also improperly drew an inference in Epic's favor that Epic does not "rely on merchant affiliate systems to track referrals" based on Epic's claim that it "tracks all of its affiliates' transactions using the cookie and pixel method of transaction tracking." A0026. Specifically, the district court improperly accepted Epic's evidence that the SpeedDate.com offer did not involve SpeedDate.com's affiliate system. It found that Epic's evidence showed that SpeedDate.com agreed to pay Epic for referrals and indicated Epic would use a cookie-and-pixel method of transaction tracking, from which it inferred that "Epic would not rely on SpeedDate.com's own merchant affiliate system to track referrals." A0026.

But there is nothing in the record indicating that the patented technology is incompatible with "cookie-and-pixel" tracking, which would be necessary to support that inference. And the court also failed to accept as true Essociate's expert testimony describing how the Epic system uses both

tracking methods together. A0108. There is a reason Epic uses both methods: the '660 Patent's method allows a *merchant* [SpeedDate.com] to track transactions through the merchant's affiliate system, but may not offer the same functionality as cookies and pixels to allow the source system [Epic's] to track its affiliate's activities after they arrive at the merchant's landing page. Even if Epic uses a cookie and pixel method, it still may (and did) use the patented technology to interface with SpeedDate.com and the other merchant affiliate systems listed in the offer_URLs table.

## B. Essociate produced sufficient evidence showing that Epic performed the "correlating" step.

Summary judgment was inappropriate because there is a genuine issue of material fact as to whether the Epic Direct system practiced the "correlating" step. The "correlating" step involves: "correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system." A0054.

The district court construed "target webmaster unique identifier" to be "a unique identifying code assigned to a webmaster in the source affiliate pool that is functional in the target merchant's affiliate system and that

corresponds to the unique identification system of the target merchant's affiliate system." A0022.

Essociate submitted evidence sufficient to show that Epic performed the correlating step using a target webmaster unique identifier consistent with the district court's construction of that term. One method of correlating involves creating a hybrid-string target webmaster unique identifier—a string that includes an identifier for the source webmaster and other information requested by the merchant affiliate system that the merchant affiliate could use to recognize the transaction as originating from the source system (*e.g.* from Epic or one of its affiliates) and track that transaction within the merchant's own system. *See* A0049 [11:13–24].

Essociate's infringement expert opined that Epic performed the correlating step where it created or recognized a relationship between the SID and the hybrid string combining the unique identifier for Epic and one of the variables requested by the merchant affiliate system. A0107.

In the SpeedDate.com example, Epic received the jump link URL http://x.azjmp.com/4b4Gq?sub=12268. A0012. That URL includes a link ID which Epic decoded to identify the source webmaster unique identifier 48192. *Id.*; A0141. Epic then created the landing page URL, which contains the string

of characters: a=53&c=1&s1=48192&s2=12268. A0012. This string of characters includes the source webmaster unique identifier 48192 and other information "chosen by SpeedDate.com for its own purposes." *Id.*

Landau testified that SpeedDate.com requested the inclusion of these variables in landing page URLs—based on his personal experience with SpeedDate.com—because SpeedDate.com needed them for its internal tracking purposes. A0137-38; A0155; A1948-49. This is correlation: looking up information requested by the target merchant and adding it to the source identifier to form a target webmaster unique identifier functional in the target affiliate system.

The hybrid-string target webmaster unique identifier Epic formed in the SpeedDate.com example exceeds the district court's requirement that the "correlating" step must be more than "merely passing through the source identifier." Even if Epic did pass through the source identifier (by decoding it from the link ID and then including it in the landing page URL), it also included other information as requested by SpeedDate.com and therefore did more than "merely pass through" the source identifier.

The burden on Essociate was to provide sufficient evidence—whether direct or circumstantial—that a reasonable jury could find in its favor. *See*

*Moleculon*, 793 F.2d at 1261 ("direct evidence of a fact is not necessary").

Although the court correctly noted that "SpeedDate.com chose [the variables in the hybrid string] for its own purposes," it failed to draw the reasonable inference, supported by Essociate's evidence, that SpeedDate.com did so because these variables were functional in SpeedDate.com's system. A0029. Essociate demonstrated that SpeedDate.com chose these variables because they were functional in SpeedDate.com's system through the Landau testimony. Landau was able to testify about this functionality because he has first-hand experience providing Essociate's own affiliates access to SpeedDate.com's merchant affiliate system.

## III. The district court erred in excluding the Landau declaration as untimely expert opinion because it improperly applied the legal standard for expert disclosures when Landau's testimony was based on personal knowledge.

The district court did not apply the correct legal standard, relying on the deadline and standards for expert opinion rather than lay factual testimony. The foundation for Landau's factual testimony was established. A witness may testify to anything within personal knowledge. Fed. R. Evid. 602.

Landau is the Chief Technology Officer of Essociate, and one of the named inventors of the '660 Patent. Landau's declaration describes

Essociate's affiliate system and Essociate's direct experience with the same merchant affiliate systems and URL syntax as Epic's infringing offers. The district court erred in disregarding Landau's factual testimony, which was based on Landau's personal knowledge.

## CONCLUSION

All of Essociate's evidence must be assumed to be true, and Essociate is entitled to all reasonable inferences. In opposition to Epic's motion for summary judgment of noninfringement, Essociate presented expert opinion based on an analysis of Epic's system and other information, a sample infringing transaction, admissions from Epic's technical staff, information from Epic's own manuals, and evidence about the operation of Essociate's affiliate system demonstrating that Epic performed each step of the '660 Patent. Epic painted a different picture and concluded that it relied on a totally different method, evidently hoping that also performing the '660 Patent's steps would simply be seen as coincidence. At best, Epic created contested issues of material fact. The district court erred in its limitation of the "correlating" step and in excluding evidence. But even with these errors, Essociate presented sufficient evidence to defeat summary judgment. The matter should be reversed for trial.

Dated: September 30, 2013

Respectfully submitted,

/s/ Derek Linke
_____
DEREK A. NEWMAN
DEREK LINKE
JOHN DU WORS
KEITH SCULLY
NEWMAN DU WORS LLP
1201 Third Avenue, Suite 1600
Seattle, Washington 98101
(206) 274-2800

*Attorneys for Plaintiff–Appellant
Essociate, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Corrected Brief for Plaintiff–Appellant Essociate, Inc. with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system. I certify that I have confirmed that counsel for Appellees is a registered CM/ECF user. Service on Appellee's counsel will be accomplished by the CM/ECF system, which will send notification of this filing to:

> James D. Peterson
> Email: jpeterson@gklaw.com
> Jennifer L. Gregor
> Email: jgregor@gklaw.com
> Godfrey & Kahn, S.C.
> One East Main Street, Suite 500
> Post Office Box 2719
> Madison, WI 53701-2719

I further certify that on September 30, 2013, I caused a copy of the foregoing Corrected Brief for Plaintiff–Appellant Essociate, Inc. to be sent by U.S. Mail to the above attorneys for Appellees.

Dated: September 30, 2013          /s/ Derek Linke
                                    Derek Linke

                                    *Attorney for Plaintiff–Appellant*
                                    *Essociate, Inc.*

## CERTIFICATE OF COMPLIANCE

Counsel for Plaintiff-Appellant hereby certifies that:

1.     The brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because exclusive of the exempted portions it contains 8,216 words as counted by the word processing program used to prepare the brief; and

2.     The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2011 in a proportionally spaced typeface: Equity Text B, font size 14.

Dated: September 30, 2013          /s/ Derek Linke
_____
                                   Derek Linke

                                   *Attorney for Plaintiff–Appellant*
                                   *Essociate, Inc.*

Judgment

Essociate, Inc. v. Azoogle.com, Inc. et al.

Western District of Wisconsin

Case No. 11-cv-727-bbc

Dated May 20, 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ESSOCIATE, INC.,

            Plaintiff,

    v.

AZOOGLE.COM, INC., EPIC MEDIA GROUP, INC.
and SOCIAL ASSETS LLC d/b/a KINETIC SOCIAL,

            Defendants.

**JUDGMENT IN A CIVIL CASE**

Case No. 11-cv-727-bbc

---

     This action came for consideration before the court with District Judge Barbara B. Crabb presiding. The issues have been considered and a decision has been rendered.

---

     IT IS ORDERED AND ADJUDGED that judgment is entered in favor of defendants Azoogle.com, Inc., Epic Media Group, Inc. and Social Assets LLC d/b/a Kinetic Social against plaintiff Essociate, Inc. granting summary judgment and dismissing plaintiff's claim that defendants infringe claims 1, 3, 6, 10, 13, 14, 15 and 28 of U.S. Patent No. 6,804,660. Defendants' counterclaims asserting invalidity and unenforceability are dismissed without prejudice.

*Peter Oppeneer*
    5/20/13

Peter Oppeneer, Clerk of Court         Date

Opinion and Order

Essociate, Inc. v. Azoogle.com, Inc. et al.

Western District of Wisconsin

Case No. 11-cv-727-bbc

Dated May 17, 2013

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ESSOCIATE, INC.,

       Plaintiff,

    v.

AZOOGLE.COM, INC., EPIC MEDIA
GROUP, INC., SOCIAL ASSETS LLC,
D/B/A KINETIC SOCIAL and
DOES 1-10,

       Defendants.

OPINION AND ORDER

11-cv-727-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Essociate, Inc. accuses defendants Azoogle.com and Epic Media Group, Inc.
of infringing plaintiff's United States Patent No. 6,804,660.  The '660 patent concerns a
method of operating a virtual affiliate system, which is a type of internet promotion.
Plaintiff also contends that Social Assets LLC, which does business as Kinetic Social, and its
officers, Does 1-10, are liable for Epic Media's infringement under the doctrines of successor
liability, alter ego liability and fraudulent transfer.

Now before the court is defendants' motion for summary judgment.  Dkt. #87.
Defendants have moved for summary judgment on (1) noninfringement; (2) invalidity of the
'660 patent; (3) their defenses of laches and equitable estoppel; and (4) successor liability.
I am granting defendants' motion with respect to noninfringement because plaintiff has
failed to show that defendant Epic Media's affiliate system performs all steps of the asserted

1

claims of the '660 patent. In particular, plaintiff has not shown that Epic's system provides a method for virtual affiliates to access existing merchant affiliate systems. Plaintiff also has not shown that Epic's system performs the "configuring" or "correlating" steps of the asserted claims. Because non-infringement is clear and defendants have shown no reason to believe they are at risk for further infringement suits, I will exercise my discretion not to decide defendants' invalidity or unenforceability counterclaims or defenses. It is also unnecessary to address defendants' laches and equitable estoppel defenses or to determine whether Social Assets LLC and Does 1-10 may be held liable as successors of Epic Media.

From the parties' proposed findings of fact and the evidence in the record, I set forth the material and undisputed facts below. However, there are a few evidentiary and procedural matters related to the facts that require some discussion. First, I disregarded several of plaintiff's proposed facts because they were not supported by admissible evidence in the record. In particular, plaintiff proposed several facts about the operation of defendant Epic Media Group's affiliate system, Epic Direct, but cited only the conclusory declaration of John Du Wors, dkt. #105, as supporting evidence. Du Wors is plaintiff's trial counsel. He did not explain why he would be qualified to provide expert or any other opinion testimony about the characteristics or operation of the Epic Direct system. Second, plaintiff cites an "Advertiser Implementation Cheat Sheet and Guide" created by Epic as evidence of how the system works. Dkt. #105-6. However, plaintiff proposes several facts about the operation of the system that are not supported by the guide or by any expert opinion offered by plaintiff. E.g., PPFOF, dkt. #107, ¶¶ 113, 119, 120, 124. Finally, plaintiff cites a

declaration of Michael Landau, submitted on February 23, 2013, which includes several conclusory opinions about whether the Epic system infringed the '660 patent. Dkt. #108. I am disregarding Landau's statements as untimely expert opinion. (According to the preliminary pretrial conference order, plaintiff's expert report on infringement was due November 5, 2012. Dkt. #46. Plaintiff filed a timely expert opinion by George Edwards regarding infringement that I have considered.) Further Landau's declaration does not establish any foundation for his statements about the Epic system. (Plaintiff's expert reports on validity were also late, but because I am not reaching the issue of patent validity, I need not decide whether those reports should be stricken.)

## UNDISPUTED FACTS

### A. The Parties

Plaintiff Essociate, Inc. is the owner of the United States Patent No. 6,804,660. Michael Landau and Evan Horowitz are plaintiff's founders and the inventors of the '660 patent. Plaintiff operates a small affiliate network and has realized the majority of its revenue from settlements in suits to enforce the '660 patent.

Defendant Azoogle.com, Inc. operated an affiliate network, called Azoogle Ads, beginning in about 2000. In 2008, Azoogle.com changed its name to Epic Media Group, Inc. and the affiliate network was renamed the Epic Direct System. In a corporate restructuring in 2011, Epic Media Group, Inc. became Epic Media Group, LLC. Defendant Social Assets, LLC, doing business as Kinetic Social, was spun off from Epic Media and is

in the business of targeting social media advertising. Social Assets does not operate an affiliate network.

## B. The '660 Patent

The Patent and Trademark Office issued the '660 patent to Essociate, Inc. on October 12, 2004. Michael Landau and Evan Horowitz are listed as the inventors. The patent is titled "System Method and Article of Manufacture for Internet Based Affiliate Pooling" and relates to internet advertising.

In online affiliate marketing, a merchant promotes goods or services by paying website operators ("webmasters" or "affiliates") to send customers to the merchant's website. The basic components of online affiliate marketing are (1) an online merchant; (2) webmasters who operate websites visited by consumers; (3) advertisements provided by the merchant to be placed on an affiliate's website which, when clicked on by a visitor, send the visitor's web browser to the merchant's website; and (4) a financial incentive for webmasters to send visitors to the merchant's website. Some merchants, such as Amazon, operate their own affiliate systems in which webmasters may enroll as affiliates. Other merchants use affiliate "hub" systems, in which another system acts as an intermediary between affiliates and the merchants and supplies tracking functionality for the merchants.

The '660 patent identifies both stand-alone merchant-operated affiliate systems and affiliate hub systems as prior art. '660 patent, cols. 2 & 3. The specification explains that both prior art systems have weaknesses, including expense, slow growth and administrative

difficulties. The '660 patent purports to address these weaknesses by disclosing and claiming a method, system and computer program for providing "virtual affiliates" access to an existing affiliate system. '660 pat., Abstract, col. 3, lns. 66-67, claims 1, 15 and 28.

"Virtual affiliates" are affiliates of one affiliate system, referred to in the patent as the "affiliate pool of source Webmasters" which can send traffic to an existing system, the "target system" without actually joining the target affiliate network. Id. at col. 7, ln. 49-50, col. 21, lns. 49-50. The applicants for the '660 patent do not claim to have invented the concept of virtual affiliates; they claim a particular multi-step technique for providing virtual affiliates access to an existing affiliate system. The invention requires that each member of the source pool be assigned a unique ID, known as the "source webmaster unique identifier," which is then correlated to another unique ID, known as the "target webmaster unique identifier," that functions in the existing target system. Id. at col. 22, lns. 1-7. In the process of directing an internet user to the target system, the source pool generates a URL for the existing target system that includes the target webmaster unique identifier. Id. The correlation of the source webmaster unique identifier and the target webmaster unique identifier allows the merchant system to track the referral from the virtual affiliate using the target webmaster unique identifier. Id. at col. 22, lns. 6-7.

## C. Defendant's Accused Epic Direct System

Defendant Epic Media operates an affiliate network known as the Epic Direct System. The system consists of affiliated webmasters and Epic's merchant customers. Through the system, the affiliated webmasters are able to promote offers for the merchants and receive

a commission for completed offers.

To enable affiliate advertising through the Epic Direct system, a merchant first contracts with Epic to make an offer available for promotion by Epic's affiliates. The merchant must have a "landing page" for each offer, which is the place where an internet user ultimately would be directed after clicking on an affiliate's promotion of an offer. On the landing page, the user can complete some action, such as making a purchase or signing up for a service. The format and content of the landing page and its URL are determined by the merchant. Commonly, the merchant will set up a landing page to receive users from affiliate networks that is distinct from its standard home page or signup page. Merchants use many variations on how they structure their landing pages and the landing page URLs to suit their own purposes.

Before arriving at the landing page, the internet user must click on a "jump link," a link that is created by Epic for each affiliate who would like to promote a particular offer. To promote the offer, the Epic affiliate will place the jump link on its own materials that it publishes. For example, the affiliate might place the jump link in an email or on its website as part of a banner advertisement.

A jump link in the Epic Direct system is in a format like this: <x.azjump.com/009Gv>. In this example, "x.azjump.com" is the domain and subdomain on the Epic Direct system where the user request will be processed. "009Gv" is the Epic link ID that encodes pertinent information for this link, including at least the "affiliate ID," the "offer ID" and the "traffic type." The affiliate ID is the numerical code that Epic assigned to each affiliate in the Epic Direct system. This allows Epic to identify the affiliate ID for

the originating Epic affiliate when that link is clicked by a visitor to the Epic affiliate network. The offer ID is a numerical code that is assigned to each offer. A merchant will have as many offer IDs as it has separate offers. The traffic type indicates what type of user traffic the affiliate would provide, such as web traffic from a website or traffic from an email campaign. Other variables might also be encoded in the link ID, depending on the offer and needs of the merchant and the affiliates.

When a user clicks on a banner ad or other promotion on an affiliated webmaster's website, the user is directed by the jump link to the Epic Direct system, where the Epic system decodes the link ID. The Epic system makes a record of the user request and places a cookie (a small, hidden text file) on the user's computer. The Epic system then redirects the user to the merchant's landing page URL. These steps are largely invisible to the user, to whom it appears that the banner ad linked directly to the merchant's website. (A user may be able to recognize the transmission path on its browser address bar and browser history if the user is paying attention.)

If a user completes the transaction, the user is brought to a "lead conversion page" on the merchant's system. The lead conversion page, or the "success" page, will typically say something like "thanks for signing up" to the user. The purpose of the lead conversion page in the Epic Direct system is that it includes a "tracking pixel." The pixel is invisible to the user, because it is set up to display as a one-pixel by one-pixel transparent square. The function of the pixel is to prompt the user's browser to process a line of code that triggers the execution of a script on the Epic system. The script reads the cookie from the user's computer, and the Epic system makes a record of the successful transaction. After recording

7

both the offer ID and the affiliate ID from the cookie on the user's computer, Epic tracks the required payment information. This transaction tracking method used by the Epic Direct system is referred to variously as "cookie tracking" or "cookie and pixel tracking."

Some Epic merchants have their own merchant affiliate systems through which they can track transactions. However, if a promotion is going through the Epic Direct system, Epic does not rely on the merchant system for tracking transactions or commissions. Because the Epic system does not rely on merchants to track transactions and commissions for particular affiliates, there is no need for the Epic system to provide the identity of the affiliate to the merchant for Epic's tracking purposes. However, some merchants request that the affiliate ID or other information be passed to them for their own internal tracking or reconciliation purposes. Some merchants would like to determine which affiliates are most productive and which affiliates are sending low-quality traffic. If, for example, some affiliates produce a large number of bogus transactions, the merchant may investigate and seek to disqualify that affiliate. On request, Epic allows certain preset variables to be passed along to the merchant system. These variables include  the affiliate ID, affiliate sub-ID, a "click hash" value and a fixed code to represent the Epic system, "aZ2." The requested variables are appended to the merchant landing page URL.

If a merchant has requested that certain variables be passed along, the merchant landing page URLs are formatted to include variables that will be filled in when the user clicks on the jump link. For example, if Netflix had requested that the affiliate ID be passed along, the Netflix landing page URL would be pre-formatted on the Epic system like this: www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIATE_ID%%. In the syntax

of protocols used on the Epic system (and in internet protocols generally), the "?" designates the end of the location part of the URL. The "%%" designates the beginning and the end of the label of the variable. Then, when a user clicks on the jump link, the Epic system fills in the variables in the pre-formatted URL to complete the merchant landing page URL. If the affiliate's ID were 12345, the landing page URL would look like this: www.netflix.com/affiliates/signup.html?affiliate_id=12345. The merchant would then be able to record the affiliate's ID for whatever purposes it wanted. The Epic system would still use the cookie and pixel method for tracking this transaction and any resulting commissions, just as though the affiliate ID had not been passed on to the merchant.

If a merchant requests it, the Epic system can also allow use of a sub ID variable, which can be useful for merchants and affiliates. For example, an affiliate that operates a local newspaper might have a website with various sections, including news, sports and arts. The affiliate promotes Epic offers and may like to know whether the offers were more successful in the sports section or the arts section. When the affiliate places an offer, for Netflix for example, in the sports section, the "sub_ID=001" is appended to the jump link. When the affiliate places the offer in the arts section, it appends "sub_ID=002." When the user clicks on the jump link, the landing page URL is completed by filling in the variables. The preformatted landing page URL would look like this: www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIATE_ID%%&sub_id=%%SUB_ID%%. If the user clicked on the jump link in the sports section, the landing page URL would be completed to look like this: www.netflix.com/affiliates/signup.html?affiliate_id=12345&sub_id=001. In transaction and

commission reports, both the merchant and the affiliate would know that the commission was earned by affiliate 12345 and that the traffic came from a link that had sub ID 001 associated with it. In this example, the affiliate would know that this successful transaction came from the sports page. Again, Epic would be tracking the transaction and commission by using its cookie and pixel tracking method and Epic would not use the passed-along variables for its own transaction and commission reports.

Although Epic generally uses the pixel and cookie tracking method, some merchants are unwilling or unable to include a pixel on their lead conversion page. In such cases, Epic can track transactions using a "click_hash" variable that is included in a destination landing page URL. The click_hash is an alpha-numeric value which, when decoded by the Epic system, identifies affiliate, click and offer data. The "click_hash" variable can be included by using the string "%%CLICK-HASH%%" in a specified value field which causes the destination landing page URL to include the click hash. If an offer is completed, the merchant notifies Epic by submitting the click_hash variable. The merchant would not know the meaning of the variable, but simply would pass it back to Epic after a completed transaction.

### D. SpeedDate.com Example

In his expert report, plaintiff's expert George Edwards analyzed a transaction involving the Epic Direct System and SpeedDate.com to reach his conclusion that the Epic Direct system infringed the '660 patent. SpeedDate.com is a merchant that uses the Epic system. A 2009 insertion order documents the relationship between SpeedDate.com and

Epic.  The insertion order states that Epic would provide an http tracking pixel to SpeedDate.com, that SpeedDate.com would place Epic's tracking pixel on its conversion page and that Epic would pass on the variables "affiliate_id" and "sub_id" to SpeedDate.com. Dkt. #88-1.

The transaction considered by Edwards involved an Epic affiliate in Colorado, with the affiliate ID number 48192.  The click URL Epic provided to the affiliate for a SpeedDate.com offer was <http://x.azjump.com/4b4Gq?sub=12268>, with 4b4Gq being the Epic link ID and 12268 being the sub-ID selected by the affiliate.  If a user clicked on the URL, the click would constitute a request for the Epic jump link that would lead to SpeedDate.com.  The destination landing page URL for SpeedDate.com on the Epic system is  http://mysdate.com/?a=53&c=1&s1=%%AFFILIATE_ID%%&s2=%%SUB_ID%%. Thus,  for  this  particular  transaction,  the  URL  generated  was <http://mysdate.com/?a=53&c=1&s1=48192&s2=12268>.  The affiliate ID is 48192 and the sub ID chosen by the affiliate for its purposes is 12268.  (It is unclear as to what a=53&c=1 refer.  Although plaintiff proposes an explanation, it offers no foundation for it. It is clear that these variables were chosen by SpeedDate.com for its own purposes.)

OPINION

A.  <u>Infringement</u>

Plaintiff contends that defendants infringe claims 1, 3, 6, 10, 13, 14, 15, and 28 of the '660 patent.  Defendants have moved for summary judgment of noninfringement on all of these claims.  Patent infringement analysis has two steps:  first, the patent claims must be

11

interpreted or construed to determine their meaning and scope; second, the properly-construed claims are compared to the process or product accused of infringing.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995).  The first step of this analysis, claim construction, is a matter of law reserved to the court.  Id. at 970-71.

1.  Claim construction

The parties disagree about the meaning of several of the terms of the asserted claims, but I need not resolve most of their disputes.  With respect to two of their disputes, the parties do not explain why the disputes or proposed constructions are relevant to any arguments presented in their briefs ("source webmaster unique identifier"; "generating a URL").  Additionally, the parties' proposed constructions for some terms are so similar that it appears that there are no real disputes about the meaning of those terms ("source webmaster unique identifier"; "target webmaster unique identifier").  However, to resolve the parties' summary judgment disputes, I must construe the terms "virtual affiliates" and "target merchant affiliate system" and provide scope and meaning to the "configuring" "correlating" steps of the asserted claims.

All of the disputed terms and phrases appear in the asserted independent claims of the '660 patent, claims 1, 15 and 28.  Claim 1 is representative:

> 1.  A method for providing **Virtual Affiliates** to an **existing target affiliate system**, the method comprising the operations of:
>
> configuring an **existing target affiliate system** to receive referrals from a first plurality of Webmasters in an affiliate pool of source Webmasters such that the **target Merchant affiliate system** recognizes a transaction as originating from a source Webmaster in an affiliate pooling system, including the step of:

> assigning a source Webmaster unique identifier for each of said first plurality of Webmasters each operating at least one web site;
>
> receiving a user request for a **target Merchant affiliate system** URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters, wherein the user request includes the source Webmaster unique identifier for the particular referring Webmaster, and wherein the target **Merchant affiliate system** includes a unique identification system for its own affiliated Webmasters;
>
> **correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system**; and
>
> generating a URL for the requested Merchant affiliate system, wherein the URL includes the correlated target Webmaster Merchant unique identifier, whereby the URL can be utilized to access the requested Merchant affiliate system, and further provide identification of the source Webmaster for requisite tracking.

'660 pat., col. 21, ln. 45–col. 22, ln. 8.

Many of plaintiff's claim construction arguments rely on a decision issued by a district court in the Central District of California in a patent case in which plaintiff sued several defendants for infringement of the '660 patent. <u>Essociate, Inc. v. Blue Whaler Investments, LLC</u>, 10-2107-jvs (C.D. Cal. Feb. 6, 2012). In that case, the court construed all of the terms at issue here, often adopting the constructions proposed by plaintiff and rejecting the defendants' proposed constructions on the grounds that they read in limitations from the specification that were not supported by the claim language. Although plaintiff contends that the claim construction decision has some persuasive value, it is of little use in the context of the parties' summary judgment arguments in this case. The district court in California adopted specific definitions of the claims at issue, and to some degree focused on the words it believed would best define the term. The court did not focus on the related

disputes about the scope of the claim terms but instead focused on clarifying the language of the terms.

At this stage of the proceedings, the only disputes that must be resolved are ones relating to the presence of specific limitations in the claims, not the ability of a juror or anyone else to understand the language. It is unnecessary to provide complete definitions for any of the terms below in order to resolve the parties' disputes about those limitations. Therefore, rather than adopt specific definitions in the manner of the California court, I will resolve only the specific disputes stemming from the following terms and phrases. Plaintiff's citations to the California court's opinion provide little help in this regard.

a. "Virtual Affiliates"

The dispute between the parties is whether the reference to "Virtual Affiliates" in the preamble of the independent claims is limiting. The term "virtual affiliates" is not used anywhere else in the claims. Plaintiff contends that the statement "method for providing Virtual Affiliates to an existing target affiliate system" is non-limiting because it does nothing more than cite the intended purpose or use for the claimed invention and provide an introduction. In other words, plaintiff contends that a system could be infringing even if it does not provide *virtual* affiliates access to an existing target affiliate system, so long as it performs all steps of the asserted claims. Defendants disagree, contending that the preambles include essential structures for the performance of the elements recited in the claims.

Generally, a preamble does not limit a claim. <u>Allen Engineering Corp. v. Bartell</u>

Industries, Inc., 299 F.3d 1336, 1346 (Fed. Cir. 2002).  However, this general rule has

numerous exceptions.  The preamble may limit the meaning of claim when (1) the preamble

"recites essential structure or steps," Catalina Marketing International, Inc. v.

Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002); (2) the preamble is "necessary

to give life, meaning, and vitality" to the claim, Pitney Bowes, Inc. v. Hewlett-Packard Co.,

182 F.3d 1298, 1305 (Fed. Cir. 1999); (3) "the claim drafter chooses to use *both* the

preamble and the body to define the subject matter of the claimed invention," Bell

Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 620 (Fed.

Cir. 1995); (4) the preamble is essential to understand limitations or terms in the claim

body, Pitney Bowes, 182 F.3d at 1306; or (5) "limitations in the body of the claim rely upon

and derive antecedent basis from the preamble," Eaton Corp. v. Rockwell International

Corp., 323 F.3d 1332, 1339 (Fed. Cir. 2003).  "Conversely, a preamble is not limiting

'where a patentee defines a structurally complete invention in the claim body and uses the

preamble only to state a purpose or intended use for the invention.'" Catalina, 289 F.3d at

808 (citing Rowe v. Dror, 112 F.3d 473, 478 (Fed. Cir. 1997)).  See also Applied Materials,

Inc. v. Advanced Semiconductor Materials America, Inc., 98 F.3d 1563, 1572-73 (Fed. Cir.

1996) ("Whether a preamble stating the purpose and context of the invention constitutes

a limitation of the claimed process is determined on the facts of each case in light of the

overall form of the claim, and the invention as described in the specification and illuminated

in the prosecution history.").

        As an initial matter, I note that plaintiff's argument is disingenuous in light of other

arguments and statements it makes throughout its brief in opposition to defendants' motion

for summary judgment.  In particular, plaintiff concedes in its brief that the '660 "invention provides 'virtual affiliates' to a target affiliate system."  Plt.'s Br., dkt. #109, at 25.  See also id. at 60 (stating that '660 patent "claim[s] . . . a specific improvement" to "virtual affiliate networks").  Later, plaintiff distinguishes prior art on the basis that it did not "disclose an existing target merchant affiliate system which receives traffic from virtual affiliates."  Id. at 53.  Plaintiff's expert and inventor of the '660 patent also states in his expert report that "the '660 patent claims a specific kind of virtual affiliate system."  Landau Expert Rep., dkt. #85, at 18.  Plaintiff cannot argue that the invention is limited to specific systems involving virtual affiliates for the purposes of its validity arguments but deny that the system is so limited for the purpose of infringement.  Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330 (Fed. Cir. 2003) ("It is axiomatic that claims are construed the same way for both invalidity and infringement").

In any event, I agree with defendants that the preamble is limiting because it defines the environment in which the claimed method, program and system operate or function and provides essential structure and meaning to the specific steps set forth in the body of the claims.  The background and specification of the '660 patent make it clear that the claimed invention is a method, program and system for providing virtual affiliates access to an existing target affiliate system.  E.g., '660 pat., col. 3, lns. 65-67 ("Summary of the Invention") ("The present invention addresses these needs by providing a method for affording virtual affiliates access to an existing affiliate system.").  This is one reason why the invention is purportedly novel and an improvement over prior systems.  As is explained in the background section, prior art already provided methods for affiliate webmasters to send

traffic to an existing merchant affiliate system, either directly or through an affiliate hub. '660 pat., cols. 2 & 3 (describing the Amazon and Linkshare systems). The '660 invention was meant to be an improvement of these systems because it allowed webmasters to refer traffic without creating a burden on the merchant affiliate systems. Id. at col. 4, lns. 53-56. ("Advantageously, the present invention allows groups of Webmasters to participate in existing Merchant affiliate systems without the need of joining those Merchant affiliate systems."); col. 7, lns. 40-45 ("Each Virtual Affiliate sends traffic to the Merchant through the Merchant's existing affiliate system, and thus has the ability to benefit from advertising the goods and/or services of the Merchant while not wholly a party of the Merchant's existing affiliate system."); col. 7, lns. 49-50 ("The Virtual Affiliate remains independent from the Merchant's affiliate system."); col. 9, lns. 47-50 ("Use of the Virtual Affiliate system allows for some responsibility to be removed from the Merchant, in terms of maintaining and expending system resources toward its relationship with the referring Webmaster."). The repeated references to virtual affiliates throughout the '660 specification make it clear that the claimed invention was a method relating to virtual affiliates.

In addition, the preamble language regarding virtual affiliates is needed to understand the limitations in the claim body. For example, the configuring step requires "configuring an existing target affiliate system to receive referrals from a first plurality of Webmasters in an affiliate pool of source Webmasters such that the target Merchant affiliate system recognizes a transaction as originating from a source Webmaster in an affiliate pooling system. . . ." '660 pat., col. 21, lns. 48-50. This language makes sense only if the "Webmasters" in the pool of affiliate webmasters are "virtual" affiliates. If the webmasters

had already joined or enrolled in the existing target affiliate system (the existing merchant affiliate system), there would be no reason to configure the system to receive referrals from the webmasters. Rather, the webmasters would simply refer traffic in accordance with the prior art cited in the '660 patent, by either registering with the merchant affiliate system or by registering with an affiliate hub system that conducts business with the merchant.

The language of the receiving step also confirms that the "first plurality of Webmasters in an affiliate pool of source Webmasters" are virtual affiliates. This step requires "a user request for a target Merchant affiliate system URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters" to include "the source Webmaster unique identifier for the particular referring Webmaster." The step goes on to explain that the target merchant affiliate system for which a request is made "includes a unique identification system for *its own affiliate Webmasters*." Id. at col. 21, lns. 58-65 (Emphasis added). This explanation distinguishes the webmasters in the first plurality of webmasters (virtual affiliates) from webmasters that are actual affiliates of the existing target merchant system.

Finally, the correlating step requires "correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the required Merchant affiliate system." Id. at col. 21, lns. 66-67, col. 22, lns. 1-2. The reason the source webmaster unique identifier must be correlated to a target webmaster unique identifier is because the referring webmaster is not an affiliate of the merchant affiliate system. If the webmaster were an affiliate enrolled in the merchant affiliate system, the system would be able to recognize the webmaster without the correlation

step. Thus, this step makes sense only if the webmaster is a virtual affiliate, not an actual affiliate of the merchant affiliate system.

In sum, a "virtual affiliate" limitation in the preamble is necessary to describe the invention "in complete and exacting structural detail." Intirtool, Ltd. v. Texar Corp., 369 F.3d 1289, 1295 (Fed. Cir. 2004). Thus, I conclude that the asserted claims require a method for allowing virtual affiliates to gain access to an existing merchant affiliate system and thus, that the webmasters in the "pool of affiliate webmasters" must be "virtual affiliates."

b. "target Merchant affiliate system" and "existing target affiliate system"

These two terms are used several times in the asserted independent claims. The parties agree that they are synonymous for the purposes of their present disputes. The parties also agree that a merchant affiliate system is a system through which a merchant can receive traffic from a group of webmasters. However, the parties disagree about the extent to which the "target merchant affiliate system" referred to in the '660 patent must be a "complete" affiliate system that performs its own tracking functions. Plaintiff contends that a merchant affiliate system is simply "a system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant." Plt.'s Br., dkt. #109, at 26. Defendants contend that merchant affiliate system, as used in the '660 patent, entails much more structure. Defendants' proposed construction is "[a] complete system that operates the merchant's affiliate program, including the tracking of transactions and commissions." Dfts.' Br., dkt. #93, at 26.

Plaintiff's proposed construction is too broad because it would encompass virtually any online linking arrangement. As defendants point out, plaintiff's proposed construction would cover a situation in which fans of an online merchant linked to the merchant's website. However, nothing in the patent suggests that it would cover such relationships. Defendants' proposed construction is too vague because it is unclear what qualifies as a "complete system." Further, although the specification states that "generally" a merchant affiliate system includes "the Merchant's back-end tracking mechanism, which keeps track of transactions and credits affiliates; the accounting system for payout of affiliates; the reporting system for reporting transaction statistics back to affiliates; and the support system for affiliate and technical support," '660 pat., col. 7, lns. 16-21, neither the claims nor the specification requires that the merchant affiliate system include all of these capabilities.

For the purpose of resolving the parties' present disputes, the claim language provides sufficient guidance about merchant affiliate systems contemplated by the claims. According to the claim language, the merchant affiliate system must (1) have its own affiliates and have a unique identification system for those affiliates; and (2) must recognize and track transactions as originating from particular source webmasters. '660 pat., col. 21, lns. 50-51, 63-65, col. 22, lns. 7-8. Even plaintiff concedes that a merchant affiliate system must meet these requirements. Plt.'s Br., dkt. #109, at 41-44 (arguing in context of its validity arguments that merchant affiliate system reads on the '660 patent only if it has "unique" identification for its affiliates and is "capable of tracking," as opposed to having the affiliate pool do tracking).

20

c. correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system

The parties are in substantial agreement as to the meaning of the terms "source Webmaster unique identifier" and "target Webmaster unique identifier." They agree that the source identifier is a unique code assigned to a webmaster within the affiliate pool of source webmasters. Dfts.' Br., dkt. #93, at 22; Plt.'s Br., dkt. #109, at 22. As for the target Webmaster unique identifier, they agree that it is a unique identifying code assigned to a webmaster in the source affiliate pool that is functional in the target merchant's affiliate system and that corresponds to the unique identification system of the target merchant's affiliate system. Plt.'s Br., dkt. #109, at 25; Dfts.' Br., dkt. #113, at 20; 660 pat., col. 21, ln. 67- col. 22, ln. 2. This definition is supported by the patent's specifications, which describe the target webmaster ID as a "unique identifying code functional within the target Merchant's home affiliate system and which corresponds to the unique identification system of the request Merchant's home affiliate system." '660 pat., col. 4, lns. 7–11. See also id. at col. 8, lns. 7-9 (target webmaster ID must be a "code that can be utilized by the particular Merchant's existing affiliate system").

However, the parties disagree as to what it means to "correlate" the source webmaster unique identifier to a target webmaster unique identifier. The parties' proposed definitions of the term "correlating" are not helpful. Plaintiff proposes "creating or recognizing a relationship between," Plt.'s Br., dkt. #109, at 24, while defendants propose "establishing a mutual or reciprocal relation between." Dfts.' Br., dkt. #93, at 25. Neither of these

definitions resolves the dispute between the parties, which is whether a system performs the "correlating" step if it merely "passes on" the source webmaster unique identifier to a merchant affiliate system that can use the source webmaster unique identifier for some purpose. Plaintiff contends that simply passing on the source ID can qualify as "correlating," while defendants contend that passing on the source ID is not enough.

Once again, plaintiff's argument seems disingenuous in light of statements it makes in its brief regarding validity and statements Landau made during his deposition to distinguish his prior art invention. Plaintiff states in its brief that "[t]he correlating step contemplated by the '660 patent involves an algorithmic process whereby the value in the affiliate ID field of the Click URL determines what value appears in the Sub ID value field of the Destination Landing Page URL." Plt.'s Br., dkt. #109, at 41. Similarly, Landau testified that his original system did not perform the "correlating" step because it merely "substituted" a source affiliate ID (the source webmaster unique identifier) for a placeholder or variable in the URL that was sent to the merchant affiliate system. 2012 Landau Dep., dkt. #76, at 127, 159; 2010 Landau Dep., dkt. #80, at 38-44. Landau testified that although the affiliate ID was included in the URL passed to the merchant affiliate system, there was no "correlating" step because there was no "logic" used to determine whether that was the appropriate way to set up a link for the merchant system. Id. Plaintiff makes no attempt to explain why "passing on" an affiliate ID without using any logic or algorithmic process would satisfy the "correlating" step if simply "substituting" the affiliate ID for a placeholder would not.

Although I cannot determine from the parties' arguments or the patent itself the

A0023

entire range of actions that would or would not satisfy the "correlating" step, I can conclude that the correlating step requires more than simply passing on the source webmaster unique identifier. Plaintiff essentially conceded this point in its validity arguments and any other conclusion would render the correlating step meaningless. The patent's specification states repeatedly that correlation occurs between unique codes assigned to source webmasters and unique codes functional in the target merchant system. This occurs when the affiliate pooling system determines which merchant is the target of a request. '660 pat., col. 10, lns. 63-65. The pooling system then determines which target webmaster unique identifier functional in the merchant system corresponds to the webmaster's source webmaster unique identifier. Id. at lns. 65-67. The affiliate pooling system may find this target webmaster unique identifier in a number of ways, including from a table provided by the merchant. Id. at col. 11, lns. 1-15. The purpose of this step is to hand off an ID code that is recognizable and functional within the merchant's own tracking system. Id. at lns. 40-45. Simply passing along the ID that was assigned to a webmaster by the affiliating pooling system does not satisfy these requirements.


2. Infringement by Epic Direct

Plaintiff contends that the Epic Direct system infringes the '660 patent because it provides a method using all steps of the asserted claims by which affiliate webmasters may refer traffic to merchant affiliate systems. Specifically, Epic Direct: (1) configures merchant affiliate systems by assigning unique IDs to webmaster affiliates and formatting URLs and offers by which affiliates can refer internet traffic to merchants; (2) receives user requests

when an internet user clicks on webmaster affiliate's promotion of a merchant's offer; (3) correlates its webmasters' unique IDs to unique IDs that are functional in the merchants' systems; and (4) generates URLs for merchant affiliate systems containing the correlated unique IDs by which the merchant system can track the transaction. Plaintiff relies specifically on Epic Direct's ability to pass on pre-set variables at the merchant's request, including the affiliate_id, sub_id and click_hash.

Defendants have moved for summary judgment on all asserted claims, contending that plaintiff cannot show that the Epic affiliate system performed every step of the asserted claims. Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1328 (Fed. Cir. 2008) ("[A] method claim is directly infringed only if each step of the claimed method is performed."). Defendants contend that plaintiff has adduced no evidence showing that the Epic Direct affiliate system provides a method by which virtual affiliates access an existing merchant affiliate system. Rather, the evidence in the record shows only that Epic Direct acts as an affiliate hub through which webmaster affiliates access merchants directly. Because plaintiff cannot show that Epic's system satisfies this threshold requirement, plaintiff cannot show that Epic's system performs the configuring or correlating steps of the claims. (The parties agree that all asserted independent claims contain the same steps and requirements.)

Every step of the asserted claims involves an affiliate system acting in relation to an existing merchant affiliate system for the purpose of providing access for virtual affiliates. At the very least, that existing merchant affiliate system must have a unique identification system for its own affiliated webmasters and must have the ability to recognize and track referrals from particular webmasters. Thus, it is not enough for plaintiff to show that Epic

Direct provides a method for webmasters to send traffic to a merchant because those methods already existed in the prior art and were disclaimed in the '660 patent. Only transactions between the Epic system and another affiliate network can be infringing. Plaintiff must show that Epic Direct provides webmasters a method for accessing established merchant affiliate systems of which the webmasters are not affiliates.

Defendants submitted evidence showing that Epic Direct does not work with existing merchant affiliate systems to provide access for virtual affiliates but acts as an affiliate hub that contracts with merchants directly. In particular, Epic tracks all of its affiliates' transactions using the cookie and pixel method of transaction tracking and does not rely on merchant affiliate systems to track referrals. Plaintiff concedes in its brief that to read on the '660 patent, the affiliate pooling system must hand off traffic to a merchant affiliate system that "recognizes that a transaction originates from the respective source system and recognizes the new target Webmaster ID such that the Merchant's existing tracking can take over." Plt.'s Br., dkt. #109 at 42.

Defendants also submitted evidence showing that the SpeedDate.com transaction identified as infringing by plaintiff did not involve SpeedDate.com's affiliate system. A 2009 insertion order documenting the relationship between Epic and SpeedDate.com shows that SpeedDate.com agreed to pay Epic $4.50 for each referral. The order also shows that Epic would use the cookie and pixel method of transaction tracking, meaning that Epic would not rely on SpeedDate.com's own merchant affiliate system to track referrals. Additionally, the SpeedDate.com domain used by SpeedDate.com affiliate system is "affiliates.speeddate.com." However, the SpeedDate domain used by the Epic Direct system

in the accused example transaction was "mysdate.com."

Plaintiff produced no evidence showing that the Epic Direct system sends virtual affiliates to existing merchant affiliate systems. Plaintiff states in its brief that "Epic provided offers from merchants with existing affiliate systems" and that the Epic Direct system generated URLs in order to refer traffic to existing merchant affiliate systems, Plt.'s Br., dkt. #109, at 29, but the evidence it cites to support this assertion is not admissible.

First, plaintiff cites the conclusory declaration of Michael Landau, the inventor of the '660 patent. As discussed above, Landau's opinion constitutes untimely expert opinion for which he fails to establish any foundation. Moreover, Landau's statements are primarily about plaintiff's own dealings with the SpeedDate.com and other affiliate systems. Landau Dec., dkt. #108, at ¶¶ 99-114. Plaintiff's dealings with affiliate networks do not establish whether and how Epic Direct interacted with affiliate networks.

Plaintiff also cites the opinion of George Edwards, its infringement expert, who states in his report that the Epic Direct system referred traffic to SpeedDate.com's "affiliate system." Edwards Rep., dkt. #84, at 6. Edwards uses the single SpeedDate.com offer as his one and only example of Epic's infringement. However, Edwards does not provide any foundation for his conclusion that Epic Direct referred traffic to SpeedDate.com's own affiliate system, rather than to an independent webpage created solely for affiliates of Epic Direct. Edwards states only that "[o]n information and belief," SpeedDate.com maintains a unique identification system for its own affiliates. Id. at 7. Edwards cites no evidence to support this assertion and plaintiff submitted no other evidence to confirm that SpeedDate.com provides a unique identification system for its affiliates, what that system

26

is or that Epic Direct affiliates engaged with such a system.

Because plaintiff has failed to show that the Epic Direct system allows webmasters to send traffic to existing merchant affiliate systems, plaintiff cannot show that the Epic Direct system "configur[es] an existing target affiliate system to receive referrals from a first plurality of Webmasters. . . ." '660 pat., col. 21, lns. 48-49.  Plaintiff contends that the Epic Direct system "configured" merchant affiliate systems by setting up destination landing page URLs to include "sub_id" macros that would include an identifier to the referring webmaster. Plaintiff states that "[t]his step is satisfied by any offer in the [Epic system's] offer_urls table relating to an existing merchant affiliate system."  Plt.'s Br., dkt. #109, at 32.  However, plaintiff's argument fails because plaintiff did not adduce admissible evidence establishing that any offer in the offer_urls table related to an existing merchant affiliate system.  With respect to the SpeedDate.com example transaction, plaintiff submitted no evidence showing that the URLs "configured" the SpeedDate.com system to recognize a transaction as coming from an affiliate in the Epic system.  Without such evidence, plaintiff cannot prove that the Epic Direct system performs the "configuring" step of the asserted claims.

Plaintiff also has not shown that the Epic Direct system performs the "correlating" step of the asserted claims, which includes "correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system."  '660 pat., col. 21, lns. 66-67—col. 22, lns. 1-2.  Plaintiff cites only the SpeedDate.com example as proof that the Epic Direct system performed the correlating steps of the asserted claims.  However, as discussed above, plaintiff has no evidence that the Epic system engaged the SpeedDate.com affiliate

system, rather than engaging SpeedDate.com directly as a merchant in the Epic system.  If there is no virtual affiliate arrangement through which virtual affiliates may refer traffic to an existing merchant affiliate system, there can be no target webmaster unique identifier. Even assuming that Epic did engage SpeedDate.com's affiliate network, plaintiff has not shown that there is a target Webmaster unique identifier in the example transaction.

Plaintiff contends that, in the example transaction, the target webmaster unique identifier is a portion of the SpeedDate landing page URL: <a=53&c=1&s1=48192&s2=12268>.  However, plaintiff has not shown that this string of variables meets the definition of target webmaster unique identifier.  In particular, plaintiff adduced no evidence that this string of variables corresponds to a unique identification system of the SpeedDate affiliate system, that the expression is "functional" in the SpeedDate affiliate system, to the extent such a system even exists.  '660 pat., col. 22, lns. 5-8. Although plaintiff's expert George Edwards states in his report that SpeedDate.com assigned a target webmaster unique identifier to each of its affiliates, Edwards Rep., dkt. #84, at 7, Edwards establishes no foundation for this statement.

Additionally, the expression identified by plaintiff, <a=53&c=1&s1=48192&s2=12268>, is not a unique code assigned to each webmaster in the Epic Direct system.  Rather, it is a string of four independent and preset variables. It is not clear to what the first and second variables in the string correspond, but it is undisputed that SpeedDate.com chose them for its own purposes.  The third variable is the Epic ID for the affiliate in Denver.  The fourth variable is the sub_id chosen and used by the Denver affiliate for his own purposes.  The only unique code assigned to the webmaster in

this transaction is 48192, which all parties agree is the "source webmaster unique identifier" for purposes of the '660 patent.  These variables were appended to the landing page link and passed on to SpeedDate.com.  Plaintiff has not shown that the variables were "correlated" using logic or algorithms or that anything happened other than the passing on of pre-set variables.  As discussed above, the "correlating" step requires more than simply passing an unmodified affiliate ID and other preset variables to the target merchant affiliate system.

In sum, plaintiff has introduced insufficient evidence to meet its burden at summary judgment.  Although plaintiff contends that Epic Direct has engaged in at least 1200 infringing transactions, plaintiff failed to adduce evidence to prove that even one of Epic Direct's transactions was infringing.  E–Pass Technologies v. 3Com Corp., 473 F.3d 1213, 1222–23 (Fed. Cir. 2007) ("If, as [plaintiff] argues, it is 'unfathomable' that no user in possession of one of the accused devices and its manual has practiced the accused method . . . [plaintiff] should have had no difficulty in meeting its burden of proof and in introducing testimony of even one such user."); Lucent Technologies, Inc. v. Gateway, Inc., 543 F.3d 710, 723 (Fed. Cir. 2008) (finding no error in court's analysis that if using infringing combination of software was "so common and so routine, then certainly [plaintiff] could have produced evidence of at least one instance" when infringement occurred); Minsurg International, Inc. v. Frontier Devices, Inc., 2011 WL 486120, *3 (M.D. Fla. Feb. 7, 2011) ("If infringement among surgeons is an inescapable conclusion, [plaintiff] should have been able to timely identify at least one instance of direct infringement.").  Accordingly, defendants are entitled to summary judgment of noninfringement as to all asserted claims of the '660 patent.

### B. Invalidity and Unenforceability

Defendants have moved for summary judgment on their invalidity counterclaims, contending that all asserted claims of the '660 patent are invalid as anticipated by the inventor's own prior art system and because the claims are obvious in light of that system and in light of well known features of internet commerce. The Court of Appeals for the Federal Circuit has held that a district court has the discretion to dismiss invalidity and unenforceability counterclaims upon a grant of summary judgment of non-infringement. Phonometrics, Inc. v. Northern Telecom Inc., 133 F.3d 1459, 1468 (Fed. Cir. 1998); Cardinal Chemical Co. v. Morton International, Inc., 508 U.S. 83, 95 (1993) (in addressing motion for declaratory judgment district court has discretion to decide whether to exercise jurisdiction even when established). It is appropriate for a district court to dismiss counterclaims of unenforceability and invalidity when non-infringement is clear and invalidity and unenforceability are not plainly evident. Phonometrics, 133 F.3d at 1468 (citing Leesona Corp. v. United States, 530 F.2d 896, 906 n.9 (Ct. Cl. 1976)).

Discretionary dismissal of defendants' invalidity and unenforceability counterclaims is appropriate in this case. It is clear that plaintiff has failed to prove infringement and it is less clear whether these patents are invalid or unenforceable. It would be a poor use of judicial resources to explore these issues at this time, particularly because defendants have given the court no reason to believe that they are at risk of a future infringement suit based on the '660 patent. Thus, I will exercise my discretionary authority and dismiss defendants' invalidity and unenforceability counterclaims without prejudice.

ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendants Azoogle.com, Inc., Epic Media Group, Inc. and Social Assets LLC, d/b/a Kinetic Social, dkt. #87, is GRANTED IN PART and DENIED IN PART. The motion is GRANTED with respect to plaintiff Essociate, Inc.'s claim that defendants infringe claims 1, 3, 6, 10, 13, 14, 15, and 28 of the United States patent 6,804,660.

2. Defendants' counterclaims asserting invalidity and unenforceability are DISMISSED without prejudice.

3. The clerk of court is directed to enter judgment accordingly and close this case. Entered this 17th day of May, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

# U.S. Patent No. 6,804,660,660

## Dated October 12, 2004

Case: 3:11-cv-00727-bbc Document

US006804660B2

## (12) United States Patent
### Landau et al.

(10) Patent No.: **US 6,804,660 B2**
(45) Date of Patent: **Oct. 12, 2004**

(54) **SYSTEM METHOD AND ARTICLE OF MANUFACTURE FOR INTERNET BASED AFFILIATE POOLING**

(75) Inventors: **Michael Landau**, Sausalito, CA (US); **Evan Horowitz**, San Francisco, CA (US)

(73) Assignee: **Essociate, Inc.**, San Francisco, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 757 days.

(21) Appl. No.: **09/846,159**

(22) Filed: **May 1, 2001**

(65) **Prior Publication Data**

US 2001/0047413 A1 Nov. 29, 2001

**Related U.S. Application Data**

(60) Provisional application No. 60/201,041, filed on May 1, 2000.

(51) **Int. Cl.**[7] ............................................... **G06F 17/60**
(52) **U.S. Cl.** ....................................................... **705/14**
(58) **Field of Search** ................................. 705/1, 10, 14

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,712,979 A | 1/1998 | Graber et al. | |
| 5,724,424 A | 3/1998 | Gifford | |
| 5,793,972 A | 8/1998 | Shane | |
| 5,974,396 A | * 10/1999 | Anderson et al. | ............. 705/10 |
| 5,991,740 A | 11/1999 | Messer | |
| 5,999,929 A | 12/1999 | Goodman | |

| | | | |
|---|---|---|---|
| 6,029,141 A | 2/2000 | Bezos et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 001160714 A1 * | 5/2001 | ........... G06F/17/60 |
| WO | WO 00/33272 | 6/2000 | |
| WO | WO 00/60484 | 10/2000 | |

OTHER PUBLICATIONS

Zineldin Mosdad; "Beyond Relationship Marketing: Technologicalship Marketing"; v18n1; ISSN:0263–4503; Sep. 23, 200 pp. 9–23.*

* cited by examiner

*Primary Examiner*—Stephen Gravini
(74) *Attorney, Agent, or Firm*—Perkins Coie LLP

(57) **ABSTRACT**

The present invention provides a method, system and computer program for affording Virtual Affiliates access to an existing affiliate system. First, having been assigned a unique identifier within a source affiliate system, a Webmaster operates a web site. Next, a request for a target Merchant Web site triggers a correlation function, such that the source Webmaster unique identifier is correlated to a target Webmaster unique identifier functional within the unique identification system of the requested Merchant system. Next, a properly formatted entry mechanism URL is returned, enabling a hand off to the target Merchant affiliate system and including the correlated target Webmaster unique identifier. The Virtual Affiliate system is notified of transactions that originated from a referring Webmaster. Referring Webmasters may be compensated for each completed transaction according to agreed-upon terms and conditions.

**40 Claims, 10 Drawing Sheets**



**U.S. Patent**  Oct. 12, 2004  Sheet 1 of 10  **US 6,804,660 B2**



FIGURE 1

**U.S. Patent**        Oct. 12, 2004        Sheet 2 of 10        US 6,804,660 B2



# FIGURE 2

Case: 3:11-cv-00727-bbc   Document #: 1-1   Filed: 10/21/11   Page 4 of 24



**FIGURE 3**



# FIGURE 4



FIGURE 5

**U.S. Patent**          Oct. 12, 2004          Sheet 6 of 10          US 6,804,660 B2



FIGURE 6

**U.S. Patent**     Oct. 12, 2004     Sheet 7 of 10     US 6,804,660 B2



**FIGURE 7**

Case: 3:11-cv-00727-bbc   Document #: 1-1   Filed: 10/21/11   Page 9 of 24

**U.S. Patent**         Oct. 12, 2004         Sheet 8 of 10         US 6,804,660 B2



FIGURE 8



## FIGURE 9



# FIGURE 10

US 6,804,660 B2

**1**

## SYSTEM METHOD AND ARTICLE OF MANUFACTURE FOR INTERNET BASED AFFILIATE POOLING

### CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. provisional patent application 60/201,041 filed May 1, 2000, incorporated herein by reference the same as if filly set forth.

### STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH

Not applicable.

### FIELD OF THE INVENTION

The present invention relates generally to e-commerce and, more particularly to systems methods and articles of manufacture for Internet based affiliate pooling across existing affiliate system boundaries.

### BACKGROUND OF THE INVENTION

Presently, both Merchants and consumers are increasingly conducting aspects of their commerce via a network of computers known as the Internet. Such business is commonly referred to as "e-commerce," or "electronic commerce."

The Internet enables vast and immediate interconnectedness through the use of a common software structure, generated and read via computer code known as hypertext markup language or "HTML." Access to information and movement around the web is enhanced through the use of hyperlinks ("links") within a web page's HTML. The link, manifest as a word in a text field or an image on a web page, acts as a path, moving a user from one web page address, known as a Uniform Resource Locator (URL), to another web page address.

The movement from one URL to another allows near-instant access to information, products, and services and is particularly well-suited to the exchange of information, goods, and services between buyers ("users") and sellers ("Merchants"). Such business is commonly referred to as "e-commerce," or "electronic commerce."

With the abundance of goods and services available, a problem arises in efficiently connecting an interested user with the appropriate information pertaining to the desired goods and/or services. A Merchant therefore must make known, or advertise, its URL in order to reach those users on the Internet that are interested in the goods and/or services offered. Hypertext links lend themselves to an active (rather than static) advertisement since they actually provide the user with a path or entry point to the Merchant's URL. Then, once at the Merchant's URL, the user can initiate a transaction.

By advertising through the use of hyperlinked banner images and/or text links, a Merchant may increase its sales by increasing the number of users (commonly referred to as "traffic") that visit their URL, and potentially increase transactions.

To this end, the Merchant must determine how and where on the Internet to advertise in order to maximize traffic that fits the Merchant's targeted market. In contrast to traditional static advertising, hyperlinked active advertising provides the opportunity to chart a transaction from inception to end, beginning with the initial movement from advertisement to Merchant URL, and ending with the user's completed transaction.

**2**

This tracking mechanism allows the Merchant to see where its traffic is coming from (i.e., from a given advertisement at a given URL). Further, the tracking mechanism allows the Merchant to determine advertising compensation based on quantity of traffic and/or the traffic's performance. Such a system, which relies on a tracking mechanism, is commonly referred to as an affiliate system.

Most Merchants currently utilize some form of affiliate system to increase sales, track traffic, and compensate Web-masters for referrals of traffic and/or transactions. Webmasters are the content providers of the Internet, who maintain URLs in order to disperse information and links to other URLs. These links are often in the form of a Merchant's advertisement, such as a banner ad. Therefore, the Webmaster directs traffic to given Merchants via their selection and placement of Merchant links. The Webmasters are then generally compensated according to a given scale or interval, based in some way on the referred traffic.

The growing popularity of affiliate systems among both Webmasters and Merchants has led to a wide array of resources addressing affiliate commerce. Such resources include search engines, directories, and compilations of Webmaster feedback relating exclusively to affiliate systems.

Two distinct models of affiliate systems have developed. The first is a stand-alone affiliate system for a single Merchant. The second type encompasses multiple Merchants within one master affiliate system.

FIG. 1 is an illustration showing a prior art stand-alone affiliate system **100**. The stand-alone affiliate system **100** includes a group of Webmasters **102**, and a Merchant affiliate system **104**. The Merchant's affiliate system **100** is a full framework that operates the Merchant's affiliate program. Generally, the Merchant's affiliate system **100** includes the Merchant's back-end tracking mechanism, which keeps track of transactions and credits affiliates, the accounting system for payout of affiliates, the reporting system for reporting transaction statistics back to affiliates, and the support system for affiliate and technical support.

In use, the group of Webmasters **102** send traffic through the surrounding affiliate system **104**. The traffic is tracked and any transactions initiated by the traffic are credited to the referring Webmaster. Each Webmaster has access to the full framework of affiliate services offered by the Merchant's affiliate system **104**.

The stand-alone affiliate system **100** is utilized only by one Merchant and that Merchant's network of affiliated Webmasters **102**.

As would be expected, the Merchant retains full access to and control of its affiliate system **104**, as well as full responsibility for promotion, administration, and improvement of the system. A good example of a stand-alone affiliate system is that used by AMAZON.COM.

A number of shortcomings become evident in regard to the stand-alone affiliate system. First, from the Merchant's point of view, there is a large startup cost, since the Merchant needs to have its entire affiliate system **104** in place before even one Webmaster **102** can begin to refer transactions. Second, the stand-alone affiliate system suffers from slow growth, mainly due to a switch in target market, a switch from obtaining new consumers (users) to new Webmasters. The single Merchant may also fail to attract Webmasters simply due to the limited number of goods and/or services available for promotion. In addition, the stand-alone affiliate system **100** entails a continuing burden of administration, promotion of the system, and Webmaster relations, all of which can tax the single Merchant's resources.

US 6,804,660 B2

**3**

In addition, there are several drawbacks to the stand-alone affiliate program from the Webmaster's **102** point of view. Generally, the Webmaster **102** can only represent the goods and/or services of a single Merchant. Ideally, a Webmaster **102** would offer a variety of goods and/or services to its traffic in order to generate increased revenue from the available customers. In order for a Webmaster **102** using the stand-alone affiliate system **100** to add a variety of Merchants to the Webmaster's web page, the Webmaster **102** must find and join multiple stand-alone programs. This makes administration of the Webmaster's business more complex because the Webmaster must then coordinate with many programs—each with its own terms, conditions, accounting, tracking and customer service—in order to keep abreast of the performance of the Webmaster's referred traffic.

FIG. 2 is an illustration showing a prior art affiliate hub system **200**. The affiliate hub system **200** includes a group of Webmasters **202**, a master affiliate system **204**, and an affiliate network **206** having individual affiliate systems **208**. The master affiliate system **204** processes Webmaster **202** information and organizes the Webmasters **202** into the networked affiliate programs **208** within. The group of Webmasters **202** send traffic through the surrounding master affiliate system **204** to the individual affiliate programs **208** within.

Each individual affiliate system **208** of the affiliate network **206** uses the framework of the master affiliate system **204**. This framework includes a back-end tracking mechanism (which keeps track of transactions and credits to affiliates), an accounting system for payout of affiliates, a reporting system for reporting transaction statistics back to affiliates, and a support system for affiliate and technical support.

Thus, each individual Merchant affiliate system **208** depends on the master affiliate system **204** to provide the framework for the Webmasters **202** with traffic to become affiliates and promote the Merchant's particular goods and/or services. Each networked Merchant affiliate system **208** uses the same group of Webmasters **202** and their traffic from within the master affiliate system **204**. An example of an affiliate hub system is that used by LINKSHARE.COM.

Using the affiliate hub system **200**, Webmasters can be affiliated with, or send traffic through, one or more of the networked Merchant affiliate systems **208**. Webmaster can also be affiliated with, or send traffic through, the master affiliate system **204** (for example, a Webmaster already in the Linkshare network can promote Linkshare and earn commissions per referred new Webmaster who joins Linkshare).

The affiliate hub **200** addresses some of the weaknesses of the stand-alone system in bringing together groups of Merchants into one network. In addition to gaining the use of the framework of the master affiliate system **204**, a Merchant entering the affiliate hub network **200** has immediate exposure to the Webmasters **202** within the hub **200**, easing the growing pains of starting an affiliate program. The Webmaster also benefits from this system, with simplified, coordinated access to the goods and services of all Merchant affiliate programs in the hub. However, the Merchants must share the same resources for traffic (the group of Webmasters **202**), and thus risk losing business to other Merchants in the hub **200**.

SUMMARY OF THE INVENTION

The present invention addresses these needs by providing a method for affording virtual affiliates access to an existing

**4**

affiliate system. First, having been assigned a source unique identifier (source Webmaster ID), each of a group of Webmasters operates a web site. Then a request for a target Merchant Web site is initiated by a user (web surfer) or by the Webmaster, which utilizes the source Webmaster ID and triggers a correlation function. The source Webmaster ID is correlated to a target Webmaster ID, which is a unique identifying code functional within the target Merchant's home affiliate system and which corresponds to the unique identification system of the requested Merchant's home affiliate system.

Next, an entry mechanism URL for a target Merchant's affiliate system is generated and returned, containing the correlated target Webmaster ID code. The entry mechanism URL enables a hand off of the user to the requested Merchant's affiliate system, which further recognizes the source affiliate system from which the referring Webmaster sends traffic.

In one embodiment of the present invention, transaction information is obtained from the target Merchant's home affiliate system for specified transactions. The transaction information may be obtained by granting an affiliate pooling system access to a server operated by the target Merchant's affiliate system and allowing the affiliate pooling system to retrieve stored transaction information from the server operated by the Merchant's affiliate system. Optionally, the transaction information may be obtained by granting the target Merchant's home affiliate system access to an affiliate pooling system server and allowing the target Merchant's affiliate system to transfer the transaction information to the affiliate pooling system server.

In another embodiment of the present invention, the received request further includes an identifier for the target Merchant's home affiliate system, and an identifier for the source affiliate pool of the referring Webmaster.

In a further embodiment of the present invention, the received source Webmaster ID code is correlated to the target Webmaster ID code by performing a lookup function utilizing the identifier for the source affiliate pool of the referring Webmaster and the unique identifier for the referring Webmaster. Optionally, the lookup function may provide the target Webmaster ID code from a block of designated codes from within the requested Merchant affiliate system.

In yet a further embodiment, a Webmaster operates a web site having a banner ad for a related Merchant affiliate system. Additionally, the banner ad may include a link that includes an identifier for the related Merchant affiliate system and a unique identifier for at least one of the plurality of Webmasters operating the web site. Also, the link may further include a URL for a virtual affiliate pooling system.

Advantageously, the present invention allows groups of Webmasters to participate in existing Merchant affiliate systems without the need of joining those Merchant affiliate systems.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention, together with further advantages thereof, may best be understood by reference to the following description taken in conjunction with the accompanying drawings in which:

FIG. **1** is an illustration showing a prior art stand-alone affiliate system;

FIG. **2** is an illustration showing a prior art affiliate hub system;

US 6,804,660 B2

5

FIG. **3** is an illustration showing an affiliate pooling system in accordance with an embodiment of the present invention;

FIG. **4** is an illustration showing a virtual affiliate system, in accordance with an embodiment of the present invention;

FIG. **5** is a flowchart showing a method for virtual affiliate pooling in accordance with one embodiment of the present invention;

FIG. **6** is a flowchart showing a method for processing and correlating user request data, in accordance with an embodiment of the present invention;

FIG. **7** is an illustration showing a complimentary pooling system, in accordance with an embodiment of the present invention;

FIG. **8** is an illustration showing an affiliate pooling system, in accordance with another embodiment of the present invention;

FIG. **9** is an illustration showing a complimentary affiliate pooling system, in accordance with yet another embodiment of the present invention; and

FIG. **10** is an illustration showing an affiliate pooling hub system, in accordance with a further embodiment of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

An invention is disclosed for Internet based affiliate pooling across existing affiliate system boundaries. In the following description, numerous specific details are set forth in order to provide a thorough understanding of the present invention. It will be apparent, however, to those skilled in the art, that the present invention may be practiced without some or all of these specific details in order to not unnecessarily obscure the present invention.

The following terms and acronyms are used throughout the detailed description:

Client-Server. A model of interaction in a distributed system in which a program at one site sends a request to a program at another site and waits for a response. The requesting program is called the "client," and the program which responds to the request is called the "server." In the context of the World Wide Web (discussed below), the client is a "Web browser" (or simply "browser") which runs on a computer of a user; the program which responds to browser requests by serving Web pages is commonly referred to as a "Web server."

Hyperlink. A navigational link from one document to another, or from one portion (or component) of a document to another. Typically, a hyperlink is displayed as a high-lighted word or phrase that can be selected by clicking on it using a mouse to jump to the associated document or documented portion.

Hypertext System. A computer-based informational system in which documents (and possibly other types of data entities) are linked together via hyperlinks to form a user-navigable "web."

Internet. A collection of interconnected (public and/or private) networks that are linked together by a set of standard protocols (such as TCP/IP and HTTP) to form a global, distributed network. (While this term is intended to refer to what is now commonly known as the Internet, it is also intended to encompass variations which may be made in the future, including changes and additions to existing standard protocols.)

World Wide Web ("Web"). Used herein to refer generally to both (i) a distributed collection of interlinked, user-

6

viewable hypertext documents (commonly referred to as Web documents or Web pages) that are accessible via the Internet, and (ii) the client and server software components which provide user access to such documents using standardized Internet protocols. Currently, the primary standard protocol for allowing applications to locate and acquire Web documents is HTTP, and the Web pages are encoded using HTML. However, the terms "Web" and "World Wide Web" are intended to encompass future markup languages and transport protocols which may be used in place of (or in addition to) HTML and HTTP.

Web Site. A computer system that serves informational content over a network using the standard protocols of the World Wide Web. Typically, a Web site corresponds to a particular Internet domain name, such as "amazon.com," and includes the content associated with a particular organization. As used herein, the term is generally intended to encompass both (i) the hardware/software server components that serve the informational content over the network, and (ii) the "back end" hardware/software components, including any non-standard or specialized components, that interact with the server components to perform services for Web site users.

HTML (HyperText Markup Language). A standard coding convention and set of codes for attaching presentation and linking attributes to informational content within documents. (HTML 4.0 is currently the primary standard used for generating Web documents.) During a document authoring stage, the HTML codes (referred to as "tags") are embedded within the informational content of the document. When the Web document (or HTML document) is subsequently transferred from a Web server to a browser, the codes are interpreted by the browser and used to parse and display the document. Additionally in specifying how the Web browser is to display the document, HTML tags can be used to create links to other Web documents (commonly referred to as "hyperlinks"). For more information on HTML, see Ian S. Graham, The HTML Source Book, John Wiley and Sons, Inc., 1995 (ISBN 0471-11894-4).

HTTP (HyperText Transport Protocol). The standard World Wide Web client-server protocol used for the exchange of information (such as HTML documents, and client requests for such documents) between a browser and a Web server. HTTP includes a number of different types of messages which can be sent from the client to the server to request different types of server actions. For example, a "GET" message, which has the format GET, causes the server to return the document or file located at the specified URL.

URL (Uniform Resource Locator). A unique address which fully specifies the location of a file or other resource on the Internet. The general format of a URL is protocol:// machine address:port/path/filename. The port specification is optional, and if none is entered by the user, the browser defaults to the standard port for whatever service is specified as the protocol. For example, if HTTP is specified as the protocol, the browser will use the HTTP default port of **80**.

Cookies. A technology that enables a Web server to retrieve information from a user's computer that reveals prior browsing activities of the user. The informational item stored on the user's computer (typically on the hard drive) is commonly referred to as a "cookie." Many standard Web browsers support the use of cookies.

PUSH Technology. An information dissemination technology used to send data to users over a network. In contrast to the World Wide Web (a "pull" technology), in which the

US 6,804,660 B2

**7**

client browser must request a Web page before it is sent, PUSH protocols send the informational content to the user computer automatically, typically based on information pre-specified by the user.

FIG. **3** is an illustration showing an affiliate pooling system **300** in accordance with an embodiment of the present invention. The affiliate pooling system **300** includes a group of Merchant affiliated Webmasters **302**, a Merchant affiliate system **304**, an affiliate pool of Webmasters **306**, Virtual Affiliates **308**, and a Virtual Affiliate system **310**. The affiliate pool of Webmasters **306**, the Virtual Affiliates **308**, and the Virtual Affiliate system **310** may be added to an existing Merchant affiliate system **304**.

The Merchant's affiliate system **304** is a full framework that operates the Merchant's affiliate program. Generally, the Merchant's affiliate system **304** includes the Merchant's back-end tracking mechanism, which keeps track of trans-actions and credits affiliates; the accounting system for payout of affiliates; the reporting system for reporting trans-action statistics back to affiliates; and the support system for affiliate and technical support.

In use, the group of Merchant affiliated Webmasters **302** sends traffic through their surrounding Merchant affiliate system **304**. The traffic is tracked and any transactions initiated by the traffic are credited to the particular referring Webmaster from within the group of Merchant affiliated Webmasters. Each Webmaster has access to the full frame-work of affiliate services offered by the Merchant affiliate system **304**.

The affiliate pool of Webmasters **306** produces a quantity of traffic. The affiliate pool is a loose aggregation of Web-masters with a quantity of traffic, who may or may not already be utilizing a Merchant affiliate system or some master affiliate hub system. All that is required for a Web-master to be considered part of the affiliate pool is the ability to send traffic through some affiliate system—that is, to have been assigned a unique identifying code (in order to track and credit referred transactions), as described in greater detail subsequently.

The Virtual Affiliates **308** are a subset of the Webmasters of the affiliate pool **306** with their quantity of traffic. Each Virtual Affiliate **308** sends traffic to the Merchant through the Merchant's existing affiliate system **304**, and thus has the ability to benefit from advertising the goods and/or services of the Merchant while not wholly a part of the Merchant's existing affiliate system. In this way, the Virtual Affiliate Webmaster uses only a portion of the Merchant affiliate system's **304** framework (or resources).

The Virtual Affiliate remains independent from the Mer-chant's affiliate system. In addition, the Virtual Affiliate may remain anonymous to the Merchant's affiliate system, iden-tified only as a member of the affiliate pool of Webmasters **306**, as described in greater detail subsequently.

The Virtual Affiliate system **310** shows the flow of traffic, as the Webmasters in the affiliate pool **306** act as Virtual Affiliates **308** of the Merchant affiliate system **304**, sending their quantity of traffic through the existing Merchant affili-ate system **304**.

FIG. **4** is an illustration showing a Virtual Affiliate system **310**, in accordance with an embodiment of the present invention. The Virtual Affiliate system **310** includes a rec-ognition system **400** and a transfer system **402**.

As discussed in greater detail below, each Webmaster in the affiliate pool **306** has assigned to it a unique identifying code, referred to below as the "source Webmaster ID." Thereafter, traffic received from a particular Webmaster,

**8**

which flows through the affiliate pooling system **300**, includes the source Webmaster ID code for that particular Webmaster.

This source Webmaster ID is utilized by the recognition system **400** to perform an initial function that identifies the source Webmaster ID as from the affiliate pool and corre-lates it to another unique ID code that can be utilized by the particular Merchant's existing affiliate system, referred to below as the "target Webmaster ID." Incorporating this target Webmaster ID, the recognition system **400** correlates the IDs and returns a properly formatted entry mechanism, such as a URL, which enables the traffic to be handed off to and recognized by the particular Merchant's existing affiliate system. In this manner the Webmaster participates as a Virtual Affiliate **308** of the Merchant's affiliate system.

The transfer system **402** receives or retrieves information from a Merchant's affiliate system concerning transactions initiated by the traffic referred by the Webmasters in the affiliate pool **306**. Generally, the transfer system **402** re-correlates each target Webmaster ID (from a particular Merchant's affiliate system) to a source Webmaster ID (from the affiliate pool). This information is then saved and pro-cessed for subsequent reporting and payout, as discussed in greater detail below.

FIG. **5** is a flowchart showing a method **500** for Virtual Affiliate pooling in accordance with one embodiment of the present invention. In an initial operation **502**, pre-process operations are performed. Pre-process operations include gathering Webmaster information for each Webmaster of the affiliate pool and other pre-process operations that will be apparent to those skilled in the art.

In a data setup operation **504**, participating Merchant systems and participating Webmasters are configured to utilize the affiliate pooling system of the present invention.

As part of the data setup operation **504**, any guidelines for integration of the Virtual Affiliate system and the existing Merchant affiliate system are laid out such that the subse-quent operations (i.e., correlation **508**, hand off **509**, data obtaining **510**, assimilation **512**) between the systems can be executed. The configuration guidelines that are set can be accessed as necessary by any subsequent operation.

The configuration information will include guidelines that ensure that the Merchant affiliate system is able to recognize that a given segment of traffic originates from some Web-master from a source affiliate pool, and that the Merchant affiliate system is able to relay back to the Virtual Affiliate system information regarding all completed transactions referred from the affiliate pool. These recognition and trans-fer functions are significant parts of the operations described in more detail hereinbelow.

The configuration information may include syntax of the URL links which Webmasters post on their sites, used in a transmitting operation **506**, as described in more detail below.

The configuration information may include designation of the particular blocks or sequences of unique identifying codes within each participating system to be correlated to each other, or rules for generating correlated codes "on the fly," used in a correlation operation **506**, as described in more detail below.

The configuration information may further include des-ignation of the syntax/format of the correlated output such that it is recognized by the Merchant affiliate system and can be handed off to it, in a hand off operation **509**, as described in more detail below. For example, redirection to the target Merchant affiliate system in this hand off operation can come in the form of a specified URL syntax.

US 6,804,660 B2

9                                              10

The configuration information may also include parameters for a data obtaining operation **510** (in which information from Virtual Affiliate-referred transactions is passed back to the Virtual Affiliate system); this includes, for example, choosing the mode of transfer and specifying the type and level of data content to be included in the transfer. At least one transfer mode should be chosen for the information to be passed from the Merchant affiliate system to the Virtual Affiliate system. These modes may include e-mail, file transfer protocol, script calls and manual entry of the information to an affiliate pooling system server. A determination as to the content of the information that is to be passed back to the Virtual Affiliate system should be made at setup. The content of information that is passed back may be different for each Merchant affiliate system that is used in connection with the affiliate pooling system. The content of information may vary depending upon the type of commerce and the tracking and reporting capabilities of the Merchant affiliate system with which the affiliate pooling system operates.

The configuration information may include rules for reporting of transaction statistics, as used in an assimilation operation **512**, as described in more detail below. For example, these rules may specify the interval of reporting (such as per day, per month, or real-time), treatment of erroneous or fraudulent transaction data, and terms of compensation for referring Webmasters (e.g., the Webmaster may receive a given unit per transaction, or a given percentage per transaction), such that revenue totals can be calculated.

Also as part of a data setup operation **504**, Webmasters in the affiliate pool are configured to operate with the affiliate pooling system. Each Webmaster from the affiliate pool of Webmasters has a quantity of traffic. As part of the setup operation, each Webmaster is assigned or verified to possess a unique identifying code (source Webmaster ID). This source Webmaster ID is the only information necessarily taken from the affiliate pool of Webmasters when used in conjunction with a Merchant's existing affiliate system. All other information (e.g., names, Social Security Numbers, or address of Webmasters, which are required for them to be compensated) can remain behind, such that the Webmaster is rendered anonymous to the Merchant affiliate system. This possibility for anonymity represents a significant advance over prior art, which limit the influx of traffic to only that which is completely tracked by and utilizes the full resources of the home system. Use of the Virtual Affiliate system allows for some responsibility to be removed from the Merchant, in terms of maintaining and expending system resources toward its relationship with the referring Webmaster. The Merchant is allowed to expand without the additional burden of keeping track of all the identifying data for every Webmaster who refers traffic, nor does the Merchant need to sign up, report on, pay out, or provide customer/technical support to every party who sends traffic to the Merchant system. Also, this anonymity feature provides added security to the Virtual Affiliate system in that the Merchants are not able to bypass the Virtual Affiliate system which some Merchants may see as a middleman. However, depending on preference and configuration, the participating systems may choose to forgo some portion or all of this anonymity feature and expend system resources to more fully participate in the relationship with Virtual Affiliate Webmasters.

As part of the Webmaster data setup operation **504**, a Webmaster may first be introduced to the affiliate pooling system of the present invention by visiting a web site sponsored by the affiliate pooling system that outlines the terms and conditions of becoming a Virtual Affiliate. The terms may vary for each Merchant affiliate system participating in the affiliate pooling system. The unique identifying code (source Webmaster ID) for the Webmaster may be assigned when the Webmaster creates an online account with any of the various Merchant affiliate systems to which access is provided through the affiliate pooling system, or with the affiliate pooling system itself.

Each Webmaster then utilizes the source Webmaster ID in order to send traffic which is "trackable" through a system. In a preferred use, the source system can provide the Webmaster with properly formatted links, which will each contain the source Webmaster ID. The Webmaster can copy and paste these HTML coded links directly into their web pages. These links then are utilized by users of a web page to transmit requests for a Merchant whose products or services are being advertised, as described in greater detail below.

In a transmitting operation **506**, a request is transmitted to the affiliate pooling system which contains 1) the unique identifying code for the Webmaster within his origin affiliate system (source Webmaster ID), and 2) some identifier for the Merchant whose product or service is offered (target system identifier). The URL may also contain information identifying the source affiliate system of the Webmaster (a source system identifier), either explicitly within the URL or somehow based on other information within the URL (such as the source Webmaster ID) in combination with a previously determined rule from the configuration information from data setup operation **504**.

In use, the transmitted request can be initiated when a user (i.e., traffic of the Webmaster from the affiliate pool) clicks a URL (on the Webmaster's web site) which contains the source Webmaster ID and identifies the target Merchant system whose products or services are being advertised. Alternately, the request can be initiated by the Webmaster himself, or by the affiliate pooling system itself, such that the correlation operation described in detail below has already happened when a user visits the Webmaster's site, and the user can thus directly click the returned entry mechanism URL for hand off to the target system, as described in more detail below.

Next, in a correlation operation **508**, the affiliate pooling system receives a request for a target Merchant URL and correlates and processes the request. In this operation, the affiliate pooling system parses the request to determine the unique ID of the referring Webmaster (source Webmaster ID).

As part of the correlation operation, the Virtual Affiliate system also recognizes the source system from which the traffic comes and in which this referring Webmaster participates. This source system can be an existing Merchant affiliate system, or the affiliate pooling system itself, and corresponds to the system from which the referring source Webmaster obtained his source Webmaster ID. Recognition of the source system can occur via an identifier (source system identifier) in the URL request that is received by the affiliate pooling system, or via a rule previously determined in the configuration of the participating systems, as described in more detail previously and hereinbelow.

From the request, the affiliate pooling system knows which Merchant is the target of the request, such that the Webmaster's unique ID for the affiliate pooling system (source Webmaster ID) can then be correlated to a unique ID for the Merchant's affiliate system (target Webmaster ID).

US 6,804,660 B2

**11**

Correlation can occur in a number of ways. For example, the Merchant may have previously allocated a sufficiently large number of unique ID's from within its existing affiliate system, reserved (or blocked off) for use with the affiliate pooling system. As needed (on the fly, or having been assigned previously), the lookup table matching the existing Merchant system's ID (target Webmaster ID) to the appropriate source Webmaster ID from the affiliate pool is created or augmented. Accordingly, when the pooling system utilizes webmaster identifiers that are different from the target Merchant affiliate system's identifiers, the Webmaster ID's can be referenced using a lookup table that cross-references the two codes.

The Merchant affiliate system may also use a hybrid string of characters as a target Webmaster ID for identifying Webmasters associated with the affiliate pooling system. For example, the first portion of the code may be an acronym for the source system from which the Webmaster is sending traffic, while the next portion may consist of numbers that represent the particular source Webmaster ID assigned to the Virtual Affiliate Webmaster. In this respect, the Merchant affiliate system recognizes that a transaction originates from the respective source system and recognizes the new target Webmaster ID such that the Merchant's existing tracking can take over.

As another alternative for setting up the Virtual Affiliate system to interact with an existing Merchant affiliate system, the Merchant can set up custom interfaces (for example, using a scripting platform like CGI, PHP, Apache, Perl, etc.), in order to incorporate variables which designate the source Webmaster as a Virtual Affiliate. Traffic sent to the target Merchant's system is recognized as originating from the source system based on the variables present or use of the interface. The variables can be set in hidden HTML in a web page or as part of the URL. In most cases, the hidden HTML and the URL are treated the same; thus it wouldn't make a difference which was used in a particular situation.

In a hand off operation **509**, the affiliate pooling system hands off the traffic to the target Merchant affiliate system. In order for the hand off to the Merchant affiliate system to run smoothly, the Merchant should be prepared to recognize traffic from the Virtual Affiliate system, as described above. The Merchant system should further recognize the target Webmaster ID and URL syntax such that the Merchant's tracking mechanism can take over, as described above.

In most cases, the Merchant has some mechanism in place for keeping track of traffic and resulting transactions; this is done using any number of methods, which will be apparent to those skilled in the art, and include use of referring URL's, unique ID numbers, user IP's, cookies, or session variables. For those Merchants that do not have this capability, a type of setup that incorporates customized compatibility between the affiliate pooling system and the existing Merchant affiliate system may be provided.

No separate transaction payment system, including authorization or processing of user-requested transactions for Merchant goods and/or services, is necessary with the present invention since it uses the existing transaction payment system of the Merchant's e-commerce setup.

The hand off to the Merchant affiliate system for processing of any initiated transactions includes the target Webmaster ID. The Merchant affiliate system then processes the rest of the user request, including completing transactions for the user. The Merchant affiliate system tracks all transactions occurring for each unique target Webmaster ID. This tracked data is then obtained by the Virtual Affiliate system, as described below.

**12**

In a data obtaining operation **510**, the Virtual Affiliate system obtains transaction data from the Merchant affiliate system. There are generally two methods of obtaining this information from the Merchant affiliate system: retrieving and receiving.

Retrieval of information is scheduled, such that at a designated time or interval the Virtual Affiliate system is granted access to the relevant transaction data of the Merchant's affiliate system, via the process for retrieving data from a remote server. The affiliate pooling system may receive and retrieve information through a server computer with a database.

Receipt of transaction data can occur either on a schedule or in real time. Scheduled receipt of transaction data occurs using the same method and process as "retrieving" the data, as explained above, except reversed. That is, the Merchant affiliate system is granted access to an area of the Virtual Affiliate system, and transfers the retained data to this area via the process for transferring data between remote servers.

Real-time receipt of transaction data occurs as follows: a given transaction is processed, and as soon as the transaction is completed, the mechanism that completes the transaction automatically sends an impulse to the Virtual Affiliate system, relating or containing information about the transaction's occurrence.

The information that is reported back to the Virtual Affiliate system includes at the very least the target Webmaster ID of the referring Webmaster, and may also include relevant transaction data, such as a transaction date, a transaction amount, an order number, customer information, product information, and so on. The level and type of transaction data available will vary depending on the type of commerce, on the tracking and reporting capabilities of the Merchant affiliate system with which the affiliate pooling system operates, and most importantly, on the configuration information for that Merchant affiliate system, as determined in a data setup operation **504**.

The information that is transmitted back to the Virtual Affiliate system may be transmitted through a variety of means. The mode may be e-mail, file transfer protocol, a direct call from the target Merchant's system, or manual entry. E-mail may be used for processing that is practically real time. E-mail also represents an advantage since e-mails are filtered by author, subject or other criteria. The subject or author field may be used to quickly determine which Merchant has sent the information. E-mail is also a convenient means for delivery of transaction information since a message that is originally undeliverable may be re-queued for later delivery.

File transfer protocol also has its advantages. File transfer protocol is a set of guidelines and programs, and is commonly used to transfer files between different computers on the Internet. As discussed above, during a data setup operation, the systems may agree on a configuration whereby the Merchant affiliate system will maintain transaction information in a directory on a server that can be accessed via an FTP client. At designated times, the Virtual Affiliate system may access the network of a Merchant affiliate system to copy new transaction information or files from a directory to the Virtual Affiliate system. The access to the Merchant affiliate system may be initiated according to a Merchant-specific process, or subroutine, set to run at designated times; for example, the subroutine could run every quarter-hour, every half-hour, every hour, daily or weekly.

The direct call from the target affiliate system may also be used as a means of passing transaction information back to

US 6,804,660 B2

**13**

the Virtual Affiliate system. This method would involve passing the required information to the Virtual Affiliate system immediately upon completion of the transaction. Network dependability would be a factor in determining whether or not this method is feasible since network failures might result in a loss of information. However, the direct call may be re-queued in the same manner as a temporarily undeliverable e-mail. Also, it should be noted that the direct call is most akin to a real-time processing mode.

Manual entry of the transaction information is also an option. However, the costs associated with labor and the probability of human error in entering the transaction would make this option less preferred. The fact that the inaccurate entry of one letter or number could make such a difference with this transaction information teaches against using this mode. In the event this method is used, it can be used to directly enter the information into the Virtual Affiliate system. The information could be entered from a print-out, fax or other form into the Virtual Affiliate system via Web interface.

The obtained data is assimilated in a data assimilation operation **512**. The data obtained from the target Merchant affiliate system is assimilated in order to enable compensation of the Webmasters for referred transactions, and to report transaction statistics back to these Webmasters. During this operation, the data obtained from the Merchant affiliate system is parsed and utilized by the Virtual Affiliate system, as described in greater detail subsequently.

The data assimilation operation **512** should have the capacity to extract relevant information from the transaction data which has been passed back from the Merchant affiliate system. The data assimilation operation **512** can be triggered by an impulse request for the obtained transaction/referral data, in the form of an impulse sent to the system. The impulse can be sent upon receipt of the obtained data above, according to a previously configured schedule, or by request of the source affiliate system. The impulse request contains information for the affiliate pooling system, namely the source system identifier, such that the configuration information for the source system can be located, and the reverse correlation can occur, as described in more detail below.

The data assimilation operation **512** should further have the capacity to perform a reverse correlation on the isolated target Webmaster ID (from the stored transaction data), in which the target Webmaster ID is correlated back to the source Webmaster ID for use by Virtual Affiliate system. That is, using the same database structure as the original correlation operation **508**, the system correlates the previously designated (or created) ID code (the target Webmaster ID, corresponding to the coding system of the target Merchant affiliate system) with the source Webmaster ID. The reverse correlation returns the source Webmaster ID, along with the parsed relevant transaction data.

The data assimilation operation **512** should also have the capacity to perform auditing functions to verify the integrity of the data (e.g., to analyze transaction records thus eliminating duplicates or fraud), depending on the related commerce.

The data assimilation operation **512** should further have the capacity to update statistical information with the new information that has been passed back from the Merchant affiliate system. Once parsed, reverse correlated, and audited, the transaction information and the "refund" code may be packaged, and these packages of information may be inserted into the appropriate place in the database structure of the affiliate pooling system's centralized database, or may

**14**

be sent to or retrieved by a source affiliate system server (for performing its own post-process operations such as reporting, payout, etc.).

In some cases, it may also be desirable for the data assimilation operation **512** to trigger e-mail notifications to the Webmasters themselves as to the receipt of transaction information that has been passed back from the Merchant affiliate system to the Virtual Affiliate system.

Finally, in operation **514**, post-process operations are performed. Post-process operations include payment of Webmasters from the affiliate pool, and other post-process operations that will be apparent to those skilled in the art. The Virtual Affiliates receive payment based on the number and value of referred transactions. Payment processing is made based on the terms and conditions of the Webmaster's agreement to provide referral services to a Merchant. Since the affiliate pooling system is based on a centralized database, check printing, account maintenance and other administrative tasks can be achieved by way of a web interface.

The affiliate pooling system has the capacity to generate statistics based on the information received from the Merchant affiliate system. The information may be broken down into whatever form the affiliate pooling system desires. For example, the statistics may organized by type of commerce, or by product and/or service currently enjoying the largest number of completed transactions or best overall performance. In addition to transaction and revenue statistics, the Virtual Affiliate system can also report statistics relating to raw traffic. Statistics will reflect information based on the type of commerce involved, the tracking and reporting capabilities of the Merchant's existing affiliate system, and the configuration information specified at setup. This information will be available to Webmasters and/or Merchants participating in the affiliate pooling system and will generally assist in improving marketing practices.

FIG. 6 is a flowchart showing a method **508** for processing and correlating user request data, in accordance with an embodiment of the present invention. In an initial operation pre-process operations are performed. Pre-process operations include assigning or verifying the presence of Webmaster unique identifier codes and other pre-process operations that will be apparent to those skilled in the art.

In a receiving operation **604**, a URL request is received by the affiliate pooling system. As described previously, the URL received includes the following information: 1) the unique identifying code for the Webmaster within his origin affiliate system or pool (source Webmaster ID), and 2) some identifier for the Merchant whose product or service is offered (target system identifier). The URL may also contain information identifying the source affiliate system of the Webmaster (a source system identifier), either explicitly within the URL or indirectly via other information within the URL (such as the source Webmaster ID) in combination with a previously determined rule from the configuration information of the systems.

Next, in a lookup operation **606**, a lookup function is performed. Specifically, the lookup function finds the database assigned to the target Merchant affiliate system (target system identifier). Within this database are three fields of information: the source system information, the Webmaster's unique ID within this source system (source Webmaster ID), and a unique identifying code from a block of designated identifiers within the target Merchant's affiliate system (target Webmaster ID). The database is then used to determine a correlating target Webmaster ID for the referring

US 6,804,660 B2

**15**

Webmaster. This identifier is then returned as an affiliate tracking code for use within the Merchant's existing affiliate system.

Depending on the complexity of the system, a database entry for a Webmaster may also include any additional unique identifiers, which would reference the source-target entry and could be used for additional or internal tracking by the affiliate pooling system.

The system of the present invention thus does a look up with the two pieces of source information (source system identifier and source Webmaster ID) to determine a correlated code for the target Merchant affiliate system.

A decision is then made as to whether a code has been returned by the system, in operation 608. If a code has not been returned, the method continues with an assignment operation 610. However, if a code has been returned, the method continues with an operation 612.

In an assignment operation 610, an unused target Webmaster ID is assigned to the referring Webmaster. If no correlated code is returned, the referring Webmaster has not yet sent ANY traffic through this mechanism (has not acted as a Virtual Affiliate). So an unused unique ID is then assigned from a block of designated codes within the target affiliate system. And, on subsequent lookups for this Webmaster's target Webmaster ID (as a result of subsequent referred transactions), the previously assigned code will be returned.

In a new URL determination operation 612, a new URL is determined based on the target Merchant and the target Webmaster ID. Once the correlated ID number for use by the target Merchant affiliate system is determined by the lookup function, the system returns a new URL, containing the "looked up" code and acting as an entry mechanism into the target Merchant's existing affiliate system. The format of the URL (i.e., syntax for the location of the target Merchant affiliate system) is determined using the configuration information specified during a data setup operation, as described in greater detail above. At this point, the user (traffic) is handed to the Merchant, and the transaction is then either completed or abandoned.

In one instance of real time use, the user begins by requesting one URL, but by the time the lookup function is done, the URL is transformed, thus re-directing the user to another URL immediately.

In this way, the Virtual Affiliate needs only to utilize the tracking mechanism of the target Merchant's affiliate system, not the entire affiliate system (i.e., not the accounting system, reporting system, support system, etc.). The target Webmaster ID (supplied in the URL) is retained by the Merchant affiliate system, along with the other transaction statistics that are collected by the Merchant's own processing of transactions (for its own affiliate system or otherwise), including date of transaction, time, order number, order total, itemized order information, etc. The retained information is then passed back to the affiliate pooling system, as described in greater detail above.

Finally, in operation 614, post process operations are performed. Post process operations include data assimilation and other post-process operations that will be apparent to others skilled in the art. As described above, transaction data is assimilated in order to enable compensation of the Webmasters for referred transactions by the source system, as well as report transaction statistics back to these Webmasters.

FIG. 7 is an illustration showing a complimentary affiliate pooling system 700, in accordance with an embodiment of

**16**

the present invention. The complimentary affiliate pooling system 700 includes a first group of Merchant affiliated Webmasters 702, a first Merchant affiliate system 704, a first Virtual Affiliate pool 706, a second group of Merchant affiliated Webmasters 708, a second Merchant affiliate system 710, and a second Virtual Affiliate pool 712.

In this embodiment, the present invention enables a first existing Merchant affiliate system 704 to send traffic or Virtual Affiliates 706 from its own system to a second Merchant affiliate system 710.

In addition, the second Merchant affiliate system 710 sends traffic or Virtual Affiliates 712 from its own system to the first Merchant affiliate system 704.

The present invention thus allows these two distinct and separate affiliate systems 704,710 to share respective sets of Virtual Affiliates 706,712. The two affiliate systems remain independent and distinct, retaining their own systems. The invention allows the two to integrate without utilizing the same system and without taking Webmasters from one another.

The following is an exemplary use of the embodiment of the present invention shown in FIG. 7. In the following example Associate is a company implementing the present invention, that is further capable of installing a system utilizing the present invention on Merchant servers.

CDMerchant.com has its own Merchant affiliate system 704 for the promotion of its goods, namely music CDs.

CDMerchant.com comes to Essociate looking for ways to increase their sales/ traffic. Essociate advises CDMerchant-.com that their customers are similar to the customers at MusicMemorabilia.com.

MusicMemorabilia.com has its own Merchant affiliate system 710 for the promotion of its goods, namely memorabilia relating to rock, jazz, and blues music.

An agreement is made between the three parties, such that Essociate will enable the two Merchants to share respective pools of Virtual Affiliates; that is, CDMerchant.com's affiliate Webmasters can become Virtual Affiliates 712 of MusicMemorabilia.com 710, and MusicMemorabilia.com's affiliate Webmasters can become Virtual Affiliates 706 of CDMerchant.com 704. The affiliates of MusicMemorabilia.com gain the ability to offer the products of MusicMemorabilia.com and be compensated for referred transactions, without having to maintain a separate account with MusicMemorabilia.com's own affiliate system. Similarly, the affiliates of MusicMemorabilia.com gain the ability to offer the products of CDMerchant.com and be compensated for referred transactions, without having to maintain a separate account with CDMerchant.com's own affiliate system.

As part of the agreement, the parties define a transaction as the purchase of an item from either MusicMemorabilia.com or CDMerchant.com. The parties also agree on a set commission structure for transactions. For example, MusicMemorabilia.com may pay out 15% of every referred sale, of which the referring Webmaster (from CDMerchant.com) gets 5%, CDMerchant.com gets 5%, and Essociate gets 5%; and CDMerchant.com may also pay out 15% of every referred sale, of which the referring Webmaster (from MusicMemorabilia.com) gets 5%, MusicMemorabilia.com gets 5%, and Essociate gets 5%.

Also, to facilitate this integration, MusicMemorabila.com defines a scheme for a block of unique identifying codes from its existing affiliate system. In this example, this block consists of the letters "cd" plus a four digit code. CDMerchant.com also sets off a block of unique identifying codes

US 6,804,660 B2

**17**

from its existing affiliate system for use by the MusicMemorabilia.com Virtual Affiliates.

Thus Essociate's affiliate pooling system enables the sharing of Webmasters across existing affiliate boundaries. CDMerchant.com and MusicMemorabilia.com do not have to release their own confidential Webmaster information (an asset itself), yet still gain the benefits of sharing Webmaster and their traffic. Both Merchants also gain traffic without having to dedicate resources to new affiliate Webmasters.

Webmaster Fred runs a site for his band at http://www.fred.com.

On his site, he participates in a Merchant affiliate system for CDMerchant.com (**702**). As a participant, he places banners and links on his band site, advertising the products of CDMerchant.com. These banners and links point to URLs that contain Fred's unique identifying code, **1001**, for the CDMerchant.com affiliate system (**704**).

So the URL that Fred sends his traffic to may look like:

http://www.cdmerchant.com/affiliate/1001/product.html

User Gretta is interested in music. After seeing Fred's band, Gretta decides to visit the band's website at http://www.fred.com. After learning about the band from the information on this site, Gretta decides she would like to purchase one of their recommended CDs.

Fred's site provides a banner for CDMerchant.com and suggests clicking the banner to purchase any CDs. Gretta clicks on this banner and is taken to a URL on one of CDMerchant.com's servers.

http://www.cdmerchant.com/affiliate/1001/product.html

As stated, this URL contains the target address as well as Fred's unique identifying code for the CDMerchant.com affiliate system **704**.

Gretta arrives at the specified URL, a page on CDMerchant.com's server. To ensure that Fred's potential sale is not lost, CDMerchant.com's affiliate system has sufficient tracking such that if Gretta completes a transaction during her visit, Fred is credited.

Because of CDMerchant.com's use of Essociate's affiliate pooling system, CDMerchant.com can expand the choice of links on its pages to include goods and service of MusicMemorabilia.com, without losing the ability to credit transactions to CDMerchant.com's referring affiliate Webmasters.

Thus, the URLs accessed by Greta after she moves from Fred's Web page to the Merchant's on-line store may contain a banner ad for MusicMemorabilia.com at the top of the page, with a URL that also contains Fred's unique identifying code (from the source CDMerchant.com affiliate system).

Alternatively, Gretta could get a "pop-up" window upon entry to CDMerchant.com, or upon exit, which would advertise and link to MusicMemorabilia.com. Or Gretta could see an interstitial, which is a temporarily loaded transition document, similar in many ways to a television commercial, and which would advertise and link to the goods of MusicMemorabilia.com. In any above case, the advertisements use links which each contain Fred's source Webmaster ID "**1001**."

Gretta arrives at a page containing the CD she was looking for. If Gretta purchases the CD during this visit, Fred will get credit for the transaction as part of the CDMerchant.com stand-alone affiliate system.

On the page, near the CD description, CDMerchant.com has placed an advertisement for MusicMemorabilia.com, stating "If you like this band, why not get one of their posters!"

**18**

As before, this ad contains a URL which contains Fred's CDMerchant.com source Webmaster ID, and because it is outside the scope of CDMerchant.com's products and tracking, the URL targets a location on Essociate's server. The URL also contains some identifier for MusicMemorabilia.com (target system identifier) and some identifier for CDMerchant.com (source system identifier) and may look like:

http://memorabilia.essociate.com/partners/cdmerch/1001/

The address includes the following: a target system identifier (in this example, memorabilia.essociate.com identifies the target as MusicMemorabilia.com), a source system identifier (cdmerch), and source Webmaster ID (**1001**).

The Essociate server receives (loads) the URL request, taking the information in the URL and processing it with a lookup function.

Specifically, the lookup function finds the database assigned to the target Merchant affiliate system (MusicMemorabilia.com). Within this database are three fields of information: the source system identifier (cdmerch), the unique Webmaster ID from this system (**1001**), and a unique identifying code from the block of previous described codes within the MusicMemorabilia.com affiliate system (a target Webmaster ID).

So, the Essociate system does a look up with the two pieces of source information, to determine a correlating MusicMemorabilia.com affiliate tracking ID.

In this example, Fred's CDMerchant.com code is **1001**. Essociate's server looks up this source Webmaster ID and correlates it with the target Webmaster ID "cd1001."

Once the correlated ID number for the MusicMemorabilia.com's affiliate program is determined by the Essociate server's lookup function, the server returns a new URL, containing the "looked up" code for MusicMemorabilia, and then targets the location on MusicMemorabilia.com's server.

http://www.musicmemorabilia.com/affiliatepartners/cd1001/poster.html

In real time, this process is extremely fast from Gretta's point of view. Gretta begins by loading one URL, but by the time the lookup function is done, this URL is transformed, thus re-directing her to another URL almost immediately.

Gretta is now within MusicMemorabilia.com's site (**712**), specifically at a URL containing the new "looked up" identifying code.

Gretta purchases the poster, as well as some lyric sheets and a set of autographed guitar picks for $100.

Using only the tracking mechanism of the MusicMemorabilia.com affiliate system and/or shopping cart, the unique identifying code and transaction details are carried through to the completion of Gretta's transaction, and this information is then sent to or grabbed by an Essociate server.

In this example, MusicMemorabilia.com sends Essociate the transaction information (referring code and designated statistics) in real-time. So when Gretta completes her transaction (her credit card is charged), the MusicMemorabilia.com affiliate system automatically sends the information to a storage area on the Essociate server.

In this example, the information includes the target Webmaster ID (from MusicMemorabilia.com's affiliate system; "cd1001" in this example), the date and time of the order, the order number, and the total of the purchases.

Once on the Essociate server, the assimilation process begins when a request for the data is received by the Essociate server.

In this example, a request impulse is sent by CDMerchant.com's affiliate system once each hour. The request

US 6,804,660 B2

19

includes information that denotes that CDMerchant.com is the source Merchant affiliate system.

When Essociate receives the request, Gretta's transaction information, as well as all other referred transactions added during that hour are parsed (line by line, with one transaction per line).

In this example, the MusicMemorabilia.com target Webmaster ID from Gretta's transaction line is matched with the corresponding source Webmaster ID (Fred's code from the CDMerchant.com affiliate system) via a "reverse lookup" function.

Using the same database structure as the original lookup, the system correlates the previously designated (or created) target Webmaster ID (MusicMemorabilia.com) with Fred's source Webmaster ID (CDMerchant.com).

Gretta's transaction information is parsed according to the configuration information for CDMerchant.com's integration with MusicMemorabilia.com and Essociate. In this example, only the date and time of the transaction and the total of the purchase, and of course Fred's "refund" source Webmaster ID, are retained through the parsing process. In addition, compensation can be calculated for the parsed information using the configuration information for the participating systems.

In this example, the Essociate system calculates Fred's commission as $5.00 (5% of Gretta's $100 transaction).

The information (Fred's ID code, date/time of Gretta's transaction, $100 transaction total, and $5.00 commission amount for Fred) is packaged and sent to the CDMerchant .com affiliate system.

The CDMerchant.com affiliate system now takes over, using the data in the information packages to handle subsequent affiliate services for Fred, such as accounting services by paying Fred $5 for his referred transaction as a Virtual Affiliate, and reporting the transaction total and date and time of the transaction to Fred.

The same set of operations which enable affiliate pooling above also apply with the source and target roles reversed. In other words, MusicMemorabilia.com's existing affiliate system acts as the source system and allows its Webmasters to send traffic to CDMerchant.com (now figured as the target system) while retaining their identity as MusicMemorabilia.com affiliates.

So, a second Webmaster Ernie has a Web site where he places links and banners promoting MusicMemorabilia.com through MusicMemorabilia.com's existing affiliate system; and a given user (either Gretta or any other user visiting Ernie's Web site) clicks one of these banners and is taken to a URL within MusicMemorabilia.com's existing affiliate system. Upon the user's exit from the MusicMemorabilia.com site, a new browser window is automatically displayed which shows advertising information for CDMerchant.com and utilizes links which include Ernie's now correlated target Webmaster ID and direct the user to the CDMerchant target affiliate system. Thus MusicMemorabilia.com's use of the Virtual Affiliate system incorporates the correlation function directly into the exit traffic mechanism used by the source MusicMemorabilia.com affiliate system, correlating the source Webmaster ID to the target Webmaster ID automatically whenever an exit console for the target Merchant affiliate system is triggered. The exit console loads a URL such that Ernie will get credit for any referred sale at CDMerchant.com initiated during that visit, but will remain separate from CDMerchant's existing affiliate system.

It should be noted that both possible configurations of target and source systems discussed above, and their respec-

20

tive flows of traffic and Virtual Affiliates, can co-exist, operating simultaneously and in parallel.

FIG. 8 is an illustration showing an affiliate pooling system 800, in accordance with another embodiment of the present invention. The affiliate pooling system 800 includes a first group of Merchant affiliated Webmasters 802, a first Merchant affiliate system 804, a first Virtual Affiliate pool 806, a second group of Merchant affiliated Webmasters 808, and a second Merchant affiliate system 810. The affiliate pooling system 800 further includes a third group of Webmasters 812, and a third Virtual Affiliate pool 814.

In this embodiment, the present invention enables a first existing Merchant affiliate system 804 to send traffic or Virtual Affiliates 806 to a second existing Merchant affiliate system 810.

In addition, the present invention allows a third pool of Webmasters 812 (not necessarily associated with any existing Merchant affiliate system, but nonetheless possessing unique identifying codes) to be Virtual Affiliates 814 of the second Merchant affiliate system 810.

Thus the second Merchant affiliate system 810 benefits from increased traffic (and therefore more potential sales), without having to divert resources dedicated to its existing affiliate Webmasters 808 or to new Webmasters.

The first pool of Webmasters 802 and the first Merchant affiliate system 804 both benefit by being able to additionally promote the goods and/or services of the second Merchant 810, while still being credited for referred transactions and without having to leave the pool or affiliate system where they currently "reside" and conduct business.

Also, the second system's 810 own base of Webmasters 808 are not Virtual Affiliates for either of the other two participating systems (however, they could be in another given situation).

FIG. 9 is an illustration showing a complimentary affiliate pooling system 900, in accordance with yet another embodiment of the present invention. The complimentary affiliate pooling system 900 includes a first group of Merchant affiliated Webmasters 902, a first Merchant affiliate system 904, a first Virtual Affiliate pool 906, a second group of Merchant affiliated Webmasters 908, a second Merchant affiliate system 910, and a second Virtual Affiliate pool 912. The complimentary affiliate pooling system 900 further includes a third group of Webmasters 914, and a third Virtual Affiliate pool 916 and a fourth Virtual Affiliate pool 918.

In this embodiment, the present invention enables a first existing Merchant affiliate system 904 to send traffic or Virtual Affiliates 906 from its own system to a second Merchant affiliate system 910.

In addition, the second Merchant affiliate system 910 sends traffic or Virtual Affiliates 912 from its own system to the first Merchant affiliate system 904.

The present invention thus allows these two distinct and separate affiliate systems 904,910 to share their respective sets of Virtual Affiliates 906,912. The two affiliate systems remain independent, using their own systems, and yet can share their Webmaster traffic without cannibalizing Webmasters from one another.

Additionally, the third pool of Webmasters 914 with unique identifying codes are Virtual Affiliates 916,918 of both existing Merchant affiliate systems 904,910, sending traffic through either or both of the existing systems, while still being credited for referred transactions and without having to leave the pool or affiliate system where they currently "reside" and conduct business.

FIG. 10 is an illustration showing a affiliate pooling hub system 1000, in accordance with a further embodiment of

US 6,804,660 B2

21

the present invention. The affiliate pooling hub system **1000** includes a first group of Webmasters **1002**, Virtual Affiliates **1004**, a second group of Webmasters **1006**, a Master Affiliate System **1008**, and an affiliate network **1010** having individual affiliate systems **1012**.

The Master Affiliate System **1008** operates as described with respect to FIG. **2**. However, in this embodiment, the present invention enables an existing affiliate pool **1002** to act as Virtual Affiliates **1004** for an existing Master Affiliate System **1008** with a number of networked affiliate systems **1010**. An example of such a Master Affiliate System would be Linkshare.com.

Used in this way, the affiliate pooling hub system **1000** creates Virtual Affiliates **1004** from the affiliate pool **1002**, allowing them to promote the goods and/or services of any one of the networked affiliate systems within the Master Affiliate System **1008**. Yet, the Virtual Affiliates **1004** do not consume as many resources from the networked affiliate system **1010** or the Master Affiliate System **1008** as the true affiliated Webmasters **1006** of these systems.

The invention can be utilized with any one of the networked affiliate systems **1012**, or all of them **1010**, or with the Master Affiliate System **1008** itself.

It should be borne in mind that FIGS. **7, 8, 9**, and **10** are examples of the use of the present invention. The use of the invention is not limited to these four examples. The invention actually enables combination or interconnection of any of the FIGS. **7, 8, 9**, and/or **10**, or of variations of them. FIGS. **7, 8, 9**, and **10** could all be combined to represent some ubiquitous configuration, each linked with an affiliate system enabled by the present invention.

The system of the invention enables the creation of an architecture of affiliate systems as simple as FIG. **3**, or an architecture of affiliate systems that extends ad infinitum.

While the present invention has been described in terms of several preferred embodiments, there are many alterations, permutations, and equivalents which may fall within the scope of this invention. It should also be noted that there are many alternative ways of implementing the methods and systems of the present invention. It is therefore intended that the following appended claims are interpreted as including all such alterations, permutations, and equivalents as fall within the true spirit and scope of the present invention.

What is claimed is:

**1**. A method for providing Virtual Affiliates to an existing target affiliate system, the method comprising the operations of:

configuring an existing target affiliate system to receive referrals from a first plurality of Webmasters in an affiliate pool of source Webmasters such that the target Merchant affiliate system recognizes a transaction as originating from a source Webmaster in an affiliate pooling system, including the step of:

assigning a source Webmaster unique identifier for each of said first

plurality of Webmasters each operating at least one web site;

receiving a user request for a target Merchant affiliate system URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters, wherein the user request includes the source Webmaster unique identifier for the particular referring Webmaster, and wherein the target Merchant affiliate system includes a unique identification system for its own affiliated Webmasters;

correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corre-

22

sponding to the unique identification system of the requested Merchant affiliate system; and

generating a URL for the requested Merchant affiliate system, wherein the URL includes the correlated target Webmaster Merchant unique identifier, whereby the URL can be utilized to access the requested Merchant affiliate system, and further provide identification of the source Webmaster for requisite tracking.

**2**. A method as recited in claim **1**, wherein the operation of correlating the received source Webmaster unique identifier and generating a URL for the target Merchant affiliate system occur prior to the receipt of the user request for the target Merchant affiliate system.

**3**. A method as recited in claim **1**, further comprising the operation of obtaining transaction information from the target Merchant affiliate system for specified transactions.

**4**. A method as recited in claim **3**, wherein the transaction information includes a target Webmaster unique identifier, as well as other relevant transaction data, such as a transaction amount and a transaction date.

**5**. A method as recited in claim **3**, wherein the transaction information is obtained by granting an affiliate pooling system access to a target Merchant affiliate system and allowing the affiliate pooling system to retrieve stored transaction information from said Merchant affiliate system.

**6**. A method as recited in claim **3**, wherein the transaction information is obtained by granting the target Merchant affiliate system access to an affiliate pooling system and allowing said Merchant affiliate system to transfer the transaction information to the affiliate pooling system.

**7**. A method as recited in claim **1**, wherein the received user request further includes an identifier for the target Merchant affiliate system, and an identifier for a source affiliate pool of the referring Webmaster.

**8**. A method as recited in claim **7**, wherein the operation of correlating the source Webmaster unique identifier to the target Webmaster unique identifier comprises the operation of performing a lookup function utilizing the identifier for the source affiliate pool of the referring Webmaster and the source Webmaster unique identifier for the referring Webmaster.

**9**. A method as recited in claim **8**, wherein the lookup function provides the target Webmaster unique identifier from a block of designated codes within the requested target Merchant affiliate system.

**10**. A method as recited in claim **1**, wherein at least one of the plurality of Webmasters operates a web site having a banner ad for a related Merchant affiliate system.

**11**. A method as recited in claim **10**, wherein the banner ad utilizes a link that includes an identifier for the target Merchant affiliate system whose banner is being displayed and a source Webmaster unique identifier for at least one of the plurality of Webmasters operating the web site.

**12**. A method as recited in claim **11**, wherein the link further includes a URL for a Virtual Affiliate pooling system.

**13**. A method as recited in claim **1**, wherein the operation of configuring a Merchant affiliate system to receive referrals from a first plurality of Webmasters, further includes the step of:

selecting at least one transfer mode by which transaction information is transferred from the target Merchant affiliate system to the affiliate pooling system.

**14**. A method as recited in claim **13**, wherein at least one transfer mode is selected from the group consisting of electronic mail, file transfer protocol, script call and manual entry.

**15**. A computer program embodied on a computer readable medium for providing Virtual Affiliates to an existing affiliate system, the computer program code comprising:

US 6,804,660 B2

23

a code segment for configuring an existing affiliate system to receive referrals from source Webmasters of an affiliate pool of Webmasters, including:

a code segment for assigning a unique identifier for each of a first

plurality of Webmasters each operating at least one web site;

a code segment for receiving a user request for a target Merchant affiliate system URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters, wherein the user request includes the source unique identifier for the particular referring Webmaster, and wherein the target Merchant affiliate system includes a unique identification system for its own affiliated Webmasters;

a code segment for correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system; and

a code segment for generating a URL for the requested Merchant affiliate system, wherein the URL includes the correlated target Webmaster Merchant unique identifier, whereby the URL can be utilized to access the requested Merchant affiliate system, and further provide identification of the source Webmaster for requisite tracking.

**16**. A computer program as recited in claim **15**, further comprising a code segment for obtaining transaction information from the target Merchant affiliate system for specified transactions.

**17**. A computer program as recited in claim **15**, wherein the transaction information includes a target Webmaster unique identifier, a transaction amount and a transaction date.

**18**. A computer program as recited in claim **16**, wherein transaction information is obtained by granting an affiliate pooling system access to a target Merchant affiliate system and allowing the affiliate pooling system to retrieve stored transaction information from said Merchant affiliate system.

**19**. A computer program as recited in claim **16**, wherein the transaction information is obtained by granting the target Merchant affiliate system access to an affiliate pooling system and allowing said Merchant affiliate system to transfer the transaction information to the affiliate pooling system.

**20**. A computer program as recited in claim **15**, wherein the received user request further includes an identifier for the target Merchant affiliate system, and an identifier for a source affiliate pool of the referring Webmaster.

**21**. A computer program as recited in claim **20**, wherein the operation of correlating the source Webmaster unique identifier to the target Webmaster unique identifier comprises the operation of performing a lookup function utilizing the identifier for the source affiliate pool of the referring Webmaster and the source Webmaster unique identifier for the referring Webmaster.

**22**. A computer program as recited in claim **21**, wherein the lookup function provides the target Webmaster unique identifier from a block of designated codes within the requested Merchant affiliate system.

**23**. A computer program as recited in claim **15**, wherein at least one of the plurality of Webmasters operates a web site having a banner ad for a related Merchant affiliate system.

**24**. A computer program as recited in claim **23**, wherein the banner ad utilizes a link that includes an identifier for the target Merchant affiliate system whose banner is being

24

displayed and a source Webmaster unique identifier for at least one of the plurality of Webmasters operating the web site.

**25**. A computer program as recited in claim **24**, wherein the link further includes a URL for a Virtual Affiliate pooling system.

**26**. A computer program as recited in claim **15**, wherein the code segment for configuring a Merchant affiliate system to receive referrals from a first plurality of Webmasters, further includes:

code segment for selecting at least one transfer mode by which transaction information is transferred from the target Merchant affiliate system to the affiliate pooling system.

**27**. A computer program as recited in claim **26**, wherein at least one transfer mode is selected from the group consisting of electronic mail, file transfer protocol, script call and manual entry.

**28**. A system for providing Virtual Affiliates to an existing affiliate system, the system comprising:

logic for configuring an existing affiliate system to receive referrals from a referring Webmaster in an affiliate pool of Webmasters, including:

logic for assigning a source Webmaster unique identifier for each of a first plurality of Webmasters each operating at one web site;

logic for receiving a user request for a target Merchant affiliate system URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters, wherein the user request includes the source Webmaster unique identifier for the particular referring Webmaster, and wherein the target Merchant affiliate system includes a unique identification system for its own affiliated Webmasters;

logic for correlating the received unique identifier to a Merchant unique identifier corresponding to the unique identification system of the requested Merchant affiliate system; and

logic for generating a URL for the requested Merchant affiliate system, wherein the URL includes the correlated Merchant unique identifier, whereby the URL can be utilized to access the requested Merchant affiliate system, and further provide identification of the source Webmaster for requisite tracking.

**29**. A system as recited in claim **28**, further comprising logic for obtaining transaction information from the target Merchant affiliate system for specified transactions.

**30**. A system as recited in claim **29**, wherein the transaction information includes a target Webmaster unique identifier a transaction amount and a transaction date.

**31**. A system as recited in claim **29**, wherein the transaction information is obtained by granting an affiliate pooling system access to a target Merchant affiliate system and allowing the affiliate pooling system to retrieve stored transaction information from said Merchant affiliate system.

**32**. A system as recited in claim **29**, wherein the transaction information is obtained by granting the target Merchant affiliate system access to an affiliate pooling system and allowing said Merchant affiliate system to transfer the transaction information to the affiliate pooling system.

**33**. A system as recited in claim **28**, wherein the received user request further includes an identifier for the target Merchant affiliate system, and an identifier for a source affiliate pool of the referring Webmaster.

**34**. A system as recited in claim **28**, wherein the logic for correlating the source Webmaster unique identifier to the

US 6,804,660 B2

**25**

target Webmaster unique identifier comprises logic for performing a lookup function utilizing the identifier for the source affiliate pool of the referring Webmaster and the source Webmaster unique identifier for the referring Webmaster.

**35**. A system as recited in claim **34**, wherein the lookup function provides the target Webmaster unique identifier from a block of designated codes within the requested target Merchant affiliate system.

**36**. A system as recited in claim **28**, wherein at least one of the plurality of Webmasters operates a web site having a banner ad for a related Merchant affiliate system.

**37**. A system as recited in claim **36**, wherein the banner ad includes a link that includes an identifier for the target Merchant affiliate system whose banner is being displayed and a source Webmaster unique identifier for at least one of the plurality of Webmasters operating the web site.

**26**

**38**. A system as recited in claim **37**, wherein the link further includes a URL for a Virtual Affiliate pooling system.

**39**. A system as recited in claim **28**, wherein the logic for configuring a Merchant affiliate system to receive referrals from a first plurality of Webmasters, further includes:

logic for selecting at least one transfer mode by which transaction information is transferred from the target Merchant affiliate system to the affiliate pooling system.

**40**. A system as recited in claim **28**, wherein at least one transfer mode is selected from the group consisting of electronic mail, file transfer protocol, script call and manual entry.

\*   \*   \*   \*   \*

Order re Claim Construction

Essociate, Inc. v. Blue Whaler Investments, LLC et al.

Central District of California

Case No. CV10-2107 JVS (MLGx)

Dated February 6, 2012

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **CV 10-2107 JVS(MLGx)**\*\*\* | Date | February 6, 2012 |
| | consolidated with CV 10-6892 JVS (MLGx) | | |

| | |
|---|---|
| Title | **Essociate, Inc. v Blue Whaler Investments, LLC, et al.** |
| | Consolidated with ShareASale.com, Inc. v. Essociate, Inc. |

Present: The Honorable      James V. Selna

| Karla J. Tunis | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**    (IN CHAMBERS) Order re Claim Construction

     **The Court, having been informed by the parties in this action that they submit on the Court's tentative ruling, hereby rules accordance with the tentative ruling as follows as to the Claim Construction of the U.S. Patent No. 6,804,660:**

     Plaintiff Essociate, Inc. ("Essociate") and Defendant Direct ROI, LLC ("Direct ROI") have submitted to the Court proposed claim constructions regarding certain language in U.S. Patent No. 6,804,660 ("the '660 Patent"). The relevant claim language is construed by the Court below.

## I.    BACKGROUND

     Essociate commenced suit against several defendants for infringing the '660 patent relating to internet advertising systems. At this stage only defendant Direct ROI remains. Essociate contends that Direct ROI infringes claims 1-9, 13-22, 26-35, and 39-40 of the '660 patent. Pursuant to Patent Local Rule 4-3,[1] the parties submitted a Joint Claim Construction and Prehearing Statement ("Joint Statement") with their proposed constructions of the disputed terms. (Docket No. 133.) After reviewing the Joint Statement, the Court directed the parties to limit themselves to twelve terms agreed upon

---

[1]The Court has adopted the Northern District of California's Patent Local Rules for patent matters.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.  **CV 10-2107 JVS(MLGx)*****          Date   February 6, 2012

consolidated with CV 10-6892 JVS (MLGx)

Title   **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**

Consolidated with ShareASale.com, Inc. v. Essociate, Inc.

---

by the parties, or six selected by each if unable to agree.  (Docket No. 134.)  The parties submitted opening claim construction briefs addressing six terms selected by each party. (Pl.'s Op.  Br., Docket No. 136; Def.'s Op.  Br., Docket No. 135.)  Essociate filed a response claim construction brief.  (Pl.'s Resp. Br., Docket No. 139.)

## II.   LEGAL STANDARD

It is well settled that claim construction is "exclusively within the province of the court."  Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996).  Such construction "begins and ends" with the claim language itself, Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001), but extrinsic evidence may also be consulted "if needed to assist in determining the meaning or scope of technical terms in the claims."  Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1216 (Fed. Cir. 1995).

In construing the claim language, the Court begins with the principle that "the words of a claim are generally given their ordinary and customary meaning."  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). Further, this ordinary and customary meaning "is the meaning that the [claim] term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  Id. at 1313.  "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  Id.

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.  In such circumstances general purpose dictionaries may be helpful."  Id. at 1314.  In other cases, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art."  Id.  In those cases, "the court looks to those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean."  Id.  These sources include "the words of the claims themselves, the remainder

---

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **CV 10-2107 JVS(MLGx)**\*\*\* | Date | February 6, 2012 |
| | consolidated with CV 10-6892 JVS (MLGx) | | |

| | |
|---|---|
| Title | **Essociate, Inc. v Blue Whaler Investments, LLC, et al.** |
| | Consolidated with ShareASale.com, Inc. v. Essociate, Inc. |

of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Id. (internal quotation marks omitted).

The claim terms are not presumed to have the meaning that a person of ordinary skill in the relevant art would ordinarily attribute to them if (1) the patentee acts as his own lexicographer, or (2) the claim term is too vague for an accurate meaning to be ascertained from the language used. Novartis Pharms. Corp. v. Abbott Labs., 375 F.3d 1328, 1334 (Fed. Cir. 2004). All that is required for a patentee to act as his own lexicographer is that a different meaning is set out in the specification in a manner sufficient to provide notice of the meaning to a person of ordinary skill in the art. In re Paulsen, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

It is improper to read limitations from the specification into the claim. Callicrate v. Wadsworth Mfg., Inc., 427 F.3d 1361, 1368 (Fed. Cir. 2005) (citing Phillips, 415 F.3d at 1312 "[I]f we once begin to include elements not mentioned in the claim, in order to limit such claim. . . . we should never know where to stop.") Although a specification may be highly relevant to construing a claim, the "written description part of the specification itself does not delimit the right to exclude. That is the function and the purpose of the claims." Markman, 52 F.3d at 980.

With these principles in mind, the Court now turns to the construction of the claim language at issue.

III. **DISCUSSION**

    A.    "Correlating"

| Claim Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| "correlating" (Claims 1-40) | "Creating or recognizing a relationship between." | "Using a Source Webmaster ID included in a referred request to a particular merchant to search a |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    **CV 10-2107 JVS(MLGx)**\*\*\*                    Date    February 6, 2012
            consolidated with CV 10-6892 JVS (MLGx)

Title    **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**
         Consolidated with ShareASale.com, Inc. v. Essociate, Inc.

|  |  | database of previously stored unique identifiers or codes to identify a particular Target Webmaster ID that can be used by a Merchant Affiliate System, and that allows the return of a URL that enables traffic to be handed off to and recognized by the Merchant Affiliate System" |
|--|--|--|

Essociate argues that "correlating" should be construed to mean "creating or recognizing a relationship between" because that is the ordinary and plain meaning of the terms as reflected by the dictionary definition and the patent specification's use of the term. (Pl.'s Op. Br. 5.) It argues that the relationship can be both created or recognized because the dictionary definition shows the plain and ordinary meaning of the term includes the establishing of a relationship. (Id. at 6.) Essociate argues that Direct ROI's proposed construction includes numerous limitations imported from the specification that are not contained in the plain meaning, nor supported by the patent language generally. (Id.) However, they point out, Direct ROI does acknowledge the process involves the recognition of a relationship. (Id.)

Direct ROI's arguments in support of its construction are comprised solely of citations to the patent specification without explanation. (Def.'s Op. Br. 4.) It additionally argues that Essociate's proposal "includes the adjective 'causal,' thus blend[ing] two distinct concepts: Causation and correlation." (Id.)

Essociate responds by pointing out that its construction doesn't include "causal" and pointing out again that Direct ROI's construction lists numerous limitations imported from the specification. (Pl.'s Resp. Br. 2.)

The Court agrees with Essociate that Direct ROI imports numerous limitations from the specification to the meaning of a single term. This is improper. Callicrate, 427

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **CV 10-2107 JVS(MLGx)**\*\*\* | Date | February 6, 2012 |
| | consolidated with CV 10-6892 JVS (MLGx) | | |

| | |
|---|---|
| Title | **Essociate, Inc. v Blue Whaler Investments, LLC, et al.** |
| | Consolidated with ShareASale.com, Inc. v. Essociate, Inc. |

F.3d at 1368. Further, several of the imported limitations considered in the context of the entire claim would be redundant. Claim 1 provides "correlating the received source webmaster unique identifier to a target webmaster unique identifier corresponding to the unique identification system of the requested Merchant Affiliate system . . . ." '660 Patent 21:66-22:2. Thus, Direct ROI's construction would in effect state:

> *Using a <u>Source</u> <u>Webmaster</u> <u>ID</u> included in a referred request to a particular merchant to search a database of previously stored unique identifiers or codes to identify <u>a particular</u> <u>Target</u> <u>Webmaster</u> <u>ID</u> that <u>can</u> <u>be</u> <u>used</u> <u>by</u> <u>a</u> <u>Merchant</u> <u>Affiliate</u> <u>System</u>, and that allows the return of a URL that enables traffic to be handed off to and recognized by the Merchant Affiliate System* the received <u>source</u> <u>webmaster</u> <u>unique</u> <u>identifier</u> to <u>a</u> <u>target</u> <u>webmaster</u> <u>unique</u> <u>identifier</u> <u>corresponding</u> <u>to</u> <u>the</u> <u>unique</u> <u>identification</u> <u>system</u> <u>of</u> <u>the</u> <u>requested</u> <u>Merchant</u> <u>Affiliate</u> <u>system</u>

This construction would be redundant in several ways. Such a redundancy violates several concepts of claim construction. First, such a construction seems reliant on analyzing "correlating" in a vacuum when claims must be analyzed as a whole, giving context to each term. <u>Phillips</u>, 415 F.3d at 1314-15 (discussing how use of the modifier "steel" for baffles implies that baffles itself does not inherently mean steel). Further, Direct ROI's construction would not give effect to all the terms of the claim since the limitations would be incorporated into the word "correlating." Specifically, the entire phrase "received source webmaster unique identifier to a target webmaster unique identifier corresponding to the unique identification system of the requested Merchant Affiliate system" would no longer have meaning since the construction subsumes these requirements. All terms of a claim are presumed to have meaning, and the claim construction should give effect to all terms. <u>Innova/Pure Water, Inc. v. Safari Water Filtration Sys.</u>, 381 F.3d 1111, 1119 (Fed. Cir. 2004); <u>Bicon, Inc. v. Straumann Co.</u>, 441 F.3d 945, 950 (Fed. Cir. 2006). The Court therefore rejects Direct ROI's proposed construction.

The Court agrees with Essociate's construction of "correlating." The term is a word where the ordinary meaning to a person of skill in the art is readily apparent

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   **CV 10-2107 JVS(MLGx)*****           Date   February 6, 2012
consolidated with CV 10-6892 JVS (MLGx)

Title   **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**
Consolidated with ShareASale.com, Inc. v. Essociate, Inc.

to a lay person. As such, the general purpose dictionary definition is helpful. Further the specification provides for an embodiment that may not only recognize an existing relationship between a target webmaster unique identifier ("TWID") and Source Webmaster unique Identifier ("SWID"), but also can create one. '660 Patent 11:5-13; 15:18-27. Therefore, the Court will construe "correlating" as "creating or recognizing a relationship between."

B.   "Unique identification system"

| Claim Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| "Unique identification system" (Claims 1-40) | "A system for using unique identification information to identify at least one webmaster in an affiliate system." | "A system that looks up a unique identifying code (that is, a Target Webmaster ID) during a correlation process based on a Source Webmaster ID included in a received URL request, which is then used as an affiliate tracking code within the Merchant's existing Affiliate System" |

Essociate argues its construction is supported by the specification and the ordinary and plain meaning of the words unique and system. (Pl.'s Op. Br. 7.) Specifically, the patent indicates that unique identification systems are used in all types of affiliate systems, including source and target affiliate systems. (Id.) Meanwhile, it argues Direct ROI's construction improperly limits the term to only target affiliate systems without justification. (Id. at 8; Pl.'s Resp. Br. 3.)

Direct ROI argues its construction is consistent with the patent itself, citing to the specification. (Def.'s Op.. Br. 4.) It argues that Essociate's construction is overly generic and reliant on dictionary definitions and points out that Essociate's

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **CV 10-2107 JVS(MLGx)*** | Date | February 6, 2012 |
| | consolidated with CV 10-6892 JVS (MLGx) | | |

| | |
|---|---|
| Title | **Essociate, Inc. v Blue Whaler Investments, LLC, et al.** |
| | Consolidated with ShareASale.com, Inc. v. Essociate, Inc. |

proposal uses all the words from the subject term and uses "system" twice. (Id. at 5.)

The Court agrees with Essociate that the term "unique identification system" should not be limited to a system that looks up a TWID during a correlation process based on a SWID in a received URL request. These limitations are unnecessary. At each instance in the claim where the term "unique identification system" is used, context or modifiers clearly indicate which system it is, e.g., "the target Merchant affiliate system includes a unique identification system for its own affiliated webmasters." '660 Patent 24:33-35. This use in claim 28 clearly shows the unduly limiting nature of Direct ROI's construction. In the quoted language describing a merchant affiliate system, it is discussing a merchant's own affiliates which would not involve any correlation or use of multiple identifiers. Importing language about looking up a code during a correlation process between TWIDs and SWIDs would directly contradict this language. Such contradiction would render the surrounding language meaningless, something to be avoided unless no other construction is reasonable. Bicon, 441 F.3d at 950.

The Court also agrees with Direct ROI that use of the terms themselves being construed with little other language can be problematic. Here, Essociate's proposed construction adds that the system is used to identify webmasters in an affiliate system but little beyond that. Essociate discusses the dictionary meaning of the terms "system" and "unique" but does not incorporate them in their construction at all. However, both parties use "system"and "unique" in their proposed construction. This implies a lack of dispute over the acquired meaning of those words in this context, likely because the ordinary and plain meaning is readily apparent to a lay person. The Court finds the other portion of Essociate's proposal supported by the specification and claim context. Accordingly, the Court will construe this term as "a system for using unique identification information to identify at least one webmaster in an affiliate system."

C. "Target Webmaster Unique Identifier"

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    **CV 10-2107 JVS(MLGx)**\*\*\*          Date    February 6, 2012
            consolidated with CV 10-6892 JVS (MLGx)

Title    **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**
         Consolidated with ShareASale.com, Inc. v. Essociate, Inc.

| Claim Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| "target Webmaster unique identifier" (Claims 1-27) | "Unique identification information used to track a webmaster within a source affiliate pool, who can direct traffic to a merchant affiliate system." | "A unique identifying code assigned to each source Webmaster in the source affiliate pool by the recognition system and that is functional within the target Merchant's home Affiliate System and which corresponds to the unique identification system of the requested Merchant's home Affiliate System." |

Essociate asserts its construction is supported by the patent specification, pointing to language that states "a target Webmaster ID, which is a unique identifying code functional within the target Merchant's home affiliate system and which corresponds to the unique identification system of the requested Merchant's home affiliate system."  (Pl.'s Op. Br. 9.)  It argues that Direct ROI's proposal imposes unsupportable and vague limitations by requiring assignment of the code "by a recognition system." (Id.)  Essociate argues that the only reference to a recognition system includes no reference to assigning a TWID.  (Id.)  In its response Essociate argues that Direct ROI's construction is illogical on its face because of the use of "a" unique identifying code assigned to "each source webmaster."  (Pl.'s Resp. Br. 5).  Essociate contends this grammatically means that the same single code is assigned to all source webmasters.  (Id.)

Direct ROI also argues the patent itself supports its construction, citing in part the same passage as Essociate, quoted above.  (Def.'s Op. Br. 5.)  It argues that Essociate uses ambiguous pronominal phrasing and indefinite pronouns that create an unnecessary lack of clarity.  Thus, Direct ROI contends its proposal

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **CV 10-2107 JVS(MLGx)**\*\*\* | Date | February 6, 2012 |
| | consolidated with CV 10-6892 JVS (MLGx) | | |

Title  **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**

Consolidated with ShareASale, Inc. v. Essociate, Inc.

provides clearer and fuller context.

The Court finds Essociate's proposed construction to be unclear and over broad. The proposal seems to ignore the word "target" and would seem to apply to both a TWID and SWID. A SWID also is used to track a webmaster in a source affiliate pool and, through the claimed invention, can direct traffic to a merchant affiliate system. In fact, it is more consistent with a SWID since a TWID is not used per se within a source affiliate pool, but in the target pool. A TWID is used to track webmasters <u>from</u> the source affiliate pool as their traffic enters and traverses the target affiliate network, so the proposal is not completely inconsistent with this construction. Regardless, this proposal is over broad and fails to give meaning to the word target.

Additionally, several of Essociate's arguments are unclear. The quoted section of the specification seems to better support Direct ROI's proposed construction. Further, it says the reference to a "recognition system" does not refer to assigning a TWID but the passage it quotes says "[t]his source Webmaster ID is utilized by <u>the recognition system</u> 400 to perform an initial function that identifies the source Webmaster ID as from the affiliate pool and <u>correlates</u> it <u>to another unique ID</u> code that can be utilized by the particular Merchant's existing affiliate system, <u>referred to below as the target Webmaster ID</u>." '660 Patent 8:4-10 (emphasis added). Combined with the proposed construction of correlation where a relationship can be "created," this phrase essentially says the recognition system assigns a TWID. This passage says the recognition system utilizes a SWID to perform a function where the SWID is identified and then creates or recognizes a relationship between the SWID and a TWID. The assignment of a TWID to a source Webmaster and the creation of a relationship between a SWID and TWID are substantially the same. Therefore, neither of these arguments are convincing.

Direct ROI's construction is also flawed. Similar to its other proposed constructions, this one incorporates a limitation that is the subject of explicit language in the claim that would be rendered redundant and meaningless. Claim 1 specifies "a target Webmaster unique identifier, corresponding to the unique identification system of the requested Merchant affiliate system. . . ." '660 Patent

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    **CV 10-2107 JVS(MLGx)*****    Date    February 6, 2012
consolidated with CV 10-6892 JVS (MLGx)

Title    **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**
Consolidated with ShareASale, Inc. v. Essociate, Inc.

21:66-22:2.  Thus, Direct ROI's proposal would render "corresponding to the unique identification system of the requested Merchant Affiliate system" meaningless, a presumptively incorrect construction.  Bicon, 441 F.3d at 950.  Further, while the unique identifying code at issue here may be assigned by a "recognition system" as discussed above, the claim and specification do not support a limitation that this be the sole means.  The specification speaks of an embodiment where a data setup operation, prior to integrating the virtual affiliate system with the merchant affiliate system, involves laying out guidelines that would allow a merchant system to recognize where traffic comes from within a source pool of affiliates.  '660 Patent 8:34-60.  Presumably, this can occur through assignment of target system functional ID codes right then and there, not later by some recognition system.  This view is reinforced by the fact the construction of correlation allows for that act to create, as discussed above, or to merely recognize, implying the assignment of the TWID to a certain source webmaster has already occurred.  Therefore, the Court will not add either of these limitations to its construction.

The remaining portions of Direct ROI's proposal would then be "a unique identifying code assigned to each source Webmaster in the source affiliate pool that is functional within the target Merchant's home Affiliate System."  The Court finds this properly reflects the contextual ordinary and plain meaning of the term without imported limitations.  Further, Essociate's logic/grammar argument seems more appropriate if the construction used "the" and that the code "is assigned."  The Court does not find that grammar does not imply or compel that the same "unique" code is assigned to all source webmasters.  Therefore "target Webmaster unique identifier" will be construed as "a unique identifying code assigned to each source Webmaster in the source affiliate pool that is functional within the target Merchant's home Affiliate System."

D.    "Configuring an Existing Target Affiliate System"

| Claim Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| "configuring an | "A data setup operation | "A data setup operation |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | |
|---|---|---|
| Case No. | **CV 10-2107 JVS(MLGx)*** | Date   February 6, 2012 |
| | consolidated with CV 10-6892 JVS (MLGx) | |

| | |
|---|---|
| Title | **Essociate, Inc. v Blue Whaler Investments, LLC, et al.** |
| | Consolidated with ShareASale.com, Inc. v. Essociate, Inc. |

| | | |
|---|---|---|
| existing target affiliate system" (Claims 1-14) | relating to a system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant." | that includes assigning to each content provider or Source Webmaster in an affiliate pool of webmasters a unique identifying code Source Webmaster ID that will be used to (1) track referral traffic received from the Source Webmasters, (2) correlate to a Target Webmaster ID code that can be used by a Merchant Affiliate System, and (3) allow the return of a URL that enables traffic to be handed off to and recognized by the particular Merchant Affiliate System" |

Essociate first points out that both parties agree this term means in part a data setup operation. (Pl.'s Op. Br. 10.) It argues that this is the meaning of "configuring." (Pl.'s Resp. Br. 6.) Essociate then says the plain language indicates the operation should "relate" to an existing target affiliate system. (Pl.'s Op. Br. 10.) It asserts its construction of "existing target affiliate system" is consistently supported by the specification. (Id.) Essociate then argues that Direct ROI's proposal has no clear basis and simply incorporates other limitations present in the '660 patent claims without illuminating the construed term. (Id. at 11-12.) Essociate contends that several of the limitations are improperly imported from the specification and that others violate the doctrine of claim differentiation. It violates this doctrine because the proposed construction includes "assigning," "correlating," and "generating" steps that are disclosed in other express terms of the '660 Patent's independent claims. (Id. at 7.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **CV 10-2107 JVS(MLGx)**\*\*\* | Date | February 6, 2012 |
| | consolidated with CV 10-6892 JVS (MLGx) | | |

| | |
|---|---|
| Title | **Essociate, Inc. v Blue Whaler Investments, LLC, et al.** |
| | Consolidated with ShareASale.com, Inc. v. Essociate, Inc. |

Direct ROI argues that Essociate has ignored the term "configuring" entirely.  (Def.'s Op. Br. 6.)  It further argues that Essociate's construction is too broad to stand because it would include "virtually every form of e-commerce." (Id.)  Finally, it states that its construction best reflects the patent itself while.  (Id.) The Court rejects these first two arguments as incorrect or irrelevant on their face.  "Configuring" is addressed by Essociate, it constructs this portion of the term as "a data setup operation."  Whether or not Essociate's proposed construction could include all of e-commerce is irrelevant because the breadth of a single term of a claim in isolation has little weight in claim construction without pointing to some limitation or description in the patent that would be inconsistent with that breadth. Each term must be read in the context of the entire claim, not in isolation. Phillips, 415 F.3d at 1314-15.  Thus, the Court finds no reason to reject Essociate's proposal.

Additionally, Direct ROI's construction is flawed.  The Court agrees with Essociate that it improperly imports limitations from the specification.  The Court does not agree that the doctrine of claim differentiation as framed by Essociate has any application here.  Claim differentiation is the presumption that each claim in a patent has a different scope. Comark Communs. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998).  Thus, independent claims should not be construed to have limitations explicitly discussed in claims dependent upon them.  Id.  In this instance, the steps Direct ROI reads into the construction of this term are not from other claims, but from the same claim (although they also appear in other claims). Nevertheless, reading explicit limitations of a claim into the meaning of another term of that claim is still something to be avoided as the Court has discussed previously.  Thus, the overall point still stands.

Essociate's proposal reflects the plain meaning of the term. A data setup operation is discussed frequently in the specification when referring to the configuration of different systems.  See '660 Patent 8:32-24; 8:35-41; 9:31-34. The specification describes a Merchant's affiliate system that "in use . . . sends traffic through their surrounding Merchant affiliate system."  '660 Patent 7:23-25. Later it refers to the same system as the "Merchant's existing affiliate system." '660 Patent 7:43-44.  In the context of other terms, Essociate has represented that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   **CV 10-2107 JVS(MLGx)*****            Date   February 6, 2012
           consolidated with CV 10-6892 JVS (MLGx)

Title      **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**
           Consolidated with ShareASale.com, Inc. v. Essociate, Inc.

Target and Merchant affiliate systems are "somewhat synonymous." (Pl.'s Resp. Br. 12.) It would seem that there can be Merchant affiliate systems existing that are not targeted by a virtual affiliate system and that such a virtual affiliate system can target non-merchant affiliate systems. However, in the context of a virtual affiliate system invention claim, it would be unlikely to refer to a merchant system not being targeted to "receive referrals" from a source affiliate pool. Here the claim itself shifts from describing the "existing target affiliate system" to "the target merchant affiliate system." '660 Patent 21:48-51. The context of the language and the specification shows these terms are referring to the same system. Furthermore this additional language clarifies "existing target affiliate system" such that elaboration in the construction is not required. Therefore, the Court will construct this term in accordance with Essociate's proposal.

> E.     "Generating a URL"

| Claim Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| "generating a URL" (Claims 1-27) | "Causing a URL to appear in a user's web browser without a further user request." | "The process of generating a URL that contains a 'looked up' code (that is, a Target Webmaster ID) and the referring webmaster unique identified (that is, the Source Webmaster ID) and serves as an entry mechanism into the target Merchant's existing Affiliate System." |

Both parties contend their construction is supported by the patent itself. (Def.'s Op. Br. 6; Pl.'s Op. Br. 12.) Direct ROI argues that Essociate's proposal is blind to context and uses URL in an overly general manner that would allow a user to click on a URL without any relevance to the patent. Essociate argues that Direct

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.  **CV 10-2107 JVS(MLGx)*****                    Date   February 6, 2012
consolidated with CV 10-6892 JVS (MLGx)

Title   **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**
Consolidated with ShareASale.com, Inc. v. Essociate, Inc.

ROI imports limitations both from the specification and from explicit language in the claim already.  (Pl.'s Op. Br. 13.)

These arguments are related.  The context Direct ROI seeks to provide comes in part from an embodiment described in the specification ("looked up"). There is no basis in the claim itself to incorporate this.  Most of the other context Direct ROI seeks to place in this term is again language echoing other explicit limitations of the patent, something unnecessary and improper ("contains a . . . Target Webmaster ID" and "serves as an entry mechanism).  Bicon, 441 F.3d at 950.  Some of the added language appears to be simply incorrect or unsupported ("a URL that contains . . . the referring webmaster unique identifier (that is the Source Webmaster ID)").  (Def.'s Op. Br. 6.)  The cited portion of the specification does not mention the placement of the Source Webmaster ID or a referring webmaster unique identifier beyond the TWID.  Therefore, none of this excess language should be incorporated into the meaning of "generating a URL."

Direct ROI's fear that a click on an irrelevant URL could meet this definition without context is misguided.  The claim is analyzed as a whole in construction and for a finding of infringement.  The context is provided by the other language in the claim explicitly.  Therefore, the Court follows Essociate's construction.

F.    "Correlated Target Webmaster [Merchant] Unique Identifier"

| Claim Term[2] | Plaintiffs' Construction | Defendants' Construction |
| --- | --- | --- |
| "correlated target Webmaster Merchant unique identifier" | "A target webmaster unique identifier for which a relationship has | "A unique ID identified through a look up process (on the fly or having been |

[2]Essociate and Direct ROI discuss this term as "correlated target Webmaster unique identifier," without "Merchant" and state it first appears in claim 1. (Pl.'s Op.  Br. 15; Def.'s Op.  Br. 7.)  Claim 1, nor any other claim contains this exact phrase, therefore the Court will construe "correlated target Webmaster Merchant unique identifier" and treat the parties' arguments as directed towards that.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.  **CV 10-2107 JVS(MLGx)*****       Date   February 6, 2012
consolidated with CV 10-6892 JVS (MLGx)

Title  **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**
Consolidated with ShareASale.com, Inc. v. Essociate, Inc.

| (Claims 1-27) | been recognized with a source webmaster" | assigned previously) for the target Merchant Affiliate System (that is, the Target Webmaster ID) via the correlating process." |
|---|---|---|

Essociate argues its construction follows from the constructions it proposed for terms A) and C). (Pl.'s Op. Br. 14.) Further, it argues that the "look-up" process is but one embodiment of the claimed invention, and Direct ROI's attempt to limit the claim to that embodiment is improper. (Id.)

Direct ROI argues its proposed construction is supported by use of the terms in the patent. (Def.'s Op. Br. 7.) It contends Essociate's construction here is inconsistent with that proposed for "correlating." (Id.) Specifically, here it limits correlating to only recognition where previously it proposed that correlating could be recognition or creation of a relationship. (Id.)

The Court agrees with both parties' critiques. There is no basis for limiting the correlation to a look-up process as the Court has already determined. Additionally, the constructions should be consistent, and the Court sees no reason to limit correlation to only recognition in this term. The Court also agrees the construction of this term should reflect the construction of terms A) and C). Fin Control Systems Pty. Ltd. v. OAM, Inc., 265 F.3d 1311, 1318 (Fed. Cir. 2001) ("the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims"). Accordingly, the Court construes this term to mean "a unique identifying code assigned to each source Webmaster in the source affiliate pool that is functional within the target Merchant's home Affiliate System for which a relationship has been created or recognized with a source webmaster identifying code."

G.    "Source Webmaster Unique Identifier"

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    **CV 10-2107 JVS(MLGx)**\*\*\*                    Date    February 6, 2012

consolidated with CV 10-6892 JVS (MLGx)

Title    **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**

Consolidated with ShareASale.com, Inc. v. Essociate, Inc.

| Claim Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| "source Webmaster unique identifier" (Claims 1-40) | "A unique identifying code assigned to a webmaster within an affiliate pool of source webmasters." | "A unique identifying code (Source Webmaster ID) assigned to each Webmaster in the affiliate that will be used to (1) perform an initial function that identifies the webmaster as from the Affiliate Pool of Webmasters, (2) correlate to a Target Webmaster ID code that can be used by a Merchant Affiliate System, and (3) allows the return of a URL that enables traffic to be handed off to and recognized by the particular Merchant Affiliate System." |

Essociate contends its construction of this term is consistent with the specification and the plain language used throughout the patent. (Pl.'s Op. Br. 15.) It points out that Direct ROI's construction imports limitations that are the subject of other express terms of the claim. Direct ROI says the patent itself supports its proposed construction and cites to several passages of the specification. (Def.'s Op. Br. 7.)

The Court finds that Direct ROI's construction imports improper limitations into the meaning of this term. These limitations would improperly render other portions of the claim superfluous. Bicon, 441 F.3d at 950. Specifically, the claims include explicit steps about the generation of a URL, the correlation of a TWID to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.  **CV 10-2107 JVS(MLGx)**\*\*\*        Date  February 6, 2012
consolidated with CV 10-6892 JVS (MLGx)

Title    **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**

Consolidated with ShareASale.com, Inc. v. Essociate, Inc.

---

be used in a Merchant affiliate system, and an initial configuration allowing source webmaster to be identified as a webmaster within an affiliate pooling system. '660 Patent 22:3-7; 21:66-67; 21:48-53. Essociate's construction is not challenged specifically by Direct ROI. The Court finds this construction to reflect the plain and ordinary meaning for these terms as determined by the context of the claim and specification. Therefore, this term is construed according to Essociate's proposal.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.     **CV 10-2107 JVS(MLGx)**\*\*\*                 Date     February 6, 2012
             consolidated with CV 10-6892 JVS (MLGx)

Title        **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**
             Consolidated with ShareASale, Inc. v. Essociate, Inc.

    H.      "Referring Webmaster"

| Claim Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| "referring Webmaster" (Claims 1-40) | "A webmaster from which traffic is directed." | "A particular webmaster from which traffic is directed to the target merchant website." |

       The parties' constructions are similar with the exception that Direct ROI seeks to restrict the definition to only webmasters whose traffic is directed to a target merchant website.  This limitation is improper because the act of "directing" is governed by other explicit steps in the patent claim. '660 Patent 22:5-6 Additionally, the provided construction would confuse rather than illuminate where traffic is first routed through a virtual affiliate system prior to arriving at a merchant website.  Therefore, the Court adopts Essociate's proposed construction "A webmaster from which traffic is directed."

    I.      "Merchant Affiliate System"

| Claim Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| "Merchant affiliate system" (Claims 1-40) | "A system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant." | "A computer system that uses a tracking mechanism to allow a Merchant to see where its traffic is originating from (that is, from a given advertisement at a given URL) and to determine advertising compensation based on quantity of traffic and/or the traffic's performance." |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **CV 10-2107 JVS(MLGx)**\*\*\* | Date | February 6, 2012 |
| | consolidated with CV 10-6892 JVS (MLGx) | | |

| | |
|---|---|
| Title | **Essociate, Inc. v Blue Whaler Investments, LLC, et al.** |
| | Consolidated with ShareASale.com, Inc. v. Essociate, Inc. |

      Essociate argues that this term is "somewhat synonymous" to "existing target affiliate system" and therefore provides a construction echoing that it provided for term D).  (Pl.'s Op. Br. 17.)  It further argues that contrary to Direct ROI's proposal, this term does not mean only systems that use tracking of origination and determination of compensation.  (<u>Id.</u>)  Direct ROI cites to several passages in the specification as evidence its proposal is "consistent with the '660 patent."  (Def.'s Op. Br. 8.)

      The Court agrees that Direct ROI's definition improperly imports limitations from the specification.  <u>Callicrate</u>, 427 F.3d at 1368 (Fed. Cir. 2005).  Direct ROI provides no basis other than citations to the specification discussing an embodiment of the invention.  This is insufficient and the Court therefore adopts Essociate's construction.

      J.      <u>"Virtual Affiliates"</u>

| Claim Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| "Virtual Affiliates" (Claims 1-40) | "Webmasters who direct traffic to one or more merchants via the placement of links to merchant websites on the webmasters' websites, but who are independent from the merchants' own affiliate systems." | "A subset of a group of Merchant affiliated Webmasters that each send traffic to the Merchant through the Merchant's existing affiliate system while remaining independent and even anonymous from the Merchant's Affiliate System." |

      Both parties argue that their proposals are most consistent with the language of the patent specification.  (Pl.'s Op. Br. 18; Def.'s Op. Br. 9.)  The primary difference between the proposals is whether Virtual Affiliates must or may be

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **CV 10-2107 JVS(MLGx)*****<br>consolidated with CV 10-6892 JVS (MLGx) | Date | February 6, 2012 |

| | |
|---|---|
| Title | **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**<br>Consolidated with ShareASale.com, Inc. v. Essociate, Inc. |

anonymous to the merchant affiliate system. The passage cited by Direct ROI states in part "the Virtual Affiliate may remain anonymous." '660 Patent 7:51-52. This clearly shows anonymity is a possibility but not a requirement for the patented invention. The Court therefore rejects Direct ROI's proposal and adopts Essociate's.

K.    "Existing Target Affiliate System"

| Claim Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| "existing target affiliate system" (Claims 1-27) | "An existing system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant." | "The Merchant's existing affiliate system is a full framework of affiliate services that operates as the Merchant's affiliate program to track traffic and any transactions initiated by the traffic to credit the referring Webmaster." |

Essociate argues this construction is dictated by the same arguments underlying its proposal for term D) which contains this term. (Pl.'s Op. Br. 19.) Direct ROI argues its construction is consistent with the patent, while Essociate contends it imports limitations from the specification. (Def.'s Op. Br. 9; Pl.'s Op. Br. 19.) The Court finds this term has already been constructed as part of term D) and does not appear separate from the full phrase in term D). Therefore, it will adopt the same construction it did previously, reflected in Essociate's proposal.

L.    "Stored Transaction Information"

| Claim Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| "stored transaction | "Stored data associated | "Stored data associated |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   **CV 10-2107 JVS(MLGx)*****       Date   February 6, 2012

consolidated with CV 10-6892 JVS (MLGx)

Title   **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**

Consolidated with ShareASale.com, Inc. v. Essociate, Inc.

| information"<br>(Claim 5) | with transactions." | with transactions between a Source Webmaster and a Target Webmaster." |
|---|---|---|

Essociate argues the specification supports its proposed construction and that no specific data need to be defined because the specification talks only about what data "may" be part of this stored information. (Pl.'s Op. Br. 20.) It also argues that Direct ROI's construction is "nonsensical and bizarre" because it imagines transactions between the webmasters rather than transactions between target merchants and users referred from the source webmaster's website. (Id.)

Direct ROI argues that Essociate's definition simply rearranges the words and uses a synonym for information while its proposal is more clear and concise. (Def.'s Op. Br. 9.)

The Court agrees that no types of transactions between source and target webmasters are disclosed in the patent. Therefore, removing that portion of Direct ROI's proposal, the remaining language is identical to Essociate's. The Court thus adopts that language.

## III.   CONCLUSION

For the foregoing reasons, the Court construes the disputed terms as follows:

| Disputed Claim Term | Court's Construction |
|---|---|
| "correlating"<br>(Claims 1-40 ) | "creating or recognizing a relationship between" |
| "unique identification system"<br>(Claims 1-40 ) | "a system for using unique identification information to identify at least one webmaster in an affiliate system" |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No. **CV 10-2107 JVS(MLGx)**\*\*\*     Date     February 6, 2012
consolidated with CV 10-6892 JVS (MLGx)

Title     **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**
Consolidated with ShareASale.com, Inc. v. Essociate, Inc.

| | |
|---|---|
| "target Webmaster unique identifier" (Claim 1-27) | "a unique identifying code assigned to each source Webmaster in the source affiliate pool that is functional within the target Merchant's home Affiliate System" |
| "configuring an existing target affiliate system" (Claims 1-14) | "a data setup operation relating to a system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant" |
| "generating a URL" (Claims 1-27) | "causing a URL to appear in a user's web browser without a further user request" |
| "correlated target Webmaster Merchant unique identifier" (Claims 1-27) | "a unique identifying code assigned to each source Webmaster in the source affiliate pool that is functional within the target Merchant's home Affiliate System for which a relationship has been created or recognized with a source webmaster identifying code" |
| "source Webmaster unique identifier" (Claims 1-40) | "a unique identifying code assigned to a webmaster within an affiliate pool of source webmasters" |
| "referring Webmaster" (Claims 1-40) | "a webmaster from which traffic is directed" |
| "merchant affiliate system" (Claims 1-40) | "a system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant" |
| "virtual affiliates" | "webmasters who direct traffic to one |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.   **CV 10-2107 JVS(MLGx)***   Date   February 6, 2012

consolidated with CV 10-6892 JVS (MLGx)

Title   **Essociate, Inc. v Blue Whaler Investments, LLC, et al.**

Consolidated with ShareASale.com, Inc. v. Essociate, Inc.

| (Claims 1-40) | or more merchants via the placement of links to merchant websites on the webmasters' websites, but who are independent from the merchants' own affiliate systems" |
|---|---|
| "existing target affiliate system" (Claims 1-27) | "an existing system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant" |
| "stored transaction information" (Claim 5) | "stored data associated with transactions" |

IT IS SO ORDERED.

_____   :   00

Initials of Preparer   kjt