2013-1446

---

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

ESSOCIATE, INC.,

Plaintiff-Appellant,

v.

AZOOGLE.COM, INC., EPIC MEDIA GROUP, INC.,
and SOCIAL ASSETS, LLC (doing business as Kinetic Social),

Defendants-Appellees.

---

Appeal from the United States District Court for the Western District of
Wisconsin in case no. 11-CV-0727, Senior Judge Barbara B. Crabb

---

## CORRECTED RESPONSE BRIEF OF DEFENDANTS-APPELLEES

---

James D. Peterson
Jennifer L. Gregor
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI  53703
Tel:    (608) 257-3911
Email: jpeterson@gklaw.com;
        jgregor@gklaw.com

Attorneys for Defendants-Appellees

## CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees certifies as follows:

1.      The full name of every party we represent is: Azoogle.com, Inc., Epic Media Group, Inc., and Social Assets, LLC (doing business as Kinetic Social).

2.      The names of the real party in interest if the party named in the caption is not the real party in interest:  not applicable.

3.      All parent corporations and any publicly-held companies that own 10 percent or more of the stock of the party represented by us are:

        a.      Epic Media Group, Inc. (f/k/a Azoogle.com, Inc.) has been converted into Epic Media Group LLC.

        b.      Epic Media Group LLC is a wholly-owned subsidiary of FAS Labs, Inc.

        c.      Social Assets LLC is a wholly-owned subsidiary of Emerald Social LLC.

        d.      Emerald Social LLC is a wholly-owned subsidiary of FAS Labs, Inc.

4.      The names of all law firms and the partners and associates that have appeared for the party in the lower tribunal or are expected to appear in this Court are: Godfrey & Kahn, S.C., by its attorneys James D. Peterson, Jennifer L. Gregor, Kerry L. Gabrielson, and Dustin D. Brown.

i

Dated: December 16, 2013.

Respectfully submitted,

*/s/ James D. Peterson*
James D. Peterson
Jennifer L. Gregor
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI  53703
Tel:   (608) 257-3911
Email: jpeterson@gklaw.com;
          jgregor@gklaw.com

Attorneys for Defendants-Appellees

# TABLE OF CONTENTS

Certificate of Interest ..................................................................................i

Table of Authorities ....................................................................................v

Statement of Related Cases.........................................................................1

Statement of Issues......................................................................................1

Statement of the Case..................................................................................2

Statement of the Facts .................................................................................3

Summary of Argument...............................................................................11

Argument...................................................................................................12

I.    The district court's evidentiary rulings were correct....................12

    A.    The Landau declaration was properly excluded.................13

    B.    The conclusory opinions of Edwards were properly
        excluded, and Essociate has waived any objection to that
        ruling................................................................................17

II.   The district court rightly determined that Essociate failed to adduce
    evidence that Epic operated a virtual affiliate system, and that it
    did not perform the configuring step. ...........................................19

    A.    Essociate adduced no evidence that the Epic system
        provides a method by which virtual affiliates access an
        existing affiliate network...................................................20

    B.    Essociate failed to show that Epic configured SpeedDate to
        recognize the transaction as originating from a particular
        Epic affiliate. .....................................................................26

III.  The district court correctly construed the correlating operation to
    require more than passing along the unmodified affiliate ID to the
    merchant............................................................................................29

A.    The district court did not err by construing the correlating operation rather than just the word "correlate." ................................29

B.    The district court's construction of the correlation operation is correct. ..........................................................................31

C.    The district court properly held that Epic does not perform the correlation operation....................................................34

Conclusion ...........................................................................38

Certificate of Service ...........................................................40

Certificate of Compliance .....................................................41

# TABLE OF AUTHORITIES

## Cases

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
    692 F.3d 1301 (Fed. Cir. 2012)............................................................27

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
    239 F.3d 1343 (Fed. Cir. 2001)............................................................34

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)............................................................34

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................19

*Athletic Alternatives, Inc. v. Prince Mfg.*,
    73 F.3d 1573 (Fed. Cir. 1996)............................................................29

*Desper Prods., Inc. v. QSound Labs, Inc.*,
    157 F.3d 1325 (Fed. Cir. 1998)............................................................29

*Musser v. Gentiva Health Servs.*,
    356 F.3d 751 (7th Cir. 2004)............................................................15

*O2 Micron Intern. Ltd. v. Beyond Innovation Technology Co., Ltd.*,
    521 F. 3d 1351 (Fed. Cir. 2008)............................................................30

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)........................................................ 1, 30

*Rand v. CF Industries*,
    42 F.3d 1139 (7th Cir. 1994)............................................................24

*Salgado by Salgado v. General Motors Corp.*,
    150 F.3d 735 (7th Cir. 1998)............................................................14

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006)............................................................14

*Toshiba Corp v. Imation Corp.*,
    681 F.3d 1358 (Fed. Cir. 2012)............................................................20

*United States v. Dunkel*,
　927 F.2d 955 (7th Cir. 1991)..................................................................14

*Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*,
　19 F.3d 1418 (Fed. Cir. 1994)...............................................................24

## Rules

Fed R. Civ. P. 56(c)(1)(B) ......................................................................12

Fed. R. Evid. 602 ....................................................................................15

Fed. R. Evid. 702 ....................................................................................15

## STATEMENT OF RELATED CASES

There has been no other appeal in or from the same civil action in this Court or any other appellate court. Counsel is not aware of any case pending in this Court or any other court that will be directly affected by this Court's decision in the pending appeal. Essociate has filed multiple suits asserting U.S. Patent No. 6,804,660, of which six are still pending in the United States District Court for the Central District of California. Although this appeal will not have a direct effect on any of these pending cases, any claim construction decision regarding the '660 patent could have an indirect effect.

## STATEMENT OF ISSUES

As the appellant, Essociate, Inc., ("Essociate"), may choose the issues it appeals. The appellees, (collectively referred to as "Epic"), do not object to the questions presented in the last sentence of each of the three issues presented by Essociate. But Epic objects to the preliminary portion of each issue because each misstates the law and mischaracterizes the decision of the district court.

1.     Essociate misstates the law of claim construction, which follows the principles set out generally in *Phillips v. AWH Corp*., 415 F.3d 1303, 1313 (Fed. Cir. 2005). The court must determine the scope of the inventors' rights, based on a full understanding of what the inventors actually invented and intended to envelop in their claims. The district court properly construed the "correlating" operation.

1

2.     Essociate omits that in opposing a motion for summary judgment, a party needs to adduce *admissible* evidence sufficient to sustain a reasonable jury verdict in the non-moving party's favor. The non-moving party is entitled to the benefit of *reasonable* inferences, but it cannot defeat summary judgment on the basis of mere assumptions contradicted by the moving party's documentary evidence. The district court properly evaluated the evidence that Essociate proffered in opposition to Epic's motion for summary judgment.

3.     Essociate misstates the law pertaining to lay and expert testimony. The district court properly excluded portions of Landau's declaration testimony as untimely expert opinion and as lacking foundation.

## STATEMENT OF THE CASE

Essociate's statement of the case is incomplete because it does not provide the disposition of all issues raised on summary judgment. In light of the grant of summary judgment of non-infringement to Epic, the district court exercised its discretion and declined to reach the other dispositive issues on which Epic sought summary judgment: laches, equitable estoppel, invalidity, and successor liability of Social Assets, LLC. A0003. This omission should not be material to this appeal.

Essociate also omits that the district court excluded as inadmissible significant portions of Essociate's summary judgment evidence, including: portions of the declarations of John Du Wors (litigation counsel) and Michael

2

Landau (a co-inventor, an owner and employee of Essociate, and one of its proffered experts), and portions of the expert report of George Edwards on infringement. *See* A003-04; A0027-29.

## STATEMENT OF THE FACTS

The factual background was aptly stated by the district court; it need not be repeated in full here. Following Circuit Rule 28, we concentrate on the points of disagreement with Essociate's statement of the facts, providing clarification as needed.

**Essociate's '660 patent and affiliate networks.** The patent-in-suit, U.S. Patent 6,804,660 (the "'660 patent"), relates generally to the field of internet affiliate networks; it claims a specific method of operating a *virtual* affiliate network. A0006, A0033. The concept of the virtual affiliate is a critical claim limitation, which Essociate does not clearly explain in its appeal brief.

Internet affiliate networks, also referred to as internet affiliate programs, are a type of promotion particularly suited to the capabilities of the internet as they developed in the 1990s. A1950 (Expert Report of Peter Kent on the validity of the '660 patent ("Kent Validity Report")). In a simple form, an e-commerce merchant creates an internet affiliate network by arranging for other websites—affiliates—to post links to the merchant's website. *Id.* If an internet user visits the affiliate's website and clicks on the link, the user is directed to the merchant's website. *Id.* If

the user makes a purchase from the merchant, the merchant pays a commission to the affiliate. *Id.* Merchants use affiliate networks to attract traffic to their websites, and in most cases the merchant pays only when the traffic produces a completed transaction, such as a purchase. *Id.*

Among the most well-known early affiliate systems are those run by Amazon.com and Linkshare, both beginning in 1996. A2062 (undisputed fact no. 88). Amazon operated what the '660 patent refers to as a "stand-alone" system in which a single merchant draws traffic from multiple affiliates. A0044 ('660 patent, 2:49-53). Linkshare operated what the '660 patent refers to as an "affiliate hub," in which the hub draws traffic from multiple affiliates on behalf of multiple merchants. A0045 ('660 patent, 3:35-42). Both Amazon and Linkshare are acknowledged as prior art affiliate networks in the '660 patent. A0044-45 ('660 patent).

The '660 patent, claiming priority to a provisional application filed May 1, 2000, discloses and claims a method, system and computer program for providing "virtual affiliates" access to an existing affiliate system. A2051-52 (undisputed fact nos. 21-23). Virtual affiliates are affiliates of one affiliate system, referred to in the patent as the "source system," which can send traffic to an existing system, the "target system," without actually joining the target affiliate network. A0006 (district court opinion); A0047 ('660 patent, 7:40-49). The '660 patent does not

claim to have invented the concept of virtual affiliates; it claims a particular multi-step technique for providing virtual affiliates to a target affiliate system. A0006 (district court opinion). The claimed method consists of four "operations": configuring; receiving a user request; correlating; and generating a URL. A0054-56 ('660 patent claims). The '660 patent has three independent claims, 1, 15 and 28. *Id.*; A0013. The parties agreed that each independent claim has the same substantive limitations and that claim 1 is representative. A0013 (district court opinion). Thus, to meet its burden to prove infringement, Essociate had to show, as a threshold matter, that Epic operated a virtual affiliate system, and then show that Epic's system performed each of the four operations of claim 1 of the '660 patent. A0024-25 (district court opinion).

**The accused Epic Direct affiliate system.** Essociate's appeal brief does not accurately describe the operation of the accused affiliate system, known as Epic Direct. In its statement of facts, Essociate repeatedly refers to Epic's "virtual affiliates," and it falsely implies that Epic had processes designed for interacting with "merchant affiliate systems." *See* Essociate's Opening Appeal Brief ("Appeal Br.") at 11-13. These statements are misleading: Epic did not have "virtual affiliates" and it did not have any process specific to "merchant affiliate systems." A0026-27 (district court opinion). Epic engaged affiliates and merchants directly, as an affiliate hub system, which the '660 patent identified as prior art affiliate

system. A0026-27; A1964 (Expert Report of Peter Kent on Infringement ("Kent Infringement Report")). Essociate's failure to adduce evidence that Epic operated a *virtual* affiliate system, rather than a simple affiliate hub system, provides one sufficient basis for the district court's summary judgment for Epic. A0027 (district court opinion).

Essociate also does not clearly describe the tracking operation of the Epic system. Transaction tracking in an affiliate system is important so that the affiliate website can get proper credit for traffic that it provides to a merchant, typically when that traffic results in a successful transaction. A1952 (Kent Validity Report).

The transaction tracking method used by the Epic system is similar to the one used by Linkshare in the mid-1990s. A1956 (Kent Infringement Report). It is referred to variously as "cookie tracking," "pixel tracking" or "cookie and pixel tracking." *Id.* The system is generally described in Epic's Advertiser Implementation Guide. A2071-86. It is described in detail in the non-infringement report of Epic's expert, Peter Kent. A1953-84.

In brief summary, Epic's cookie and pixel tracking works like this. When an internet user visits an affiliate website and clicks on a link or an ad promoting a merchant, the user is redirected to the Epic Direct system. A0007-08 (district court opinion). The system places a small text file, called a cookie, on the user's computer. A0008. The cookie contains the information needed to track the referral.

6

A0008-09. The Epic system then redirects the user to the merchant's website, at a landing page URL specified by the merchant. A0008; A1957-59 (Kent Infringement Report). If the user completes a transaction on the merchant's website, the website takes the user to a "success page," which indicates to the user that the transaction is successful. A0008; A1957-59. But the success page also has a bit of code called a "pixel," which prompts the Epic Direct system to read the information from the cookie on the user's computer. A0008-09; A1959 (Kent Infringement Report). The Epic Direct system thus tracks the referral and the resulting commission without using the tracking system of the merchant. A0009; A1956-59 (Kent Infringement Report).

**Essociate's infringement case.** Essociate acknowledges that, by itself, Epic's cookie and pixel tracking does not infringe the '660 patent. Appeal Br. at 38. Instead, Essociate attempts to make out an infringement case based on Epic Direct capacity to use certain "preset variables." A0026-30; A0103-07 (Essociate's Expert Report of George Edwards).

The Epic system does not rely on merchants to track transactions and commissions for particular affiliates, and thus there is no need for the Epic system to provide the identity of the affiliate to the merchant. A0009 (district court opinion); A1956-59 (Kent Infringement Report). However, some merchants request that the affiliate ID or other information is passed along to them for their

own purposes. A0009. Some merchants would like to determine which affiliates are most productive, or which affiliates are sending low-quality traffic. A0009. If, for example, some affiliates produce a large number of bogus transactions, the merchant may investigate and ultimately seek to disqualify those affiliates. A0009.

To serve the various needs of its merchants and its affiliates, Epic allows, upon a merchant's request, certain preset variables to be passed along to the merchant system. A0009. The available variables in the Epic system include: the affiliate ID, affiliate sub-ID, click hash value, and a fixed code to represent the Epic system, "az2." A0009. The requested variables are appended to the merchant landing page URL. A0009; A1962 (Kent Infringement Report).

When variables are to be passed along, the merchant landing page URLs are formatted to include variables that will be filled in when the user clicks on the jump link. A0009; A1962 (Kent Infringement Report). For example, if the merchant were Netflix and it had requested that the affiliate ID be passed along, the Netflix landing page URL would be pre-formatted on the Epic system like this:

> www.netflix.com/affiliates/signup.html?affiliate_id=%%
> AFFILIATE_ID%%

A0009-10; A1962 (Kent Infringement Report).

In the syntax of protocols used on the Epic system (and in internet protocols generally), the "?" designates the end of the location part of the URL. A0009-10. The "%%" designates the beginning and the end of the label of the variable.

8

A0010. Then, when a user clicks on the jump link, the Epic system fills in the variables in the pre-formatted URL to complete the merchant landing page URL. A0010. If the affiliate's ID was 12354, the filled-in landing page URL would look like this:

www.netflix.com/affiliates/signup.html?affiliate_id=12345

A0010; A1962 (Kent Infringement Report). In this example, Netflix would then be able to record the affiliate's ID for whatever purposes it wanted. *Id.* However, the Epic system would still use the cookie and pixel method for tracking this transaction and any resulting commissions, just as though the affiliate ID had not been passed on to the merchant. A0010; A1962 (Kent Infringement Report).

**The SpeedDate example transaction.** Essociate based its infringement case on a single example transaction with the online merchant SpeedDate.com, ("SpeedDate"), which Essociate contended demonstrated that the Epic system infringed the '660 patent. A0011-12; A0026-30 (district court opinion); A2003-04 (infringement contentions[1]). Essociate contended that it was able to track a URL redirection sequence from a banner ad posted by an Epic affiliate, to the Epic Direct system, and ultimately to SpeedDate. A0011-12. In the SpeedDate

---

[1] Essociate's infringement contentions were disclosed in a supplemental interrogatory response under the title "Epic Media's First Set of Interrogatories and Plaintiff Essociate, Inc.'s Answers and Objections Thereto." A1993-A2040. In this brief Epic will refer to this document simply as "Infringement Contentions."

transaction, the ID of an Epic affiliate in Colorado was appended to the SpeedDate landing page URL. A0012. The landing page URL in the SpeedDate example transaction is:

http://mysdate.com/?a=53&c=1&s1=48192&s2=12268

A0012. Essociate's infringement theory is that by passing along the affiliate ID to SpeedDate, Epic performed all the steps of claim 1. A0029.

Essociate presented this theory first in its October 2012 infringement contentions. A1993-2040. One of Essociate's experts, George Edwards, submitted a brief report in which he described the same SpeedDate transaction and endorsed Essociate's infringement contentions. A0101-13. Edwards did not consider any other transaction in the Epic system.

Epic's motion for summary judgment pointed out that the SpeedDate transaction did not demonstrate a virtual affiliate system because Epic engaged SpeedDate directly as a merchant in its affiliate hub. In opposition to Epic's motion for summary judgment, Essociate attempted to buttress its infringement case with a declaration by Michael Landau, one of the co-inventors on the '660 patent and Essociate's chief technology officer. Landau's declaration (portions of which were excluded by the district court) also did not analyze any other transaction in the Epic system. A1880-97 (Landau Declaration). Landau contended, however, that, based on his own experiences with SpeedDate's affiliate

network, Landau could identify 1,200 infringing Epic transactions. A1892.
Essociate has still never identified these 1,200 allegedly infringing transactions.
Thus, Essociate's infringement case rises or falls on the single SpeedDate
transaction first presented in its infringement contentions.

## SUMMARY OF ARGUMENT

The district court granted summary judgment of non-infringement on three
grounds: (1) Essociate failed to adduce admissible evidence to show that the Epic
system met the threshold requirement of operating a virtual affiliate network;
(2) Essociate failed to adduce evidence that the Epic system "configured" an
existing affiliate system to recognize transactions as coming from an Epic affiliate;
and (3) for multiple reasons, the Epic system did not perform the "correlating"
operation, which the inventors had characterized as the key to the invention. The
district court is correct on all three grounds, any one of which alone would be
enough to sustain summary judgment of non-infringement.

On appeal, Essociate relies heavily on declaration evidence of Michael
Landau, who wears many hats in this case: he is an owner of Essociate, one of the
named inventors of the '660 patent, and one of Essociate's experts. But the key
declaration evidence that Essociate relies on now—concerning the operation of the
Epic system—was properly excluded by the district court because it lacked
foundation and because it constituted untimely expert opinion. Without the

conclusory Landau evidence, Essociate has no evidence whatsoever that Epic operated a virtual affiliate system. The district court properly excluded this evidence, and Essociate's perfunctory two-paragraph argument against the exclusion provides no reason to reverse the district court on this point.

The district court was also right to grant summary judgment on the ground that the Epic system does not perform the "configuring" operation or the critical "correlation" operation. The Epic system, an affiliate hub system, operates in a fundamentally different way than the virtual affiliate system claimed in the '660 patent. The passing along of the affiliate ID, appended as a variable to the merchant's landing page URL, does not perform the correlation operation of the '660 patent. Essociate's infringement case, and this appeal, relies on unsustainable claim interpretations to stretch the scope of the claims to cover systems that it did not invent.

## ARGUMENT

## I.    The district court's evidentiary rulings were correct.

Evidence adduced in opposition to a motion for summary judgment must be admissible. *See* Fed R. Civ. P. 56(c)(1)(B). In its summary judgment reply brief, Epic challenged the admissibility of some Essociate's summary judgment evidence, most of which had not been previously disclosed. A1988-92. The district court properly evaluated the admissibility of Essociate's summary judgment

12

evidence, found it lacking, and excluded significant parts of it. A0003-04. The

district court excluded much of Essociate's evidence concerning the operation of

the Epic system as lacking foundation and as untimely disclosed expert opinion. *Id*.

Essociate does not challenge most of the district court's evidentiary rulings.

### A.    The Landau declaration was properly excluded.

Essociate appeals only the district court's exclusion of certain declaration

statements by Michael Landau that had been submitted with Essociate's summary

judgment opposition. Appeal Br. 42-43. The district court concluded that Landau's

declaration statements about the Epic system constituted untimely expert opinion

and that they lacked foundation.

The district court's exclusion is correct. Essociate does not attempt to justify

the Landau declaration as admissible expert opinion, even though the declaration is

chock-full of expert evidence. *See, e.g.,* A1885 (Landau Declaration ¶ 46,

concerning the level of ordinary skill in the art). Essociate implicitly concedes, as it

must, that any new expert evidence introduced in Essociate's summary judgment

opposition would have been untimely. Essociate's deadline for its infringement

expert reports was November 17, 2012 (extended by stipulation from original date

of November 5). A2070; A2063-69. The Landau declaration was served and filed

on February 23, 2013. Essociate offers no argument that such a delay in disclosing

expert evidence was either justified or harmless. *Cf., Salgado by Salgado v.*

13

*General Motors Corp.*, 150 F.3d 735, 741-42 (7th Cir. 1998) (exclusion of untimely expert is automatic and mandatory unless it was either justified or harmless).

Essociate attempts to justify the Landau declaration as admissible lay testimony, but that attempt must fail for multiple reasons. First, Essociate's argument is inadequately developed. Essociate's argument on the Landau declaration is a scant two paragraphs, which do not identify any particular statement by Landau that Essociate contends was wrongly excluded as lacking foundation. The contested Landau declaration contains 163 paragraphs. A1880-97. If Essociate contends that Landau had an adequate foundation to support some of these statements, it needs at least to identify these particular statements and argue for their admissibility. Because Essociate failed to do so in its appeal brief, this argument is waived. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006), *citing United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim . . . . Especially not when the brief presents a passel of other arguments . . . . Judges are not like pigs, hunting for truffles buried in briefs.").

But Essociate's challenge would fail on the merits even if it were developed. Essociate misstates the law concerning lay evidence. Essociate wrongly contends that "[a] witness may testify to anything within personal knowledge," citing

14

Federal Rule of Evidence 602. Appeal Br. 42. Rule 602 actually says that "[a]

witness may testify to a matter only if evidence is introduced sufficient to support a

finding that the witness has personal knowledge of the matter." In other words,

personal knowledge is a necessary condition for lay testimony, but it is not a

sufficient condition, as Essociate implies.

If evidence consists of scientific, technical or other specialized knowledge

beyond the understanding of a lay juror, it is expert evidence within the scope of

Rule 702. Whether the witness is formally described as an "expert," or whether the

subject of his testimony is somehow within his "personal knowledge" does not

matter. As the district court's scheduling order in this case makes clear, a party

employee's witnesses are be subject to the expert disclosure deadlines: "Any

employee of a party who will be offering expert opinions during any phase of this

case must comply with all of these disclosure requirements." A2065. Landau's

testimony in support of Essociate's infringement position should have been

disclosed with Essociate's expert testimony in November, 2012. Landau's

declaration statements about the operation of affiliate network systems were

properly excluded as expert testimony even if they included Landau's "personal

knowledge." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 756 n.2 (7th Cir.

2004) ("Occurrence witnesses, including those providing 'lay opinions,' cannot

provide opinions 'based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'")

But the Landau declaration was also properly excluded for lack of foundation because Landau did not have personal knowledge of the operation of the Epic system. In its summary judgment papers, Epic demonstrated that Essociate lacked evidence concerning the SpeedDate example transaction on which Essociate had based its infringement case. In response, Essociate attempted to fill the gaps with evidence of Essociate's own interaction with SpeedDate and with other affiliate networks. The Landau declaration provided information concerning Essociate interactions with other affiliate networks, and then—based on the mere assumption that the Epic system worked the same way—offered conclusions concerning the Epic system's operations with affiliate networks. The district court properly excluded Landau's statements about the Epic system as lacking in foundation.

Although Essociate does not identify the Landau statements that it contends were wrongly excluded, the following paragraphs are likely at issue:

> 122.   Like Essociate, Epic provided offers from merchants with existing affiliate systems.
>
>         . . .
>
> 124.   Based on my dealings on behalf of Essociate with many of the same merchant affiliate systems Epic provided services to, I am able to confirm that at least

> approximately 1200 of the configured Destination
> Landing Page URL's in Epic's offer_urls table are
> infringing offers.

A1892. Essociate apparently regards Paragraph 124 as particularly significant,

because it repeats the notion that it identified 1,200 infringing transactions

throughout its appeal brief.

But Landau provides no basis for his assumption that the Epic system

worked the same way as the Essociate system. Landau has no personal knowledge

of Epic system; he was able to review the "offer_urls table" only because it was

provided to him by Essociate's counsel after it was produced by Epic in the course

of this litigation. Landau cannot simply assume Essociate and Epic work the same

way, especially after Epic presented direct evidence documenting the SpeedDate

transaction.

Essociate has not provided evidence sufficient to support a finding that

Landau has personal knowledge of the workings of the Epic system. The district

court was right to exclude the statements in the Landau declaration concerning the

operation of the Epic system for lack of foundation.

### B. The conclusory opinions of Edwards were properly excluded, and Essociate has waived any objection to that ruling.

The district court indicated that it would consider the expert report of

George Edwards, Essociate's infringement expert, because it was timely disclosed.

A0004. But that does not mean that the Edwards report was necessarily admissible;

17

the district court rejected certain of Edwards' opinions as lacking foundation. The district court held that Edwards provided no foundation for:

    a)   his opinion that Epic sent traffic to SpeedDate's own affiliate system rather than directly to SpeedDate as a merchant in the Epic system. A0027 (citing A0106-07, (Edwards report)).

    b)   his opinion that SpeedDate had a system of unique identifiers for its own affiliates. A0027 (citing A0107, (Edwards report)).

Essociate has not objected to the district court's rulings on the lack of foundation in the Edwards report, and thus any objection is waived.

The district court's rulings on Edwards are correct in any case. The only source Edwards cites for information about SpeedDate is a single-page attachment to Essociate's infringement contentions. A0104, citing A2031. That attachment is a screen capture of a page on a SpeedDate website promoting its affiliate program, but is says nothing about how the affiliate program works. In fact, as the district court notes, Edwards expressly qualifies his statements about the SpeedDate affiliate system as being made "on information and belief." A0107. Ultimately, Edwards has no admissible evidence about how the SpeedDate system works, or how Epic interacted with it.

**II.   The district court rightly determined that Essociate failed to adduce evidence that Epic operated a virtual affiliate system, and that it did not perform the configuring step.**

As the patentee, Essociate bears the burden to prove by a preponderance of admissible evidence that the Epic system met every limitation of claim 1.[2] To survive summary judgment, Essociate had to adduce substantial evidence on each claim element, which is to say evidence that would be sufficient to sustain a reasonable jury verdict for Essociate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If Essociate failed to adduce substantial evidence on any claim limitation, Epic was entitled to summary judgment. The district court held that Essociate failed to adduce evidence that the Epic system met the threshold requirement of providing *virtual* affiliates to an existing affiliate network, or that it performed the "configuring" or "correlating" operations. A0025.

Essociate's challenge to the district court's summary judgment methodology misses the mark for multiple reasons, and its presentation of its infringement case in the district court was fatally deficient.

---

[2] As the Court acknowledged, the parties agreed that each of independent claims 1, 15, and 28 of the '660 patent have the same substantive elements, and that claim 1 is representative. A0013, A0025. Because a dependent claim cannot be infringed if the base claim is not infringed, the district court appropriately addressed only claim 1. This Court may likewise limit its analysis to claim 1.

Essociate's infringement case was based entirely on the single example transaction involving the online merchant SpeedDate. Essociate contended that it recorded a sequence of URL redirections involving the SpeedDate transaction using Epic's affiliate network, and its infringement case analyzes only this single transaction, which it contended "provides an example of Epic's infringing conduct." A1993-2040 (infringement contentions). Essociate contends, on appeal, that even a single example of infringement is sufficient to survive summary judgment. Appeal Br. 37 (citing *Toshiba Corp v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012). But the district court did not grant summary judgment because Essociate did not provide enough examples of infringement; it granted summary judgment because Essociate failed to show that even the single chosen example transaction infringed the '660 patent.

## A. Essociate adduced no evidence that the Epic system provides a method by which virtual affiliates access an existing affiliate network.

As Essociate now concedes, the '660 patent covers only virtual affiliate systems. The district court reached this conclusion in construing the preamble to claim 1 as a limitation. A0014-19. The district court construed "virtual affiliate" to mean an affiliate that can access an existing affiliate network, without actually joining that existing network. A0020. Essociate does not appeal the district court's

holding that the preamble is limiting, nor does it appeal the district court's construction of the term "virtual affiliate."

Thus, to prove infringement, Essociate had to show that the Epic system allowed its affiliate webmasters to send traffic to another existing affiliate network without actually joining the other existing affiliate network. It would not be enough for Essociate to show that affiliates in the Epic system could send traffic to a merchant who was a member of the Epic system. Such an arrangement would be an example of a prior-art affiliate hub, just like the Linkshare system of the 1990s. The district court held that the SpeedDate example transaction showed that SpeedDate was a merchant in the Epic system, and that the example transaction showed nothing more than Epic operating as an affiliate hub. A0025-29.

Essociate addresses the critical threshold issue of whether Epic operates a virtual affiliate system almost in passing, in the section devoted to the "configuring operation." Appeal Br. 36-38. Essociate's argument on appeal relies chiefly on the declaration testimony of Michael Landau, particularly pages 11-13 (A1890-1892), which it cites repeatedly. Although Essociate does not identify which particular paragraphs it relies on, these pages include statements among those that were excluded by the district court as lacking foundation and as untimely expert opinion. Essociate also relies on the conclusory opinions of its expert George Edwards,

21

which were also excluded by the district court. *See* Appeal Br. at 34, 38-39.[3] Thus, on appeal, Essociate continues to press its case on the basis of inadmissible evidence.

Essociate's appeal argument does not withstand scrutiny. Essociate argues that Landau (presumably as Essociate's chief technology officer) knew that *Essociate* worked with existing affiliate networks operated by SpeedDate, iBallers and AsSeenOnPC. Appeal Br. 37. Further, Landau knew that *Essociate* set up offers so that traffic could be tracked by the SpeedDate, iBallers and AsSeenOnPC affiliate networks. *Id*. Thus, based on Landau's allegedly personal knowledge of SpeedDate, iBallers and AsSeenOnPC, Essociate contends that a reasonable jury could infer *that Epic operated the same way. Id*. Essociate's appeal brief does not pinpoint any specific statement from the Landau declaration, but presumably it relies on these paragraphs:

> 122.   Like Essociate, Epic provided offers from merchants with existing affiliate systems.
>
> . . .
>
> 124.   Based on my dealings on behalf of Essociate with many of the same merchant affiliate systems Epic provided services to, I am able to confirm that at least

---

[3] Essociate contends also that Edwards provided evidence explaining why an affiliate network would use both cookie-and-pixel tracking along with the method of the '660 patent. Appeal Br. at 38-39, citing A0108. But the cited page of the Edwards report provides no such explanation.

> approximately 1200 of the configured Destination
> Landing Page URL's in Epic's offer_urls table are
> infringing offers.

A1892. On appeal, Essociate repeatedly asserts that it has "presented evidence of over 1200 examples of Epic's direct infringement." *See, e.g.,* Appeal Br. 32. But Essociate did not identify the 1,200 allegedly infringing offers in the district court, and it has not done so on appeal. Essociate includes in its Appendix nearly 600 pages excerpted from the 1,716-page offer_urls table, but it still makes no reference to any specific transaction of the approximately 50,000 offers on that table.

Essociate contends that the district court improperly rejected Essociate's evidence, which Essociate defends as admissible circumstantial evidence that would support an inference that Epic operated a virtual affiliate network. Landau's conclusory declaration testimony does not adduce substantial evidence for multiple reasons.

First, as explained above, Landau's declaration testimony and the Edwards Infringement Report concerning the operation of the Epic system was correctly excluded by the district court as untimely expert opinion or lacking foundation. Essociate bases its appeal primarily on inadmissible evidence.

Second, a patent owner cannot prove infringement by showing that the accused product is similar to the patent owner's own commercial embodiment of

the invention. *C.f., Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994) ("As we have repeatedly said, it is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent."). It is irrelevant how Essociate's affiliate network operates; only Epic's system is at issue.

Third, Essociate is entitled to the benefit only of *reasonable* inferences. Reasonable inferences are only those based on observation and logic, not hunches, speculation, or guesswork. *Rand v. CF Industries*, 42 F.3d 1139, 1146 (7th Cir. 1994). Infringement may be proven by indirect or circumstantial evidence, but indirect evidence must lead reasonably and logically to the fact to be proven. Essociate provides no reason to assume that the Epic system must engage SpeedDate in the same way that Essociate's system does. The problem with Essociate's infringement case was not that it relies on indirect evidence, but that there is no sufficient nexus between Essociate's indirect evidence and the fact that Essociate purports to prove.

Fourth, the inferences that Essociate now advances—that the Essociate system and the Epic system must work in the same way—are contradicted by documentary evidence. In support of its motion for summary judgment, Epic presented a 2009 "insertion order" showing that SpeedDate was a merchant

member of the Epic affiliate network. A2089-91. According to the declaration of Sasenarine Appiah, formerly Epic's Senior Vice President of Technology, the SpeedDate insertion order demonstrates that SpeedDate was an Epic client, a merchant who used the Epic system. A2008. Essociate admitted this. A2060 (undisputed fact no. 84). The insertion order documents the relationship between Epic and SpeedDate, and it demonstrates certain facts about the SpeedDate offer. SpeedDate requested that the pre-set variables "affiliate_id" and "sub-id" be appended to the landing page URL, but the insertion order also shows that transaction tracking would be performed by Epic using its standard cookie-and-pixel method. The insertion order shows that SpeedDate has signed ups as Epic merchant, as part of a prior-art affiliate hub system, not a virtual affiliate system.

On appeal, Essociate contends that there is nothing "incompatible" with using cookie-and-pixel method *and* the technique of the '660 patent. But this misses the point: the insertion order shows that SpeedDate joined the Epic system as a merchant to receive offers from Epic affiliates. The insertion order contradicts the inference that Essociate now urges: that the Epic system was a *virtual* affiliate system rather than an affiliate hub system. In fact, Essociate's theory is contradicted by Landau's own declaration testimony, a point that the district court recognized, but that Essociate ignores in its opening brief. The SpeedDate domain used by Epic in the accused example transaction is "mysdate.com." But the

25

SpeedDate domain used by Essociate when it engaged the SpeedDate affiliate system is "affiliates.speeddate.com." A1890 (Landau Declaration ¶ 103), A0026. The different domains used by Epic and by Essociate are themselves enough to doom Essociate's theory.

Essociate chose to present its infringement case using a single example transaction. SpeedDate may indeed have its own affiliate system, but Essociate adduced no evidence to show that its SpeedDate example transaction required Epic to use SpeedDate's affiliate system. Based on the relationship between Epic and its merchant SpeedDate, the example transaction demonstrates an actual affiliate relationship, not a virtual affiliate relationship. Because Essociate failed to adduce evidence sufficient to show that Epic operated a virtual affiliate network, the district court properly granted summary judgment of non-infringement.

**B.    Essociate failed to show that Epic configured SpeedDate to recognize the transaction as originating from a particular Epic affiliate.**

The district court concluded that the Epic system engaged SpeedDate as merchant, not as an "existing target affiliate system." A0025-28. The district court further concluded that because Essociate had not shown that Epic dealt with an existing target affiliate system, it also did not show that Epic had "configured" an existing target affiliate system. A0028. On appeal, Essociate presents no counter to this conclusion, which follows logically from Essociate's failure to show that Epic

operated a virtual affiliate system. But there are additional reasons why Essociate failed to show that Epic configured the SpeedDate system.

Essociate's argument on appeal is that Epic "configured" SpeedDate by "configuring the landing page URL provided by SpeedDate, and that it did so at SpeedDate's request for SpeedDate's tracking purposes." Appeal Br. 36. In the conclusory paragraph in which it presents this argument, Essociate plays fast and loose with concept of "configure" and it ignores certain facts established in the record.

First, the format of the landing page URL is dictated by the merchant, not Epic. A1957 (Kent Infringement Report); A2074 (Advertiser Implementation Guide); A2088 (Declaration of Sasenarine Appiah). Because Epic follows the direction of the merchant concerning how to set up the landing page URL, Epic is not "configuring" the merchant (target) affiliate system. It would be more accurate to say that Epic configures its own system at the direction of the merchant. On the merchant's request, Epic will format the landing page URL so the unmodified Epic affiliate ID is passed along to the merchant, but Epic does not thereby modify the merchant system in any way. And Essociate has never advanced any theory of divided or induced infringement. *See Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012).

Second, as the district court noted, A0028, Essociate had no evidence the landing page URLs configured the merchant system to recognize a transaction as coming from a particular Epic affiliate. There is no genuine dispute that in the SpeedDate example transaction, the Epic affiliate ID is an independent variable appended unmodified to SpeedDate's landing page URL, and thus the affiliate ID will be passed along to SpeedDate. But Essociate has provided no evidence that SpeedDate has been configured by Epic such that SpeedDate will recognize this transaction as coming from an affiliate in the Epic system. The claim requires more than just passing along the unmodified affiliate ID to the merchant. Essociate provides no evidence that SpeedDate can recognize the Epic affiliate ID, or that SpeedDate process or understand the Epic affiliate ID in any way. Essociate's only evidence on this point was the conclusory opinion of George Edwards, which the district court properly excluded. *See* Section I.B. above.

Essociate also plays fast and loose with it argument that Epic supposedly conceded in its briefing that it performed the configuring step. Appeal Br. at 35. The passage of briefing cited by Essociate for this so-called concession states only that some merchants want the affiliate ID passed through (A0125), this does not concede the configuring step, which requires more, as explained above. Nor does it matter that some of Epic's merchants operate their own merchant affiliate systems.

Because Epic does not operate a virtual affiliate system and does not configure the merchant system, it does not perform the configuring step.

### III. The district court correctly construed the correlating operation to require more than passing along the unmodified affiliate ID to the merchant.

The district court also concluded that, even if one assumed that the SpeedDate transaction involved virtual affiliates, the Epic Direct system did not perform the required correlation operation. The district court's conclusion on this point is essentially a matter of claim construction, because it turns on the district court's determination of the scope of the claims. When the operation of the accused system is undisputed, the question of infringement is essentially a question of law for the court, as part of its duty to determine the scope of the claims. *Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332-33 (Fed. Cir. 1998); *Athletic Alternatives, Inc. v. Prince Mfg.,* 73 F.3d 1573, 1578 (Fed. Cir. 1996). The operation of the Epic Direct system in processing the SpeedDate example transaction was not genuinely disputed. Thus, whether the passing along the Epic affiliate ID to SpeedDate demonstrated correlation was properly decided as a matter of law.

### A. The district court did not err by construing the correlating operation rather than just the word "correlate."

Essociate's argument on appeal is that the district court erred by construing the correlation operation to require more than simply passing on the unmodified

affiliate ID to the merchant system. Indeed, Essociate contends that the district court erred by construing the correlation operation at all, because the plain language should govern. Appeal Br. 28-30. This simplistic argument must be rejected, if only for the simple reason that the claim language and claim scope is not plain on its face. *Phillips*, 415 F.3d at 1314 (Fed. Cir. 2005) (explaining that the meaning of claim terms is "often not immediately apparent"); *see also*, *O2 Micron Intern. Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F. 3d 1351, 1361-63 (Fed. Cir. 2008) ("[W]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it").

Essociate argues that the district court should have limited its construction to the word "correlate," leaving rest of the correlation operation to be understood as "plain language." Appeal Br. at 27-32. But Essociate's arguments on this point are, again, undeveloped and largely unsupported. Essociate contends that the district court should have accorded "reasoned deference" to the claim construction order in *Essociate, Inc. v. Blue Whaler Investments*, *LLC*, (C.D. Cal. No. 10-cv-2107-JVS). *Id*. at 30. But the district court considered that order, and provided its reasons for declining to adopt its constructions. A0014-15. Essociate provides no counter-argument to the district court's reasoning.

Essociate argues that the '660 patent contemplates that sometimes the SID and TWID can be the same, and that correlation is simpler when the source and

target use "common data." Appeal Br. at 30-32. Apparently, Essociate considers that the notion of the same ID could serve as both SID and TWID—an idea never advanced in the district court—supports Essociate's argument that simply passing the affiliate ID to the merchant is a correlation operation. But this notion is not supported by admissible evidence. Essociate cites *nothing* for its contention that correlation is simpler when the source and target use "common data." Essociate quotes a snippet from the '660 patent that mentions "webmaster identifiers that are different from the target Merchant affiliate system's identifiers," but it provides no citation for the passage. In response to the district court's observation that Landau himself had conceded that "correlation" involves more than mere "substitution" of the affiliate ID, Essociate cites Landau's testimony at A1893. But that page is, once again, the excluded Landau declaration testimony.

In sum, the district court did not err in construing the correlation operation as a whole, rather than construing only the word "correlate."

### B.     The district court's construction of the correlation operation is correct.

The district court analyzed the language of the correlation operation as set out in claim 1:

> correlating the received source Webmaster unique
> identifier to a target Webmaster unique identifier
> corresponding to the unique identification system of the
> requested Merchant affiliate system;

A0054 ('660 patent, 21:66-22:2). As the district court recognized, the correlation

operation required that the accused system correlate two things: the source

webmaster unique identifier (the SID, using the abbreviation in the patent) and the

target webmaster unique identifier (the TWID). Thus, applying the claim language,

the correlation operation necessarily involves applying the concepts of SID and

TWID to the accused system, or in this case, the single accused transaction.

The meaning of the terms SID and TWID were substantially agreed by the

parties, and Essociate does not contest the district court's application or use of

those terms on appeal. The parties agreed that the SID is the Epic affiliate ID. In

the example transaction, the SID is 48192, which is the affiliate ID for an Epic

affiliate in Denver, Colorado. A2060 (undisputed fact no. 86).

The first critical issue in the correlation step, as the district court recognized,

concerns the TWID. Based on the substantial agreement of the parties, the district

court construed the TWID as:

> a unique identifying code assigned to a webmaster in the
> source affiliate pool that is functional in the target
> merchant's affiliate system and that corresponds to the
> unique identification system of the target merchant's
> affiliate system.

A0022. Two aspects of the TWID are important in the SpeedDate example: the

TWID must be a unique code assigned to each webmaster in the Epic system, and

the TWID must correspond to the unique identification system used in SpeedDate's affiliate system.

As the district court rightly recognized, by Essociate's own admission, the correlation operation requires some logic or algorithm. In defending the validity of the '660 patent, Essociate specifically disclaimed the idea that passing along the source affiliate ID to the merchant constitutes "correlation" within the meaning of the '660 patent. In its summary judgment opposition, Essociate contended that the correlation operation required "an algorithmic process." A1920. As Landau (speaking as Essociate's validity expert) put it:

> The correlation in the '660 Patent is between unique codes assigned to source webmasters and unique codes functional in the target merchant system. The [prior art] Old Xpays system did not include unique codes functional in the target merchant system and therefore there was nothing which could be correlated.
>
> . . .
>
> Rather, it is clear that the [prior art's use of the] xmake.cgi script—even assuming that was used in connection with iGallery and Python, which does not appear to be the case—*operated by substitution*. That script substituted a placeholder, <!--ASJCGI- -> with the 5-digit code for a particular Xpays affiliate.

A1986-87 (emphasis added). Just as Landau (speaking as the inventor) testified, the simple substitution of a variable does not constitute "correlation" within the meaning of the '660 patent. A2043-44 (2012 Landau Dep. 157:19-158:22).

33

Specifically, Landau testified that substitution is not enough, but rather that there must be "some form of logic that occurs." A2041 (2012 Landau Dep. 127:01-15).

The district court rightly recognized that Essociate's argument was a disingenuous attempt to read the patent one way to establish infringement and another to defend its validity. *Cf., Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003); *see also Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("Because the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses."). Essociate cannot disavow its many prior statements about claim scope now, simply because the validity of the '660 patent is not at issue on this appeal.

### C.    The district court properly held that Epic does not perform the correlation operation.

On appeal, Essociate contends that it adduced sufficient evidence to show that the SpeedDate transaction performed the "hybrid string" method of correlation operation. Appeal Br. 40-41; citing A0049 ('660 patent, 11:13-24). In the hybrid string method, the TWID is created by combining characters representing the source affiliate system itself with the ID of the affiliate in the source system. Essociate contended that in the SpeedDate.com example transaction, the TWID is:

a=53&c=1&s1=48192&s2=12268

A1985 (Essociate's brief in opposition to summary judgment). As discussed above,

This expression is the string of four variables appended to the SpeedDate.com

landing page URL:

http://mysdate.com/?a=53&ca=53&c=1&s1=48192&s2=12268

A2003 (infringement contentions). But, as the district court concluded, Essociate

has adduced no evidence to show that the string of variables

a=53&c=1&s1=48192&s2=12268 could meet the definition of TWID. There are

two reasons for this.

The first reason is an evidentiary problem: Essociate adduced no admissible

evidence to show that the string corresponds to a unique identification system in

the SpeedDate affiliate system. Essociate's appeal brief cites no evidence

concerning SpeedDate's unique identification system, or even that SpeedDate has

such a system. Essociate cites Landau's declaration testimony that SpeedDate

requested that Essociate use certain variables in its landing page URLs, but the

Landau declaration contains no statement that SpeedDate had a unique

identification system for its own affiliates. As the district court rightly held,

Essociate's expert, George Edwards, lacked foundation to opine on the SpeedDate

system.

Second, the expression a=53&c=1&s1=48192&s2=12268 is not a unique

code assigned to each affiliate webmaster in the Epic system. The expression is,

35

instead, a string of four independent variables, in a format prescribed by SpeedDate.com. A1957 (Kent Infringement Report); A2074 (Advertiser Implementation Guide); A2088 (Appiah Declaration). The third variable in the string is the Epic ID for the affiliate in Denver, 48192. A2061 (undisputed fact no. 86). The fourth variable is the sub-ID chosen and used by the Denver affiliate for his own purposes. A2059 (undisputed fact no. 78). The first and second variables were prescribed by SpeedDate.com for its own purposes. A1957 (Kent Infringement Report); A2074 (Advertiser Implementation Guide); A2088 (Appiah Declaration). The only unique code assigned to the webmaster in this transaction is 48192, which is the Epic affiliate ID. In the terms of the '660 patent, the Epic ID is the SID. There simply is no TWID in the SpeedDate.com example transaction.

Essociate contends that the district court failed to draw the reasonable inference that the all the variables in the string a=53&c=1&s1=48192&s2=12268 are functional in the SpeedDate system. But Essociate has not adduced evidence to show what these variables did, if anything, in the SpeedDate example transaction. As the district court rightly held, it is not enough that these independent variables are passed on to the SpeedDate system. That this string is an example of a unique code assigned to each webmaster in the Epic system, and Essociate has not adduced evidence to show that it corresponds to SpeedDate's own affiliate identification system.

36

Essociate contended that in the SpeedDate transaction, the TWID is:

a=53&c=1&s1=48192&s2=12268

A1985 (Essociate's brief in opposition to summary judgment). This expression is a string of four variables appended to the SpeedDate landing page URL:

http://mysdate.com/?a=53&ca=53&c=1&s1=48192&s2=12268

The district court correctly rejected Essociate's contention because the string of variables a=53&c=1&s1=48192&s2=12268 does not meet the definition of TWID. The district court's opinion provides three reasons for this conclusion.

First, Essociate adduced no evidence concerning SpeedDate's unique identification system for its own affiliates, or even that SpeedDate had such a system. The district court rightly disregarded Edward's conclusory opinion on this subject.

Second, the expression a=53&c=1&s1=48192&s2=12268 is not an example of a unique code assigned to each affiliate webmaster in the Epic system. The expression is, instead, a string of four independent variables, in a format prescribed by SpeedDate. A1957 (Kent Infringement Report); A2074 (Advertiser Implementation Guide); A2088 (Appiah Declaration). The third variable in the string is the Epic ID for the affiliate in Denver, 48192. A2061 (undisputed fact no. 86). The fourth variable is the sub-ID chosen and used by the Denver affiliate for his own purposes. A2059 (undisputed fact no. 78). The first and second variables

were prescribed by SpeedDate for its own purposes. A1957 (Kent Infringement Report); A2074 (Advertiser Implementation Guide); A2088 (Appiah Declaration). Essociate offers no explanation, and has no evidence, for what these variables represent or how they are used. The only unique code assigned to the webmaster in this transaction is 48192, which is the Epic affiliate ID. In the terms of the '660 patent, the Epic ID is the SID. There simply is no TWID in the SpeedDate example transaction.

The district court properly considered the claim language itself in light of the specification. It reached the correct conclusion concerning the scope of the claims, based on a full understanding of what the inventors actually invented. Essociate did not invent the idea of passing the unmodified affiliate ID along to the merchant, and doing so does not infringe the '660 patent.

## CONCLUSION

Essociate's infringement theory is fatally deficient. Essociate relies on a convoluted construction of the correlation operation to stretch the '660 patent to cover affiliate systems that it did not invent. The evidence adduced by Essociate— even if it were admissible—is insufficient to establish even the threshold requirement that Epic operated a virtual affiliate system, rather than a standard affiliate hub. The district court's grant of summary judgment was entirely correct and should be affirmed.

Dated: December 16, 2013.

Respectfully submitted,

*/s/ James D. Peterson*

James D. Peterson
Jennifer L. Gregor
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI  53703
Tel:    (608) 257-3911
Email: jpeterson@gklaw.com;
          jgregor@gklaw.com

Attorneys for Defendants-Appellees

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Corrected Response Brief of

Defendants-Appellees with the Clerk of the United States Court of Appeals for the

Federal Circuit via the CM/ECF system. Service on appellant's counsel will be

accomplished by the CM/ECF system, which will send notification of this filing to:

Derek A. Newman (derek@newmanlaw.com)
Derek Linke (linke@newmanlaw.com)
John Du Wors (duwors@newmanlaw.com)
Keith Scully (keith@newmanlaw.com)
NEWMAN DU WORS LLP
1201 Third Avenue, Suite 1600
Seattle, WA 98101-3029

I further certify that on December 16, 2013, I caused a copy of the foregoing

Corrected Response Brief of Defendants-Appellees to be sent by U.S. Mail to the

above attorneys for Appellants.

*/s/ James D. Peterson*
James D. Peterson

Attorney for Defendants-Appellees

## CERTIFICATE OF COMPLIANCE

Counsel for Defendants-Appellees herby certifies that:

1.      The brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, exclusive of the exempted portions, it contains 8,438 words as counted by the word processing program used to prepare the brief; and

2.      The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2010 in a proportionally-spaced typeface: Times New Roman, font size 14.

Dated: December 16, 2013.


 */s/ James D. Peterson*
James D. Peterson

Attorney for Defendants-Appellees

10581662