**Appeal No. 2015-1907, -1941, -1958**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## TRANXITION, INC., a Delaware corporation,

*Plaintiff–Appellant,*

**v.**

## LENOVO (UNITED STATES), INC., a Delaware corporation,

*Defendant–Appellee,*

## NOVELL, INC., a Delaware corporation,

*Defendant–Appellee.*

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF OREGON IN NOS. 3:12-cv-01065-HZ AND 3:12-cv-01404-HZ,
JUDGE MARCO A. HERNANDEZ

## BRIEF OF DEFENDANT–APPELLEE NOVELL, INC.

STERLING A. BRENNAN
L. REX SEARS
MASCHOFF BRENNAN LAYCOCK GILMORE
   ISRAELSEN & WRIGHT P.L.L.C.
20 Pacifica, Suite 1130
Irvine, California 82618
Telephone: (949) 202-1900

*Attorneys for Defendant–Appellee*
*NOVELL, INC.*
February 11, 2016

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Tranxition, Inc.                    **v.**    Novell, Inc.

Case No.    15-1958

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellee, Novell, Inc.              certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Novell, Inc.

2.    The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

Novell, Inc. is 95% owned by The Attachmate Group, Inc., and 5% owned by Attachmate Corporation

4.  ☐   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Daniel P. Larsen, Ater Wynne, LLP
Sterling A. Brennan, Maschoff Brennan Laycock Gilmore Isrealsen & Wright PLLC
L. Rex Sears, Maschoff Brennan Laycock Gilmore Isrealsen & Wright PLLC
Jared J. Braithwaite, Maschoff Brennan Laycock Gilmore Isrealsen & Wright PLLC

September 3, 2015                              /s/ L. Rex Sears
        Date                                          Signature of counsel

Please Note: All questions must be answered

                                              L. Rex Sears
cc:    All counsel of record                  Printed name of counsel

Reset Fields

# TABLE OF CONTENTS

INTRODUCTION ........................................................................... 1

STATEMENT OF RELATED CASES .................................................. 2

JURISDICTIONAL STATEMENT ..................................................... 3

STATEMENT OF ISSUES ............................................................... 3

STATEMENT OF THE CASE ........................................................... 4

STATEMENT OF FACTS ................................................................. 4

    A.   The Original, Abandoned Patent Application ............................4

    B.   Later Applications, the Patents in Suit, and the Distinction between "Claim 30" and the "Primary Claims" ............................5

    C.   Relevant Inconsistencies in the Intrinsic Evidence ......................7

        1.   Intrinsic Evidence that a Change in Location *Is* a Change in Format ...................................................................8

        2.   Intrinsic Evidence that a Change in Location *Is Not* a Change in Format ...................................................................9

SUMMARY OF ARGUMENT ........................................................ 11

    A.   Subject-Matter Ineligibility .......................................................11

    B.   Indefiniteness ............................................................................12

    C.   Claim Construction ...................................................................13

STANDARD OF REVIEW .............................................................. 13

ARGUMENT .............................................................................. 14

    I.   The Patents Are Invalid under Section 101 ........................................14

    A.   The Patents in Suit Are Directed to Settings Migration ..............15

B.   Settings Migration Is an Abstract Idea ........................................17

    1.   Tranxition Does Not Dispute that Settings Migration Is Abstract ................................................................................17

    2.   Settings Migration Is an Abstract Idea under *Flook* and *Alice* ......................................................................................18

    3.   *DDR Holdings* and the USPTO's Guidance Are Not to the Contrary ......................................................................21

    4.   Tranxition's Remaining Arguments against Abstractness Lack Merit.............................................................................23

C.   The Claims Do Not Add any Inventive Concept to the Abstract Idea of Migration ..........................................................23

    1.   Tranxition Fails to Identify any Inventive Concept Overlooked by the District Court ........................................24

    2.   Tranxition Failed to Create a Genuine Issue as to whether Migration Was either a Longstanding Practice or Could Be Performed Manually........................................26

    3.   *DDR Holdings* and the USPTO Guidance Are Inapposite ..28

D.   Tranxition's Machine-or-Transformation Analysis Is Irremediably Flawed.................................................................29

    1.   Tranxition's Machine-Prong Argument Misconstrues and Conflicts with Controlling Authority............................30

    2.   Tranxition's Transformation-Prong Argument Fails, Too ..31

E.   Tranxition's Preemption Arguments Are Unpersuasive and Unavailing ................................................................................33

F.   Even if this Court Were to Find that the Primary Claims Have Patentable Subject Matter, it Should Affirm the District Court's Ruling that Claim 30 Does Not.........................34

II.    The Primary Claims Are Invalid for the Further Reason that "Format" Is Indefinite ........................................................36

    A.    The Intrinsic Evidence about the Meaning of "Format" Is Equivocal .....................................................................37

    B.    When the Intrinsic Evidence Equivocates, Those Skilled in the Art Are Not Informed about the Scope of the Invention with Reasonable Certainty...........................................38

    C.    The District Court Erred by Interpreting "Format" Differently in One Patent than in the Other ................................39

III.    The Interpretive Rulings Challenged by Tranxition (1) Are Not Ripe for Review, but (2) Were Correct, in any Event.........................40

    A.    The Contested Constructions Are Not Ripe for Review............42

    B.    The District Court Interpreted "Personality Object" Properly ......................................................................44

        1.    Tranxition's Arguments during Prosecution Require that "personality object" Be Limited to an Object-oriented Programming Object...........................................45

        2.    Tranxition's Prosecution Arguments also Require that a Personality Object Not Be (1) Directly Associated with an Initialization File or (2) a Wizard ...................................46

        3.    Tranxition's Arguments about Prosecution History Disclaimer Are Wrong and Unavailing ...............................48

    C.    The District Court Construed "extraction plan" Properly...........49

    D.    The District Court Interpreted "active configuration settings" Properly ....................................................................52

    E.    The District Court Construed "value" Properly ..........................54

    F.    The District Court Interpreted the Transitioning-of-Format Limitations Properly ...................................................................54

G.    The District Court Construed the Manipulating-of-Format
        Limitations Properly ................................................................56

CONCLUSION ...........................................................................59

CERTIFICATE OF COMPLIANCE ............................................................ 61

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alice Corp. v. CLS Bank International*
  573 U.S. __, 134 S. Ct. 2347, 189 L. Ed. 2d 296 (2014) ...........................*passim*

*Altiris, Inc. v. Symantec Corp.*
  318 F.3d 1363 (Fed. Cir. 2003) ........................................................................50

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*
  788 F.3d 1371 (Fed. Cir. 2015) .......................................................................32

*Broadcast Innovation, L.L.C. v. Charter Communications, Inc.*
  420 F.3d 1364 (Fed. Cir. 2005) ..............................................................3, 13, 43

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*
  776 F.3d 1343 (Fed. Cir. 2014) ....................................................................21, 52

*CyberSource Corp. v. Retail Decisions, Inc.*
  620 F. Supp. 2d 1068 (C.D. Cal. 2009) ............................................................30

*CyberSource Corp. v. Retail Decisions, Inc.*
  654 F.3d 1366 (Fed. Cir. 2011) ......................................................21, 22, 30, 35

*DDR Holdings, LLC v. Hotels.com, L.P.*
  773 F.3d 1245 (Fed. Cir. 2014) ...............................................................*passim*

*DealerTrack, Inc. v. Huber*
  674 F.3d 1315 (Fed. Cir. 2012) ........................................................................21

*Diamond v. Diehr*
  450 U.S. 175, 101 S. Ct. 1048, 67 L. Ed. 2d 155 (1981) ............................23, 24

*Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*
  758 F.3d 1344 (Fed. Cir. 2014) ...............................................................*passim*

*Gottschalk v. Benson*
  409 U.S. 63, 93 S. Ct. 253, 34 L. Ed. 2d 273 (1972) ...................................22, 30

*Intellectual Ventures I LLC v. Capital One Bank (USA)*
  792 F.3d 1363 (Fed. Cir. 2015) .............................................................20, 26, 27

v

*Internet Patents Corp. v. Active Network, Inc.*
   790 F.3d 1343 (Fed. Cir. 2015) ............................................................27, 31, 32

*Lighting World, Inc. v. Birchwood Lighting, Inc.*
   382 F.3d 1354 (Fed. Cir. 2004) ...........................................................43

*In re Lowry*
   32 F.3d 1579 (Fed. Cir. 1994) .............................................................30

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*
   566 U.S. 10, 132 S. Ct. 1289, 182 L. Ed. 2d 321 (2012) ......................22, 23, 32

*Microsoft Corp. v. Multi-Tech System, Inc.*
   357 F.3d 1340 (Fed. Cir. 2004) ...........................................................39, 48, 49

*Parker v. Flook*
   437 U.S. 584, 98 S. Ct. 2522, 57 L. Ed. 2d 451 (1978) ..................11, 18, 19, 20

*Planet Bingo, LLC v. VKGS LLC*
   576 F. App'x 1005 (Fed. Cir. 2014) ....................................................28

*Praxair, Inc. v. ATMI, Inc.*
   543 F. 3d 1306 (Fed. Cir. 2008) .........................................................13

*Resonate Inc. v. Alteon Websystems, Inc.*
   338 F.3d 1360 (Fed. Cir. 2003) ..........................................................43

*Serverside Group Ltd v. Tactical8 Technologies, L.L.C.*
   927 F. Supp. 2d 623 (N.D. Iowa 2013) .............................................51

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*
   574 U.S. __, 135 S. Ct. 831, __ L. Ed. 2d __ (2015) ........................14

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*
   789 F.3d 1335 (Fed. Cir. 2015) ...............................................*passim*

*Toro Co. v. White Consolidated Industries, Inc.*
   199 F.3d 1295 (Fed. Cir. 1999) ..........................................................52, 53, 58

*Ultramercial, Inc. v. Hulu, LLC*
   772 F.3d 709 (Fed. Cir. 2014) ............................................................29

*United States v. Ford Motor Co.*
  463 F.3d 1267 (Fed. Cir. 2006) ........................................................................55

**Statutes**

35 U.S.C. § 101 .....................................................................................*passim*

35 U.S.C. § 102 .............................................................................................5

35 U.S.C. § 103 .............................................................................................5

35 U.S.C. § 112 .............................................................................................5

# **INTRODUCTION**

In the cases below, Tranxition[1] tried to assert two patents against software pioneer Novell and personal computer supplier Lenovo.  Tranxition lost the *Lenovo* action first, when the district court granted Lenovo's motions for summary judgment of invalidity under 35 U.S.C. § 101 ("section 101" or "§ 101").  (*See* Joint Appendix ["JA"] 0031.)  Then Tranxition lost its case against Novell when that same ruling was given preclusive effect in the *Novell* action.  (*See* JA0037.)

Tranxition does not contest that the district court's summary judgment ruling in the *Lenovo* action has preclusive effect in the *Novell* action.  So if this Court sustains the *Lenovo*-action ruling then Novell's judgment against Tranxition will stand, as well.  This Court should affirm the district court's judgment against Tranxition in the *Novell* action because the district court's summary-judgment ruling in the *Lenovo* action was correct:  all asserted claims are invalid under section 101 because they are directed to the migration of settings between computers, which is an abstract idea; and the asserted claims add no inventive concept to that underlying idea.  *See Alice Corp. v. CLS Bank International*, 573 U.S. __, 134 S. Ct. 2347, 2355, 189 L. Ed. 2d 296 (2014).

---

[1] The parties to this consolidated appeal are:  (1) Novell, Inc., appellee here and defendant–counterclaimaint in *Tranxition, Inc. v. Novell, Inc.*, No. 3:12-cv-1404-HZ ("*Novell* action"); (2) patentee Tranxition, Inc., appellant here and plaintiff–counterdefendant below; and (3) Lenovo (United States), Inc. ("Lenovo"), appellee here and defendant–counterclaimant in *Tranxition, Inc. v. Lenovo (United States) Inc.*, No. 3:12-cv-1065-HZ (D. Or.) ("*Lenovo* action").

But even if this Court were to find some flaw in the district court's summary judgment ruling—still it should affirm the district court's invalidity judgments, in both the *Lenovo* and *Novell* actions, on alternative grounds. First, with only one exception, each asserted claim either includes or depends from a claim that includes the term "format," and equivocal representations made during prosecution of the patents in suit render that term indefinite. *See Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343–45 (Fed. Cir. 2015). Second, the one asserted claim that is *not* invalidated by the indefiniteness of "format" is directed to "information" inscribed on a computer-readable medium; and *that* cannot be patent eligible under section 101, even if this Court were to conclude that the systems and methods recited by other asserted claims are (or might be). *See Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344, 1349–51 (Fed. Cir. 2014).

Tranxition also contests various interpretive rulings made by the district court. Those rulings (1) are not ripe for review and (2) were correct, in any event.

## STATEMENT  OF  RELATED  CASES

So far as Novell is aware: no other appeal from the *Novell* action was previously before this or any other appellate court; and the only cases that will directly affect or be directly affected by this Court's decision in this appeal are the *Novell* and *Lenovo* actions.

2

## JURISDICTIONAL STATEMENT

Novell agrees with Tranxition's jurisdictional statement, except to the extent that it asserts appellate jurisdiction over the district court's claim construction orders. Other than the indefiniteness issue, those orders are not implicated by the appealed judgments and therefore "are not properly before this court at this time." *See Broadcast Innovation, L.L.C. v. Charter Comms., Inc.*, 420 F.3d 1364, 1368 (Fed. Cir. 2005).

## STATEMENT OF ISSUES

Tranxition claims that ten issues are presented. The first four come down to one:

1.     Did the district court err by holding that the subject matter claimed by the patents in suit is ineligible under section 101?

As shown below, the district court did not err.

In addition, Novell presents a further issue:

2.     Did the district court err by holding that the claim term "format" is not indefinite?

As shown below, the district court *did* err in that limited respect—but correction of that error is an alternative ground for affirming the district court's ultimate judgment of invalidity.

The other six issues alleged by Tranxition are claim construction disputes. Collectively, they present a third issue:

3.    Are the interpretive rulings presented by Tranxition ripe for review— and if so, are they correct?

As shown below, those rulings are not ripe for review.  But if they are then, as shown below, this Court should affirm them.

## STATEMENT OF THE CASE

Novell disputes the first paragraph of Tranxition's statement of the case and in its place offers the following:

> Both of Tranxition's patents in suit claim systems and methods for migrating computer settings (a.k.a., a computer's "personality").  In the *Lenovo* and *Novell* actions, Tranxition alleged infringement of both patents by Lenovo and Novell.

At least for purposes of this appeal, Novell does not otherwise dispute Tranxition's statement of the case.

## STATEMENT OF FACTS

Novell rejects Tranxition's argumentative "Statement of the Facts" as biased and inaccurate—and in its place offers the following, limited to the facts that really matter:

### A.    The Original, Abandoned Patent Application

On April 28, 1999, Tranxition filed U.S. Patent Application No. 09/300,862 ("'862 application").  On November 30, 2001, the examiner made rejections under

35 U.S.C. §§ 101, 102, 103, and 112—including anticipation by and obviousness in view of a Microsoft patent, U.S. Patent No. 6,161,176 to Hunter ("Hunter"), which teaches a software wizard "for reading and storing configuration settings from a first computer for transfer to a second computer." (*See* JA0837, JA0842–45, JA0853.)  After two unsuccessful attempts to amend and argue over the examiner's various rejections, Tranxition allowed the'862 application to go abandoned on April 24, 2003.  (JA2162.)

### B.    Later Applications, the Patents in Suit, and the Distinction between "Claim 30" and the "Primary Claims"

Before allowing the original, '862 application to go abandoned, Tranxition filed as a continuation the application on which U.S. Patent No. 6,728,877 ("'877 patent") eventually issued.  (JA0073.)  Before the '877 patent issued, on April 27, 2004, Tranxition filed a continuation on which issued the other patent in suit, U.S. Patent No. 7,346,766 ("'766 patent").  (JA0244.)  The '766 patent issued on March 18, 2008.

Each claim of the '877 patent, other than claim 30 ("Claim 30"), either includes or depends from a claim that includes the term "format."  (JA0090–91.) So too does each *asserted* claim of the '766 patent.[2]  (JA0261–63.)  Thus Claim 30 is the only asserted claim that does not include or depend from a claim that

---

[2] Claim 28 and its dependents do not include the term "format" but they are not asserted.  (*See* Opening Br. at 10–11.)

includes the term "format."  A further difference is that all asserted claims *other*

than Claim 30 are system or method claims,[3] but Claim 30 is a computer-readable

medium claim.  Hereafter, Novell follows the district court in referring to the

asserted claims *other* than Claim 30 as the "Primary Claims."  (*See* JA0005.)

Claim 30 reads, in full:

> A computer-readable medium containing a data structure comprising:
>
> > information for locating of user preferences that affect the appearance and operation of a basic windowed user interface;
> >
> > information for locating visual elements, user interface hardware settings, and windows preferences configuration information;
> >
> > information for locating service providers, services, clients, and domains configuration information;
> >
> > information for locating accounts, browser, and network addresses configuration information;
> >
> > information for locating mail application and mail application settings configuration information;
> >
> > information for locating application and application settings configuration information; and
> >
> > information for locating registry settings configuration information.

(JA0091.)  That is, Claim 30 is directed to (1) a computer-readable medium that

(2) contains a data structure that (3) is comprised of "information for locating"

---

[3] Mostly they are method claims:  claim 16 of the '877 patent, and its dependents, are system claims; but claim 1 of the '877 patent, its dependents, and all asserted claims of the '766 patent are method claims.

6

seven other types of information.  As shown below, *that* would *not* be eligible

subject matter under section 101, even if the systems and methods of the Primary

Claims *were*.

### C.    Relevant Inconsistencies in the Intrinsic Evidence

Throughout prosecution of the patents in suit, Tranxition struggled to

overcome the aforementioned Hunter patent, which teaches a software wizard that

automatically migrates settings, (*see* JA 4730), and other prior art.[4]  Tranxition's

ongoing efforts to distinguish Hunter figured prominently in *Markman* proceedings

below.  Insofar as they relate to the interpretive rulings that Tranxition tries to

challenge on appeal, those efforts are explained below, in connection with Novell's

arguments in support of those rulings.  Here, Novell narrates those efforts only

insofar as they relate to the indefiniteness analysis.

According to the patents in suit, the claimed invention "relates to a method

and system for automatic transitioning of configuration settings among computer

systems."  (JA0082.)  In accordance with the putative invention, settings are

"extracted" and then "manipulated."  (JA0087.)  The manipulation step "includes

transitioning one or more configuration settings from a *format* used on the source

computing system to a format used on the target computing system."  (JA0088,

---

[4] Tranxition tries to analogize the subject matter of its patents to a mousetrap.  (*See* Opening Br. at 11–15.)  But the analogy is instructive in only one respect:  settings migration was already a crowded field long before Tranxition came along.

italics added.)  What does it mean to transition the format of a setting?  As shown below, the intrinsic evidence contradictorily establishes that changing a setting's location (i.e., where it is stored) both *is* and *is not* a change in format.

### 1.    Intrinsic Evidence that a Change in Location *Is* a Change in Format

As examples—indeed, the *only* examples—of manipulating a setting's format, the specification shared by both patents in suit gives storing the setting with a different filename or in a different directory—i.e., in a different location:

> The manipulation … includes transitioning one or more configuration settings from a format used on the source computing system to a format used on the target computing system.  For example, a configuration setting for a computer monitor may be stored with the name config-monitor-old on the source computer system.  However, on the target computer system, the same configuration setting may be stored with a name con fig-monitor-new.  In addition, a configuration setting may be stored in a first directory-A on the source system, and in a second directory-B, on the target system.

(JA0088 at 13:14–24; JA0259 at 13:31–41.)  Tranxition reinforced the connection between location and format, in its response to the first office action in the prosecution of the '766 patent, by citing to that very passage in response to the examiner's statement "that the 'manipulating' of a configuration setting is not enabled":

> Applicants' specification … provides several examples of such manipulating.  One example describes that a configuration setting needs to be manipulated so that it is stored with the name "config-monitor-new" on the target computing system, rather

8

> than the name "config-monitor-old" used by the source computing system. Another example describes that a configuration setting needs to be manipulated so that [it] is stored in a directory on the target computing system that is different from that on the source computing system.

(JA0360 n. 1.)

### 2. Intrinsic Evidence that a Change in Location *Is Not* a Change in Format

But in response to the next office action, in order to obtain allowance of the '766 patent over Hunter, Tranxition argued that "mapping a setting from a location on the first computer to a location on the second computer" is not even "similar to manipulating the format of a setting." (JA0325.) More fully:

> Hunter describes using a token to identify the location where a setting may be stored. In some cases … the path identified by the token can differ between computers. … Assuming that replacing the actual path of a setting with a token is the same as manipulating the setting, Hunter's technique still does not manipulate the setting <u>from a format</u> used on the first computer <u>to a format</u> used on the second computer because the path of a setting does not correspond to the setting's format. … Thus, Hunter's use of tokens (at best) corresponds to mapping a setting from a location on the first computer to a location on the second computer. Hunter describes nothing similar to manipulating the format of a setting.
>
> The Examiner also suggests that Hunter's use of environment variables is the same as manipulating the format of an extracted configuration setting. … When a setting is located in a user-specific directory … Hunter describes substituting the user-specific portion of the directory path with an environment variable to identify that the location is the current user's profile directory …. Assuming that replacing the user-specific directory with the environment variable is the same as manipulating a

> setting, Hunter's technique still does not manipulate the setting <u>from a format</u> used on the first computer <u>to a format</u> used on the second computer because the path of a setting does not correspond to the setting's format. … Similar to Hunter's use of tokens, the use of an environment variable (at best) corresponds to mapping the setting from a location on the first computer to a location on the second computer. Hunter describes nothing similar to manipulating the format of a setting. …

(JA0324–25, internal citations omitted, underlining in original.) Based on that argument, the '766 patent claims were amended to *distinguish* between format and location and, as thus amended, were allowed. As issued, claim 1 of the '766 patent, for example, recites:

> manipulating at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, a name, a value, and a format used on the target computing system[.]

(JA0261.) The separate enumeration of location and format only makes sense if location and format are mutually distinct.

As documented above, the intrinsic evidence establishes—indeed requires—both that a change in location *is* a change in format and that a change in location *is not* a change in format. As explained below, the district court recognized and acknowledged the inconsistency—but instead of finding the term "format" indefinite, as this Court's precedents require, it improperly interpreted "format" differently in one patent than in the other.

10

## SUMMARY OF ARGUMENT

### A.    Subject-Matter Ineligibility

The patent-eligibility inquiry under section 101 proceeds in two steps. "First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts," i.e., to "laws of nature, natural phenomena, and abstract ideas." *Alice*, 134 S. Ct. at 2355. If so, "we consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 10, 132 S. Ct. 1289, 1298, 1297, 182 L. Ed. 2d 321 (2012)). That second step is "a search for an '"inventive concept"'—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294).

Here, the patents in suit are directed to the migration of computer settings. Settings migration is an abstract idea because it comes down to the collection, manipulation, and transmission of information; and an unbroken line of authority reaching back at least to *Parker v. Flook*, 437 U.S. 584, 98 S. Ct. 2522, 57 L. Ed. 2d 451 (1978) establishes that collecting, manipulating, and transmitting information is, like information itself, an abstract idea. That settings migration is

11

an abstract idea is further evidenced by the patents' express recognition that "the migration process" could be and had been "done by hand," (*see, e.g.*, JA0082 at 2:7), and Tranxition's concession on appeal that its putative invention consists of nothing more than "ways to automate the transitioning of … configuration settings," (Opening Br. at 53).  Therefore the validity of the patents turns on whether they include an inventive concept, beyond the abstract idea of settings migration.  As shown below, they do not.

Claim 30, in particular, presents a special case of subject-matter ineligibility.  Unlike the other claims, which at least *try* to recite systems and methods, Claim 30 recites only information, organized into a data structure, which is stored on a computer-readable medium.  Information per se is not patentable; information does not become patentable by being organized into a "data structure"; and information stored in a data structure does not become patentable by being stored on a computer-readable medium.  *See Digitech*, 758 F.3d at 1349–51.  Therefore Claim 30 would still be invalid under section 101, even if some of the other claims were not.

## B.    Indefiniteness

The shared specification of the patents in suit gives changing a setting's location as an example of changing its format.  Indeed that is the *only* example given by the specification.  But during prosecution of the '766 patent, Tranxition

12

argued over the Hunter reference by insisting that changing location is *not* the same as changing format. Were the district court's judgment reversed, Novell would prove on remand that Tranxition's express disclaimer of the only disclosed example of format manipulation renders all claims using the term "format" nonenabled and unsupported by written description. But it should not be necessary to reach those further issues because the equivocation in the intrinsic record renders the term "format" indefinite, and thus every Primary Claim invalid. *See Teva Pharmaceuticals*, 789 F.3d at 1343–45.

### C.    Claim Construction

Coming finally to claim construction, the interpretive rulings challenged by Tranxition are not ripe for appeal because reversal would neither undermine nor support the district court's invalidity judgment. *See Broadcast Innovation*, 420 F.3d at 1368. But if this Court *were* to review those rulings then it should affirm them because each is dictated by the intrinsic evidence of record.

## STANDARD OF REVIEW

Novell does not dispute Tranxition's contention that this Court's review of the rulings challenged by Tranxition is de novo. The same standard applies to the district court's indefiniteness ruling: "Indefiniteness, like claim construction, is a question of law" that this Court reviews "de novo." *Praxair, Inc. v. ATMI, Inc.*, 543 F. 3d 1306, 1319 (Fed. Cir. 2008). Because the district court's indefiniteness

13

ruling did not turn on any "subsidiary factual findings about … extrinsic evidence," there are no underlying factual findings to review for clear error. *See Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 574 U.S. __, 135 S. Ct. 831, 834, __ L. Ed. 2d __ (2015).

## ARGUMENT

### I.     The Patents Are Invalid under Section 101

Tranxition begins its subject-matter-eligibility argument by criticizing the district court for supposedly failing to (1) draw inferences *against* the summary-judgment movant and (2) apply a clear and convincing standard to the evidence. (*See* Opening Br. at 25–31.)  Both complaints are misplaced.

First, there is no dispute about what the summary judgment standard *is*.  No one disputes that *genuine* factual disputes must be resolved in the nonmovant's favor.  But as shown below, Tranxition has not identified any genuine, material, factual dispute that the district court resolved against it.

Second, someday a case may come before this Court that *requires* it to decide, finally, whether the clear-and-convincing evidence standard applies to analysis under section 101—but this is not that case.  As the district court found, Tranxition has "not raised any *factual* disputes … for the Court to resolve" and thus "the clear and convincing evidentiary standard simply does not come into play."  (*See* JA0009–10, italics added.)

As shown below, the patents in suit are directed to computer-settings migration, which is an abstract idea; and they do not add any inventive concept to that basic idea.  Therefore this Court should affirm the district court's judgment.  Tranxition's complaints about inferences and evidentiary standards are taken up in the course of addressing the ultimate issues of abstractness and inventive concept.

## A.     The Patents in Suit Are Directed to Settings Migration

As the district court recognized, "[t]he first step of the Mayo/Alice analysis essentially requires the Court to ask:  what are the claims generally trying to achieve?"  (JA0010.)  Here, the district court properly concluded:  "The purpose of the Primary Claims and Claim 30 is to move a user's custom configuration settings from one computer to another computer," (JA0011)—or, more briefly, "'migrating' settings between computers," (JA0012).

Tranxition insists that the district court's characterization was wrong because "the term 'migration' is not in the claim language."  (Opening Br. at 36.)  But *Alice* distilled the four patents before it down to the single concept of "intermediated settlement," despite the fact that the phrase "intermediated settlement" did not appear in *any* of the 245 claims of the patents there in suit, or indeed *anywhere* in those patents.  *See Alice*, 134 S. Ct. at 2352; *cf.* U.S. Patent Nos. 5,970,479, 6,912,510, 7,149,720, and 7,725,375.  So whether Tranxition's asserted claims use the term "migration" is irrelevant.

15

Tranxition's misplaced critique is also hypocritical.  Tranxition insists "the Patents-in-Suit claim a dynamic transitioning of settings."  (Opening Br. at 37.) But the word "dynamic" does not appear in the claims; indeed unlike "migrate" and its cognates, which at least appear throughout the *specification*, "dynamic" does not appear *anywhere* in the patents in suit.

Finally, any objection to the district court's characterization was waived because in proceedings below successive generations of Tranxition counsel— including the attorney who signed Tranxition's Opening Brief in this appeal, in briefs and oral argument on the very summary judgment motions that yielded the appealed judgment—told the district court that the patents in suit are directed to settings migration.  (*See, e.g.*, JA1715 [Tranxition was "founded … to pursue … this idea … the idea of migration"], JA2524 ["Claim 30 is … directed to … migrating … settings"], JA3146 ["The Asserted Claims … teach a … way to migrate a computer's personality"[5]], JA4239 ["the particular problem identified in the patents here" is "migration as understood in the claims"].)[6]

---

[5] As Tranxition's Opening Brief explains, and the abstract of the patents in suit confirm, a computer's "personality" is made up of settings.  (Opening Br. at 6; JA0073.)

[6] Tranxition's recent attempt to distinguish transitioning from migration, (*see, e.g.*, Opening Br. at 36 ["**transitioning**—not 'migration'"]), is similarly undermined by its counsel's ready equation of the two in district court proceedings.  (*See, e.g.*, JA1719 ["migrate or transition"], JA1741 [same].)

## B.     Settings Migration Is an Abstract Idea

Having settled that the patents in suit are directed to settings migration, the question then becomes: is settings migration an abstract idea? It seems *that* issue need not be revisited by this Court because, as further discussed below, Tranxition does not dispute the district court's conclusion that settings migration is an abstract idea; instead, Tranxition's contention is that its patents do not claim settings migration, which as shown above is incorrect. But as shown below, even if this Court were to revisit the district court's undisputed finding, still it should affirm because settings migration consists in the collection, processing, and transmission of data—and an unbroken line of authority, reaching back decades (at least), establishes that data collection, processing, and transmission is an abstract idea.

### 1.     Tranxition Does Not Dispute that Settings Migration Is Abstract

Having first correctly characterized the basic concept of the patents in suit as settings migration, the district court then properly concluded that settings migration is "an abstract idea." (JA0011.) Tranxition never disputes that ruling.

Tranxition *does* dispute that its patents are directed to an abstract idea. But it does so by arguing that they are not directed to settings migration. According to Tranxition, "whether the unclaimed action of 'migration' is abstract is irrelevant to whether the dynamic transitioning process claimed by the Patents-in-Suit is abstract" because migration is not what they claim. (Opening Br. at 15.) Indeed

17

Tranxition itself applies the label "abstract idea" to settings migration. (*See id.* at 38 ["Far from claiming the abstract idea of migrating settings …"].)

Because Tranxition does not contest the district court's ruling that migration is an abstract idea, this Court need not revisit that determination; and upon determining that the patents in suit are indeed directed to migration, it should further conclude that the patents in suit are directed to an abstract idea.

### 2. Settings Migration Is an Abstract Idea under *Flook* and *Alice*

Even if this Court had reason to review the ruling that settings migration is an abstract idea, it should affirm. The settings migration process of claim 1 of the '877 patent includes the following steps:

[1] providing the name and location of configuration settings on a source computing system;

[2] identifying settings to be extracted;

[3] extracting to-be-extracted settings;

[4] identifying extracted settings to be transferred;

[5] extracting to-be-transferred settings; and

[6] transitioning to-be-transferred settings from a source system format to a target-system format.

(JA0090 at 17:28–62.) Claim 1 of the '766 patent adds the further step of:

[7] storing the extracted-and-"manipulated" settings.

18

(JA0261 at 18:4–8.)  And finally, claim 42 of the '766 patent adds the step of:

[8]    "applying the stored configuration settings to the target computing

system."

(JA9263 at 21:12–13.)  As those claims illustrate, settings migration is the

extraction, manipulation, and transfer of certain data from one computer to

another.

As such, based on a line of precedent reaching back at least to *Flook*,

settings migration is an abstract idea.  *Flook* considered a patent application

directed to a method for setting alarm limits, which "consist[ed] of three steps":

> an initial step which merely measures the present value of the
> process variable (*e.g.*, the temperature); an intermediate step
> which uses an algorithm to calculate an updated alarm-limit
> value; and a final step in which the actual alarm limit is adjusted
> to the updated value.

*Flook*, 437 U.S. at 585.  Although the majority did not use the phrase "abstract

idea,"[7] it held the subject matter unpatentable, *see id.* at 596; and *Alice* (like many

other cases) cites *Flook* as an application of the prohibition against patenting

abstract ideas, *see Alice*, 134 S. Ct. at 2355.  Read in light of *Alice*, *Flook* teaches

that the collection, manipulation, and storage of information—even if automated

---

[7] The dissent *did* use the phrase "abstract ideas."  *See Flook*, 437 U.S. at 599
(Stewart, J., dissenting).

19

by a computer, and however useful or practically applicable the information might

be—is an abstract idea.

Alice itself illustrates that adding a further step of *transmitting*

information—to the preliminary steps of *collecting*, *manipulating*, and *storing*

information—is also an abstract idea.  That case dealt with claims for "a method of

exchanging financial obligations," according to which:

> The intermediary creates and updates "shadow" records to reflect
> the value of each party's actual accounts held at "exchange
> institutions," thereby permitting only those transactions for
> which the parties have sufficient resources.  At the end of each
> day, the intermediary issues irrevocable instructions to the
> exchange institutions to carry out the permitted transactions.

*Alice*, 134 S. Ct. at 2356.  Those claims required information to be obtained,

manipulated, stored, *and transmitted*—but still, like the claims in *Flook*, they were

directed to an abstract idea.  *See id.*

Information, per se, "does not fall under any of the categories of eligible

subject matter under section 101."  *Digitech Image Techs., LLC v. Electronics for

Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014).  The uniform teaching of

*Flook*, *Alice*, and many other cases is that the collection, manipulation, and

transmission of information likewise amounts to an unpatentable abstract idea.

*See, e.g.*, *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363,

1371 (Fed. Cir. 2015) ("'the entry of data … the breakdown and organization of

that entered data … and the transmission of information derived from that entered

20

data … through … conventional computer components …' … do not confer patent eligibility"); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1345 (Fed. Cir. 2014) ("1) extracting data …, 2) recognizing specific information from the extracted data, and 3) storing that information in a memory" is an abstract idea); *DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) ("receiving data … (step A), selectively forwarding the data (step B …), and forwarding reply data … (step C)" is an abstract idea); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370, 1375 (Fed. Cir. 2011) (internal bracketing and quotation marks removed) (in part quoting *In re Grams*, 888 F.2d 835, 840 (Fed. Cir. 1989)) ("mere data-gathering steps cannot make an otherwise nonstatutory claim statutory"; "[t]he mere manipulation or reorganization of data" is not patentable subject matter).  Because settings migration is nothing more than the collection, manipulation, and transmission of data, it too is an abstract idea.

### 3.    *DDR Holdings* and the USPTO's Guidance Are Not to the Contrary

Tranxition tries to resist the abstractness conclusion by analogizing its claims to (1) those upheld in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014) and (2) an exemplary hypothetical claim considered at pages 1–3 of United States Patent and Trademark Office document available at http://www.uspto.gov/patents/law/exam/abstract_idea_examples.pdf.  (Opening

Br. at 39, 44–45.)  Tranxition's reliance on *DDR Holdings* is misplaced because far from finding that the claims before it were *not* abstract, *DDR Holdings* assumed that they were and then found an inventive concept at *Mayo* step two.  *See DDR Holdings*, 773 F.3d at 1257.  Tranxition's arguments from both *DDR Holdings* and the USPTO guidance fail for the further reason that *neither* is authority for the broad proposition urged by Tranxition, viz., that "a problem specifically arising in the realm of computers" cannot be an unpatentable abstract idea.  (*See* Opening Br. at 38–39.)

Tranxition's interpretation of *DDR Holdings* and the USPTO guidance would make them inconsistent with, for example, *CyberSource*, which considered a method relating to credit card transactions *utilizing an internet address*:  the prevention of fraud associated with credit card transactions *that utilize internet addresses* is "a problem specifically arising in the realm of computers," but still this Court found the method to be an unpatentable abstract idea.  *Id.* at 1370, 1371.  It would also make them inconsistent with *Gottschalk v. Benson*, 409 U.S. 63, 93 S. Ct. 253, 34 L. Ed. 2d 273 (1972), which held unpatentable an invention that "has no substantial practical application except in connection with a digital computer."  *See id.* at 71.

### 4.    Tranxition's Remaining Arguments against Abstractness Lack Merit

Finally, Tranxition alleges that the district court, by finding that settings could be transitioned manually, failed to credit Tranxition's evidence and resolve inferences in its favor.  According to Tranxition, it submitted a declaration raising at least a factual dispute as to whether the specific process *recited in the claims* (1) could be performed manually or (2) had been so performed before Tranxition made its "invention."  (*See* Opening Br. at 39–44.)  That argument is misdirected because the issue at *Mayo* step one is not whether settings migration had been or could be manually performed *using the claimed process* but whether settings migration had been or could be manually performed *at all*.  And there can be no *genuine* issue of fact as to *that* because, as the district court pointed out, the specification of the patents in suit repeatedly acknowledges the pre-"invention" ubiquity of manual migration.  (*See* JA0021–23.)

### C.    The Claims Do Not Add any Inventive Concept to the Abstract Idea of Migration

"At *Mayo* step two, we must examine the elements of the claim to determine whether it contains an '"inventive concept"' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."  *Alice*, 134 S. Ct. at 2357.  Thus, for example, what removes *Diamond v. Diehr*, 450 U.S. 175, 101 S. Ct. 1048, 67 L. Ed. 2d 155 (1981) and *DDR Holdings* from the line of cases establishing that the

23

mere collection, manipulation, and transmission of information is unpatentable is that in *Diehr* and *DDR* the information was eventually put to practical use: in *Diehr*, a rubber mold was opened; in *DDR Holdings*, a new, hybrid webpage was created and displayed. The asserted claims of Tranxition's patents in suit are invalid because they include nothing analogous to *Diehr*'s rubber mold or *DDR Holdings*'s new webpage.

### 1.    Tranxition Fails to Identify any Inventive Concept Overlooked by the District Court

Belying Tranxition's dismissive characterization, the district court's search for an inventive concept spans *11 pages*. (*See* JA0018–28.) Tranxition disrespectfully accuses the district court of, among other things, "gloss[ing]" things over, (Opening Br. at 47), having "simply overlooked, ignored or misunderstood," (*id.* at 48), "superficial analysis," (*id.* at 50), and of being conclusory and arbitrary (*id.* at 46, 47, 48, 52, 53, 54). But other than endlessly quoting claim language that it accuses the district court of having "superficial[ly]," "arbitrar[ily]," or "conclusorily" "overlooked, ignored, or misunderstood," Tranxition only ever pinpoints the following allegedly inventive concepts:

[1]    transitioning settings to a format used on the target system, without which "configuration settings on the target system [would] not work in the same manner as in the source computer, causing many to revert

to their default settings and in some cases the software applications themselves to potentially not work at all," (Opening Br. at 48);

[2]    identification of specific settings "to be transitioned," (*id.* at 50);

[3]    recitation of "three applications that each performs specific operations," (*id.*);

[4]    "transitioning not only one, but manifold settings buried in applications and operating systems," (*id.* at 56), and thus "transitioning a computer's personality more deeply" than manual migration, (*id.* at 57–58).

But none of those transforms the abstract idea of settings migration into patentable subject matter because none takes the putative invention beyond the collection, manipulation, and transmission of information:  concept [1] is data manipulation, plain and simple; concept [2] further specifies the data to be manipulated, but does not change the underlying character of the operation, or extend it to new uses (such as *Diehr*'s rubber-mold opening or the new hybrid webpage of *DDR Holdings*); concept [3] requires the data collection, manipulation, and transmission tasks to be apportioned among discrete applications, which again does not change the basic character of the operations or give them tangible application; and concept [4] goes to scope (scale) or repetition, again without changing the basic character of the operations, or putting them to any further use.

25

Concept [4] suffers from a further infirmity:  as pointed out by the district court, the Primary Claims require only *one* setting to be migrated—not hundreds or thousands, as Tranxition's argument assumes.  (*See* JA0014–15.)  Tranxition complains that the district court made an error that "cannot be overstated" because it affords "***no weight***" to Tranxition's contrary evidence.  (Opening Br. at 56.)  The error is Tranxition's, not the district court's, because the summary judgment standard did not even *permit*, let alone *require*, the district court to give weight to a declaration that directly contradicts the express recitation, in each independent Primary Claim (and thus, by incorporation, each *dependent* Primary Claim), of either "one or more … settings" or "at least one … setting."  (*See* JA0090 at 17:59–60; JA0090–91 at 18:67–19:1; JA0261 at 17:66–67, 18:4–5; JA0262 at 20:66–67; JA0263 at 21:3–4, 9–10.)  Tranxition could not create a *genuine* issue of *material* fact by submitting a declaration saying that the claims require the migration of more settings than the claims themselves say they require.

### 2.    Tranxition Failed to Create a Genuine Issue as to whether Migration Was either a Longstanding Practice or Could Be Performed Manually

Tranxition insists that it raised genuine issues of material fact that should have precluded summary judgment by presenting inventor declarations attesting that the methods and systems claimed by the patents (1) had not been performed before Tranxition "invented" them and (2) could not be performed manually.  But

as the district court found, Tranxition's declarations failed to address the claims *as written*.  As noted above, the claims *as written* are directed to the migration of as few as one setting.  But instead of addressing whether the migration of as few as one setting had been done before or could be done manually, Tranxition's declarations focused on the history and feasibility of manually "mov[ing] large numbers and varieties of configuration settings," "mak[ing] perhaps thousands of changes personally," "perform[ing] a migration of … depending on the system, 700-10,000 or more settings," "hundreds of thousands of settings," and "wad[ing] through … potentially hundreds of settings."  (JA2531–32 at ¶¶ 12, 13; JA3173 at ¶ 13; JA3175 at ¶ 21.)

Tranxition's declarations simply have no bearing on whether migration of as few as *one* setting, as recited by the Primary Claims,[8] was an old process or could be performed manually.  Tranxition's *patents*, on the other hand, expressly recognize that migration, on *at least* a small scale,[9] had been done before and can

---

[8] The Primary Claims expressly recite one setting.  Claim 30 does not recite either *one* setting or, in Tranxition's phrase, "*manifold* settings."

[9] The specification of Tranxition's patents describes manual migration as part of the prior art, without indicating whether it was large-scale or small-scale.  But both large-scale and small-scale migration would necessarily require the migration of "at least one" or "one or more" settings, which is all that the Primary Claims require.

be done manually.  (*See, e.g.*, JA0082 at 2:1–12, 25–30.)  Thus the district court did not err.[10]

### 3.    *DDR Holdings* and the USPTO Guidance Are Inapposite

According to Tranxition, the district court erred because "[l]ike the claims in *DDR Holdings*, the Asserted Claims … solve a problem faced by computer users." (Opening Br. at 53.)  But as pointed out above, *DDR Holdings* did not hold and does not imply that every "invention" that "solve[s] a problem faced by computer users" is patent eligible.  The holding of *DDR Holdings* is much narrower than that, and it does not help Tranxition.  The technology at issue in *DDR Holdings* "overrides the routine and conventional sequence of events" in order to "construct

---

[10] Tranxition's related criticism of the district court's "reliance on *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 (Fed. Cir. 2014)," (Opening Br. at 57), likewise misses the mark.  In *Planet Bingo*, the patentee advanced an argument like Tranxition's:  "Planet Bingo argues that 'in real world use, literally thousands, if not millions of preselected Bingo numbers are handled by the claimed computer program,' making it impossible for the invention to be carried out manually."  *Id.* at 1008.  This Court rejected that argument because "the claimed inventions do not require as much. At most, the claims require 'two sets of Bingo numbers.'"  *Id.*  Tranxition tries to distinguish *Planet Bingo* by seizing on the phrase "at most," arguing:  "Unlike Claim 1 [of Tranxition's '877 patent], which, in part, defines the *minimum* number of settings required, the claims in *Planet Bingo* were found by this Court to define a *maximum*."  (Opening Br. at 57.)  *Planet Bingo* relied on the following claim language:  "input of at least two sets of Bingo numbers."  *See* U.S. Patent No. 6,398,646 at 8:54, U.S. Patent No. 6,656,045 at 9:5.  That language unambiguously defines a *minimum* of two, not a *maximum*, and it is absurd for Tranxition to suggest that this Court held otherwise. If this Court *had* ruled that "at least" signifies a maximum then Tranxition's claims would be limited to the migration of a single setting.

and serve to the visitor a new, hybrid web page." *See id. at* 1257, 1258.  But the

whole point of Tranxition's "invention," by contrast, is not to give computer users

a *new* experience but instead to reproduce the familiar behavior they are already

accustomed to; and such reproduction follows in "the routine and conventional

sequence of events" whenever and however settings are migrated, be it manually or

automatically.  *DDR Holdings* does not validate Tranxition's attempt to

monopolize the mere *automation* of a data collection, manipulation, and

transmission process that yields the same results as a prior art manual process.

Tranxition also tries to analogize its patents to those sanctioned by a USPTO

guidance document by reasoning that the claimed "invention" "transition[s] a

computer's personality more deeply" than the manual process it automates.

(Opening Br. at 58.)  That argument fails for a variety of reasons—most simply

because, as pointed out above, the Primary Claims are not limited to the "deeper"

migration that the argument assumes but instead cover the migration of as few as

one setting.

### D.    Tranxition's Machine-or-Transformation Analysis Is Irremediably Flawed

According to Tranxition, the district court did not apply the machine-or-

transformation test, but if it had, "it would have confirmed that the Patents-in-Suit

cover patent eligible subject matter."  (Opening Br. at 59.)  To satisfy the machine-

or-transformation test, the claims must be "tied to [some] particular novel machine

or apparatus." *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014). Tranxition's asserted claims do meet that requirement because they recite "only a general purpose computer." *See id.* As shown below, Tranxition's arguments to the contrary rely on inapposite authority and contradict controlling authority.

### 1.    Tranxition's Machine-Prong Argument Misconstrues and Conflicts with Controlling Authority

Tranxition cites *CyberSource Corp. v. Retail Decisions, Inc.*, 620 F. Supp. 2d 1068, 1079 (C.D. Cal. 2009), a *district court* opinion, for the proposition that *this Court* "has expressed the view that data structures can represent a 'machine.'" (Opening Br. at 59.) But so far as Novell can tell, this Court has never expressed that view, and the *CyberSource* district court neither adopted that view nor attributed it to this Court.

According to Tranxition, *In re Lowry*, 32 F.3d 1579 (Fed. Cir. 1994), "explained that data structures on computers are physical entities." (Opening Br. at 59.) But *Lowry* was an obviousness case, not a section 101 case. Reading *Lowry* as Tranxition does, to establish that computer-stored information is a machine, would bring it into conflict with *Benson*, which held that a "method of converting signals from binary coded decimal form into binary" was unpatentable because it did not satisfy the machine-or-transformation test. *See Benson*, 409 U.S. at 73.

Tranxition's argument that data structures satisfy the machine prong of the machine-or-transformation test finds no support in the caselaw. To the contrary, as explained above, it contradicts *Benson*.

### 2. Tranxition's Transformation-Prong Argument Fails, Too

Regarding the second prong of the machine-or-transformation test, Tranxition argues: "the Patents-in-Suit satisfy the transformation prong by transforming a target computer into a computer that looks and behaves in many respects like the source computer." (Opening Br. at 60.) That argument fails in several respects.

First, of the asserted claims, only claim 42 of the '766 patent and its dependents get so far as "applying the stored configuration settings to the target computing system." (*See* JA0263 at 21:12–13.) The other asserted claims only *prepare* settings for migration, without actually migrating them.

Second, just as a computer's hidden data is not even considered a machine for section 101 purposes (as shown above), so too changing the observable "look[] and behav[ior]" of a computer does not *transform* the computer. That is the teaching of *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015). That case addressed a patent relating to online forms. Using back and forward buttons on internet browsers can result in data loss when completing online forms, requiring the user to re-enter data. Internet Patent Corp. ("IPC") held

a patent on methods, systems, and computer-readable media for preserving entered data, when navigating forward and backward through different pages. *See Internet Patents*, 790 F.3d at 1344; U.S. Patent No. 7,707,505. IPC's patented technology affected the visible behavior of computers by preserving data in completed fields. But this Court held the subject matter ineligible. *Internet Patents*, 790 F.3d at 1349. So too here, that *some* of Tranxition's asserted claims might be directed to technology affecting the visible behavior of a computer is not enough to make them patent eligible because the machine itself, far from being transformed, remains just what it was before: a general purpose computer.[11]

As Tranxition acknowledges, the machine-or-transformation test is not controlling. (*See* Opening Br. at 59.) But even if that test were controlling, it could not help Tranxition because Tranxition's putative "inventions" fail to pass that test.

---

[11] The point here is that not every modification a computer's behavior constitutes a patent-eligible transformation of the computer itself, as Tranxition's argument assumes. *DDR Holdings* affirmed the patent-eligibility of *specified* manipulation of "interactions with the Internet" in order to "override[] the routine and conventional sequence of events" and thereby "construct and serve to the visitor a new, hybrid web page." *DDR Holdings*, 773 F.3d at 1257, 1258. So some technologies that modify observable computer behavior are patent eligible. But *Internet Patents* reminds that *DDR Holdings* does not establish the much broader proposition insisted upon by Tranxition, viz., that the modification of observable behavior is per se the patent-eligible transformation of a machine.

### E.    Tranxition's Preemption Arguments Are Unpersuasive and Unavailing

Tranxition also disputes the district court's preemption analysis.  But Tranxition cannot save its patents by insisting that they are not broadly preemptive because "[w]here a patent's claims are deemed only to disclose patent ineligible subject matter under the *Mayo* framework, as they are in this case, preemption concerns are fully addressed and made moot."  *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015).

Moreover, Tranxition's argument rings hollow.  Consider, for example, claim 1 of the '766 patent, which reads:

> A method for preparing configuration settings of a source computing system for transitioning for use by a target computing system, the method comprising:
>
>> providing information about configuration settings of the source computing system, the information identifying locations of configuration settings;
>>
>> displaying an indication of the configuration settings that can be extracted from the source computing system;
>>
>> receiving a selection of configuration settings to be extracted from the source computing system for use by the target computing system;
>>
>> extracting the selected configuration settings from the locations of the source computing system indicated by the information;
>>
>> manipulating at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, a name, a value, and a format used on the target computing system; and
>>
>> storing the extracted configuration settings and the at least one manipulated configuration settings on a storage device, wherein

the stored configuration settings can be used by the target computing system to control its operation.

(JA0261 at 17:52–18:8.)  Or, more succinctly:

[1]    show the user a list of settings;

[2]    let the user choose from the list which settings to migrate;

[3]    retrieve the chosen settings from the source computer;

[4]    make the retrieved settings usable by the target computer (by

"manipulating" them); and

[5]    store the manipulated settings somewhere.

How is that *not* broadly preemptive of any computer-assisted settings migration, as the district court correctly found?  Plainly, it is.

### F.    Even if this Court Were to Find that the Primary Claims Have Patentable Subject Matter, it Should Affirm the District Court's Ruling that Claim 30 Does Not

Claim 30, quoted in full above, more briefly and with reference numbers added recites:

A [1] computer-readable medium containing [2] a data structure comprising:

[3] information for locating [other information] …

(JA0091.)  That is, Claim 30 is directed to (1) information for locating other information, that is (2) organized into a data structure, which is (3) stored on a computer-readable medium.  Because information per se is neither a "process,

34

machine, manufacture, or composition of matter, or any new and useful improvement thereof," *see* § 101, it "does not fall within any of the categories of eligible subject matter under section 101," *see Digitech*, 758 F.3d at 1349. It is instead an abstract idea and the inquiry moves to whether Claim 30 adds some "inventive concept" that "transform[s]" into patent-eligible subject matter. *See Alice*, 134 S. Ct. at 2355.

Other than "information," Claim 30 recites only (1) "a data structure" that the information comprises and (2) "[a] computer-readable medium" that contains the data structure. Like information itself, "organizing . . . information into a new form" is an abstract idea that "is not patent eligible." *See Digitech*, 758 F.3d at 1351. So the fact that the information recited in the body of Claim 30 comprises some unspecified "data structure" does not transform it into patent-eligible subject matter. And inscribing ineligible subject matter onto a generic computer-readable medium is not an inventive concept that makes the subject matter eligible, either. *See Alice*, 134 S. Ct. at 2352 ("merely requiring generic computer implementation fails to transform that abstract idea into a patent-eligible invention"); *CyberSource*, 654 F.3d at 1375 ("the basic character of a process claim drawn to an abstract idea is not changed . . . by claiming the process embodied in program instructions on a computer readable medium").

The information-comprised "data structure" of Claim 30 is indistinguishable, in all pertinent respects, from the device profile that was held unpatentable in *Digitech*. In *Digitech*, this Court first held that the device profile itself, consisting of "a collection of intangible color and spatial information," is not "eligible subject matter as required by section 101." *Digitech*, 758 F.3d at 1350. *Digitech*'s "collection of intangible … information" corresponds to the information recited in the body of Tranxition's Claim 30; and *Digitech*'s profile, comprised of that information, corresponds to Claim 30's data structure. *Digitech* thus compels the conclusion that Tranxition's data structure, standing alone, is not patent eligible. And under *Alice*, 134 S. Ct. at 2352, and *CyberSource*, 654 F.3d at 1375, inscribing that ineligible subject matter onto a generic computer readable medium does not transform it into eligible subject matter.

Even if the methods and systems of the Primary Claims were patent-eligible subject matter—the information recited in the body of Claim 30 is an abstract idea, organizing that information into a data structure that is written onto a generic computer-readable medium does not transform it into patentable subject matter, and thus Claim 30 is invalid for failure to comply with section 101.

## II.     The Primary Claims Are Invalid for the Further Reason that "Format" Is Indefinite

As explained at the outset, the correctness of the district court's summary judgment ruling and analysis is only one ground available for affirming the district

court's invalidity judgment.  Another is that the Primary Claims all include or depend from claims that include the term "format," which is indefinite; and Claim 30 would be invalid under section 101 even if some of the Primary Claims were not.  Novell's alternative section 101 analysis for Claim 30 is given above. That the Primary Claims are invalid for indefiniteness is shown below.

## A.    The Intrinsic Evidence about the Meaning of "Format" Is Equivocal

The intrinsic evidence equivocates about whether "format" does or does not include location.  That equivocal evidence is more fully rehearsed in the statement of facts given above.  (*See supra*, pp. 7ff.)  Here it is summarized.

On the one hand, the specification gives a change in location as an example of a change in format.  (JA0088.)  Indeed a change in location is the *only* example of a format change given in the specification.  And in response to the *first* office action in the '766 patent case, Tranxition gave the same example.  (JA0360 n. 1.)

But the claims of the '766 patent *distinguish* between format and location changes.  (*See* JA0261–63).  Tranxition obtained allowance of the '766 patent over Hunter by arguing, in response to the *second* office action in that case, that the change in location taught by Hunter is *not* a change in format.  (JA0324–25.)

Thus the intrinsic evidence equivocates about whether "format" includes location or not.

**B.     When the Intrinsic Evidence Equivocates, Those Skilled in the Art Are Not Informed about the Scope of the Invention with Reasonable Certainty**

On the facts related above, this Court's ruling on remand in *Teva Pharmaceuticals* requires a finding of indefiniteness.  In that case, the term "molecular weight" was susceptible to three interpretations:  "peak average molecular weight ($M_p$), number average molecular weight ($M_n$), and weight average molecular weight ($M_w$)."  *Teva Pharmaceuticals*, 789 F.3d at 1338, 1341.  During prosecution of U.S. Patent No. 6,620,847, the patentee made arguments equating "molecular weight" with $M_w$; but during prosecution of U.S. Patent No. 6,939,539, the patentee made arguments equating it with $M_p$.  *Id.* at 1343, 1344.  Both the '847 and '539 patents were descendants of U.S. Patent No. 5,800,808.  *Id.* at 1345.  This Court reversed the *Teva* district court's finding of no indefiniteness and held that the inconsistent positions taken while prosecuting the *later* patents invalidated the *earlier* patent:

> We hold that claim 1 is invalid for indefiniteness by clear and convincing evidence because read in light of the specification and the prosecution history, the patentee has failed to inform with *reasonable certainty* those skilled in the art about the scope of the invention.

*Id.*

So too here, the district court's finding of no indefiniteness should be reversed because Tranxition's inconsistent statements about whether "format" does

or does not include location "fail[] to inform with *reasonable certainty* those skilled in the art about the scope of the invention."

## C.    The District Court Erred by Interpreting "Format" Differently in One Patent than in the Other

Here, the district court acknowledged the inconsistency in the intrinsic evidence. (JA0071.)  However, instead of finding the term "format" indefinite, the district court concluded that "format" was used "broadly in the '877 patent claims," so as to encompass location, but "in a narrower sense in the '766 claims," to the exclusion of location.  (*Id.*)  That resolution of the conflict in the intrinsic evidence was improper for at least two reasons.

First, as *Teva Pharmaceuticals* illustrates, later generations in a family of patents, and arguments made to prosecute those later patents, guide the interpretation of earlier patents in the same family.  *See also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349–50 (Fed. Cir. 2004) ("the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application"; "even though the '649 patent had already issued, we think that it is not unsound to apply the same interpretation to that patent"; "[a]ny statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction").  So it was improper for the district court to

disregard the '766 patent's claim language, and the arguments by which allowance of those claims was obtained, when interpreting the '877 patent.

Second, the inconsistency here is not simply *between* the two patents but is instead internal to them. The '766 patent's *specification* teaches that "format" includes location, (JA0259 at 13:31–41), but the '766 patent's *claims* distinguish between them (by separately reciting both "format" and "location"), (JA1261–63). And during prosecution of the '766 patent, Tranxition argued in response to the *first* office action that a change in location is a change in format, (JA3060 n. 1), but then in response to the *second* office action argued that a change in location is *not* a change in format, (JA0324–25). Tranxition did not use "format" broadly in the '877 patent and narrowly in the '766 patent—instead, it used "format" *both* broadly *and* narrowly *within* the '766 patent, and while prosecuting it.

### III. The Interpretive Rulings Challenged by Tranxition (1) Are Not Ripe for Review, but (2) Were Correct, in any Event

On appeal, Tranxition challenges the district court's interpretation of six terms and phrases. Those terms and phrases, together with (1) the district court's interpretations, (*see* JA0066–67), and (2) the interpretations Tranxition urges, in place of the district court's, (*see* Opening Br. at 24–25), are given below. Specific portions of the district court's interpretations to which Tranxition objects are italicized; except as otherwise explained, Tranxition contends the italicized language should be eliminated.

| Term | District Court's Interpretation (disputed portions italicized) | Tranxition's Interpretation |
|---|---|---|
| "personality object" | "an *object oriented programming object*, which (1) *is not directly associated with an initialization file* and (2) *is not a wizard or other programming module capable of reading and writing settings*, containing (3) at least one object with information about configuration settings and (4) multiple transition rules for locating configuration settings" | "An object containing information related to the collection of configuration settings"; it seems Tranxition does not dispute clauses (3) and (4). (*See* Opening Br. at 18). |
| "extraction plan" | "a plan for extracting configuration settings *that includes a full list of identity units to be located, an exclusion list, and an inclusion list*" | Plain and ordinary meaning. |
| "active configuration settings" | "configuration settings selected *from an inclusion list*" | Plain and ordinary meaning. |
| "value" | "data stored in a variable or constant *that is distinct from location, name, and format*" | "The data stored in a variable or constant." |
| "transition[ing/s] one or more of the retrieved configuration settings from a format used on the source computing system to a format used on the target computing system" | "[chang(ing/es)] *the arrangement of data of* one or more retrieved configuration settings from a format used on the source computing system to a format used on the target computing system" | Plain and ordinary meaning; Tranxition alleges that "the arrangement of data" is redundant. (*Id.* at 22–23.) |

| Term | District Court's Interpretation (disputed portions italicized) | Tranxition's Interpretation |
|---|---|---|
| "manipulating at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, a name, a value, and a format used on the target computing system" | "*changing* at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, name, value, and format used on the target computing system" | Plain and ordinary meaning; Tranxition disputes that "manipulate" means "change." (*Id.* at 23–24.) |

### A.    The Contested Constructions Are Not Ripe for Review

As documented above, for *each* disputed term or phrase, Tranxition complains that the district court's interpretation is too narrow. That underscores why Tranxition's attempt to obtain review of the district court's interpretations, in *this* appeal, is improper. Tranxition insists—without explication, and without any supporting argument or citation to authority—that "claim construction and subject matter eligibility are particularly intertwined with regard to the patents-in-suit." (Opening Br. at 5.) But a *broader* interpretation of the asserted claims, which is what Tranxition uniformly seeks, could only make the claims even more abstract—which would reinforce, and not undermine, the district court's invalidation of those claims for abstractness under section 101.

Confirming that analysis, in its argument about patent eligibility, Tranxition makes only two references to the disputed claim constructions; and in both, Tranxition tacitly concedes that reversal would not have any implications for patent eligibility.  First, Tranxition notes that the district court's construction of the transitioning-of-format limitations is "under appeal," but then peremptorily concludes that "under either interpretation of the term"—i.e., under the district court's interpretation or Tranxition's—"the District Court failed to find the inventive concepts in the claims."  (Opening Br. at 37 n. 7.)  Because the patent-eligibility analysis is the same "under either interpretation," affirmance or reversal of that construction would make no difference.  Tranxition's second reference is to "extraction plan," of which Tranxition says only:  "the District Court's reasoning was undercut by its own claim construction ruling."  (*Id.* at 47.)  That is, instead of arguing for reversal of the district court's patent-eligibility ruling because "extraction plan" was *wrongly* construed, Tranxition contends that the patent-eligibility ruling should be reversed *based on the challenged interpretation*.

As Tranxition's own admissions underscore, reversal of the claim construction rulings that Tranxition challenges would not change the appealed invalidity judgment.  Therefore Tranxition's request for review of those rulings seeks an advisory opinion, *see Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1368 (Fed. Cir. 2003), and the request should be denied, *see Broadcast*

*Innovation*, 420 F.3d at 1368 (declining "to address the claim construction issues" where "the invalidity determination … does not require [their] resolution"). *See also Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1367 (Fed. Cir. 2004) (if "[r]eversal … would not alter the judgment" then "that issue is not properly presented"). But if this Court does review those rulings then it should affirm them, as shown below.

### B.    The District Court Interpreted "Personality Object" Properly

The district court properly interpreted "personality object" as:

> an *object oriented programming object*, which (1) *is not directly associated with an initialization file* and (2) *is not a wizard* or other programming module capable of reading and writing settings, containing (3) at least one object with information about configuration settings and (4) multiple transition rules for locating configuration settings.

(JA0067, italics added.) According to Tranxition, that interpretation is wrong because "'Personality object' is not limited to an object oriented programming object, to not being a wizard, or to not being directly associated with an initialization file." (Opening Br. at 18.)

Tranxition acknowledges that the district court's interpretation was based on arguments that Tranxition made during prosecution of the '862 application (which is the parent and grandparent of the '877 and '766 patents in suit, respectively). But Tranxition fails to disclose those arguments to this Court. So Novell begins by marshaling the evidence that Tranxition did not.

44

The first office action on the '862 application relied on the prior art Hunter patent to reject claims then pending in the application.  (JA4652–54.)  The examiner noted that "Hunter fails to explicitly teach using a Personality object for locating configuration settings," but then found that Hunter's "Wizard program 38" did the same things and "[i]t would have been obvious … to label Wizard program 38 as a Personality object."  (JA4653.) Tranxition responded by distinguishing Hunter in ways that support—indeed mandate—each of the disputed limitations.

**1.     Tranxition's Arguments during Prosecution Require that "personality object" Be Limited to an Object-oriented Programming Object**

Tranxition now disputes the district court's limitation of "personality object" to an object-oriented programming object.  But during prosecution of the '862 application, Tranxition distinguished Hunter as follows:

> … Hunter specifically teaches "the wizard 38 is a software program module ..." and not a "software object" or "object-oriented software module."  Hunter does not teach, suggest, or even mention the words "object," "object-oriented object" for any programming module described.  Thus, this equivalency suggest [sic.] by the Examiner is not recognized in Hunter.
>
> …
>
> … it would not be appropriate, or likely attempted by one having even ordinary skill in the art, to label the Wizard program 38 a personality object if the wizard was in fact not implemented with object oriented technology.  Those skilled in the art typically do not call program modules "objects" unless they are implemented using object-oriented programming techniques.
>
> …

45

> … the claimed invention teaches a [sic.] configuration setting are located with a Personality Object, that is an object-oriented object. ...

(JA4680–82.)  The foregoing not only justifies but indeed *compels* limiting "personality object" to object-oriented programming objects.

### 2. Tranxition's Prosecution Arguments also Require that a Personality Object Not Be (1) Directly Associated with an Initialization File or (2) a Wizard

Tranxition also disputes the district court's definitional requirements that the personality object "(1) is not directly associated with an initialization file" and "(2) is not a wizard or other programming module capable of reading and writing settings."  But during prosecution of the '862 application, Tranxition distinguished Hunter as follows:

> … it would not be appropriate, or likely attempted by one having even ordinary skill in the art, to label the Wizard program 38 a personality object if the wizard was in fact not implemented with object oriented technology.  Those skilled in the art typically do not call program modules "objects" unless they are implemented using object-oriented programming techniques.
>
> …
>
> Hunter teaches away from the claimed invention in a number of material respects.  First … Hunter teaches the wizard 38 is a programming module capable of reading and writing settings.  In contrast, the claimed invention teaches … a Personality Object …[12]

---

12 Without ellipses:

Hunter teaches away from the claimed invention in a number of material respects.  First, at Col. 4, lines 60–61, Hunter teaches the

Second … Hunter teaches an initialization file ("INI") file [sic.] 74 <u>is associated</u> with the wizard 38 and contains information related to application 37. … [I]n addition, the INI file 74 <u>need not be separate</u> from the wizard 38. For instance the information contained within the INI file 74 <u>may also reside within the compute executable code of the wizard itself</u> 38. In that case, the INI file 74 would not be a separate file from the wizard, but rather be a portion of the computer-executable code forming the wizard or other software module. …

In contrast, the claimed invention has no such limitations associated with INI files. The configuration setting information located by the Personality Object are [sic.] separate from the Personality Object and are [sic.] not included as part of the Personality Object. The Personality Object is not directly associated with any INI file.

(JA4681–83, underlining in original.) In those passages, Tranxition repeatedly and expressly contrasted the personality object with a wizard; and Tranxition directly stated: "The Personality Object is not directly associated with any INI file." Again, the positions that Tranxition staked out during prosecution, in order to overcome the prior art, require those elements of the district court's interpretive ruling that Tranxition now disputes.

---

wizard 38 is a programming module capable of reading and writing settings. In contrast, the claimed invention teaches a [sic.] configuration setting are located with a Personality Object, that is an object-oriented object. See the discussion above for programming modules v. objects.

47

### 3.    Tranxition's Arguments about Prosecution History Disclaimer Are Wrong and Unavailing

Tranxition tries to escape its arguments during prosecution in several ways. First, Tranxition baldly asserts, without argument or citation to authority, that any prosecution history disclaimer resulting from arguments made during prosecution of the '862 application would be limited to that application and not flow to the patents in suit.  (Opening Br. at 19.)  That is incorrect:  although some species of estoppel might not run from *later* to *earlier* generations in the same patent family, estoppel freely runs from *earlier* to *later* generations.  *See Microsoft Corp.*, 357 F.3d at 1350.

Next, Tranxition argues that the statements quoted above do not amount to "a clear, unambiguous, and deliberate disclaimer."  (Opening Br. at 19.) Regarding "object-oriented programming object"—during prosecution, Tranxition argued:  "Those skilled in the art typically do not call program modules 'objects' unless they are implemented using object-oriented programming techniques' and "the claimed invention teaches a [sic.] configuration setting are located with a Personality Object, that is an object-oriented object."  As for "is not directly associated with an initialization file"—Tranxition argued during prosecution:  "The Personality Object is not directly associated with any INI file."  And regarding "is not a wizard"—Tranxition argued:  "it would not be appropriate … to label the Wizard program 38 a personality object if the wizard was in fact not implemented

with object oriented technology" and "Hunter teaches the wizard 38 is a programming module capable of reading and writing settings. In contrast, the claimed invention teaches … a Personality Object." More clear, unambiguous, and deliberate disclaimers are difficult to imagine.

Even if either of Tranxition's arguments about prosecution history disclaimer had merit, still the district court's interpretation of "personality object" should be affirmed. "*Any* statement of the patentee in the prosecution of a related application," *whatever* its position in the family tree, is "relevant to claim construction"—even if it does not amount to prosecution history disclaimer. *See Microsoft Corp.*, 357 F.3d at 1350 (italics added); *see also id.* ("the '627 patent's prosecution history is pertinent to an interpretation of the later issued '532 patent"). Prosecution history disclaimer aside—the district court's interpretation of "personality object" should be affirmed, based on the prosecution history passages quoted above, simply as a matter of routine claim construction.

### C.   The District Court Construed "extraction plan" Properly

The district court properly interpreted "extraction plan" as: "a plan for extracting configuration settings *that includes a full list of identity units to be located, an exclusion list, and an inclusion list*." (JA0066, italics added.) That comes directly from the specification, which expressly teaches: "The Extraction

49

plan includes a full list of identity units to be located, an exclusion list and an inclusion list." (JA0087 at 11:50–52.)

Tranxition contends that the extraction plan need not include (1) a full list, (2) an exclusion list, and (3) an inclusion list. In opposition to the district court's construction, Tranxition ostensibly sets up the "plain and ordinary meaning." But "extraction plan" has no "plain and ordinary meaning" in the field of the invention—and no evidence that it does is cited in Tranxition's Opening Brief (or was ever presented to the district court, so far as Novell recalls). Like most of the other disputed claim terms, it is a nonce phrase invented by Tranxition.

The circumstances here are instructively similar to those in *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003). There, Altiris argued that the district court had improperly limited the term "automation code" to a preferred embodiment. This Court first noted and agreed with the ruling below that the phrase *as a whole* lacked a common meaning, and went on to observe that "a look at the individual words in the phrase is also unhelpful." *Id.* at 1374. Under those circumstances, recourse to other intrinsic evidence was unavoidable and "the only other intrinsic evidence" available was "the description of the preferred embodiment." *Id.* at 1375.

So too here, the phrase "extraction plan" as a whole lacks a common meaning, at least within the relevant industry; and although the individual words

"extraction" and "plan" have plain and ordinary meanings, from which *some*

understanding of what *might* be meant by "extraction plan" can be derived, any

such understanding "is so broad as to lack significant meaning," *see Altiris*, 318

F.3d at 1374, and none is specific to the field of the putative "invention."  As

Novell pointed out below, in the absence of any established usage *in the relevant*

*context*, Tranxition's invocation of "plain and ordinary meaning" is worthless:

> when the Nazis overran France in 1940, an "extraction plan" to
> rescue the remnants of the British Expeditionary Force from
> Dunkirk was hastily devised and executed.  …  And dentists
> routinely make "extraction plans" for wisdom teeth.  But what
> have any of those to do with the issues in this case?

(JA4627–28.)  *See also Serverside Group Ltd v. Tactical8 Techs., L.L.C.,* 927 F.

Supp. 2d 623, 659 (N.D. Iowa 2013) (quoting *O2 Micro Int'l Ltd. v. Beyond*

*Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008)) (rejecting

interpretation that "utterly fails to 'resol[ve] disputed meanings and technical

scope, to clarify and … explain what the patentee covered by the claims …'").  So

the district court properly consulted the specification to find out what Tranxition

meant by its new phrase.

Moreover although Tranxition, like Altiris, accuses the district court of

importing limitations from a preferred embodiment, (Opening Br. at 20), that is not

what the district court did in this case.  Here, the district court simply followed the

specification's express teaching about what an extraction plan is.

Finally, Tranxition complains that the district court's interpretation, notwithstanding its fidelity to the specification, violates the doctrine of claim differentiation.  (Opening Br. at 20.)  Tranxition does not elaborate—but presumably it is referring to the fact that some dependent claims recite, for example, "[t]he method of claim **1** wherein the extraction plan includes an exclusion list" and "[t]he method of claim **1** wherein the extraction plan includes an inclusion list."  (*See* JA0090 at 18:36–41.)  But "the doctrine of claim differentiation … does not override clear statements of scope in the specification." *Toro Co. v. White Consolidated Indus., Inc.*, 199 F.3d 1295, 1302 (Fed. Cir. 1999). It is hard to imagine how the specification's statement of scope could have been clearer:  "The Extraction plan includes a full list of identity units to be located, an exclusion list and an inclusion list."  (JA0087 at 11:50–52.)

The district court's interpretation of "extraction plan" should be affirmed because it properly tracks the specification's express teaching that "[t]he Extraction plan includes a full list of identity units to be located, an exclusion list and an inclusion list."  (*See* JA0087 at 11:50–52.)

## D.    The District Court Interpreted "active configuration settings" Properly

The district court properly interpreted "active configuration settings" as "configuration settings selected *from an inclusion list*."  (JA0067, italics added.) Again that tracks the specification—which in one place teaches, "configuration

52

settings *from the inclusion list* from the *Extraction* plan will marked as 'active,'" and in another places teaches, "configuration settings *from the inclusion list* from the *Transition* plan will marked as 'active.'"  (JA0087 at 11:67–12:1, JA0088 at 13:5–6, italics added.)

According to Tranxition, the district court's interpretation "violates the doctrine of claim differentiation."  (Opening Br. at 21.)  As with "extraction plan," Tranxition failed to identify any claims whose differentiation supposedly require a broader definition of "active configuration settings."  But this time, Novell cannot supply the lack.  Novell has not found, for example, any dependent claims that further expressly define active configuration settings as selected *from an inclusion list*.  With this limitation, Tranxition's recitation of claim differentiation seems to have degenerated into boilerplate, without even the pretense of any evidentiary foundation.

Tranxition also contends "that full lists, inclusion lists, and exclusion lists are alternative ways of selecting 'active configuration settings.'"  (Opening Br. at 21.)  But the only specification passages that explain "active configuration settings" are those quoted above, according to which only *inclusion* lists are used to select active configuration settings.  Because "[n]o other, broader concept was described as embodying the applicant's invention, or shown in any of the drawings, or presented for examination," *Toro*, 199 F.3d at 1301, the district court

53

properly limited "active configuration settings" to those that are selected *from an inclusion list*.

### E.   The District Court Construed "value" Properly

The district court properly construed "value" as "data stored in a variable or constant *that is distinct from location, name, and format*."  (JA0066, italics added.)  Tranxition complains that "there is no intrinsic evidence requiring" the italicized language "to be imported into this term."  (*See* Opening Br. at 22.)  But claims 1, 42, and 47 of the '766 patent recite "a location, a name, a value, and a format used on the source computing system"; claims 16 and 17 recite "a source location, a source name, a source value and a source format" and "a target location, a target name, a target value, and a target format"; and claim 37 recites "a first location, a first name, a first value, and a first format" and "a second location, a second name, a second value, and a second format."  (JA0261 at 17:67–18:2, 18:47–50, 18:66–67; JA0262 at 19:1–2, 20:27–32; JA0263 at 21:3–7, 22:2–5.)  Each of those recitations assumes a distinction between *value*, on the one hand, and *location*, *name*, and *format* on the other.  Thus the intrinsic evidence requires that value be "distinct from location, name, and format," as the district court ruled.

### F.   The District Court Interpreted the Transitioning-of-Format Limitations Properly

Claim 1 of the '877 patent is directed to a method that includes the step of "transitioning … retrieved configuration settings from a format used on the source

computing system to a format used on the target computing system." (JA0090 at 17:59–62.) Claim 16 is directed to a computer system with a transition application that "transitions … retrieved configuration settings from a format used on the source computing system to a format used on the target computing system." (JA0090–91 at 18:67–19:3.) The district court interpreted those limitations as "changing [or changes] *the arrangement of data* of … retrieved configuration settings from a format used on the source computing system to a format used on the target computing system." (JA0066, italics added.) That is, the district court ruled that "transition" in those contexts means *change*, and that what is changed from one format to another is the configuration settings' *arrangement of data*.

Tranxition does not dispute the district court's equation of *transitioning* format with *changing* format.[13] (*See* Opening Br. at 23.) Instead Tranxition challenges only the phrase "the arrangement of data." According to Tranxition, inserting that phrase "redundantly requires that a configuration setting have a

---

[13] Having failed to raise the issue in its Opening Brief, Tranxition should not be permitted to argue on reply that "transition" does *not* mean change. *See United States v. Ford Motor Co.*, 463 F.3d 1267, 1276-77 (Fed. Cir. 2006). If Tranxition were to try raising that argument, it would be wrong in any event. The relevant limitations, quoted above, require "transitioning [or transitions] … settings from a format used on the source computing system to a format used on the target computing system." If transitioning *from a format* used on the source system *to a format* used on the target system did not require that the format change then those limitations would be equivalent to "transitioning [or transitions] … settings from a … source computing system to a … target computing system"; i.e., "from a format" and "to a format" would be surplusage.

format."[14]  (*See id.*)  But redundancy is not reversible error.  By characterizing

those words as redundant, Tranxition admits that they are correct; and if they are

correct then there is no error for this Court to rectify.

## G.     The District Court Construed the Manipulating-of-Format Limitations Properly

The '766 patent replaces limitations that require the *transitioning* of settings'

formats with limitations that require settings to be *manipulated*.  Specifically,

claims 1 and 42 of the '766 patent are directed to methods that include

"manipulating … configuration settings from a location, a name, a value, and a

format used […] on the source computing system to a location, a name, a value,

and a format used […] on the target computing system."  (JA0261 at 17:66–18:3,

JA0262 at 21:3–8.)  Tranxition contends that the district court erred when it

construed "manipulating" a setting's location, name, value, and format as *changing*

its location, name, value and format.  (JA0067, Opening Br. at 24.)  According to

Tranxition, that interpretation "alter[ed] the intentional selection of the all-

encompassing word 'manipulating' to the very narrow and restrictive word

'changing.'"  (Opening Br. at 24.)

---

[14] By way of explanatory background, the district court separately construed "format" as "a specific arrangement of data," (JA0072), and Tranxition does not contest that construction.  Tranxition relies on that construction when it reasons that, by interpreting the transitioning of a setting's format as changing its *arrangement of data*, the district court "redundantly requires that a configuration setting have a format."

The original '862 application, from which the patents in suit are descended, included claims directed to methods that include "manipulating" settings. Those claims were rejected because "the manipulating step is indefinite and unclear as to the function performed by the step." (JA4647.) The "manipulating" limitations were eventually dropped and do not appear in the '877 patent, as issued. But "manipulating" limitations were reintroduced during prosecution of the '766 patent. Then, in response to the first office action on the '766 patent, Tranxition again tried to distinguish the prior art Hunter patent, in part as follows:

> Although Hunter generally describes transferring settings from first computer to a second computer, Hunter fails to teach or suggest manipulating configurations.
>
> … In contrast to Hunter, applicants' technology manipulates configuration settings to transition configuration settings from a format used on the source computing system to a format used on the target computing system.

(JA4704.) In response to the second office action, Tranxition similarly *and successfully* argued, in part: "Although Hunter generally describes transferring settings from a first computer to a second computer … Hunter falls to teach or suggest manipulating or calculating configuration settings." (JA4720.) By those arguments, Tranxition surrendered the "all-encompassing" scope of the word "manipulating" for which it now contends by disclaiming any interpretation broad enough to encompass *transferring*. (*See* Opening Br. at 24.)

57

The district court's interpretation of "manipulate" as *change* finds further support in the only examples that Tranxition ever gave of manipulation. In response to the first office action on the '766 patent, Tranxition answered the examiner's statement (during an interview) that the "manipulating" limitations were not enabled by arguing:

> Applicants' specification … provides several examples of such manipulating. One example describes that a configuration setting needs to be manipulated so that it is stored with the name "config-monitor-new" … rather than the name "config-monitor-old" …. Another example describes that a configuration setting needs to be manipulated so that it is stored in a directory on the target computing system that is different from that on the source computing system. Also, applicants' specification … provides an additional example of manipulating as removing an extracted configuration setting.

(JA4704 n. 1.) In a similar vein, Tranxition responded to the second office action in part by indulging the assumptions that "replacing the actual path of a setting with a token is the same as manipulating the setting" and "replacing the user-specific directory with the environment variable is the same as manipulating a setting." (JA4720–21.) The common thread running through each example is *change*.

As shown above, during prosecution Tranxition unambiguously surrendered the plain and ordinary meaning of "the all-encompassing word 'manipulating'" for which it now contends, (*see* Opening Br. at 24). By interpreting "manipulate" as

58

*change*, the district court properly narrowed the scope of "manipulate" to the only examples that Tranxition ever gave. *See Toro*, 199 F.3d at 1301.

## CONCLUSION

Tranxition's appeal should be denied and the district court's judgment affirmed because the district court properly ruled, in the *Lenovo* action, that *all* asserted claims of the patents in suit invalid under section 101, and (as Tranxition apparently concedes) the district court properly gave that ruling preclusive effect in the *Novell* action. But even if this Court were to find error in the *Lenovo* action rulings, still it should affirm the district court's judgment because (1) the Primary Claims are invalid for indefiniteness and (2) Claim 30 is directed to information, organized into a data structure, written on a computer-readable medium, which plainly *is not* eligible subject matter under section 101, even if this Court were to conclude that the methods and systems of the Primary Claims *are* eligible.

Finally, this Court should not review the six interpretive rulings challenged by Tranxition because they are not ripe—but if this Court were to review those rulings, it should affirm them all because they were and are correct.

Dated:  February 11, 2016                    Respectfully submitted,

                                             MASCHOFF BRENNAN LAYCOCK
                                                GILMORE ISRAELSEN & WRIGHT PLLC

                                             /s/ *L. Rex Sears*
                                             Sterling A. Brennan
                                                *sbrennan@mabr.com*
                                             L. Rex Sears
                                                *rsears@mabr.com*
                                             20 Pacifica, Suite 1130
                                             Irvine, CA 92618
                                             (949) 202-1900

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 13,743 words, excluding those parts of the brief that are exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  February 11, 2016

/s/ *L. Rex Sears*

Sterling A. Brennan
   *sbrennan@mabr.com*
L. Rex Sears
   *rsears@mabr.com*
20 Pacifica, Suite 1130
Irvine, CA 92618
(949) 202-1900

## CERTIFICATE OF SERVICE

I certify that on February 11, 2016, the foregoing **DEFENDANT–**

**APPELLEE NOVELL, INC.'S OPENING BRIEF** was filed with the Court

through the CM/ECF system for service on all parties or their counsel of record.


 /s/ *L. Rex Sears*