2015-1448

# United States Court of Appeals
# for the Federal Circuit

SITE UPDATE SOLUTIONS, LLC,

Plaintiff-Appellee,

v.

CBS CORP., JASON'S DELI CORP., TICKETMASTER ENTERTAINMENT, INC., THE WALT DISNEY COMPANY, and TIME WARNER INC.,

Defendants,

and

NEWEGG, INC.,

Defendant-Appellant.

*Appeal from the United States District Court for the Northern District of California in case no. 3:11-cv-03306-PSG, Judge Paul S. Grewal*

## CORRECTED BRIEF OF PLAINTIFF-APPELLEE

July 29, 2015

John J. Edmonds
Shea N. Palavan
COLLINS, EDMONDS, POGORZELSKI,
SCHLATHER & TOWER, PLLC
1616 South Voss Road, Suite 125
Houston, Texas 77057
Telephone: (281) 501-3425
Facsimile: (832) 415-2535
jedmonds@cepiplaw.com
spalavan@cepiplaw.com

*Attorneys for Plaintiff-Appellee*
*SITE UPDATE SOLUTIONS, LLC*

### CERTIFICATE OF INTEREST

Pursuant to Federal Rule of Appellate Procedure 26.1 and Federal Circuit Rule 47.4, the undersigned counsel for Plaintiff-Appellee hereby certifies that:

1.    The full names of every party or amicus represented by me is:

     Site Update Solutions, LLC

2.    The names of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me is:

     None.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

     Acacia Research Corporation is the ultimate parent of Plaintiff-Appellee.

4.    The names of all law firms and the partners or associates that appeared for any of the parties represented by me in the District Court or are expected to appear in this court are:

     John J. Edmonds, Stephen F. Schlather and Shea Palavan of COLLINS, EDMONDS, POGORZELSKI, SCHLATHER & TOWER, PLLC represent Plaintiff-Appellee for this appeal; and

     Edward W. Goldstein of GOLDSTEIN LAW, PLLC and Alisa A. Lipski formerly of that that firm represented Plaintiff-Appellee in the District Court.

Dated: July 29, 2015                   */s/ John J. Edmonds*
                                       John J. Edmonds

TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................... ii

TABLE OF CONTENTS.......................................................................... iii

TABLE OF AUTHORITIES ....................................................................vi
    Cases..................................................................................................vi

    Statutes .......................................................................................... vii

    Other Authorities .......................................................................... vii

I.    STATEMENT OF RELATED CASES ...........................................1

II.   STATEMENT OF THE ISSUES ..................................................1

III.  STATEMENT OF THE CASE.....................................................3

IV.   STATEMENT OF THE FACTS ....................................................4
    A. The '683 Patent.............................................................................4

    B. Claim construction.......................................................................5

    C. Post-claim construction dismissals.............................................7

    D. Newegg's original exceptional case motion.................................8

    E. The District Court's original order denying Newegg's exceptional case
    motion..............................................................................................8

    F. Newegg's appeal to the Federal Circuit.......................................9

    G. The District Court's Second Denial of Newegg's § 285 motion. ...................9

V.    SUMMARY OF THE ARGUMENT ...........................................13

VI.   ARGUMENT ..............................................................................18
    A. Legal Authorities .......................................................................18
       1.    Standards for exceptional cases. ..........................................18

2.      Standards for claim construction...............................................................20

B. The District Court did not abuse its discretion in denying Newegg's motion. ........................................................................................................21

C. The District Court did not clearly err in rejecting Newegg's unfounded and untimely non-infringement arguments, nor was its denial of exceptionality an abuse of discretion. .........................................................................................24

D. SUS's MPF constructions were reasonable, made in good faith, had support in the specification, and were supported by a well-reasoned declaration by a qualified expert. ...........................................................................................25
    1. SUS's construction of "means for creating and modifying…" was reasonable, made in good faith, based upon linked structures in the specification, and supported by a well-reasoned declaration by a qualified expert. ..........................................................................................30

    2. This case does not stand out because SUS did not include the tables of the website database as linked structure.  SUS's position was reasonable and made in good faith, and Newegg's recitation of the claim construction hearing is inaccurate, as the District Court recognized. ...........................................32

    3. SUS's proposed construction of "means for identifying …" was reasonable, made in good faith, based upon linked structures in the specification, and supported by a well-reasoned declaration by a qualified expert. ..........................................................................................37

    4. SUS's proposed construction of "means for transmitting …" was reasonable, made in good faith, based upon linked structures in the specification, and was supported by a well-reasoned declaration by a qualified expert. ..........................................................................................38

    5. SUS's proposed construction of "means for opening …" was reasonable, made in good faith, based upon linked structures in the specification, and supported by a well-reasoned declaration by a qualified expert. ..................40

    6. SUS's proposed construction of "means for submitting …" was reasonable, made in good faith, based upon linked structures in the specification, and supported by a well-reasoned declaration by a qualified expert. ..........................................................................................41

7.  SUS's proposed construction of "means for parsing …" was reasonable, made in good faith, based upon linked structures in the specification, and supported by a well-reasoned declaration by a qualified expert. ..................42

8.  SUS's proposed construction of "means for updating …" was reasonable, made in good faith, based upon linked structures in the specification, and supported by a well-reasoned declaration by a qualified expert. .................43

9.  SUS's non-inclusion of the Table of Files within the Table of Search Engines in its proposed construction of "means for creating and modifying a database of a website" was reasonable, non-frivolous, and does not "stand out" from any other claim construction position, unsuccessful or otherwise. ...................................................................................................45

10. SUS's proposed construction for "website database" was reasonable and made in good faith.  No clear error in the District Court's ruling or abuse of discretion has been shown. ..........................................................................46

11. SUS did not "misrepresent inapplicable case law." ................................49

E. SUS's settlements do not make this case stand out, or show it was brought for any improper purpose of obtaining nuisance-value settlements.   This is true alone, or in combination with Newegg's other failed arguments regarding SUS's litigation positions. ...........................................................................51

VII.  CONCLUSION ............................................................................................53

VIII. CERTIFICATE OF SERVICE ....................................................................54

IX.  CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPE-FACE      REQUIREMENTS,      AND      TYPE-STYLE REQUIREMENTS ........................................................................................55

TABLE OF AUTHORITIES

## Cases

*Adjustacam v. Amazon.com, Inc. et al.*,
    No. 6:10-cv-00329-LED (E.D. Tex Aug. 19, 2013)....................................13, 14

*ArrivalStar v. Meitek*,
    No. 2:12-cv-01225-JVS (C.D. Cal. Nov. 20, 2012) ...........................................51

*Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*,
    393 F.3d 1378 (Fed. Cir. 2005) ......................................................................3, 4

*Budde v. Harley–Davidson, Inc.*,
    250 F.3d 1369 (Fed.Cir.2001) .............................................................................22

*Daubert v. Merrell Dow Pharmaceuticals*,
    509 U.S. 579 (1993).................................................................................................7

*Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003) ..........................................................................20

*Digitech Image Technologies, LLC v. Newegg, Inc.*,
    2013 WL 5604283, No. 8:12-CV-01688-ODW (C.D.Cal., Oct. 11, 2013)  13, 14

e.*Digital Corp. v. Creative Labs, et al.*,
    Civ. A. No. 12-cv-2879-DMS (S.D. Cal. October 1, 2013) ..............................13

*e.Digital Corp. v. Newegg, Inc.*,
    No. 3:12-cv-02879-DMS-WVG (S.D. Cal. Oct. 1, 2013 ...........................13, 14

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) ..........................................................................21

*Gaymar Industries, Inc. v. Cincinnati Sub-Zero Products, Inc.*,
    2015 WL 3893711 (Fed. Cir. Jun. 25, 2015)...............................................19, 50

*Goss Intern. Am., Inc. v. Graphic Mgmt. Assoc., Inc.*,
    739 F. Supp. 2d 1089 (N.D. Ill. 2010)...............................................................26

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*,
    134 S.Ct. 1744 (2014)...........................................................................................18

*In re Katz Interactive Call Processing Patent Litigation*,
    639 F.3d 1303 (Fed. Cir. 2011) ..........................................................................49

*Macrosolve v. Newegg*,
    No. 6:12-cv-46 (E.D. Tex. Oct. 16, 2015)....................................................13, 14

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed.Cir.2003) ...........................................................11, 26, 27, 50

*Microsoft v. i4i*, 131 S.Ct. 2238 (2011) .....................................................................28

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    134 S.Ct. 1749 (2014)........................................................................4, 18, 19, 20

*Pavilion Techs., v. Emerson Elec.*,
    2006 WL 6210180 (W.D. Tex. Sept. 5, 2006) ..........................................11, 50

*Pragmatus Telecom v. Newegg*,

Case 2014-1777 (Fed. Cir. Oct. 28, 1994)..........................................................14

*Pragmatus Telecom v. Newegg*,
    No. 12-1533-RGA (D. Del. July 25, 2014) .....................................................13

*SFA Systems, LLC v. Newegg Inc.*,
    2015 WL 4154110 (Fed. Cir. July 10, 2015)................. 13, 14, 15, 17, 19, 20, 52

*State Farm v. Campbell*,
    538 U.S. 408 (2003)...........................................................................................17

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*,
    57 F. 3d 1054 (Fed. Cir. 1995) .........................................................................8

*TecSec, Inc. v. International Business Machines Corp.*,
    731 F.3d 1336 (Fed. Cir. 2013) ..................................... 11, 26, 27, 50

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
    659 F.3d 1376 (Fed. Cir. 2011) .......................................................................26

*U.S. Ethernet Innovations, LLC v. Acer, Inc.*,
    2012 U.S. Dist. LEXIS 17918 (N.D. Cal. 2012) ..............................................46

*Uniloc v. Microsoft*,
    632 F.3d 1292 (Fed.Cir. 2011) .........................................................................52

*Visto Corp. v. Sproqit Techs., Inc.*,
    No. C–04–0651 EMC, 2007 WL 160942 (N.D.Cal. Jan.17, 2007) .................20

**Statutes**

35 U.S.C. § 282.......................................................................................................3

35 U.S.C. § 284......................................................................................................51

35 U.S.C. § 285 .............................................................................................. 3, 18

**Other Authorities**

Acacia Research Group Corporate Presentation,
    http://acaciaresearch.com/wp-content/uploads/2013/10/AcaciACorporate-
    Presentation-Q3-2014.pdf..................................................................................15

Graham, Scott, "In-house Impact Winners: Lee Cheng, Newegg,"
    http://www.therecorder.com/id=1202724143534/Inhouse-Impact-Winners-Lee-
    Cheng-Newegg ..................................................................................................14

Miller, Shawn P., "Do "Fuzzy" Software Boundaries Explain High Claim
    Construction Reversal Rates?,"
    http://mason.gmu.edu/~smille9/ShawnMillerJobMarketPaper.pdf (last updated
    11/13/2012) ............................................................................... 20, 29

Mullin, Joe, "Jury: Newegg infringes Spangenberg patent, must pay $2.3 million," http://arstechnica.com/tech-policy/2013/11/jury-newegg-infringes-spangenberg-patent-must-pay-2-3-million ............................................................................ 14

# I.    STATEMENT OF RELATED CASES

Site Update Solutions, LLC ("SUS") is unaware of any other case in this Court or other court that will directly affect, or be directly affected by, the Court's decision in this appeal.

# II.    STATEMENT OF THE ISSUES

1. Whether the District Court abused its discretion in denying (for a second time) Newegg's motion for fees under 35 U.S.C. § 285. A1-34.

2. Whether Newegg has waived any arguments of clear error since its Opening Brief (and further its Opening Brief in its prior appeal) does not argue clear error with respect to any findings of the District Court.

3. Whether Newegg's baseless and unsubstantiated allegations and hyperbole regarding SUS's "business model" (a mantra that Newegg seems to make repetitively, irrespective of the facts and without supporting evidence) justify, in whole or in part, a reversal of the District Court's discretionary ruling, including based upon any clear error that Newegg failed to specify or allege.

4. Assuming *arguendo* that Newegg has not waived the issue of clear error, whether the District Court committed clear error in finding that:

   A.    the substantive strength of SUS's litigating position was not so contrary to the governing law and the facts of the case that this case is one that stands out from others. A12.

B.    SUS's claim construction positions asserted in a prior, transferor court did not make the case one that stands out from others, including when SUS adopted more reasonable claim constructions when given the opportunity, namely in briefing before the District Court. A13-14.

C.    SUS's subsequent claim constructions were not so objectively unreasonable or frivolous that they made the case one that stands out from others. A14-28.

D.    Newegg's unsupported non-infringement argument did not make the case one that stands out from others. A28-30.

E.    SUS's settlement behavior did not have "indicia of extortion" and did not make the case one that stands out from others. A30-32.

### III.  STATEMENT OF THE CASE

This is a patent case that involved a dispute over claim 8 of U.S Patent No. RE 40,683 (the "'683 Patent'). On July 20, 2012, the District Court held its claim construction hearing. A1681. At the conclusion of the hearing, the District Court issued an oral decision on claim construction. *Id*. at lns. 6-10. As to four terms/phrases, the District Court stated it was "declining to construe these four terms because [it had] concerns that the terms are indefinite." A1854, lns. 5-15. The District Court also stated that, "[i]n light of a construction at this time, I'm going to invite, not require, but invite the defendants to present a motion for summary judgment on indefiniteness…" *Id*. at lns. 16-22.

SUS brought and maintained this suit in good faith asserting a claim which duly issued twice (the second time in reissue) from the Patent Office and which is presumed valid under the law. *See* 35 U.S.C. § 282. However, despite SUS's good faith and reasoned belief in the definiteness of claim 8, when the District Court indicated its concerns that four terms were indefinite, rather than prolong the litigation, and in deference to the District Court's determination, SUS acted prudently by promptly dismissing its claims against the remaining Defendants, including Newegg. A1682; A1901.

On November 26, 2012, Newegg filed a motion for fees under 35 U.S.C. § 285, which the District Court denied under the former *Brooks Furniture* standard.

A3367-3399; *see Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005). The District Court's Order denying Newegg's original § 285 motion included findings that SUS's claim construction positions were not objectively baseless. A3381. Newegg appealed the District Court's ruling but while Newegg's appeal was pending, the Supreme Court rendered its decision in the *Octane Fitness* case. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 134 S.Ct. 1749 (2014). Accordingly, this Court remanded the case to the District Court for further proceedings under *Octane Fitness*.

The parties re-briefed and re-argued their positions in the District Court.[1] On February 11, 2015, the District Court denied Newegg's motion under the *Octane Fitness* standard. A1-34. The District Court's Order has multiple factual findings supportive of its discretionary ruling, based upon the totality of the circumstances, denying Newegg's motion. *Id.* Newegg has now appealed that decision.

## IV.  STATEMENT OF THE FACTS

### A.    The '683 Patent.

The '683 Patent initially issued in 2001 and was reissued by the Patent Office in 2009.  The only claim at issue in this case was claim 8. A143. For claim 8, the only change with reissuance was deletion of the word "unmodified." A159.

The invention of the '683 patent relates to the process of developing and

---

[1] *See* A2492-2343 (Plaintiff's Response) and A4116-4147 (Transcript).

maintaining the content of Internet search engine databases. A151, 1:10-12. Internet search engines use agent programs called Spiders, Robots, or Worms, among other names, to inspect the text of resources on web sites. *Id*. at 1:48-50. Embodiments disclosed in the '683 patent provide, *inter alia*, a mechanism for search engines and web site managers to maintain as complete a registration of web site content as is possible. *Id*. at 3:61-63.

**B.     Claim construction.**

The claim construction issues in this case were legitimately and reasonably disputed, including within the complex legal and factual framework of whether the structures relied upon by SUS in the specification for meeting the means-plus-function ("MPF") limitations performed and were clearly linked to the claimed functions. Limited claim construction filings took place in Texas before the case was transferred to Northern California. *See* A645-668.

Newegg complains much about SUS's original claim construction positions in Texas. SUS's proposed construction for "means for creating and modifying a database of a website…" was a "[w]eb server adapted as described in Col. 4, lines 19-34." This passage refers to certain "search engine update software tools" and SUS's proposed construction of the other MPF terms was "Common Interface (CGI) programs." A656-661 & 665. However, although SUS's opening claim construction brief could have been better and more clearly written, it also made clear, when read

as a whole, that the CGI program "works in conjunction with the web server."[2] The District Court never provided any findings or detailed explanation of why it deemed SUS's original constructions in Texas prior to transfer to be unduly problematic.

It is important to note that, despite all of Newegg's complaints about SUS's failure to acknowledge the supposedly clear indefiniteness of the three computer based MPF terms found by the District Court to lack a clearly linked algorithm, Newegg's original claim construction positions did not argue indefiniteness of a single element on this ground.  For each of the three MPF terms that the District Court found to be indefinite,[3] Newegg's original position was that there was sufficient algorithmic structure in specification clearly linked to the website server.[4] Newegg's brief fails to explain how SUS "stands out" in failing to acknowledge the indefiniteness of claims on MPF grounds that Newegg did not even allege in the first round of claim construction briefing.

As the District Court acknowledged, SUS lacked an opportunity to correct or revise its claim constructions in Texas because the case was transferred to Northern

---

[2] *See, e.g.,* A655-658 ("The software disclosed in the '483 patent works in conjunction with the web server. A CGI program, and equivalent software tools, are well known to those of ordinary skill in the art, and was well known at the time of filing…A CGI script is also referenced numerous times in the specification, and it is clear that it, or equivalent software, may perform a number of functions.").

[3] Those terms are "means for transmitting…", "means for parsing…" and "means for updating…" A11.

[4] *See* A879-1017, including at A993-994, A1001-1002, A1003-1004.

California before SUS's reply claim construction brief came due. A13. SUS instead attempted to correct the defects Defendants identified by filing a new claim construction brief once the transferee court held its own claim construction proceedings anew. A13.[5]

SUS's claim construction positions articulated to the District Court are at its briefs at A1327-1349 and A1561-1656. As to the claim terms at issue, SUS was reasonable in relying in good faith upon the specification and well-reasoned analysis and opinions of its technical expert, Dr. Lavian,[6] whose credentials were not challenged and whose opinions were not challenged as being unreliable under Federal Rule of Evidence 702 or *Daubert. See Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993).

## C.    Post-claim construction dismissals.

Following the District Court's comments at the claim construction hearing, SUS and twenty-three Defendants amicably stipulated to their dismissal. A1683. The sole hold out was Newegg, who initially required SUS to file an opposed motion to dismiss in accordance with the *Super Sack* case, (A1858), but who subsequently relented to being dismissed, (A1901), and finally filed a Motion

---

[5] Newegg complains of what it alleges to be SUS's "ever-changing" claim construction positions, but the facts show that SUS addressed and corrected defects pointed out by Newegg and its co-defendants in SUS's initial claim construction positions in Texas upon the first opportunity for doing so in Northern California.
[6] A1589-1648.

seeking fees.    A1097; A1912; A2211; *see Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F. 3d 1054 (Fed. Cir. 1995).

## D.    Newegg's original exceptional case motion.

In its original exceptional case motion, Newegg argued that (1) SUS filed this case in bad faith and for the improper purpose of obtaining "nuisance value" settlements, A2225-2229; and (2) that SUS's case was objectively baseless because it "failed to follow well-established means-plus-function law" and advanced allegedly frivolous constructions with respect to seven claim terms, A2229-2234.

## E.    The District Court's original order denying Newegg's exceptional case motion.

The District Court's Original Order denying Newegg's first exceptional case motion (A3367-3399), made a number of findings. With respect to the terms "means for creating" and "means for identifying," the District Court noted that "the Federal Circuit and District Courts have created a complicated framework" and that "given the disputes within the Federal Circuit regarding this area of the law, the Court cannot say that SUS's argument is objectively baseless or frivolous." A3389.  With respect to the other "means for" terms, which the District Court found to be indefinite, the District Court found that "the terms were not so obviously indefinite that SUS's pursuit of infringement causes of action on claim 8 was frivolous." A3390-3391. The District Court also found that SUS had not brought suit in bad faith, including because "SUS's positions were not entirely baseless," and "[SUS's]

attempts to settle claims early in the litigation for costs lower than the amounts of a defense are not sufficient, alone, to find subjective bad faith." A3394, A3397-3398.

## F.    Newegg's appeal to the Federal Circuit.

Newegg then appealed the District Court's denial of its exceptional case motion. However, Newegg did not appeal every finding by the District Court. *See Id.* Newegg only appealed the District Court's findings of objective baselessness, s*ee, e.g., id.* at pp. 9-11, 13-14, 24-25, and lack of bad faith, *id.* at pp. 11-12, 14-15, and ultimate conclusion that the case was not exceptional. Newegg did not appeal the District Court's finding that SUS's claim construction positions were not frivolous, nor did it appeal the District Court's finding that SUS had not committed litigation misconduct. *See id.*

## G.    The District Court's Second Denial of Newegg's § 285 motion.

After holding a hearing on remand,[7] the District Court issued its second denial of Newegg's § 285 Motion, this time under the recently pronounced *Octane* standard. A1-34.  The District Court acknowledged that SUS's claim constructions at issue, which it had previously rejected, were erroneous, but it found that "the substantive strength of [SUS's] litigating position" was not so contrary to the "governing law and the facts of the case" that this case is one that "stands out from others." A12.  The District Court also held that SUS's litigating position was "not

---

[7] *See* Transcript at A4116-4147.

entirely frivolous or objectively unreasonable," and that "[v]iewed together under the totality of the circumstances, these findings establish that this case is not exceptional." *Id.*  The District Court further noted that Newegg had revised its initial claim constructions as the case proceeded, A13, and that "[v]iewed under the totality of the circumstances, then, SUS's adoption of initially unreasonable claim constructions does not make "the substantive strength of [its] litigating position" so weak that this case stands out from others because SUS abandoned its reliance on these constructions when it was given the opportunity to do so." *Id.*

The District Court also held that "SUS misinterpreted the Federal Circuit's guidance *to the extent that it asserted that* its proposed structures were special purpose computers simply because they performed functions similar to those performed by computers that courts have identified as 'special purpose computers.'" *Id.* (emphasis added).  However, a fair reading of the totality of SUS's claim construction positions, *see* discussion *infra,* shows that SUS had not advanced such an assertion.  A fair reading of SUS's positions in their totality indicates SUS fundamentally argued that a web server, which inherently performs certain functions,[8] combined with the other identified structures, including a CGI script and

---

[8] As SUS pointed out in its claim construction submissions, Newegg's own expert, Dr. Maggs, admitted that a web server "receives requests in HTTP, HTTPS, or a similar standardized web protocol," A1429 at ¶ 17; "generates responses to those requests," Id.; "[uses] CGI scripts . . . to pass data between different processes running on the web server," *Id.* at ¶ 16; and "passes data between a web server and

a form (*see* below), resulted, in combination, in a special purpose computer.[9]

The District Court also "agree[d] with Newegg that SUS's use of *TecSec*[10] to support its claim that its structures were not required to include an algorithm fails" because "SUS cannot rely on *TecSec*'s finding that a structure provides sufficient disclosure when it includes "detailed prose that shows how the specific software products operate to implement the claimed functions" because SUS did not provide such a structure. A18-19.  The District Court further held that

> Even if [SUS's] reading of these cases was correct, it would not justify SUS's failure to include an algorithm because SUS had not disclosed "detailed prose" showing how its structures operated to "implement the claimed functions." But SUS's misunderstanding of the case law relates to the extent of disclosure the cases require. It is not rare or out of the ordinary for a party to misunderstand nuances in the case law and the applicability of those cases to the facts at issue.

---

web client, [using] a standardized web protocol . . ., such as HTTP or HTTPS." *Id.* at ¶ 16. A1575.

[9] *See, e.g.,* A3510 (SUS stating that "[t]he primary issue in dispute with regard to claim construction, as borne out in the *Markman* briefing and at the *Markman* hearing, was whether the *combination* of a web server, form (which includes a robots.txt file), CGI interface script, and website database provided enough structure that no algorithm was necessary.") (emphasis added).

[10] In its response (A3492-A3522) to Newegg's supplemental motion for an exceptional case finding filed post-remand, SUS cited *TecSec, Inc. v. International Business Machines Corp.*, 731 F.3d 1336 (Fed. Cir. 2013); *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1214 (Fed.Cir.2003); and *Pavilion Techs., v. Emerson Elec.*, 2006 WL 6210180, *8-*9 (W.D. Tex. Sept. 5, 2006), as better authorities more on point than previously cited cases for why SUS's factual claim construction positions were "reasonable and made in good faith." A3510-3511.

A20.[11]   Based upon a reasoned and careful analysis, the District Court concluded that "SUS's interpretation of MPF law was flawed but not so objectively unreasonable or unusual as to make this case exceptional." A21.

The District Court addressed each of the claim construction issues raised by Newegg, and in each instance it concluded that SUS's positions were not so frivolous, unreasonable or lacking in support to make this case one that "stands out from others." A23-28.  Further, the District Court rejected Newegg's unsubstantiated exceptionality arguments based upon allegations of non-infringement. A29.

The District Court further held that SUS's settlement behavior did not have "indicia of extortion;" that "unlike cases which were deemed exceptional in part because plaintiffs filed frivolous suites in order to extort settlement fees, here SUS's litigating position was not so contrary to the governing law and facts of the case as to be objectively unreasonable;" that the "size and structure of settlement agreements … are not necessarily linked with or an indication of a lack of substantive strength... , that evidence suggests that it is not uncommon for cases to settle below the average cost of defense;" and that "SUS's willingness to settle with Newegg for a settlement amount that was lower than the amount it originally claimed is also not sufficient to warrant a finding that this case is exceptional." A30-31. Based upon the facts, the

---

[11] SUS respectfully suggests that this passage from the District Court's opinion is important, as explained below.

District Court found that "SUS's settlement behavior thus does not rise to the level sufficient to establish that this case is exceptional." A32.

Further, based on the facts, the District Court found that, "[a]lthough SUS's litigating position was ultimately unsuccessful, it was not completely without support in the governing law and facts of the case." A32.

In sum, the District Court properly concluded that, "considering the totality of the circumstances," this case is not one that "stands out from others." A33.

## V.    SUMMARY OF THE ARGUMENT

Newegg's appeal is yet another battle in Newegg's apparent current crusade to prevail on a § 285 motion against a non-practicing entity.[12]    Indeed, being apparently indifferent to whether an appeal is even merited, especially as here on a discretionary ruling, Newegg has made it well known that it budgets an appeal in

---

[12] *See, e.g., SFA Systems, LLC v. Newegg Inc.,* 2015 WL 4154110 (Fed. Cir. July 10, 2015) (affirming denial of Newegg's § 285 motion); *Macrosolve v. Newegg,* No. 6:12-cv-46 (E.D. Tex. Oct. 16, 2015) (denying Newegg's § 285 motion and currently on appeal as Case No. 15-1642); *Pragmatus Telecom v. Newegg,* No. 12-1533-RGA (D. Del. July 25, 2014) (denying Newegg's § 285 motion and on appeal as Case 14-1777); *Digitech Image Technologies, LLC v. Newegg, Inc.,* 2013 WL 5604283, No. 8:12-CV-01688-ODW, Doc No. 473 (C.D.Cal., Oct. 11, 2013) (denying Newegg's § 285 motion); *e.Digital Corp. v. Newegg, Inc.,* No. 3:12-cv-02879-DMS-WVG, Doc. 50 (S.D. Cal. Oct. 1, 2013 (denying Newegg's § 285 motion); *Adjustacam v. Amazon.com, Inc. et al.,* No. 6:10-cv-00329-LED, Doc No. 761 (E.D. Tex Aug. 19, 2013) (denying Newegg's § 285 motion and currently on appeal as Case No. 13-1664); e.*Digital Corp. v. Creative Labs, et al.,* Civ. A. No. 12-cv-2879-DMS, Dkt. No. 46 (S.D. Cal. October 1, 2013) (denying Newegg's § 285 motion).

every case.[13]  Newegg's general counsel has disclosed that "[w]e're going to explore the limits of § 285 jurisprudence," and that "[i]f we lose every one of our fee motions, at the very least we achieve something… It's called peace on our borders." *See* Recorder Article.  Although Newegg's overaggressive efforts to  recover fees, even when unwarranted, have been rejected multiple times, apparently part of Newegg's strategy of gaining "peace on our borders" is to allege, as it has done here, that unsuccessful patentees had nefarious "business models" or "litigation strategies" that somehow justify shifting fees.[14] Yet this Court recently reminded Newegg that allegations of nefarious business models unsupported by evidence (like the baseless allegations Newegg makes in this case) are unpersuasive and insufficient for finding an abuse of discretion in denying exceptionality. *SFA Systems*, 2015 WL 4154110,

---

[13] *See, e.g.,* Mullin, Joe, "Jury: Newegg infringes Spangenberg patent, must pay $2.3 million,"        http://arstechnica.com/tech-policy/2013/11/jury-newegg-infringes-spangenberg-patent-must-pay-2-3-million ("All Newegg cases are budgeted for appeal from the start, Cheng said."); Graham, Scott, "In-house Impact Winners: Lee Cheng,    Newegg,"    http://www.therecorder.com/id=1202724143534/Inhouse-Impact-Winners-Lee-Cheng-Newegg ("Recorder Article") ("Cheng said he budgets for a trial and an appeal in every case).

[14] *See, e.g., SFA Systems, LLC v. Newegg, Inc.*, Case 2014-1712, Brief of Appellant Newegg, Inc., pp. 44-45 (Fed. Cir.); *Pragmatus Telecom v. Newegg*, Case 2014-1777, Brief of Newegg, Inc., Doc 18, p. 9 (Fed. Cir. Oct. 28, 1994) *Macrosolve, Inc.* v. Newegg, Inc., Case No. 15-1642, Brief of Newegg, Inc., Doc 19, pp. 48-54 (E.D. Tex.); *Digitech Image Technologies, LLC v. Newegg, Inc.*, No. 8:12-CV-01688-ODW, Motion of Newegg, Inc. for Fees, Doc No. 43, pp. 5-6 (C.D. Cal.); *e.Digital Corp. v. Newegg, Inc.,* No. 3:12-cv-02879-DMS-WVG, Newegg Inc.'s Motion for Fees, Doc. 46, p. 5 (S.D. Cal.); *Adjustacam, LLC v. Newegg, Inc.*, at al.; Case: 2013-1665, Brief of Newegg, Inc., Doc. 44, p. 37 (E.D. Tex.).

*6.

Aside from being factually devoid of any merit or support, Newegg's allegations about the "business model" of SUS and its affiliates are an erroneous distortion of the facts. SUS's parent entity, Acacia Research Group, LLC, has a well-publicized model of "partner[ing] with patent owners to bridge the gap between invention and production, helping patent owners get paid by licensing their patents to the companies that use them."[15] SUS's ultimate parent, Acacia Research Corporation, is a publicly traded company (NASDAQ: ACTG), and there is simply no evidence that this publicly traded company or its subsidiaries, namely SUS, have any improper or nefarious business models.

Fundamentally, Newegg seeks to have this Court hold that the District Court abused its discretion in holding that this case does not stand out from others sufficient for fee shifting in view of SUS's defending the validity of its presumptively valid (and thus presumptively definite) patent claim, which was twice determined valid by the Patent Office – once at issuance and again on reissuance, including when neither Newegg nor any of its co-defendants had argued that the subject MPF claim terms were indefinite for lacking clearly linked algorithmic structure during the first round of claim construction briefing in the case. A978-

---

[15] Acacia Research Group Corporate Presentation, http://acaciaresearch.com/wp-content/uploads/2013/10/AcaciACorporate-Presentation-Q3-2014.pdf.

1017.

As to disputed means plus function terms, SUS's primary position (with some specific differences for specific terms as noted above) was that the combination of a server with a web server combined with a form (which includes a robots.txt file), CGI interface script, and website database was a special purpose computer linked to the claimed functions.[16] SUS's position was rejected the District Court and SUS respects and defers to the District Court's determination. Newegg seeks to paint SUS's defense of the validity of its patent as a mis-understanding or mis-assertion of means-plus-function law. To the contrary, the claim construction dispute was fundamentally, and at least primarily, a factual dispute about whether the patent disclosed, including to one of ordinary skill in the art, that the structures identified by SUS performed, and whether they were clearly linked, to the claimed functions. In this factually disputed issue, SUS reasonably relied upon the intrinsic evidence of the patent specification and its technical expert's well informed and articulated opinions, which it had submitted to the District Court with its claim construction briefing. A1589-1648.

Newegg's argument that the District Court abused its "discretion by not properly applying this 'considerably lower' standard" is Newegg's way of saying that the District Court's ultimate conclusion of non-exceptionality was flawed.

---

[16] *See* specific references to claim construction submissions *infra*.

Newegg has tried this argument before without success. *See, e.g., SFA Systems,* 2015 WL 4154110, *4 (Newegg does not contend that the District Court used the wrong law, only that its conclusions were flawed). Moreover, the findings underlying an exceptional case ruling are reviewed under a clear error standard. Newegg's Opening Brief did not argue clear error with respect to a single finding by the District Court. Thus, Newegg has waived any argument of clear error.

Newegg's argument that whether a patentee is a practicing entity, whether it is "sophisticated," or whether its counsel are experienced, should somehow lower the bar for assessing fees lacks any legal merit, lacks fundamental fairness, is poor public policy, and, if accepted, would violate fundamental notions of due process and equal protection under the laws.[17]

Newegg's argument that "the District Court failed to consider each defect or 'error' by Site Update in the *aggregate* in deciding whether this case is exceptional" (emphasis in original) constitutes an inexcusable mis-statement of the District Court's ruling. The District Court was crystal clear in its holding that, "[b]ecause the court finds that, considering the *totality of the circumstances*, this case is not 'one that stands out from others,' Newegg's motion for declaration of exceptionality and attorney's fees is DENIED." A33 (emphasis added).

---

[17] *See generally State Farm v. Campbell*, 538 U.S. 408, 423 (2003) ("Due process does not permit courts, in calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims…").

In sum, the District Court fairly and duly considered all the facts and issues, including in their totality, and it made reasonable and supportable factual findings. The District Court exercised its discretion in a reasonable manner that should not be disturbed in appeal.

## VI.    ARGUMENT

### A.    Legal Authorities

#### 1.  Standards for exceptional cases.

This Court reviews the District Court's factual findings underlying an exceptional case determination for clear error. *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.,* 134 S.Ct. 1744, 1748–49 (2014).  It reviews the District Court's determination of whether a case is "exceptional" for an abuse of discretion. *Id.* at 1748, n. 2.

As espoused by the Supreme Court, an exceptional case is now "one that stands out from the others with respect to the substantive strength of a party's litigating positions (considering both the governing law and the facts of the case) or the unreasonable manner in which it was litigated." *Octane*, 134. S.Ct. at 1756. *See* 35 U.S.C. § 285.  "District Courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane*, 134. S.Ct. at 1756. The inquiry into the objective reasonableness of a party's litigating position may still be relevant under *Octane*

because, if a case "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated," it is "exceptional" under § 285. *Id.*

The Supreme Court made clear in *Octane* that fee awards are not to be used "as a penalty for failure to win a patent infringement suit." *Id.* 1753. In other words, fees are not awarded solely because one party's position did not prevail. *Gaymar Industries, Inc. v. Cincinnati Sub-Zero Products, Inc.*, 2015 WL 3893711, *3 (Fed. Cir. Jun. 25, 2015).

In *Octane Fitness*, the Supreme Court made clear that it is the "substantive strength of the party's litigating position" that is relevant to an exceptional case determination, not the correctness or eventual success of that position. *Octane Fitness*, 134 S.Ct. at 1756; *SFA Systems*, 2015 WL 4154110 at *3. A party's position on issues of law ultimately need not be correct for them to be found reasonable or to not stand out. *Octane Fitness*, 134 S.Ct. at 1756; *SFA Systems*, 2015 WL 4154110 at *3. Importantly, this means that this Court need not rule on the correctness of the District Court's decision on all underlying issues of law in reviewing a District Court's exceptional case determination. *SFA Systems*, 2015 WL 4154110 at *3. This Court need only determine whether the District Court abused its discretion when it found that the party's litigating position was not so merit-less as to "stand out" from

the norm and, thus, be exceptional. *Octane Fitness*, 134 S.Ct. at 1756; *SFA Systems*, 2015 WL 4154110 at \*3.

Reasonable minds can differ as to claim construction positions and losing constructions can nevertheless be nonfrivolous. *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1368 (Fed.Cir.2012). *See Visto Corp. v. Sproqit Techs., Inc.,* No. C–04–0651 EMC, 2007 WL 160942, at \*5 (N.D.Cal. Jan.17, 2007) ("Given the vagaries often inherent in the claims construction process, it appears to be the exception, and not the rule, for a court to find terms of a patent so obvious on its face, and thus the construction offered by a party so obviously unreasonable, that sanctions under § 285 would be warranted.").  In fact, a recent study indicates that even the well-reasoned claim construction decisions by federal district judges are reversed by this Court 45% percent of the time in regard to software patents.[18]

### 2.  Standards for claim construction.

Generally, MPF elements cover the structure disclosed in the specification that performs, and is clearly linked to, the claimed function. *Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003). For computer-implemented inventions

---

[18] *See* p. 3 of Miller, Shawn P., "Do "Fuzzy" Software Boundaries Explain High Claim Construction Reversal Rates?," http://mason.gmu.edu/~smille9/ShawnMillerJobMarketPaper.pdf (last updated 11/13/2012) (concluding that "the Federal Circuit found claim construction error in 45.1 percent of the opinions involving software patents and 28.9 percent of the opinions involving non-software patents.").

with terms in MPF format, the particular structure disclosed must be more than just a general purpose computer or microprocessor. *Aristocrat. Techs. Austl. Pty Ltd. v. Int'l Game Tech.,* 521 F.3d 1328, 1333 (Fed. Cir. 2008). Where the only structure identified for performing the function described by a mean-plus-function limitation is a general purpose computer, an algorithm is required to achieve a specific, non-general, purpose. *See, e.g., Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008).

## B.    The District Court did not abuse its discretion in denying Newegg's motion.

The District Court properly concluded that, "considering the totality of the circumstances, this case is not "one that stands out from others." A33. Newegg alleges eight "problems" that it alleges justify an exceptional case finding. Dkt. No. 21, pp. 23-24. However, the District Court carefully considered each of these alleged "problems" and based upon multiple findings for which Newegg has not alleged clear error, in its discretion, the District Court determined that the totality of the circumstances did not make this case stand out.  As Newegg acknowledges, "[o]n remand, the district court disagreed, as its order addressed each basis." *Id.*, p. 25. Including due to the absence of clear error and given the discretion properly afforded district courts on § 285 motions, Newegg has not shown, and cannot show, that the District Court abused its discretion.

In particular, aside from the complexity of MPF law, the parties had a

reasonable and legitimate ***factual*** dispute, including a battle of experts, over whether the recited functions were performed by a general purpose computer or a special purpose computer, in view of the structures recited in the specification that SUS reasonably contended performed, and were clearly linked to, the recited functions. Further, the District Court "rel[ied] in part on Newegg's expert" in resolving the factual dispute as to whether a CGI program was sufficient to make a web server a special purpose computer. A18.  There was nothing baseless or unreasonable about SUS having its expert's reasoned opinions weighed against those of Newegg's expert for the Court to decide which views would be adopted.  As noted above, "[r]easonable minds can differ as to claim construction positions." *Raylon*, 700 F.3d at 1368.  That is especially true when there is a factual dispute, including a battle of experts, that must be resolved by the Court in order to determine which claim construction should apply.

Newegg's erroneously claims that SUS should have known that claim 8 of its presumptively valid patent – which issued in 2001 and then re-issued in 2009 – was invalid due to the lack of an algorithm.  To the contrary, including in view of its good faith and reasonable claim constructions positions discussed below, SUS was reasonable in relying in part on the presumption of validity, and the heavy burden of clear and convincing evidence[19] for overcoming validity, in support of its view that

---

[19] *See Budde v. Harley–Davidson, Inc.*, 250 F.3d 1369, 1380–81 (Fed.Cir.2001).

the means plus function elements at issue involved a special purpose computer with clearly linked structures.

Newegg's argument that "the District Court failed to consider each defect or 'error' by Site Update in the *aggregate* in deciding whether this case is exceptional" (emphasis in original) constitutes an inexcusable mis-statement of the District Court's ruling. The District Court was crystal clear in its holding that, "[b]ecause the court finds that, considering the *totality of the circumstances*, this case is not 'one that stands out from others,' Newegg's motion for declaration of exceptionality and attorney's fees is DENIED." A33 (emphasis added).[20]  Had SUS made such an excusably erroneous mis-statement of the record, no doubt Newegg would be arguing that would be grounds for an exceptional case finding.

Newegg's repeated cherry-picking of the District Court's findings throughout its Brief does not justify exceptionality or reversal. Time and again, Newegg selectively cites the District Court's criticisms of SUS's positions (*e.g.*, "difficult to make logical sense," "strains credibility," etc.), while then failing to acknowledge that, in each instance, the District Court declined to make a finding of frivolousness, objective baseless, litigation misconduct, SUS litigating the case in an unreasonable manner, or anything else that would justify reversing the District Court's conclusion,

---

[20] *See also* A13 ("Viewed together under the totality of the circumstances, these findings establish that this case is not exceptional."); A14 ("Viewed under the totality of the circumstances….").

based upon the totality of the circumstances, that this case does not stand out from the others.

## C.    The District Court did not clearly err in rejecting Newegg's unfounded and untimely non-infringement arguments, nor was its denial of exceptionality an abuse of discretion.

As to Newegg's allegations of exceptionality based upon non-infringement and premised upon SUS's claim constructions being incorrect, it should be noted that Newegg came forward with no evidentiary proof of non-infringement, which should have been fatal to its contentions on this issue since Newegg has the burden of proof in proving exceptionality. The District Court did not reach the issue raised by SUS of whether Newegg had waived[21] its non-infringement positions "because [the District Court held] that Newegg's noninfringement arguments do not show that this case is exceptional even if they are not waived." A20, fn. 139. On the substance of this issue, the District Court properly held that, "[e]ven if Newegg is correct that SUS's proposed construction was motivated in part by a desire to support its infringement theory, this does not make this case exceptional because this motivation would not negate the fact that SUS's proposed construction of "website database" was not so erroneous that it makes this case one that stands out from others." A29.  Further, the District Court noted that Newegg's contention that "SUS could not 'credibly assert' that it could have proved infringement under the court's

---

[21] *See* A3504-3505.

construction of website database," a contention that lacked any evidentiary support, "is not sufficient to justify a finding of exceptionality. A29. Newegg has not shown, and cannot show, that the District Court clearly erred on these issues, including because SUS's claim construction positions do not justify exceptionality and because Newegg's non-infringement arguments, aside from being waived, are baseless and lack any evidentiary support, despite Newegg having the burden of proof on exceptionality.

**D.** **SUS's MPF constructions were reasonable, made in good faith, had support in the specification, and were supported by a well-reasoned declaration by a qualified expert.**

As to the MPF terms at issue, although SUS's claim construction positions at issue were unsuccessful, SUS was reasonable in relying in good faith upon the well-reasoned analysis and opinions of its technical expert, Dr. Lavian, A1589-A1648, whose credentials were not challenged and whose opinions were not challenged as being unreliable. The primary issue in dispute with regard to claim construction, as borne out in the *Markman* briefing and at the *Markman* hearing, was whether the combination of a web server, form (which includes a robots.txt file), CGI interface script, and website database (or other software structures such as agents identified by SUS and its expert) provided sufficiently described and linked structure for the subject MPF terms such that no algorithm was necessary. This Court's precedents have allowed a specific software to satisfy the algorithm requirement if the facts are

sufficient to show that it performs, and is clearly linked to, the claimed function. *See, e.g., TecSec*, 731 F.3d 1336 ("The specification discloses the specific software products and how to use those products to implement the claimed functions… The defendants contend that these examples only disclose generic software and not a specific algorithm. We disagree … the examples here provide detailed prose that shows how the specific software products operate to implement the claimed functions… Short of providing source code, it is difficult to envision a more detailed disclosure.");[22] *Elekta*, 344 F.3d at 1214 ("there would be no need for a disclosure of the specific program code if software were linked to the ... function and one skilled in the art would know the kind of program to use").

Although SUS did not cite these specific cases in its claim construction briefing, SUS did cite cases that stood for general principles of MPF law,[23] *TecSec*

---

[22] As Newegg acknowledges at page 37 of its Brief, *TecSec* is consistent with *Typhoon Touch*, which held that the required algorithm can be disclosed "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner...." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376 (Fed. Cir. 2011)."

[23] Newegg's allegation that SUS had a "complete absence" of legal authority is meritless. SUS's claim construction briefing and briefing in response to Newegg's exceptional case motion each cite to multiple authorities, *see* A1327-1349, A1561-1656, & A3492-A3522, for general principles of claim construction and MPF law and for principles of law more specific to the facts of the case. Further, Newegg's allegation that SUS's reliance upon the *Goss* case was a misrepresentation or frivolous is unfounded. At a minimum, *Goss* stands for the proposition that under appropriate factual circumstances a computer-related structure, *i.e.*, a controller, can satisfy 112(f) without an algorithm being disclosed. *See Goss Intern. Am., Inc. v. Graphic Mgmt. Assoc., Inc.*, 739 F. Supp. 2d 1089 (N.D. Ill. 2010). SUS

had not been decided at the time of claim construction proceeding, and, SUS did cite them in its briefing on remand. A3510-3511.[24]  Moreover, whether either case was specifically cited is immaterial to the point that SUS's *factual positions and arguments* made during claim construction were consistent with Federal Circuit precedents, specifically with respect to SUS's factual view that a CGI script, in combination with a web server and the other applicable structures, was sufficient software support to obviate the need for an enumerated algorithm beyond the software disclosed and described. The District Court opined that SUS's "misunderstanding" of *TecSec* (and presumably *Elekta*) relates "to the extent of disclosure the cases require."  SUS respectfully suggests that this passage from the District Court's opinion is important, because it tends to support SUS's view that the disputed claim construction positions in this case were, fairly viewed in their totality, factual disputes, including disputes between competing experts.  The District Court's pronouncement that SUS "had not disclosed 'detailed prose'" is fairly indicative of the District Court's resolution of the Section 112(f) issues being fundamentally the resolution of a factually disputed issue over the sufficiency of the intrinsic and extrinsic (*i.e.*, Lavian Declaration) evidence cited by SUS and Newegg in support of

---

acknowledges that the factual circumstances of this invention are different from the invention at issue in *Goss*, but SUS has argued those different facts reasonably and in good faith.

[24] In addition, SUS cited *TecSec* (which was a recent case at the time) during oral argument prior to remand. A3456:9-20.

their respective positions. The District Court's acknowledgment that the disputed 112(f) issues over CGI scripts were based "in part on Newegg's expert," A22, thus further supporting SUS's view that the disputed claim construction issues were good faith, reasonable, and legitimate factual disputes, including among experts in the field.

The MPF issues in this case were complicated, including because reasonable technical experts disagreed (including based upon specific disclosures in the specification) about whether the disclosure of a web server and "software tools" comprising a CGI script, form, and/or database provided sufficient disclosure of software and structure to create a special purpose computer. These complicated issues received well-reasoned and substantial briefing, evidence in the form of expert declarations, and argument.

Newegg has not shown, and Newegg did not argue in its original motion for fees or originally on appeal (thus waiving the issue), that this is a case in which no reasonable claim construction (including this Court's construction, the reasonableness of which is not disputed) could result in infringement of the claim elements which were disputed and/or construed. Newegg's basic complaint is that SUS should have known that claim 8 was indefinite. However, duly issued patent claims are presumed valid absent clear and convincing evidence to the contrary. *See Microsoft v. i4i,* 131 S.Ct. 2238 (2011). As set forth above, claim 8 was examined

and issued *twice* by the USPTO. SUS was reasonable in advancing legally and factually supported claim constructions which were consistent with the presumption of validity.

Every patent case involves disputed claim constructions, *see, e.g. EON Corp.*, 2014 WL 3726170 at *5 (denying fee award after adverse *Markman* ruling resulted in non-infringement), and this case in particular involved complex claim construction issues. It is not the law, nor should it be the law, that a case is "exceptional" whenever a court does not adopt a parties' proposed construction or whenever a claim is allegedly not infringed after being construed. In fact, a recent study indicates that even the well-reasoned claim construction decisions by federal district court judges are reversed by the Federal Circuit 45% percent of the time with software patents and 29% of the time with non-software patents.[25] Under Newegg's flawed logic, any unsuccessful claim construction position would be a "failure to follow the law" thus rendering a case exceptional.  In reality, every patent case involves disputes over claim scope and interpretation, and every patent case involves winners and losers on those issues.

---

[25] *See* Miller, Shawn at p. 3.

**1. SUS's construction of "means for creating and modifying…" was reasonable, made in good faith, based upon linked structures in the specification, and supported by a well-reasoned declaration by a qualified expert.**

SUS's construction of "means for creating and modifying a database of a website wherein said website database contains content capable of being indexed by an internet search engine" was the combination of a web server and Common Gateway Interface script, website, and form, and equivalents. A1335-1336; A1574; A1769.   As SUS pointed out during the claim construction proceedings in the District Court,[26] linkage between the "means for creating … a database…" function and structures in the specification is found at the following:

- "The process is begun by distributing a set of search engine update software tools to the web site owner." '683/4:19-20.
- "Installation of the software tools places a number of CGI scripts, database tables, and HTML forms on the server. Each element *performs a specific function* relevant to the process and is outlined below." '683/6:48-49 (emphasis added).
- "The user is provided with an HTML form and CGI script, hereinafter referred to as a CGI program, in order to configure the Enabled and Table of Files fields (See, FIG. 1, Box 100-101). A154, 7:18-22.  *See also* Fig. 1a, boxes 201, 202Ac.
- "The Tables of Files is a field in the Table of Search Engines database. It is initially configured by the user through a CGI program (FIG. 1, Box 200) to list the files the user wishes to be registered with this search engine." A154, 7:29-32.
- "The form allows the user to choose from many methods of building the Table of Files." A154, 7:57–58
- Dependent claims 6 and 13 specifically refer to "creating a table of files, contained in said search engine database, via said script." A158.

---

[26] *See, e.g.,* A1336-1337; A1574-1576; A1769-1774.

As SUS pointed out during claim construction proceedings in the District Court, linkage between the "means for … modifying a database…" function and structures in the specification is found in connection with "means for creating…" *supra* and at the following:[27]

- "The process is begun by distributing a set of search engine update software tools to the web site owner." '683/419-20.
- "Installation of the software tools places a number of CGI scripts, database tables, and HTML forms on the server. Each element *performs a specific function* relevant to the process and is outlined below." '683/6:48-49 (emphasis added).
- "Upon each subsequent execution the software tools inspect the current state of the web site against the content of the database. When altered, removed, or additional content is found, the software tools make the appropriate changes to the database and then notify the search engine of those changes (see FIG. 1, Box206a, 207b c). Changes to the database are made as follows:…" A152 at 4:51-67. *See also* A145, Fig. 1a, 201, 202Ac.

Again, SUS's good faith belief was that one of ordinary skill in the art would understand a CGI script and that it could perform the claimed functions. A1838-1739; A1738-39.  Here and elsewhere with respect to the claim terms at issue, based upon the intrinsic evidence as understood by one of ordinary skill in the art (*i.e.*, SUS's technical expert, Dr. Lavian), SUS had a reasonable and good faith position that it had shown how the specific software products, including a CGI script as

---

[27] In its claim construction submissions, SUS also pointed out, with citations to the specification, that a Table of Functions is not a corresponding structure: the Table of Functions is part of the built database – it does not create or modify the databases. A1574. Further, SUS pointed out, with citations to the specification, that Table of Files fields are configured, not built, and they are acted upon – they do not take action / perform the function of this limitation. A1574-1575.

described in the specification and understood by one of ordinary skill in the art, operate to implement the claimed functions.

Finally, it should be noted that while the District Court did not agree with SUS's construction, it did not fully agree with Newegg's construction of this term either. *Compare* A1851, ln. 11 – A1852, ln. 3, *with* A1775, lns. 1-17.

**2.   This case does not stand out because SUS did not include the tables of the website database as linked structure.   SUS's position was reasonable and made in good faith, and Newegg's recitation of the claim construction hearing is inaccurate, as the District Court recognized.**

Newegg complains that SUS acted exceptionally by advancing a construction of "means for creating and modifying a database of a website…" that did not include a structure comprising a Table of Files within the Table of Search Engines.   The agreed function was "creating and modifying a database of a web site wherein said website database contains content capable of being indexed by an internet search engine." A1335. SUS's proposed construction for this term was "the combination of a web server, Common Gateway Interface script, website database and form and equivalents." *Id.*   SUS's proposed construction was reasonable and reflected SUS's good faith belief that the structure in the specification clearly linked to the agreed function.   In claim construction proceedings,[28] SUS pointed to specific linkages to the function, as follows:

---

[28] *See, e.g.,* A1335.

- "Installation of the software tools places a number of CGI scripts, database tables, and HTML forms on the server. Each element performs a specific function relevant to the process and is outlined below." '683/648-49.
- "The user is provided with an HTML form and CGI script, hereinafter referred to as a CGI program, in order to configure the Enabled and Table of Files fields (See, FIG. 1, Box 100-101). '683/718-22; and
- "The Tables of Files is a field in the Table of Search Engines database. It is initially configured by the user through a CGI program (FIG. 1, Box 200) to list the files the user wishes to be registered with this search engine." '683/7:29-32.

*Id*. Thus, the database is created and modified using the web server, and the CGI script, database, and form on the server.  A1337. As summarized in the specification: "The process is begun by distributing a set of search engine update software tools to the web site owner." '683/4:19-20. Figure 1a, 201, 202Ac are also instructive.  *Id*.

SUS reasonably contended that a Table of Functions was not a corresponding structure because it reasonably believed that the Table of Functions is part of the database built, and it does not create or modify the databases.  There is substantial support for this position in the specification, as follows:

- "The user is provided with an HTML form and CGI script, hereinafter referred to as a CGI program, in order to configure the Enabled and Table of Files fields[.]"'683/7:19–21;
- "The Table of Files . . . is initially configured by the user through a CGI program[.]"'683/7:29–31;
- "The form allows the user to choose from many methods of building the Table of Files." '683/7:57–58.

*Id*.; A1341.

Consequently, SUS reasonably contended that the Table of Files, which is

merely a field in a database (*i.e.*, the Table of Search Engines database) is "configured" or "built" by the user performing the invention. A230, 7:29–31 & 57–58. Further, claims 6 and 13 specify "creating a table of files" in the Table of Search Engines database, while claim 8 does not.  A234. Since Table of Files fields are configured or built – *i.e.*, they are acted upon – they do not perform a function.[29]

Here, it should be noted that not all defendants agreed on these issues, as Newegg's co-defendant Wal-Mart did not include the "Table of Files within the Table of Search Engines" in its construction of "means for creating" either. *See* A654-A657.

Newegg's focus on SUS's counsel's "preferred embodiment" comment is out of context. During the same back and forth with the Court, SUS's counsel clarified that SUS disputed that the Table of Files and the Table of Search Engines was specifically linked to the claimed functions; rather, in SUS's view, the software tools were what create and modify the website database, and they are the structures clearly

---

[29] *See, e.g.,* A1392 ("three ways to populate the Table of Files records"; '683/7:61-62 ("[R]esources are added to the Table of Files."); Fig. 1a, Box 201 ("User selects method to update Table of Files database.");  '683/161-63 (stating that a Table of Files is a "Database table of files indexed on this site and for which changes must be tracked); *Id.* at 7:29-31 ("The Table of Files is a field in the Table of Search Engines database. It is initially configured by the user through a CGI program[.]"); Claim 6, element d "creating a table of files, contained in said search engine database, via said script." '683/15:13-23 & 16:29-39. Claim 6; accord claim 13, limitation d.  Further, the Table of Files contains "data" (*e.g.*, A222 Fig. 1b, Boxes 206a, 207b, 207c ["notified of changed data in Table of Files."])

linked to the creating and modifying of the website. A1670-73, at 73:25-76:13.

Newegg's accusation that SUS "disregarded 35 U.S.C. § 112(6)'s requirement that the claim be construed to cover the structure described in the specification" is incorrect. As noted above, SUS was following the legal requirement for linked structure, it just disputed which structure was linked, including based upon the specification. SUS's factual position was that the Table of Files, which is merely a field in a database (*i.e.*, the Table of Search Engines database) is "configured" or "built" by the user performing the invention. A230, 7:29-31 & 57-58. Further, claims 6 and 13 specify "creating a table of files" in the Table of Search Engines database, while claim 8 does not. Thus, given this indication that Table of Files fields are configured or built – *i.e.*, they are acted upon – SUS took the reasonable, albeit unsuccessful, position that they do not perform a function.

It should also be noted that while the District Court did not agree with SUS's construction, it did not agree with Newegg's construction of this term either. *Compare* A1851, ln. 11-A1852, ln. 3 *with* A1775, lns. 1-17; *See also* A8-A12. Under

The District Court found that "SUS's position that the Table of Files within the Table of Search Engines should not be included as a necessary structure for the "means for creating" claim also did not make this case "exceptional," including because SUS "looked to the specification to support its construction." A21. Here, and elsewhere, with respect to the MPF terms, it should be noted that the District

Court "relying in part on Newegg's expert, [] found that the CGI program was a general tool … and so it was only a "general purpose computer" requiring an algorithm to meet the Section 112(f) requirement." A22. Again, SUS respectfully submits that it is significant that the District Court relied upon a factual issue disputed by the parties' respective experts[30] in determining that a CGI script was insufficient to satisfy 112(f).   On this issue, the District Court ultimately found that "[t]aken together, these facts[31] show that SUS's position that the Table of Files could be excluded because they did not perform a function themselves and instead are performed on by being 'configured' or 'built' was not entirely unreasonable or frivolous." A23.   Similarly, it found that "SUS's position that the Table of Files could be excluded [from the "means for creating" term] was incorrect but was not so frivolous or lacking in support as to make this case one that stands out from others." A25.

Aside from failing to even allege clear error, Newegg has not shown, and

---

[30] *See, e.g.,* Lavian expert declaration at A1615 ("'CGI script' does not merely describe a general purpose computing program, not would a person of ordinary skill in the art consider it to be one in 1999 or any other relevant time period; it serves specific purposes, including passing data between a client, a computer requesting data or processing and a program or script on a server, a computer providing data or processing, as described in the patent at 1:66 – 2:2.").

[31] *See* facts recited on A23-A25, including that another defendant had adopted a position similar to SUS, the patent states that the Table of Files is "configured" or "built" by the user performing the invention, and SUS's litigation counsel had "clarified" an "inartful statement" made at the claim construction hearing.

cannot show, that the District Court's findings on this issue, or any other issues, were

clearly erroneous, or that the District Court abused its discretion.

### 3. SUS's proposed construction of "means for identifying …" was reasonable, made in good faith, based upon linked structures in the specification, and supported by a well-reasoned declaration by a qualified expert.

SUS's proposed construction of "a means for identifying, using said web site

database, new, deleted, or modified content" was the combination of a web server

and Common Gateway Interface script, website database and form, and equivalents.

A1576; A1337; A1792.  As SUS pointed out during claim construction proceedings

in the District Court,[32] linkage between the "means for creating … a database…"

function and structures in the specification is found in the following:

- "The process is begun by distributing a set of search engine update software tools to the web site owner." '683/4:19-20.
- "Installation of the software tools places a number of CGI scripts, database tables, and HTML forms on the server. Each element *performs a specific function* relevant to the process and is outlined below." '683/6:48-49 (emphasis added).
- "The CGI is a means of passing data between a client, a computer requesting data or processing and a program or script on a server, a computer providing data or processing." '683/1:66–2:1-2.
- "Upon each subsequent execution the software tools inspect the current state of the web site against the content of the database. When altered. removed, or additional content is found, the software tools make the appropriate changes to the database and then notify the search engine of these changes (see FIG. 1, Box206a, 207b c). Changes to the database are made as follows:
  A. A resource is marked as deleted if the resource is listed in the current database, but cannot be retrieved.
  B. A resource is marked as modified if the date and time of last

---

[32] *See, e.g.,* A1792-1793.

modification in the current database is earlier than the date and time of last modification provided by the web server for the resource.

C. A resource is added and marked as added if it is present on the web server, hut not yet in the database and the web site manager has opted to add it either manually or automatically." A152, 4:50-67

- "The Table of Files is a list of the above records. The list is built by first obtaining the set of resources the user wishes to maintain and register with a search engine (FIG. 1, Box 201). The user enters the files they wish to monitor into a CGI program and submits the form (FIG. 1, Box 203a-c, Box 204a-c)." A154, 7:53-57.

- "Upon each subsequent execution the software tools inspect the current state of the web site against the content of the database. When altered, removed, or additional content is found, the software tools make the appropriate changes to the database and then notify the search engine of those changes (see FIG. 1, Box206a, 207b c). Changes to the database are made as follows:…" A152, 4:50-67.

- "If the user specifies a map page, this map page is retrieved." '683/7:63-64.

**4. SUS's proposed construction of "means for transmitting …" was reasonable, made in good faith, based upon linked structures in the specification, and was supported by a well-reasoned declaration by a qualified expert.**

SUS's proposed construction of "a means for transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted, or modified database content" was the combination of a web server and CGI program, and equivalents. A1339; A1576; A1799.  As SUS pointed out during claim construction proceedings in the District Court,[33] linkage between the "means for transmitting…" function and structures in the specification is found in the following:

- "The process is begun by distributing a set of search engine update software tools to the web site owner. The first way is to implement the tools on the web server of the site owner. The software can run automatically, having direct

---

[33] *See, e.g.,* A1339-A1340; A1576-1577; A1610-1613; A1799-1780.

access to all resources on the web site… The third way is through the use of client-side tools. The software will run on each client's computer, check the client's web server via internet protocols, and relay the information on the web server to the search engine." A152, 4:19-231.

- "FIG. 1 is a flowchart of the steps to select which search engines will receive updates and which files shall be updated on those search engines. 5:46-48. *See also* boxes 102, 203Ac.

- "Installation of the software tools places a number of CGI scripts, database tables, and HTML forms on the server. Each element *performs a specific function* relevant to the process and is outlined below." '683/7:48-49 (emphasis added).

- "The software tools will notify a specific Internet search engine[.]" Abstract.

- "The software will run on each client's computer, check the client's web server via internet protocols, and relay the information on the web server to the search engine." 152, 4:29-31.

- "The query data is sent to the search engine through a standard interface, including but not limited to the Common Gateway Interface (CGI). The CGI is a means of passing data between a client, a computer requesting data or processing and a program or script on a server, a computer providing data or processing. The combination of form and script is hereinafter referred to as a script application." 1:64 – 2:3. *See also* A152, 4:51-67.

- "An HTML form is provided for the purpose of adding a resource to the search engine index. On submitting the form, a CGI script is invoked." '683/10:42-44.

Further, the CGI script is a means of passing data between the client and the computer providing the data or processing, as described at '683/1:66-2:2, and, as such, it must be capable of transmission of the data from one to the other. "Another aspect of the present invention is to actively transmit said changes to an internet search engine. Another aspect of the present invention is to automatically transmit batches of updates (a list of content that has changed since the last search engine index), in a predetermined manner." '683/5:34-39. With respect to the Figures, 206a

is exemplary of 207b and 207c. In one example, "[i]f the user specifies a map page, this map page is retrieved." The map page and the set of indices it contains is transmitted to the search engine, notifying it of new, deleted or modified database content.

SUS also reasonably relied upon its technical expert, Dr. Lavian, who reviewed and discussed the intrinsic evidence, and opined from the perspective of one of ordinary skill in the art that "[t]hese portions of the specification clearly identif[y] structure linked to the function of transmitting to an internet search engine a set of indices." A1611.

**5. SUS's proposed construction of "means for opening …" was reasonable, made in good faith, based upon linked structures in the specification, and supported by a well-reasoned declaration by a qualified expert.**

SUS's proposed construction of "a means for opening, by a user, a form on a computer to enable or disable internet search engines to be updated with information" was a web browser (which opens a search engine enabled HTML form) running on a web server and equivalents. A1825-1826.  As SUS pointed out during claim construction proceedings in the District Court,[34] linkage between the "means for opening…" function and structures in the specification is found in the following:

- "FIG. l is a flowchart of the steps to select which search engines will receive updates and which files shall be updated on those search engines." A153, 1:47-49.

---

[34] *See, e.g.,* A1340-A1341; A1577-1578; A1826 & 1828-1829.

- "User opens search 'search engine enable HTML form in browser." A145, Fig. 1a, Box100.
- "The form allows the user to choose from many methods of building the Table of Files. These methods include, but are not limited to:…
  - B. The user may specify a map page." '683/7:57-63.

Further, SUS reasonably contended that any program that is used to open the form is the means for opening, with the software tools inherent in the CGI script of a browser being just one example of such a program. In one example, "[t]he form allows the user to choose from many methods of building the Table of Files. These methods include, but are not limited to…[that t]he user may specify a map page." '683/7:57-63. The software must be able to be opened in order for the user to open and edit the form to specify a map page.

**6. SUS's proposed construction of "means for submitting …" was reasonable, made in good faith, based upon linked structures in the specification, and supported by a well-reasoned declaration by a qualified expert.**

SUS's proposed construction of "a means for submitting, by said user, said information to a script" was a form and equivalents. A1344; A1579; A1829.  As SUS pointed out during claim construction proceedings in the District Court,[35] linkage between the "means for submitting…" function and structures is found in the specification.  For example, the patent indicates in multiple places that the form is what is used to submit information to a script, including as follows:

- "The user enters the files they wish to monitor into a CGI program and submits

---

[35] *See, e.g.,* A1344; A1829 & 1832-1833.

the form (FIG 1, Box 203a—c, Box 203Ac). The form allows the user to choose from many methods of building the Table of Files." 7:55-58.

- "<u>Submitting the above form</u> also invokes a CGI script to set the Enabled and 'Register by default' fields of the appropriate search engine record according to the preferences of the user." 8:13-16.
- "An HTML form is provided for the purpose of adding a resource to the search engine index. On <u>submitting the form</u>, a CGI script is invoked." 10:40-43.

### 7. SUS's proposed construction of "means for parsing ..." was reasonable, made in good faith, based upon linked structures in the specification, and supported by a well-reasoned declaration by a qualified expert.

SUS's proposed construction of "a means for parsing, through the use[36] of said script, said information from said form" was agents (programs that can travel over the internet and access remote resources) and their equivalents. A1345; A1834-1835. As SUS pointed out during claim construction proceedings in the District Court,[37] linkage between the "means for parsing…" function and structures is found in the specification, *i.e.*, that agents are disclosed as a means for parsing through information, is found at the following:

- "Agents are programs that can travel over the internet and access remote resources. The internet search engine uses agent programs called Spiders, Robots, or Worms, among other names to inspect the text of resources contained in a resource are called hyperlinks. The agents can follow these hyperlinks to other resources. The process of following hyperlinks to other resources, which are then index, and followed the hyperlinks contained within the new resource, is called spidering."." '683/1:45-56.
- "The data in Mahoney's patent is not being collected, stored or maintained by automated spiders, as it is in the applicant's invention." Amendment

---

[36] *See* Certificate of Correction at A160 ("In column 16, line 1, change "user" to --use--").
[37] *See, e.g.,* A1345-1346; A1608-1610; A1835.

Under 37 C.F.R. § 1.111 dated December 4, 2000. A1369.

- "The user may specify entry points to the web site. If the user specifies entry points, the CGI program will enter the site and spider to all resources references on those entry points, adding those resources to the Tables of Files (FIG. 1, Box 202c, 205c, 207c).
- "If the file exists (FIG. 3, Box 101, the search engine determines whether the configuration of the web site will allow indexing through robots.txt and or ROBOTS Meta Tag (FIG. 3, Box 104)." '683/10:46-49.
- "If the site can be indexed the search engine determines if the resources are registered by the search engine. If the resource is registered, the search engine determines if the resource has changed since it was last indexed (FIG. 3, Box 109)." '683/10:53-56.
- "In a case where the site can be indexed and the resource does not exist in the search engine database, the resource URL is added to a list of URLs the search engine will index. (FIG. 3, Box 108)." '683/10:66-11:2.

Further, SUS submitted the declaration of its expert, Dr. Lavian, which opined from the perspective of one of ordinary skill in the art, based upon the intrinsic evidence, that: "[a]s shown by this intrinsic evidence, it was well known to one of skill in the art that an agent could parse through information for a search engine using a script. One of skill in the art would understand that "means for parsing, though the use of said scripts, said information from said form" are linked to the agents disclosed in the patent." A1610.

**8. SUS's proposed construction of "means for updating …" was reasonable, made in good faith, based upon linked structures in the specification, and supported by a well-reasoned declaration by a qualified expert.**

SUS's proposed construction of "a means for updating, through the use of said script, said database of search engine" was a Common Gateway Interface (CGI) program of the search engine and equivalents. A1346; A1580; A1844-45. As SUS

pointed out during claim construction proceedings in the District Court,[38] linkage

between the "means for updating…" function and structures in the specification is

found in the following:

- "The software tools will notify a specific Internet search engine of the URLs of specific WWW site resources that have been added, changed, or deleted. The Internet search engine will process the list of indices of changes, additions or deletions provided by a web site, or add the URL of resources that require indexing or re-indexing to a database and visit the WWW site to index added or re-index changed content when possible." Abstract.
- "1. The search engine provides a Common Gateway Interface to allow resources to be added to, modified, or deleted from the search engine database. 2. The search engine can update the database index quickly (ideally immediately) in response to additions, modifications.…" 6:4-16.
- "The Process by Which a Search Engine is Updated by a Web Site Using This Process
  There are three ways the process may update a search engine:
  1. It can register a resource in an attempt to have that file added to the search engine database (FIG. 3, Box 104).
  2. It can register a resource in an attempt to update the resource's listing in the search engine database (FIG. 3, Box 105).
  3. It can unregister a resource in an attempt to remove the file from the search engine index (FIG. 3, Box 103).
  In practice, these three activities are usually performed by the same CGI program on current search engines. This CGI program is the 'register file' program and is nm manually by the user of automatically (FIG. 3, Box 100). A1455, 10:26–41.
- Thus, it is clear that the structure that performs the function of updating the search engine is the CGI program of the search engine. Exemplary pseudo code is given at '683/11:9-44.
- "For current internet search engines, the present invention process uses the CGI program(s) provided by the search engines in order to add, modify an [sic] remove files from the search engine index." '683/3:7-10. Figures 3a and 3b, 103, 106, 108 and 110 are also instructive.

---

[38] *See, e.g.,* A1347-1348; A1613-1614; A1845-1846.

SUS also reasonably relied upon its technical expert, Dr. Lavian, who opined that "[t]his passage[39] explicitly states that a Common Gateway Interface may be used to update a search engine database, and who further opined, based upon the cited intrinsic evidence, that "one of ordinary skill in the art at the time of the invention would understand that a CGI script is clearly linked to 'means for updating.'" A1614.

**9. SUS's non-inclusion of the Table of Files within the Table of Search Engines in its proposed construction of "means for creating and modifying a database of a website" was reasonable, non-frivolous, and does not "stand out" from any other claim construction position, unsuccessful or otherwise.**

As set forth in SUS's *Markman* briefing and as pointed out at the *Markman* hearing, the Table of Files, which is merely a field in a database (*i.e.*, the Table of Search Engines database) is "configured' or "built" by the user performing the invention. '683/7:29-31 & 57-58. Further, there is support in the specification (and from SUS's expert) that the "software tools" are what creates and modifies the website database. (*See* cites *supra.*). In addition, claims 6 and 13 specify "creating a table of files" in the Table of Search Engines database, while claim 8 does not. Thus, since Table of Files fields *are configured or built – i.e.*, they are acted upon – SUS took the reasonable, albeit unsuccessful, position that they do not perform a

---

[39] Here. Dr. Lavian was referring to the passage above from '683/6:4-16. A1613-1614.

function.

**10. SUS's proposed construction for "website database" was reasonable and made in good faith. No clear error in the District Court's ruling or abuse of discretion has been shown.**

SUS's proposed construction for "website database" was a "record of resources on the website." A1335-1574; A1572-A1784-1787; A1790-1791. SUS's construction, although rejected in part by the District Court, was reasonable. It was also consistent with the intrinsic evidence. As stated in the Summary of the Invention of the '683 patent:

> Upon initial execution, the software builds a database of the resources on the website. The resources catalogued can be specified by the user, or automatically through spidering function of the software. The database consists of one record per resource indexed on the site.

A152, 4:35-39. SUS's proposed construction reasonably defined database in a way that encompasses what would be understood by one of skill in the art, and makes sense within the context of the specification and claims. In some cases, disputed claim language involves a commonly understood term that is readily apparent to the Court. In such a case, the Court considers that a person of ordinary skill in the art would give the term its widely accepted meaning, unless a specialized definition is stated in the patent specification or was stated by the patentee during prosecution of the patent. *U.S. Ethernet Innovations, LLC v. Acer, Inc.*, 2012 U.S. Dist. LEXIS 17918, 21-22 (N.D. Cal. 2012).

Newegg's real complaint is not that SUS's proposed construction was

baseless; rather, Newegg complains that SUS's proposed construction failed to draw a distinction that the "'website database' is separate from the underlying resources on the website itself." However, no such distinction was necessary for purposes of claim construction. SUS's proposed construction never stated that the "website database" was not separate from the underlying resources, *e.g.*, hyperlinks, on the website itself. SUS did not contend that a website database was not separate from the underlying resources on the website itself. Newegg cannot point to anything in SUS's infringement contentions that makes such a contention. Rather, SUS's infringement contentions make clear that its infringement theory comprised Newegg's XML Sitemaps, (A1877), something clearly distinct from the underlying resources on the website itself.[40] Further, Newegg cannot point to anywhere in SUS's claim construction briefing where it argued that a website database was not separate from the underlying resources on the website itself. In fact, SUS agreed, on the record, during the claim construction hearing that the database would have to be something more than the site itself, as follows:

> The Court: So perhaps the database could be on the website, but wouldn't it have to be separate from? In other words, there has to be something more than just the site itself. Would you agree with that? …
> Ms. Lipski: I would agree with that, your honor.

A1785:19-24. Newegg's allegation that SUS contended to the contrary is meritless.

---

[40] Newegg complains that this is a new point made by SUS on remand, however SUS was responding to new arguments made by Newegg on remand.

The only thing that Newegg can point to is that SUS's counsel, after having clearly agreed *on the record* that the database would have to be something more than the site itself, stated that "I think we'd rather stay with our proposed construction," in lieu of agreeing with Newegg's construction, which was believed to suggest a "separate and distinct" database that was not an included limitation in the claim language and that appeared to preclude the website itself from hosting the database. A16 & A1791. Just because SUS's counsel arguing the *Markman* hearing would "rather stay with [their] proposed construction," does not mean that she "reneged" on SUS's clear agreement that the database would have to be something more than the site itself, including because SUS's construction did not state that a database would not have to be something more than the site itself.

Further, the meaning (including the plain and ordinary meaning) of "website database" to one of ordinary skill in the art in view of the specification was a matter of legitimate dispute between persons having at least ordinary skill in the art. Both sides submitted declarations from experts in the field supporting their proposed constructions. The declaration of SUS's technical expert, Dr. Lavian – whose qualifications were not challenged – was thorough and well-reasoned. A1572-74.

On the "website database issue," the District Court held that that "the court's need to add a clause to SUS's proposed construction to establish that the website and website database were distinct does not mean that the intrinsic record provided no

support for SUS's proposed construction. In particular, SUS's construction relied on language from the Summary of Invention, which states that "[u]pon initial execution, the software builds a database of resources on the website." Further, the District Court's ultimate adoption of a claim construction that incorporated part of SUS's proposed construction also suggests that that SUS's position was not so objectively unreasonable as to be exceptional. And, as SUS notes, Newegg can hardly claim that SUS's proposal of a claim construction that the court did not in its entirety adopt is sufficient to establish exceptionality when the court did not adopt Newegg's proposed construction in its entirely either." A28.

### 11. SUS did not "misrepresent inapplicable case law."

Newegg alleges that SUS "misrepresent[ed] inapplicable case law" because it cited the *Katz* case. *See In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303 (Fed. Cir. 2011). However, *Katz* was cited primarily for general principles of MPF law, *see, e.g.,* A1568, including to focus upon the fact that Newegg bears the burden of proof on invalidity. A1569. Further, both the District Court and Newegg acknowledge that SUS never argued that the "*Katz* exception" is applicable to this case. A16 & App.Br., p. 39. Newegg's speculation that SUS was somehow actually arguing that the *Katz* exception applies, or somehow trying to "confuse" the District Court, is baseless and unfounded. The fact that SUS used similar cites in subsequent briefing is evidence of nothing more nefarious than

drawing from prior briefing, something which Newegg appears to do as well when alleging exceptionality.

Newegg's allegation that SUS cited *Elekta* and *Pavilion* in an attempt to somehow mislead the District Court that the *Katz* exception applied is likewise baseless.  SUS cited *Elekta* and *Pavilion* in a string cite with *TecSec* relative to *TecSec's* proposition that identified software could satisfy 112(f).  A3511.  To be clear, SUS never argued that the *Katz* exception applied, based upon *Elekta*, *Pavilion*, or based upon anything else.  Rather, SUS consistently argued that the structures including software disclosed in the specification combined to form a special purpose computer.[41]

At worst, SUS's citation to cases which Newegg disputes are on point to the real issues in the case would amount to sloppiness or less than stellar lawyering on SUS's part. *See Gaymar,* 2015 WL 3893711 at *6. However, Newegg can point to no misrepresentations or other litigation misconduct by SUS. *See, id.* Newegg's baseless allegations regarding citations to the *Katz* case and other cases do not justify, or even support, an exceptional case finding. *See id.*

---

[41] *See, e.g., A1740 "... THE COMBINATION ... IS A SPECIAL-PURPOSE COMPUTER."; A1742-43; A1765 ("WE ARGUE THAT THIS HAS ALREADY DISCLOSED A SPECIAL-PURPOSE COMPUTER.")*

**E.    SUS's settlements do not make this case stand out, or show it was brought for any improper purpose of obtaining nuisance-value settlements.   This is true alone, or in combination with Newegg's other failed arguments regarding SUS's litigation positions.**

Newegg complains that SUS sued multiple defendants. However, SUS is legally entitled to obtain a reasonable royalty from all infringers of its patent. *See* 35 U.S.C. § 284. When – as here – there are multiple infringers, SUS is entitled to seek just compensation from each of them. *See, e.g., ArrivalStar v. Meitek,* No. 2:12-cv-01225-JVS, Dkt No. 55, p. 8 (C.D. Cal. Nov. 20, 2012). It would certainly be improper if SUS had brought suit against multiple defendants if it lacked a good faith basis to believe they infringed the '683 patent. However, that is not the case and there is no evidence of it being the case. Despite Newegg having the burden of proving an exceptional case by clear and convincing evidence, Newegg has chosen to rely upon rhetoric instead of facts, and it has not proven that SUS lacked a good faith basis to contend infringement against any defendant, much less against Newegg. Newegg has complained about the timing of SUS's settlements, however, the nine settlement agreements cited by Newegg were signed as follows:  one in October 2010, three in November 2010, one in December 2011, two in April 2011, and two in June 2011. *See* A2252-A2348.   This was not immediate, nor does the settlement history of this case evidence an effort to avoid the merits.   In fact, the great majority of defendants were still in the case through *Markman.* Further, even as to settlements reached early in the case, Newegg has failed to explain how such

settlements are *per se* improper, instead resorting to conclusory attorney arguments.

Newegg's complaints about the amounts of SUS's settlements are unfounded. Newegg's only support for this erroneous allegation is its citation to ten of SUS's settlements with other defendants, which average $111,000 and are as high as $450,000. A1912. The undisputed facts are that the amounts of SUS's settlements, as reflected by their varying amounts, were based upon reasonable judgment using available information about the extent of use and relative importance of the patented technology in general and available information about the extent of use and relative importance of the patented technology specifically to each defendant. A2570. *See Uniloc v. Microsoft*, 632 F.3d 1292, 1312–15 (Fed. Cir. 2011). In view of the patented technology, in calculating settlement metrics, SUS took into account factors comprising the URL count, with flexibility given if the accused functionality was less important to the business, including in consideration of feedback from defendants, ALEXA ratings, how many visitors reached the site from search engine searches, and how many visitors are from the United States. *Id.* Newegg's allegations of improper settlement practices by SUS constitute baseless and erroneous speculation which should be given no weight.

This is not the first time that Newegg has made factually unsupported arguments about the motivations behind settlements. *SFA Systems*, 2015 WL 4154110 at *6 ("The problem with Newegg's request that we reverse the District

Court's exceptional case determination on these grounds, however, is its failure to make a record supporting its characterization of SFA's improper motivations."). Newegg attempts to bolster its settlement-related allegations by lumping them together with all of its other arguments, and arguing the totality makes this case stand out. However, the District Court duly considered all of Newegg's arguments, and based upon factual findings for which no clear error has even been alleged or shown, in its discretion the District Court determined the totality of the circumstances did not justify exceptionality. Newegg has shown no abuse of discretion.

## VII.   CONCLUSION

Accordingly, Newegg's appeal should be in all respects denied and the District Court's second denial of Newegg's exceptional case motion should be affirmed.

Dated: July 29, 2015                    Respectfully submitted,

*/s/ John J. Edmonds*
John J. Edmonds
Shea Palavan
Collins, Edmonds, Pogorzelski,
Schlather & Tower, PLLC
1616 South Voss Road, Suite 125
Houston, Texas 77057
Telephone: (281) 501-3425
Facsimile: (832) 415-2535
jedmonds@cepiplaw.com
spalavan@cepiplaw.com

Attorneys for Plaintiff-Appellee
SITE UPDATE SOLUTIONS LLC

## VIII.    CERTIFICATE OF SERVICE

I, John J. Edmonds, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On July 29, 2015, a copy of the foregoing Corrected Brief of Plaintiff-Appellee was filed electronically with the Clerk of the Court using the CM/ECF System, which will serve via electronic mail notice of such filing to all counsel registered as CM/ECF users. Paper copies will also be sent to all opposing counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the electronically filed document, six paper copies will be filed with the Court via courier within the time provided by the Court's rules.

Dated: July 29, 2015                          /s/ *John J. Edmonds*
                                              John J. Edmonds

                                              COLLINS, EDMONDS, POGORZELSKI,
                                              SCHLATHER & TOWER, PLLC

## IX.    CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPE-FACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A), because it contains <u>13,716</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14 Point Times New Roman.

Dated: July 29, 2015                 */s/ John J. Edmonds*
                                       John J. Edmonds

                                       COLLINS, EDMONDS, POGORZELSKI, SCHLATHER & TOWER, PLLC