2014-1527

_____

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

_____

CLEARCORRECT OPERATING, LLC
and CLEARCORRECT PAKISTAN (PRIVATE), LTD.,
*Appellants,*

v.

INTERNATIONAL TRADE COMMISSION
*Appellee,*

and

ALIGN TECHNOLOGY, INC.,
*Intervenor.*

_____

Appeal from the United States International Trade Commission
in Investigation No. 337-TA-833

_____

**BRIEF OF THE MOTION PICTURE ASSOCIATION OF AMERICA
AND THE RECORDING INDUSTRY ASSOCIATION OF AMERICA
AS *AMICI CURIAE* IN SUPPORT OF THE U.S. INTERNATIONAL
TRADE COMMISSION AND AFFIRMANCE**

_____

Tom M. Schaumberg
Jonathan J. Engler
Thomas R. Burns, Jr.
ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.
1133 Connecticut Avenue, N.W., 12th Floor
Washington, DC 20036
Tel:   202.467.6300
Fax:   202.466.2006

*Counsel for Amici Curiae Motion Picture Association of America
and Recording Industry Association of America*

**Form 9**

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

CLEARCORRECT OPERATING, LLC et al v. INTERNATIONAL TRADE COMMISSION et al

No. 2014-1527

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Amicus Curiae Motion Picture Association of America, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Motion Picture Association of America, Inc.

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

_____

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Adduci, Mastriani, & Schaumberg L.L.P.: Tom M. Schaumberg, Jonathan J. Engler, Thomas R. Burns, Jr.

_____

February 25, 2015                              /s/ Jonathan J. Engler
_____                    _____
        Date                                              Signature of counsel

                                                   Jonathan J. Engler
                                               _____
                                                   Printed name of counsel

Please Note: All questions must be answered
cc: All counsel of record _____

**Form 9**

FORM 9.   Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

CLEARCORRECT OPERATING, LLC et al <sub>v.</sub> INTERNATIONAL TRADE COMMISSION et al

No. 2014-1527

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Amicus Curiae Recording Industry Association of America certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Recording Industry Association of America

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Adduci, Mastriani, & Schaumberg L.L.P.: Tom M. Schaumberg, Jonathan J. Engler, Thomas R. Burns, Jr.

February 25, 2015
Date

/s/ Jonathan J. Engler
Signature of counsel

Jonathan J. Engler
Printed name of counsel

Please Note: All questions must be answered

cc: All counsel of record

# **TABLE OF CONTENTS**

I.     STATEMENT OF IDENTITY AND INTEREST ..........................................1

II.    SUMMARY OF ARGUMENT......................................................3

III.   ARGUMENT...............................................................................4

    A.    The Commission, Consistent with Governing Precedent, Properly Construed the Term "Articles" Under Section 337 to Encompass the Importation of Electronic Transmissions ......................................................................5

        1.    The Commission's Construction  of "Articles" to Include Electronic Data Is Entitled to *Chevron* Deference ...................................................................5

        2.    The Commission's Construction Is Consistent with the Statute, Legislative History, and  Holdings by Other Courts and Agencies .......................................................7

    B.    The Commission's Construction of "Articles" Finds Further Support in the Copyright Act, Which Congress and the Courts, Long Before the 1988 Amendments to Section 337, Extended to Electronically Transmitted Works ................................................................................14

IV.    CONCLUSION.............................................................................19

i

# TABLE OF AUTHORITIES

## Cases

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ..........................................................16

*Canton Railroad Co. v. Rogan*,
340 U.S. 511 (1951)..........................................................................9

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984)..........................................................................5

*Corning Glass Works v. Int'l Trade Comm'n*,
799 F.2d 1559 (Fed. Cir. 1986) .........................................................6

*Cunard S.S. Co. v. Mellon*,
262 U.S. 100 (1923)..........................................................................9

*Diamond v. Chakrabarty*,
447 U.S. 303 (1980)........................................................................10

*Enercon GmbH v. Int'l Trade Comm'n*,
151 F.3d 1376 (Fed. Cir. 1998) .........................................................6

*Former Emps. of Computer Scis. Corp. v. U.S. Sec. of Labor*,
414 F. Supp. 2d 1334 (Ct. Int'l Trade 2006)................................ 11, 12

*Former Emps. of Merrill Corp. v. United States*,
483 F. Supp. 2d 1256 (Ct. Int'l Trade 2007)................................ 11, 12

*Lau Ow Bew v. United States*,
144 U.S. 47 (1892)............................................................................9

*Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*,
982 F. Supp. 503 (N.D. Ohio 1997)..................................................17

*Sega Enters. v. MAPHIA*,
948 F. Supp. 923 (N.D. Cal. 1996) ...................................................16

*Sega Enters. v. Sabella*,
No. C93-04260 CW, 1996 WL 780560 (N.D. Cal. Dec. 18, 1996) ....................16

*TianRui Grp. Co. v. Int'l Trade Comm'n*,
661 F.3d 1322 (Fed. Cir. 2011) .........................................................6

*Whitman v. American Trucking Ass'ns*,
531 U.S. 457 (2001)........................................................................18

*Zuber v. Allen*,
  396 U.S. 168 (1969) ...........................................................................10

**Statutes**

19 U.S.C. § 1337(a)(1)(A) ...................................................................7

19 U.S.C. § 1337(a)(1)(B) ...................................................................7

19 U.S.C. § 1337(a)(1)(B)(i) ................................................... 17, 18, 20

28 U.S.C. § 1295 ...............................................................................11

28 U.S.C. § 1581 ...............................................................................11

**Other Authorities**

71 Fed. Reg. 18355-02 (Apr. 11, 2006) ..............................................13

H.R. REP. NO. 100-40 (Apr. 6, 1987) ..................................................18

H.R. REP. NO. 94-1476, 1976 WL 14045 (1976) ..................................16

HQ 114459, 1998 U.S. CUSTOM HQ LEXIS 640 (Sept. 17, 1998) ......13

Pub. L. No. 63-203, § 5, 38 Stat. 717, 719 (1914) ...............................8

Pub. L. No. 67-318, § 316(a), 42 Stat. 858, 943 (1922) ........................8

S. REP. NO. 100-71 (1987) ..............................................................8, 10

S. REP. NO. 67-595 (1922) ..................................................................8

STAFF OF H. COMM. ON THE JUDICIARY, 89TH CONG.,
  SUPPLEMENTARY REPORT OF THE REGISTER OF COPYRIGHTS ON
  THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW:
  1965 REVISION BILL (Comm. Print 1965) ......................................15

**Administrative Decisions**

*Certain Apparatus for the Continuous Prod. of Copper Rod*,
  Inv. No. 337-TA-52, Comm'n Mem. Op., 1979 WL 445781 (Nov. 23, 1979) ...13

*Certain Digital Models, Digital Data, & Treatment Plans for Use
  in Making Incremental Dental Positioning Adjustment Appliances,
  the Appliances Made Therefrom, & Methods of Making the Same*,
  Inv. No. 337-TA-833, Comm'n Op. (Pub. Version) (Apr. 10, 2014) ..................12

*Certain Floppy Disk Drives & Components Thereof*,
  Inv. No. 337-TA-203, Initial Determination,
  1985 WL 303605 (Apr. 26, 1985) .....................................................13

iii

*Certain Hardware Logic Emulation Sys. & Components Thereof*,
Inv. No. 337-TA-383, Comm'n Determination on Remedy, Public
Interest, and Bonding, 1998 WL 307240 (Mar. 1, 1988) ...................................9

*In re Orion Co.*,
71 F.2d 458 (C.C.P.A. 1934) ...............................................................................8

35029-16

## I.    <u>STATEMENT OF IDENTITY AND INTEREST</u>[1]

The Motion Picture Association of America, Inc. (MPAA) is a not-for-profit trade association founded in 1922 to address issues of concern to the U.S. motion picture industry.  Its members include Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Twentieth Century Fox Film Corporation, Universal City Studios LLLP, Walt Disney Studios Motion Pictures, and Warner Bros. Entertainment Inc.  MPAA's members and their affiliates are the leading producers and distributors of filmed entertainment in the theatrical, television, and home entertainment markets.

The Recording Industry Association of America (RIAA) is a nonprofit trade association founded in 1952 to represent the American recording industry.  RIAA's record company members include UMG Recordings, Inc., Sony Music Entertainment, Warner Music Group Corp., and Capitol Records, LLC.  RIAA's members create, manufacture, and/or distribute approximately eighty-five percent of all authorized sound recordings produced and sold in the United States.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), all parties have consented to this brief.  Pursuant to Federal Rule of Appellate Procedure 29(c)(5), counsel for the MPAA and RIAA authored the brief.  No party, counsel for any party, or any person – other than the Amici Curiae, its members, or its counsel – contributed money that was intended to fund preparing or submitting the brief.

1

The motion picture and music industries, like many other IP-intensive industries, have transitioned rapidly to an electronic distribution business that relies on electronic transmissions.  This trend is accelerating in the motion picture and music businesses, both domestically and in the rapidly growing international market.

Just as the industry for legitimate commerce is quickly shifting to electronic distribution models, illegal distributions now largely occur in the same way.  Most infringement losses suffered by U.S. motion picture studios and record companies today come from illegal downloads and illegal streaming.  The same is true for other industries that depend on copyright protection for books, video games, and software.  Copyright protection is essential to the health of the motion picture and music industries and the U.S. economy as a whole.  Infringing transmissions of copyrighted works into the United States are causing and threaten to cause significant further harm to the legitimate U.S. market for motion pictures and music recordings.

In applying Section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337), to electronic transmissions into the United States, the International Trade Commission (ITC) recognized that Section 337 is a powerful mechanism for stopping illegal electronic imports.  By affirming the Commission's interpretation of the phrase "importation . . . of articles" under Section 337 to encompass

electronic transmissions, this Court would give effect to the intent of Congress that Section 337 protect U.S. industries from all manner of unfair acts in international trade.

Thus, the MPAA and RIAA file this Amicus Brief in support of the Commission's interpretation of "articles" to include electronic transmissions. Neither party takes a position on the other issues raised in this appeal.

## II.    <u>SUMMARY OF ARGUMENT</u>

The Commission properly construed the phrase "importation . . . of articles" under Section 337 to encompass electronic transmissions.  The Commission's construction is consistent with the statutory scheme and legislative purpose of the statute, particularly the 1988 Amendments to Section 337.  The proper construction of the term "articles" must take into account the structure of the statute as a whole, Congressional intent in enacting the 1988 amendments to the statute – which was to provide broader protection for federally registered patents, trademarks and copyrights – and the broader body of U.S. intellectual property law into which Section 337 fits.  Were this Court to reverse the Commission's determination that the "importation . . . of articles" for purposes of Section 337 includes electronic transmissions, it could effectively read copyright protection out of Section 337 because electronic transmission is the mode by which most unauthorized copyrighted works are imported into the United States.

3

Congress and the courts, long before Congress enacted the 1988 Amendments to Section 337, clearly and consistently found that electronic transmissions of copyrighted works are protected under the Copyright Act. A construction of the phrase "importation . . . of articles" that could exclude electronically transmitted copyrighted works would frustrate the expanded protection for U.S. industries intended by Congress with the 1988 amendments. Nothing in the statute or legislative history suggests that Congress intended to circumscribe copyright protection under Section 337 to apply only to physical copies of copyrighted works, or to provide protection in a manner that was not technologically neutral. Were this Court to embrace the limited construction argued by the Appellants, copyright protection could effectively be read out of Section 337. This would be contrary to the express intent of Congress that the 1988 Amendments were to expand, not limit, the scope of intellectual property protection available to U.S. industries.

## III.  <u>ARGUMENT</u>

The Commission correctly construed "importation . . . of articles" to include electronic transmissions. First, the Commission's interpretation of the statute is entitled to *Chevron* deference. The agency's construction is supported by the statute itself, its legislative history, Commission precedent applying and interpreting Section 337, and determinations by the Court of International Trade

4

and other federal agencies. Second, the Commission's interpretation is supported by the courts' consistent interpretation of the Copyright Act as reaching electronic copies of protected works.

### A. The Commission, Consistent with Governing Precedent, Properly Construed the Term "Articles" Under Section 337 to Encompass the Importation of Electronic Transmissions

#### 1. The Commission's Construction of "Articles" to Include Electronic Data Is Entitled to *Chevron* Deference

The Commission has no choice but to exercise interpretative judgment in construing the term "articles" because it is undefined in Section 337. In *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, the Supreme Court set out a two-step analysis for reviewing an "agency's construction of the statute which it administers." 467 U.S. 837, 842 (1984). First, a court must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-843. Where, however, Congress's construction of a statutory term is not defined, as is the case here, the court must then determine "whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843.

It is the responsibility of the Commission, as the agency charged with interpreting and enforcing the Tariff Act, to resolve questions such as the scope of

the term "articles" so as to give effect to Congressional intent.  *See Corning Glass Works v. Int'l Trade Comm'n*, 799 F.2d 1559, 1565 (Fed. Cir. 1986) (recognizing that it is "particularly within the province and expertise of the Commission to define" the terms of the Tariff Act); *see also*, *e.g.*, *TianRui Grp. Co. v. Int'l Trade Comm'n*, 661 F.3d 1322, 1332 (Fed. Cir. 2011)  ("We have held that the Commission's reasonable interpretations of section 337 are entitled to deference."); *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1381 (Fed. Cir. 1998) (stressing that the Commission is "the agency charged with the administration of section 337").

Given that the Tariff Act does not define the term "articles," the only question for this Court is whether the Commission has reasonably construed that term.  *See Corning Glass Works*, 799 F.2d at 1565 (emphasizing that the Court's function in reviewing the Commission's interpretation of the Tariff Act is only "to decide whether the Commission's definitions or standards are reasonable in light of the language, policies and legislative history of the statute").  The Commission's construction of that term here to encompass electronic transmissions is reasonable, consistent with the text, history, and policies of the Tariff Act, and entitled to deference.

**2.    The Commission's Construction Is Consistent
        with the Statute, Legislative History, and
        Holdings by Other Courts and Agencies**

The Commission's construction of the phrase "importation . . . of articles" to include electronic transmissions – thereby giving the agency authority to adjudicate cases involving the importation of electronic goods – finds support in: (a) the text, structure, and legislative history of the Tariff Act as a whole – including Section 337 (19 U.S.C. § 1337), the Trade Adjustment Assistance provisions of the Trade Act of 1974 (the "Trade Act"), 19 U.S.C. § 2271 *et seq.* (administered by the DOL), and the Copyright Act; (b) governing Supreme Court and U.S. Court of International Trade (CIT) precedent; and (c) determinations by numerous federal trade agencies.

Section 337 of the Tariff Act of 1930 prohibits, in relevant part, "[u]nfair methods of competition and unfair acts in the importation of articles . . . or in the sale of such articles by the owner, importer, or consignee, the threat or effect of which is to injure an industry in the United States" and "[t]he importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles" that infringe statutory intellectual property rights.  19 U.S.C. §§ 1337(a)(1)(A); (a)(1)(B).

The legislative history of Section 337 demonstrates that Congress intended the Commission to have broad jurisdiction over unfair acts in international trade.

7

There is no evidence that Congress intended to limit the scope of the statute to particular forms of merchandise or modes of importation, or to allow the statute to discriminate among technologies. Congress first enacted a prohibition against "unfair methods of competition" in the Federal Trade Commission Act of 1914. Pub. L. No. 63-203, § 5, 38 Stat. 717, 719 (1914) (now codified, as amended, at 15 U.S.C. §§ 41-58 (2010)). Congress then incorporated the same language into Section 337's predecessor, Section 316 of the Tariff Act of 1922. Pub. L. No. 67-318, § 316(a), 42 Stat. 858, 943 (1922). The Senate report on the 1922 Act explained that "[t]he provision relating to unfair methods of competition in the importation of goods is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any antidumping statute the country has ever had." S. REP. NO. 67-595, pt. 1, at 3 (1922); *see In re Orion Co.*, 71 F.2d 458, 467 (C.C.P.A. 1934).

The Commission's broad discretion to define and remedy "unfair methods of competition" in the importation of goods carried forward unchanged into the Tariff Act of 1930, as amended. In 1988, Congress again amended the statute "to strengthen the effectiveness of Section 337 in addressing the growing problems being faced by U.S. companies from the importation of articles which infringe U.S. intellectual property rights." S. REP. NO. 100-71, at 128 (1987); *see, e.g.*, *Certain Hardware Logic Emulation Sys. & Components Thereof*, Inv. No. 337-TA-383,

Comm'n Determination on Remedy, Public Interest, and Bonding, 1998 WL 307240, at *3 (Mar. 1, 1988).

The Commission's construction of the term "importation" to encompass the transmission of electronic articles is on all fours with clear Supreme Court precedent that the term "importation" is to be construed broadly and in a technologically neutral manner.  As the Supreme Court explained almost a century ago, "[i]f there be an actual bringing in it is importation regardless of the mode in which it is effected." *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122 (1923); *see Canton Railroad Co. v. Rogan*, 340 U.S. 511, 515 (1951) ("to import means to bring into the country").  The primary inquiry, in accordance with *Cunard* and *Canton,* is whether there has been a "bringing in," not the particular mode or form of that importation or form of the article.

That Section 337 does not contain an express definition of the term "article" does not mean that the Court is required to adopt an artificial, narrow construction that ignores the realities of the marketplace.  The Supreme Court has consistently held that general terms such as "articles" or "importation" should "receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion." *Lau Ow Bew v. United States*, 144 U.S. 47, 59 (1892).

9

Here, legislative silence as to the definition of "article" cannot reasonably be read as intent to exclude electronic importation from the scope of Section 337.  *See Zuber v. Allen*, 396 U.S. 168, 185 (1969) ("Legislative silence is a poor beacon to follow in discerning the proper statutory route.").  This is particularly so given clear legislative history to the contrary:  "as indicated by the scope of its language, section 337 was designed to cover a broad range of unfair acts."  S. REP. NO. 100-71 at 130.  Whether or not Congress in 1930 or 1988 specifically contemplated that electronic transmission would become a dominant mode of importation – and it is clear that Congress was well aware and believed by 1988 that the Copyright Act reached electronic copies of protected works, *see* Section III.B, *infra* – the technological state of affairs at the time the statute was drafted does not lock in historical amber the meaning of a general term such as "articles."  It is well established that "a statute is not to be confined to the 'particular application[s] . . . contemplated by the legislators.'"  *Diamond v. Chakrabarty*, 447 U.S. 303, 315-316 (1980) (quoting *Barr v. United States*, 324 U.S. 83, 90 (1945) (alterations in original).

The courts, accordingly, have consistently construed the term "article" as used in the Tariff Act to encompass the importation of electronic transmissions. The Tariff Act of 1930 includes *inter alia*, 19 U.S.C. § 1337, 19 U.S.C. § 1202,

which is the Harmonized Tariff Schedule of the United States (HTSUS),[2] and 19 U.S.C. § 2271 *et seq.*, which relate to trade adjustment assistance (TAA) to workers whose jobs were lost by reason of the importation of competing "articles." The CIT has affirmed that electronic transmissions can constitute imported "articles" for purposes of the TAA:

> The Trade Act does not define the term articles within the statutory language, and specifically absent is a tangibility requirement. *See* 19 U.S.C. §§ 2101-2495 (2000). . . .
>
> . . . .
>
> . . . General Note 3(e) [of 2004 HTSUS] supports the conclusion that telecommunications transmissions, which would include transmissions of software code via the Internet, are exempt from duty while acknowledging that they are goods entering into the customs boundaries of the United States. *See* General Note 3(e), HTSUS. The mode of importation, via tangible compact discs versus the Internet, is not the material analysis.

*Former Emps. of Computer Scis. Corp. v. U.S. Sec. of Labor*, 414 F. Supp. 2d 1334, 1340-41 (Ct. Int'l Trade 2006) (citing *Cunard*, 262 U.S. at 122); *see Former Emps. of Merrill Corp. v. United States*, 483 F. Supp. 2d 1256, 1267-68 (Ct. Int'l Trade 2007). The CIT, rejecting an effort by the Department of Labor to restrict

---

[2] U.S. Customs and Border Protection (CBP) is responsible for interpreting and administering the HTSUS, and its determinations are reviewed by the CIT and the Federal Circuit. *See* 28 U.S.C. §§ 1295, 1581.

11

trade assistance where the imported goods at issue were in electronic form, explained:

> The distinction between tangible and intangible articles is contrary to the purpose of the Trade Act, which is to provide assistance to workers who are displaced from their jobs due to increases in "imports of *articles* like or directly competitive with articles produced by" the displaced workers or due to a shift of production outside the United States. 19 U.S.C. § 2272(a) (emphasis added). [The] distinction between tangible and intangible articles is "inconsistent with . . . statutory mandate [and] . . . frustrate[s] congressional policy underlying [the] statute."

*Former Emps. of Merrill Corp.*, 483 F. Supp. 2d at 1267-68 (quoting *SEC v. Sloan*, 436 U.S. 103, 118 (1978)) (alterations in original); *see Former Emps. of Computer Scis. Corp.*, 414 F. Supp. 2d at 1340-41 (telecommunications transmission [including] transmissions of software code . . . "are goods entering . . . the United States").[3]

---

[3] In the underlying opinion in this case, the Commission briefly addressed the CIT's interpretation of "articles" in *Former Employees of Merrill Corp.* and *Former Employees of Sciences Corp. See Certain Digital Models, Digital Data, & Treatment Plans for Use in Making Incremental Dental Positioning Adjustment Appliances, the Appliances Made Therefrom, & Methods of Making the Same*, Inv. No. 337-TA-833, Comm'n Op. (Pub. Version) at 51, n.28 (Apr. 10, 2014). The Commission noted, "for completeness," an earlier CIT decision and this Court's affirmance, denying benefits on the basis that the employer in question did not produce an article. *Id.* (citing *Woodrum v. United States*, 737 F.2d 1575 (Fed. Cir. 1984) affirming on the basis of the CIT opinion, *Woodrum v. Donovan*, 564 F. Supp. 826 (Ct. Int'l Trade 1983)). The more recent CIT decisions in *Former Employees of Merrill Corp.* and *Former Employees of Sciences Corp.* made clear, however, that the term "article" does extend to electronic transmissions, and that

*Continued . . .*

12

CBP has also consistently found "that the transmission of software modules and products to the United States from a foreign country via the Internet is an importation of merchandise . . . ."  HQ 114459, 1998 U.S. CUSTOM HQ LEXIS 640 (Sept. 17, 1998).  Similarly, the DOL has determined that "[s]oftware and similar intangible goods . . . will now be considered to be articles regardless of their method of transfer."  71 Fed. Reg. 18355-02, 18356 (Apr. 11, 2006).

The CIT's approach is consistent with the Commission's longstanding practice of taking into account the "realities of the marketplace" when construing undefined terms in Section 337.  *See, e.g.*, *Certain Apparatus for the Continuous Prod. of Copper Rod*, Inv. No. 337-TA-52, Comm'n Mem. Op., 1979 WL 445781, at *25-26, 28 (Nov. 23, 1979) (rejecting a narrow definition of "domestic industry" based on intellectual property and instead looking to the "realities of the marketplace"); *see also Certain Floppy Disk Drives & Components Thereof*, Inv. No. 337-TA-203, Initial Determination, 1985 WL 303605, at *22 (Apr. 26, 1985) ("The Commission does not adhere to any rigid formula in determining the scope of the domestic industry as it is not precisely defined in the statute, but will examine each case in light of the realities of the marketplace.").

---

*. . . continued*

the distinction between tangible and intangible articles is contrary to the purpose of the Trade Act.

13

As previously mentioned, the reality of the marketplace, particularly in the motion picture and music industries, is that the electronic transmission of copyrighted electronic works has become the predominant form of distribution. Most infringement losses to U.S. motion picture studios and record companies today come from illegal transmissions, accounting for the biggest threat to the motion picture, television, and music industries.  The same is true for other industries that depend on copyright protection for books, video games, and software.

The Commission's construction of the "importation . . . of articles" to include electronic transmissions of protected goods therefore finds support in the Commission's practice, legislative history, and CIT precedent, and is entitled to *Chevron* deference.  It would be anomalous and inconsistent with the realities of the marketplace and Congressional intent for the Court to find that the Commission lacks authority to hear cases involving the importation of infringing, electronically-transmitted articles.

### B.    The Commission's Construction of "Articles" Finds Further Support in the Copyright Act, Which Congress and the Courts, Long Before the 1988 Amendments to Section 337, Extended to Electronically Transmitted Works

The extension of federal copyright protection to electronic copies and transmissions of protected works reaches back at least fifty years.  In its 1965 report to Congress, proposing revisions to the Copyright Act that were eventually

14

incorporated into the 1976 Copyright Act, the Register of Copyrights noted that "linked computers, and other new media of communication" could be used to transmit and exhibit unauthorized copies of infringing works. STAFF OF H. COMM. ON THE JUDICIARY, 89TH CONG., SUPPLEMENTARY REPORT OF THE REGISTER OF COPYRIGHTS ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW: 1965 REVISION BILL, pt. 6, at 14 (Comm. Print 1965).

> [I]t is becoming increasingly apparent that the transmission of works by nonprofit broadcasting, linked computers, and other new media of communication, may soon be among the most important means of disseminating them, and will be capable of reaching vast audiences. . . .
>
> . . . .
>
> . . . It seems clear, for example, that the actual copying of entire works (or substantial portions of them) for "input" or storage in a computer would constitute a "reproduction" under clause (1), whatever form the "copies" take: punchcards, punched or magnetic tape, **electronic storage units**, etc. Similarly, at the "output" end of the process, the "retrieval" or "print-out" of an entire work (or a substantial part of it) in tangible copies would also come under copyright control.

*Id.* at 14, 18 (emphasis added).

In the legislative history to the 1976 Copyright Act, accordingly, Congress explicitly stated its unambiguous intent that federal copyright protection extend to electronic transmissions of protected works:

> The corresponding definition of "display" covers any showing of a "copy" of the work, "either directly or by

15

> means of a film, slide, television image, or any other device or process." . . . In addition to the direction showings of a copy of a work, "display" would include the projection of an image on a screen or other surface by any method, **the transmission of an image by electronic or other means . . . .**

H.R. REP. NO. 94-1476, 1976 WL 14045, at *64 (1976) (emphasis added); *see id.* at *80 ("Unless [excused under some other provision of the Copyright Act] . . . transmission of an image to the public over television or other communication channels, would be an infringement for the same reasons that reproduction in copies would be.").

The courts, in interpreting the Copyright Act of 1976, have, accordingly, consistently recognized that federal copyright protection extends to electronic copies of protected works. *See, e.g.*, *Sega Enters. v. MAPHIA*, 948 F. Supp. 923, 931-33 (N.D. Cal. 1996) (holding that uploading and downloading a copyrighted computer game to a computer bulletin board constituted the making of copies of the work); *Sega Enters. v. Sabell*a, No. C93-04260 CW, 1996 WL 780560, at *6, 8 (N.D. Cal. Dec. 18, 1996) ("[C]opies were made when the Sega game files were uploaded to or downloaded from '[the defendant's] BBS" and the making of those copies constituted "direct copyright infringement by [the defendant's] BBS users."); *see also A&M Records, Inc. v. Napster, Inc*., 239 F.3d 1004, 1014 (9th Cir. 2001) ("Napster users infringe at least two of the copyright holders' exclusive rights . . . . Napster users who upload file names to the search index for others to

16

copy violate plaintiffs' distribution rights. Napster users who download files containing copyrighted music violate plaintiffs' reproduction rights."); *Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 513 (N.D. Ohio 1997) ("Distributing unlawful copies of a copyrighted work violates the copyright owner's distribution right and, as a result, constitutes copyright infringement."); *id.* at 505, 513 (Unlawful distribution occurs where "[f]iles of [copyrighted] information are stored in the central system, and subscribers may either 'download' information into their [computers], or 'upload' information from their [computers] into the central files.").

It is therefore clear that Congress, by the time it amended Section 337 in 1988, understood and intended federal copyright law to extend to electronic transmissions of copyrighted works. There is no question, moreover, that the Copyright Act today reaches electronic transmissions and that Section 337 makes unlawful the importation of unauthorized copies of works protected by an "enforceable United States copyright registered under title 17." 19 U.S.C. § 1337(a)(1)(B)(i). The Commission's construction of the phrase "importation . . . of articles" to include electronic transmissions finds strong support in the Copyright Act. By the time Congress enacted the 1988 amendments to Section 337 "to make it a more effective remedy for the protection of U.S. intellectual property rights; and to provide for the development of an overall strategy to ensure

17

adequate and effective international protection for U.S. persons that rely on protection of intellectual property rights," it was well-established that federal copyright protection extended to the electronic transmission of protected works. H.R. REP. NO. 100-40, pt. 1, at 154 (Apr. 6, 1987). It cannot be that Congress sought to enhance the protection of intellectual property rights under Section 337 by taking away the Commission's authority to address copyright infringement in the then already common circumstance of electronically copied works. Congress does not, as the Supreme Court has observed, "hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). There is no evidence that Congress intended a more restrictive copyright protection under Section 337 than in U.S. district court. Instead, Congress intended *expanded* protection for U.S. industries facing imports that infringe a "valid and enforceable United States copyright registered under title 17" by removing the requirement that the U.S. industry be injured to obtain relief under Section 337. 19 U.S.C. § 1337(a)(1)(B)(i).[4]

In short, it would be anomalous if the scope of U.S. copyright law as enforced by the Commission in the context of illegal importation and sale of

---

[4] In their respective *amici* briefs, the Business Software Alliance and the Public Knowledge/Electronic Frontier Foundation make much of the silence of the original Tariff Act of 1930 with respect to electronic transmissions. Both briefs ignore, however, the 1988 amendments to the Tariff Act.

18

electronic copies of protected works were interpreted more narrowly than in the domestic context. If Congress had intended to limit the scope of Section 337 to create an exception to the copyright law, putting imports of copyrighted electronic works beyond the reach of the ITC, it knew how to do so. Instead, Section 337 provides, without reservation, that the copyright protections set forth under Title 17 are enforceable at the border by the ITC.

## IV.    <u>CONCLUSION</u>

Section 337 of the Tariff Act, as amended, was intended by Congress to give the Commission the flexibility to remedy all manner of unfair acts in international trade. The plain language of the statute, the 1988 amendments to the Tariff Act, the legislative history and subsequent governing precedent consistently show an appreciation that for the Commission to fulfill its statutory role, it must have discretion to interpret the statute – particularly undefined terms such as "article" – to reflect the evolving realities of the marketplace. The rigid, formalistic analytical framework proposed by the Appellants and *Amici*, whereby the term "article" must be construed based on the state of technology in 1930, is inconsistent with the remedial purpose of Section 337. It is clear that by 1988, when the amendments to Section 337 were enacted to expand protections for U.S. industries from unfair trade in copyrighted works, Congress intended copyright protection to extend to electronic copies. The artificially narrow construction of the term "articles"

19

offered by the Appellants and *Amici,* could, if subsequently applied to copyrighted articles, effectively write the 1988 copyright protection provisions out of Section 337.  This cannot be reconciled with the express intent of Congress that the ITC have authority to reach any imported goods, whatever their form, that infringe an "enforceable United States copyright registered under title 17."   19 U.S.C. § 1337(a)(1)(B)(i).   For these reasons, the Court should affirm the ITC's construction that "importation . . . of articles" covers electronic transmissions.

Dated:  February 25, 2015

*/s/ Jonathan J. Engler*
Tom M. Schaumberg
Jonathan J. Engler
Thomas R. Burns, Jr.
ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.
1133 Connecticut Avenue, N.W., 12th Floor
Washington, DC 20036
Tel:   202.467.6300
Fax:   202.466.2006

*Counsel for Amici Curiae Motion Picture Association of America and Recording Industry Association of America*

20

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **BRIEF OF THE MOTION PICTURE ASSOCIATION OF AMERICA AND THE RECORDING INDUSTRY ASSOCIATION OF AMERICA AS *AMICI CURIAE* IN SUPPORT OF THE U.S. INTERNATIONAL TRADE COMMISSION AND AFFIRMANCE** was served to the parties, in the manner indicated below, this 25th day of February, 2015**:**

**COUNSEL FOR APPELLANT CLEARCORRECT OPERATING, LLC AND CLEARCORRECT PAKISTAN (PRIVATE), LTD.**

| | | |
|---|---|---|
| Michael D. Myers | ☒ | **CM/ECF DELIVERY** |
| Robert Henry Espey, II | | |
| MCCLANAHAN MYERS ESPEY, LLP | ☐ | **VIA FIRST CLASS MAIL** |
| 3355 West Alabama. Suite 210 | | |
| Houston, TX 77098 | | |

| | | |
|---|---|---|
| Gary Hnath | ☒ | **CM/ECF DELIVERY** |
| Paul Whitfield Hughes | | |
| MAYER BROWN LLP | ☐ | **VIA FIRST CLASS MAIL** |
| 1999 K Street, NW | | |
| Washington, DC 20006 | | |

**COUNSEL FOR APPELLEE INTERNATIONAL TRADE COMMISSION**

| | | |
|---|---|---|
| Sidney A. Rosenzweig | ☒ | **CM/ECF DELIVERY** |
| Assistant General Counsel | | |
| Wayne W. Herrington | ☐ | **VIA FIRST CLASS MAIL** |
| INTERNATIONAL TRADE COMMISSION | | |
| Suite 707 | | |
| 500 E Street, SW | | |
| Washington, DC 20436 | | |

**COUNSEL FOR INTERVENOR ALIGN TECHNOLOGY, INC.**

Stephen Blake Kinnaird
Igor Victor Timofeyev
PAUL HASTINGS LLP
875 15th Street, NW
Washington, DC 20005

☒ **CM/ECF DELIVERY**

☐ **VIA FIRST CLASS MAIL**


Thomas A. Counts
PAUL HASTINGS LLP
24th Floor
55 Second Street
San Francisco, CA 94105

☒ **CM/ECF DELIVERY**

☐ **VIA FIRST CLASS MAIL**


**COUNSEL FOR AMICUS CURIAE**
**ELECTRONIC FRONTIER FOUNDATION; AND PUBLIC KNOWLEDGE**

Charles Duan
PUBLIC KNOWLEDGE
1818 N Street, NW. Suite 410
Washington, DC 20036

☒ **CM/ECF DELIVERY**

☐ **VIA FIRST CLASS MAIL**


**COUNSEL FOR AMICUS CURIAE THE INTERNET ASSOCIATION**

John Thorne
Aaron M. Panner
Matthew A. Seligman
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, PLLC
Sumner Square
1615 M Street, NW
Washington, DC 20036

☒ **CM/ECF DELIVERY**

☐ **VIA FIRST CLASS MAIL**

**COUNSEL FOR AMICUS CURIAE BUSINESS SOFTWARE ALLIANCE**

Jeffrey A. Lamken                    ⊠    **CM/ECF DELIVERY**
MOLOLAMKEN LLP
600 New Hampshire Avenue, NW         ☐    **VIA FIRST CLASS MAIL**
Washington, DC 20037

*/s/ Jonathan J. Engler*
ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.

3

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel for the Motion Picture Association of America and the Recording Industry Association of America, hereby certifies that, in compliance with Fed. R. App. P. 29(d) and Fed. R. App. P. 32(a)(7)(B)-(C), the attached **BRIEF OF THE MOTION PICTURE ASSOCIATION OF AMERICA AND THE RECORDING INDUSTRY ASSOCIATION OF AMERICA AS *AMICI CURIAE* IN SUPPORT OF THE U.S. INTERNATIONAL TRADE COMMISSION AND AFFIRMANCE** is proportionally spaced, has a typeface of 14 point Times New Roman, was prepared using Microsoft Word, and contains 4,533 words.

Dated:  February 25, 2015          */s/ Jonathan J. Engler*

                              Jonathan J. Engler