2014-1527

————————

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

————————

CLEARCORRECT OPERATING, LLC
and CLEARCORRECT PAKISTAN (PRIVATE), LTD.,
*Appellants,*
v.

INTERNATIONAL TRADE COMMISSION
*Appellee,*
and

ALIGN TECHNOLOGY, INC.,
*Intervenor.*

————————

Appeal from the United States International Trade Commission
in Investigation No. 337-TA-833

————————

**BRIEF OF THE ASSOCIATION OF AMERICAN PUBLISHERS
AS *AMICUS CURIAE* IN SUPPORT OF THE U.S. INTERNATIONAL
TRADE COMMISSION AND AFFIRMANCE**

————————

Steven J. Metalitz
MITCHELL SILBERBERG & KNUPP LLP
1818 N Street, N.W., 8th Floor
Washington, DC 20036
Tel:   202.355.7902

*Counsel for Amicus Curiae
Association of American Publishers*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for *amicus curiae* certifies the following:

1. The full name of every party or *amicus* represented by me is: Association of American Publishers.

2. The name of the real party in interest represented by me is:
   Not Applicable.

3. All parent corporations and any publicly held companies that own 10% or more of the stock of the party or *amicus curiae* represented by me are:
   None.

4. The names of all law firms and the partners or associates that appeared for the party or *amicus curiae* now represented by me in the trial court or agency or are expected to appear in this Court are:

Steven J. Metalitz
MITCHELL SILBERBERG & KNUPP LLP
1818 N Street, N.W., 8th Floor
Washington, D.C. 20036
(202) 355-7902
(Amicus was represented at the agency level by in-house counsel.)

Dated: February, 25, 2015                /s/ Steven J. Metalitz
                                         Steven J. Metalitz
                                         MITCHELL SILBERBERG & KNUPP LLP
                                         1818 N Street, N.W., 8th Floor
                                         Washington, DC 20036
                                         Tel:    202.355.7902

                                         *Counsel for Amicus Curiae*
                                         *Association of American Publishers*

i

# **TABLE OF CONTENTS**

**Page**

STATEMENT OF IDENTITY AND INTEREST ....................................................1

SUMMARY OF ARGUMENT ............................................................................3

ARGUMENT .....................................................................................................6

I.    THE COMMISSION CORRECTLY CONSTRUED THE
      PHRASE "IMPORTATION…OF ARTICLES" UNDER
      SECTION 1337(a)(1)(B). .................................................................6

      A.    The Commission's construction of "importation…of articles" is
      confined to digital data that infringes U.S. patents and copyrights of existing
      or developing U.S. industries, not all "intangible, digital information." ........6

      B.    The Commission's construction of "importation…of articles" is
      consistent with the statute, legislative history, and holdings by other courts. 8

      C.    Since digital data is considered an article when embodied in a
      physical object, changing the "mode" of importing this data does not change
      its status as an article. ...................................................................13

II.   THE COMMISSION'S CONSTRUCTION OF
      "IMPORTATION…OF ARTICLES" IS NECESSARY TO
      REMAIN CONSISTENT WITH THE COPYRIGHT ACT'S
      APPLICATION TO DIGITAL FORMATS OF
      COPYRIGHTED WORKS...............................................................14

      A.    The Copyright Act protects works in digital format, therefore articles
      that infringe copyrights must include such digital formats. ..........................14

      B.    Congress expressly limited the Commission's jurisdiction, but these
      limits do not confine the Commission's jurisdiction to physical goods. ......16

III.  ELECTRONIC TRANSMISSION OF DIGITAL DATA THAT
      INFRINGES U.S. COPYRIGHTS UNDERMINES U.S.
      COPYRIGHT INDUSTRIES AND IS THE TYPE OF
      UNFAIR TRADE PRACTICE THAT CONGRESS INTENDS
      THE COMMISSION TO GUARD AGAINST...........................................18

# TABLE OF CONTENTS
## (continued)

Page

IV.  THE COMMISSION HAS BROAD AUTHORITY TO ISSUE
CEASE AND DESIST ORDERS "IN LIEU OF"—INSTEAD
OF—EXCLUSION ORDERS....................................................................20

A.  Cease and Desist Orders provide an alternative remedy where an
exclusion order may be inappropriate. ..........................................................20

B.  Cease and Desist Orders are an appropriate tool to inhibit electronic
transmissions of digital data. .........................................................................23

CONCLUSION ........................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Cunard S.S. Co. v. Mellon*,
 262 U.S. 100 (1923)................................................................4, 14

*Diamond v. Chakrabarty*,
 447 U.S. 303 (1980)...................................................................10

*Fortnightly Corp. v. United Artists Television, Inc.*,
 392 U.S. 390 (1968)...................................................................12

*In re Von Clemm*,
 229 F.2d 441 (CCPA 1955) .......................................................10

*New York Times Co. v. Tasini*,
 533 U.S. 483 (2001)...................................................................16

*Reno v. Condon*,
 528 U.S. 141 (2000)...................................................................14

*Textron, Inc. v. ITC*,
 753 F.2d 1019 (Fed. Cir. 1985) .................................................23

*Viscofan, S.A. v. ITC*,
 787 F.2d 544 (Fed. Cir. 1986) ...................................................22

## STATUTES

17 U.S.C.
  § 102(a) .....................................................................................15
  § 512..........................................................................................20

19 U.S.C.
  § 1337..........................................................................................7
  § 1337(a)(1) ...............................................................................20
  § 1337(a)(1)(B)...................................................................5, 6, 24
  § 1337(a)(2)-(3) ...........................................................................6
  § 1337(f)(1)...........................................................................22, 23

Tariff Act, Pub. L. No. 100-418, § 1341(b) (1988) .................................11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

### OTHER AUTHORITIES

Association of American Publishers, Book Industry Study Group, *BookStats Volume 3* (May 15, 2013) ................................................................18

Dotan Oliar, *et al.*, *Copyright Registrations: Who, What, When, Where, and Why*, 92 TEXAS L. REV. 2211, 2241 (2014) ...................................17

David Price, *Sizing the Piracy Universe* (Sept. 2013)................................................2

*Digital Trade in the U.S. and Global Economies*, Part I, Inv. No. 332-531, USITC Pub. 4415 (July 2013) ...............................................................9, 13

Eric J. Schwartz, *United States,* in INTERNATIONAL COPYRIGHT LAW AND PRACTICE § 2 [1][a] (Lionel Bently ed., Lexis Nexis 2015).......................15

Fed. Rule App. Proc.
    § 29(c)(5) .............................................................................................................1
    § 32(a)(5) ...........................................................................................................26
    § 32(a)(6) ...........................................................................................................26
    § 32(a)(7)(B)(iii) ................................................................................................26
    § 32(a)(7)(C) ......................................................................................................26
    § Rule 32(b) .......................................................................................................26

H.R. REP. NO. 100-40, pt. 1 (Apr. 6, 1987) ...........................................................11

*Merriam-Webster's Collegiate Dictionary*, 11th ed. (2003) ...................................22

*The Rise of Innovative Business Models: Content Delivery Methods in the Digital Age: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (Nov. 26, 2013) (Post-hearing Statement of the AAP) .......................................................................................................2, 18

*Section 512 of Title 17*, *Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. ("Elsevier Testimony") (Mar. 13, 2013) ..........18, 19, 20

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Section 512 of Title 17*, *Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (Mar. 28, 2013) ............................................................19

Sen. Ron Wyden, *OPEN Act, Frequently Asked Questions* ....................................24

United States-South Korea Free Trade Agreement (2007).......................................9

U.S. COPYRIGHT OFFICE, CIRCULAR 1: COPYRIGHT BASICS 3 (May 2012) ...........................................................................................................16, 17

U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT PRACTICES §305 (3d ed. 2014) ...............................................................................................15

U.S. COPYRIGHT OFFICE, DMCA SECTION 104 REPORT 82 (AUG. 29, 2001) ...................................................................................................................19

# STATEMENT OF IDENTITY AND INTEREST[1]

The Association of American Publishers ("AAP") is the largest national

trade organization of U.S. book and journal publishers, representing over 400

members, ranging from major commercial book and journal publishers to small

non-profit, university, and scholarly presses.  AAP seeks to promote the effective

and efficient protection of copyright to enable publishers and our technology

partners to create and disseminate literary, scholarly, and educational works in new

and convenient formats for consumers around the world to enjoy.  AAP's members

have an interest in ensuring that the International Trade Commission

("Commission") is able to interpret and apply the Tariff Act in flexible, yet

appropriate, ways that reflect, and provide important remedies to address, modern

trade practices.

The Commission's authority over electronically transmitted copyrighted

works is critical because, in recent years, there has been rapid growth in digital

publications, including mass-market eBooks and professional and scholarly

publications, as well as adaptive educational content delivered through digital

---

[1] All parties have consented to the filing of this *amicus curiae* brief.  Pursuant to Federal Rule of Appellate Procedure 29(c)(5), counsel for *amicus curiae* represent that they authored this brief in its entirety and that none of the parties or their counsel, nor any other person or entity other than the Association of American Publishers and its members, made a monetary contribution intended to fund the preparation or submission of this brief.

1

networks. There has also been growth in the variety of online platforms through which digital reading materials may be accessed, ranging from digital bookstores, to library eBook lending, to a number of different subscription services.[2] At the same time, many consumers enjoy having hard copies (print versions) of the books they read. Thus, publishers are offering consumers print and digital formats of the same copyrighted works.

Unfortunately, the realities of digital trade today also include copyright infringement. A recent study concluded that "23.8% of the total bandwidth used by all internet users" in North America, Europe and Asia-Pacific is used to access or download copyright infringing material. David Price, *Sizing the Piracy Universe*, NETNAMES, at 3 (Sept. 2013), http://www.netnames.com/digital-piracy-sizing-piracy-universe. U.S. residents often download or access these infringing works through websites operated in foreign countries, which are primarily run for profit. *Id.* at 7 (finding that "the majority of these sites draw revenue from advertising, with others supplementing this income by offering users premium subscription accounts" to access eBooks, movies, and music). In essence, the

---

[2] *The Rise of Innovative Business Models: Content Delivery Methods in the Digital Age: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. 3-9 (2013) (Post-hearing Statement of the AAP) http://www.publishers.org/_attachments/docs/publicstatements/aapstatement-riseofinnovativebusinessmodels.pdf.

2

business model for these website operators is to enrich themselves at the expense of U.S. creators and innovators by raking in advertising revenue without paying a dime to the copyright owners that produce labor-intensive and unique films, music, works of fiction, scholarship, and more.

It is crucial to publishers that this Court affirm the Commission's April 9, 2014, opinion finding that "'importation…of articles' should be construed to include electronic transmission of digital data." *In the Matter of Certain Digital Models, Digital Data, and Treatment Plans for Use in Making Incremental Dental Positioning Adjustment Appliances, the Appliances Made Therefrom, and Methods of Making the Same*, USITC Inv. No. 337-TA-833, Commission Opinion, at 55 (April 9, 2014) ("Comm'n Op.").  Doing so will help ensure that unfair trade practices abroad do not harm the livelihoods of the dedicated editors, designers, authors, and innovators that rely on copyright protection in order to bring books, journals, and educational resources to people when, where, and in what formats they want.

## SUMMARY OF ARGUMENT

The Commission correctly construed the phrase "importation…of articles" under Section 337(a)(1)(B) to include "electronic transmissions of digital data" that infringe a U.S. patent or copyright, provided the other requirements of Section 337 are met.  This construction is: (1) appropriately narrow, (2) consistent with the

3

intent of the statute, and (3) necessary in light of modern trade practices and advances in technology. These narrow circumstances – where a person or entity engages in electronic transmission of digital data that infringes a patent or registered copyright, and unfairly competes with an existing or developing U.S. industry – pose exactly the type of trade harm that Congress intended the Commission to address.

For nearly a century, U.S. industries have benefited from the Commission's effective and efficient investigation and remedying of unfair trade practices, including practices that infringe intellectual property rights.  Today, electronic transmissions as well as freight containers can be used to import books.  This fact must not diminish the scope of the Commission's authority to address the underlying unfairness of trade practices that infringe U.S. intellectual property rights.  The Commission's opinion ensures the continued utility of the Tariff Act by adhering to Supreme Court precedent holding that "bringing an article into a country from the outside… is importation regardless of the mode by which it is effected."  *Comm'n Op.* at 41 (quoting *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122 (1923)).

These imported articles are not limited to physical goods.  This Court has previously held that Congress's broad language in Section 337 should not be unduly limited, and that "articles" should be construed in light of new

4

technologies.  "Articles" under Section 337(a)(1)(B) include those that "infringe

a…patent or… copyright." 19 U.S.C. § 1337(a)(1)(B).  The 1976 Copyright Act

applies to original works of authorship fixed in print and digital formats, including

digital data files.  Thus, a plain reading of the statute confirms that "articles" under

Section 337(a)(1)(B) includes at least this type of "digital data."

For these reasons, this Court should affirm the Commission's determination

that "'importation…of articles' [under Section 337(a)(1)(B)] should be construed

to include electronic transmission of digital data" that "infringe a valid and

enforceable [U.S.] patent or a valid and enforceable [U.S.] copyright registered

under title 17." *Comm'n Op.* at 55; 19 U.S.C. § 1337(a)(1)(B).

In addition, to the extent that the Commission must have a means to remedy

such unfair trade practices, Congress gave the Commission authority to issue cease

and desist orders "in lieu of" exclusion orders, recognizing that, in certain cases, an

exclusion order might be inappropriate.  The Commission determined that such

was the case here, and issued only a cease and desist order.  To be sure, previous

cases involving cease and desist orders prohibiting electronic transmissions of

digital data also involved exclusion orders against physical goods.  To limit the

availablity of cease and desist orders to such cases, however, would be inconsistent

with the plain language of the statute, Congressional intent, and this Court's

precedent.  This Court has made clear that the Commission has discretion over the

5

form, scope, and extent of remedies granted under Section 337, including cease and desist orders.

For these reasons, and those explained in more detail below, this Court should affirm the Commission's April 9, 2014, opinion.

## ARGUMENT

I. **THE COMMISSION CORRECTLY CONSTRUED THE PHRASE "IMPORTATION…OF ARTICLES" UNDER SECTION 1337(a)(1)(B).**

A. **The Commission's construction of "importation…of articles" is confined to digital data that infringes U.S. patents and copyrights of existing or developing U.S. industries, not all "intangible, digital information."**

The Commission's Opinion correctly held that "importation…of articles" must cover electronic transmission of the digital data "at issue in this investigation." *Comm'n Op.* at 55. The only digital data at issue is digital data that "infringes a valid and enforceable [U.S.] patent or a valid and enforceable [U.S. registered] copyright" of an existing or developing U.S. industry. 19 U.S.C. § 1337(a)(1)(B); *see also* 19 U.S.C. § 1337(a)(2)-(3); *Comm'n Op.* at 42.

Thus, the Commission did not rule that: (a) *all* types of digital data can constitute an article; (b) it has jurisdiction over telecommunications transmissions in general; or (c) it has jurisdiction over all electronically transmitted *information*. Thus, the Appellants' statement of the question at issue in this review: "whether intangible, digital information is an 'article' described in 19 U.S.C. § 1337" is over-broad and inaccurate.

6

Furthermore, the Commission did not rule that all digital data that infringes U.S. intellectual property can constitute an article. The Commission recognized the scope of the term "articles" under Section 337(a)(1)(B) is further narrowed by Congress's explicit limitations in Section 337(a)(2)–(3). *Compare Comm'n Op.* at 42 *with In the Matter of Certain Digital Models, Digital Data, and Treatment Plans for Use in Making Incremental Dental Positioning Adjustment Appliances, the Appliances Made Therefrom, and Methods of Making the Same*, USITC Inv. No. 337-TA-833, Dissent of Comm'r Johanson, at 15 (April 9, 2014) ("Comm'n Op. Dissent") (cautioning against "treating infringement and Section 337 as coextensive"). AAP agrees that Section 337(a)(1)(B) is not intended to address all instances of infringement as "it is, first and foremost, a trade law." *Comm'n Op. Dissent* at 2. If no domestic industry exists (or is developing) that relates to the intellectual property at issue, the statutory limitations in Section 337(a)(2)–(3) prohibit the Commission from wasting its time and resources investigating such matters. However, in the narrow circumstances where a foreign entity engages in electronic transmissions of digital data, which constitute copyright or patent infringements that unfairly compete with an existing or developing domestic industry – as in the instant case – such practices pose exactly the type of trade harm that Congress intended the Commission to address.

7

For these reasons, the much narrower question at issue in this case is: whether digital data that infringes a valid and enforceable U.S. patent or registered copyright, relevant to U.S. industry, is an article under Section 337(a)(1)(B) that can be imported via electronic transmission, and is therefore subject to the Commission's jurisdiction?

After extensive analysis, the Commission carefully determined that the answer to this question is "yes." *Comm'n Op.* at 34-55. For the reasons below, as well as those cited by the Commission, this Court should affirm that determination.[3]

### B.    The Commission's construction of "importation…of articles" is consistent with the statute, legislative history, and holdings by other courts.

The term "articles" is not expressly defined in the statute or in its legislative history.  *See Comm'n Op.* at 36.  AAP acknowledges that legislative history of prior legislation from 1922 and 1930 indicates that the term "articles" was considered synonymous with "goods, commodities, and merchandise," *Comm'n Op.* 43 (internal citations omitted), and that trade at the time may only have involved tangible goods.  However, among all of the legislative history examined in this case, there is no indication that Congress intended to freeze in time any

---

[3] In addition to AAP's arguments in support of affirming the Commission's interpretation of "articles" under Section 337, AAP endorses the arguments submitted by *amici curiae* Motion Picture Association of America and Recording Industry Association of America.

particular interpretation of "articles." *Comm'n Op. Dissent* at 14 (noting that "[n]o one would argue that Section 337 is frozen to cover only items that existed in 1930" and that "it is appropriate to apply a statute to new technology when that technology falls within the words of the statute").

Today, discussion of electronic commerce in digital "goods," such as eBooks and movies, is common, and e-commerce chapters are regularly included in trade agreements.  *See generally Digital Trade in the U.S. and Global Economies*, Part I, Inv. No. 332-531, USITC Pub. 4415 (July 2013) ("Digital Trade Part I"); *see e.g.*, United States-South Korea Free Trade Agreement, Jun. 30, 2007, *available at* https://ustr.gov/trade-agreements/free-trade-agreements/korus-fta/final-text (separating Electronic Commerce (Chapter 15) from Telecommunications (Chapter 14)). The Dissent and Appellants' insistence that "articles" remain limited to tangible goods, however, would force the Commission to ignore this reality of modern trade.  Accepting such arguments would lock the interpretation of "articles" in the 20th century, and inhibit the Commission from adjusting to current and growing trade practices without Congressional intervention.

Requiring Congressional intervention to continually update the statute to reflect modern trade practices would conflict with rulings by this Court's predecessor, the United States Court of Customs and Patent Appeals, which

concluded that "it is evident from the language [of Section 337] that Congress intended to allow [the Commission] wide discretion in determining what practices are to be regarded as unfair." *Comm'n Op.* at 45 (quoting *In re Von Clemm*, 229 F.2d 441 (CCPA 1955)).  Moreover, Congress' decision to leave the term "articles" undefined suggests that the term "should be construed flexibly to fit new technologies." *Comm'n Op.* at 47; *see also Diamond v. Chakrabarty*, 447 U.S. 303, 316 (1980) (illustrating the general principle that "Congress employ[s] broad general language . . . precisely because [] inventions are often unforeseeable").

Admittedly, *In re Von Clemm* focused on the term "articles" as used in what is now Section 337(a)(1)(A), 229 F.2d at 442, which covers all "unfair practices in import trade" other than those related to intellectual property in Section 337(a)(1)(B)-(E). *Comm'n Op. Dissent* at 1-2 n.2.  Nonetheless, following general rules of statutory construction, the term "articles" should be used consistently throughout Section 337.  *Comm'n Op. Dissent* at 7 (citing *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) ("[I]dentical words used in different parts of the same act are intended to have the same meaning.").  Therefore, the Commission's discretion to define "articles" in Section 337(a)(1)(A) must still apply to subsequent uses of the term.  The general meaning of "articles" under Section 337 would, as the Dissent points out, also be "narrowed," as appropriate, by any qualifying language in a particular provision. *Comm'n Op. Dissent* at 2 n.2.  For example, this case directly

10

concerns the scope of "articles" as narrowed by the language of Section

337(a)(1)(B) – only articles that "infringe a valid and enforceable [U.S.] patent or a

valid and enforceable [U.S. registered] copyright" – not digital information writ

large.  But no language anywhere in the statute narrows the term "articles" to

exclude digital data altogether.

Recent legislative history further supports the Commission's interpretation

of "articles."  All parties agree that Congress intended to provide "greater

protection to U.S. intellectual property rights" through its 1988 amendment to the

Tariff Act.  Appellant's Br. at 14; *accord Comm'n Op.* at 48; Align Submission

Before the USITC at 7, *In the Matter of Certain Digital Models*, Inv. No. 337-TA-

833 (Feb 10, 2014).  Congress said plainly that the "purpose" of the amendment

was to "make [the Tariff Act] a more effective remedy for the protection of [U.S.]

intellectual property rights," Tariff Act, Pub. L. No. 100-418, § 1341(b) (1988),

and to provide "an *overall strategy* to ensure adequate and effective international

protection for U.S. persons that rely on protection of intellectual property rights."

H.R. REP. NO. 100-40, pt. 1, at 154 (Apr. 6, 1987) (emphasis added).  An overall

strategy to protect U.S. copyrights can only be adequate and effective today if the

Commission's jurisdiction includes both physical and digital articles that infringe

copyrighted works.

11

Despite Congress' clear intent that Section 337 should be implemented in a manner that provides improved protection of U.S. intellectual property, the Dissent attempts to limit the scope of "articles" to physical objects by citing the Supreme Court's decision in *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968). *Comm'n Op. Dissent* at 14. In *Fortnightly*, the Court had to determine whether a third-party operating a large antenna that could receive television broadcasts for an entire community (CATV) violated the "performance" right as written in the Copyright Act of 1909. 392 U.S. at 392. In interpreting the statute, the Court noted that "it is clear that the petitioner's [CATV] systems did not 'perform' the respondent's copyrighted works in any conventional sense of that term, *or in any manner envisaged by the Congress* that enacted the law in 1909." *Id*. at 396. (emphasis added). The Court reasoned that "our inquiry *cannot be limited to ordinary meaning and legislative history*, for this is a statute that was drafted long before the development of the electronic phenomena with which we deal here." *Id.* at 395 (emphasis added). In other words, the Court acknowledged that the scope of terms used in a statute may change over time. *Id.* at 396 (the Court "must read the statutory language of 60 years ago in the light of drastic technological change").

Rather than supporting the Dissent's view that "articles" must remain confined to physical goods, the reasoning of *Fortnightly* more plausibly supports

12

the Commission's more modern interpretation of "articles." Digital trade

involving electronic transmission of copyrighted works, such as eBooks, movies,

and music, is a real, growing, and increasingly important aspect of international

trade. *Digital Trade Part I* at Appendix A (letter from former Chairman of the

Sen. Finance Comm. Max Baucus) ("digital trade has increased rapidly in recent

years, and is an increasingly important activity within the global economy"). To

exclude eBooks and other electronically transmitted digital goods from the scope

of "articles" would fail to read the phrase "importation…of articles" in Section

337(a)(1)(B) "in light of technological change."

The Commission's interpretation of "articles" reflects the realities of trade in

the "goods" of today and implements Congress' intent to provide an overall

strategy to protect U.S. intellectual property.

### C. <u>Since digital data is considered an article when embodied in a physical object, changing the "mode" of importing this data does not change its status as an article.</u>

Without question, *digital* books, movies, and music are articles under

Section 337 when they are embodied in a physical object, such as CDs or DVDs.

The fact that these digital copies can now be transmitted electronically over the

Internet merely changes the *mode* by which these same digital, copyrighted works

enter the U.S.

The Supreme Court has made clear that importation "consists in bringing an

article into a country from the outside. If there be an actual bringing in it is

importation *regardless of the mode* in which it is effected." *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122 (1923) (emphasis added); *see also Reno v. Condon*, 528 U.S. 141, 148 (2000). Notably, the Supreme Court does not tie importation to what can go through U.S. ports. Electronic transmission is simply a mode of importation – a way to send an article (*e.g.*, a digital good such as an eBook) – made available on a website operated in one country to the tablet, phone, or computer of a consumer in the U.S.

The fact that a book can be imported through electronic transmissions, in addition to freight containers, must not diminish the scope of the Commission's authority to address the underlying unfairness of trade practices concerning such copyrighted books or other American brands, inventions, or creations protected by U.S. intellectual property rights.

## II.  THE COMMISSION'S CONSTRUCTION OF "IMPORTATION…OF ARTICLES" IS NECESSARY TO REMAIN CONSISTENT WITH THE COPYRIGHT ACT'S APPLICATION TO DIGITAL FORMATS OF COPYRIGHTED WORKS.

### A.  <u>The Copyright Act protects works in digital format, therefore articles that infringe copyrights must include such digital formats.</u>

The language of Section 337(a)(1)(B) concerns a narrow subset of the "articles" addressed under Section 337 generally, namely, "articles that…infringe" a patent or copyright. AAP agrees with the Internet Association that "the phrase 'articles that …infringe a...copyright' incorporates substantive copyright law,"

including the Copyright Act. *Internet Ass'n Amicus Br.* at 12 n.3 ("IA Br.").[4]

When Congress amended the Tariff Act in 1988 to ensure that it provided "more effective" protection to U.S. intellectual property rights, the Copyright Act already covered digital formats of copyrighted works. A critical feature of the 1976 Copyright Act is that it "accords protection to works regardless of the medium in which they are embodied." Eric J. Schwartz, *United States*, in INTERNATIONAL COPYRIGHT LAW AND PRACTICE § 2 [1][a] (Lionel Bently ed., Lexis Nexis 2015). Section 102(a) of the Copyright Act states that:

> Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly *or with the aid of a machine or device.*

17 U.S.C. § 102(a) (1976) (emphasis added). Clearly, purely digital instantiations of copyrighted works qualify for protection. *See* U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT PRACTICES §305 (3d ed. 2014) (listing as examples of protectible formats "digital audio files" and "a screenplay saved in a data file"). The language of Section 102(a) clarifies that copyrighted works that can be "perceived, reproduced or otherwise communicated...with the aid of a

---

[4] As explained by the Commission, the case at issue addresses digital models that infringe patents. *Comm'n Br.* at 25-31. However, it is worth bearing in mind that Section 337(a)(1)(B) applies to articles that infringe patents *or* copyrights, not just patents.

15

machine," such as eBooks downloaded to a tablet, are entitled to the same copyright protection as hard-bound books.

Specifically, a fundamental principle of copyright law – media neutrality – requires that a copyrighted work be afforded the same copyright protection regardless of the format in which it is fixed. *See New York Times Co. v. Tasini*, 533 U.S. 483, 502 (2001) (the mere "'transfer of a work between media' does not 'alter the character of' that work for copyright purposes"). Reading Section 337(a)(1)(B) to limit protection to particular formats (physical copies), while excluding other formats (digital copies) of the same copyrighted work, would directly conflict with this principle. By contrast, the Commission's interpretation – that "importation of …articles" covers electronically transmitted digital data that infringes a patent or copyright – fully respects the principle of media neutrality.

### B.    Congress expressly limited the Commission's jurisdiction, but these limits do not confine the Commission's jurisdiction to physical goods.

Congress included certain express limitations on the Commission's jurisdiction under Section 337. In particular, under Section 337(a)(1)(B), Congress limited the Commission's jurisdiction to imported articles that infringe a specific subset of copyrighted works, namely, those that are valid, enforceable, and *registered*.

Registration is not mandatory in the U.S. for a work to be lawfully copyrighted. U.S. COPYRIGHT OFFICE, CIRCULAR 1: COPYRIGHT BASICS 3 (May

2012) ("copyright is secured automatically when the work is created").  As such, only a fraction of all works of original authorship are officially registered with the Copyright Office. Dotan Oliar, *et al.*, *Copyright Registrations: Who, What, When, Where, and Why*, 92 TEXAS L. REV. 2211, 2241 (2014) (relying on recent Copyright Office registration data to explain that millions of copyrighted works are created every day, but that "the vast majority of these are not registered").  The Commission's jurisdiction under Section 337(a)(1)(B), thus, only extends to this small fraction of copyrighted works.  Congress' deliberate limitation that the copyrighted works must be "registered" demonstrates that where Congress sought to limit the Commission's jurisdiction within Section 337, it *made such limitations clear* in the plain language of the statute.

The absence of express language excluding digital articles from Section 337(a)(1)(B) following the 1988 amendment, when Congress (a) was aware that the Copyright Act covered digital formats, and (b) amended the Tariff Act to provide "more effective" protection to U.S. intellectual property rights, further supports the Commission's determination that the term "articles" includes electronically transmitted digital data that infringes a patent or registered copyright.

17

## III. ELECTRONIC TRANSMISSION OF DIGITAL DATA THAT INFRINGES U.S. COPYRIGHTS UNDERMINES U.S. COPYRIGHT INDUSTRIES AND IS THE TYPE OF UNFAIR TRADE PRACTICE THAT CONGRESS INTENDS THE COMMISSION TO GUARD AGAINST.

The growth of digital publications and the variety of online platforms for accessing these works (*e.g.*, online retail outlets, digital library lending, online subscription services, and others) hold great potential for publishers and technology companies, many of which are partnering to create innovative digital reading experiences.[5]  In just the last few years, unit sales of trade eBooks have increased over 4,456%, from just over 10 million eBooks in 2008, to over 457 million eBooks in 2012.  Association of American Publishers, Book Industry Study Group, *BookStats Volume 3* (May 15, 2013).

At the same time, publishers and other copyright owners have made clear to Congress that their copyrighted books, journals, and textbooks are constantly made available online without authorization, often through websites operated overseas that rarely respond to legitimate requests to take down the content.  *See e.g., Section 512 of Title 17, Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (Mar. 13, 2013) (Witness Testimony of Paul F. Doda, Global Litigation Counsel,

---

[5] *See The Rise of Innovative Business Models: Content Delivery Methods in the Digital Age: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (Nov. 26, 2013) (Post-hearing Statement of the AAP).

Elsevier Inc.) ("Elsevier Testimony"); *Section 512 of Title 17, Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (Mar. 28, 2013) (Post-hearing Statement of AAP). Restricting the Commission's jurisdiction to physical articles would ignore this serious unfair trade practice, and would require U.S. copyright industries to face massive unfair competition from infringing digital copies of books, movies, and music.

These electronically transmitted infringing digital copies compete with authentic U.S. books, movies, and music just as unfairly, if not more so, than infringing physical goods, because the digital copies are often given away for free. As noted by the Copyright Office, "time, space, effort and cost no longer act as barriers to the movement of copies [of copyrighted works], since digital copies can be transmitted [via the Internet] nearly instantaneously anywhere in the world with minimal effort and negligible cost." U.S. COPYRIGHT OFFICE, DMCA SECTION 104 REPORT 82 (Aug. 29, 2001). Thus, for the copyright industries, the need for Section 337 to provide an effective remedy against unfair competition from electronically transmitted imports of infringing, digital copies of copyrighted works may be greater than that for physical goods, the importation of which is naturally hampered by the "time, space, effort and cost" of copying, transporting, and distributing hard-bound books or other physical copies of copyrighted works.

19

## IV. THE COMMISSION HAS BROAD AUTHORITY TO ISSUE CEASE AND DESIST ORDERS "IN LIEU OF"—INSTEAD OF—EXCLUSION ORDERS.

### A. <u>Cease and Desist Orders provide an alternative remedy where an exclusion order may be inappropriate.</u>

The publishing industry has undertaken lengthy and costly litigations around the world to disable websites that infringe hundreds of thousands of eBooks.[6] Publishers also routinely send takedown notices, in accordance with the statutory procedures, *see* 17 U.S.C. 512, asking website operators to remove links to infringing copies of their copyrighted works—often to no avail in countries that do not have strong copyright protections. *See generally Elsevier Testimony* (noting hundreds of re-postings of alleged infringements). Section 337, however, authorizes the Commission to provide a fair and efficient additional remedy to copyright owners that addresses the root of unfair competition from infringing digital imports. 19 U.S.C. § 1337(a)(1). The Commission has broad authority to issue cease and desist orders, including where failure to cover electronically transmitted digital data would result in circumvention of an exclusion order. *Comm'n Op. Dissent* at 8 n.10 (agreeing that *Hardware Logic* is sound precedent supporting the Commission's authority to include "electronic transmissions within

---

[6] For example, an international coalition of publishers, coordinated by AAP, went through the German courts to sue file hosting site Rapidshare and a linking site working in tandem with it that offered an "internet library" containing infringements of more than 400,000 copyrighted eBooks for free and anonymous downloading.

the scope of a cease and desist order").  Implicit in the acceptance of the Commission's authority to issue these "supplemental" cease and desist orders (*i.e.*, where the principal Section 337 violation pertains to an infringing physical good) is that the orders effectively address problems arising from electronic transmission of digital data.

Without question, these "supplemental" cease and desist orders help to comprehensively protect against circumvention of exclusion orders pertaining to physical goods and are therefore important to publishers, given that they routinely produce both print and digital formats of their copyrighted works.  The Commission's authority to issue an effective remedy against electronic transmissions of digital data that infringe an eBook, however, should not be predicated on whether the publisher principally or simultaneously seeks an exclusion of infringing copies in physical format.

As the Internet Association points out in its *amicus* brief, Congress gave the Commission authority to issue cease and desist orders in 1974 "because an exclusion order might be 'so extreme or *inappropriate* in some cases that it is … likely to result in the Commission not finding a violation.'" *IA Br.* at 25 (citing S. REP. NO. 93-1298, at 198; 1974 U.S.C.C.A.N. 7331).  In other words, Congress created cease and desist orders as an *alternative* remedy that could be issued without imposing an exclusion order.  This interpretation of cease and desist orders

21

is also confirmed by the language of the statute.  Section 337(f)(1) authorizes the Commission to issue a cease and desist order "in addition to, *or in lieu of*" an exclusion order.  The plain meaning of "in lieu of" is "instead of" or "in the place of," meaning that a cease and desist order can be an independent, alternative remedy, not solely a "supplement" or a "step on the road" to an exclusion order. *Merriam-Webster's Collegiate Dictionary*, 11th ed. (2003), available at http://www.merriam-webster.com/dictionary/lieu.

More generally, the language of Section 337(f)(1) demonstrates that Congress intended to provide the Commission with broad discretion in fashioning appropriate cease and desist orders:  "The Commission may at any time…in such *manner as it deems proper*, modify… any such order."  19 U.S.C. § 1337(f)(1) (emphasis added); s*ee also Viscofan, S.A. v. ITC*, 787 F.2d 544, 548 (Fed. Cir. 1986) (noting that the Commission has "broad discretion in selecting the form, scope and extent of the remedy").  This broad discretion supports the Commission's authority to issue cease and desist orders, either to supplement an exclusion order, or as an alternative remedy where an exclusion order may be inappropriate, such as where Customs cannot effectively interdict the entry of an article. *See Comm'n Op.* at 144-148 (noting previous issuance of cease and desist orders to halt distribution of goods warehoused in the U.S., *i.e.*, beyond the reach of Customs, as well as orders directly applied to foreign entities).

22

To hold that the Commission cannot issue a cease and desist order where no exclusion order is sought directly contradicts Congress' intent to provide the Commission with a new remedy that would address instances where an exclusion order might be "inappropriate." *See Comm'n Op.* at 52 n.29.

**B.    Cease and Desist Orders are an appropriate tool to inhibit electronic transmissions of digital data.**

AAP accepts that a traditional exclusion order may be an inappropriate remedy to address electronic transmissions of digital data that infringe U.S. patents or copyrights, because Customs cannot effectively control such imports. Nonetheless, the Commission can issue and enforce cease and desist orders that direct a foreign entity to stop "engaging in the unfair methods or acts involved" in the importation of articles that infringe patents or registered copyrights. 19 U.S.C. § 1337(f)(1).

While these cease and desist orders may be described as "softer" remedies than exclusion orders, such orders are still remedies. *Textron, Inc. v. ITC*, 753 F.2d 1019, 1029 (Fed. Cir. 1985). Thus, it is not "inconsistent with the remedial scheme of Section 337" for the Commission to exercise jurisdiction over electronic transmission of digital data, given that the Commission can issue a remedy, even if it is limited, to address such unfair trade practices. *Cf. Comm'n Op. Dissent* at 7.

As digital trade continues to grow, Congress may want to provide the Commission with more effective enforcement mechanisms to address electronic

imports of digital data that infringe U.S. patents and copyrights.[7] Its current ability to issue cease and desist orders "in lieu of" exclusion orders, however, already provides at least one remedy applicable to electronic transmission of digital data.

## CONCLUSION

For the foregoing reasons, it is crucial that this Court affirm the Commission's determination that "'importation…of articles' [under Section 337(a)(1)(B)] should be construed to include electronic transmission of digital data" that "infringe a valid and enforceable [U.S.] patent or a valid and enforceable [U.S.] copyright registered under title 17." *Comm'n Op.* at 55; 19 U.S.C. § 1337(a)(1)(B).

Dated:  February, 25, 2015          /s/ Steven J. Metalitz
                                    Steven J. Metalitz
                                    Mitchell Silberberg & Knupp LLP
                                    1818 N Street, N.W., 8th Floor
                                    Washington, DC 20036
                                    Tel:    202.355.7902

                                    *Counsel for Amicus Curiae*
                                    *Association of American Publishers*

---

[7] Members of the House and Senate supported the "Online Protection and Enforcement of Digital Trade Act" ("OPEN Act"), H.R. 3782 and S. 2029, which would have authorized the Commission to issue cease and desist orders to enjoin U.S.-based third-party service providers from facilitating online infringement conducted overseas thus helping to "deter these unfair imports from reaching the U.S. market." *See* Sen. Ron Wyden, *OPEN Act, Frequently Asked Questions*, http://www.wyden.senate.gov/priorities/open-act (last visited Feb. 11, 2015).

## **CERTIFICATE OF SERVICE**

I certify that on February 25, 2015, I caused the foregoing Brief of Amicus

Curiae Association of American Publishers in Support of Appellees to be

electronically filed with the Clerk of the Court using CM/ECF, which will

automatically send notification of such filing to the following counsel of record:

Michael D. Myers                    mike@mmellp.com
Robert H. Espey, II                 bob@mmellp.com
McCLANAHAN·MYERS·ESPEY, LLP

Gary M. Hnath                       ghnath@mayerbrown.com
Paul W. Hughes                      phughes@mayerbrown.com
MAYER BROWN LLP

Sidney Rosenzweig                   Sidney.rosenzweig@usitc.gov
Wayne W. Herrington                 wayne.herrington@usitc.gov
U.S. INTERNATIONAL TRADE COMMISSION

Stephen B. Kinnaird                 stephenkinnaird@paulhastings.com
Igor V. Timofeyev                   igortimofeyev@paulhastings.com
Thomas A. Counts                    tomcounts@paulhastings.com
PAUL HASTINGS, LLP

Dated:  February, 25, 2015          /s/ Steven J. Metalitz
                                    Steven J. Metalitz
                                    MITCHELL SILBERBERG & KNUPP LLP
                                    1818 N Street, N.W., 8th Floor
                                    Washington, DC 20036
                                    Tel:    202.355.7902

                                    *Counsel for Amicus Curiae*
                                    *Association of American Publishers*

25

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the applicable type-volume limitations. Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this brief contains 5, 388 words. Counsel relies on the word count of the computer program used to prepare this brief.

The undersigned further certifies that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.

Dated:  February, 25, 2015           /s/ Steven J. Metalitz
                                     Steven J. Metalitz
                                     MITCHELL SILBERBERG & KNUPP LLP
                                     1818 N Street, N.W., 8th Floor
                                     Washington, DC 20036
                                     Tel:     202.355.7902

                                     *Counsel for Amicus Curiae*
                                     *Association of American Publishers*

26