2013-1625, -1631, -1632, -1633

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

ERICSSON, INC. and
TELEFONAKTIEBOLAGET LM ERICSSON,

*Plaintiffs-Appellees*,

*v.*

D-LINK SYSTEMS, INC., NETGEAR, INC., ACER, INC.,
ACER AMERICA CORPORATION, and GATEWAY, INC.,

*Defendants-Appellants*,

and

DELL, INC.,

*Defendant-Appellant*,

and

TOSHIBA AMERICA INFORMATION SYSTEMS, INC.
and TOSHIBA CORPORATION,

*Defendants-Appellants*,

and

INTEL CORPORATION,

*Intervenor-Appellant*,

and

BELKIN INTERNATIONAL, INC.,

*Defendant*.

Appeals from the United States District Court for the Eastern District of Texas
in case no. 10-CV-0473, Chief Judge Leonard Davis.

**NON-CONFIDENTIAL BRIEF FOR INTERVENOR-APPELLANT INTEL
AND DEFENDANTS-APPELLANTS ACER, GATEWAY,
NETGEAR, D-LINK, AND TOSHIBA**

December 16, 2013             *(Counsel Listed on Inside Cover)*

ROBERT A. VAN NEST
STEVEN A. HIRSCH
EUGENE M. PAIGE
MATAN SHACHAM
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400

CHRISTINE M. MORGAN
DOYLE B. JOHNSON
JONAH D. MITCHELL
SCOTT D. BAKER
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
(415) 543-8700

JAMES C. MARTIN
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
(412) 288-3546

*Attorneys for Defendants-Appellants
Acer, Inc., Acer America Corporation,
Gateway, Inc., NETGEAR, Inc., and D-
Link Systems, Inc.*

JOHN J. FELDHAUS
PAVAN K. AGARWAL
FOLEY & LARDNER LLP
3000 K Street, N.W. Suite 600
Washington, DC 20007
(202) 672-5300

*Attorneys for Defendants-Appellants
Toshiba Corporation and Toshiba
America Information Systems, Inc.*

WILLIAM F. LEE
JOSEPH J. MUELLER
MARK C. FLEMING
LAUREN B. FLETCHER
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

JAMES L. QUARLES III
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
(202) 663-6000

GREG AROVAS
KIRKLAND & ELLIS LLP
601 Lexington Avenue
Citigroup Center
New York, NY 10022
(212) 446-4800

ADAM R. ALPER
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
(415) 439-1876

JOHN C. O'QUINN
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, DC 20005
(202) 879-5191

*Attorneys for Intervenor-Appellant
Intel Corporation*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel of record for Intervenor-Appellant Intel Corporation certify as follows:

1.     The full name of every party represented by us is:
   Intel Corporation

2.     The names of the real parties in interest represented by us are:
   Not applicable.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by us are:
   None.

4.     The names of all law firms and the partners or associates that appeared for the parties represented by us in the trial court, or are expected to appear in this Court, are:

    KIRKLAND & ELLIS LLP:  Adam Alper, Gregory S. Arovas, Oliver Bennett, Luke L. Dauchot, Michael W. De Vries, Jared D. Edgar, John R. Edwards, Sarah Forney, Lov Goel, Raghav R. Krishnapriyan, Peter C. Magic, Tim Majors, John C. O'Quinn, Sarah E. Piepmeier, Kevin Spark, Jeremy J. Taylor

    PARKER, BUNT & AINSWORTH, P.C.:  Robert C. Bunt, Robert M. Parker

    POTTER MINTON P.C.:  John F. Bufe, Allen F. Gardner, Michael E. Jones

    SIDLEY AUSTIN LLP:  Bryan C. Mulder, Stephanie P. Koh, Thomas D. Rein

    WILMER CUTLER PICKERING HALE AND DORR LLP:  Sameer Ahmed, Brittany Amadi, Megan Barbero, Mark C. Fleming, Lauren B. Fletcher, William F. Lee, Joseph J. Mueller, James L. Quarles III, Joshua Salzman

Dated:  December 16, 2013             */s/  William F. Lee*
                                    WILLIAM F. LEE

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel of record for Appellants Acer, Inc., Acer America Corporation, Gateway, Inc., NETGEAR, Inc., and D-Link Systems, Inc. certify as follows:

1.    The full name of every party represented by us is:
      Acer, Inc., Acer America Corporation, Gateway, Inc., NETGEAR, Inc., and D-Link Systems, Inc.

2.    The names of the real parties in interest represented by us are:
      Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by us are:
      D-Link Corporation is the parent company of D-Link Systems, Inc.

      Acer, Inc. owns 100% of Boardwalk Capital Holdings Limited, which owns 100% of Acer American Holdings Corp., which owns 100% of Gateway, Inc., which owns 99.92% of Acer America Corporation.

4.    The names of all law firms and the partners or associates that appeared for the parties represented by us in the trial court, or are expected to appear in this Court, are:

      KEKER & VAN NEST LLP:  Robert A. Van Nest, Steven A. Hirsch, Corey A. Johanningmeier, Eugene M. Paige, Matan Shacham

      REED SMITH LLP:  Scott D. Baker, John P. Bovich, Jonah D. Mitchell, William R. Overend, Adaline J. Hilgard, James C. Martin, Christine M. Morgan, James A. Daire, Seth B. Herring, Kirsten R. Rydstrom, Doyle B. Johnson

      YARBROUGH WILCOX, PLLC:  Herbert A. Yarbrough, III, Debra Elaine Gunter

      FULBRIGHT & JAWORSKI:  Dan Duncan Davison

      FREITAS TSENG & KAUFMAN LLP:  Kaiwen Tseng

Dated:  December 16, 2013        /s/  Robert A. Van Nest
                                 ROBERT A. VAN NEST

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel of record for Appellants Toshiba Corporation and Toshiba America Information Systems, Inc. certify as follows:

1.     The full name of every party represented by us is:
Toshiba Corporation and Toshiba America Information Systems, Inc.

2.     The names of the real parties in interest represented by us are:
Toshiba Corporation and Toshiba America Information Systems, Inc.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by us are:

   Toshiba America Information Systems, Inc. is a wholly owned subsidiary of Toshiba America, Inc., which is a wholly owned subsidiary of Toshiba Corporation, which is a publicly held company

4.     The names of all law firms and the partners or associates that appeared for the parties represented by us in the trial court, or are expected to appear in this Court, are:

   FOLEY & LARDNER LLP: John J. Feldhaus, Pavan K. Agarwal, Liane M. Peterson, Kevin Malaney, Andrew Cheslock, Jason J. Keener

   LAW OFFICES OF GUY N. HARRISON: Guy N. Harrison

Dated: December 16, 2013        */s/ John J. Feldhaus*
                                        JOHN J. FELDHAUS

# TABLE OF CONTENTS

Page(s)

CERTIFICATES OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ........................................................................ix

TABLE OF ABBREVIATIONS ................................................................. xiii

STATEMENT OF RELATED CASES ..........................................................1

STATEMENT OF JURISDICTION..............................................................2

INTRODUCTION .......................................................................................2

STATEMENT OF ISSUES ..........................................................................5

STATEMENT OF CASE .............................................................................6

STATEMENT OF FACTS ............................................................................8

    A.    The 802.11n Standard And Defendants' Products...............................8

    B.    Facts Relating To The '568 Patent.......................................................9

          1.    The claimed invention...............................................................10

          2.    The asserted claims ...................................................................11

          3.    Ericsson's infringement contentions.........................................12

          4.    Post-trial rulings .......................................................................13

    C.    Facts Relating To The '215 Patent.....................................................13

          1.    The claimed invention...............................................................13

          2.    The asserted claims ...................................................................15

3.   Ericsson's infringement contentions.........................................16

4.   Post-trial rulings........................................................................17

D.   Facts Relating To The '625 Patent.................................................17

1.   The claimed invention...............................................................18

2.   The asserted claim....................................................................19

3.   Ericsson's infringement contentions and Defendants' invalidity contentions...............................................................20

4.   Post-trial rulings........................................................................21

E.   Facts Relating To Ericsson's Damages Claim.................................21

1.   Ericsson's RAND commitments...............................................21

2.   Ericsson's end-product licenses..............................................22

3.   Ericsson's damages claim........................................................23

4.   Jury instructions.......................................................................25

5.   Verdict and post-trial damages rulings....................................26

SUMMARY OF ARGUMENT...............................................................................27

STANDARD OF REVIEW....................................................................................30

ARGUMENT.........................................................................................................31

I.   THE INFRINGEMENT JUDGMENT FOR THE '568 PATENT SHOULD BE REVERSED...................................................................................................31

A.   There Is No Substantial Evidence That The Accused Products Have A "Service Type Identifier."........................................31

B.      The District Court Erred By Ruling That Mere Capability Was Enough To Infringe The '568 Patent—A Theory Unsupported By Substantial Evidence In Any Event. ...................... 34

II.    THE INFRINGEMENT JUDGMENT FOR THE '215 PATENT SHOULD BE REVERSED ................................................................................................ 39

     A.      The District Court Erred In Construing "Type Identifier Field." ............................................................................................... 39

     B.      Even Under The District Court's Construction, There Is No Substantial Evidence That The Accused Products Generate Feedback Responses "From A Number Of Different Message Types." ............................................................... 43

     C.      There Is No Substantial Evidence That Defendants Directly Infringed Or Induced Infringement Of The Asserted Method Claims. .................................................. 46

III.   THE INFRINGEMENT AND VALIDITY JUDGMENTS FOR THE '625 PATENT SHOULD BE REVERSED. .................................................................. 49

     A.      There Is No Substantial Evidence That The Accused Products' Transmitters Send A "Command To Receive" Packets. .................................................................................... 49

     B.      There Is No Substantial Evidence That Defendants Directly Infringed Or Induced Infringement Of The Asserted Method Claim. ................................................... 52

     C.      A Reasonable Jury Could Only Have Found That Petras Anticipates Claim 1—Especially After Accepting Ericsson's Infringement Theory. .......................................... 53

IV.   THE DISTRICT COURT PREJUDICIALLY ERRED BY PERMITTING ERICSSON TO USE THE ENTIRE MARKET VALUE OF END PRODUCTS TO JUSTIFY ITS DAMAGES CLAIMS. ............................................................. 55

     A.      Ericsson's Damages Case Violated The EMV Rule. .......................... 56

1.      Ericsson improperly derived its per-unit royalty from end-product prices and justified that royalty by reference to end-product licenses. ..........................................................56

2.      Ericsson improperly drew comparisons between its royalty demand and end-product prices....................................59

B.      The District Court Prejudicially Erred By Repeatedly Failing To Enforce The EMV Rule.....................................................61

1.      The district court erred in denying Defendants' *Daubert* motion relating to the EMV rule..............................................61

2.      The district court erred in refusing to instruct the jury on the EMV rule............................................................................64

3.      The district court erred in denying Defendants' JMOL and new-trial motion on EMV issues. ......................................64

V.   THE DISTRICT COURT PREJUDICIALLY ERRED BY REFUSING TO INSTRUCT THE JURY TO CALCULATE REASONABLE ROYALTY DAMAGES CONSISTENT WITH ERICSSON'S RAND COMMITMENT...................................66

A.      Enforcing RAND Commitments Is Critical To Preserving The Benefits Of Standards. ....................................................66

B.      The District Court Prejudicially Erred By Failing To Give Appropriate Jury Instructions For RAND-Committed Patents. ............................................................72

1.      The district court erred by refusing to instruct the jury to consider hold-up.........................................................74

2.      The district court erred by refusing to instruct the jury to consider royalty stacking. ........................................77

VI.  THE DISTRICT COURT ERRONEOUSLY ORDERED AN ONGOING ROYALTY ON PRODUCTS ERICSSON CHOSE NOT TO ACCUSE OF INFRINGEMENT. ................................................................81

CONCLUSION ..................................................................................................82

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 22, 23, 24, 25, 58, 59, 62, 63, 65, 76 and 77 describes the terms of certain license agreements entered into by Ericsson.  The material omitted on pages 81 and 82 describes Ericsson's identification of accused products and damages theory with respect to those accused products.  The foregoing material was designated confidential by Ericsson pursuant to a protective order entered by the district court.

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*ACCO Brands, Inc. v. ABA Locks Manufacturer Co.*,
   501 F.3d 1307 (Fed. Cir. 2007) ........................................30

*American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*,
   456 U.S. 556 (1982) ........................................68

*Apple Inc. v. Motorola, Inc.*,
   869 F. Supp. 2d 901 (N.D. Ill. 2012) ........................................69, 70, 75

*Apple Inc. v. Samsung Electronics Co.*,
   695 F.3d 1370 (Fed. Cir. 2012) ........................................76

*Aristocrat Technologies Australia Pty Ltd. v. International Game Technology*, 709 F.3d 1348 (Fed. Cir. 2013) ........................................46, 47

*B. Braun Medical, Inc. v. Abbott Laboratories*,
   124 F.3d 1419 (Fed. Cir. 1997) ........................................30

*Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.*,
   555 F.3d 984 (Fed. Cir. 2009) ........................................36, 37

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007) ........................................67, 68, 70, 72

*Commil USA, LLC v. Cisco Systems, Inc.*,
   720 F.3d 1361 (Fed. Cir. 2013) ........................................48, 64

*Cybersettle Inc. v. National Arbitration Forum, Inc.*,
   243 F. App'x 603 (Fed. Cir. 2007) ........................................47

*Cybor Corp. v. FAS Technologies., Inc.*,
   138 F.3d 1448 (Fed. Cir. 1998) (en banc) ........................................30

*Davis v. Wakelee*,
   156 U.S. 680 (1895) ........................................82

*DSU Medical Corp. v. JMS Co.*,
   471 F.3d 1293 (Fed. Cir. 2006) (en banc) ........................................48

*Finisar Corp. v. DirecTV Group, Inc.*,
   523 F.3d 1323 (Fed. Cir. 2008) .........................................................30

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010) .........................................................36

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970) .............................................72, 74

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   131 S. Ct. 2060 (2011)......................................................................48

*Hewlett-Packard Co. v. Mustek Systems, Inc.*,
   340 F.3d 1314 (Fed. Cir. 2003) .........................................................46

*IGT v. Bally Gaming International, Inc.*,
   659 F.3d 1109 (Fed. Cir. 2011) .........................................................51

*Imonex Services, Inc. v. W.H. Munzprufer Dietmar Trenner GmbH*,
   408 F.3d 1374 (Fed. Cir. 2005) .........................................................31

*In re Coastal Plains, Inc.*,
   179 F.3d 197 (5th Cir. 1999) .............................................................82

*In re Innovatio IP Ventures, LLC Patent Litigation*,
   No. 11 C 9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013)........................passim

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ..............................................55, 61, 62

*Lighting Ballast Control LLC v. Philips Electronics North America Corp.*,
   500 F. App'x 951 (Fed. Cir. 2013) ....................................................30

*Lucent Technologies, Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ...................................................passim

*Medical Care America, Inc. v. National Union Fire Insurance Co. of
   Pittsburgh, Pennsylvania*, 341 F.3d 415 (5th Cir. 2003)....................30

*Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holdings*,
   370 F.3d 1354 (Fed. Cir. 2004) .........................................................40

*Microsoft Corp. v. Motorola, Inc.*,
  871 F. Supp. 2d 1089 (W.D. Wash. 2012) ........................................................67

*Microsoft Corp. v. Motorola, Inc.*,
  696 F.3d 872 (9th Cir. 2012) .................................................................66, 67, 72

*Microsoft Corp. v. Motorola, Inc.*,
  No. C10-1823JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013).........passim

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) .........................................................42

*Qualcomm Inc. v. Broadcom Corp.*,
  539 F. Supp. 2d 1214 (S.D. Cal. 2007)...............................................................68

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ...........................................................................63

*Retractable Technologies., Inc. v. Becton, Dickinson & Co.*,
  653 F.3d 1296 (Fed. Cir. 2011) .........................................................................42

*Ricoh Company, Ltd. v. Quanta Computer Inc.*,
  550 F.3d 1325 (Fed. Cir. 2008) .........................................................................47

*SanDisk Corp. v. Memorex Products, Inc.*,
  415 F.3d 1278 (Fed. Cir. 2005) .........................................................................82

*Siemens Medical Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics,
  Inc.*, 637 F.3d 1269 (Fed. Cir. 2011) ..................................................................31

*SiRF Technology, Inc. v. International Trade Commission*,
  601 F.3d 1319 (Fed. Cir. 2010) ....................................................................46, 47

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ..................................................................passim

*Upsher-Smith Laboratories, Inc. v. Pamlab, L.L.C.*,
  412 F.3d 1319 (Fed. Cir. 2005) .........................................................................55

*Verizon Services Corp. v. Cox Fibernet Virginia, Inc.*,
  602 F.3d 1325 (Fed. Cir. 2010) .........................................................................30

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000) ............................................................66

### STATUTES

28 U.S.C.
§ 1295(a)(1) ......................................................................2
§ 1331..................................................................................2
§ 1338(a) ...........................................................................2

### OTHER AUTHORITIES

Brief of Amicus Curiae Federal Trade Commission Supporting Neither
Party, *Apple Inc. v. Motorola, Inc.*, Nos. 2012-1548, 2012-1549 (Fed.
Cir. Dec. 14, 2012) ............................................................69

Brief of Amicus Curiae The Institute of Electrical and Electronics Engineers,
Incorporated in Support of No Party, *Apple Inc. v. Motorola, Inc.*, Nos.
2012-1548, 2012-1549 (Fed. Cir. Dec. 19, 2012) ........................70, 71

European Comm'n Memo 13/403, *Commission sends Statement of
Objections to Motorola Mobility on potential misuse of mobile phone
standard-essential patents—Questions and Answers* (May 6, 2013)................71

Federal Trade Commission, *Analysis of Agreement Containing Consent
Order to Aid Public Comment, In re Robert Bosch GmbH,*
File No. 121-0081, Docket No. C-4377 (F.T.C. Nov. 26, 2012) ......................71

Hesse, Renata, Deputy Assistant Attorney General, Antitrust Division, U.S.
Department of Justice, *The Art of Persuasion: Competition Advocacy at
the Intersection of Antitrust and Intellectual Property* (Nov. 8, 2013),
*available at* http://www.justice.gov/atr/public/speeches/301596.pdf ...............73

Lemley & Shapiro, *Patent Holdup & Royalty Stacking*, 85 TEX. L. REV.
1991, 1992 (2007) ............................................................68

United States Department of Justice & United States Patent & Trademark
Office, *Policy Statement on Remedies for Standards-Essential Patents
Subject to Voluntary F/RAND Commitments* (Jan. 8, 2013) .......................71, 72

## TABLE OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| '435 patent | U.S. Patent No. 6,330,435 |
| '625 patent | U.S. Patent No. 6,424,625 |
| '568 patent | U.S. Patent No. 6,466,568 |
| '223 patent | U.S. Patent No. 6,519,223 |
| '215 patent | U.S. Patent No. 6,772,215 |
| Acer | Defendants-Appellants Acer America Corporation and Acer, Inc. |
| Belkin | Defendant Belkin International, Inc. |
| Defendants | Acer, Belkin, Dell, D-Link, Gateway, Intel, NETGEAR, and Toshiba |
| Dell | Defendant-Appellant Dell Inc. |
| D-Link | Defendant-Appellant D-Link Systems, Inc. |
| Ericsson | Plaintiffs Ericsson Inc. and Telefonaktiebolaget LM Ericsson |
| EMV | Entire Market Value |
| Gateway | Defendant-Appellant Gateway, Inc. |
| IEEE | Institute of Electrical and Electronics Engineers |
| Intel | Intervenor-Appellant Intel Corporation |
| NETGEAR | Defendant-Appellant NETGEAR, Inc. |
| RAND | Reasonable And Non-Discriminatory |
| Toshiba | Defendants-Appellants Toshiba America Information Systems, Inc. and Toshiba Corporation |

## STATEMENT OF RELATED CASES

The appeals filed by Acer America Corporation, Acer, Inc., D-Link Systems, Inc., Gateway, Inc., and NETGEAR, Inc. (No. 13-1625); Dell Inc. (No. 13-1631); Toshiba America Information Systems, Inc. and Toshiba Corporation (No. 13-1632); and Intel Corporation (No. 13-1633) (collectively, "Defendants") have been consolidated. No other appeal in this case was previously before this Court or any other court.

Four cases and proceedings pending before other courts and agencies may be affected by the Court's decision in this appeal:

1. Ericsson has asserted the '215 patent at issue in this appeal in *Ericsson, Inc., et al. v. Samsung Electronics Co., et al.*, No. 12-cv-894, pending before the United States District Court for the Eastern District of Texas.

2. Ericsson has asserted the '568 patent at issue in this appeal in *Ericsson, Inc., et al. v. Samsung Electronics Co., et al.*, No. 12-cv-895, pending before the United States District Court for the Eastern District of Texas.

3. Ericsson has also asserted the '215 patent in an investigation titled *In the Matter of Certain Electronic Devices, Including Wireless Communication Devices, Tablet Computers, Media Players, and Televisions, and Components Thereof*, No. 337-TA-862, pending before the United States International Trade Commission.

4.     The '215, '568, and '625 patents are the subject of petitions for *inter partes* review filed by Broadcom Corporation, pending before the United States Patent and Trademark Office.

Counsel for Defendants are aware of no other cases that will directly affect, or be directly affected by, the Court's decision in this appeal.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338(a).  Final judgment entered on August 9, 2013 (A104-A106), and Defendants timely appealed.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## INTRODUCTION

This case concerns patents that Ericsson contends are essential to the IEEE 802.11n wireless standard, commonly known as "Wi-Fi."  That standard defines the hundreds (if not thousands) of features enabling Wi-Fi devices to interoperate seamlessly, and resulted from the innovations and efforts of many of the Defendants and their component suppliers.  In contrast, Ericsson did not contribute any technology incorporated into the 802.11n standard, but nevertheless alleged that its patents cover aspects of minor features described in the standard.  Ericsson asserted its allegedly "standard-essential" patents against several laptop and wireless-router manufacturers and also, ultimately, against Intel, which makes chips providing Wi-Fi functionality in many of the accused products.

2

A jury found that Defendants' accused products did not infringe two of Ericsson's allegedly essential patents. The infringement judgment for the three remaining patents asserted at trial should be reversed. For the '568 patent, Ericsson's infringement theory focused on how the 802.11n standard **could** be implemented, rather than on how Defendants' accused products—as manufactured and programmed—actually operate. For the '215 patent, the district court erroneously construed the claim language ("type identifier field") to eliminate the purported invention in its entirety, and then compounded that error by allowing the jury to find infringement even though Defendants' products undisputedly operate in a manner that cannot satisfy the full claim language. For the '625 patent, Ericsson failed to prove a key claim element (that Defendants' products transmit a "command to receive"), while Defendants proved that the prior art anticipates the asserted claim. Finally, the district court erroneously ruled that Defendants' **sales of 802.11n-compliant products** sufficed to prove direct and/or induced infringement of the asserted **method** claims.

The jury's damages award also cannot be sustained. Ericsson demanded and received a royalty based on the entire market value of expensive, multi-component laptops and routers that support Wi-Fi, without any evidence that the patented features drive demand for those end products—contrary to the entire market value ("EMV") rule. Moreover, the district court instructed the jury to calculate

reasonable royalty damages in a manner incompatible with Ericsson's binding commitment to license its allegedly standard-essential patents on reasonable and non-discriminatory ("RAND") terms. Due to that instructional error, the jury awarded Ericsson a royalty based not on the actual value of Ericsson's claimed inventions, but on the artificial value they supposedly acquired from their alleged incorporation into the 802.11n standard. These errors can only be remedied by a new trial.

Reversal of the judgment is necessary not only to correct these specific errors, but—more importantly—to prevent Ericsson from improperly using its allegedly "essential" patents to hold up the entire industry. While the jury awarded approximately $10 million for the specific end products that Ericsson accused of infringement, the judgment's impact is much more significant than that number suggests. The district court ordered Defendants to pay an ongoing royalty of $0.15 per product, not just for the laptops and routers found to infringe, but for *all their 802.11n-compliant devices*. The court thus converted the jury's limited damages award into a per-unit royalty likely to extract *hundreds of millions of dollars* from suppliers of products supporting Wi-Fi. Ericsson's strategy—and the district court's endorsement of it—should be recognized for what it is and stopped.

## STATEMENT OF ISSUES

1.     Whether the infringement judgment for the '568 patent should be reversed because there is no substantial evidence that the accused products contain a "service type identifier."

2.     Whether the infringement judgment for the '215 patent should be reversed because (a) the district court misconstrued "type identifier field," (b) even under the court's construction, the accused products do not generate feedback responses "from a number of different message types," and (c) there is no substantial evidence that Defendants directly infringed or induced infringement of the asserted method claims.

3.     Whether the infringement and validity judgments for the '625 patent should be reversed because (a) the accused products' transmitters do not send "command[s] … to receive" out-of-sequence data packets, (b) there is no substantial evidence that Defendants directly infringed or induced infringement of the asserted method claim, and (c) the asserted claim is anticipated by Petras.

4.     Whether the district court prejudicially erred in concluding that Ericsson's damages theory did not violate the EMV rule even though (a) Ericsson sought a royalty derived from the entire market value of end products such as laptops and routers, without any proof that the claimed inventions drove demand for such products, and (b) throughout trial, Ericsson juxtaposed its royalty demand

with the end products' entire market value to make its demand seem reasonable by
comparison.

5.     Whether the district court prejudicially erred in refusing to instruct the
jury to award reasonable royalty damages consistent with Ericsson's commitment
to license its patents on RAND terms, including the need to consider the impact of
hold-up and royalty stacking.

6.     Whether the district court erroneously ordered Defendants to pay an
ongoing royalty on products that Ericsson removed from its list of "accused"
products.

## STATEMENT OF CASE

In September 2010 and June 2011, Ericsson sued Acer, Belkin, Dell,
D-Link, Gateway, NETGEAR, and Toshiba in the Eastern District of Texas,
asserting that their computers and routers containing Wi-Fi chips compatible with
the IEEE 802.11n wireless standard infringed nine patents.  A5001; A5009-A5010;
A5030; A5042-A5043.  Intel, which makes and sells the Wi-Fi chips used in
several accused products, intervened in May 2012.  A5070.

The district court construed the disputed claim terms (A1-A23), and the case
proceeded to trial in June 2013.  At trial, Ericsson presented only five of the nine
originally-asserted patents.  The court allotted just 15 hours per side for direct and
cross-examination on all jury and non-jury issues, excluding willfulness.  A6533-

A6534.  Ericsson thus had 15 hours to present its case, while the eight Defendants shared 15 hours total.

The jury found that Defendants' accused products did not infringe the '223 and '435 patents, but did infringe the '568, '215, and '625 patents; found that the asserted claims of the '435 and '625 patents were not invalid; and awarded damages totaling approximately $10 million.  A230-A234.  The same jury thereafter found that Defendants' infringement was not willful.  A235-A236.

The district court separately held a three-hour bench trial on Defendants' counterclaim that Ericsson had breached its obligations to license the patents-in-suit on RAND terms.  The court determined that Ericsson had not breached its RAND obligations and awarded Ericsson an ongoing royalty of $0.15 per infringing device.  A92-A102.

In August 2013, the district court denied Defendants' renewed motions for JMOL or a new trial (A52-A91), awarded pre- and post-judgment interest (A92-A93), and entered final judgment (A104-A106).  These appeals followed.[1]

---

[1]     Because Ericsson has not cross-appealed, the judgments of non-infringement for the '223 and '435 patents and non-willfulness are final.

7

## STATEMENT OF FACTS

### A.     The 802.11n Standard And Defendants' Products

Ericsson asserted its patents against standardized wireless functionality,

commonly known as "Wi-Fi," performed by semiconductor chips that support the

802.11n standard.  The 802.11n standard was issued by the Institute of Electrical

and Electronics Engineers ("IEEE"), a standards-setting organization made up of

many technology companies and organizations, including Defendants.[2]  IEEE

participants work together to standardize the technology used for exchanging

information among wireless systems and networks so that consumers can use

wireless technology across multiple products seamlessly.  A1450-A1451(53:4-

54:1, 59:2-60:23).

Intel and other Wi-Fi chip suppliers were major contributors to the

development of the 802.11n standard, including the features that Ericsson now

accuses of infringement.[3]  By contrast, Ericsson made ***no contributions*** to any

technology included in the 802.11n standard.  *See* A1295(58:2-59:21, 60:11-16);

A1481(24:6-9).

---

[2]     A1274(137:1-23); A1294(56:22-25); A1300-A1301(80:1-16, 81:25-82:3);
A1450-A1452(53:4-54:1, 59:2-60:23, 61:9-64:13); A1481(22:13-24, 23:21-25);
A1608(41:6-12).

[3]     A1452(61:9-64:13); A1477-A1478(8:25-9:9); A1482(28:13-21);
A1493(72:17-25); A1509(134:8-23); A15069-A15088; A15089-A15125; A15159-
A15163; A15164-A15177.

Ericsson nonetheless asserted that its patents are "essential" to the 802.11n standard, meaning that they are necessarily practiced by any products that comply with the standard. A1272(130:16-23); A1299(76:15-20). Ericsson does not contend that the patents-in-suit cover the 802.11n standard generally, but rather that they cover aspects of three minor features among the hundreds of features defined in the standard and implemented by the accused Wi-Fi chips. A1303-A1304(92:14-93:1); A1481-A1482(24:22-25:22); A1708(22:18-22).

Defendants make and sell products that are compatible with the 802.11n standard. Defendants fall into two categories: (1) Intel, which makes and sells Wi-Fi chips that perform the 802.11n functionality; and (2) Dell, Toshiba, Acer, Gateway, D-Link, and NETGEAR, which purchase Wi-Fi chips from suppliers such as Intel and incorporate them into end products such as laptops and routers.[4] There is no dispute that the accused functionalities are performed by the Wi-Fi chips, not by other components in Defendants' end products. A1296-A1297(63:18-64:1, 64:24-65:1); A1403(25:21-26:2, 27:4-7); A1441(19:17-22); A1482(26:25-27:5).

## B. Facts Relating To The '568 Patent

The '568 patent, entitled "Multi-Rate Radiocommunication Systems and Terminals," describes a communication station that uses a "service type identifier"

---

[4] A router is a wireless access point that allows devices to access the Internet.

to distinguish among different types of information transmitted in a wireless

network.  A257.

### 1.    The claimed invention

Different types of information or "services," such as voice, video, and data,

may be transmitted in a wireless network.  A266(2:17-27).  "These various types of

information … will likely have different optimal transmission characteristics" that

"should be considered together when determining an optimal specification for the

air interface."  A266(2:27-29, 2:52-55).  As the number of services transmitted on

a traffic channel increases, they become more difficult to distinguish.  A270(9:23-

25).

To better process the different types of information (A266(2:56-60)), the

'568 patent describes "a service type identifier which informs the mobile or base

station of the ***type of information*** (e.g., voice, video or data) being conveyed" in a

data packet's "payload."  A267(3:10-15).[5]  For example, a service type identifier

for "voice" indicates that the packet's payload contains voice information, whereas

a service type identifier for "video" indicates that the packet's payload contains

video information.  As the patent explains, "[t]his information can be used by the

---

[5]      Emphases are added except where otherwise noted.

receiving equipment to aid in processing the information conveyed in the payload."

A267(3:16-18); *see* A270(9:26-37).[6]

### 2. The asserted claims

Claim 1, which Ericsson asserted against all Defendants, recites:

> 1.  A communication station comprising:
>
> a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes a ***service type identifier which identifies a type of payload information*** provided in said at least one first field; and
>
> a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field.

A272(13:11-21).  Dependent claim 5, which Ericsson asserted only against Belkin, D-Link, and NETGEAR, additionally requires that the "communication station is a base station."  A272(14:13-14).

During claim construction, the district court agreed with Defendants that the "service type identifier" must identify "the ***type*** of payload information," and not merely the "transmission characteristics of that information" as Ericsson had proposed.  A18-A19.  The court thus construed "service type identifier" as:  "[A]n

---

[6]  Information is broken into "data packets" for transmission.  A packet's "payload" contains the transmitted data content, as distinct from other information sent to facilitate the payload's transmission (*e.g.*, headers or identifiers). A1392(110:22-111:2, 112:3-7).

identifier that identifies *the type of information* conveyed in the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia." A19.

### 3. Ericsson's infringement contentions

For the '568 patent, Ericsson's infringement contentions were directed to an aspect of one small feature of the 802.11n standard, relating to Wi-Fi's Quality of Service ("QoS"). Ericsson's technical expert, Dr. Scott Nettles, opined that the 802.11n standard's "traffic identifier" ("TID") subfield, which is part of a transmitted data packet, is a "service type identifier." A1393-A1394(115:4-117:21); A1404(32:1-16); A15781; A16761-A16762. When the TID subfield contains a value between 0 and 7, that value determines the transmission priority for the associated data packet. A1405(33:6-13); A1551(114:12-23).

Dr. Nettles conceded, however, that the TID subfield "[does not] necessarily reflect the type of data that's in the payload." A1405(36:20-23). He agreed that "an 802.11n system *cannot determine from the TID value whether the data in the payload is video, voice, Internet, or multimedia*." A1647(34:17-21). Nonetheless, Dr. Nettles opined that the TID subfield was a "service type identifier" because it *could* be used in a way that would correlate to whether a data packet's payload contains video or voice. A1394(118:5-13). After the district court allowed

Ericsson to proceed with that capability-based theory, the jury found infringement. A231-A232.

### 4. Post-trial rulings

In denying Defendants' JMOL motion, the district court relied on Dr. Nettles' testimony regarding how someone employing the 802.11n standard ***could*** use the TID subfield. A63. The court dismissed Defendants' non-infringement evidence as merely "show[ing] that their products can be configured in a non-infringing manner." A63.

### C. Facts Relating To The '215 Patent

The '215 patent, entitled "Method for Minimizing Feedback Responses in ARQ Protocols," describes a method for dynamically constructing a feedback response that is "responsive to" incoming data packets in order to optimize system performance. A273.

### 1. The claimed invention

Automatic Repeat Request ("ARQ") protocols, which were known in the prior art, help ensure that data packets are transmitted successfully. A277(1:20-25). ARQ protocols require a receiver, upon receiving a packet, to send an acknowledgement ("ACK") to the transmitter confirming receipt. If a packet is not received successfully, the receiver may send a negative acknowledgement ("NAK"). A277(2:34-36). These ACK and NAK messages are transmitted in

13

"feedback responses," which allow the system to control and correct transmission errors.  A277(2:22-55).  The '215 patent also refers to feedback responses as "status protocol data units" or "S-PDUs."  A277(1:29-30, 2:5-7, 2:46-48).

According to the '215 patent, prior-art ARQ protocols wasted bandwidth by always transmitting a "static," or one-size-fits-all, feedback response.  A278(3:46-50) ("A significant problem with existing ARQ protocols is that they are static in construction.").  The '215 patent recognized that different feedback responses might be more efficient in different situations.  For example, some sequences of transmission errors might be more efficiently reported using a "list" format (*e.g.*, line 1 below), while others might better be served by a "bitmap" format (*e.g.*, line 4 below):



A278(4:18-29) (annotations added).

To overcome this problem, the '215 patent describes constructing a feedback response that is "responsive to" the incoming data units. A281(10:24-27); A278(Table 1); A281(Table 3). By constructing an optimal feedback response "in response to" the incoming data, the system can "minimize feedback responses" to "optimize system performance." A278(4:42-54); *see* A273(abstract); A278(3:46-50). According to the patent, the receiver constructs the optimal feedback response either by minimizing the size of the feedback response or by maximizing the number of data units represented in it. A278(4:43-54); A281(9:37-50). A "type identifier field" identifies the type of feedback response (*e.g.*, list, bitmap, etc.) selected for a given set of data units. A279-A280(5:60-67, 6:19-21, 7:60-65).

### 2. The asserted claims

Ericsson asserted claims 1 and 2 of the '215 patent against all Defendants. Claim 1 recites:

1. A method for ***minimizing feedback responses in an ARQ protocol***, comprising the steps of:

   sending a plurality of first data units over a communication link;

   receiving said plurality of first data units; and

   ***responsive to the receiving step***, constructing a message field for a second data unit, said message field including a ***type identifier field*** and at least one of a sequence number field, a length field, and a content field.

A281(10:19-27).  Dependent claim 2 adds that the "message field comprises a bitmap message."  A281(10:28-29).

During claim construction, Defendants proposed that the third claim step requires the "type identifier field," which identifies the type of feedback response, to be "*selected from* multiple available feedback responses *in order to minimize* the size or number of feedback responses."  A5084.  The district court declined to construe this limitation to require minimizing feedback responses, but the court and the parties recognized that the claims nonetheless require the receiver to *choose* a type of feedback response.  A7-A8; A6478:5-9 (Ericsson arguing that "the invention is, as is expressed in the claims, giving the receiver a choice").  The court thus construed the third claim step to mean "responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message *from a number of different message types*."  A9.

### 3.  Ericsson's infringement contentions

Dr. Nettles opined that the "BlockAck" control field in the 802.11n standard is a "type identifier field," claiming that the three different BlockAck message types described in the standard are "the choices in the system."  A1372(32:7-13); A1374(40:3-17); *see* A16778.  But Dr. Nettles conceded that Defendants' accused products, as manufactured and programmed, can transmit only *one type* of acknowledgement—the "Compressed BlockAck" response—such that no choice is

ever made by the receiver.  A1425(113:14-114:17).  Nevertheless, the jury found infringement.  A231-A232.

### 4. Post-trial rulings

In denying JMOL, the district court ruled that the jury was entitled to find that Defendants' products satisfied the "from a number of different message types" requirement because "[t]he type identifier bit indicates the message is in Compressed Block Ack form, one of three available options in the 802.11n standard"—even though there was no dispute that "Defendants' products only use [the] Compressed Block Ack" message type.  A60.

The district court further concluded that Defendants' ***sales of the accused products*** sufficed to prove direct infringement of the asserted ***method*** claims because "Dr. Nettles testified that the accused products perform the patented methods automatically without user intervention."  A68.  The court also determined that there was substantial evidence of inducement, because "Defendants advertise their 802.11n compliance," "submit their products for independent compliance testing," and "indicate on their packaging the products are compliant."  A71-A72.

### D. Facts Relating To The '625 Patent

The '625 patent, entitled "Method and Apparatus for Discarding Packets in a Data Network Having Automatic Repeat Request," describes a method for

discarding data packets that purports to minimize bandwidth usage and avoid the "deadlock" problem that arose in prior-art systems. A237.

### 1. The claimed invention

Prior-art receivers featured a "reception window" for keeping track of the data packets that the receiver expected to receive. A1306(104:16-23); A1343(83:23-84:9); A1379(59:10-12); A1381(65:7-10). If an expected packet had not been received, the receiver could not accept later packets falling outside the reception window. The system might then "deadlock" when the receiver repeatedly requested a discarded packet, instead of moving on to accept later packets. A250(2:66-3:4); A1352(117:14-25); A1411(57:15-59:3); A1414(71:25-72:6); A1530(31:25-32:25).

The '625 patent addressed this "deadlock" problem by having the transmitter send a specialized "command" to force the receiver to receive a packet following a discarded packet. A251-A252(4:23-30, 4:36-41, 5:15-40); A1411(58:12-59:3); A1414(71:25-72:2); A1530(32:16-20). Thus, in one embodiment, the transmitter discards an outdated packet and sets a Receiver Packet Enforcement Bit ("RPEB") in a following packet's header. The RPEB "force[s] the receiver" to accept later packets. A237(abstract); *see* A252(5:28-32) (by setting and sending an RPEB, the transmitter "orders the receiver to accept" the attached packet); A252(6:39-40) (receiver can be "forced to receive" a packet); A1411(58:22-59:1). The following

figures depict, respectively, an ordinary prior-art packet with no RPEB and thus no "command to receive" (Fig. 5) and a packet containing an RPEB that can be set to convey a "command to receive" (Fig. 8):



FIG. 5
(PRIOR ART)

FIG. 8

A242; A244.

### 2.     The asserted claim

Claim 1, which Ericsson asserted against all Defendants, recites:

1.     A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:

> a *transmitter* in the data network *commanding a receiver* in the data network *to* a) *receive* at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet; and

> the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet.

19

A254(10:13-25).  The parties did not request any claim constructions for the '625 patent.

### 3. Ericsson's infringement contentions and Defendants' invalidity contentions

The infringement and invalidity disputes for the '625 patent both centered on the "command to receive" limitation.

As to infringement, Ericsson did not identify any specialized "command to receive" an out-of-sequence data packet in the 802.11n standard or transmitted by Defendants' products.  Instead, Dr. Nettles opined that every ordinary data packet transmitted by the accused products is itself a "command to receive."  A1410-A1411(56:23-57:5).  He acknowledged, however, that the accused products will receive all valid data packets regardless of sequence (A1413(67:2-68:15)), and that where "a receiver could already receive a packet, you wouldn't need a command to receive it" (A1413(66:7-10)).  But again, the jury found infringement.  A231-A232.

As to invalidity, Defendants' expert, Dr. Chris Heegard, testified that a prior-art publication ("Petras") anticipated claim 1.  A1589-A1590(142:11-145:1).  Ericsson disputed only whether Petras disclosed the "command to receive" limitation.  A1622(99:10-14).  But as Dr. Heegard explained, Petras taught a system that overcame the "deadlock" problem by appending a "discard message" to a data packet, thereby commanding the receiver to receive that packet.  A15041;

*see* A1584(122:14-123:23); A1586(130:20-131:22).  The jury, however, found

claim 1 not invalid.  A233.

### 4.    Post-trial rulings

The district court denied JMOL.  Although the court acknowledged that

"802.11n receivers accept all packets" (A66), it concluded that Dr. Nettles'

testimony provided substantial evidence that the accused products satisfy the

"command to receive" limitation (A67).  The court next ruled that the evidence

was sufficient to sustain findings of both direct and induced infringement.  A67-

A72.  Finally, the court concluded that the jury was entitled to accept Ericsson's

view of Petras.  A72-A74.  The court did not address how the jury could have

reconciled Ericsson's competing infringement and validity positions for the

"command to receive" limitation.

### E.    Facts Relating To Ericsson's Damages Claim

### 1.    Ericsson's RAND commitments

The IEEE requests that its members sign contractual letters of assurance

("LOAs") promising to license any patents essential to IEEE standards under

"reasonable rates, with reasonable terms and conditions that are demonstrably free

of any unfair discrimination."  A15067.  This is known as a RAND commitment.

In two LOAs, Ericsson promised to license any 802.11-essential patents on

RAND terms.  A17249; A17253.  Ericsson "acknowledge[d] that users and

21

implementers of the [Proposed] IEEE Standard … are relying or will rely upon and may seek enforcement of the terms of th[e] LOA[s]." A17254. Because Ericsson claims that the patents-in-suit are essential to the 802.11n standard, it is obligated to license those patents on RAND terms.

### 2. Ericsson's end-product licenses

Despite its RAND commitments, Ericsson has not been willing to license its purportedly 802.11n-essential patents on RAND terms to all implementers of the standard. Even though its patents are directed to technology contained in Wi-Fi chips, Ericsson has a policy of not licensing chipmakers and thus has never licensed a Wi-Fi chip supplier to the patents-in-suit. A1323(4:4-15); A1335(50:14-17); A1600(9:15-19).

Instead, Ericsson has entered into license agreements with end-product manufacturers, 

. A15298-A15479; A17256-A17275.

. A1461-A1463(8:4-12, 10:5-10, 12:23-13:3, 14:3-9, 15:5-10).

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

███████████████████████████████████

████████████████ A15200; *see* A15010; A1331-A1332(36:19-37:21).

### 3.    Ericsson's damages claim

As discussed above (pp. 8-9), the accused features of the 802.11n standard are implemented by Wi-Fi chips—not by other components in Defendants' laptops and routers—and comprise only a small portion of a Wi-Fi chip's technology. Significantly, Ericsson did not contend that the accused features, or even the entire Wi-Fi functionality, drive consumer demand for Defendants' end products. A1296(62:18-63:1, 63:18-64:1); A1444(31:4-20).

Defendants' damages expert, Dr. Ray Perryman, accordingly proposed a lump-sum royalty of approximately $1.5 million, applying a rate of $0.009 per unit.  Dr. Perryman used the Wi-Fi chip price (about $2.50) as his royalty base and calculated royalties based on a conservative approximation of Ericsson's share of the many allegedly standard-essential patents contained within a Wi-Fi chip. A1602(20:5-25); A1608(43:17-44:13).  He further emphasized that the asserted patents are only a handful of the hundreds (if not thousands) of patents applicable to the 802.11n standard, which likewise represents only a portion of the technology on a Wi-Fi chip.  A1606(35:1-36:23); A1608(41:19-42:18).

In contrast, Ericsson offered an end-product-focused theory.  Rather than use a royalty base consisting of the price or profit margin of the patented features (or

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

even the Wi-Fi chips), Ericsson's damages expert, John Bone, advocated royalties derived from Ericsson's licenses with end-product suppliers. He urged a royalty of $0.34 to $0.59 per unit for routers and $0.25 to $0.88 per unit for computers, with $0.50 per unit as the target rate. A1439(9:1-11). Mr. Bone testified that "***the price of the chip is not relevant in determining the royalty***" and that his $0.50 per-unit royalty is "***based on the sales of the end user products***." A1433(146:8-20). █

████████████████████████████████████████████████████████

████████████████████████████. *E.g.*, A1433(145:24-146:7); A1462(10:5-10).

Defendants had moved to exclude Mr. Bone's testimony as contrary to the EMV rule, but the district court denied the motion. A35-A36. Throughout trial, Ericsson's attorneys and witnesses repeatedly compared Mr. Bone's $0.50 per-unit royalty with the $100 to $1,000 prices of Defendants' end products, in an effort to make the royalty seem reasonable by comparison. *E.g.*, A1251(46:5-10)(opening) ("[T]he price is the same regardless of whether it's a 100-dollar router or 1,000-dollar laptop."); A1325(12:19-21)(Petersson) (Ericsson licensing witness agreeing with Ericsson's counsel that "50 cents is a relatively small price of a thousand-dollar laptop"); A1432(144:10-14)(Bone) ("computers that are sold by the Defendants in this case, average 500 to a thousand dollars apiece").

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

Ericsson also repeatedly compared the $0.50 per-unit royalty to the value of Wi-Fi itself, as opposed to the value of Ericsson's claimed technology. Beginning with *voir dire*, Ericsson's counsel asked the jury: "[W]ho would be willing to pay another hundred dollars to get Wi-Fi in their laptop computer?" A1224(43:5-10); *see* A1325-A1326(10:25-13:3)(Petersson); A1432(143:10-144:14)(Bone). In summation, Ericsson's counsel argued that "█████████████████████ ████████████████████████████████████████████████████ ████████████████████" A1702(6:13-20).

### 4. Jury instructions

Defendants sought an instruction that, to recover a reasonable royalty based on end-product prices under the EMV rule, the patentee must establish "that the patented feature creates the basis for customer demand or substantially creates the value of the component parts." A6643. The district court refused. A227.

Defendants also requested instructions to account for Ericsson's RAND obligations. A6638-A6642. The court rejected those proposals (A224-A225), but added as a sixteenth *Georgia-Pacific* factor: "Ericsson's obligation to license its technology on RAND terms" (A226). That instruction did not explain, however, what Ericsson's RAND obligation was or how it should factor into the jury's reasonable royalty determination.

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

### 5.    Verdict and post-trial damages rulings

The jury awarded approximately $10 million in damages against Defendants collectively, which amounted to $0.15 per infringing product.  A234.[7]

In denying Defendants' JMOL and new-trial motions, the district court determined that Ericsson's damages theory did not violate the EMV rule because (according to the court) Mr. Bone's royalty base was "the market value of the contribution of the asserted patents to the end products," not the market value of the end products.  A82.  The court stated that, because Mr. Bone's per-unit royalty did not fluctuate with the price of the end product, it "further illustrates that Mr. Bone did not rely on the value of end products in his analysis."  A82.  The court also concluded that the jury's damages award was not inconsistent with Ericsson's RAND obligations.  A83-A88.

Rather than separately determine a RAND rate for the patents found infringed, the district court adopted the jury's $0.15 per-unit royalty.  A96.  The court also granted Ericsson's request for an ongoing future royalty of $0.15 per unit (A92), later clarifying that this ongoing royalty applied not just to the laptops

---

[7]    Because of its strategy to extract end-product royalties, Ericsson refused to seek damages from Intel, which supplies Wi-Fi chips, and only sought damages from those Defendants that sell end products such as laptops and routers.  The jury accordingly awarded no damages against Intel.  A234.

and routers found to infringe, but to "all devices that are in compliance with 802.11n, or future 802.11 standards that are not colorably different."  A8886.

## SUMMARY OF ARGUMENT

The judgment should be reversed or vacated for several reasons.

1. *The '568 patent*.  The accused products do not contain the claimed "service type identifier," which must identify the type of information contained in a data packet's payload.  Rather, the accused feature (the TID subfield) prioritizes packets for transmission without regard to the type of information they convey.  Moreover, the district court legally erred by concluding that infringement could be found if the TID subfield ***could*** potentially correspond to the type of information in the payload, because the claims require more than a mere capability.  In any event, Ericsson did not provide substantial evidence to support its erroneous capability theory.

2. *The '215 patent*.  There is no infringement when "type identifier field" is properly construed to require that the type of feedback response be "selected from multiple available feedback responses in order to minimize the size or number of feedback responses."  The accused products send only one static type of feedback response (Compressed BlockAck).  Even under the district court's construction, there is no infringement because the receiver does not generate the feedback response type "from a number of different message types."  And Ericsson

27

separately failed to present substantial evidence of direct or induced infringement by Defendants—a defect the district court excused by erroneously ruling that Defendants' ***sale of 802.11n-compliant products*** sufficed to show infringement of the asserted ***method*** claims.

3. *The '625 patent*.  The accused products do not send the claimed "command to receive"; instead, they receive ***all*** valid data packets, without being commanded to do so by the transmitter.  The district court's legal errors regarding direct and induced infringement for the '215 patent equally infect its ruling as to the '625 patent's asserted method claim.  Finally, a reasonable jury could only have found the asserted claim anticipated by Petras, which discloses a "command to receive"—the only limitation disputed by Ericsson.

4. *Damages in violation of EMV rule*.  The district court erred by permitting Ericsson and its damages expert to demand royalties based on the entire market value of expensive, multi-component end products like laptops and routers, even though the accused features—minor aspects of Wi-Fi technology—undisputedly do not drive demand for those products.  By any reasonable measure, Ericsson's "flat" per-unit rate was derived from the entire market value of end products.  In further contravention of this Court's EMV principles, the district court allowed Ericsson's counsel and witnesses to contrast the royalty demand against the end products' entire market value to make the demand seem reasonable—a tactic that

was designed to, and did, encourage the jury to award damages beyond the value of the claimed inventions.

5. *Instructions inconsistent with RAND*.  Despite Ericsson's obligation to license the patents-in-suit on RAND terms, the district court erroneously gave generic damages instructions that other courts have recognized are inappropriate in a RAND case.  Those instructions invited the jury to reward Ericsson not only for its claimed technology, but also for the artificial market power conferred by alleged incorporation into the 802.11n standard.  The court's instructions also failed to address royalty stacking, which improperly led the jury to award Ericsson a royalty equal to 6% of a Wi-Fi chip's average price, even though Ericsson possesses at most a tiny handful of the hundreds (if not thousands) of patents purportedly essential to the 802.11n standard.

6. *Scope of ongoing royalty*.  During this litigation, Ericsson abandoned its infringement contentions as to certain 802.11n-compliant products and limited its expert disclosures to a specific subset of "accused" products containing particular Wi-Fi chips.  The district court erroneously awarded Ericsson an ongoing royalty applicable to ***all*** of Defendants' 802.11n-compliant products, including products that Ericsson ***removed*** from its list of "accused" products.

## STANDARD OF REVIEW

This Court reviews JMOL and new trial rulings under regional circuit law. *Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1331 (Fed. Cir. 2010). The Fifth Circuit reviews the denial of JMOL *de novo*, making JMOL appropriate if "the Court believes that reasonable men could not arrive at a contrary verdict." *Medical Care Am., Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 341 F.3d 415, 420 (5th Cir. 2003). This Court has interpreted that standard to mean that the jury's determination must be supported by substantial evidence. *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007).

This Court reviews claim construction *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454-1455 (Fed. Cir. 1998) (en banc).[8] Infringement and anticipation are questions of fact reviewed for substantial evidence. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1423 (Fed. Cir. 1997); *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008). The patentee has the burden of proving damages, which are reviewed for substantial evidence. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1310, 1324 (Fed. Cir. 2009).

---

[8]    The en banc Court is considering whether to defer to a district court's claim construction. *Lighting Ballast Control LLC v. Philips Elec. N. Am. Corp.*, 500 F. App'x 951 (Fed. Cir. 2013).

This Court "reviews a trial court's admission or exclusion of expert testimony for abuse of discretion." *Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GmbH*, 408 F.3d 1374, 1380 (Fed. Cir. 2005).

"This [C]ourt reviews the legal sufficiency of jury instructions on an issue of patent law without deference to the district court." *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1278 (Fed. Cir. 2011). A jury verdict will be set aside if the jury instructions were "legally erroneous" and "the errors had prejudicial effect." *Id.* (citations omitted).

## ARGUMENT

### I. THE INFRINGEMENT JUDGMENT FOR THE '568 PATENT SHOULD BE REVERSED.

#### A. There Is No Substantial Evidence That The Accused Products Have A "Service Type Identifier."

Each asserted claim of the '568 patent requires "a *service type identifier* which identifies a type of payload information." A272(13:16-17). The district court correctly construed this phrase to mean: "[A]n identifier *that identifies the type of information* conveyed in the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia." A19. Ericsson presented no evidence, let alone substantial evidence, that Defendants' products contain such an identifier.

31

Ericsson alleged that the TID subfield found in data packets transmitted by Defendants' accused products is a "service type identifier." A1404(31:21-32:24); A16761-A16762. But the accused functionality of the TID subfield determines only the ***transmission priority*** for data packets. A1405(33:6-13); A1514(153:7-22); A1551(114:12-23). It contains a single number; when that number is between 0 and 7, it corresponds to the user priority ("UP") for a particular packet, as shown in Table 9-1 of the 802.11n standard:

**Table 9-1—UP-to-AC mappings**

| Priority | UP (Same as 802.1D user priority) | 802.1D designation | AC | Designation (informative) |
|---|---|---|---|---|
| Lowest | 1 | BK | AC_BK | Background |
| | 2 | — | AC_BK | Background |
| | 0 | BE | AC_BE | Best Effort |
| | 3 | EE | AC_BE | Best Effort |
| | 4 | CL | AC_VI | Video |
| | 5 | VI | AC_VI | Video |
| Highest | 6 | VO | AC_VO | Voice |
| | 7 | NC | AC_VO | Voice |

UP values 0 to 7 are contained in the TID subfield

A15781 (annotations added). The TID subfield value of 0 to 7 determines which of four transmission queues a packet will be placed in. Generally, packets in

higher-priority queues are likely to be transmitted before packets in lower-priority queues.  A1405(33:6-34:5, 35:23-36:15).  For example, packets with TID subfield values 6 and 7 are mapped to the AC_VO Access Category ("AC"), which corresponds to the highest-priority queue for transmission.  A15781; A1405(35:2-22).

A packet's TID subfield value thus indicates that packet's transmission priority, but, as Ericsson's expert conceded, it "[does not] necessarily reflect the type of data that's in the payload."  A1405(36:20-23); *see* A1406(37:8-18). Rather, Dr. Nettles agreed that "an 802.11n system *cannot determine from the TID value whether the data in the payload is video, voice, Internet, or multimedia*."  A1647(34:17-21); *see* A1406(38:19-23) ("Q. So whether the information conveyed in the payload is voice or video is not apparent from looking at the TID value, correct?  A. At the 802.11, yes -- level, yes, sir, correct.").[9]

Dr. Nettles further conceded that, for example, a TID value of 0 could be found in a data packet that contains voice, video, or any other type of information. A1406(38:24-39:2) ("Q. Now, if you look at a TID value of zero, for example, you can't tell whether the information in the payload is voice, video, data, or

---

[9]      Dr. Nettles agreed that "*nothing* in the accused devices that implement 802.11 functions looks at the payload of a data packet and, from that, identifies the type of information that's actually in the payload." A1406(38:5-18).

multimedia, can you? A. That's correct."); *see* A1406(39:3-6) (admitting that,

looking at "a TID value of 6, you can't tell whether that data in the payload is

video or voice or something else"). Meanwhile, as Dr. Nettles also agreed, two

packets carrying the same type of information, such as video, could have two

different TID values. A1647(33:15-34:21).

Dr. Nettles' admissions were corroborated by *every* witness who testified on

this topic.[10] Thus, there was no substantial evidence that the accused TID subfield

"identifies the type of information conveyed in the payload," as the claims require.

A19.

### B. The District Court Erred By Ruling That Mere Capability Was Enough To Infringe The '568 Patent—A Theory Unsupported By Substantial Evidence In Any Event.

Faced with these undisputed facts, Ericsson resorted to arguing infringement

based on mere capability. *E.g.*, A1396(125:20-21)(Nettles) ("[T]his claim is

infringed because of the capability of doing this."). Ericsson contended that, even

though there is no necessary correlation between a data packet's TID subfield

value and the type of information in that packet's payload, the accused products

are still *capable* of infringement because there *could be* a correlation between TID

subfield value and payload information type. The district court then instructed the

---

[10]    *E.g.*, A1485-A1487, A1504(38:12-15, 46:2-13, 116:15-23)(Kitchin); A1514(153:23-154:6)(McFarland); A1551-A1552(114:12-23, 117:9-13)(Gibson).

jury, over Defendants' objection (A1660(86:2-24)), that "[a]n accused system or product directly infringes a claim if it is ***reasonably capable*** of satisfying the claim elements even though it may also be capable of non-infringing modes of operation." A211; *see* A1671(23:7-11). That instruction was legally erroneous, as was the denial of JMOL on the same basis.

Ericsson's "capability" theory focused on the last column in Table 9-1 of the 802.11n standard. A15781; *see supra* p. 32. That column provides "informative" designations for the four Access Categories, which correspond to the different priority queues for transmission. A1405(35:5-36:12). An "informative" designation provides an ***example*** of how the standard may be implemented, but it does not "actually set[] a compliance or conformance requirement." A1506(122:6-20). In the example shown in Table 9-1, the informative designations for the various Access Categories are "Background," "Best Effort," "Video," and "Voice." A15781. That example only indicates, for instance, that the TID subfield values 4 and 5 ***could*** be used to correspond to "video," but the standard does not require it. A15781; A1394(118:5-13).

Ericsson did not dispute that these informative designations do ***not*** require data packets containing "video" information to have TID subfield values of 4 or 5, or packets containing "voice" information to have TID subfield values of 6 or 7. Instead, Ericsson argued that certain software programs can ***choose*** to assign TID

35

subfield values in that manner. A1395-A1396(124:23-125:2)(Nettles) ("[The program] won't always take advantage of this facility. Only when it thinks it's advantageous to do so."); A1394(118:5-13)(Nettles) ("[T]his table is telling someone who would use this capability that if they want to carry voice, they *should* give it a UP of 6 or 7. And if they want to carry video, they *should* give it a UP of 4 or 5."). Ericsson asserted that such a hypothetical program constitutes an infringing mode of operation, even if there is otherwise no correlation whatsoever between TID subfield value and payload information type.

In instructing the jury and denying JMOL, the district court adopted Ericsson's capability theory. A64. That was error. Even when claims are directed to an apparatus, mere capability does not constitute infringement *unless* the claim language is "drawn to capability." *Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.*, 555 F.3d 984, 994 (Fed. Cir. 2009) ("BASC's reliance on cases that found infringement by accused products that were reasonably capable of operating in an infringing manner is misplaced, since that line of cases is relevant only to claim language that specifies that the claim is drawn to capability."); *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010) ("[T]o infringe a claim that *recites capability* and not actual operation, an accused device 'need only be capable of operating' in the described mode." (citation omitted)).

36

Here, the asserted claims require not that the "service type identifier" merely be *capable* of identifying the type of information in the data packet's payload, but that it *actually* identify the type of information. A272(13:16-17) (claiming "a service type identifier *which identifies* a type of payload information"); A19. The claim language thus requires that the "service type identifier" reveal the type of information contained in a packet's payload in *all* instances.

Despite the mandatory claim language, Ericsson only sought to present evidence showing, at most, that the TID subfield value *could*, in some circumstances, correlate to the type of information in the payload. *E.g.*, A7933; *see supra* pp. 12, 34. That evidence cannot prove infringement where the claims *require* the "service type identifier" to identify the type of information in all circumstances; anything else is not a "service type identifier." *E.g.*, *Ball Aerosol*, 555 F.3d at 994-995 ("[T]he language of [the claims] specifies that infringement occurs only if the accused product *is configured* with the cover being used as a base underneath a candle holder with feet. That the Travel Candle was reasonably capable of being put into the claimed configuration is insufficient for a finding of infringement.").

Additionally, Ericsson failed to prove infringement even under its own theory. Ericsson did not show that any programs—let alone any programs running on Defendants' accused products—actually assign TID subfield values that track

the "Video" and "Voice" informative designations in Table 9-1 of the 802.11n

standard. Ericsson relied on the "Ekiga" videoconferencing program running on a

"Fedora" operating system (although it presented no evidence that any accused

products were sold with Ekiga and Fedora installed). A1395(124:3-15);

A1403(26:16-27:3); A1573(77:12-78:3). But Dr. Nettles admitted that his own

testing demonstrated that video packets sent by Ekiga do ***not*** always contain a TID

subfield value of 4 or 5, as the example in Table 9-1 shows for "Video";

sometimes the video packets had a TID subfield value of 0, which corresponds to

the "Best Effort" informative designation in Table 9-1:

> Q.     In general, with your Ekiga testing … sometimes the TID value
> was 5 and sometimes it was 0, right?
>
> A.     Yes, sir.
>
> Q.     So for the same type of packet that you knew was video,
> sometimes the TID value was 5 and sometimes the TID value was 0.
> That's what your tests showed, right?
>
> A.     Yes, sir.
>
> <div align="center">* * *</div>
>
> Q.     And the system will run those packets, whatever TID value they
> have, regardless of what's inside the packet, right?
>
> A.     Yes, sir, that's correct.
>
> Q.     And as you told me last week point-blank, that's why an
> 802.11n system cannot determine from the TID value whether the
> data in the payload is video, voice, Internet, or multimedia, right?

<div align="center">38</div>

A.    Yes, sir.

A1647(33:19-34:21); *see* A1395-A1396(124:23-125:2).[11]

Thus, even in the program on which Ericsson relied, the TID subfield does not actually identify the type of information in the data packet's payload. It therefore cannot be the claimed "service type identifier," and the infringement judgment should be reversed.

## II.    THE INFRINGEMENT JUDGMENT FOR THE '215 PATENT SHOULD BE REVERSED.

### A.    The District Court Erred In Construing "Type Identifier Field."

Claims 1 and 2 of the '215 patent are directed to "[a] method for minimizing feedback responses in an ARQ protocol," including the following step:

> responsive to the receiving step, constructing a message field for a second data unit, said message field including a ***type identifier field***.

A281(10:19-29). The intrinsic evidence makes clear that the "type identifier field" must not only identify the type of feedback response, but also be "***selected from*** multiple available feedback responses ***in order to minimize*** the size or number of

---

[11]    While Ericsson claimed that other applications operate like Ekiga, it presented no testimony about those applications other than Dr. Nettles' conclusory statements. Dr. Nettles claimed that he had tested the other applications, but said nothing about what his tests purportedly showed. A1395-A1396(123:4-125:2).

feedback responses," as Defendants proposed.  A5084.  The district court improperly omitted this requirement from its claim construction.[12]

Each asserted claim is drawn to "a method for minimizing feedback responses" in which the optimal feedback response must be constructed in a manner "***responsive to the receiving step***."  A281(10:24).  Unlike the prior art's use of a "static" message type, the claims require constructing a feedback response in response to the incoming data to "minimiz[e] feedback responses," which is the claimed invention's expressly-recited purpose.  A281(10:19); *see Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1362 (Fed. Cir. 2004) ("A preamble may provide context for claim construction, particularly, where as here, that preamble's statement of intended use forms the basis for distinguishing the prior art.").

The problem the inventors sought to solve concerned inefficiencies resulting from the "static" use of a one-size-fits-all feedback response, when a more efficient

---

[12]    As Ericsson acknowledged, the only claim construction dispute for this limitation was whether it requires minimizing the size or number of feedback responses.  A6475:14-19.  Thus, Ericsson readily conceded that "***the invention is, as is expressed in the claims, giving the receiver a choice*** and constructing a message field that has a type identifier ***so it can express what it has chosen***."  A6478:5-9; *see also* A6473:2-6; A6473:21-A6474:2; A6474:17-18; A6477:17-22; *infra* pp. 43-44.

response type is available.  A278(3:46-50); *supra* pp. 13-15.  The purported

solution is to "select" a feedback response to optimize system performance:

> ***The solution to the problem*** is to have a set of different types of
> mechanisms to indicate the erroneous D-PDUs and build up the
> S-PDU by using one or combining several of these mechanisms.  ***The
> different methods chosen when building an S-PDU may then be
> selected in such a way that it optimises the performance*** according to
> some criteria.

A5170 (provisional application); *see* A281(9:12-14).  As the "Summary of the

Invention" teaches, the feedback response is customized to optimize system

performance by minimizing feedback responses.  A278(4:48-50).  That

customization responds to the incoming data units by using specific criteria, such

as the size of the feedback response or the number of data units identified in a

feedback response.  A278(4:50-54).[13]

    This is not merely some side "benefit" of the invention—***it is*** the invention.

The '215 patent repeatedly confirms that the claimed invention minimizes

feedback responses.  Its title is "Method for ***Minimizing Feedback Responses*** in

ARQ Protocols," and its abstract states that a "method for ***minimizing feedback

responses*** in an ARQ protocol is disclosed."  A273; *see also* A279(5:51-59);

A281(9:10-14, 9:27-36).  Further, the patent expressly illustrates how the claimed

---

[13]    The advantages identified in the '215 patent—saving radio bandwidth,
minimizing protocol overhead, and increasing system capacity—flow from
reducing the size or number of feedback responses.  A278(4:43-60).

invention is performed by, for example, calculating the sizes of "list" and "bitmap" feedback responses in response to different sequences of incoming data units, thereby allowing the system to select the type of feedback response with the smallest size. A278(4:1-40); A281(9:27-50).

Thus, the specification—the "single best guide to understanding the meaning of the disputed term," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (citation and internal quotation marks omitted)—confirms that the appropriate feedback response ***must be selected from multiple available feedback responses*** in a manner responsive to the incoming data packets. *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (claim construction seeks "to capture the scope of the ***actual invention***" to avoid "allow[ing] the claim language to become divorced from what the specification conveys is the invention").

Under a proper construction of "type identifier field," Defendants' products undisputedly do not infringe. As Ericsson's expert confirmed, the accused products "will ***always*** send" only one static type of feedback response—the "[C]ompressed BlockAck." A1425(113:14-114:17). They therefore cannot generate a feedback response that "is selected from multiple available feedback responses." And because the accused products do not have multiple types of feedback responses from which to select, they also cannot generate a selected

42

feedback response "in order to minimize the size or number of feedback responses." No reasonable jury could have found infringement under a correct construction. The infringement judgment should be reversed or, at a minimum, vacated and remanded for a new trial under the proper construction.

### B. Even Under The District Court's Construction, There Is No Substantial Evidence That The Accused Products Generate Feedback Responses "From A Number Of Different Message Types."

Even under the district court's erroneous construction, Defendants' accused products do not infringe. The court ruled that the asserted claims require the type of feedback response message to be generated "*from a number of different message types*." A9. Essential to this construction was Ericsson's repeated assertion—which the court adopted—that the receiver must make a "choice" among different message types. As Ericsson's counsel urged during claim construction:

> *[T]he invention is, as is expressed in the claims, giving the receiver a choice* and constructing a message field that has a type identifier *so it can express what it has chosen* to use as a format for communicating the packets that have been dropped.

A6478:5-9; *see also* A6473:2-6; A6473:21-A6474:2; A6474:17-18; A6477:17-22; A8 n.2 ("Ericsson … contends that the invention is 'the creation of a *choice* in the receiver of multiple different formats of messages to use and then also the creation

of a type identifier field which allows the receiver to identify to the transmitter

which it is *choosing*.'").

   In its pre-trial brief, Ericsson again acknowledged that "the '215 patent

enables devices *to choose between different feedback responses* by using a type

identifier field."  A6523; *see* A7026 (Ericsson stipulating that "the '215 patent

enables devices *to choose between different feedback responses* by using a type

identifier field").  Ericsson's expert likewise testified at trial that "what must

happen in order for this claim to be infringed is that *after* a packet is received by

the receiver, the receiver has to generate a message field which identifies a type

from a number of different message types."  A1646(29:21-30:1).  Inventor

testimony confirmed this as well.  A1340(69:24-70:10).

   No reasonable jury could have found infringement under the district court's

construction, because the undisputed evidence established that Defendants'

accused products, as manufactured and programmed, can transmit only *one type* of

acknowledgement—a "[C]ompressed BlockAck."  A1425(114:12-17)(Nettles) ("It

will always send a compressed BlockAck, yes, sir.");  *see also* A1493(72:10-16);

A1512(147:4-20); A1549(106:12-23).  Because the receivers in the accused

products do not (and cannot) make a choice of message type, Defendants' products

do not perform the claimed step of constructing a message field "*responsive to the*

*receiving step*" that identifies the feedback response message type "*from a number of different message types*." A9; A209.

Ericsson did not contest these facts. Instead, Ericsson attempted to disavow its prior acknowledgments of the need for a "choice" and told the jury that Defendants infringed based solely on the existence of certain bits that Ericsson claimed were a "type identifier field," while ignoring that the accused products do not generate any acknowledgement "from a number of different message types." A1680-A1681(60:5-61:3).

Ericsson's indefensible change in position led the district court to commit legal error in its JMOL opinion. The court stated that its claim construction did not require the receiver to make a choice (A60-A61), even though the claim construction—given to the jury without objection—clearly required just that. Specifically, the claim construction required the message type of the feedback response to be generated "from a number of different message types" in response to incoming data packets. A9; A209. Because the claims require generating the feedback response in a manner "responsive" to the incoming data, the receiver must choose among different message types, as both sides agreed. *See supra* pp. 16, 43-44.

Under the claim construction given to the jury, no reasonable factfinder could have found infringement. Moreover, the district court erred in denying

45

JMOL based on a different claim construction not presented to the jury. *See Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1320 (Fed. Cir. 2003) ("When issues of claim construction have not been properly raised in connection with the jury instructions, it is improper for the district court to adopt a new or more detailed claim construction in connection with the JMOL motion.").

### C. There Is No Substantial Evidence That Defendants Directly Infringed Or Induced Infringement Of The Asserted Method Claims.

Separately, because the '215 patent's asserted claims are *method* claims, Ericsson had to prove either (i) that Defendants directly infringed by performing the claimed method themselves, or (ii) that Defendants induced others to infringe by performing the claimed method. Ericsson proved neither.

*First*, Ericsson presented no evidence that Defendants "perform[ed] all the steps of the claimed method" themselves. *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1362 (Fed. Cir. 2013) (citation and internal quotation marks omitted). Rather, Ericsson argued—and the district court agreed—that Defendants' *sales of accused products* directly infringed the *method* claims because the accused products "'automatically perform the disputed steps' without user modification." A68 (relying on *SiRF Tech., Inc. v. ITC*, 601 F.3d 1319, 1331 (Fed. Cir. 2010)). That was error.

46

In *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325 (Fed. Cir. 2008), this Court made clear that "a party that sells or offers to sell software containing instructions to perform a patented method does not [directly] infringe the patent." *Id.* at 1335. *SiRF* did not overrule *Ricoh* (and could not have); nor did it alter the longstanding proposition that direct infringement of a method claim requires performing all claimed steps. In *SiRF*, this Court determined that the defendant performed the claimed method steps by providing an "end-to-end service" to its customers, and rejected attempts to read into the claims additional limitations that would be performed by the defendant's customers. 601 F.3d at 1329-1331 (construing the claims as ***not*** requiring the defendant's customers to "forward," "download," "enable," or "activate"). Here, by contrast, there is no evidence that Defendants performed ***any*** of the claimed method steps or provided ***any*** service to customers who buy their products. Accordingly, the court erred in ruling that Defendants directly infringed the method claims. *See Aristocrat*, 709 F.3d at 1362; *Ricoh*, 550 F.3d at 1335; *Cybersettle Inc. v. Nat'l Arbitration Forum, Inc.*, 243 F. App'x 603, 607 (Fed. Cir. 2007) (non-precedential) ("A party that does not perform a claimed step does not infringe a method claim merely because it is capable of doing so.").

***Second***, Ericsson failed to prove that Defendants induced infringement of the asserted method claims. Induced infringement "requires both knowledge of the

existence of the patent and 'knowledge that the induced acts constitute patent infringement.'" *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1367 (Fed. Cir. 2013) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011)). In addition, the alleged infringer must specifically intend to encourage another's direct infringement. *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc).

Regarding knowledge and specific intent, Ericsson cited the following: (i) Ericsson gave Defendants notice of the patents before filing suit; (ii) Defendants sold the accused products; and (iii) Defendants advertised that their products are 802.11n-compliant. A71. But those facts do not show that Defendants knew that using the products to comply with the standard constituted ***infringement***, much less that Defendants specifically intended to induce infringement of the claimed method.[14] A defendant's mere awareness of a patent prior to selling its products does not establish specific intent to cause infringement. *DSU*, 471 F.3d at 1305. Likewise here, Ericsson failed to show that Defendants knew or intended that infringement would occur. Reversal is warranted for this reason as well.

---

[14] Compliance with the 802.11n standard refers to interoperability; it does not require that every substantive section of the standard be included in a Wi-Fi-certified product. A1519-A1520(175:18-177:1).

III. **THE INFRINGEMENT AND VALIDITY JUDGMENTS FOR THE '625 PATENT SHOULD BE REVERSED.**

A. **There Is No Substantial Evidence That The Accused Products' Transmitters Send A "Command To Receive" Packets.**

Claim 1 of the '625 patent recites "[a] method for discarding packets in a data network" that includes the following step:

> a *transmitter* in the data network *commanding a receiver* in the data network *to* a) *receive* at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet ….

A254(10:13-19). No reasonable jury could have found that Defendants' accused products satisfy that "command to receive" limitation. Rather, an 802.11n-compliant transmitter undisputedly does *not* send the receiver a "command to receive" data packets later in sequence than an outdated packet that the transmitter has discarded. *E.g.*, A1412(61:22-62:8)(Nettles). The reason is simple: an 802.11n-compliant receiver accepts *all* valid data packets *without* being commanded by the transmitter to do so, regardless of when or the order in which the packets are received.[15]

---

[15]    A1412-A1415(64:24-65:11, 67:2-68:15, 72:7-11, 72:16-73:3, 75:2-5); A1489-A1490(55:9-56:8, 57:10-58:5); A1513(149:14-150:2, 150:11-21); A1530(30:14-31:16); A1532-A1534(39:10-23, 41:4-7, 41:24-42:21, 45:18-46:18); A1536-A1537(54:13-55:13, 57:10-21, 57:24-58:12); A1574-A1575(81:9-22, 84:21-85:6, 86:11-17); A15128; A15178.1-A15178.2; A15248; A15594; A16883-A16884.

Experts and engineers on both sides, as well as the patent's inventors, testified that a receiver that accepts all packets does not need the transmitter to send it a "command to receive."[16]  That is logical; a transmitter cannot "command" a receiver to do what it already does on its own.  As Dr. Nettles agreed:  "If [the receiver] could receive [a packet], then would you need to ***insist*** that it receives it?  ***No, because it could already receive it***."  A1412-A1413(64:24-65:11); *see also* A1413(66:7-10, 66:21-25).

At trial, Ericsson did not even try to prove that an 802.11n-compliant transmitter sends the receiver a specific "command to receive" out-of-sequence data packets.  Rather, Ericsson argued that, given that the receiver accepts all valid packets, ***every ordinary packet*** sent by the transmitter effectively "commands" the receiver to accept it.  Dr. Nettles thus testified that "the packets themselves … are the commands" (A1624(105:20-23)), which he attempted to explain as follows:

> Q.    Okay.  And what makes that a command?
>
> A.    Well, the system doesn't have any choice about whether or not to accept that packet or not.  It's—it's required to do that, and that's what makes it a command.

A1384(80:4-15).

---

[16]    A1308(110:7-14); A1412-A1413(64:24-65:11, 66:7-10, 66:21-25); A1490(57:17-58:5); A1530(30:14-24); A1532(40:3-20) (quoting A15243(124:3-9)); A1532(39:17-23); A1534(45:18-46:18); A1536-A1537(54:13-55:13, 57:10-21, 57:24-58:12); A1574-A1575(82:17-83:10, 84:21-85:6, 86:11-17); A15128.

Q.    And so what you're now telling the jury is, a command to receive is a standard, routine set of aggregated packets that take data from the transmitter to the receiver, right?

A.    Yes, sir.

Q.    So in your world, every single packet that carries data is a command, right?

A.    Yes, sir.

A1410-A1411(56:23-57:5); *see also* A1410(54:23-55:6); A1423(105:21-106:7).

Ericsson's attempt to equate "receiving" ordinary data packets with having a transmitter specially "command" the receiver to receive them cannot be reconciled with the claim language or the specification. The claim recites "a ***transmitter*** in the data network ***commanding a receiver*** in the data network to … receive." A254(10:16-19). The focus of this limitation is on the action of the "transmitter," requiring that it actually "command" the receiver to receive the packets, not merely that the receiver receive all data packets regardless of any "command" by the transmitter. *See* A1624(105:24-106:4)(Nettles).

Indeed, the ordinary meaning of "command" supports Defendants' position that the transmitter must specifically command the receiver to do something that the receiver otherwise would not do. A1530(30:14-31:16); *see IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1121 (Fed. Cir. 2011) ("[T]he ***command*** causes an extra payment to the user at the gaming device that the gaming device ***would not have paid out***."). The specification reinforces this by stating several times that

the command from the transmitter "force[s] the receiver to accept" packets sent its way. A251-A252(4:27, 6:39).

Additionally, as Ericsson's expert conceded, the '625 patent explicitly confirms that sending ordinary data packets *cannot* satisfy the claimed "command to receive" requirement, because the reception of such packets is identified by the '625 patent as *prior art*. A242(Fig. 5); A250(2:44-50); A1411-A1412(60:1-61:12)(Nettles); A1644(22:3-18)(Nettles); *see also* A1532(37:14-38:8)(Gibson).

In denying JMOL, the district court stated that Ericsson's expert had testified that "802.11n receivers accept all packets *because* of the command to receive. This was a fact issue ripe for jury resolution." A67 (emphasis in original). But there was no "fact issue," and certainly not as to how the accused products function. The undisputed evidence demonstrated that Defendants' products have no transmitter that "commands" a receiver to accept data packets later in sequence than an outdated packet that the transmitter has discarded. The infringement judgment for the '625 patent should accordingly be reversed.

### B. There Is No Substantial Evidence That Defendants Directly Infringed Or Induced Infringement Of The Asserted Method Claim.

As with the '215 patent, Ericsson failed to prove that Defendants directly infringed or induced infringement of the asserted method claim for the '625 patent. As to direct infringement, Ericsson presented no evidence that Defendants

performed the recited steps themselves. Contrary to the district court's reasoning (A68), Defendants' sale of the accused products does not establish that they performed the claimed method. *See supra* pp. 46-47.

Ericsson also failed to prove that Defendants induced infringement. Ericsson and the district court again relied on the facts that (i) Ericsson gave Defendants notice of the patent before filing suit; (ii) Defendants sold the accused products; and (iii) Defendants advertise that their products are 802.11n-compliant. A71. But again, that evidence could not show knowledge of infringement or specific intent to induce infringement. *See supra* pp. 47-48.

## C. A Reasonable Jury Could Only Have Found That Petras Anticipates Claim 1—Especially After Accepting Ericsson's Infringement Theory.

Defendants clearly and convincingly proved that Petras (A15027-A15053) anticipates claim 1 of the '625 patent. The ***only*** limitation that Ericsson asserted was missing from Petras was the "command to receive." A1622(99:10-100:25). But Petras discloses both the same problem ("deadlock") and the same purported solution (sending a "command to receive") as the '625 patent. After describing the problem of a receiver waiting indefinitely for a packet that the transmitter has discarded (A15041; A1584(122:14-124:5)), Petras discloses sending the receiver a "discard message," which directs the receiver to stop waiting for a delayed packet and to shift its window to receive later packets. A15041 ("In order to avoid this

53

situation a short *discard message* that only contains the sequence number instead of the discarded cell is sen[t] by the sender." (emphasis in original)); A1584(123:24-124:10); A1586(130:6-132:21); A1588-A1589(140:10-141:8); A1622(100:7-11). The transmitter's discard message is piggybacked onto a packet and ***forces*** the receiver to accept later packets instead of waiting for delayed packets that the transmitter is not going to re-send—and that is a "command to receive." A15041-A15042; A1586(130:20-132:21); A1588-A1589(140:10-23, 142:22-143:19); A1593-A1595(160:16-161:2, 161:7-24, 166:24-167:20).[17]

Ericsson's contention that Petras' "discard message" does not satisfy the "command to receive" limitation is not only wrong; it is also contradicted by Ericsson's insistence that, for infringement purposes, ***every*** ordinary data packet is itself a "command to receive." A1410-A1411(56:23-57:5)(Nettles); *see supra* pp. 50-52. Petras describes the transmission and receipt of both ordinary data packets and ordinary data packets with discard messages appended to them. A15041; A1584(123:24-124:10); A1586(130:20-131:22). Thus, under any reading of the asserted claim, Petras discloses a "command to receive" and anticipates claim 1.

---

[17]   The district court pointed to a purported admission by Defendants' expert that, as a general matter, a message that merely informs a receiver that the transmitter has discarded packets does not necessarily "command" the receiver to receive other packets. A74. But Dr. Heegard was clear that the particular discard message disclosed in Petras, which solves the deadlock problem, is a "command to receive." A1593-A1594(160:16-161:2).

*See Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir.

2005) ("A century-old axiom of patent law holds that a product 'which would

literally infringe if later in time anticipates if earlier.'" (citation omitted)).  The

validity judgment for the '625 patent therefore should be reversed.[18]

## IV.  THE DISTRICT COURT PREJUDICIALLY ERRED BY PERMITTING ERICSSON TO USE THE ENTIRE MARKET VALUE OF END PRODUCTS TO JUSTIFY ITS DAMAGES CLAIMS.

"Where small elements of multi-component products are accused of

infringement, calculating a royalty on the entire product carries a considerable risk

that the patentee will be improperly compensated for non-infringing components of

that product."  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67

(Fed. Cir. 2012).  A patentee may therefore recover damages based on the entire

market value of the accused end product only if the patentee proves that "the

patent-related feature is ***the*** 'basis for customer demand'" for the end product.

*Lucent*, 580 F.3d at 1336 (citation omitted).

Ericsson did not dispute that the asserted claims are practiced (if at all) by

relatively minor features within ***the Wi-Fi chips***, not by other components in

Defendants' accused ***laptops and routers***.  A1296(62:18-63:1, 63:18-64:1);

A1403(25:21-26:2, 27:4-7)(Nettles); A1441(19:8-22)(Bone).  Ericsson introduced

---

[18]    Because the jury's damages award clearly reflected a price-per-patent
approach (*see infra* pp. 65-66), vacatur or reversal of the infringement judgment as
to any one patent means the damages award must be reduced.

no evidence that those features, or even the entire Wi-Fi capability, drive demand for the accused end products. In fact, Ericsson's damages expert admitted that he did not even analyze which features drive laptop or router sales. A1444(31:4-20).

Despite conceding that it could not satisfy the EMV rule (A1444(31:4-20)), Ericsson sought—and the jury awarded—a royalty that was, in fact, derived from the entire market value of Defendants' expensive, multi-component end products, not from the inexpensive chips that provide their Wi-Fi functionality. To make matters worse, Ericsson frequently juxtaposed its royalty demand with end-product prices to make the claimed damages seem reasonable by comparison. Those tactics—and the district court's acceptance of them—violate this Court's precedents and warrant reversal or a new trial.

### A. Ericsson's Damages Case Violated The EMV Rule.

#### 1. Ericsson improperly derived its per-unit royalty from end-product prices and justified that royalty by reference to end-product licenses.

Ericsson attempted to evade the EMV rule by not asking the jury to award a percentage of the end-product price directly, and instead requesting "flat" per-unit royalties with $0.50 per unit as the preferred rate. But as Ericsson's own witnesses testified, Ericsson in fact arrived at its per-unit royalty by applying a 0.5% royalty to each ***end-product*** sales price with an arbitrary $0.50 per-unit cap. Christina

Petersson, head of Ericsson's IPR and technology legal department, clearly linked

Ericsson's royalty demand and the sales prices of end products:

> Q.    …There's a rate of one-half of 1 percent; is that correct?
>
> A.    Yes.
>
> Q.    ***And this is the price of the end product, things that are sold to consumers?***
>
> A.    ***Yes.***
>
> Q.    One-half of one percent.  But there's a maximum of 50 cents?
>
> A.    Yes, there is.

A1325(11:8-16).

Ericsson's witnesses also testified that Ericsson had a policy of licensing its

Wi-Fi patents not to chip suppliers, but only to end-product manufacturers.

A1323(4:4-15); A1329(27:5-11); A1335(50:14-17); A1600(9:15-19).  According

to Ms. Petersson, Ericsson adopted this policy to extract higher royalties by

licensing much more expensive end products:

> Q.    … Now, you won't deny, will you, Ms. Petersson, that your patenting group adopted this strategy to maximize profits— namely, the strategy of not going to chipset makers for a license; am I correct?
>
> A.    Yes, you're correct. …
>
>               * * *
>
> Q.    All right.  But ***you're not denying that one big advantage, from Ericsson's perspective, is that if its chipset maker stays***

>*out of the negotiation room policy will make it likely that the royalty will be higher since you're dealing with folks who make a more expensive product*?  You're not denying that, are you?

A.  *No, correct.  Because it's the—the product that can be used that we see the value of our technology.*

A1331-A1332(36:19-22, 40:14-22). 

Consistent with that approach, Ericsson's royalty demand relied entirely on licenses to end-product manufacturers (A1433(146:8-20); A15298-A15479; A17256-A17275),

_____

[19]    A15304; A15316; A15326; A15333; A15339; A15353; A15440-A15442; A15457-A15458; A17262; A1461-A1463(8:4-12, 10:5-10, 12:23-13:3, 14:3-9, 15:3-10)(Bone).

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

███████████).  In other words, Ericsson used licenses incompatible with the EMV rule to urge a damages award far larger than the EMV rule would allow.

As the final proof that Ericsson's demand was tied to end-product prices rather than the value of the component (let alone features) at issue, Ericsson's damages expert refused to employ the Wi-Fi chip itself as the starting point for a royalty base, and Ericsson even declined to seek damages against Intel's allegedly infringing 802.11n chips.  A1433(145:12-14, 146:8-20) ("the price of the chip is not relevant in determining the royalty").  In short, Ericsson ignored the proper starting point in favor of a more lucrative—but legally impermissible—royalty base.  *See In re Innovatio IP Ventures, LLC Patent Litig.*, 2013 WL 5593609, at *14 (N.D. Ill. Oct. 3, 2013) (rejecting end-product-based Wi-Fi royalty arguments because use of "end-products as a royalty base would include value far beyond the patented features of the 802.11 standard" and the patentee "did not credibly apportion the value of the end-products down to the patented features").

### 2. Ericsson improperly drew comparisons between its royalty demand and end-product prices.

Over Defendants' objection (*e.g.*, A1437-A1438(4:15-5:14)), Ericsson made repeated and prejudicial use of its EMV evidence to "skew the damages horizon for the jury" by contrasting the royalty sought against some large but inapplicable sales price.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011).  Ericsson's counsel used this comparison as early as *voir dire*, remarking

59

that "a laptop [has] … got all the features you want, including Wi-Fi, and it cost a thousand dollars." A1224(42:11-14). Counsel's opening statement likewise observed:

> I mentioned a reasonable royalty a couple of times and I'm sure you're probably wondering how much is that? The standard rate that Ericsson charges for a license to its essential 802.11n patents *is 50 cents per device for laptops and routers*. That's a one-time payment. It's good for the lifetime of the device regardless of how often it's used and the price is the same regardless of *whether it's a 100-dollar router or 1,000-dollar laptop*.

A1251(46:2-10). Ericsson's counsel also elicited Ms. Petersson's agreement that "*50 cents is a relatively small price of a thousand-dollar laptop*." A1325(12:19-21).

Ericsson's damages expert similarly highlighted the sales prices of laptops and routers in establishing the basis for his royalty calculation. *E.g.*, A1432(144:2-14) (explaining that "routers typically sell—at least the ones sold by the Defendants here, range in price from 30 to $60; and for computers that are sold by the Defendants in this case, average 500 to a thousand dollars apiece"); A1433(146:8-20) ("[T]he price of the chip is not relevant in determining the royalty. … [T]he market rate they've been willing to pay is in the neighborhood of 50 cents per unit, and that is based on the sales of the end user products.").

Ericsson's repeated invocation of the expensive sales prices of end products—rather than the prices of the Wi-Fi chips, much less the value of the

60

accused features within those chips—contravenes a primary purpose behind the

EMV rule:  to shield jurors from evidence and argument that "only serve[s] to

make a patentee's proffered damages amount appear modest by comparison, and to

artificially inflate the jury's damages calculation."  *LaserDynamics*, 694 F.3d at

68; *see Uniloc*, 632 F.3d at 1320.

**B.    The District Court Prejudicially Erred By Repeatedly Failing To
Enforce The EMV Rule.**

The district court enabled Ericsson's legally improper damages presentation

through a series of errors, any one of which compels reversal or a new trial.

**1.    The district court erred in denying Defendants' *Daubert*
motion relating to the EMV rule.**

Before trial, Defendants moved to exclude Mr. Bone's expert testimony as

contrary to the EMV rule.  A5681-A5698.  The district court denied Defendants'

motion on two grounds, but neither is correct.

*First*, the court reasoned that Mr. Bone's royalty base was the "market value

of the contribution of the asserted patents to the end products," not "the market

value of the end products."  A35-A36.  The court appears to have concluded that

Ericsson could refer to end-product prices because Ericsson did not explicitly seek

a percentage of those end-product prices, but instead argued that its patents

provided "value" to the end products.  That reasoning, if accepted, would render

the EMV rule meaningless.  A patentee can always claim that its invention

61

provides *some* "value." But this Court's precedents hold that a patentee can rely on a multi-component product's entire market value only if the patented feature is "*the* basis for consumer demand," not merely *a* basis for demand. *Lucent*, 580 F.3d at 1337; *see Uniloc*, 632 F.3d at 1318.

Moreover, as Ms. Petersson acknowledged, the "flat rate" claimed by Ericsson was still derived using an improper royalty base, namely the prices of end products subject to a cap. A1325(10:21-12:7). A patentee cannot sidestep this Court's EMV precedents by presenting its damages claim as a "flat rate" that is itself originally derived from an improper EMV base. That "the royalty rate remains constant" despite fluctuations in end price (A36) does not render the requested royalty "'reasonable' in light of the technology at issue." *LaserDynamics*, 694 F.3d at 67.

***Second***, the district court relied on the existence of other licenses to excuse Ericsson's violation of the EMV rule, summarily concluding: "It goes without saying that the licensees would not have paid value for portions of the 802.11 standard unrelated to Ericsson's patents." A36. That reasoning, too, is legally erroneous. The EMV rule is not satisfied simply because ███████████████████ ████████████████████████████████. Again, if that were the case, this Court's EMV precedents could be circumvented whenever a patentee produced a license that allegedly included end-product royalties, without any proof

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

that the patented features were the basis for consumer demand. A legally improper

damages theory does not become proper merely because it could be consistent with

a license.

That is particularly so here, because the licenses that Ericsson relied on are

not comparable to the license that a hypothetical negotiation would have yielded.

*See Lucent*, 580 F.3d at 1332 (patentees have the burden "to prove that the licenses

relied on [are] sufficiently comparable"); *Innovatio*, 2013 WL 5593609, at *31

(802.11-related licenses were not comparable because ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ A1360(8:11-9:15);

A1471(49:5-50:24); A1631-A1634(7:19-19:4); *see ResQNet.com, Inc. v. Lansa,*

*Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (licenses "radically different" from the

"hypothetical agreement under consideration" are not comparable); *Lucent*, 580

F.3d at 1328 (██████████████████████████████████

██████████████████████████████████████████); *see also Innovatio*,

2013 WL 5593609, at *34 ████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████).

63

### 2. The district court erred in refusing to instruct the jury on the EMV rule.

The district court also erred by refusing Defendants' request to instruct the jury on the EMV rule. A6643; *see* A1663(99:20-100:8). That omission was critical because Ericsson based its royalty on end-product prices, repeatedly referred to a laptop's thousand-dollar price tag, and attempted to capture the full value of Wi-Fi, not just the patented features. *See supra* pp. 56-61. Given Ericsson's approach, the court's refusal to instruct the jury on the limited use of the erroneously admitted evidence of the accused products' entire market value undoubtedly "had [a] prejudicial effect" requiring a new damages trial. *See Commil*, 720 F.3d at 1365, 1367 (requiring new trial where erroneous instruction "certainly could have changed the result"); *Uniloc*, 632 F.3d at 1320 (affirming grant of new trial where EMV rule violation necessarily "skew[ed] the damages horizon for the jury").

### 3. The district court erred in denying Defendants' JMOL and new-trial motion on EMV issues.

Finally, the district court incorrectly denied Defendants' motion for JMOL or a new trial. A103. Ericsson presented no legally permissible evidence establishing a reasonable royalty consistent with the EMV rule—most notably, no evidence (much less any damages analysis) as to how its royalties could be properly derived from the cost of the specific, allegedly infringing functionality

64

within the accused products, or even the cost of the Wi-Fi chips, which themselves

contain many features that Ericsson's asserted patents admittedly do not cover.

*See supra* pp. 9, 23.[20]

Ericsson's legally improper EMV evidence plainly influenced the jury's

damages award. Ericsson's damages expert—who impermissibly relied on the

accused products' entire market value and on non-comparable end-product

licenses—testified that a reasonable royalty range would be $0.34 to $0.59 per unit

for routers and $0.25 to $0.88 per unit for laptops, and advocated $0.50 as the

reasonable rate. A1439(9:1-11); A1461-A1463(8:4-12, 9:1-11, 10:5-10, 12:23-

13:3, 14:3-9, 15:3-10). The jury selected a $0.15 per-unit royalty (A234),

apparently by adopting the lowest number in Mr. Bone's ranges ($0.25) multiplied

by three-fifths to account for the finding that only three of the five asserted patents

were infringed. Without Mr. Bone's improper opinions, the only remaining

royalty evidence was Defendants' expert's testimony that the appropriate royalty

rate was $0.009 per unit. A1602(20:5-25); A1608(43:17-44:13). This Court can

---

[20]     The district court ruled that Ericsson sufficiently apportioned its royalties

because, ████████████████████████████████████████, Ericsson

purportedly took steps to exclude royalties attributable to non-802.11 patents and

other unasserted patents. A80. But nothing in the court's reasoning changes the

fact that ██████████████████████████████████████████████

██████████████████████████████████

65

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

adopt that rate as the only one supported by admissible evidence. *See Weisgram v. Marley Co.*, 528 U.S. 440, 456-457 (2000).

At a minimum, Defendants are entitled to a new damages trial given Ericsson's improper expert testimony and repeated misleading references to the accused products' entire market value. This Court has ordered a new trial in such circumstances, even where the jury was ***instructed*** that damages could not be based on the accused products' entire market value. *See Uniloc*, 632 F.3d at 1321. Here, the court ***refused*** such an instruction, exacerbating the prejudice from Ericsson's legally improper arguments.[21]

## V. THE DISTRICT COURT PREJUDICIALLY ERRED BY REFUSING TO INSTRUCT THE JURY TO CALCULATE REASONABLE ROYALTY DAMAGES CONSISTENT WITH ERICSSON'S RAND COMMITMENT.

A new trial on damages is separately required because the district court erred in refusing to instruct the jury on the impact of Ericsson's RAND obligations.

### A. Enforcing RAND Commitments Is Critical To Preserving The Benefits Of Standards.

Industry standards, such as the 802.11n standard, play a critical role by dictating specific formats or protocols that allow products made by industry competitors to communicate and work together seamlessly. *See Microsoft Corp. v.*

---

[21] If this Court vacates the jury's damages award, the district court's determination of a $0.15 per-unit RAND rate for the patents-in-suit and order of a $0.15 per-unit ongoing royalty—which are derived directly from the jury's award (A92; A96)—should likewise be vacated.

*Motorola, Inc.*, 696 F.3d 872, 875 (9th Cir. 2012); *Innovatio*, 2013 WL 3874042,

at *3. Standards can "lower costs by increasing product manufacturing volume"

and can "increase price competition by eliminating 'switching costs' for consumers

who desire to switch from products manufactured by one firm to those

manufactured by another." *Microsoft Corp. v. Motorola, Inc.*, 871 F. Supp. 2d

1089, 1092-1093 (W.D. Wash. 2012); *see also Broadcom Corp. v. Qualcomm Inc.*,

501 F.3d 297, 308-309 (3d Cir. 2007). By providing a common platform on which

products can compete, standards impart tremendous value to both manufacturers

and consumers. This value can exceed the value of the technology itself; the

technical merits of a particular approach often matter less than the fact that all

industry participants have chosen it as the standard.

For all their benefits, however, standards pose a potential problem: the

standardization process—in which certain technologies are selected from among

available alternatives—can artificially increase the market power of parties holding

standard-essential patents. Before standardization, patented technologies compete

with other technologies on their own merits; after standardization, manufacturers

may have only a single choice—the standardized version—even if alternative

technologies are equally good. For example, travelers abroad encounter various

electrical-outlet designs that function equally well as a technical matter, but only

one design—the standard—works in each country. The same is true in technology

markets; after a standard becomes widely adopted, companies cannot effectively

compete without offering products that support the standard. *See American Soc'y*

*of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 559 (1982) ("Obviously,

if a manufacturer's product cannot satisfy the [standard], it is at a great

disadvantage in the marketplace."). This artificial power is conveyed to all holders

of essential patents even when, as is common in wireless technologies like

802.11n, a standard is subject to thousands of allegedly essential patents held by

dozens of different parties. *See* Lemley & Shapiro, *Patent Holdup & Royalty*

*Stacking*, 85 TEX. L. REV. 1991, 1992 (2007).

The artificial market power of standard-essential patents is exacerbated by

the fact that, while there may be numerous *ex ante* choices before a standard is

adopted, the *ex post* switching costs after a standard's adoption would be

"prohibitively expensive"—requiring that the industry and consumers abandon

investments in developing and purchasing products that conform to the adopted

standard. *Broadcom*, 501 F.3d at 310. Thus, once an industry becomes locked in

to a standard, the owner of a standard-essential patent can "hold[] hostage the

entire industry," *Qualcomm Inc. v. Broadcom Corp.*, 539 F. Supp. 2d 1214, 1248

(S.D. Cal. 2007), by "extract[ing] supracompetitive royalties" based on the

commercial success of the standard and the investments made by the industry and

consumers in adopting that standard. *Broadcom*, 501 F.3d at 310; *see Innovatio*,

2013 WL 3874042, at *3; A1618-A1619(84:24-85:17). This "***hold-up***"

phenomenon is widely recognized. *See Apple Inc. v. Motorola, Inc.*, 869 F. Supp.

2d 901, 913 (N.D. Ill. 2012) (Posner, J., sitting by designation) ("[O]nce a patent

becomes essential to a standard, the patentee's bargaining power surges because a

prospective licensee has no alternative to licensing the patent; he is at the

patentee's mercy."); *see also* Br. of Amicus Curiae Federal Trade Comm'n at 5,

*Apple Inc. v. Motorola, Inc.*, Nos. 2012-1548, -1549 (Fed. Cir. Dec. 14, 2012)

(hold-up demands "break[] the connection between the value of an invention and

its reward—a connection that is the cornerstone of the patent system").[22]

Relatedly, because industry standards typically incorporate hundreds or

thousands of essential patents held by multiple parties, if individual patent holders

can demand excessive royalties, the total royalty burden necessary to implement

the standard could render the standard economically unviable. *See Innovatio*, 2013

WL 5593609, at *9-10; *Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217, at

*11 (W.D. Wash. Apr. 25, 2013); *see also* A1333-A1334(44:19-45:2);

A1442(22:15-23); A1609(46:5-15). This phenomenon, where the aggregate

royalties claimed by all holders of standard-essential patents exceed what is

---

[22]     The history of this litigation underscores the risk of "hold up" even for
patents that are not standard-essential. Although Ericsson initially asserted seven
patents as essential to the 802.11n standard, it dropped two of them before trial and
the jury found two others not infringed.

economically feasible for the standard to succeed, is known as "***royalty stacking***."

Even Ericsson has acknowledged—outside this litigation—that measures must be

undertaken to guard against royalty stacking as a byproduct of standardization. *See*

*Microsoft*, 2013 WL 2111217, at *11-12 (summarizing Ericsson, Motorola, and

Nokia submission to the European Telecommunications Standards Institute).

      To help counter the dangers of hold-up and royalty stacking, most standards-

setting organizations "require firms supplying essential technologies … to commit

to licensing their technologies on FRAND terms." *Broadcom*, 501 F.3d at 313.[23]

That requirement binds declarants to "confin[ing] [their] royalty demand to the

value conferred by the patent itself, as distinct from the additional value—the hold-

up value—conferred by the patent's being designated as standard essential."

*Apple*, 869 F. Supp. 2d at 913; *see Microsoft*, 2013 WL 2111217, at *18 ("[T]here

is substantial value in the agreed standard itself apart from any contribution of the

patented technology to the standard, and the RAND commitment exists so that

[standard-essential] patent holders cannot demand more than they contribute."); Br.

of Amicus Curiae IEEE at 15-16, *Apple Inc. v. Motorola, Inc.*, Nos. 2012-

---

[23]    Some standards-setting organizations refer to a commitment to license on fair, reasonable and non-discriminatory ("FRAND") terms, similar to the RAND obligation here.

1548, -1549 (Fed. Cir. Dec. 19, 2012) ("IEEE Br.") ("Patent commitments like the IEEE [Letter of Assurance] protect implementers of a standard against hold-up.").

In sum, as courts, regulatory agencies, and standards-setting organizations have recognized, the safeguard of RAND commitments is critical in encouraging investment in standard-supporting products. IEEE Br. 12 ("Inclusion of patented technology without the patent holder's commitment that it will grant licenses to implementers on reasonable and non-discriminatory terms … jeopardizes the goal of widespread adoption."); U.S. Dep't of Justice & U.S. Patent & Trademark Office, *Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments* at 5 (Jan. 8, 2013) ("DOJ/PTO Policy Statement") ("F/RAND commitments … facilitate … successful widespread adoption of a standard[.]"); European Comm'n Memo 13/403, *Commission sends Statement of Objections to Motorola Mobility on potential misuse of mobile phone standard-essential patents—Questions and Answers* (May 6, 2013) ("In order to ensure such access and to prevent patent hold-up, standard-setting organisations generally require that members commit ex ante to license their standard essential patents (SEPs) on … (FRAND) terms."); Fed. Trade Comm'n, *Analysis of Agreement Containing Consent Order to Aid Public Comment* at 4, *In re Robert Bosch GmbH*, File No. 121-0081 (F.T.C. Nov. 26, 2012) (noting "the risk of patent hold-up that FRAND commitments are intended to ameliorate"). For these

reasons, the IEEE will generally not approve standards that require patents not

subject to a RAND commitment. *Broadcom*, 501 F.3d at 313.[24]

### B. The District Court Prejudicially Erred By Failing To Give Appropriate Jury Instructions For RAND-Committed Patents.

Ericsson undisputedly made a binding commitment to license each patent-in-

suit on RAND terms. A17252-A17255; A17249-A17251; *see Microsoft*, 696 F.3d

at 884 (approving "[t]he district court's conclusions that Motorola's RAND

declarations to the ITU created a contract enforceable by Microsoft as a third-party

beneficiary"). Yet the district court refused to instruct the jury on the implications

of Ericsson's RAND commitment in determining reasonable royalty damages. The

court instead instructed the jury on the customary fifteen factors from *Georgia-*

*Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1119-1120 (S.D.N.Y.

1970). A26-A27; A1675-A1676(40:6-42:20). Although the court added a

sixteenth factor—"Ericsson's obligation to license its technology on RAND terms"

(A28; A1676(42:21-22))—that barebones statement provided no meaningful

---

[24] Patent holders are willing to make RAND commitments because they encourage the industry to sell products supporting the standard. That, in turn, creates licensing opportunities. Moreover, consumer adoption of standardized technologies creates sales opportunities for RAND patent holders that also supply products. *See generally* DOJ/PTO Policy Statement at 5; *see also Microsoft*, 2013 WL 2111217, at *5 (describing how "[i]ndustry participants in the standard-setting process enjoy significant potential benefits").

guidance as to how the jury should determine reasonable royalty damages for RAND-committed patents.

At a minimum, the court should have instructed the jury to consider the impact of hold-up and royalty stacking in determining reasonable royalty damages for RAND-committed patents. *See Microsoft*, 2013 WL 2111217, at *86 ("RAND is informed by two prevailing concerns:  preventing stacking and eliminating hold-up."); Addendum, Tab 11, pp. 106-108 (preliminary jury instructions in *Microsoft*, providing guidance regarding the need to consider hold-up and royalty stacking in RAND cases).  The court's refusal to do so was reversible error that can only be remedied by a new trial.  But additionally, as the only judicial decisions to consider the question have concluded, the *Georgia-Pacific* factors "must be adjusted to account for the purpose of the RAND commitment."  *Microsoft*, 2013 WL 2111217, at *18-19; *see also Innovatio*, 2013 WL 5593609, at *5-6 (largely adopting *Microsoft*'s modified *Georgia-Pacific* framework).[25]  Thus, the district

---

[25]  Federal regulators have endorsed the approach taken in these cases.  *See* Renata Hesse, Deputy Assistant Attorney General, Antitrust Division, U.S. DOJ, *The Art of Persuasion:  Competition Advocacy at the Intersection of Antitrust and Intellectual Property* at 12, *available at* http://www.justice.gov/atr/public/speeches/301596.pdf ("In my view, both [*Motorola* and *Innovatio*] applied sensible approaches to calculating the appropriate value of RAND-encumbered patents essential to a standard.").

court further erred in giving generic *Georgia-Pacific* instructions that were

unsuitable for the RAND context.[26]

### 1. The district court erred by refusing to instruct the jury to consider hold-up.

Defendants requested instructions making clear that Ericsson should not

receive damages based on hold-up value, including the following instruction:

> [I]n order to prevent patent hold-ups, which RAND commitments are
> designed to prevent, the parties would examine a reasonable royalty
> rate under the RAND commitment based on the contribution of the
> patented technology to the capabilities in the standard, and in turn, the
> contributions of those capabilities in the standard to the Defendants
> and the Defendants' products.

A6639.  Defendants also urged the court to omit *Georgia-Pacific* Factor 6—"[t]he

effect of selling the patented specialty in promoting … derivative or convoyed

sales" (*Georgia-Pacific*, 318 F. Supp. at 1120)—a consideration that would

actually *increase* patent hold-up by permitting consideration of the artificial

market power conferred by standardization.  *Microsoft*, 2013 WL 2111217, at *18.

And Defendants sought modifications of Factors 8, 9, 10, 11, and 15 so that they

would not suggest that hold-up value is a proper measure of damages.  A6641-

---

[26]    For example, Factor 4—whether the licensor has sought "to maintain his
patent monopoly by not licensing others" (*Georgia-Pacific*, 318 F. Supp. at
1120)—makes little sense for a RAND patent, which must be licensed to all
comers on non-discriminatory terms.  *See Microsoft*, 2013 WL 2111217, at *18.
Instructing the jury on Factor 4 was likely only to cause confusion, yet the district
court rejected Defendants' request to omit it (A224; A6640).

A6642 (proposing the following instructions: that Ericsson is not entitled to damages based on the "existence of the standard itself as distinct from the value of Ericsson's technology claimed in the patents-in-suit"; "you should consider the contribution of the patent to the technical capabilities of the standard"; "you should also not take into account the value created to Ericsson by the existence of the standard itself"; "it is important to separate the patented technology from the value associated with incorporation of the patented technology into the standard"; and that a purpose of RAND commitments is "preventing patent hold-ups"); *see Microsoft*, 2013 WL 2111217, at *18; *Innovatio*, 2013 WL 5593609, at *5.

By refusing these instructions (A224-A225; A1663(98:16-99:3)), the district court erroneously allowed the jury to award Ericsson damages based on the inflated value its patents acquired from their alleged incorporation into the 802.11n standard. *See Microsoft*, 2013 WL 2111217, at *12 (patent holder is entitled to "the economic value of [the] patented technology itself, ***apart from the value associated with incorporation of the patented technology into the standard***"); *Apple*, 869 F. Supp. 2d at 913 ("The proper method of computing a FRAND royalty starts with what the cost to the licensee would have been of obtaining, just before the patented invention was declared essential to compliance with the industry standard, a license for the function performed by the patent. ***That cost would be a measure of the value of the patent qua patent***."); *Innovatio*, 2013 WL

5593609, at *9 (RAND rate should "reflect **only the value of the underlying technology** and not the hold-up value of standardization"); *cf. Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1375 (Fed. Cir. 2012) (patentee should not be permitted "to leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant").[27]

The district court's failure to focus the jury on the difference between the value of the narrow features allegedly covered by Ericsson's patents and the value of the Wi-Fi standard further prejudiced Defendants by allowing Ericsson to emphasize the value of Wi-Fi generally, rather than focus on the pre-standardization value of the relatively minor features that Ericsson claimed. This theme arose in Ericsson's opening statement and closing argument and at several points in between. *E.g.*, A1253(53:10-14) ("[T]he real comparison is 50 cents in light of the importance of Wi-Fi functionality to a laptop or a router, the ability to take the end user product and set it up in your house and surf the web or watch movies or get sports scores."); A1702(6:13-20) (██████████████████████

---

[27] The prejudicial impact of the failure to instruct the jury on hold-up was aggravated by the district court's decision to instruct the jury, over Defendants' objection (A6671-A6674), that: "An infringer's net profit margin is not the ceiling by which a reasonable royalty is capped. The infringer's selling price can be raised if necessary to accommodate a higher royalty rate." A226-A227. The record contains no foundation for that instruction, particularly in the RAND context, and the instruction effectively invited the jury to award a non-RAND royalty reflecting the hold-up value of the patents-in-suit.

76

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

██████████████████████████████████████████████████

████████████████████████ ); A1325-A1326(10:25-13:3);

A1432(143:10-144:14).

In addition, a jury properly instructed on the effect of hold-up would have

discounted Ericsson's past licenses to end-product manufacturers, on which

Ericsson based its entire damages case. *See Lucent*, 580 F.3d at 1332 ("it was

[patentee]'s burden to prove that the licenses relied on were sufficiently

comparable"). ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████ A1461(8:4-12);

A1463(13:23-14:9, 15:3-10) (████████████████████████

██████████████████████████████████████ );

A1462(9:24-11:2); A1462(9:24-11:2) (██████████████████ ); *see also*

A1325(10:21-12:2).  Because it was not properly instructed, the jury lacked the

guidance necessary to ████████████████████ .

### 2. The district court erred by refusing to instruct the jury to consider royalty stacking.

Defendants likewise requested an instruction on royalty stacking and the

need to keep aggregate royalties on standard-supporting products reasonable.

A6640 ("[P]arties attempting to reach an agreement consistent with RAND

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

obligations would consider the overall licensing landscape in existence vis-à-vis the standard and the Defendants' products."). And because the *Georgia-Pacific* factors do not address royalty stacking, Defendants also sought a corresponding modification of Factor 15. A6642 ("the aggregate royalties associated with a given standard [should be] reasonable"); *see Microsoft*, 2013 WL 2111217, at *20 (modifying Factor 15 to recognize the importance of "consider[ing] other [standard-essential patent] holders and the royalty rate that each of these patent holders might seek from the implementer based on the importance of these other patents to the standard and to the implementer's products"); *Innovatio*, 2013 WL 5593609, at *38 (considering proportionality and royalty-stacking principles as part of hypothetical negotiation).

The district court legally erred in refusing to provide these instructions. *See Innovatio*, 2013 WL 5593609, at *10 ("In evaluating a potential RAND royalty … the court will consider whether the overall royalty of all standard-essential patents would prohibit widespread adoption of the standard."); *Microsoft*, 2013 WL 2111217, at *12 ("[A] proper methodology for determining a RAND royalty should address the risk of royalty stacking by considering the aggregate royalties that would apply if other [standard-essential patent] holders made royalty demands of the implementer.").

78

The court's refusal to provide any royalty-stacking instruction also was clearly prejudicial. A properly instructed jury would have recognized that a royalty of $0.05 per patent cannot be assessed where, as here, there are hundreds (likely thousands) of patents purportedly essential to the 802.11n standard, and the Wi-Fi chip embodying the standard sells for an average of only about $2.50. A1603(23:21-23); A1608(41:19-42:18). Awarding a royalty of 6% of the average Wi-Fi chip's total price for only three patents—none of which was shown to be uniquely important or valuable—makes the development of a cost-prohibitive royalty stack almost inevitable. *See Innovatio*, 2013 WL 5593609, at *38 ("[I]f the royalty is excessive in comparison to a chip manufacturer's profit margin on a chip … the royalty is too high.").

The district court dismissed Defendants' royalty-stacking concerns as "theoretical." A87. But royalty stacking is relevant regardless of whether current licensing payments for standard-essential patents are already cost-prohibitive. If a cost-prohibitive stack exists, the time to address stacking has already passed and the harm to consumer welfare and the standard's viability has already been inflicted. *See Innovatio*, 2013 WL 5593609, at *10; *Microsoft*, 2013 WL 2111217, at *74. The district court's approach would render courts unable to prevent patent hold-up until it had already occurred to such an extent as to defeat the value of the standard. Notably, the *Microsoft* court properly did ***not*** require proof of historical

abuse as a predicate for instructions concerning the importance of RAND commitments as a safeguard against stacking problems. *See* Addendum, Tab 11, pp. 107-108 (preliminary jury instructions in *Microsoft*).

<div align="center">* * *</div>

The prejudicial effect of the district court's erroneous instructions is perhaps best illuminated by comparing the magnitude of the jury's award to the RAND rates set for 802.11 standard-essential patents in cases where the courts properly took RAND principles into account. The jury's award of $0.05 per unit for each Ericsson patent found infringed is nearly ***35 times*** the per-patent rate set in *Microsoft*. *See* 2013 WL 2111217, at *100 (setting rate of $0.03471 for twenty-four Wi-Fi patents, or $0.001446 per patent). Similarly, the jury's rate is an order of magnitude higher than the rate set in *Innovatio*, even though that rate covered all Wi-Fi standards (not just 802.11n) and the *Innovatio* court determined that the patents before it were among the most important to the 802.11 standard. *See* 2013 WL 5593609, at *43 (setting a rate of $0.0956 for nineteen patents, or $0.00503 per patent). The gap between the royalties set in cases applying an appropriate legal framework and the damages awarded here strongly suggests that the improper jury instructions were prejudicial, warranting a new trial.

## VI.    THE DISTRICT COURT ERRONEOUSLY ORDERED AN ONGOING ROYALTY ON PRODUCTS ERICSSON CHOSE NOT TO ACCUSE OF INFRINGEMENT.

The district court awarded Ericsson an ongoing future royalty of $0.15 per unit, applied to "all devices that are in compliance with 802.11n, or future 802.11 standards that are not colorably different."  A8886; *see* A92.  That was error, permitting Ericsson to collect royalties on products it had ***removed*** from its list of accused products.

Ericsson's complaint alleged infringement by Defendants' "802.11-compliant products."  A5043(¶ 56).  But during discovery, Ericsson deliberately abandoned its infringement contentions as to certain 802.11n-compliant products and limited its expert disclosures to a specific subset of "accused" products. A6801-A6854 (



).[28]  In fact, Ericsson limited its "accused" products to those containing ***particular Wi-Fi chipsets***.  A5923-A5924(¶ 92) (

---

[28]    *See also* Amended Expert Report of John R. Bone, March 4, 2013 ("Amended Bone Report"), Exs. 2.2.1-2.2.2, 2.3.1-2.3.2, 2.4.1-2.4.2, 2.5.1-2.5.2, 2.6.1-2.6.2 (                                                                ).

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

███████ ).[29]  At trial, Ericsson sought damages only for those identified, "accused" products.  A1440(14:19-15:19)(Bone).[30]

Having pursued a strategy of accusing some, but not all, Wi-Fi chips of infringement, Ericsson cannot now recapture the products that it removed from its infringement contentions.  *See Davis v. Wakelee*, 156 U.S. 680, 689 (1895) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."); *see also In re Coastal Plains, Inc.*, 179 F.3d 197, 206 (5th Cir. 1999); *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1290 (Fed. Cir. 2005).  Thus, any ongoing royalty should ***not*** apply to Defendants' products that Ericsson abandoned.

## CONCLUSION

The district court's judgment with respect to infringement, validity, and damages should be reversed or, alternatively, remanded for a new trial.

---

[29]    *See also* Amended Bone Report, Ex. 2.7 (i████████████████████ ████████████ ); A8820-A8821(Toshiba); A8823-A8824(Dell); A8832-A8833(NETGEAR); A8836-A8837(Acer/Gateway); A8840-A8841(D-Link) (stipulating to number of sales based on accused chipsets).

[30]    *See also* Amended Bone Report, Ex. 6.1-6.6 (████████████████ ████████████████████████ ).

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

Dated:  December 16, 2013

Respectfully submitted,

/s/ Robert A. Van Nest
ROBERT A. VAN NEST
STEVEN A. HIRSCH
EUGENE M. PAIGE
MATAN SHACHAM
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400

SCOTT D. BAKER
CHRISTINE M. MORGAN
DOYLE B. JOHNSON
JONAH D. MITCHELL
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
(415) 543-8700

JAMES C. MARTIN
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
(412) 288-3546

*Attorneys for Acer, Inc., Acer America Corporation, Gateway, Inc., NETGEAR, Inc., and D-Link Systems, Inc.*

/s/ John J. Feldhaus
JOHN J. FELDHAUS
PAVAN K. AGARWAL
FOLEY & LARDNER LLP
3000 K Street, N.W. Suite 600
Washington, DC 20007
(202) 672-5300

*Attorneys for Toshiba Corp. and Toshiba America Information Systems, Inc.*

/s/ William F. Lee
WILLIAM F. LEE
JOSEPH J. MUELLER
MARK C. FLEMING
LAUREN B. FLETCHER
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

JAMES L. QUARLES III
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC  20006
(202) 663-6000

GREG AROVAS
KIRKLAND & ELLIS LLP
601 Lexington Avenue
Citigroup Center
New York, NY 10022
(212) 446-4800

ADAM R. ALPER
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
(415) 439-1876

JOHN C. O'QUINN
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, DC 20005
(202) 879-5191

*Attorneys for Intel Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 16th day of December, 2013, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

*/s/ William F. Lee*
December 16, 2013                     William F. Lee


**Law Firm:**            Wilmer Cutler Pickering Hale and Dorr LLP
**Address:**             60 State Street
**City, State, ZIP:**    Boston, MA  02109
**Telephone:**           (617) 526-6000
**FAX:**                 (617) 526-5000
**E-mail Address:**      William.Lee@WilmerHale.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies

that this brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R.

App. P. 32(a)(7)(B), the brief contains 16,994 words.[31]

2.    The brief has been prepared in proportionally spaced typeface using

Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed.

R. App. P. 32(a)(7)(B), the undersigned has relied upon the word count feature of

this word processing system in preparing this certificate.

Dated:  December 16, 2013                    */s/ William F. Lee*
                                             WILLIAM F. LEE

---

[31]    The parties filed an Unopposed Joint Motion To File Extended Opening And Responsive Briefs on December 10, 2013, which is pending before the Court.  In an effort to reduce the total amount of briefing filed, Defendants requested a total of 17,000 words for this consolidated opening brief.

CASE PARTICIPANTS ONLY Document: 55 Page: 101 Filed: 12/16/2013

# ADDENDUM

# TABLE OF CONTENTS

Page(s)

Memorandum Opinion and Order Construing Claim Terms,
Dkt. No. 341 (Mar. 8, 2013) ........................................................... A1 (TAB 1)

Order Overruling Objections to Opinion of United States
Magistrate Judge on Claim Construction,
Dkt. No. 374 (April 16, 2013) .................................................... A24 (TAB 2)

Memorandum Opinion and Order denying Dkt. 364,
Defendants' *Daubert* Motion to Exclude the Opinions of
Mr. John R. Bone Regarding Issues Related to Damages,
Dkt. No. 443 (May 21, 2013) ...................................................... A31 (TAB 3)

Memorandum Opinion and Order regarding Post Trial Filings,
Dkt. No. 615 (Aug. 6, 2013) ....................................................... A52 (TAB 4)

Final Judgment Pursuant to Fed. R. Civ. P. 54(b),
Dkt. No. 616 (Aug. 8, 2013) ..................................................... A104 (TAB 5)

Jury Verdict Form on Infringement and Validity,
Dkt. No. 508 (June 13, 2013) .................................................. A230 (TAB 6)

Jury Verdict Form on Willfulness,
Dkt. No. 510 (June 13, 2013) .................................................. A235 (TAB 7)

U.S. Patent No. 6,424,625 ....................................................... A237 (TAB 8)

U.S. Patent No. 6,466,568 ....................................................... A257 (TAB 9)

U.S. Patent No. 6,772,215 ..................................................... A273 (TAB 10)

Excerpts from the transcript of Jury Instructions in
*Microsoft Corp. v. Motorola, Inc.*,
(W.D. Wa. Aug. 26, 2013) ................................................................ (TAB 11)

# TAB 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| ERICSSON INC., *et. al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| v. | § | Civil Action No. 6:10-CV-473 |
| | § | (LED/KFG) |
| D-LINK CORPORATION, *et. al.*, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER CONSTRUING CLAIM TERMS OF UNITED STATES PATENT NOS. 6,772,215, 6,330,435, 5,987,019, 6,466,568, and 5,790,516

This claim construction opinion construes the disputed claim terms in U.S. Patent Nos. 6,772,215, 6,330,435, 5,987,019, 6,466, 568, and 5,790,516 as asserted in the above captioned case. A *Markman* hearing was held on June 27, 2012, to construe the disputed terms of the various patents. For the reasons stated herein, the Court adopts the constructions set forth below.

## CLAIM CONSTRUCTION PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005)(quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 111, 115 (Fed. Cir. 2004)). The Court examines a patent's intrinsic evidence to define the patented invention's scope. *Id.* at 1313-1314; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.,* 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the claims, the rest of the specification and the prosecution history. *Phillips,* 415 F.3d at 1312-13; *Bell Atl. Network Servs.,* 262 F.3d at 1267. The Court gives claim terms their ordinary and customary meaning as understood

1

**A1**

by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms. *Phillips*, 145 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning that it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See Sci Med Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example, "[a]

2

**A2**

claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elam Computer Group, Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004)(quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during the prosecution of the patent. *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004)("As in the case of the specification, a patent applicant may define a term in prosecuting the patent."). The well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003). The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1988)(quotations omitted). "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although, "less significant than the intrinsic record in determining the legally operative meaning of claim language, "the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and treatises

3

**A3**

may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

Determining the claimed function and the corresponding structure of means-plus-function clauses are matters of claim construction. *WMS Gaming Inc., v. Int'l Game Tech.*, 184 F.3d 1339, 1347 (Fed. Cir. 1999). Claim construction of a means-plus-function limitation involves two steps. *See Medical Instrumentation and Diagnostics v. Elekta*, 344 F.3d 1205, 1210 (Fed. Cir. 2003). The court must first identify the particular claimed function, and then look to the specification and identify the corresponding structure for that function. *Id.* "Under this second step, 'structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.'" *Id.* (citations omitted). "While corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function." *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005).

## OVERVIEW OF THE '215 PATENT

The '215 patent is entitled "Method for Minimizing Feedback Responses in ARQ Protocols" and the invention relates in general to the telecommunications field and, in particular, to a method for minimizing feedback responses in Automatic Repeat Request (ARQ) protocols. Data sent by a

4

**A4**

transmitter (such as a wireless router) to a receiver (such as a computer) is broken into data packets (also called "Protocol Data Units" or "PDUs") which have sequence numbers. '215 patent at 1:29-30. The receiver assembles the data packets back into the proper order using the sequence numbers. In a perfect world, the receiver would receive all the data packets in the proper order. However, frequently data packets get lost or corrupted during the transmission from the transmitter to the receiver and never make it to the receiver's buffer. Certain algorithms are used to recover from the transmission of erroneous data and the loss of data on the transmission links between the nodes. '215 patent at 1:21-23. An algorithm commonly used to recover from the transmission of erroneous data is referred to as an Automatic Repeat Request (ARQ) protocol. '215 patent at 1:23-25. The basic function of the ARQ protocol is to allow the receiver to request that the transmitter re-transmit those PDUs that were lost or contained errors during transmission. '215 patent at 1:34-37. The PDUs that are sent from the receiver back to the transmitter include control data needed for error control/recovery and are called "status PDUs" (S-PDUs).

Two main methods are currently used for coding the sequence numbers of the lost or corrupted data within the S-PDUs sent from the transmitter back to the receiver. One method is to use a list of sequence numbers to be re-transmitted. The second method is to use a bitmap to represent the sequence numbers to be re-transmitted. '215 patent at 2:48-52. However, a significant problem with the existing ARQ protocols is that they are static in construction and, in certain situations, this may lead to a waste of bandwidth, because a great deal of information is transmitted unnecessarily in the S-PDUs. '215 patent at 3:46-50.

Therefore, the inventors of the '215 patent recognized that a significant need existed for a method that can be used to minimize the size of S-PDUs in an ARQ protocol and for a method that

5

**A5**

can be used to maximize the number of sequence numbers in an S-PDU with limited size, if it is not possible to fit all potential sequence numbers into a single S-PDU. '215 patent at 4:33-38. The inventors summarized the invention as "a method for minimizing feedback responses in an ARQ protocol ... whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. In particular, these different mechanisms can be combined in a single S-PDU. The S-PDUs are constructed so as to optimize system performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of [sequence numbers] in an S-PDU of limited size." '215 patent at 4:44-53.

## DISCUSSION

### I. Disputed terms of the '215 patent.

The disputed terms and their proposed constructions are set forth below.

#### a. "responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field" (claims 1, 15 and 25)

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message from a number of different message types | responsive to the receiving step, generating a message field including a field identifying the type of feedback response that is selected from multiple available feedback responses in order to minimize the size of number of feedback responses |

Plaintiffs acknowledge that the proposed constructions are nearly identical, but argue that Defendants' proposed construction contains superfluous language and should be rejected. Plaintiffs' first objection to Defendants' proposed construction is that it requires the type of feedback response to be actively "selected from multiple available feedback responses", which, they argue, would import an entirely additional step (the step of selecting) into the claim, violating the canons of claim

6

**A6**

construction.

Plaintiffs also object to Defendants' requirement that the unclaimed "selecting" further accomplish the goal of "minimiz[ing] the size or number of feedback responses." Plaintiffs argue that while minimizing the size of number of feedback responses may be the benefit of the invention, not every benefit flowing from an invention is a claim limitation, citing *i4i, Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010), *aff'd* __U.S.__, 131 S. Ct. 2238, 180 L. Ed. 2d 131. They contend Defendants' construction adds only two, and not all, of the advantages set forth in the patent. According to Plaintiffs, Defendants do not point to any lexicography, disclaimer, or disavowal that allow the limitations to be included in the claims and, further, the patentee apparently chose to put "minimization of feedback responses" in the preamble where it is not a limitation.[1] They further argue that the claims define the invention, and that those claims do not include Defendants' proposed extraneous limitations.

Defendants respond that their construction captures the actual inventive concept claimed to overcome the prior art problems identified in the specification. They further argue that the solution to the problem (the static use of a particular type of response) not addressed by the prior art is to "select" a feedback response to optimize system performance. '215 patent at 9:12-14. They contend that "selecting" or "minimizing" is already part of the claim as part of the element requiring the construction of a feedback response "in response to" incoming data units. Defendants argue that this is not merely some benefit of the invention, it *is* the invention and the claims should be construed

---

[1] Plaintiffs contend that Defendants have never before claimed in their briefing that the preamble is a limitation and are essentially trying to back-door it in as a limitation now. *See Transcript of Claim Construction Hearing* (doc. #255), p. 16.

to capture the scope of the actual invention,[2] citing *Retractable Techs., Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296 (Fed Cir. 2011) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005)(en banc)).

This Court notes that there is currently a split among the judges on the Federal Circuit regarding the appropriate role of the specification in construing the claims of a patent. *See Retractable Technologies, Inc. v. Becton, Dickinson and Company*, 659 F.3d 1369 (Fed. Cir. 2011)(denial of re-hearing en banc). As stated above, Defendants urge that the claims should be construed in order to capture the actual scope of the invention. Judge Lourie is of the view that the claims are limited by the "invention" described in the specification. *Retractable*, 653 F.3d at 1305 ("In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of the claim to disclosed embodiments or allow claim language to become divorced from what the specification conveys is the invention."). However, Judge Moore along with Chief Judge Rader take the view that the claims define the metes and bounds of the patented invention and, although the specification may shed light on the plain and ordinary meaning of a claim term, it cannot be used to narrow the claim term unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope. *Retractable*, 659 F.3d at 1360-71.

This Court is inclined toward Judge Moore's and Chief Judge Radar's view in *Retractable*. Defendants' proposed construction seems to fall on the side of reading limitations into the claims

---

[2] Ericsson disagrees that the advantage of minimizing the feedback response is the crux of the invention. It contends that the invention is "the creation of a choice in the receiver of multiple different formats of messages to use and then also the creation of a type identifier field which allows the receiver to identify to the transmitter which it is choosing." Transcript, p. 13.

8

rather than reading the claims in light of the specification. In addition, this Court agrees with Plaintiffs that Defendants' construction adds only two, and not all, of the advantages set forth in the patent. "[T]he fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives." *Phillips*, 415 F.3d at 1327 (internal quotations omitted).

Therefore, this Court finds that the term "responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field" means **"responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message from a number of different message types."**

    b.    **"means for receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields" (claim 45)**

<center>9</center>

<center>**A9**</center>

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Recited Function: receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields<br><br>Corresponding Structure: the receiver of a peer entity, see '215:2:29-30, whereby different mechanisms can be used to indicate erroneous data units so as to optimize performance, see '215::5:53-56, and the mechanisms refer to any of the methods described for constructing a bitmap feedback response message disclosed at '215::3:17-28 and '215::6:8-48, any of the methods for constructing a compressed bitmap feedback response message disclosed at '215::6:49-54, any of the methods for constructing a list feedback response message disclosed at '215::2:63-3:16 and '215::7:28-51, and/or the method for constructing a feedback response message combining the list and bitmap methods, and any equivalents thereof. | Recited Function: receiving the plurality of first data units and generating a message field including a field identifying the type of feedback response that is selected from multiple available feedback responses in order to minimize the size or number of feedback responses and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields<br><br>Corresponding Structure: (a) Fig. 4, Fig. 5, Fig. 6, Table 1, 3:6-13, 36-42, 4:1-54, 5:50-6:49, 6:55-64, 7:28-51<br><br>(b) Invalid under Section 112, paragraphs 2,6. |

Plaintiffs' contend that their proposed function for this term is the function explicitly recited in the claim and that they have identified corresponding structure that "actually performs" the recited function. Plaintiffs argue that Defendants' proposed recited function for this term is a different function and therefore is legally defective. Plaintiffs note that the substantive dispute regarding this

10

**A10**

term is related to a previous argument as to whether minimization or optimization is a required part of the function. Plaintiffs argue that the structure set forth at 3:6-13 and 3:36-42 deal with the calculation of the size of the S-PDU and has nothing to do with the actual construction of the message. Likewise, they contend that Table 1 has nothing to do with constructing the feedback response message.

Defendants agree that this debate is an extension of the initial debate, that is, what does this claim capture? Defendants again contend that the essence of the invention is that there be a minimization or optimization of the size or the number of the S-PDUs. Defendants argue that the claimed invention cannot be something that merely constructs a S-PDU to send back to the transmitter without the determination of which type of S-PDU (list, bitmap, etc.) would be optimal. According to defendants, this is all over the prior art.

The Court finds that Plaintiffs have proposed the correct function for this means-plus-function term. Although Defendants argue that the Court is not restricted to the actual language used in the claim to define the function, the Federal Circuit has made it clear that "[t]he statute does not permit limitation of a means plus function claim by adopting a function different from that explicitly recited in the claim." *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). In addition, Plaintiffs have correctly identified the "corresponding structure" disclosed in the specification.

In a related argument, Defendants contend that claim 45 is invalid because Ericsson's proposals for corresponding structure do not include portions of the specification necessary to support their interpretation of the claimed function. *See Motion for Summary Judgment* [Clerk's doc. # 224, p. 16]. In other words, they assert that Plaintiffs' proposed structure is incomplete because it omits

11

**A11**

portions of the specification relating to the claimed optimization. Therefore, they contend that Plaintiffs' proposed structure is incomplete, and as such does not disclose an algorithm to support its construction of the "means for receiving . . .and constructing" element. During the hearing, Defendants "absolutely concede[d]" that there is adequate structure disclosed in the specification and that this issue is a claim construction issue and not a summary judgment indefiniteness issue. *See Transcript*, pp. 61-62.

This Court agrees with Plaintiffs and finds that there is no "optimization" claimed in the recited function, and it would be error to import any function other than what is explicitly recited in the claim. *See Micro Chem.*, 194 F.3d at 1258.

This Court finds that the recited function is: **"receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields."**

The corresponding structure is: **the receiver of a peer entity, see '215::2:29-30, whereby different mechanisms can be used to indicate erroneous data units so as to optimize performance, see '215::5:53-56, and the mechanisms refer to any of the methods described for constructing a bitmap feedback response message disclosed at '215::3:17-28 and '215::6:8-48, any of the methods for constructing a compressed bitmap feedback response message disclosed at '215::6:49-54, any of the methods for constructing a list feedback response message disclosed at '215::2:63-3:16 and '215::7:28-51, and/or the method for constructing a feedback response**

12

**A12**

message combining the list and bitmap methods, and equivalents thereof."

## OVERVIEW OF THE '435 PATENT

The '435 patent builds on what happens after an ACK message is sent to the transmitter from the receiver. As shown in the '215 patent, a receiver may request that the transmitter resend data packets that it (the receiver) didn't receive with an ACK message. The transmitter may continue to retransmit those data packets but it may be that the receiver still may not receive the data packets due to a continued corruption of the signal. The receiver may still wait on the data packets even though the data may be obsolete. The transmitter continues to store these data packets in the buffer because the receiver still has not acknowledged receipt of them. This causes the buffers of both the transmitter and the receiver to become full and the result is that the buffers cannot receive the next group of data packets. This causes unacceptable delay in real time applications such as streaming video and television.

The '435 patent attempts to address this problem by using a "discard notification message." The transmitter will hold a specified number of packets in its buffer until it receives and acknowledgment that the receiver got them. The receiver holds an incomplete set of packets in its buffer until the complete set is received. ACK messages are sent from the receiver to the transmitter and the transmitter keeps re-sending the data packets until a timer expires. The transmitter then sends a discard message to the receiver which tells the receiver that the transmitter deleted the old packets so they will not be resent. The receiver gets this message and then determines which packets have been discarded by the transmitter. It then removes these data packets from the list of those expected to be received from the transmitter. This allows the transmitter and receiver to transmit and receive other data packets without having to wait on the transmission of obsolete data packets.

13

**A13**

## II. Disputed terms of the '435 patent.

### a. "data packet discard notification message from the transmitter to the receiver indicating data packets the transmitter has discarded." (claim 1)

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a control message in an Automatic Repeat Request Protocol that indicates data packets that the transmitter has discarded | message containing the identity of unacknowledged data packets the transmitter has discarded |

One dispute between the parties focuses on whether the discard message must actually contain the explicit identity of the discarded packets. Plaintiffs assert that it does not. Initially, Plaintiffs point out that Claim 1 requires that the receiver will compute "which data packets have been discarded by the transmitter based on the data packet discard notification message." In addition, Plaintiffs argue that dependent Claim 6 specifically requires that the data packet discard notification message include a sequence number field for each data packet to be discarded by the receiver. Plaintiffs further note that dependent Claim 3 requires that the discard message include a sequence number to indicate the first data packet to be discarded and a length field to indicate a number of data packets immediately preceding the first data packet, that are to be discarded by the receiver. According to Plaintiffs, the use of a length field in this context shows that the message itself does not explicitly indicate each packet to be discarded. Rather, the message need contain only enough information for the receiver to derive, in its computing step, which packets should be discarded. Defendants initially responded that "identify" carries the same meaning as "indicate". However, during the hearing, Defendants responded that they had no objection to the term "indicating".

"Indicating" and "identifying" are not used interchangeably in the '435 patent. Forms of "indicating" are used 29 times, always in the same context as the claim language. Forms of "identify"

14

were used 13 times, mostly in the context of sequence numbers "identifying" discarded cells. The plain language of Claim 1 and Claim 13 show that "identifying" and "indicating" are used differently in this patent. This Court agrees with Plaintiffs on this particular point. "Indicates" should be used instead of "containing the identity."

The second dispute focuses on whether the Defendant's addition of the word "unacknowledged" in their construction is proper. Plaintiffs note that, in the present invention, the discard message is triggered by both an NACK (a negative acknowledgment from the receiver to the transmitter) and in a situation where the there is no acknowledgment from the receiver to the transmitter (unacknowledged). '435 patent at 1:14-22. The so-called NACK embodiment is illustrated at 4:53-67. Plaintiffs also argue that Defendant's addition of the word "unacknowledged" in their construction reads out the preferred embodiment disclosed at 4:53-67.

Defendants respond that "unacknowledged" packets and "negatively acknowledged data packets" refer to the same thing, that is, packets that have not been successfully received. In other words, according to Defendants, "negatively acknowledged packets" are "unacknowledged packets."

This Court agrees with Plaintiffs. At worst, Defendants' construction does in fact exclude the preferred embodiment set forth at 4:53-67. "A claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004). At best, inserting "unacknowledged" into the claim construction would be importing limitations into the claim which is improper.

Finally, Defendants argue that "control message" and "Automatic Repeat Request" are improper limitations to import into the claim. The Court notes that the claim calls for a "message"

15

**A15**

and not a "control message." The Court also notes that it agrees with Defendants that "in an Automatic Repeat Request protocol" is not necessary language to be included in the construction or helpful to the jury because of its existence in the preamble.

Therefore, this Court finds that the proper construction is: **"a message that indicates data packets that the transmitter has discarded."**

## OVERVIEW OF THE '019 AND '568 PATENTS

The '568 patent, which contains apparatus claims, is a division of the '019 patent, which contains method claims. Both patents contain the same specification and similar claim language. Both of these patents are entitled "Multi-Rate Radiocommunication Systems and Terminals" and describe ways to efficiently transmit a variety of different types of information. Different types of information often have different optimal transmission characteristics. For examples, users communicating by cellular telephone will desire rapid two-way communication and may not be concerned with minor transmission errors. On the other hand, a user downloading email will tolerate small delays but will expect better error control. To accommodate the different transmission characteristics, the '019 and the '568 patents teach that a wireless transmitter should send a service type identifier along with the user's payload information. The service type identifier informs the receiver of the transmission characteristics for the type of payload information being sent.

**III.    Disputed terms of the '019 and '568 patents.**

    **a.    "separate from said first field" (claim 19 of the '019, claim 1 of the '568)**

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary. | in a different portion of a radio channel from said first field |

16

**A16**

Plaintiffs contend that the limitation merely clarifies that the claim requires two distinct fields, i.e., the field with the payload information is not the same field as the service type identifier field. As such, Plaintiffs argue that there is no need to construe this straightforward limitation. Plaintiffs contend that Defendants seek to attempt to inject limitations from exemplary TDMA embodiments of the invention into the claim even though the claim itself is not limited to TDMA applications. According to Plaintiffs, none of the limitations of Claim 19 require that the two fields be in separate time slots or in separate portions of a radio channel.[3]

Defendants agree that there are necessarily two different fields. According to them, the dispute is what it additionally means for the first field to be separate from the second field. Defendants argue that the requirement that there be a "first" field and a "second" field show that the fields are distinct but there is an additional requirement that the second field be separate from the first field. Defendants contend that this is the crux of the "separate field", by transmitting the service type identifier separately from the payload information, the receiver can be informed of how to decode different service types having varying transmission characteristics without knowing what those transmission characteristics are.

The claim in question clearly requires a first field and a second field that are transmitted on a radio channel. As Plaintiffs correctly note, there is no restriction or limitation that the two fields be distanced apart on the radio channel. As the Court noted, and as the Defendants agree, the key is that the two fields just have to be transmitted separately. Although Defendants do not deny that the fields can be adjacent to each other, this Court notes that Defendants' proposed construction seems

---

[3] Claim 1 of the '019 requires that the second field be in "at least another one of successive time slots." Ericsson argues that Claim 19 is not drafted so narrowly.

17

to imply that the two fields must be distanced from one another along the radio channel. This Court rejects Defendants' construction and determines that no construction is necessary.

   b.   "a service type identifier which identifies a type of payload information" (claim 19 of the '019, claim 1 of the '568)

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| an identifier which identifies transmission characteristics of payload information | an identifier that identifies the type of information (e.g. video, voice, or data) conveyed in the payload. |

Plaintiffs contend that their proposal recognizes that the inventors anticipated many more types of payload information than the few examples discussed in the patent and the patentee, instead of attempting to predict all of the various types of information that may be used in future radio communications, flexibly accounted for future developments. They contend that the service type identifier must inform the receiver about the transmission characteristics of the payload it is receiving so that it may handle the transmission correctly rather than merely knowing if the payload is a video or audio.

Defendants argue that there is a distinct difference between the type of service and how it is sent and that Plaintiffs disavowed "transmission characteristics" to distinguish the '019 over the Raith reference, which disclosed channel coding. They contend that Plaintiffs' attempt to inject the phrase "transmission characteristics" into the claim doesn't broaden the claim, but is an attempt to rewrite it. They argue that the service type identifier merely identifies the type of data conveyed in the payload and not the transmission characteristics of that data.

The language of the claim is clear in that the service type identifier identifies the type of payload information, not the transmission characteristics of that information. The specification also

18

**A18**

makes it clear that "the service type identifier informs the mobile or base station of the type of information (e.g., voice, video, or data) being conveyed in the payload. This information can be used by the receiving equipment to aid in processing the information conveyed in the payload, e.g., by knowing the channel coding rate." '019 patent at 3:9-19. In another embodiment involving a multimedia connection where the transmission may rapidly between voice, data and video, "a change in the FOC can inform the mobile station of the type of information being transmitted, so that the mobile station will know how to process the information, e.g., how to decode the received bits." '019 patent at 9:32-38.

In addition, claim 22, which is dependent on claim 19, claims an additional step of changing the type of information from a first type to a second type. Claim 23, which is dependent on Claim 22, claims the method of claim 22 "wherein said first type of information is one of video, voice and data and said second type of information is different one of video, voice and data."

Further, it appears that Plaintiffs previously acknowledged that in some cases "it may not be possible to identify the type of payload information based upon an indication of channel coding since the type of channel coding identified may be employed for different types of information." '568 file history, May 10, 2002 Amendment, page 6 (Ericsson's Response to Examiner's Second Raith Rejection).

Therefore, this Court finds that the proper construction for this term is **"an identifier that identifies the type of information conveyed in the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia."**

19

**A19**

## OVERVIEW OF THE '516 PATENT

When multiple devices transmit signals, those signals can interfere with each other. However, in frequency division multiplexing (FDM) the signals are assigned to different frequency bands and are transmitted on different frequencies. A special type of frequency division multiplexing is orthogonal frequency division multiplexing (OFDM). In the OFDM system there is a particular way of selecting the frequencies (called subcarriers) so that the frequencies do not interfere with each other. The subcarriers are spaced on a radio channel so that they do not overlap or interfere with other subcarriers so that multiple data symbols can be transmitted on a single channel simultaneously. Only a single subcarrier has a non-zero value at a given frequency. However, these signals can naturally become distorted due to frequency dispersion which causes the subcarriers to shift so that they have non-zero values at other frequencies which results in intersymbol interference (ISI). They overlap each other in an interfering manner and some transmitted information may be lost. To remedy this situation, the '516 patent teaches that a pulseshaping waveform can be used to modify the transmitted signal so that it approaches zero outside of its frequency.

### IV.    Disputed terms of the '516 patent.

####     a.    "pulseshaping waveform" (claim 1)

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a waveform that lessens the effects of both time dispersion and intersymbol interference of an OFDM signal | a waveform that changes the shape of said first data signal |

Plaintiffs contend that the defining feature of a pulsating waveform is that it lessens the effect of time dispersion and intersymbol interference and that all pulsating waveforms achieve these effects by increasing spectral decay. They argue that Defendants' proposed construction would include any

20

**A20**

waveform that changes the shape of a signal and that Defendants are broadening the construction to invalidate for prior art.

Defendants contend that Plaintiffs' proposed construction is not consistent with the well-known meaning of "pulseshaping" and merely lists the potential effects of pulseshaping. The argue that the dictionary definition of pulseshaping is "intentionally changing the shape of a pulse" and this is an ordinary meaning. They submit that lessening the effect of time dispersion and intersymbol interference may be an effect of using a pulseshaping waveform if the application of the technique achieves its goals, but is itself neither a requirement nor a result that will necessarily occur. They also note that Plaintiffs omit other potential effects of pulseshaping, such as the reduction of frequency dispersion and intercarrier interference. The argue that, according to a clear reading of the claim language, the pulseshaping waveform only needs to have a first amplitude greater than the second amplitude.

This Court notes that the parties' respective positions regarding the construction of this particular term are opposite those taken when arguing the first disputed term in the '215 patent. Again, this Court takes the view that the claims define the metes and bounds of the patented invention and, although the specification may shed light on the plain and ordinary meaning of a claim term, it cannot be used to narrow the claim term unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope. *Retractable*, 659 F.3d at 1360-71.

In the specification, the patentee did not define the term "pulseshaping waveform". Nor did he give the term a different meaning that it would otherwise possess, or disclaim or disavow some claim scope. Claim 1 was drafted as a broad claim and the USPO allowed it as such. The Court declines the opportunity to now narrow the claim by importing some of the potential effects of

21

**A21**

pulseshaping into it. The patentee could have easily acted as his own lexicographer in defining

"pulsating waveform" or could have limited the claim to waveforms applied to OFDM signals.

"Pulseshaping waveform" is construed to mean **"a waveform that changes the shape of said**

**first data signal."**

b.   **"performing an N'-point inverse fast fourier transform (IFFT)"; Claim 6**

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| performing an N'-point IFFT such that N' refers to the number of IFFT points that are required as a result of the pulseshaping waveform used | performing an N'-point IFFT such that N' refers to an adjusted number of subcarriers [IFFT points] depending on the pulseshaping waveform used |

Plaintiffs complain that Defendants' proposed construction refers to N' as "subcarriers" when

the claim uses N' to refer to the "points" of an IFFT. They also note that Defendants' construction

refers to N' as "adjusted . . . depending on the pulseshaping waveform used." According to Plaintiffs,

under this construction, determining whether an IFFT falls within the scope of this method step would

require a comparison between the IFFT for a pulseshaping waveform actually used against some other

pulseshaping waveform which is a comparison not required by the claims. Plaintiffs argue that N'

does not always have to be an adjustment and the insertion of that term reads out the situation where

there is a mild pulse shaping that does not result in a decreased number of subcarriers.

Defendants concede that it does not matter whether you use "subcarriers" instead of "IFFT

points" and that this dispute may no longer be an issue since they are mathematically identical. They

frame the issue as to using the word "adjusted" versus "required." Defendants argue that Plaintiffs'

construction reads into the claim a required bandwidth. They argue that the correct definition is found

in the patent at col. 7:7-10 and col. 5:10-11.

Defendants are correct that the proper definition of N' is N'=N/alpha where alpha is a frequency adjustment factor that depends on the pulseshaping function w(t) used. '516 patent, Col. 7:7-10; Col. 5:10-11. However, the language at col. 6:5-8 which states that using a particular pulseshaping function "may" require adjustment in the choice of subcarriers chosen in order to maintain orthogonality during data transmission, is a concern. This certainly implies that the inventor recognized that there may be situations where mild pulseshaping occurs but the number of subcarriers remain the same.

Therefore, this Court construes "performing an N'-point inverse fast fourier transform (IFFT)" to mean **"performing an N'-point IFFT such that N' refers to the number of IFFT points which depend on the pulseshaping waveform used."**

The above-cited terms of the patents at issue should, therefore, be construed in accordance with this order.

**SIGNED this the 8th day of March, 2013.**

KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE

23

**A23**

# TAB 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ERICSSON, INC. *et al,* | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | Civil Action No. 6:10-cv-473 |
| v. | § | |
| | § | |
| D-LINK CORP. *et al*, | § | |
| | § | |
| *Defendants*. | § | |

### ORDER OVERRULING OBJECTIONS TO OPINION OF UNITED STATES MAGISTRATE JUDGE ON CLAIM CONSTRUCTION

Plaintiffs Ericsson, Inc. *et al* filed suit against Defendants D-Link Corp. *et al*, claiming infringement of nine patents. The case was referred to United States Magistrate Judge Keith F. Giblin pursuant to 28 U.S.C. § 636 for claim construction. Judge Giblin entered a memorandum opinion construing the disputed claim terms in the patents-in-suit. Doc. # 341. Both sides have filed objections to this Order. Docs. # 345, 347.[1]

Pursuant to Federal Rule of Civil Procedure 72(a) and 28 U.S.C. § 636(b), the court has reviewed the magistrate judge's claim construction order, the parties' objections, and the record as a whole, and concludes that the magistrate judge's claim construction order was neither clearly erroneous nor contrary to law.

---

[1]The court previously overruled one objection raised by Defendants, seeking reconsideration of the magistrate judge's construction of the means-plus-function claim 45 in the '215 patent, when adopting the magistrate judge's Report and Recommendation that Defendants' motion for summary judgment of invalidity be denied. Doc. # 356.

1

**A24**

**Plaintiffs' Objection**

Plaintiffs raise only one objection, to the magistrate judge's construction of the term "a service type identifier which identifies a type of payload information" in claim 19 of the '019 patent and claim 1 of the '568 patent. The magistrate judge construed this term to mean "an identifier that identifies the type of information conveyed to the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia." Doc. # 341 at 19.

Plaintiffs re-urge the construction they proffered at the claim construction hearing, namely "an identifier which identifies transmission characteristics of payload information." Doc. # 347 at 2. Plaintiffs argue that by rejecting this construction, the magistrate judge did not give proper weight to the intrinsic evidence.

The magistrate judge explained in his opinion that the claim language itself clearly states that the service type identifier identifies the type of payload information, *not* transmission characteristics of the payload information. The specification of the patents itself also makes it clear that the service type identifier "informs the mobile or base station of the type of information (e.g., voice, video, or data) being conveyed in the payload. This information can be used by the receiving equipment to aid in processing the information conveyed in the payload, e.g., by knowing the channel coding rate." '019 patent at 3:9-19; *see also* claim 22 of the '019 patent (dependent from claim 19 and adding a step of changing the type of information—given as video, voice, and data—from a first type to a second type). To the extent that this is a preferred embodiment in the specification, the magistrate judge did not limit the construction to only voice, video, or data.

Plaintiffs make much of a statement by the patentee during prosecution of the '568 patent, where the patentee explained that "[d]ue to the different transmission characteristics associated with

2

**A25**

the different types of information, it would be desirable to provide an ability for a transmitter to be able to inform a receiver of the type of information in a transmission payload." Doc. # 209-12 at Page ID# 5184. However, the specification is "the single best guide to the meaning of a disputed term." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, –F.3d–, 2013 WL 1200270 at *8 (Fed. Cir. Mar. 26, 2013) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Here, the specification of the '019 and '568 patents expressly differentiate between types of information in a payload (such as voice, video, and data), and the transmission characteristics of payload information (such as error protection or channel coding). *See, e.g.*, '568 patent at 2:27-55.

The court does not find that the magistrate judge's construction of this term was clearly erroneous or contrary to law, and overrules Plaintiffs' objections.

### Defendants' Objections

Defendants raise five objections to the magistrate judge's claim construction. One— the objection to the construction of means-plus-function claim 45 in the '215 patent—was previously overruled when the undersigned adopted the magistrate judge's Report and Recommendation that Defendants' motion for summary judgment of invalidity be denied. Doc. # 356. Another is not an objection to a specific claim construction at all—"the opinion in contrary to law because it does not give weight to the alleged inventions as described in the specifications"—and does not request any particular relief with respect to a particular claim term.[2]

---

[2]This dispute does arise in the context of Defendants' third, fourth, and fifth objections, which are specific to claim terms, and are discussed below.

3

**A26**

A. **Objection to "responsive to receiving step, construing a message field for a second data unit, said message field including a type identifier field."**

Defendants' third objection concerns the magistrate judge's construction of the term "responsive to the receiving step, construing a message field for a second data unit, said message field including a type identifier field." This term is found in claims 1, 15, and 25 of the '215 patent. The magistrate judge construed the term to mean "responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message from a number of different message types." Doc. # 341 at 9.

Defendants argue that the term should have been construed as they urged during claim construction: "responsive to the receiving step, generating a message field including a field identifying the type of feedback response that is selected from multiple available feedback responses in order to minimize the size of number of feedback responses." Doc. # 345 at 6. In other words, they seek to include the requirement that the message field include a field identifying the type of feedback response selected from multiple available feedback responses in order to minimize the size or number of feedback responses.

Defendants' position is that the magistrate judge's construction gives no weight at all to the specification, and that Plaintiffs agreed with Defendants that the "invention" here is the "creation of a choice in the receiver of multiple different formats of messages to use and then also the creation of a type identifier field which allows the receiver to identify to the transmitter what it is choosing." *Markman* Tr. at 13:18-22 [Doc. # 255]. Defendants neglect to point the court toward counsel's next sentences in the transcript: "But very clearly the applicant stopped and did not choose to include a

4

**A27**

requirement that the advantage be met as an element. And that's very clear and it's expressed in the patent and we believe error to read in something the applicant didn't include" Tr. at 13:22-14:1.

This is, as the magistrate judge noted at the claim construction hearing and in his opinion, the problem presented by the Federal Circuit's opinions in *Retractable Technologies, Inc. v. Becton, Dickinson, & Co.*, 653 F.3d 1296 (Fed. Cir. 2011), *opinion denying rehearing*, 659 F.3d 1369 (Fed. Cir. 2011). While the majority opinion states that claim construction should "strive to capture the scope of the actual invention, rather than strictly limit the scope of the claim to disclosed embodiments or allow claim language to become divorced from what the specification conveys is the invention," 653 F.3d at 1305, the dissenting opinion takes the position that the specification cannot be used to narrow a claim term unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope, 659 F.3d at 1360-71.

Here, the court cannot conclude that the magistrate judge's claim construction was clearly erroneous or contrary to law. The claim language itself does not include the limitations Defendants urge, and narrowing the claims as Defendants wish would be inappropriate. This is especially true as Defendants have cherry-picked only two of the advantages set forth in the specification to add to their construction, not all of them.

**B.     Objection to "data packet discard notification message from the transmitter to the receiver indicating data packets the transmitter has discarded."**

Defendants' fourth objection is to the magistrate judge's construction of "data packet discard notification message from the transmitter to the receiver indicating data packets the transmitter has discarded." This term is found in claim 1 of the '435 patent. The magistrate judge construed the term to mean "a message that indicates data packets that the transmitter has discarded." Doc. # 341 at 16.

Defendants object to this construction, urging the construction they previously proffered: "message containing the identity of unacknowledged data packets the transmitter has discarded." Doc. # 345 at 8. Defendants again argue that the magistrate judge improperly failed to consider the specification when construing this term.[3]

The court cannot conclude that the magistrate judge's claim construction was clearly erroneous or contrary to law. Defendants' construction either imports limitations into the claim (by inserting "unacknowledged") or excludes the preferred embodiment in the '435 patent specification at 4:53-67 (by inserting "unacknowledged," this reads out the NACK embodiment set out in this passage). Defendants' objection is overruled.

## C.    Objection to "separate from said first field."

Defendants' final objection is to the court's construction of "separate from said first field." This term is found in claim 19 of the '019 patent and claim 1 of the '568 patent. The magistrate judge determined that no claim construction was necessary. Doc. # 341 at 18.

Defendants object, arguing that the magistrate judge should have adopted their proposed construction, "in a different portion of a radio channel from said first field." Doc. # 345 at 9. Defendants again argue that the magistrate judge improperly failed to consider the  specification when deciding not to construe this term and therefore eliminates the key feature of the patents (i.e., that the two fields have to be transmitted separately).

---

[3]Defendants also suggest the magistrate judge erred by not adopting an alternate construction urged by Defendants at the *Markman* hearing, which would "resolve the parties' dispute," citing to the transcript at 91:16-18. The transcript, however, indicates that Plaintiffs still had a problem with this alternate construction. Tr. at 96:25-98:23.

6

**A29**

This term is found in claims that require both a first field and a second field transmitted on a radio channel. There is no restriction or limitation in these claims that the two fields have to be some distance from each other on the radio channel, as Defendants' construction implies. The language of the claim itself conveys what Defendants wish to make clear: that the first and second fields are transmitted separately on a radio channel. Construing the term further is redundant and unnecessary. *See, e.g., United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. Claim construction . . . is not an obligatory exercise in redundancy.").

The court cannot conclude that the magistrate judge's claim construction was clearly erroneous or contrary to law. Defendants' objection is overruled.

### Conclusion

After careful consideration of both parties' objections, the record as a whole, and the magistrate judge's claim construction opinion, the court concludes that the objected-to claim constructions are not clearly erroneous or contrary to law and OVERRULES both parties' objections.

**So ORDERED and SIGNED this 16th day of April, 2013.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

7

**A30**

# TAB 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **ERICSSON INC., et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:10-CV-473** |
| | § | |
| **D-LINK CORPORATION, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants'[1] Motion to Exclude the Opinions of Mr. John R. Bone Regarding Issues Related to Damages (Docket No. 364) ("Motion"). The Court heard oral argument on May 9, 2013. For the reasons set forth below, the Motion is **DENIED**.

## BACKGROUND

This is a standards case. The Plaintiff Ericsson[2] contends its asserted patents cover two features of the IEEE 802.11n standard. Ericsson's damages expert, John Bone, relied on previous Ericsson 802.11 licenses to determine a per unit royalty for each licensed product. Bone then applied his per unit royalty to the accused products to calculate a reasonable royalty. Defendants contend Bone's analysis violates the entire market value rule because Ericsson did not prove that the patented features were the basis for customer demand of the accused products.

---

[1] "Defendants" refers to D-Link Systems, Inc., Netgear, Inc., Acer, Inc., Acer America Corporation, Gateway, Inc., Dell, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation, Belkin International, Inc., and Intel Corporation.

[2] "Ericsson" refers to Ericsson Inc. and Telefonaktiebolaget LM Ericsson.

**A31**

Bone's damage model is based on eight previous Ericsson licenses involving the asserted patents. From the previous licenses, Bone established a per unit royalty. Bone applied his per unit royalty to Defendants' accused products to determine his reasonable royalty. Defendants' objection is predominately with Bone's per unit royalty. Defendants contend Bone's royalty includes revenues associated with non-infringing features.

## APPLICABLE LAW

Federal Rule of Evidence 702 allows a witness "qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion or otherwise if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

As a preliminary matter, district courts are asked to act as gatekeepers and exclude expert testimony from trial that is irrelevant or unreliable. FED. R. EVID. 104(a); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (discussing *Daubert v. Merrell Dow Pharm.* 509 U.S. 579, 593–94 (1993)). "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.' Relevance depends upon 'whether [that] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.,* 482 F.3d 347, 351 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592–93).

Courts will consider a nonexclusive list of factors to determine whether scientific expert testimony is reliable. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 593–94 (1993). These factors include: (1) whether others can or have objectively tested the expert's technique or theory; (2) whether the technique or theory has been subject of peer review and publication; (3) the known or potential error rate of the technique or theory when applied; (4) the existence and

maintenance of standards and controls; and (5) whether the scientific community has generally accepted the technique or theory. FED. R. EVID. 702 (advisory committee notes, 2000 amendments); *Daubert*, 509 U.S. at 593–94.

However, the district courts are not "intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1078 (5th Cir. 1996); FED. R. EVID. 702 (advisory committee notes, 2000 amendments). "Vigorous cross–examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Accordingly, if a party offering expert testimony can prove by a preponderance of the evidence that the expert is qualified, the expert's testimony is relevant, and the testimony is reliable, a court should not exclude it. *Id.* at 590–91.

## ANALYSIS

Defendants argue Mr. Bone's report should be excluded because he fails to apportion his royalty base between accused features and non-accused features. Motion at 10. Defendants contend Bone's lack of apportionment is in essence an attempt to side-step the requirements of the entire market value rule. *Id*. Defendants also argue Bone's report squarely violates the entire market value rule because he impermissibly uses the value of end products in his royalty base. *Id*. at 1. Defendants contend the accused features are found entirely within the chipset, one of many components in the larger end products. *Id*. at 2. However, the patented features within the chipset do not form the basis for customer demand of the end products. *Id*. at 8. Thus, Bone cannot use the value of the end products in his royalty analysis. *Id*. Instead, Bone's royalty base must be limited to the value of the chipsets, which Defendants contend are the smallest salable patent-practicing units. *Id*. at 5.

Ericsson makes two major arguments in support of Bone's report. First, Ericsson argues Bone's report does not implicate the entire market value rule. Docket No. 378 ("Response") at 9. Ericsson contends Bone's analysis is based purely on the number of units sold, not the price of the units sold. *Id.* Second, Ericsson contends Bone's report is consistent with other standards-based licenses of the same patents. *Id.* at 6. Ericsson asserts that a per unit royalty based on the number of products sold is common in standards licensing. *Id.* Further, Ericsson argues Bone's damages model ties the hypothetical negotiation to real world evidence. *Id.* at 8.

Defendants' apportionment argument ignores two different levels of apportionment in Bone's analysis. At the first level, Bone only considered revenue from the licensing of Ericsson's 802.11 portfolio. At the second level, Bone apportioned the 802.11 licensing revenue to extract the value attributed to non-asserted patents. Combined, these two levels limit the revenue pool to the market value of the asserted patents' contribution to the 802.11 standard.

The first level of apportionment reduced the revenue pool to the value of Ericsson's 802.11 contributions. On eight separate occasions, Ericsson licensed its 802.11 portfolio to third parties. *See* Docket No. 378, Ex. 1 ("Bone Report") at 37–38. Each license covered only a particular portion of the 802.11 standard—namely, the portion of the 802.11 standard the third party licensees believed was covered by Ericsson's portfolio. Defendants attempt to downplay the significance of these licenses, but they reflect a real-world valuation of Ericsson's 802.11 patents. *See Monsanto Co. v. McFarling*, 488 F.3d 973, 978–79 (Fed. Cir. 2007) ("An established royalty is usually the best measure of a "reasonable" royalty for a given use of an invention because it removes the need to guess at the terms to which parties would hypothetically agree."). The licensees would not have paid value for a license unless they believed Ericsson's patents covered at least a portion of the standard. Similarly, the licensees

would not have paid value for the portion of the standard not covered by Ericsson's patents. Consequently, the money paid under these licenses represents the market's valuation of the 802.11 contributions of Ericsson's patents. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)) ("The trial court must carefully tie proof of damages to the claimed invention's footprint in the market place.").

The six patents asserted in this case are not the entirety of Ericsson's 802.11 portfolio—they are only a subset of it.[3] However, Bone's second level of apportionment factors this into account. Bone stated he "very conservatively assumed that the Patents-in-Suit represent at least 50 percent of the total value of the Ericsson 802.11 Portfolio," and he reduced his per unit royalty accordingly. Bone Report at 90. While Defendants are free to cross-examine Bone on his valuation of the asserted patents in relation to the non-asserted Ericsson 802.11 patents, he makes a realistic and thorough attempt to apportion revenue to only the asserted patents.[4] *Compare VirnetX Inc. v. Cisco Sys., Inc.*, 2013 WL 789288, at *2 (E.D. Tex. Mar. 1, 2013) (Davis, J.). The end result of Bone's analysis is a royalty pool comprising money paid by third party licensees for the value of the asserted patents' contributions to the 802.11 standard. *See LaserDynamics,* 694 F.3d at 68 (requiring courts to examine only revenues associated with the patented components).

Defendants also argue Mr. Bone's analysis violates the entire market value rule by using the value of end products without proving the patented feature forms the basis for customer demand of the accused product. This argument fails for many of the same reasons as Defendants' apportionment argument. Bone's revenue base is not the market value of the end products. *See* Bone Report at 101 (providing a per unit royalty). Rather, it is the market value of the

---

[3] Ericsson owns 18 standard essential patents, six of which are asserted in this lawsuit. Bone Report at 24.

[4] Bone supported his 50 percent apportionment with approximately twenty pages of analysis. *See* Bone Report at 79–99.

contribution of the asserted patents to the end products. This distinction is critical to the analysis. The licensing revenue from Ericsson's portfolio is attributable only to the value Ericsson's patents add to the licensees' end products; it is not attributable to the end products as a whole. It goes without saying that the licensees would not have paid value for portions of the 802.11 standard unrelated to Ericsson's patents. Therefore, Mr. Bone's report does not implicate the entire market value rule. *See Versata Software, Inc. v. SAP Am., Inc.*, --- F.3d ----, 2013 WL 1810957, at *12 (Fed. Cir. May 1, 2013) (finding that a plaintiff's damage model did not implicate the entire market value rule because it "merely accounted for all infringing sales"); *Fractus, S.A. v. Samsung Elecs. Co.*, 876 F. Supp. 2d 802, 833 (E.D. Tex. 2012) (Davis, J.).

Additionally, Bone's analysis calls for a per unit royalty on all sales of accused products. Bone Report at 34. As a per unit royalty, it does not fluctuate with the price of the end product. Regardless of the ultimate sale price of the end product, the royalty rate remains constant. This further illustrates that Mr. Bone does not rely on the value of end products in his analysis. *See SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1383 (Fed. Cir. 2013) (determining that a plaintiff did not invoke the entire market value rule when it "never sought to justify its damages figure based on the price of the customer end products").

Lastly, Defendants argue Mr. Bone's report should be excluded because it fails to account for Ericsson's RAND obligations. Defendants first raised this argument at the hearing, and it has not been briefed by either side.[5] Further, Defendants did not cite any authority to support their position that failing to account for RAND obligations mandates striking Bone's report. For these reasons, Defendants' RAND arguments do not justify exclusion of Bone's report.

---

[5] Defendants' Motion only referenced Ericsson's RAND obligations in a footnote and in a string citation. *See* Motion at 12 n.4, 13. Defendants' Reply only references RAND in a footnote. *See* Docket No. 393 at 1.

## CONCLUSION

For all the foregoing reasons, Defendants' Motion to Exclude the Opinions of John Bone

(Docket No. 364) is **DENIED**.

 **So ORDERED and SIGNED this 20th day of May, 2013.**

_____
 **LEONARD DAVIS**
 **UNITED STATES DISTRICT JUDGE**

# TAB 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **ERICSSON INC., ET AL.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:10-CV-473** |
| | § | |
| **D-LINK SYSTEMS, INC., ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the following motions:

- Ericsson's Motion for a Compulsory Future Royalty and Pre-Judgment and Post-Judgment Interest (Docket No. 527);

- Defendants' Rule 50(b) Renewed Motion for Judgment as a Matter of Law in Favor of Defendants (Non-Infringement and Invalidity) and Motion for a New Trial (Docket No. 528);

- Defendants' Renewed Motion for Judgment as a Matter of Law on Ericsson's Damages Claims or, in the Alternative, for Vacatur, Remittitur or a New Trial on Damages (Docket No. 529);

- Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law (Docket No. 539);

- Defendants' Motion for Judgment on Post-Trial Proposed Findings of Fact and Conclusions of Law (Docket No. 588); and

- Ericsson's Motion to Supplement the Record (Docket No. 589).

For the reasons stated below, Ericsson's Motion for a Compulsory Future Royalty and Pre-Judgment and Post-Judgment Interest (Docket No. 527) is **GRANTED**. Defendants' Rule 50(b) Renewed Motion for Judgment as a Matter of Law in Favor of Defendants (Non-Infringement

**A52**

and Invalidity) and Motion for a New Trial (Docket No. 528) is **DENIED**. Defendants' Renewed

Motion for Judgment as a Matter of Law on Ericsson's Damages Claims or, in the Alternative,

for Vacatur, Remittitur or a New Trial on Damages (Docket No. 529) is **DENIED**. Defendants'

Motion for Judgment on Post-Trial Findings of Fact and Conclusions of Law (Docket No. 588) is

**GRANTED** as set forth below. Ericsson's Motion to Supplement the Record (Docket No. 589)

is **GRANTED**. All other pending motions in this case are **DENIED**.

## I. Background

Plaintiffs Ericsson Inc. and Telefonaktiebolaget LM Ericsson (collectively "Ericsson")

brought this infringement action against the following Defendants: D-Link Systems, Inc. ("D-

Link"); Netgear, Inc. ("Netgear"); Belkin International, Inc. ("Belkin"); Acer, Inc. and Acer

America Corp. ("Acer"); Gateway, Inc ("Gateway"); Dell, Inc ("Dell"); Intel Corp.[1] ("Intel");

and Toshiba, Inc. ("Toshiba"). Ericsson alleged infringement of the following patents: 6,772,215

(the "'215 Patent"); 6,330,435 (the "'435 Patent"); 6,466,568 (the "'568 Patent"); 6,424,625 (the

"'625 Patent"); and 6,519,223 (the "'223 Patent). Ericsson also alleged Defendants' infringement

was willful. Defendants alleged they did not infringe, and that the '435 and '625 Patents were

invalid based on anticipation.

The Court conducted an eight day jury trial in June 2013, resulting in the following

infringement verdict:[2]

---

[1] Intel intervened in the case (Docket No. 205), and Ericsson amended its complaint to include Intel as a Defendant. *See* Docket No. 249.

[2] "Yes" means the jury found the Claim infringed; "no" means the jury found the Claim not infringed. Ericsson only asserted Claim 11 of the '223 Patent against Acer/Gateway, Dell, Toshiba, and Intel. Ericsson only asserted Claim 5 of the '568 Patent against D-Link, Netgear, and Belkin.

| | D-Link | Netgear | Belkin | Acer/Gateway | Dell | Toshiba | Intel |
|---|---|---|---|---|---|---|---|
| **'568 Patent** | | | | | | | |
| **Claim 1** | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Claim 5** | Yes | Yes | Yes | N/A | N/A | N/A | N/A |
| **'625 Patent** | | | | | | | |
| **Claim 1** | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **'435 Patent** | | | | | | | |
| **Claim 1** | No | No | No | No | No | No | No |
| **Claim 2** | No | No | No | No | No | No | No |
| **'215 Patent** | | | | | | | |
| **Claim 1** | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Claim 2** | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **'223 Patent** | | | | | | | |
| **Claim 11** | N/A | N/A | N/A | No | No | No | No |

Docket No. 508 at 2–3. The jury also determined the '625 and '435 Patents were not invalid, and it found damages of $435,000 for D-Link, $3,555,000 for Netgear, $1,170,000 for Acer/Gateway, $1,920,000 for Dell, $2,445,000 for Toshiba, and $600,000 for Belkin. *Id*. at 4–5. The Court bifurcated willfulness into a separate portion of the trial, conducted after the jury reached its infringement/validity verdict. The jury found that Ericsson failed to prove willful infringement. Docket No. 510.

3

**A54**

## II. Defendants' Rule 50(b) Renewed Motion for Judgment as a Matter of Law in Favor of Defendants (Non-Infringement and Invalidity) and Motion for New Trial (Docket No. 528)

In this motion, Defendants challenge nearly every aspect of the infringement and invalidity portions of the case. First, Defendants contend Ericsson did not present sufficient evidence of direct infringement of the '215, '568, and '625 Patents. Next, Defendants contend Ericsson did not present sufficient evidence that any Defendant infringed the asserted method claims. Next, Defendants contend there was no evidence of indirect infringement. Finally, Defendants contend the jury erred in finding the '625 and '435 Patents not invalid.

### A. Judgment as a matter of law and new trial standards

Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). Thus, a jury verdict must be upheld, and judgment as a matter of law may not be granted, unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* at 700. The jury's verdict must also be supported by "substantial evidence" in support of each element of the claims. *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004).

A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). However, a court may not make credibility determinations or weigh the

**A55**

evidence, as those are solely functions of the jury. *Id.* The moving party is entitled to judgment as a matter of law "only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005).

Under Federal Rule of Civil Procedure 59, a new trial may be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985).

## B. Direct Infringement

### i. Applicable Law

To prove infringement, the plaintiff must show the presence of every element or its equivalent in the accused device. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). Determining infringement is a two-step process. First, the claim must be properly construed to determine its scope and meaning. Second, the construed claim must be compared to the accused device or process. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). "A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007).

### ii. The '215 Patent

Claim 1 of the '215 Patent contains the following limitation:

Responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field.

'215 Patent, Claim 1, at 10:25–27. The Court construed the phrase to mean "responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message *from a number of different message types*." Docket No. 341 at 9 (emphasis added). Defendants contend they do not infringe because their products only transmit one type of feedback response message. Because their products only transmit one type of message, their feedback response messages are not identified from "a number of different message types."

Ericsson relied on the BlockAck Control field within the 802.11n standard to satisfy the type identifier field limitation. *See* Docket No. 528 at 5. The BlockAck Control field relates to communications between a transmitter and a receiver. Pursuant to the 802.11n standard, the receiver sends feedback response messages to the transmitter indicating which packets the receiver has already received. The standard contains three different types of feedback responses: Basic BlockAck, Compressed BlockAck, and Multi-TID BlockAck. Each response type has a two-digit identifier to indicate which of the three variants is being used.[3] Ericsson's expert (Dr. Nettles) testified that these two-digit identifiers satisfy the type identifier field limitation because they indicate which of the three types of feedback responses is contained in a particular message.

The issue at trial (and in Defendants' post-trial briefing) is Defendants' products only use Compressed BlockAck feedback response messages. Defendants contend their products do not have the ability transmit Basic BlockAck or Multi-TID BlockAck responses, so they cannot satisfy the "number of different message types" requirement. Docket No. 528 at 5. Defendants believe the element of "choice" is critical to satisfying the asserted Claims, and they assert that

---

[3] For example, the identifier for Compressed BlockAck is 01. *See* Docket No. 581 at 9.

**A57**

their receivers are incapable of choosing which type of feedback response message is transmitted because they always transmit responses in Compressed BlockAck form. *Id*. at 6.

Defendants also contend Ericsson cannot satisfy the asserted Claims by arguing Defendants' engineers chose which feedback response type to transmit when designing the product. *Id*. at 9. Instead, Defendants contend the "choice" must be made by the receiver in real-time while in operation. *Id*. at 10. Defendants argue any other result would vitiate the "from a number of different message types" limitation. Docket No. 592 at 2. According to Defendants, if Ericsson's infringement evidence is sufficient, the Claim scope would be identical regardless of whether the "number of different message types" language was included. *Id*.

Ericsson makes three arguments in support of the jury's infringement verdict. First, it argues Defendants previously conceded infringement was a factual matter for the jury. Docket No. 581 at 3. About a week before trial, Defendants filed a Motion for Confirmation of the Court's Claim Construction. *See* Docket No. 448. In that motion, Defendants sought confirmation that a device "where only one type of message is available" could not meet the "from a number of different types" limitation. *See id*. at 5. In its response, Ericsson stated its infringement theory—"even if the accused devices always choose to use a single Block ACK variant, they infringe the '215 Patent." Docket No. 460 at 6. Based on this statement from Ericsson, Defendants withdrew their motion. Docket No. 460. In their brief withdrawing the motion, Defendants stated "now that Ericsson has confirmed that it will not take a position inconsistent with the Court's claim construction or its assertions during the *Markman* proceedings, the only remaining issues appear to be disputes of fact." *Id*. at 4. Defendants further stated "Ericsson's allegations regarding the operation of Defendants' products…are issues of fact for the jury." *Id*. Ericsson contends Defendants should not be allowed to retreat from their

**A58**

previous admission that infringement was a fact issue by now arguing Ericsson's trial evidence was legally insufficient. Docket No. 581 at 4–5.

Ericsson characterizes its second argument as a claim construction argument. Ericsson argues Defendants are adding a "selecting" limitation to the Claim. *Id*. at 3. Ericsson asserts there is no requirement that a receiver "select" between a number of different feedback response types. *Id*. Instead, the Court's construction only requires the receiver to "identif[y]" the response type. *Id*. at 4.

Third, Ericsson contends it presented legally sufficient evidence to support an infringement verdict. *Id*. at 8. Ericsson argues the 802.11n standard uses the type identifier field to distinguish between three different types of feedback responses. *Id*. Ericsson asserts that the type identifier field is mandatory, and Defendants' transmitters always check the type identifier field when receiving feedback response messages. *Id*. Thus, Ericsson argues it presented sufficient evidence for the jury to find infringement. *Id*.

There is no real dispute how Defendants' products operate; the only disputed issue is whether Defendants' one-message products could satisfy the "from a number of different message types" requirement. The jury determined they did, and there is substantial evidence to support their verdict.

There are three different types of feedback responses available in the 802.11n standard. 6/5/13 a.m. Tr. at 40:10–13 (Nettles). To distinguish between the different types of feedback responses, each message contains a type identifier. *Id*. at 39:6–16. Dr. Nettles testified that this type identifier in Defendants' products satisfied the type identifier field limitation. *Id*. at 41:16–42:5. Dr. Nettles stated that each accused product transmits a type identifier in each feedback response message. *Id*. at 42:6–16. Dr. Nettles confirmed this infringed the '215 Patent because it

indicates which type of message is transmitted, given a number of potential options. *Id.* at 41:24–42:3.

Defendants contend their products do not identify the message type from a number of different types because their products exclusively use Compressed Block Ack. However, this was an issue appropriately resolved by the jury. Dr. Gibson testified that the type identifier field is mandatory, and Defendants' products all check the type identifier field to determine the type of message. *See* 6/10/13 p.m. Tr. at 19:4–11. Dr. Nettles further testified that Defendants' products must include and check the type identifier field to ensure interoperability with other 802.11n-compliant products. *See* 6/5/13 a.m. Tr. at 43:3–5. Thus, even though Defendants' products only use Compressed Block Ack, each feedback message *must* contain a type identifier bit, and each receiver *must* check the type identifier bit. *See* 6/11/13 a.m. Tr. at 104:17–24 (Nettles) ("And they need to transmit that because there's a possibility that some other manufacturer will be transmitting some other value in that field, and they need to check that field to make sure that their products are processing BlockAcks that their products understand how to deal with. So it's important to process that field, even though they don't change it."). The type identifier bit indicates the message is in Compressed Block Ack form, one of three available options in the 802.11n standard. 6/10/13 p.m. Tr. at 18:24–19:7 (Gibson). This was Ericsson's infringement theory at trial, a theory the jury accepted, and there was substantial evidence to support it.

Much of Defendants' JMOL briefing is an attempt to re-litigate claim construction positions rejected by both the Magistrate Judge and this Court. During claim construction, Defendants argued the "type identifier field" limitation should be construed as identifying the type of feedback response "that is *selected* from multiple *available* feedback responses." Docket

No. 341 at 6 (emphasis added). The Magistrate Judge rejected Defendants' proposed construction because it improperly imported limitations from the specification. *Id.* at 8–9. Defendants objected to the Magistrate Judge's construction because it failed to include their proposed limitations, and this Court rejected their argument. *See* Docket No. 374 at 5 ("The claim language itself does not include the limitations Defendants urge, and narrowing the claims as Defendants wish would be inappropriate."). Thus, there is no requirement the accused products "select" the type of feedback message or that there be multiple "available" types of messages. *Compare* 6/12/13 a.m. Tr. at 104:9–10 ("The multiple ACKs have to be available at the time of response.") (Defendants' closing argument). It is sufficient that the products "identif[y]" the message type from "a number of different message types." *See* Docket No. 341 at 9.

Defendants' motion for judgment as a matter of law that they do not infringe the '215 Patent is **DENIED**.

### iii.    The '568 Patent

Claim 1[4] of the '568 Patent requires "a service type identifier which identifies a type of payload information." The Court construed the phrase to mean "an identifier that includes the type of information conveyed in the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia."

Ericsson relied on the TID subfield value in the 802.11n standard to meet the service type identifier limitation. *See* 6/5/13 a.m. Tr. at 115:4–117:21 (Nettles). Each TID subfield contains an integer ranging from 0 to 7. *See* PX283 at 253. These eight integers map to four access categories: 1 and 2 correspond to AC_BK; 0 and 3 correspond to AC_BE; 4 and 5 correspond to

---

[4] Ericsson asserted Claim 1 against all Defendants and Claim 5 against only the Router Defendants (D-Link, Netgear, and Belkin). *See* Docket No. 508. The jury found infringement of all asserted '568 Claims. *See id.* Claim 5 depends from Claim 1.

AC_VI; and 6 and 7 correspond to AC_VO. Each access category is assigned a further "designation," which the 802.11n standard describes as "informative." AC_BK is designated Background, AC_BE is designated Best Effort, AC_VI is designated Video, and AC_VO is designated Voice. These "informative" designations are central to the parties' dispute. Defendants believe they do not infringe because the access category designations are not mandatory (i.e. voice data need not be designated "AC_VO" or "Voice"), while Ericsson asserts that Defendants infringe because their products are capable of using and in some instances actually use the "informative" classifications.

Defendants contend they do not infringe because the TID subfield does not identify the type of information contained in a packet's payload. Docket No. 528 at 12. Instead, Defendants contend the TID subfield value is only used to prioritize packets for transmission. *Id*. at 13. Defendants presented evidence that different types of information can be assigned the same TID value, and the same type of information can be assigned different TID values. *Id*. Thus, Defendants believe the TID subfield does not meet the service type identifier limitation because the TID subfield does not identify the type of information conveyed in the packet. *Id*.

Further, Defendants argue their products do not infringe even though the TID subfield value *may* correspond to the type of information in the payload. *Id*. at 14. Defendants contend merely having the capability of identifying the type of information is insufficient. *Id*. Defendants assert there is no requirement in the 802.11n standard that certain TID values be used with certain types of information. *Id*. Therefore, even though TID values may be configured to match their descriptive designations, there is no infringement because TID values do not have to be configured to match their descriptive designations. *Id*.

11

**A62**

Ericsson contends it presented sufficient evidence to support the jury's verdict. Docket No. 581 at 12. Ericsson argues when Defendants' products are used in accordance with the 802.11n standard, the TID value identifies the type of information in the payload. *Id.* at 13. In support, Ericsson cites internal Intel documents instructing customers to use TID values that match the type of data in the payload. *Id.* Further, Ericsson argues both Dr. Nettles and Dr. Gibson performed testing indicating where the TID values identified the type of data in the payload. *Id.* Ericsson argues this is sufficient evidence to support the jury's infringement verdict. *Id.*

Dr. Nettles testified that when devices are used in accordance with the 802.11n standard, the TID value identifies the type of information in the payload. 6/5/13 p.m. Tr. at 110:9–24; *see* 6/5/13 p.m. Tr. at 39:7–9 (noting the user can assign "any TID value that he or she chooses"). Dr. Nettles stated that while the categories were not mandatory, someone using the standard would actually use the given designations. 6/5/13 a.m. Tr. at 118:5–13; *see* 6/5/13 p.m. Tr. at 36:24–37:2 ("Q: So what they establish is how the system will treat them, not the kind of information conveyed in the payload? A: No, I can't agree with that in general."). Further, Dr. Nettles provided several specific examples of products where the TID values match the type of information in the payload. *See* 6/5/13 a.m. Tr. at 123:10–15, 124:3–8, 124:16–22. There was also evidence Intel encouraged its customers to follow the TID subfield designations for video and voice. *See* PX514 at 65; 6/10/13 p.m. Tr. at 50:8–53:10 (Gibson).

At best, Defendants' evidence showed their products can be configured in a non-infringing manner. In particular, Dr. Gibson presented testing data demonstrating that a particular TID subfield was not required to match the content of the payload. *See* 6/10/13 a.m. Tr. at 117:23–120:13. Conversely, Dr. Nettles identified instances where the TID values matched

the payload content. *See* 6/5/13 a.m. Tr. at 123:10–15, 124:3–8, 124:16–22; 6/10/13 p.m. Tr. at

57:16–58:18 (Gibson). The jury was not required to find Dr. Gibson's testing data more

influential than Dr. Nettles's product data.[5] Further, even though the TID subfield classifications

are not mandatory, they are still included in the 802.11n standard. *See* PX283 at 253. It was

entirely logical for the jury to conclude that Defendants would choose to follow even the

"informative" portions of the standard.

      Defendants' motion for judgment as a matter of law that they do not infringe the '568

Patent is **DENIED**.

### iv. The '625 Patent

      Claim 1 of the '625 Patent requires:

> A transmitter in the data network *commanding a receiver* in the data network to a)
> receive at least one packet having a sequence number that is not consecutive with
> a sequence number of a previously received packet and b) release any expectation
> of receiving outstanding packets having sequence numbers prior to the at least one
> packet;

'625 Patent, Claim 1, at 10:16–23 (emphasis added). Ericsson relied on transmitted data packets

to satisfy the command to receive limitation. Dr. Nettles testified that data packets sent either

individually (MPDUs) or aggregated (A-MPDUs) act as a command from the transmitter to the

receiver to accept an out of sequence packet. Docket No. 528 at 16. Defendants contend this is

insufficient evidence of a command to receive. *Id.* at 17. Defendants argue the normal operation

of 802.11n receivers is to receive all packets, regardless of whether the packets are out of

sequence. *Id.* Further, Defendants' receivers receive all data packets the same—there is no

---

[5] At the post-trial hearing, the Court repeatedly asked Defendants' counsel why the specific instances identified by Dr. Nettles where the TID subfield matched the content of the data were not sufficient to support the jury's verdict. Those questions were never directly answered. Instead, Defendants consistently reiterated their position that there could only be infringement if the TID subfield *was required* to match the type of data contained within it. This is not necessary to find infringement. *See z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1350 (Fed. Cir. 2007) (affirming an infringement verdict even though the accused products were capable of non-infringing modes of operation); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 458 F.3d 1354, 1363 (Fed. Cir. 2006).

special process for receiving out of sequence packets. *Id.* at 18. Because all packets are received the same, there is no need for a command to receive. *Id.* at 19.

Additionally, Defendants contend Ericsson cannot rely on the data packets themselves as commands to receive. Docket No. 528 at 21. Defendants argue Ericsson did not present any evidence of 802.11n programming forcing receivers to receive out of sequence packets. *Id.* Therefore, there is no evidence to support the jury's finding of infringement. *Id.* Finally, Defendants argue Ericsson did not present any evidence that the steps of Claim 1 (a method claim) were actually performed. *Id.* at 22. Defendants cite testimony from Dr. Nettles that Defendants "program their devices to do these steps without human intervention." *Id.* Defendants believe this statement is insufficient to prove direct infringement because Ericsson never demonstrated anyone actually performed the claimed method. *See id.* (citing *Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*, 243 Fed. Appx. 603, 607 (Fed. Cir. 2007)).

In a footnote, Defendants also contend Ericsson failed to present sufficient evidence that the accused products command a receiver to release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet. Docket No. 528 at 22, n.14. Defendants contend Ericsson failed to present any evidence the accused products send explicit BARs when a block acknowledgment is lost. *Id.* Likewise, Defendants assert that transmission of A-MPDUs does not meet the claim steps because A-MPDUs do not release expectation of receiving outstanding packets. *Id.*

Ericsson argues it presented substantial evidence of a command to receive out of sequence packets. Docket No. 581 at 17. Dr. Nettles testified that 802.11n receivers are programmed to treat all packets as commands to receive, so 802.11n-compliant products must receive all out of sequence packets. *Id.* Ericsson also contends the jury resolved Defendants'

semantic arguments in Ericsson's favor. *Id*. at 19. Because all packets must be received, Defendants contend this indicates 802.11n devices do not need a command to receive. *Id*. Ericsson believes the opposite is true. *Id*. Ericsson argues 802.11n devices receive all packets because of the command to receive. *Id*. Ericsson posits that this is a fact issue the jury was entitled to resolve, and did resolve, in Ericsson's favor. *Id*. Accordingly, there is substantial evidence to support the verdict. *Id*.

Regarding the "at least one packet" limitation, Ericsson first argues Defendants waived this argument. *Id*. at 21. Ericsson contends Defendants never presented this issue in their JMOL at trial, and they did not make any argument about it to the jury. *Id*. at 22. Second, Ericsson argues it presented substantial evidence this limitation was met. *Id*. at 21. Ericsson asserts it demonstrated that the accused products command a receiver to release any expectation of receiving outstanding packets when a receiver receives an A-MPDU. *Id*. at 22. When a receiver receives an A-MPDU, it shifts the window forward, releasing any expectation of packets before the window. *Id*. Ericsson contends this same function discards packets below the window, so it satisfies the referenced claim language. *Id*.

Dr. Nettles testified that 802.11n receivers treat MPDUs and A-MPDUs as commands to receive out of sequence packets. 6/5/13 a.m. Tr. at 80:4–10. Each receiver contains programming instructing it to treat out of sequence packets as commands to receive, so the receiver knows to accept the packets. *Id*. at 82:4–17. Because of this programming, 802.11n receivers accept all packets. *Id*. at 83:7–13. Dr. Nettles further testified that 802.11n receivers operate similarly to a preferred embodiment in the '625 Patent. *See* 6/11/13 a.m. Tr. at 108:5–11. The '625 Patent contains an embodiment where each transmitted packet contains an enforcement bit. *Id*. Dr. Nettles hypothesized that in the embodiment, the system could be configured so the enforcement

bit was always set to one. *Id*. If every enforcement bit was set to one, every packet would be a command to receive. *Id*. at 108:12–14. Dr. Nettles contends this is similar to the 802.11n system. *Id*. at 108:15–19. Since every "enforcement bit" is set to one, Defendants no longer need to transmit them. *Id*. However, every packet is still treated as a command to receive. *Id*.

Additionally, Dr. Nettles provided substantial testimony about the releasing expectations limitation. Dr. Nettles stated when a window of expected packets shifts, the receiver releases any expectation of receiving packets before the window. 6/5/13 a.m. Tr. at 87:14–17. Dr. Nettles presented two animations explaining how this occurred to the jury. *See id*. at 87:18–88:6. Dr. Nettles also testified that the receipt of an A-MPDU causes the window to shift. *Id*. at 92:6–15. This window shift causes the receiver to release expectation of receiving packets outside the window. *Id*.

Based on Dr. Nettles's testimony, there is substantial evidence to support the jury's verdict. Both sides presented competing evidence about the command to receive. Dr. Gibson testified that because 802.11n receivers accept all packets, there is no command to receive. *See* 6/10/13 a.m. Tr. at 30:14–24. Dr. Nettles testified that 802.11n receivers accept all packets *because* of the command to receive. *See* 6/5/13 p.m. Tr. at 57:3–5. This was a fact issue ripe for jury resolution, and there was substantial evidence to support their decision.

Defendants' motion for judgment as a matter of law that they do not infringe the '625 Patent is **DENIED**.

### v. Direct Infringement of Method Claims

Defendants argue Ericsson failed to present any evidence any Defendant infringed the asserted method claims. Docket No. 528 at 23. Defendants contend Ericsson's only evidence of direct infringement of the method claims is a statement from Dr. Nettles that Defendants' programming performs the asserted methods without user intervention. *Id*. at 24. Ericsson

A67

counters that it introduced substantial evidence to support the jury's verdict. Ericsson argues a manufacturer can be liable for direct infringement of a method claim through use by its customers. Docket No. 581 at 24. Further, Ericsson asserts that it presented evidence showing Defendants' customers used the accused products without modification. *Id.* at 25. Therefore, Ericsson believes Defendants are liable for direct infringement for both making and selling the accused products. *Id.*

Ericsson presented substantial evidence that Defendants directly infringed the asserted method claims. A method claim is directly infringed when someone practices the patented method. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1359 (Fed. Cir. 2009). A manufacturer can directly infringe a method claim if its products "automatically perform the disputed steps" without user modification. *See SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1331 (Fed. Cir. 2010) (finding direct infringement when the accused products automatically performed every step of a method claim). This is exactly the type of evidence Ericsson presented at trial. Dr. Nettles testified that the accused products perform the patented methods automatically without user intervention. *See* 6/5/13 a.m. Tr. at 25:7–11 ('215 Patent); 78:25–79:10 ('625 Patent). This is not an issue of joint infringement, as Defendants contend. *See* Docket No. 592 at 8. Rather, Ericsson presented evidence Defendants directly infringed by performing all the steps of the asserted claims.

There was substantial evidence to support the jury's infringement verdict of the method claims. Defendants' motion for judgment as a matter of law that they do not infringe the asserted method claims is **DENIED**.

## C.  Indirect Infringement

### i.  Applicable Law

Infringement is a question of fact that is reviewed for substantial evidence when tried to a jury. *Finisar Corp.*, 523 F.3d at 1332. Under 35 U.S.C § 271(b), a party is liable for infringement if it "actively induces infringement of a patent." "In order to prevail on an inducement claim, the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *ACCO Brands*, 501 F.3d at 1312 (internal quotation marks omitted). Thus, to support a finding of inducement, there must be "evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). Furthermore, "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts," and that the infringer "knowingly induced infringement." *Id.* at 1306. A party has the requisite knowledge if it knew "that the induced acts constitute patent infringement," or was willfully blind to the infringement. A party is willfully blind if it believed there was a high probably that the acts constituted patent infringement and took deliberate steps to avoid learning of the infringement. *Global-Tech Appliances, Inc. v. SEB S.A.*, --- U.S. ----, 131 S. Ct. 2060, 2068, 2070 (2011); *see Smith & Nephew, Inc. v. Arthrex, Inc.*, 2013 U.S. App. LEXIS 1038, *10–12 (Fed. Cir. 2013).

A patentee may prove both indirect infringement and the underlying direct infringement by circumstantial evidence. *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006). "There is no requirement that direct evidence be introduced, nor is a jury's preference for circumstantial evidence over direct evidence unreasonable per se." *Id.* Moreover, "[t]he drawing of inferences, particularly in respect of an intent-implicating question . . . is

18

peculiarly within the province of the fact finder that observed the witnesses." *Rolls-Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986); *see also Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) (declining to disturb jury's verdict because intent to induce infringement "is a factual determination particularly within the province of the trier of fact").

### ii. Analysis

Defendants contend Ericsson failed to present sufficient evidence of indirect infringement for two reasons. First, Defendants believe Ericsson failed to prove direct infringement by Ericsson's customers for all the reasons recited above. Docket No. 528 at 24. Second, Defendants argue no reasonable jury could have found they intended for their customers to infringe the asserted claims. *Id.* at 25. Defendants contend Ericsson's proof regarding knowledge of infringement is lacking. *Id.* Defendants argue the evidence only demonstrated they were aware of Ericsson's lawsuit; they were not aware their products actually infringed. *Id.* at 26. Defendants contend they have maintained reasonable and consistent positions regarding non-infringement and invalidity throughout this trial, so Ericsson failed to prove the knowledge requirement of induced infringement. *Id.* at 27. Additionally, Defendants contend Ericsson failed to present any evidence that Defendants manifested a specific intent to encourage their customer's infringing acts. *Id.* at 28.

Ericsson argues its evidence was "more than sufficient" to support a finding of induced infringement. Docket No. 581 at 27. Ericsson cites eight different pieces of testimony, including testimony from Dr. Nettles, that operation in an infringing manner is "the whole reason for selling" Defendants' products. *See id.* at 27–28. Ericsson also cites evidence that Defendants submitted their products for 802.11n compatibility testing, and they advertised their products'

19

**A70**

802.11n compliance. *Id.* at 28. Ericsson believes this evidence "goes far beyond what has been found to be sufficient evidence to find inducement." *Id.*

There was substantial evidence to support a verdict of induced infringement. First, Ericsson presented substantial evidence of direct infringement by Defendants' customers.[6] *See Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1308 (Fed. Cir. 2012) (en banc) ("There can be no indirect infringement without direct infringement."). Dr. Nettles testified that end customers performed the patented methods when they used the accused products. 6/5/13 a.m. Tr. at 25:12–14. Ericsson also presented evidence that Defendants sold infringing units to end customers. *See* 6/6/13 a.m. Tr. at 10:21–12:2 (Bone). This is sufficient evidence to infer end customers used the infringing products. *See Liquid Dynamics*, 449 F.3d at 1219 (noting that a patentee may prove indirect infringement through circumstantial evidence).

Second, Ericsson presented substantial evidence Defendants "knowingly induced infringement and possessed specific intent to encourage another's infringement." *See Akamai Techs.*, 692 F.3d at 1308. The parties stipulated that Ericsson notified each Defendant of its infringement allegations before the suit was filed. 6/4/13 p.m. Tr. at 7:5–10:20; *see id*. at 7:1–4 (Petersson) ("Q: Did Ericsson contact each of the Defendants in this case about taking a license to Ericsson's Wi-Fi patents? A: Yes, we did."). After receiving notice, Defendants continued selling the accused products. *See* 6/6/13 a.m. Tr. at 11:18–21 (Bone). Dr. Nettles testified that Defendants' accused products comply with the 802.11n standard, and the accused products automatically infringe without user intervention. 6/5/13 a.m. Tr. at 25:21–26:2. Ericsson also presented evidence Defendants advertise their 802.11n compliance. *See* 6/6/13 p.m. Tr. at 175:18–176:13 (McFarland) (describing testing by the Wi-Fi Alliance). Defendants submit their

---

[6] Defendants also re-urge non-infringement arguments made previously in their Motion. *See* Docket No. 528 at 24. For the reasons set forth above, those arguments are without merit.

**A71**

products for independent compliance testing, then indicate on their packaging the products are compliant. *See* 6/4/13 p.m. Tr. at 123:15–22, 130:18–136:17 (Nettles); 6/5/13 p.m. Tr. at 144:15–24 (Bone). Taken together, this is substantial evidence of "specific intent to encourage another's infringement." *See DSU Med.*, 471 F.3d at 1306.

Defendants' motion for judgment as a matter of law regarding indirect infringement is **DENIED**.

### D. Invalidity

#### i. Applicable Law

Patents are presumed valid, and overcoming this presumption requires clear and convincing evidence. *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1354 (Fed. Cir. 2010) (*en banc*). A patent claim is invalid as anticipated if the claimed invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention by the applicant. 35 U.S.C. § 102(a) (2006). Anticipation requires the presence in the prior art of each and every limitation of the claimed invention. *Amgen, Inc. v. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1366 (Fed. Cir. 2009).

#### ii. The '625 Patent

At trial, Defendants presented evidence that a submission to the European Telecommunications Standards Institute ("ETSI") by Dietmar Petras anticipated Claim 1 of the '625 Patent. *See* DX120 ("Petras Reference" or "Petras"). Ericsson argued the Petras Reference did not disclose a command to receive, as required by Claim 1. Defendants now contend they presented clear and convincing evidence the Petras Reference disclosed a command to receive, as well as every other limitation in Claim 1.

21

**A72**

Dr. Nettles testified at trial (and Ericsson argues now) that Petras was not anticipatory because it failed to show a command to receive an out of sequence packet. Docket No. 581 at 33. In particular, the discard message relied on by Defendants was not a command to receive; it was merely a notification the transmitter has discarded a packet. *Id*. Further, Ericsson contends Dr. Heegard admitted the Petras Reference did not need a command to receive. *Id*. at 34. Defendants contend their evidence demonstrates that in the Petras Reference, a discard message is a command to receive. Docket No. 592 at 9. Defendants argue the discard message forces the receiver to accept the packet to which the message is attached, but the receiver would not otherwise accept the packet. *Id*. at 9. Thus, Defendants believe the Petras Reference discloses every element of Claim 1. *Id*.

Anticipation of the '625 Patent presents a classic fact issue for the jury. At issue was whether a single reference disclosed a single limitation. Ericsson's expert testified it did not; Defendants' expert testified it did. After reviewing the evidence, the jury determined the Defendants failed to prove by clear and convincing evidence that the reference contained the limitation. Such a determination is squarely within the purview of the jury, and Defendants failed to present sufficient evidence to overturn the verdict. *See Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 480 (5th Cir. 2007); *The Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1344 (Fed. Cir. 2008).

Dr. Nettles testified the Petras discard message in was not a command to receive. 6/11/13 a.m. Tr. at 99:23–100:2. According to Dr. Nettles, the only effect of the Petras discard notice is to shift the window of anticipated packets. *Id*. at 100:7–11. However, shifting the window has no impact on whether out of sequence packets are received. *Id*. at 100:12–14. Further, Dr. Nettles testified there was "definitely no disclosure" in the Petras Reference indicating a discard notice

22

**A73**

was a command to receive. *Id*. at 100:15–21; *see* 6/11/13 p.m. Tr. at 17:20–24 (Nettles) ("Q: And that's what they said—and that's what Dr. Heegard said represented a command to receive, right? A: That's what he identified. I don't agree with him.").

Dr. Heegard testified the discard message in Petras was a command to receive. *See* 6/10/13 p.m. Tr. at 142:22–143:15. According to Dr. Heegard, the Petras discard message acts like the enforcement bit in the '625 Patent, and it commands a receiver to accept out of sequence packets. *See id*. Ericsson presented evidence that Dr. Heegard's position conflicted with the analysis of Dr. Gibson, Defendants' non-infringement expert. Ericsson cross-examined Dr. Heegard on a statement from Dr. Gibson's expert report where Dr. Gibson stated that a "message that informs a receiver that the transmitter has discarded packets, does not command the receiver to receive any packets." 6/10/13 a.m. Tr. at 159:2–9. Dr. Heegard then conceded that discard messages are "generally speaking" not commands to receive. *Id*. at 160:16–19; *see id*. at 160:25–161:2 ("So generally is a discard message a command to receive, no. In this system, this message is a command to receive."). Thus, Dr. Heegard admitted his view of the Petras discard messages conflicted with the generally understood operation of discard messages. Given that Dr. Heegard's entire invalidity analysis was based on Petras discard messages being commands to receive, the jury was entitled to view this concession in Ericsson's favor.

Both sides presented competing views of the Petras reference, and the jury accepted Ericsson's view. *Cf. Goodman v. Harris Cnty.*, 571 F.3d 388, 398 (5th Cir. 2009) (quoting *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991)) ("We accept all credibility choices that tend to support the jury's verdict."). There is sufficient evidence to support the jury's finding of no invalidity of Claim 1 of the '625 Patent. Defendants' motion for judgment as a matter of law is **DENIED**.

### iii.  The '435 Patent

Defendants also relied on the Petras Reference to show anticipation of Claims 1 and 2 of the '435 Patent. At trial, Ericsson presented testimony that Petras did not disclose removing entries from a list of expected packets. Ericsson now argues this evidence was sufficient to support the jury's verdict. *See* Docket No. 581 at 35. Ericsson contends Dr. Heegard made inconsistent statements about the list of expected packets. *Id*. at 35. Ericsson believes Dr. Heegard first testified a buffer was the list, then later testified a buffer was not the list. *Id*. Regardless, Ericsson argues Dr. Heegard's final list does not track packets but instead makes timestamp calculations. *Id*. at 36. Therefore, because the Petras Reference does not teach removing entries from a list of expected packets, it is not anticipatory. *Id*.

Defendants contend no reasonable jury could have found Claims 1 and 2 not invalid in light of the Petras Reference. Docket No. 528 at 33. Dr. Heegard testified that the Petras Reference discloses a list that tracks which packets are expected or missing from the receiver's buffer. *Id*. at 34. Defendants argue this evidence mandated a finding of invalidity by the jury. *Id*.

Analysis of the '435 Patent is very similar to the analysis of the '625 Patent. Once again, Dr. Heegard testified the Petras Reference contained a particular limitation, and Dr. Nettles testified it did not. Both sides presented competing expert opinions, and the jury sided with Ericsson. This is no reason to disrupt the jury's verdict.

Ericsson presented substantial evidence to support the verdict. Dr. Nettles testified Petras failed to disclose removing entries from a list of expected packets. 6/11/13 a.m. Tr. at 101:5–13. Dr. Nettles explained that the figure identified by Dr. Heegard was something "you would never want to remove expectations from." *Id*. at 101:23–25. According to Dr. Nettles, the figure identified by Dr. Heegard is used to make calculations about timestamps. *Id*. at 102:2–6.

24

**A75**

Consequently, if an entry was removed from the list, the timestamp calculation would be incorrect. *See id.*

Dr. Heegard presented a somewhat muddled view of how he believed the Petras Reference actually disclosed a list of expected entries. On direct examination, Dr. Heegard testified the receiver keeps track of which packets "have been received and are sitting in the buffer." 6/10/13 p.m. Tr. at 137:13–17. Heegard explained that a receiver must "keep track of what things are received and they're sitting in the buffer, and it's got to keep track of what things it expects to receive." *Id.* at 137:18–22. On cross examination, Dr. Heegard then stated "the buffer's not the list." *Id.* at 162:23. Instead, one of ordinary skill would know to keep a list.[7] *Id.* at 163:3–15. Dr. Heegard further testified that the buffer was not the list, but "a list keeps track of a buffer." *Id.* at 164:21–22. On re-direct, Dr. Heegard clarified that Petras shows "a buffer and with a list keeping track of it." *Id.* at 166:22–23.

As is apparent from the quoted testimony, Dr. Heegard struggled to consistently articulate his reasoning for anticipation. Combined with the testimony of Dr. Nettles, there was more than enough evidence to support the jury's verdict of no invalidity of the '435 Patent. Defendants' motion for judgment as a matter of law is **DENIED**.

### E. Motion for New Trial

As an alternative to judgment as a matter of law, Defendants request a new trial on all validity and infringement issues. As discussed above, there was substantial evidence to support the jury's verdict of both infringement and no invalidity. Accordingly, Defendants' motion for a new trial on infringement and validity is **DENIED**.

---

[7] *See* 6/10/13 p.m. Tr. at at 164:14–17 ("The buffer has 1 and 3 in it. So I know, okay, 1 and 3 sitting in the buffer, 0 and 2 is missing. I keep track. 0 and 2 is missing. 1 and 3 is in the buffer. That's the list.") (Heegard).

**III.    Defendants' Renewed Motion for Judgment as a Matter of Law on Ericsson's Damages Claims or, in the Alternative, for Vacatur, Remittitur or a New Trial on Damages (Docket No. 529)**

In this motion, Defendants challenge the jury's damage award. First, Defendants contend the damages violate the entire market value rule. Next, Defendants contend Ericsson's expert (Mr. Bone) relied on non-comparable licenses and failed to apportion between patented and non-patented features. Next, Defendants contend the damage award is inconsistent with Ericsson's RAND obligations and fails to account for royalty stacking. Finally, Defendants request a new trial on damages. Defendants contend the Court's jury instructions and verdict form contained prejudicial errors.

### A.  Applicable Law

A patentee is entitled to damages for infringement under 35 U.S.C. § 284. The burden of proving damages falls on the patentee. *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003). There are two alternative categories of infringement compensation—the patentee's lost profits, and the reasonable royalty the patentee would have received through arms-length bargaining. *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

To ascertain a reasonable royalty, patentees commonly consider a hypothetical negotiation in which the asserted patent claims are assumed valid, enforceable, and infringed, and attempt to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began. *Id.* at 1324–25; *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995) (en banc). Calculation of a reasonable royalty requires determination of two separate and distinct amounts: 1) the royalty base, or the revenue pool implicated by the infringement; and 2) the royalty rate, or the

A77

percentage of that pool "adequate to compensate" the plaintiff for the infringement. *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 286 (N.D.N.Y. 2009).

The entire market value rule "recognizes that the economic value of a patent may be greater than the value of the sales of the patented part alone." *See King Instruments Corp. v. Perego*, 65 F.3d 941, 951 n.5 (Fed. Cir. 1995). "The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product [if] the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (citing *Lucent*, 580 F.3d at 1336). "[T]he patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative," or show that "the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Id.* (citing *Garreston v. Clark*, 111 U.S. 120, 121, 4 S.Ct. 291, 28 L.Ed. 371 (1884)); *see also Lucent*, 580 F.3d at 1336–67. For minor patent improvements, a patentee cannot justify using the entire market value of an accused product simply by asserting a lower royalty rate. *Uniloc*, 632 F.3d at 1319–20 (rejecting contrary interpretation of *Lucent*, 580 F.3d at 1338–39). Although a reasonable royalty analysis "necessarily involves an element of approximation and uncertainty," *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995), the Court must ensure the jury verdict is supported by sufficient evidence.

"A district court's duty to remit excessive damages is a procedural issue, not unique to patent law." *Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1380 (Fed. Cir. 2005). In the Fifth Circuit, a decision on remittitur and new trial is within the

sound discretion of the trial court. *See Volger v. Blackmore*, 352 F.3d 150, 154 (5th Cir. 2003). The standard is highly deferential, and damages are set aside "only upon a clear showing of excessiveness." *i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 857 (Fed. Cir. 2010) (quoting *Duff v. Werner Enters., Inc.*, 489 F.3d 727, 730 (5th Cir. 2007)). An excessive award exceeds the "maximum amount calculable from the evidence." *Carlton v. H.C. Price Co.*, 640 F.2d 573, 579 (5th Cir. 1981).

### B. Entire Market Value Rule and Apportionment

Defendants first contend they are entitled to judgment as a matter of law because the jury's damages award violates the entire market value rule. Docket No. 529 at 2. Defendants contend Mr. Bone derived his $0.50 per unit royalty from the value of end products (i.e. routers and computers) instead of limiting his royalty base to the smallest salable patent-practicing unit. *Id.* at 3. Defendants argue the WiFi chips are the smallest salable unit, and there was no evidence the chips drove demand for the end products. *Id.* at 4. Accordingly, Defendants assert that Mr. Bone improperly relied on end-product revenues to arrive at his royalty. *Id.*

Ericsson argues Mr. Bone's analysis did not violate the entire market value rule because it did not implicate the entire market value rule. Docket No. 584 at 8. Ericsson contends Mr. Bone's royalty base was not the market value of the end products; it was the market value of the asserted patents' contributions to the end products. *Id.* at 9. Additionally, Ericsson contends both sides agreed on the proper royalty base—the stipulated number of accused products sold—and Defendants' own expert used router and computer sales as his base. *Id.* at 9.

Defendants next contend they are entitled to judgment as a matter of law because Mr. Bone failed to apportion between patented and unpatented features. Docket No. 529 at 6. Defendants argue Mr. Bone did not properly apportion Ericsson's portfolio rate to account for

the value of the patented features as opposed to non-patented features. *Id*. As an example, Defendants cite testimony from Dr. Perryman that only 17.5% of a WiFi chip relates to 802.11n, and that 17.5% covers significantly more than the accused Quality of Service and Block Acknowledgment features. *Id*. Ericsson counters that Mr. Bone's analysis contained two distinct levels of apportionment to arrive at an appropriate royalty. Docket No. 584 at 10. Further, Ericsson argues the Court rejected an identical argument in Defendants' pre-trial *Daubert* motion, so there is no reason to reach a different result post-trial. *Id*.

Defendants' entire market value rule and apportionment arguments are nearly identical to those raised (and rejected) pre-trial. *See* Docket No. 443. These same arguments are once again rejected post-trial. Defendants' apportionment argument ignores two different levels of apportionment in Mr. Bone's analysis. At the first level, Bone only considered revenue from the licensing of Ericsson's 802.11 portfolio. At the second level, Mr. Bone apportioned the 802.11 licensing revenue to extract the value attributed to non-asserted patents. Combined, these two levels limit the revenue pool to the market value of the asserted patents' contribution to the 802.11 standard.

The first level of apportionment reduced the revenue pool to the value of Ericsson's 802.11 contributions. On multiple occasions, Ericsson licensed its 802.11 portfolio to third parties. *See* 6/5/13 p.m. Tr. at 148:6–20 (Bone). Each license covered only a particular portion of the 802.11 standard—namely, the portion of the 802.11 standard the third party licensees believed was covered by Ericsson's portfolio.[8] Defendants attempt to downplay the significance of these licenses, but they reflect a real-world valuation of Ericsson's 802.11 patents. *See* 6/5/13 p.m. Tr. at 146:15–17, 150:24–152:18 (Bone); *Monsanto Co. v. McFarling*, 488 F.3d 973, 978–

---

[8] 6/6/13 a.m. Sealed Tr. at at 3:10–7:3 (HP); 7:5–9:17 (Buffalo); 9:18–11:23 (RIM); 11:24–13:18 (Option); 13:19–14:22 (Ascom); 14:23–16:5 (Sonim).

79 (Fed. Cir. 2007) ("An established royalty is usually the best measure of a "reasonable" royalty for a given use of an invention because it removes the need to guess at the terms to which parties would hypothetically agree."). The licensees would not have paid value for a license unless they believed Ericsson's patents covered at least a portion of the standard. Similarly, the licensees would not have paid value for the portion of the standard not covered by Ericsson's patents. Consequently, the money paid under these licenses represents the market's valuation of the 802.11 contributions of Ericsson's patents. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)) ("The trial court must carefully tie proof of damages to the claimed invention's footprint in the market place.").

The five patents asserted in this case are not the entirety of Ericsson's 802.11 portfolio— they are only a subset of it. However, Mr. Bone's second level of apportionment factors this into account. Mr. Bone reduced his rates "to account for the fact we're only dealing with five patents in this case." 6/6/13 a.m. Sealed Tr. at 18:24–19:1. He further testified that the five asserted patents comprise at least fifty percent of the value of Ericsson's 802.11 portfolio. *Id*. at 20:3–14. This was a realistic and thorough attempt to apportion revenue to only the asserted patents. *Compare VirnetX Inc. v. Cisco Sys., Inc.*, 2013 WL 789288, at *2 (E.D. Tex. Mar. 1, 2013) (Davis, J.). The end result of Mr. Bone's analysis is a royalty pool comprising money paid by third party licensees for the value of the asserted patents' contributions to the 802.11 standard. *See* 6/6/13 a.m. Sealed Tr. at 58:20–59:1 ("Q: Okay. Is there some indications to you in this case that Ericsson's portfolio is worth 50 cents? A: Yes. Q: And what is that? A: The actual agreements that companies were willing to pay for Ericsson's technology, the six agreements

we've talked about."); *LaserDynamics,* 694 F.3d at 68 (requiring courts to examine only revenues associated with the patented components).

Defendants also argue Mr. Bone's analysis violates the entire market value rule by using the value of end products without proving the patented feature is the basis for customer demand of the accused product. This argument fails for many of the same reasons as Defendants' apportionment argument. Mr. Bone's revenue base is not the market value of the end products. Rather, it is the market value of the contribution of the asserted patents to the end products. This distinction is critical to the analysis. The licensing revenue from Ericsson's portfolio is attributable only to the value Ericsson's patents add to the licensees' end products; it is not attributable to the end products as a whole. It goes without saying that the licensees would not have paid value for portions of the 802.11 standard unrelated to Ericsson's patents. Therefore, Mr. Bone's report does not implicate the entire market value rule. *See Versata Software, Inc. v. SAP Am., Inc.,* --- F.3d ----, 2013 WL 1810957, at *12 (Fed. Cir. May 1, 2013) (finding that a plaintiff's damage model did not implicate the entire market value rule because it "merely accounted for all infringing sales"); *Fractus, S.A. v. Samsung Elecs. Co.,* 876 F. Supp. 2d 802, 833 (E.D. Tex. 2012) (Davis, J.).

Additionally, Mr. Bone's analysis calls for a per unit royalty on all sales of accused products. As a per unit royalty, it does not fluctuate with the price of the end product. Regardless of the ultimate sale price of the end product, the royalty rate remains constant. 6/5/13 p.m. Tr. at 147:16–17 ("So the value is on a per-unit basis regardless of whether it's in a router or a laptop.") (Bone). This further illustrates that Mr. Bone did not rely on the value of end products in his analysis.[9] *See SynQor, Inc. v. Artesyn Techs., Inc.,* 709 F.3d 1365, 1383 (Fed. Cir. 2013)

---

[9] Mr. Bone acknowledges that it would not have been appropriate to calculate damages as a percentage of the sales of end products like routers and computers. *See* 6/5/13 p.m. Tr. at at 147:8–17.

(determining that a plaintiff did not invoke the entire market value rule when it "never sought to justify its damages figure based on the price of the customer end products").

Defendants' motion for judgment as a matter of law regarding the entire market value rule and lack of apportionment is **DENIED**.

## C. Ericsson's RAND Obligations

Next, Defendants contend they are entitled to judgment as a matter of law because the jury's damages award is inconsistent with Ericsson's RAND obligations. Docket No. 529 at 8. Defendants argue Ericsson is under a RAND obligation to provide licenses to an "unrestricted" number of licensees, but Ericsson refused to offer a license to Intel. *Id.* At Ericsson's request, the verdict form did not include a space to award damages against Intel. *Id.* Defendants contend this is equivalent to a refusal to offer a license to Intel, which runs contrary to Ericsson's RAND obligations. *Id.*

Ericsson contends Defendants waived this argument because Defendants never objected to the verdict form on the grounds that it did not contain a space to assess damages against Intel. Docket No. 584 at 11. Additionally, Ericsson contends this issue is moot because it has now offered a license to Intel. *Id.*

Defendants basically argue Ericsson breached its RAND obligations by not suing Intel, then not seeking damages against Intel after it intervened in the case. This argument fails for two reasons. First, Ericsson is the plaintiff. As the plaintiff, it is the master of its own case. Originally, Ericsson elected not to sue Intel, and Defendants cite no law requiring a patentee to *sue* all potential licensees.[10] After Intel intervened in the case, Ericsson elected not to pursue

---

[10] Defendants argue Ericsson must *license* an unrestricted number of users on fair and reasonable terms. *See* Docket No. 529 at 7.

damages from Intel. *See* 6/5/13 p.m. Tr. at 145:12–146:7 (Bone). Once again, Defendants cite no authority that a plaintiff must seek damages from all Defendants in a case.

Second, this issue is moot because Ericsson offered Intel a license prior to trial. *See* 6/4/13 p.m. Tr. at 51:2–15 (Petersson). The license offer was on the same terms as Ericsson's offers to other Defendants, and it was at the same rate Ericsson sought against the other Defendants at trial. *See id.* Intel may argue the license offer was superficial, but Intel itself never meaningfully engaged in licensing talks with Ericsson after Ericsson's initial offer. *See id.* at 57:4–15. Intel cannot rely on its failure to negotiate to prove Ericsson's failure to make a legitimate license offer.

Defendants' motion for judgment as a matter of law that Ericsson breached its RAND obligation by not seeking damages against Intel is **DENIED**.[11]

### D. Non-Comparable Licenses

Next, Defendants contend they are entitled to judgment as a matter of law because Ericsson presented evidence of non-comparable licenses. Docket No. 529 at 8. Initially, Defendants argue Mr. Bone's $0.50 royalty rate is not found in any of the prior licenses. *Id.* Instead, it is an artificial value manufactured by Mr. Bone for the purposes of this litigation. *Id.* Defendants also argue the licenses are non-comparable because they cover different scopes. *Id.* None of the licenses were limited to the asserted patents, and several licenses had a worldwide scope. *Id.* at 10. Defendants next contend the licenses are non-comparable because they include value derived from Ericsson's "overall patent leverage in the cellular space." *Id.* at 12. Finally, Defendants assert that none of the licenses were comparable because none were negotiated with Ericsson's RAND obligations in mind. *Id.* at 9.

---

[11] There is further analysis of Ericsson's licensing policy towards Intel below in the Court's findings of fact and conclusions of law. *See infra.*

**A84**

Ericsson argues it only presented comparable licenses at trial, and the jury was in the best position to determine the degree of comparability of the licenses. Docket No. 584 at 11. Additionally, it argues Defendants' arguments about the value of the previous licenses are misplaced. *Id*. at 12–13. Ericsson contends third party licensees like Buffalo, HP, and RIM are in the best position to determine the value of Ericsson's 802.11n portfolio, so their licenses are highly relevant. *Id*. at 13.

Defendants' arguments regarding the comparability of Mr. Bone's licenses were more appropriate for cross examination than for judgment as a matter of law. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("The degree of comparability of the…license agreements as well as any failure on the part of [the plaintiff's] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion."). All of the licenses Mr. Bone cited contain the patents in suit, and he gave detailed testimony addressing his apportionment of those licenses.[12] *See* 6/5/13 p.m. Tr. at 149:5–14 (Bone); 6/6/13 a.m. Sealed Tr. at 3:10–27:7 (Bone); 6/4/13 a.m. Sealed Tr. at 3:11–12:16, 14:4–28:7 (Petersson); *LaserDynamics*, 694 F.3d at 79–80 ("Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace."); *compare ResQNet*, 594 F.3d at 870 (vacating a damages award because the plaintiff relied on licenses with no relationship to the claimed invention). Defendants had the opportunity to cross-examine Mr. Bone about his apportionment, and they presented their own damages expert to rebut Mr. Bone's analysis. *See* 6/6/13 a.m. Sealed Tr. at 27:24–50:25 (Bone cross examination); 6/11/13 a.m. Sealed Tr. at 3:18–25 (Perryman). The

---

[12] Defendants contend Mr. Bone's analysis was flawed because he failed to rely on the Infineon license. *See* Docket No. 529 at 9–10. However, the Infineon license did not even contain the patents in suit.

determination of which expert's apportionment was more credible was an issue for the jury, and there is no reason to re-open the jury's factual determination.

Defendants also argue the licenses are incomparable because "there is no evidence that the licenses were negotiated with Ericsson's RAND obligations in mind." *See* Docket No. 529 at 9. However, they cite no binding authority that a prior license is incomparable as a matter of law if it was not negotiated within the RAND framework. *See id.* at 8–13; Docket No. 593 at 4. Even if there were binding authority on the issue, Mr. Bone testified that the prior licenses were all negotiated within the framework of Ericsson's RAND obligations. 6/6/13 a.m. Tr. at 13:4–8. Ericsson also presented evidence that it considered its RAND obligations when establishing a $0.50 per unit royalty. 6/4/13 a.m. Sealed Tr. at 15:22–16:17 (Petersson); 6/4/13 p.m. Tr. at 14:11–25, 53:13–54:6 (Petersson).

Additionally, Ericsson's RAND obligations are public knowledge. Ericsson's letters of assurance to the IEEE are publically available, so any potential licensee would be able to determine whether Ericsson had RAND obligations. The previous licensees were sophisticated parties, making it likely they would have been aware of Ericsson's RAND obligations during the negotiations. Taken together, there was substantial evidence that the prior licenses were negotiated within the framework of Ericsson's RAND obligations.

Defendants' motion for judgment as a matter of law regarding the comparability of prior licenses is **DENIED**.

### E.  Royalty Stacking

Defendants next contend they are entitled to judgment as a matter of law because the verdict failed to account for royalty stacking. Docket No. 529 at 13. Defendants believe "a legally proper damages model would necessarily account for the danger that royalty stacking

A86

would block or impede the 802.11 standard." *Id.* at 14. Defendants argue one of Ericsson's RAND obligations is to account for the impact of royalty stacking, but said accounting is missing from Mr. Bone's analysis. *Id.* Defendants contend the "undisputed evidence" established that a proper RAND rate should be limited to "pennies or fractions thereof" per unit. *Id.*

Ericsson counters that Defendants' royalty stacking arguments are purely hypothetical. Docket No. 584 at 14. Ericsson argues Mr. Bone considered the possibility of royalty stacking, but he could not find any evidence that a rate of $0.50 per unit would create royalty stacking problems. *Id.* Additionally, Ericsson asserts that Defendants failed to present any evidence of actual royalty stacking on 802.11n-compliant products. *Id.* at 15.

The best word to describe Defendants' royalty stacking argument is theoretical. At trial, Defendants extensively cross-examined Mr. Bone regarding the impact of royalty stacking on standard-essential patents.[13] *See* 6/6/13 a.m. Tr. at 22:15–29:21 (Bone). At one point, Defendants' counsel even suggested a theoretical stack could be $23.30 on a $2.50 standard-essential chip. *See id.* at 29:12–21. However, given the opportunity to present evidence of an *actual* stack on 802.11n essential products, Defendants came up empty. Dr. Perryman did not testify the actual royalty stack was $23.30. Nor did he testify the actual stack was $16, as Defendants' counsel also hypothesized. *See id.* at 29:3–10. Instead, Dr. Perryman never identified an actual royalty stack; he never even attempted to determine the actual amount of royalties Defendants currently pay for 802.11 patents. *See* 6/11/13 a.m. Tr. at 64:19–65:3 ("Q: Did you try to figure out the cost per unit that these Defendants are paying for standard essential 802.11 patents? A: No, sir, I did not."). Further muddling Defendants' royalty stacking

---

[13] Mr. Bone testified that third party licensees considered royalty stacking during negotiations with Ericsson. *See* 6/6/13 a.m. Sealed Tr. at 17:3–20.

argument, their infringement expert conceded that "very little of the standard is patented." *See* 6/10/13 p.m. Tr. at 5:16–23 (Gibson).

Defendants' motion for judgment as a matter of law regarding royalty stacking is **DENIED**.

### F. Method Claims

Next, Defendants contend they are entitled to judgment as a matter of law because the jury failed to properly account for the method claims found infringed. Docket No. 529 at 14. Defendants assert that damages should be limited to the demonstrated number of accused products that have been used in an infringing manner. *Id.* Defendants argue Ericsson did not provide any evidence regarding how often Defendants or their customers actually performed the claimed methods. *Id.* at 15. Thus, Ericsson's damages theories with respect to method claims are insufficient as a matter of law. *Id.*

Ericsson argues it presented substantial evidence to support the jury's damages award regarding the methods claims. Docket No. 584 at 15. Ericsson contends Dr. Nettles testified that Ericsson's method claims are infringed during normal operation of the devices. *Id.* Thus, it presented evidence that Defendants infringed by making and selling the accused products. *See id.* (citing *SiRF Tech.*, 601 F.3d at 1331).

As discussed above in the infringement section, Ericsson presented substantial evidence to support the jury's infringement verdict for the method claims. There was substantial evidence to support both direct and induced infringement by Defendants. Accordingly, Defendants' motion for judgment as a matter of law regarding method claim damages is **DENIED**.

### G. Defendants' Motion for Vacatur, Remittitur, or a New Trial

**A88**

In the alternative, Defendants ask the Court to either vacate or remit the jury's damages award or grant a new trial on damages. *See* Docket No. 529 at 16–21. Remittitur is within the sound discretion of the trial court and is only appropriate when the damages verdict is "clearly excessive." *See Alameda Films S.A. v. Authors Rights Restoration Corp.*, 331 F.3d 472, 482 (5th Cir. 2003). Most of Defendants' arguments in this section are identical to their JMOL arguments presented above.[14] For the reasons set forth above, there was substantial evidence to support the jury's verdict.

Defendants also present two additional arguments that they are entitled to a new damages trial. First, the verdict form did not include an entry for a paid-up lump sum license. Docket No. 529 at 22. The verdict form instructed the jury to determine the amount of damages that "would fairly and reasonably compensate Ericsson for infringement of the patents by the following Defendants up to the time of trial." *Id*. at 23. Defendants contend this was a prejudicial error requiring a new trial, going so far as to say their "Constitutional rights to have the jury decide the appropriate form of the reasonable royalty" had been violated. *See* Docket No. 593 at 8. Defendants assert that they presented evidence at trial a lump-sum license was the appropriate form of damages. *Id*. Second, Defendants argue the Court committing prejudicial error by instructing the jury "an infringer's net profit margin is not the ceiling by which a reasonable royalty is capped." Docket No. 529 at 23. Defendants contend there was no evidence about their profit margins, so this instruction was improper. *Id*. at 24.

Regarding the lump sum license issue, Ericsson argues no new trial is needed. Docket No. 584 at 16. Ericsson contends Defendants' argument is illogical because both sides stipulated to the number of infringing sales. *Id*. Because both sides agreed at trial to the proper damages

---

[14] For example, Defendants contend a new trial is appropriate because: (1) the verdict was against the great weight of the evidence; (2) prejudicial error occurred by allowing Mr. Bone to testify; and (3) prejudicial error occurred because the Court admitted several non-comparable licenses.

base, Defendants should not be permitted to challenge that stipulation after the fact. *Id*. Ericsson also argues Defendants failed to cite any authority indicating they are entitled to a jury determination of future royalties. *Id*. at 17. With regard to the jury instruction regarding Defendants' profit margins, Ericsson makes two arguments. First, it argues the instruction was an accurate statement of the law. *Id*. Second, Ericsson contends the instruction was necessary. *Id*. at 18. Ericsson contends Defendants' statements to the jury about the cost of the 802.11n chip necessitated the instruction. *Id*.

A new trial is not warranted based on the verdict form. The verdict form stated:

What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Ericsson for infringement of the patents by the following Defendants up to the time of trial?

Docket No. 508 at 5. Defendants contend this instruction constitutes prejudicial error because it prevented the jury from awarding a lump sum royalty. Docket No. 529 at 23. However, the jury was specifically instructed that a lump sum royalty was appropriate. *See* Docket No. 504 at 28. Further, Defendants cite no authority for the proposition that there is a constitutional right to have a jury award future damages. *See Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1581 (Fed. Cir. 1992) (affirming a district court's refusal to present the issue of future damages to the jury); *Telecordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1377–78 (Fed. Cir. 2010); *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1316 (Fed. Cir. 2007).

Nor is a new trial warranted based on the Court's instruction about profit margins. The Court gave the following instruction to the jury:

An infringer's net profit margin is not the ceiling by which a reasonable royalty is capped. The infringer's selling price can be raised, if necessary, to accommodate a higher royalty rate. Requiring the infringer to do so, may be the only way to adequately compensate the patentee for the use of its technology.

A90

6/12/13 a.m. Tr. at 43:18–24. This is an accurate statement of the law, taken almost verbatim from a recent Federal Circuit opinion. *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, --- F.3d ----, 2013 WL 2158423, at *7 (Fed. Cir. May 21, 2013); *Rite-Hite*, 56 F.3d at 1555. Defendants do not contest the legal correctness of the statement. Rather, they argue there was no basis for giving the instruction because Ericsson did not present any evidence of Defendants' profit margins. *See* Docket No. 529 at 24; 6/11/13 p.m. Tr. at 81:10–23. However, Defendants repeatedly referenced the impropriety of a $0.50 royalty on a $2.50 chip. *See* 6/11/13 a.m. Tr. at 27:4–28:11, 46:5–15 (Perryman); 6/6/13 a.m. Tr. at 20:11–18 (Bone cross examination). These arguments are thinly-veiled references to Intel's profit margin. In light of these statements, it was not improper or prejudicial to give the instruction.

Defendants' motion for vacatur, remittitur, or a new trial on damages is **DENIED**.

## IV. Ericsson's Post-Trial Motion for a Compulsory Future Royalty and Pre-Judgment and Post-Judgment Interest (Docket No. 527)

In this motion, Ericsson requests an ongoing future royalty of $0.15 per unit. Ericsson also requests pre-judgment and post-judgment interest at the Texas statutory rate, compounded quarterly.

### A. Applicable Law

A court should award interest in patent cases after a finding of infringement. 35 U.S.C. § 284. The purpose of prejudgment interest is to place the patentee in as good a position as it would have been had the infringer paid a reasonable royalty instead of infringing. *Beatrice Foods v. New England Printing*, 923 F.2d 1576, 1580 (Fed. Cir. 1991). Prejudgment interest should be awarded unless there is a significant justification for withholding such an award, such as a delay in bringing suit against the infringer. *See Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983); *Bio-Rad Labs. v. Nicolet Instrument Corp.*, 807 F.2d 964, 967 (Fed. Cir. 1986).

The interest rate used to calculate prejudgment interest and the method and frequency of compounding are left to the discretion of the district court. *See Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1579–80 (Fed. Cir. 1988) (citing *Bio-Rad Labs.*, 807 F.2d at 969). Interest should be awarded from the date of infringement to the date of judgment. *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 800 (Fed. Cir. 1988).

### B. Future Royalty

Ericsson contends it is entitled to an ongoing future royalty of $0.15 per unit. Docket No. 527. At the post-trial hearing, Defendants stated they did not oppose a $0.15 per unit future royalty if the Court denied their JMOL motions. Accordingly, the Court **GRANTS** Ericsson's motion for an ongoing royalty of $0.15 per unit.

### C. Pre-Judgment and Post-Judgment Interest

At the post-trial hearing, Defendants stated they would not oppose awarding interest to Ericsson. However, the parties debate which interest rate should be used.

Ericsson argues it should be awarded pre-judgment and post-judgment interest at the Texas statutory rate, compounded quarterly. Docket No. 527 at 5. Ericsson acknowledges that this Court generally awards interest at the prime rate, compounded quarterly. *Id*. However, Ericsson contends the prime rate is artificially low because of the Federal Reserve's recent efforts to combat the recession. *Id*. Therefore, Ericsson believes the Texas statutory rate more accurately reflects current market conditions. *Id*. at 6. Defendants believe the appropriate interest rate is the prime rate, compounded quarterly. Docket No. 579 at 5.

This Court's standard practice is to award interest at the prime rate, compounded quarterly. *See VirnetX Inc. v. Apple Inc.*, ---F. Supp. 2d----, 2013 WL 692652, at *19 (E.D. Tex.

41

**A92**

Feb. 26, 2013) (Davis, J.) (collecting cases). In keeping with its standard practice, the Court

**GRANTS** Ericsson's motion for pre-judgment[15] and post-judgment[16] interest at the prime rate,

compounded quarterly.

## V.  Ericsson's Motion to Supplement the Record (Docket No. 589)

As stated at the hearing, Ericsson's motion to supplement the record is **GRANTED**.

Defendants may respond by supplementing the record with brief portions of Mr. Bone's report.

## VI.  Defendant's Motion for Judgment on Post-Trial Proposed Findings of Fact and Conclusions of Law (Docket No. 588)

On June 12, 2013, the Court conducted a bench trial on the issue of Ericsson's RAND

obligations. *See* 6/12/13 p.m. Tr. at 6:15–194:4. Defendants now ask the Court to make three

findings. *See* Docket No. 588 at 2. First, Defendants ask the Court to determine the RAND rate

for Ericsson's 802.11n essential patents. Second, Defendants seek a determination that Ericsson

breached its RAND obligations by refusing to license chip suppliers (i.e. Intel) on RAND terms

and by demanding a royalty rate that exceeds RAND amounts. Third, Defendants request a

determination that Ericsson is not entitled to injunctive relief. The Court will address each issue

individually.

### A.  Determination of a RAND Royalty

There is no need for the Court to determine an appropriate RAND royalty for the

infringed patents because the jury already determined a reasonable royalty for those same

patents, and the jury considered Ericsson's RAND obligations when rendering its verdict. In

their post-trial briefing, Defendants asked the Court to determine an appropriate RAND rate for

the patents in suit. *See* Docket No. 588 at 2. However, Defendants wavered on whether they

---

[15] Each Defendant is responsible for the following pre-judgment interest: $98,275 for Acer/Gateway; $127,626 for Dell; $22,508 for D-Link; $224,141 for Netgear; and $152,798 for Toshiba.

[16] Each Defendant is responsible for the following post-judgment interest, per day, from the date this judgment issues: $113 for Acer/Gateway; $182 for Dell; $41 for D-Link; $336 for Netgear; and $231 for Toshiba.

would agree to actually *pay* the RAND rate determined by the Court. In essence, Defendants asked the Court to determine Ericsson's initial RAND offer, but they refused to make any assurances they would accept such an offer. This would have amounted to nothing more than an advisory opinion as to Ericsson's initial RAND license offer. *See Artic Corner, Inc. v. United States*, 845 F.2d 999, 1000 (Fed. Cir. 1988) ("At the heart of the 'case or controversy' requirement is the prohibition against advisory opinions."); *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1337–38 (Fed. Cir. 2007).

Defendants cannot ask the Court to determine a RAND rate but refuse to be bound by it. At the post-trial hearing, the Court ordered the Defendants to notify it whether they would accept a RAND rate entered by this Court. Defendants responded that they would "accept a Court-determined RAND rate limited to the Subject Products and Subject Patents." *See* Docket No. 612 at 1. A RAND rate limited to the Subject Products and Subject Patents is another way of saying Defendants would accept the jury's verdict. The jury's verdict was limited to the asserted patents, and it was limited to the accused products. Thus, Defendants will only agree to pay a RAND rate for the territory already covered by the trial. Because there was substantial evidence to support the jury's verdict, there is no need for this Court to make its own factual determination of an appropriate royalty rate.

Defendants attempt to distinguish the jury verdict from the RAND case on three grounds: (1) Defendants presented additional evidence to the Court that was not presented to the jury; (2) Ericsson did not present a damages claim against Intel to the jury; and (3) the jury trial "was restricted in scope to the five U.S. patents-in-suit. It thus did not consider the appropriate RAND rate for Ericsson's worldwide portfolio of alleged 802.11 patents." Docket No. 599 at 11. The Court will address each argument in turn.

43

**A94**

First, Defendants contend the jury verdict does not dictate the RAND rate because Defendants presented additional evidence during the bench trial. This argument fails because Defendants presented substantial RAND evidence to the jury. 6/11/13 a.m. Tr. at 9:15–10:17 (Forslund); 6/11/13 a.m. Tr. at 75:9–77:11 (Perryman); 6/6/13 a.m. Tr. at 21:16–20 (Bone cross examination). By presenting additional evidence during the bench trial, Defendants attempted to hedge their RAND position post-trial. Essentially, Defendants sought to use RAND as their jury defense while keeping an equitable RAND defense in their back pocket. Thus, Defendants wanted to use RAND as their primary defense *and* their fallback position. There was no justification for doing so—all of the RAND evidence presented during the bench trial would have been equally appropriate during the jury trial.

Defendants presented significant RAND evidence during the jury portion of the trial. In fact, a significant portion of Defendants' damages argument was based on Ericsson's RAND obligations. Defendants requested multiple RAND instructions, two of which were given to the jury. In particular, the Court gave the following instruction:

> Moreover, because Ericsson has agreed that it is under an obligation to license the patents-in-suit on Reasonable and Non-Discriminatory ("RAND") terms, you must ensure that any damages award is consistent with and does not exceed the amounts permitted under Ericsson's RAND obligations.

Docket No. 504 at 23. The Court also modified the traditional *Georgia-Pacific* factors in its instructions to include Ericsson's obligation to license its patents on RAND terms. *See id*. at 28. Defendants cannot now argue the jury's verdict failed to consider Ericsson's RAND obligations when they based their jury defense on RAND.

Second, Defendants contend the jury's verdict does not reflect the RAND rate because Ericsson did not present a damage calculation against Intel. Defendants cross-examined Mr. Bone on this exact issue. Defendants asked Mr. Bone if his royalty rate would apply to chips, and

A95

he responded that it would. *See* 6/6/13 a.m. Tr. at 20:11–18. Thus, Defendants' argument regarding Intel damages is incorrect.

Third, Defendants argue the jury did not consider the appropriate RAND rate for Ericsson's worldwide 802.11 portfolio. This argument rings hollow in light of Defendants' refusal to agree to pay a Court-determined worldwide RAND rate. Defendants contend the jury verdict is not a proper RAND rate because it is not a worldwide license, but Defendants refuse to agree to pay a worldwide RAND license. *See* Docket Nos. 612, 614. Defendants cannot have it both ways. Since Defendants refuse to agree to pay a Court-determined worldwide RAND license, they cannot use the lack of worldwide RAND evidence to distinguish the jury verdict.

For the foregoing reasons, the Court need not determine an appropriate RAND rate because the jury already made this determination. The appropriate United States RAND rate is $0.15 per product for the three infringed patents.

## B. Ericsson's RAND Obligation to License Intel

### i. Findings of Fact

Ericsson is a member of the IEEE. 6/3/13 p.m. Tr. at 137:8–9 (Brismark). As an IEEE member, Ericsson has an obligation to license its standard-essential patents on reasonable and non-discriminatory terms. *Id.* at 128:4–8. A RAND license offer must be "at a price which is reasonable in light of the contribution [the] technology gives to the end user who is using that standard." *Id.* at 128:16–19. A RAND offer must also be non-discriminatory, meaning a licensor may not discriminate against any particular licensee. *Id.* at 129:13–20.

An IEEE participant declares its patents standard-essential through letters of assurance. *Id.* at 141:1–10. A letter of assurance is a commitment from a patent holder to potential licensees that it will offer licenses on RAND terms. *Id.* Participation in standard setting is voluntary, and a

company is not required to participate in the standard-setting process to hold standard-essential patents. *See* 6/12/13 p.m. Tr. at 29:14–31:24 (Shoemake). Further, because participation is voluntary, an IEEE member may restrict or limit its participation in the process. *See id.* at 32:20–24.

Ericsson committed to offer RAND licenses to "fully compliant" products, and it gave notice of this position in its letters of assurance to the IEEE. *See* 6/4/13 p.m. Tr. at 40:23–41:4, 52:3–21 (Petersson). Ericsson's objective in licensing only fully compliant products was to isolate a particular level of the supply chain and to license companies at that level. 6/12/13 p.m. Tr. at 148:8–149:11 (Brismark). By licensing end product manufacturers, Ericsson believed it was indirectly licensing chip manufacturers such as Intel. *See id.* Ericsson believed it complied with its RAND obligations because it did not discriminate against competitors. 6/3/13 p.m. Tr. at 129:21–130:4 (Brismark); *see* 6/12/13 p.m. Tr. at 34:7–14 (Shoemake). There is no IEEE rule preventing restricted RAND commitments, and other companies have adopted the same "fully compliant" licensing policy as Ericsson. *See* 6/12/13 p.m. Tr. at 137:5–8 (Perryman).

Ericsson offered Intel a license to the asserted patents in March 2013 at the rate of $0.50 per unit. 6/12/13 p.m. Tr. at 149:20–150:5, 166:1–8 (Brismark). Ericsson made this offer in an attempt to settle the pending litigation. *Id.* at 149:20–150:5; 6/4/14 p.m. Tr. at 51:13–15 (Petersson). After Ericsson made its initial offer to Intel, Intel requested a proposed draft license agreement. 6/12/13 p.m. Tr. at 166:16–22 (Brismark). Ericsson submitted a proposed agreement to Intel on April 25, 2013, but Intel never responded to the proposed agreement. *Id.* at 166:21–167:12. When Ericsson submitted the draft agreement to Intel, Ericsson was prepared to negotiate the final terms of the license. *Id.* at 167:3–6.

ii.     **Conclusions of Law**

Ericsson did not violate its RAND obligations by refusing to license Intel because it offered a license to Intel in March 2013. Ericsson offered a license to Intel at the same rate and terms as the remaining Defendants. Intel contends Ericsson's offer was illusory, but it presented no evidence to support this assertion. *Compare id.* at 167:3–12 (testifying that Ericsson was prepared to negotiate the terms of a potential license). After the trial, Ericsson amended its license offer to Intel to reflect the jury verdict. *See* PX628. Both of these offers were legitimate RAND offers to which Intel never countered. Ericsson therefore satisfied any RAND obligation to offer a license to Intel.

Defendants have no breach of contract remedy against Ericsson for its policy of licensing only "fully compliant" products.[17] Participation in standard-setting organizations such as the IEEE is voluntary, and parties are free to restrict or limit their level of participation. There is nothing inherently wrong or unfair with Ericsson's practice of licensing "fully compliant" products, and they gave notice of this position in their initial letter of assurance. Further, other large companies have adopted similar policies of only licensing fully compliant products. Defendants cite no IEEE rule or guideline requiring full participation in order to have standard-essential patents. Thus, Defendants have no right to equitable relief for Ericsson's practice of licensing only fully compliant products.

Ericsson did not violate its RAND obligations by refusing to license Intel.

---

[17] At the outset, this issue is moot because Ericsson offered a license to Intel, and there are no remaining Defendants asserting that Ericsson refused to offer them a license because their products were not fully compliant. *Cf.* 6/12/13 p.m. Tr. at 149:15–16 (Brismark) ("Ericsson has never attempted to block any chipset player.").

## C. Ericsson's $0.50 RAND Rate

### i. Findings of Fact

Ericsson is a sophisticated licensing entity, with over 100 outstanding patent licenses. *See* 6/3/13 p.m. Tr. at 109:22–110:14 (Brismark); 6/4/13 a.m. Tr. at 132:23–25 (Petersson). It has an incentive to establish a reasonable licensing rate to maintain credibility in the licensing community. *See* 6/12/13 p.m. Tr. at 180:23–182:9 (Bone). For its 802.11 portfolio, Ericsson believes an appropriate royalty rate is $0.50 per unit. 6/3/13 p.m. Tr. at 133:4–11 (Brismark). Ericsson calculated this rate based on collaboration between technical and licensing experts, and it sought feedback from third party licensees about the reasonableness of its rate. *See* 6/4/13 a.m. Tr. at 127:24–129:22 (Petersson). Ericsson supported its rate with expert testimony from Mr. Bone. Mr. Bone relied on six previous licenses involving the asserted patents to determine an appropriate royalty rate. *See* 6/5/13 p.m. Tr. at 149:5–14 (Bone); 6/6/13 a.m. Sealed Tr. at 3:10–27:7 (Bone); 6/4/13 a.m. Sealed Tr. at 3:11–12:16, 14:4–28:7 (Petersson).

Ericsson considered its RAND obligations when determining its rate. 6/4/13 p.m. Tr. at 14:11–25 (Petersson). Ericsson has a team of employees tasked with monitoring Ericsson's compliance with its RAND obligations. *See* 6/12/13 p.m. Tr. at 142:8–24 (Brismark). These individuals attempt to determine the number of standard-essential patents, and they attempt to determine Ericsson's share of 802.11n patents. *Id.* at 142:25–143:15; *see* 6/4/13 p.m. Tr. at 21:4–12 (Petersson) ("We are, of course, taking into consideration that there are other patent holders in the standard when we set our rate."). This is an ongoing process shaped by feedback from potential licensees. 6/12/13 p.m. Tr. at 143:16–24 (Brismark); 6/4/13 p.m. Tr. at 53:13–54:6 (Petersson).

There is no way to determine the exact number of standard-essential patents. *Cf.* 6/12/13 p.m. Tr. at 29:7–9 (Shoemake); *id*. at 134:9–15 (Perryman). The IEEE makes no determination whether the patents identified in a letter of assurance are essential to the standard, so companies may wrongly declare "non-essential" patents essential. *See* 6/6/13 a.m. Tr. at 23:11–25:4 (Bone) (discussing letters of assurance). Neither side attempted to determine the exact number of standard-essential patents. Dr. Shoemake testified about the number of patents related to the 802.11n standard, but he did not try to determine how many patents are standard-essential. *See* 6/12/13 p.m. Tr. at 29:4–9. Mr. Bone based his analysis on previous licenses—he made no attempt to determine the number of essential patents. Additionally, Dr. Gibson testified that very little of the 802.11n standard is actually patented. *See* 6/10/13 p.m. Tr. at 5:16–23.

Defendants did not present any evidence of an actual royalty stack on the asserted patents. Dr. Perryman did not attempt to calculate the actual royalties Defendants currently pay on 802.11n products. *See* 6/11/13 a.m. Tr. at 64:19–65:3. Dr. Perryman even refused to provide a maximum hypothetical royalty a company should be expected to pay on an 802.11 product. 6/12/13 p.m. Tr. at 139:2–11. Dr. Shoemake attempted to calculate the number of patents related to the 802.11n standard, but he did not opine on a potential royalty stack on those patents. *See* 6/12/13 p.m. Tr. at 27:6–12.

Dr. Perryman identified one license to the 802.11n standard (the CSIRO license). *See* 6/12/13 p.m. Sealed Tr. at 8:8–21. Dr. Perryman found that Intel's royalty obligation from the CSIRO license was $0.13. *Id*. at 9:15–22. However, Dr. Perryman could not identify any further royalty obligations on 802.11n products. *See id*. at 12:22–13:6; 6/12/13 p.m. Tr. at 34:21–23 (Shoemake).

**A100**

Defendants did not present any evidence any licensee ever complained to Ericsson about hold-up, and Mr. Brismark testified he never heard a licensee complain its royalty rate was the result of hold-up or lock-in. *See* 6/12/13 p.m. Tr. at 148:4–7 (Brismark); *id*. at 180:12–14 (Bone) ("Q: As part of your analysis, did you find that any of Ericsson's actual agreements included holdup? A: No."); *id*. at 183:2–8 (Bone); *id*. at 94:21–95:6, 96:13–22 (Leonard).

ii.     **Conclusions of Law**

The paradox of RAND licensing is that it requires a patent holder to offer licenses on reasonable terms, but it offers no guidance over what is reasonable. *See Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217, at *10 (W.D. Wash. Apr. 25, 2013). Thus, RAND creates an obligation that must be followed, but it provides no guidance on how to follow that obligation. This creates a situation ripe for judicial resolution. If two parties negotiating a RAND license are unable to agree to the financial terms of an agreement, it is entirely appropriate to resolve their dispute in court. *See Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 1001–02 (W.D. Wash. 2012) ("Because the policies leave it to the parties to determine what constitutes a RAND license, when such a genuine disagreement arises, it appears to the court that the only recourse for the parties is to file a lawsuit in the appropriate court of law."). A patent holder does not violate its RAND obligations by seeking a royalty greater than its potential licensee believes is reasonable. Similarly, a potential licensee does not violate its RAND obligations by refusing a royalty the patent holder believes is reasonable. Instead, both sides' initial offers should be viewed as the starting point in negotiations. Even if a court or jury must ultimately determine an appropriate rate, merely seeking a higher royalty than a potential licensee believes is reasonable is not a RAND violation.

50

**A101**

RAND licensing also includes an obligation to negotiate in good faith. This obligation is a two-way street. As potential licensees in a RAND negotiation, Defendants possessed an obligation to negotiate in good faith and earnestly seek an amicable royalty rate. They failed to do so. Defendants' entire argument boils down to the fact that they believed Ericsson's initial RAND offer was too high. However, Ericsson's $0.50 offer was only the starting point in the negotiations. Defendants never meaningfully engaged Ericsson in RAND licensing negotiations after the initial offer. Further, the fact that the RAND rate was ultimately litigated in court does not make Ericsson's initial offer unreasonable. *Compare* 6/12/13 p.m. Tr. at 130:6–10 (Perryman) ("Q: Okay. Now, is Ericsson's 50-cent rate so high in relation to the chip price that from an economic perspective, it amounts to a refusal to deal? A: Given all the technology in the chips, absolutely, yes, sir."). Ericsson demonstrated the reasonableness of its offer by presenting substantial evidence of its licensing policies and its attempts to comply with RAND obligations.

Further, Defendants failed to present any evidence of *actual* hold-up or royalty stacking. Neither Dr. Perryman nor Dr. Shoemake calculated an actual royalty stack on the accused products or the 802.11n standard. Further, Dr. Perryman could only identify one "block" in the actual royalty stack. *See* 6/12/13 p.m. Sealed Tr. at 12:19–13:6. All of Defendants' concerns about royalty stacking were just that—concerns. Faced with no actual evidence of stacking, Defendants were forced to argue hypothetically. However, their hypothetical arguments would have carried more weight if Defendants presented any real evidence of stacking. Further, Ericsson presented evidence that it considered royalty stacking issues when it established its royalty rates. Accordingly, Ericsson's RAND rate did not fail to account for hold-up or royalty stacking.

Ericsson did not violate is RAND obligations by seeking a $0.50 per unit royalty.

51

**A102**

### D. Injunctions for the Patents in Suit

Ericsson did not seek an injunction for the infringed patents. *See* Docket No. 527. Accordingly, there is no need for the Court to determine whether injunctions are available for the infringed patents. *See* Docket No. 588 at 15.

## VII. Conclusion

For all the foregoing reasons, Ericsson's Motion for a Compulsory Future Royalty and Pre- and Post-Judgment Interest (Docket No. 527) is **GRANTED**. Defendants' Rule 50(b) Renewed Motion for Judgment as a Matter of Law in Favor of Defendants (Non-Infringement and Invalidity) and Motion for a New Trial (Docket No. 528) is **DENIED**. Defendants' Renewed Motion for Judgment as a Matter of Law on Ericsson's Damages Claims or, in the Alternative, for Vacatur, Remittitur or a New Trial on Damages (Docket No. 529) is **DENIED**. Defendants' Motion for Judgment on Post-Trial Findings of Fact and Conclusions of Law (Docket No. 588) is **GRANTED** as set forth above. Ericsson's Motion to Supplement the Record (Docket No. 589) is **GRANTED**. All other pending motions in this case are **DENIED**. The Clerk of Court is **ORDERED** to terminate all other pending motions.

**So ORDERED and SIGNED this 6th day of August, 2013.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

# TAB 5

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ERICSSON. INC., ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CASE NO. 6:10-CV-473 |
| | § | |
| D-LINK CORPORATION. ET AL., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 54(b)

On September 14, 2010, Ericsson Inc. and Telefonaktiebolaget LM Ericsson ("Ericsson") filed this action against D-Link Corporation[1] and D-Link Systems, Inc. ("D-Link"), Netgear, Inc. ("Netgear"), Acer, Inc. and Acer America Corporation ("Acer") and Gateway, Inc. ("Gateway"). Ericsson filed an amended complaint on June 8, 2011. The amended complaint added the following defendants: Dell, Inc. ("Dell"); Toshiba Corporation, Toshiba America, Inc.,[2] Toshiba America Information Systems, Inc., and Toshiba America Consumer Products, LLC ("Toshiba"); and Belkin International, Inc. ("Belkin"). Intel Corporation ("Intel") intervened in this action on June 22, 2012, and Ericsson brought a counterclaim against Intel on July 3, 2012. The Court conducted an eight day trial beginning June 3, 2013. Final judgment is now appropriate because all issues between Ericsson and the Defendants have been finally resolved by either the jury or the Court's Memorandum Opinion and Order (Docket No. 615).

---

[1] The Court dismissed D-Link Corporation on January 31, 2011. Docket No. 54.
[2] The Court dismissed Toshiba America, Inc. and Toshiba America Consumer Products, LLC on August 16, 2011. Docket No. 120.

Therefore, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, consistent with the Court's Memorandum Opinion and Order, and the Court having expressly determined that there is no just cause for delay, the Court **ORDERS AND ENTERS FINAL JUDGMENT** as follows:

- Defendants D-Link, Netgear, and Belkin are found to infringe Claims 1 and 5 of U.S. Patent No. 6,466,568. Defendants Acer/Gateway, Dell, Toshiba, and Intel are found to infringe Claim 1 of U.S. Patent No. 6,466,568.

- Defendants D-Link, Netgear, Belkin, Acer/Gateway, Dell, Toshiba, and Intel are found to infringe Claim 1 of U.S. Patent No. 6,424,625.

- Defendants D-Link, Netgear, Belkin, Acer/Gateway, Dell, Toshiba, and Intel are found to not infringe Claims 1 and 2 of U.S. Patent No. 6,330,435.

- Defendants D-Link, Netgear, Belkin, Acer/Gateway, Dell, Toshiba, and Intel are found to infringe Claims 1 and 2 of U.S. Patent No. 6,772,215.

- Defendants Acer/Gateway, Dell, Toshiba, and Intel are found to not infringe Claim 11 of U.S. Patent No. 6,519,223.

- The Asserted Claims are valid.

- Defendants' infringement was not willful.

- The Court awards the following in damages to Ericsson for Defendants' infringement of the claims found infringed: $435,000 for D-Link; $3,555,000 for Netgear; $1,170,000 for Acer/Gateway; $1,920,000 for Dell; $2,445,000 for Toshiba; and $600,000 for Belkin.

- Ericsson is further awarded pre-judgment interest, post-judgment interest, and an ongoing royalty as detailed in the Court's Memorandum Opinion and Order.

**A105**

All relief not specifically granted herein is **DENIED**. All pending motions not previously

resolved are **DENIED.**

**So ORDERED and SIGNED this 8th day of August, 2013.**

_____
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**

CASE PARTICIPANTS ONLY Document: 92 Page: 200 Filed: 12/16/2013

# TAB 6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ERICSSON INC., et al., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. 6:10-CV-473-LED |
| | § | |
| D-LINK CORPORATION., et al. | § | |
| | § | |
| Defendant. | § | |

## FINAL VERDICT FORM

In answering these questions, you are to follow all of the instructions I have given you in the Court's Charge.

A230

1. Did **Ericsson** prove by a preponderance of the evidence that Defendants **D-LINK Systems, Inc., Netgear, Inc.,** and **Belkin International, Inc.** infringe the following claims of the following patents?

   **Write "Yes" or "No" for each Claim.**

| | D-LINK Systems, Inc. | Netgear, Inc. | Belkin International, Inc. |
|---|---|---|---|
| **'568 Patent** | | | |
| Claim 1 | yes | yes | yes |
| Claim 5 | yes | yes | yes |
| **'625 Patent** | | | |
| Claim 1 | yes | yes | yes |
| **'435 Patent** | | | |
| Claim 1 | No | No | No |
| Claim 2 | No | No | No |
| **'215 Patent** | | | |
| Claim 1 | yes | yes | yes |
| Claim 2 | yes | yes | yes |

2

**A231**

2. Did **Ericsson** prove by a preponderance of the evidence that Defendants **Acer/Gateway, Dell, Inc., Toshiba**, and **Intel Corp.** and infringe the following claims of the following patents?

**Write "Yes" or "No" for each Claim.**

|  | Acer/Gateway | Dell, Inc. | Toshiba | Intel Corp. |
|---|---|---|---|---|
| **'568 Patent** | | | | |
| Claim 1 | Yes | Yes | Yes | Yes |
| **'625 Patent** | | | | |
| Claim 1 | Yes | Yes | Yes | Yes |
| **'435 Patent** | | | | |
| Claim 1 | No | No | No | No |
| Claim 2 | No | No | No | No |
| **'215 Patent** | | | | |
| Claim 1 | Yes | Yes | Yes | Yes |
| Claim 2 | Yes | Yes | Yes | Yes |
| **'223 Patent** | | | | |
| Claim 11 | No | No | No | No |

3

**A232**

3. Did **Defendants** prove by clear and convincing evidence that any of the listed claims of the following patents are invalid?

**If you find the claim invalid, answer "Yes;" otherwise, answer "No."**

'625 Patent

Claim 1 _____NO_____

'435 Patent

Claim 1 _____NO_____
Claim 2 _____NO_____

4

**A233**

4.  What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate **Ericsson** for infringement of the patents by the following Defendants up to the time of trial?

**Answer with the Amount:**

D-LINK          $ 435,000

Netgear         $ 3,555,000

Acer/Gateway    $ 1,170,000

Dell            $ 1,920,000

Toshiba         $ 2,445,000

Belkin          $ 600,000

JURY FOREPERSON

5

**A234**

# TAB 7

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| ERICSSON INC., et al., | § |
| | § |
| Plaintiff, | § |
| | § |
| vs. | § Civil Action No. 6:10-CV-473-LED |
| | § |
| D-LINK CORPORATION., et al. | § |
| | § |
| Defendant. | § |

## WILLFULNESS VERDICT FORM

In answering these questions, you are to follow all of the instructions I have given you in the Court's Charge.

1.   Did **Ericsson** prove by clear and convincing evidence that **D-LINK Systems Inc.'s, Netgear's, and Belkin International, Inc.'s** infringement was willful?

   **Answer "Yes" or "No" for each patent below.**

| | D-LINK Systems, Inc. | Netgear, Inc. | Belkin International, Inc. |
|---|---|---|---|
| '568 Patent | No | No | No |
| '625 Patent | No | No | No |
| '215 Patent | No | No | No |

1

**A235**

2.    Did **Ericsson** prove by clear and convincing evidence that **Acer/Gateway's, Dell, Inc.'s, Toshiba's, and Intel Corp.'s** infringement was willful?

**Answer "Yes" or "No" for each patent below.**

|             | Acer/Gateway | Dell, Inc. | Toshiba | Intel Corp. |
|-------------|--------------|------------|---------|-------------|
| '568 Patent | No           | No         | No      | No          |
| '625 Patent | No           | No         | No      | No          |
| '215 Patent | No           | No         | No      | No          |

CASE PARTICIPANTS ONLY

# TAB 8

US006424625B1

(12) **United States Patent**
Larsson et al.

(10) Patent No.: **US 6,424,625 B1**
(45) Date of Patent: **Jul. 23, 2002**

(54) **METHOD AND APPARATUS FOR DISCARDING PACKETS IN A DATA NETWORK HAVING AUTOMATIC REPEAT REQUEST**

(75) Inventors: **Peter Larsson**, Euro Asia View; **Mikael Larsson**, Doer Park, both of (SG)

(73) Assignee: **Telefonaktiebolaget LM Ericsson (publ)**, Stockholm (SE)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/179,952**

(22) Filed: **Oct. 28, 1998**

(51) Int. Cl.$^7$ ............................................... **H04L 12/26**
(52) U.S. Cl. ................................. **370/236**; 370/410
(58) Field of Search ................................. 370/389, 394, 370/410, 426, 428, 429, 470, 471, 473, 236; 714/748, 749, 750

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,344,171 A | * 8/1982 | Lin et al. | 714/751 |
| 4,726,027 A | * 2/1988 | Nakamura et al. | 714/748 |
| 5,483,545 A | * 1/1996 | Darmon et al. | 714/748 |
| 5,826,028 A | 10/1998 | Bennett et al. | |
| 6,163,861 A | * 12/2000 | Yoshioka et al. | 714/712 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 98/42108 | 9/1998 |

OTHER PUBLICATIONS

Heliomar M. de Lima and Otto Carlos M.B. Duarte, "A Go–Back–N Protocol with Multicopy Retransmission for High Speed Satellite Communications", 1994, pp. 859–863.

F. Argenti and G. Benelli, "An ARQ Protocol For Mobile Radio Systems", 1992, pp. 1323–1326.

Nachum Shacham and Byung Cheol Shin, "A Selective–Repeat–ARQ Protocol for Paralle Channels and Its Resequencing Analysis", Apr. 1992, pp. 773–782.

Standard Search Report dated Jul. 16, 1999.

* cited by examiner

*Primary Examiner*—Kwang B. Yao
(74) *Attorney, Agent, or Firm*—Burns, Doane, Swecker & Mathis, L.L.P.

(57) **ABSTRACT**

Techniques are provided for use with automatic repeat request (ARQ) schemes in a data network to minimize a bandwidth used by a receiver and a transmitter in the network to transfer data packets, by discarding outdated packets that have not yet been successfully transferred. In accordance with an embodiment of the invention, a bit is set in the ARQ packet header to force the receiver to accept packets subsequent to one or more erroneous or unreceived packets that have been discarded and not resent. In accordance with another embodiment of the invention, after data packets have been discarded, sequence numbers are reassigned to the non-discarded data packets that are yet to be sent to the receiver, so that a transmitted stream of the non-discarded packets will have consecutive sequence numbers.

**19 Claims, 12 Drawing Sheets**



FIG. 1A (PRIOR ART)

FIG. 1B (PRIOR ART)



FIG. 2 (PRIOR ART)



FIG. 3D
(PRIOR ART)

Retransmission
from N(R) up to TSN.
BSN is set to N(R).

FIG. 3C
(PRIOR ART)

Erroneous or lost
LLC PDUs. A NACK
with N(R)=ESN is issued.

FIG. 3B
(PRIOR ART)

LLC PDUs sent.
All are received.

FIG. 3A
(PRIOR ART)

A240



FIG. 4D
(PRIOR ART)
LLC PDUs sent
All are received.
BSN is set to N(R)+1.

FIG. 4C
(PRIOR ART)
PACK issued.

FIG. 4B
(PRIOR ART)
LLC PDUs sent.
All are received.

FIG. 4A
(PRIOR ART)



510

512 — ARQ header

Data

516

514

N(S)

k bit sequence number

# FIG. 5
## (PRIOR ART)



610

612

Identifier

NACK/ PACK

N(R)

ACK message

614

616

# FIG. 6
## (PRIOR ART)



ESN 1,2,3 are missing. NACK(s) is/are sent for all outstanding packets.

**FIG. 7A**
(PRIOR ART)

ESN1 has been retransmitted and correctly received. ESN2 is currently being retransmitted. BSN is set to ESN1 - 1, i.e. NACK with cumulative PACK for preceeding packets.

**FIG. 7B**
(PRIOR ART)

ESN1-3 has successfully been received. Some more new packets have also been sent.

**FIG. 7C**
(PRIOR ART)

Case: 13-1625 Case: PARTICIPANTS-ONLY Document: 55 Page: 217 Filed: 12/16/2013



FIG. 8



FIG. 9



FIG. 10A



FIG. 10B



# FIG. 11



# FIG. 12



# FIG. 13

US 6,424,625 B1

1

# METHOD AND APPARATUS FOR DISCARDING PACKETS IN A DATA NETWORK HAVING AUTOMATIC REPEAT REQUEST

## FIELD OF THE INVENTION

The present invention relates to Automatic Repeat Request (ARQ) techniques for transferring data in fixed/wireless data networks.

## BACKGROUND OF THE INVENTION

ARQ techniques are commonly used in data networks to ensure reliable data transfer and to protect data sequence integrity. Data packets are encoded with an error detecting code, so that when a transmitter in the data network sends or transfers data packets to a receiver in the data network, the receiver receiving the data packets can detect corrupted, erroneous or lost packets and thereby request that the transmitter retransmit the affected data packets. The integrity of a data sequence is normally protected by sequentially numbering packets and applying certain transmission rules.

There are three main ARQ schemes: Stop-and-Wait; Go-Back-N; and Selective Reject (sometimes referred to as Selective Repeat). All three methods provide mechanisms for transferring packets to a receiver in a data network in an appropriate order. In terms of throughput efficiency as a function of the signal to noise ratio, generally Selective Reject is most efficient, Stop-and-Wait is least efficient, and Go-Back-N is intermediate. Also, various mixtures of the Selective Reject and Go-Back-N techniques exist, and fall between pure Selective Reject and pure Go-Back-N techniques in both efficiency and complexity.

With respect to Go-Back-N, several different variants exist which differ in terms of how they use positive acknowledgments (PACKs), negative acknowledgments (NACKs), retransmission timers, polling schemes, etc.

One type of Go-Back-N technique uses both PACKs and NACKs that have the following characteristics:

A PACK for a data packet having a sequence number N(R) gives a cumulative positive acknowledgment for data packets having sequence numbers before N(R), but does not positively acknowledge the data packet having the sequence number N(R), as shown for example in FIG. 1A.

The NACK positively acknowledges all data packets before the data packet it negatively acknowledges. The data packet which the NACK negatively acknowledges is indicated by N(R), as shown for example in FIG. 1B.

FIG. 2 shows a simplified ARQ transmitter window, in which five variables are used to keep track of a transmitter state. The five variables include: a bottom sequence number, BSN; a top sequence number, TSN; a maximum top sequence number, $TSN_{MAX}$; an instant sequence number, ISN; and an expected sequence number, ESN.

BSN denotes the oldest packet in the transmitter buffer, and can also indicate that all packets before the BSN packet have been acknowledged or discarded. Packets prior to the packet indicated by TSN have been sent. ESN denotes the expected sequence number of a packet to be received. ISN indicates the sequence number of the next packet to be sent. When a packet is sent for the first time, TSN and ISN will be identical. However, when a retransmission is performed, ISN will start over from the first retransmitted packet and progress in consecutive order, one packet at a time, up to TSN. TSN cannot exceed $TSN_{MAX}$, which is defined by the window size W. Assuming that a sequence number field has

2

k bits, $2^k$ different sequence numbers can be created. Thus, the maximum size W of the window shown in FIG. 2 is $2^k-1$.

Operation of the Go-Back-N technique using both PACKs and NACKs can be envisioned by imagining a clockwise consecutive modulo $2^k$ sequence numbering superimposed upon the circumference of the circles shown in FIGS. 3A–3D. FIG. 3A shows a circle indicating a state where no packets have yet been sent, and TSN, ESN, BSN and ISN all have the same value, i.e., point to the same packet. The circle shown in FIG. 3B indicates that (TSN-BSN) packets have been sent and also received, since ESN=TSN. An erroneous or lost packet causes ESN to stop progressing forward, although more packets have been sent. For example, in FIG. 3C packets up to the packet indicated by TSN and ISN have been sent, but ESN indicates a prior packet which was not received. After a packet is lost or an erroneous packet is received, the ARQ receiver sends a NACK to the ARQ transmitter to inform the ARQ transmitter about the lost or erroneous packet. The NACK includes a returned sequence number N(R) that is set equal to ESN, thereby acknowledging that all previous packets were correctly received. BSN and ISN are set equal to ESN (and N(R)) so that BSN moves forward and ISN moves backward to the sequence number representing the lost or erroneous packet. Thereafter, as shown in FIG. 3D, ISN and ESN move forward together as the lost or erroneous packet is retransmitted, and as the succeeding packets are also retransmitted.

FIGS. 4A–4D illustrate use of a PACK. For example, FIG. 4A shows a state where nothing has yet been sent, and TSN=ISN=BSN=ESN. FIG. 4B shows a situation where all sent packets have been correctly received. FIG. 4C shows that a timer-initiated PACK is sent, conveying the sequence number N(R) of a packet between BSN and TSN=ESN=ISN. As shown in FIG. 4D, after the PACK is sent, BSN is set to N(R).

Sending PACKs ensures that sequence number starvation does not occur. Since TSN may not pass BSN, if the transmitter does not receive PACKs, it may continue to send data packets up to $TSN_{MAX}$. However, if data packets up to $TSN_{MAX}$ are sent but no PACKs are received, then $TSN_{MAX}$ cannot progress and sequence number starvation occurs. The transmitter must wait until it receives a PACK, which will allow BSN and thus $TSN_{MAX}$ to progress.

FIG. 5 shows a general example of an ARQ data packet 510. The packet 510 typically includes an ARQ header 512 and a data portion 516. The header 512 contains a k-bit sequence number 514, and can be located at the front of the packet 510 as shown in FIG. 5, or at any predefined position within the packet 510.

FIG. 6 shows an exemplary ACK message 610, with an identifier field 612 that identifies the responding terminal sending the ACK message 610, a NACK/PACK type indicator 614 indicating whether a PACK or a NACK is being sent, and finally a sequence number field N(R) 616 that indicates for which sequence number the ACK message 610 is valid.

In a Selective Reject scheme, a sender window having a size of $2^{k-1}$ or less is normally used in order to avoid certain ambiguities which appear in conjunction with an automatic (timer-initiated) retransmission. The receiver window size in a Selective Reject scheme can include up to $2^{k-1}$ positions, instead of just one position as in a Go-Back-N scheme. In Selective Reject a range of packets can be received since the receiver window can include up to $2^{k-1}$ positions.

As long as packets are received correctly, they are sent or forwarded to the next higher layer. When an outstanding

3

packet is detected, i.e., a packet that has been sent but not received or not correctly received, the sending of subsequent packets up to the higher layer is halted and a list of correct and missing packets is built up. A NACK is used to initiate a request for a retransmission of the outstanding packet or of a multitude of outstanding packets. When the first detected outstanding packet is correctly received, that packet and all subsequent packets are sent to the higher layer, until the next outstanding packet is detected and the process repeats with respect to the new outstanding packet.

FIG. **7A**, for example, shows a situation wherein three packets are outstanding. The outstanding packets are denoted by ESN1, ESN2 and ESN3. The receiver sends one or several NACKs indicating the sequence number of these outstanding packets. In FIGS. **7B** and **7C**, the transmitter has received the one or several NACKs and in response retransmits the outstanding packets. The transmission of new packets can proceed to the $TSN_{MAX}$ limit, which of course can also occur when no NACKs are received. In particular, FIG. **7B** shows a situation where ESN1 has been retransmitted and correctly received, and ESN2 is currently being retransmitted. BSN has also been set to ESN1. In other words, the NACK for ESN1 functions as a cumulative positive acknowledgment for packets preceding ESN1, and BSN is adjusted accordingly.

Sometimes, NACKs fail to reach the transmitter for unknown reasons. In such a situation, after a specified or predetermined time has expired, packets in the sender buffer that have not been acknowledged (by either a NACK or a PACK) can be automatically retransmitted.

NACKs can be efficiently sent by sending a NACK and explicitly indicating the oldest NACK's sequence number, here represented by ESN1, and using a bitmap to thereafter represent correctly received packets and missing packets. This type of NACK performs a cumulative PACK for the packets preceding the sequence number which is NACKed. Other NACK options can also be used, for example NACK options where a cumulative positive ACK is not performed or sent for the packets preceding the sequence number which is NACKed.

The Selective Reject and Go-Back-N techniques differ in the sense that Selective Reject does not require packets to be sent in any particular order, while the Go-Back-N receiver needs to receive packets in consecutive sequence number order.

Normally, in data networks it is desirable to transfer all packets without any packet loss. Sometimes, however, sending significantly delayed packets provides no benefit, for example where the delay causes the information in the packets to become outdated and therefore useless to the receiver. Examples of delay sensitive applications are, e.g., telephony, video conferencing and delay sensitive control systems.

Furthermore, non-time-critical applications commonly issue higher level retransmissions whenever they detect an absence of responses or acknowledgments from the receiving end, which can give rise to situations where the ARQ buffers are filled with not-yet-successfully transmitted data, and/or with newly retransmitted data. This can be avoided if data is associated with a validity time, and the validity time is set to be slightly shorter than the retransmission time for the application. However, in practice it can be difficult or impossible to discern which retransmission time is used, since the lower layer (LLC) is unaware which application is at the top level. In such a situation one has to assume a certain application and specially design the communication system based on that assumption.

4

For certain service classes and after a certain transfer delay time, discarding of data packets is allowed in Asynchronous Transfer Mode (ATM). An ARQ in conjunction with ATM can use transfer delay information provided by the ATM layer in order to adjust connection-specific discard timers in the ARQ function. However, the ARQ in the receiver may detect missing or incomplete packets and require retransmission.

In summary, current ARQ methods do not recognize and allow for situations where data packets have a limited lifetime, and therefore fail to minimize bandwidth usage by not sending (or resending) significantly delayed or outdated data packets.

## SUMMARY OF THE INVENTION

In accordance with exemplary embodiments of the invention, ARQ techniques are provided that minimize bandwidth usage by accounting for data packets that have an arbitrary but limited lifetime. The lifetime can either be assumed to be fixed, or can be deduced from ATM layer information. In particular, exemplary embodiments of the invention variously illustrate enhanced Go-Back-N and also Selective Reject techniques that discard outdated data packets, and which embody principles that can be applied to Stop-and-Wait techniques to discard outdated data packets.

In accordance with an embodiment of the invention, a bit is set in the ARQ header to force the receiver to accept packets subsequent to one or more erroneous or unreceived packets that have been discarded and not resent.

In accordance with another embodiment of the invention, when a NACK has been received and data packets have been discarded, sequence numbers are reassigned to the non-discarded data packets so that a transmitted stream of the non-discarded packets will have consecutive sequence numbers.

In accordance with another embodiment of the invention, at a packet discard the transmitter monitors the receiver state. If a packet is expected which has already been discarded, then the transmitter resynchronizes by renumbering data packets or by commanding the receiver to accept an arbitrarily chosen sequence number.

## BRIEF DESCRIPTION OF THE DRAWINGS

Other objects and advantages of the invention will become apparent to those skilled in the art from the following detailed description of preferred embodiments, when read in conjunction with the accompanying drawings. Like elements in the drawings have been designated by like reference numerals.

FIGS. **1A** and **1B** illustrate a prior art Go-Back-N technique.

FIG. **2** illustrates a window in a prior art Go-Back-N technique.

FIGS. **3A–3D** illustrate a transmission sequence in a prior art Go-Back-N technique.

FIGS. **4A–4D** illustrate use of a positive acknowledgment in a prior art Go-Back-N technique.

FIG. **5** illustrates a prior art example of an ARQ data packet.

FIG. **6** illustrates a prior art example of an acknowledgement message.

FIGS. **7A–7C** illustrate use of a negative acknowledgment in a prior art Selective Reject technique.

FIG. **8** illustrates a receiver packet enforcement bit in accordance with an embodiment of the invention.

US 6,424,625 B1

5

FIG. 9 illustrates operation of an embodiment of the invention.

FIGS. 10A and 10B illustrate operation of an embodiment of the invention.

FIG. 11 illustrates operation of an embodiment of the invention.

FIG. 12 illustrates operation of an embodiment of the invention.

FIG. 13 illustrates operation of an embodiment of the invention.

DETAILED DESCRIPTION OF THE INVENTION

In accordance with an exemplary embodiment of the invention involving a communications system wherein a transmitter and a receiver are exchanging data packets, at a packet discard procedure, the progress of a bottom part of a sender window of the transmitter is reported to the receiver in order to allow the receiver to properly skip packets which do not exist anymore because they have been discarded. Thus, the receiver can be commanded to skip or overlook the packets which have been discarded, or in other words, to release any expectation of receiving the packets which have been discarded. To prevent ambiguity problems, special rules are defined for, and followed by, the receiver and the transmitter.

In the case where the transmitter discards a packet, it orders the receiver to accept the next packet, by setting a certain Receiver Packet Enforcement Bit (RPEB) in the ARQ header of the next packet and sending the packet to the receiver. When the receiver receives the packet, the RPEB bit will cause the receiver to accept the packet. FIG. 8 shows an ARQ packet 810 with an ARQ header 812 and a data portion 818. The header 812 includes a receive packet enforcement bit RPEB 814, and a k-bit sequence number N(S) 816. Alternatively, a plurality of enforcement bits can be sent separately from the ARQ packets together with implicit or explicit indications as to which ARQ packet each enforcement bit belongs.

This enforcement function of sending an RPEB associated with a particular ARQ packet, can be used a variety of situations. For example, a situation can arise where a NACK associated with an ARQ packet designated by a sequence number N(R) is sent by the ARQ receiver and properly received by the ARQ transmitter. If the NACK is valid for one discarded data packet, then the next data packet to be retransmitted can have an RPEB set to TRUE.

In another example situation, a retransmission timer expires and one or more data packets have been discarded. The next incoming data packet to be transmitted, or the first data packet to be retransmitted, can have an RPEB set to TRUE.

The system can be further configured so that in all other situations, the RPEB associated with a data packet is set FALSE.

In particular, when the system uses a Go-Back-N type packet exchange, two types of packet enforcement schemes can be used. The first type is a general method with an arbitrary window size W, and the second type is a special case of the general method. In the special case, the window size is $W=2^{k-1}$, i.e., half the maximum sequence number.

In the method of the special case, ambiguities can be circumvented by applying very simple rules. The method of the special case employs a new variable, DSN. DSN is shown, for example, in FIG. 9, and indicates that all previous

6

packets have been acknowledged as having been properly transmitted and received. In FIG. 9, all packets from DSN through BSN-1 have been discarded due to a packet discard time-out. A packet discard time-out can occur, for example, when the oldest packets in the buffer have been in the buffer for a predetermined amount of time, and are discarded upon expiration of the predetermined amount of time. When the old packets are discarded, the value of BSN is incremented until it points to the oldest remaining (i.e., undiscarded) packet in the buffer. FIG. 9 shows BSN pointing to the oldest remaining packet in the buffer. After the predetermined amount of time expires, the value of TSN is greater than or equal to the new value of BSN. This indicates that packets from BSN through TSN-1 have been sent. TSN indicates the next new packet to send, and ISN has the same function as indicated earlier, namely, to indicate the sequence number of the next packet to be sent. ESN (e.g., ESN1) indicates the sequence number of the next packet that the receiver expects to receive. To prevent ambiguities, TSN must not pass $TSN_{MAX}$. In this alternative, $TSN_{MAX}$ is $DSN+2^{k-1}$.

Although the data packets between DSN and BSN have been discarded as shown in FIG. 9, for some unknown reason either the previous ACKs have not made their way from the ARQ receiver to the ARQ transmitter or the ARQ packets from ESN1 up to TSN have not been received. That explains why ESN1 is in the sequence of sequence numbers representing discarded ARQ packets, or in other words, why the receiver is expecting a sequence number which has been discarded. At this juncture either a retransmission timer initiates the retransmission, or a NACK is properly received. In both cases, the RPEB is set to TRUE for the next packet to be transmitted. If the difference between N(S) and ESN (for example, ESN1) is less than $2^{k-1}$ and RPEB=TRUE at a packet reception, then the packet will be accepted and forwarded to higher layer as long as the data carried in the packet is also correct.

FIG. 9 also shows that no ambiguity will occur when $TSN_{MAX}$ is defined as $DSN+2^{k-1}$. When ESN (ESN1) lags behind BSN, the receiver can always be forced to receive an ARQ packet whose RPEB=TRUE. If ESN (ESN1) is leading BSN and the RPEB for a received ARQ packet is TRUE, then the packet shall not be accepted. This can be determined by discerning whether BSN-ESN exceeds $W=2^{k-1}$. If a NACK is received in the ARQ transmitter for a higher sequence number than TSN, then a fault has occurred and a reinitialization or a restart is likely to take place. In a reinitialization or a restart, all counters and/or variables are reset to a certain value so that the ARQ can restart anew. For example, the variables can be set so that TSN=ISN=BSN= ESN=DSN, and so forth.

FIGS. 10A and 10B show the variable definitions more precisely, by showing two cases. FIG. 10A shows a case where the content in the buffer is low, and FIG. 10B shows a case where the buffer is very full. FIGS. 10A and 10B also indicate that an upper limit (fixed or dynamic) may exist for the packet buffer. There may also be packets which have been received from the higher layer, but were not allowed to be transmitted since TSN might have reached $TSN_{MAX}$. Such packets would be pending for transmission, and indicated by pending sequence number PSN shown in FIG. 10B. As soon as clearance is given to proceed, the pending packets will be transmitted. Clearance is given when a NACK or PACK is properly received, thereby causing DSN and perhaps also BSN to progress forward. This allows $TSN_{MAX}$ to progress forward also.

The more general case, on the other hand, requires more complex rules. The function of the ARQ transmitter with an

7

arbitrary window size representing a more general case is next described.

FIG. 11 shows an arbitrary state of the ARQ. The general case differs from the special case described above in that the window size (W) is defined using BSN rather than DSN. This gives the greatest possible distance between the last acknowledged packet (DSN) and the highest sent packet (TSN). As in the special case, TSN may not pass $TSN_{MAX}$. $TSN_{MAX}=BSN+W$, where $1 \leq W \leq 2^{k-1}$.

Below, the sign $\leq$ is used. It is used more in the "before" and "after" sense than in the ordinary mathematical sense, since we are using modulus arithmetic. For example, assume k=8 bits, BSN=192 and W=128. This yields $BSN+W=(192+128)mod2^k=64$. TSN can be, e.g., 254, which is before BSN+W, even though mathematically $254>(192+128)mod2^k=64$.

Some important conditions are $TSN \leq DSN-1$, $TSN \leq TSN_{MAX}$, and $DSN \leq BSN \leq TSN$, where $TSN_{MAX}=BSN+W$. W can assume an arbitrary value between 1 and $2^{k-1}$. However, the receiver and transmitter must both use the same arbitrary value for W.

A packet shall be accepted, apart from the normal Go-Back-N function, when $N(S)-ESN<2^k-W$, RPEB= TRUE and the data in the packet are correct.

An additional rule for the general case is that in order to avoid ambiguity problems, BSN-DSN shall always be less than $2^k-W$. If a situation arises where $(BSN-DSN)=2^k-W$, then typically either a resynchronization will take place, or a notification indicating bad link performance will be sent to the control and management layer. The control and management layer can then implement a countermeasure to handle the problem.

In another exemplary embodiment of the invention illustrated for example in FIG. 12, a Selective Reject type packet exchange is used that relies on the same basic principles described above with respect to the special and general cases for use with a Go-Back-N type packet exchange. Namely, a receive enforcement bit such as the RPEB described above with respect to other embodiments, is sent to facilitate discarding of packets from a transmitter buffer.

In this embodiment, the basic rules include $DSN \leq BSN \leq TSN \leq TSN_{MAX}$ and $TSN_{MAX}-DSN=2^{k-1}$. The variable definitions are the same as those described above with respect to other embodiments. Some additional rules on how to handle NACK, PACK and automatic retransmission of packets will also be described below.

In a situation where a number of packet retransmissions have taken place, a packet discard time-out can occur that will cause the oldest, not-yet-acknowledged packets in the buffer to be discarded. This can be seen, for example, in FIG. 12, where the packets having sequence numbers between DSN and BSN have been discarded.

After the old packets have been discarded from the transmitter buffer, two things can happen. Either a packet retransmission command is invoked by a timer expiration, or a NACK is received for a sequence number falling between DSN and BSN. First, consider the NACK case.

Assume that one use of NACK includes the following characteristics. When a NACK is sent, the oldest not-yet-received packet is explicitly indicated by its sequence number. Packets with sequence numbers preceding this oldest, outstanding packet are at the same time positively acknowledged by this NACK message. Accompanying this NACK can be a) a bitmap of length n indicating outstanding packets, wherein, for example, those bits that are set to one

8

indicate outstanding packets, or b) a number N of explicitly indicated sequence numbers for which packets have not been received, or c) some combination of a) and b).

In a first case, with reference to FIG. 12, if a NACK is received for ESN1 in the interval DSN to BSN and the covered ACK range for the NACK is greater than BSN-ESN1 and at least one packet is not yet discarded (TSN≠BSN), then the packet indicated by BSN with RPEB set to True, is retransmitted. Note that the transmitter can also send a short control message, in order to inform the receiver that packets have been discarded, thereby saving bandwidth.

In a second case, if a NACK is received for ESN1 located in the interval between DSN and BSN and the covered ACK range for the NACK is less than BSN−ESN1 and all packets have been discarded, i.e. BSN=TSN, then a pending packet with RPEB=TRUE is sent. However, if no packet is pending for transmission, then the system either a) waits until the next packet is received from the higher layer and then sends this packet with RPEB=TRUE, or b) informs the receiver that there are currently no more packets to send. A shorter message than the packet can be used instead to inform the receiver that packets have been discarded; thereby conserving bandwidth.

In a third case, if a NACK is received for ESN1 in the interval DSN to BSN, and the covered ACK range for the NACK is greater than BSN-ESN1, and at least one packet is not yet discarded, and at least one outstanding packet exists that has a sequence number ≧BSN, then the first outstanding packet after BSN, as indicated by the NACK message, is retransmitted with RPEB=TRUE.

In a fourth case, if a) a NACK is received for ESN1 in the interval between DSN and BSN, and b) the covered ACK range for the NACK is greater than BSN−ESN1, and c) at least one packet exists that has been sent but not acknowledged either positively or negatively and which has a sequence number after the packet indicated by the NACK message, and d) there are no outstanding packets indicated in the NACK message with sequence numbers ≧BSN, then the first packet after the packets indicated in the NACK message is retransmitted with RPEB=TRUE. A shorter message than the packet can be used instead to inform the receiver that packets have been discarded, thereby saving bandwidth.

In a fifth case, if a) a NACK is received for ESN1 in the interval DSN to BSN, and b) the covered ACK range for the NACK is greater than BSN-ESN1, and c) no packet exists after the packet indicated by the NACK message, and d) there are no outstanding packets indicated in the NACK message with sequence numbers ≧BSN, then a packet which is pending for transmission is sent with RPEB= TRUE. In other words, when all packets having sequence numbers N(S) in the range from BSN to TSN (i.e., TSN≦N (S)≦BSN) have been positively acknowledged, then a packet which is pending for transmission is sent with RPEB=TRUE. However, if no packet is pending for transmission, then the system waits until the next packet is received from the higher layer and then sends this next packet with RPEB=TRUE, or alerts the receiver that there are currently no more packets to send. A shorter message than the packet can be used instead to alert the receiver that packets have been discarded, thereby saving bandwidth.

In a sixth case, when a timer-initiated retransmission of a packet occurs, and ISN=BSN, then RPEB should be set to TRUE. Otherwise, RPEB should be set to FALSE. Alternatively, RPEB can be set to TRUE when ((ISN=BSN) and (BSN≠DSN)), and can otherwise be set to FALSE.

US 6,424,625 B1

9

When a correct packet with RPEB=TRUE is received, then all packets preceding this packet and up to the next outstanding packet will be released from the buffer and forwarded to the higher layer. The application or the other layers decide whether the packets can be used or not, if delay and assembly requirements are met.

In the case where a window of size $<2^{k-1}$ is used, no additional discard capability concerns are necessary to consider, beyond the ordinary requirement imposed by Selective Reject itself.

In another embodiment of the invention for use with a Go-Back-N scheme, it is assumed that resynchronization takes place only when a NACK is received and N(R)<BSN. Then the transmitter will have full knowledge of the receiver state, i.e., ESN is known. Note that there exists a case where a NACK as described above is received and the receiver can wait one round-trip delay period to ensure full knowledge of the receiver state. In other words, when a retransmission of the NACKed packet has just been performed and it is not known if the packet has passed all buffers and other delay-causing functions, the receiver can wait one round-trip delay period. Here, renumbering of packets sequence number can be performed, such that the first ARQ packet sent after the renumbering will carry the same sequence number as that of the packet to which the NACK referred.

In FIG. 13, a NACK is received for a discarded packet, since ESN precedes BSN. Consequently, all subsequent packets from BSN and onwards are renumbered such that the BSN packet starts with ESN, the BSN+1 packet is renumbered to ESN+1, and so on. Note, renumbering is not performed for timer-initiated retransmissions.

In another embodiment of the invention for use with a basic Go-Back-N scheme, the receiver and the transmitter are resynchronized at each discard occasion. In this embodiment, ARQ packets can only be discarded if they have not previously been acknowledged.

The resynchronization is initiated by the transmitter, since it knows when a discard has been performed. The transmitter ask for a sequence number, up to which (but not including) the receiver has accepted ARQ packets. If the sequence number is before the last discarded sequence number, then the transmitter commands the receiver to start over from some arbitrarily chosen, but predefined, sequence number. The next sent packets are numbered upwards from this arbitrarily chosen sequence number. As an alternative, only the transmitter is resynchronized, such that the first packet sent after the resynchronization has the same sequence number as the next packet expected by the receiver.

In various embodiments of the invention, a magnitude of W can be defined when a call is initially set up between a transmitter and a receiver within a data network, in accordance with the particular application involved. For example, when the transmitter is initialized by a higher layer of software in the data network, it can select the magnitude of W and inform the receiver of this magnitude, and vice versa. The information indicating the magnitude of W can be sent from the transmitter to the receiver (or vice versa) using a control message.

In summary, the various embodiments of the invention increase throughput of a communications system using ARQ packets by discarding outdated packets. In addition, the various embodiments of the invention reduce a risk that the ARQ buffer in the transmitter will overflow. Those skilled in the art will also recognize that the principles described above with respect to the various embodiments of the invention can be applied to Stop-and-Wait ARQ schemes.

10

It will be appreciated by those skilled in the art that the present invention can be embodied in other specific forms without departing from the spirit or essential characteristics thereof, and that the invention is not limited to the specific embodiments described herein. The presently disclosed embodiments are therefore considered in all respects to be illustrative and not restrictive. The scope of the invention is indicated by the appended claims rather than the foregoing description, and all changes that come within the meaning and range and equivalents thereof are intended to be embraced therein.

What is claimed is:

1. A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:

a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet; and

the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet.

2. The method of claim 1, wherein each of the at least one packet includes a receive enforcement bit, and the step of commanding comprises the steps of:

setting the receive enforcement bit for each of the at least one packet to a TRUE value; and

sending the at least one packet to the receiver.

3. The method of claim 1, wherein the step of commanding comprises the steps of:

setting a receive enforcement bit to a TRUE value for each at least one packet; and

sending the at least one receive enforcement bit set to TRUE together with identification of a transmitter sending the packets and the sequence numbers of the packets in a control message to the receiver.

4. The method of claim 1, wherein the method pertains to a go-back-n automatic repeat request scheme and further comprises the steps of:

defining a maximum top sequence number equal to a value (DSN+$2^{k-1}$), where DSN is a sequence number indicating that all packets having sequence numbers previous to DSN have been acknowledged by a receiver in the data network as having been received, and k is a number of bits in a sequence number field for a packet in the data network;

accepting a received packet when a receive enforcement bit for the received packet is set to TRUE and N(S)−ESN<$2^{k-1}$, where N(S) is a sequence number of the received packet and ESN is an expected sequence number of a next packet to be received; and

performing one of a) a restart of the automatic repeat request scheme and b) reporting a failure event to a management control system when the receive enforcement bit for the received packet is set to TRUE and N(S)−ESN$\geq 2^{k-1}$.

5. The method of claim 1, wherein the method pertains to a go-back-n automatic repeat request scheme and further comprises the steps of:

constraining a top sequence number TSN according to the rules (TSN$\leq$DSN−1), (TSN$\leq$BSN+W) and ($1\leq$W$\leq 2^{k-1}$), where k is a number of bits in a sequence

US 6,424,625 B1

number field for a packet in the data network, DSN is a sequence number indicating that all packets having sequence numbers previous to DSN have been acknowledged by a receiver in the data network as having been received, BSN is a bottom sequence number indicating a sequence number of an oldest packet stored in a transmit buffer of a transmitter in the data network, and W is a window size known to both the receiver and the transmitter, within which packets are tracked;

accepting a received packet when a receive enforcement bit for the received packet is set to TRUE and N(S)–ESN$<2^k$–W, where N(S) is a sequence number of the received packet and ESN is an expected sequence number of a next packet to be received;

performing one of a) a restart of the automatic repeat request scheme and b) reporting a failure event to a management control system when the receive enforcement bit for the received packet is set to TRUE and N(S)–ESN$\geq 2^k$–W; and

constraining BSN according to the rule (DSN$\leq$BSN$\leq$TSN).

6. The method of claim 1, wherein the method pertains to a selective repeat automatic repeat request scheme and further comprises the steps of:

constraining a bottom sequence number BSN indicating a sequence number of an oldest packet stored in a transmit buffer of a transmitter in the data network, and a top sequence number TSN according to the rules (DSN$\leq$BSN$\leq$TSN$\leq$TSN$_{MAX}$), where DSN is a sequence number indicating that all packets having sequence numbers previous to DSN have been acknowledged by a receiver in the data network as having been received, TSN$_{MAX}$ is a maximum top sequence number, (TSN$_{MAX}$–DSN=$2^{k-1}$), and k is a number of bits in a sequence number field for a packet in the data network;

accepting a received packet when a receive enforcement bit for the received packet is set to TRUE and N(S)–ESN$<2^{k-1}$, where N(S) is a sequence number of the received packet and ESN is an expected sequence number of a next packet to be received; and

performing one of a) a restart of the automatic repeat request scheme and b) reporting a failure event to a management control system when the receive enforcement bit for the received packet is set to TRUE and N(S)–ESN$\geq 2^{k-1}$.

7. The method of claim 6, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is less than a difference between BSN and the sequence number of the first packet, and c) TSN$\neq$BSN, setting a receive enforcement bit for the packet indicated by BSN and resending the packet indicated by BSN from the transmitter to the receiver.

8. The method of claim 6, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is less than a difference between BSN and the sequence number of the first packet, and c) TSN=BSN,

if a packet is pending for transmission, then setting a receive enforcement bit for the pending packet to

TRUE and sending the pending packet from the transmitter to the receiver;

if no packets are pending for transmission, then performing one of a) waiting until a packet is received from a higher layer and b) informing the receiver that no packets are pending.

9. The method of claim 6, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is greater than a difference between BSN and the sequence number of the first packet, and c) TSN$\neq$BSN, setting a receive enforcement bit for a first outstanding packet after BSN and resending the first outstanding packet from the transmitter to the receiver.

10. The method of claim 6, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is greater than a difference between BSN and the sequence number of the first packet, c) at least one packet exists after the first packet, and d) there are no negatively acknowledged packets having sequence numbers after BSN, setting a receive enforcement bit for a first packet after BSN and resending the first packet after BSN from the transmitter to the receiver.

11. The method of claim 6, further comprising the steps of:

when a first packet having a sequence number after DSN and before BSN is negatively acknowledged, and all packets having sequence numbers greater than or equal to BSN and less than TSN have been positively acknowledged,

if a packet is pending for transmission, then setting a receive enforcement bit for the pending packet to TRUE and sending the pending packet from the transmitter to the receiver;

if no packets are pending for transmission, then performing one of a) waiting until a packet is received from a higher layer and b) informing the receiver that no packets are pending.

12. The method of claim 6, further comprising the steps of:

when a timer-initiated retransmission of a packet occurs, and ISN=BSN, setting a receive enforcement bit for the packet to TRUE; and

when a timer-initiated retransmission of the packet occurs, and ISN$\neq$BSN, setting the receive enforcement bit for the packet to FALSE; wherein

ISN indicates a sequence number of a next packet to be sent.

13. The method of claim 6, further comprising the steps of:

when (ISN=BSN) and (BSN$\neq$DSN), setting a receive enforcement bit for the packet to TRUE, and otherwise setting the receive enforcement bit for the packet to FALSE, where ISN indicates a sequence number of a next packet to be sent.

14. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

US 6,424,625 B1

13

discarding at least one packet from a transmitter;

receiving a NACK for the at least one packet from a receiver; and

assigning consecutive sequence numbers to non-discarded packets adjacent to the at least one packet.

**15**. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

a transmitter in the data network discarding at least one packet that has been sent by the transmitter but has not been acknowledged by a receiver in the data network as received;

after discarding the at least one packet, resynchronizing the transmitter and the receiver so that the last packet received by the receiver and the next packet to be transmitted by the transmitter have consecutive sequence numbers.

**16**. The method of claim **15**, wherein the step of resynchronizing comprises the steps of:

determining what sequence number the receiver expects to receive next; and

when the expected sequence number is different from the sequence number of the packet to be sent next from the transmitter, assigning the expected sequence number to the packet to be sent next from the transmitter.

**17**. The method of claim **15**, wherein the step of resynchronizing comprises the steps of:

14

determining what sequence number the receiver expects to receive next; and

when the expected sequence number is different from the sequence number of the packet to be sent next from the transmitter, commanding the receiver to expect a sequence number of a next packet to be sent from the transmitter to the receiver.

**18**. The method of claim **15**, wherein the step of resynchronizing comprises the step of commanding the receiver to expect a sequence number of a next packet to be sent from the transmitter to the receiver.

**19**. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

a transmitter in the data network discarding at least one packet that has been sent by the transmitter but has not been acknowledged by a receiver in the data network as received;

after discarding the at least one packet, resynchronizing the receiver and the transmitter by determining what sequence number the receiver next expects, and consecutively renumbering packets pending at the transmitter starting with the expected sequence number.

* * * * *

# TAB 9

(12) **United States Patent** (10) Patent No.: **US 6,466,568 B1**

Raith et al. (45) Date of Patent: **Oct. 15, 2002**

(54) **MULTI-RATE RADIOCOMMUNICATION SYSTEMS AND TERMINALS**

(75) Inventors: **Alex Krister Raith**, Durham; **James Ragsdale**, Raleigh; **John Diachina**, Garner, all of NC (US)

(73) Assignee: **Telefonaktiebolaget LM Ericsson (publ)**, Stockholm (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/399,771**

(22) Filed: **Sep. 21, 1999**

**Related U.S. Application Data**

(62) Division of application No. 08/725,643, filed on Oct. 15, 1996, now Pat. No. 5,987,019.

(51) Int. Cl.[7] ............................................. **G06F 11/00**

(52) U.S. Cl. ...................... **370/347**; 370/328; 370/471; 455/422

(58) Field of Search ................................ 370/320, 342, 370/335, 347, 280, 294, 328, 329, 321, 330, 337, 479, 468, 469, 470, 471, 472; 455/422, 561, 575

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,177,740 A | 1/1993 | Toy et al. |
| 5,182,753 A | 1/1993 | Dahlin et al. |
| 5,230,003 A | 7/1993 | Dent et al. |
| 5,299,235 A | 3/1994 | Larsson et al. |
| 5,570,467 A | 10/1996 | Sawyer |
| 5,603,081 A | 2/1997 | Raith et al. |
| 5,757,813 A | * 5/1998 | Raith ......................... 370/468 |
| 5,770,927 A | 6/1998 | Abe |
| 5,930,706 A | * 7/1999 | Raith ......................... 455/422 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 399612 | 11/1990 |
| EP | 605312 | 7/1994 |
| EP | 642233 | 3/1995 |
| WO | WO 95/01012 | 1/1995 |
| WO | WO 96/21998 | 7/1996 |

* cited by examiner

*Primary Examiner*—Wellington Chin
*Assistant Examiner*—Frank Duong
(74) *Attorney, Agent, or Firm*—Burns, Doane, Swecker & Mathis, L.L.P.

(57) **ABSTRACT**

Variances in bandwidth used by a radiocommunication connection are adapted to by changing the type of information being transmitted. For example, in a TDMA environment, a first downlink time slot associated with a double- or triple-rate connection may have a first format, while a second time slot associated with the same connection may have a second format different from the first format. Bandwidth in the second (or third) time slot can be used to carry information in a fast out-of-band channel (FOC). The FOC may provide information relating to the same connection as the payload or data field in that time slot, e.g., a service type identifier which informs the mobile or base station of the type of information (e.g., voice, video or data) being conveyed in the payload. Alternatively, the FOC information may be associated with a connection or connections which are different from that supported by the payload or data field containing the FOC.

**7 Claims, 8 Drawing Sheets**





FIG. 1

*FIG. 2*



| ONE FRAME = 1944 BITS (972 SYMBOLS) = 40 ms. (25 FRAMES PER SECOND) | | | | | |
|---|---|---|---|---|---|
| SLOT 1 | SLOT 2 | SLOT 3 | SLOT 4 | SLOT 5 | SLOT 6 |

ONE SLOT

*FIG. 3*
PRIOR ART

| 28 | 12 | 130 | 12 | 130 | 1 | 11 |
|---|---|---|---|---|---|---|
| SYNC | SACCH | DATA | CDVCC | DATA | RSVD = 1 | CDL |
| 0        27 | 39        169 | 181        311 | 312        323 |

*FIG. 4A*



*FIG. 4B*

| SLOT 1 | SLOT 2 | SLOT 3 | SLOT 4 | SLOT 5 | SLOT 6 |

*FIG. 5*



## FIG. 6

| SLOT 1 | SYNC | SACCH | DATA | CDVCC | DATA | CDL |
|---|---|---|---|---|---|---|

| SLOT 2 | SYNC | FOC | DATA | FOC | DATA | FOC |
|---|---|---|---|---|---|---|

| SLOT 3 | SYNC | FOC | DATA | FOC | DATA | FOC |
|---|---|---|---|---|---|---|

## FIG. 7A

| SLOT 1 | SYNC | SACCH | DATA | CDVCC | DATA | CDL |
|---|---|---|---|---|---|---|

| SLOT 2 | SYNC | FOC | DATA | FOC | DATA | CDL |
|---|---|---|---|---|---|---|

| SLOT 3 | SYNC | FOC | DATA | FOC | DATA | CDL |
|---|---|---|---|---|---|---|

## FIG. 7B

| SLOT 1 | SYNC | SACCH | DATA | CDVCC | DATA | CDL |
|---|---|---|---|---|---|---|

| SLOT 2 | SYNC | FOC | DATA | CDVCC | DATA | CDL |
|---|---|---|---|---|---|---|

| SLOT 3 | SYNC | FOC | DATA | CDVCC | DATA | CDL |
|---|---|---|---|---|---|---|





*FIG. 8C*

A263

FIG. 9

START
IS NEW CONNECTION FOR MULTIMEDIA?
90
YES
NO
READ FOC AS SERVICE TYPE IDENTIFIER
92
IGNORE FOC INFORMATION
96
PROCESS PAYLOADS BASED ON FOC
94
READ PAYLOAD
98
END

*FIG. 10* PRIOR ART

| 6 | 6 | 16 | 28 | 122 | 12 | 12 | 122 |
|---|---|----|----|-----|----|----|-----|
| G | R | DATA | SYNC | DATA | SACCH | CDVCC | DATA |

*FIG. 11*

| DATA | SYNC | DATA | SACCH | CDVCC | DATA |
|------|------|------|-------|-------|------|

| DATA | SYNC | DATA | FOC | FOC | DATA |
|------|------|------|-----|-----|------|

A265

US 6,466,568 B1

1

# MULTI-RATE RADIOCOMMUNICATION SYSTEMS AND TERMINALS

## RELATED APPLICATION

This application is a divisional, of application Ser. No. 08/725,643 filed Oct. 15, 1996 now U.S. Pat. No. 5,987,019.

This application is related to U.S. Pat. No. 6,028,854, entitled "Radiocommunication Systems and Terminals with Increased Payload Bandwidth".

## BACKGROUND

Applicant's invention relates generally to radiocommunication systems, e.g., cellular or satellite systems, that use digital traffic channels in a multiple access scheme, e.g., time division multiple access (TDMA) or code division multiple access (CDMA).

The growth of commercial radiocommunications and, in particular, the explosive growth of cellular radiotelephone systems have compelled system designers to search for ways to increase system capacity without reducing communication quality beyond consumer tolerance thresholds. One way to increase capacity is to use digital communication and multiple access techniques such as TDMA, in which several users are assigned respective time slots on a single radio carrier frequency.

In North America, these features are currently provided by a digital cellular radiotelephone system called the digital advanced mobile phone service (D-AMPS), some of the characteristics of which are specified in the interim standard IS-54B, "Dual-Mode Mobile Station-Base Station Compatibility Standard", published by the Electronic Industries Association and Telecommunications Industry Association (EIA/TIA). Because of a large existing consumer base of equipment operating only in the analog domain with frequency-division multiple access (FDMA), IS-54B is a dual-mode (analog and digital) standard, providing for analog compatibility in tandem with digital communication capability. For example, the IS-54B standard provides for both FDMA analog voice channels (AVC) and TDMA digital traffic channels (DTC), and the system operator can dynamically replace one type with the other to accommodate fluctuating traffic patterns among analog and digital users. The AVCs and DTCs are implemented by frequency modulating radio carrier signals, which have frequencies near 800 megahertz (MHz) such that each radio channel has a spectral width of 30 kilohertz (KHz). A subsequent standard, referred to as IS-136, adds specifications for digital control channels. This standard document, in particular the version identified as PN-3474.1, dated Dec. 15, 1995 and published by EIA/TIA, is incorporated here by reference.

In a TDMA cellular radiotelephone system, each radio channel is divided into a series of time slots, each of which contains a burst of information from a data source, e.g., a digitally encoded portion of a voice conversation. The time slots are grouped into successive TDMA frames having a predetermined duration. According to IS-54B and IS-136, each TDMA frame consists of six consecutive time slots and has a duration of 40 milliseconds (msec). Thus, each frame can carry from one to six traffic channels (e.g., one to six radio connections). The number of connections which can be supported by each TDMA frame depends on the desired information transmission rate. For example, if the connections are used to support the transmission of voice information, the number of slots used per channel depends on the source rates of the speech coder/decoders (codecs) used to digitally encode the conversations. Such speech

2

codecs can operate at either full-rate or half-rate, with full-rate codecs being expected to be used until half-rate codecs that produce acceptable speech quality are developed.

Thus, a full-rate DTC requires twice as many time slots in a given time period as a half-rate DTC, and in IS-54B, each radio channel can carry up to three full-rate DTCs or up to six half-rate DTCs. Each full-rate DTC uses two slots of each TDMA frame, i.e., the first and fourth, second and fifth, or third and sixth of a TDMA frame's six slots. Each half-rate DTC uses one time slot of each TDMA frame. During each DTC time slot, 324 bits are transmitted, of which the major portion, 260 bits, is due to the speech output of the codec, including bits due to error correction coding of the speech output, and the remaining bits are used for guard times and overhead signalling for purposes such as synchronization.

In addition to voice information being transmitted on the traffic channels, various other types of data can and will be transmitted thereon. For example, facsimile (fax) transmissions are commonly supported by radiocommunication systems. Similarly, packet data transmissions, which divide information streams into packets rather than providing dedicated (i.e., "connection-oriented") channels for each information stream, will be supported in radiocommunication systems. Other types of information transmission, e.g., video or hybrid voice, data and video to support internet connections, will likely be supported in the future.

These various types of information communication (also referred to herein as different "services") will likely have different optimal transmission characteristics. For example, services between a remote user and the internet may benefit by providing a greater bandwidth in the downlink (i.e., from the internet to the remote station) than in the uplink, since many users spend a significant portion of their connection time downloading information from the internet rather than uploading thereto. Thus, it may be desirable in such cases to allocate a triple rate connection in the downlink (e.g., all six time slots of an IS-136 TDMA frame) but only a full rate connection in the uplink (e.g., two time slots of an IS-136 frame). This inequality between uplink and downlink bandwidth is referred to herein as an "asymmetrical" connection. In addition to bandwidth considerations, other transmission characteristics may also be impacted. For example, different services may require different degrees of error protection. Thus, for example, an optimal channel coding for the transmission of voice information might be rate ½ since voice information transmission is typically not provided with a procedure for retransmission, while optimal channel coding for the transmission of data, e.g, facsimile, might be rate ⅝ since retransmission procedures are typically provided. Other transmission characteristics, for example, the ability to tolerate delay in the reception of information, may also vary between services. All of these differences in transmission characteristics should be considered together when determining an optimal specification for the air interface.

Accordingly, it would be desirable to provide techniques for transmitting information between remote stations and the system in radiocommunication networks that provide sufficient flexibility for the anticipated variety of information communication services described above, while also providing sufficient compatibility with existing technology so that equipment used by the existing consumer base will not become obsolete.

## SUMMARY

According to exemplary embodiments of the present invention, the type of information transmitted in the uplink

3

or downlink may vary depending upon the transmission rate. For example, in a TDMA environment, a first downlink time slot associated with a double- or triple-rate connection may have a first format, while a second time slot associated with the same connection may have a second format different from the first format. The different formats take into account the need to transmit certain types of information at only full rate, and not double- or triple-rate.

According to some exemplary embodiments, bandwidth in the second (or third) time slot can be used to carry information in a fast out-of-band channel (FOC). The FOC may provide information relating to the same connection as the payload or data field in that time slot, e.g., a service type identifier which informs the mobile or base station of the type of information (e.g., voice, video or data) being conveyed in the payload. This information can be used by the receiving equipment to aid in processing the information conveyed in the payload, e.g., by knowing the channel coding rate. These exemplary embodiments find particular application to multimedia communications where the type of payload may vary rapidly, e.g., on a slot-by-slot basis, or even within each slot.

Various exemplary mapping techniques for associating the FOC information with each time slot or each block of data which may be interleaved over two or more time slots are also described herein. These exemplary mapping techniques also account for the fact that there may not be FOC information provided in each time slot.

According to other exemplary embodiments of the present invention, the FOC information may be associated with a connection or connection which is different from that supported by the payload or data field containing the FOC. For example, in asymmetrical connections, e.g., where a mobile station transmits in a different number of slots per frame than it receives, a downlink channel may carry payload to a first mobile station in the data fields in several time slots of a frame but the FOC may provide control information to one or more other mobile stations which are not interested in the payload. All of these mobile stations may share the same frequency on the uplink, e.g., the one or more other mobile stations may transmit packet data and use the FOC to receive retransmission requests.

### BRIEF DESCRIPTION OF THE DRAWINGS

The features and advantages of Applicants' invention will be understood by reading this description in conjunction with the drawings, in which:

FIG. 1 is a block diagram of an exemplary cellular radio telephone system in which the present invention may be applied;

FIG. 2 illustrates an exemplary TDMA frame structure;

FIG. 3 illustrates a conventional downlink traffic channel time slot format;

FIG. 4A illustrates triple rate downlink frame usage;

FIG. 4B illustrates full rate uplink frame usage;

FIG. 5 illustrates a base station and three mobile stations communicating therewith;

FIG. 6 illustrates downlink time slot formats according to a first exemplary embodiment of the present invention;

FIG. 7A illustrates downlink time slot formats according to a second exemplary embodiment of the present invention;

FIG. 7B illustrates downlink time slot formats according to a third exemplary embodiment of the present invention;

FIGS. 8A–8C illustrate exemplary mappings of FOC information to payload according to various exemplary embodiments of the present invention;

4

FIG. 9 is a flowchart illustrating an exemplary, alternative usage of an FOC field by a mobile station according to the present invention;

FIG. 10 is a conventional format for all uplink traffic channel time slots; and

FIG. 11 is an exemplary format for two or more uplink traffic channel time slots according to an exemplary embodiment of the present invention.

### DETAILED DESCRIPTION

The following description is scripted in terms of a cellular radiotelephone system, but it will be understood that Applicant's invention is not limited to that environment. Also, the following description is in the context of TDMA cellular communication systems, but it will be understood by those skilled in the art that the present invention may apply to hybrid access methodologies, e.g,. those including TDMA and Code Division Multiple Access (CDMA).

FIG. 1 represents a block diagram of an exemplary cellular mobile radiotelephone system, including an exemplary base station **110** and mobile station **120**. The base station includes a control and processing unit **130** which is connected to the MSC **140** which in turn is connected to the PSTN (not shown). General aspects of such cellular radiotelephone systems are known in the art, as described by the above-cited U.S. patent applications and by U.S. Pat. No. 5,175,867 to Wejke et al., entitled "Neighbor-Assisted Handoff in a Cellular Communication System," and U.S. patent application Ser. No. 07/967,027 entitled "Multi-Mode Signal Processing," which was filed on Oct. 27, 1992, both of which are incorporated in this application by reference.

The base station **110** handles a plurality of traffic channels through a traffic channel transceiver **150**, which is controlled by the control and processing unit **130**. Also, each base station includes a control channel transceiver **160**, which may be capable of handling more than one control channel. The control channel transceiver **160** is controlled by the control and processing unit **130**. The control channel transceiver **160** broadcasts control information over the control channel of the base station or cell to mobiles locked to that control channel. It will be understood that the transceivers **150** and **160** can be implemented as a single device, like the traffic and control transceiver **170** in the mobile station, for use with control channels and traffic channels that share the same radio carrier frequency.

The traffic channels can be used in a dedicated, connection-oriented manner to transmit information, e.g., for a voice connection, where each channel is used continuously for a period of time to support transmission of a single stream of information or in a packet-oriented manner where each channel can be used to send independent units of information associated with different information streams. When used in the former sense, control channels and traffic channels will be referred to herein as DCCHs and DTCs, respectively. When used in the latter sense, control channels and traffic channels win be referred to herein as PCCHs and PDTCs, respectively. For more information regarding packet data radiocommunication systems generally, the interested reader is referred to U.S. patent application Ser. No. 08/544,836, entitled "Packet Channel Feedback," filed on Oct. 18, 1995, the disclosure of which is expressly incorporated here by reference.

After an idle mobile station **120** has located a control channel, e.g., by using digital control channel location information found on a traffic channel, it can then read the control information transmitted on that control channel, e.g.,

US 6,466,568 B1

5

paging messages, using its traffic and control channel transceiver 170. Then, the processing unit 180 evaluates the received control channel information, which may include, for example, paging messages or requests to measure signals strengths on identified channels. When a connection between the mobile station 120 and the system is desired, the transceiver 170 will tune to an appropriate traffic channel as described below.

An exemplary organization of the information transmitted on each radio channel, i.e., the channel bursts, or time slots, in accordance with Applicant's invention is shown in FIG. 2. The consecutive time slots on a radio channel are organized in TDMA frames of, for example, six slots each so that a plurality of distinct channels can be supported by a single radio carrier frequency. Each TDMA frame in this example has a duration of 40 msec and supports six half-rate logical channels, three full-rate logical channels, or greater bandwidth channels as indicated in the following table. Each slot can, for example, have a duration of 6.67 msec and carry 324 bits (162 symbols), which have positions in each slot that are conventionally consecutively numbered 1–324.

| Number of Slots | Used Slots | Rate |
|---|---|---|
| 1 | 1 | half |
| 2 | 1, 4 | full |
| 4 | 1, 4, 2, 5 | double |
| 6 | 1, 4, 2, 5, 3, 6 | triple |

Currently, IS-136 defines a downlink DTC slot format as illustrated in FIG. 3. Therein, the numbers above each field denote the number of bits associated therewith. For example, the SYNC field is used for synchronization equalizer training and time slot identification. The SACCH (Slow Associated Control Channel) is a signalling channel used, for example, for transmission of control and supervision messages between the mobile station and the base station. The two DATA fields are used to transmit the "payload" of the slot, e.g., user information or control channel information as part of the FACCH (Fast Associated Control Channel). The CDVCC (Coded Digital Verification Color Code) is a cell identifier that identifies the base station which is transmitting to the mobile station. The CDL (Coded Digital Control Channel Locator) is a pointer which can be used to indicate on which frequency, or set of frequencies, a digital control channel is likely to be found. Conventionally, this downlink format is used for each time slot in a TDMA frame, i.e., all six time slots for systems operating according to IS-136. According to the present invention, however, it may be desirable to provide alternative slot formats to accommodate the different communication services provided above.

Consider again the situation where it is desirable to provide a triple rate connection in the downlink (i.e., base-to-mobile direction) and a full rate connection in the uplink (i.e., mobile-to-base direction). This situation is shown in FIGS. 4A and 4B. Therein, FIG. 4A illustrates a downlink frame wherein all six time slots are allocated to a particular mobile, as denoted by the cross-hatching of each of time slots 1–6. FIG. 4B illustrates a corresponding uplink frame. Note that only slots 1 and 4 are allocated to the particular mobile station which is using all of the time slots of FIG. 4A. Thus, the remaining time slots 2, 3, 5 and 6 are unallocated and, conventionally, would go unused.

Bandwidth being a precious commodity, exemplary embodiments of the present invention provide techniques for using unallocated bandwidth in a single link without

6

adversely impacting compatibility with existing air interface specifications, e.g., IS-136. According to a first exemplary embodiment described below, the unused uplink time slots can be used to send packet data. Packet data communications support independent usage of uplink and downlink frequencies. Accordingly, packet data can be sent on the unused time slots in the uplink from one or more other mobile stations to the base station. Consider FIG. 5. Therein, mobile station 500 is allocated the downlink and uplink time slots illustrated in FIGS. 4A and 4B for communicating with base station 505. To fully utilize the bandwidth resources according to the present invention, another mobile station 510 transmits packet data to base station 505 in a PDTC comprising time slots 2 and 5 of FIG. 4B, while a third mobile station 520 transmits packet data to base station 505 on a PDTC comprising time slots 3 and 6.

If either of the mobile stations 510 and 520 require downlink bandwidth, then a downlink channel may be assigned on some other frequency, since mobile station 500 is using all of the time slots of the frequency represented by FIG. 4A. Alternatively, it may be the case that, for a particular time period during a packet data connection which is referred to herein as an "activity burst", one or both mobile stations 510 and 520 only need to transmit packet data and, therefore, do not require downlink bandwidth for the purposes of receiving packet data. Nonetheless, mobile stations 510 and 520 will still need to receive overhead information from base station 505, e.g., relating to which packets were not received and whether each mobile station is allowed to transmit in a particular frame. Assigning a downlink PDTC purely for the transmission of such overhead information is spectrally inefficient. One solution would be to provide this overhead information to mobiles 510 and 520 on a PCCH and require the mobile stations to return to the PCCH periodically, e.g., after transmitting packets on the PDTC during the activity burst which lasts, for example, one second.

However, according to exemplary embodiments of the present invention, another technique for providing overhead information to mobile stations 510 and 520 using one or more downlink time slots whose data or "payload" fields are being used to transmit information to mobile station 500. Specifically, the downlink time slot format illustrated in FIG. 3 can be altered to (1) provide overhead information regarding packet data communications to mobile stations 510 and 520, without (2) significantly altering mobile station 500's ability to receive triple rate downlink information. FIG. 6 illustrates downlink time slot formats according to this exemplary embodiment of the present invention.

Therein, three downlink slot formats are illustrated for an exemplary traffic channel according to the present invention. These three slot formats might correspond, for example, to slots 1, 2 and 3 of FIG. 4A. Slots 4, 5 and 6 would have the same format as slots 1, 2 and 3, respectively for this exemplary embodiment. Unlike conventional systems, e.g., those currently specified by IS-136, the downlink formats illustrated in FIG. 6 differ within the frame. Specifically, while time slot 1 has the same slot format as conventional downlink traffic time slots (see, e.g., FIG. 3), time slots 2 and 3 differ in that the SACCH, CDVCC and CDL fields of slot 1 have each been replaced by an FOC (fast out-of-band channel) field. It will be noted that, for the purposes of simplicity, the RSVD bit illustrated in FIG. 3 has been omitted. However, this bit may also be reserved and included in downlink slot formats according to the present invention.

In the example described above, mobile station 500 is using a triple rate downlink connection, i.e., it is reading the

7

data fields of each of time slots **1**, **2** and **3** in FIG. **6**. However, some of the other fields provided in the conventional downlink time slot format of FIG. **3** need not be transmitted in each time slot under these circumstances. For example, the type of overhead signalling that occurs on the SACCH is such that mobile station **500** need not receive the SACCH at triple rate. That is, mobile station **500** may only need to receive one SACCH burst every three time slots. Thus the field that is normally used for SACCH information in slots **2** and **3** can be replaced by FOC information according to the present invention. The CDVCC field includes information that aids in the identification of the radio link and is conventionally used for radio link control, e.g., tearing down of a connection. However, this information can be provided to the mobile station over the control channel at call-setup and, accordingly, need not be transmitted by the base station in each downlink time slot. Various techniques are described below to avoid problems caused by omitting the CDL information from some downlink time slots.

Omitting these fields in time slots **2** and **3** (as well as **5** and **6**) provides an opportunity to inform the other mobile stations, e.g., mobile stations **510** and **520**, of information pertaining to their uplink connections, without assigning a new PDTC or forcing mobile stations **510** and **520** to revert periodically to listening to the PCCH. For example, the FOC fields can be used to inform mobile station **510** or mobile station **520** that a previously transmitted packet was not properly received and should be retransmitted. Note that since the FOC information is "out-of-band" (i.e., is not encoded as part of the data), mobile stations **510** and **520** advantageously need not be aware of the channel coding and interleaving needed to read the data fields in time slots **2** and **3**.

Many variations of the foregoing exemplary embodiment are possible and contemplated by the present invention. For example, although the foregoing example is provided in terms of an asymmetrical connection wherein the downlink is triple rate and the uplink is full rate, any asymmetrical connection lends itself to application of the present invention. For example, the downlink may be double rate and the uplink full rate, whereupon the FOC fields would replace the SACCH, CDVCC and CDL fields in only one of slots **2** and **3** illustrated in FIG. **6**.

Moreover, it may not be desirable to replace all three of the SACCH, CDVCC and CDL fields with FOC information. For example, it may be determined that 36 bits of FOC information is not needed. Alternatively, for compatibility reasons, it may be determined that one or more of the SACCH, CDVCC and CDL fields should be maintained in each downlink slot. Thus, for example, downlink slot formats for the triple rate downlink/full rate uplink example provided above could instead be as illustrated in one of FIGS. **7A** and **7B**. Therein, the FOC replaces only the SACCH and CDVCC in FIG. **7A** and only the SACCH in FIG. **7B**. Those skilled in the art will appreciate that many more variations exist, such as time slot **2** or **3** being the "master" channel having the conventional slot format of FIG. **3** instead of slot **1**.

As mentioned above, exemplary embodiments of the present invention wherein the base station **505** only transmits the CDVCC and/or the CDL in some downlink slots of a traffic channel may cause difficulties for mobile stations that expect this information in all time slots on a downlink traffic channel. For extensive information relating to the CDL and mobile functionality relating to locating digital traffic channels, the reader is referred to U.S. patent appli-

8

cation Ser. No. 08/331,711 entitled "Method and Apparatus for Locating a Digital Control Channel in a Radiocommunication System", filed on Oct. 31, 1994, the disclosure of which is incorporated here by reference. In brief, the CDL field is used by unconnected mobile stations (e.g., at power-up) to locate a control channel if the first channel to which it tunes is a traffic channel. According to one exemplary technique, a mobile station reads the field corresponding to the CDVCC in the time slot to which it first tunes on a frequency. This conventional mobile station will identify this field as either a CDVCC (implying a traffic channel per the format of FIG. **3**) or a coded superframe phase (CSFP) (implying a control channel per IS-136). If a traffic channel, the mobile station will then use the CDL information as a pointer to search another channel number, or set of channel numbers, for a control channel.

Thus, if the CDVCC information is replaced by FOC information on some downlink time slots, a conventional mobile station reading this field for the purpose of identifying the channel as either a control channel or a traffic channel may misidentify a traffic channel as a control channel. Alternatively, the mobile station might read the FOC information as valid CDVCC data (thus correctly identifying the channel as a traffic channel) and then look for the CDL, which is not present (thus moving to an incorrect channel number or set to search).

Both of these problems can be avoided according to exemplary embodiments of the present invention by recognizing that both the CSFP and the CDVCC according to IS-136 are (12,8) encoded data words, i.e., 8 bits of data encoded to 12 bits that have particular characteristics. Specifically, the CDVCC is a (12,8) code word that remains the same in each time slot associated with a particular channel and has non-inverted checkbits, while the CSFP is a (12,8) code word that has inverted checkbits and acts as an upcounter. Since the universe of (12,8) codewords having these characteristics is relatively small as compared with the number of total number of 12 bit binary words, the FOC information can be made distinct from the CDVCC and CSFP to avoid confusion. Specifically, the base station can transmit FOC information in the field which conventionally been used in downlink channels as either the CSFP or the CDVCC (i.e., bits 169–181 in FIG. **3**), which is carefully tailored to avoid similarity with a (12,8) codeword having these characteristics by adding filler bits to distinguish therefrom as will be readily appreciated by those skilled in the art.

Of course, those mobile stations (or other receiving equipment) which are designed with the present invention in mind will be aware that the SACCH, CDVCC and CDL information can be located at a pre-defined full-rate portion of a multi-rate channel, which pre-defined portion is referred to herein as the "master channel". The master channel may, as in the afore-described examples, be transmitted on time slots **1** and **4**, or alternatively on time slots **2** and **5** or **3** and **6**. In any case, a mobile station which has been suitably programmed to be aware of master channels can simply tune to a master channel to find CDL information.

The present invention also has application in situations other than asymmetrical data/packet data situations described above. For example, in order to ensure complete compatibility, and for ease of implementation, it may be desirable to adopt the downlink slot format of slot **2** in FIG. **6** for situations in which packet data is transmitted in both the uplink and downlink, i.e., for uplink and downlink PDTCs as well as downlink DTCs and uplink PDTCs. That is, base stations according to the present invention which

transmit packet data traffic channels can use this downlink format for transmitting to mobile stations. Moreover, this aspect of the present invention is also applicable to situations wherein the connection is not asymmetrical.

Another area in which the present invention finds application is in multimedia communication. As described above, it is anticipated that future radio communications will need to support intermingled voice, data and video service, wherein the type of information to be transmitted may vary rapidly, e.g., time slot by time slot and wherein the different services may require different levels of channel coding. One technique for dealing with this type of situation is to use call control signalling (e.g., over the FACCH) to identify which type of instantaneous service is to be supported over the channel. Another alternative is simply to allow the base station to transmit information pertaining to different services on a slot-by-slot basis, and require the mobile station to discriminate between the different services based on the differences in channel coding. See, for example, U.S. Pat. No. 5,230,003 to Dent and Raith, the disclosure of which is expressly incorporated here by reference. This procedure is currently used to determine whether FACCH information or voice information is carried in the DATA field of a particular downlink time slot. However, as the number of services expands beyond two, the complexity of discriminating between services in this manner becomes excessive.

Thus, according to another exemplary embodiment of the present invention, the FOC fields may also serve the purpose of service type identifier. In this embodiment, the FOC can provide information regarding the type of service which the associated payload is currently supporting, the channel coding and/or interleaving associated therewith. For example, in a multimedia connection information transfer may rapidly vary between voice, data and video information. In such a case, a change in the FOC can inform the mobile station of the type of information being transmitted, so that the mobile station will know how to process the received information, e.g., how to decode the received bits. As will be apparent from reviewing FIG. 6, FIG. 7A and FIG. 7B, exemplary embodiments of the present invention do not provide FOC fields in each time slot received by the mobile station in order to maintain full-rate transmission of SACCH, CDVCC and CDL. That is, using again IS-136 as an illustrative example, a mobile station receiving data at triple-rate will read FOC information in time slots **2**, **3**, **5**, and **6**, but not slots **1** and **4**. Thus, it is desirable to provide a mapping between the FOC information received in time slots **2**, **3**, **5**, and **6** and the information payload received by the mobile station in all six time slots.

More specifically, exemplary embodiments of the present invention provide a service type indicator for each block of information transmitted to the mobile station. These blocks of information are commonly referred to as "Layer 2 frames" which include, for example, speech frames associated with voice connections and radio link protocol (RLP) frames associated with data, e.g., fax, connections. Layer 2 frames, which are thus contained within the DATA fields of one or more downlink time slots, should not, however be confused with TDMA frames, which consist of a plurality of time slots. The number of time slots in which each Layer 2 frame is contained will vary depending upon the size of the Layer 2 frames and the amount of interleaving associated with a particular system.

For the purposes of illustration, the exemplary mappings provided below are described in the context of interleaving over two time slots, i.e., each Layer 2 frame is spread over two time slots. However, those skilled in the art will appreciate that Layer 2 frames could be interleaved over more than two time slots in which case the mappings described below would also change accordingly.

Several exemplary associations between the FOC information and the Layer 2 frames for a triple-rate connection are illustrated in FIGS. **8A–8C**. Therein, the six larger blocks **80–85** refer to the payload portion of each of the six time slots in a TDMA frame. For example, as shown in any of FIGS. **6**, **7A** and **7B**, the payload portion includes the information contained in both DATA fields of a time slot. Within each payload portion parts of two Layer 2 frames are carried, as denoted by the letters A–G. As seen in FIGS. **8A–8C**, each Layer 2 frame in this example is interleaved over two time slots. Above the six payload portions are the four FOC portions **86–89** which are contained in slots **2**, **3**, **5** and **6**, respectively. For example, each FOC portion **86** could, for example, be 36 bits as shown in the exemplary embodiment of FIG. **6**, 24 bits as shown in the exemplary embodiment of FIG. **7A** or 12 bits as shown in the exemplary embodiment of FIG. **7B**.

The arrows in each of FIGS. **8A–8C** denote the mapping between the bits in each FOC portion and Layer 2 frames in each time slot. In particular, an arrow from an FOC portion **86–89** drawn to a time slot **80–85** implies that the FOC portion includes bits which identify the service type of the Layer 2 frame which begins at that time slot. For example, in FIG. **8A**, the arrow leading from FOC SLOT **2** block **86** to PAYLOAD SLOT **1** block **80**, indicates that some of the bits contained in the FOC field(s) of slot two are used to convey an identification of the service type of Layer 2 frame B to the recipient equipment (mobile or base station). Thus, according to the exemplary mapping of FIG. **8A**, Layer 2 frame C has bits in both FOC blocks **86** and **87** relating to an indication of its service identity, while Layer 2 frames B and D have identifying bits only in one of blocks **86** and **87**, respectively.

The way in which the identifier bits are divided between FOC **86** and FOC **87** can vary. For example, a straightforward approach might be to include the complete identifier for Layer 2 frame B, redundancy associated with that identifier, the complete identifier for Layer 2 frame C and redundancy associated with that identifier in FOC **86**. At the same time FOC **87** would include, the complete identifier for Layer 2 frame C, redundancy associated with that identifier, the complete identifier for Layer 2 frame D and redundancy associated with that identifier. As will be appreciated by those skilled in the art, redundancy is provided to allow for correction of errors created during transmission of the bits over the air interface. For ease of reference, this division of bits is referred to using the following notation:

FOC **86** includes: Ib, R{Ib}, Ic, R{Ic}

FOC **87** includes: Ic, R{Ic}, Id, R{Id}

wherein, for example, "Ib" refers to the identifier information associated with Layer 2 frame B and "R{Ib}" refers to the redundancy provided for identifier information associated with Layer 2 frame B.

This exemplary division of bits provides two complete identifiers for Layer 2 frame C, implying unequal redundancy, i.e., less redundancy for Layer 2 frames B and D. Another possible division of identifier bits, using the same notation above (and noting that division by 2 implies simply half of the bits associated with that information), would be:

FOC **86** includes: Ib, R{Ib}, (Ic, R{Ic})/2

FOC **87** includes: (Ic, R{Ic})/2, Id, R{Id}

Using this exemplary division of bits, equal redundancy is achieved. Similar comments and bit divisions apply to FOC

US 6,466,568 B1

11

88 and 89 with respect to identifying the service types of Layer 2 frames E, F and G.

FIG. 8B illustrates another exemplary mapping according to the present invention. Therein, like reference numerals are used to refer to like bits as described with respect to FIG. 8A. The only differences between FIG. 8B and FIG. 8A are that an additional arrow connects FOC block 86 to the payload of slot 3 and that an additional arrow connects FOC block 87 to the payload of slot 1 (analogous additional arrows are associated with FOC blocks 88 and 89 as well). As discussed above, this means that according to the exemplary mapping of FIG. 8B, bits in FOC blocks 86 and 87 are also provided which relate to the service identity of the Layer 2 frames B and D, respectively. Accordingly, an exemplary bit division between FOC blocks 86 and 87 (as well as 88 and 89 but for Layer 2 frames E, F and G) is as follows:

FOC **86** includes: (Ib, R{Ib})/2, (Ic, R{Ic})/2, (Id, R{Id})/2

FOC **87** includes: (Ib, R{Ib})/2, (Ic, R{Ic})/2, (Id, R{Id})/2

This exemplary embodiment provides an equal amount of redundancy for each Layer 2 frame service type indicator, as well as time slot interleaving of all indicators. However, the receiver will need to- wait longer than in the aforedescribed embodiment to take advantage of all of the redundancy.

A third exemplary mapping is illustrated in FIG. 8C. Therein, like reference numerals are used to refer to like bits as described with respect to FIGS. 8A and 8B. The only differences between FIG. 8C and FIG. 8B are that an arrow connects FOC block 87 to the payload of slot 4 (instead of slot 1 in FIG. 8B). Similarly, FOC block 89 has an arrow which points to the first time slot in the next TDMA frame. As discussed above, this means that according to the exemplary mapping of FIG. 8C, bits in FOC block 87 are also provided which relate to the service identity of the Layer 2 frame E. Accordingly, an exemplary bit division between FOC blocks 86 and 87 (as well as 88 and 89 but for Layer 2 frames E, F, G and A) is as follows:

FOC **86** includes: Ib, R{Ib}, Ic, R{Ic}, Id, R{Id}

FOC **87** includes: Ic, R{Ic}, Id, R{Id}, Ie, R{Ie}

This exemplary embodiment has less delay involved in decoding the identifier information than the exemplary embodiment of FIG. 8B since, e.g., all of the identifier information for Layer 2 frame B will have been received by time 2. Those skilled in the art will readily appreciate that other mappings are possible and are considered to be within the scope of the present invention.

As described above, the FOC can be used in the downlink in different ways. Specifically, if a mobile station is assigned to an asymmetrical data connection, then the FOC is not associated with the connection and may be used in the manner described above to provide feedback relating to one or more uplink packet data connections. Alternatively, if the mobile station is assigned a multimedia connection, then the FOC can instead serve as a signalling channel associated with the connection that provides out-of-band information regarding the connection itself. In the former case, the mobile station which is receiving, for example, at double- or triple-rate need not read the FOC since the information provided therein relates to a connection associated with another mobile station. In the latter case, the mobile station needs to read the FOC since its information pertains to the mobile station's connection. At call set-up or handoff, the mobile station can be informed, e.g., as part of the channel assignment message, which type of connection is being set-up. If, for example, the mobile station is informed that a non-multimedia (e.g., an asymmetrical data) connection is

12

being set-up, then that mobile station will know that it should ignore the FOC information.

This handling of the FOC by a mobile station is illustrated in the flow chart of FIG. 9. Therein, at decision block 90, the mobile station determines whether the new (greater than full-rate) connection is a multimedia connection. If so, then the flow proceeds to block 92, wherein the mobile station recognizes that because the connection is multimedia, the FOC provides instantaneous service type information for that mobile station's downlink connection and should be read. The mobile then proceeds to use the FOC information in processing the payload at block 94.

If the connection is not a multimedia connection, e.g., it is an asymmetrical data/fax connection wherein the mobile will be receiving at double- or triple-rate, then the flow follows the "No" branch leaving decision block 92. Thus, the mobile station will then recognize at block 96 that the FOC fields in some of the downlink time slots should be ignored since that information is used to provide feedback to other mobile stations regarding their uplink connections. Note, block 96 is not meant to imply that all mobile stations would ignore the FOC, only the mobile station receiving the double- or triple-rate downlink information on that frequency. This mobile station will then read the payload of the slots associated with the additional bandwidth, while ignoring the FOC fields at block 98.

To this point, the discussion has focused on adjustments which can be made to transmission formats in the downlink. However, there may also be situations where the mobile station transmits in more time slots in each frame than it receives. Thus, it is desirable to optimize the uplink traffic channel format for these situations as well.

FIG. 10 illustrates a conventional uplink traffic channel format as currently specified by IS-136. Therein, the bit sizes of each field are specified by the numbers above each field. Similarly identified fields, including DATA, SYNC, CDVCC, and SACCH, are used in the manner described above with respect to the conventional downlink traffic channel format of FIG. 3. Guard time field (G) and ramp time field (R) are provided to provide the base station some time between received time slots from different mobiles and to avoid spectral splatter. Unlike the downlink, the uplink has no CDL field since the base station has no need of such information.

However, the base station need not receive SACCH and/or CDVCC information in each uplink time slot when connected at greater than full rate to a mobile station. Thus, according to exemplary embodiments of the present invention, one or both of these fields can be filled with FOC information in a manner analogous to that described for the downlink. Accordingly, an exemplary uplink format according to the present invention may be illustrated in FIG. 11. Therein, for double-rate transmission in the uplink, the slot format for the first (and fourth) slot in an exemplary six slot frame system will be as shown in the top row, while the format for the second (and fifth) slot will be as shown on the bottom. For triple-rate transmission in the uplink the third and sixth slots will have the same format as shown in the bottom row of FIG. 11. Thus, for example, 24 bits of FOC information per time slot can be provided in the uplink to, for example, identify the service type of the payload being transmitted by the mobile station. As in the exemplary embodiments for the downlink, it may be desirable to maintain one of the SACCH or the CDVCC in additional time slots, in which case FOC information may be provided only in one of the two fields shown in the bottom row of FIG. 11.

**13**

It is, of course, possible to embody the invention in specific forms other than those described above without departing from the spirit of the invention. The embodiments described above are merely illustrative and should not be considered restrictive in any way. The scope of the invention is determined by the following claims, rather than the preceding description, and all variations and equivalents which fall within the scope of the claims are intended to be embraced therein.

What is claimed is:

1. A communication station comprising:

a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field; and

a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field.

**14**

2. The communication station of claim **1**, wherein said processor is also for changing said type of payload information from a first type to a second type during a connection involving said communication station and adjusting a value of said service type identifier to correspond to the second type of information.

3. The communication station of claim **2**, wherein said first type of information is one of video, voice and data and said second type of information is different one of video, voice and data.

4. The communication station of claim **1**, wherein said information is multimedia information.

5. The communication station of claim **1**, wherein said communication station is a base station.

6. The communication station of claim **1**, wherein said communication station is a mobile station.

7. The communication station of claim **1**, wherein said processor is also for mapping said service type identifier to said at least one first field.

* * * * *

# TAB 10

(12) **United States Patent**　　(10) Patent No.: **US 6,772,215 B1**
Rathonyi et al.　　　　　　　　　(45) Date of Patent: **Aug. 3, 2004**

(54) **METHOD FOR MINIMIZING FEEDBACK RESPONSES IN ARQ PROTOCOLS**

(75) Inventors: **Bela Rathonyi**, Malmö (SE); **Joachim Sachs**, Aachen (DE); **Michael Meyer**, Aachen (DE); **Per Beming**, Stockholm (SE); **Mathias Johansson**, Sollentuna (SE); **Christiaan Roobol**, Hässelby (SE); **Erik Schön**, Tokyo (JP); **Kazuhiko Inoue**, Tokyo (JP)

(73) Assignee: **Telefonaktiebolaget LM Ericsson (publ)**, Stockholm (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/537,146**

(22) Filed: **Mar. 29, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/128,517, filed on Apr. 9, 1999.

(51) Int. Cl.[7] .............................................. **G06F 15/16**
(52) U.S. Cl. ...................................... **709/230**; 370/229
(58) Field of Search ........................ 709/230; 370/229, 370/232, 394, 395.1, 349

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,439,859 A | | 3/1984 | Donnan | 371/32 |
| 5,477,550 A | * | 12/1995 | Crisler et al. | 714/748 |
| 5,566,170 A | * | 10/1996 | Bakke et al. | 370/392 |
| 5,673,252 A | * | 9/1997 | Johnson et al. | 370/449 |
| 5,752,078 A | * | 5/1998 | Delp et al. | 710/7 |
| 5,754,754 A | | 5/1998 | Dudley et al. | 395/182.16 |
| 5,799,012 A | * | 8/1998 | Ayerst et al. | 370/336 |
| 5,968,197 A | * | 10/1999 | Doiron | 714/748 |
| 5,991,299 A | * | 11/1999 | Radogna et al. | 370/392 |
| 6,034,963 A | * | 3/2000 | Minami et al. | 370/401 |
| 6,069,886 A | * | 5/2000 | Ayerst et al. | 370/336 |
| 6,317,430 B1 | * | 11/2001 | Knisely et al. | 370/394 |
| 6,359,877 B1 | * | 3/2002 | Rathonyi et al. | 370/349 |
| 6,473,399 B1 | * | 10/2002 | Johansson et al. | 370/229 |
| 6,542,490 B1 | * | 4/2003 | Ahmadvand et al. | 370/338 |

FOREIGN PATENT DOCUMENTS

EP　　0 768806 A2　4/1997

OTHER PUBLICATIONS

Throughput analysis of some ARQ protocols in the presence of feedback errors by Cam et al.; IEEE; vol. 45 No. 1, Jan. 1997.*

Richard Cam and Cyril Leung; *Throughput Analysis of Some ARQ Protocols in the Presence of Feedback Errors;* IEEE Transactions on Communications; Jan. 1997; vol. 45, No. 1; pp. 35–44.

ISR, PCT/SE/ 00/00677, Completed Aug. 23, 2000.

* cited by examiner

*Primary Examiner*—Frantz B. Jean

(57) **ABSTRACT**

A method for minimizing feedback responses in an ARQ protocol is disclosed, whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. The S-PDUs are constructed so as to optimize performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of SNs included in an S-PDU of limited size.

**64 Claims, 3 Drawing Sheets**

| |
|---|
| type=LIST |
| LENGTH=0 |
| LENGTH=4 |
| $SN_1=1$ |
| $SN_2=25$ |
| $SN_3=50$ |
| $SN_4=95$ |



FIG.1
PRIOR ART

FIG. 2
PRIOR ART

FIG.3
PRIOR ART

FIG. 6

FIG. 5

FIG.4

| type=ACK |
|---|
| SN |

FIG. 7

| Type=BITMAP' |
|---|
| FSN |
| LENGTH |
| Bitmap |
| Type=LIST' |
| LENGTH |
| SN_1 |
| L_1 |
| ... |
| SN_LENGTH |
| L_LENGTH |
| Type=BITMAP' |
| LENGTH |
| bitmap |
| Type=NO_MORE |

FIG. 8

| Field | Field Value | | Field size |
|---|---|---|---|
| | Decimal | Bits | |
| LIST' | N/A' | 01 | 2 |
| LENGTH | 1 | 00001 | 5 |
| $SN_1$ | 51 | 000000110011 | 12 |
| $L_1$ | 27 | 11011 | 5 |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

FIG. 9

| Field | Field Value | | Field size |
|---|---|---|---|
| | Decimal | Bits | |
| LIST' | N/A | 01 | 2 |
| LENGTH | 0 | 00000 | 5 |
| LENGTH | 4 | 00100 | 5 |
| $SN_1$ | 1 | 000000000001 | 12 |
| $SN_2$ | 25 | 000000011001 | 12 |
| $SN_3$ | 50 | 000001100100 | 12 |
| $SN_4$ | 95 | 000001011111 | 12 |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

FIG.10

| Field | Field Value | | Field size |
|---|---|---|---|
| | decimal | Bits | |
| BITMAP' | N/A | 10 | 2 |
| LENGTH | 2 | 00010 | 5 |
| FSN | 27 | 000000011011 | 12 |
| Bitmap | 28-43 | 0001111011101011 | 16 |
| LIST' | N/A | 01 | 2 |
| LENGTH | 2 | 00010 | 5 |
| $SN_1$ | 91 | 000001011011 | 12 |
| $L_1$ | 3 | 00011 | 5 |
| $SN_1^2$ | 101 | 000001100101 | 12 |
| $L_2$ | 0 | 00000 | 5 |
| NO_MORE | N/A | 00 | 2 |

FIG. 11

A275

| Field | Field Value | | Field |
|---|---|---|---|
| | *decimal* | *Bits* | size |
| BITMAP' | N/A | 10 | 2 |
| LENGTH | 11 | 01011 | 5 |
| FSN | 3 | 000000000011 | 12 |
| Bitmap | 4-10 | 1110111 | 88 |
| | 11-20 | 0111101111 | |
| | 21-30 | 1111111111 | |
| | 31-40 | 1101111111 | |
| | 41-50 | 1111011111 | |
| | 51-60 | 1111011111 | |
| | 61-70 | 1111101111 | |
| | 71-80 | 1111111011 | |
| | 81-90 | 1011111111 | |
| | 91 | 0 | |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

FIG. 12

| Field | Field Value | | Field |
|---|---|---|---|
| | *decimal* | *Bits* | size |
| LIST' | N/A | 01 | 2 |
| LENGTH | 1 | 00001 | 5 |
| $SN_1$ | 10 | 000000001010 | 12 |
| $L_1$ | 20 | 10100 | 5 |
| BITMAP' | N/A | 10 | 2 |
| LENGTH | 1 | 00001 | 5 |
| Bitmap | 31-38 | 01011011 | 8 |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

FIG. 13

US 6,772,215 B1

1

# METHOD FOR MINIMIZING FEEDBACK RESPONSES IN ARQ PROTOCOLS

## CROSS-REFERENCES TO RELATED APPLICATIONS

This Application for Patent claims the benefit of priority from, and hereby incorporates by reference the entire disclosure, of co-pending U.S. Provisional Application for patent Ser. No. 60/128,517, filed Apr. 9, 1999.

## BACKGROUND OF THE INVENTION

### 1. Technical Field of the Invention

The present invention relates in general to the telecommunications field and, in particular, to a method for minimizing feedback responses in Automatic Repeat Request (ARQ) protocols, such as, for example, selective-repeat ARQ protocols.

### 2. Description of Related Art

When data is conveyed between nodes in a telecommunication network, certain algorithms are used to recover from the transmission of erroneous data and the loss of data on the transmission links between the nodes. An algorithm commonly used to recover from the transmission of erroneous data is referred to as an ARQ protocol.

The existing ARQ protocols (i.e., algorithms) include two peer entities that communicate with each other over transmission links. Each such entity includes a receiver and a sender. The units of data conveyed between the peer entities are commonly referred to as Protocol Data Units (PDUs). The ARQ protocols include certain rules for sending and receiving PDUs, as well as rules for the structure of the PDUs. As such, the name "Automatic Repeat Request" indicates the basic function of the protocol: the receiver requests the sender to retransmit those PDUs that were lost or contained errors during transmission.

The receiver can inform the sender about which PDUs were correctly received (i.e., receiver acknowledges correctly-received PDUs) or which PDUs were incorrectly received. When the sender receives this information, it retransmits the "lost" PDUs. In other words, an ARQ protocol is a set of rules that allow the use of efficient retransmission mechanisms between a sending side and receiving side in a communication system. These rules specify, for example, how and in what form the PDUs are to be constructed so that the receiving side can interpret the conveyed PDUs correctly and respond to them accordingly.

Three main types of information elements (PDUs) can be transferred between two ARQ peer entities: user data; error recovery control data; and common control data. These three types of PDUs can be found in all of the existing ARQ protocols. A user data PDU contains at least user data and a sequence number. An error recovery control data PDU contains various control information needed for error recovery and control functions such as positive and negative acknowledgments. A common control data PDU contains common control data.

In the known High Level Data Link Control (HDLC) protocol, which forms the basis for many existing ARQ protocols, the three types of PDUs are called, respectively, information frames (I-frames), supervisory frames (S-frames), and unnumbered frames (U-frames). Examples of HDLC-derived ARQ protocols are the Radio Link Protocol (RLP) used in the Global System for Mobile Communications (GSM), the Radio Link Control (RLC) and Logical Link Control (LLC) protocols used in the General Packet

2

Radio Service (GPRS), the Infrared Link Access Protocol (IrLAP) used in IrDA systems, and the LAP-B protocol used in X.25 systems. Notably, PDUs that include user data and at least a sequence number are denoted herein as Data-PDUs (D-PDUs), and PDUs that include control data needed for error control/recovery are denoted herein as Status-PDUs (S-PDUs).

In most communication systems, user data information is conveyed in both directions between the peer entities. A common feature included in an ARQ protocol is the possibility of including error control information in the user data PDUs. This capability is known as "piggybacking". For example, an acknowledgment is included in all I-frames (i.e., D-PDUs) of HDLC-derived protocols. The acknowledgment informs the peer entity about the sequence number of the last (in-sequence) correctly received PDU.

The most common existing ARQ protocols implement one or more mechanisms to recover from errors on a transmission link, such as a Stop-and-Wait ARQ, Go-back-N ARQ, and Selective-Repeat ARQ. The use of these mechanisms and ARQs is well known.

FIG. 1 is a sequence diagram that illustrates the use of ARQ protocols. As shown, two ARQ peer entities 10, 12 are communicating with each other. The arrows in FIG. 1 indicate the transmission of PDUs between the two entities, and the content of each PDU is described directly above the respective arrow. Referring to FIG. 1, a sequence of transmitted D-PDUs and S-PDUs is shown. A D-PDU includes user data, a sequence number (SN), and possibly piggybacked error control information. An S-PDU includes status information but no user information. A sequence number (SN=x) is associated with a D-PDU to identify that specific D-PDU. An acknowledgment (ACK=x) is used to acknowledge any PDU with a SN<x. A negative acknowledgment (NAK=x) is used to acknowledge that a PDU (with an SN=x) has not been correctly received.

Two types of error control feedback responses are shown in FIG. 1. For one of the feedback responses (e.g., S-PDU, ACK=2) 14, the second ARQ peer entity 12 has acknowledged that it has received the PDUs with the SN=0 and SN=1. For the second type of feedback response (e.g., S-PDU, NAK=3) 16, the second peer entity 12 has indicated that the PDU with the SN=3 was corrupted and should be retransmitted by the first peer entity 10.

As discussed above, the S-PDUs are special PDUs which are transmitted between peer entities. An S-PDU includes information about the SNs of corrupted PDUS. Two main methods are currently used for coding the SNs within S-PDUs. One such method is to use a list of SNs to be retransmitted. The second method is to use a bitmap to represent the SNs to be retransmitted. As such, apart from representing SNs, an S-PDU also includes a format identifier which can be used by a receiver to distinguish between the different PDU formats (i.e., D-PDUs and S-PDUs).

The list method used for coding SNs includes the SNs of the erroneous PDUs in the S-PDU. If the length of the list is not predefined and thereby known, this length information is indicated in the S-PDU. For example, a length field can be included in the S-PDU. FIG. 2 shows such an S-PDU, which can be created by a receiver using a list method for coding SNs.

Referring to FIG. 2, a receiver can create an S-PDU with the contents shown, if the sender has transmitted a sequence of D-PDUs with SNs=0–15, and the PDUs with SNs=3, 5, 6, 7 and 8 have failed (not been correctly received). For example, the first two elements in the list (after the length

US 6,772,215 B1

3

field) indicate that the D-PDU with SN=3 was erroneous. The third and fourth elements in the list indicate that the D-PDUs with SNs=5–8 were erroneous. The final element is included to acknowledge the remaining PDUs (SNs up to 15).

The size of the S-PDU depends on the number of bits used to represent the PDU format identifier field, the length field and the SN field. As such, the size of an S-PDU can be calculated by the expression:

$$\text{DU.SIZE}_{LIST} = \text{size}(pdu.\text{format.field}) + \text{size}(\text{length.field}) + \text{no.listelements} * \text{size}(\text{seq.no.field}). \quad (1)$$

For example, this list method is used in the SSCOP protocol, wherein two S-PDU formats exist and are denoted by the term "STAT" for a variable list length, and "USTAT" for a list with a limited number of elements (e.g., 2 elements).

FIG. 3 shows an S-PDU which can be created by a receiver using a bitmap method for coding SNs. When a bitmap is used to indicate SNs, the receiver creates the S-PDU from the SN of the last in-sequence correctly received D-PDU and a bitmap. This SN is referred to as a Start SN (SSN). Consequently, this S-PDU implicitly acknowledges all D-PDUs received up to the value of the SSN. Each location in the bitmap is used to address a specific S-PDU relative to the SSN. Typically, the size of the bitmap is fixed to the size of the ARQ receiver window and does not have to be explicitly indicated. If the bitmap is not fixed, the length has to be indicated.

The bitmap shown in FIG. 3 shows an S-PDU created from the example described above with respect to FIG. 2, and a window size of 16. As such, each location in the bitmap can have one of the two values, 0 or 1: A "1" means that SN=(SSN+bit_position) has been correctly received; and a "0" value means that SN=(SSN+bit_position) has not been correctly received. Of course, the meaning of the "0" and "1" values can be interchanged. The size of an S-PDU when using such a bitmap can be derived from the following expression:

$$\text{PDU.SIZE}_{BITMAP} = \text{size}(pdu.\text{format.field}) + \text{size}(\text{SSN.field}) + \text{size}(\text{bitmap.field}). \quad (2)$$

Both the RLC and LLC protocols in the GPRS system use such an expression and convey bitmaps between peer entities for error control purposes.

A significant problem with existing ARQ protocols is that they are static in construction (e.g., fixed length messages are used). In certain situations, this approach leads to a waste of bandwidth resources, because a great deal of overhead information is transmitted unnecessarily. For example, such situations can occur in systems having a large number of D-PDUs being transmitted between two ARQ peer entities, and these D-PDUs have to be acknowledged and selectively requested for retransmission. For some error control situations, the existing solutions introduce a significant amount of unnecessary overhead. The following example illustrates a situation.

In the Wideband-Code Division Multiple Access (WCDMA) system currently being standardized for the so-called 3rd Generation Cellular Communication System, one ARQ protocol used is an RLC protocol. The SN set includes the values 0–4095, which means that each SN is coded with 12 bits. An assumption can be made that for high data rates, a relatively large set of SNs will have to be addressed in some S-PDUs. Also, assume that the status of 100 D-PDUs (SN=1–100) needs to be communicated between the RLC peer entities in an S-PDU.

4

Table 1 below shows the number of bits needed to code an S-PDU using the list and bitmap methods described above. Different error circumstances are provided to highlight the large difference in the number of bits required for the two methods. Assume that the following element sizes are used: bitmap=128 bits; length=5 bits; and one PDU format identifier=1 bit (for distinguishing between a D-PDU and an S-PDU). As such, the different S-PDU sizes shown in Table 1 are calculated in accordance with Equations (1) and (2) above, respectively.

As illustrated by rows 2–5 in Table 1, both of the existing solutions have problems with efficiently building small S-PDUs for error circumstances shown. The length of the LIST does not depend so much on the number of erroneous D-PDUs, but rather on the distribution of the errors within the window used. This fact becomes evident by comparing rows 1 and 2 in Table 1.

TABLE 1

| | | | Size of S-PDU (bits) | |
| Erroneous D-PDUs | # | | | |
| (SN) | SN | LIST | BITMAP | |
|---|---|---|---|---|
| 1 | 51–77 | 27 | 42 | 141 |
| 2 | 1, 25, 50, 95 | 4 | 114 | 141 |
| 3 | 27–30, 35, 39, 41, 91–93 | 10 | 138 | 141 |
| 4 | 3, 7, 11, 16, 33, 45, 55, 66, 78, 82, 91 | 11 | 282 | 141 |
| 5 | 10–29, 31, 33, 36 | 23 | 114 | 141 |

A general statement of the problem to be solved is to determine how to efficiently represent (encode) in a message the status of an arbitrary amount and distribution of n numbers from a set of m numbers. As such, a significant need exists for a method that can be used to minimize the size of S-PDUs in an ARQ protocol Also, a significant need exists for a method that can be used to maximize the number of SNs in an S-PDU with limited size, if it is not possible to fit all potential SNs into a single S-PDU. As described in detail below, the present invention successfully resolves the above-described problems and other related problems.

SUMMARY OF THE INVENTION

In accordance with an embodiment of the present invention, a method for minimizing feedback responses in an ARQ protocol is provided, whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. In particular, these different mechanisms can be combined in a single S-PDU. The S-PDUs are constructed so as to optimize system performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of SNs included in an S-PDU of limited size.

An important technical advantage of the present invention is that radio interface bandwidth resources can be saved.

Another important technical advantage of the present invention is that protocol overhead can be minimized.

Still another important technical advantage of the present invention is that system capacity can be increased.

Yet another important technical advantage of the present invention is that the number of feedback responses in a selective-repeat ARQ protocol can be minimized.

BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the method and apparatus of the present invention may be had by reference to the

US 6,772,215 B1

5

following detailed description when taken in conjunction with the accompanying drawings wherein:

FIG. **1** is a sequence diagram that illustrates the use of ARQ protocols;

FIG. **2** is a diagram that shows an S-PDU which can be created by a receiver using an existing list method for coding SNs;

FIG. **3** is a diagram that shows an S-PDU which can be created by a receiver using an existing bitmap method for coding SNs;

FIG. **4** is a bitmap message for use in an S-PDU, constructed in accordance with a first embodiment of the present invention;

FIG. **5** is a diagram of a message with the fields and contents of the LIST S-PDU for row 2 in Table 1, constructed in accordance with the first embodiment of the present invention;

FIG. **6** is a diagram of the fields of a LIST' message in an S-PDU, constructed in accordance with the first embodiment of the present invention;

FIG. **7** is a diagram that shows the contents of an "ACK" message constructed in accordance with the second embodiment of the present invention;

FIG. **8** is a diagram that illustrates how an S-PDU can be constructed in accordance with the combination method of the second embodiment;

FIG. **9** is a diagram that shows the contents of row 1 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention;

FIG. **10** is a diagram that shows the contents of row 2 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention;

FIG. **11** is a. diagram that shows the contents of row 3 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention;

FIG. **12** is a diagram that shows the contents of row 4 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention; and

FIG. **13** is a diagram that shows the contents of row 5 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention.

## DETAILED DESCRIPTION OF THE DRAWINGS

The embodiments of the present invention and their advantages are best understood by referring to FIGS. **1**–**13** of the drawings, like numerals being used for like and corresponding parts of the various drawings.

Essentially, in accordance with a first embodiment of the present invention, a method for minimizing feedback responses in an ARQ protocol is provided, whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. The S-PDUs are constructed so as to optimize performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of SNs included in an S-PDU of limited size.

Specifically, hereinafter, the basic components being described are messages. For this embodiment, such a message can be described by using a Type, Length, Value (TLV) syntax. In other words, each message includes three fields. One field includes type information, the second field includes length information, and the third field includes a value. The size of the type field is preferably non-zero, while the sizes of the other two fields can be zero.

6

Notably, as mentioned earlier, all existing bitmap solutions include information about the sequence number (herein called the SSN) of the last received in-sequence D-PDU in a constructed S-PDU. The SSN indicates that no errors exist prior to that sequence number. In other words, the SSN is used to acknowledge all D-PDUs having SNs up to that of the SSN.

For this exemplary embodiment, a basic message to be used for minimizing feedback responses in an ARQ protocol can be constructed as follows. Using a BITMAP method for this embodiment, the SN included in a constructed S-PDU indicates the SN of any (not necessarily the first) erroneous D-PDU from the set of SNs. The status of the subsequent SNs are indicated in the bitmap. Although the SN of the first erroneous D-PDU is used in this exemplary embodiment, it should be understood that any D-PDU (from the SN set) can be used in the bitmap method instead. In that case, the bitmap also has to include the status (0 or 1) of the SN included in the constructed S-PDU. As such, a "BITMAP" message can be created with a type identifier field, a first SN (FSN) field, a bitmap length field, and a bitmap field. FIG. **4** illustrates a bitmap message with such fields for use in an S-PDU, in accordance with the first embodiment of the present invention.

Referring to the bitmap message shown in FIG. **4**, a number of methods can be used to represent the length of the bitmap (LENGTH field). For one method, a predefined number of bits can be used to represent the size of the bitmap in a basic data unit. Such a data unit can have any granularity and include, for example, one or more bits, bytes, words, etc. For example, if a byte is used as the basic data unit, the value, x, in the LENGTH field means that 8*x bits are covered by the bitmap. This resulting value also represents the size of the bitmap in bits.

For a second method used to represent the length of the bitmap, a different SN can be used to indicate the last SN covered by the bitmap. The size of the LENGTH field is then equal to the size of the FSN field. As such, the size of the bitmap can be calculated by subtracting the FSN value from the LENGTH value.

A third method that can be used for representing the length of the bitmap is to fix the size of the bitmap so that no LENGTH field is required in the S-PDU. Alternatively, the size of the LENGTH field can be set to zero. Also, the size of the FSN field can also be set to zero if the SN that the bitmap covers is signalled remotely. Such a method is described in more detail below.

Notably, a conventional data compression method can be used to compress the information in the bitmap field. As such, both normal and compressed bitmaps can be included in one S-PDU. In this case, the value of the type field for the compressed bitmap would be different than that for a normal bitmap.

As mentioned earlier, a significant drawback of the existing LIST methods is that two SNs are required for each error group. An error group comprises a single error or several consecutive errors of D-PDUs. In order to resolve such a problem using a LIST method in accordance with this exemplary embodiment, only erroneous SNs are listed. In other words, a new LIST type can be defined wherein only single errors are listed. Consequently, the size of a resulting S-PDU can be significantly reduced for certain error situations, in comparison with the existing LIST solutions.

Another method that can be used to reduce the size of S-PDUs, in accordance with this embodiment, is to combine an existing LIST method (2 SNs per error group) with the

US 6,772,215 B1

7

above-described single error SN LIST method to create the list message. For example, the existing LIST method can be improved significantly by introducing the following rules for creating the LENGTH field value:

(1) A zero value means that a single error SN LIST method is applied. A second (new) length field is included directly after the original LENGTH field to indicate the number of single erroneous SNs that follow directly after the second field. All list elements represent single erroneous SNs, and no acknowledgment is provided while using this list method.

(2) An odd value implies that the last list element is an acknowledgment.

(3) An even value (excluding zero) implies that the last element is not an acknowledgment. Consequently, following the above-described rules in accordance with this embodiment, the (LIST) S-PDU for row 2 in Table 1 now contains the fields and contents shown in FIG. 5. As such, if the field sizes shown in row 2 of the example illustrated by Table 1 were to be used with respect to the embodiment illustrated by FIG. 5, then the total size of the S-PDU would be 59 bits. Consequently, in accordance with the present invention, the number of bits needed for the resulting S-PDU is significantly smaller than the number of bits (114) needed for the existing LIST solution.

FIG. 6 is a diagram that illustrates another method that can be used to reduce the size of an S-PDU using a LIST method. The method used in accordance with this embodiment is to include a field after each list element which determines the length of the error, instead of indicating the length of the error with an "ending" SN. In most systems, the size of the length field would then be substantially smaller than the size of the SN field. Furthermore, typically there is no need to represent very large consecutive, erroneous D-PDUs (i.e., a large error group) in an S-PDU.

Referring to FIG. 6, the fields of a new message (denoted as LIST) in an S-PDU are shown. The new length field introduced after each $SN_i$ is denoted $L_i$ for $1 \leq i \leq LENGTH$. Notably, a value of zero can be used for $L_i$ to further improve the functionality of the resulting LIST' message. As such, the following alternatives can be used:

(1) A zero value for $L_i$ means that $SN_i$ is an acknowledgment (i.e., Li is not pointing out an error).

(2) A zero value represents the end of the LIST' message. The first LENGTH field can be omitted if the interpretation of the last SN has been predefined. For example, the last SN can be restricted so as to always be an acknowledgment (e.g., as in the first alternative), or the length can be predefined (e.g., so as to point out a single error).

In accordance with a second embodiment of the present invention, a number of different message types can be combined to create an S-PDU. These message types can be added in any arbitrary order in the S-PDU, and there is no rule on the number of messages or the type of message that can be included in the S-PDU. For this exemplary embodiment, each such message includes a type identifier, and the length is either fixed or indicated by a length field for each specific message. The first type identifier preferably has a predefined position in the resulting S-PDU. The rest of the type identifiers can be located at arbitrary locations depending on the sizes of the included messages. For example, the messages, LIST', BITMAP' and ACK can be included in the S-PDU.

The number of such messages that can possibly be included in an S-PDU determines the size (bits) of the type

8

identifier field used in the S-PDU. For example, the size of such a type identifier field can be determined by the following expression:

$$\text{ize(type. field)} = \lfloor \log_2(\text{number of possible messages}+1) \rfloor, \quad (3)$$

where the operator $\lfloor \ \rfloor$ rounds the argument off to the next highest integer value. The "+1" part of the argument is used so that a type identifier can be used to indicate that no other messages are included in an S-PDU. This special identifier is denoted herein as a "NO_MORE" message. As such, in accordance with Equation (3), the size of the type field is 2 bits for three different messages, because $\lfloor \log_2(4) \rfloor 2$.

The contents of an "ACK" message constructed in accordance with this embodiment are shown in FIG. 7. The ACK message shown includes a type identifier field and SN. This ACK message marks the end of an S-PDU, and all prior D-PDUs not indicated to be erroneous within this S-PDU are acknowledged by the SN. Consequently, when such an ACK message is included in an S-PDU, there is no need to include a NO_MORE message to terminate the combined S-PDU.

Assume that a LIST' message with an acknowledgment feature (i.e., a zero value for $L_i$ means that $SN_i$ is an acknowledgment) is used (with a LENGTH field). When a BITMAP' message is included directly after a LIST' message, the size of the FSN field is zero. As such, the first SN which is represented in the bitmap is $SN_{LENGTH} + L_{LENGTH}$. Furthermore, a zero in the LENGTH field of the LIST' message means that an additional LENGTH field is included, and the message is constructed as shown in FIG. 5 with no $L_{SNi}$ fields.

Another way to obtain the above-described LIST feature is to define a new type (denoted, for example, "LIST"). However, the size of the type field can be affected, which can result in a larger S-PDU. In any event, there is a trade-off (which is system dependent) to consider in selecting the exact rules to follow for the combination method described above.

FIG. 8 is a diagram that illustrates how an S-PDU can be constructed in accordance with the combination method described above. As shown, the resulting S-PDU includes two BITMAP' messages and one LIST' message. The second BITMAP' message does not include an FSN field (or, the size of the FSN field is zero). Consequently, the first element in the bitmap represents the SN having the value, $SN_{LENGTH} + L_{LENGTH}$.

In order to demonstrate the advantages of the above-described combination method, it can be applied to the example described above with respect to Table 1. As such, Table 2 shows different messages (along with their corresponding bit values) which can be combined in an S-PDU, in accordance with the second embodiment of the present invention. For this embodiment, each S-PDU starts with one of the type identifiers shown. Also, the sizes of the LENGTH and $L_{SNi}$ fields are fixed to 5 bits.

Consequently, these fields can each hold a value between $0-32(2^5)$. Notably, although the sizes of the fields are fixed, their sizes are not necessarily equal, as in this example (i.e., the size of the LENGTH field in the BITMAP' message can be different than the size of the LENGTH field in the LIST' message). The value of the LENGTH field in the BITMAP' message corresponds to the size of the bitmap in bytes (i.e., a maximum of $8*32=256$ SNs can be addressed in a single S-PDU). All of the fields containing an SN value have a size of 12 bits (i.e., the FSN, SN and SSN fields).

US 6,772,215 B1

9

10

**TABLE 2**

| Type Identifier | Value |
|---|---|
| NO__MORE | 00 |
| LIST' | 01 |
| BITMAP' | 10 |
| ACK | 11 |

FIG. **9–13**, respectively, are diagrams that show the contents of an S-PDU for each row shown in Table 1 for the above-described example. For this embodiment, the combination is selected so as to minimize the total size of the S-PDU.

As illustrated by the example described above with respect to Table 1, FIG. **9** shows the contents of row 1 in the resulting (combination) S-PDU, FIG. **10** shows the contents of row 2, and FIG. **11** shows the contents of row 3. Note that by including an ACK type instead of the list element $SN_i$ in FIG. **11**, an additional 5 bits can be saved with respect to the total size of the S-PDU. FIG. **12** shows the contents of row 4 in the resulting S-PDU, and FIG. **13** shows the contents of row 5. As such, the contents of the entire coded S-PDU can be obtained by concatenating all values from the "bits" column. For example, the contents of row 1 of the S-PDU (FIG. **9**) would appear as:

"01000010000001100111101111000001100101".

Table 3 shows the sizes of the S-PDUs constructed in accordance with the existing LIST and BITMAP methods, and also the combination method described above in accordance with the second embodiment. The sizes of the S-PDUs are calculated by adding the "Field size" columns in FIGS. **9–13**. As illustrated by Table 3, the size of the S-PDU resulting from the combination method of the present invention is significantly smaller than the S-PDUs resulting from the existing solutions.

**TABLE 3**

| | Size of S-PDU (bits) | | |
|---|---|---|---|
| | State-of-the-art solutions | | Combination |
| | LIST | BITMAP | solution |
| 1 | 42 | 141 | 38 |
| 2 | 114 | 141 | 74 |
| 3 | 138 | 141 | 78 |
| 4 | 282 | 141 | 121 |
| 5 | 114 | 141 | 53 |

In many ARQ protocols, the size of the D-PDUs is predefined and can have limited set of different values. Padding can be used if the amount of user data provided to the sending ARQ entity is smaller than the size of the D-PDU. Padding is a technical whereby nonsensical data is used to fill up the remaining empty locations in the D-PDU. For example, if a D-PDU can be filled with 20 bytes of user data, and the sending ARQ entity has only 14 bytes of user data, the rest of the D-PDU can be filled or padded with 6 bytes of padding data. The length of the user data part is indicated in the D-PDU. The RLC protocol in the GPRS and W-CDMA systems use this type of padding function.

The combination method of the second embodiment can also be used efficiently with piggybacking. For example, an ARQ entity can piggyback status information after the end of the last user data byte, if enough space exists to fill the padding fields with a status message. A NO MORE type

identifier is used whenever there is no status information to be included in a D-PDU which contains padding bytes. This piggybacking scheme advantageously reduces the number of packets being exchanged between two ARQ entities and, consequently, saves system capacity. The cost for such a piggybacking scheme is relatively low, because no field is reserved in the D-PDU for the piggybacking scheme, which is the case for existing ARQ protocols that use piggybacking.

Although embodiments of the method and apparatus of the present invention have been illustrated in the accompanying Drawings and described in the foregoing Detailed Description, it will be understood that the invention is not limited to the embodiments disclosed, but is capable of numerous rearrangements, modifications and substitutions without departing from the spirit of the invention as set forth and defined by the following claims.

What is claimed is:

1. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

   sending a plurality of first data units over a communication link;

   receiving said plurality of first data units; and

   responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a sequence number field, a length field, and a content field.

2. The method of claim **1**, wherein said message field comprises a bitmap message.

3. The method of claim **1**, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

4. The method of claim **1**, wherein said sequence number field includes any sequence number from said plurality of first data units.

5. The method of claim **1**, wherein said length field comprises a length value for said content field.

6. The method of claim **1**, wherein said content field comprises a bitmap.

7. The method of claim **1**, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

8. The method of claim **1**, wherein said second data unit comprises information about missing or erroneous said first data units.

9. The method of claim **1**, wherein the size of said length field is zero and a predefined bitmap size is used.

10. The method of claim **1**, wherein said length field indicates a final sequence number in a bitmap.

11. The method of claim **1**, wherein said length field comprises a value of zero.

12. The method of claim **1**, wherein a size of said sequence number field equals zero.

13. The method of claim **1**, wherein at least one of said plurality of first data units is used to piggy-back said message field.

14. The method of claim **1**, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

15. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

   sending a plurality of first data units over a communication link;

   receiving said plurality of first data units; and

   responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of, a length field,

US 6,772,215 B1

11 12

a plurality of erroneous sequence number-fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

**16**. The method of claim **15**, wherein said message field comprises a list message.

**17**. The method of claim **15**, wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

**18**. The method of claim **15**, wherein said length field comprises a value of zero.

**19**. The method of claim **15**, wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

**20**. The method of claim **15**, wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

**21**. The method of claim **15**, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

**22**. The method of claim **15**, wherein said second data unit comprises information about missing or erroneous said first data units.

**23**. The method of claim **15**, wherein at least one of said plurality of first data units is used to piggy-back said one message field.

**24**. The method of claim **15**, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

**25**. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing between one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

**26**. The method of claim **25**, wherein said one to several message fields further comprise an acknowledgment message.

**27**. The method of claim **25**, wherein the last of said one to several message fields includes an acknowledgment of all SNs not indicated erroneous by all other of said one to several message fields in said second data unit.

**28**. The method of claim **25**, wherein said one to several message fields further comprise a no more message.

**29**. The method of claim **25**, wherein said one to several message fields include a bitmap message.

**30**. The method of claim **25**, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

**31**. The method of claim **25**, wherein said length field comprises a length value for said content field.

**32**. The method of claim **25**, wherein said content field comprises a bitmap.

**33**. The method of claim **25**, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

**34**. The method of claim **25**, wherein said second data unit comprises information about missing or erroneous said first data units.

**35**. The method of claim **25**, wherein the size of said length field is zero and a predefined bitmap size is used.

**36**. The method of claim **25**, wherein said length field indicates a final sequence number in a bitmap.

**37**. The method of claim **25**, wherein said length field comprises a value of zero.

**38**. The method of claim **25**, wherein a size of said sequence number field equals zero.

**39**. The method of claim **25**, wherein said one to several message fields include a list message.

**40**. The method of claim **25**, wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

**41**. The method of claim **25**, wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

**42**. The method of claim **25**, wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

**43**. The method of claim **25**, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

**44**. The method of claim **25**, wherein at least one of said plurality of first data units is used to piggy-back said one to several message fields.

**45**. A system for minimizing feedback responses in an ARQ protocol, comprising:

a first peer entity;

a second peer entity; and

a communication link coupled between said first peer entity and said second peer entity for communicating data therebetween;

said first peer entity including means for sending a plurality of first data units over said communication link to said second peer entity;

said second peer entity including means for receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

**46**. The system of claim **45**, wherein said one to several message fields further comprise an acknowledgment message.

**47**. The system of claim **45**, wherein the last of said one to several message fields includes an acknowledgment of all SNs not indicated erroneous by all other of said one to several message fields in said second data unit.

**48**. The system of claim **45**, wherein said one to several message fields further comprise a no more message.

**49**. The system of claim **45**, wherein said one to several message fields include a bitmap message.

**50**. The system of claim **45**, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

**51**. The system of claim **45**, wherein said length field comprises a length value for said content field.

**52**. The system of claim **45**, wherein said content field comprises a bitmap.

**53**. The system of claim **45**, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

US 6,772,215 B1

13

**54**. The system of claim **45**, wherein said second data unit comprises information about missing or erroneous said first data units.

**55**. The system of claim **45**, wherein the size of said length field is zero and a predefined bitmap size is used.

**56**. The system of claim **45**, wherein said length field indicates a final sequence number in a bitmap.

**57**. The system of claim **45**, wherein said length field comprises a value of zero.

**58**. The system of claim **45**, wherein a size of said sequence number field equals zero.

**59**. The system of claim **45**, wherein said one to several message fields include a list message.

**60**. The system of claim **45**, wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

14

**61**. The system of claim **45**, wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

**62**. The system of claim **45**, wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

**63**. The system of claim **45**, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

**64**. The system of claim **45**, wherein at least one of said plurality of first data units is used to piggy-back said one to several message fields.

* * * * *

# **TAB 11**

```
 1              UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____

      MICROSOFT CORPORATION,        )
 4                                   )
                     Plaintiff,      )
 5                                   )  C10-1823-JLR
      v.                             )
 6                                   )  August 26, 2013
      MOTOROLA, INC., et al,         )
 7                                   )       TRIAL
                     Defendant.      )
 8                                   )

 9    _____

10           BEFORE THE HONORABLE JAMES L. ROBART
                UNITED STATES DISTRICT JUDGE
11    _____

12

      APPEARANCES:
13

14    For the Plaintiff:       Arthur Harrigan, Christopher
                                Wion, David Pritikin, Richard
15                              Cederoth, Andy Culbert, Nathaniel
                                Love and Ellen Robbins
16

17

18    For the Defendants:      Ralph Palumbo, William Price,
19                             Brian Cannon, Kathleen Sullivan,
                                Andrea Roberts and Phillip McCune
20

21

22

23

24

25
```

1    The other thing I remind you is the difference between an

2   opening statement and a closing argument.  So don't have your

3   expectations too high to see any fireworks.  And at this time

4   I'm going to ask the clerk to swear you all in as jurors.

5                    (The jury panel was sworn.)

6            THE COURT:  Ladies and gentlemen, when I have

7   occasion these days to fly across country -- I do it a lot

8   less than when I was a lawyer in private practice -- I always

9   buy a really cheap Elmore Leonard novel, and then turn to the

10  last page to find out who did it.  I'm going to ask you not

11  to do that.  Studies show that if we read you something and

12  you have it in front of you and can follow along, your

13  retention of that material is quite a bit higher.  So I would

14  ask that you not flip ahead to see "who did it" but follow

15  along with me as I read these.

16       No. 1.  Duty of the jury.  Ladies and gentlemen, you are

17  now the jury in this case.  It is my duty to instruct you on

18  the law.  You must not infer from these instructions, or from

19  anything I may say or do, as indicating that I have an

20  opinion regarding the evidence or what your verdict should

21  be.  It is your duty to find the facts from all the evidence

22  in the case.  To those facts you will apply the law as I give

23  it to you.  You must follow the law as I give it to you,

24  whether you agree with it or not.  You are not to be

25  influenced by any personal likes or dislikes, opinions,

1 breach of its RAND commitments and denies that it violated

2 any duty of good faith and fair dealing implied in its

3 contract with the IEEE and the ITU.  Motorola also denies

4 that any of its conduct in this case caused Microsoft

5 damages.  Motorola contends that Microsoft has not taken

6 reasonable steps to mitigate any damages that it may have

7 suffered.

8     Having given you this general overview, I will now provide

9 you with additional detail on some of the concepts that are

10 important in this case.  The owner of a patent that is not a

11 standards-essential patent may grant licenses to other

12 companies permitting them to sell products that include the

13 patent owner's patented technology.  Such licenses may

14 require payment of a licensing fee, which is sometimes called

15 a royalty payment.  If the patent is not a

16 standards-essential patent, then the owner of the patent can

17 charge as much as it wants for the license.  If the price is

18 too high, the other companies can just walk away and not use

19 the patents.

20     There are different rules regarding standards and

21 standards-essential patents.  When a standard becomes widely

22 implemented or adopted, the owner of a standards-essential

23 patent could have substantial leverage to demand excessive

24 royalties.  Indeed, there may have been alternatives to the

25 patented technology available when the standard was agreed

1    to, but after the standard is widely adopted by the industry,

2    switching to those alternatives is either no longer viable or

3    would be too expensive.

4        The ability of an owner of a standards-essential patent to

5    demand more than the value of its patented technology and

6    attempt to capture that value that comes from being the

7    standard is called "hold-up."  Hold-up can undermine the

8    standard-setting process and threaten the adoption of

9    valuable standards.

10       Another issue with standards and standards-essential

11   patents is called royalty stacking, which occurs when many

12   different holders of standards-essential patents seeks

13   excessive royalty payments for a given standard.  If there

14   are a large number of owners of standards-essential patents

15   for a given standard, the total royalty payments might make

16   the product too expensive to make and sell and undermine the

17   standard.

18       Complex industry standards like H.264 and 802.11 can

19   require the use of hundreds or thousands of

20   standards-essential patents held by dozens of patent holders.

21   Stacking concerns arise if the total "stack" of royalty

22   payments would make the use of the standard too expensive and

23   the standard would potentially fail in the market.  Royalty

24   stacking can be an even bigger problem for products that must

25   comply with multiple standards.  The RAND commitment seeks to

1   prevent royalty stacking and ensures that the aggregate

2   royalties associated with a given standard are reasonable.

3       To address the problems of hold-up and stacking, many

4   standard-setting organizations, including the IEEE and the

5   ITU, have adopted rules relating to the licensing of

6   essential patents.  Their policies require or encourage

7   companies participating in the standard-setting process to

8   agree to license their standards-essential patents on

9   reasonable and non-discriminatory or RAND terms to anyone who

10  requests a license.  These agreements are contracts called

11  RAND commitments.

12      The purpose of these contracts is to encourage widespread

13  adoption of the standard and prevent hold-up and royalty

14  stacking.  RAND commitments address the hold-up problem

15  because a RAND commitment limits a patent holder to a

16  reasonable royalty on the economic value of its patented

17  technology alone, not any value of the standard.  RAND

18  commitments address the stacking problem by ensuring that the

19  total royalties for all standards-essential patents within

20  any standard are reasonable and non-discriminatory.

21      As I mentioned earlier, this case involves two standards

22  called 802.11 and H.264.  The 802.11 standard is a wireless

23  communication standard developed over many years by the IEEE,

24  and you may know it by its more common name of "WiFi."  The

25  H.264 standard is a video coding compression standard.

1   Popular examples of technologies that use the H.264 video

2   compression standard include Blu-ray movies and YouTube

3   videos.  Two different standard-setting organizations were

4   involved in developing the H.264 standard, but for

5   simplicity, I will refer to H.264's standard-setting

6   organizations as just ITU.

7       The 802.11 standard allows companies to build products for

8   wireless local area networking of computers and other

9   electronic devices.  If you have a home WiFi network, a

10  computer chip in your laptop uses the 802.11 standard to

11  connect to that network through the internet.  The 802.11

12  standard is the most widely used and universally accepted

13  wireless communication standard for ordinary and consumer

14  business use.

15      Although there are many video coding standards, the H.264

16  standard developed by the ITU is currently the most widely

17  used video coding and compression format.  Video coding and

18  compression is the process of transforming video into

19  compressed files that take up less space.  When a consumer is

20  ready to watch a video, the video will be decoded by hardware

21  or software on the device that is being used to watch the

22  video.  Such a computer decoding turns an encoded smaller

23  file back into an uncompressed video for viewing.

24      I will now explain the rules that the IEEE and the ITU

25  adopted and the RAND licensing commitments that Motorola made

1   to the IEEE and ITU.  The ITU's policies require that a

2   patent essential to the H.264 standard must be accessible to

3   everyone without undue constraints.  When patent owners

4   disclose they may have a patent essential to the standard,

5   the ITU will seek a licensing commitment from the patent

6   holder.  The licensing commitment is often referred to as a

7   Letter of Assurance, or an LOA for short.  The ITU provides

8   three options:  First, the patent holder may commit to

9   license its standards-essential patents on a royalty-free

10  basis; second, the patent holder may commit to license its

11  standards-essential patents on RAND -- again, reasonable and

12  non-discriminatory -- or, third, the patent holder may

13  decline to make any licensing commitment.  However, if a

14  standard essential holder declines to make to make a RAND or

15  royalty-free licensing commitment, the ITU's policy is that

16  the standard will not include any technology that might

17  depend on the patent.  In other words, either the patented

18  technology must be free, or the licensing terms must be

19  reasonable and non-discriminatory; otherwise, the ITU will

20  not incorporate the technology in the standard.

21      Motorola submitted several Letters of Assurance to the ITU

22  in connection with its H.264 standards-essential patents.

23  Motorola's Letters of Assurance stated it would grant

24  licenses to an unrestricted number of applicants on a

25  worldwide, non-discriminatory basis and on reasonable terms

1  and conditioned on reciprocity.  Reciprocity means if Company

2  X wanted a license on RAND terms to Motorola's H.264 patents,

3  it has to provide Motorola with a license on RAND terms to

4  any of Company X's H.264 patents.

5      Like the ITU, the IEEE has policies that encourage

6  standards-essential patent holders to make RAND commitments

7  and provide Letters of Assurance.  The IEEE does not require

8  that specific patents be identified; instead, it only

9  requires that the contributing patent holder make the

10  licensing commitment for all patents that may potentially be

11  essential to the standard.  Like the ITU, the IEEE

12  historically has not included technology into a standard

13  unless it obtained such a Letter of Assurance from the holder

14  of standards essential patents.  Motorola submitted Letters

15  of Assurance to the IEEE and agreed to grant licenses to any

16  of its patents that are essential to the 802.11 standard on

17  RAND terms.

18      The IEEE and the ITU do not define what RAND licensing

19  terms are, but leave negotiation of such terms to the parties

20  involved.

21      The primary Microsoft products at issue in this case that

22  use the H.264 standard are Windows and Xbox.  Windows is an

23  operating system for computers.  Xbox is historically a video

24  game player, but now also plays video from sources on the

25  internet and can be used to play DVDs.  As for the 802.11