Appeal Nos. 2013-1625, -1631, -1632, -1633

# United States Court of Appeals

*for the*

# Federal Circuit

ERICSSON, INC. and TELEFONAKTIEBOLAGET LM ERICSSON,

*Plaintiffs-Appellees,*

– v. –

D-LINK SYSTEMS, INC., NETGEAR, INC., ACER, INC.,
ACER AMERICA CORPORATION, and GATEWAY, INC.,

*Defendants-Appellants,*

*(For Continuation of Caption See Next Page)*

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TEXAS IN CASE NO. 10-CV-0473,
CHIEF JUDGE LEONARD DAVIS

## BRIEF OF *AMICI CURIAE* CISCO SYSTEMS, INC., ARUBA NETWORKS, INC., HEWLETT-PACKARD COMPANY, RUCKUS WIRELESS, INC., SAFEWAY INC., AND SAS INSTITUTE INC. IN SUPPORT OF APPELLANTS AND IN SUPPORT OF REVERSAL WITH RESPECT TO DAMAGES

JEFFREY BLUMENFELD
PRINCIPAL ATTORNEY
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 262-6700

*Counsel for Amici Curiae*
*Cisco Systems, Inc., Aruba Networks, Inc.,*
*Ruckus Wireless, Inc., Safeway Inc., and*
*SAS Institute Inc.*

MARTA BECKWITH
CISCO SYSTEMS, INC.
170 West Tasman Drive
San Jose, California 95134
(408) 526-4000

*Counsel for Amicus Curiae*
*Cisco Systems, Inc.*

Barry K. Shelton
BRACEWELL & GIULIANI
111 Congress Avenue
Suite 2300
Austin, Texas 78701-4061
(512) 494-3693

*Counsel for Amicus Curiae*
*Hewlett-Packard Company*

– and –

DELL, INC.,

*Defendant-Appellant,*

– and –

TOSHIBA AMERICA INFORMATION SYSTEMS, INC.
and TOSHIBA CORPORATION,

*Defendants-Appellants,*

– and –

INTEL CORPORATION,

*Intervenor-Appellant,*

– and –

BELKIN INTERNATIONAL, INC.,

*Defendant.*

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

ERICSSON, INC. v.  D-LINK SYSTEMS, INC.,

2013-1625, -1631, -1632, -1633

**CERTIFICATE OF INTEREST**

Counsel for *Amicus Curiae*, Cisco Systems, Inc., certifies the following:

1.      The full name of *amicus curiae* represented by me is:

Cisco Systems, Inc.

2.      The name of the real party in interest (if the name in the caption is not the real party in interest) represented by me is:

None

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the *amici curiae* represented by me are:

None

4.      The names of all law firms and the partners or associates that appeared for the *amici curiae* now represented by me in the trial court or agency or are expected to appear in this court are:

None

December 23, 2013

*/s/ Jeffrey Blumenfeld*
Jeffrey Blumenfeld

cc:   Counsel of Record

i

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

ERICSSON, INC. v.  D-LINK SYSTEMS, INC.,

2013-1625, -1631, -1632, -1633

**CERTIFICATE OF INTEREST**

Counsel for *Amicus Curiae*, Aruba Networks, Inc. certifies the following:

1.       The full name of *amicus curiae* represented by me is:

Aruba Networks Inc.

2.       The name of the real party in interest (if the name in the caption is not the real party in interest) represented by me is:

None

3.       All parent corporations and any publicly held companies that own 10 percent or more of the stock of the *amici curiae* represented by me are:

None

4.       The names of all law firms and the partners or associates that appeared for the *amici curiae* now represented by me in the trial court or agency or are expected to appear in this court are:

None

December 23, 2013

*/s/ Jeffrey Blumenfeld*
Jeffrey Blumenfeld

cc:    Counsel of Record

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ERICSSON, INC. v.  D-LINK SYSTEMS, INC.,

2013-1625, -1631, -1632, -1633

## CERTIFICATE OF INTEREST

Counsel for *Amicus Curiae*, Ruckus Wireless, Inc. certifies the following:

1.  The full name of *amicus curiae* represented by me is:

Ruckus Wireless, Inc.

2.    The name of the real party in interest (if the name in the caption is not the real party in interest) represented by me is:

None

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the *amici curiae* represented by me are:

None

4.    The names of all law firms and the partners or associates that appeared for the *amici curiae* now represented by me in the trial court or agency or are expected to appear in this court are:

None

December 23, 2013

*/s/ Jeffrey Blumenfeld*
Jeffrey Blumenfeld

cc:    Counsel of Record

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ERICSSON, INC. v. D-LINK SYSTEMS, INC.,

2013-1625, -1631, -1632, -1633

## CERTIFICATE OF INTEREST

Counsel for *Amicus Curiae*, Safeway Inc. certifies the following:

1.  The full name of *amicus curiae* represented by me is:

Safeway Inc.

2.  The name of the real party in interest (if the name in the caption is not the real party in interest) represented by me is:

None

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the *amici curiae* represented by me are:

None

4.  The names of all law firms and the partners or associates that appeared for the *amici curiae* now represented by me in the trial court or agency or are expected to appear in this court are:

None

December 23, 2013

*/s/ Jeffrey Blumenfeld*
Jeffrey Blumenfeld

cc:    Counsel of Record

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ERICSSON, INC. v. D-LINK SYSTEMS, INC.,

2013-1625, -1631, -1632, -1633

## CERTIFICATE OF INTEREST

Counsel for *Amicus Curiae*, SAS Institute Inc. certifies the following:

1. The full name of *amicus curiae* represented by me is:

    SAS Institute Inc.

2. The name of the real party in interest (if the name in the caption is not the real party in interest) represented by me is:

    None

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the *amici curiae* represented by me are:

    None

4. The names of all law firms and the partners or associates that appeared for the *amici curiae* now represented by me in the trial court or agency or are expected to appear in this court are:

    None

December 23, 2013

*/s/ Jeffrey Blumenfeld*

Jeffrey Blumenfeld

cc:     Counsel of Record

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

ERICSSON, INC. v.  D-LINK SYSTEMS, INC.,

2013-1625, -1631, -1632, -1633

**CERTIFICATE OF INTEREST**

Counsel for *Amicus Curiae*, Hewlett-Packard Company. certifies the following:

1.      The full name of *amicus curiae* represented by me is:

Hewlett-Packard Company

2.      The name of the real party in interest (if the name in the caption is not the real party in interest) represented by me is:

None

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the *amici curiae* represented by me are:

None

4.      The names of all law firms and the partners or associates that appeared for the *amici curiae* now represented by me in the trial court or agency or are expected to appear in this court are:

None

December 23, 2013

*/s/ Barry K. Shelton*
Barry K. Shelton

cc:      Counsel of Record

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................ix

INTERESTS OF AMICI CURIAE...........................................................1

INTRODUCTION ...................................................................................1

ARGUMENT ..........................................................................................4

I.   REASONABLE ROYALTY DAMAGES, WHETHER FOR A RAND-ENCUMBERED PATENT OR FOR A NON-RAND-ENCUMBERED PATENT, MUST BE BASED ON THE PARTICULAR AND SPECIFIC CONTRIBUTION OF THE INVENTION DISCLOSED IN THE PATENT.......................................................................................4

   A.   Calculation of a Reasonable Royalty Requires a Rigorous Analysis to Identify and Isolate the Inventive Value of the Patented Technology. ...........................................................5

   B.   Applying this Rigorous Analysis in the Real World Requires Several Apportionment Steps............................................6

      1.   The Smallest Saleable Unit Should be Used as a Starting Point for the Analysis....................................................7

      2.   Determine the Operating Profit Attributable to that SSU.........10

      3.   Apportion that Operating Profit Between the Patented Invention and the Other Inventions Contained in that SSU. ...........................................................12

II.  FOR ALL PATENTS, BUT PARTICULARLY FOR RAND-ENCUMBERED PATENTS, THE VALUE ATTRIBUTED TO THE PATENTED INVENTION MUST EXCLUDE VALUE DUE TO "LOCK-IN" OR "HOLD-UP." .......................................................13

III. A REASONABLE ROYALTY FOR A STANDARD-ESSENTIAL PATENT MUST BE RAND.........................................................20

   A.   By Participating in Standards Setting, a SEP Patentee Makes Tradeoffs in its Economic Self-Interest. ...........................20

B.    Determination of a RAND Royalty Differs from a Traditional Damages Analysis. ..............................................................................21

1.    RAND Royalty Analysis Must Consider the Broader Industry Within Which the Defendant Participates to Achieve Royalties that are "Non-Discriminatory." ..................22

2.    A RAND Royalty Rate Must Take into Account Royalty Stacking. ....................................................................................23

IV.  THE AMOUNTS SOUGHT AND RECEIVED BY ERICSSON ARE INCONSISTENT WITH A PROPER APPORTIONMENT ANALYSIS AND WITH ERICSSON'S RAND OBLIGATION ........................................26

CONCLUSION ........................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988)................................................................................14

*Apple, Inc. v. Motorola Mobility, Inc.*,
  No. 11-cv-178, 2011 WL 7324582 (W.D. Wis. June 7, 2011) .........................13

*AVM Techs., LLC v. Intel Corp*,
  No. 10-610-RGA, 2013 WL 126233 (D. Del. Jan. 4, 2013) ..............................12

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d. Cir. 2007) ...........................................................................13

*Cornell Univ. v. Hewlett-Packard Co.*,
  609 F. Supp. 2d 279 (N.D.N.Y. 2009)................................................................8

*Dynetix Design Solutions, Inc. v. Synopsis, Inc.*,
  No. C 11-05973, 2013 WL 4538210 (N.D. Cal. Aug. 22, 2013) ........................8

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)........................................................................................17

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  No. 6:10-CV-473, 2013 WL 4046225 (E.D. Tex. Aug. 5, 2013).................19, 25

*Garretson v. Clark*,
  111 U.S. 120 (1884)..........................................................................................6

*In re Innovatio IP Ventures LLC Patent Litig.*,
  No. 11C 9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013)........................passim

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F3d 51 (Fed. Cir. 2012) .............................................................................8

*Lucent Techs., Inc. v Gateway, Inc.*,
  580 F.3d 1301 (Fed Cir 2009) .....................................................................7, 11

*Microsoft Inc. v. Motorola, Inc.*, No. C10–1823JLR, 2013 WL 2111217
  (W.D. Wash. Apr. 25, 2013)........................................................................18, 19

*Uniloc USA, Inc. v. Microsoft Corp*.,
632 F.3d 1292 (Fed. Cir. 2011) ...........................................................................12

**OTHER AUTHORITIES**

Amicus Curiae Brief of the IEEE In Support of Neither Party at 2-5, *Apple,
Inc. v. Motorola Mobility, Inc.*, No. 12-1548 (Fed. Cir., ECF No. 113,
Dec. 19, 2012).........................................................................................................13

Fed. Trade Comm'n, The Evolving IP Marketplace: Aligning Patent Notice
and Remedies with Competition (Mar. 2011) *available at*
http://www.ftc.gov/sites/default/files/documents/reports/evolving-ip-
marketplace-aligning-patent-notice-and-remedies-competition-report-
federal-trade/110307patentreport.pdf .............................................................9, 16

Investopedia, *Operating Profit*,
http://www.investopedia.com/terms/o/operating_profit.asp .............................11

Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*,
85 Tex. L. Rev. Vol. 1991 (2007)........................................................................24

Posting of Daniel O'Connor (Oct. 17, 2012), *http://www.project-
disco.org/intellectual-property/one-in-six-active-u-s-patents-pertain-to-
the-smartphone* ......................................................................................................4

Posting of Mike Masnick (Oct. 18, 2012 08:28 EST),
*http://www.techdirt.com/blog/innovation/articles/20121017/1048052073
4/there-are-250000-active-patents-that-impact-smartphones-
representing-one-six-active-patents-today.shtml*. ..................................................4

Joseph S. Miller, *Standard Setting, Patents and Access Lock-In: RAND
Licensing and the Theory of the Firm*, 40 Ind. L. Rev. 351 (2007) ...................21

Press Release, Dep't of Justice, Antitrust Div., Statement of the Department
of Justice's Antitrust Division on Its Decision to Close Its Investigations
of Google Inc.'s Acquisition of Motorola Mobility Holdings Inc. and the
Acquisitions of Certain Patents by Apple Inc., Microsoft Corp. and
Research in Motion Ltd a (Feb. 13, 2013), *available at*
http://www.justice.gov/atr/public/press_releases/2012/280190.pdf. ...............16

*Standards-Setting Practices: Competition, Innovation and Consumer Welfare*, *Hearing Before the Dep't of Justice, Antitrust Div. and Fed. Trade Comm'n* (Apr. 18, 2002), *available at* http://www.ftc.gov/sites/default/files/documents/public_events/competiti on-ip-law-policy-knowledge-based-economy-hearings/020418trans.pdf..........14

Written Comments of Verizon Communications Inc. for Fed. Trade Comm'n Workshop on Standard-Setting Issues, Patent Standards Workshop, Project No. P11 1204 (Aug. 5, 2011), *available at* http://www.ftc.gov/sites/default/files/documents/public_comments/reque st-comments-and-announcement-workshop-standard-setting-issues- project-no.p111204-00051%C2%A0/00051-80236.pdf.  .................................24

## INTERESTS OF *AMICI CURIAE*

*Amici curiae* make, use, or sell products that comply with the 802.11n or other 802.11 standards.  Each has faced or is facing patent infringement actions in which the patent owner seeks damages far in excess of the value of the patented invention.  Cisco participated in the development of the 802.11n standard at issue here and committed to license its 802.11n standard-essential patents on RAND terms.  Thus, *amici* have an interest in ensuring that damages for RAND-encumbered, 802.11 standard-essential patents are properly determined.[1]  *Amici* file this brief with the consent of all parties to this appeal.

For purposes of Rule 29 of the Federal Rules of Appellate Procedure, no party's counsel played any role in authoring this brief, no party or party's counsel contributed money that was intended to fund preparation or submission of the brief, and no person other than the *amici curiae*, or their counsel, contributed money that was intended to fund preparation or submission of this brief.

## INTRODUCTION

Any methodology for calculating a reasonable royalty must be economically rational, rewarding a patentee with a reasonable royalty on the value of the inventive aspect of its patented technology, but not for anything in excess of that value, and certainly not for value that was *not* contributed by the patented

---

[1] *Amici* do not take a position as to whether the patents at issue here are, in fact, standard essential.

1

invention.  Just as it is economically rational to reward a patentee for the inventive value of its invention, it is economically *irrational* to reward a patentee for value contributed by others.

The economically sound principle that a patent holder should be rewarded only for the value of its own contribution also is a bedrock principle of patent law. A patentee is entitled to reasonable royalties "for the use made of the invention," not for the use made in the accused product[2] of other inventions and not for other features, functions and factors that contribute to the value of the accused product but are *not* attributable to the patented invention.

Accordingly, a methodology for calculating a reasonable royalty must carefully distinguish between the value contributed by the patent at issue and the value contributed by other aspects of an accused product.  In this regard, the methodology for calculating royalties for a patent essential to the practice of a standard (a "standard-essential patent" or "SEP") and subject to a RAND obligation (a "RAND-encumbered SEP"), and for a patent not subject to a RAND obligation, are the same.  And both a RAND analysis and a traditional reasonable royalty analysis require exclusion of any value due to "lock-in" or "hold-up."

---

[2] The terminology "product" or "device" as used in this brief is intended broadly to cover products, components, apparatus, methods, processes, systems and anything else amenable to patenting.

2

However, determining a RAND royalty differs in some respects, requiring additional analysis. First, RAND requires that the reasonable royalty be non-discriminatory, *i.e.*, that all licensees be treated the same. This means that a RAND analysis should not be based on the specific circumstances, or relative bargaining positions, of the patentee and the accused infringer. The analysis must yield a result that is truly non-discriminatory as applied to all participants across the entire industry.

A SEP owner makes a voluntary commitment to RAND licensing to pursue its own economic interests in standard setting. Similarly, a licensee pursues its own economic interests in implementing the standard. Therefore, in a hypothetical negotiation for a RAND license, both the licensee *and the licensor* should be deemed to have an interest in the success of the standard and therefore in not unduly burdening the standard with royalties that would be excessive either for the asserted patents or in the aggregate across all SEPs. For this and other reasons discussed below, a RAND royalty must take into account the total value of all SEPs relative to the patent at issue; the value of each SEP must be set such that the overall royalties for all SEPs is reasonable in the aggregate, and for all potential licensees.

3

The royalty awarded here did not comport with a proper apportionment analysis and did not comply with Ericsson's obligation to license on reasonable and non-discriminatory ("RAND") terms.

## ARGUMENT

I.  **REASONABLE ROYALTY DAMAGES, WHETHER FOR A RAND-ENCUMBERED PATENT OR FOR A NON-RAND-ENCUMBERED PATENT, MUST BE BASED ON THE PARTICULAR AND SPECIFIC CONTRIBUTION OF THE INVENTION DISCLOSED IN THE PATENT.**

The devices at issue in this case are complex, incorporating multiple technologies providing numerous features. Each technology may be covered by hundreds or thousands of patents, but each contributes only a small portion of the overall value of the device.[3] In addition, a device derives value from factors other than the technology it contains, including quality of manufacture, reliability, brand name, product design, packaging, advertising, marketing, sales, and customer support. A patentee generally has no claim on the value contributed by any of these other technologies, patents, or factors.

---

[3] *In re Innovatio IP Ventures LLC Patent Litig.*, No. 11C 9308, 2013 WL 5593609, at *9-10 (N.D. Ill. Oct. 3, 2013) (finding there are at least 3,000 SEPs relevant to the WiFi functionality in a WiFi chip). By some estimates, there are over 250,000 patents used by a typical smartphone. Posting of Daniel O'Connor (Oct. 17, 2012), *http://www.project-disco.org/intellectual-property/one-in-six-active-u-s-patents-pertain-to-the-smartphone; see also* Posting of Mike Masnick (Oct. 18, 2012 08:28 EST), *http://www.techdirt.com/blog/innovation/articles/20121017/10480520734/there-are-250000-active-patents-that-impact-smartphones-representing-one-six-active-patents-today.shtml*.

### A.    Calculation of a Reasonable Royalty Requires a Rigorous Analysis to Identify and Isolate the Inventive Value of the Patented Technology.

Basing a reasonable royalty analysis on the value of a patented invention within an accused device requires identifying the specific contribution of that patented invention to the device's overall value.  Isolating the value of the specific contribution that *is* attributable to that patent's inventive value requires apportioning out all value *not* attributable to the inventive value of that patent. Only the remainder is the appropriate base on which to measure a reasonable royalty.

Failing to perform the apportionment analysis rigorously will over-assign value to a particular contribution, risking:

- Over-compensating the patentee by rewarding it for contributions it did not make;

- Under-compensating the licensee by appropriating to the patentee value contributed by the licensee;

- Appropriating to the patentee value contributed by others, potentially under-rewarding these other contributors, and;

- Burdening the accused product with unduly high total royalties, particularly if these type of errors are compounded (indeed, if each

5

contribution is assigned more than its inventive value, the sum of those assigned values can exceed the total value of the device).

The need for rigorous apportionment to compensate a patent holder appropriately has been recognized in patent law for well over a century:

> The patentee . . . must in every case give evidence tending to separate or *apportion* the defendant's profits and the patentee's damages between the patented feature and the unpatented features.[4]

Moreover, as *Garretson* also taught, performing that apportionment analysis is the plaintiff's responsibility and the plaintiff's burden; it is not a "defense" and it is not the defendant's responsibility.[5]

## B.  Applying this Rigorous Analysis in the Real World Requires Several Apportionment Steps.

Measuring the value of a patented invention by its contribution to the overall value of an accused product requires several apportionment steps:

- Determine the smallest saleable patent practicing unit ("SSU") that includes the inventive aspect of the patented invention;[6]

---

[4] *Garretson v. Clark*, 111 U.S. 120, 121 (1884) (emphasis added) (internal quotations omitted).

[5] *Id.*

[6] In some circumstances, the reasonable royalty analysis may start with the incremental value of a device containing the patented invention over the nearest non-infringing alternative. With the rarest of exceptions, in the electronics industry each invention is an incremental advance in the state of the art. The

6

- Determine the operating profit attributable to the SSU to strip out of the SSU value contributed by manufacturing, sales, marketing, advertising and the like, and;

- Apportion out of the operating profit attributable to the SSU the value of other inventions, patented or unpatented.

Once this methodology has been applied, what remains approximates the value of the patented invention.[7]

### 1. The Smallest Saleable Unit Should be Used as a Starting Point for the Analysis.

As this Court has recognized, it is presumptively improper to set royalties based on the value of an entire end-user product when only a portion of that product embodies the inventive value of the patent at issue:

---

inventive aspect of a particular patent is the incremental improvement of the patent over the prior state of the art. The value of this inventive aspect can sometimes be identified by determining the additional value of a device containing the patented invention over that of the nearest alternative that does not embody the incremental improvement that made the patented invention patentable. In most circumstances, however, this incremental value includes more than merely the value of the patented invention, and so must be further apportioned as discussed herein. Where it can be determined, it is appropriate to cap reasonable royalty damages at the incremental value of the patented invention over the closest non-infringing alternative. For a SEP, alternatives that existed prior to standardization should be considered.

[7] Of course, a reasonable royalty analysis also must address the fair distribution of the value of the patented invention as between the patentee and prospective licensee that would result from a negotiation if the licensor and licensee were both willing and reasonable in their negotiations. *See, e.g., Lucent Techs., Inc. v Gateway, Inc.*, 580 F.3d 1301, 1337 (Fed Cir 2009).

> Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product. . . . [I]t is generally required that royalties be based not on the entire product, but instead on the "smallest salable patent-practicing unit."[8]

This Court's recent jurisprudence concerning the SSU addresses these concerns by requiring that the royalty base used for patent damages be the "smallest salable infringing unit *with close relation to the claimed invention*."[9]

Determining the SSU with the closest relation to the patented invention requires consideration of the inventive aspect of the patented invention. Focusing on the SSU that most closely relates to the *inventive* feature(s) prevents a patentee from enlarging its damages base by incorporating known elements into a claim. This is not a rote exercise of simply looking at the words in a claim. The fact that patent claims may be expressed in different formats of different scope should not allow the patent owner to claim the revenue associated with an overall accused product as the proper revenue base. As the Federal Trade Commission explained

---

[8] *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F3d 51, 67 (Fed. Cir. 2012).

[9] *Id.* (*quoting Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 288 (N.D.N.Y. 2009) (Rader, J.)) (emphasis added); *see also Dynetix Design Solutions, Inc. v. Synopsis, Inc.*, No. C 11-05973, 2013 WL 4538210, at *3 (N.D. Cal. Aug. 22, 2013) (noting that the *LaserDynamics* "language affirms that the smallest salable unit must be closely tied to the patent to suffice.").

in its seminal March 2011 Report, *The Evolving IP Marketplace: Aligning Patent*

*Notice and Remedies with Competition*:

> Another artificial construct for identifying the base that courts should reject is always to equate it with the device recited in the infringed claim.  In many cases, there will be an easy correspondence between the inventive feature, the device recited in the infringed claim, and the appropriate base.  In other cases, the correspondence will not be so clear.  For example, a software invention for rendering video images can be recited in a claim covering video software, or in a claim covering a standard personal computer running the video software. . . . *The real focus ought to be on the economic realities and not the vagaries of claim drafting, particularly because the way claims are drafted [is] . . . so manipulable.*[10]

The SSU should be used, rather than the entire device, regardless of whether the

asserted claim is to an apparatus or a method.[11]

The SSU might be a product sold *by* the accused infringer, or it might be a

component containing the inventive functionality sold *to* the accused infringer or *to*

the device manufacturer for incorporation into the accused product.  The SSU

should be the same regardless of whether the entity sued is the component supplier,

---

[10] Fed. Trade Comm'n, The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition (Mar. 2011) (hereafter, "FTC Evolving IP Report"), *available at* http://www.ftc.gov/sites/default/files/documents/reports/evolving-ip-marketplace-aligning-patent-notice-and-remedies-competition-report-federal-trade/110307patentreport.pdf (emphasis added) (internal quotations and citations omitted).

[11] *See, e.g., Lucent Techs*., 580 F. 3d at 1337-38 (pointing to Microsoft's Outlook program as the smallest saleable unit for a method claim).

the original equipment manufacturer, or the end user of that accused product; the inventive aspect of the patented invention does not depend on the position of the accused infringer in the distribution chain.

In the context of a patent essential to practice the 802.11 WiFi standard, the SSU is the WiFi chip, because regardless of the nature, type, size, or price of a WiFi capable device – whether a dongle, an access point, a computer, or even an automobile – the WiFi chip is "the . . . module that provides WiFi capability to . . . devices in which it is inserted."[12]

### 2.      Determine the Operating Profit Attributable to that SSU.

An invention is an idea; a patent is a writing expressing that idea.  But a patented invention becomes useful only once implemented in a device.  Creating a practical and useful device embodying the patented invention can itself require a great deal of skill and inventiveness.

For example, implementing the 802.11 standard in a WiFi chip requires semiconductor circuitry of ever-shrinking physical dimensions and increasing speed, pushing the boundaries of the physically possible.  A manufacturer also must manufacture at scale, with the attendant challenge of achieving scalable yields at reasonable per-device costs, and also must market, sell and support the product in order to succeed.

---

[12] *Innovatio*, 2013 WL 5593609, at *8; *see also id.* at *12-18 (discussing this determination).

The value of all these activities, and of factors such as product design, brand name and reliability, generally is not attributable to the value of the patented invention. Failing to apportion out their value will incorrectly assign to the patentee value actually contributed by the licensee or its suppliers; moreover it would require the licensee to pay again in the form of royalties costs it already has paid for those factors and activities, and which are part of its contribution to the device's value.

Using the operating profit attributable to the SSU, rather than its sales price, revenue, or gross margin, is a reliable mechanism for apportioning out value attributable to these other factors. Operating profit is a broadly-used accounting tool that focuses on the actual value obtained for a particular product, by subtracting from the product's revenue the portion of the revenue attributable to factors including the cost of goods sold, labor, and other overhead in designing, developing, manufacturing and selling a product.[13] The use of operating profit thus reflects the net economic value of the SSU, making it a reliable mechanism for apportioning out the value contributed by these other activities and factors.

---

[13] *See, e.g.,* Investopedia, *Operating Profit*, http://www.investopedia.com/terms/o/operating_profit.asp (last visited, Dec. 16, 2013) ("Operating Profit = Operating Revenue – COGS [Cost of Goods Sold, *i.e.,* costs of inputs] – Operating Expenses – Depreciation & Amortization").

### 3. Apportion that Operating Profit Between the Patented Invention and the Other Inventions Contained in that SSU.

Whether the SSU is the entire device, a smaller subassembly, or, as here, a chip, if the SSU contains features and functions other than the patented invention, the value contributed by those other features and functions must be apportioned out to determine the value of the patented invention within the operating profit attributable to the SSU.[14]

A patent holder is entitled to a reasonable royalty based only on the inventive aspect of its own patented invention, not on the value contributed by other people's inventions, regardless of whether such inventions are patented, whether any such patents have expired, and whether a royalty has been paid on them. Evidence that the SSU includes multiple functionalities is essential to, and therefore admissible in, a proper apportionment analysis to determine the footprint of the asserted patent within the operating profit attributable to the SSU.[15]

---

[14] *See, e.g.*, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *AVM Techs., LLC v. Intel Corp*, No. 10-610-RGA, 2013 WL 126233, at *2 (D. Del. Jan. 4, 2013) (holding that even the "smallest salable . . . unit" must be apportioned).

[15] To the extent those other technologies are also patented, the term "royalty stacking" is sometimes used. Royalty stacking as an economic theory is discussed at III.B, below. But whether royalties have been paid on other patents is separate from, and irrelevant to, the consideration of the value contributed by other patented, or unpatented, inventions contained in the SSU.

One mechanism for this apportionment is comparing the number and relative value of the asserted patents to the other patents likely to be essential to the same standard.[16]   Another technique is considering the proportion of the electrical circuits contained in the WiFi chip (WiFi chips are semiconductors comprised of electrical circuits) that are involved with the allegedly-infringing functionalities as compared to the portions of the circuits that are not involved.  Still another would be comparing the nature and volume of the sections of the 802.11 standards related to the inventive aspects of the patented invention, to the sections of the 802.11 standards related to other contributions.

## II.    FOR ALL PATENTS, BUT PARTICULARLY FOR RAND-ENCUMBERED PATENTS, THE VALUE ATTRIBUTED TO THE PATENTED INVENTION MUST EXCLUDE VALUE DUE TO "LOCK-IN" OR "HOLD-UP."

Standards benefit all stakeholders in an emerging technology, increasing competition and enhancing consumer welfare by promoting technology adoption,[17] improving utility, increasing choice, reducing costs, and simplifying the innovation and product development processes.[18]   As the Supreme Court has found,

---

[16] *See Innovatio*, 2013 WL 5593609, at *8.

[17] *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 309 (3d. Cir. 2007); Amicus Curiae Brief of the IEEE In Support of Neither Party at 2-5, *Apple, Inc. v. Motorola Mobility, Inc.*, No. 12-1548 (Fed. Cir., ECF No. 113, Dec. 19, 2012).

[18] *Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178, 2011 WL 7324582, at *1 (W.D. Wis. June 7, 2011).

13

"standards can have significant procompetitive advantages."[19]  Complying with a standard provides interoperability, ensuring that products from different manufacturers function seamlessly together, enabling large numbers of companies to create and sell standard-compliant interoperable products.  This creates a dense and highly-competitive product market, offering consumers more choices and lower prices than would be available in a less competitive market.[20]

The process of creating an interoperability standard like the 802.11n standard at issue here is, in large part, a series of collective choices by participants among alternative available technologies.  Once a standard is set, however, it is difficult to replace a particular technology included in the standard with an alternative.  And once standard-compliant products are introduced, it can be extremely costly for the industry and its customers to switch to alternative technologies.  As a result, standards bodies rarely make such changes; the industry is locked into the technologies in the standard.[21]  Moreover, an implementer must

---

[19] *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988).

[20] *Standards-Setting Practices: Competition, Innovation and Consumer Welfare*, *Hearing Before the Dep't of Justice, Antitrust Div. and Fed. Trade Comm'n* 49-53 (Apr. 18, 2002) (testimony of Amy A. Marasco Vice President and Gen. Counsel, Am. Nat'l Standards Inst. (ANSI)), *available at* http://www.ftc.gov/sites/default/files/documents/public_events/competition-ip-law-policy-knowledge-based-economy-hearings/020418trans.pdf.

[21] It can be difficult and expensive for an individual company (and its customers) to design around a patented technology after it has designed, manufactured and

use the essential technologies in order to be compliant with the standard; even if there is are better or cheaper available non-SEP alternatives, an implementer cannot choose them without rendering its products no longer standard compliant.

The adoption of a patented technology into a standard thus increases the hold-up potential of that patent: a SEP patent holder may prevent[22] an entity not just from practicing its patent, but from implementing the standard at all. This increases the potential of the patentee to extract value created by other SEP patent holders and by the implementer itself, undermining the purpose of standards-setting and harming innovation, implementers, and consumers.[23]

As the Federal Trade Commission stated in its Evolving IP Report:

> [a] reasonable royalty damages award that is based on high switching costs, rather than the ex ante value of the patented technology compared to alternatives,

---

sold products including that technology, particularly if the product has been in the marketplace for a long time. A standard magnifies this difficulty because it first requires a collective decision to create a new standard excluding that technology and then requires all implementers of the standard, and their customers, to change. Further, backward compatibility is important in many standards so that older devices can communicate with newer ones; a given change may make it impossible for new products to be compatible with pre-existing products thereby rendering existing product investments worthless.

[22] See discussion at III.A, *infra*, explaining the SEP holder's voluntary waiver of this right.

[23] This increased power is inherent in the complementary nature of SEPs: to implement a standard, the maker of a compliant product needs access to all of the patents essential to that standard.

overcompensates the patentee. It improperly reflects the economic value of investments by the infringer [in getting its patented technology adopted into the standard] rather just than the economic value of the invention. . . . [This] ability . . . is commonly called "hold-up."[24]

Eliminating "hold-up" value from reasonable royalty determinations is particularly important in the context of SEPs because standardization by its nature increases the potential for lock-in and hold-up, as the Antitrust Division of the Department of Justice has explained:

> Once a patent is included in a standard, it becomes essential to the implementation of that standard, thus the term 'Standard Essential Patent.' After industry participants make complementary investments, abandoning the standard can be extremely costly. Thus, after the standard is set, the patent holder could seek to extract a higher payment than was attributable to the value of the patented technology before the standard was set. Such behavior can distort innovation and raise prices to consumers.[25]

---

[24] FTC Evolving IP Report, *supra*, note 10, at 190-91 (internal citations omitted).

[25] Press Release, Dep't of Justice, Antitrust Div., Statement of the Department of Justice's Antitrust Division on Its Decision to Close Its Investigations of Google Inc.'s Acquisition of Motorola Mobility Holdings Inc. and the Acquisitions of Certain Patents by Apple Inc., Microsoft Corp. and Research in Motion Ltd at 3 (Feb. 13, 2013), *available at* http://www.justice.gov/atr/public/press_releases/2012/280190.pdf.

This threat of "super-exclusion" can become, in the words of Justice Kennedy, a "bargaining tool to [enable the SEP holder to] charge exorbitant fees to companies that seek to buy licenses to practice the patent."[26]

When holders of SEPs demand supra-competitive royalty rates based not on the actual value of their patented invention but instead on the hold-up value the invention gains once incorporated into a standard, they undermine the procompetitive benefits of standard setting.  Imposing excessive royalties on companies making compliant products makes those products more expensive to manufacture.  As a result fewer companies will participate and those that do will sell at higher prices and lower volumes.  Consumers will have fewer choices and will buy fewer products at higher prices, undercutting the goal of rapid and widespread adoption.  If the cumulative royalty burden to implement a standard becomes too high, implementers and consumers alike will abandon the standard and the benefits of standardization, as well as the investments already made in the standard, will be lost.

The ability of a SEP holder to demand higher royalties than it could have achieved before the patent was adopted into the standard – "exorbitant fees" – does not reflect any increase in the inherent value of the invention disclosed in the

---

[26] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 396 (2006) (Kennedy, J., concurring).

patent.  Instead, it reflects only the additional market power – the "hold-up" power – the patentee gains when its patented invention is included in the standard.

Both Judge Robart in *Microsoft Corp. v Motorola Inc.* and Judge Holderman in *In re Innovatio IP Ventures LLC Patent Litigation* recognized the need to distinguish between the inventive value of the patent at issue, which should be appropriately rewarded, and the "super-exclusion" hold-up power conferred by adoption of the patent into a standard, which should not.  As Judge Holderman found:

> patent hold-up is a substantial problem that RAND is designed to prevent . . . [A judicially-determined] RAND rate therefore must, to the extent possible, reflect only the value of the underlying technology and not the hold-up value of standardization.[27]

Given the increased pricing power of a SEP patentee, however, licenses extracted by that patentee after adoption of its patent into a standard may reflect the patentee's hold-up power, over and above the inherent value of its patent. Looking to such licenses as a benchmark of reasonableness is likely to cause exactly the harm to consumers that a RAND royalty is designed to avoid.  Both Judge Robart and Judge Holderman rejected certain licenses as non-comparable

---

[27] *Innovatio*, 2013 WL 5593609, at *9 (citing *Microsoft Inc. v. Motorola, Inc.*, No. C10–1823JLR, 2013 WL 2111217, at *12 (W.D. Wash. Apr. 25, 2013) ("[A] proper methodology used to determine a RAND royalty should therefore recognize and seek to mitigate the risk of patent hold-up that RAND commitments are intended to avoid.")).

because they did not clearly reflect consideration of a RAND royalty and may instead have included such hold-up value.[28]

In contrast, in the decision below, the court assumed without evidence that post-adoption licenses did not include such hold-up value:

> [t]he licensees would not have paid value for a license unless they believed Ericsson's patents covered at least a portion of the standard. Similarly, the licensees would not have paid value for the portion of the standard not covered by Ericsson's patents.[29]

Merely because an entity made a public RAND commitment does not mean that a given license reflects a RAND amount. It is the patentee's burden to establish which licenses are "comparable," which in this context includes establishing that a given license complies with RAND. This cannot be assumed. In making that assumption without evidentiary basis, the Court upheld as "reasonable" exactly the "exorbitant fees" against which Justice Kennedy warned.

To avoid this error and the harm supra-competitive royalties cause, a Court looking at previously-negotiated license terms in determining the value of a SEP generally should consider only licenses executed before the patent was adopted into the standard; post-adoption licenses generally should be excluded, unless the

---

[28] *Id.* at *33; *Microsoft*, 2013 WL 2111217, at *79-82.

[29] *Ericsson, Inc. v. D-Link Sys., Inc.*, No. 6:10-CV-473, 2013 WL 4046225, at *15 (E.D. Tex. Aug. 5, 2013).

19

patentee proves that they clearly evidence a RAND amount, and do not include any

hold-up value.

## III. A REASONABLE ROYALTY FOR A STANDARD-ESSENTIAL PATENT MUST BE RAND.

### A. By Participating in Standards Setting, a SEP Patentee Makes Tradeoffs in its Economic Self-Interest.

An entity participating in standard setting is customarily required to commit

that it will license its SEPs on RAND terms.[30]  This RAND commitment is actually

two commitments: (1) a commitment to license, and therefore a voluntary waiver

of the right to exclude, effectively a statement that monetary compensation is

sufficient, and (2) a commitment that the patentee will offer licensing terms that

are "reasonable and non-discriminatory."

By participating in standard setting and making a RAND commitment, a

patentee accepts certain tradeoffs, and its willingness to do so shows that those

tradeoffs are in its own economic self-interest.  The most significant tradeoff for

present purposes is the patent holder's voluntarily agreement that it will forego its

exclusionary power and license its SEPs on RAND terms.  Making this RAND

commitment is a self-interested economic decision that the benefits of

standardization – an increase in the volume of licensable products and benefits of

---

[30] The exact nature of the commitment varies to some extent among standard-setting organizations.

standardization for its own products – are worth more than the potential licensing revenue of its patent if it were not incorporated into the standard.[31]

A SEP patent holder who implements the standard in compliant products also gains additional benefits: its participation in the standard setting gives it a deep understanding of the standard, it already knows how to implement its own patented technology.  Thus, the SEP patentee often has a significant time-to-market advantage for standard compliant products over its competitors.  These benefits comprise part of the value patentees get in return for their RAND commitments.

### B.   Determination of a RAND Royalty Differs from a Traditional Damages Analysis.

As noted earlier, determination of a reasonable royalty must be based solely on the inventive value of the patent at issue, regardless of whether that patent is subject to a RAND obligation.  But the determination of a RAND royalty differs in some ways from a traditional analysis.  A RAND royalty must be a royalty that, when applied to any implementer of the standard, is "non-discriminatory."  Also, a RAND royalty must take into account royalty stacking issues; the royalty on each

---

[31] The increase in volume comes from the overall increase in adoption of the technology as a result of standardization and because of its adoption into many different types of products.  Joseph S. Miller, *Standard Setting, Patents and Access Lock-In: RAND Licensing and the Theory of the Firm*, 40 Ind. L. Rev. 351, 374 (2007).

SEP must be set such that the total royalty for all SEPs does not unduly burden the standard.[32]

### 1. RAND Royalty Analysis Must Consider the Broader Industry Within Which the Defendant Participates to Achieve Royalties that are "Non-Discriminatory."

A RAND royalty must consider the broader industry within which the standard has been adopted, so that the analysis applied to other industry participants will yield "reasonable" results that are also "non-discriminatory." To accomplish this goal, the analysis must look at average prices, costs and operating profit across all industry participants, not just the alleged infringer.

In addition, the analysis must look at those averages over the entire damages period, not just at a single point in time. In the technology industry, capabilities and performance of devices increase dramatically over time, while their size and cost shrink at similar rates. Just as electronic devices have a natural life cycle, so too do standards. Standards, and compliant devices, generally are most valuable when first introduced. But over time as new standards are developed or existing ones improved, the value of older standards and compliant devices decreases. As a result, the inventive value of the SEPs in a standard generally are worth more when the standard is new and less later on.

---

[32] This problem of "royalty stacking" is a form of apportionment as discussed above. But in the context of a RAND royalty, it also must be considered as an economic issue that can impede the implementation and adoption of a standard.

This is clear in the 802.11 family of standards at issue here: speed and performance have *increased* dramatically as the standard has evolved from 802.11a/b to 802.11g to 802.11n and now to 802.11ac, while the average 802.11 chip price has *fallen* dramatically, from a high of $37 in 2000 to a 2010 average of less than $3.[33]

Therefore, to be non-discriminatory, the hypothetical negotiation must use the industry-wide average operating profit for the SSU over the damages period and must determine the average inventive value of the patented invention to the SSU over that same period. A RAND royalty should not be based on the revenue, profits, or relative bargaining position, of the specific alleged infringer or the patentee.

**2.    A RAND Royalty Rate Must Take into Account Royalty Stacking.**

As noted above, because today's devices contain numerous functionalities, each of which may be covered by thousands of patents, the implementer of a standard-compliant device will face the prospect of total royalties that are the sum of all possible individual SEP royalties. Judging the "reasonableness" of each individual royalty in isolation, without reference to the total royalty stack, risks the implementer facing a cumulative royalty that is unreasonable and not RAND. The analysis therefore requires considering all potential individual royalties on an

---

[33] *Innovatio*, 2013 WL 5593609, at *39-40.

aggregated (stacked) basis to determine an appropriate and economically reasonable royalty for any particular patent used in the accused product or SSU.[34]

The problem of "royalty stacking" arises because a standard is developed by multiple participants whose contributing technologies that often are patented. Royalty stacking is of particular concern in the standards context because standard setting often is "characterized by patent thickets, resulting in standard-compliant products being potentially covered by hundreds, if not thousands, of patents."[35]  A proper RAND royalty should account for stacking to avoid awarding a disproportionate amount to any one patent holder and/or skewing potential aggregate royalties to an unreasonably high level.  Both results would impede the adoption of the standard, contrary to the RAND commitment.

Each dispute over a RAND royalty will concern only one (or a small number) of the total patents in the stack for a particular standard.  Thus, it may seem appealing to ignore the stacking issue entirely, or as the court did below, to

---

[34] Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*, 85 Tex. L. Rev. Vol. 1991, 1993 (2007).

[35] Written Comments of Verizon Communications Inc. for Fed. Trade Comm'n Workshop on Standard-Setting Issues at 3-4, Patent Standards Workshop, Project No. P11 1204, (Aug. 5, 2011), *available at* http://www.ftc.gov/sites/default/files/documents/public_comments/request-comments-and-announcement-workshop-standard-setting-issues-project-no.p111204-00051%C2%A0/00051-80236.pdf; *see also* Lemley & Shapiro, *supra*, note 34, at 2016.

24

require a defendant to prove that it was already a victim of stacking in order to be permitted to raise the issue.[36]

But the reality is that if the issue is not addressed in each dispute – because stacking has not yet become "real" – it will not be addressed until it is too late, and therefore not at all. By the time a defendant can prove that it is a victim of stacking, there will be no mechanism to adjust all of the already-adjudicated or already-agreed royalties later determined to be too high in the aggregate. And courts may use these earlier licenses (as the court did here) as "comparable" licenses, thereby exacerbating the royalty stacking problems.

Therefore, in determining a RAND royalty for any particular SEP, the analysis must account for the total number of SEPs for that standard, without requiring proof that the defendants already have paid multiple royalties to multiple patentees.[37] As Judge Holderman explained:

> because most standards implicate hundreds, if not
> thousands of patents . . . the cumulative royalty payments
> to all standard-essential patent holders can quickly

---

[36] The Court below based its rejection of the defendants' stacking concerns on the observation that the defendants had not provided evidence of "an *actual stack.*" *Ericsson,* 2013 WL 4046225, at *18 (emphasis in original); *see also id.* at *26.

[37] As discussed above, evidence of other patents on the standard must be considered both as a form of apportionment, *i.e.*, determining the footprint of the patented invention within the standard and within the SSU, and as a measure of whether the damages sought by the patent holder are reasonable and non-discriminatory as required by RAND.

25

> become excessive and discourage adoption of the standard. . . . Therefore, the determination of a RAND royalty must "address the risk of royalty stacking by considering the aggregate royalties that would apply if other [standard-essential patent] holders made royalty demands of the implementer."[38]

Moreover, the need to consider the stacking issue is entirely consistent with the considerations that would be taken into account by the parties to an actual royalty negotiation, and therefore is mandated by the "hypothetical negotiation" construct.[39]

## IV. THE AMOUNTS SOUGHT AND RECEIVED BY ERICSSON ARE INCONSISTENT WITH A PROPER APPORTIONMENT ANALYSIS AND WITH ERICSSON'S RAND OBLIGATION.

The risks of determining RAND licensing terms in a process that does not include the necessary elements of a rigorous analysis – proper apportionment, non-discrimination in royalties for RAND-encumbered patents, and consideration of patent stacking – are starkly illustrated by the actual facts of this case.

Ericsson was awarded damages on three patents.  The 802.11 standard includes some 3,000 potentially essential patents that an implementer might be required to license.[40]  The jury awarded Ericsson a running royalty for these three

---

[38] *Innovatio*, 2013 WL 5593609, at *9 (quoting *Microsoft,* 2013 WL 2111217, at *12).

[39] *Id*. at *10; *see also id.* at *9-10.

[40] *Id.* at *9-10 (relying on expert testimony from both sides).

patents of $0.15 per unit.  If the same proportional royalty ($0.05) were awarded to each of the other 2,997 potentially essential patents, the total royalty would be $150.  The average *selling* price of a WiFi chip was less than $3 in 2010, and is even lower today, while the average operating profit on such chips is 10-15%.[41]  In other words, the outcome below rewards Ericsson a total of one-half to one-third of the entire profit made in 2010 by 802.11-compliant chipmakers for designing, developing and selling functioning WiFi chips.  And that is for just three of 3,000 SEPs.

Given these facts, it is readily apparent that a $150 royalty is not "reasonable" under any measure when applied to a device/SSU that sells for less than $3.  RAND requires that every implementer of the standard, including the WiFi chipmakers, be licensed on non-discriminatory rates and terms that do not unduly burden the standard.  Accordingly, the royalty amount sought and obtained must be reasonable in proportion to the operating profit obtained by the chipmakers.  But awarding half (or even one-third) of a chipmaker's profit to a holder of 0.1 percent of the 802.11 SEPs (and without any consideration of the value contributed to the WiFi chip by the semiconductor and other non-802.11 technology embodied in it) is not rational, fair, reasonable or non-discriminatory.

---

[41] *Id.* at *40-41.

This error was compounded when the court instructed the jury that, rather than looking to actual prices and profits as a measure of reasonableness:

> An infringer's net profit margin is not the ceiling by which a reasonable royalty is capped. The infringer's selling price can be raised if necessary to accommodate a higher royalty rate.[42]

This was error.  In a large, highly competitive market such as that for WiFi chips and WiFi products, the price set by market participants in arm's-length negotiations is the most reliable basis to determine the overall value the market sets for the entire set of features, functions and technology contained in those chips and products.  The patentee should bear a heavy burden, which Ericsson did not meet here, when it seeks to demonstrate that multiple arms-length negotiations resulted in something less than the "actual" value that market participants place on the features, functions and technology contained in a product.

Even if a patentee could satisfy that burden, a patentee is not entitled to higher royalties by claiming that the actual selling price of the product is artificially low, that it should be – or could be – increased (contrary to economic principles) to reflect the "true" value of the patented invention, while the patentee nevertheless obtain royalties on the volume of products sold at the actual price. Instead, the patentee bears an additional burden of demonstrating that market

---

[42] Appellant's Br. at 76 n. 27 (ECF No. 58).

28

participants and consumers would have purchased the same volume of products at a higher price, also contrary to fundamental principles of economics.

Ericsson has not met that burden here.  The evidence is clear that the market for 802.11 WiFi chips is highly responsive to price: sales volumes have increased dramatically as prices have dropped.  In 2000, when, according to ABI, prices averaged $37 per chip, volume was only 5.4 million chips per year.  As prices dropped to about $3 per chip, volume skyrocketed to over a billion chips sold per year.[43]

Moreover, Ericsson made its RAND commitment knowing that, if its patented technology was incorporated into the standard, Ericsson would benefit from the rapid expansion in demand, and higher volume of sales, that standardization creates.  This rapid market expansion and increase in volume of sales has in fact occurred, clearly due to standardization.  Ericsson should not now be entitled to avoid the consequence of its RAND commitment by arguing that the entire industry must raise prices to pay Ericsson higher royalties, while also keeping the benefits of higher volume from its RAND commitment.  Permitting Ericsson that result would eviscerate the bargain Ericsson freely made when it sought incorporation of its technology into the standard in exchange for its

---

[43] *Innovatio*, 2013 WL 5593609, at *39-40

commitment to license its SEPs on RAND terms to all implementers of the 802.11 standard.

This case thus dramatically demonstrates that ignoring proper apportionment and patent stacking when calculating reasonable royalty rates in any particular dispute leads to a bad result. It leads to bad patent law, because it grossly over-rewards patentees. It leads to bad patent policy, because excessive royalties increase the cost of manufacturing standards-compliant devices, thus increasing the prices consumers pay for these staples of modern life. And it leads to bad public policy because it further reduces the competitiveness of the downstream market of devices, further limiting consumer choice and increasing consumer prices. And finally, it leads to outcomes directly contrary to standard setting's goal of rapid and widespread adoption of standardized technology.

## CONCLUSION

*Amici* respectfully urge this Court to provide clarification and guidance, as set forth in this brief, concerning the proper methodologies and procedures for calculating reasonable royalty damages.  Additional clarity will benefit district courts and a wide variety of business and consumer interests, and promote innovation by fairly and appropriately rewarding innovation, and by fostering rapid and widespread adoption of new technologies.

Dated:  December 23, 2013

Marta Beckwith
Cisco Systems, Inc.
170 West Tasman Drive
San Jose, CA 95134
Phone: (408) 527-4978
mabeckwi@cisco.com

*Counsel for Cisco Systems, Inc.*

/s/ Barry K. Shelton
Barry K. Shelton
**Bracewell & Giuliani**
111 Congress Avenue, Suite 2300
Austin, Texas  78701-4061
Phone: (512) 494-3693
barry.shelton@bgllp.com

*Counsel for Amicus Curiae Hewlett-Packard Company*

Respectfully submitted,

*/s/ Jeffrey Blumenfeld*
Jeffrey Blumenfeld
Principal Attorney
**Lowenstein Sandler LLP**
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 204-8699
jblumenfeld@lowenstein.com

*Counsel for Amici Curiae Cisco Systems, Inc., Aruba Networks, Inc., Ruckus Wireless, Inc. Safeway Inc., and SAS Institute Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of December, 2013, I electronically transmitted the attached document to the Clerk of the Court of the Federal Circuit Court of Appeals using the ECF System of the Court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.  I further certify that a copy has been sent via email and United States first class mail, postage prepaid, to the persons listed below who do not receive electronic notice pursuant to the Court's ECF filing system.

Aruba Networks, Inc.
c/o Ava Hahn
1344 Crossman Ave.
Sunnyvale, CA 94089-1113
Phone: +1 408 227 4500

Ruckus Wireless, Inc.
c/o Scott Hauser
350 West Java Dr.
Sunnyvale, CA 94089
USA
Phone: +1 (650) 265-4200

Safeway Inc.
c/o Tad Bell
5918 Stoneridge Mall Rd.
Pleasanton, CA 94588


SAS Institute, Inc.
c/o Tim Wilson
701 SAS Campus Drive
Cary, NC 27513


*/s/ Jeffrey Blumenfeld*
Jeffrey Blumenfeld

Dated: December 23, 2013

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. Proc. 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. Proc. 32(a)(7)(B).

Excluding the exempt portions of the brief (as provided in Fed. R. App. Proc. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b)), this brief includes 6,976 words.

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font. As permitted by Fed. R. App. Proc. 32(a)(7)(C), the undersigned has relied upon the word count of this word-processing system in preparing this certification.

*/s/ Jeffrey Blumenfeld*
Jeffrey Blumenfeld

Dated: December 23, 2013

## ECF CERTIFICATION

I hereby certify (i) the required privacy redactions have been made pursuant to Federal Rule of Civil Procedure 5.2; (ii) the electronic submission is an exact copy of the paper document; (iii) the document has been scanned for viruses using Symantec Endpoint Protection active scan and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues.

*/s/ Jeffrey Blumenfeld*
Jeffrey Blumenfeld

Dated: December 23, 2013

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

ERICSSON, INC. v. D-LINK SYSTEMS, INC.,

2013-1625, -1631, -1632, -1633

**CERTIFICATE OF INTEREST**

Counsel for *Amicus Curiae*, Aruba Networks, Inc. certifies the following:

1.       The full name of *amicus curiae* represented by me is:

Aruba Networks Inc.

2.       The name of the real party in interest (if the name in the caption is not the real party in interest) represented by me is:

None

3.       All parent corporations and any publicly held companies that own 10 percent or more of the stock of the *amici curiae* represented by me are:

None

4.       The names of all law firms and the partners or associates that appeared for the *amici curiae* now represented by me in the trial court or agency or are expected to appear in this court are:

None

December 23, 2013

*/s/ Jeffrey Blumenfeld*
Jeffrey Blumenfeld

cc:     Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of December, 2013, I electronically transmitted the attached document to the Clerk of the Court of the Federal Circuit Court of Appeals using the ECF System of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means. I further certify that a copy has been sent via email and United States first class mail, postage prepaid, to the persons listed below who do not receive electronic notice pursuant to the Court's ECF filing system.

Aruba Networks, Inc.
c/o Ava Hahn
1344 Crossman Ave.
Sunnyvale, CA 94089-1113
Phone: +1 408 227 4500

Ruckus Wireless, Inc.
c/o Scott Hauser
350 West Java Dr.
Sunnyvale, CA 94089
USA
Phone: +1 (650) 265-4200

Safeway Inc.
c/o Tad Bell
5918 Stoneridge Mall Rd.
Pleasanton, CA 94588


SAS Institute, Inc.
c/o Tim Wilson
701 SAS Campus Drive
Cary, NC 27513



_/s/ Jeffrey Blumenfeld_____
Jeffrey Blumenfeld

Dated: December 23, 2013

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

ERICSSON, INC. v. D-LINK SYSTEMS, INC.,

2013-1625, -1631, -1632, -1633

**CERTIFICATE OF INTEREST**

Counsel for *Amicus Curiae*, Cisco Systems, Inc., certifies the following:

1.      The full name of *amicus curiae* represented by me is:

Cisco Systems, Inc.

2.      The name of the real party in interest (if the name in the caption is not the real party in interest) represented by me is:

None

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the *amici curiae* represented by me are:

None

4.      The names of all law firms and the partners or associates that appeared for the *amici curiae* now represented by me in the trial court or agency or are expected to appear in this court are:

None

December 23, 2013

*/s/ Jeffrey Blumenfeld*
Jeffrey Blumenfeld

cc:      Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of December, 2013, I electronically transmitted the attached document to the Clerk of the Court of the Federal Circuit Court of Appeals using the ECF System of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means. I further certify that a copy has been sent via email and United States first class mail, postage prepaid, to the persons listed below who do not receive electronic notice pursuant to the Court's ECF filing system.

Aruba Networks, Inc.
c/o Ava Hahn
1344 Crossman Ave.
Sunnyvale, CA 94089-1113
Phone: +1 408 227 4500

Ruckus Wireless, Inc.
c/o Scott Hauser
350 West Java Dr.
Sunnyvale, CA 94089
USA
Phone: +1 (650) 265-4200

Safeway Inc.
c/o Tad Bell
5918 Stoneridge Mall Rd.
Pleasanton, CA 94588


SAS Institute, Inc.
c/o Tim Wilson
701 SAS Campus Drive
Cary, NC 27513


*/s/ Jeffrey Blumenfeld*
Jeffrey Blumenfeld

Dated: December 23, 2013

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ERICSSON, INC. v. D-LINK SYSTEMS, INC.,

2013-1625, -1631, -1632, -1633

## CERTIFICATE OF INTEREST

Counsel for *Amicus Curiae*, Hewlett-Packard Company. certifies the following:

1.      The full name of *amicus curiae* represented by me is:

Hewlett-Packard Company

2.      The name of the real party in interest (if the name in the caption is not the real party in interest) represented by me is:

None

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the *amici curiae* represented by me are:

None

4.      The names of all law firms and the partners or associates that appeared for the *amici curiae* now represented by me in the trial court or agency or are expected to appear in this court are:

None

December 23, 2013

*/s/ Barry K. Shelton*
Barry K. Shelton

cc:      Counsel of Record

# CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of December, 2013, I electronically transmitted the attached document to the Clerk of the Court of the Federal Circuit Court of Appeals using the ECF System of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means. I further certify that a copy has been sent via email and United States first class mail, postage prepaid, to the persons listed below who do not receive electronic notice pursuant to the Court's ECF filing system.

Aruba Networks, Inc.
c/o Ava Hahn
1344 Crossman Ave.
Sunnyvale, CA 94089-1113
Phone: +1 408 227 4500

Ruckus Wireless, Inc.
c/o Scott Hauser
350 West Java Dr.
Sunnyvale, CA 94089
USA
Phone: +1 (650) 265-4200

Safeway Inc.
c/o Tad Bell
5918 Stoneridge Mall Rd.
Pleasanton, CA 94588


SAS Institute, Inc.
c/o Tim Wilson
701 SAS Campus Drive
Cary, NC 27513


*/s/ Jeffrey Blumenfeld*
Jeffrey Blumenfeld

Dated: December 23, 2013