**Nos. 15-1080, -1081, -1082, -1083, -1084, -1085, -1086, -1087, -1088, -1089, -1090, -1092, -1093, -1094, -1095, -1096, -1097, -1098, -1099, -1100, -1101**

IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FEDERAL CIRCUIT

MCRO, INC., DBA PLANET BLUE,

*Plaintiff-Appellant*,

v.

BANDAI NAMCO GAMES AMERICA INC., NAUGHTY DOG, INC., KONAMI DIGITAL ENTERTAINMENT, INC., SEGA OF AMERICA, INC., ELECTRONIC ARTS INC., OBSIDIAN ENTERTAINMENT, INC., DISNEY INTERACTIVE STUDIOS, INC., SQUARE ENIX, INC., NEVERSOFT ENTERTAINMENT, INC., TREYARCH CORPORATION, CAPCOM USA, INC., SONY COMPUTER ENTERTAINMENT AMERICA LLC, ATLUS U.S.A., INC., SUCKER PUNCH PRODUCTIONS, LLC, INFINITY WARD, INC., LUCASARTS, A DIVISION OF LUCASFILM ENTERTAINMENT COMPANY LTD. LLC, WARNER BROS. INTERACTIVE ENTERTAINMENT, A DIVISION OF WARNER BROS. HOME ENTERTAINMENT INC., ACTIVISION PUBLISHING, INC., BLIZZARD ENTERTAINMENT, INC., VALVE CORPORATION, CODEMASTERS USA GROUP, INC., CODEMASTERS SOFTWARE INC., CODEMASTERS, INC., AND THE CODEMASTERS SOFTWARE COMPANY LIMITED,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of California, Judge George H. Wu

## JOINT APPENDIX

John Whealan
4613 Merivale Road
Chevy Chase, MD  20815
(202) 994-2195 (telephone)

Mark S. Raskin
Robert A. Whitman
John F. Petrsoric
MISHCON DE REYA NEW YORK LLP
750 Seventh Avenue 26th Floor
New York, NY  10019
(212) 612-3279 (telephone)
(212) 612-3297 (fax)

Jeffrey A. Lamken
  *Counsel of Record*
Michael G. Pattillo, Jr.
MOLO LAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000 (telephone)
(202) 556-2001 (fax)
jlamken@mololamken.com

*Counsel for Plaintiff-Appellant McRO, Inc.*
*(Additional counsel listed on inside cover)*

Edward R. Reines
Marion Read
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000
edward.reines@weil.com
marion.read@weil.com

*Attorneys for Defendants-Appellees
Bandai Namco Games America Inc.;
Sega of America, Inc.; Electronic Arts
Inc.; Disney Interactive Studios, Inc.;
Neversoft Entertainment, Inc.; Treyarch
Corporation; Capcom USA, Inc.; Atlus
U.S.A., Inc.; Infinity Ward, Inc.;
LucasArts, a division of LucasFilm
Entertainment Company Ltd. LLC;
Warner Bros. Interactive Entertainment,
a division of Warner Bros. Home
Entertainment Inc.; Activision
Publishing, Inc.; and Blizzard
Entertainment, Inc.*

Wendy J. Ray
Benjamin J. Fox
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA 90017-3543
(213) 892-5200
WRay@mofo.com
BFox@mofo.com

*Attorneys for Defendants-Appellees
Konami Digital Entertainment, Inc. and
Square Enix, Inc.*

B. Trent Webb
John D. Garretson
Beth A. Larigan
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
(816) 474-6550
bwebb@shb.com
jgarretson@shb.com
blarigan@shb.com

*Attorneys for Defendants-Appellees
Naughty Dog, Inc., Sucker Punch
Productions, LLC and Sony Computer
Entertainment America LLC*

Thomas E. Walling
Andrew D. Tsu
SPACH, CAPALDI &
WAGGAMAN, LLP
4675 MacArthur Court, Suite 550
Newport Beach, CA 92660
(949) 852-0710
thomas.walling@gmail.com

*Attorneys for Defendant-Appellee
Obsidian Entertainment, Inc.*

Kevin W. Kirsch
Jared A. Brandyberry
Barry E. Bretschneider
BAKER & HOSTETLER LLP
312 Walnut Street
Cincinnati, OH 45202
(513) 929-3499
kkirsch@bakerlaw.com

*Attorneys for Defendants-Appellees
Codemasters, Inc., Codemasters
USA Group, Inc. and The Codemasters
Software Company Limited*

Jan P. Weir
Theodore J. Angelis
David T. McDonald
Joseph J. Mellema
K&L GATES LLP
12th Floor, 1 Park Plaza
Irvine, CA 92614
(949) 253-0900
jan.weir@klgates.com

*Attorneys for Defendant-Appellee
Valve Corporation*

# TABLE OF CONTENTS

<u>Page</u>

Ruling on Defendants' Motion for Judgment on the Pleadings Based
on Unpatentability under 35 U.S.C. § 101, dated Sept. 22, 2014
(Docket No. 365) ........................................................................A1

Final Judgment, dated Oct. 31, 2014 (Docket No. 372) .....................................A24

'576 Patent ....................................................................................A27

'278 Patent ....................................................................................A39

Docket Entries, No. 12-cv-10322 ........................................................A51

Excerpts of Planet Blue's Opening Claim Construction Brief,
filed Feb. 18, 2014 (Docket No. 230).....................................A3036

DVD: Planet Blue's Claim Construction Tutorial, filed Apr. 16, 2014
(Docket No. 267) ....................................................................A3573

Minutes of Claim Construction Hearing, filed Apr. 29, 2014
(Docket No. 292) ....................................................................A4009

Minutes & Final Rulings on Claim Construction, filed May 1, 2014
(Docket No. 298) ....................................................................A4155

Decision Denying Institution of *Inter Partes* Review, dated May 28,
2014 (Docket No. 311-1).........................................................A4362

Excerpts of Defendants' Notice of Motion and Motion for Judgment
on the Pleadings Based on Unpatentability under 35 U.S.C.
§101, filed July 10, 2014 (Docket No. 338)............................A4659

Transcript of Hearing on Claim Construction, dated Apr. 28, 2014
(Docket No. 339-4) (Ex. D to Request for Judicial Notice in
Support of Defendants' Motion for Judgment on the Pleadings
Based on Unpatentability under 35 U.S.C. § 101, filed July 10,
2014) ......................................................................................A4781

Declaration of Dr. Michael Gleicher in Support of Planet Blue's Brief
in Opposition to Defendants' Motion for Judgment of
Invalidity, filed July 24, 2014 (Docket No. 345) ...................................A4946

Declaration of John F. Petrsoric in Support of Planet Blue's Brief in
Opposition to Defendants' Motion for Judgment of
Unpatentability, filed July 24, 2014 (Docket No. 346) ..........................A4974

Exhibit 1 – Planet Blue Invoices (Docket No. 346-1)............................A4977

Exhibit 2 – Warner Bros. Memorandum, dated
January 27, 1999 (Docket No. 346-2).........................................A4994

Excerpts of Transcript of Hearing on Defendants' Motion for
Judgment on the Pleadings, dated Sept. 18, 2014
(Docket No. 367) ....................................................................................A5257

Notice of Appeal, dated Oct. 22, 2014 (Docket No. 368) ...............................A5324

Docket Entries, No. 13-cv-1874 ......................................................................A5519

Excerpts of Transcript of Hearing on Claim Construction, dated
Apr. 28, 2014 (Docket No. 44)...............................................................A5757

DVD: Parties' Claim Construction Tutorials and Excerpts.............................A6121

*Planet Bingo, LLC, v. VKGS LLC*, 576 F. App'x 1005
(Fed. Cir. 2014)......................................................................................A6122

*I/P Engine, Inc., v. AOL Inc.*, 576 F. App'x 982 (Fed. Cir. 2014) ..................A6126

*Fuzzysharp Techs. Inc., v. Intel Corp.*, 595 F. App'x 996
(Fed. Cir. 2015).......................................................................................A6144

JS - 6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **McRO, Inc., d.b.a. Planet Blue**, | No. CV 12-10322-GW(FFMx) |
| Plaintiffs, | **RULING ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS BASED ON UNPATENTABILITY UNDER 35 U.S.C. § 101** |
| v. | |
| **Namco Bandai Games America, Inc.**, | |
| Defendants. | |

## I. __Background__

   The Court is presiding over two sets of consolidated patent infringement cases filed by Plaintiff McRO, Inc., d.b.a. Planet Blue ("Plaintiff" or "Planet Blue"): the "Track 1" cases, consolidated under Case No. CV-12-10322,[1] and the "Track 2" cases, consolidated under Case No. CV 13-1872.[2] The cases all involve Plaintiff's

---

   [1] The current Track 1 cases are: *McRO, Inc. v. Namco Bandai Games America, Inc.*, CV-12-10322; *McRO, Inc. v. Konami Digital Entertainment, Inc.*, CV-12-10323; *McRO, Inc. v. Sega of America, Inc.*, CV-12-10327; *McRO, Inc. v. Electronics Arts, Inc.*, CV-12-10329; *McRO, Inc. v. Obsidian Entertainment, Inc.*, CV-12-10331; *McRO, Inc. v. Disney Interactive Studios, Inc.*, CV-12-10333; *McRO, Inc. v. Naughty Dog, Inc.*, CV-12-10335; *McRO, Inc. v. Capcom USA, Inc.*, CV-12-10337; *McRO, Inc. v. Square Enix, Inc.*, CV-12-10338; *McRO, Inc. v. Neversoft Entertainment, Inc.*, CV-12-10341; *McRO, Inc. v. Treyarch Corporation*, CV-12-10342; *McRO, Inc. v. Atlus U.S.A., et al.*, CV-13-1870; McRO, *Inc. v. Sucker Punch Productions, LLC*, CV-14-0332; *McRO, Inc. v. Activision Blizzard, Inc.*, CV-14-0336; *McRO, Inc. v. Infinity Ward, Inc.*, CV-14-0352; *McRO, Inc. v. LucasArts Entertainment Company LLC*, CV-14-358; *McRO, Inc. v. Sony Computer Entertainment America, LLC, et al.*, CV-14-0383; *McRO, Inc. v. Warner Bros. Interactive Entertainment Inc.*, CV-14-0417.

   [2] The current Track 2 cases are: *McRO, Inc. v. Valve Corporation*, CV-13-1874; *McRO, Inc. v. Codemasters USA Group, Inc. et al*, CV-14-0389; *McRO, Inc. v. Codemasters, Inc., et al*, CV-14-0439.

-1-

A1

allegation that Defendants directly or indirectly infringed two patents for automatically animating the lip synchronization and facial expressions of 3D characters. The cases are proceeding on different tracks due to the filing or transfer dates of the cases, although various later-filed cases have been consolidated into Track 1 due to corporate or counsel relationships.

This Motion for Judgment on the Pleadings Based on Unpatentability under 35 U.S.C. § 101 ("Motion") was jointly filed by all defendants in both Tracks: Namco Bandai Games America, Inc.; Sega of America, Inc.; Electronic Arts, Inc.; Disney Interactive Studios, Inc.; Capcom USA, Inc.; Neversoft Entertainment, Inc.; Treyarch Corporation; Warner Bros. Interactive Entertainment, Inc.; LucasArts Entertainment Co. LLC; Activision Publishing, Inc.; Blizzard Entertainment, Inc.; Infinity Ward, Inc.; Atlus U.S.A., Inc.; Konami Digital Entertainment, Inc.; Square Enix, Inc.; Obsidian Entertainment, Inc.; Naughty Dog, Inc.; Sony Computer Entertainment America, LLC; Sucker Punch Productions, LLC; The Codemasters Software Company Limited; Codemasters, Inc.; Codemasters USA Group, Inc.; and Valve Corp. (collectively, "Defendants"). Notice of Mot., Docket No. 338 at 2. Plaintiff filed its Opposition on July 24, 2014. Docket No. 344. Defendants filed their Reply on July 31, 2014. Docket No. 350.

At issue are United States Patent Nos. 6,307,576 ("'576 Patent"), issued October 23, 2001, and 6,611,278 ("'278 Patent"), issued August 26, 2003, both to Maury Rosenfeld, and both titled "Method for Automatically Animating Lip Synchronization and Facial Expression of Animated Characters." The '278 Patent resulted from a continuation of the application that resulted in the '576 Patent, meaning the patents share the same disclosure. *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304, n.3 (Fed. Cir. 2008).

The patents explain that prior methods of animating lip synchronization and facial expressions were laborious and uneconomical. '576 Patent 1:14-31. The

-2-

**A2**

patents address that problem with an automated method of using "weighted morph targets and time aligned phonetic transcriptions of recorded text, and other time aligned data." '576 Patent 2:64-3:12. The patents explain that in the relevant art, "'phonemes [are] defined as the smallest unit of speech, and correspond[] to a single sound." '576 Patent 1:34-36. A sound recording can be transcribed into a "time aligned phonetic transcription" in which the timing of each phoneme is noted. '576 Patent 1:32-34. Such transcriptions can be created by hand or by automatic speech recognition programs. '576 Patent 1:39-43.

The patents explain that the prior art practice for 3-D computer generated speech animation was by manual techniques using a "morph target" approach. '576 Patent 1:44-46. That approach uses a reference model of a neutral mouth position in conjunction with "morph targets," which are models of the mouth in non-neutral positions corresponding to different phonemes. '576 Patent 1:46-49. The reference model and morph targets all share the same "topology" of the mouth, defined by the same number and placement of "vertices" that designate specific points on the mouth. For example, vertex "n" on the neutral mouth and all of the morph targets may represent the left corner of the mouth. '576 Patent 1:51-54.

The "deltas," or changes, of each vertex on each morph target relative to the corresponding vertex on the neutral model are computed as a vector to produce an individual "delta set" of vectors for each morph target. '576 Patent 1:58-62. From the neutral model, the animator need not move the mouth position all the way to a morph target. Instead, the animator can apply a value between 0 and 1, called the "morph weight," to a delta set to move the mouth just a percentage of the way to the corresponding morph target. '576 Patent 1:63-2:1. For example, if the sound (morph target) is "oh," and the morph weight is 0.5, the mouth only moves halfway between the neutral position and the "oh" morph target. '576 Patent 2:16-22. It is also possible to blend the morph targets, for example, 0.3 "oh" and 0.7 "ee," resulting in

a mouth position exhibiting a combination of the "oh" and "ee" sound characteristics. '576 Patent 2:23-28.

According to the patents, applying the appropriate morph weights in the prior art was usually done using a "keyframe" approach. In the keyframe approach, an artist sets the morph weights at certain important times, and a computer program then interpolates each of the channels at each frame between the keyframes. '576 Patent 2:29-34. The patents state that this method requires the artist to manually set a large number of keyframes, which is tedious, time consuming, and inaccurate. '576 Patent 2:34-37. Therefore, an object of the invention is to provide "an extremely rapid and cost effective means to automatically create lip synchronization and facial expression in three dimensional animated characters." '576 Patent 2:50-54.

The invention "utilizes a set of rules that determine the system[']s output comprising a stream or streams of morph weight sets when a sequence of timed phonemes or other timed data is encountered." '576 Patent 3:3-7. The invention includes:

> [C]onfiguring a set of default correspondence rules between a plurality of visual phoneme groups and a plurality of morph weight sets; and specifying a plurality of morph weight set transition rules for specifying durational data for the generation of transitionary curves between the plurality of morph weight sets, allowing for the production of a stream of specified morph weight sets to be processed by a computer animation system . . . .

'576 Patent 3:23-30.

Defendants argue that the claims of both patents in suit are patent ineligible under 35 U.S.C. § 101 because they merely "set[] forth the previously-known animation method as a series of mathematical steps, and instruct[] the user to perform those steps on a computer." Mot., Docket No. 338 at 12.

## II. Legal Standard

### A. Motion for Judgment on the Pleadings

Rule 12(c) of the Federal Rules of Civil Procedure permits a party to move to dismiss a suit "[a]fter the pleadings are closed . . . but early enough not to delay trial."

Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when, taking all allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." *Stanley v. Trustees of Cal. State Univ.*, 433 F.3d 1129, 1133 (9th Cir. 2006); *see also Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). Because a motion for judgment on the pleadings is "functionally identical" to a motion to dismiss, the standard for a Rule 12(c) motion is the same as for a Rule 12(b)(6) motion. *See Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1052 n.1 (9th Cir. 2008).

A complaint may be dismissed for failure to state a claim upon which relief can be granted for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). *See also Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."). A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face. *See Twombly*, 550 U.S. at 558-59, 570; *see also William O. Gilley Enters., Inc. v. Atlantic Richfield Co.*, 588 F.3d 659, 667 (9th Cir. 2009) (confirming that *Twombly* pleading requirements "apply in all civil cases"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

In deciding a 12(b)(6) or 12(c) motion, the court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable and other extrinsic documents when "the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that

document in the complaint." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). The court must construe the complaint in the light most favorable to the plaintiff and must accept all factual allegations as true. *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court must also accept as true all reasonable inferences to be drawn from the material allegations in the complaint. *See Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1247-48 (9th Cir. 2013); *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). Conclusory statements, unlike proper factual allegations, are not entitled to a presumption of truth. *See Iqbal*, 556 U.S. at 681; *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

### B. Patentable Subject Matter Under 35 U.S.C. § 101[3]

35 U.S.C. § 101 "defines the subject matter that may be patented under the Patent Act." *Bilski v. Kappos*, 561 U.S. 593, ___, 130 S.Ct. 3218, 3225 (2010). It provides:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

*Id.* "In choosing such expansive terms . . . modified by the comprehensive 'any,' Congress plainly contemplated that the patent laws would be given wide scope" "to ensure that 'ingenuity should receive a liberal encouragement.'" *Id.* (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (quoting 5 Writings of Thomas Jefferson 75–76 (H. Washington ed. 1871)) (some internal quotation marks omitted).

The "wide scope" of patent eligibility is not unlimited. Instead, the Supreme Court has invented or discovered "three specific exceptions to § 101's broad patent-eligibility principles: 'laws of nature, physical phenomena, and abstract ideas.'" *Bilski*, 130 S.Ct. at 3225 (quoting *Chakrabarty*, 447 U.S. at 309). Although "the exceptions have defined the statute's reach as a matter of statutory *stare decisis*

---

[3] This section concerning the applicable legal standard is the same as the corresponding section in this Court's recent decision in *Eclipse IP LLC v. McKinley Equip. Corp.*, CV-14-154-GW (AJWx), 2014 WL 4407592 (C.D. Cal. Sept. 4, 2014), except for minor changes.

going back 150 years,"[4] *id.*, they have not been enumerated consistently during that time. Forty years ago, the list of unpatentable "basic tools of scientific and technological work" was: "[p]henomena of nature . . . , mental processes, and abstract intellectual concepts." *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972).

In *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S.Ct. 1289 (2012), the Supreme Court "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). That framework is as follows:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. We have described step two of this analysis as a search for an "'inventive concept'" – *i.e.*, an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Id*. at 2355 (citations omitted).

Describing this as a two-step test may overstate the number of steps involved. If the claim is not "directed" to a patent-ineligible concept, then the test stops at step one. If the claim is so directed, but we find in step two that the claim contains an "inventive concept" that "transforms" the nature of the claim into something patent eligible, then it seems that there was a categorization error in finding the claim – which is considered "as an ordered combination" – "directed to an abstract idea" in step one.

---

[4] "Statutory *stare decisis*" is a recent coinage, apparently used for the first time by Justice Scalia concurring in part in *Rita v. United States*, 551 U.S. 338, 368 (2007). Justice Ginsburg was the next to use the phrase: "Although I joined Justice SCALIA in *Rita* accepting the *Booker* remedial opinion as a matter of 'statutory *stare decisis*' . . . ." *Kimbrough v. United States*, 552 U.S. 85, 116 (2007). Justice Ginsburg's use of quotation marks could have been a comment on the novelty of the phrase, but might have simply indicated a quotation. In any event, Justice Ginsburg later used the phrase without quotation marks in *CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2641 (2011). The context there makes clear that the phrase refers to the principle that "[c]onsiderations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done." *Patterson v. McLean Credit Union*, 491 U.S. 164, 172-73 (1989).

So, the two-step test may be more like a one step test evocative of Justice Stewart's most famous phrase. *See Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J. concurring) ("I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it . . . ."); *cf. Alice*, 134 S.Ct. at 2357 ("In any event, we need not labor to delimit the precise contours of the 'abstract ideas' category in this case.").

Rest and relaxation prevailed in *Alice* because it was "enough to recognize that there is no meaningful distinction between the concept of risk hedging in *Bilski* and the concept of intermediated settlement at issue [in *Alice*]. Both are squarely within the realm of 'abstract ideas' . . . ." *Id.* at 2357 (citing to *Bilski*, 130 S.Ct. 3218). Thus, so far, the two-part test for identifying an abstract idea appears to be of limited utility, while comparisons to previously adjudicated patents – or more precisely, to past cases' characterizations of those patents[5] – have done the heavy lifting. *See also Bilski*, 130 S. Ct. at 3229 ("Rather than adopting categorical rules that might have wide-ranging and unforeseen impacts, the Court resolves this case narrowly on the basis of this Court's decisions in *Benson*, *Flook*, and *Diehr* . . . .").[6] It remains true that "[t]he life of the law has not been logic: it has been experience." Oliver Wendell Holmes, Jr., *The Common Law* 1 (1881).

But despite its narrow holding, *Alice* did categorically establish a clear rule that had previously been subject to debate: "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." 134 S.Ct. at 2358. And before *Alice*, it was unclear to some, including the USPTO,

---

[5] *Mayo* noted that, as to the patent-ineligible approach of simply instructing artisans "to apply" unpatentable subject matter, "[t]he process in *Diehr* was not so **characterized**; that in *Flook* was **characterized** in roughly this way." 132 S. Ct. at 1299-1300 (emphasis added).

[6] Scholars have argued that "the *Mayo* decision has revived the *Flook* approach, although without displacing *Diehr* or explaining how the two apparently contradictory decisions can be reconciled." Brief of Professors Peter S. Menell and Jeffrey A. Lefstin as Amici Curiae in Support of Respondents, *Alice Corp. Pty, Ltd. v. CLS Bank Int'l*, No. 13-298, 2014 U.S. Briefs LEXIS 784 at 10 (Feb. 27, 2014).

that the framework set forth in *Mayo* applied to abstract ideas as well as to the law of nature/natural phenomena at issue in *Mayo*.  *See* Memo to Patent Examining Corps from Andrew H. Hirschfeld, Deputy Commissioner for Patent Examination Policy, Preliminary Examination Instructions in view of the Supreme Court Decision in *Alice Corporation Pty. Ltd. v. CLS Bank International, et al.* (June 25, 2014), *available at* http://www.uspto.gov/patents/announce/alice_pec_25jun2014.pdf.[7]

And, while the boundaries of the judicial exceptions remain subject to further development, the Supreme Court has clearly stated the policy underlying those exceptions, i.e. avoiding patents that "too broadly preempt the use of a natural law [or abstract idea]." *Mayo*, 132 S.Ct. at 1294. Thus, patent law should "not inhibit further discovery by improperly tying up the future use of laws of nature [or abstract ideas]." *Id*. at 1301.

*Mayo* discussed the Supreme Court's 1854 decision upholding many of Samuel Morse's telegraph patent claims, but invalidating the most general claim, which covered "the use of the motive power of the electric or galvanic current . . . however developed, for making or printing intelligible characters, letters, or signs, at any distances." *Id*. The Supreme Court presciently explained that such a claim would inhibit, rather than promote, the progress of the useful arts:

> For aught that we now know some future inventor, in the onward march of science, may discover a mode of writing or printing at a distance by means of the electric or galvanic current, without using any part of the process or combination set forth in the plaintiff's specification.  His invention may be less complicated – less liable to get out of order – less expensive in construction, and in its operation. But yet if it is covered by this patent the inventor could not use it, nor the public have the benefit of it without the permission of this patentee.

*Id*. (quoting *O'Reilly v. Morse*, 15 How. 62, 113 (1854).)   True, patents always

---

[7] Indeed, in the USPTO's view, *Alice*'s embrace of the *Mayo* framework for abstract idea cases was such a significant change or clarification that it has withdrawn issued notices of allowance – that is, stopped patents that had made it all the way through examination and were about to issue – "due to the presence of at least one claim having an abstract idea and no more than a generic computer to perform generic computer functions." USPTO Commissioner for Patents Peggy Focarino, Update on USPTO's Implementation of 'Alice v. CLS Bank' (Aug. 4, 2014), available at http://www.uspto.gov/blog/director/entry/update_on_uspto_s_implementation.

present some impediment to follow-on innovation.  The principle is one of balance: patents should not "foreclose[] more future invention than the underlying discovery could reasonably justify."  *Mayo*, 132 S.Ct. at 1301.

Of course, § 101 is not the sole, or even primary, tool to ensure that balance. Every condition of patentability set forth in the Patent Act acts to ensure that patents promote, rather than retard, the progress of science and useful arts.  For example, in a manner quite similar to recent § 101 jurisprudence, "[t]he written description requirement guards against claims that 'merely recite a description of the problem to be solved while claiming all solutions to it and . . . cover any compound later actually invented and determined to fall within the claim's functional boundaries.'"  *Abbvie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, __ F.3d __, 2013-1338, 2014 WL 2937477, 11 (Fed. Cir. July 1, 2014) (quoting *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1353 (Fed. Cir. 2010)).

However, scholars have argued that the written description and enablement doctrines of § 112, as currently applied, do not adequately prevent unwarranted obstructions to follow-on innovation, and have urged that § 101 can and should do so.  *See, e.g.*, Lemley et al., *Life After Bilski*, 63 Stan. L. Rev. 1315, 1330 (2011) (cited in *Mayo*, 132 S.Ct. at 1301-03, 1304); *but see* Lemley, *Point of Novelty*, 105 Nw. U. L. Rev. 1253, 1279 (2011) ("[T]here is good reason to worry about overbroad patent claims that lock up a wide swath of potential future applications.  But the enablement and written description doctrines largely address that concern.").

In any event, the Supreme Court has spoken, and § 101 now plays an important limiting role.  But District Courts and the Federal Circuit are now left with the task of figuring out when the "two-part" test is satisfied.  Perhaps something like the function-way-result test used to evaluate infringement under the doctrine of equivalents might be useful.  Thus, in one long-standing formulation, an accused instrumentality infringes "if it performs substantially the same function in

substantially the same way to obtain the same result." *Union Paper-Bag Mach. Co. v. Murphy*, 97 U.S. 120, 125 (1877); *InTouch Technologies, Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1343 (Fed. Cir. 2014).

The test in practice often focuses on the "way" aspect of the test, because function and result are often identical in the patent and accused product, and the question is whether the accused infringer uses the same "way." Laura A. Handley, *Refining the Graver Tank Analysis with Hypothetical Claims: A Biotechnology Exemplar*, 5 Harv. J.L. & Tech. 36 (1991) ("In practice, the second prong of the test – 'substantially the same way' is often emphasized, since most infringement suits result from competition for a given market niche which dictates the 'function' and 'result' prongs.") (citing *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1531 (Fed. Cir. 1987)).[8]

Similarly, the question in the abstract idea context is whether there are other *ways* to use the abstract idea in the same field. If so, the Supreme Court has expressly encouraged others to find those other ways, without being held back by patents that preempt the whole concept. *Mayo*, 132 S.Ct. at 1294 (citing *O'Reilly*, 15 How. at 113); *Alice*, 134 S.Ct. at 3258 (noting "the pre-emption concern that undergirds our § 101 jurisprudence.").

Concomitantly, we must be wary of facile arguments that a patent preempts all applications of an idea. It may often be easier for an infringer to argue that a patent fails § 101 than to figure out a different way to implement an idea, especially a way that is "less complicated – less liable to get out of order – less expensive in construction, and in its operation." *O'Reilly*, 15 How. at 113. But the patent law does not privilege the leisure of an infringer over the labors of an inventor. Patents

---

[8] *Perkin-Elmer* held that "repeated assertions that the claimed and accused devices perform substantially the same function and achieve substantially the same end result are not helpful. That circumstance is commonplace when the devices are sold in competition. That a claimed invention and an accused device may perform substantially the same function and may achieve the same result will not make the latter an infringement under the doctrine of equivalents where it performs the function and achieves the result in a substantially different way." 822 F.2d at 1532 n.6.

-11-

should not be casually discarded as failing § 101 just because the infringer would prefer to avoid the work required to develop non-infringing uses of the abstract idea at the heart of an appropriately circumscribed invention.

### III. <u>Analysis</u>

#### *A. Defendants' Patents Are Irrelevant*

Plaintiff argues that Defendants' own patents for lip-synchronization, some of which issued very recently, undermine Defendants' argument that the patents-in-suit are directed to unpatentable subject matter. Opp'n, Docket No. 344 at 20-22. The validity of Defendants' patents is not before the Court, and Plaintiff has cited no authority for the proposition that Defendants' obtaining them operates as an estoppel in this case. There may be numerous factual differences between Defendants' patents and those at issue here. And even if Defendants' patents rise and fall with Plaintiff's, it is hard to fault anyone for seeking patents that may turn out to be invalid where the applicable standards are shifting and uncertain. "A change in the weather has known to be extreme." Bob Dylan, *You're a Big Girl Now*, <u>Blood on the Tracks</u> (Columbia Records 1974).

#### *B. The Patents-in-Suit Fail § 101*

##### **1. The Claims, In Isolation, Appear Tangible and Specific**

Defendants argue that the patents-in-suit are directed to a "fundamental, abstract animation practice," namely, "the abstract idea of rules-based synchronization of animated mouth movement." Mot., Docket No. 338 at 12. That is, Defendants argue that the patents cover the mere idea of using rules for three-dimensional lip synchronization, without requiring specific content for those rules. *Id*. at 12-13. But considered standing alone, the asserted claims do not seem to cover any and all use of rules for three-dimensional lip synchronization. The independent claims of each of the patents in suit are:

-12-

'576 Patent claim 1:

A method for automatically animating lip synchronization and facial
expression of three-dimensional characters comprising:
   obtaining a first set of rules that define output morph weight set
      stream as a function of phoneme sequence and time of said
      phoneme sequence;
   obtaining a timed data file of phonemes having a plurality of
      sub-sequences;
   generating an intermediate stream of output morph weight sets and a
      plurality of transition parameters between two adjacent morph
      weight sets by evaluating said plurality of sub-sequences
      against said first set of rules;
   generating a final stream of output morph weight sets at a desired
      frame rate from said intermediate stream of output morph
      weight sets and said plurality of transition parameters; and
   applying said final stream of output morph weight sets to a sequence
      of animated characters to produce lip synchronization and
      facial expression control of said animated characters.

'278 Patent claim 1:

A method for automatically animating lip synchronization and facial
expression of three-dimensional characters comprising:
   obtaining a first set of rules that defines a morph weight set stream as
      a function of phoneme sequence and times associated with said
      phoneme sequence;
   obtaining a plurality of sub-sequences of timed phonemes
      corresponding to a desired audio sequence for said
      three-dimensional characters;
   generating an output morph weight set stream by applying said first
      set of rules to each sub-sequence of said plurality of
      sub-sequences of timed phonemes; and
   applying said output morph weight set stream to an input sequence of
      animated characters to generate an output sequence of animated
      characters with lip and facial expression synchronized to said
      audio sequence.

Facially, these claims do not seem directed to an abstract idea. They are
tangible, each covering an approach to automated three-dimensional computer
animation, which is a specific technological process. They do not claim a monopoly,
as Defendants argue, on "the idea that the human mouth looks a certain way while
speaking particular sounds," "applied to the field of animation." Mot., Docket No.
338 at 12, n.9. Further, the patents do not cover the prior art methods of computer
assisted, but non-automated, lip synchronization for three-dimensional computer
animation.

And according to Defendants, they do not cover the automated methods of lip synchronization for three-dimensional computer animation that Defendants employ. It is hard to show that an abstract idea has been preempted if there are noninfringing ways to use it in the same field.  Section 101 motions can place parties in unfamiliar and uncomfortable positions: here it is to the patentee's advantage to identify noninfringing alternatives, and it is the accused infringer's advantage to posit the lack of any; the reverse of their positions at the infringement and damages stages of the case.

At first blush, it is therefore difficult to see how the claims might implicate the "basic underlying concern that these patents tie up too much future use of" any abstract idea they apply.  *Mayo*, 132 S. Ct. at 1302; *Alice*, 134 S.Ct. at 2358 (noting "the pre-emption concern that undergirds our § 101 jurisprudence").

## 2.  The Claims Must Be Evaluated in the Context of the Prior Art

However, for purposes of the § 101 analysis, it is not enough to view the claims in isolation.   Instead, when determining whether a patent contains an adequate inventive concept, the Court must factor out conventional activity.   That is because the inclusion of "well-understood, routine, conventional activity" previously used in the field "is normally not sufficient to transform an unpatentable law of nature [or abstract idea] into a patent-eligible application . . . ."  *Mayo*, 132 S.Ct. at 1298.[9] Further, in addition to evaluating each step of the claim, the claims must be considered as "an ordered combination."  *Alice*, 132 S.Ct. at 2355.

This dual analysis tracks the law's long-standing concern with patents that

---

[9] In a forthcoming paper, Jeffrey Lefstin argues that for more than a hundred years, the lesson drawn from the English *Neilson* case (relied upon by the Supreme Court in *Mayo*) was that any practical application of a new discovery was patentable, even if the application was entirely conventional.  Jeffrey Lefstin, *Inventive Application: A History*, Fla. L. Rev. & Hastings Research, Paper No. 94 (Mar. 2014), *available at* http://ssrn.com/abstract =2398696.  This is contrary to the current law that "appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable."  *Mayo*, 132 S.Ct. at 1300. What the Supreme Court says about prior cases is often more important than what the cases themselves said.  *See, e.g., Daimler AG v. Bauman*, 134 S. Ct. 746, 756 n.8 (2014) (eight-member majority chiding Justice Sotomayor for relying in her concurrence on the facts recited in *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952) and in the intermediate appellate opinion in that case, rather than acquiescing to the characterization of *Perkins* in a recent decision, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846 (2011)) (which Justice Sotomayor had joined).)

A14

consist of old material with the addition of a new, but abstract, idea: "the vice of a functional claim exists not only when a claim is 'wholly' functional, if that is ever true, but also when the inventor is painstaking when he recites what has already been seen, and then uses conveniently functional language at the exact point of novelty." *Gen. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 371, 58 S. Ct. 899, 903 (1938). An abstract idea is the extreme case of functional language.

Thus, where a claim recites tangible steps, but the only new part of the claim is an abstract idea, that may constitute a claim to an abstract idea. *See Alice*, 134 S. Ct. at 2358. (disregarding the presence of a computer in the claim given "the ubiquity of computers"); *Mayo*, 132 S.Ct. at 1297-98 (claim step calling for administration of drug only disregarded because it "refers to the relevant audience, namely doctors who treat patients with certain diseases with thiopurine drugs"; claim step of determining the level of the relevant metabolites disregarded because it was "well known in the art").

Here, the patents teach that in the prior art, three-dimensional character lip synchronization was performed using a "timed data file of phonemes having a plurality of sub-sequences," as recited in the claims. '576 Patent 1:32-43. But the prior art did not, according to the patents, involve obtaining rules that define output morph weight sets as a function of the phonemes, or using those rules to generate the morph weight sets. Instead, an artist manually set the morph weights at certain important keyframes, and a computer program then interpolated the frames between the keyframes. '576 Patent 2:29-37. Therefore, while tangible, the steps of (1) using a timed phoneme transcript, (2) setting morph weight sets at keyframes, or (3) interpolating between keyframes, are not "inventive steps" that could transform the claims herein into patent eligible subject matter, if those claims are directed to an abstract idea.

In attacking the claims as simply drawn to the abstract idea of "rules-based lip-

-15-

synchronized animation on a computer," Mot., Docket No. 338 at 3, Defendants' argument does not account for the presence in the claims, or the Court's construction, of "morph weight set." The Court construed "morph weight set" as a "set of values, one for each delta set, that, when applied, transform the neutral model to some desired state, wherein each delta set is the [set of vectors] from each vertex on the neutral (reference) model to each vertex on a model of another mouth position." Rulings on Claim Constr., Docket No. 298-1 at 9.

However, the patents themselves teach that the prior art includes using morph targets that correspond to phonemes and calculating delta sets that contain the vectors from each vertex on the neutral model to the morph target. '576 Patent at 1:44-62. So, while Defendant's characterization is overly broad, it would be fair to characterize the claims as drawn to the idea of automated rules-based use of morph targets and delta sets for lip-synchronized three-dimensional animation. Indeed, Plaintiff's expert opines that:

> A central part of the creative insight of the patents is the realization to use the specific approach of using morph weight set representations of the facial shape coupled with rules, including explicit and distinct timing rules, to generate keyframes. This approach uniquely provides the automation required to produce animation in a cost-effective way, yet provided the necessary artistic control required to produce commercial grade animation.

Declaration of Michael Gleicher, Ph.D. in Supp. of Opp'n, Docket No. 345, ¶ 20. Defendants object to this testimony, because "[t]he Court may not consider declarations in opposition to a Rule 12(c) motion without converting the motion to a motion for summary judgment." Defs.' Objections to Declarations Filed in Connection with Motion for Judgment on the Pleadings, Docket No. 351 at 2.[10] It is unclear how that response helps Defendants. Certainly, one option is for the Court to deny the Motion as presenting an issue that turns on the facts.

However, nothing in the Declaration affects the analysis. In the paragraph

---

[10] Plaintiff submitted a response to Defendant's Objections, which also included an unauthorized five-page sur-reply, which the Court would not consider. Planet Blue's Response to Defs.' Objections to Declarations Filed in Opposition to Motion for Judgment on the Pleadings, Docket No. 355. Neither would the Court consider Defendants' Reply to that Response, Docket No. 356.

-16-

A16

quoted above, Plaintiff's expert opines that a central part of the patents is "using morph weight set representations of the facial shape coupled with rules, including explicit and distinct timing rules, to generate keyframes." Everyone appears to agree with that characterization, except that Defendants point out that no particular "explicit and distinct" rules are required by the claims. The question is therefore whether the inclusion of that *concept* in the claims satisfies § 101 given (1) the prior art, and (2) the fact that the claims do not require any particular rules.

A consideration of the prior art recited in the patents shows that the point of novelty here is the idea of using rules, including timing rules, to automate the process of generating keyframes. The following chart compares the '576 Patent's claim elements to the prior art described in that patent.

| '576 Patent, Claim 1 | |
|---|---|
| **Step** | **Admitted Prior Art** |
| A method for automatically animating lip synchronization and facial expression of three-dimensional characters comprising: | Automating the process is the focus of the invention. However, the patent teaches that in the prior art, the use of computerized interpolation partially automated the process by allowing animators to set mouth shapes only at keyframes, rather than at every frame, as would be the case in hand-drawn animation. '576 Patent 2:31-34. |
| obtaining a first set of rules that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence; | Rules for defining morph weight sets as a function of phoneme sequence are disclosed as within the prior art. '576 Patent 1:44-2:28. Rules for defining morph weight sets as a function of timing are not; instead, the timing results from the artist's choice of keyframes. '576 Patent 2:29-34. Note, however, that no particular timing rules are required by any claim. |

-17-

| Step | Admitted Prior Art |
|---|---|
| generating an intermediate stream of output morph weight sets and a plurality of transition parameters between two adjacent morph weight sets by evaluating said plurality of sub-sequences against said first set of rules; | An intermediate stream of morph weight sets is disclosed as being part of the prior art through the keyframes manually set by the artist. '576 Patent 2:29-34. The transition parameters are not. Those parameters flow from the timing rules. |
| generating a final stream of output morph weight sets at a desired frame rate from said intermediate stream of output morph weight sets and said plurality of transition parameters; and | The patent teaches that the prior art generated the final stream by interpolating between the keyframes. '576 Patent 2:29-34. Again, transition parameters are not disclosed as being within the prior art. |
| applying said final stream of output morph weight sets to a sequence of animated characters to produce lip synchronization and facial expression control of said animated characters. | Both the final set of output morph weight sets and applying those sets are covered by the interpolation process of the prior art. '576 Patent 2:29-34. |

So, what the claim adds to the prior art is the use of rules, rather than artists, to set the morph weights and transitions between phonemes. However, both of these concepts are specified at the highest level of generality. At the hearing on the Motion, Plaintiff emphasized that the rules inventively take into account the timing of the phoneme sequence. But the specification states clearly that "[i]n operation and use, the user must manually set up default correspondence rules" that "specify the durational information needed to generate appropriate transitionary curves between morph weight sets, such as transition start and end times." '576 Patent 6:46-54. Thus, the user, not the patent, provides the rules. And while the patent does provide an example of a very partial set of default and secondary rules, it expressly states that "this is only an example of a set of rules which could be use[d] for illustrative purposes, and many other rules could be specified according to the method of the invention." '576 Patent 7:36-9:23. Because the claim purports to cover all such rules, in light of the prior art, the claim merely states "an abstract idea while adding the words 'apply it.'" *Alice*, 134 S. Ct. at 2358 (quoting *Mayo*, 132 S.Ct. at 1294)

(some quotation marks omitted).  The same is true for claim 1 of the '278 Patent, which does not differ in a manner relevant to this analysis.

Here, while the patents do not preempt the field of automatic lip synchronization for computer-generated 3D animation, they do preempt the field of such lip synchronization using a rules-based morph target approach.  And if, as Plaintiff suggests, the inventive step is the use of timing rules, given the state of the prior art, that still leaves an abstract idea at the point of novelty, and preventing the development of any additional ways to use that abstract idea in the relevant field.  *See Alice*, 134 S. Ct. at 2360 ("the claims at issue amount to 'nothing significantly more' than an instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer").

### 3.  The Failure of the Claims Is Not Inconsistent with the Inventor Having Developed an Innovative Process

Defendants argue that a "patentee simpl[y] does not waste the time, money and effort to prosecute a patent application for an invention they casually indicate was known in the art."  Opp'n, Docket No. 344 at 10-11.  But a § 101 defect does not mean that the invention was in the prior art.  The invention here may have been novel, but the claims are directed to an abstract idea.  And the patent's casual – and honest – description of the prior art was made at a time when, under the then-prevalent interpretation of the law, such admissions were unlikely to be harmful.    One unintended consequence of *Alice*, and perhaps of this and other decisions to come, is an incentive for patent applicants to say as little as possible about the prior art in their applications.[11]

Plaintiff points to one Defendant's contemporaneous characterization of Plaintiff's system as "revolutionary."  Opp'n, Docket No. 344 at 1 (quoting Decl. of John Petrsoric In Opp'n to Mot., Docket No. 346, Ex. 2, January 27, 1999 Warner

---

[11]However, that strategy is limited by the doctrine of inequitable conduct.

-19-

Bros. Memorandum (inviting colleagues to a demonstration of Plaintiff's "revolutionary lip synch technique" that "utilizes proprietary software.")).

This argument is unpersuasive in this context for two reasons. First, for purposes of the § 101 inquiry, which is different from the § 103 inquiry, the revolutionary nature of an abstract idea does not weigh in favor of patentability. *See Mayo*, 132 S. Ct. at 1293 ("Einstein could not patent his celebrated law that E=mc$^2$ . . . . Such discoveries are 'manifestations of . . . nature, free to all men and reserved exclusively to none.'") (quoting *Chakrabarty*, 100 S.Ct. at 2204). Second, there has been no showing that the cited praise relates to the claims in all their breadth, rather than to a particular implementation that is not specified by the claims. Thus, the inventor's specific implementation of the abstract idea represented by the claim may have been of significant value beyond that of the abstract idea itself.

### 4. None of the Additional Content in the Asserted Dependent Claims Yields a Different Result

Plaintiff has asserted '576 Patent claims 1, 7-9, and 13, and '278 Patent, claims 1-4, 6, 9, 13, 15-17. Mot., Docket No. 338 at 2. The additional content of the dependent claims is addressed in the following chart:

| Claim | Language | Analysis |
|-------|----------|----------|
| '576 Patent claim 7 | The method of claim 1 wherein said timed data is a time[] aligned phonetic transcriptions data. | Because "time aligned phonetic transcriptions" were used in the prior art ('576 Patent 1:32-37), the additional limitation of this claim does not affect the § 101 analysis. |
| '576 Patent claim 8 | The method of claim 7 wherein said timed data further comprises time aligned data. | This adds nothing to claim 7, and so does not affect the § 101 analysis. |

| Claim | Language | Analysis |
|-------|----------|----------|
| '576 Patent claim 9 | The method of claim 7 wherein said timed data further comprises time aligned emotional transcription data. | Not specifically referenced in the patent's description of the prior art. However, this is just another idea of a factor that could be taken into account by the rules; the patent claims no specific method of doing so. |
| '576 Patent claim 13 | The method of claim 1 wherein said first set of rules comprises:<br>    correspondence rules between a plurality of visual phoneme groups and a plurality of morph weight sets; and<br>    morph weight set transition rules specifying durational data for generating transitionary curves between morph weight sets. | Claim 1 already includes "obtaining a first set of rules that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence." The specific content of claim 13 is not meaningfully different from that from a § 101 perspective. |
| '278 Patent claim 2 | The method of claim 1, wherein said first set of rules comprises:<br>    correspondence rules between all visual phoneme groups and morph weight sets; and<br>    morph weight set transition rules specifying durational data between morph weight sets. | These elements have already been discussed in the context of the '576 Patent. |
| '278 Patent claim 3 | The method of claim 2, wherein said durational data comprises transition start and transition end times. | Transition start and end times are inherent in "transition rules specifying durational data between morph weight sets," which is an element of '278 Patent claim 2. |
| '278 Patent claim 4 | The method of claim 1, wherein said desired audio sequence is from a pre-recorded live performance. | This is merely limiting the claim to a particular field of use. "[T]he prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' . . . ." *Bilski*, 130 S.Ct. at 3230 (quoting *Diehr*, 450 U.S. at 191). |
| '278 Patent claim 6 | The method of claim 1, wherein said plurality of subsequences of timed phonemes is obtained from a file. | This presents the same issue as '278 Patent claim 4. *See* discussion above. |

| Claim | Language | Analysis |
|---|---|---|
| '278 Patent claim 9 | The method of claim 1, wherein said generating said output morph weight stream comprises: generating an appropriate morph weight set corresponding to each subsequence of said timed phonemes; and generating time parameters for transition of said appropriate morph weight set from a morph weight set of a prior sub-sequence of said timed data. | This presents the same issue as '278 Patent claim 2. *See* discussion above. |
| '278 Patent claim 13 | The method of claim 1, wherein said plurality of subsequences of timed phonemes comprises a time[] aligned phonetic transcriptions sequence. | This is a basic feature of the prior art. '278 Patent 1:35-47. |
| '278 Patent claim 15 | The method of claim 13, wherein said plurality of subsequences of timed phonemes further comprises time aligned emotional transcription data. | Not specifically referenced in the patent's description of the prior art. However, this is just another idea of a factor that could be taken into account by the rules; the patent claims no specific method of doing so. |
| '278 Patent claim 16 | The method of claim 9, wherein said transition parameters comprises:      transition start time; and      transition end time. | This presents the same issue as '278 Patent claim 2. *See* discussion above. |
| '278 Patent claim 17 | The method of claim 16, further comprising: generating said output morph weight set stream by interpolating between morph weight sets at said transition start time and said transition end time according to a desired frame rate of said output sequence of animated characters | Such interpolation was used in the prior art. '278 Patent 2:29-32. |

## 5. The Draftsman's Art

This case illustrates the danger that exists when the novel portions of an invention are claimed too broadly. As noted above, the claims here are drafted to give the impression of tangibility, but the Supreme Court has "long warn[ed] . . .

-22-

against interpreting § 101 in ways that make patent eligibility depend simply on the draftsman's art. " *Alice*, 134 S. Ct. at 2351 (citing *Mayo*, 132 S.Ct. at 1294). When examined in light of the prior art, the claims are directed to an abstract idea, and lack an "inventive concept" "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." *Id*. at 2355 (citations omitted).

**IV.  Conclusion**

For the foregoing reasons, the Court would GRANT the Motion, and hold '576 Patent claims 1, 7-9, and 13, and '278 Patent claims 1-4, 6, 9, 13, and 15-17 invalid under 35 U.S.C. § 101.

Dated: This 22nd day of September, 2014.

GEORGE H. WU
United States District Judge

1

2

3

4

5

6 UNITED STATES DISTRICT COURT

7 CENTRAL DISTRICT OF CALIFORNIA

8 WESTERN DIVISION

9

| | |
|---|---|
| 10  McRo, Inc., d.b.a. Planet Blue, | CASE No. 12-cv-10322-GW (FFMx) |
| 11                    Plaintiff, | **FINAL JUDGMENT** |
| 12 | Honorable George H. Wu |
| 13        v. | |
| 14  Bandai Namco Games America, Inc., et | CONSOLIDATED WITH:<br>12-cv-10323-GW (FFMx)<br>12-cv-10326-GW (FFMx) |
| 15  al. | 12-cv-10327-GW (FFMx)<br>12-cv-10329-GW (FFMx) |
| 16                    Defendants. | 12-cv-10331-GW (FFMx)<br>12-cv-10333-GW (FFMx) |
| 17 | 12-cv-10335-GW (FFMx)<br>12-cv-10337-GW (FFMx) |
| 18  Bandai Namco Games America, Inc., et<br>al., | 12-cv-10338-GW (FFMx)<br>12-cv-10341-GW (FFMx) |
| 19 | 12-cv-10342-GW (FFMx)<br>13-cv-01870-GW (FFMx) |
| 20            Counterclaim-Plaintiffs, | 13-cv-01874-GW (FFMx)<br>14-cv-00332-GW (FFMx) |
| 21        v. | 14-cv-00336-GW (FFMx)<br>14-cv-00352-GW (FFMx) |
| 22 | 14-cv-00358-GW (FFMx)<br>14-cv-00383-GW (FFMx) |
| 23  McRo, Inc., d.b.a. Planet Blue, | 14-cv-00389-GW (FFMx)<br>14-cv-00417-GW (FFMx) |
| 24            Counterclaim-Defendants. | 14-cv-00439-GW (FFMx) |
| 25 | |
| 26 | |

27

28

FINAL JUDGMENT                    1               LEAD CASE NO. 12-CV-10322-GW (FFMx)

**A24**

WHEREAS, Defendants' Motion for Judgment on the Pleadings Based on Unpatentability under 35 U.S.C. § 101 (the "Motion") was fully briefed and oral argument heard by the Court on September 18, 2014;

WHEREAS, the Court issued an order granting Defendants' Motion on September 22, 2014, holding that the asserted claims of U.S. Patent No. 6,307,576 (*i.e.* claims 1, 7, 8, 9, and 13 – collectively, "the Asserted Claims of U.S. Patent No. 6,307,576") and the asserted claims of U.S. Patent No. 6,611,278 (*i.e.* claims 1, 2, 3, 4, 6, 9, 13, 15, 16, and 17 – collectively, "the Asserted Claims of U.S. Patent No. 6,611,278") are invalid under 35 U.S.C. § 101;

WHEREAS, in light of the Court's Order granting Defendants' Motion, final judgment should be entered in favor of Defendants and against Plaintiff and Counterclaim-Defendant McRo, Inc., d.b.a. Planet Blue ("Plaintiff").

It is **ADJUDGED** that:

- The Asserted Claims of U.S. Patent No. 6,307,576 are found to be invalid based on unpatentability under 35 U.S.C. § 101.
- The Asserted Claims of U.S. Patent No. 6,611,278 are found to be invalid based on unpatentability under 35 U.S.C. § 101.

Accordingly, it is **ADJUDGED** that Plaintiff and Counterclaim-Defendant McRo, Inc., d.b.a. Planet Blue ("Plaintiff") takes nothing from Defendants and Counterclaim-Plaintiffs Bandai Namco Games America, Inc.; Sega of America, Inc.; Electronic Arts Inc.; Disney Interactive Studios, Inc.; Capcom USA, Inc.; Neversoft Entertainment, Inc.; Treyarch Corporation; Warner Bros. Interactive Entertainment; LucasArts; Activision Publishing, Inc.; Blizzard Entertainment, Inc.; Infinity Ward, Inc.; Atlus U.S.A., Inc.; Konami Digital Entertainment, Inc.; Square Enix, Inc.; Obsidian Entertainment, Inc.; Naughty Dog, Inc.; Sony Computer Entertainment America LLC; Sucker Punch Productions LLC; Codemasters USA Group, Inc.;

Codemasters, Inc.; The Codemasters Software Company Limited; and Valve Corporation ("Defendants").

All remaining pending motions are **DENIED** as moot.

As Defendants are the prevailing parties in this action, Defendants' costs of court shall be taxed against Plaintiff.

Dated: _October 31, 2014_

_[signature]_

Hon. George H. Wu,
United States District Judge

US006307576B1

(12) **United States Patent**
Rosenfeld

(10) **Patent No.:**     **US 6,307,576 B1**
(45) **Date of Patent:**     *****Oct. 23, 2001

(54) **METHOD FOR AUTOMATICALLY ANIMATING LIP SYNCHRONIZATION AND FACIAL EXPRESSION OF ANIMATED CHARACTERS**

(76) Inventor: **Maury Rosenfeld**, 1040 N. Las Palmas Ave. No. 25, Los Angeles, CA (US) 90038

(*) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/942,987**

(22) Filed: **Oct. 2, 1997**

(51) **Int. Cl.**[7] ..................................................... **G06T 15/70**

(52) **U.S. Cl.** .......................... **345/956;** 345/951; 345/955; 345/473

(58) **Field of Search** ..................... 345/473, 951, 345/953, 956, 957, 955

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,600,919 | * | 7/1986 | Stern ..................................... | 345/473 |
| 4,884,972 | * | 12/1989 | Gasper et al. ...................... | 345/473 |
| 5,111,409 | * | 5/1992 | Gasper et al. ...................... | 345/302 |
| 5,416,899 | * | 5/1995 | Poggio et al. ...................... | 345/475 |
| 5,613,056 | * | 3/1997 | Gasper et al. ...................... | 345/473 |
| 5,657,426 | * | 8/1997 | Waters et al. ...................... | 704/276 |
| 5,663,517 | * | 9/1997 | Oppenheim .......................... | 84/649 |

| | | | | |
|---|---|---|---|---|
| 5,684,942 | * | 11/1997 | Kimura ................................. | 345/473 |
| 5,692,117 | * | 11/1997 | Berrend et al. ..................... | 345/475 |
| 5,717,848 | * | 2/1998 | Watanabe et al. ................. | 345/474 |
| 5,818,461 | * | 3/1999 | Rouet et al. ........................ | 345/473 |
| 5,880,788 | * | 3/1999 | Bregler ............................... | 348/515 |
| 5,907,351 | * | 5/1999 | Chen et al. ......................... | 348/14 |
| 6,097,381 | * | 8/2000 | Scott et al. ......................... | 345/302 |
| 6,108,011 | * | 8/2000 | Fowler ................................ | 345/441 |
| 6,147,692 | * | 11/2000 | Shaw et al. ........................ | 345/433 |
| 6,232,965 | * | 5/2001 | Scott et al. ......................... | 707/500 |

OTHER PUBLICATIONS

Beier et al; Feature–Based Image Metamorphosis; Computer Graphics, 26, 2, Jul. 1992.*

Brooke et al; Computer graphics animations of talking faces based on stochastic models; Proceedings; ISSIPNN 1994 International Symposium; p. 73–76 vol. 1, Apr. 1994.*

* cited by examiner

*Primary Examiner*—Matthew Luu
*Assistant Examiner*—Ryan Yang
(74) *Attorney, Agent, or Firm*—The Hecker Law Group

(57) **ABSTRACT**

A method for controlling and automatically animating lip synchronization and facial expressions of three dimensional animated characters using weighted morph targets and time aligned phonetic transcriptions of recorded text. The method utilizes a set of rules that determine the systems output comprising a stream of morph weight sets when a sequence of timed phonemes and/or other timed data is encountered. Other data, such as timed emotional state data or emotemes such as "surprise", "disgust", "embarrassment", "timid smile", or the like, may be inputted to affect the output stream of morph weight sets, or create additional streams.

**26 Claims, 4 Drawing Sheets**





**FIG. 1A**

*A28*



**FIG. 1B**

A29



*10*

FOR AUTOMATICALLY ANIMATING LIP SYNCHRONIZATION AND FACIAL EXPRESSION OF THREE DIMENSIONAL CHARACTERS FOR FILMS, VIDEOS, CARTOONS, AND OTHER ANIMATION PRODUCTS.

CONFIGURING A SET OF DEFAULT CORRESPONDENCE RULES BETWEEN A PLURALITY OF VISUAL PHONEME GROUPS AND A PLURALITY OF MORPH WEIGHT SETS. — 50

SPECIFYING A PLURALITY OF MORPH WEIGHT SET TRANSITION RULES FOR SPECIFYING DURATIONAL DATA FOR THE GENERATION OF TRANSITIONARY CURVES BETWEEN THE PLURALITY OF MORPH WEIGHT SETS, ALLOWING FOR THE PRODUCTION OF A STREAM OF SPECIFIED MORPH WEIGHT SETS TO BE PROCESSED BY A COMPUTER ANIMATION SYSTEM FOR INTEGRATION WITH ANOTHER ANIMATION. — 52

**FIG. 2**



*10*

FOR AUTOMATICALLY ANIMATING LIP SYNCHRONIZATION AND FACIAL EXPRESSION OF THREE DIMENSIONAL CHARACTERS FOR USE WITH A COMPUTER ANIMATION SYSTEM.

*56*

DETERMINING MEANS FOR PRODUCING A STREAM OF MORPH WEIGHT SETS WHEN A SEQUENCE OF PHONEMES OR OTHER TIMED DATA IS ENCOUNTERED

*58*

EVALUATING A PLURALITY OF TIME ALIGNED PHONETIC TRANSCRIPTIONS AGAINST THE DETERMINING MEANS FOR PRODUCING A STREAM OF MORPH WEIGHT SETS.

*60*

APPLYING THE DETERMINING MEANS FOR PRODUCING A STREAM OF MORPH WEIGHT SETS TO GENERATE AN OUTPUT MORPH WEIGHT SET STREAM, ALLOWING FOR AN APPROPRIATE MORPH WEIGHT SET CORRESPONDENCE WITH EACH OF A PLURALITY OF TIME ALIGNED PHONETIC TRANSCRIPTION SUB-SEQUENCE AND CORRECT TIME PARAMETERS APPLIED TO A PLURALITY OF MORPH WEIGHT SET TRANSITIONS BETWEEN A REPRESENTATION OF A PRIOR TIME ALIGNED PHONETIC TRANSCRIPTION SUB-SEQUENCE AND A CURRENT ONE.

*FIG. 3*

US 6,307,576 B1

| 1 | 2 |

# METHOD FOR AUTOMATICALLY ANIMATING LIP SYNCHRONIZATION AND FACIAL EXPRESSION OF ANIMATED CHARACTERS

## BACKGROUND OF THE INVENTION

### 1. Field of Invention

This invention relates generally to animation producing methods and apparatuses, and more particularly is directed to a method for automatically animating lip synchronization and facial expression for three dimensional characters.

### 2. Description of the Related Art

Various methods have been proposed for animating lip synchronization and facial expressions of animated characters in animated products such as movies, videos, cartoons, CD's, and the like. Prior methods in this area have long suffered from the need of providing an economical means of animating lip synchronization and character expression in the production of animated products due to the extremely laborious and lengthy protocols of such prior traditional and computer animation techniques. These shortcomings have significantly limited all prior lip synchronization and facial expression methods and apparatuses used for the production of animated products. Indeed, the limitations of cost, time required to produce an adequate lip synchronization or facial expression in an animated product, and the inherent limitations of prior methods and apparatuses to satisfactorily provide lip synchronization or express character feelings and emotion, leave a significant gap in the potential of animated methods and apparatuses in the current state of the art.

Time aligned phonetic transcriptions (TAPTS) are a phonetic transcription of a recorded text or soundtrack, where the occurrence in time of each phoneme is also recorded. A "phonemes" is defined as the smallest unit of speech, and corresponds to a single sound. There are several standard phonetic "alphabets" such as the International Phonetic Alphabet, and TIMIT created by Texas Instruments, Inc. and MIT. Such transcriptions can be created by hand, as they currently are in the traditional animation industry and are called "x" sheets, or "gray sheets" in the trade. Alternatively such transcriptions can be created by automatic speech recognition programs, or the like.

The current practice for three dimensional computer generated speech animation is by manual techniques commonly using a "morph target" approach. In this practice a reference model of a neutral mouth position, and several other mouth positions, each corresponding to a different phoneme or set of phonemes is used. These models are called "morph targets". Each morph target has the same topology as the neutral model, the same number of vertices, and each vertex on each model logically corresponds to a vertex on each other model. For example, vertex #n on all models represents the left corner of the mouth, and although this is the typical case, such rigid correspondence may not be necessary.

The deltas of each vertex on each morph target relative to the neutral are computed as a vector from each vertex n on the neutral to each vertex n on each morph target. These are called the delta sets. There is one delta set for each morph target.

In producing animation products, a value usually from 0 to 1 is assigned to each delta set by the animator and the value is called the "morph weight". From these morph weights, the neutral's geometry is modified as follows: Each vertex N on the neutral has the corresponding delta set's

vertex multiplied by the scalar morph weight added to it. This is repeated for each morph target, and the result summed. For each vertex v in the neutral model:

$$|result| = |neutral| + \sum_{x=1}^{n} |delta\ set_x| * morph\ weight_x$$

$|delta\ sets| * morph\ weight_x$

where the symbol $|xxx|$ is used to indicate the corresponding vector in each referenced set. For example, Iresult is the corresponding resultant vertex to vertex v in the neutral model $|neutral|$ and $|delta\ sets|$ is the corresponding vector for delta set x.

If the morph weight of the delta set corresponding to the morph target of the character saying, for example, the "oh" sound is set to 1, and all others are set to 0, the neutral would be modified to look like the "oh target. If the situation was the same, except that the "oh" morph weight was 0.5, the neutral's geometry is modified half way between neutral and the "oh" morph target.

Similarly, if the situation was as described above, except "oh" weight was 0.3 and the "ee" morph weight was at 0.7, the neutral geometry is modified to have some of the "oh" model characteristics and more of the "ee" model characteristics. There are also prior blending methods including averaging the delta sets according to their weights.

Accordingly, to animate speech, the artist needs to set all of these weights at each frame to an appropriate value. Usually this is assisted by using a "keyframe" approach, where the artist sets the appropriate weights at certain important times ("keyframes") and a program interpolates each of the channels at each frame. Such keyframe approach is very tedious and time consuming, as well as inaccurate due to the large number of keyframes necessary to depict speech.

The present invention overcomes many of the deficiencies of the prior art and obtains its objectives by providing an integrated method embodied in computer software for use with a computer for the rapid, efficient lip synchronization and manipulation of character facial expressions, thereby allowing for rapid, creative, and expressive animation products to be produced in a very cost effective manner.

Accordingly, it is the primary object of this invention to provide a method for automatically animating lip synchronization and facial expression of three dimensional characters, which is integrated with computer means for producing accurate and realistic lip synchronization and facial expressions in animated characters. The method of the present invention further provides an extremely rapid and cost effective means to automatically create lip synchronization and facial expression in three dimensional animated characters.

Additional objects and advantages of the invention will be set forth in the description which follows, and in part will be obvious from the description, or may be learned by practice of the invention. The objects and advantages of the invention may be realized and obtained by means of the instrumentalities and combinations particularly pointed out in the appended claims.

## SUMMARY OF THE INVENTION

To achieve the foregoing objects, and in accordance with the purpose of the invention as embodied and broadly described herein, a method is provided for controlling and automatically animating lip synchronization and facial

3

expressions of three dimensional animated characters using weighted morph targets and time aligned phonetic transcriptions of recorded text, and other time aligned data. The method utilizes a set of rules that determine the systems output comprising a stream or streams of morph weight sets when a sequence of timed phonemes or other timed data is encountered. Other timed data, such as pitch, amplitued, noise amounts, or emotional state data or emotemes such as "surprise, "disgust, "embarrassment", "timid smile", or the like, may be inputted to affect the output stream of morph weight sets.

The methodology herein described allows for automatically animating lip synchronization and facial expression of three dimensional characters in the creation of a wide variety of animation products, including but not limited to movies, videos, cartoons, CD's, software, and the like. The method and apparatuses herein described are operably integrated with computer software and hardware.

In accordance with the present invention there also is provided a method for automatically animating lip synchronization and facial expression of three dimensional characters for films, videos, cartoons, and other animation products, comprising configuring a set of default correspondence rules between a plurality of visual phoneme groups and a plurality of morph weight sets; and specifying a plurality of morph weight set transition rules for specifying durational data for the generation of transitionary curves between the plurality of morph weight sets, allowing for the production of a stream of specified morph weight sets to be processed by a computer animation system for integration with other animation, whereby animated lip synchronization and facial expression of animated characters may be automatically controlled and produced.

### BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate a preferred embodiment of the invention and, together with a general description given above and the detailed description of the preferred embodiment given below, serve to explain the principles of the invention.

FIG. 1 is a flow chart showing the method of the invention with an optional time aligned emotional transcription file, and another parallel timed data file, according to the invention.

FIG. 2 is a flow chart illustrating the principal steps of the present method, according to the invention.

FIG. 3 is another representational flow chart illustrating the present method, according to the invention.

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

Reference will now be made in detail to the present preferred embodiments of the invention as illustrated in the accompanying drawings.

In accordance with the present invention, there is provided as illustrated in FIGS. 1–3, a method for controlling and automatically animating lip synchronization and facial expressions of three dimensional animated characters using weighted morph targets and time aligned phonetic transcriptions of recorded text. The method utilizes a set of rules that determine the systems output comprising a stream of morph weight sets when a sequence of timed phonemes is encountered. Other timed data, such as timed emotional state data or emotemes such as "surprise, "disgust, "embarrassment",

4

"timid smilen", pitch, amplitued, noise amounts or the like, may be inputted to affect the output stream of morph weight sets.

The method comprises, in one embodiment, configuring a set of default correspondence rules between a plurality of visual phoneme groups and a plurality of morph weight sets; and specifying a plurality of morph weight set transition rules for specifying durational data for the generation of transitionary curves between the plurality of morph weight sets, allowing for the production of a stream of specified morph weight sets to be processed by a computer animation system for integration with other animation, whereby animated lip synchronization and facial expression of animated characters may be automatically produced.

There is also provided, according to the invention a method for automatically animating lip synchronization and facial expression of three dimensional characters for use with a computer animation system, comprising the steps of: determining means for producing a stream of morph weight sets when a sequence of phonemes is encountered; evaluating a plurality of time aligned phonetic transcriptions or other timed data such as pitch, amplitude, noise amounts and the like, against the determining means for producing a stream of morph weight sets; applying said determining means for producing a stream of morph weight sets to generate an output morph weight set stream, allowing for an appropriate morph weight set correspondence with each of a plurality of time aligned phonetic transcription sub-sequences and correct time parameters applied to a plurality of morph weight set transitions between a representation of a prior time aligned phonetic transcription sub-sequence and a current one, whereby lip synchronization and facial expressions of animated characters is automatically controlled and produced.

The method preferably comprises a set of rules that determine what the output morph weight set steam will be when any sequence of phonemes and their associated times is encountered. As used herein, a "morph weight set" is a set of values, one for each delta set, that, when applied as described, transform the neutral model to some desired state, such as speaking the "oo" sound or the "th" sound. Preferably, one model id designated as the anchor model, which the deltas are computed in reference to. If for example, the is a morph target that represents all possible occurrences of an "e" sound perfectly, it's morph weight set would be all zeros for all delta sets except for the delta set corresponding to the "ee" morph target, which would set to 1.

Preferably, each rule comprises two parts, the rule's criteria and the rule's function. Each sub-sequence of time aligned phonetic transcription (TAPT) or other timed data such as pitch, amplitude, noise amount or the like, is checked against a rule's criteria to see if that rule is applicable. If so, the rule's function is applied to generate the output. The primary function of the rules is to determined 1) the appropriate morph weight set correspondence with each TAPT sub-sequence; and 2) the time parameters of the morph weight set transitions between the representation of the prior TAPT sub-sequence or other timed data,and the current one. Conditions 1) and 2) must be completely specified for any sequence of phonemes and times encountered. Together, such rules are used to create a continuous stream of morph weight sets.

In the present method, it is allowable for more than one phoneme to be represented by the same morph target, for example, "sss" and "zzz". Visually, these phonemes appear

5

6

similar. Through the use of such rules, the user can group phonemes together that have a similar visual appearance into visual phonemes"that function the same as one another. It is also acceptable, through the rules, to ignore certain phoneme sequences. For example, a rule could specify: "If in the TAPT, there are two or more adjacent phonemes that are in the same "visual phoneme" group, all but the first are ignored".

The rules of the present method may be categorized in three main groupings; default rules, auxiliary rules and post processing rules. The default rules must be complete enough to create valid output for any TAPT encountered at any point in the TAPT. The secondary rules are used in special cases; for example, to substitute alternative morph weight set correspondences and/or transition rules if the identified criteria are met. The post processing rules are used to further manipulate the morph weight set stream after the default or secondary rules are applied, and can further modify the members of the morph weight sets determined by the default and secondary rules and interpolation.

If for example, a specific TAPT sub-sequence does not fit the criteria for any secondary rules, then the default rules take effect. If, on the other hand, the TAPT sub-sequence does fit the criteria for a secondary rule(s) they take precedence over the default rules. A TAPT sub-sequence take into account the current phoneme and duration, and a number of the preceding and following phonemes and duration's as well may be specified.

Preferably, the secondary rules effect morph target correspondence and weights, or transition times, or both. Secondary rules can create transitions and correspondences even where no phoneme transitions exist. The secondary rules can use as their criteria the phoneme, the duration or the phoneme's context in the output stream, that is what phonemes are adjacent or in the neighborhood to the current phoneme, what the adjacent durations are, and the like.

The post processing rules are preferably applied after a preliminary output morph weight set is calculated so as to modify it. Post processing rules can be applied before interpolation and/or after interpolation, as described later in this document. Both the secondary and post processing rules are optional, however, they may in certain applications be very complex, and in particular circumstances contribute more to the output than the default rules.

In FIG. 1, a flow chart illustrates the preferred steps of the methodology 10 for automatically animating lip synchronization and facial expression of three dimensional animated characters of the present invention. A specific sub-sequence 20 is selected form the TAPT file 12 and is evaluated 22 to determine if any secondary rule criteria for morph weight set target apply. Time aligned emotional transcription file 14 data may be inputted or data from an optional time aligned data file 16 may be used. Also shown is a parallel method 18 which may be configured identical to the primary method described, however, using different timed data rules and different delta sets. Sub-sequence 20 is evaluated 22 to determine if any secondary rule criteria apply. If yes, then a morph weight set is assigned 24 according to the secondary rules, if no, then a morph weight set is assigned 26 according to the default rules. If the sub-string meets any secondary rule criteria for transition specification 28 then a transition start and end time are assigned according to the secondary rules 32, if no, then assign transition start and end times 30 according to default rules. Then an intermediate file of transition keyframes using target weights and transition rules as generated are created 34, and if any keyframe

sequences fit post process before interpolation rules they are applied here 36. This data may be output 38 here if desired. If not, then interpolate using any method post processed keyframes to a desired frequency or frame rate 40 and if any morph weight sequences generated fit post processing after interpolation criteria, they are applied 42 at this point. If parallel methods or systems are used to process other timed aligned data, they may be concatenated here 44, and the data output 46.

In FIG. 2, the method for automatically animating lip synchronization and facial expression of three dimensional characters for films, videos, cartoons, and other animation products 10 is shown according to the invention, where box 50 show the step of configuring a set of default correspondence rules between a plurality of visual phoneme groups or other timed input data and a plurality of morph weight sets. Box 52 shows the steps of specifying a plurality of morph weight set transition rules for specifying durational data for the generation of transitionary curves between the plurality of morph weight sets, allowing for the production of a stream of specified morph weight sets to be processed by a computer animation system for integration with other animation, whereby animated lip synchronization and facial expression of animated characters may be automatically produced.

With reference now to FIG. 3, method 10 for automatically animating lip synchronization and facial expression of three dimensional characters for use with a computer animation system is shown including box 56 showing the step of determining means for producing a stream of morph weight sets when a sequence of phonemes is encountered. Box 58, showing the step of evaluating a plurality of time aligned phonetic transcriptions or other timed at such as pitch, amplitude, noise amounts, and the like, against said determining means for producing a stream of morph weight sets. In box 60 the steps of applying said determining means for producing a stream of morph weight sets to generate an output morph weight set stream, allowing for an appropriate morph weight set correspondence with each of a plurality of time aligned phonetic transcription sub-sequences and correct time parameters applied to a plurality of morph weight set transitions between a representation of a prior time aligned phonetic transcription sub-sequence and a current one, whereby lip synchronization and facial expressions of animated characters is automatically controlled and produced are shown according to the invention.

In operation and use, the user must manually set up default correspondence rules between all visual phoneme groups and morph weight sets. To do this, the user preferably specifies the morph weight sets which correspond to the model speaking, for example the "oo" sound, the "th" sound, and the like. Next, default rules must be specified. These rules specify the durational information needed to generate appropriate transitionary curves between morph weight sets, such as transition start and end times. A "transition" between two morph weigh sets is defined as each member of the morph weight set transitions from it's current state to it's target state, starting at the transition start time and ending at the transition end time. The target state is the morph weight set determined by a correspondence rule.

The default correspondence rules and the default morph weight set transition rules define the default system behavior. If all possible visual phoneme groups or all members of alternative data domains have morph weight set correspondence, any phoneme sequence can be handled with this rule set alone. However, additional rules are desirable for effects, exceptions, and uniqueness of character, as further described below.

US 6,307,576 B1

7

According to the method of the invention, other rules involving phoneme's duration and/or context can be specified. Also, any other rules that do not fit easily into the above mentioned categories can be specified. Examples of such rules are described in greater detail below and are termed the "secondary rules". If a timed phoneme or sub-sequence of timed phonemes do not fit the criteria for any of the secondary rules, the default rules are applied as seen in FIG. 1.

It is seen that through the use of these rules, an appropriate morph weight stream is produced. The uninterpolated morph weight stream has entries only at transition start and end time, however. A morph weight set may be evaluated at any time by interpolating between these keyframes, using conventional methods. This is how the output stream is calculated each desired time frame. For example, for television productions, the necessary resolution is 30 evaluations per second.

The post processing rules may be applied either before or after the above described interpolation step, or both. Some rules may apply only to keyframes before interpolation, some to interpolated data. If applied before the interpolation step, this affects the keyframes. if applied after, it effects the interpolated data. Post processing can use the morph weight sets calculated by the default and secondary rules. Post processing rules can use the morph weigh sets or sequences as in box **44** of FIG. **1**, calculated by the default and secondary rules. Post processing rules can modify the individual members of the morph weight sets previously generated. Post processing rules may be applied in addition to other rules, including other post processing rules. Once the rule set up is completed as described, the method of the present invention can take any number and length TAPT's as input, and automatically output the corresponding morph weight set stream as seen in FIGS. **1–3**.

For example, a modeled neutral geometric representation of a character for an animated production such as a movies, video, cartoon, CD or the like, with six morph targets, and their delta sets determined. Their representations, for example, are as follows:

| Delta Set | Visual Representation |
|---|---|
| 1 | "h" |
| 2 | "eh" |
| 3 | "l" |
| 4 | "oh" |
| 5 | exaggerated "oh" |
| 6 | special case "eh" used during a "snide laugh" sequences |

In this example, the neutral model is used to represent silence. The following is an example of a set of rules, according to the present method, of course this is only an example of a set of rules which could be use for illustrative purposes, and many other rules could be specified according to the method of the invention.

### Default Rules

Default Correspondence Rules;

Criteria: Encounter a "h" as in "house"

Function: Use morph weight set (1,0,0,0,0,0) as transition target.

Criteria: Encounter an "eh" as in "bet"

Function: Use morph weight set (0,1,0,0,0,0) as transition target.

Criteria: Encounter a "l" as in "old"

8

Function: Use morph weight set (0,0,1,0,0,0) as transition target.

Criteria: Encounter an "oh" as in "old"

Function: Use morph weight set (0,0,0,1,0,0) as transition target.

Criteria: encounter a "silence"

Function: use morph weight set (0,0,0,0,0,0) as transition target.

Default Transition Rule:

Criteria: Encounter any phoneme

Function: Transition start time=(the outgoing phoneme's end time)−0.1*(the outgoing phoneme's duration);

transition end time=(the incoming phoneme's start time)+ 0.1* (the incoming phoneme's duration)

### Secondary Rules

Criteria: Encounter an "oh" with a duration greater than 1.2 seconds.

Function: Use morph weigh set (0,0,0,0,1,0)

Criteria: Encounter an "eh" followed by an "oh" and preceded by an "h".

Function: Use morph weigh set (0,0,0,0,0,1) as transition target.

Criteria: Encounter any phoneme preceded by silence

Function: Transition start time=(the silence's end time)− 0.1*(the incoming phoneme's duration):Transition end time=the incoming phoneme's start time

Criteria: Encounter silence preceded by any phoneme.

Function: Transition start time=the silence's start time +0.1* (the outgoing phoneme's duration)

### Post Processing Rules

Criteria: Encounter a phoneme duration under 0.22 seconds.

Function: Scale the transition target determined by the default and secondary rules by 0.8 before interpolation.

Accordingly, using this example, if the user were to use these rules for the spoken word "Hello", at least four morph targets and a neutral target would be required, that is, one each for the sound of "h","e","1","oh" and their associated delta sets. For example, a TAPT representing the spoken word "hello" could be configured as,

| Time | Phoneme |
|---|---|
| 0.0 | silence begins |
| 0.8 | silence ends, "h" begins |
| 1.0 | "h" ends, "eh" begins |
| 1.37 | "eh" ends, "l" begins |
| 1.6 | "l" ends, "oh" begins |
| 2.1 | "oh" ends, silence begins. |

The method, for example embodied in computer software for operation with a computer or computer animation system would create an output morph weight set stream as follows:

| Time | D.S.1 ("h") | D.S.2 ("eh") | D.S.3 ("1") | D.S.4 ("oh") | D.S.5 (aux"oh") | D.S.6 |
|---|---|---|---|---|---|---|
| 0.0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0.78 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0.8 | 1 | 0 | 0 | 0 | 0 | 0 |
| 0.98 | 1 | 0 | 0 | 0 | 0 | 0 |
| 1.037 | 0 | 1 | 0 | 0 | 0 | 0 |
| 1.333 | 0 | 1 | 0 | 0 | 0 | 0 |
| 1.403 | 0 | 0 | 1 | 0 | 0 | 0 |
| 1.667 | 0 | 0 | 1 | 0 | 0 | 0 |

US 6,307,576 B1

9 | 10

-continued

| Time | D.S.1 ("h") | D.S.2 ("eh") | D.S.3 ("1") | D.S.4 ("oh") | D.S.5 (aux"oh") | D.S.6 |
|------|-------------|--------------|-------------|--------------|------------------|-------|
| 1.74 | 0 | 0 | 0 | 1 | 0 | 0 |
| 2.1  | 0 | 0 | 0 | 1 | 0 | 0 |
| 2.14 | 0 | 0 | 0 | 0 | 0 | 0 |

Such morph weight sets act as keyframes, marking the transitory points. A morph weight set can be obtained for any time within the duration of the TAPT by interpolating between the morph weight sets using conventional methods well known in the art. Accordingly, a morph weight set can be evaluated at every frame. However, the post processing rules can be applied to the keyframes before interpolation as in box **36** of FIG. **1**, or to the interpolated data as in box **40** of FIG. **1**. From such stream of morph weight sets, the neutral model is deformed as described above, and then sent to a conventional computer animation system for integration with other animation. Alternatively, the morph weight set stream can be used directly by an animation program or package, wither interpolated or not.

The rules of the present invention are extensible and freeform in the sense that they may be created as desired and adapted to a wide variety of animation characters, situations, and products. As each rule comprise a criteria and function, as in an "if . . . then . . . else" construct. The following are illustrative examples of other rules which may be used with the present methodology.

For example, use {0,0,0,0 . . . 0} as the morph weight set when a "m" is encountered. This is a type of default rule, where:

Criteria: Encounter a "m" phoneme of any duration.

Function: Use a morph weight set {0,0,0,0 . . . 0} as a transition target.

Another example would be creating several slightly different morph targets for each phoneme group, and using them randomly each time that phoneme is spoken. This would give a more random, or possibly comical or interesting look to the animation's. This is a secondary rule.

An example of post processing rule, before interpolation would be to add a small amount of random noise to all morph weight channels are all keyframes. This would slightly alter the look of each phoneme to create a more natural look.

Criteria: Encounter any keyframe

Function: Add a small random value to each member of the morph weight set prior to interpolation.

An example of a post processing rule, after interpolation would be to add a component of an auxiliary morph target (one which does not correspond directly to a phoneme) to the output stream in a cyclical manner over time, after interpolation. If the auxiliary morph target had the character's mouth moved to the left, for example, the output animation would have the character's mouth cycling between center to left as he spoke.

Criteria: Encounter any morph weight set generated by interpolation

Function: Add a value calculated through a mathematical expression to the morph weigh set's member that corresponds to the auxiliary morph target's delta set weight. The expression might be, for example: 0.2*sin (0.2*time*2*pi)+0.2. This rule would result in an oscillation of the animated character's mouth every five seconds.

Another example of a secondary rule is to use alternative weight sets(or morph weight set sequences) for certain contexts of phonemes, for example, if an "oh" is both preceded and followed by an "ee" then use an alternate "oh". This type of rule can make speech idiosyncrasies, as well as special sequences for specific words (which are a combination of certain phonemes in a certain context). This type of rule can take into consideration the differences in mouth positions for similar phonemes based on context. For example, the "1" in "hello" is shaped more widely than the "1" in "burly" due to it's proximity to an "eh" as opposed tp a "r".

Criteria: Encounter an "1" preceded by an "r".

Function: Use a specified morph weight set as transition target.

Another secondary rule could be, by way of illustration, that if a phoneme is longer than a certain duration, substitute a different morph target. this can add expressiveness to extended vowel sounds, for instance, if a character says "HELLOOOOOOO!" a more exaggerated "oh" model would be used.

Criteria: Encounter an "oh" longer than 0.5 seconds and less than 1 second.

Function: Use a specified morph weight set as a transition target.

If a phoneme is longer than another phoneme of even longer duration, a secondary rule may be applied to create new transitions between alternate morph targets at certain intervals, which may be randomized, during the phoneme's duration. This will add some animation to extremely long held sounds, avoiding a rigid look. This is another example of a secondary rule

Criteria: Encounter an "oh" longer than 1 second long.

Function: Insert transitions between a defined group of morph weight sets at 0.5 second intervals, with transition duration's of 0.2 seconds until the next "normal" transition start time is encountered.

If a phoneme is shorter than a certain duration, its corresponding morph weight may be scaled by a factor smaller than 1. This would create very short phonemes not appear over articulated. Such a post processing rule, applied before interpolation would comprise:

Criteria: Encounter a phoneme duration shorter than 0.1 seconds.

Function: Multiply all members of the transition target (already determined by default and secondary rules) by duration/0.1.

As is readily apparent a wide variety of other rules can be created to add individuality to the different characters.

A further extension of the present method is to make a parallel method or system, as depicted in box **14** of FIG. **1**, that uses time aligned emotional transcriptions (TAET) that correspond to facial models of those emotions. Using the same techniques as previously described additional morph weight set streams can be created that control other aspects of the character that reflect facial display of emotional state. Such morph weight set streams can be concatenated with the lip synchronization stream. In addition, the TAET data can be used in conjunction with the lip synchronization secondary rules to alter the lip synchronization output stream. For example:

Criteria: An "L" is encountered in the TAPT and the nearest "emoteme" in the TAET is a "smile".

Function: Use a specified morph weight set as transition target.

As is evident from the above description, the automatic animation lip synchronization and facial expression method described may be used on a wide variety of animation products. The method described herein provides an

US 6,307,576 B1

11

12

extremely rapid, efficient, and cost effective means to provide automatic lip synchronization and facial expression in three dimensional animated characters. The method described herein provides, for the first time, a rapid, effective, expressive, and inexpensive means to automatically create animated lip synchronization and facial expression in animated characters. The method described herein can create the necessary morph weight set streams to create speech animation when given a time aligned phonetic transcription of spoken text and a set of user defined rules for determining appropriate morph weight sets for a given TAPT sequence. This method also defines rules describing a method of transitioning between these sets through time. The present method is extensible by adding new rules, and other timed data may be supplied, such as time "emotemes" that will effect the output data according to additional rules that take this data into account. In this manner, several parallel systems may be used on different types of timed data and the results concatenated, or used independently. Accordingly, additional advantages and modification will readily occur to those skilled in the art. The invention in its broader aspects is, therefore, not limited to the specific methodological details, representative apparatus and illustrative examples shown and described. Accordingly, departures from such details may be made without departing from the spirit or scope of the applicant's inventive concept.

What is claimed is:

1. A method for automatically animating lip synchronization and facial expression of three-dimensional characters comprising:

obtaining a first set of rules that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence;

obtaining a timed data file of phonemes having a plurality of sub-sequences;

generating an intermediate stream of output morph weight sets and a plurality of transition parameters between two adjacent morph weight sets by evaluating said plurality of sub-sequences against said first set of rules;

generating a final stream of output morph weight sets at a desired frame rate from said intermediate stream of output morph weight sets and said plurality of transition parameters; and

applying said final stream of output morph weight sets to a sequence of animated characters to produce lip synchronization and facial expression control of said animated characters.

2. The method of claim 1 wherein each of said first set of rules comprises a rule's criteria and a rule's function.

3. The method of claim 2 wherein said evaluating comprises:

checking each sub-sequence of said plurality of sub-sequences for compliance with said rule's criteria; and

applying said rule's function upon said compliance.

4. The method of claim 1 wherein said first set of rules comprises a default set of rules and an optional secondary set of rules, said secondary set of rules having priority over said default set of rules.

5. The method of claim 4 wherein said default set of rules is adequate to create said intermediate stream of output morph weight sets and said plurality of transition parameters between two adjacent morph weight sets for all sub-sequences of phonemes in said timed data file.

6. The method of claim 4 wherein said secondary set of rules are used in special cases to substitute alternate output morph weight sets and/or transition parameters between two adjacent morph weight sets.

7. The method of claim 1 wherein said timed data is a timed aligned phonetic transcriptions data.

8. The method of claim 7 wherein said timed data further comprises time aligned data.

9. The method of claim 7 wherein said timed data further comprises time aligned emotional transcription data.

10. The method of claim 1 wherein each of said plurality of transition parameters comprises a transition start time and a transition end time; and said intermediate stream of output morph weight sets having entries at said transition start time and said transition end time.

11. The method of claim 10 wherein said generating a final stream of output morph weight sets comprises:

obtaining the output morph weight set at a desired time by interpolating between said intermediate stream of morph weight sets at said transition start time and said transition end time, said desired time representing a frame of said final stream of output.

12. The method of claim 11, further comprising:

applying a second set of rules to said output morph weight set for post processing.

13. The method of claim 1 wherein said first set of rules comprises:

correspondence rules between a plurality of visual phoneme groups and a plurality of morph weight sets; and

morph weight set transition rules specifying durational data for generating transitionary curves between morph weight sets.

14. An apparatus for automatically animating lip synchronization and facial expression of three-dimensional characters comprising:

a computer system;

a first set of rules in said computer system, said first set of rules defining output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence;

a timed data file readable by said computer system, said timed data file having phonemes with a plurality of sub-sequences;

means, in said computer system, for generating an intermediate stream of output morph weight sets and a plurality of transition parameters between two adjacent morph weight sets by evaluating said plurality of sub-sequences against said first set of rules;

means, in said computer system, for generating a final stream of output morph weight sets at a desired frame rate from said intermediate stream of output morph weight sets and said plurality of transition parameters; and

means, in said computer system, for applying said final stream of output morph weight sets to a sequence of animated characters to produce lip synchronization and facial expression control of said animated characters.

15. The apparatus of claim 14 wherein each of said first set of rules comprises a rule's criteria and a rule's function.

16. The apparatus of claim 15 wherein said evaluating comprises:

checking each sub-sequence of said plurality of sub-sequences for compliance with said rule's criteria; and

applying said rule's function upon said compliance.

17. The apparatus of claim 14 wherein said first set of rules comprises a default set of rules and an optional secondary set of rules, said secondary set of rules having priority over said default set of rules.

18. The apparatus of claim 17 wherein said default set of rules is adequate to create said intermediate stream of output

US 6,307,576 B1

13

morph weight sets and said plurality of transition parameters between two adjacent morph weight sets for all sub-sequences of phonemes in said timed data file.

**19**. The apparatus of claim **17** wherein said secondary set of rules are used in special cases to substitute alternate output morph weight sets and/or transition parameters between two adjacent morph weight sets.

**20**. The apparatus of claim **14** wherein said timed data is a timed aligned phonetic transcriptions data.

**21**. The apparatus of claim **20** wherein said timed data further comprises time aligned data.

**22**. The apparatus of claim **20** wherein said timed data further comprises time aligned emotional transcription data.

**23**. The apparatus of claim **14** wherein each of said plurality of transition parameters comprises a transition start time and a transition end time; and said intermediate stream of output morph weight sets having entries at said transition start time and said transition end time.

**24**. The apparatus of claim **23** wherein said generating a final stream of output morph weight sets comprises:

14

obtaining the output morph weight set at a desired time by interpolating between said intermediate stream of morph weight sets at said transition start time and said transition end time, said desired time representing a frame of said final stream of output.

**25**. The apparatus of claim **24**, further comprising:

means for applying a second set of rules to said output morph weight set for post processing.

**26**. The apparatus of claim **14** wherein said first set of rules comprises:

correspondence rules between a plurality of visual pho-neme groups and a plurality of morph weight sets; and

morph weight set transition rules specifying durational data for generating transitionary curves between morph weight sets.

\*    \*    \*    \*    \*

US006611278B2

(12) **United States Patent**
Rosenfeld

(10) Patent No.: **US 6,611,278 B2**
(45) Date of Patent: *** Aug. 26, 2003**

| | | | | | |
|---|---|---|---|---|---|
| 5,416,899 | A | * | 5/1995 | Poggio et al. | 345/475 |
| 5,630,017 | A | * | 5/1997 | Gasper et al. | 704/276 |
| 5,684,942 | A | * | 11/1997 | Kimura | 345/473 |
| 5,717,848 | A | * | 2/1998 | Watanabe et al. | 345/474 |
| 5,741,136 | A | * | 4/1998 | Kirksey et al. | 434/169 |
| 5,818,461 | A | * | 10/1998 | Rouet et al. | 345/473 |
| 5,880,788 | A | * | 3/1999 | Bregler | 348/515 |
| 5,907,351 | A | * | 5/1999 | Chen et al. | 348/14.12 |
| 6,097,381 | A | * | 8/2000 | Scott et al. | 707/500.1 |
| 6,108,011 | A | * | 8/2000 | Fowler | 345/441 |
| 6,147,692 | A | * | 11/2000 | Shaw et al. | 345/433 |
| 6,232,965 | B1 | * | 5/2001 | Scott et al. | 707/505 |
| 6,307,576 | B1 | * | 10/2001 | Rosenfeld | 345/700 |

(54) **METHOD FOR AUTOMATICALLY ANIMATING LIP SYNCHRONIZATION AND FACIAL EXPRESSION OF ANIMATED CHARACTERS**

(76) Inventor: **Maury Rosenfeld**, 4941 Ambrose Ave, Los Angeles, CA (US) 90027

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/960,831**

(22) Filed: **Sep. 21, 2001**

(65) **Prior Publication Data**

US 2002/0101422 A1 Aug. 1, 2002

**Related U.S. Application Data**

(63) Continuation of application No. 08/942,987, filed on Oct. 2, 1997, now Pat. No. 6,307,576.

(51) Int. Cl.⁷ .......................... **G06T 13/00**; G09G 5/00
(52) U.S. Cl. ........................ **345/956**; 345/473; 345/646
(58) Field of Search ............................ 345/473, 646, 345/647, 951, 953, 955, 956, 957

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,600,919 A * 7/1986 Stern ......................... 345/473

* cited by examiner

Primary Examiner—Jeffery Brier
Assistant Examiner—Ryan Yang
(74) Attorney, Agent, or Firm—The Hecker Law Group

(57) **ABSTRACT**

A method for controlling and automatically animating lip synchronization and facial expressions of three dimensional animated characters using weighted morph targets and time aligned phonetic transcriptions of recorded text. The method utilizes a set of rules that determine the systems output comprising a stream of morph weight sets when a sequence of timed phonemes and/or other timed data is encountered. Other data, such as timed emotional state data or emotemes such as "surprise", "disgust", "embarrassment", "timid smile", or the like, may be inputted to affect the output stream of morph weight sets, or create additional streams.

**36 Claims, 4 Drawing Sheets**



**FIG. 1**

U.S. Patent          Aug. 26, 2003          Sheet 1 of 4          US 6,611,278 B2



**FIG. 1A**



*FIG. 1B*



*10*

FOR AUTOMATICALLY ANIMATING LIP SYNCHRONIZATION AND FACIAL EXPRESSION OF THREE DIMENSIONAL CHARACTERS FOR FILMS, VIDEOS, CARTOONS, AND OTHER ANIMATION PRODUCTS.

CONFIGURING A SET OF DEFAULT CORRESPONDENCE RULES BETWEEN A PLURALITY OF VISUAL PHONEME GROUPS AND A PLURALITY OF MORPH WEIGHT SETS. — 50

SPECIFYING A PLURALITY OF MORPH WEIGHT SET TRANSITION RULES FOR SPECIFYING DURATIONAL DATA FOR THE GENERATION OF TRANSITIONARY CURVES BETWEEN THE PLURALITY OF MORPH WEIGHT SETS, ALLOWING FOR THE PRODUCTION OF A STREAM OF SPECIFIED MORPH WEIGHT SETS TO BE PROCESSED BY A COMPUTER ANIMATION SYSTEM FOR INTEGRATION WITH ANOTHER ANIMATION. — 52

*FIG. 2*



*10*

FOR AUTOMATICALLY ANIMATING LIP SYNCHRONIZATION AND FACIAL EXPRESSION OF THREE DIMENSIONAL CHARACTERS FOR USE WITH A COMPUTER ANIMATION SYSTEM.

*56*

DETERMINING MEANS FOR PRODUCING A STREAM OF MORPH WEIGHT SETS WHEN A SEQUENCE OF PHONEMES OR OTHER TIMED DATA IS ENCOUNTERED.

*58*

EVALUATING A PLURALITY OF TIME ALIGNED PHONETIC TRANSCRIPTIONS AGAINST THE DETERMINING MEANS FOR PRODUCING A STREAM OF MORPH WEIGHT SETS.

*60*

APPLYING THE DETERMINING MEANS FOR PRODUCING A STREAM OF MORPH WEIGHT SETS TO GENERATE AN OUTPUT MORPH WEIGHT SET STREAM, ALLOWING FOR AN APPROPRIATE MORPH WEIGHT SET CORRESPONDENCE WITH EACH OF A PLURALITY OF TIME ALIGNED PHONETIC TRANSCRIPTION SUB-SEQUENCE AND CORRECT TIME PARAMETERS APPLIED TO A PLURALITY OF MORPH WEIGHT SET TRANSITIONS BETWEEN A REPRESENTATION OF A PRIOR TIME ALIGNED PHONETIC TRANSCRIPTION SUB-SEQUENCE AND A CURRENT ONE.

**FIG. 3**

US 6,611,278 B2

1

# METHOD FOR AUTOMATICALLY ANIMATING LIP SYNCHRONIZATION AND FACIAL EXPRESSION OF ANIMATED CHARACTERS

This is a continuation of application Ser. No. 08/942,987 filed Oct. 2, 1997, now U.S. Pat. No. 6,307,576.

## BACKGROUND OF THE INVENTION

### 1. Field of Invention

This invention relates generally to animation producing methods and apparatuses, and more particularly is directed to a method for automatically animating lip synchronization and facial expression for three dimensional characters.

### 2. Description of the Related Art

Various methods have been proposed for animating lip synchronization and facial expressions of animated characters in animated products such as movies, videos, cartoons, CD's, and the like. Prior methods in this area have long suffered from the need of providing an economical means of animating lip synchronization and character expression in the production of animated products due to the extremely laborious and lengthy protocols of such prior traditional and computer animation techniques. These shortcomings have significantly limited all prior lip synchronization and facial expression methods and apparatuses used for the production of animated products. Indeed, the limitations of cost, time required to produce an adequate lip synchronization or facial expression in an animated product, and the inherent imitations of prior methods and apparatuses to satisfactorily provide lip synchronization or express character feelings and emotion, leave a significant gap in the potential of animated methods and apparatuses in the current state of the art.

Time aligned phonetic transcriptions (TAPTS) are a phonetic transcription of a recorded text or soundtrack, where the occurrence in time of each phoneme is also recorded. A "phoneme" is defined as the smallest unit of speech, and corresponds to a single sound. There are several standard phonetic "alphabets" such as the International Phonetic Alphabet, and TIMIT created by Texas instruments, Inc. and MIT. Such transcriptions can be created by hand, as they currently are in the traditional animation industry and are called "x" sheets, or "gray sheets" in the trade. Alternatively such transcriptions can be created by automatic speech recognition programs, or the like.

The current practice for three dimensional computer generated speech animation is by manual techniques commonly using a "morph target" approach. In this practice a reference model of a neutral mouth position, and several other mouth positions, each corresponding to a different phoneme or set of phonemes is used. These models are called "morph targets". Each morph target has the same topology as the neutral model, the same number of vertices, and each vertex on each model logically corresponds to a vertex on each other model, or example, vertex #n on all models represents the left corner of the mouth, and although this is the typical case, such rigid correspondence may not be necessary.

The deltas of each vertex on each morph target relative to the neutral are computed as a vector from each vertex n on the reference to each vertex n on each morph target. These are called the delta sets. There is one delta set for each morph target.

In producing animation products, a value usually from 0 to 1 is assigned to each delta set by the animator and the value is called the "morph weight". From these morph

2

weights, the neutral's geometry is modified as follows: Each vertex N on the neutral has the corresponding delta set's vertex multiplied by the scalar morph weight added to it. This is repeated for each morph target, and the result summed. For each vertex v in the neutral model:

$$|result| = |neutral| + \Sigma_{x=1}^{n}|delta\ setx|morph\ weigh$$

where the symbol |xxx| is used to indicate the corresponding vector in each referenced set. For example, |result| is the corresponding resultant vertex to vertex v in the neutral model |neutral| and |delta setx| is the corresponding vector for delta set x.

If the morph weight of the delta set corresponding to the morph target of the character saying, for example, the "oh" sound is set to 1, and all others are set to 0, the neutral would be modified to look like the "oh target. If the situation was the same, except that the "oh" morph weight was 0.5, the neutral's geometry is modified half way between neutral and the "oh" morph target.

Similarly, if the situation was as described above, except "oh" weight was 0.3 and the "ee" morph weight was at 0.7, the neutral geometry is modified to have some of the "oh" model characteristics and more of the "ee" model characteristics. There also are prior blending methods including averaging the delta sets according to their weights.

Accordingly, to animate speech, the artist needs to set all of these weights at each frame to an appropriate value. Usually this is assisted by using a "keyframe" approach, where the artist sets the appropriate weights at certain important times ("keyframes") and a program interpolates each of the channels at each frame. Such keyframe approach is very tedious and time consuming, as well as inaccurate due to the large number of keyframes necessary to depict speech.

The present invention overcomes many of the deficiencies of the prior art and obtains its objectives by providing an integrated method embodied in computer software for use with a computer for the rapid, efficient lip synchronization and manipulation of character facial expressions, thereby allowing for rapid, creative, and expressive animation products to be produced in a very cost effective manner.

Accordingly, it is the primary object of this invention to provide a method for automatically animating lip synchronization and facial expression of three dimensional characters, which is integrated with computer means for producing accurate and realistic lip synchronization and facial expressions in animated characters. The method of the present invention further provides an extremely rapid and cost effective means to automatically create lip synchronization and facial expression in three dimensional animated characters.

Additional objects and advantages of the invention will be set forth in the description which follows, and in part will be obvious from the description, or may be learned by practice of the invention. The objects and advantages of the invention may be realized and obtained by means of the instrumentalities and combinations particularly pointed out in the appended claims.

## SUMMARY OF THE INVENTION

To achieve the foregoing objects, and in accordance with the purpose of the invention as embodied and broadly described herein, a method is provided for controlling and automatically animating lip synchronization and facial expressions of three dimensional animated characters using weighted morph targets and time aligned phonetic transcrip-

US 6,611,278 B2

3

tions of recorded text, and other time aligned data. The method utilizes a set of rules that determine the systems output comprising a stream or streams of morph weight sets when a sequence of timed phonemes or other timed data is encountered. Other timed data, such as pitch, amplitued, noise amounts, or emotional state data or emotemes such as "surprise, "disgust, "embarrassment", "timid smile", or the like, may be inputted to affect the output stream of morph weight sets.

The methodology herein described allows for automatically animating lip synchronization and facial expression of three dimensional characters in the creation of a wide variety of animation products, including but not limited to movies, videos, cartoons, CD's, software, and the like. The method and apparatuses herein described are operably integrated with computer software and hardware.

In accordance with the present invention there is also provided a method for automatically animating lip synchronization and facial expression of three dimensional characters for films, videos, cartoons, and other animation products, comprising configuring a set of default correspondence rules between a plurality of visual phoneme groups and a plurality of morph weight sets; and specifying a plurality of morph weight set transition rules for specifying durational data for the generation of transitionary curves between the plurality of morph weight sets, allowing for the production of a stream of specified morph weigh sets to be processed by a computer animation system for integration with other animation, whereby animated lip synchronization and facial expression of animated characters may be automatically controlled and produced.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate a preferred embodiment of the invention and, together with a general description given above and the detailed description of the preferred embodiment given below, serve to explain the principles of the invention.

FIG. **1** is a flow chart showing the method of the invention with an optional time aligned emotional transcription file, and another parallel timed data file, according to the invention.

FIG. **2** is a flow chart illustrating the principal steps of the present method, according to the invention.

FIG. **3** is another representational flow chart illustrating the present method, according to the invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Reference will now be made in detail to the present preferred embodiments of the invention as illustrated in the accompanying drawings.

In accordance with the present invention, there is provided as illustrated in FIGS. **1–3**, a method for controlling and automatically animating lip synchronization and facial expressions of three dimensional animated characters using weighted morph targets and time aligned phonetic transcriptions of recorded text. The method utilizes a set of rules that determine the systems output comprising a stream of morph weight sets when a sequence of timed phonemes is encountered. Other timed data, such as timed emotional state data or emotemes such as "surprise, "disgust, "embarrassment", "timid smile", pitch, amplitued, noise amounts or the like, may be inputted to affect the output stream of morph weight sets.

4

The method comprises, in one embodiment, configuring a set of default correspondence rules between a plurality of visual phoneme groups and a plurality of morph weight sets; and specifying a plurality of morph weight set transition rules for specifying durational data for the generation of transitionary curses between the plurality of morph weight sets, allowing for the production of a stream of specified morph weight sets to be processed by a computer animation system for integration with other animation, whereby animated lip synchronization and facial expression of animated characters may be automatically produced.

There is also provided, according to the invention a method for automatically animating lip synchronization and facial expression of three dimensional characters for use with a computer animation system, comprising the steps of: determining means for producing a stream of morph weight sets when a sequence of phonemes is encountered; evaluating a plurality of time aligned phonetic transcriptions or other timed data such as pitch, amplitude, noise amounts and the like, against the determining means for producing a stream of morph weight sets; applying said determining means for producing a stream of morph weight sets to generate an output morph weight set stream, allowing for an appropriate morph weight set correspondence with each of a plurality of time aligned phonetic transcription subsequences and correct time parameters applied to a plurality of morph weight set transitions between a representation of a prior time aligned phonetic transcription subsequence and a current one, whereby lip synchronization and facial expressions of animated characters is automatically controlled and produced.

The method preferably comprises a set of rules that determine what the output morph weight set stream will be when any sequence or phonemes and their associated times is encountered. As used herein, a "morph weight set" is a set of values, one for each delta set, that, when applied as described, transform the neutral mode to some desired state, such as speaking the "oo" sound or the "th" sound. Preferably, one model id designated as the anchor model, which the deltas are computed in reference to. If for example, the is a morph target that represents all possible occurrences of an "e" sound perfectly, it's morph weight set would be all zeros for all delta sets except for the delta set corresponding to the "ee" morph target, which would set to 1.

Preferably, each rule comprises two parts, the rule's criteria and the rule's function. Each sub-sequence of time aligned phonetic transcription (TAPT) or other timed data such as pitch, amplitude, noise amount or the like, is checked against a rule's criteria to see if that rule is applicable. If so, the rule's function is applied to generate the output. The primary function of the rules is determined 1) the appropriate morph weight set correspondence with each TAPT sub-sequence; and 2) the time parameters of the morph weight set transitions between the representation of the prior TAPT sub-sequence or other timed data and the current one. Conditions 1) and 2) must be completely specified for any sequence of phonemes and times encountered. Together, such rules are used to create a continuous stream of morph weight sets.

In the present method, it is allowable for more than one phoneme to be represented by the same morph target, for example, "sss" and "zzz". Visually, these phonemes appear similar. Through the use of such rules, the user can group phonemes together that have a similar visual appearance into visual phonemes" that function the same as one another. It is also acceptable, through the rules, to ignore certain

| 5 | | 6 |
|---|---|---|

phoneme sequences. For example, a rule could specify: "If in the TAPT, there are two or more adjacent phonemes that are in the same "visual phoneme" group, all but the first are ignored".

The rules of the present method may be categorized in three main groupings; default rules, auxiliary rules and post processing rules. The default rules must be complete enough to create valid output for any TAPT encountered at any point in the TAPT. The secondary rules are used in special cases; for example, to substitute alternative morph weight set correspondences and/or transition rules if the identified criteria are met. The post processing rules are used to further manipulate the morph weight set stream after the default or secondary rules are applied, and can further modify the members of the morph weight sets determined by the default and secondary rules and interpolation.

If for example, specific TAPT subsequence does not fit the criteria for any secondary rules, then the default rules take effect. If, on the other hand, the TAPT sub-sequence does fit the criteria for a secondary rule(s) they take precedence over the default rules. A TAPT sub-sequence take into account the current phoneme and duration, and a number of the preceding and following phonemes and duration's as well may be specified.

Preferably, the secondary rules effect morph target correspondence and weights, or transition times, or both. Secondary rules can create transitions and correspondences even where no phoneme transitions exist. The secondary rules can use as their criteria the phoneme, the duration or the phoneme's context in the output stream, that is what phonemes are adjacent or in the neighborhood to the current phoneme, what the adjacent duration's are, and the like.

The post processing rules are preferably applied after a preliminary output morph weight set is calculated so as to modify it. Post processing rules can be applied before interpolation and/or after interpolation, as described later in this document. Both the secondary and post processing rules are optional, however, they may in certain applications be very complex, and in particular circumstances contribute more to the output than the default rules.

In FIG. 1, a flow chart illustrates the preferred steps of the methodology **10** or automatically animating lip synchronization and facial expression of three dimensional animated characters of the present invention. A specific sub-sequence **20** is selected from the TAPT file **12** and is evaluated **22** to determine if any secondary rule criteria for morph weight set target apply. Time aligned emotional transcription file **14** data may be inputted or data from an optional time aligned data file **16** may be used. Also shown is a parallel method **18** which may be configured identical to the primary method described, however, using different timed data rules and different delta sets. Sub-sequence **20** is evaluated **22** to determine if any secondary rule criteria apply. If yes, then a morph weight set is assigned **24** according to the secondary rules, if no, then a morph weight set is assigned **26** according to the default rules. If the sub-string meets any secondary rule criteria for transition specification **28** then a transition start and end time are assigned according to the secondary rules **32**, if no, then assign transition start and end times **30** according to default rules. Then an intermediate file of transition keyframes using target weights and transition rules as generated are created **34**, and if any keyframe sequences fit post process before interpolation rules they are applied here **36**. This data may be output **38** here if desired. If not, then interpolate using any method post processed keyframes to a desired frequency or frame rate **40** and if any

morph weight sequences generated fit post processing after interpolation criteria, they are applied **42** at this point. If parallel methods or systems are used to process other timed aligned data, they may be concatenated here **44**, and the data output **46**.

In FIG. **2**, the method for automatically animating lip synchronization and facial expression of three dimensional characters for films, videos, cartoons, and other animation products **10** is shown according to the invention, where box **50** show the step of configuring a set of default correspondence rules between a plurality of visual phoneme groups or other timed input data and a plurality of morph weight sets. Box **52** shows the steps of specifying a plurality of morph weight set transition rules for specifying durational data for the generation of transitionary curves between the plurality of morph weight sets, allowing for the production of a stream of specified morph weight sets to be processed by a computer animation system for integration with other animation, whereby animated lip synchronization and facial expression of animated characters may be automatically produced.

With reference now to FIG. **3**, method **10** for automatically animating lip synchronization and facial expression of three dimensional characters for use with a computer animation system is shown including box **56** showing the step of determining means for producing a stream of morph weight sets when a sequence of phonemes is encountered. Box **53**, showing the step of evaluating a plurality of time aligned phonetic transcriptions or other timed ata such as pitch, amplitude, noise amounts, and the like, against said determining means for producing a stream of morph weight sets. In box **60** the steps of applying said determining means for producing a stream of morph weight sets to generate an output morph weight set stream, allowing for an appropriate morph weight set correspondence with each of a plurality of time aligned phonetic transcription sub-sequences and correct time parameters applied to a plurality of morph weight set transitions between a representation of a prior time aligned phonetic transcription sub-sequence and a current one, whereby lip synchronization and facial expressions of animated characters is automatically controlled and produced are shown according to the invention.

In operation and use, the user must manually set up default correspondence rules between all visual phoneme groups and morph weight sets. To do this, the user preferably specifies the morph weight sets which correspond to the model speaking, for example the "oo" sound, the "th" sound, and the like. Next, default rules must be specified. These rules specify the durational information needed to generate appropriate transitionary curves between morph weight sets, such as transition start and end times. "transition" between two morph weigh sets is defined as each member of the morph weight set transitions from it's current state to it's target state, starting at the transition start time and ending at the transition end time. The target state is the morph weight set determined by a correspondence rule.

The default correspondence rules and the default morph weight set transition rules define the default system behavior. If all possible visual phoneme groups or all members of alternative data domains have morph weight set correspondence, any phoneme sequence can be handled with this rule set alone. However, additional rules are desirable for effects, exceptions, and uniqueness of character, as further described below.

According to the method of the invention, other rules involving phoneme's duration and/or context can be speci-

US 6,611,278 B2

7

fied. Also, any other rules that do not fit into the above mentioned categories can be specified. Examples of such rules are described in greater detail below and are termed the "secondary rules". If a timed phoneme or sub-sequence of timed phonemes do not fit the criteria for any of the secondary rules, the default rules are applied as seen in FIG. 1.

It is seen that through the use or these rules, an appropriate morph weight stream is produced. The uninterpolated morph weight stream has entries only at transition start and end time, however. These act as keyframes. A morph weight set may be evaluated at any time by interpolating between these keyframes, using conventional methods. This is how the output stream is calculated each desired time frame. For example, for television productions, the necessary resolution is 30 evaluations per second.

The post processing rules may be applied either before or after the above described interpolation step, or both. Some rules may apply only to keyframes before interpolation, some to interpolated data. If applied before the interpolation step, this affects the keyframes. if applied after, it effects the interpolated data. Post processing can use the morph weight sets calculated by the default and secondary rules. Post processing rules can use the morph weigh sets or sequences as in box 44 of FIG. 1, calculated by the default and secondary rules. Post processing rules can modify the individual members of the morph weight sets previously generated. Post processing rules may be applied in addition to other rules, including other post processing rules. Once the rule set up is completed as described, the method of the present invention can take any number and length TAPT's as input, and automatically output the corresponding morph weight set stream as seen in FIGS. 1–3.

For example, a modeled neutral geometric representation of a character for an animated production such as a movies, video, cartoon, CD or the like, with six morph targets, and their delta sets determined. Their representations, for example, are as follows:

| Delta Set | Visual Representation |
|---|---|
| 1 | "h" |
| 2 | "eh" |
| 3 | "l" |
| 4 | "oh" |
| 5 | exaggerated "oh" |
| 6 | special case "eh" used during a "snide laugh" sequences |

In this example, the neutral model is used to represent silence. The following is an example of a set of rules, according to the present method, of course this is only an example of a set of rules which could be use for illustrative purposes, and many other rules could be specified according to the method of the invention.

Default Rules:
Default Correspondence Rules
Criteria: Encounter a "h" as in "house"
Function: Use morph weight set (1,0,0,0,0,0) as transition target.

8

Criteria: Encounter an "eh" as in "bet"
Function: Use morph weight set (0,1,0,0,0,0) as transition target.
Criteria: Encounter a "l" as in "old"
Function: Use morph weight set (0,0,1,0,0,0) as transition target.
Criteria: Encounter an "oh" as in "old"
Function: Use morph weight set (0,0,0,1,0,0) as transition target.
Criteria: encounter a "silence"
Function: use morph weight set (0,0,0,0,0,0) as transition target.
Default Transition Rule
Criteria: Encounter any phoneme
Function: Transition start time=(the outgoing phoneme's end time)–0.1*(the outgoing phoneme's duration); transition end time=(the incoming phoneme's start time)+ 0.1* (the incoming phoneme's duration)
Secondary Rules
Criteria: Encounter an "oh" with a duration greater than 1.2 seconds.
Function: Use morph weigh set (0,0,0,0,1,0)
Criteria: Encounter and "ch" followed by an "h" and preceded by an "h".
Function: Use morph weigh set (0,0,0,0,0,1) as transition target.
Criteria: Encounter any phoneme preceded by silence
Function: Transition start time=(the silence's end time)– 0.1*(the incoming phoneme's duration) Transition end time=the incoming phoneme's start time
Criteria: Encounter silence preceded by any phoneme.
Function: Transition start time=the silence's start time–0.1* (the outgoing phoneme's duration)
Post Processing Rules
Criteria: Encounter a phoneme duration under 0.22 seconds.
Function: Scale the transition target determined by the default and secondary rules by 0.8 before interpolation.
Accordingly, using this example, if the user were to use these rules for the spoken word "Hello", at least four morph targets and a neutral target would be required, that is, one each for the sound of "h", "e", "l","oh " and their associated delta sets. For example, a TAPT representing the spoken word "hello" could be configured as,

| Time | Phoneme |
|---|---|
| 0.0 | silence begins |
| 0.8 | silence ends, "h" begins |
| 1.0 | "h" ends, "eh" begins |
| 1.37 | "eh" ends, "l" begins |
| 1.6 | "l" ends, "oh" begins |
| 2.1 | "oh" ends, silence begins. |

The method, for example embodied in computer software for operation with a computer or computer animation system would create an output morph weight set stream as follows:

| Time | D.S.1("h") | D.S.2("eh") | D.S.3("l") | D.S.4("oh") | D.S.5(aux"oh") | D.S.6 |
|---|---|---|---|---|---|---|
| 0.0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0.78 | 0 | 0 | 0 | 0 | 0 | 0 |

US 6,611,278 B2

9                                                    10

-continued

| Time | D.S.1("h") | D.S.2("eh") | D.S.3("l") | D.S.4("oh") | D.S.5(aux"oh") | D.S.6 |
|------|------------|-------------|------------|-------------|----------------|-------|
| 0.8   | 1 | 0 | 0 | 0 | 0 | 0 |
| 0.98  | 1 | 0 | 0 | 0 | 0 | 0 |
| 1.037 | 0 | 1 | 0 | 0 | 0 | 0 |
| 1.333 | 0 | 1 | 0 | 0 | 0 | 0 |
| 1.403 | 0 | 0 | 1 | 0 | 0 | 0 |
| 1.667 | 0 | 0 | 1 | 0 | 0 | 0 |
| 1.74  | 0 | 0 | 0 | 1 | 0 | 0 |
| 2.1   | 0 | 0 | 0 | 1 | 0 | 0 |
| 2.14  | 0 | 0 | 0 | 0 | 0 | 0 |

Such morph weight sets act as keyframes, marking the transitionary points. A morph weight set can be obtained for any time within the duration of the TAPT by interpolating between the morph weight sets using conventional methods well known in the art. Accordingly, a morph weight set can be evaluated at every frame. However, the post processing rules can be applied to the keyframes before interpolation as in box **36** of FIG. **1**, or to the interpolated data as in box **40** of FIG. **1**. From such stream of morph weight sets, the neutral model is deformed as described above, and then sent to a conventional computer animation system for integration with other animation. Alternatively, the morph weight set stream can be used directly by an animation program or package, wither interpolated or not.

The rules of the present invention are extensible and freeform in the sense that they may be created as desired and adapted to a wide variety of animation characters, situations, and products. As each rule comprise a criteria and function, as in an "if . . . then . . . else" construct. The following are illustrative examples of other rules which may be used with the present methodology.

For example, use {0,0,0,0 . . . } as the morph weighs, set when a "m" is encountered. This is a type of default rule, where: Criteria: Encounter a "m" phoneme of any duration. Function: Use a morph weight set {0,0,0,0 . . . 0} as a transition target.

Another example would be creating several slightly different morph targets for each phoneme group, and using them randomly each time that phoneme is spoken. This would give a more random, or possibly comical or interesting look to the animation's. This is a secondary rule.

An example of post processing rule, before interpolation would be to add a small amount of random noise to all morph weight channels are all keyframes. This would slightly alter the look of each phoneme to create a more natural look.

Criteria: Encounter any keyframe
Function: Add a small random value to each member of the morph weight set prior to interpolation.

An example of a post processing rule, after interpolation would be to add a component of an auxiliary morph target (one which does not correspond directly to a phoneme) to the output stream in a cyclical manner over time, after interpolation. If the auxiliary morph target had the character's mouth moved to the left, for example, the output animation would have the character's mouth cycling between center to left as he spoke.

Criteria: Encounter any morph weight set generated by interpolation
Function: Add a value calculated through a mathematical expression to the morph weigh set's member that corresponds to the auxiliary morph target's delta set weight. The expression might be, for example: $0.2*\sin(0.2*time*2*pi)+0.2$. This rule would result in an oscillation of the animated character's mouth every five seconds.

Another example of a secondary rule is to use alternative weight sets (or morph weight set sequences) for certain contexts of phonemes, for example, in an "oh" is both preceded and followed by an "ee" then use an alternate "oh". This type of rule can make speech idiosyncrasies, as well as special sequences for specific words (which are a combination of certain phonemes in a certain context). This type of rule can take into consideration the differences in mouth positions for similar phonemes based on context. For example, the "l" in "hello" is shaped more widely than the "l" in "burly" due to it's proximity to an "eh" as opposed to a "r".

Criteria: Encounter an "l" preceded by an "r".
Function: Use a specified morph weight set as transition target.

Another secondary rule could be, by way of illustration, that if a phoneme is longer than a certain duration, substitute a different morph target. this can add expressiveness to extended vowel sounds, for instance, if a character says "HELLOOOOOOO!" a more exaggerated "oh" model would be used.

Criteria: Encounter an "oh" longer than 0.5 seconds and less than 1 second.
Function: Use a specified morph weight set as a transition target.

If a phoneme is longer than another phoneme of even longer duration, a secondary rule may be applied to create new transitions between alternate morph targets at certain intervals, which may be randomized, during the phoneme's duration. This will add some animation to extremely long held sounds, avoiding a rigid look. This is another example of a secondary rule

Criteria: Encounter an "oh" longer than 1 second long.
Function: Insert transitions between a defined group of morph weight sets at 0.5 second intervals, with transition duration's of 0.2 seconds until the next "normal" transition start time is encountered.

If a phoneme is shorter than a certain duration, its corresponding morph weight may be scaled by a factor smaller than 1. This would create very short phonemes not appear over articulated. Such a post processing rule, applied before interpolation would comprise:

Criteria: Encounter a phoneme duration shorter than 0.1 seconds.
Function: Multiply all members of the transition target (already determined by default and secondary rules by duration/0.1.

As is readily apparent a wide variety of other rules can be created to add individuality to the different characters.

A further extension of the present method is to make a parallel method or system, as depicted in box **14** of FIG. **1**, that uses time aligned emotional transcriptions (TAET) that correspond to facial models of those emotions. Using the same techniques as previously described additional morph

US 6,611,278 B2

11

weight set streams can be created that control other aspects of the character that reflect facial display of emotional state. Such morph weight set streams can be concatenated with the lip synchronization stream. In addition, the TAET data can be used in conjunction with the lip synchronization second- ary rules to alter the lip synchronization output stream. For example:

Criteria: An "L" is encountered in the TAPT and the nearest "emoteme" in the TAET is a "smile".

Function: Use a specified morph weight set as transition target.

As is evident from the above description, the automatic animation lip synchronization and facial expression method described may be used on a wide variety of animation products. The method described herein provides an extremely rapid, efficient, and cost effective means to pro- vide automatic lip synchronization and facial expression in three dimensional animated characters. The method described herein provides, for the first time, a rapid, effective, expressive, and inexpensive means to automati- cally create animated lip synchronization and facial expres- sion in animated characters. The method described herein can create the necessary morph weight set streams to create speech animation when given a time aligned phonetic tran- scription of spoken text and a set of user defined rules for determining appropriate morph weight sets for a given TAPT sequence. This method also defines rules describing a method of transitioning between these sets through time. The present method is extensible by adding new rules, and other timed data may be supplied, such as time "emotemes" that will effect the output data according to additional rules that take this data into account. In this manner, several parallel systems may be used on different types of timed data and the results concatenated, or used independently. Accordingly, additional advantages and modification will readily occur to those skilled in the art. The invention in its broader aspects is, therefore, not limited to the specific methodological details, representative apparatus and illus- trative examples shown and described. Accordingly, depar- tures from such details may be made without departing from the spirit or scope of the applicant's inventive concept.

What is claimed is:

1. A method for automatically animating lip synchroni- zation and facial expression of three-dimensional characters comprising:

obtaining a first set of rules that defines a morph weight set stream as a function of phoneme sequence and times associated with said phoneme sequence;

obtaining a plurality of sub-sequences of timed phonemes corresponding to a desired audio sequence for said three-dimensional characters;

generating an output morph weight set stream by applying said first set of rules to each sub-sequence of said plurality of sub-sequences of timed phonemes; and

applying said output morph weight set stream to an input sequence of animated characters to generate an output sequence of animated characters with lip and facial expression synchronized to said audio sequence.

2. The method of claim 1, wherein said first set of rules comprises:

correspondence rules between all visual phoneme groups and morph weight sets; and

morph weight set transition rules specifying durational data between morph weight sets.

3. The method of claim 2, wherein said durational data comprises transition start and transition end times.

12

4. The method of claim 1, wherein said desired audio sequence is from a pre-recorded live performance.

5. The method of claim 1, wherein said desired audio sequence is synthetically generated by a computer.

6. The method of claim 1, wherein said plurality of subsequences of timed phonemes is obtained from a file.

7. The method of claim 1, wherein said plurality of subsequences of timed phonemes is generated during ani- mation.

8. The method of claim 1, wherein said output sequence of animated characters is transmitted over a computer net- work.

9. The method of claim 1, wherein said generating said output morph weight stream comprises:

generating an appropriate morph weight set correspond- ing to each subsequence of said timed phonemes; and

generating time parameters for transition of said appro- priate morph weight set from a morph weight set of a prior sub-sequence of said timed data.

10. The method of claim 1, wherein each of said first set of rules comprises a rule's criteria and a rule's function.

11. The method of claim 10, wherein said generating an output morph weight set stream comprises:

checking each sub-sequence of said plurality of sub- sequences of timed data for compliance with said rule's criteria; and

generating an output morph weight set and transition parameters by applying said rule's function upon said compliance with said criteria.

12. The method of claim 1, wherein said first set of rules comprises a default set of rules and an optional secondary set of rules, said secondary set of rules having priority over said default set of rules.

13. The method of claim 1, wherein said plurality of subsequences of timed phonemes comprises a timed aligned phonetic transcriptions sequence.

14. The method of claim 1, wherein said plurality of subsequences of timed phonemes comprises time aligned data.

15. The method of claim 13, wherein said plurality of subsequences of timed phonemes further comprises time aligned emotional transcription data.

16. The method of claim 9, wherein said transition param- eters comprises:

transition start time; and

transition end time.

17. The method of claim 16, further comprising:

generating said output morph weight set stream by inter- polating between morph weight sets at said transition start time and said transition end time according to a desired frame rate of said output sequence of animated characters.

18. The method of claim 1, further comprising:

applying a second set of rules to said output morph weight set prior to said generating of said output sequence of animated characters.

19. An apparatus for automatically animating lip synchro- nization and facial expression of three-dimensional charac- ters comprising:

a computer system;

computer code in said computer system, said computer code comprising:

a method for obtaining a first set of rules that defines a morph weight set stream as a function of phoneme sequence and times associated with said phoneme sequence;

US 6,611,278 B2

13

a method for obtaining a plurality of sub-sequences of timed phonemes corresponding to a desired audio sequence for said three-dimensional characters;

a method for generating an output morph weight set stream by applying said first set of rules to each sub-sequence of said plurality of subsequences of timed phonemes;

a method for applying said output morph weight stream to an input sequence of animated characters to generate an output sequence of animated characters with lip and facial expression synchronized to said audio sequence.

**20**. The apparatus of claim **19**, wherein said first set of rules comprises:

correspondence rules between all visual phoneme groups and morph weight sets; and

morph weight set transition rules specifying durational data between morph weight sets.

**21**. The apparatus of claim **20**, wherein said durational data comprises transition start and transition end times.

**22**. The apparatus of claim **19**, wherein said desired audio sequence is from a pre-recorded live performance.

**23**. The apparatus of claim **19**, wherein said desired audio sequence is synthetically generated by a computer.

**24**. The apparatus of claim **19**, said plurality of subsequences of timed phonemes is obtained from a file.

**25**. The apparatus of claim **19**, wherein said plurality of subsequences of timed phonemes is generated during animation.

**26**. The apparatus of claim **19**, wherein said output sequence of animated characters is transmitted over a computer network.

**27**. The apparatus of claim **19**, wherein said generating said output morph weight stream comprises:

generating an appropriate morph weight set corresponding to each subsequence of said timed phonemes; and

generating time parameters for transition of said appropriate morph weight set from a morph weight set of a prior sub-sequence of said timed data.

**28**. The apparatus of claim **19**, wherein each of said first set of rules comprises a rule's criteria and a rule's function.

14

**29**. The apparatus of claim **28**, wherein said generating an output morph weight set stream comprises:

checking each sub-sequence of said plurality of sub-sequences of timed data for compliance with said rule's criteria; and

generating an output morph weight set and transition parameters by applying said rule's function upon said compliance with said criteria.

**30**. The apparatus of claim **19**, wherein said first set of rules comprises a default set of rules and an optional secondary set of rules, said secondary set of rules having priority over said default set of rules.

**31**. The apparatus of claim **19**, wherein said plurality of subsequences of timed phonemes comprises a timed aligned phonetic transcriptions sequence.

**32**. The apparatus of claim **19**, wherein said plurality of subsequences of timed phonemes comprises time aligned data.

**33**. The apparatus of claim **31**, wherein said plurality of subsequences of timed phonemes further comprises time aligned emotional transcription data.

**34**. The apparatus of claim **27**, wherein said transition parameters comprises:

transition start time; and

transition end time.

**35**. The apparatus of claim **34**, wherein said computer code further comprises:

a method for generating said output morph weight stream by interpolating between morph weight sets at said transition start time and said transition end time according to a desired frame rate of said output sequence of animated characters.

**36**. The apparatus of claim **19**, wherein said computer code further comprises:

a method for applying a second set of rules to said output morph weight set prior to said generating of said output sequence of animated characters.

* * * * *

(FFMx),APPEAL,CLOSED,CONSOLPT,DISCOVERY,LEADPT,MANADR,PPP,PROTORD


# UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:12-cv-10322-GW-FFM

McRO Inc v. BANDAI NAMCO Games America Inc          Date Filed: 12/04/2012
Assigned to: Judge George H. Wu                     Date Terminated: 09/22/2014
Referred to: Magistrate Judge Frederick F. Mumm     Jury Demand: Both
Related Cases: 2:12-cv-10329-GW-FFM                  Nature of Suit: 830 Patent
               2:12-cv-10331-GW-FFM                  Jurisdiction: Federal Question
               2:12-cv-10333-GW-FFM
               2:12-cv-10335-GW-FFM
               2:12-cv-10336-GW-FFM
               2:12-cv-10337-GW-FFM
               2:12-cv-10338-GW-FFM
               2:12-cv-10340-GW-FFM
               2:12-cv-10341-GW-FFM
               2:12-cv-10342-GW-FFM
               2:12-cv-10344-GW-FFM
               2:12-cv-10345-GW-FFM
               2:12-cv-10327-GW-FFM
               2:12-cv-10326-GW-FFM
               2:14-cv-00332-GW-FFM
               2:12-cv-10323-GW-FFM
               8:13-cv-01870-GW-FFM
               8:13-cv-01871-GW-FFM
               8:13-cv-01872-GW-FFM
               8:13-cv-01873-GW-FFM
               8:13-cv-01874-GW-FFM
               2:14-cv-00439-GW-FFM
               2:14-cv-00417-GW-FFM
               2:14-cv-00389-GW-FFM
               2:14-cv-00383-GW-FFM
               2:14-cv-00358-GW-FFM
               2:14-cv-00352-GW-FFM
               2:14-cv-00336-GW-FFM
Case in other court: Federal Circuit, 15-01080
Cause: 35:271 Patent Infringement

**Plaintiff**

**McRO Inc**                          represented by  **Eric P Berger**
*doing business as*                                   Mishcon de Reya New York LLP
Planet Blue                                           750 Seventh Avenue 26th Floor

New York, NY 10019
212-612-3270
Fax: 212-612-3297
Email: Eric.Berger@mishcon.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
Russ August and Kabat
12424 Wilshire Boulevard 12th Floor
Los Angeles, CA 90025
310-826-7474
Fax: 310-826-6991
Email: ilee@raklaw.com
*ATTORNEY TO BE NOTICED*

**James J McGuire**
Mishcon de Reya New York LLP
750 Seventh Avenue 26th Floor
New York, NY 10019
212-612-3270
Fax: 212-612-3297
Email: James.McGuire@mishcon.com
*TERMINATED: 01/27/2014*
*PRO HAC VICE*

**John F Petrsoric**
Mishcon de Reyea New York LLP
750 Seventh Avenue 26th Floor
New York, NY 10019
212-257-6494
Fax: 212-612-3297
Email: john.petrsoric@mishcon.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
Russ August and Kabat
12424 Wilshire Boulevard 12th Floor
Los Angeles, CA 90025
310-826-7474
Fax: 310-826-6991
Email: mafenster@raklaw.com
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
Mishcon de Reya New York LLP
750 Seventh Avenue 26th Floor
New York, NY 10019
212-612-3270

Fax: 212-612-3297
Email: Mark.Raskin@mishcon.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
Mishcon de Reya New York LLP
750 Seventh Avenue 26th Floor
New York, NY 10019
212-612-3270
Fax: 212-612-3397
Email: robert.whitman@mishcon.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**
Mishcon de Reya New York LLP
750 Seventh Avenue 26th Floor
New York, NY 10019
212-612-3265
Fax: 212-612-3297
Email: vincent.filardo@mishcon.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Namco Bandai Games America Inc**        represented by **Edward R Reines**
Weil Gotshal and Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway Suite 500
Redwood Shores, CA 94065-1175
650-802-3000
Fax: 650-802-3100
Email: edward.reines@weil.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
Weil Gotshal and Manges LLP
201 Redwood Shores Parkway Suite 500
Redwood Shores, CA 94065-1175
650-802-3000
Fax: 650-802-3100
Email: sonal.mehta@weil.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward R Reines**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
Weil Gotshal and Manges LLP
201 Redwood Shores Parkway Suite 500
Redwood Shores, CA 94065
650-802-3000
Fax: 650-802-3100
Email: evan.budaj@weil.com
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
Weil Gotshal and Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3000
Fax: 650-802-3100
Email: justin.m.lee@weil.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Naughty Dog Inc**                    represented by    **Tony M Diab**
Shook Hardy and Bacon LLP
5 Park Plaza Suite 1600
Irvine, CA 92614-2546
949-475-1500
Fax: 949-475-0016
Email: tdiab@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Albert F Harris , III**
Shook Hardy and Bacon LLP
2555 Grand Boulevard
Kansas City, MO 64108
816-474-6550
Fax: 816-421-5547
Email: afharris@shb.com
*TERMINATED: 03/07/2014*
*PRO HAC VICE*

**B Trent Webb**
Shook Hardy and Bacon LLP
2555 Grand Boulevard
Kansas City, MO 64108
816-474-6550
Fax: 816-421-5547
Email: bwebb@shb.com
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Beth A Larigan**
Shook Hardy and Bacon LLP
2555 Grand Boulevard
Kansas City, MD 64108
816-474-6550
Fax: 816-421-5547
Email: blarigan@shb.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jamie H Kitano**
Shook Hardy and Bacon LLP
One Montgomery Suite 2700
San Francisco, CA 94104
415-544-1900
Fax: 415-391-0281
Email: jkitano@shb.com
*ATTORNEY TO BE NOTICED*

**John D Garretson**
Shook Hardy and Bacon LLP
2555 Grand Boulevard
Kansas, MO 64108
816-474-6550
Fax: 816-421-5547
Email: jgarretson@shb.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan N Zerger**
Shook Hardy and Bacon LLP
2555 Grand Boulevard
Kansas City, MO 64108
816-474-6550
Fax: 816-421-5547
Email: jzerger@shb.com
*TERMINATED: 03/07/2014*
*PRO HAC VICE*

**Lynn C Herndon**
Shook Hardy and Bacon LLP
2555 Grand Boulevard
Kansas City, MO 64108
816-474-6550
Fax: 816-421-5547
Email: lherndon@shb.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Konami Digital Entertainment Inc**                    represented by    **Benjamin J Fox**
Morrison and Foerster LLP
707 Wilshire Blvd Suite 6000
Los Angeles, CA 90017-3543
213-892-5200
Fax: 213-892-5454
Email: bfox@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wendy J Ray**
Morrison and Foerster LLP
707 Wilshire Boulevard Suite 6000
Los Angeles, CA 90017-3543
213-892-5446
Fax: 213-892-5454
Email: wray@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ashleigh K Landis**
Morrison & Foerster LLP
707 Wilshire Boulevard Suite 6000
Los Angeles, CA 90017-3543
213-892-5200
Fax: 213-892-5454
Email: alandis@mofo.com
*ATTORNEY TO BE NOTICED*

**Jason Jaewook Lee**
Morrison and Foerster LLP
707 Wilshire Boulevard Suite 6000
Los Angeles, CA 90017-3543
213-892-5363
Fax: 213-892-5454
Email: jlee@mofo.com
*TERMINATED: 10/31/2013*

**Defendant**

**Shiny Entertainment Inc**
*TERMINATED: 03/28/2014*

**Defendant**

**Sega of America Inc**                    represented by    **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
Weil Gotshal and Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3000
Fax: 650-802-3100
Email: justin.m.lee@weil.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
Weil Gotshal and Manges LLP
201 Redwood Shores Parkway Suite 500
Redwood Shores, CA 94065-1175
650-802-3000
Fax: 650-802-3100
Email: sonal.mehta@weil.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Electronic Arts, Inc.**                    represented by    **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Obsidian Entertainment Inc**                    represented by    **Madison S Spach , Jr**
Spach Capaldi & Waggaman LLP
4675 MacArthur Court Suite 550

Newport Beach, CA 92660
949-852-0710
Fax: 949-852-0714
Email: madison.spach@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Disney Interactive Studios Inc**                    represented by **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sonic Team**
*TERMINATED: 03/28/2014*

**Defendant**

**Square Enix Inc**                    represented by **Benjamin J Fox**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wendy J Ray**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ashleigh K Landis**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Jason Jaewook Lee**
(See above for address)
*TERMINATED: 10/31/2013*

**Defendant**

**Insomniac Games Inc**                    represented by   **Benjamin L Singer**
*TERMINATED: 07/18/2014*                                   Colt Singer Bea LLP
                                                           235 Montgomery Street
                                                           Suite 907
                                                           San Francisco, CA 94104
                                                           415-500-6080
                                                           Fax: 415-500-6080
                                                           Email: bsinger@coltsinger.com
                                                           *TERMINATED: 07/18/2014*

                                                           **Stephen Rubin**
                                                           Stephen Rubin Law Offices
                                                           553 12th Street
                                                           Santa Monica, CA 90402-2907
                                                           310-393-0900
                                                           Fax: 310-496-0810
                                                           Email: sr@stephenrubin.com
                                                           *TERMINATED: 07/18/2014*

**Defendant**

**Neversoft Entertainment Inc.**           represented by   **Edward R Reines**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Evan N Budaj**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Justin Morteza Lee**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Karin G Pagnanelli**
                                                           Mitchell Silberberg and Knupp LLP
                                                           11377 West Olympic Boulevard
                                                           Los Angeles, CA 90064-1683
                                                           310-312-2000
                                                           Fax: 310-312-3100
                                                           Email: kgp@msk.com
                                                           *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Marc Ellis Mayer**
Mitchell Silberberg & Knupp LLP
11377 West Olympic Blvd
Los Angeles, CA 90064-1683
310-312-2000
Fax: 310-312-3100
Email: mem@msk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Treyarch Corporation**                    represented by    **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marc Ellis Mayer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Visceral Games**                          represented by    **Edward R Reines**
*TERMINATED: 06/19/2013*                                       (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**THQ, Inc.**
*TERMINATED: 08/30/2013*

**Defendant**

**Capcom USA Inc**                    represented by    **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sony Computer Entertainment**        represented by    **Tony M Diab**
**America LLC**                                          (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas Wayne Robinson**
Shook Hardy and Bacon LLP
Jamboree Center
5 Park Plaza Suite 1600
Irvine, CA 92614-2546
949-475-1500

Fax: 949-475-0016
Email: dwrobinson@shb.com
*ATTORNEY TO BE NOTICED*

**Jamie H Kitano**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John D Garretson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Index Digital Media, Inc.**                    represented by   **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sucker Punch Productions LLC**                 represented by   **Tony M Diab**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Albert F Harris , III**
(See above for address)
*TERMINATED: 03/07/2014*
*PRO HAC VICE*

**B Trent Webb**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Beth A Larigan**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Douglas Wayne Robinson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamie H Kitano**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John D Garretson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Activision Blizzard Inc**          represented by      **Edward R Reines**
*TERMINATED: 04/15/2014*                                (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Sonal Naresh Mehta**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Evan N Budaj**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Justin Morteza Lee**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Infinity Ward Inc.**               represented by      **Edward R Reines**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Sonal Naresh Mehta**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Evan N Budaj**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**LucasArts Entertainment Company LLC**

represented by **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SCE Santa Monica Studio Inc.**
*TERMINATED: 04/04/2014*

**Defendant**

**Warner Bros Interactive Entertainment Inc**

represented by **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Activision Publishing, Inc.**

represented by **Sonal Naresh Mehta**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Blizzard Entertainment, Inc.**                represented by    **Sonal Naresh Mehta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Insomniac Games Inc**                         represented by    **Benjamin L Singer**
*TERMINATED: 07/24/2013*                                          (See above for address)
*TERMINATED: 07/18/2014*

**Stephen Rubin**
(See above for address)
*TERMINATED: 07/18/2014*

V.

**Counter Defendant**

**McRO Inc**                                    represented by    **Eric P Berger**
*TERMINATED: 07/24/2013*                                          (See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Disney Interactive Studios Inc**              represented by    **Edward R Reines**
*TERMINATED: 07/24/2013*                                          (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**<u>Counter Defendant</u>**

**McRO Inc**                          represented by **Eric P Berger**
*TERMINATED: 07/24/2013*                (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Irene Y Lee**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **James J McGuire**
                                        (See above for address)
                                        *TERMINATED: 01/27/2014*

                                        **John F Petrsoric**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Marc A Fenster**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Mark S Raskin**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

**<u>Counter Claimant</u>**

**Treyarch Corporation**              represented by **Edward R Reines**
*TERMINATED: 07/24/2013*                (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marc Ellis Mayer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**                          represented by  **Eric P Berger**
*TERMINATED: 07/24/2013*                             (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Neversoft Entertainment Inc.**        represented by  **Edward R Reines**

*TERMINATED: 07/24/2013*

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karin G Pagnanelli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marc Ellis Mayer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**<u>Counter Defendant</u>**

**McRO Inc**                         represented by  **Eric P Berger**
*TERMINATED: 07/24/2013*                            (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Irene Y Lee**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **James J McGuire**
                                                    (See above for address)
                                                    *TERMINATED: 01/27/2014*

                                                    **John F Petrsoric**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Marc A Fenster**
                                                    (See above for address)

*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Namco Bandai Games America Inc**          represented by   **Edward R Reines**
*TERMINATED: 07/24/2013*                                    (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Sonal Naresh Mehta**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Edward R Reines**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Evan N Budaj**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Justin Morteza Lee**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**                               represented by   **Eric P Berger**
*TERMINATED: 07/24/2013*                                    (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Irene Y Lee**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **James J McGuire**
                                                            (See above for address)
                                                            *TERMINATED: 01/27/2014*

                                                            **John F Petrsoric**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Marc A Fenster**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Electronic Arts, Inc.**
*TERMINATED: 07/24/2013*

represented by **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**
*TERMINATED: 07/24/2013*

represented by **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Sega of America Inc**
*TERMINATED: 07/24/2013*

represented by **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**
*TERMINATED: 07/24/2013*

represented by **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Capcom USA Inc**                    represented by    **Edward R Reines**
*TERMINATED: 07/24/2013*                                (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Sonal Naresh Mehta**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Evan N Budaj**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Justin Morteza Lee**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**                          represented by    **Eric P Berger**
*TERMINATED: 07/24/2013*                                (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Irene Y Lee**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **James J McGuire**
                                                        (See above for address)
                                                        *TERMINATED: 01/27/2014*

                                                        **John F Petrsoric**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Marc A Fenster**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Mark S Raskin**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Insomniac Games Inc**                   represented by   **Benjamin L Singer**
*TERMINATED: 07/18/2014*                                  (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Stephen Rubin**
                                                          (See above for address)
                                                          *TERMINATED: 07/18/2014*


V.

**Counter Defendant**

**McRO Inc**                              represented by   **Eric P Berger**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Irene Y Lee**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James J McGuire**
                                                          (See above for address)
                                                          *TERMINATED: 01/27/2014*

                                                          **John F Petrsoric**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Marc A Fenster**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Mark S Raskin**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Robert A Whitman**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Vincent Filardo , Jr**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*


**Counter Claimant**

**Capcom USA Inc**                        represented by   **Edward R Reines**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**                          represented by **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Treyarch Corporation**                    represented by    **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marc Ellis Mayer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**                    represented by    **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**

**A75**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Disney Interactive Studios Inc**          represented by   **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**          represented by   **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Electronic Arts, Inc.**                     represented by **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**                               represented by **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Namco Bandai Games America Inc**          represented by **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward R Reines**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Counter Defendant</u>**

**McRO Inc**                          represented by  **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Counter Claimant</u>**

**Neversoft Entertainment Inc.**      represented by  **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karin G Pagnanelli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marc Ellis Mayer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**<u>Counter Defendant</u>**

**McRO Inc**                    represented by **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Sega of America Inc**                    represented by **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**                    represented by **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Obsidian Entertainment Inc**          represented by    **Madison S Spach , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**          represented by    **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Naughty Dog Inc**                    represented by    **Tony M Diab**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Albert F Harris , III**
(See above for address)
*TERMINATED: 03/07/2014*
*PRO HAC VICE*

**B Trent Webb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Beth A Larigan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamie H Kitano**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John D Garretson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan N Zerger**
(See above for address)
*TERMINATED: 03/07/2014*
*PRO HAC VICE*

**Lynn C Herndon**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Counter Defendant</u>**

**McRO Inc**                                        represented by   **Eric P Berger**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Irene Y Lee**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **James J McGuire**
                                                                 (See above for address)
                                                                 *TERMINATED: 01/27/2014*

                                                                 **John F Petrsoric**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Marc A Fenster**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Mark S Raskin**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Robert A Whitman**
                                                                 (See above for address)
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Vincent Filardo , Jr**
                                                                 (See above for address)
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*

**<u>Counter Claimant</u>**

**Sucker Punch Productions LLC**              represented by   **Tony M Diab**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Albert F Harris , III**
                                                                 (See above for address)
                                                                 *TERMINATED: 03/07/2014*

                                                                 **B Trent Webb**
                                                                 (See above for address)

*ATTORNEY TO BE NOTICED*

**Beth A Larigan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Douglas Wayne Robinson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamie H Kitano**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John D Garretson**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Counter Defendant</u>**

**McRO Inc**                    represented by **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Sony Computer Entertainment**            represented by    **Tony M Diab**
**America LLC**                                               (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Douglas Wayne Robinson**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Jamie H Kitano**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **John D Garretson**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**                                 represented by    **Eric P Berger**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Irene Y Lee**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **James J McGuire**
                                                             (See above for address)
                                                             *TERMINATED: 01/27/2014*

                                                             **John F Petrsoric**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Marc A Fenster**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Mark S Raskin**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Robert A Whitman**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Infinity Ward Inc.**                  represented by **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**                  represented by **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Warner Bros Interactive**                    represented by   **Edward R Reines**
**Entertainment Inc**                                         (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Sonal Naresh Mehta**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Evan N Budaj**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Justin Morteza Lee**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**                                   represented by   **Eric P Berger**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Irene Y Lee**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **James J McGuire**
                                                             (See above for address)
                                                             *TERMINATED: 01/27/2014*

                                                             **John F Petrsoric**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Marc A Fenster**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**LucasArts Entertainment Company LLC**          represented by          **Edward R Reines**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sonal Naresh Mehta**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan N Budaj**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Morteza Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**          represented by          **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Activision Publishing, Inc.**                    represented by    **Sonal Naresh Mehta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Blizzard Entertainment, Inc.**                    represented by    **Sonal Naresh Mehta**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRO Inc**                    represented by    **Eric P Berger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James J McGuire**
(See above for address)
*TERMINATED: 01/27/2014*

**John F Petrsoric**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc A Fenster**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert A Whitman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vincent Filardo , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 12/04/2012 | 1 | COMPLAINT against Defendant Namco Banda Games America Inc. Case assigned to Judge Percy Anderson for all further proceedings. Discovery referred to Magistrate Judge Frederick F. Mumm. (Filing fee $ 350 PAID.) Jury Demanded., filed by Plaintiff McRO Inc.(et) (mg). (Entered: 12/07/2012) |
| 12/04/2012 |   | 21 DAY Summons Issued re Complaint - (Discovery) 1 as to Defendant Namco Banda Games America Inc. (et) (Entered: 12/07/2012) |
| 12/04/2012 | 2 | CERTIFICATION AND NOTICE of Interested Parties filed by Plaintiff McRO Inc. (et) (mg). (Entered: 12/07/2012) |
| 12/04/2012 | 3 | DISCLOSURE STATEMENT filed by Plaintiff McRO Inc. (et) (mg). (Entered: 12/07/2012) |
| 12/04/2012 | 4 | REPORT ON THE FILING OF AN ACTION Regarding a Patent or a Trademark (Initial Notification) filed by McRO Inc. (et) (Entered: 12/07/2012) |
| 12/04/2012 | 5 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (et) (Entered: 12/07/2012) |
| 12/07/2012 | 6 | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to Mark S. Raskin for Plaintiff McRO Inc. Your Pro Hac Vice application has not been received by the court. Please return your completed Application of Non-Resident Attorney to Appear in a Specific Case, form G-64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out-of-state federal government attorneys who are not employed by the U.S. Department of Justice are required to file a Pro Hac Vice application; no filing fee is required. (et) (Entered: 12/07/2012) |
| 12/07/2012 | 7 | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to Vincent Filardo Jr. for Plaintiff McRO Inc. Your Pro Hac Vice application has not been received by the court. Please return your completed Application of Non-Resident Attorney to Appear in a Specific Case, form G-64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out-of-state federal government attorneys who are not employed by |

|  |  | the U.S. Department of Justice are required to file a Pro Hac Vice application; no filing fee is required. (et) (Entered: 12/07/2012) |
| --- | --- | --- |
| 12/07/2012 | 8 | STANDING ORDER by Judge Percy Anderson: This action has been assigned to the calendar of Judge Percy Anderson. All counsel are ordered to familiarize themselves with the Federal Rules of Civil Procedure and the Local Rules of the Central District of California. See document for further details. (gk) (Entered: 12/12/2012) |
| 12/14/2012 | 9 | PROOF OF SERVICE Executed by Plaintiff McRO Inc, upon Defendant Namco Banda Games America Inc served on 12/12/2012, answer due 1/2/2013. Service of the Summons and Complaint were executed upon David Greenspan, Senior Director of Legal and Business Affairs Authorized to Accept Service in compliance with Federal Rules of Civil Procedure by service on a domestic corporation, unincorporated association, or public entity. Original Summons NOT returned. (Lee, Irene) (Entered: 12/14/2012) |
| 12/21/2012 | 10 | NOTICE of Related Case(s) filed by Plaintiff McRO Inc. Related Case(s): 15 (Lee, Irene) (Entered: 12/21/2012) |
| 12/27/2012 | 11 | STIPULATION Extending Time to Answer the complaint as to Namco Banda Games America Inc answer now due 1/28/2013, filed by defendant Namco Banda Games America Inc.(Reines, Edward) (Entered: 12/27/2012) |
| 12/28/2012 | 12 | MINUTE IN CHAMBERS - COURT ORDER by Judge Percy Anderson: The Court orders that for each defendant in this action and each of the Potentially Related Actions, Plaintiff must identify by claim number every claim of the '576 Patent and every claim of the '278 Patent that Plaintiff alleges is infringed by each respective defendant. Plaintiff's written response to this Order shall be filed in Case No. CV 12-10322 no later than 1/7/2013. (jp) (Entered: 12/28/2012) |
| 01/03/2013 | 13 | ORDER TO TRANSFER CASE TO THE PATENT PILOT PROGRAM by Judge Percy Anderson. Case transferred from Judge Percy Anderson to Judge George H Wu for all further proceedings. Case number now reads CV12-10322 GW (FFMx). (at) (Entered: 01/03/2013) |
| 01/04/2013 | 14 | Standing Order Re Final Pre-Trial Conferences for Civil Jury Trials Before Judge George H. Wu. You are instructed to read and to follow (unless otherwise superseded herein) the Central District of California Local Rules (henceforth Local Rules) 16-1 through 16-15 regarding pre-trial requirements. (See Order for details.) (kti) (Entered: 01/04/2013) |
| 01/04/2013 | 15 | MINUTE ORDER IN CHAMBERS by Judge George H Wu. This action has been reassigned to the HONORABLE GEORGE H. WU, United States District Judge. On the Courts own motion, The Court Order issued by Judge Anderson 12 on December 28, 2012 is hereby VACATED. (See Order for details.) (kti) (Entered: 01/04/2013) |
| 01/25/2013 | 16 | APPLICATION for attorney Mark S. Raskin to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-11571603 paid.) filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Lee, Irene) (Entered: 01/25/2013) |
| 01/28/2013 | 17 | STIPULATION for Extension of Time to File Answer to February 4, 2013 re Complaint - (Discovery), Complaint - (Discovery) 1 filed by Defendant Namco |

| | | |
|---|---|---|
| | | Banda Games America Inc. (Attachments: # 1 Declaration of Sonal N. Mehta in Support of Stipulation, # 2 Proposed Order)(Mehta, Sonal) (Entered: 01/28/2013) |
| 01/28/2013 | 18 | ORDER by Judge George H. Wu: granting 16 Application to Appear Pro Hac Vice by Attorney Mark Raskin on behalf of plaintiff, designating Irene Lee as local counsel. (ak) (Entered: 01/30/2013) |
| 01/31/2013 | 19 | ORDER re Stipulation to Extend Time to Answer 17 by Judge George H. Wu. Defendant NAMCO BANDAI GAMES AMERICA, INC. may have until February 4, 2013, to respond to the Complaint. (kti) (Entered: 02/01/2013) |
| 02/04/2013 | 20 | NOTICE of Appearance filed by attorney Justin Morteza Lee on behalf of Defendant Namco Banda Games America Inc (Lee, Justin) (Entered: 02/04/2013) |
| 02/04/2013 | 21 | NOTICE of Appearance filed by attorney Evan N Budaj on behalf of Defendant Namco Banda Games America Inc (Budaj, Evan) (Entered: 02/04/2013) |
| 02/04/2013 | 22 | NOTICE of Appearance filed by attorney Sonal Naresh Mehta on behalf of Defendant Namco Banda Games America Inc (Mehta, Sonal) (Entered: 02/04/2013) |
| 02/04/2013 | 23 | CORPORATE DISCLOSURE STATEMENT filed by Defendant Namco Banda Games America Inc identifying Namco Bandai Holdings Inc. as Corporate Parent. (Mehta, Sonal) (Entered: 02/04/2013) |
| 02/04/2013 | 24 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendant Namco Banda Games America Inc. Motion set for hearing on 3/4/2013 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Proposed Order)(Mehta, Sonal) (Entered: 02/05/2013) |
| 02/05/2013 | 25 | DECLARATION of Sonal N. Mehta In Support of MOTION to Dismiss Case 24 filed by Defendant Namco Banda Games America Inc. (Attachments: # 1 Exhibit A)(Mehta, Sonal) (Entered: 02/05/2013) |
| 02/05/2013 | 26 | NOTICE OF MOTION AND MOTION for Relief from Local Rule 7-3 re MOTION to Dismiss Case 24 filed by Defendant Namco Banda Games America Inc. Motion set for hearing on 3/4/2013 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Proposed Order)(Mehta, Sonal) (Entered: 02/05/2013) |
| 02/05/2013 | 27 | DECLARATION of Sonal N. Mehta in Support of MOTION for Relief from Local Rule 7-3 re MOTION to Dismiss Case 24 MOTION for Relief from Local Rule 7-3 re MOTION to Dismiss Case 24 26 filed by Defendant Namco Banda Games America Inc. (Attachments: # 1 Exhibit A)(Mehta, Sonal) (Entered: 02/05/2013) |
| 02/05/2013 | 28 | APPLICATION for Leave to File Motion to Dismiss, Motion for Relief, and Supporting Documents filed by Defendant Namco Banda Games America Inc. (Attachments: # 1 Proposed Order)(Budaj, Evan) (Entered: 02/05/2013) |
| 02/05/2013 | 29 | DECLARATION of Evan N. Budaj re APPLICATION for Leave to File Motion to Dismiss, Motion for Relief, and Supporting Documents 28 filed by Defendant Namco Banda Games America Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Budaj, Evan) (Entered: 02/05/2013) |
| 02/07/2013 | 30 | NOTICE of Change of Lead Counsel filed by Defendant Namco Banda Games |

America Inc, (Mehta, Sonal) (Entered: 02/07/2013)

| | | |
|---|---|---|
| 02/07/2013 | 31 | ORDER Granting Leave to File by Judge George H. Wu granting 28 Application for Leave: The Court, having considered Defendants Namco Bandai Games America, Inc.; Sega of America, Inc.; Electronic Arts Inc.; Disney Interactive Studios, Inc.; Capcom USA, Inc.; Neversoft Entertainment, Inc.; Treyarch Corporation; and Visceral Gamess (Defendants) Application for Leave to File Motion to Dismiss, Motion for Relief, and Supporting Documents Due to Technical Failure filed Feb. 5, 2013, hereby ORDERS as follows: Defendants are hereby GRANTED leave to file their Motion to Dismiss, Motion for Relief, and Supporting Documents on February 5, 2013. (bm) (Entered: 02/08/2013) |
| 02/07/2013 | 32 | ORDER Granting Leave to File by Judge George H. Wu: The Court, having considered Defendants Namco Bandai Games America, Inc.; Sega of America, Inc.; Electronic Arts Inc.; Disney Interactive Studios, Inc.; Capcom USA, Inc.; Neversoft Entertainment, Inc.; Treyarch Corporation; and Visceral Games's ("Defendants'") Application for Leave to File Motion to Dismiss, Motion for Relief, and Supporting Documents Due to Technical Failure filed Feb. 5, 2013, hereby ORDERS as follows: Defendants are hereby GRANTED leave to file their Motion to Dismiss, Motion for Relief, and Supporting Documents on February 5, 2013. (bm) (Entered: 02/08/2013) |
| 02/08/2013 | 33 | NOTICE OF CLERICAL ERROR: Due to clerical error Re: ORDER Granting Leave to File by Judge George H. Wu 32 , Filed Date: 2/7/13, Document Number: 32. Other: Order is a duplicate docket entry of document 31 , that was docketed to the incorrect case. Please disregard. (bm) (Entered: 02/08/2013) |
| 02/11/2013 | 34 | ORDER Granting Relief from Local Rule7-3 by Judge George H. Wu: Defendant Namco Bandai Games America, Inc.s Motion for Relief from Local Rule 7-3 is hereby GRANTED. 26 (pj) (Entered: 02/11/2013) |
| 02/11/2013 | 35 | MEMORANDUM in Opposition to MOTION to Dismiss Case 24 filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 02/11/2013) |
| 02/14/2013 | 36 | NOTICE OF ERRATA filed by Plaintiff McRO Inc. correcting MEMORANDUM in Opposition to Motion 35 (Attachments: # 1 Exhibit Substitute Memorandum)(Raskin, Mark) (Entered: 02/14/2013) |
| 02/15/2013 | 37 | REPLY in Support of MOTION to Dismiss Case 24 filed by Defendant Namco Banda Games America Inc. (Mehta, Sonal) (Entered: 02/15/2013) |
| 03/01/2013 | 38 | APPLICATION for attorney James J. McGuire to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-11743314 paid.) filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Lee, Irene) (Entered: 03/01/2013) |
| 03/01/2013 | 39 | APPLICATION for attorney Eric P. Berger to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-11743830 paid.) filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Lee, Irene) (Entered: 03/01/2013) |
| 03/01/2013 | 40 | NOTICE filed by Plaintiff McRO Inc. *re First Amended Complaint for Patent Infringement* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Lee, Irene) (Entered: 03/01/2013) |

| | | |
|---|---|---|
| 03/04/2013 | 41 | MINUTES OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT (filed 02/05/13) Motion Hearing held before Judge George H. Wu: The Tentative circulated and attached hereto, is adopted as the Court's final ruling. Defendants' motion is GRANTED WITH LEAVE TO AMEND. Plaintiffs will have until March 18, 2013 to manually file the First Amended Complaint. Additionally, the Clerk's Office's Notice of Discrepancies regarding Plaintiff's First Amended Complaint, issued on February 28, 2013, is deemed MOOT.Court Reporter: Mary Rickey. (bp) (Entered: 03/05/2013) |
| 03/06/2013 | 42 | ORDER by Judge George H. Wu: granting 38 Application to Appear Pro Hac Vice by Attorney James J. McGuire on behalf of Plaintiff, designating Irene Y. Lee as local counsel. (lt) (Entered: 03/08/2013) |
| 03/06/2013 | 43 | ORDER by Judge George H. Wu: granting 39 Application to Appear Pro Hac Vice by Attorney Eric P. Berger on behalf of Plaintiff, designating Irene Y. Lee as local counsel. (lt) (Entered: 03/08/2013) |
| 03/18/2013 | 44 | FIRST AMENDED COMPLAINT against Defendant Namco Banda Games America Inc amending Complaint - (Discovery), 1 ,filed by Plaintiff McRO Inc (Attachments: # 1 21 day summons issued)(pj) (Entered: 03/20/2013) |
| 03/18/2013 | | 21 DAY Summons Issued re FIRST Amended Complaint 44 as to Defendant Namco Banda Games America Inc. (pj) (Entered: 03/20/2013) |
| 03/18/2013 | 120 | FIRST AMENDED COMPLAINT against Defendant Insomniac Games Inc amending Complaint - (Discovery), 1 ,filed by Plaintiff McRO Inc (THIS IS A COPY OF WHICH WAS FILED IN THE CIVIL CASE NUMBER 12-10340 GW) (pj) (Main Document 120 replaced on 6/18/2013) (pj). (Entered: 06/18/2013) |
| 03/18/2013 | 130 | FIRST AMENDED COMPLAINT against Defendant Treyarch Corporation amending Complaint - (Discovery), 1 ,filed by Plaintiff McRO Inc (THIS IS A COPY OF WHICH WAS FILED IN THE CIVIL CASE NUMBER 12-10342 ON 3/18/2013 GW) (pj) (Entered: 06/25/2013) |
| 03/18/2013 | | 21 DAY Summons Issued re FIRST A Amended Complaint, 130 as to Defendant Treyarch Corporation. (ORIGINALLY ISSUED IN THE CIVIL CASE NUMBER 12-10342 ON 3/18/2013 GW (pj) (Entered: 06/25/2013) |
| 03/29/2013 | 45 | TEXT ONLY NOTICE - A Scheduling Conference for related case, CV12-10331, is set for April 1, 2013, at 8:30 a.m. The schedule issued on said date shall also be the schedule for all related "McRO" cases. Parties may appear telephonically at the conference provided that notice is given to Judge Wu's Clerk. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(kbr) TEXT ONLY ENTRY (Entered: 03/29/2013) |
| 03/29/2013 | 46 | NOTICE filed by Plaintiff McRO Inc. *for Telephone Appearance re 4/1/13 Scheduling Conference* (Lee, Irene) (Entered: 03/29/2013) |
| 03/29/2013 | 47 | NOTICE Relating to April 1, 2013 Scheduling Conference filed by Defendant Namco Banda Games America Inc. (Mehta, Sonal) (Entered: 03/29/2013) |
| 04/01/2013 | 48 | MINUTES OF SCHEDULING CONFERENCE held before Judge George H. Wu. All subsequent documents will now be filed in CV 12-10322-GW(FFMx). |

| | | The Scheduling Conference is continued to April 18, 2013 at 8:30 a.m. Joint Status Report will be filed by noon on April 15, 2013. (See attached document for list of consolidated action.) Court Reporter: Anne Kielwasser. (lom) (Entered: 04/04/2013) |
|---|---|---|
| 04/04/2013 | 49 | STIPULATION for Extension of Time to File Reponse to First Amended Complaints filed by Defendant Namco Banda Games America Inc. (Attachments: # 1 Proposed Order)(Mehta, Sonal) (Entered: 04/04/2013) |
| 04/10/2013 | 50 | ORDER re Stipulation for Extension of Time to File 49 by Judge George H. Wu. The above-captioned Defendants may have until April 11, 2013, to respond to the First Amended Complaints. (kti) (Entered: 04/10/2013) |
| 04/10/2013 | 51 | NOTICE of Appearance filed by attorney Evan N Budaj on behalf of Defendant Namco Bandai Games America Inc (Budaj, Evan) (Entered: 04/10/2013) |
| 04/10/2013 | 52 | WAIVER OF SERVICE Returned Executed filed by Plaintiff McRO Inc. upon Naughty Dog Inc waiver sent by Plaintiff on 3/5/2013, answer due 5/4/2013. Waiver of Service signed by Jonathan N. Zerger representing Naughty Dog, Inc.. (Lee, Irene) (Entered: 04/10/2013) |
| 04/10/2013 | 53 | NOTICE OF MOTION AND MOTION for Leave to file Second Amended Complaints Against Konami Digital and Square Enix filed by Plaintiff McRO Inc. (Attachments: # 1 Exhibit 1 - Konami SAC, # 2 Exhibit A '576 Patent re Konami SAC, # 3 Exhibit B '278 Patent re Konami SAC, # 4 Exhibit C re Konami SAC, # 5 Exhibit 2 - Redline Konami FAC v SAC, # 6 Exhibit 3 - Square Enix SAC, # 7 Exhibit A '576 re Square Enix SAC, # 8 Exhibit B '278 Patent re Square Enix, # 9 Exhibit C re Square Enix SAC, # 10 Exhibit 4 - Redline Square Enix FAC v SAC, # 11 Proposed Order)(Lee, Irene) (Entered: 04/10/2013) |
| 04/11/2013 | 54 | TEXT ONLY ENTRY (IN CHAMBERS): by Judge George H. Wu; Plaintiffs' MOTION for Leave to file Second Amended Complaints Against Konami Digital and Square Enix 53 , filed on April 10, 2013, is set for hearing on 5/13/2013 at 08:30 AM before Judge George H. Wu. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(jag) TEXT ONLY ENTRY (Entered: 04/11/2013) |
| 04/11/2013 | 55 | Joint STIPULATION for Extension of Time to File Responses to First Amended Complaints filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Lee, Irene) (Entered: 04/11/2013) |
| 04/12/2013 | 56 | Joint STIPULATION for Extension of Time to File Rule 26(f) Report in Conjunction with Request to Continue 4/18/13 Status Conference re 2nd Amended Complaints filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Lee, Irene) (Entered: 04/12/2013) |
| 04/12/2013 | 57 | NOTICE OF MOTION AND MOTION for Leave to file Second Amended Complaints *UNOPPOSED* filed by Plaintiff McRO Inc. (Attachments: # 1 Exhibit 1 - Namco Bandai SAC, # 2 Exhibit A '576 Patent re Namco Bandai SAC, # 3 Exhibit B '278 Patent re Namco Bandi SAC, # 4 Exhibit C re Namco Bandai SAC, # 5 Exhibit 2 - Sega SAC, # 6 Exhibit A '576 Patent re Sega SAC, # 7 Exhibit B '278 Patent re Sega SAC, # 8 Exhibit C re Sega SC, # 9 Exhibit 3 - Electronic Arts SAC, # 10 Exhibit A '576 Patent re Electronic Arts SAC, # 11 Exhibit B '278 Patent re Electronic Arts SAC, # 12 Exhibit C re Electronic Arts SAC, # 13 |

| | | |
|---|---|---|
| | | Exhibit 4 - Disney SAC, # [14](#) Exhibit A '576 Patent re Disney SAC, # [15](#) Exhibit B '278 Patent re Disney SAC, # [16](#) Exhibit C re Disney SAC, # [17](#) Exhibit 5 - Capcom SAC, # [18](#) Exhibit A '576 Patent re Capcom SAC, # [19](#) Exhibit B '278 Patent re Capcom SAC, # [20](#) Exhibit C re Capcom SAC, # [21](#) Exhibit 6 - Neversoft SAC, # [22](#) Exhibit A '576 Patent re Neversoft SAC, # [23](#) Exhibit B '278 Patent re Neversoft SAC, # [24](#) Exhibit C re Neversoft SAC, # [25](#) Exhibit 7 - Visceral Games SAC, # [26](#) Exhibit A '576 Patent re Visceral Games SAC, # [27](#) Exhibit B '278 Patent re Visceral Games SAC, # [28](#) Exhibit C re Visceral Games SAC, # [29](#) Exhibit 8 Namco Redline FAC v SAC, # [30](#) Exhibit 9 Sega Redline FAC v SAC, # [31](#) Exhibit 10 Electronic Arts Redline FAC v SAC, # [32](#) Exhibit 11 Disney Redline FAC v SAC, # [33](#) Exhibit 12 Capcom Redline FAC v SAC, # [34](#) Exhibit 13 Neversoft Redline FAC v SAC, # [35](#) Exhibit 14 Visceral Games Redline FAC v SAC)(Lee, Irene) (Entered: 04/12/2013) |
| 04/13/2013 | [58](#) | SUPPLEMENT to MOTION for Leave to file Second Amended Complaints *UNOPPOSED* [57](#) filed by Plaintiff McRO Inc. (Attachments: # [1](#) Proposed Order) (Lee, Irene) (Entered: 04/13/2013) |
| 04/15/2013 | [59](#) | ORDER ON STIPULATIONREGARDING SECOND AMENDEDCOMPLAINTS by Judge George H. Wu, re Stipulation for Extension of Time to File [56](#) The scheduling conference currently set for April 18, 2013 is taken off calendar and will be continued from April 18, 2013 to the date on which the Court will hear Defendants motion to dismiss. The due date for the parties joint Rule 26(f) Report will be continued from 12 noon PT on April 15, 2013 to 12 noon PT three (3) days prior to the date of the parties scheduling conference pursuant to this Order. Plaintiffs response to defendant Obsidian Entertainment, Inc.s Counterclaimwill be due ten (10) days after the date on which the Court will hear Defendants Motion to Dismiss pursuant to this Order. (pj) (Entered: 04/16/2013) |
| 04/15/2013 | [60](#) | ORDER by Judge George H. Wu, re Stipulation for Extension of Time to File [55](#) The Court, having considered the Stipulation to Extend Time to Respond to First Amended Complaints jointly filed on April 11, 2013, hereby ORDERS as follow: Defendants Namco Bandai Games America, Inc., Konami Digital Entertainment, Inc., Sega of America, Inc., Electronic Arts, Inc., Disney Interactive Studios, Inc., Capcom USA, Inc., Square Enix, Inc., Insomniac Games, Inc., Neversoft Entertainment, Inc., Treyarch Corporation, and Visceral Games may have until April 12, 2013, to respond to the First Amended Complaints. (pj) (Entered: 04/16/2013) |
| 04/15/2013 | [61](#) | ORDER ON UNOPPOSED MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINTS by Judge George H. Wu: Plaintiff McRO, Inc., dba Planet Blues Motion for leave to file its Second Amended Complaints against Defendants Namco Bandai Games America, Inc., Sega of America, Inc., Electronic Arts Inc., Disney Interactive Studios, Inc., Capcom USA, Inc., Neversoft Entertainment, Inc., and Visceral Games is hereby GRANTED. Plaintiffs Second Amended Complaints will be manually filed by April 17, 2013 and any responsive pleadings to these Second Amended Complaints are due twenty one (21) days thereafter. [53](#) [57](#) (pj) (Entered: 04/16/2013) |
| 04/15/2013 | [63](#) | NOTICE of Appearance filed by attorney Benjamin J Fox, Wendy J Ray, Jason Jaewook Lee on behalf of Defendants Konami Digital Entertainment Inc, Square |

| | | |
|---|---|---|
| | | Enix Inc (pj) (Entered: 04/17/2013) |
| 04/16/2013 | 62 | NOTICE of Change of address by Benjamin J Fox attorney for Defendants Konami Digital Entertainment Inc, Square Enix Inc. Changing attorneys address to 707 Wilshire Blvd., Suite 6000, Los Angeles, CA 90017-3543. Filed by Defendants Konami Digital Entertainment Inc, Square Enix Inc. (Fox, Benjamin) (Entered: 04/16/2013) |
| 04/17/2013 | 64 | SECOND AMENDED COMPLAINT against Defendant Electronic Arts, Inc. amending Amended Complaint 44 ,filed by Plaintiff McRO Inc (pj) (Entered: 04/18/2013) |
| 04/17/2013 | 65 | SECOND AMENDED COMPLAINT against Defendant Capcom USA Inc amending Amended Complaint 44 ,filed by Plaintiff McRO Inc (pj) (Entered: 04/18/2013) |
| 04/17/2013 | 66 | SECOND AMENDED COMPLAINT against Defendant Disney Interactive Studios Inc amending Amended Complaint 44 ,filed by Plaintiff McRO Inc (pj) (Entered: 04/18/2013) |
| 04/17/2013 | 67 | SECOND AMENDED COMPLAINT against Defendant Neversoft Entertainment Inc. amending Amended Complaint 44 ,filed by Plaintiff McRO Inc (pj) (Entered: 04/18/2013) |
| 04/17/2013 | 68 | SECOND AMENDED COMPLAINT against Defendant Namco Bandai Games America Inc amending Amended Complaint 44 ,filed by Plaintiff McRO Inc (pj) (Entered: 04/18/2013) |
| 04/17/2013 | 69 | SECOND AMENDED COMPLAINT against Defendant Visceral Games amending Amended Complaint 44 ,filed by Plaintiff McRO Inc (pj) (Entered: 04/18/2013) |
| 04/17/2013 | 70 | SECOND AMENDED COMPLAINT against Defendant Sega of America Inc amending Amended Complaint 44 ,filed by Plaintiff McRO Inc (pj) (Entered: 04/18/2013) |
| 04/23/2013 | 71 | STIPULATION to Amend filed by defendants Konami Digital Entertainment Inc, Square Enix Inc. (Attachments: # 1 Proposed Order on Stipulation Regarding Responses to Complaints and Briefing Schedule)(Fox, Benjamin) (Entered: 04/23/2013) |
| 04/24/2013 | 72 | ORDER ON STIPULATION by Judge George H. Wu: Plaintiffs unopposed motion for leave to file Second AmendedComplaints as against Konami Digital Entertainment, Inc. and Square Enix, Inc. [D.I. 53] is granted, and the May 13, 2013 hearing for Plaintiffs motion for leave to amend is taken off calendar. Plaintiffs Second Amended Complaints against Konami DigitalEntertainment, Inc. and Sqaure Enix, Inc. will be manually filed by April 26, 2013. 53 Defendants Namco Bandai Games America, Inc., Konami DigitalEntertainment, Inc., Sega of America, Inc., Electronic Arts, Inc., Disney InteractiveStudios, Inc., Capcom USA, Inc., Square Enix, Inc., Neversoft Entertainment, Inc.,and Visceral Games shall have until May 6, 2013 to respond to the Second AmendedComplaints. Defendants Treyarch Corporation and Insomniac Games, Inc. shall haveuntil May 6, 2013 to respond to Plaintiffs First Amended Complaints. In the event that Defendants file their anticipated motions to |

| | | |
|---|---|---|
| | | dismiss,Plaintiffs opposition will be due on May 17, 2013 and Defendants reply briefs willbe due on May 23, 2013. The Court will hear Defendants anticipated motions todismiss on May 30, 2013, at 8:30 a.m. The scheduling conference in this action will be reset for May 30, 2013 to coincide with the hearing on Defendants motions to dismiss. The Rule 26(f) report to be submitted in conjunction with that scheduling conference will be filed no later than 12 noon PT on May 24, 2013. (pj) (Entered: 04/25/2013) |
| 04/29/2013 | 73 | SECOND AMENDED COMPLAINT against Defendants Konami Digital Entertainment Inc amending Amended Complaint 44 ,filed by Plaintiff McRO Inc (pj) (Entered: 04/29/2013) |
| 04/29/2013 | 74 | SECOND AMENDED COMPLAINT against Defendants Square Enix Inc amending Amended Complaint 44 ,filed by Plaintiff McRO Inc (pj) (Entered: 04/29/2013) |
| 05/06/2013 | 75 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by defendant Naughty Dog Inc. Motion set for hearing on 5/30/2013 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Proposed Order, # 2 Declaration, # 3 Exhibit A to Declaration of Tony M. Diab)(Diab, Tony) (Entered: 05/06/2013) |
| 05/06/2013 | 76 | NOTICE of Interested Parties filed by defendant Naughty Dog Inc, identifying Sony Computer Entertainment America LLC, Sony Corporation. (Diab, Tony) (Entered: 05/06/2013) |
| 05/06/2013 | 77 | CORPORATE DISCLOSURE STATEMENT filed by Defendant Naughty Dog Inc identifying Sony Computer Entertainment America LLC, Sony Corporation as Corporate Parent. (Diab, Tony) (Entered: 05/06/2013) |
| 05/06/2013 | 78 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendants Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Insomniac Games Inc, Konami Digital Entertainment Inc, Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Square Enix Inc, Treyarch Corporation, Visceral Games. Motion set for hearing on 5/30/2013 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Proposed Order) (Mehta, Sonal) (Entered: 05/06/2013) |
| 05/06/2013 | 79 | DECLARATION of Sonal N. Mehta in Support of MOTION to Dismiss Case 78 filed by Defendants Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Insomniac Games Inc, Konami Digital Entertainment Inc, Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Square Enix Inc, Treyarch Corporation, Visceral Games. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Mehta, Sonal) (Entered: 05/06/2013) |
| 05/09/2013 | 80 | APPLICATION for attorney Albert F. Harris III to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-12089244 paid.) filed by defendant Naughty Dog Inc. (Attachments: # 1 Proposed Order)(Diab, Tony) (Entered: 05/09/2013) |
| 05/09/2013 | 81 | APPLICATION for attorney Beth A. Larigan to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-12091435 paid.) filed by defendant Naughty Dog Inc. (Attachments: # 1 Proposed Order)(Diab, Tony) (Entered: 05/09/2013) |
| 05/09/2013 | 82 | APPLICATION for attorney Jonathan N. Zerger to Appear Pro Hac Vice(PHV |

| | | |
|---|---|---|
| | | Fee of $325 receipt number 0973-12091581 paid.) filed by defendant Naughty Dog Inc. (Attachments: # 1 Proposed Order)(Diab, Tony) (Entered: 05/09/2013) |
| 05/09/2013 | 83 | APPLICATION for attorney Basil Trent Webb to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-12091639 paid.) filed by defendant Naughty Dog Inc. (Attachments: # 1 Proposed Order)(Diab, Tony) (Entered: 05/09/2013) |
| 05/09/2013 | 84 | APPLICATION for attorney Lynn C. Herndon to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-12091705 paid.) filed by defendant Naughty Dog Inc. (Attachments: # 1 Proposed Order)(Diab, Tony) (Entered: 05/09/2013) |
| 05/14/2013 | 85 | ORDER by Judge George H. Wu: granting 80 Application to Appear Pro Hac Vice by Attorney Albert F. Harris on behalf of Defendant, designating Tony M. Diab as local counsel. (lt) (Entered: 05/15/2013) |
| 05/14/2013 | 86 | ORDER by Judge George H. Wu: granting 81 Application to Appear Pro Hac Vice by Attorney Beth Larigan on behalf of Defendant, designating Tony M. Diab as local counsel. (lt) (Entered: 05/15/2013) |
| 05/14/2013 | 87 | ORDER by Judge George H. Wu: granting 82 Application to Appear Pro Hac Vice by Attorney Jonathan N. Zerger on behalf of Defendant, designating Tony M. Diab as local counsel. (lt) (Entered: 05/15/2013) |
| 05/14/2013 | 88 | ORDER by Judge George H. Wu: granting 83 Application to Appear Pro Hac Vice by Attorney B. Trent Web on behalf of Defendant, designating Tony M. Diab as local counsel. (lt) (Entered: 05/15/2013) |
| 05/14/2013 | 89 | ORDER by Judge George H. Wu: granting 84 Application to Appear Pro Hac Vice by Attorney Lynn C. Herndon on behalf of Defendant, designating Tony M. Diab as local counsel. (lt) (Entered: 05/15/2013) |
| 05/17/2013 | 90 | MEMORANDUM in Opposition to MOTION to Dismiss Case 78 filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order Denying Defendants' Motion to Dismiss Amended Complaints)(Raskin, Mark) (Entered: 05/17/2013) |
| 05/17/2013 | 91 | DECLARATION of Eric P. Berger re MEMORANDUM in Opposition to Motion 90 filed by Plaintiff McRO Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 8, # 8 Exhibit 9, # 9 Exhibit 10, # 10 Exhibit 11, # 11 Exhibit 7)(Raskin, Mark) (Entered: 05/17/2013) |
| 05/17/2013 | 92 | FIRST AMENDED COMPLAINT against Defendant Naughty Dog Inc 1 , 44 ,filed by Plaintiff McRO Inc (pj) (Entered: 05/21/2013) |
| 05/17/2013 | 93 | 21 DAY Summons Issued re FIRST AMENDED Complaint 92 as to Defendant Naughty Dog Inc. (pj) (Entered: 05/21/2013) |
| 05/22/2013 | 94 | Notice of Withdrawal of Motion to Dismiss Case, 75 filed by defendant Naughty Dog Inc. (Diab, Tony) (Entered: 05/22/2013) |
| 05/23/2013 | 95 | REPLY In Support Of MOTION to Dismiss Case 78 filed by Defendants Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Insomniac Games Inc, Konami Digital Entertainment Inc, Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Square Enix Inc, Treyarch Corporation, Visceral Games. (Attachments: # 1 Proposed Order)(Mehta, Sonal) |

| | | (Entered: 05/23/2013) |
|---|---|---|
| 05/24/2013 | 96 | JOINT RULE 26(f) REPORT filed by Plaintiff McRO Inc. (Lee, Irene) (Entered: 05/24/2013) |
| 05/24/2013 | 97 | REQUEST for Leave of Beth A. Larigan to Appear for Scheduling Conference by telephone (Ms. Larigan does not anticipate presenting argument at the hearing) filed by defendant Naughty Dog Inc. Request set for hearing on 5/30/2013 at 08:30 AM before Judge George H. Wu. (Diab, Tony) (Entered: 05/24/2013) |
| 05/28/2013 | 98 | REQUEST for Leave of Evan N. Budaj to Appear for Scheduling Conference *by telephone* filed by defendants Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Treyarch Corporation, Visceral Games. Request set for hearing on 5/30/2013 at 08:30 AM before Judge George H. Wu. (Budaj, Evan) (Entered: 05/28/2013) |
| 05/29/2013 | 99 | APPLICATION for attorney John Francis Petrsoric to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-12180702 paid.) filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Lee, Irene) (Entered: 05/29/2013) |
| 05/30/2013 | 100 | MINUTES OF DEFENDANTS NAMCO BANDAI GAMES AMERICA, INC., KONAMIDIGITAL ENTERTAINMENT, INC., SEGA OF AMERICA, INC.,ELECTRONIC ARTS INC., DISNEY INTERACTIVE STUDIOS, INC.,CAPCOM USA, INC., SQUARE ENIX, INC., INSOMNIAC GAMESINC., NEVERSOFT ENTERTAINMENT, INC., TREYARCHCORPORATION AND VISCERAL GAMES'S MOTION TO DISMISSAMENDED COMPLAINTS (filed 05/06/13); 78 held before Judge George H. Wu.; Scheduling Conference held before Judge George H. Wu; Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's final ruling. Defendants' motion is DENIED. Defendants alternate request to order Plaintiff to file and serve infringement contentions before being permitted to "proceed further," is DENIED. The Scheduling Conference is continued to June 13, 2013 at 8:30 a.m. Revised Joint Scheduling Report will be filed by noon on June 6, 2013. Court Reporter: Wil Wilcox. (pj) (Entered: 05/31/2013) |
| 05/30/2013 | 102 | Notice of Electronic Filing re Order on Motion to Dismiss Case, Motion Hearing, Scheduling Conference, Set/Reset Deadlines/Hearings,,,,,,,,,,,,,, 100 , Order on Application to Appear Pro Hac Vice 101 e-mailed to john.petsoric@mishcon.com bounced due to 5.1.0 - Unknown address error 550-'Invalid Recipient. Primary e-mail address corrected. Notice of Electronic Filing resent addressed to john.petrsoric@mishcon.com. Pursuant to the General Order and Local Rules it is the attorneys obligation to maintain all personal contact information including e-mail address in the CM/ECF system. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(tyw) TEXT ONLY ENTRY (Entered: 06/04/2013) |
| 06/02/2013 | 101 | ORDER by Judge George H. Wu: granting 99 Application to Appear Pro Hac Vice by Attorney John F. Petrsoric on behalf of Plaintiff, designating Irene Y. Lee as local counsel. (lt) Modified on 6/3/2013 (lt). (Entered: 06/03/2013) |
| 06/06/2013 | 103 | Joint STIPULATION for Extension of Time to File Joint Rule 26(f) Report filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Lee, Irene) (Entered: |

| | | 06/06/2013) |
|---|---|---|
| 06/10/2013 | 104 | REQUEST for Leave of Sonal N. Mehta to Appear for Scheduling Conference by telephone filed by Defendants Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Treyarch Corporation, Visceral Games. Request set for hearing on 6/13/2013 at 08:30 AM before Judge George H. Wu. (Mehta, Sonal) (Entered: 06/10/2013) |
| 06/10/2013 | 105 | NOTICE OF MOTION AND MOTION to Dismiss claims for willful infringement and infringement pursuant to 35 U.S.C. section 271(g) filed by defendant Naughty Dog Inc. Motion set for hearing on 7/11/2013 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Declaration, # 2 Proposed Order) (Diab, Tony) (Entered: 06/10/2013) |
| 06/10/2013 | 106 | JOINT REPORT Rule 26(f) Discovery Plan *Amended* filed by Plaintiff McRO Inc.. (Lee, Irene) (Entered: 06/10/2013) |
| 06/10/2013 | 107 | REQUEST for Leave to Appear by Telephone for Scheduling Conference for Benjamin L. Singer filed by defendant Insomniac Games Inc. Request set for hearing on 6/13/2013 at 08:30 AM before Judge George H. Wu. (Singer, Benjamin) (Entered: 06/10/2013) |
| 06/10/2013 | 109 | ORDER by Judge George H. Wu, re Stipulation for Extension of Time to File 103 ,The Revised Joint Scheduling Report will be submitted no later than June 10, 2013. The continued Scheduling Conference is reset for June 17, 2013 at 8:30 a.m. (pj) (Entered: 06/12/2013) |
| 06/11/2013 | 108 | NOTICE of Telephonic Appearance at 6/13/13 Scheduling Conference filed by Plaintiff McRO Inc. (Lee, Irene) (Entered: 06/11/2013) |
| 06/13/2013 | 110 | REQUEST for Leave to Appear by Telephone for Scheduling Conference for Benjamin L. Singer filed by defendant Insomniac Games Inc. Request set for hearing on 6/17/2013 at 08:30 AM before Judge George H. Wu. (Singer, Benjamin) (Entered: 06/13/2013) |
| 06/13/2013 | 111 | ANSWER to Amended Complaint 73 with JURY DEMAND filed by defendant Konami Digital Entertainment Inc.(Fox, Benjamin) (Entered: 06/13/2013) |
| 06/13/2013 | 112 | ANSWER to Amended Complaint 74 filed by defendant Square Enix Inc.(Fox, Benjamin) (Entered: 06/13/2013) |
| 06/14/2013 | 113 | JOINDER filed by Defendant Obsidian Entertainment Inc joining in Joint Report Rule 26(f) Discovery Plan 106 . (Spach, Madison) (Entered: 06/14/2013) |
| 06/17/2013 | 114 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Joinder 113 . The following error(s) was found: Case number is missing. Pursuant to Court Order (Dkt. 48) filed April 1, 2013, the caption of all subsequent documents shall include case # CV 12-10322-GW(FFMx). In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and until the court directs you to do so. (kti) (Entered: 06/17/2013) |
| 06/17/2013 | 115 | STIPULATION Extending Time to Answer the complaint as to Capcom USA Inc |

| | | |
|---|---|---|
| | | answer now due 6/21/2013, filed by Defendant Capcom USA Inc. (Attachments: # 1 Proposed Order)(Mehta, Sonal) (Entered: 06/17/2013) |
| 06/17/2013 | 116 | STIPULATION to Dismiss Case pursuant to FRCP 41 filed by Defendants Electronic Arts, Inc., Visceral Games. (Attachments: # 1 Exhibit A, # 2 Proposed Order)(Mehta, Sonal) (Entered: 06/17/2013) |
| 06/17/2013 | 117 | CERTIFICATE OF SERVICE filed by Defendants and Counterclaim-Plaintiffs Disney Interactive Studios Inc, Electronic Arts, Inc., Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Treyarch Corporation, served on June 17, 2013. (Budaj, Evan) (Entered: 06/17/2013) |
| 06/17/2013 | 118 | MINUTES OF SCHEDULING CONFERENCE held before Judge George H. Wu. Defendants will have a total of 200 hours for fact depositions. Further, the Court sets the following. Further Case Management and Scheduling Conference set for 12/16/2013 08:30 AM. Claims Consru set for 4/28/2014 08:30 AM before Judge George H. Wu.Court Reporter: Wil Wilcox. (bp) (Entered: 06/18/2013) |
| 06/17/2013 | 121 | ANSWER to FIRST Amended Complaint, 120 , COUNTERCLAIM against McRO Inc filed by Defendant Insomniac Games Inc. Demand for Jury Trial (pj) (Entered: 06/18/2013) |
| 06/18/2013 | 119 | PROOF OF SERVICE filed by defendant and counterclaim-plaintiff Insomniac Games Inc, served on June 17, 2013. (Singer, Benjamin) (Entered: 06/18/2013) |
| 06/19/2013 | 122 | CERTIFICATE OF SERVICE filed by Defendants and Counterclaim-Plaintiffs Disney Interactive Studios Inc, Electronic Arts, Inc., Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Treyarch Corporation, *[Corrected]* served on June 19, 2013. (Budaj, Evan) (Entered: 06/19/2013) |
| 06/19/2013 | 126 | ORDER by Judge George H. Wu, re Stipulation to Dismiss Case 116 ,Case number 2:12-cv-10344 shall be dismissed with prejudice. Visceral Games terminated. (see attached for further details) (pj) (Entered: 06/21/2013) |
| 06/19/2013 | 128 | ANSWER to SECOND Amended Complaint 66 , COUNTERCLAIMS against McRO Inc filed by Defendant Disney Interactive Studios Inc.(pj) (Entered: 06/21/2013) |
| 06/19/2013 | 129 | NOTICE OF INTERESTED of Interested Parties filed by Defendants Disney Interactive Studios Inc, identifying Corporate Parent Walt Disney Company for Disney Interactive Studios Inc, Disney Interactive Studios Inc. (pj) (Entered: 06/21/2013) |
| 06/19/2013 | 131 | ANSWER to FIRST Amended Complaint, 130 , COUNTERCLAIM against McRO Inc filed by Defendant Treyarch Corporation.(pj) (Entered: 06/25/2013) |
| 06/19/2013 | 132 | NOTICE of Interested Parties filed by Defendant Treyarch Corporation, identifying Corporate Parent Activison Blizzard Inc, Corporate Parent Vivendi SA for Treyarch Corporation. (pj) (Entered: 06/25/2013) |
| 06/19/2013 | 133 | ANSWER to SECOND Amended Complaint 67 , COUNTERCLAIM against McRO Inc filed by Defendant Neversoft Entertainment Inc..(pj) (Entered: 06/25/2013) |
| 06/19/2013 | 134 | NOTICE of Interested Parties filed by Defendant Neversoft Entertainment Inc., |

| | | |
|---|---|---|
| | | identifying Corporate Parent Activison Blizzard Inc, Corporate Parent Vivendi SA for Neversoft Entertainment Inc.. (pj) (Entered: 06/25/2013) |
| 06/19/2013 | 135 | ANSWER to SECOND Amended Complaint 68 , COUNTERCLAIM against McRO Inc filed by Defendant Namco Bandai Games America Inc.(pj) (Entered: 06/25/2013) |
| 06/19/2013 | 136 | NOTICE of Interested Parties filed by Defendant Namco Bandai Games America Inc, identifying Corporate Parent Namco Bandai Holdings USA Inc, Corporate Parent Namco Bandai Holdings Inc for Namco Bandai Games America Inc. (pj) (Entered: 06/25/2013) |
| 06/19/2013 | 137 | ANSWER to SECOND Amended Complaint 64 , COUNTERCLAIM against McRO Inc filed by Defendant Electronic Arts, Inc..(pj) (Entered: 06/25/2013) |
| 06/19/2013 | 138 | NOTICE of Interested Parties filed by Defendant Electronic Arts, Inc., (pj) (Entered: 06/25/2013) |
| 06/19/2013 | 139 | ANSWER to SECOND Amended Complaint 70 , COUNTERCLAIM against McRO Inc filed by Defendant Sega of America Inc.(pj) (Entered: 06/25/2013) |
| 06/19/2013 | 140 | NOTICE of Interested Parties filed by Defendant Sega of America Inc, identifying Corporate Parent Sega Sammy Holdings Inc, Corporate Parent Sega Corporation for Sega of America Inc. (pj) (Entered: 06/25/2013) |
| 06/20/2013 | 123 | ORDER re Stipulation Extending Time to Answer 115 by Judge George H. Wu. Capcom USA, Inc. may have until June 21, 2013, to respond to the Second Amended Complaint. (kti) (Entered: 06/20/2013) |
| 06/20/2013 | 124 | MEMORANDUM in Opposition to MOTION to Dismiss claims for willful infringement and infringement pursuant to 35 U.S.C. section 271(g) 105 filed by Counter Defendant McRO Inc, Plaintiff McRO Inc. (Attachments: # 1 Proposed Order Denying)(Raskin, Mark) (Entered: 06/20/2013) |
| 06/20/2013 | 125 | DECLARATION of Eric Berger In Opposition to MOTION to Dismiss claims for willful infringement and infringement pursuant to 35 U.S.C. section 271(g) 105 filed by Counter Defendant McRO Inc, Plaintiff McRO Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Raskin, Mark) (Entered: 06/20/2013) |
| 06/21/2013 | 127 | CERTIFICATE OF SERVICE filed by Defendant and Counterclaim-Plaintiff Capcom USA Inc, served on June 21, 2013. (Lee, Justin) (Entered: 06/21/2013) |
| 06/21/2013 | 141 | ANSWER to SECOND Amended Complaint 65 , COUNTERCLAIM against McRO Inc filed by Defendant Capcom USA Inc.(pj) (Entered: 06/25/2013) |
| 06/21/2013 | 142 | NOTICE of Interested Parties filed by Defendant Capcom USA Inc, identifying Corporate Parent Capcom Co Ltd for Capcom USA Inc, Capcom USA Inc. (pj) (Entered: 06/25/2013) |
| 06/27/2013 | 143 | REPLY in support MOTION to Dismiss claims for willful infringement and infringement pursuant to 35 U.S.C. section 271(g) 105 filed by Defendant Naughty Dog Inc. (Diab, Tony) (Entered: 06/27/2013) |
| 06/28/2013 | 144 | NOTICE OF MOTION AND MOTION for Leave to file amended complaint *UNOPPOSED* filed by plaintiff McRO Inc. Motion set for hearing on 7/25/2013 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Exhibit 1 - Obsidian |

|  |  | FAC, # 2 Exhibit A - 576 patent re Obsidian FAC, # 3 Exhibit B - 278 patent re Obsidan FAC, # 4 Exhibit C - re Obsidian FAC, # 5 Proposed Order)(Raskin, Mark) (Entered: 06/28/2013) |
|---|---|---|
| 07/03/2013 | 145 | ORDER ON UNOPPOSED MOTION FOR LEAVE TO FILE AMENDED COMPLAINT by Judge George H. Wu: Plaintiff McRO, Inc., dba Planet Blues Motion for leave to file its First Amended Complaint against Defendant Obsidian Entertainment, Inc. is hereby GRANTED. Plaintiffs Proposed Second Amended Complaints will be manually filed and any responsive pleadings to this First Amended Complaint are due twenty one (21) days thereafter. 144 (pj) (Entered: 07/05/2013) |
| 07/09/2013 | 146 | REQUEST for Leave of Sonal N. Mehta to Appear for hearing by telephone filed by Defendants Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Treyarch Corporation. Request set for hearing on 7/11/2013 at 08:30 AM before Judge George H. Wu. (Mehta, Sonal) (Entered: 07/09/2013) |
| 07/10/2013 | 147 | Joint STIPULATION for Extension of Time to File Response to Defendants' Counterclaims filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order) (Raskin, Mark) (Entered: 07/10/2013) |
| 07/10/2013 | 148 | NOTICE filed by Plaintiff McRO Inc. *for Telephone Appearance re 7/11/13 Hearing re Naughty Dog's Motion to Dismiss* (Raskin, Mark) (Entered: 07/10/2013) |
| 07/10/2013 | 149 | FIRST AMENDED COMPLAINT against Defendant Obsidian Entertainment Inc,filed by Plaintiff McRO Inc (Attachments: # 1 Part 2)(pj) (Entered: 07/10/2013) |
| 07/10/2013 | 150 | 21 DAY Summons Issued re FIRST Amended Complaint 149 as to Defendant Obsidian Entertainment Inc. (pj) (Entered: 07/10/2013) |
| 07/10/2013 | 151 | CERTIFICATE OF SERVICE filed by Plaintiff McRO Inc, re Amended Complaint 149 , Summons Issued 150 served on 7/10/13. (Raskin, Mark) (Entered: 07/10/2013) |
| 07/11/2013 | 153 | MINUTES OF DEFENDANT NAUGHTY DOG, INC.'S MOTION TO DISMISSPLAINTIFF'S FIRST AMENDED COMPLAINT (filed 06/10/13; Dkt.No. 105) 105 Motion Hearing held before Judge George H. Wu: Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's final ruling. Defendants' motion is GRANTED IN PART and DENIED IN PART. Defendant Naughty Dog, Inc.'s response to the amended complaint will be due 21 days from the date of this order. Court Reporter: Wil Wilcox. (pj) (Entered: 07/15/2013) |
| 07/12/2013 | 152 | ORDER granting Stipulation for Extension of Time to File 147 The Court, having considered the Stipulated Extension of Time to Respond to Counterclaims, hereby ORDERS as follow: Plaintiff may have until July 25, 2013, to respond to Defendants Counterclaims, (Counter Defendant McRO Inc answer due 7/25/2013) by Judge George H. Wu (pj) (Entered: 07/12/2013) |
| 07/24/2013 | 154 | CERTIFICATE OF SERVICE filed by Defendants Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Namco Bandai Games America Inc, |

| | | |
|---|---|---|
| | | Neversoft Entertainment Inc., Sega of America Inc, Treyarch Corporation, served on July 24, 2013. (Budaj, Evan) (Entered: 07/24/2013) |
| 07/24/2013 | 155 | FIRST AMENDED ANSWER TO FIRST AMENDED COMPLAINT 121 , 120 AND, COUNTERCLAIMS against McRO Inc filed by Defendant Insomniac Games Inc. (pj) (pj). (Entered: 07/24/2013) |
| 07/24/2013 | 157 | FIRST AMENDED ANSWER TO 2ND AMENDED COMPLAINT 65 AND, COUNTERCLAIM against McRO Inc filed by Defendant Capcom USA Inc. (pj) (pj). (Entered: 07/31/2013) |
| 07/24/2013 | 158 | FIRST AMENDED ANSWER to FIRST Amended Complaint, 130 , COUNTERCLAIM against McRO Inc filed by Defendant Treyarch Corporation. (pj) (pj). (Entered: 07/31/2013) |
| 07/24/2013 | 159 | FIRST AMENDED ANSWER to SECOND Amended Complaint 66 , COUNTERCLAIM against McRO Inc filed by Defendant Disney Interactive Studios Inc. (pj) (pj). (Entered: 07/31/2013) |
| 07/24/2013 | 160 | FIRST AMENDED ANSWER to SECOND Amended Complaint 64 , COUNTERCLAIMS against McRO Inc filed by Defendant Electronic Arts, Inc.. (pj) (pj). (Entered: 07/31/2013) |
| 07/24/2013 | 161 | FIRST AMENDED ANSWER to SECOND Amended Complaint 68 , COUNTERCLAIM against McRO Inc filed by Defendant Namco Bandai Games America Inc. (pj) (pj). (Entered: 07/31/2013) |
| 07/24/2013 | 162 | FIRST AMENDED ANSWER to SECOND Amended Complaint 67 , COUNTERCLAIMS against McRO Inc filed by Defendant Neversoft Entertainment Inc.. (pj) (pj). (Entered: 07/31/2013) |
| 07/24/2013 | 163 | FIRST AMENDED ANSWER to SECOND Amended Complaint 70 , COUNTERCLAIMS against McRO Inc filed by Defendant Sega of America Inc. (pj) (pj). (Entered: 07/31/2013) |
| 07/25/2013 | 156 | PROOF OF SERVICE filed by defendant and counterclaim-plaintiff Insomniac Games Inc, served on July 24, 2013. (Singer, Benjamin) (Entered: 07/25/2013) |
| 07/31/2013 | 164 | [***COUNTERCLAIM PORTION IS STRICKEN PURSUANT TO 167 ***] AMENDED ANSWER to Amended Complaint 149 , Amended COUNTERCLAIM against McRO Inc filed by Defendant Obsidian Entertainment Inc. (Spach, Madison) Modified on 7/31/2013 (kti). (Entered: 07/31/2013) |
| 07/31/2013 | 165 | PROOF OF SERVICE filed by Defendant Obsidian Entertainment Inc, re Amended Answer to Complaint, Counterclaim 164 served on July 31, 2013. (Spach, Madison) (Entered: 07/31/2013) |
| 07/31/2013 | 166 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Amended Answer and Counterclaim 164 . The following error(s) was found: Pursuant to Local Rule 3-2, Initiating Documents must be *MANUALLY* filed at the Civil Intake Window. A conformed filed stamped PDF image shall be emailed to (CivilIntakeCourtDocs-LA@cacd.uscourts.gov) within 24 hours. In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and |

| | | until the court directs you to do so. (kti) (Entered: 07/31/2013) |
|---|---|---|
| 07/31/2013 | 167 | RESPONSE BY THE COURT TO NOTICE TO FILER OF DEFICIENCIES IN ELECTRONICALLY FILED DOCUMENTS RE: Amended Answer and Counterclaim 164 by Judge George H. Wu. The Counterclaim portion of the document is hereby stricken. Counsel will have 48 hours from the date of receipt of this response to manually file the Counterclaim at the Court's Civil Intake Window. (kti) (Entered: 07/31/2013) |
| 08/01/2013 | 168 | REPLY filed by Defendant Naughty Dog Inc to Amended Complaint 92 (Diab, Tony) (Entered: 08/01/2013) |
| 08/01/2013 | 169 | COUNTERCLAIMS TO PLAINTIFFS FIRST AMENDED COMPLAINT against Counter Defendant McRO Inc DBA Planet Blue, filed by Counter Claimant Defendant Naughty Dog Inc.(pj) (pj). (Entered: 08/02/2013) |
| 08/01/2013 | 170 | 21 DAY Summons Issued re Counterclaim 169 as to Counter Defendant McRO Inc. (pj) (Entered: 08/02/2013) |
| 08/09/2013 | 171 | NOTICE OF MOTION AND Joint MOTION for Protective Order for Handling of Confidential Information filed by Plaintiff McRO Inc. Motion set for hearing on 9/9/2013 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Proposed Order Proposed Protective Order)(Raskin, Mark) (Entered: 08/09/2013) |
| 08/13/2013 | 172 | NOTICE of Errata re [Proposed] Protective Order Governing the Designation and Handling of Confidential Materials filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 08/13/2013) |
| 08/14/2013 | 173 | AMENDED ANSWER *to Plaintiff's First* to Amended Complaint 149 filed by defendant and counterclaimant Naughty Dog Inc. (Diab, Tony) (Entered: 08/14/2013) |
| 08/14/2013 | 174 | FIRST AMENDED COUNTERCLAIM against Counter Defendant McRO Inc to the FIRST AMENDED COMPLAINT amending Counterclaim 169 ,filed by Defendant and Counterclaimant Naughty Dog Inc (pj) Modified on 8/15/2013 (pj). (pj). (Entered: 08/15/2013) |
| 08/14/2013 | 186 | 21 DAY Summons Issued re Amended Counterclaim, 174 as to Counter Defendant McRO Inc by Counter-claimant Naughty Dog Inc (pj) (Entered: 08/28/2013) |
| 08/15/2013 | 175 | PROTECTIVE ORDER GOVERNING THE DESIGNATION AND HANDLING OF CONFIDENTIAL MATERIALS by Magistrate Judge Frederick F. Mumm: 171 Motion for Protective Order : Note Changes Made by Court: (see attached) (jm) (Entered: 08/16/2013) |
| 08/19/2013 | 176 | *Plant Blue's* ANSWER to Amended Answer to Complaint, Counterclaim 157 *to Defendant Capcom USA Inc Counterclaims* filed by Plaintiff McRO Inc.(Raskin, Mark) (Entered: 08/19/2013) |
| 08/19/2013 | 177 | *Plant Blue's* ANSWER to Amended Answer to Complaint, Counterclaim 159 *to Defendant Disney Interactive Studios, Inc. Counterclaims* filed by Plaintiff McRO Inc.(Raskin, Mark) (Entered: 08/19/2013) |
| 08/19/2013 | 178 | *Plant Blue's* ANSWER to Amended Answer to Complaint, Counterclaim 160 *to* |

| | | |
|---|---|---|
| | | *Defendant Electronic Arts Inc. Counterclaims* filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 08/19/2013) |
| 08/19/2013 | 179 | *Plant Blue's* ANSWER to Amended Answer to Complaint, Counterclaim 155 *to Defendant Insomniac Games, Inc. Counterclaims* filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 08/19/2013) |
| 08/19/2013 | 180 | *Plant Blue's* ANSWER to Amended Answer to Complaint, Counterclaim 161 *to Defendant Namco Bandai Games America, Inc. Counterclaims* filed by Plaintiff McRO Inc.(Raskin, Mark) (Entered: 08/19/2013) |
| 08/19/2013 | 181 | ANSWER to Amended Counterclaim, 174 JURY DEMAND. *of Naughty Dog, Inc.* filed by Plaintiff McRO Inc.(Raskin, Mark) (Entered: 08/19/2013) |
| 08/19/2013 | 182 | *Plant Blue's* ANSWER to Amended Answer to Complaint, Counterclaim 162 *to Defendant Neversoft Entertainment, Inc. Counterclaims* filed by Plaintiff McRO Inc.(Raskin, Mark) (Entered: 08/19/2013) |
| 08/19/2013 | 183 | *Plant Blue's* ANSWER to Amended Answer to Complaint, Counterclaim 163 *to Defendant Sega of America, Inc. Counterclaims* filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 08/19/2013) |
| 08/19/2013 | 184 | *Plant Blue's* ANSWER to Amended Answer to Complaint, Counterclaim 158 *to Defendant Treyarch Corporation Counterclaims* filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 08/19/2013) |
| 08/28/2013 | 185 | TRANSCRIPT ORDER as to Defendants Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Treyarch Corporation Court Reporter. Court will contact Evan N. Budaj at evan.budaj@weil.com with any questions regarding this order. Transcript portion requested: Other: 6/17/2013 Scheduling Conference. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Budaj, Evan) (Entered: 08/28/2013) |
| 08/30/2013 | 187 | NOTICE OF DISMISSAL filed by Plaintiff McRO Inc pursuant to FRCP 41a(1) *With Prejudice* as to THQ, Inc.. (Raskin, Mark) (Entered: 08/30/2013) |
| 10/02/2013 | 188 | TRANSCRIPT for proceedings held on Monday, June 17, 2013; 8:48 A.M.. Court Reporter: Wil S. Wilcox, phone number 213-290-2849. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 10/23/2013. Redacted Transcript Deadline set for 11/2/2013. Release of Transcript Restriction set for 12/31/2013. (Wilcox, Wil) (Entered: 10/02/2013) |
| 10/02/2013 | 189 | NOTICE OF FILING TRANSCRIPT filed for proceedings Monday, June 17, 2013; 8:48 A.M. re Transcript 188 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Wilcox, Wil) TEXT ONLY ENTRY (Entered: 10/02/2013) |
| 10/08/2013 | 190 | NOTICE of Change of Attorney Business or Contact Information: for attorney Benjamin L Singer counsel for Counter Claimants Insomniac Games Inc, Insomniac Games Inc, Defendant Insomniac Games Inc. Changing firm name to |

| | | Colt / Singer / Bea LLP. Changing email to bsinger@coltsinger.com. Filed by defendant Insomniac Games, Inc.. (Singer, Benjamin) (Entered: 10/08/2013) |
|---|---|---|
| 10/31/2013 | 191 | Notice of Appearance or Withdrawal of Counsel: for attorney Jason Jaewook Lee counsel for Defendants Konami Digital Entertainment Inc, Square Enix Inc. Jason J. Lee is no longer attorney of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Defendant Konami Digital Entertainment, Inc. and Square Enix, Inc.. (Lee, Jason) (Entered: 10/31/2013) |
| 11/18/2013 | 192 | APPLICATION for attorney Vincent Filardo, Jr. to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-12997276 paid.) filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 11/18/2013) |
| 11/22/2013 | 193 | NOTICE OF MOTION AND MOTION for Discovery regarding UNOPPOSED Issuance of a Letter of Request Under the Hague Convention From Third-Party Witness Catherine Pelachaud, a Resident of France *; and Memorandum of Points and Authorities* filed by defendant Insomniac Games Inc. Motion set for hearing on 12/31/2013 at 10:00 AM before Magistrate Judge Frederick F. Mumm. (Attachments: # 1 Declaration of Benjamin L. Singer in Support of UNOPPOSED Motion for Issuance of a Letter of Request Under the Hague Convention for Discovery from Third-Party Witness Catherine Pelachaud, a Resident of France, # 2 Request for International Judicial Assistance Pursuant to the Hague Convention) (Singer, Benjamin) (Entered: 11/22/2013) |
| 11/25/2013 | 195 | ORDER by Judge George H. Wu: granting 192 Application to Appear Pro Hac Vice by Attorney Vincent Filardo, Jr. on behalf of McRo, Inc., designating Irene Y. Lee as local counsel. (lt) (Entered: 11/27/2013) |
| 11/27/2013 | 194 | Notice of Appearance or Withdrawal of Counsel: for attorney Ashleigh K Landis counsel for Defendants Konami Digital Entertainment Inc, Square Enix Inc. Adding Ashleigh K. Landis as attorney as counsel of record for Konami Digital Entertainment, Inc. and Squire Enix, Inc. for the reason indicated in the G-123 Notice. Filed by defendants Konami Digital Entertainment, Inc. and Squire Enix, Inc. (Attorney Ashleigh K Landis added to party Konami Digital Entertainment Inc(pty:dft), Attorney Ashleigh K Landis added to party Square Enix Inc(pty:dft)) (Landis, Ashleigh) (Entered: 11/27/2013) |
| 12/02/2013 | 196 | (IN CHAMBERS) ORDER RE DEFENDANTS MOTION FOR DISCOVERY by Magistrate Judge Frederick F. Mumm: The Court ADVANCES the hearing to December 17, 2013. To the extent plaintiff opposes any part of the request, its opposition is due by December 6, 2013. Defendant may file a reply, to the extent an opposition is filed, by December 13, 2013. The hearing will be held at 10:00 a.m. in Courtroom E of the above entitled court located at 312 N. Spring Street, Los Angeles, California 90012. IT IS SO ORDERED. (See attached Order.) (Entered: 12/02/2013) |
| 12/06/2013 | 197 | OPPOSITION to MOTION for Discovery regarding UNOPPOSED Issuance of a Letter of Request Under the Hague Convention From Third-Party Witness Catherine Pelachaud, a Resident of France *; and Memorandum of Points and Authorities* 193 filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 12/06/2013) |
| 12/10/2013 | 198 | REQUEST for Leave to to Appear by Telephone *(Jonathan N. Zerger)* filed by |

| | | |
|---|---|---|
| | | defendant Naughty Dog Inc. Request set for hearing on 12/16/2013 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Proposed Order)(Diab, Tony) (Entered: 12/10/2013) |
| 12/12/2013 | 199 | NOTICE of Telephonic Appearance at 12-16-2013 Further Case Management and Scheduling Conference filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 12/12/2013) |
| 12/12/2013 | 200 | STATUS REPORT *(Joint)* filed by Defendants Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Insomniac Games Inc, Konami Digital Entertainment Inc, Namco Bandai Games America Inc, Naughty Dog Inc, Neversoft Entertainment Inc., Obsidian Entertainment Inc, Sega of America Inc, Square Enix Inc, Treyarch Corporation, Counter Claimants Capcom USA Inc, Capcom USA Inc, Disney Interactive Studios Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Electronic Arts, Inc., Insomniac Games Inc, Insomniac Games Inc, Namco Bandai Games America Inc, Namco Bandai Games America Inc, Naughty Dog Inc, Neversoft Entertainment Inc., Neversoft Entertainment Inc., Obsidian Entertainment Inc, Sega of America Inc, Sega of America Inc, Treyarch Corporation, Treyarch Corporation. (Mehta, Sonal) (Entered: 12/12/2013) |
| 12/13/2013 | 201 | REPLY in support of MOTION for Discovery regarding UNOPPOSED Issuance of a Letter of Request Under the Hague Convention From Third-Party Witness Catherine Pelachaud, a Resident of France *; and Memorandum of Points and Authorities* 193 filed by Counter Claimant Insomniac Games Inc, Defendant Insomniac Games Inc. (Singer, Benjamin) (Entered: 12/13/2013) |
| 12/16/2013 | 202 | TRANSCRIPT ORDER as to Plaintiff McRO Inc Court Reporter. Court will contact Mark S. Raskin at mark.raskin@mishcon.com with any questions regarding this order. Transcript portion requested: Other: 12/16/2013 Case Management/Scheduling Conference. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Raskin, Mark) (Entered: 12/16/2013) |
| 12/16/2013 | 203 | MINUTE ORDER IN CHAMBERS by Magistrate Judge Frederick F. Mumm: ORDER VACATING HEARING DATE re: MOTION for Discovery regarding UNOPPOSED Issuance of a Letter of Request Under the Hague Convention From Third-Party Witness Catherine Pelachaud, a Resident of France *; and Memorandum of Points and Authorities* 193 . The Court shall rule on this motion based on the papers submitted. The noticed hearing date of December 17, 2013, is VACATED. (jm) (Entered: 12/16/2013) |
| 12/16/2013 | 204 | ORDER re Request for International Judicial Assistance pursuant to the Hague Convention of March 18, 1970 on the taking of evidence in civil or commercial matters by Magistrate Judge Frederick F. Mumm: 193 Motion for Discovery : (see attached) (jm) (Entered: 12/16/2013) |
| 12/16/2013 | 205 | TRANSCRIPT ORDER as to Defendants Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Treyarch Corporation Court Reporter. Court will contact Evan N. Budaj at evan.budaj@weil.com with any questions regarding this order. Transcript portion requested: Other: 12/16/2013, Further Case Management/Scheduling. Transcript preparation will not begin until |

| | | payment has been satisfied with the court reporter/recorder. (Budaj, Evan) (Entered: 12/16/2013) |
|---|---|---|
| 12/16/2013 | 206 | MINUTES OF Scheduling Conference held before Judge George H. Wu, Court and counsel confer re newly transferred cases. The Court continues the scheduling conference toJanuary 30, 2014 at 8:30 a.m. The Court will allow discovery to be served, except as to damages. Responses will not be required until 10 days after said hearing.All other matters reassigned to this Court will be set for a status conference on January 30, 2014. Court Reporter: Pat Cuneo. (pj) (Entered: 12/17/2013) |
| 01/03/2014 | 207 | TRANSCRIPT for proceedings held on December 16, 2013 at 8:48 a.m. Court Reporter: PAT CUNEO, CSR 1600, OFFICIAL REPORTER, website www.patcuneo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 1/24/2014. Redacted Transcript Deadline set for 2/3/2014. Release of Transcript Restriction set for 4/3/2014. (Cuneo, Patricia) (Entered: 01/03/2014) |
| 01/03/2014 | 208 | NOTICE OF FILING TRANSCRIPT filed for proceedings December 16, 2013 at 8:48 a.m. re Transcript 207 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Cuneo, Patricia) TEXT ONLY ENTRY (Entered: 01/03/2014) |
| 01/15/2014 | 209 | NOTICE OF MOTION AND MOTION for Extension of Time to File Joint Claim Construction Statement filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 01/15/2014) |
| 01/17/2014 | 210 | ORDER re Motion for Extension of Time to File 209 by Judge George H. Wu: The Court, having considered the Unopposed Motion to Extend Time to Submit to the Court the Parties Joint Claim Construction Statement, hereby ORDERS as follows: The parties may have until February 3, 2014 to submit their Joint Claim Construction Statement to the Court. (kti) (Entered: 01/21/2014) |
| 01/27/2014 | 211 | Notice of Appearance or Withdrawal of Counsel: for attorney Mark S Raskin counsel for Plaintiff McRO Inc. James J. McGuire is no longer attorney of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Plaintiff McRO, Inc., dba Planet Blue. (Raskin, Mark) (Entered: 01/27/2014) |
| 01/28/2014 | 212 | NOTICE OF TELEPHONIC APPEARANCE AT THE JANUARY 30, 2014 HEARING filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 01/28/2014) |
| 01/29/2014 | 213 | STATUS REPORT *Joint* filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 01/29/2014) |
| 01/30/2014 | 214 | TRANSCRIPT ORDER as to defendant Naughty Dog Inc Court Reporter. Court will contact Tony Diab at tdiab@shb.com with any questions regarding this order. Transcript portion requested: Other: 1/30-2014. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Diab, Tony) (Entered: 01/30/2014) |
| 01/30/2014 | 215 | TRANSCRIPT ORDER as to Plaintiff McRO Inc Court Reporter. Court will |

| | | |
|---|---|---|
| | | contact Mark Raskin at mark.raskin@mishcon.com with any questions regarding this order. Transcript portion requested: Other: Status Conference. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Raskin, Mark) (Entered: 01/30/2014) |
| 01/30/2014 | 216 | TRANSCRIPT ORDER as to Defendants Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Treyarch Corporation Court Reporter. Court will contact Evan N. Budaj at evan.budaj@weil.com with any questions regarding this order. Transcript portion requested: Other: Status Conference. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Budaj, Evan) (Entered: 01/30/2014) |
| 01/30/2014 | 217 | MINUTES OF Scheduling Conference held before Judge George H. Wu, Court and counsel confer re newly transferred cases. For reasons stated on the record, the Court tentatively consolidates the following with the cases consolidated under CV 12-10322-GW(FFMx): McRo, Inc. v. Atlus U.S.A., et al., SACV 13-1870-GW(FFMx); McRo Inc. v. Activision Blizzard Inc., CV 14-336-GW(FFMx); McRo Inc. v. Infinity Ward Inc., CV 14-352-GW(FFMx); McRo Inc. v. LucasArts Entertainment Company LLC, CV 14-358-GW(FFMx)McRo Inc. v. Warner Bros. Interactive Entertainment Inc., CV 14-417-GW(FFMx)A hearing re further consideration to consolidate these cases is set for February 13, 2014 at 8:30 a.m. Additionally, parties will meet and confer and within 10 days file a joint status report as to consolidation of remaining cases in Categories B and C. A Status Conference is set for February 13, 2014 at 8:30 a.m. Parties may appear telephonically provided that notice is given to the clerk by February 11, 2014.The Motions to Stay in CV 13-1872 and CV 13-1873 will remain on calendar for March 6, 2014 at 8:30a.m.Court Reporter: Katie Thibideaux. (pj) (Entered: 02/03/2014) |
| 01/30/2014 | 219 | AMENDED MINUTES SCHEDULING CONFERENCE held before Judge George H. Wu re: 217 For reasons stated on the record, the Court tentatively consolidates the following with the cases consolidated under CV 12-10322-GW(FFMx):.A hearing re further consideration to consolidate these cases is set for February 13, 2014 at 8:30 a.m.Additionally, parties will meet and confer and within 10 days file a joint status report as to consolidation of remaining cases in Categories B and C. A Status Conference is set for February 13, 2014 at 8:30 a.m. Parties may appear telephonically provided that notice is given to the clerk by February 11, 2014. The Motions to Stay in CV 13-1871 and CV 13-1873 will remain on calendar for March 6, 2014 at 8:30 a.m. (pj) (Entered: 02/04/2014) |
| 02/03/2014 | 218 | NOTICE OF MOTION AND MOTION for Extension of Time to File Joint Claim Construction Statement filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 02/03/2014) |
| 02/04/2014 | 220 | STATEMENT JOINT CLAIM CONSTRUCTION filed by Plaintiff McRO Inc (Raskin, Mark) (Entered: 02/04/2014) |
| 02/06/2014 | 223 | ORDER GRANTING UNOPPOSED MOTION TO EXTEND TIME TO SUBMIT TO THE COURT THE PARTIES JOINT CLAIM CONSTRUCTIONSTATEMENT by Judge George H. Wu: The Court, having considered the Joint Unopposed Motion to Extend Timeto Submit the Parties Joint Claim Construction Statement, hereby ORDERS asfollows: The parties may have |

| | | until February 4, 2014 to submit their Joint ClaimConstruction Statement to the Court. 218 . (pj) (Entered: 02/10/2014) |
|---|---|---|
| 02/07/2014 | 221 | TRANSCRIPT for proceedings held on 1/30/14 8:42 am. Court Reporter/Electronic Court Recorder: Katie Thibodeaux, CSR, RPR, CRR, phone number www.katiethibodeaux.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 2/28/2014. Redacted Transcript Deadline set for 3/10/2014. Release of Transcript Restriction set for 5/8/2014. (Thibodeaux, Katie) (Entered: 02/07/2014) |
| 02/07/2014 | 222 | NOTICE OF FILING TRANSCRIPT filed for proceedings 1/30/14 8:42 am re Transcript 221 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Thibodeaux, Katie) TEXT ONLY ENTRY (Entered: 02/07/2014) |
| 02/10/2014 | 224 | JOINT STATUS REPORT filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 02/10/2014) |
| 02/11/2014 | 225 | NOTICE OF TELEPHONIC APPEARANCE FOR MARK S. RASKIN AT THE FEBRUARY 13, 2014 HEARING filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 02/11/2014) |
| 02/12/2014 | 226 | NOTICE of Appearance filed by attorney Douglas Wayne Robinson on behalf of Defendant Sony Computer Entertainment America LLC (Attorney Douglas Wayne Robinson added to party Sony Computer Entertainment America LLC(pty:dft))(Robinson, Douglas) (Entered: 02/12/2014) |
| 02/13/2014 | 227 | MINUTE ORDER IN CHAMBERS by Judge George H. Wu: (Attachments: # 1 Court's Tentative) (jag) (Entered: 02/13/2014) |
| 02/13/2014 | 228 | TRANSCRIPT ORDER as to Plaintiff McRO Inc Court Reporter. Court will contact Mark S. Raskin at mark.raskin@mishcon.com with any questions regarding this order. Transcript portion requested: Other: 2/13/2014. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Raskin, Mark) (Entered: 02/13/2014) |
| 02/13/2014 | 229 | TRANSCRIPT ORDER as to Defendants Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Treyarch Corporation Court Reporter. Court will contact Evan N. Budaj at evan.budaj@weil.com with any questions regarding this order. Transcript portion requested: Other: February 13, 2014. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Budaj, Evan) (Entered: 02/13/2014) |
| 02/13/2014 | 234 | MINUTES OF Status Conference held before Judge George H. Wu:,For reasons stated on the record, the Court consolidates the following with the cases consolidated underCV 12-10322-GW(FFMx):McRO, Inc. v. Atlus U.S.A., et al., SACV 13-1870-GW(FFMx); McRO, Inc. v. Sucker Punch Productions, LLC, CV 14-332-GW(FFMx); McRO Inc. v. Activision Blizzard Inc., CV 14-336-GW(FFMx); McRO Inc. v. Infinity Ward Inc., CV 14-352-GW(FFMx); McRO Inc. v. LucasArts Entertainment Company LLC, CV 14-358-GW(FFMx); McRO, Inc. v. Sony Computer Entertainment America, LLC, et al., CV 14-383- |

| | | |
|---|---|---|
| | | GW(FFMx); McRO, Inc. v. Warner Bros. Interactive Entertainment Inc., CV 14-417-GW(FFMx); The Courts Tentative Position re Scheduling is circulated (see Docket No. 227). The Court adopts its schedule for Track 1 Cases as follows: (SEE ATTACHED FOR FURTHER DETAILS) Pretrial Conference set for 11/24/2014 08:30 AM before Judge George H. Wu. Jury Trial set for 12/9/2014 09:00 AM before Judge George H. Wu. Claim Construction Hearing set on 4/28/2014 at 08:30 AM before Judge George H. Wu. Post-Mediation Status Conference set for 9/25/2014 08:30 AM before Judge George H. Wu.Court Reporter: Katie Thibodeaux. (pj) (Entered: 02/20/2014) |
| 02/13/2014 | 256 | FIRST AMENDED COMPLAINT against Defendants SCE Santa Monica Studio Inc., Sony Computer Entertainment America LLC amending Amended Complaint 44 , filed by Plaintiff McRO Inc (FILED IN CASE NUMBER 14-383-GW attached document number 13 filed in Delaware in Case No. 12-1514 on 2/28/13 PURSUANT TO CONSOLIDATION OF CASE FILED ON 2/13/2014)) (pj) (Entered: 04/04/2014) |
| 02/13/2014 | 257 | FIRST AMENDED COMPLAINT against Defendant Sucker Punch Productions LLC amending Amended Complaint 44 , filed by Plaintiff McRO Inc LED IN CASE NUMBER 14-332-GW attached document number 13 filed in Delaware in Case No. 12-1514 on 2/28/13 PURSUANT TO CONSOLIDATION OF CASE FILED ON 2/13/2014) (pj) (Entered: 04/04/2014) |
| 02/13/2014 | 271 | FIRST AMENDED COMPLAINT against Defendant Activision Blizzard Inc amending Complaint - (Discovery), 1 , filed by Plaintiff McRO Inc (COPY OF THE FIRST AMENDED COMPLAINT FILED WHICH WAS CONSOLIDATED ON 2/13/2014 DOCUMENT NUMBER 234 IN THE HIGHER CASE 14-336-GW document number 14 which was a transferred from District of Delaware with the case number of 12-1508) (pj) (Entered: 04/17/2014) |
| 02/13/2014 | 273 | FIRST AMENDED COMPLAINT against Defendant Infinity Ward Inc. amending Complaint - (Discovery), 1 , filed by Plaintiff McRO Inc (COPY OF THE FIRST AMENDED COMPLAINT FILED WHICH WAS CONSOLIDATED ON 2/13/2014 DOCUMENT NUMBER 234 RE THE HIGHER CASE 14-352-GW document number 14 which was a transferred from District of Delaware with the case number of 12-1511) (pj) (Entered: 04/17/2014) |
| 02/13/2014 | 274 | FIRST AMENDED COMPLAINT against Defendant LucasArts Entertainment Company LLC amending Complaint - (Discovery), 1 , filed by Plaintiff McRO Inc (COPY OF THE FIRST AMENDED COMPLAINT FILED WHICH WAS CONSOLIDATED ON 2/13/2014 DOCUMENT NUMBER 234 RE THE HIGHER CASE 14-358-GW document number 14 which was a transferred from District of Delaware with the case number of 12-1512) (pj) (Entered: 04/17/2014) (pj) (Entered: 04/17/2014) |
| 02/13/2014 | 275 | FIRST AMENDED COMPLAINT against Defendant Warner Bros Interactive Entertainment Inc amending Complaint - (Discovery), 1 , filed by Plaintiff McRO Inc (COPY OF THE FIRST AMENDED COMPLAINT FILED WHICH WAS CONSOLIDATED ON 2/13/2014 DOCUMENT NUMBER 234 RE THE HIGHER CASE 14-417-GW document number 14 which was a transferred from District of Delaware with the case number of 12-1518)(pj) (Entered: 04/17/2014) |

| | | |
|---|---|---|
| 02/18/2014 | 230 | BRIEF filed by Plaintiff McRO Inc. *PLAINTIFFS OPENING CLAIM CONSTRUCTION BRIEF* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Raskin, Mark) (Entered: 02/18/2014) |
| 02/19/2014 | 231 | TRANSCRIPT ORDER as to defendant Naughty Dog Inc Court Reporter. Court will contact Tony M. Diab at tdiab@shb.com with any questions regarding this order. Transcript portion requested: Other: 02-13-2014. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Diab, Tony) (Entered: 02/19/2014) |
| 02/19/2014 | 232 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Transcript Designation and Ordering Form (G-120), 231 . The following error(s) was found: THERE WAS NO COURT REPORTER PRESENT; NO TRANSCRIPT IS AVAILABLE.You must electronically refile the above referenced Request for Transcript in this case to correct this deficiency. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ha) TEXT ONLY ENTRY (Entered: 02/19/2014) |
| 02/19/2014 | 233 | TRANSCRIPT ORDER as to defendants Konami Digital Entertainment Inc, Square Enix Inc Court Reporter. Court will contact Ashleigh Landis at alandis@mofo.com with any questions regarding this order. Transcript portion requested: Other: 02/13/2014. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Landis, Ashleigh) (Entered: 02/19/2014) |
| 02/24/2014 | 235 | DISCOVERY REPORT filed by Plaintiff McRO Inc. (Attachments: # 1 Exhibit A)(Raskin, Mark) (Entered: 02/24/2014) |
| 02/28/2014 | 236 | REPLY filed by Defendant Insomniac Games Inc to Report 235 *Defendants' Response to Plaintiff's Unilaterally Submitted Discovery Report* (Singer, Benjamin) (Entered: 02/28/2014) |
| 03/05/2014 | 237 | MINUTE ORDER (IN CHAMBERS) TENTATIVE RULING CURRENT DISCOVERY DISPUTES by Judge George H. Wu: Status Conference set for 3/6/2014 09:30 AM. **SEE DOCUMENT FOR DETAILS** (jag) (Entered: 03/05/2014) |
| 03/05/2014 | 238 | NOTICE OF TELEPHONIC APPEARANCE AT THE MARCH 6, 2014 HEARING REGARDING DISCOVERY DISPUTES filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 03/05/2014) |
| 03/05/2014 | 239 | REQUEST for Leave of Benjamin L. Singer to Appear for March 6, 2014 Hearing By Telephone filed by defendant Insomniac Games Inc. Request set for hearing on 3/6/2014 at 09:30 AM before Judge George H. Wu. (Singer, Benjamin) (Entered: 03/05/2014) |
| 03/06/2014 | 242 | MINUTES OF Status Conference held before Judge George H. Wu: Case called. Counsel state their appearances. Court and counsel confer re Tentative Ruling on CurrentDiscovery Disputes, which was filed on March 5, 2014 237 . The Court adopts the Tentative Ruling as the Courts final Ruling. Court Reporter: Katie Thibideaux. (pj) (Entered: 03/10/2014) |
| 03/07/2014 | 240 | Notice of Appearance or Withdrawal of Counsel: for attorney Tony M Diab counsel for Defendants Naughty Dog Inc, Sony Computer Entertainment America |

| | | |
|---|---|---|
| | | LLC, Sucker Punch Productions LLC. Albert F. Harris, III is no longer attorney of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by defendant Naughty Dog, Inc.; Sucker Punch Productions LLC; Sony Computer Entertainment America LLC. (Attorney Tony M Diab added to party Sucker Punch Productions LLC(pty:dft))(Diab, Tony) (Entered: 03/07/2014) |
| 03/07/2014 | 241 | Notice of Appearance or Withdrawal of Counsel: for attorney Tony M Diab counsel for Defendants Naughty Dog Inc, Sony Computer Entertainment America LLC, Sucker Punch Productions LLC. Jonathan N. Zerger is no longer attorney of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by defendant Naughty Dog, inc.; Sucker Punch Productions LLC; Sony Computer Entertainment America LLC. (Diab, Tony) (Entered: 03/07/2014) |
| 03/11/2014 | 243 | Notice of Appearance or Withdrawal of Counsel: for attorney Jamie H Kitano counsel for Defendants Naughty Dog Inc, Sony Computer Entertainment America LLC, Sucker Punch Productions LLC, Counter Claimant Naughty Dog Inc. Filed by Defendants Naughty Dog Inc., Sucker Punch Productions LLC and Sony Computer Entertainment America LLC. (Attorney Jamie H Kitano added to party Naughty Dog Inc(pty:dft), Attorney Jamie H Kitano added to party Naughty Dog Inc(pty:cc), Attorney Jamie H Kitano added to party Sony Computer Entertainment America LLC(pty:dft), Attorney Jamie H Kitano added to party Sucker Punch Productions LLC(pty:dft))(Kitano, Jamie) (Entered: 03/11/2014) |
| 03/11/2014 | 244 | OF SERVICE filed by Defendants Naughty Dog Inc, Sony Computer Entertainment America LLC, Sucker Punch Productions LLC, re Notice of Appearance or Withdrawal of Counsel (G-123),, 243 *CERTIFICATE OF SERVICE* served on March 11, 2014. (Kitano, Jamie) (Entered: 03/11/2014) |
| 03/12/2014 | 245 | TRANSCRIPT ORDER as to Plaintiff McRO Inc Court Reporter. Court will contact Mark Raskin at mark.raskin@mishcon.com with any questions regarding this order. Transcript portion requested: Other: Discovery Dispute Conference. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Raskin, Mark) (Entered: 03/12/2014) |
| 03/14/2014 | 246 | BRIEF filed by Defendants Activision Blizzard Inc, Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Index Digital Media, Inc., Infinity Ward Inc., Insomniac Games Inc, Konami Digital Entertainment Inc, LucasArts Entertainment Company LLC, Namco Bandai Games America Inc, Naughty Dog Inc, Neversoft Entertainment Inc., Obsidian Entertainment Inc, Sega of America Inc, Sony Computer Entertainment America LLC, Square Enix Inc, Sucker Punch Productions LLC, Treyarch Corporation, Warner Bros Interactive Entertainment Inc. *DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF* regarding Brief (non-motion non-appeal) 230 . (Mehta, Sonal) (Entered: 03/14/2014) |
| 03/14/2014 | 247 | DECLARATION of Sonal N. Mehta re Brief (non-motion non-appeal),, 246 *DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF* filed by Defendants Activision Blizzard Inc, Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Index Digital Media, Inc., Infinity Ward Inc., Insomniac Games Inc, Konami Digital Entertainment Inc, LucasArts Entertainment Company LLC, Namco Bandai Games America Inc, Naughty Dog Inc, Neversoft Entertainment Inc., Obsidian Entertainment Inc, Sega of America Inc, Sony |

| | | |
|---|---|---|
| | | Computer Entertainment America LLC, Square Enix Inc, Sucker Punch Productions LLC, Treyarch Corporation, Warner Bros Interactive Entertainment Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Mehta, Sonal) (Entered: 03/14/2014) |
| 03/17/2014 | 248 | APPLICATION for attorney John D. Garretson to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-13522293 paid.) filed by defendants Naughty Dog Inc, Sony Computer Entertainment America LLC, Sucker Punch Productions LLC. (Attachments: # 1 Proposed Order)(Diab, Tony) (Entered: 03/17/2014) |
| 03/18/2014 | 249 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: APPLICATION for attorney John D. Garretson to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-13522293 paid.) 248 . The following error(s) was found: Other error(s) with document(s) are specified below. Other error(s) with document(s): Form is out-of-date. Forms and Local Rules were updated and amended as of June 1, 2013. See Notices from the Clerk, 5/2/13; Applicant did not supply Good Standing Certificates for each of the state bar for each of the states that the attorney is admitted of that particular state bar. See LR 83-2.1.3.3 (NY). In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and until the court directs you to do so. (lt) (Entered: 03/18/2014) |
| 03/21/2014 | 252 | ORDER by Judge George H. Wu: granting 248 Application to Appear Pro Hac Vice by Attorney John D. Garretson on behalf of Defendants Naughty Dog Inc, Sony Computer Entertainment America LLC and for Sucker Punch Productions LLC, designating Tony Diab as local counsel. (lt) (Entered: 03/24/2014) |
| 03/24/2014 | 250 | TRANSCRIPT for proceedings held on 3/6/14 9:50 am. Court Reporter/Electronic Court Recorder: Katie Thibodeaux, CSR, RPR, CRR, phone number www.katiethibodeaux.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/14/2014. Redacted Transcript Deadline set for 4/24/2014. Release of Transcript Restriction set for 6/22/2014. (Thibodeaux, Katie) (Entered: 03/24/2014) |
| 03/24/2014 | 251 | NOTICE OF FILING TRANSCRIPT filed for proceedings 3/6/14 9:50 am re Transcript 250 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Thibodeaux, Katie) TEXT ONLY ENTRY (Entered: 03/24/2014) |
| 03/27/2014 | 253 | NOTICE OF MOTION AND MOTION for Leave to file Second Amended Complaints against Sony Computer Entertainment LLC and Sucker Punch Productions LLC filed by Plaintiff McRO Inc. (Attachments: # 1 Exhibit 1 - Sucker Punch Second Amended Complaint, # 2 Exhibit 2 - Sony Second Amended Complaint, # 3 Proposed Order)(Raskin, Mark) (Entered: 03/27/2014) |
| 03/28/2014 | 254 | BRIEF filed by Plaintiff McRO Inc. *Plaintiff's Reply Claim Construction Brief* regarding Brief (non-motion non-appeal) 230 . (Raskin, Mark) (Entered: 03/28/2014) |
| | | |

| | | |
|---|---|---|
| 03/31/2014 | 255 | ORDER UNOPPOSED MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINTS by Judge George H. Wu: Plaintiff McRO, Inc., dba Planet Blues Motion for leave to file its SecondAmended Complaints against Defendants Sucker Punch and Sony is herebyGRANTED. Plaintiffs Proposed Second Amended Complaints will be manuallyfiled and any responsive pleadings to these Second Amended Complaints are duetwenty one (21) days thereafter. 253 (pj) (Entered: 04/01/2014) |
| 04/04/2014 | 258 | SECOND AMENDED COMPLAINT amending Amended Complaint, 256 , against defendant Sony Computer Entertainment America LLC filed by Plaintiff McRO Inc (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Raskin, Mark) (Entered: 04/04/2014) |
| 04/04/2014 | 259 | SECOND AMENDED COMPLAINT against Defendant Sucker Punch Production, LLC Sucker Punch Productions LLC amending Amended Complaint, 257 , filed by Plaintiff McRO Inc (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Raskin, Mark) (Entered: 04/04/2014) |
| 04/04/2014 | 260 | NOTICE OF MOTION AND MOTION for Leave to file Second Amended Complaints against Infinity Ward, LucasArts and Warner Bros. filed by Plaintiff McRO Inc. (Attachments: # 1 Exhibit 1 - Infinity Ward Second Amended Complaint, # 2 Exhibit 2 - LucasArts Second Amended Complaint, # 3 Exhibit 3 - Warner Bros. Second Amended Complaint, # 4 Proposed Order)(Raskin, Mark) (Entered: 04/04/2014) |
| 04/09/2014 | 263 | ORDER ON UNOPPOSED MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINTS by Judge George H. Wu: Plaintiff McRo, Inc., d.b.a. Planet Blues Motion for leave to file its Second Amended Complaints against Defendants Infinity Ward, Inc., LucasArts, a divisionof Lucasfilm Entertainment Company Ltd. LLC and Warner Bros. InteractiveEntertainment, a division of Warner Bros. Home Entertainment Inc. is herebyGRANTED. Plaintiffs Proposed Second Amended Complaints may be filed andany responsive pleadings to these Second Amended Complaints are due twenty one(21) days thereafter. 260 (pj) (Entered: 04/11/2014) |
| 04/10/2014 | 261 | NOTICE OF MOTION AND MOTION for Extension of Time to File Submission of Technology Tutorials filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 04/10/2014) |
| 04/10/2014 | 262 | MINUTE ORDER IN CHAMBERS by Judge George H. Wu: No later than April 18, 2014, Plaintiff shall lodge a copy of the certified file history for each asserted patent. Each file history shall be printed double-sided, indexed, tabbed, and compiled in a 3-ring binder. Each office action, response, filing, or other communication shall be given a separate tab, with the date of each clearlydesignated. Portions of the file history relied upon by the patentee for claim construction shall be highlighted in yellow. Portions of the file history relied upon by the accused infringers shall be highlighted in blue. Portions of the file history relied upon by both sides shall be highlighted in green. Plaintiff shall also lodge an electronic copy of each file history on a CD-ROM, DVD, or USB thumb drive. Each file history shall be a single PDF file with bookmarks corresponding to the tabs on the paper copy, and containing the highlighting present on the paper copy. (pj) (Entered: 04/11/2014) |

| 04/11/2014 | 264 | ORDER GRANTING UNOPPOSED MOTION TO EXTEND TIME TO SUBMIT TECHNOLOGY TUTORIALS TO THE COURT by Judge George H. Wu: ORDER GRANTING UNOPPOSED MOTION TO EXTEND TIME TOSUBMIT TECHNOLOGY TUTORIALS TO THE COURT The Court, having considered the Unopposed Motion to Extend Time to Submit Technology Tutorials to the Court, hereby ORDERS as follows: The parties may have until April 16, 2014 to submit their Technology Tutorials to the Court. 261 (pj) (Entered: 04/14/2014) |
|---|---|---|
| 04/14/2014 | 265 | STIPULATION to Dismiss Defendant Activision Blizzard Inc filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 04/14/2014) |
| 04/15/2014 | 272 | ORDER by Judge George H. Wu, re Stipulation to Dismiss Party 265 , Pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure, ActivisionBlizzard, Inc. is dismissed without prejudice, and Activision Publishing, Inc. and Blizzard Entertainment, Inc. are substituted in its place. Plaintiffs Proposed Second Amended Complaints may be filed and any responsive pleadings to these SecondAmended Complaints are due twenty one (21) days thereafter. (Activision Publishing, Inc. and Blizzard Entertainment, Inc. added. Activision Blizzard Inc terminated). (pj) (Entered: 04/17/2014) |
| 04/16/2014 | 266 | NOTICE of Compliance filed by Plaintiff McRO Inc. *with 6/17/13 Scheduling Order re Claim Construction Tutorial Submission* (Raskin, Mark) (Entered: 04/16/2014) |
| 04/16/2014 | 267 | NOTICE of Manual Filing filed by Plaintiff McRO Inc of DVD re Claim Construction Technology Tutorial. (Raskin, Mark) (Entered: 04/16/2014) |
| 04/16/2014 | 268 | NOTICE OF LODGING filed *re Planet Blue's Claim Construction Technology Tutorial DVD* re Notice of Manual Filing (G-92) 267 (Raskin, Mark) (Entered: 04/16/2014) |
| 04/16/2014 | 269 | NOTICE OF LODGING filed re Order on Motion for Extension of Time to File, 264 (Fox, Benjamin) (Entered: 04/16/2014) |
| 04/16/2014 | 270 | NOTICE OF LODGING filed *re TECHNOLOGY TUTORIAL* re Brief (non-motion non-appeal),, 246 (Fox, Benjamin) (Entered: 04/16/2014) |
| 04/18/2014 | 276 | NOTICE of Manual Filing filed by Plaintiff McRO Inc of DVD re US Patents '576 and '278 File Histories. (Raskin, Mark) (Entered: 04/18/2014) |
| 04/18/2014 | 277 | NOTICE OF LODGING filed *re US Patents '576 and '278 File Histories* re Notice of Manual Filing (G-92) 276 (Raskin, Mark) (Entered: 04/18/2014) |
| 04/18/2014 | 278 | NOTICE filed by Plaintiff McRO Inc *of Compliance with Judge Wu's 4/10/14 Order, Docket No. 262* (Raskin, Mark) (Entered: 04/18/2014) |
| 04/18/2014 | 279 | SEALED DOCUMENT - Plaintiff MCRO, Inc., dba Planet Blue's Claim Construction Technology Tutorial.(cbr) (Entered: 04/21/2014) |
| 04/18/2014 | 280 | SEALED DOCUMENT - Plaintiff MCRO, Inc., dba Planet Blue's File Histories on DVD and in Paper Format.(cbr) (Entered: 04/21/2014) |
| 04/23/2014 | 281 | STIPULATION for Order to Amend Caption of Case filed by Defendant Namco |

| | | Bandai Games America Inc. (Attachments: # 1 Proposed Order)(Mehta, Sonal) (Entered: 04/23/2014) |
|---|---|---|
| 04/23/2014 | 282 | APPLICATION for attorney Robert Whitman to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-13711056 paid.) filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Lee, Irene) (Entered: 04/23/2014) |
| 04/25/2014 | 283 | COUNTERCLAIM against Plaintiff and Counter Defendant McRO Inc; Jury Demand, filed by defendant and counterclaimant Sucker Punch Productions LLC. (Diab, Tony) (Entered: 04/25/2014) |
| 04/25/2014 | 284 | COUNTERCLAIM against Plaintiff and Counter Defendant McRO Inc; Jury Demand, filed by Defendant and Counterclaimant Sony Computer Entertainment America LLC.(Diab, Tony) (Entered: 04/25/2014) |
| 04/25/2014 | 285 | Request for Clerk to Issue Summons on Counterclaim 283 filed by Defendant and Counterclaimant Sucker Punch Productions LLC. (Diab, Tony) (Entered: 04/25/2014) |
| 04/25/2014 | 286 | Request for Clerk to Issue Summons on Counterclaim 284 filed by Defendant and Counterclaimant Sony Computer Entertainment America LLC. (Diab, Tony) (Entered: 04/25/2014) |
| 04/25/2014 | 287 | ANSWER to Amended Complaint, 259 filed by Defendant Sucker Punch Productions LLC.(Diab, Tony) (Entered: 04/25/2014) |
| 04/25/2014 | 288 | ANSWER to Amended Complaint 258 filed by Defendant Sony Computer Entertainment America LLC.(Diab, Tony) (Entered: 04/25/2014) |
| 04/28/2014 | 289 | ORDER by Judge George H. Wu: granting 282 Application to Appear Pro Hac Vice by Attorney Rogert Whitman on behalf of Plaintiff, designating Irene Y. Lee as local counsel. (lt) (Entered: 04/28/2014) |
| 04/28/2014 | 291 | ORDER by Judge George H. Wu, re Stipulation for Order 281 . The Court, having considered the Stipulation to Amend Caption of Case filed by Plaintiff McRo Inc., d.b.a. Planet Blue and Defendant BANDAI NAMCO Games America Inc. on April 23, 2014, hereby ORDERS as follow: The caption of this case shall be amended as follows: McRo, Inc., d.b.a. PlanetBlue v. BANDAI NAMCO Games America Inc. (pj) (Entered: 04/29/2014) |
| 04/28/2014 | 303 | AMENDED MINUTES held before Judge George H. Wu re: Markman Hearing, 292 .The Courts Tentative Rulings on Markman Hearing is circulated. Court hears oral argument. For reasons stated on the record, the Markman Hearing is TAKEN UNDER SUBMISSION. Court to issue its final ruling. A Status Conference is set for June 30, 2014 at 8:30 a.m. Parties will file proposed dates by June 26, 2014. (pj) (Entered: 05/09/2014) |
| 04/29/2014 | 290 | NOTICE OF DEFICIENCIES in Request to Issue Summons RE: Summons Request 285 , Summons Request 286 . The following error(s) was found: The caption of the summons must match the caption of the complaint verbatim. If the caption is too large to fit in the space provided, enter the name of the first party and then write see attached.Next, attach a face page of the complaint or a second page addendum to the Summons. Missing the Counter-Claims Caption. The summons cannot be issued until this defect has been corrected. Please correct the |

| | | |
|---|---|---|
| | | defect and re-file your request. (pj) (Entered: 04/29/2014) |
| 04/29/2014 | 292 | MINUTES OF Markman Hearing held before Judge George H. Wu: The Court's Tentative Rulings on Markman Hearing is circulated and attached hereto. Court hears oralargument. For reasons stated on the record, the Markman Hearing is TAKEN UNDER SUBMISSION. Court to issue its final ruling. A Status Conference is set for June 30, 2014 at 8:30 a.m. Parties will file proposed dates by June 26, 2014.Court Reporter: Katie Thibodeaux. (pj) (Entered: 04/29/2014) |
| 04/30/2014 | 293 | TRANSCRIPT ORDER as to Plaintiff McRO Inc Court Reporter. Court will contact Dominick Vitaliano at dominick.vitaliano@mishcon.com with any questions regarding this order. Transcript portion requested: Other: Markman Hearing. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Raskin, Mark) (Entered: 04/30/2014) |
| 04/30/2014 | 294 | TRANSCRIPT ORDER as to Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc., Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Index Digital Media, Inc., Infinity Ward Inc., LucasArts Entertainment Company LLC, Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Treyarch Corporation, Warner Bros Interactive Entertainment Inc Court Reporter. Court will contact Evan N. Budaj at evan.budaj@weil.com with any questions regarding this order. Transcript portion requested: Other: April 28, 2014 Markman Hearing. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Budaj, Evan) (Entered: 04/30/2014) |
| 04/30/2014 | 295 | Request for Clerk to Issue Summons on Counterclaim 283 filed by counterclaimant Sucker Punch Productions LLC. (Diab, Tony) (Entered: 04/30/2014) |
| 04/30/2014 | 296 | Request for Clerk to Issue Summons on Counterclaim 284 filed by counterclaimant Sony Computer Entertainment America LLC. (Diab, Tony) (Entered: 04/30/2014) |
| 04/30/2014 | 297 | NOTICE filed by Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc., Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Index Digital Media, Inc., Infinity Ward Inc., Insomniac Games Inc, Konami Digital Entertainment Inc, LucasArts Entertainment Company LLC, Namco Bandai Games America Inc, Naughty Dog Inc, Neversoft Entertainment Inc., Obsidian Entertainment Inc, Sega of America Inc, Sony Computer Entertainment America LLC, Square Enix Inc, Sucker Punch Productions LLC, Treyarch Corporation, Warner Bros Interactive Entertainment Inc *of Filing Presentation Slides Used at Markman Hearing* (Attachments: # 1 Exhibit A)(Budaj, Evan) (Entered: 04/30/2014) |
| 05/01/2014 | 298 | MINUTE ORDER (IN CHAMBERS): by Judge George H. Wu: Attached hereto is the Court's Final Ruling on Claim Construction 292 . (Attachments: # 1 Final Ruling Claim Construction) (jag) (Main Document 298 replaced on 5/1/2014) (jag). (Entered: 05/01/2014) |
| 05/02/2014 | 299 | 21 DAY Summons Issued re Counterclaim 283 as to Counter defendant McRO Inc by Counter-Claimant Sucker Punch Productions LLC. (pj) (Entered: 05/02/2014) |

| | | |
|---|---|---|
| 05/02/2014 | 300 | 21 DAY Summons Issued re Counterclaim 284 as to Counter defendant McRO Inc by Counter-Claimant Sony Computer Entertainment America LLC. (pj) (Entered: 05/02/2014) |
| 05/07/2014 | 301 | PROOF OF SERVICE Executed by counterclaimant Sucker Punch Productions LLC, upon counter-defendant McRO Inc served on 5/6/2014, answer due 5/27/2014. Service of the Summons and Complaint were executed upon Russ, August and Kabat, Attorneys for McRo, Inc. in compliance with Federal Rules of Civil Procedure by personal service. Original Summons returned. (Diab, Tony) (Entered: 05/07/2014) |
| 05/07/2014 | 302 | PROOF OF SERVICE Executed by counterclaimant Sony Computer Entertainment America LLC, upon Counter-Defendant McRO Inc served on 5/6/2014, answer due 5/27/2014. Service of the Summons and Complaint were executed upon Russ, August and Kabat, Attorneys for McRo, Inc. in compliance with Federal Rules of Civil Procedure by personal service. Original Summons returned. (Diab, Tony) (Entered: 05/07/2014) |
| 05/09/2014 | 304 | TRANSCRIPT ORDER as to defendants Sony Computer Entertainment America LLC, Sucker Punch Productions LLC Court Reporter. Court will contact Kim Brunton at kbrunton@shb.com with any questions regarding this order. Transcript portion requested: Other: April 28, 2014. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Diab, Tony) (Entered: 05/09/2014) |
| 05/19/2014 | 305 | SECOND AMENDED COMPLAINT against Activision Publishing, Inc. and Blizzard Entertainment, Inc. Activision Publishing, Inc., Blizzard Entertainment, Inc. amending Amended Complaint, 271 , filed by Plaintiff McRO Inc (Attachments: # 1 Exhibit A '576 Patent, # 2 Exhibit B '278 Patent, # 3 Exhibit C) (Raskin, Mark) (Entered: 05/19/2014) |
| 05/19/2014 | 306 | SECOND AMENDED COMPLAINT against Infinity Ward, Inc. Infinity Ward Inc. amending Amended Complaint, 273 , filed by Plaintiff McRO Inc (Attachments: # 1 Exhibit A '576 Patent, # 2 Exhibit B '278 Patent, # 3 Exhibit C) (Raskin, Mark) (Entered: 05/19/2014) |
| 05/19/2014 | 307 | SECOND AMENDED COMPLAINT against LucasArts, a division of Lucasfilm Entertainment Company Ltd., LLC LucasArts Entertainment Company LLC amending Amended Complaint, 274 , filed by Plaintiff McRO Inc (Attachments: # 1 Exhibit A '576 Patent, # 2 Exhibit B '278 Patent, # 3 Exhibit C)(Raskin, Mark) (Entered: 05/19/2014) |
| 05/19/2014 | 308 | SECOND AMENDED COMPLAINT against Warner Bros. Interactive Entertainment, a division of Warner Bros. Home Entertainment, Inc. Warner Bros Interactive Entertainment Inc amending Amended Complaint, 275 , filed by Plaintiff McRO Inc (Attachments: # 1 Exhibit A '576 Patent, # 2 Exhibit B '278 Patent, # 3 Exhibit C)(Raskin, Mark) (Entered: 05/19/2014) |
| 05/27/2014 | 309 | ANSWER *to Sucker Punch COUNTERCLAIM 283* filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 05/27/2014) |
| 05/27/2014 | 310 | ANSWER *to Sony Computer Entertainment America LLC COUNTERCLAIM 284* filed by Plaintiff McRO Inc.(Raskin, Mark) (Entered: 05/27/2014) |

| | | |
|---|---|---|
| 05/29/2014 | 311 | NOTICE OF DENIAL OF PETITIONS FOR INTER PARTES REVIEW filed by PLAINTIFF McRO Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Raskin, Mark) (Entered: 05/29/2014) |
| 06/09/2014 | 312 | CERTIFICATE OF SERVICE filed by Defendant Infinity Ward Inc., served on June 9, 2014. (Mehta, Sonal) (Entered: 06/09/2014) |
| 06/09/2014 | 313 | CERTIFICATE OF SERVICE filed by Defendant LucasArts Entertainment Company LLC, served on June 9, 2014. (Mehta, Sonal) (Entered: 06/09/2014) |
| 06/09/2014 | 314 | CERTIFICATE OF SERVICE filed by Defendant Warner Bros Interactive Entertainment Inc, served on June 9, 2014. (Mehta, Sonal) (Entered: 06/09/2014) |
| 06/09/2014 | 315 | STIPULATION for Extension of Time to File Response to Plaintiff's Second Amended Complaint filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 06/09/2014) |
| 06/09/2014 | 318 | ANSWER to Amended Complaint, 306 , COUNTERCLAIM against McRO Inc filed by Defendant Infinity Ward Inc..(bp) (pj). (Entered: 06/11/2014) |
| 06/09/2014 | 319 | ANSWER to Amended Complaint, 308 , COUNTERCLAIM against McRO Inc filed by Defendant Warner Bros Interactive Entertainment Inc.(bp) (pj). (Entered: 06/11/2014) |
| 06/09/2014 | 320 | CERTIFICATE of Interested Parties filed by Defendant/Counter-claimant Infinity Ward Inc., (bp) (Entered: 06/12/2014) |
| 06/09/2014 | 321 | INFINITY WARD, INC.'S DISCLOSURE PURSUANT TO FED.R.CIV.PROC.7.1 filed by Counter Claimant Infinity Ward Inc., Defendant Infinity Ward Inc. (bp) (Entered: 06/12/2014) |
| 06/09/2014 | 322 | ANSWER to Amended Complaint, 307 , COUNTERCLAIM against McRO Inc filed by Defendant LucasArts Entertainment Company LLC.(bp) (pj). (Entered: 06/12/2014) |
| 06/09/2014 | 323 | CERTIFICATE of Interested Parties filed by Defendant/Counter-claimant LucasArts Entertainment Company LLC, identifying Other Affiliate Lucasfilm Entertainment Company Ltd., LLC, Other Affiliate Lucasfilm Ltc. LLC for LucasArts Entertainment Company LLC, LucasArts Entertainment Company LLC. (bp) (Entered: 06/12/2014) |
| 06/09/2014 | 324 | LUCASARTS, A DIVISION OF LUCASFILM ENTERTAINMENT COMPANY LTD. LLC'S DISCLOSURE PURSUANT TO FED.R.CIV.PROC.7.1 filed by Defendant LucasArts Entertainment Company LLC, Counter Claimant LucasArts Entertainment Company LLC (bp) (Entered: 06/12/2014) |
| 06/09/2014 | 325 | CERTIFICATE of Interested Parties filed by Defendant/Counter-claimant Warner Bros Interactive Entertainment Inc, identifying Other Affiliate Warner Bros. Home Entertainment Inc., Other Affiliate Warner Communications LLC, Other Affiliate Warner Bros. Entertainment Inc. for Warner Bros Interactive Entertainment Inc, Warner Bros Interactive Entertainment Inc. (bp) (Entered: 06/12/2014) |
| 06/09/2014 | 326 | WARNER BROS. INTERACTIVE ENTERTAINMENT INC.'S DISCLOSURE |

| | | |
|---|---|---|
| | | PURSUANT TO FED.R.CIV.PROC.7.1 filed by Defendant Warner Bros Interactive Entertainment Inc, Counter Claimant Warner Bros Interactive Entertainment Inc (bp) (Entered: 06/12/2014) |
| 06/10/2014 | 317 | ORDER GRANTING STIPULATION TO EXTEND TIME TO RESPOND TO SECOND AMENDED COMPLAINT AGAINST ACTIVISION PUBLISHING, INC. AND BLIZZARD ENTERTAINMENT, INC., granting Stipulation for Extension of Time to File 315 , Defendants' Activision Publishing, Inc. answer due 6/19/2014; Blizzard Entertainment, Inc. answer due 6/19/2014 by Judge George H. Wu (bp) (Entered: 06/11/2014) |
| 06/11/2014 | 316 | NOTICE OF MOTION AND MOTION for Leave to file Third Amended Complaint against Activision Publishing and Blizzard filed by Plaintiff McRO Inc. (Attachments: # 1 Exhibit 1 - Third Amended Complaint Activision Publishing/Blizzard, # 2 Proposed Order)(Raskin, Mark) (Entered: 06/11/2014) |
| 06/16/2014 | 327 | ORDER by Judge George H. Wu: 316 Plaintiff McRo, Inc., d.b.a. Planet Blues Motion for leave to file its Third Amended Complaint against Defendants Activision Publishing, Inc. and BlizzardEntertainment, Inc. is hereby GRANTED. Plaintiffs Proposed Third Amended Complaint may be filed and any responsive pleadings to this Third AmendedComplaint are due twenty one (21) days thereafter. (pj) (Entered: 06/16/2014) |
| 06/26/2014 | 328 | NOTICE of Telephonic Appearance of Mark S. Raskin at the June 30, 2014 Status Conference filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 06/26/2014) |
| 06/26/2014 | 329 | STATUS REPORT *Joint* filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 06/26/2014) |
| 06/30/2014 | 330 | TRANSCRIPT ORDER as to Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc., Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Index Digital Media, Inc., Infinity Ward Inc., LucasArts Entertainment Company LLC, Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Treyarch Corporation, Warner Bros Interactive Entertainment Inc Court Reporter. Court will contact Evan N. Budaj at evan.budaj@weil.com with any questions regarding this order. Transcript portion requested: Other: Status Conference June 30, 2014. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Budaj, Evan) (Entered: 06/30/2014) |
| 06/30/2014 | 331 | MINUTES OF STATUS CONFERENCE held before Judge George H. Wu. The Court, as indicated on the record, will allow Plaintiff to propound discovery, but will require no response until its decision on Defendant's § 101 motion. Any objections will be responded within one week after the Court's decision on the § 101 motion. Actual responses will be due three weeks after the Courts decision on the § 101 motion. Court Reporter: Katie Thibodeaux. (lom) (Entered: 07/01/2014) |
| 07/03/2014 | 332 | ANSWER to Answer to Complaint (Discovery), Counterclaim 319 *of Warner Brothers* filed by Plaintiff McRO Inc.(Raskin, Mark) (Entered: 07/03/2014) |
| 07/03/2014 | 333 | ANSWER to Answer to Complaint (Discovery), Counterclaim 322 *of LucasArts* filed by Plaintiff McRO Inc.(Raskin, Mark) (Entered: 07/03/2014) |
| 07/03/2014 | 334 | ANSWER to Answer to Complaint (Discovery), Counterclaim 318 *of Infinity* |

| | | |
|---|---|---|
| | | *Ward* filed by Plaintiff McRO Inc.(Raskin, Mark) (Entered: 07/03/2014) |
| 07/08/2014 | 335 | TRANSCRIPT ORDER as to Plaintiff McRO Inc Court Reporter. Court will contact Mark S Raskin at mark.raskin@mishcon.com with any questions regarding this order. Transcript portion requested: Other: June 30, 2014 Status Conference. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Raskin, Mark) (Entered: 07/08/2014) |
| 07/09/2014 | 336 | Third AMENDED COMPLAINT against Defendant Activision Publishing, Inc., Blizzard Entertainment, Inc. amending Amended Complaint, 305 , filed by Plaintiff McRO Inc (Attachments: # 1 Exhibit A '576 Patent, # 2 Exhibit B '278 Patent, # 3 Exhibit C)(Raskin, Mark) (Entered: 07/09/2014) |
| 07/09/2014 | 337 | TRANSCRIPT ORDER re: Status Conference, 331 , as to defendants Naughty Dog Inc, Sony Computer Entertainment America Inc, Sucker Punch Productions LLC Court Reporter. Court will contact Kim Brunton at kbrunton@shb.com with any questions regarding this order. Transcript portion requested: Other: 6-30-14 - Status Conference. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Diab, Tony) (Entered: 07/09/2014) |
| 07/10/2014 | 338 | NOTICE OF MOTION AND MOTION for Judgment on the Pleadings as to Unpatentability Under 35 U.S.C. Section 101 filed by Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc., Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Index Digital Media, Inc., Infinity Ward Inc., Konami Digital Entertainment Inc, LucasArts Entertainment Company LLC, Namco Bandai Games America Inc, Naughty Dog Inc, Neversoft Entertainment Inc., Obsidian Entertainment Inc, Sega of America Inc, Sony Computer Entertainment America LLC, Square Enix Inc, Sucker Punch Productions LLC, Treyarch Corporation, Warner Bros Interactive Entertainment Inc. Motion set for hearing on 8/14/2014 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Proposed Order)(Attorney Sonal Naresh Mehta added to party Activision Publishing, Inc.(pty:dft), Attorney Sonal Naresh Mehta added to party Blizzard Entertainment, Inc.(pty:dft))(Mehta, Sonal) (Entered: 07/10/2014) |
| 07/10/2014 | 339 | REQUEST FOR JUDICIAL NOTICE re MOTION for Judgment on the Pleadings as to Unpatentability Under 35 U.S.C. Section 101 338 filed by Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc., Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Index Digital Media, Inc., Infinity Ward Inc., Konami Digital Entertainment Inc, LucasArts Entertainment Company LLC, Namco Bandai Games America Inc, Naughty Dog Inc, Neversoft Entertainment Inc., Obsidian Entertainment Inc, Sega of America Inc, Sony Computer Entertainment America LLC, Square Enix Inc, Sucker Punch Productions LLC, Treyarch Corporation, Warner Bros Interactive Entertainment Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Mehta, Sonal) (Entered: 07/10/2014) |
| 07/15/2014 | 340 | NOTICE OF MOTION AND Joint MOTION to Dismiss Defendant and Counterclaimant Insomniac Games Inc filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 07/15/2014) |
| 07/18/2014 | 341 | ORDER GRANTING JOINT MOTION FOR DISMISSAL OF ALL CLAIMS AND COUNTERCLAIMS BETWEEN MCRO, INC., DBA PLANET BLUE AND INSOMNIAC GAMES, INC. PURSUANT TO FEDERAL RULE OF |

| | | |
|---|---|---|
| | | CIVIL PROCEDURE 41(a)(1)(A)(ii) 340 by Judge George H. Wu. The Court hereby confirms that: Pursuant to Rule 41(a) of the Federal Rules of Civil Procedures, all claims, counterclaims and defenses in this action between Plaintiff, McRO, Inc., dba Planet Blue ("Planet Blue") and Defendant and Counterclaimant Insomniac Games, Inc. ("Insomniac") are hereby dismissed with prejudice; and The parties shall bear their own costs, expenses and attorneys' fees. IT IS SO ORDERED. (lom) (Entered: 07/18/2014) |
| 07/21/2014 | 342 | TRANSCRIPT for proceedings held on 6/30/14 9:28 am. Court Reporter/Electronic Court Recorder: Katie Thibodeaux, CSR, RPR, CRR, phone number www.katiethibodeaux.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 8/11/2014. Redacted Transcript Deadline set for 8/21/2014. Release of Transcript Restriction set for 10/19/2014. (Thibodeaux, Katie) (Entered: 07/21/2014) |
| 07/21/2014 | 343 | NOTICE OF FILING TRANSCRIPT filed for proceedings 6/30/14 9:28 am re Transcript 342 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Thibodeaux, Katie) TEXT ONLY ENTRY (Entered: 07/21/2014) |
| 07/24/2014 | 344 | MEMORANDUM in Opposition to MOTION for Judgment on the Pleadings as to Unpatentability Under 35 U.S.C. Section 101 338 filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 07/24/2014) |
| 07/24/2014 | 345 | DECLARATION of Michael Gleicher, Ph.D. in opposition MOTION for Judgment on the Pleadings as to Unpatentability Under 35 U.S.C. Section 101 338 filed by Plaintiff McRO Inc. (Attachments: # 1 Exhibit Ex. A - CV)(Raskin, Mark) (Entered: 07/24/2014) |
| 07/24/2014 | 346 | DECLARATION of John F. Petrsoric in opposition MOTION for Judgment on the Pleadings as to Unpatentability Under 35 U.S.C. Section 101 338 filed by Plaintiff McRO Inc. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7, # 8 Exhibit Exhibit 8, # 9 Exhibit Exhibit 9) (Raskin, Mark) (Entered: 07/24/2014) |
| 07/30/2014 | 347 | ANSWER to Amended Complaint, 336 and Counterclaims filed by Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc..(Mehta, Sonal) (Entered: 07/30/2014) |
| 07/30/2014 | 348 | CORPORATE DISCLOSURE STATEMENT filed by Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc. identifying Activision Blizzard, Inc. as Corporate Parent. (Mehta, Sonal) (Entered: 07/30/2014) |
| 07/30/2014 | 349 | NOTICE of Interested Parties filed by Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc., identifying Activision Blizzard, Inc., Activision Entertainment Holdings, Inc., ASAC II LP. (Mehta, Sonal) (Entered: 07/30/2014) |
| 07/30/2014 | | COUNTERCLAIM against Counter-Defendant McRO Inc, filed by Defendant and Counter-Claimants Activision Publishing, Inc., Blizzard Entertainment, Inc.. (SEE DOCUMENT NUMBER 347 FOR THE ATTACHMENT THIS DOCUMENT WAS FILED AS AN ANSWER AND COUNTERCLAIMS) (pj) |

| | | (Entered: 08/21/2014) |
|---|---|---|
| 07/31/2014 | 350 | REPLY In Support of MOTION for Judgment on the Pleadings as to Unpatentability Under 35 U.S.C. Section 101 338 filed by Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc., Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Index Digital Media, Inc., Infinity Ward Inc., Konami Digital Entertainment Inc, LucasArts Entertainment Company LLC, Namco Bandai Games America Inc, Naughty Dog Inc, Neversoft Entertainment Inc., Obsidian Entertainment Inc, Sega of America Inc, Sony Computer Entertainment America LLC, Square Enix Inc, Sucker Punch Productions LLC, Treyarch Corporation, Warner Bros Interactive Entertainment Inc. (Mehta, Sonal) (Entered: 07/31/2014) |
| 07/31/2014 | 351 | OBJECTIONS to Declaration (Motion related), 346 , Declaration (Motion related), 345 filed by Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc., Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Index Digital Media, Inc., Infinity Ward Inc., Konami Digital Entertainment Inc, LucasArts Entertainment Company LLC, Namco Bandai Games America Inc, Naughty Dog Inc, Neversoft Entertainment Inc., Obsidian Entertainment Inc, Sega of America Inc, Sony Computer Entertainment America LLC, Square Enix Inc, Sucker Punch Productions LLC, Treyarch Corporation, Warner Bros Interactive Entertainment Inc. (Mehta, Sonal) (Entered: 07/31/2014) |
| 08/05/2014 | 352 | TEXT ONLY ENTRY (IN CHAMBERS): by Judge George H. Wu; The Court, on its own motion, CONTINUES Defendants' MOTION for Judgment on the Pleadings as to Unpatentability Under 35 U.S.C. Section 101 338 , previously scheduled for 8/14/2014 to 8/21/2014 at 08:30 AM before Judge George H. Wu. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 08/05/2014) |
| 08/06/2014 | 353 | **AMENDED** TEXT ONLY ENTRY 352 (IN CHAMBERS): by Judge George H. Wu; The Court, on its own motion, CONTINUES Defendants' MOTION for Judgment on the Pleadings as to Unpatentability Under 35 U.S.C. Section 101 338 , previously scheduled for 8/14/2014 to 9/4/2014 at 08:30 AM before Judge George H. Wu. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 08/06/2014) |
| 08/08/2014 | 354 | TEXT ONLY ENTRY (IN CHAMBERS): by Judge George H. Wu; Pursuant to the request of defense counsel, Defendant's MOTION for Judgment on the Pleadings as to Unpatentability Under 35 U.S.C. Section 101 338 previously scheduled for 09/04/2014 is CONTINUED to 9/18/2014 08:30 AM before Judge George H. Wu. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 08/08/2014) |
| 08/14/2014 | 355 | RESPONSE filed by Plaintiff McRO Incto Objections - non-motion,, 351 (Attachments: # 1 Exhibit A)(Raskin, Mark) (Entered: 08/14/2014) |
| 08/20/2014 | 356 | REPLY filed by Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc., Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Index Digital Media, Inc., Infinity Ward Inc., Konami Digital Entertainment Inc, LucasArts Entertainment Company LLC, Namco Bandai Games America Inc, Naughty Dog Inc, Neversoft Entertainment Inc., Obsidian Entertainment Inc, Sega of America Inc, Sony Computer Entertainment America LLC, Square Enix Inc, |

| | | |
|---|---|---|
| | | Sucker Punch Productions LLC, Treyarch Corporation, Warner Bros Interactive Entertainment Inc to Response (non-motion) 355 (Mehta, Sonal) (Entered: 08/20/2014) |
| 08/21/2014 | 357 | ANSWER to Counterclaim, *of Activision Publishing Inc. and Blizzard Entertainment Inc. [DI 347]* filed by Plaintiff McRO Inc.(Raskin, Mark) (Entered: 08/21/2014) |
| 09/02/2014 | 358 | SUPPLEMENT to MOTION for Judgment on the Pleadings as to Unpatentability Under 35 U.S.C. Section 101 338 *NOTICE OF SUPPLEMENTAL AUTHORITY RELATING TO DEFENDANTS MOTION FOR JUDGMENT ON THE PLEADINGS* filed by Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc., Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Index Digital Media, Inc., Infinity Ward Inc., Konami Digital Entertainment Inc, LucasArts Entertainment Company LLC, Namco Bandai Games America Inc, Naughty Dog Inc, Neversoft Entertainment Inc., Obsidian Entertainment Inc, Sega of America Inc, Sony Computer Entertainment America LLC, Square Enix Inc, Sucker Punch Productions LLC, Treyarch Corporation, Warner Bros Interactive Entertainment Inc. (Attachments: # 1 Exhibit A)(Mehta, Sonal) (Entered: 09/02/2014) |
| 09/15/2014 | 359 | NOTICE of telephonic appearance Eric Berger for the September 18, 2014 hearing regarding Defendants' Request for Judicial Notice filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 09/15/2014) |
| 09/18/2014 | 360 | TRANSCRIPT ORDER as to Plaintiff McRO Inc Court Reporter. Court will contact Dominick Vitaliano at dominick.vitaliano@mishcon.com with any questions regarding this order. Transcript portion requested: Other: September 18, 2014 Rule 101 motion hearing. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Raskin, Mark) (Entered: 09/18/2014) |
| 09/18/2014 | 361 | TRANSCRIPT ORDER as to Defendants Naughty Dog Inc, Sony Computer Entertainment America LLC, Sucker Punch Productions LLC Court Reporter. Court will contact Liz Gonsalves at Egonsalves@shb.com with any questions regarding this order. Transcript portion requested: Other: 09/18/2014 / Katie Thibodeaux. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Kitano, Jamie) (Entered: 09/18/2014) |
| 09/18/2014 | 362 | TRANSCRIPT ORDER as to Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc., Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Index Digital Media, Inc., Infinity Ward Inc., LucasArts Entertainment Company LLC, Namco Bandai Games America Inc, Neversoft Entertainment Inc., Sega of America Inc, Treyarch Corporation, Warner Bros Interactive Entertainment Inc Court Reporter. Court will contact Evan N. Budaj at evan.budaj@weil.com with any questions regarding this order. Transcript portion requested: Other: 9/18/2014 Rule 101 Motion Hearing. Transcript preparation will not begin until payment has been satisfied with the court reporter/recorder. (Budaj, Evan) (Entered: 09/18/2014) |
| 09/18/2014 | 363 | MINUTES OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGSBASED ON UNPATENTABILITY UNDER 35 U.S.C. Section 101 338 held before Judge George H. Wu: The Court's Tentative Ruling is circulated |

| | | |
|---|---|---|
| | | and attached hereto. Court hears oral argument. For reasons stated on the record, Defendants' motion is TAKEN UNDER SUBMISSION. Court to issue its ruling. Court Reporter: Katie Thibideaux. (pj) (Entered: 09/19/2014) |
| 09/22/2014 | 364 | STIPULATION to Continue Post-Mediation Status Conference from September 25, 2014 to December 18, 2014 Re: Scheduling Conference,, Set/Reset Deadlines/Hearings, 118 filed by Defendants Activision Publishing, Inc., Blizzard Entertainment, Inc., Capcom USA Inc, Disney Interactive Studios Inc, Electronic Arts, Inc., Infinity Ward Inc., Konami Digital Entertainment Inc, LucasArts Entertainment Company LLC, Namco Bandai Games America Inc, Naughty Dog Inc, Neversoft Entertainment Inc., Obsidian Entertainment Inc, Sega of America Inc, Sony Computer Entertainment America LLC, Square Enix Inc, Sucker Punch Productions LLC, Treyarch Corporation, Warner Bros Interactive Entertainment Inc. (Attachments: # 1 Proposed Order)(Mehta, Sonal) (Entered: 09/22/2014) |
| 09/22/2014 | 365 | RULING ON DEFENDANTS MOTION FOR JUDGMENT ON THE PLEADINGS BASED ON UNPATENTABILITY UNDER 35 U.S.C. SECTION 101by Judge George H. Wu. For the foregoing reasons, the Court would GRANT the Motion, and hold 576 Patent claims 1, 7-9, and 13, and 278 Patent claims 1-4, 6, 9, 13, and 15-17 invalid under 35 U.S.C. Section 101. 363 , 338 (MD JS-6, Case Terminated). (pj) (Entered: 09/24/2014) |
| 09/24/2014 | 366 | REPORT ON THE DETERMINATION OF AN ACTION Regarding a Patent or Trademark. (Closing) (Attachments: # 1 COPY OF JUDGMENT) (pj) (Entered: 09/24/2014) |
| 10/09/2014 | 367 | TRANSCRIPT for proceedings held on 9/18/14 9?31 am. Court Reporter/Electronic Court Recorder: Katie Thibodeaux, CSR, RPR, CRR, phone number www.katiethibodeaux.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 10/30/2014. Redacted Transcript Deadline set for 11/9/2014. Release of Transcript Restriction set for 1/7/2015. (Thibodeaux, Katie) (Entered: 10/09/2014) |
| 10/22/2014 | 368 | NOTICE OF APPEAL to the Federal Circuit filed by Plaintiff McRO Inc. Appeal of Judgment, 365 (Appeal fee of $505 receipt number 0973-14662368 paid.) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Raskin, Mark) (Entered: 10/22/2014) |
| 10/23/2014 | | TRANSMISSION of the Notice of Appeal, Docket Sheet, Judgment and or order e-mailed to the US Court of Appeals for the Federal Circuit re: Notice of Appeal to Federal Circuit Court of Appeals 368 (mat) (Entered: 10/23/2014) |
| 10/24/2014 | 369 | REQUEST for Judgment filed by Defendant Namco Bandai Games America Inc. (Attachments: # 1 Exhibit 1)(Mehta, Sonal) (Entered: 10/24/2014) |
| 10/27/2014 | 371 | NOTIFICATION by Federal Circuit Court of Appellate Docket Number 15-1080, regarding Notice of Appeal to Federal Circuit Court of Appeals 368 as to plaintiff McRO Inc. (car) (Entered: 10/29/2014) |
| 10/28/2014 | 370 | OBJECTIONS to REQUEST for Judgment 369 filed by Plaintiff McRO Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 10/28/2014) |

| | | |
|---|---|---|
| 10/31/2014 | 372 | FINAL JUDGMENT by Judge George H. Wu, Accordingly, it is ADJUDGED that Plaintiff and Counterclaim-Defendant McRo, Inc., d.b.a. Planet Blue ("Plaintiff") takes nothing from Defendants andCounterclaim-Plaintiffs (SEE ATTACHED FOR FURTHER DETAILS) All remaining pending motions are DENIED as moot. As Defendants are the prevailing parties in this action, Defendants' costs ofcourt shall be taxed against Plaintiff. (pj) (Entered: 11/03/2014) |
| 11/05/2014 | 373 | Federal Circuit Form 22 filed by Plaintiff McRO Inc (Raskin, Mark) (Entered: 11/05/2014) |
| 11/14/2014 | 374 | APPLICATION to the Clerk to Tax Costs against Plaintiff McRO Inc filed by Defendant Namco Bandai Games America Inc. Application set for hearing on 12/4/2014 at 10:00 AM before Clerk of Court. (Attachments: # 1 Exhibit A) (Budaj, Evan) (Entered: 11/14/2014) |
| 11/26/2014 | 375 | OBJECTIONS to APPLICATION to the Clerk to Tax Costs against Plaintiff McRO Inc 374 filed by Plaintiff McRO Inc. (Raskin, Mark) (Entered: 11/26/2014) |
| 12/01/2014 | 376 | REPLY in support of APPLICATION to the Clerk to Tax Costs against Plaintiff McRO Inc 374 filed by Defendant Naughty Dog Inc. (Diab, Tony) (Entered: 12/01/2014) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/28/2015 05:28:09 | | | |
| **PACER Login:** | ml3885:3523160:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:12-cv-10322-GW-FFM End date: 1/28/2015 |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

MISHCON DE REYA NEW YORK LLP
Mark S. Raskin (*admitted Pro Hac Vice*)
Email: mark.raskin@mishcon.com
John F. Petrsoric (*admitted* Pro *Hac Vice*)
Email: john.petrsoric@mishcon.com
Eric P. Berger (*admitted Pro Hac Vice*)
Email: eric.berger@mishcon.com
750 7th Avenue, 26th Floor
New York, New York 10019
Telephone: 212.612.3270
Facsimile: 212.612.3297

RUSS AUGUST & KABAT
Marc A. Fenster, State Bar No. 181067
Email: mfenster@raklaw.com
Irene Y. Lee, State Bar No. 213625
Email: ilee@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: 310.826.7474
Facsimile: 310.826.6991

Attorneys for Plaintiff
McRO, Inc., d.b.a. Planet Blue

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| McRo, Inc., d.b.a. Planet Blue,<br><br>Plaintiff,<br><br>v.<br><br>Namco Bandai Games America, Inc., et al.<br><br>Defendants. | **CASE No. 12-cv-10322-GW (FFMx)**<br><br>**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>**Honorable George H. Wu**<br><br><u>Hearing</u>:<br>Date: April 28, 2014<br>Time: 8:30 a.m.<br>Courtroom: 10<br><br>CONSOLIDATED WITH:<br>12-cv-10323-GW (FFMx)<br>12-cv-10326-GW (FFMx)<br>12-cv-10327-GW (FFMx)<br>12-cv-10329-GW (FFMx)<br>12-cv-10331-GW (FFMx)<br>12-cv-10333-GW (FFMx)<br>12-cv-10335-GW (FFMx)<br>12-cv-10336-GW (FFMx)<br>12-cv-10337-GW (FFMx) |

MISHCON DE REYA NEW YORK LLP

the number of key frames required to accurately depict lip-synchronized speech, this process can be inaccurate when a low number of key frames is utilized because the mouth and facial movement would be unrealistic and not smooth. (*Id.*)

The typical audience is very familiar with lip and facial movements and would be highly sensitive to imperfections in the animation. The unrealistic quality produced by a low-key-frame approach would destroy the illusion the artist was attempting to create. Accurate facial animation is important to maintain the illusion. So when it came to animating a character's face, artists found that a high rate of carefully set key frames was the only way to achieve an acceptable level of quality. Early attempts at the automation of the lip-synchronization process called for the application of standard (i.e., one-size-fits-all) key frames at each phoneme time, where each "oo" and each "ah," etc., looks like every other one. For the reasons discussed above, when combined with the lack of artistic control in this one-size-fits-all approach, these early attempts resulted in animations of low and less-than-acceptable quality.

### B. The Patented Technology

To address the time-consuming nature of manual animation and overcome the unacceptable deficiencies of the one-size-fits-all key frame approach, Maury Rosenfeld devised a unique automated method and system. This method/system uses a set of rules to automate the process of lip synchronization and facial expression for animated 3-D characters and produce high-quality animation. By utilizing a set of rules (*see* Section IV.E, *infra*, for reference to the various rules and combinations that could be applied), the artist has finer control and the process produces more realistic transitions between more appropriate mouth shapes. The artist could also tailor the rules to take into account different speech patterns, emotions, emphases and other features.

The method first requires a timed transcript of the sounds the animated character is supposed to speak (a timed sequence of phonemes, or a "phonetic

MISHCON DE REYA NEW YORK LLP

7

MISHCON DE REYA NEW YORK LLP

1   sequence"). The timing of the phonetic sequence is essential to the output

2   generated by the patented method. Also required are models of the neutral

3   mouth/face position for the character and a library of other desired mouth/face

4   positions. Each mouth/face position in the library is represented mathematically as

5   a set of differences from the neutral mouth/face position. (*See* '576 Patent at 1:32-

6   36, 46-49.)

7      The rules evaluate the phoneme sequence that is input into the process and

8   determine the output by producing a stream of morph weight sets. The sequence of

9   morph weight sets instructs the animation software how to morph/blend models in

10  the library to create the desired animation. (*See* '576 Patent at 4:35-48.)

11     The method is also able to incorporate additional timed data, such as

12  emotional state data or emotemes such as "surprise," "disgust," "embarrassment,"

13  "timid smile" to affect the output sequence of morph weight sets, or create

14  additional streams. (*See* '576 Patent at 3:66-4:3.)

15     The method works as follows. An artist sets up a reference model of a

16  neutral mouth/face position and a number of other mouth/face positions in the

17  library that can either correspond to individual phonemes (*see* '576 Patent at 2:16-

18  22) or be blended together to correspond to individual phonemes (*see* '576 Patent

19  at 2:23-28). (*See also* '576 Patent at 6:46-51.) The method then takes a sequence

20  of timed phonemes (i.e., speech to be spoken by the animated character) and

21  applies a set of rules to that sequence to create a stream of morph weight sets – a

22  sequence that specifies the blending/morphing of the mouth/face models in the

23  library to produce the facial animation represented by the phoneme sequence. (*See*

24  '576 Patent at 6:51-59.) The set of rules allows for the control of the behavior and

25  movement between the neutral position and the other mouth/face positions based

26  on the sequence of phonemes, the timing of the phonemes, and various other

27  criteria. (*See* '576 Patent at 6:60-67.) The stream of morph weight sets is applied

28  to a character, controlling the facial movements and producing an animated,

1   speaking character. (*See* '576 Patent at 10:64-11:3.)

2         By using this automated approach, Mr. Rosenfeld was able to significantly

3   streamline the animation workflow and cut down the time spent creating accurate,

4   commercially acceptable computer facial animation.

5   **IV.    PROPOSED CONSTRUCTIONS**

6         **A.    "[A method for] automatically animating lip synchronization**
          **and facial expression of three-dimensional characters**
7         **comprising"**

8
| Plaintiff's Construction | Defendants' Construction |
|---|---|
9  | The preamble of Claim 1 of the '576 Patent and Claim 1 of the '278 Patent are limiting. | the claimed steps are performed from beginning to end without any human intervention to animate lip synchronization and facial expression of three-dimensional characters |
10 |  |  |
11 | A method for animating lip synchronization and facial expression of three-dimensional characters performed by a computer in response to human user input. |  |
12 |  |  |
13 | Asserted Patents/claims: '576 Patent, claim 1; '278 Patent, claim 1 | |
14 | **Construction significance**: Defendants contend that they do not practice this claim limitation because the software tools used to create the games at issue allegedly do not operate "automatically" by performing all of the steps of the claimed methods without human intervention. Defendants have not indicated which steps of the patented method/patent claims they contend require "human intervention." Therefore, Plaintiff is unable to determine the significance of Defendants' proposed construction.[4] | |

18         The parties agree that the preamble is limiting for Claim 1 of both the '576

19  and the '278 Patents. The parties disagree as to the preamble's construction.

20         Defendants wish to construe the preamble so as to import two terms into the

21  claims, first that the "claimed steps are performed from beginning to end" and

22  second, that the steps are performed "without any human intervention."

23  Defendants' construction would impart a specific order to the method claim and

24  exclude any human input from the claimed method. Putting aside Defendants'

25  transparent attempt to limit the claim by importing Defendant-created language

26  _____

27  [4]  Planet Blue includes this and subsequent statements regarding the effect of
    proposed constructions in response to Judge Wu's repeated instructions, including
28  during the February 13, 2014 case management conference, that this content be
    included in the claim construction briefs.

MISHCON DE REYA NEW YORK LLP

MISHCON DE REYA NEW YORK LLP

that appears nowhere in the intrinsic record, Defendants' proposed construction contradicts the specification and would exclude the inventor's preferred embodiment from the claims.

The specification teaches that the claimed method is performed by a computer in response to human user input. (*See, e.g.*, '576 Patent at 6:46-50 ("In operation and use, ***the user must manually set up*** default correspondence rules between all visual phoneme groups and morph weight sets. To do this, ***the user preferably specifies*** the morph weight sets which correspond to the model speaking. . . ."); 5:1-3 ("Through the use of such rules ***the user can group*** phonemes together that have a similar visual appearance into visual phonemes that function the same as one another."); and 8:36-38 ("Accordingly, using this example, if the user were to use these rules for the spoken word 'Hello', at least four morph targets and a neutral target would be required. . .").)[5]

Moreover, the Patents-in-Suit make it clear that the user's involvement in practicing the claimed method is not limited to specifying rules. For example, a user may input time aligned phonetic transcriptions ("TAPTS") as part of the claimed method. (*See* '576 Patent at 7:31-35 ("Once the rule set up is completed as described, the method of the present invention can take any number and length TAPT's ***as input***, and automatically output the corresponding morph weight set stream as seen in FIGS. 1-3.").) As part of the claimed method, a user may also input various types of timed data to affect the stream of output morph weight sets. (*See* '576 Patent Abstract ("The method utilizes a set of rules that determine the

[5] *See also* '576 Patent at 2:38-41 ("The present invention overcomes many of the deficiencies of the prior art and obtains its objectives by providing an integrated method ***embodied in computer software for use with a computer*** . . ."); 1:45-48 ("Accordingly, it is the primary object of this invention to provide a method for automatically animating lip synchronization and facial expression of three dimensional characters, which is integrated with ***computer*** means . . ."); 3:16-18 ("The method and apparatuses herein described are operably integrated with ***computer*** software and hardware.").

10

systems output comprising a stream or streams of morph weight sets when a sequence of timed phonemes or other timed data is encountered.  Other timed data, such as pitch, amplitude, noise amounts, or emotional state data or emotemes such as 'surprise,' 'disgust,' 'embarrassment,' 'timid smile,' or the like, may be inputted to affect the output stream of morph weight sets.").)  That the claimed method "can take . . . TAPT's as input," and timed data "may be inputted" makes clear the existence of human user input.

Consequently, the Defendants' proposed construction, which would seemingly exclude user input, is improper because it contradicts what is expressly and repeatedly taught in the specification.  The specification makes it abundantly clear that: (i) a human user may set up and specify rules (*see* '576 Patent at 6:46-50), (ii) a user may inputs time aligned phonetic transcriptions (*see* '576 Patent at 7:31-35), and (iii) a user may input various types of timed data (*see* '576 Patent abstract).  Defendants' proposed construction cannot be reconciled with the teaching of the specification.  *See On-Line Techs.*, 386 F.3d at 1138 (An interpretation that excludes an embodiment "is rarely, if ever, correct.").

Defendants also seek to construe the preamble to require that "the claimed steps are performed from beginning to end," implying a specific ordering of the claimed method steps.  Defendants presumably seek to include such an extraneous limitation to later argue that their practice of the claimed method is somehow non-infringing because while they perform the steps of the method, they do so in a different order.  But nothing in the claims or the specification assigns the steps of the claimed method a specific order, or requires that those steps be performed from a Defendant-created, undefined "beginning" to a Defendant-created, undefined "end."  To the contrary, the steps of a method claim need only be performed – not necessarily in the recited order, and not necessarily from a "beginning" to an "end."  *See Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323, 1342-43 (Fed. Cir. 2000) ("Unless the steps of a method

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

MISHCON DE REYA NEW YORK LLP

1  proposal appears to be nothing more than an improper attempt to re-write, limit

2  and confuse what are plain and easily understood claim terms.

3      **E.**    **"first set of rules"**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| A group of instructions | A group of logic statements that are embodied in a computer software program and used together |
| Asserted Patents/claims: '576 Patent, claims 1, 13; '278 Patent, claims 1, 2 | |
| **Construction significance**: Defendants contend that they do not practice this claim limitation because the use of software tools to create the games at issue allegedly do not obtain a "first set of rules" because the software tools allegedly do not have a collection of rules that are organized together and meant to be used together in performing the claimed method. Defendants have not explained why this claim limitation is allegedly not met or why the software tools allegedly do not have a collection of rules that are organized together and meant to be used together in performing the claimed method. Based on Defendants' position, Plaintiff is unable to determine the significance of Defendants' proposed construction, as it would appear to Plaintiff that Defendants' non-infringement position is not dependent upon the construction of this claim term. | |

    A set of rules is, quite simply, a set of instructions. The patents use the

term "rules" to describe the instructions that will define an output morph weight

set stream based on the incoming sequence and timing of phonemes:

> The method preferably comprises a set of rules that
> determine what the output morph weight set steam will
> be when any sequence of phonemes and their associated
> times is encountered.

('576 Patent at 4:36-39; *see also id.*, 11:30-32 ("obtaining a first set of rules that

define output morph weight set stream as a function of phoneme sequence and

time of said phoneme sequence.")

    These "instructions" have two parts: (i) the input criteria (e.g., does this

particular instruction apply here?), and (ii) functions that will create the output as

a result of the input criteria (e.g., if the instruction applies, then apply it to create

an output):

> Preferably, each rule comprises two parts, the rule's
> criteria and the rule's function. Each sub-sequence of
> time aligned phonetic transcription (TAPT) or other
> timed data such as pitch, amplitude, noise amount or the

MISHCON DE REYA NEW YORK LLP

1  like, is checked against a rule's criteria to see if that rule
2  is applicable. If so, the rule's function is applied to
3  generate the output. The primary function of the rules is
   to determined [sic] 1) the appropriate morph weight set
4  correspondence with each TAPT sub-sequence; and 2)
5  the time parameters of the morph weight set transitions
   between the representation of the prior TAPT sub-
6  sequence or other timed data, and the current one.

7  ('576 Patent at 4:50-61.)

8       The specification is further replete with examples of how the output (the

9  morph weight set stream) is instructed/defined based on the input (phonemes in

10 the phoneme sequence):

| Exemplary Rules | '576 Patent |
|---|---|
| Manually Configured Correspondence Rules | 7:59 – 8:8; 9:30–35. |
| Timing Rules | 8:9–20; 8:25–35; 10:14–45. |
| Context Rules | 8:21–24; 9:66 – 10:13. |
| Randomness Rules | 9:36–48. |
| Emotional Rules | 10:48–63. |

20      The specification illustrates numerous rules, used in varying configurations.
21 ('576 Patent, Fig. 1A; 5:9-45; 9:23-26.)  These rules, as clearly understood from
22 the entirety of the specification and the requirements of the asserted claims, define
23 the output of the morph weight set stream from the instructions / rules of the
24 Patents-in-Suit.  These "instructions" specify to the program generating the morph
25 weight set stream how the morph weight set stream should be assembled based on
26 the criteria of the phonetic sequence that is encountered.  There is therefore no
27 need to limit the construction of "rules" beyond the concept of "instructions."
28      Defendants, however, seek to import numerous limitations to this simple

MISHCON DE REYA NEW YORK LLP

MISHCON DE REYA NEW YORK LLP

1    concept, adding a requirement that "logic statements" are "embodied in a

2    computer software program" and are "used together."  While "instructions" and

3    "logic statements" are not fundamentally different definitions,[9]  Defendants'

4    attempt to include further limitations is improper.  Mr. Rosenfeld did not show an

5    "intent to deviate from the ordinary and accustomed meaning" of "rules" and

6    therefore has not made the clear disavowal of claim scope that would warrant

7    importing these limitations.  *See Thorner*, 669 F.3d at 1366.  Defendants'

8    additional limitations are, at best, found in unrelated aspects of the specification,

9    and, at worst, directly contradicted by the specification and would exclude the

10   preferred embodiment.  The Court should not interpret "rules" in a "way that

11   excludes embodiments disclosed in the specification."  *Oatey*, 514 F.3d at 1276;

12   *see also On-Line Techs.*, 386 F.3d at 1138.

13       More particularly, Defendants' proposed limitation "embodied in a

14   computer software program" appears to have been cherry-picked from column 2

15   (lines 38-44) and column 8 (lines 52-54).  The specification's reference to a

16   computer software program refers generally to the operation of the invention ***as a***

17   ***whole***, not to describe the manner in which "rules" are incorporated into the

18   method.  The word "rule" does not even appear in these sections of the

19   specification.  As discussed above with respect to the preamble of the asserted

20   independent claims, one aspect of the artistic control afforded by the invention is

21   the manual input of the correspondence rules.  (*See* '576 Patent, 6:46-48 ("In

22   operation and use, the user must manually set up default correspondence rules

23   between all visual phoneme groups and morph weight sets.").)  Defendants'

24   _____

25   [9]  While the substantially similar and basic concepts applicable to "rules,"
     "instructions," and "logic statements" might be completely understood by a lay

26   jury, it would appear that construing "rules" or "instructions" as "logic statements"
     would be an "exercise in redundancy," *U.S. Surgical Corp.,* 103 F.3d at 1568, and

27   Planet Blue would further urge the Court to find that no construction is necessary.
     "Rules" (and "instructions") are common, easily understood terms.  There is no

28   need to construe commonly understood terms for constructions sake alone.

                                              23

importation of "embodied in a computer software program" into the claim makes it unclear as to whether, after rules information is input and likely stored in some form of data file, the rules information has taken the form of being "embodied in a computer software program." If the answer is in the negative (or possibly in the negative), then the Defendants' proposed limitation contradicts the specification and the preferred embodiment and must be rejected. *See Oatey*, 514 F.3d at 1276; *see also On-Line Techs.*, 386 F.3d at 1138. In any event, Defendants' proposed construction, importing "embodied in a computer software program" into the claims, is unnecessarily limiting and imparts confusion, especially where the specification makes it clear that user-input is expected.

Similarly, Defendant's proposed limitation of "used together" must be rejected. Defendants appear to have created this phrase from whole cloth and then imported it into the claim in an attempt to avoid infringement. The phrase "used together" is not found in the intrinsic record and Planet Blue can discern no credible reason for its inclusion in the construction of the term "rules." Nothing in the claims or specification indicates that the recited "first set of rules" must necessarily be "used together" (whatever the Defendants intend "used together" to mean). A "first set of rules" is plain on its face and self-explanatory. Defendants' attempt to import the phrase "used together" (and "embodied in a computer software program") into this claim term is unhelpful and confuses the otherwise plain claim language.

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

**A3066**

DVD: Planet Blue's Claim Construction Tutorial

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-10322-GW(FFMx) | Date | April 29, 2014 |
|---|---|---|---|

| Title | *McRO, Inc., v. Namco Bandai Games America, Inc.* |
|---|---|

Present: The Honorable **GEORGE H. WU, UNITED STATES DISTRICT JUDGE**

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| John F. Petrsoric | Sonal N. Mehta |
| Eric P. Berger | Evan N. Budaj |
| Robert A. Whitman | Wendy J. Ray |
| Vincent Filardo, Jr. - by telephone | Stephen Rubin |
| | Nick Saros |
| | Benjamin L. Singer |
| | Andrew D. Tsu |
| | Beth A. Larigan |

**PROCEEDINGS:     MARKMAN HEARING**

The Court's Tentative Rulings on *Markman* Hearing is circulated and attached hereto.  Court hears oral argument.  For reasons stated on the record, the *Markman* Hearing is TAKEN UNDER SUBMISSION.  Court to issue its final ruling.  A Status Conference is set for June 30, 2014 at 8:30 a.m.  Parties will file proposed dates by June 26, 2014.

|  | 2 | : | 55 |
|---|---|---|---|
| Initials of Preparer | JG | | |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 12-10322-GW(FFMx) | Date | May 1, 2014 |
|---|---|---|---|
| Title | *McRO, Inc., v. Namco Banda Games America, Inc.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):**      **RULINGS ON CLAIM CONSTRUCTION**

Attached hereto is the Court's Final Ruling on Claim Construction.

                               :

Initials of Preparer    JG

_**McRO, Inc., d.b.a. Planet Blue v. Namco Bandai Games America, Inc.**_, Case No. CV 12-10322-GW (FFMx) (LEAD TRACK 1 CONSOLIDATED CASE); Rulings on Claim Construction

## I. Background

The Court is presiding over two sets of consolidated patent infringement cases filed by Plaintiff McRO, Inc., d.b.a. Planet Blue ("Plaintiff" or "Planet Blue"): the "Track 1" cases, consolidated under Case No. CV 12-10322,[1] and the "Track 2" cases, consolidated under Case No. CV 13-1872.[2] The cases all involve Plaintiff's allegation that Defendants directly or indirectly infringed two patents for automatically animating the lip synchronization and facial expressions of 3D characters. The cases are proceeding on different tracks due to the filing or transfer dates of the cases, although various later-filed cases have been consolidated into Track 1 due to corporate or counsel relationships.

These _Markman_ proceedings are being held in Track 1, CV 12-10322. The parties filed their Joint Claim Construction Statement on February 6, 2014. Docket No. 220. Plaintiff filed its opening claim construction brief ("Plaintiff's Brief") on February 18, 2014. Docket No. 230. Defendants filed their responsive claim construction brief ("Defendants' Brief") on March 14, 2014. Docket No. 246. Plaintiff filed its reply brief ("Reply") on March 28, 2014. Docket No. 254. Each side lodged helpful technology tutorials on April 16, 2014. Docket Nos. 268, 270.

At issue are United States Patent Nos. 6,307,576 ("'576 Patent"), issued October 23, 2001, and 6,611,278 ("'278 Patent"), issued August 26, 2003, both to Maury Rosenfeld, and both titled "Method for Automatically Animating Lip Synchronization and Facial Expression of Animated Characters." The '278 Patent resulted from a continuation of the application that resulted in the '576 Patent, meaning the patents share the same disclosure. _See PowerOasis, Inc. v. T-Mobile USA, Inc._, 522 F.3d 1299, 1304 n.3 (Fed. Cir. 2008).

The patents explain that prior methods of animating lip synchronization and facial expressions were laborious and uneconomical. The patents purport to solve that problem using "weighted morph targets and time aligned phonetic transcriptions of recorded text, and other time aligned data." '576 Patent 1:14-31, 2:64-3:12. The patents explain that in the relevant art,

---

[1] The current Track 1 cases are: _McRO, Inc. v. Namco Bandai Games America, Inc._, CV 12-10322; _McRO, Inc. v. Konami Digital Entertainment, Inc._, CV 12-10323; _McRO, Inc. v. Sega of America, Inc._, CV 12-10327; _McRO, Inc. v. Electronic Arts, Inc._, CV 12-10329; _McRO, Inc. v. Obsidian Entertainment, Inc._, CV 12-10331; _McRO, Inc. v. Disney Interactive Studios, Inc._, CV 12-10333; _McRO, Inc. v. Naughty Dog, Inc._, CV 12-10335; _McRO, Inc. v. Capcom USA, Inc._, CV 12-10337; _McRO, Inc. v. Square Enix, Inc._, CV 12-10338; _McRO, Inc. v. Insomniac Games, Inc._, CV 12-10340; _McRO, Inc. v. Neversoft Entertainment, Inc._, CV 12-10341; _McRO, Inc. v. Treyarch Corporation_, CV 12-10342; _McRO, Inc. v. Atlus U.S.A., et al._, SACV 13-1870; _McRO, Inc. v. Sucker Punch Productions, LLC_, CV 14-332; _McRO, Inc. v. Infinity Ward, Inc._, CV 14-352; _McRO, Inc. v. LucasArts Entertainment Company LLC_, CV 14-358; _McRO, Inc. v. Sony Computer Entertainment America, LLC, et al._, CV 14-383; _McRO, Inc. v. Warner Bros. Interactive Entertainment Inc._, CV 14-417. The defendants in the Track 1 cases are referred to collectively as "Defendants."

[2] The current Track 2 cases are: _McRO, Inc. v. Tecmo Koei Corporation. et. al._, CV 13-1872, _McRO, Inc. v. Valve Corporation_, CV 13-1874; _McRO, Inc. v. Codemasters USA Group, Inc. et al_, CV 14-389; _McRO, Inc. v. Codemasters, Inc., et al_, CV 14-439.

A4156

"phonemes" are defined as the smallest unit of speech, and correspond to a single sound. '576 Patent 1:34-36. A sound recording can be transcribed into a "time aligned phonetic transcription," in which the timing of each phoneme is recorded. '576 Patent 1:32-34. Such transcriptions can be created by hand, or by automatic speech recognition programs. '576 Patent 1:39-43.

The patents explain that the prior art practice for 3-D computer generated speech animation was by manual techniques using a "morph target" approach. '576 Patent 1:44-47. That approach uses a reference model of a neutral mouth position in conjunction with "morph targets," which are models of the mouth in non-neutral positions corresponding to different phonemes. '576 Patent 1:46-50. The reference model and morph targets all share the same "topology" of the mouth, defined by the same number and placement of "vertices" that designate specific points on the mouth. For example, vertex "n" on the neutral mouth and all of the morph targets may represent the left corner of the mouth. '576 Patent 1:51-54.

The "deltas," or changes, of each vertex on each morph target relative to the corresponding vertex on the neutral are computed as a vector to produce an individual "delta set" for each morph target. '576 Patent 1:58-62. From the neutral model, the animator need not move the mouth position all the way to a morph target. Instead, the animator can apply a value between 0 and 1, called the "morph weight," to a delta set to move the mouth just a percentage of the way to the corresponding morph target. '576 Patent 1:63-2:1. For example, if the sound (morph target) is "oh," and the morph weight is 0.5, the mouth only moves halfway between the neutral position and the "oh" morph target. '576 Patent 2:16-22. It is also possible to blend the morph targets, for example, 0.3 "oh" and 0.7 "ee, " resulting in a mouth position exhibiting a combination of the "oh" and "ee" sound characteristics. '576 Patent 2:23-28.

According to the patents, applying the appropriate morph weights in the prior art was usually done using a "keyframe" approach. In the keyframe approach, an artist sets the morph weights at certain important times, and a computer program then interpolates each of the channels at each frame between the keyframes. '576 Patent 2:29-37. The patents state that this method requires the artist to manually set a large number of keyframes, which is tedious, time consuming, and inaccurate. *Id.* Therefore, a primary object of the invention is to provide "an extremely rapid and cost effective means to automatically create lip synchronization and facial expression in three dimensional animated characters." '576 Patent 2:45-54.

The invention "utilizes a set of rules that determine the system[']s output comprising a stream or streams of morph weight sets when a sequence of timed phonemes or other timed data is encountered." '576 Patent 3:3-7. The invention includes "configuring a set of default correspondence rules between a plurality of visual phoneme groups and a plurality of morph weight sets; and specifying a plurality of morph weight set transition rules for specifying durational data for the generation of transitory curves between the plurality of morph weight sets, allowing for the production of a stream of specified morph weight sets to be processed by a computer animation system . . . ." '576 Patent 3:23-32.

## II. **Legal Standard**

Claim construction is an issue of law "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). "Claim construction is a legal statement of the scope of the patent right; it does not turn on witness credibility, but on the content of the patent documents." *Lighting Ballast Control LLC v. Philips Electronics N. Am. Corp.*, 744 F. 3d. 1272, 1284 (Fed. Cir. 2014). Claim construction is generally the process of articulating the

2

"ordinary and customary meaning" that the words of the claim would have had "to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303*, *1312-13 (Fed. Cir. 2005) (internal quotations and citations omitted). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent." *Id.* at 1313.

Claim construction begins with an analysis of the claim language itself. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). That is because the claims define the scope of the claimed invention. *Phillips*, 415 F.3d at 1312. Claims "must be read in view of the specification," which is "always highly relevant to the claim construction analysis." *Phillips*, 415 F.3d at 1315 (internal quotations omitted). "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* While claims are read in light of the specification, limitations from the specification must not be read into the claims. *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998). "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Phillips*, 415 F.3d at 1323.

The prosecution history is also part of the intrinsic evidence consulted. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317 (citations omitted). "Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent." *Id.* "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

In some cases, claim terms will not be given their ordinary meaning because the specification defines the term to mean something else. *Novartis Pharms. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1334 (Fed. Cir. 2004); *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003). For the specification to provide a non-ordinary definition for a term, it must set out its definition in a manner sufficient to provide notice of the meaning to a person of ordinary skill in the art. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Where the patent itself does not make clear the meaning of a claim term, courts may look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including the prosecution history and "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (internal quotations omitted). "The court may indeed benefit from explanation of the technology and the instruction of treatises, but the elaboration of experts or tutorial explanation of technical subject matter does not convert patent claim construction into a question of fact." *Lighting Ballast*, 744 F.3d at 1284. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. "In such circumstances general purpose dictionaries may be helpful." *Id.*

## III. **Analysis**

**A. "[A method for] automatically animating lip synchronization and facial expression of three-dimensional characters comprising" ('576 Patent, claim 1; '278 Patent, claim 1)**

3

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| A method for animating lip synchronization and facial expression of three-dimensional characters performed by a computer in response to human user input. | the claimed steps are performed from beginning to end without any human intervention to animate lip synchronization and facial expression of three-dimensional characters |

Defendants contend that this dispute is important because none of their animation methods involve performing all of the steps of the claimed methods from beginning to end without human intervention. Defs.' Br. at 5. Plaintiff responds that Defendants have not indicated which steps of their software tools require human intervention, so Plaintiff cannot assess the significance of the dispute. Pl.'s Br. at 9. Defendants also contend that rejecting their construction will support their invalidity position by making it more difficult for Plaintiff to distinguish the asserted prior art. Defs.' Br. at 5 n.7.

The disputed phrase is the preamble to claim 1 of both patents. A claim preamble is not always a claim limitation. *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). The parties here agree that the preamble is a claim limitation. Pl.'s Br. at 9-10, Defs.' Br. at 5-6. The relevant claims are reproduced below with the disputed term in bold:

*'576 Patent claim 1*:

**A method for automatically animating lip synchronization and facial expression of three-dimensional characters** comprising:

obtaining a first set of rules that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence;

obtaining a timed data file of phonemes having a plurality of sub-sequences;

generating an intermediate stream of output morph weight sets and a plurality of transition parameters between two adjacent morph weight sets by evaluating said plurality of sub-sequences against said first set of rules;

generating a final stream of output morph weight sets at a desired frame rate from said intermediate stream of output morph weight sets and said plurality of transition parameters;

and applying said final stream of output morph weight sets to a sequence of animated characters to produce lip synchronization and facial expression control of said animated characters.

*'278 Patent claim 1:*

**A method for automatically animating lip synchronization and facial expression of three-dimensional characters** comprising:

obtaining a first set of rules that defines a morph weight set stream as a function of phoneme sequence and times associated with said phoneme sequence;

obtaining a plurality of sub-sequences of timed phonemes corresponding to a desired audio sequence for said three-dimensional characters;

4

generating an output morph weight set stream by applying said first set of rules to each sub-sequence of said plurality of sub-sequences of timed phonemes;

and applying said output morph weight set stream to an input sequence of animated characters to generate an output sequence of animated characters with lip and facial expression synchronized to said audio sequence.

Plaintiff characterizes Defendants' proposed construction as imposing two requirements: first, that all of the steps of the method be performed without any human intervention, and second, that the steps be performed in the order recited ("from beginning to end"). Pl.'s Br. at 9. Defendants seem to agree with that characterization, and defend both the "no-human" and "in-order" requirements. Defs.' Br. at 6-8.

Plaintiff argues that a "no-human" construction would contradict the specification and exclude a preferred embodiment because the specification teaches that "the user must manually set up default correspondence rules between all visual phoneme groups and morph weight sets. To do this, the user preferably specifies the morph weight sets which correspond to the model speaking . . . ." Pl.'s Br. at 10 (quoting '576 Patent 6:46-50).

Plaintiff points to other portions of the specification which also show the user involved in selecting and using rules: "Through the use of such rules the user can group phonemes together that have a similar visual appearance . . . ." '576 Patent 5:1-3. "[I]f the user were to use these rules for the spoken word 'Hello', at least four morph targets and a neutral target would be required." '576 Patent 8:36-38. Those portions of the specification do, in fact, show user involvement. Plaintiff also highlights the portions of Figure 2 (at right) showing the steps performed by the user to allow the computer processing of the morph weight sets. Reply at 3. Absent limiting language in the claim, a construction that excludes a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).



FIG. 2

Plaintiff also argues that the portions of the specification that describe inputting data – both the basic time aligned phonetic transcriptions and other timed audio and emotional state data – show user involvement. Pl.'s Br. at 10-12 (citing '576 Patent 7:31-35; Abstract). These portions of the specification do not expressly teach user involvement. But the specification also does not teach that they are performed automatically – in contrast to the specific teaching that other steps of the method are performed automatically – and nowhere excludes the possibility of user involvement in these steps.

Defendants argue that the term "automatically" modifies the verb "animating," and the whole claim is one for automatic animation, as shown by the fact that the claimed steps "comprise" the automatic method. Defs.' Br. at 6. Defendants also emphasize the patents' teaching of the

5

importance of the automatic nature of the invention in overcoming the prior art's "laborious and lengthy protocols." Defs.' Br. at 6. Defendants also cite the contemporaneous IBM Dictionary of Computing, which defines the term "automatic" as "[p]ertaining to a process or device that, under specified conditions, functions without intervention by a human operator." IBM Dictionary of Computing 42 (10th ed. 1994), Decl. of Sonal N. Mehta in Supp. of Defs.' Br. ("Mehta Decl."), Ex. A.

But the claimed process is for automatically animating, not automatically obtaining rules. The laborious and expensive process that the patents avoid is manually setting keyframes. There is no indication that automating the steps of obtaining rules or obtaining time aligned phonetic transcriptions was important to, or even part of, the invention. And the benefits of automatic lip synchronization are obtained whether or not the user manually directs the computer to obtain a "timed data file of phonemes" after the computer has obtained the first set of rules.

Defendants argue that the specification's teaching that the user must set up the default correspondence rules does not support Plaintiff's construction because the claimed step is "obtaining" the rules, not "setting them up." Defs.' Br. at 7. Defendants argue that the patent teaches that "once the rule set up is completed as described, the method of the present invention can take any number and length TAPT's as input, and automatically output the corresponding morph weight set stream . . . ." Defs.' Br. at 7 (quoting '576 Patent 7:31-35). But this does not suggest that "obtaining" the rule set is invariably an automatic process.

As to Defendants' argument that the specification distinguished the prior art as non-automatic: the specification teaches that the prior art required the user to manually set the morph weights at certain important times ("keyframes") and that the computer then interpolated between those keyframes, and that by contrast, the invention automates the setting of morph weights at the keyframes. '576 Patent 2:29-37; 7:10-18. In the context of the prior art, a system that automatically sets the morph weights at the keyframes could be described as "automatic" even if human interaction is required at other steps of the process. The specification does not teach or suggest that to be "automatic," all of the claimed steps must proceed without human interaction.

Regarding the second question, whether the steps must be performed in the order they appear in the claim, the general rule is that "[u]nless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift Express*, 256 F.3d 1323, 1342 (Fed. Cir. 2001). Steps are construed to require performance in the recited order when it is necessary as a matter of logic or grammar, or if the specification requires that construction. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369-70 (Fed. Cir. 2003).

It appears that certain steps of the claims have a necessary order. In claim 1 of the '576 Patent, the intermediate stream must come before the final stream, and the final stream must exist before it can be applied. Likewise, in claim 1 of the '278 Patent, the output morph weight set stream must exist before it can be applied to an input sequence. But Defendants acknowledge that "the order of the first two 'obtaining' steps could be switched without making the claim nonsensical," Defs.' Br. at 8, so it is unclear why Defendants sought a construction that prevents their being switched. And Defendants acknowledged at the *Markman* hearing that they would agree to a construction that allowed for the first two steps to be switched. Further, Plaintiff agreed at the hearing that steps 3, 4, and 5 of '576 Patent claim 1 occur in that order. The Court will therefore construe the claim to require that in-order performance, and will specify the analogous order for claim 1 of the '278 Patent. *See Altiris*, 318 F.3d at 1369.

6

Finally, Plaintiff's addition to the claims – "performed by a computer in response to human user input" – is not warranted. While the specification teaches human involvement in some circumstances, and while the Court should not construe claims in a way that excludes preferred embodiments, neither should the Court read limitations from the specification into the claims. *Phillips*, 415 F.3d at 1323 (quoting *Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification.")).

Therefore, the Court rejects the parties' "human"-related requirements, and construes the order of steps as follows:

- In claim 1 of the '576 Patent, steps 1 and 2 (the "obtaining" steps) can be performed in any order. After they have been performed, steps 3, 4, and 5 ("generating an intermediate stream . . .", "generating a final stream . . .", and "applying said final stream") occur in that order (3, then 4, then 5), although other steps may occur between those steps, and the entire process may be repeated.

- In claim 1 of the '278 Patent, steps 1 and 2 (the "obtaining" steps) can be performed in any order. After they have been performed, steps 3 and 4 ("generating an output morph weight set stream . . ." and "applying said output morph weight set stream") occur in that order (3, then 4) although other steps may occur between those steps, and the entire process may be repeated.

### B. "morph weight set[s]" ('576 Patent, claim 1; '278 Patent, claims 1, 17)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| A set of values, one for each delta set that, when applied, transform the neutral model to some desired state<br><br>In the alternative:<br>A set of values, one for each delta set that, when applied, transform the neutral model to some desired state, wherein each delta set is the mathematical representation of the difference between the neutral model and another model | a set of values, one for each delta set, that, when applied, transform the neutral model to some desired state such as speaking the "oo" sound or the "th" sound, where there is one delta set for each morph target comprising the vectors that define the position change for each vertex in the morph target relative to the position of the same vertex in the neutral model |

Plaintiff contends that it is unable to determine the significance of Defendants' proposed construction because it does not understand how Defendants' noninfringement position depends upon their construction. Pl.'s Br. at 12. Defendants contend that if their construction is adopted, the accused tools do not infringe because they do not (1) use "delta sets," (2) assign morph weights to each delta set, or (3) use the position of the vertices on the face model in their calculations to transform the neutral model to a desired state. Defs.' Br. at 9.

The relevant claims are reproduced below with the disputed term in bold:

7

*'576 Patent claim 1:*

A method for automatically animating lip synchronization and facial expression of three-dimensional characters comprising:

obtaining a first set of rules that define output **morph weight set** stream as a function of phoneme sequence and time of said phoneme sequence;

obtaining a timed data file of phonemes having a plurality of sub-sequences;

generating an intermediate stream of output **morph weight sets** and a plurality of transition parameters between two adjacent **morph weight sets** by evaluating said plurality of sub-sequences against said first set of rules;

generating a final stream of output **morph weight sets** at a desired frame rate from said intermediate stream of output **morph weight sets** and said plurality of transition parameters;

and applying said final stream of output **morph weight sets** to a sequence of animated characters to produce lip synchronization and facial expression control of said animated characters.

*'278 Patent claim 1:*

A method for automatically animating lip synchronization and facial expression of three-dimensional characters comprising:

obtaining a first set of rules that defines a **morph weight set** stream as a function of phoneme sequence and times associated with said phoneme sequence;

obtaining a plurality of sub-sequences of timed phonemes corresponding to a desired audio sequence for said three-dimensional characters;

generating an output **morph weight set** stream by applying said first set of rules to each sub-sequence of said plurality of sub-sequences of timed phonemes;

and applying said output **morph weight set** stream to an input sequence of animated characters to generate an output sequence of animated characters with lip and facial expression synchronized to said audio sequence.

*'278 Patent claim 17:*

The method of claim 16, further comprising:

generating said output **morph weight set** stream by interpolating between **morph weight sets** at said transition start time and said transition end time according to a desired frame rate of said output sequence of animated characters.

The parties' dispute narrowed considerably in the process of briefing. The parties agree that the patents set forth express definitions for the terms "morph weight set," "delta set," and "morph target." Those definitions are:

> As used herein, a "morph weight set" is a set of values, one for each delta set, that, when applied as described, transform the neutral model to some desired state, such as speaking the "oo" sound or the "th" sound. Preferably, one model is designated as the anchor model, which the deltas are computed in reference to.

'576 Patent 4:39-44.

8

A4163

The deltas of each vertex on each morph target relative to the neutral are computed as a vector from each vertex n on the reference to each vertex n on each morph target. These are called the delta sets. There is one delta set for each morph target. '576 Patent 1:58-62.

The current practice for three dimensional computer generated speech animation is by manual techniques commonly using a "morph target" approach. In this practice a reference model of a neutral mouth position, and several other mouth positions, each corresponding to a different phoneme or set of phonemes is used. These models are called "morph targets." '576 Patent 1:45-51.

Defendants do not insist on the inclusion of the exemplary language they initially proposed ("such as speaking the 'oo' sound or the 'th' sound") in the construction. Defs.' Br. at 12. Plaintiff suggests that the Court need not delve into the construction of all three terms, but acknowledges that if the Court does so, "morph weight set" becomes: "A set of values, one for each delta set, that, when applied, transform the neutral model to some desired state, wherein each delta set is the vector from each vertex on the neutral (reference) model to each vertex on a model of another mouth position." Pl.'s Br. at 15.

Plaintiff argues that this construction can be "simplified" to: "A set of values, one for each delta set, that, when applied, transform the neutral model to some desired state, wherein each delta set is the mathematical representation of the difference between the neutral model and another model." Pl.'s Br. at 15. But the Court agrees with Defendants that this is not an innocuous "simplification," but rather, a significant generalization. Defs.' Br. at 11. As quoted above, the specification teaches that the delta sets are comprised of vectors from each vertex on the neutral model to each corresponding vertex on the morph target. Plaintiff provides no reason to deviate from the specification's express definition. "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.

Plaintiff argues that terms like "vector" and "vertex" will be hard for the jury to understand. But while claim constructions should not be complex for complexity's sake, there is no requirement it sacrifice accuracy for immediately accessible lay understanding. Instead, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Here, the level of detail in Defendants' language is necessary to resolve disputed issues of claim scope. Any additional explanation necessary for a layman to understand the technology will be ably provided by the parties at trial.

Defendants propose correcting Plaintiff's "unsimplified" construction to make "vector(s)" plural, since the specification teaches that the delta set is the deltas [plural] of each vector." Defs.' Br. at 12. The Court adopts Defendants' refined proposal, which is: "A set of values, one for each delta set, that, when applied, transform the neutral model to some desired state, wherein each delta set is the set of vectors from each vertex on the neutral (reference) model to each vertex on a model of another mouth position." Defs.' Br. at 12.

9

### C.  *"an intermediate stream of output morph weight sets"* ('576 Patent, claim 1)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No further construction is required | A series of morph weight sets, having morph weight sets only at transition start and end times |

Plaintiff contends that it does not understand the significance of Defendants' proposed construction, because while Defendants contend that their software tools do not generate morph sets or transition parameters between morph weigh sets, Defendants have not explained why that is the case.  Pl.'s Br. at 15.  Defendants contend that their construction is significant because (1) the accused Annosoft SDK does not have "morph weight sets" or "a series of morph weight sets" at all, instead operating only on phonemes; (2) any "intermediate stream" in the accused FaceFX that has "morph weight sets" does not have them only at transition start and end times; (3) FaceFX does not output a series of discrete items, and instead uses "a continuous [H]ermite curve."  Defs.' Br. at 12.

The relevant claim is reproduced below with the disputed term in bold:

*'576 Patent claim 1:*
1. A method for automatically animating lip synchronization and facial expression of three-dimensional characters comprising:

obtaining a first set of rules that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence;

obtaining a timed data file of phonemes having a plurality of sub-sequences;

generating **an intermediate stream of output morph weight sets** and a plurality of transition parameters between two adjacent morph weight sets by evaluating said plurality of sub-sequences against said first set of rules;

generating a final stream of output morph weight sets at a desired frame rate from said intermediate stream of output morph weight sets and said plurality of transition parameters;

and applying said final stream of output morph weight sets to a sequence of animated characters to produce lip synchronization and facial expression control of said animated characters.

Plaintiff argues that "morph weight sets" has already been construed, and the additional terms, "intermediate," "final," and "output" can easily be understood by a jury.  Pl.'s Br. at 15.  Plaintiff argues that nothing in the claim or the specification requires the intermediate stream of output morph weight sets to consist only of morph weight sets at transition start and end times.  Pl.'s Br. at 16.  The parties agree that the specification teaches that the initial morph weight sets act as keyframes that mark transitionary points.  '576 Patent 9:10-11, Pl.'s Br. at 16, Defs.' Br. at 14.  But Plaintiff argues that the specification teaches that a "morph weight set may be evaluated [i.e., determined for a time period for which there is not yet a morph weight set] at any time by interpolating between these keyframes, using conventional methods."  Pl.'s Br. at 16 (quoting '576 Patent 7:13-15).  Thus, Plaintiff argues that an intermediate stream of output morph weight sets

10

could include morph weights that have been interpolated between what were initially transition start and end points. Pl.'s Br. at 16.

Defendants argue that the specification teaches that the intermediate morph weight set stream is the morph weight set stream prior to interpolation, meaning that it has morph weight sets only at transition start and end times. Defs.' Br. at 13. However, the portions of the specification Defendants cite do not use the term "intermediate stream or morph weigh sets," but instead discuss "an intermediate **file** of transition keyframes using target weights and transition rules . . . before interpolation" ('576 Patent 5:65-6:1) and "an **appropriate** morph weight stream" that is "uninterpolated" having "entries only at transition start and end time[s]." '576 Patent 7:10-12.

Defendants clarified at the *Markman* hearing that they can do without a construction that discusses transition start and end times, so long as it is made clear that the intermediate stream consists of morph weight sets for keyframes, and that the final stream is generated by interpolating between the morph weight sets at those keyframes using the transition parameters. Plaintiff expressed concern that Defendants sought to exclude from the scope of the claim intermediate streams that contain frames other than those Defendants might contend are keyframes.

Defendants presented the limiting case, asking the Court to decide whether "an intermediate stream of output morph weight sets" can include a stream of output morph weight sets that are continuously generated at **every** frame rather than interpolated between keyframes. Plaintiff responded by pointing to column seven of the specification, which includes the following passage:

> It is seen that through the use of these rules, an appropriate morph weight stream is produced. The uninterpolated morph weight stream has entries only at transition start and end time, however. These act as keyframes. A morph weight set may be evaluated at any time by interpolating between these keyframes, using conventional methods. This is how the output stream is calculated each desired time frame. For example, for television productions, the necessary resolution is 30 evaluations per second.

> The post processing rules may be applied either before or after the above described interpolation step, or both. Some rules may apply only to keyframes before interpolation, some to interpolated data. If applied before the interpolation step, this affects the keyframes. If applied after, it effects the interpolated data. Post processing can use the morph weight sets calculated by the default and secondary rules. Post processing rules can use the morph weigh sets or sequences as in box 44 of FIG. 1, calculated by the default and secondary rules. Post processing rules can modify the individual members of the morph weight sets previously generated.

'576 Patent 7:10-30. This portion of the specification was also the source for Defendants' construction. Plaintiff emphasizes the portions of the passage stating that the post processing rules can be applied before or after interpolation, and that interpolation can be performed "at any time." Because the specification does not teach that there can be only one intermediate stream, the Court will not impose a construction that requires that the intermediate stream itself not be the result of any interpolation. But the Court agrees with Defendants that a construction that allowed a fully-interpolated stream would contradict the language of the claim, which requires the final stream to

11

be generated from the intermediate stream through application of the transition parameters.[3]

"The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). An "intermediate stream" that contained a morph weight set at every frame would not allow the final stream to be generated by the application of transition parameters to the intermediate stream, and thus conflicts with the language of the claim. The Court therefore construes "an intermediate stream of output morph weight sets" to mean "a series of morph weight sets to which interpolation will be applied." This construction does not exclude the possibility that the intermediate stream can itself result from interpolation, so long as more interpolation is performed to generate the final stream. Given the information presented by the parties, the Court believes this construction resolves the "fundamental dispute regarding the scope of a claim term." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

### D. "lip synchronization and facial expression control"/"lip and facial expression synchronized" ('576 Patent, claim 1; '278 Patent, claim 1)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction is required | Lip and facial movements matching the final stream of output morph weight sets |

Plaintiff contends that it does not understand the significance of Defendants' proposed construction, because while Defendants contend that their software tools do not generate morph weight sets and their lip and facial movements do not match the output morph weight sets, Defendants have not provided the factual bases for those contentions. Pl.'s Br. at 18. Defendants contend that under their construction, Plaintiff cannot establish that the animation methods accused in its infringement contentions produce animations that match the "final stream of morph weight sets," to the extent any such sets exist. Defs.' Br. at 16.

---

[3] Plaintiff also argues under the doctrine of claim differentiation, which "normally means that limitations stated in dependent claims are not to be read into the independent claim from which they depend." *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 972 (Fed. Cir. 1999). Claim differentiation is "ultimately based on the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Id.* at 971-72 (citing *Comark Commc'ns Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)). Here, unasserted claim 10 of the '576 Patent covers "[t]he method of claim 1 wherein each of said plurality of transition parameters comprises a transition start time and a transition end time; and said intermediate stream of output morph weight sets having entries at said transition start time and said transition end time." Defendants respond that claim 10 also requires that "each" of the transition parameters comprise transition start and end times, and that there be a morph weight set for "each" of those times. Defs.' Br. at 15-16. Defendants argue that, by contrast, their construction of claim 1 only requires that the intermediate stream not have morph weight sets at times other than transition start and end times. Defs.' Br. at 16. Thus, Defendants' construction of claim 1 prohibits morph weight sets between transition times but does not require morph weight sets at all transition times, while claim 10 requires morph weight sets at each of the transition times.

12

The relevant claims are reproduced below with the disputed term in bold:

*'576 Patent claim 1:*
A method for automatically animating lip synchronization and facial expression of three-dimensional characters comprising:

obtaining a first set of rules that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence;

obtaining a timed data file of phonemes having a plurality of sub-sequences;

generating an intermediate stream of output morph weight sets and a plurality of transition parameters between two adjacent morph weight sets by evaluating said plurality of sub-sequences against said first set of rules;

generating a final stream of output morph weight sets at a desired frame rate from said intermediate stream of output morph weight sets and said plurality of transition parameters;

and applying said final stream of output morph weight sets to a sequence of animated characters to produce **lip synchronization and facial expression control** of said animated characters.

*'278 Patent claim 1:*
A method for automatically animating lip synchronization and facial expression of three-dimensional characters comprising:

obtaining a first set of rules that defines a morph weight set stream as a function of phoneme sequence and times associated with said phoneme sequence;

obtaining a plurality of sub-sequences of timed phonemes corresponding to a desired audio sequence for said three-dimensional characters;

generating an output morph weight set stream by applying said first set of rules to each sub-sequence of said plurality of sub-sequences of timed phonemes;

and applying said output morph weight set stream to an input sequence of animated characters to generate an output sequence of animated characters with **lip and facial expression synchronized** to said audio sequence.

Plaintiff argues that no construction is required because the meaning of these phrases in the claims comports with "the widely accepted meaning of commonly understood words." Pl.'s Br. at 18 (quoting *Phillips*, 415 F.3d at 1314). Plaintiff argues that the claims as written clearly convey that lip and facial expressions are synchronized to the audio sequence, and that Defendants' construction would only serve to confuse the jury. Pl.'s Br. at 19. Plaintiff also points out that Defendants' "matching" language raises the question of whether Defendants intend to exclude lip and facial expressions that are synchronized but not perfectly matched by some unarticulated standard. Pl.'s Br. at 19. Plaintiff also points out that the construction does not work well in '278 Patent claim 1: that claim does not refer to a "final stream," so it does not make sense for the construction to refer to "the final stream." Pl.'s Br. at 20.

Defendants argue that their construction is supported by the specification, and that the questions Plaintiff raises show the need for construction to determine what "synchronization" and "control" mean, and what is being controlled – the lip synchronization, the facial expression, or both. Defs.' Br. at 18. As to Plaintiff's criticism that '278 Patent claim 1 does not use the term

13

"final stream," Defendants respond that the "output morph weight set stream" term used in '278
Patent claim 1 corresponds to the "final stream" used in '576 Patent claim 1, and agree to modify
their proposed construction for '278 Patent claim 1 to be "lip and facial movements matching the
output morph weight set stream." Defs.' Br. at 19. And as to Plaintiff's argument that the patents
do not use the term "match," Defendants argue that the word provides a "helpful, easily-understood
explanation" of what "lip synchronization and facial expression control" and "[synchronized] lip and
facial expression" mean in the context of the patents. Defs.' Br. at 19. Defendants further point out
that the term "matching" was used in the prosecution history, when the PTO examiner noted that a
prior art reference for automatic synchronization taught "matching of the image with the
soundtrack." Defs.' Br. at 19 (citing '576 File History, Rejections dated 7/21/99, 11/16/99 and
5/9/00).

The terms are perfectly understandable on their own, and the rest of the claim explains how
the morph weight sets result in synchronization and facial expression control. Defendants have not
disclosed exactly why this matters for their non-infringement position. The Court could guess that
Defendants will contend that in the accused processes, the "lip and facial movements" do not
"match" the final morph weight sets because some other processing is applied, or that there is some
other mismatch that Defendants have not articulated. The Court ordered the parties to explain the
impact of their constructions, but Defendants did so conclusorily here, frustrating the Court's ability
to understand what this dispute is about. *See Jang v. Boston Scientific Corp.*, 532 F.3d 1330, 1337
(Fed. Cir. 2008) (vacating and remanding where nothing in the stipulated judgment provides any
context with respect to how the disputed claim construction rulings relate to the accused products).

At the *Markman* hearing, the parties agreed that the "final stream of output morph weight
sets" ('576 Patent Claim 1) and the "output morph weight set stream" are applied to the animations
without further changes. Accepting that agreement, the Court finds that no further construction is
necessary.

### E. "first set of rules" ('576 Patent, claims 1, 13; '278 Patent, claims 1, 2)

| Plaintiff's Construction | Defendants' Construction |
| --- | --- |
| A group of instructions | A group of logic statements that are embodied in a computer software program and used together |

Plaintiff contends that it does not understand the significance of Defendants' proposed
construction, because while Defendants contend that their software tools lack a collection of rules
that are organized together and used together, Defendants have not explained why that is the case.
Pl.'s Br. at 21. Defendants contend that the alleged "first set of rules" in at least one of the accused
tools is a disparate set of guidelines that exist across multiple different pieces of software. Defs.'
Br. at 20.

The relevant claims are reproduced below with the disputed term in bold:

*'576 Patent claim 1:*

14

A method for automatically animating lip synchronization and facial expression of three-dimensional characters comprising:

obtaining a **first set of rules** that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence;

obtaining a timed data file of phonemes having a plurality of sub-sequences;

generating an intermediate stream of output morph weight sets and a plurality of transition parameters between two adjacent morph weight sets by evaluating said plurality of sub-sequences against said **first set of rules**;

generating a final stream of output morph weight sets at a desired frame rate from said intermediate stream of output morph weight sets and said plurality of transition parameters;

and applying said final stream of output morph weight sets to a sequence of animated characters to produce lip synchronization and facial expression control of said animated characters.

*'576 Patent claim 13:*

The method of claim 1 wherein said **first set of rules** comprises:

correspondence rules between a plurality of visual phoneme groups and a plurality of morph weight sets;

and morph weight set transition rules specifying durational data for generating transitionary curves between morph weight sets.

*'278 Patent claim 1:*

A method for automatically animating lip synchronization and facial expression of three-dimensional characters comprising:

obtaining a **first set of rules** that defines a morph weight set stream as a function of phoneme sequence and times associated with said phoneme sequence;

obtaining a plurality of sub-sequences of timed phonemes corresponding to a desired audio sequence for said three-dimensional characters;

generating an output morph weight set stream by applying said **first set of rules** to each sub-sequence of said plurality of sub-sequences of timed phonemes;

and applying said output morph weight set stream to an input sequence of animated characters to generate an output sequence of animated characters with lip and facial expression synchronized to said audio sequence.

*'278 Patent claim 2:*

The method of claim 1, wherein said **first set of rules** comprises: correspondence rules between all visual phoneme groups and morph weight sets; and morph weight set transition rules specifying durational data between morph weight sets.

Plaintiff points to the specification's teaching that: "[t]he method preferably comprises a set of rules that determine what the output morph weight set stream will be when any sequence of phonemes and their associated times is encountered." Pl.'s Br. at 21 (quoting '576 Patent 4:36-39). The specification teaches that:

15

Preferably, each rule comprises two parts, the rule's criteria and the rule's function. Each sub-sequence of time aligned phonetic transcription (TAPT) or other timed data such as pitch, amplitude, noise amount or the like, is checked against a rule's criteria to see if that rule is applicable. If so, the rule's function is applied to generate the output. The primary function of the rules is to determine[] 1) the appropriate morph weight set correspondence with each TAPT sub-sequence; and 2) the time parameters of the morph weight set transitions between the representation of the prior TAPT sub-sequence or other timed data, and the current one.

'576 Patent 4:50-61.  Plaintiff believes that "rules," "instructions," and "logic statements" are essentially the same, but that it serves no purpose to construe "rules" as "logic statements."  Pl.'s Br. at 23.  Plaintiff argues that the rules should not be required to be embodied in a computer software program because the specification teaches manual input of the correspondence rules.  Pl.'s Br. at 23 (citing '576 Patent 6:46-48).  Plaintiff is concerned that Defendants' construction requires, after rules information is input and likely stored in some form of data file, that the information is "embodied in a computer software program."  Pl.'s Br. at 24.  Plaintiff also objects to the "used together" language as ambiguous and unsupported by the specification.  Pl.'s Br. at 24.

Defendants argue that the claim must be construed to make clear that the "first set of rules" must be a single, cohesive unit, rather than an amalgam of rules from multiple pieces of software. Defs.' Br. at 20.  Defendants argue that if the "first set of rules" can be any "amorphous 'group' of 'instructions,' it adds nothing to the claim."  Defs.' Br. at 20.

Defendants' argument ignores that the claims themselves set out meaningful requirements for the first set of rules: they "define[] a morph weight set stream as a function of phoneme sequence and times associated with said phoneme sequence."  Nothing in the claims or specification require the rules to be in one place, or that they be "used together," if that is intended to mean anything more than the claim's requirement that the first set of rules "generat[e] an output morph weight set stream by applying said first set of rules to each sub-sequence of said plurality of sub-sequences of timed phonemes."

Nor is Defendants' citation to general purpose dictionaries helpful.  Defs.' Br. at 22 (Merriam Webster Collegiate Dictionary definition of "set" as "a number of things of the same kind that belong or are used together <an electric train set>," Mehta Decl. Ex. C).  General purpose dictionaries may be helpful "where the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges."  *Phillips*, 415 F.3d at 1314. But dictionary definitions may "not contradict any definition found in or ascertained by a reading of the patent documents."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).  Here, the claims recite specific uses of the rules, and do not require that they be "used together" if that means anything more than using them to generate a morph weight set stream.  And contrary to Defendants' argument, the specification does not teach that the "first set of rules" are "a single entity, not a group of disparate rules scattered among multiple programs and files in a computer."  So, the Court rejects Defendants' construction.

As to Plaintiff's proposal that "first set of rules" be construed to mean "a group of instructions," that word substitution does not add clarity to claims when read as a whole.  Instead, the substitution would only add unnecessary complication to the coming tasks of the Court and jury. Therefore, no construction is necessary.

16

## IV. **Conclusion**

For the foregoing reasons, the Court construes the disputed terms as follows:

| Term | Construction |
|------|-------------|
| [A method for] automatically animating lip synchronization and facial expression of three-dimensional characters comprising ('576 Patent, claim 1; '278 Patent, claim 1) | In claim 1 of the '576 Patent, steps 1 and 2 (the "obtaining" steps) can be performed in any order. After they have been performed, steps 3, 4, and 5 ("generating an intermediate stream . . .", "generating a final stream . . .", and "applying said final stream") occur in that order (3, then 4, then 5), although other steps may occur between those steps, and the entire process may be repeated.<br><br>In claim 1 of the '278 Patent, steps 1 and 2 (the "obtaining" steps) can be performed in any order. After they have been performed, steps 3 and 4 ("generating an output morph weight set stream . . ." and "applying said output morph weight set stream") occur in that order (3, then 4) although other steps may occur between those steps, and the entire process may be repeated. |
| morph weight set[s] ('576 Patent, claim 1; '278 Patent, claims 1, 17) | A set of values, one for each delta set, that, when applied, transform the neutral model to some desired state, wherein each delta set is the set of vectors from each vertex on the neutral (reference) model to each vertex on a model of another mouth position. |
| an intermediate stream of output morph weight sets ('576 Patent, claim 1) | "a series of morph weight sets to which interpolation will be applied." This construction does not exclude the possibility that the intermediate stream can itself result from interpolation, so long as more interpolation is performed to generate the final stream. |

17

| Term | Construction |
|---|---|
| lip synchronization and facial expression control/lip and facial expression synchronized ('576 Patent, claim 1; '278 Patent, claim 1) | No construction necessary, other than the parties' agreement that the "final stream of output morph weight sets" ('576 Patent Claim 1) and the "output morph weight set stream" are applied to the animations without further changes. |
| first set of rules ('576 Patent, claims 1, 13; '278 Patent, claims 1, 2) | No construction necessary. |

18

Trials@uspto.gov                                                                Paper 9
Tel: 571-272-7822                                              Entered:  May 28, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

NAUGHTY DOG, INC.
Petitioner

v.

McRO, INC.
Patent Owner

————————————

Case IPR2014-00198
Patent 6,307,576 B1

————————————

Before BRIAN J. McNAMARA, RICHARD E. RICE, and
JEREMY M. PLENZLER, *Administrative Patent Judges*.

PLENZLER, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

IPR2014-00198
Patent 6,307,576 B1

## I.  INTRODUCTION

### A. Background

Naughty Dog, Inc. ("Petitioner") filed a petition to institute an *inter partes* review of claims 1-26 of U.S. Patent No. 6,307,576 B1 ("the '576 patent"). Paper 4 ("Petition" or "Pet."). McRO, Inc. ("Patent Owner") filed a preliminary response. Paper 8 ("Prelim. Resp."). The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a), which provides as follows:

> THRESHOLD.—The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

Petitioner contends that the challenged claims are unpatentable under 35 U.S.C. §§ 102 and 103 on the following specific grounds (Pet. 4-54):

| References | Basis | Claims challenged |
|---|---|---|
| Peng[1] | § 102 | 1-26 |
| Waters[2] | § 102 | 1-3, 7-16, 20-26 |
| Kaneko[3] | § 102 | 1-3, 5, 7, 8, 10, 13-16, 18, 20, 21, 23, 26 |

---

[1] Antai Peng, *Speech Expression Modeling and Synthesis* (Ph.D. dissertation, Georgia Institute of Technology) (May 1996) (Ex. 1004) ("Peng").

[2] Keith Waters & Thomas M. Levergood, *DECface: An Automatic Lip-Synchronization Algorithm for Synthetic*, CAMBRIDGE RES. LAB. TECH REPORT SERIES (Sept. 23, 1993) (Ex. 1005) ("Waters").

[3] UK Patent Application No. GB 2231246 A, published Nov. 7, 1990 (Ex. 1006) ("Kaneko").

2

**A4363**

IPR2014-00198
Patent 6,307,576 B1

| References | Basis | Claims challenged |
|---|---|---|
| Parke[4] | § 102 | 1-26 |
| Peng and Waters | § 103 | 1-26 |
| Peng and Kaneko | § 103 | 1-26 |
| Peng and Parke | § 103 | 1-26 |
| Waters and Kaneko | § 103 | 1-3, 5, 7-16, 18, 20-26 |
| Waters and Parke | § 103 | 1-26 |
| Kaneko and Parke | § 103 | 1-26 |

For the reasons given below, we deny institution on all grounds.

*B. Additional Proceedings*

Petitioner indicates that the '576 patent is the subject of the following co-pending federal district court case filed December 4, 2012: *McRO, Inc., d.b.a. Planet Blue v. Naughty Dog, Inc.*, Case No. 2:12-cv-10335-GW-FFM, pending in the United States District Court for the Central District of California. Pet. 1-2.

Petitioner also indicates that the '576 patent is asserted against Sony Computer Entertainment America, LLC (of which Naughty Dog is a wholly owned subsidiary) in a suit filed November 21, 2012, *McRO, Inc., d.b.a. Planet Blue v. Sony Computer Entertainment America, LLC and SCE Santa Monica Studio, Inc.*, Case No. 1:12-cv-01514-LPS, pending in the United States District Court for the District of Delaware. Petitioner additionally indicates that the '576 patent is asserted against Sucker Punch Productions, LLC (also a wholly owned subsidiary of Sony Computer Entertainment America, LLC) in a suit filed November 21,

---

[4] Frederick I. Parke & Keith Waters, COMPUTER FACIAL ANIMATION (1996) (Ex. 1007) ("Parke").

3

IPR2014-00198
Patent 6,307,576 B1

2012, *McRO, Inc., d.b.a. Planet Blue v. Sucker Punch Productions, LLC*, Case No. 1:12-cv-01515-LPS, pending in the United States District Court for the District of Delaware. *Id.* at 2.

In addition to this Petition, Petitioner has filed a petition (IPR2014-00197) challenging the patentability of Patent Owner's U.S. Patent No. 6,611,278 B2 ("the '278 patent"). *Id.* This decision will refer to the decision for IPR2014-00197 as "the '197 Decision."

### C. The Claimed Invention

The technology of the '576 patent is identical to that described for the related '278 patent in the '197 Decision.[5] The '576 patent is titled "Method for Automatically Animating Lip Synchronization and Facial Expression of Animated Characters" and describes a set of rules that determine a stream of morph weight sets when a sequence of timed phonemes is encountered. Ex. 1002, 3:63-66.

The '576 patent explains that a "phoneme" is defined as "the smallest unit of speech, and corresponds to a single sound." *Id.* at 1:34-36. A "morph weight set" is defined in the '576 patent as "a set of values, one for each delta set, that, when applied as described, transform the neutral model to some desired state, such as speaking the 'oo' sound or the 'th' sound." *Id.* at 4:38-41. The values (or morph weights) usually range from 0 to 1, and are assigned to a delta set to modify the geometry of the neutral model (i.e., a neutral mouth position). *Id.* at 1:63-66.

Delta sets are described in the '576 patent as the deltas of each vertex on each morph target relative to the neutral mouth position and are computed as a vector from each vertex (n) on the neutral mouth position reference to each vertex (n) on a morph target. *Id.* at 1:58-60. A morph target is described as a mouth

---

[5] The '278 patent is a continuation of the '576 patent.

A4365

IPR2014-00198
Patent 6,307,576 B1

position displaced relative to the neutral mouth position and corresponding to a phoneme or set of phonemes. *Id*. at 1:46-50. The '576 patent explains that there is one delta set for each morph target. *Id*. at 1:60-61.

An example sequence of timed phonemes ("the example phoneme sequence") is illustrated in a table at column 8, lines 42-51 of the '576 patent and a corresponding example morph weight set stream ("the example morph weight set stream") is illustrated in a table at column 8, line 56 through column 9, line 9. The tables summarizing the example phoneme sequence and the example morph weight set stream are reproduced below.

| Time | Phoneme |
|------|---------|
| 0.0 | silence begins |
| 0.8 | silence ends, "h" begins |
| 1.0 | "h" ends, "eh" begins |
| 1.37 | "eh" ends, "l" begins |
| 1.6 | "l" ends, "oh" begins |
| 2.1 | "oh" ends, silence begins. |

Example Phoneme Sequence Table

The example phoneme sequence table includes two columns, one for time and the other for the phonemes corresponding to the times. The example phoneme sequence is a simplified example, including only the delta sets relevant to the word "hello."

5

IPR2014-00198
Patent 6,307,576 B1

| Time | D.S.1 ("h") | D.S.2 ("eh") | D.S.3 ("1") | D.S.4 ("oh") | D.S.5 (aux"oh") | D.S.6 |
|---|---|---|---|---|---|---|
| 0.0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0.78 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0.8 | 1 | 0 | 0 | 0 | 0 | 0 |
| 0.98 | 1 | 0 | 0 | 0 | 0 | 0 |
| 1.037 | 0 | 1 | 0 | 0 | 0 | 0 |
| 1.333 | 0 | 1 | 0 | 0 | 0 | 0 |
| 1.403 | 0 | 0 | 1 | 0 | 0 | 0 |
| 1.667 | 0 | 0 | 1 | 0 | 0 | 0 |
| -continued | | | | | | |
| Time | D.S.1 ("h") | D.S.2 ("eh") | D.S.3 ("1") | D.S.4 ("oh") | D.S.5 (aux"oh") | D.S.6 |
| 1.74 | 0 | 0 | 0 | 1 | 0 | 0 |
| 2.1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 2.14 | 0 | 0 | 0 | 0 | 0 | 0 |

Example Morph Weight Set Stream Table

The example morph weight set stream table includes a column for time and a column for each delta set. A series of morph weight sets are included in the columns for the delta sets and form the morph weight set stream.

The '576 patent describes rules that determine morph weight sets based on encountered phonemes. *Id.* at 7:58-8:8. For example, if the phoneme "eh" is encountered, the morph weight set (0,1,0,0,0,0) is used. *Id.* at 7:64-66. The '576 patent also provides examples of rules that determine the morph weight set stream as a function of phoneme sequence and times associated with the phoneme sequence. *Id.* at 8:9-31. For example, transition rules are applied to determine transition start and end times between phonemes as a function of the outgoing phoneme's end time and duration and the incoming phoneme's start time and duration. *Id.* at 8:9-14.

A4367

IPR2014-00198
Patent 6,307,576 B1

The application of the rules to an incoming phoneme sequence, such as the example phoneme sequence, results in an output morph weight set stream, such as the example morph weight set stream, indicating morph targets at times corresponding to the phonemes of the incoming phoneme sequence. *Id*. at 7:59-9:9. The '576 patent explains that morph weight sets may be evaluated at times between the start and end times in the morph weight set stream by interpolation. *Id.* at 7:13-15.

Claim 1 illustrates the claimed subject matter and is reproduced below:

1. A method for automatically animating lip synchronization and facial expression of three-dimensional characters comprising:

obtaining a first set of rules that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence;

obtaining a timed data file of phonemes having a plurality of sub-sequences;

generating an intermediate stream of output morph weight sets and a plurality of transition parameters between two adjacent morph weight sets by evaluating said plurality of sub-sequences against said first set of rules;

generating a final stream of output morph weight sets at a desired frame rate from said intermediate stream of output morph weight sets and said plurality of transition parameters; and

applying said final stream of output morph weight sets to a sequence of animated characters to produce lip synchronization and facial expression control of said animated characters.

A4368

IPR2014-00198
Patent 6,307,576 B1

### D. Claim Construction

Consistent with the statute and the legislative history of the Leahy-Smith America Invents Act,[6] the Board will interpret claims of an unexpired patent using the broadest reasonable construction in light of the specification of the patent. *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012); 37 C.F.R. § 42.100(b). Claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). An inventor may rebut that presumption by providing a definition of the term in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

#### 1. "phoneme sequence"

The parties present the same opposing views on the construction of "phoneme sequence" as those discussed in the '197 Decision. Petitioner and Patent Owner agree that a phoneme is the smallest unit of speech and corresponds to a single sound. Pet. 11 (quoting Ex. 1002, 1:34-36); Prelim. Resp. 9-10 (citing Ex. 1002, 1:35-37). Petitioner contends that a "phoneme sequence," therefore, is a sequence of phonemes or units of speech. Pet. 11. Patent Owner argues that Petitioner's proposed construction (a sequence of phonemes *or* units of speech) is overly broad because the use of "or" reads "phoneme" out of the phrase. Prelim. Resp. 9-10. Similar to the reasons discussed in the '197 Decision, and for purposes of this decision, we determine that a "phoneme sequence" is a sequence of the smallest units of speech, i.e., a sequence of phonemes, which is consistent with the portions of the specification cited by Petitioner and Patent Owner.

---

[6] Pub. L. No. 112-29, 125 Stat. 284 (2011).

### 2. "morph weight set"

The parties agree on the definition of "morph weight set" as set forth in the '576 patent, which is the same as the definition provided in the '278 patent and that discussed in the '197 Decision. Pet. 11 (quoting Ex. 1002, 4:38-41); Prelim. Resp. 10 (quoting Ex. 1002, 4:38-42). Therefore, for purposes of this decision, we determine that a "morph weight set" is a set of values, one for each delta set, that, when applied as described, transform the neutral model to some desired state, as defined by the '576 patent. *See* Ex. 1002, 4:38-40.

### 3. "first set of rules"

Petitioner contends that the term "first set of rules" should be construed to mean a set of conditional statements or correspondence between an input and an output. Pet. 12. While not proposing a specific construction for this term, Patent Owner argues that the surrounding claim language expressly requires that the "first set of rules" "define output morph weight set stream as a function of a phoneme sequence and time of said phoneme sequence." Prelim. Resp. 12. As we discuss further below, in view of the claim language, the specific definition of "first set of rules" is not material to our decision in this proceeding. Therefore, we do not construe this term separately.


## II. ANALYSIS

### A. Overview

Petitioner contends that claims 1-26 of the '576 patent are unpatentable over the prior art cited in the table above. Claims 1 and 14 are independent, with claims 2-13 depending from claim 1 and claims 15-26 depending from claim 14. In support of the proposed challenges to these claims, Petitioner provides testimony from Joseph Marks, Ph.D. (Ex. 1001; the "Marks Declaration"), which is similar to

IPR2014-00198
Patent 6,307,576 B1

the testimony provided in IPR2014-00197.

    B.   *Proposed Ground of Anticipation over Peng (Ground 1)*

        1.   *Overview of Peng*

Peng is a Ph.D. dissertation that addresses mapping phonemes to synthetic facial images. Ex. 1004, x. The facial expression modeling in Peng is based on the Facial Action Coding System (FACS). *Id.* at 14. FACS was developed prior to Peng with the purpose of finding a mapping from speech phonemes to realistic facial expressions. *Id.* FACS defines 46 action units (AUs) that describe facial expressions. *Id.* at 15. Peng utilizes 11 AUs focusing on lower face actions for facial expression modeling, which are summarized in Table 3-1, reproduced below. *Id.* at 15-16.

Table 3-1. Action Units Used in the Proposed System

| Action Unit Groups | AU | Description |
|---|---|---|
| Vertical AUs | AU 10 | Raise Upper Lip |
| | AU 15 | Depress Lip Corner |
| | AU 25 | Lip Apart |
| | AU 26 | Drop Jaw |
| | AU 27 | Stretch Open Mouth |
| Horizontal AUs | AU 20 | Horizontal Stretch Lip |
| Oblique AUs | AU 18 | Pucker Lip |
| | AU22 | Funnel Lip |
| Orbital AUs | AU 12 | Pull Lip Corner |
| Misc. AUs | AU 29 | Jaw Thrust |
| | AU 32 | Bite |

Table 3-1 from Peng summarizes the AUs associated with facial expression modeling, identifies the description of the action group (vertical, horizontal, oblique, orbital, misc.) of the AUs, and provides a description of the facial feature associated with each AU (e.g., raise upper lip). Peng discusses characterizing

10

IPR2014-00198
Patent 6,307,576 B1

these AUs as vectors and applying expression weight vectors to the AU vectors to construct a desired facial expression. *Id.* at 16-18.

Peng discusses a key-frame animation technique where a text string is converted to a stream of phonemes and their corresponding synthetic facial image frames (key-frames). *Id.* at 52. These key-frames are determined based on the AUs and weight vectors. *Id.* at 48. Peng explains that interpolation can be used to smooth the transition between key-frames. *Id.* at 52-54. Peng additionally discusses a phoneme parsing scheme to address differences in phoneme appearance based on where the phoneme appears in a word or sentence. *Id.* at 55-56.

### 2. *Analysis*

Petitioner contends that Peng discloses the limitations of claims 1-26. Pet. 14, 22-53. Similar to claim 1 of the '278 patent, claim 1 of the '576 patent recites "obtaining a first set of rules that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence" ("limitation 1(a)"). Similar to claim 1, claim 14 of the '576 patent recites "said first set of rules defining output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence" and Petitioner's contentions regarding this limitation in claim 14 are the same as those presented regarding claim 1. *See* Pet. 14, 22, 38; Ex. 1001, 14-17, 61-62. For simplicity, the challenge will be discussed with respect to claim 1.

Petitioner presents the same contentions regarding limitation 1(a) as those discussed in the '197 Decision. As noted above, Petitioner contends that the claimed first set of rules requires "a set of conditional statements or correspondence between an input and an output." Pet. 12. Regardless of whether the first set of rules requires a set of conditional statements or correspondence

11

IPR2014-00198
Patent 6,307,576 B1

between an input and an output, as Petitioner contends, the claim requires that the rules define a morph weight set stream as a *function of* phoneme sequence and *times associated with said phoneme sequence*.

Patent Owner acknowledges that Peng describes a rule base, but argues that "there is no rule in Peng's rule-base that defines a morph weight set stream as a function of time of the phoneme sequence" as required by the claims. Prelim. Resp. 18 (emphasis omitted). Petitioner contends that "in Peng, an output morph weight set stream is generated by evaluating a plurality of phoneme sequences against a set of rules," and "[t]he rule base which is implemented in Peng's finite state machine is a function which produces the corresponding weight vector set after evaluating the phonemic input against predetermined criteria." Pet. 14. Petitioner's discussion of Peng relative to the '576 patent does not identify any disclosure in Peng that corresponds to a morph weight set stream being defined as a *function of time of said phoneme sequence*. Petitioner's claim chart also fails to identify clearly what in Peng corresponds to the claimed "function of . . . time of said phoneme sequence" in limitation 1(a). From Petitioner's claim chart, it appears that Petitioner may consider Peng's weight vectors as corresponding to the claimed morph weight set stream.[7] *See* Pet. 24 (citing Ex. 1004, 48, 50-52, 56-58). However, as Patent Owner explains, Peng's discussion of weight vectors on pages 48 and 50-51 does not indicate that the weight vectors are a function of phoneme times or that they contain any time values. *See* Prelim. Resp. 18; Ex. 1004, 48, 50-51.

---

[7] This is an assumption, as Petitioner does not address clearly what discloses the claimed morph weight set stream in Peng, and page 24 of the Petition is actually a portion of the claim chart for a further claim limitation ("generating an output morph weight set stream").

IPR2014-00198
Patent 6,307,576 B1

Petitioner's claim chart also cites to pages 14-17 of the Marks Declaration for limitation 1(a). Pet. 22. However, after review of the cited portions of the Marks Declaration, we see no further discussion of what in Peng allegedly discloses the claimed "function of . . . time of said phoneme sequence" in limitation 1(a). Rather, the cited portions of the Marks Declaration simply reproduce the text from the portions of Peng cited in the Petition's claim chart. *See* Ex. 1001, 14-17.

In the challenge to claims 1 and 14, Petitioner has failed to specify what in Peng corresponds to the claimed "function of . . . time of said phoneme sequence." Based on the Petition and evidence provided, we are not persuaded that Peng discloses a first set of rules that defines a morph weight set stream as a function of time of said phoneme sequence.

For these reasons, Petitioner has failed to establish a reasonable likelihood of success on this challenge to claims 1-26.

### C. Proposed Ground of Anticipation over Waters (Ground 2)

#### 1. Overview of Waters

Waters is a report that addresses automatic synchronization of computer generated faces with synthetic speech. Ex. 1005, Abstract. Figure 1 of Waters illustrates a synchronization model, and is reproduced below.

13

**A4374**

IPR2014-00198
Patent 6,307,576 B1



Figure 1: The synchronization model TTS = text-to-speech.

Figure 1 of Waters is a schematic illustration of a system for converting input text
into synthesized audio and corresponding graphics of mouth deformations on a
display. The schematic illustration in Figure 1 includes input text, a text to speech
converter, a face generator, a mouth deformation calculator, and a viseme table.

Waters explains that mouth deformations corresponding to audio are based
on calculated displacement of mouth nodes at a series of times. *Id.* at 7.
Intermediate nodes can be interpolated at times between the calculated node
displacements. *Id.* Waters discusses determining node displacement based on
Newtonian physics. *Id.* at 8. Waters explains that this system provides for creation
of viseme tables that are based on the calculated mouth node displacements and
correlated to specific speech synthesizers. *Id.* at 18.

    *2. Analysis*

Petitioner contends that Waters discloses the limitations of claims 1-3, 7-16,
and 20-26. Pet. 16, 22-53. As noted above, and similar to claim 1 of the '278

A4375

IPR2014-00198
Patent 6,307,576 B1

patent, limitation 1(a) of claim 1 of the '576 patent includes rules defining an "output morph weight set stream" (i.e., a series of output morph weight sets). Claim 14 of the '576 patent includes the same limitation and Petitioner's contentions regarding this limitation in claim 14 are the same as those presented regarding claim 1. *See* Pet. 16, 22, 38 and Ex. 1001, 69-72, 97. For simplicity, the challenge will be discussed with respect to claim 1.

Petitioner presents the same contentions regarding limitation 1(a) as those discussed in the '197 Decision. Petitioner contends that "Waters relies on a rule base of physical characteristics of mouth shapes ('visemes') corresponding to a given phoneme input text" and that the "rules are implemented as an equation (function) which calculates displacement of nodes on a parameterized facial model." Pet. 16. With respect to limitation 1(a), Petitioner's claim chart cites to the discussion of mouth deformation calculation and interpolation in Waters. *Id.* at 22-23 (citing Ex. 1005, 7-8). Petitioner's claim chart also cites to pages 3, 5, 6, and 11 of Waters and pages 69-72 of the Marks Declaration. *See id.* However, the cited portions of the Marks Declaration simply reproduce the text from Waters cited in the Petition's claim chart. *See* Ex. 1001, 69-72.

Patent Owner argues that Petitioner fails to identify what in Waters corresponds to the claimed output morph weight set streams. Prelim. Resp. 24. Patent Owner further argues that regardless of what Petitioner may consider as the claimed output morph weight set, nothing in Waters discloses this feature. *Id.* at 24, 27. It is unclear from the Petition whether Petitioner considers the calculated node displacement ($x_i(t)$), the intermediate interpolation position ($x(s)$), or some other feature on pages 3, 5-8, and 11 of Waters to be an output morph weight set. It is not apparent why the cited portions of Waters disclose an output morph weight

A4376

set. Based on the Petition and the evidence provided, we are not persuaded that Waters discloses an output morph weight set.

For these reasons, Petitioner has failed to establish a reasonable likelihood of success on this challenge to claims 1-3, 7-16, and 20-26.

### D. Proposed Ground of Anticipation over Kaneko (Ground 3)

#### 1. Overview of Kaneko

Kaneko is a foreign Patent Application directed to synthesizing an image of a face to represent changes in mouth shape based on speech output. Ex. 1006, 1:2-7. Figure 4 illustrates an embodiment of the image synthesis system of Kaneko and is reproduced below.



Figure 4 of Kaneko is a block diagram illustrating a system for converting input text to an output picture corresponding to the input text. Figure 4 includes speech synthesizer 1 that receives input text. Time adjuster 2 controls an input to picture

IPR2014-00198
Patent 6,307,576 B1

generator 6 based on the duration of the phoneme provided by speech synthesizer 1. *Id.* at 9:7-11.

Converter 3 converts the phoneme from speech synthesizer 1 to a mouth-shape feature corresponding to the phoneme. *Id.* at 9:17-19. Examples of mouth-shape features include degree of mouth opening, degree of roundness of lips, height of lower jaw, and degree to which the tongue is seen. *Id.* at 9:19-24. Correspondence between the vocal sound feature and the mouth-shape feature is determined based on observations of how a person actually utters each phoneme. *Id.* at 9:24-26. Conversion table 4 converts the mouth-shape feature to a mouth-shape parameter value representing a concrete mouth shape (i.e., a specific displacement of points $P_1$-$P_8$ defining mouth position). *Id.* at 10:13-11:3. The mouth-shape parameter values are predetermined based on mouth-shape measurements of a person actually uttering each phoneme. *Id.* at 11:3-5. Transition detector 8 detects when a transition between phonemes occurs. *Id.* at 14:23-15:11. Mouth-shape parameter modifier 7 obtains intermediate parameter values between consecutive mouth shape parameters for intermediate frames. *Id.* at 15:14-20.

### 2. Analysis

Petitioner contends that Kaneko discloses each of the limitations in claims 1-3, 5, 7, 8, 10, 13-16, 18, 20, 21, 23, and 26. Pet. 18-19, 22-53. As previously indicated, and similar to the '278 patent, limitation 1(a) from claim 1 of the '576 patent includes rules defining an "output morph weight set stream." Claim 14 of the '576 patent includes the same limitation and Petitioner's contentions regarding this limitation in claim 14 are the same as those presented regarding claim 1. *See* Pet. 18-19, 23, 38-39; Ex. 1001, 102-103, 118. For simplicity, the challenge will be discussed with respect to claim 1.

17

IPR2014-00198
Patent 6,307,576 B1

Petitioner presents the same contentions regarding limitation 1(a) as those discussed in the '197 Decision. Petitioner contends that "Kaneko uses a conversion table which represents a rule base specifying mouth shapes corresponding to phonemes." Pet. 18. With respect to limitation 1(a), Petitioner's claim chart cites to Kaneko's discussion of the operation of speech synthesizer 1, which postulates the use of an existing speech rule synthesizing method that employs a Klatt type format speech synthesizer for matching mouth shape generation. *Id.* at 23 (citing Ex. 1006, 8:6-9:2). Kaneko provides no detailed description of the speech synthesizer. Petitioner's claim chart also cites to pages 102-103 of the Marks Declaration. However, again, the cited portions of the Marks Declaration simply reproduce the text from Kaneko cited in the Petition's claim chart. *See* Ex. 1001, 102-103.

Patent Owner argues that "there is no set of rules in Kaneko's synthesizer 1 that *defines a morph weight set stream* as required by claim 1." Prelim. Resp. 33. Indeed, page 8, line 6 through page 9, line 2 of Kaneko generally explains that "speech synthesizer 1 synthesizes a speech output corresponding to an input sentence" and discusses various speech synthesizing methods. There is no discussion of rules or any disclosure that appears to correspond to an output morph weight set in this portion of Kaneko.

The additional portions of the claim chart related to claim 1 also fail to identify what allegedly corresponds to rules defining an output morph weight set stream in Kaneko. *See* Pet. 22-26. To the extent Petitioner considers Kaneko's conversion table 4 as corresponding to the claimed rules, Petitioner does not allege, and offers no explanation as to why, conversion table 4 defines a morph weight set stream. The only portion of the claim chart for claim 1 that references the conversion table, discussed earlier in the Petition (*see* Pet. 18) as corresponding to

A4379

IPR2014-00198
Patent 6,307,576 B1

the claimed rules, is the portion directed to limitation (c) in claim 1: "generating an intermediate stream of output morph weight sets . . . by evaluating said plurality of sub-sequences against said first set of rules." Pet. 24 (citing Ex. 1006, 11:6-10). However, the cited portion of Kaneko simply states that "[i]n response to the mouth-shape feature corresponding to the phoneme concerned, provided from the speech feature to mouth-shape feature converter 3, the unit 5 refers to the conversion table 4 to read out therefrom a set of values of mouth-shape parameters for the phoneme." Ex. 1006, 11:6-10. We are not persuaded that this discloses rules defining an output morph weight set stream.

For these reasons, Petitioner has failed to establish a reasonable likelihood of success on this challenge to claims 1-3, 5, 7, 8, 10, 13-16, 18, 20, 21, 23, and 26.

### E. Proposed Ground of Anticipation over Parke (Ground 4)

#### 1. Overview of Parke

Parke is a book about computer facial models, computer generated facial images, and facial animation, and is intended to summarize "the diverse developments in facial animation." Ex. 1007, xiii. Parke discusses advertising, film, gaming, medicine, teleconferencing, and avatar applications. *Id.* at 5-7. Parke discusses a variety of facial animation techniques. *Id.* at 105-146. Parke also discusses a variety of methods for speech synchronized animation. *Id.* at 259-284.

#### 2. Analysis

Petitioner contends that Parke discloses each of the limitations in claims 1-26. Pet. 20-53. As noted above, and similar to claim 1 of the '278 patent, limitation 1(a) from claim 1 of the '576 patent includes rules defining an "output morph weight set stream." Claim 14 of the '576 patent includes the same limitation and Petitioner's contentions regarding this limitation in claim 14 are the

A4380

IPR2014-00198
Patent 6,307,576 B1

same as those presented regarding claim 1. *See* Pet. 20-21, 23, 39; Ex. 1001, 123-124, 157. For simplicity, the challenge will be discussed with respect to claim 1.

Petitioner presents the same contentions regarding limitation 1(a) as those discussed in the '197 Decision. Petitioner contends that "[c]oncepts discussed [in Parke] include viseme table lookup, speech synthesizer output parameters, key framing, and interpolation. For example, key frames (mouth positions) corresponding to phoneme input may be obtained from a viseme table." Pet. 20. With respect to limitation 1(a), Petitioner's claim chart refers to pages 270 and 273 of Parke. Pet. 23. The cited portions of Parke generally discuss generation of a phoneme sequence from input text, determination of timing for facial animation based on input text and corresponding phonemes, and synthesis by rule algorithms. Ex. 1007, 270, 273.

Patent Owner argues that "Petitioner never identifies what in Parke allegedly corresponds to the claimed output morph weight set stream, or what in Parke allegedly corresponds to the claimed first set of rules." Prelim. Resp. 43. Patent Owner argues that although pages 270 and 273 of Parke discuss the use of phoneme sequences, synthesis by rule algorithms, and timing, Parke does not disclose the claimed output morph weight set stream. *Id.*

Based on the Petition and evidence provided, we are unable to determine what in Parke Petitioner considers as corresponding to the claimed rules defining a morph weight set stream. For example, Petitioner does not offer any explanation as to why Parke's discussion of phoneme sequences, synthesis by rule algorithms, and timing discloses rules defining an output morph weight set stream. The cited portions of the Marks Declaration simply reproduce the text from Parke cited in the Petition's claim chart. *See* Ex. 1001, 143-144. We are not persuaded that the general discussion found on pages 270 and 273 of Parke discloses this limitation,

20

IPR2014-00198
Patent 6,307,576 B1

nor are we persuaded that Parke discloses rules defining an output morph weight set stream based on Petitioner's general summary of "concepts discussed" in Parke (*see* Pet. 20).

For these reasons, Petitioner has failed to establish a reasonable likelihood of success on this challenge to claims 1-26.

### F. *Proposed Obviousness Grounds 5-10*

#### 1. *Overview*

Petitioner proposes a number of obviousness challenges based on various combinations of Peng, Waters, Kaneko, and Parke. Pet. 5, 21-58.

#### 2. *Analysis*

Petitioner presents similar contentions regarding these challenges, at least with respect to limitation 1(a) and the similar limitation in claim 14, to those discussed in the '197 Decision. Similar to the contentions presented regarding the '278 patent in IPR2014-00197, Petitioner contends that the '576 patent claims "merely recite the combination of 'prior art elements according to known methods to yield predictable results' and/or the '[u]se of known technique[s] to improve similar devices (methods, or products) in the same way.' MPEP § 2143 (A, C)." *Id.* at 21.

Patent Owner argues that

> (1) Petitioner NEVER explains what is allegedly lacking in the base reference, (2) Petitioner NEVER points out the differences between the claimed invention and the base reference or cited art, (3) Petitioner NEVER explains how the base reference should be allegedly modified, (4) Petitioner NEVER explains what modification would have been obvious, and (5) Petitioner NEVER explains what modifications to each base reference would have allegedly been made.

Prelim. Resp. 47-48. We agree.

21

IPR2014-00198
Patent 6,307,576 B1

Petitioner does not identify any specific features of the cited references to be included in the proposed combinations and does not provide any further rationale for the combinations. *See id.* at 22-53; Ex. 1001, 163-543. The Petition's claim chart simply includes citations to the claim chart in the Marks Declaration and to additional rationale for a general combination of the references in the Marks Declaration. *Id.* at 22-53. The claim charts in the Marks Declaration do not identify specifically which elements are to be substituted in the various proposed combinations or how the references are to be modified. *See* Ex. 1001, 164-543. The claim charts only cite to the references in the combination proposed in the challenge without specifying which reference is relied on to meet each limitation.

For example, in proposed Ground 5 (challenge based on the combination of Peng and Waters), the Petition cites the same portions of Peng relied on in proposed Ground 1 (anticipation challenge based on Peng) and the same portions of Waters relied on in proposed Ground 2 (anticipation challenge based on Waters) for limitation 1(a). Pet. 22. The Petition additionally cites to pages 164-165 of the Marks Declaration. *Id.* However, the cited portion of the Marks Declaration simply includes the text from the portion of Peng cited in the Petition's claim chart with the addition of "See also *Waters* at, *e.g.*, pp. 3, 5, 6, 7, 11." Ex. 1001, 165-168.

The rationale for the proposed combinations also fails to identify specifically any proposed modifications. Instead, for each obviousness challenge, the Marks Declaration summarizes the references relied on, and then concludes that

> To a skilled artisan, this combination would have yielded a predictable result—namely, a more desirable system for not only utilizing an input and other data to automatically into animate lip synchronization, but also to modify a facial expression of a character based on emotional data. The implementation of such a system would be more efficient, resulting in an implicit, common sense motivation

22

**A4383**

IPR2014-00198
Patent 6,307,576 B1

> to combine the references to create a computer animation system for automatically animating lip synchronization and facial expression of a character, such as a three-dimensional character.

*Id.* at 237-238, 312, 386, 443, 501, 543-544.

Petitioner has failed to resolve any differences between the claimed invention and the cited references, identify any specific proposed modifications to the references, or explain persuasively why one skilled in the art would have made any specific modifications to the references relied on in the challenges in Grounds 5-10. Based on the Petition and evidence provided, we are not persuaded that any of the obviousness challenges (Grounds 5-10) cures the deficiencies in the challenges based on Peng, Waters, Kaneko, and Parke (Grounds 1-4) discussed above. Thus, we are not persuaded that Petitioner has established a reasonable likelihood of succeeding on any of these challenges to claims 1-26.

### G. Petitioner's Challenge to Dates of Peng and Waters

In addition to the arguments discussed above, Patent Owner additionally argues that Petitioner has not established that Peng and Waters are prior art printed publications. Prelim. Resp. 3-9. For example, Patent Owner argues that although "Peng is an alleged 'thesis' . . . petitioner has submitted no evidence establishing that Peng was sufficiently publicly accessible prior to the critical date (October 2, 1997) to qualify as a printed publication." *Id.* at 4. Patent Owner provides similar arguments regarding Waters, asserting that "there is no evidence that Waters was ever disseminated outside of Digital Equipment Corporation (DEC), and there is no evidence that anyone outside of DEC exercising reasonable diligence would have located Waters prior to the critical date." *Id.* at 8. Patent Owner argues that neither Peng nor Waters should be considered as prior art printed publications for these reasons. *Id.* at 9.

Because we have determined that Petitioner fails to meet its burden

IPR2014-00198
Patent 6,307,576 B1

regarding Peng and Waters meeting the limitations of the challenged claims, we need not address whether Peng or Waters is a prior art printed publication. Therefore, the issues raised in Patent Owner's Preliminary Response regarding whether Peng and Waters are prior art printed publications are moot.

## III. SUMMARY

Petitioner has failed to demonstrate that there is a reasonable likelihood of prevailing on any of the challenges to the patentability of claims 1-26 of the '576 patent.

The Petition is denied as to all grounds proposed.

## IV. ORDER

For the reasons given, it is

ORDERED that the Petition is *denied*.

A4385

IPR2014-00198
Patent 6,307,576 B1

For PETITIONER:

Tawni Wilhelm
twilhelm@shb.com

Jonathan Zerger
jzerger@shb.com

For PATENT OWNER:

Joseph Rhoa
jar@nixonvan.com

Updeep Gill
usg@nixonvan.com

A4386

1    Counsel listed on signature page

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    WESTERN DIVISION

11   McRo, Inc., d.b.a. Planet Blue,        CASE No. 12-cv-10322-GW (FFMx)

12                                          DEFENDANTS' NOTICE OF
                          Plaintiff,        MOTION AND MOTION FOR
13                                          JUDGMENT ON THE PLEADINGS
                                            BASED ON UNPATENTABILITY
14        v.                                UNDER 35 U.S.C. § 101;
                                            MEMORANDUM OF POINTS AND
15   Bandai Namco Games America, Inc., et   AUTHORITIES
16   al.

17                        Defendants.       Honorable George H. Wu

18                                          Hearing:
                                            Date: August 14, 2014
19   Bandai Namco Games America, Inc., et   Time: 8:30 a.m.
20   al.,                                   Courtroom: 10

21              Counterclaim-Plaintiffs,    CONSOLIDATED WITH:
                                            12-cv-10323-GW (FFMx)
22                                          12-cv-10326-GW (FFMx)
          v.                                12-cv-10327-GW (FFMx)
23                                          12-cv-10329-GW (FFMx)
24   McRo, Inc., d.b.a. Planet Blue,        12-cv-10331-GW (FFMx)
                                            12-cv-10333-GW (FFMx)
25              Counterclaim-Defendants.    12-cv-10335-GW (FFMx)
                                            12-cv-10336-GW (FFMx)
26                                          12-cv-10337-GW (FFMx)
                                            12-cv-10338-GW (FFMx)
27                                          12-cv-10340-GW (FFMx)
28                                          12-cv-10341-GW (FFMx)

MOTION FOR JUDGMENT ON THE           CASE No. 12-cv-10322-GW (FFMx)
PLEADINGS

## III.   LEGAL STANDARDS

Whether a claim recites patent-eligible subject matter under § 101 is a question of law.  *See Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012); *CyberSource*, 654 F.3d at 1369.  The statutory § 101 inquiry is a "threshold test." *Bilski*, 130 S. Ct. at 3225.  A Court may properly address this threshold test by way of a motion for judgment on the pleadings.  *See, e.g.*, *Gametek LLC v. Zynga, Inc.*, Nos. 13-cv-2546-RS, 13-cv-3089-RS, 13-cv-3472-RS, 13-cv-3493-RS, 2014 WL 1665090 (N.D. Cal. Apr. 25, 2014); *Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*, ___ F.Supp.2d ___, No. 6:12-cv-674, 2014 WL 923280 (E.D. Tex. Jan. 21, 2014); *buySAFE, Inc. v. Google Inc.*, 964 F.Supp.2d 331 (D. Del. 2013); *see also Dietgoal Innovations LLC v. Bravo Media LLC*, No. 13-cv-8391, slip op. at 2 n.1 (S.D.N.Y. July 8, 2014) (granting summary judgment of unpatentability under § 101 and noting that the motions "could equally validly have been styled motions for judgment on the pleadings").

## IV.   ARGUMENT — JUDGMENT SHOULD BE ENTERED IN DEFENDANTS' FAVOR BECAUSE PLAINTIFF'S CLAIMED INVENTION IS INELIGIBLE FOR PATENT PROTECTION

### A.   Abstract Ideas Are Not Eligible For Patent Protection

Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  In recent years, the Supreme Court has underscored two fundamental principles of § 101 applicable to this case.

First, the Supreme Court has emphasized repeatedly that § 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice Corp.*, 2014 WL 2765283, at *5 (quoting *Ass'n for*

MOTION FOR JUDGMENT ON THE PLEADINGS

7

CASE No. 12-cv-10322-GW (FFMx)

*Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. ___, 133 S. Ct. 2107, 2116, 186 L.Ed.2d 124 (2013)); *see also Mayo*, 132 S. Ct. at 1293; *Bilski*, 130 S. Ct. at 3255 ("Phenomena of nature, mental processes, and abstract intellectual concepts are not patentable." (quoting *Benson*, 409 U.S. at 67)).[7]

These principles cannot be eligible for patent protection because "they are the basic tools of scientific and technological work" and are "free to all men and reserved exclusively to none." *Mayo*, 132 S. Ct. at 1293 (quoting *Benson*, 409 U.S. at 67, and *Diamond v. Chakrabarty*, 447 U.S. 303, 309, 100 S. Cr. 2204, 65 L. Ed. 2d 144 (1980)). Indeed, "'monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws." *Alice Corp.*, 2014 WL 2765283, at *5 (quoting *Mayo*, 132 S. Ct. at 1293).

A patent on an abstract idea effectively pre-empts the idea itself, and attempts to claim ownership of inventions that a patentee never conceived of, and did not contribute to the state of the art by way of his patent application. *See Bilski*, 130 S. Ct. at 3230-31; *Mayo*, 132 S. Ct. at 1294 (finding that, by covering a broad range of potential known ***and unknown*** uses of an abstract idea, a patent would pre-empt an entire field and "risk disproportionately tying up" the use of the abstract idea); *see also OIP Techs, Inc. v. Amazon.com, Inc.*, No. 12-1233-EMC, 2012 WL 3985118, at *20 (N.D. Cal. Sept. 11, 2012) ("The central question remains whether the patentee seeks broad monopoly rights over a basic concept, fundamental principle, or natural law without a concomitant contribution to the existing body of scientific and technological knowledge."); *Compression Tech. Solutions LLC v. EMC Corp.*, No. 12-1746-RMW, 2013 WL 2368039, at *8 (N.D. Cal. May 29, 2013) (holding that

---

[7] Internal quotation marks, citations, and alterations omitted, and emphasis added, throughout except where otherwise noted.

claims would broadly cover almost all applications and thus pre-empt unknown future use even though the method was "limited to digital data and context insensitive parsing.").

Where a patent claim attempts to pre-empt a mathematical formula or algorithm, the Supreme Court has consistently found that claim to be directed to an abstract idea and therefore unpatentable subject matter.  In *Bilski*, the Supreme Court looked to precedent—namely *Benson* and *Flook*—to clarify what is an "abstract idea." The *Benson* Court found that "converting . . . numerals to pure binary numerals" was an abstract idea because "[a] contrary holding 'would wholly pre-empt the mathematical formula and in practical effect would be a patent on the algorithm itself.'"  *Bilski*, 130 S. Ct. at 3230 (quoting *Benson*, 409 U.S. at 71, 72).  The *Flook* Court held as abstract "a procedure for monitoring the conditions during the catalytic conversion process in the petrochemical and oil-refining industries."  *Id.* (discussing *Flook*, 437 U.S. at 594).  Notably, the *Flook* Court determined that, if the underlying mathematical algorithm was "assumed to be within the prior art, the application, considered as a whole, contain[ed] no patentable invention," and that "the prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity.'"  *Id.* (quoting *Flook*, 437 U.S. at 594, and *Diamond v. Diehr*, 450 U.S. 175, 191-192, 101 S. Ct. 1048, 67 L. Ed. 2d 155 (discussing *Flook*)). Accordingly, the *Bilski* Court held that "[t]he concept of hedging . . . is an unpatentable abstract idea, just like the algorithms at issue in *Benson* and *Flook*," since "[a]llowing petitioners to patent risk hedging would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea." *Bilski*, 130 S. Ct. at 3231.

In *Alice Corp.*, the Supreme Court once again reinforced that a concept may be abstract even though it does not "exist[] in principle apart from any human action."

2014 WL 2765283, at *8. The Supreme Court further confirmed that an "abstract idea" need not be a fundamental natural truth, finding that "[t]he concept of risk hedging [it] identified as an abstract idea in [*Bilski*] cannot be described as a preexisting fundamental truth," but was nonetheless an "abstract idea." *Id.* In fact, the Court recognized that, "[a]lthough hedging is a longstanding commercial practice, it is a method of organizing human activity, not a truth about the natural world that has always existed." *Id.* Nonetheless, the claims in both *Bilski* and *Alice Corp.* were held unpatentable because they were "abstract ideas in the understanding that risk hedging was a fundamental economic practice." *Id.*

The Federal Circuit, following the Supreme Court's guidance, has similarly held "that methods which can be performed mentally, or which are the equivalent of human mental work, are unpatentable abstract ideas—the 'basic tools of scientific and technological work' that are open to all." *Cybersource*, 654 F.3d at 1371 (quoting *Benson*, 409 U.S. at 67, and holding that a "mental process" is "a subcategory of unpatentable abstract ideas"). The *CyberSource* court also noted that, when a patent's claimed steps "could still 'be made [using a] pencil and paper,'" the claims are directed to an unpatentable mental process—an abstract idea. *Id.* (quoting *Flook*, 437 U.S. at 594-95).

Second, transformation of a patent-ineligible abstract idea "into a patent-eligible application requires more than simply stating the abstract idea while adding the words 'apply it.'" *Alice Corp.*, 2014 WL 2765283, at *9 (quoting *Mayo*, 132 S. Ct. at 1294). That is, in order to be eligible for patent protection, a *particular application* of an abstract idea must "contain[] an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice Corp.*, 2014 WL 2765283, at *9 (quoting *Mayo*, 132 S. Ct. at 1294). Merely taking an abstract idea and adding steps (or breaking the idea into steps) involving "well-understood," "routine," or "conventional" activities does nothing to add an inventive

concept to an abstract idea. *Mayo*, 132 S. Ct. at 1294; *Flook*, 437 U.S. at 590. Similarly, limiting the application of an abstract idea to a particular "field of use or adding token postsolution components" does not transform the idea into a patent-eligible invention. *Bilski*, 130 S. Ct. at 3231.[8]

Most recently, in *Alice Corp.*, the Supreme Court confirmed that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice Corp.*, 2014 WL 2765283, at *10. The fact that a user of the patented technology is instructed to use "some unspecified, generic computer" to perform those steps is not sufficient to confer patentability. *See id.*, 2014 WL 2765283, at *11.

The *Alice Corp.* Court also confirmed—unanimously—that *Mayo* sets forth the correct test to apply to a computer-implemented process, notwithstanding the split decision in *Alice Corp.* at the Federal Circuit. *See Alice Corp.*, 2014 WL 2765283, at *4. First, courts must "determine whether the claims at issue are directed to [a] patent-ineligible concept[]." *Id.*, at *6. Where, as here, the claims of the patents-in-suit are directed to a patent-ineligible concept, courts must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (describing this second step "as a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent

---

[8] "Postsolution component" refers to inconsequential steps appended to an abstract idea that do not meaningfully limit the scope of the concept. *See Flook*, 437 U.S. at 590 (rejecting "that the presence of specific 'post-solution' activity—the adjustment of the alarm limit to the figure computer according to the formula"— renders the performance of the mathematical formula patent-eligible, and further explaining that "[t]he notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process exalts form over substance.").

MOTION FOR JUDGMENT ON THE
PLEADINGS

11

CASE NO. 12-cv-10322-GW (FFMx)

in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'") (quoting *Mayo*, 132 S. Ct. at 1298, 1297, 1294).

### B. The Patents-In-Suit Are Directed To Ineligible Subject Matter

The patents-in-suit improperly attempt to claim abstract ideas, and no "inventive concept" exists to transform them into patent-eligible applications. They are, therefore, invalid for lack of patent-eligible subject matter.

#### 1. The Patents-In-Suit Are Directed To An Abstract Idea

The animation methods claimed in the patents-in-suit are merely directed to a fundamental, abstract animation practice. The patentee requests that the Court allow it to hold a monopoly over the abstract idea of rules-based synchronization of animated mouth movement, which is a fundamental and pre-existing industry wide animation practice, as the patents-in-suit readily acknowledge. *See supra*, Section II.[9] But this rules-based practice does not represent any improvement in the technology used to perform animation, or even the process of performing the animation itself—it simply sets forth the previously-known animation method as a series of mathematical steps, and instructs the user to perform those steps on a computer.

Most importantly, the patents-in-suit instruct the user to supply his own TAPT and rules to convert that TAPT into a series of morph weight sets. In fact, Plaintiff repeatedly characterized these "extensible and freeform" rules as "the crux of the invention" during the *Markman* hearing. *See, e.g.*, Ex. D [Claim Construction Hr'g Tr.] at 86:9-15. But even Plaintiff was forced to admit that the patents-in-suit do not actually **claim** that any particular rules must be used, instead describing them as "extensible and freeform." *See id.* at 86:24-87:12, 103:17-25; Ex. A ['576 patent] at

---

[9] Perhaps even more than in *Bilski* and *Alice*, the idea that the human mouth looks a certain way while speaking particular sounds *is* indeed a "pre-existing fundamental truth" that "exists in principle apart from any human action." But even when applied to the field of animation, which is indeed a human activity, this concept does not become any less abstract.

9:23-26.   Instead, the patents-in-suit attempt to claim the use of ***any and all*** such "extensible and freeform" rules—or put more simply, the mere ***idea*** of using rules. That is, the patent purports to require the public (e.g., makers of automated lip-synchronization tools like FaceFX and Annosoft) to develop for themselves the proper set of rules to use in order to obtain an acceptable animation.   Of course, there are infinitely many such "sets of rules" that could be developed—including many that Plaintiff and the named inventor of the patents-in-suit never thought of—and the patents-in-suit attempt to claim, and thus monopolize, ***all*** of them.   In doing so, the patents-in-suit attempt to wholly pre-empt the use of ***any*** rules in the automated lip-sync process, thereby patenting the abstract idea of using rules itself.   *See Bilski*, 130 S. Ct. at 3230, 3231; *Mayo*, 132 S. Ct. at 1294.

The patents-in-suit then simply instruct the user to use a computer to apply those rules to the TAPT—a simple mathematical operation that, admittedly, a computer can perform faster than a human in his head or using a pencil and paper. But such rules—and the computer-based methods that apply them—cannot be patentable.   In *Flook*, the Supreme Court found that "a mathematical formula for computing 'alarm limits' in a catalytic conversion process was . . . a patent ineligible abstract idea," even though the patents implemented the fundamental concept in a specific way and directed it toward a specific field.   *Alice Corp.*, 2014 WL 2765283, at *9 (discussing *Flook*, 437 U.S. at 594-95); *see also Fuzzysharp Techs. Inc. v. Intel Corp.*, No. 12-4413-YGR, 2013 WL 5955668, at *13 (N.D. Cal. Nov. 6, 2013) (finding claims directed to computer graphics technology directed to an abstract idea and therefore unpatentable under § 101).   Here, the patents-in-suit attempt to claim no more than the use of a basic algorithm that implements fundamental mathematical formulae and relationships in a particular field.

Furthermore, as in *Flook*, the process claimed in the patents-in-suit can be performed solely with pencil and paper.   Indeed, the patents-in-suit confirm this fact

by providing a pencil-and-paper example of animating the word "hello." Ex. A ['576 patent] at 7:36-9:23. This pencil-and-paper example begins with a group of delta sets, *id.* at 7:43-51, a set of rules, *id.* at 7:58-8:34, and a TAPT, *id.* at 8:43-51. By simply applying the set of rules to the TAPT, one may (in one's mind or by using only pencil and paper) confirm that the appropriate output morph weight set stream is given. *Id.* at 8:57-9:9.[10] The patents-in-suit then explain that this output morph weight set stream is to be interpolated "using conventional methods well known in the art." *Id.* at 9:12-14. But patents that merely claim the performance of such computations, which could be done solely in one's mind or using pencil and paper, are unpatentable. *See Flook*, 437 U.S. at 594-95; *CyberSource*, 654 F.3d at 1371.

## 2. The Patents-In-Suit Do Not Contain An "Inventive Concept" Sufficient To Transform Their Application Of An Abstract Idea Into A Patent-Eligible Invention

Turning to the second step of the *Mayo* test, the Supreme Court noted in *Alice Corp.* that "[a] claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Alice Corp.*, 2014 WL 2765283, at *9. "Simply appending conventional steps, specified at a high level of generality, [is] not *enough* to supply an inventive concept." *Id.* (emphasis in original); *see also Mayo*, 132 S. Ct. at 1294 (finding method not patentable, even when a series of "conventional," "routine," or "well-understood" limitations were appended to an otherwise unpatentable principle). Moreover, adding "a computer into the claims does not alter the analysis . . . ." *Alice Corp.*, 2014 WL 2765283, at *9; *see also Dealertrack*, 674 F.3d at 1333.

---

[10] Significantly, the claims of the patents-in-suit do not claim the application of the rules used in this example, or indeed *any* particular rules—they merely claim that an output morph weight set stream is generated by "evaluating said plurality of sub-sequences against said first set of rules" (or similar)—that is, *any* set of rules. *See* Ex. A ['576 patent] at 11:36-39.

Instead, "the relevant question is whether the claims here do more than simply instruct the practitioner to implement the abstract idea . . . on a generic computer." *Alice Corp.*, 2014 WL 2765283, at *11. The answer is no. Method claim 1 of the '278 patent, for example, recites steps of obtaining rules defining morph weights as a function of phoneme sequence and times, obtaining timed phoneme sub-sequences corresponding to a desired audio sequence, generating morph weights by applying the rules to the sub-sequences, and applying the morph weights to animate characters synchronized to the audio sequence—all steps which may be done by hand. Ex. B ['278 patent] at 11:43-59.[11] The patents-in-suit admit that each of these steps was conventional, both when considered alone and as an ordered combination, because, as explained above, manual animation based on phonemes and morph weights was "traditional." *See supra*, Section II; Ex. A ['576 patent] at 1:14-2:37. Such conventional steps directed to mental processes cannot confer patentability. *See Alice Corp.*, 2014 WL 2765283, at *9, 11; *see also supra*, Section III.A (citing cases). Claims directed to a mental process, even when claimed as performed on a computer, are an improper attempt to monopolize the "basic tools of scientific and technological work" by "patent[ing] the use of human intelligence." *CyberSource*, 654 F.3d at 1372-73.

At the *Markman* hearing in this matter, Plaintiff made clear that the claimed "invention" of the patents-in-suit is merely an automation of a long-known and long-practiced manual process:

> ***What the invention was*** was actually applying ***specific rules***
> in not only the correspondence which was well known but
> also in timing and how you set up the start timing and how

---

[11]    The '278 patent was attached to the operative complaint against each Defendant joining this Motion and is therefore part of the pleadings to these actions.

you set up the stop timing so that when the — so that there
was ***an automated fashion to arrive at a set of keyframes***
***that previously needed to be done by feel and by hand to***
***create***.

Ex. D [Claim Construction Hr'g Tr.] at 24:3-10.  But an examination of the elements of representative claim 1 of the '278 patent reveals that the patents-in-suit do *not* claim an inventive concept sufficient to transform this unpatentable abstract idea into a patentable application of the abstract idea.

The preamble to claim 1 recites a method for performing such animation "automatically," but even assuming *arguendo* that the preamble ties the claim to a computer, this is merely an instruction to perform the animation "using some unspecified, generic computer," which again is insufficient.  *See Alice Corp.*, 2014 WL 2765283, at *11; *supra*, Section III.A.  In fact, during claim construction, Plaintiff vehemently *opposed* a construction that would impose limitations on the preamble and require that there be no "human intervention" during the performance of the claimed steps.[12]  Ultimately, this Court construed "automatically" to mean that the claimed steps must only be performed in order, but that the steps need not be performed without human intervention.  Indeed, if the claimed methods of the patents-in-suit are not required to be performed "automatically" (that is, without human intervention), then the only purported advance over the prior art—saving time and performing lip synchronization more quickly—is lost.  Thus, there is no inventive concept sufficient to transform the unpatentable abstract idea into a patentable application of that idea.

The first limitation requires the user to "obtain[] a first set of rules."  Notably, the claim does not limit in any way what these rules might be, except that they must

---

[12]  Even with these limitations, the preamble would simply disclose abstract concepts performed by a generic computer.

MOTION FOR JUDGMENT ON THE PLEADINGS

16

CASE NO. 12-cv-10322-GW (FFMx)

"define[] a morph weight set stream as a function of phoneme sequence and times associated with said phoneme sequence."  Indeed, the patent describes these rules as "*extensible and freeform* in the sense that they may be *created as desired* and adapted to a wide variety of animation characters, situations, and products."  Ex. A ['576 patent] at 9:23-26.  Put differently, the claimed "rules" must only take as input a TAPT and must output a morph weight set stream; beyond this requirement, the claims seek to pre-empt the use of *any* such rules—including those known to animation practitioners and used in the "traditional" method.  This makes sense, as the claimed method simply requires the user to "obtain" a set of rules—leaving the choice of those rules to the user.

Again, during claim construction Plaintiff argued that the "first set of rules" should be given its plain and ordinary meaning—simply any set of rules that can be applied to the animation process.  The Court agreed with Plaintiff and found that the term "first set of rules" needed no construction.  Thus, this "set of rules" is nothing more than a "set" of "rules," with no limitation on what those rules might be, how they are organized/stored, or how they are used.  As discussed in Section IV.B.1, *supra*, even Plaintiff admitted at the *Markman* hearing that the patents-in-suit claim *any and all* such rules.  There is no "inventive concept" in instructing the user to "obtain" an arbitrary set of rules that would be "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Alice Corp.*, 2014 WL 2765283, at *6.

Next, claim 1 requires the user to "obtain[] a plurality of sub-sequences of timed phonemes corresponding to a desired audio sequence for said three-dimensional characters."  Once again, the patent simply instructs the user to provide this TAPT, which it specifically notes "can be created by hand, as they currently are in the traditional animation industry."  Ex. B ['278 patent] at 1:42-44; *see also* Ex. E [Plaintiff's Claim Construction Tutorial] at 4:05-4:20 (stating that the TAPT can be

MOTION FOR JUDGMENT ON THE
PLEADINGS

CASE NO. 12-cv-10322-GW (FFMx)

generated "manually, as it's been done for a long time in 2d animation"). Again, there is no "inventive concept" in asking the user to supply something he would have created even to perform animation in the "traditional" method.

The third limitation requires "generating an output morph weight set stream by applying said first set of rules to each sub-sequence of said plurality of sub-sequences of timed phonemes." While this limitation uses many terms of art, in practice it only involves performing simple math. As shown in the patents' example of animating "hello," these rules can be as simple as using a particular morph weight set (e.g., (0,0,0,1,0,0)) when a specific phoneme is encountered (e.g., "oh" as in "old"). *See* Ex. B ['278 patent] at 8:7-9. But this step, just like the first, does not claim any particular rules themselves. Instead, it merely instructs a user to ***apply*** the rules—something that could be done in a user's mind or using a pencil and paper. Indeed, in the prior art, an animator would use a set of rules based on his own skill and experience to determine, based on the TAPT, what the appropriate morph weight set should be at each keyframe. *See* Ex. E [Plaintiff's Claim Construction Tutorial] at 8:21-8:40 ("The artist would animate the weights from viseme to viseme [i.e., of each morph target] at the times that each of the phonemes occurred in the audio track, either by eye, or if they had the luxury, by referencing the transcript."). Once again, no "inventive concept" exists in merely instructing a user to apply a set of user-supplied rules to a user-supplied TAPT.

Finally, claim 1 requires the user to "apply[] said output morph weight set stream to an input sequences of animated characters . . . ." The patents-in-suit explicitly admit that this step is one that can be performed by a "conventional computer animation system." *See* Ex. B ['278 patent] at 9:22-27; Ex. E [Plaintiff's Claim Construction Tutorial] at 9:00-9:25 (referring to "industry-standard 3d software," which runs on a generic computer, performing this step). Furthermore, the substance of this step fares no better. In the prior art method, for example, a simple

18

morph weight set stream for two frames of animation with only two morph targets might be ((1,0), (0,1))—that is, the first frame consists of expressing the first morph target fully, and the second frame consists of expressing the second morph target fully. To "apply" these to an animated character, an animator would simply use the first morph target as the facial model for the first frame, and the second morph target for the second frame. Even if the second morph weight set was, for example, (.5,.5), the animator would simply average the location of each pixel between the two morph targets and use those pixel locations for the facial model at that frame. This process can be performed completely by hand, and consists of no more than simple mathematics. Thus, there is no "inventive concept" here—the claim merely instructs the user to use a conventional computer in a conventional way.

Analyzing the claim "as an ordered combination," as the Supreme Court described in *Alice Corp.*, yields the same result. The "ordered combination" of the claim is precisely the same process that the patents-in-suit acknowledge was performed in the "traditional" method. *See supra*, Section II. As described in Section II, *supra*, the animator would choose the proper morph weight set for each sub-sequence of timed phonemes using his own judgment. This judgment would be informed by an internal set of guidelines, or rules, based on the animator's experience and skills. For example, an animator would know that when she encounters an "oh," she should fully weight the "oh" morph target and unweight all of the other morph targets. This is identical to the application of the types of rules contemplated in the specification of the patents-in-suit, *see, e.g.*, Ex. B ['278 patent] at 8:7-9 (showing example rule for "oh" phoneme that fully weights the "oh" morph target and unweights all others). Critically, however, the patents-in-suit do not claim any *particular* rules at all. Indeed, the fact that an animator would traditionally perform this same process in her mind only highlights the abstract nature of the idea claimed. *See CyberSource*, 654 F.3d at 1371.

The remaining asserted claims are also deficient. Claim 2 of the '278 patent adds phoneme "correspondence rules" and "morph weight set transition rules" that merely elaborate on the abstract idea of animating based on rules. Claim 3 of the '278 patent adds start and end times for morph weight transitions that were conventional. *See* Ex. B ['278 patent] at 2:27-34 (conventional "keyframe" approach). Claim 1 of the '576 patent is similar to claim 1 of the '278 patent but generates both intermediate and final streams of morph weights that likewise are conceptual and conventional. *See* Ex. A ['576 patent] at 1:44-2:37, 7:13-15, 9:11-14. The other asserted claims of both patents—none of which differs significantly from these claims for the purpose of analysis under § 101—present similar issues.[13]

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion for Judgment on the Pleadings Based On Unpatentability under 35 U.S.C. § 101.

DATED: July 10, 2014

Respectfully submitted,

WEIL, GOTSHAL & MANGES LLP

By:   */s/ Sonal N. Mehta*
Sonal N. Mehta
Attorneys for Defendants
BANDAI NAMCO GAMES AMERICA, INC.; SEGA OF AMERICA, INC.; ELECTRONIC ARTS INC.; DISNEY INTERACTIVE STUDIOS, INC.; CAPCOM USA, INC.; NEVERSOFT

---

[13]    The Supreme Court and Federal Circuit have both made clear that analyzing claims in groups is appropriate when those claims are sufficiently similar for the purpose of analysis under § 101. *See Bilski*, 130 S. Ct. at 3223, 3231 (analyzing the "key claims" and then characterizing the "remaining claims" as "broad examples of how hedging can be used in commodities and energy markets"); *Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1322-24 (Fed. Cir. 2012) (analyzing 41 claims in two groups based on the presence or absence of a computer).

1               UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3               HONORABLE GEORGE WU

4        UNITED STATES DISTRICT JUDGE PRESIDING

5                   - - -

6

   MCRO, INC.,                   )

7              PLAINTIFF,   )
                         )

8   VS.                    )  NO. CV 12-10322 GW
                         )

9   NAMCO BANDAI GAMES AMERICA, INC.,  )
   ET AL.,                  )

10              DEFENDANT,  )
   _____)

11

12

13

14       REPORTER'S TRANSCRIPT OF PROCEEDINGS

15          LOS ANGELES, CALIFORNIA

16          MONDAY, APRIL 28, 2014

17

18

19      _____

20        KATIE E. THIBODEAUX, CSR 9858
         U.S. Official Court Reporter

21        312 North Spring Street, #436
        Los Angeles, California 90012

22

23

24

25

   UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFF:

4    MISHCON DE REYA LLP
     BY:  JOHN PETRSORIC
5    -and- ROBERT A. WHITMAN
     -and- ERIC BERGER
6    -and- DOMINICK VITILIANO
     -and- VINCENT FILARDO
7    750 Seventh Avenue 26th Floor
     New York, NY 10019
8

9    FOR DEFENDANTS:

10   WEIL GOTSHAL AND MANGES LLP
     BY:  SONAL NARESH MEHTA
11   -and- EVAN BUDAJ
     201 Redwood Shores Parkway Suite 500
12   Redwood Shores, CA 94065-1175

13

14   MORRISON AND FOERSTER LLP
     BY:  WENDY RAY
15   707 Wilshire Boulevard Suite 6000
     Los Angeles, CA 90017-3543
16

17   SHOOK HARDY AND BACON LLP
     BY:  BETH A. LARIGAN
18   2555 Grand Boulevard
     Kansas City, MD 64108
19

20   COLT SINGER BEA LLP
     BY:  BENJAMIN L. SINGER
21   633 West Fifth Street 28th Floor
     Los Angeles, CA 90071
22

23   STEPHEN RUBIN LAW OFFICES
     BY:  STEPHEN RUBIN
24   553 12th Street
     Santa Monica, CA 90402-2907
25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4782**

1    APPEARANCES:  (Cont'd)

2

3    SPACH CAPALDI & WAGGAMAN LLP
     BY:  ANDREW TSU
4    4675 MacArthur Court Suite 550
     Newport Beach, CA 92660
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          LOS ANGELES, CALIFORNIA; MONDAY, APRIL 28, 2014

 2                      9:09 A.M.

 3                      - - - -

 4

 5

 6          THE COURT:  Let me call McRO versus all the other

 7   defendants in Track 1.

 8               Let me have appearances starting with

 9   plaintiff's counsel.

10          MR. PETRSORIC:  Your Honor, John Petrsoric,

11   Mishcon De Reya, New York, for plaintiff McRO, Inc.,

12   Planet Blue.  With me are Robert Whitman, Eric Berger and

13   Dominick Vitiliano from my office.  And I would also like

14   to introduce Maury Rosenfeld who is the named inventor on

15   the patents in suit and also the owner of Planet Blue.

16          THE COURT:  Somewhat fitting that Godzilla is

17   going to open up this week, but be that as it may.

18               All right.

19               Vincent Filardo also on the line?

20          MR. FILARDO:  -- here in New York.

21          THE COURT:  And for the defense?

22          MS. MEHTA:  Good morning, your Honor, Sonal Mehta

23   from Weil, Gotshal for Namco Bandai Games America, Sega

24   of America, Electronic Arts, Disney Interactive Studios,

25   Capcom USA, Neversoft Entertainment, Treyarch
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Corporation, Warner Brothers Interactive, Lucas Arts,

 2   Activision Blizzard, Infinity Ward and Index Digital

 3   Media.

 4            With me is Evan Budaj also from Weil, Gotshal

 5   and Roger Kennedy and John Chow from Disney Interactive

 6   are here as well.  They are in-house counsel.

 7        MS. RAY:  Good morning, your Honor.  Wendy Ray of

 8   Morrison and Foerster on behalf of defendants Konami

 9   Digital and Square Enix, Inc..

10        MR. SINGER:  Morning, your Honor.  Benjamin Singer

11   on behalf of defendant Insomniac Games, Inc..

12        MR. RUBIN:  Steven Rubin also on behalf of

13   Insomniac Games.

14        MR. TSU:  Good morning, your Honor.  Andrew Tsu on

15   behalf of defendant Obsidian Entertainment.

16        THE COURT:  All right.

17        MS. LARIGAN:  Good morning, your Honor.  Beth

18   Larigan on behalf of Naughty Dog, Sony Computer

19   Entertainment America and Sucker Punch Productions.  And

20   with me is Dan Herp who is in-house counsel at Sony

21   Computer Entertainment America.

22        THE COURT:  All right.  Everybody have a seat.

23   Find chairs.

24            I issued a tentative, but the tentative is a

25   real tentative.  I base it on what you have presented so
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    far, and I looked at the tutorials.  The tutorials are

2    interesting, but I must confess that even after looking

3    at all that stuff, I don't quite have a sense of what the

4    invention is yet.

5            The invention is basically software?

6        MR. PETRSORIC:  Software to perform lip

7    synchronization.

8        THE COURT:  Let me ask this.  Why, in the way that

9    the patent is written, why isn't the word computer in the

10   first claim?  Why is it left until the 14th?  I think

11   that is when the word computer first appears.

12       MR. PETRSORIC:  I believe, your Honor, it ends up

13   appearing in the apparatus claims, and then within the

14   method claim, the prosecutor at the time chose not to use

15   the term.

16       THE COURT:  Okay.  All right.  So indeed it is

17   software.

18            And so in the software, if you look at Claim

19   1, it talks about obtaining a first set of rules.

20            Oh.  Do you guys have a presentation for me

21   and I am interrupting?

22       MS. MEHTA:  No, your Honor.  So when your Honor is

23   ready to hear on particular terms, we are happy to go

24   into the presentation, but we can answer any questions

25   you have about the technology.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1      THE COURT:  I thought there was another tutorial

2  for me.  Both tutorials had cute things about it.  So I

3  am always willing to look at the tutorials.

4          All right.  So we are talking basically about

5  software.  And when Claim 1 talks about obtaining a first

6  set of rules, the first set of rules are already

7  incorporated in software or the rules have to be

8  incorporated into the software in some way or programmed

9  into the software such that the software will thereafter

10  operate on its own devices?

11      MR. PETRSORIC:  Your Honor, I believe the rules,

12  some of the rules could be incorporated into software,

13  but there is also the option to further incorporate

14  additional rules.  For example, the correspondence rules

15  where the animator sets up correspondence between

16  particular facial models and particular phonemes.

17      MS. MEHTA:  Your Honor, on that point, I think the

18  parties have a difference of opinion as to actually what

19  the patent discloses.  So from the defendant's

20  perspective and if you read the specification of the

21  patent, what it describes is the ability for the animator

22  to define a set of rules to do a variety of things

23  including the decision of how to actually interpolate, to

24  do post processing and the like, and, then, to automate

25  the process by which you take the time aligned phonetic

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    transcript, the TAPT, and you apply those rules

 2    automatically to the TAPT to generate the animation.

 3            And we can get into this when we get into the

 4    preamble limitation, but what the patent is describing is

 5    allowing somebody to set up that input.  And then once

 6    you get to the claimed method, you are running that claim

 7    method automatically, and that is why the first

 8    two limitations of Claim 1 are not inputting the time

 9    aligned phonetic transcript in the rules, they are simply

10    obtaining them.

11            So if you think about it from the perspective

12    of a software program, what you would have would be the

13    ability for someone to, before starting the claimed

14    process, the animator would say, here is my transcript, I

15    am going to input this into the process, here are the

16    rules that I am going define, I am going to input those

17    into the process, and then I am going kick off the

18    process.

19            And from that point forward, each of the claim

20    limitations in Claim 1 would run automatically, without

21    human input because the rules are already input before

22    the process starts.

23        THE COURT:  Let me stop you.  I understand what

24    you are saying.  Obviously, however, my tentative

25    disagrees with you on those points somewhat.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1            But maybe you will convince me with further

 2    argument, but, at least initially, you are going to be

 3    arguing that one.

 4            MS. MEHTA:  Fair enough.

 5            THE COURT:  But let me get back to this notion of

 6    obtaining the rules.  So these rules, are there any rules

 7    that are automatically included in the patent such that

 8    they cannot be overridden?

 9            MR. PETRSORIC:  I don't think the patent

10    specifically speaks to that, your Honor, but I think from

11    the position of one of ordinary skill in the art, there

12    may be, one, there may be a fixed set of rules that an

13    animator or the person writing the software will fix in

14    place, and then there may be additional rules that can be

15    incorporated and are modifiable.

16            THE COURT:  All right.  Also, in the defendant's

17    tutorial, the defendant -- I think it is defendant, yes,

18    defendant's tutorial -- at one point, they show -- well,

19    they used the term vizemes.  Is that how you pronounce

20    it?

21            MR. PETRSORIC:  Vizemes.

22            THE COURT:  Like the eye drops.  Vizemes.  But

23    vizemes is not utilized in terms of the patent; is that

24    correct?  Or vizemes are incorporated into the patent?

25            MR. PETRSORIC:  I do not believe the term vizeme
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**A4789**

1    is used in the claims, but there is, I think, visual

2    phonemes is used in the specification at least.

3          THE COURT:  All right.  And vizemes, at one point

4    in time, the defendant has this chart that has 16

5    vizemes.  Is it the defendant's position that there are

6    only 16 vizemes?

7          MS. MEHTA:  I believe the answer is, your Honor,

8    and to have admit that I am not as deeply steeped in the

9    animation arts as our experts will ultimately be at

10   trial, but I believe the answer is that those 16 vizemes

11   are what are normally associated with phonetic speech.

12   So those would be the standard thing that you would

13   normally look at in terms of creating a lip sync set of

14   vizemes.

15         THE COURT:  All right.  Is there, in the industry,

16   is there a recognition of the fact that there are only a

17   certain limited number of vizemes, and is that utilized

18   because, again, in the defendant's tutorial when they

19   presented a morph set, they had 16 numbers, so I presume

20   that if those were accepted, then all the visual, I'm

21   sorry, all the lip synchronization would be based upon 16

22   vizemes and then that is what we are talking about.

23         But, conversely, in the patent itself, you

24   use, the plaintiff uses a sequence with only five for the

25   word hello.  And so the reason I am wondering is that,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    well, is there like uniformity insofar as how these
 2    things are normally expressed?
 3         MR. PETRSORIC:  I think the only place there may
 4    be uniformity, your Honor, is in the total collection of
 5    phonemes that the human utterance can cover.
 6              I think in terms of the industry and what the
 7    defendant, the software defendants use to perform the lip
 8    synchronization, they probably have the tools, will start
 9    with probably a combination of six to seven vizemes or
10    models, and, then, the user can build on it from there.
11    But I believe they say it is typically, reasonably
12    realistic lip synchronization can be performed with a
13    minimum of six vizemes.
14         MS. MEHTA:  So, your Honor, I think we probably
15    agree, but I just want to make sure there is clarity
16    here.  The question is there is a total number of vizemes
17    that can apply to the normal sounds and lip shapes that
18    are made in speech.
19              And then the question is how many of those do
20    you want to use for a particular lip synchronization
21    application, and depending on how many you use, you will
22    have a certain level of granularity of movement.  So the
23    patent describes using five phonemes because it is using
24    an example of the word hello, and so it only applies the
25    phonemes that apply to that word and doesn't give you
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  examples of the other phonemes that aren't implicated by

2  that word.

3      But in the normal course of doing animation,

4  an animator could choose to use up to 16 or potentially

5  even more, but I think 16 is probably at the high end

6  depending on how sophisticated they want to be.

7      THE COURT:  That is what I was wondering because,

8  again, I don't quite understand the patent in this case

9  fully because, for example, I could understand if the

10  patent included some sort of like universal calculations

11  such that for every expression we would always have 16.

12      Now, a lot of this, insofar as a lot of the

13  vizemes on 16, the weight would be zero because you

14  wouldn't be using, for example, like in hello, you are

15  only concerned with the H-E-L-L-O and something else

16  maybe, but you would have those as numerically encoded or

17  whatever the word would be.  I am very bad with terms.

18      And then you would have all that already

19  contained within the -- within the patented device.  But

20  maybe I am misunderstanding the patented device.

21      MR. PETRSORIC:  No. I think you are understanding

22  it correctly, your Honor.  I think it really comes down

23  to, it comes down to a matter of degree.  So if the

24  animator can get away with reasonably realistic

25  animation, and only use six or eight separate vizemes,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   they may do that, but if they are looking to achieve

 2   significantly greater realism and still and yet -- and

 3   cover a greater range of phonetic utterances, there is

 4   the option to use even more vizemes and models.

 5        THE COURT:  Let me ask you when somebody --

 6   obviously, your client has a patent.  I presume the

 7   patent is incorporated into software.  When somebody

 8   decides to get a license for the use of that particular

 9   patent, they get sent this piece of software, and they

10   can do certain inputs to customize the software for their

11   own use.

12        But what is basically in the software before

13   any inputting by the purchaser?

14        MR. PETRSORIC:  Well, the software is built to

15   accept the input, to accept the setup of, okay, for a

16   particular -- for a particular phoneme for one of the, I

17   don't know if I have this correct, but for a fricative

18   phoneme such as "bu."  It is all about translating

19   language into facial expressions.

20        So what is in the software is the ability to

21   correlate the particular phoneme with the particular

22   facial and mouth expression.  And that can be done on a

23   one-to-one basis where for a particular phoneme like

24   "bu", that there is one particular model, the "bu" model.

25   There could also be the possibility, and I think it is
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1  mentioned in Column 2 of the patent, that the "bu"

 2  phoneme is -- the animator actually wants it to be a

 3  combination, a morphing of two separate models so more of

 4  something with a little more of an open mouth shape and

 5  something with a little more of a closed mouth shape if

 6  that makes any sense.

 7       THE COURT:  All right.  But is the basic patent --

 8  what the patent does, once all this inputting is done, it

 9  provides a, I guess, the way in which the computer will

10  do the -- is it interpolation?  Is that the term?

11       MR. PETRSORIC:  Interpolation is basically --

12       THE COURT:  Between the keyframes where one --

13  well, I guess in the program you are putting in the

14  transcript and, et cetera, et cetera, and it does these

15  interpolations.  How do you pronounce that word again?

16       MR. PETRSORIC:  Interpolation.

17       THE COURT:  It goes through the interpolation

18  between keyframes, and that is basically what is the

19  basis of the patent.

20       MR. PETRSORIC:  Yes.  And what is core to that,

21  your Honor, is basically applying rules to get a very --

22  to get more exacting control of the way the keyframes are

23  established.  So that when the interpolation is done, it

24  is not just interpolation necessarily between full mouth

25  positions.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Let me say this.  So, for example, if
 2   you want to customize the way in which a character says
 3   the word E, for example, the -- you can modify what a
 4   keyframe for E would be in terms of the degree to which
 5   the -- the normal way the E is done, you give a regular E
 6   like a hundred percent, and then you can modify that by
 7   changing it to say that unless otherwise you want, it
 8   will be a 75 percent rather than a hundred percent for
 9   that particular sound.
10          MR. PETRSORIC:  Correct.  And what may also play
11   into that, your Honor, is the concept of timing.  So if
12   somebody is saying please so the E is in there, if they
13   are please versus please, the way the mouth is going to
14   respond or build up to that E is going to be different
15   depending on the cadence in which it is pronounced.  So
16   the timing comes into play.
17              So what the patent also speaks to is adjusting
18   the keyframes and the keyframes that are output to morph
19   weight sets according to the timing of the spoken word.
20          THE COURT:  All right.  And it is my understanding
21   that in the prior art, the adjustments, just the regular
22   adjustments between one keyframe to another keyframe,
23   that had to be done manually by a person on a computer
24   normally.  Well, nobody draws anymore, but when they did
25   draw in, they would have to draw that, but I guess your
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4795**

1  client's patent doesn't work for hand-made drawings.

2  MR. PETRSORIC:  Absolutely not.

3  THE COURT:  It only works for purposes of computer

4  animation.  So but what used to be supposedly under the

5  prior art, the persons would have to manually do the

6  interpolation process.  Would it have to be an

7  interpolation process was done at each and every single

8  instance or would it be an interpolation process where

9  you can program the computer to put in a particular

10  interpolation process for a particular character, and,

11  thereafter, you just continually run that same program

12  for that particular character?

13  MR. PETRSORIC:  Let me speak a little bit to, I

14  think when we talk about manual animation, and it is

15  still done much of that brute force method is still

16  applied in the computer-animated movies.

17  And what happens in those instances is an

18  animator is able to set the keyframes more precisely.  So

19  they will sit there with multiple models, and they will

20  make -- they will make fine adjustments to the way the

21  multiple models are morphed together or blended together

22  at a single keyframe.  And they will set that keyframe

23  and the time of that keyframe, and then the computer will

24  be used to interpolate between the keyframes.

25  THE COURT:  Is there any prior art where there is

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    another methodology used for interpolation that is not

2    covered -- well, obviously, it is prior art.  Your

3    client's patent, it does something different from what

4    the prior art does obviously.

5         MR. PETRSORIC:  Obviously.  And the patents do not

6    cover all forms of computer-assisted lip synchronization.

7         THE COURT:  Okay.  What is the other, in terms of

8    the prior art, what are the other methodologies utilized

9    for doing this interpolation process?

10        MR. PETRSORIC:  The methods include more of a

11   one-size-fits-all approach.  So if the user had defined a

12   particular mouth or vizeme for a phoneme, they would --

13   that would be fixed, and there wouldn't be any adjustment

14   for the timing of the way the word is spoken.

15            And I think in the tutorial we tried to show

16   that in those instances where timing is not taken into

17   consideration, depending on how quickly the words were

18   spoken could affect the realism of the output, of the

19   animation.  So if words were spoken very quickly, it

20   would just look like the mouth was flapping as opposed to

21   when the words were spoken more slowly and the phonemes

22   could stretch on that the one-size-fits-all approach

23   where you are going from a particular fixed model to

24   another particular fixed model would look realistic in

25   those scenarios.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              MS. MEHTA:  Your Honor, I think there is a very

 2    different view in the prior art in the patent from the

 3    two sides.  So one thing I think we need to be clear on

 4    and take a step back -- and I am not sure if we have a

 5    disagreement on this or not, but I think if we look at

 6    the patents, we shouldn't -- is that this patent is not

 7    purporting to have invented or claimed the concept of

 8    interpolation or even interpolation between keyframes.

 9              So all the patent purports to do is take what

10    was known in the prior art which was to use a set of

11    rules that the animator would know and apply it to a

12    phonetic transcript to create the keyframes based on the

13    weighting of the different morph targets, and then what

14    was done in the prior art was that you would simply

15    interpolate that.

16              And what Mr. Rosenfeld purports to have

17    invented is the concept of taking that and taking the

18    application of the rule to the phonetic transcript which

19    the patent says is a very labor intensive and time

20    consuming process that required the manual labor of the

21    animator and automating that by claiming that you would

22    take the transcript and the set of rules that are defined

23    in the program and simply let the program run those

24    rules.

25              So it is not claiming interpolation as the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    invention.  It is a step of overall method, but the thing

 2    he is claiming to have invented is the concept of how do

 3    you make it easier for the animator to not have to do the

 4    manual work of applying rules as to how you might weight

 5    two particular targets to achieve a particular transition

 6    between phonemes and doing all of that in the computer

 7    and letting the computer apply the rules to the phonetic

 8    transcript.

 9         THE COURT:  But that is what I am trying to figure

10    out is what exactly the patent is because, you know, if

11    the patent itself does not create the rules and the rules

12    have to be inputted and interpolation has been done via

13    computers previous to this, I don't quite exactly

14    understand what exactly is the patent.

15         MR. PETRSORIC:  You are asking, your Honor, what

16    the inventive step is?

17         THE COURT:  Yes.

18         MR. PETRSORIC:  And the inventive step is not only

19    is taking what was in the prior art which was known,

20    which was not manual animation and also some forms of

21    automated lip synchronization but where those forms

22    really were not able to take into account the timing of

23    the spoken word.  So they really were not able to

24    consistently reproduce realistic results.  So the patent

25    really is directed towards evaluating the timing and, in
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    the phonetic transcript, to further adjust the models and

 2    the weights that are being applied to the models.

 3          THE COURT:  The thing I don't understand is isn't

 4    most of these items that you are talking about, those are

 5    the rules that you are incorporating --

 6          MS. MEHTA:  That's right.

 7          THE COURT:  -- into the process.  So, therefore, I

 8    don't quite understand what the invention or the

 9    inventive invention is because, you know -- does your

10    client want to talk to you for some reason?  Do you want

11    to talk to him?  Feel free.  You are the client.  You can

12    sit next to him if you so desire.

13          MS. MEHTA:  Maybe while they are conferring, your

14    Honor, I can give you our view on this.

15          THE COURT:  The attorney should hear it.

16          MS. MEHTA:  So your Honor is asking I think a

17    fundamental question that we have had, and the reason it

18    hasn't been presented to your Honor in the form of a 101

19    motion yet is that as you know the Supreme Court is still

20    giving us or attempting to give us guidance on exactly

21    what the standards of 101 are.

22             But what the patent says expressly throughout

23    the specification in describing the background of the

24    invention and what the purported invention here is is

25    that it is taking a known method that was done manually
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4800**

 1   using the input of an animator and simply automating that

 2   process.

 3            So everything that Mr. Petrsoric was

 4   describing in terms of the timing of the vizeme and not

 5   having the flapping of the lips because we can adjust the

 6   time, that is not anywhere in the claim.  And the reason

 7   that is not anywhere in the claim or frankly anywhere in

 8   any of the description that correlates to the claim is

 9   because those are the rules that get input by the

10   animator before the process starts.

11            So the claim doesn't say here is a solution

12   for how to avoid lip flapping because we are going to

13   adjust the timing of the way the mouth works between

14   two phonemes.

15            THE COURT:  Let me stop you.  Even if I were to

16   accept your presentation as being accurate and correct,

17   not that I am doubting you, but why couldn't a patent be

18   awarded simply in that type of situation where a person

19   creates a device that if you do incorporate these certain

20   rules that it will make the interpolation process not as

21   manually intensive because it will automatically do

22   certain things that you have programmed into the

23   software?  Why can't that -- assuming the software is

24   patentable, why wouldn't that -- why can't you do that?

25            MS. MEHTA:  So I think there is two separate

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    questions there, your Honor.  The first one is what is it

2    that they actually invented and claimed, and what they

3    actually invented and claimed is removing from the manual

4    step, the creation of the morph weight targets and the

5    keyframes that you would then go and interpolate because

6    interpolation was already known.

7              So, basically, what you are doing is you are

8    taking the process of applying a set of rules to the

9    phonetic transcript and making that application automatic

10   in the software.

11        THE COURT:  I know you keep on saying automatic

12   because you want to make the argument that not a human

13   hand comes into play.

14        MS. MEHTA:  When I say automatic, I am not

15   assuming our construction of automatic.  I am using the

16   claim language, your Honor.

17        THE COURT:  All right.

18        MS. MEHTA:  So all I am saying it is done

19   automatically meaning it is done by the software as

20   opposed to by the person.  So that is one issue.  That is

21   what the claim is claiming, and that is what the patent

22   describes as the invention.

23        THE COURT:  Let me stop you.  Do you agree with

24   that?

25        MR. PETRSORIC:  I believe, your Honor, I disagree
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   with that from the fundamental perspective of, from the

 2   prior art, manual animation, there weren't necessarily

 3   rules being applied.  The animator was doing this by

 4   feel.

 5          What the patent seeks to do is to add rules

 6   regarding correspondence and timing so that you can put

 7   together a complete output that takes into account from a

 8   mathematical and an automated perspective what the

 9   animator may have previously achieved by feel.

10       THE COURT:  But let me just ask you this.  In the

11   end, however, the patent invention is the software where

12   if you input these certain rules whatever they are, they

13   make this interpolation process between keyframes faster

14   with less involvement of some person, from the animator,

15   himself, herself or itself.

16       MR. PETRSORIC:  Correct.  That is correct.  And

17   what happens as a result is that by setting up keyframes

18   where there is now more control as a result of the

19   application of correspondence and timing rules, now,

20   there is more realistic output at each keyframe so that

21   when the interpolation does take place, a more -- a more

22   realistic animation results.

23       THE COURT:  But the application of more input to

24   define the keyframe is not the invention nor is it -- can

25   he claim that as -- in other words, he may have --
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   because that was known.  You can always do that.  Anybody

2   can do that.  That wasn't part of the invention.

3       MR. PETRSORIC:  No.  What the invention was was

4   actually applying specific rules in not only the

5   correspondence which was well known but also in timing

6   and how you set up the start timing and how you set up

7   the stop timing so that when the -- so that there was an

8   automated fashion to arrive at a set of keyframes that

9   previously needed to be done by feel and by hand to

10  create.

11      THE COURT:  So the patent is for the software that

12  once you put in the rules, it effectuates these rules in

13  a faster way and in the end a more productive way because

14  what you get is better than -- well, not necessarily

15  better than if you did it by hand, but if you didn't have

16  this program and you did it by computer, the other

17  programs, it wouldn't come out as nicely, but you could

18  do the same thing if you wanted to do it by hand but it

19  would take a lot more time.  So, in other words, that is

20  the invention.

21      MR. PETRSORIC:  Exactly.  And that is why the

22  companies like Pixar and Dream Works typically

23  incorporate an army of animators.

24      THE COURT:  That was my question.  Does Pixar use

25  this like, for example, in their movies that they are

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    famous for, like Toy Story and Monsters, do they use this

2    patent?

3            MR. PETRSORIC:  Not to my knowledge, your Honor.

4    But I can't speak with completeness to that.

5            MS. MEHTA:  So, your Honor, I think it sounds like

6    we have some points of agreement, but I think one thing

7    we should be clear on is what was known in the prior art

8    because the concept of computer-assisted animation was

9    known in the prior art.  The concept of an animator using

10   a set of rules or if as Mr. Petrsoric said their

11   experience which is just rules that aren't written out in

12   computer language, they are applied in the person's

13   brain.  All that we are doing is taking that concept and

14   putting it in a software program; right?

15           So they are not suggesting, I haven't heard

16   Mr. Petrsoric suggest that the patent is saying that

17   there is any particular rule or set of rules that is

18   being claimed or that has been invented or any particular

19   set of timing that is magic that makes this so much

20   better than anything that came before.

21           It is a very simple concept which is it was

22   known to use computer-assisted animation.  It was known

23   that you could use interpolation between keyframes, and

24   it was known that at a minimum in the head of the

25   animator, you would apply normal rules as to how to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   weight different morph targets to achieve the right set

 2   of inputs to this process.

 3            The only thing that they are purporting to

 4   have invented is taking the rules and applying them using

 5   a software program as opposed to having the animator

 6   apply them manually, and that is where all the cost and

 7   time savings that is described --

 8        THE COURT:  Why isn't that a patentable invention?

 9        MS. MEHTA:  So that is where we get to the second

10   question which is under 101 whether that would be

11   patentable subject matter, and as I said before, the

12   reason we haven't already presented this to your Honor as

13   a Section 101 motion which I think it would be ripe for

14   is because we know there is some uncertainty in the law

15   pending the Supreme Court's outcome in CLS.  But I

16   suspect that we are going to get perhaps not clear

17   guidance but, hopefully, some additional guidance.

18        THE COURT:  I would just say in the patent area,

19   does the Supreme Court ever give you really clear

20   guidelines?

21        MS. MEHTA:  Fair enough.  But, hopefully, we will

22   get some additional guidance to help give us a little bit

23   more of what the framework should look like.

24        THE COURT:  I should say this off the record, but

25   I will leave it on the record because what can I say.  I
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4806**

1    listened to one argument.  It was in the copyright area

2    because my case went up to the Supreme Court.  And I

3    listened to the copyright arguments on that case, and

4    then I read the transcript of another copyright case

5    which wasn't my case but it was a Second Circuit case and

6    I reached a decision -- it was against a Second Circuit

7    decision because I didn't think the Second Circuit

8    decision was right.

9           I read the transcript of the oral arguments in

10   front of the Supreme Court on that, and what I walked

11   away with in both those situations was the fact that the

12   justices really didn't seem to understand it because I

13   don't understand the area very well myself.  But the

14   justices seemed to understand less than I did about the

15   areas.  So I don't know if the Supreme Court is going to

16   give you anything that is going to be particularly

17   helpful in that regard.

18       MS. MEHTA:  Fair enough.  And I won't comment on

19   that, your Honor, but I will say that I am hoping we will

20   get some additional guidance at least from the Supreme

21   Court.  And what I think that guidance will show or what

22   I think, at least what the federal circuit and the

23   Supreme Court have done up until this point will confirm

24   is that you can't simply take something that was known in

25   the prior art and then saying we are going to implement

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    that in software and patent that because that is based on

2    the current jurisprudence not patentable subject matter.

3           And if you read the specification, if you read

4    the claims, and, frankly, if you listen to what

5    Mr. Petrsoric just said about what this patent is

6    purporting to claim, that is all that they purport to

7    cover is taking a known method and moving it to software

8    so that the rules don't have to be applied manually but

9    they are applied in the software.

10       THE COURT:  I don't know if I would agree with

11   that because I mean let's presume, for example, that we

12   had somebody, when cars were first made, you would have

13   people standing on the production line and you would get

14   a little widget thing, you put it here and you put

15   another widget thing there and it took a lot -- it was

16   time consuming.  Then somebody invented a machine that

17   does all that automatically, why wouldn't that be

18   patentable?  And if that is patentable, why wouldn't this

19   be patentable?

20       MS. MEHTA:  Well, your Honor, the difference is in

21   the context of a machine that there is going to be an

22   apparatus or something that can achieve that result.

23   Here, all we would be doing is taking rules and steps

24   that are known to the person that is doing it manually

25   and writing them in computer software code and then

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4808**

1  having the computer execute on that code.  And that is

2  what the current Section 101 jurisprudence has said is

3  not sufficient to be patentable subject matter.

4          Now, all of this is a little bit of an aside

5  for the purposes of today because I think what we have is

6  an agreement that in terms of what the patent is

7  purporting to cover, all we are talking about is

8  inputting the rules, inputting the transcript and then

9  letting the software actually apply the rules to the

10 transcript, and then we get into some of the details of

11 how that works.  But that is what I think both sides

12 agree is actually what is purported to be claimed and

13 covered by the patent.

14      THE COURT:  I will hear response from plaintiff's

15 counsel, and then I will have one more question and then

16 I will allow you to make the presentation you wanted to.

17      MR. PETRSORIC:  There is a little putting the cart

18 before the horse here on several fronts.

19          Number one, when we have said manual

20 animation, that was done by feel.  That wasn't per se

21 done by rules.  So it didn't necessarily yield consistent

22 results.

23      THE COURT:  Also, you could argue that different

24 people have different aesthetics in terms of what they

25 do, and so the whole point of having it as a program is

1    that it provides, to the extent that the animator wants,

2    uniformity.  In other words, you as the animator set

3    certain parameters as far as what you want in terms of

4    the interpolation, and the program will give it to you on

5    a consistent basis.  And you make a determination as to

6    whether or not you want to even vary that which you could

7    do according to the program.  I presume that is what you

8    are going to say.

9         MR. PETRSORIC:  That is exactly what I was going

10   to say, your Honor.

11        THE COURT:  Not exactly, but it was near.

12        MR. PETRSORIC:  I will say, your Honor, that was

13   exactly what I was going say.  And you mentioned the key

14   points of repeatability and efficiency.  So there is the

15   opportunity to do this in a -- in a cost-effective manner

16   even if it doesn't necessarily give you the best results.

17   You know, the old adage is that perfect can sometimes be

18   the enemy of good enough.  And that is something you

19   could apply here.

20             So the other point I would like to make is

21   that whether we are talking 101, 102 or 103 validity,

22   nobody has briefed the issue.  Nobody has addressed it.

23   And, clearly, we have got a pending request for an inter

24   partes review before the PTO, and we will expect a

25   decision on whether that will be instituted in the next

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   six weeks or so.  So there is going to be -- there are
 2   parallel proceedings to address many of these issues
 3   already.
 4         THE COURT:  Okay.  My last question before I allow
 5   you guys to make the presentation is that when -- in
 6   Claim 1, there is a reference to -- on the second phrase,
 7   obtaining a timed data file of phonemes having a
 8   plurality of subsequences.  What does plurality of
 9   subsequences mean in that context?
10         MR. PETRSORIC:  What I believe it means --
11         THE COURT:  Don't say you believe.  Say what it
12   means.
13         MR. PETRSORIC:  What it means, your Honor, is that
14   there are, since timing comes into effect both in the
15   particular phoneme that you are speaking at any instance
16   versus the phoneme that was spoken before and the phoneme
17   that was spoken after, what you are doing is this is
18   referring to a window of -- regarding as you go through
19   the sequence of the phonemes to evaluate the present
20   phoneme and the application of the morph weight to it not
21   just on itself, not just including the prior phoneme but
22   also including the subsequent phoneme.
23         THE COURT:  All right.  Actually, from what you
24   said, I have another question then.
25               If you look at Claim 1, you know, it talks
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    about obtaining a first set of rules, talks about

 2    obtaining a timed data file of phonemes, talks about

 3    generating an intermediate stream of output morphed

 4    weight sets and then generating a stream of -- generating

 5    a final stream of output morph weight sets at a desired

 6    frame rate, et cetera, et cetera.

 7            Obviously, all that is done by somebody who

 8    gets the patent and inputs this stuff.

 9        MR. PETRSORIC:  Well, that is all going to be done

10    by the computer.

11        THE COURT:  Oh.  That is done by the computer.

12    Well, no, because I asked you obtaining a first set of

13    rules, the computer doesn't obtain the first set of

14    rules.  You put rules.  Now, the program may already have

15    certain rules already incorporated in, but you are saying

16    that first there has to be a selection of the rules that

17    are going to be applied; right?

18        MR. PETRSORIC:  There is a selection of the rules

19    that are going to be applied, but, at some point, the

20    computer closes the doors and evaluates the rules, says,

21    okay, in this file, I have got these particular phonemes

22    corresponding to these particular vizemes, I have got

23    these other timing rules, okay, I am obtaining those and

24    applying them.

25            So while there is user input to set up the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A4812

1    rules, the computer does obtain the rules prior to

2    applying them.

3         THE COURT:  See, I thought maybe I had

4    misinterpreted it.  I thought that when I refer to these

5    in Claim No. 1, obtained the first set, I will say that

6    is the first phrase, obtaining a timed data, that is the

7    second phrase, et cetera, et cetera.  I thought 1 and 2

8    were input aspects that had to be done, and, then, the

9    generating was what comes out of the program.

10        MR. PETRSORIC:  And they are input aspects, and

11   there is both a human component to them and a machine

12   component to them.

13        THE COURT:  Okay.  All right.

14        MS. MEHTA:  Your Honor, I think this may be

15   something where I am not sure if we agree or disagree

16   because what I thought I just heard Mr. Petrsoric say

17   before this last response was that the way they read the

18   claim, and this is consistent with the way we read the

19   claim in the entire specification, is that you input the

20   rules and the phonetic transcript before you get to the

21   claim, and, then, once you start the process, you have

22   closed the door is what he said, and what the software

23   does is it calls or basically reaches out and says, let

24   me get the rules I am supposed to apply, let me get the

25   transcript I am supposed to apply them to, now, I am

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   going to run through the steps of the software method to

 2   actually achieve the animation.

 3          So, in that regard, the concept of obtaining

 4   is the software taking the rules that were already input

 5   before the method starts and simply grabbing them so that

 6   it can run through the process of applying the rules to

 7   the transcript that has been given for that particular

 8   animation.  And I think we agree on that based on what

 9   Mr. Petrsoric is describing.

10          MR. PETRSORIC:  I can't -- I can find no area of

11   disagreement in what Ms. Mehta just said.

12          THE COURT:  And I think I agree with that to some

13   extent, but the problem is, again, because I think in the

14   back of my mind, this argument about automatic, it seems

15   to me that this step can be seen, you know,

16   microscopically.  I don't know if that is the proper

17   word.  My English is really bad, and English is my first

18   language, too.

19          It seems to be that one could look at it

20   microscopically or macroscopically, and it seems to me

21   that, you know, yes, there is some element that it is

22   automatic in the sense that human, there is no human

23   input.  But that may just be a megasecond or megamoment

24   in the overall process.

25          Your eyebrows twitched when I said that.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Maybe that was a vizeme.

2         MR. PETRSORIC:  That was probably an involuntary

3    reflex, your Honor.

4         THE COURT:  And, so, but it seems to me that the

5    process can be done where there is constant input from

6    the animator in the regard, but it is just that

7    individual sections may be automatic in the sense that,

8    yes, you are doing something, but you are constantly

9    evaluating what is being done.

10         So even though you don't have to sit there

11   and, you know, do all this stuff on the computer, you are

12   watching the thing and you can say, oh, don't like that,

13   change it and do a different set of rules or

14   modifications.

15        MS. MEHTA:  So, your Honor, I think we are going

16   to talk about this at length when we get to the first

17   limitation, the preamble, but I think that our view and

18   if you read the patent it is quite clear is that is not

19   what is contemplated.  And I think you have honed in on

20   the right issue which is what is the view that we are

21   looking at, sort of what period of time is this supposed

22   to be covering, and what the patented method and system

23   covers is the steps of grabbing the rules, grabbing the

24   transcript, applying them to generate your intermediate

25   morph weight set stream, your final set stream and then

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4815**

1   generating an animation.

2          Now, there may be things that happen after

3   that.  There may be an animation on the screen and say

4   someone says, oh, that looks really ugly, let's change

5   how we are going to have the speech work with the thing,

6   that can all happen after the process.  But for purposes

7   of the claimed method, the question is what are the steps

8   and how does this work and what we have agreed on now is

9   that the door is closed to human input before we get to

10  the obtaining step.

11         We have got the rules already input.  We have

12  got the phonetic transcript to which they are going to be

13  applied input.  And then the next steps are to generate

14  the two sets of streams and apply them to the animation.

15         So that is what we are going to get into, the

16  question of whether at that point there is anything in

17  the specification or the claims or anywhere in this

18  patent that would suggest that it allows the human to

19  interfere in the application of the rules to the

20  transcript in which case, if that were what was

21  contemplated, then there would be no invention at all

22  because the only thing they purport to have invented is

23  automating the application of the rules to the

24  transcript.

25         So you can't have it be, well, what we have

1    invented is applying rules to the transcript

2    automatically using software and yet we are going to say

3    let the human get in there and not have it be automatic

4    because then what we have is no invention at all.

5         THE COURT:  I understand your argument.

6              Your response.

7         MR. PETRSORIC:  I am a bit confused because the --

8    it is a comprising claim.  So to infringe, you have to do

9    at least these things.  I sense a bit of the defendant

10   saying that you need to do only these things, if you do

11   anything additionally, you don't infringe.  And I will

12   bring up one example, your Honor.

13             When you are putting a feature presentation

14   together, you have got multiple characters, multiple

15   scenes.  You may be only doing one, the lip

16   synchronization for one character at a time, or you may

17   have two separate animators working on two separate

18   characters.  And when you do get -- when you do collect

19   the final morph weight set stream, what you are going to

20   want to do is bring that into the software that renders

21   the complete display so not only including the face, but

22   the bodies and the scenery behind the bodies.

23             So it is really, this is not necessarily a

24   fixed and walled-off process, but it is a process that

25   allows for additional steps to take place.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1        THE COURT:  Except that I had thought that the
 2   invention was for lip synchronization and facial
 3   expression not necessarily what is going on in the
 4   scenery all around.
 5        MR. PETRSORIC:  No.  But one of the things when
 6   you do with lip synchronization, your Honor, is that you
 7   want to use the face of the character you have created in
 8   a broader presentation.
 9        THE COURT:  Well, but it is still the face, it is
10   not the -- I mean, obviously, the face is in the context
11   of the overall frame of the picture.  So, obviously,
12   unless they are looking solely at the face, there is
13   going to be other things around it, and I understand that
14   that has to be incorporated, but I didn't think that the
15   invention concerned itself with anything other than the
16   facial expression and the lip synchronization.
17             But I would agree with an argument that,
18   again, the whole point of having the patent is to avoid
19   the labor intensiveness of making the interpolation, you
20   know, process from keyframe to keyframe.  But the whole,
21   all the other point is that the whole purpose is to reach
22   a certain level of, you know, the aesthetic result.  And
23   so, therefore, it doesn't seem to me that the patent
24   necessarily precludes tweaking as the process goes on,
25   but it doesn't necessarily require it, doesn't
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    necessarily forbid it, it doesn't preclude it.  But at
 2    some level there has to be a certain amount of automation
 3    because without the automation, that is the whole point
 4    of it is to automating this process so it is not as time
 5    consuming and it is more reliable, et cetera, et cetera.
 6             So I understand both sides' position, I think.
 7    So let's start with the Markman itself at this point.
 8    How do you guys want to do it?  Also, by the way, I
 9    think, let me just take a look at my calendar.  I have a
10    10:30 and an 11:00 o'clock.  So we can go to 10:30, and
11    then we will have to take a break.
12         MR. PETRSORIC:  I think, your Honor, maybe the
13    best way to proceed is that we have no objection to your
14    Honor's tentative.  Maybe it would be advantageous to you
15    for the defendants to --
16         THE COURT:  They don't mind that.  That way they
17    don't have to wait.
18         MS. MEHTA:  Yes, your Honor.  That is fine.  So
19    with your Honor's permission, I think what we will do is
20    we will start with the preamble and just go through the
21    order of the tentative and the order of the briefing.
22         THE COURT:  Okay.
23         MS. RAY:  Good morning, your Honor.  I am going to
24    address the preamble.  So I am going to work on skipping
25    through some stuff in addressing the issues in the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    tentative.  So in looking at Claim 1, the preamble is a

2    method for automatically animating lip synchronization

3    and facial expression of three-dimensional characters

4    comprising and the preamble is the same for the first

5    claim in both patents.

6              So the first dispute as your Honor knows is

7    there is a dispute about whether the automatic animation

8    permits human intervention.  And I think the key issue

9    here is whether that human intervention can occur during

10   the claimed steps, and I am going to walk through why the

11   answer is no to this question.

12             So the plaintiff's argument is that the

13   specification points to human intervention particularly

14   in terms of inputting the rules and inputting the TAPT.

15   And we don't -- I don't think there is a disagreement

16   that there is manual set up of the rules.  But our

17   argument is that those rules have to be set up first, and

18   I think we even heard that in plaintiff's argument this

19   morning which is the rules get manually set up, then they

20   exist, then the door is closed and the computer program

21   starts running automatically.  And so this first step of

22   obtaining the first set of rules is code that calls the

23   first set of rules.

24             So the rules exist, they have been put into

25   the program, and then the step of the claim first starts

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4820**

1  with getting those rules.  So we are not arguing that

2  there are other steps but really this invention isn't

3  about all the steps involved in lip synchronization.  It

4  is -- it claims certain steps.  And it claims the

5  automation, and as plaintiff said, the comprising here

6  starts with a closed door where the computer then walks

7  through automatically the steps including obtaining a

8  first series of rules which is just a calling of the

9  rules.  It doesn't have as a first step inputting a first

10  set of rules.

11         And, then, again, with the time aligned

12  phonetic transcriptions or TAPT, again, there is no

13  dispute that those might be able to be put in manually,

14  and I don't think that is an issue, but, again, the step

15  is obtaining that.  So, again, the door is closed, the

16  computer program is running, and it is performing code

17  that calls the rules that have been inputted.  So, again,

18  the step isn't inputting the TAPT which could have been

19  claimed but that is not what is claimed.  If you look at

20  the claim, both claim terms are the obtaining of the

21  rules which in software code is just calling the code.

22       THE COURT:  Let me ask you as I indicated in Pages

23  5 and 6 of the tentative, again, it seems to me what the

24  defense wants to do is impose a limitation which is not

25  imposed necessarily by the plain language of the claim.

1    MS. RAY:  Well, I think what our view is actually

2   that the plaintiff is trying to add steps to the claim.

3   So here is a comprising claim which it only claims

4   obtaining.  It doesn't claim the inputting which is

5   manual because the preamble which, again, we agree is

6   limiting here, plaintiff doesn't dispute that, is a

7   method for automatically animating and comprising.

8        So the inputting steps, the human steps aren't

9   what is claimed here.  That was known before; right?  I

10   mean, the whole purpose of the patent is automating a

11   portion of the lip synchronization process such that that

12   is faster and an improvement over the prior art.

13        So there is no dispute that there is human

14   involvement to create the rules, but that is not what is

15   claimed here in the automatic part of the method.

16        THE COURT:  Well, let me hear a response to that.

17        MR. BERGER:  Your Honor, I think everything that

18   defense counsel just argued was presented in their

19   briefing I think addressed in your tentative.

20        THE REPORTER:  Counsel, state your name.

21        MR. BERGER:  Sorry.  Eric Berger from Mishcon de

22   Reya.

23        So, your Honor, comprising does not mean a

24   closed door.  I think that is a mischaracterization of

25   what was stated earlier.  It actually means exact

```
 1    opposite.  Comprises these steps means you have to do at

 2    least these steps, but it doesn't prohibit you from doing

 3    other things.  So we are not trying to add additional

 4    claim requirements, but the defendants are trying to

 5    prohibit you from doing anything other than just the

 6    specific steps listed there, and their construction

 7    results in kind of a nonsensical outcome where --

 8             THE COURT:  Let me stop.  I think I understand the

 9    position of both sides, but it seems to me that in the

10    end, I wind up agreeing with my tentative.

11             But aside from that, I think that on the

12    one hand, I do agree with the defense that the whole

13    point of this is to animate, not animate, automate the

14    process.  And so, therefore, the goal is to limit the

15    human interjection once the process starts, but,

16    conversely, however, this is not a mechanical, purely

17    mechanical thing.  It is an aesthetic thing.

18             So, therefore, it might be that you obtain a

19    first set of rules, you obtain a time data file of

20    phonemes, but once you see the rules in application, you

21    may decide to change that, and, you know, to do different

22    things, modifications.  So, therefore, if one takes it as

23    just being, well, at a moment between point A and point

24    B, it might be entirely automatic, but it may not be

25    because you might decide between point A and point B you
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A4823

1 are going to change your rules or stuff like that, of

2 that sort.  And the patent allows you to do that.

3          So I don't understand.  In this regard, I kind

4 of agree with both sides in a way, but when I agree with

5 both sides, I wind up agreeing with the plaintiff because

6 I don't think that an absence of human input is essential

7 for the patent.

8      MS. RAY:  Well, your Honor, if I could just

9 address that.

10          Again, we are not disputing that there isn't

11 any human input, but what is claimed is the automatic

12 method.  So, here, in your Honor's scenario, where you

13 decide you need a tweak, so you have to go and adjust the

14 rules, and we don't deny that that would happen.  You run

15 this automatic process again on the rules.  So the method

16 that is claimed is a software process that calls rules

17 and then, automatically, through the software program,

18 processes that.

19          If you tweak, you are doing it outside this

20 narrow piece that is claimed because I think you even

21 heard from plaintiff's counsel that a lot of this process

22 is known in the prior art.  The improvement is this

23 automatic process of calling on these things to do it

24 more efficiently.  So we don't deny that you wouldn't

25 tweak the rules and that humans would do that, but, then,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4824**

```
 1    you just rerun the set of obtaining those rules and

 2    running them.

 3         THE COURT:  Why isn't she right on that?

 4         MR. BERGER:  Because you don't have to go through

 5    this entire process and hit all these steps and only do

 6    that and then start it over to be practicing the patented

 7    method.  You could start walking through these steps,

 8    tweak something with human user input and then finish

 9    walking through the steps, and you are still practicing

10    the patented method.

11         There is nothing, as you recognized in the

12    tentative, there is nothing that prohibits the human user

13    to tweak things during the process.  So you might obtain

14    your first set of rules and start the process and then

15    you might decide you are going to change the time data

16    file, but you already have the rules.  You want to apply

17    the same rules you already input and now you are going to

18    change the time data file.  You are still practicing the

19    method even though after this first obtaining step is

20    performed, a human user is doing something to modify the

21    time data file as an example.

22         THE COURT:  See, this is where I kind of agree

23    with both sides in a sense that there is something that

24    is essential to the patent.  That is that at some point

25    there is an automatic application, automated application,
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   and, therefore, there is not envisioned a human

2   interaction because if there was constant human

3   interaction, then it would be the old method.  And so it

4   is not that.

5        But, conversely, however, it is not -- the

6   patent does not envision that it is entirely free of

7   human intervention at some points in time, but that

8   doesn't mean that when there is that human intervention,

9   that all of a sudden, that it is not the, what do you

10  call it, the use of the patent at that point.

11       MS. RAY:  Just maybe briefly close out on this.

12       I mean, the specification doesn't have any

13  mention of the type of tweaking that the plaintiff is

14  talking about.  There is only two ways to do it, and I

15  think even in his discussion, he said you could change

16  the TAPT.  But, again, yes, you can change that, but it

17  still then requires obtaining the rules and obtaining the

18  new TAPT.  So the method, here, is the automated part of

19  it.

20       So you can change before, you can change the

21  rules, you can change the TAPT and you can do that

22  however many times you want, and then you push the, run

23  the program.  Then, afterwards, you get an output and

24  then you can make other changes but the claim doesn't

25  relate to the creation and the input of the rules or the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   fixing after the output.

 2              The improvement is this module of processing

 3   these steps.  Once you have the rules, the software

 4   program obtains them and then processes them.

 5        THE COURT:  Let me ask why isn't she right on

 6   that?

 7        MR. BERGER:  Well, I think, your Honor, again, it

 8   is not prohibited to do it in that manner.  You could set

 9   up a process that practices the claimed invention that

10   goes A through Z and just does all these steps after the

11   files are input but you are not required to.

12              Again, as you recognized in the tentative,

13   there is no prohibition on human influence during this

14   process so just because it is automatic, you can think of

15   it --

16        THE COURT:  What interaction would there be other

17   than, well, for lack of a better term, tweaking in the

18   sense that you modify or change the rules or the time

19   data file in some way, shape or form?

20        MR. BERGER:  For example, you could change the

21   rules you apply but not change the audio, not change the

22   timeline phonetic transcription would be one such

23   example.

24        THE COURT:  I agree, but that is what I am talking

25   about.  In other words, again, it just seems to me that
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   there can be changes, you know, but at some point there

2   still also has to be the automated process.

3        MR. BERGER:  Right.  Your Honor, if you think

4   about it like an automatic transmission on a car, the

5   driver is still going to press on the gas and cause the

6   changing of gears in the car.  And you might set whether

7   you are in overdrive or drive, but it is still an

8   automatic transmission.  There are still parts that are

9   automated as the machine itself is doing as opposed to

10  you having to change between first and second.

11       So, again, you can have the user influencing

12  certain steps during the process, and it is not required

13  as they suggest to go from the beginning to the end

14  without any user input.  I think it is a little difficult

15  to divorce the two limitations they are trying to impose

16  from each other because, again, if there is no human user

17  input, then if you decide to first obtain the time data

18  file and then obtain the first set of rules by prompting

19  the user, all right, identify the file that has your rule

20  file, under defendant's proposed construction, they could

21  argue that doesn't infringe even though there is no

22  meaningful difference between that and going in the other

23  order where you first prompt the user, input both these

24  files and then start the generating steps and the

25  applying step.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1        THE COURT:  That is one of the questions I asked
 2   was whether or not the invention as it is actually I
 3   guess sold has certain initial rules and you just add
 4   onto rules.  For example, is there a rule -- I mean even
 5   those initial rules, they are present, but they can also
 6   be modified, for example, a rule that if there is
 7   silence, the character's mouth will be closed.  Now, you
 8   can have that as a general rule that is always there so
 9   therefore somebody may want to just have that and they
10   would just not make any changes, or, then, in certain
11   other situations, there may be ones where the character,
12   they want the mouth to be open to some extent so they
13   override that rule.  But there is certain rules that are
14   there anyway.
15        MR. BERGER:  That's correct, and the patent
16   doesn't limit it.
17        THE COURT:  You haven't answered my question
18   though.  Are there certain rules that are contained in
19   the software as it is sold?  So there is initial rules,
20   certain initial rules that are automatically already
21   there?
22        MR. BERGER:  Yes.  That is my understanding, and,
23   then, as you indicate, those rules could be modified.
24        THE COURT:  All right.
25        MS. RAY:  So, your Honor, I think I can walk
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4829**

1   through and we will see some more examples of it, but

2   really our position is there are lots of steps.  We don't

3   disagree with that.  But they claimed a particular method

4   of automation, and automation is really the core of this

5   claim.

6           And if you look at the specification, there is

7   nothing disclosed that embodies the examples that were

8   just discussed.  The only embodiments including the

9   embodiment that plaintiff points to doesn't contemplate

10  what was just discussed, and I will walk through that in

11  a moment.

12          So, again, plaintiff in its brief focuses on

13  Figure 2 as the preferred embodiment and points to the

14  configuring and specifying steps that are in Figure 2.

15  But, again, those steps aren't what plaintiff just

16  discussed.  And then if you look to Figure 2, those

17  steps, configuring and specifying, those aren't in the

18  claims.  They could have been claimed, but that is not

19  what is part of the claim of Claim 1.  And so at the end

20  of the day, you need to look at what is claimed.

21          And if you look at Claim 1, in the preamble,

22  the method is automatically animating that process.  It

23  is not the whole process, it is this process that is

24  comprised in Claim 1.  And if you look throughout the

25  specification, you know, the title of the patent is a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    method for automatically animating the abstract focuses

2    on automatically animating.  The background of the

3    invention says this invention is directed to a method of

4    automatically animating.  The spec says the primary

5    object of this invention, again.

6            THE COURT:  Yes.  But all that language you just

7    pointed out does not impose a limitation.

8            MS. RAY:  Well, no.  But I think there is case

9    law, and I will flip to it.  Again, automation is 26

10   times in the patent.  But present invention and this

11   invention have been used by the federal circuit to define

12   what the invention is.

13            And, here, again, there is no dispute that

14   there is lots of steps but that is known in the prior

15   art.  This invention is about the automation of those

16   steps.  And everything that we have discussed, the rules,

17   the TAPT, the tweaking of the output, that is not what is

18   automated.  We don't disagree about that.  What is

19   automated are steps of obtaining and generating.

20            THE COURT:  I understand your argument.

21            MS. RAY:  Okay.  So I will move on, your Honor.

22            And so, then, the second issue is the order of

23   the terms.  And your Honor's tentative discusses the

24   ability to swap the first two obtaining terms.  We don't

25   dispute that, and we would be open to a construction that
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    permits that.  And so the issue, though, is the remaining
2    terms.
3            So the second obtaining term has to happen
4    before the generating term because it obtains the
5    plurality of subsequences as you can see in the pink.
6    And then the said plurality of subsequences is used in
7    the generating step.  So, necessarily, that obtaining
8    step, whether it is first or second, has to occur before
9    the generating step.
10           And, then, likewise, if you look at the green,
11   the generating and intermediate stream, that third step,
12   has to happen before the fourth step because the fourth
13   step uses the intermediate stream.  And, then, going onto
14   the blue, the third step has generating a plurality of
15   transition parameters, and the fourth step uses that
16   plurality of transition parameters.
17           And then lastly looking at the salmon, the
18   generating of final stream and applying the final stream,
19   those fourth and fifth steps, have to happen in that
20   order.  So there is no dispute that if you wanted to you
21   could swap the obtaining the rules because obtaining the
22   rules files, it doesn't matter what order it happens in.
23   And we would agree that a construction that excludes
24   those happening would be fine.
25           But, really, the rest of the steps, again

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4832**

1   flipping through, they have to be in order.  The pink

2   terms go together.  They can't be swapped.  The green

3   terms go together.  They can't be swapped.  The blue

4   terms go together.  They can't be swapped.  The salmon

5   terms go together.  They can't be swapped.  So there is

6   no way of getting around the case law that requires when

7   a latter step requires a former step that they have to be

8   in that order.

9        THE COURT:  Let me put it this way, I agree that

10  the first two steps are interchangeable, and so,

11  therefore, it is not in order in that sense.  I probably

12  would also agree that 3 and 4 and 5 have to follow

13  thereafter with obviously five being the last one.  It is

14  the last.

15        But it seems to me that at any point in time,

16  you could jump around to make changes because, for

17  example, you may decide after obtaining the first set of

18  rules and obtaining the time data file of the phonemes,

19  you might decide to change a rule.

20       MS. RAY:  But then you are outside of this

21  process.

22       THE COURT:  Well, no, you are just starting the

23  process over again.

24       MS. RAY:  You are starting over.  But the three

25  last steps still have to occur in order.  If they don't

1    occur in order, they don't work because you can't

2    generate a plurality of transition parameters.

3         THE COURT:  Let me hear a response from the --

4         MR. BERGER:  Your Honor, none of that argument

5    justifies their proposed construction requires this

6    performance from beginning to end or explains what that

7    would even mean.

8         THE COURT:  Well, they are saying now they may not

9    want that, but they are saying something that 1 and

10   2 don't necessarily have to come in order but 3, 4 and 5

11   have to be in that order.

12        MR. BERGER:  Your Honor, the clear language of the

13   claim orders certain steps in the claim.  You know, that

14   is not disputed, but there is no need to impose some

15   additional construction.  That language is clear, and if

16   a device meets that claimed language, then, that is the

17   end of the story and there is no additional requirement

18   that should be imposed.

19        THE COURT:  But let me ask you as a matter of

20   fact, you would never have, unless there is a redoing of

21   steps 1 and 2, you would always have 3 following 1 and 2.

22   You would have would always have 4 following 3, and you

23   would always have 5 following 4.

24        MR. BERGER:  That's correct.  We don't dispute

25   that, and we believe that is clear from the language of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   the claim itself.

2       THE COURT:  Let me ask, that is all it seems to me

3   that the court would have to do in this situation.  I

4   don't say it is in order per se because we have already

5   agreed that 1 and 2 are interchangeable but 3 would have

6   to follow 1 and 2, 4 would have to follow 3 and

7   five would have to follow 4 unless at some point in time

8   you decided to change 1 and 2 in which case you start

9   over again.  But the same interpretation I just gave

10  would apply.

11      MS. RAY:  That's correct, your Honor, and we would

12  seek a construction that permits 1 and 2 to be

13  interchangeable but necessarily that 3, 4 and 5 have to

14  proceed after 1 and 2 in that order.

15      THE COURT:  Well, 3, 4 and 5 would have to precede

16  as 3, 4 and 4.

17      MS. RAY:  After 1 or 2.  After either 1 and 2 or

18  2 and 1.  They can't precede 1 and 2, 3, 4 and 5 because

19  you have to have --

20      THE COURT:  I presume you have to have --

21      MS. RAY:  You have to have 1 before 3.

22      THE COURT:  In other words, it seems to me you

23  have to have -- unless the -- my understanding is the

24  plaintiff has already conceded that the patented device

25  does not come with all the rules already on it.  So there

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4835**

```
 1   has to be obtaining of some rules of some sort, although
 2   the patented device or the software when sold may already
 3   have some rules on it or in it.  And then there have to
 4   be timed data files of the phonemes.  So it would seem to
 5   me that you have to have 1 and 2, and then after 1 and
 6   2, you have to have 3, and from 3, 4 and 4, 5.
 7        MR. BERGER:  And we don't dispute that, your
 8   Honor.  We think that is clear from the language of the
 9   complaint.
10        THE COURT:  All right.  So what else?
11        MS. RAY:  Pass it on.
12        MR. SINGER:  Can we have one minute, your Honor?
13        THE COURT:  Okay.  We're going to take a break
14   now.
15        (Other unrelated matters were handled by the
16         court.)
17        THE COURT:  All right.  We are back on the McRO
18   matter.  Let me indicate to counsel, I have other
19   criminal matters.  I can give you about another 15
20   minutes, and then I will probably have to put you over
21   until the afternoon.  So that is what is going to happen.
22        MS. MEHTA:  Thank you, your Honor.  May I approach
23   to hand out copies?
24        THE COURT:  Sure.
25        MS. MEHTA:  So, your Honor, I believe the next
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4836**

1    term was morph weight set stream, and your Honor's

2    tentative resolves that and we have no problem with the

3    construction.  So unless the other side wants to argue

4    that, I think we can move on.

5        THE COURT:  I don't think the other side indicated

6    they had any objections to the tentative.

7        MS. MEHTA:  Well, then, why don't we move on to

8    the intermediate set of output morph weight sets.

9        THE COURT:  All right.

10        MS. MEHTA:  Your Honor, I think what might be

11    helpful here is a little bit further explanation of the

12    context of the dispute and why this limitation matters to

13    what the parties are ultimately going to be litigating

14    when it comes to noninfringement and invalidity.

15        So the issue is, as your tentative

16    acknowledges, is whether or not the intermediate stream

17    is the uninterpolated keyframe stream or it is simply any

18    stream that is the nonfinal stream.  And our position is,

19    based on the claim language of the 576 patent and the

20    specification, that this intermediate stream are the

21    keyframes before you interpolate them.

22        And the reason for that or the reason that

23    that dispute matters is that the way that the plaintiffs

24    are reading the patent claims, they are purporting to

25    read the intermediate stream on a tool that does not have

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    a stream of uninterpolated keyframes but rather has what

2    is called a hermetic curve.  It is a continuous curve of

3    speech targets.  So it is a fundamentally different thing

4    than what is described in the patent.

5          And the way in which the accused devices are

6    purported to work under their infringement allegation is

7    that you have this continuous curve that goes all along

8    the entire speech, and then you just sample it at points

9    in time.

10         And what is different about that relative to

11   the patent is that in the accused devices there is not

12   this concept of a keyframe at two particular points in

13   time and then interpolation to get from one keyframe to

14   the next which is central to the patented method and the

15   method that is claimed and described in the patent.

16         And so that is why this dispute matters

17   because -- and I want to be clear on this because I think

18   there may be some confusion through the briefing and that

19   is obviously the fault of the parties as to whether or

20   not there is some trick here with respect to transition

21   start and end times.  And your tentative suggests that

22   maybe that is inviting further dispute, and I understand

23   that concern.  So I want to be clear.

24         Transition start and end times, there is not

25   some magic to that that we are trying to plant the seed

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:12-cv-01080-JFM Document 138-4 Filed 06/16/2015 Page 9 of
Case 2:25-cv-01080-FM Document 113-9 Filed 06/10/15 Page 265 of 426 Page ID
#:4347

 1    for a later dispute down the road.  The issue is that our

 2    construction is intended to be clear that what the claims

 3    are talking about when they talk about this intermediate

 4    stream are the keyframes before you interpolate them.

 5    And that the following steps are where you perform the

 6    interpolation and then generate the final output stream.

 7          And that interpretation of the claims which is

 8    what the claims say and what the specification describes

 9    uniformly would be inconsistent with their infringement

10    read on this continuous curve.  So that is the issue.

11        THE COURT:  All right.  Let me hear a response

12    from the plaintiff.

13        MR. WHITMAN:  Yes, your Honor.  This is Bob

14    Whitman, I am going to handle this term.

15          A few things.  I think that the phrase

16    intermediate stream of output morph weight sets, of

17    course, morph weight sets was construed separately.  Also

18    claimed is final stream of output morph weight sets, and

19    the parties agree that term doesn't require construction

20    other than morph weight sets being construed separately.

21    So final stream, like intermediate stream, I think are

22    very common terms.

23          Also, it is important to focus on what the

24    defendants are actually trying to construe this claim as,

25    and that is having morph weight sets only at transition

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    start and end times, and there definitely is an

2    embodiment with morph weight sets at transition start and

3    end times but not only at transition start and end times.

4           There are other embodiments directed to post

5    processing where you can change that.  And, in fact, that

6    ties in with the claim term transition parameters which

7    is also in Claim 1 that the parties have not asked for

8    construction on, and that defines the timing, the

9    transitions whether they be at start end times or at

10   other times or in the middle or anywhere else.

11          And reading these transition parameters into

12   an intermediate stream is improper.  There is another

13   term in the claim that sets the timing, sets the

14   transitions and it is not intermediate stream.  And to

15   try to read this claim on one embodiment out of many, I

16   think is improper especially when there is a dependent

17   claim which does limit the claim to the one embodiment.

18      MS. MEHTA:  Your Honor, if I may briefly respond

19   to that.  So I think that we may be talking past

20   one another.  So their argument and what I heard just now

21   I think is summarizing what was in their brief is, well,

22   intermediate is obvious, everyone knows what that is so

23   we don't need to construe it.

24          What we are trying to present to the court is

25   the more substantive dispute with respect to how this

1    claim limitation is actually going to be applied in the

2    context of their infringement contentions and our

3    noninfringement contentions.  So that under 02 Micro,

4    your Honor can resolve that dispute now and that is not

5    something that we have hanging out for the rest of the

6    case.

7              And with respect to that dispute, the issue is

8    whether or not in the context of the claim, the term

9    intermediate stream is referring to the start -- is

10   referring to the uninterpolated keyframes or is referring

11   to any nonfinal stream including a stream that exists

12   after interpolation.

13             And here is the claim language.  I have put up

14   Claim 1.  And the claim language is very instructive on

15   this.  What it says is in step 3 as we have been calling

16   it throughout the day today, you are going to generate an

17   intermediate stream of output morph weight sets and the

18   transition parameters that allow you to make the

19   transition from the end of one morph set to the beginning

20   of the next.  And, then, what you are going to do is

21   through the process of interpolation, you are going to

22   generate a final stream of output morph sets based on

23   that set of keyframes or intermediate stream that you

24   have just generated in step 3.

25             And what their infringement contentions appear

1   to be doing is eviscerating the requirement of the

2   keyframes from which you do the interpolation.  So if you

3   were to take their infringement contentions at face

4   value, what you would have is a situation in which there

5   is not an intermediate stream of keyframes that you

6   interpolate to arrive at your final stream, but, rather,

7   there is a continuous curve and no interpolation is

8   necessary.

9          And that is the dispute is could that possibly

10  be captured within this claim, and the answer is no

11  because the claim requires that there be this

12  intermediate stream that is the keyframes that you then

13  interpolate to get to the final stream.

14          Let me ask, as currently argued by defense

15  counsel, if the position of the plaintiff is that the

16  intermediate stream of output morph weight sets does not

17  have to be construed because it is just simply something

18  that is not the final stream of output morph weight sets,

19  what does the -- well, let me take a step back.  Let me

20  put it more fundamentally.  What is the plaintiff's

21  definition or interpretation of this phrase at this

22  point?

23     MR. WHITMAN:  We believe it is self-explanatory.

24  It is an intermediate stream.  There is a final stream

25  that follows the intermediate stream.  The intermediate

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4842**

1  stream is --

2      THE COURT:  Well, let me just ask, is the

3  intermediate stream the initial stream.

4      MR. WHITMAN:  Do you mean the first stream?

5      THE COURT:  Yes.  The first stream.  In other

6  words, you have the -- the user of the device has

7  obtained a first set of rules, has obtained a timed data

8  file of phonemes and has placed that information in the

9  software, into the software.  And from that, is generated

10  an intermediate stream of output morph weight sets?  Is

11  that what has transpired?

12      MR. WHITMAN:  Yes.  So it very well could be the

13  first stream.  But let me point out too, that the

14  specification makes clear that there could be more than

15  one intermediate stream.  And this ties in with post

16  processing rules that we kind of discussed before.

17      THE COURT:  Okay.

18      MR. WHITMAN:  And this is at Column 7 between

19  Lines 10 and 24.  And it says the post processing rules

20  may be applied either before or after interpolation.  And

21  if they are applied before interpolation, you affect

22  keyframes.  So, one, I would like to back up.  If the

23  defendant is saying they don't have an intermediate

24  stream, I don't think we would accuse them of

25  infringement.  If they don't have an intermediate stream,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    fine.  But I am not completely sure what they are trying

 2    to argue here.

 3         THE COURT:  I think what they are trying to argue

 4    is that they are defining the intermediate stream as

 5    being intermediate streams between keyframes.

 6         MS. MEHTA:  Not quite, your Honor.  Here is the

 7    difference.  The difference is that under their

 8    interpretation of the claim, the intermediate stream

 9    could be any stream of frames whether it is interpolated

10    or uninterpolated that exists prior to the final output.

11    And if you read the patent specification and you read the

12    claims, what is actually being described and claimed is a

13    system within which you get your rules, you get your

14    phonetic transcript, you apply your rules to your

15    phonetic transcript to achieve an intermediate stream

16    which is the keyframes.  And, then, mathematically, the

17    computer will run through the process of interpolating

18    between the keyframes.  But the intermediate stream is

19    the stream of keyframes before that interpolation process

20    has taken place.

21              And they seem to believe that the intermediate

22    stream can be anything including something that exists

23    after interpolation or anything that doesn't include

24    keyframes, and if that were true, then the claim would

25    make no sense and the patent specification wouldn't jive
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   with the claim at all.

 2          So the key issue is whether or not, in the

 3   context of this claim requirement, what we are talking

 4   about is the requirement of uninterpolated keyframes.

 5   That is the dispute.  And they seem to be suggesting that

 6   there is no requirement anywhere in the patent claims or

 7   in the specification that you generate uninterpolated

 8   keyframes that you can then go and interpolate, and that

 9   can't be right.

10      THE COURT:  Okay.  I think I understand.  What you

11   are saying, in other words, is that the intermediate

12   stream of output morph weight sets has to be

13   interpolated.

14      MS. MEHTA:  It is the stream that exists before

15   interpolation.  It is the keyframe stream that exists

16   before the next step of interpolation.  That is what we

17   mean by, and I apologize if I am not being clear, but

18   when we say an uninterpolated keyframe set, what we mean

19   is that the stream of information at the intermediate

20   step which is this limitation is the keyframes before the

21   computer has taken keyframe A and keyframe B and done the

22   interpolation to figure out what would take place

23   between.

24          And what they are saying is, no, you don't

25   need keyframes at all, you can read this patent claim and

1   this specification and read it on something where there

2   is no concept of interpolating between keyframes.  That

3   is the problem.

4          THE COURT:  Let me ask the plaintiff's counsel,

5   then, again, what is your definition of the intermediate

6   stream of output morph weight sets?

7          MR. WHITMAN:  Your Honor, I think it is clear from

8   the claim itself so I am not sure I completely understand

9   defense's --

10          THE COURT:  Well, when you say it is clear from

11   the complaint, clear, again, that doesn't answer.  You

12   are saying it is clear, but you haven't said what it is.

13          MR. WHITMAN:  It is an intermediate stream that

14   the final stream is generated from, and it is exactly

15   what the claim says.  It doesn't necessarily have to be

16   limited to keyframe A or B.  There is definitely some

17   interpolation going on, but it is set forth and the claim

18   tells you that.  So the claim -- you generate --

19          THE COURT:  Let me put it this way, both sides

20   seem to be saying that the intermediate stream of output

21   morph weight sets is going to be a stream that is

22   utilized in the interpolation because interpolation has

23   not been done at that point?

24          MR. WHITMAN:  Interpolation is definitely -- it is

25   a word used in the specification, but it is not a word

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   used in the claim.  The claim says you generate a final
 2   stream using the intermediate stream at a desired frame
 3   rate, and if that is what you mean by interpolation, I
 4   agree with you.
 5           I am not sure what defendants mean by
 6   interpolation.  They seem to be trying to read in
 7   keyframes A and B and transition times and start and end
 8   times, and I don't know what they mean by that.  But if
 9   you mean by interpolation generating a final stream from
10   the intermediate stream at a desired frame rate, yes,
11   that is what the claim says.
12      MS. MEHTA:  Your Honor, perhaps I can try to
13   crystallize the dispute a little bit more clearly.  I am
14   not sure what the confusion is.  Key frames A and B are
15   simply examples to illustrate the point that I was
16   making.  That is not in the construction.  No one is
17   purporting to limit it to that.
18           The question before the court and perhaps the
19   answer is McRO agrees to this although I am not sure from
20   what we have just heard whether they do or not is when
21   you are looking at the intermediate stream of morph
22   weight sets from which the final stream is generated is
23   the intermediate stream, the stream of keyframes before
24   the interpolation process that generates the final
25   stream, or can it include any stream including an
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    interpolated stream?

2            So, in other words, can the interpolation

3    happen before the intermediate stream?  And that is the

4    issue.  And the patent and the claim doesn't permit that

5    because what the intermediate stream is is the keyframes

6    that you then go and interpolate to generate the final

7    stream.

8            THE COURT:  Well, I guess what the question is is

9    that -- if seems to me that an intermediate stream is

10   just simply an intermediate stream.  Now, there could be

11   I suppose an initial stream as opposed to an intermediate

12   stream.

13           MS. MEHTA:  So, your Honor, I don't think that

14   works, and here is why.  Because if you look at the

15   overall claim language, what the claim says is you take

16   the rules and you take the phonetic transcript and then

17   you generate the intermediate stream based on those rules

18   and the transcript.  There is nothing in the claim and no

19   disclosure in the specification at all to suggest any

20   other stream that exists between steps 1 and 2 and step

21   3.

22           That is not something that is contemplated by

23   the patent, and it would be inconsistent with the claim

24   language because the claim language doesn't say the

25   intermediate stream follows an initial stream.  It says

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  the intermediate stream is generated based on or taking

2  into account the two parameters that you obtain in step 1

3  and 2.

4          Once you have that intermediate stream, it is

5  then interpolated to generate the final stream.  If they

6  were correct that the intermediate stream could be any

7  intermediate stream short of the final stream, then this

8  limitation would be meaningless in the context of the

9  claim and the method described in the specification just

10  wouldn't apply at all because what the claim wouldn't be

11  covering then is the concept of taking the keyframes and

12  interpolating between them.

13          The way to give that concept which is

14  described as central to the invention throughout the

15  specification meaning and the way to give meaning to

16  claim limitation number 3 in Claim 1 is to read

17  intermediate stream as the stream of keyframes before you

18  get to the interpolation set.  Without that, it is

19  meaningless.  Their construction of plain meaning

20  basically reads that limitation out because all you have

21  then is any old stream that you can then generate a final

22  stream from.

23      THE COURT:  All right.  I think I understand the

24  position of both parties, but at this point in time I

25  must stop.  And we will start again at 1:15 on this

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   matter.  Have a very nice lunch.  And I will see you back

2   here at 1:15.

3          MS. MEHTA:  Thank you, your Honor.

4          (Recess from 11:08 a.m. to 1:23 p.m.)

5          THE COURT:  All right.  Back on McRO.  We left off

6   at this question of intermediate stream.

7              And let me ask plaintiff's counsel, if

8   one looks at the, I guess, Claim 1 of the 576 patent, as

9   indicated in the claims, there is a step which we refer

10  to as like the third phase or third phrase, talks about

11  generating an intermediate stream of output morph weight

12  sets.  It seems to indicate that in that portion of the

13  or in that particular step, there is, one, an

14  intermediate stream, and, two, transition parameters; is

15  that correct?

16         MR. WHITMAN:  Pardon me, your Honor.  That is

17  correct, yes.

18         THE COURT:  Okay.  And then the next step which is

19  the -- step No. 4 talks about generating a final stream

20  from 1 which would be the intermediate stream and, 2, the

21  transition parameters; is that correct?

22         MR. WHITMAN:  Yes.

23         THE COURT:  Now, it seems to me that the way that

24  the patent teaches the generating the final step is to

25  take the keyframes, in other words, from the intermediate

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4850**

1  stream and interpolate them using the transition rules;

2  is that correct?

3       MR. WHITMAN:  I think that is definitely a

4  preferred embodiment.  Okay.  It is not the only

5  embodiment so keyframes may be an issue here.  Key frames

6  is not a term in Claim 1, and there is nothing, of

7  course, that prevents the intermediate stream from

8  perhaps having some pre interpolation step which I am not

9  exactly sure what the defendants are arguing here.  They

10  are saying we do have an intermediate stream.  We

11  practice the recited elements, but somehow they break up

12  interpolation in maybe two steps.

13       THE COURT:  Well, let's put aside what the defense

14  will argue at some point in time in the future, and let's

15  just look back at what the plaintiff is saying the patent

16  teaches at this point.

17          So, in other words, you are generating a final

18  stream and taking the keyframes which are part or

19  indicated in the intermediate stream, and then

20  interpolating them using the transition rules.

21       MR. WHITMAN:  Yes.  The intermediate stream in the

22  preferred embodiment can be keyframes, but you can do

23  some post processing and change the keyframes and change

24  some timing.  So the keyframes are not necessarily locked

25  down and carried over to step 4, for example.  So I guess

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   it depends what you mean by keyframes.

 2            So if you look, for example --

 3        THE COURT:  Key frames was, I thought keyframes

 4   had a clear meaning.

 5        MR. WHITMAN:  Right.  But if you look at Column 7

 6   at Line 23 of the 576 patent, before interpolation, you

 7   can apply some post processing rules that affect

 8   keyframes.  So the keyframes perhaps of step 3 in the

 9   patent and step 4 in the patent, you may do additional

10   things beyond what is recited in the claim because the

11   claim is recited as a comprising claim.

12        THE COURT:  Let me ask isn't the process

13   interpolation between keyframes?

14        MR. WHITMAN:  I think, generally, yes.

15        THE COURT:  Let me ask you what other would it be

16   besides that?

17        MR. WHITMAN:  You can affect keyframes.  So, for

18   example, you may have a character speaking the O sound,

19   and you may say, okay, we are going to add some emotion

20   in there.  So halfway through the O sound, let's add some

21   emotion, let's add some excitement to the lips, you can

22   spread the lips more.  Or we can have randomized, a

23   character could have hiccups.  So we could have

24   randomized sound when the character would eject some type

25   of --
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1          THE COURT:  But wouldn't that be part of the rules

2    that you are throwing in?

3          MR. WHITMAN:  There can be secondary rules and

4    post processing rules.

5          THE COURT:  But then looking at the claim, what

6    are you talking about then in terms of generating an

7    intermediate stream of output morph weight sets.

8          MR. WHITMAN:  Right.  So you have generated a

9    intermediate stream of output morph weight sets in the

10   third phrase of the claim.  And then you can, and you

11   evaluate that against the first set of rules.  There is

12   nothing now to say, okay, now, implement a secondary set

13   of rules.  We can tweak or tinker with what was set up in

14   that intermediate frame and make a secondary intermediate

15   stream.

16            You can add emotion or hiccups or anything you

17   want to do, and in the defendant's case, it sounds like

18   they may do some pre interpolation or something like

19   that.  That is all beyond what is recited in the claim,

20   but as long as you practice what is recited in the third

21   phrase --

22         THE COURT:  Let me ask you, let me use an example.

23   Let's assume that we have what are keyframes being 1, 10

24   and 20 and what are 2 through 9 and 11 through 19 are the

25   frames that are going to be interpolated to get from
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    keyframe 1 to keyframe 10 to keyframe 20.

2           If the intermediate stream is not limited or

3    you are not basing it upon keyframes but, instead, you

4    are using all the frames how is this third step

5    generating the final stream from the transition

6    parameters as required by the claim language?

7         MR. WHITMAN:  Again, I don't think you are using

8    all the frames.  You are probably picking a frame.  You

9    could pick 11, you can pick 12, you can pick 13.

10        THE COURT:  You can pick whatever frame you want

11   and call it a keyframe I suppose, but I presume that you

12   are using -- in other words, the interpolation is to go

13   from one frame to this other frame.  And the reason why

14   we are referring to it as keyframes is because it is

15   important that it go from one to the other.

16          This is the transition that we are talking

17   about.  And so I have just used the term keyframes

18   because I thought that keyframe was the point of

19   interpolation to go from one frame to this other frame,

20   and that is why they are keyframes.  Am I wrong?

21        MR. WHITMAN:  I don't think you are wrong.  I

22   don't think you are wrong, but what I am trying to do is

23   just ensure that we are covering this potential --

24        THE COURT:  Let me stop you.  This is not like

25   formulating a claim for the patent office where -- I

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    understand that sometimes attorneys want to make things

2    kind of specific so they will get the patent but not so

3    specific that they can't claim once they get the patent

4    it covers everything.  I understand that.  I am only

5    talking now.  I am trying to figure out what we are doing

6    here.

7        MR. WHITMAN:  What I think happened here is the

8    defendants have abandoned the original construction.

9        THE COURT:  Don't worry about the defendants.  We

10   will take care of them later.  At this stage, they are

11   irrelevant.

12        I am trying to figure out what the plaintiff

13   is claiming is the scope of the invention.  And it is --

14   I have a problem with -- because I have said that it

15   doesn't need -- this phrase doesn't need any further

16   interpretation.  Maybe I am wrong.  Maybe it does need

17   further interpretation because, apparently, it is like

18   pulling teeth to get a statement from you as to what this

19   means.

20        MR. WHITMAN:  I apologize for that.  I think there

21   is a nervousness about what they --

22        THE COURT:  Don't worry about them.  They are

23   irrelevant.  Imagine that they are not here.  Close your

24   eyes, and imagine they are not here.

25        MR. WHITMAN:  I think that everything you said was

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4855**

1    accurate.  I do.  You are interpolating between

2    keyframes.  That is the preferred embodiment.  The

3    keyframes are not necessarily set in stone.  You can

4    change them but you do interpolate.  As long as you don't

5    have what I think -- I don't want to say that word again

6    other counsel has said keyframe A and B, you can modify

7    that.  You can say, okay, we are going to put in 8.1 and

8    8.2 keyframes, and we will interpolate between those.

9    That is okay, too.  So I don't disagree with what you

10   said.

11        THE COURT:  So the transition parameters tell the

12   computer how to generate the interpolated frames?

13        MR. WHITMAN:  I believe that is accurate.  Yes.

14   Or when to.  It could be timing.

15        THE COURT:  Both timing and settings.  I agree

16   with that obviously.  So, then, what are the transition

17   parameters doing in a system that does not involve

18   keyframes?  If it didn't involve keyframes, what would

19   transition parameters be doing if it doesn't involve

20   keyframes which is the reason why one would presume there

21   would have to be keyframes.

22        MR. WHITMAN:  Well, the keyframes are set up with

23   the timing parameters, and, again, it could be something

24   as I mentioned before if you are speaking the O sound,

25   you can say there is a transition, we will start the O,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   we will stop the O, but in between we are going to add

2   some emotion.  We will create, then, a new keyframe with

3   an exaggerated O sound for some other period of time for

4   example.

5         THE COURT:  Then getting back to the issue that we

6   discussed prior to the lunch break, and that is isn't --

7   now, we are getting to what defendants are arguing.

8               Isn't the -- is the intermediate stream of

9   output morph weight sets -- I can't remember how exactly

10  they phrased it.  Phrase it again.

11              What is your question again?

12        MS. MEHTA:  Uninterpolated keyframes.

13        THE COURT:  Uninterpolated keyframes.  In other

14  words, it is based upon a recognition of what the

15  keyframes are but without the interpolation done at that

16  point in time.  So that is the difference between the

17  intermediate stream of output morph weight sets and the

18  final stream.

19        MR. WHITMAN:  I think here it now goes to the

20  question of what you mean by interpolated.  So if you

21  mean interpolated is what is recited in claim phrase 4, I

22  am fine.  I mean, that is what it says is you must

23  generate a final stream of output morph weight sets at a

24  desired frame rate from the intermediate stream, et

25  cetera.  And if that is interpolation, I think that it is

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    plainly recited in the claim.

 2            If you have an intermediate stream in phrase 3

 3    that is perhaps partially interpolated, I am not sure

 4    that that is necessarily excluded from the claim as long

 5    as you perform phrase 4.  So it is what I -- you know,

 6    that is my confusion of I am not sure what they are

 7    trying to insert into the claim at this point.

 8    Uninterpolated, of course, and interpolated don't appear

 9    anywhere in the claim.  And I think they are trying to

10    create a noninfringement argument on the fly that we

11    haven't had the opportunity to consider.  They kind of

12    sprung it on us.

13            Whereas interpolation, I think, is recited in

14    the claim, and if they practice, if they generate a final

15    stream of output morph weight sets at a desired frame

16    rate from the intermediate stream, I think that is the

17    end of the story.  But if what they say is they don't

18    have an intermediate stream and they are not doing

19    interpolation, then, obviously, they don't infringe.

20         THE COURT:  Let me do this, let me ask the defense

21    now this question since I want to know why you want to

22    have this particular interpretation.  Why do you want to

23    have this interpretation that generating an intermediate

24    stream of output morph weight sets and tying that concept

25    into uninterpolated keyframes?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              MS. MEHTA:  Your Honor, the reason for that is it
 2      is based on the infringement contentions that we have
 3      from the plaintiff and the noninfringement contentions
 4      that we have provided to them.  And it is the following
 5      distinction which is in one of the two tools that is
 6      accused of infringement in this case, the FaceFX tool,
 7      the way that they are interpreting the tool and applying
 8      in their infringement allegations is they are taking what
 9      is called a curve of speech targets.
10              These are not morph weight sets with vertices
11      and vectors that show the different -- it doesn't have
12      delta sets but it is what is called a curve of speech
13      targets.  And you could sample that curve at different
14      points in time.  So, for example, you could say at this
15      point in time the weighting of the speech targets is
16      this, and at another point of time, the weighting of the
17      speech targets is different or the value of the speech
18      targets is different.
19              The difference between that and what is
20      described and claimed in the patent is in the accused
21      system, FaceFX system, this concept of having keyframes
22      and then interpolating between them so that you generate
23      an intermediate stream and then apply the intermediate
24      stream and the transition parameters to generate your
25      final stream is completely orthogonal to what is actually
```

1    being done in the FaceFX case.

2          THE COURT:  What is orthogonal?

3          MS. MEHTA:  It doesn't make any sense to use those

4    concepts in the context of FaceFX because there is no set

5    of morph weight targets that are keyframed as an

6    intermediate step from which you then take interpolation.

7              So in terms of what the dispute is between the

8    court, if we have an agreement between the parties that

9    the third step of the claim requires creation of

10   keyframes and transition parameters and that the fourth

11   step then covers interpolation that uses the keyframes

12   and the transition parameters to interpolate the final

13   output morph weight sets, then I don't think we have a

14   dispute because I don't think they can continue to make

15   their argument.

16             The problem and the reason this needs to be

17   construed by your Honor is their infringement theory

18   right now is inconsistent with that reading of the claim,

19   and as I was mentioning before lunch essentially reads

20   out the steps of the claim that take the keyframes and

21   interpolate them using the transition parameters and are

22   completely inconsistent with the patented method as

23   described throughout in particular in Column 7 but

24   throughout the specification.

25             THE COURT:  Let me ask you what do you mean by

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    interpolate keyframes?

2         MS. MEHTA:  All we mean is -- and one thing that

3    should be clear is that the patent does not specify the

4    technique for interpolation because it was well known in

5    the art that you could take two keyframes and interpolate

6    between them.  That is a mathematical function.

7    Essentially, what it would do is say I have a keyframe

8    with a mouth of an O shape and I have another keyframe

9    with a mouth of an E shape, and in order to make the

10   transition between those two keyframes and mouth shapes

11   smooth, the computer will interpolate so it will create a

12   series of mouth shapes in between to get from the O to

13   the E.

14        The patent doesn't specify nor does it purport

15   to claim or invent the specific code that you would write

16   for that interpolation because that was well known and

17   that was not an automated animation for a long time.

18   What is essential is that, as part of what they are

19   purporting to have invented, you generate this

20   intermediate stream of keyframes and then using the known

21   techniques for interpolation, you create the final

22   stream.

23        If that isn't required which seems to be what

24   they are suggesting so that they can continue to assert

25   the patents against FaceFX, then we don't have any need

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    for having the two generating steps in the patent.  It

 2    just wouldn't make sense to generate them that way.  If

 3    you look at Column 7, in particular, where it describes

 4    how this works, I will fast forward to that.  It talks at

 5    length about how the whole point of this is to create

 6    this uninterpolated morph weight set, and then those are

 7    the keyframes.  And then you will evaluate that by using

 8    the transition between those keyframes using conventional

 9    methods.

10            There is no question that interpolation was

11    well known, and then the next sentence is key.  It says

12    this is how the output stream is calculated.

13        THE COURT:  Let me stop you.  If interpolation --

14    you know, interpolation can simply mean going from point

15    A to point B in some fashion, and I thought what the

16    plaintiff was arguing was the fact that their computer

17    has a methodology for interpolation according to a

18    certain set of rules that you would plug into it, and

19    once you have plugged into it, these rules, it would do

20    the interpolation automatically rather than having a

21    person do it manually.

22        MS. MEHTA:  I think that is where there is a lack

23    of clarity perhaps in terms of what we discussed this

24    morning.  So as I understood the discussion between the

25    parties and your Honor this morning where the parties
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    ended up in agreement is that the so-called special sauce

2    of the invention isn't the rules for interpolation

3    because it was already known how to interpolate.  It is

4    actually what happens right before that.  It is the

5    process by which you take known rules for using a time,

6    TAPT, the phonetic transcript, and applying those rules

7    to generate your mouth shapes.

8            Those rules were known, the transcript was

9    known.  What their patent purports to do is execute on

10   those rules that are input by the animator.  And it is

11   the execution of the rules to generate the keyframes that

12   is the so called special sauce.

13           The actual interpolation, as the patent says

14   here in Column 7, is just known using conventional

15   methods, and there is absolutely no discussion in the

16   specification of the specifics of how you might write

17   code or what steps you would take to interpolate.  That

18   is not the special sauce.  It is getting from the

19   transcript and the rules that are input by the animator

20   and then creating the keyframes that you then go and

21   interpolate using conventional methods.  Let me be clear,

22   when I say special sauce, I don't mean to suggest that

23   that wasn't in the prior art.  Even that was in the prior

24   art.

25           But in terms of what they are standing here

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    today purporting to have invented, it is that.  The

2    interpolation itself is just a mathematical process that

3    was well known and as column 7 says, it is just a

4    conventional method.  But in order to satisfy the

5    two generating steps, you must get those keyframes using

6    the rule in the transcript and then apply those keyframes

7    and the transition parameters to get to your final

8    output.

9         THE COURT:  All right.  Let me ask plaintiff's

10   counsel, again, what is the invention here?

11        MR. WHITMAN:  One, I would like to go back, and I

12   think counsel has repeatedly said that the rules were

13   known in the art.  But I am not sure that is accurate.  I

14   think counsel is just making that up.

15            We haven't seen anything where timing rules,

16   for example, have been shown in the art.  Transaction

17   parameters were shown in the art.  I think that these

18   rules are part of the invention.  The invention is set

19   forth in the claim.  Yes.  The interpolation step,

20   perhaps that was known in the art.  Interpolation is not

21   even mentioned in the claim.  What the claim requires is

22   that you generate a final stream of output morph weight

23   sets at a desired frame rate using the intermediate

24   stream and the transition parameters.

25            So you must use the timing rules and

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    transition parameters to generate your final stream.  It

2    is not -- there is more to the claim than defense counsel

3    states.

4         THE COURT:  But, again, I had thought that the

5    whole point of this was a lip synchronization facial

6    expression process that avoids the manual insertion by

7    the animator of transition points between the

8    one expression or shape of the mouth to another.

9         And, so, you know, if you are telling me that

10   the rules were known, the interpolation process is known,

11   I mean, because the patent is not the four rules.  I

12   asked that originally.  I said does the patent cover

13   rules, and I thought the answer was, no, the patent does

14   not cover rules.  Rules are inserted perhaps, but they

15   are not -- the patent does not cover the rules

16   themselves.

17        MR. WHITMAN:  The rules are part of the claim.  So

18   you have to apply the rules.

19        THE COURT:  Yes.  But are the rules themselves the

20   invention?  In other words, you know, as I said, for

21   example, like you could have rules that, for example, in

22   the tutorial, there was a rule insofar as again if their

23   mouth is shut but you can change that rule if you so

24   desire but that is not claimed to be an invention of the

25   plaintiff, is it?  And then the situation of Bob versus

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   blob.  The way in which L is formulated depending upon

2   the particular emphasis that is utilized, the

3   pronunciation of Bob and blob can be exactly the same,

4   but if you want to differentiate because of a lengthier

5   period of saying blob, well, then the L would be more

6   formulated.  That could be a rule as well I suppose.  But

7   none of those rules are rules that are part of the

8   patent.

9        MR. PETRSORIC:  Your Honor, I think the rules, the

10  rules that are used to generate the intermediate weight

11  sets which are what you are referring to as keyframes,

12  that is what we were referring to before as the crux of

13  the invention.  And we definitely dispute that those were

14  known in the art prior to the filing of the -- the filing

15  for the application of the patents.

16       THE COURT:  But the question that I have is you

17  are saying you have to obtain a first set of rules.  If

18  the rules are part of the patent, they should come with

19  the patent.  In other words, then, there wouldn't be any

20  input, they would be in the patent.  But if you are

21  saying that somebody has to interject these rules into

22  the software, they are not part of the patent because the

23  animator is putting those rules in.

24       MR. PETRSORIC:  The patent identifies different

25  sets of rules including correspondence rules and timing

1    rules and what I was trying to explain before was that

2    you -- the animator and the people writing the software

3    have a certain amount of control over the rules.

4            Some of them can be fixed, but there is also

5    the possibility to add additional rules to further

6    enhance the process.  So it is not about fixing

7    one specific set of rules.  It is about applying specific

8    timing rules including transition parameters which then

9    are applied in the interpolation process.

10           THE COURT:  Where does it say that in the patent?

11           MR. PETRSORIC:  I think I am just making a

12   generalization about the patent, your Honor.

13           THE COURT:  Okay.  All right.  Maybe I will have

14   to define what intermediate stream is or maybe not.  I

15   will have to think about it some more.  So we have gone

16   over that one.  What else?

17           MS. MEHTA:  So, your Honor, the next term is the

18   lip synchronization and facial expression control and lip

19   and facial expression synchronized limitations in Claims

20   1 of the 576 and the 278.

21           So, again, I think it is going to be helpful

22   hopefully especially in view of the tentative to discuss

23   what the dispute is between the parties that has yielded

24   this particular claim construction issue.

25           What we heard from the plaintiffs in their

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   briefing is, again, these are terms, everyone would know
 2   what they mean so we don't need to construe them.  The
 3   problem with that, again, is just looking at the words
 4   lip synchronization and expression control in isolation
 5   doesn't get to the core of the dispute that is going to
 6   be the dispute for purposes of infringement and
 7   noninfringement.  So under 02 Micro what we want to do is
 8   present to your Honor something that is concrete that
 9   will help us actually move the ball forward in the case.
10           So, in that regard, the dispute as we
11   understand it is the following which is as defendants
12   read the claim, the final stream output of morph weight
13   sets is what is applied to the animated characters to
14   create the lip synchronization or expression.
15           As we understand their position, and it hasn't
16   been a hundred percent clear from their briefing, but as
17   best we can understand it is they read the claims to
18   allow that it is something other than the final stream of
19   output morph weights that is applied to the animation.
20           And the reason I think we have that dispute is
21   if you look at the claim language, what we see is a
22   construction, the final limitation, this is limitation
23   5 of the method claim that says that the final step of
24   the process is you take that final stream of output morph
25   weight sets that was the interpolated stream in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   limitation 4, and you are going to apply that to a

 2   sequence of animated characters to produce the lip sync.

 3            And, critically, what the claim says in both

 4   claim 1 of the 576 and the 278 is you are applying said

 5   output morph weight sets, not any output morph weight

 6   sets, not some final output morph weight sets in the

 7   abstract.  But said final stream of output morph weight

 8   sets which is a direct reference to the antecedent basis

 9   which is the final stream that is generated in step 4.

10            And so the defendant's view is that the plain

11   language of the claim -- and this is fully consistent

12   with everything that is disclosed in the specification;

13   there is nothing to the contrary in the specification or

14   elsewhere -- is that you take the keyframes in step 3,

15   you generate your final output morph weight set stream in

16   step 4 and then you apply that to the animated characters

17   in step 5.  That is straightforward.

18            The issue is whether or not the plaintiffs

19   agree to that and I am sure we will hear from them in a

20   second.  From their briefing, they haven't actually

21   raised a substantive dispute with that from what we can

22   tell.  They haven't actually said, no, that is not right,

23   it is some other stream that gets modified or adjusted in

24   some way that then gets applied.

25            They seem to be disputing the use of the word
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    matching in the defendant's proposed construction, and

2    they suggest that the use of the word matching is somehow

3    an improper attempt to import limitations from somewhere.

4    The reality is I don't think there is any magic to the

5    word matching.

6              So we use the term matching to convey the fact

7    that the claim requires that it be the same said final

8    output morph set stream that gets applied in step 5 as

9    was generated in step 4.  And we picked matching because

10   that happens to be the way this concept was described in

11   the file history.

12             If they don't like the word matching, we can

13   come up with some other word.  But the key thing that

14   needs to be decided under 02 Micro is whether or not it

15   is the stream that is generated in step 4 that is applied

16   in step 5 or whether it can be some other stream that is

17   modified or based on that or changed in some way that

18   then gets applied.

19             If that is their position, then we have a

20   substantive dispute.  And that position would be

21   inconsistent with the claim language including the

22   antecedent basis and the entirety of the disclosure of

23   the patent.

24        THE COURT:  Would it have to be the exclusive

25   basis?  So you are saying it has to be the exclusive

1  basis.  In other words, the said final stream is the

2  exclusive basis to produce lip synchronization and facial

3  expression.

4           MS. MEHTA:  Your Honor, I think there would have

5  to be -- you are applying it to animation so there is

6  probably some other graphics and things that come into

7  play.  The critical point is that the morph weights that

8  are generated in that final output morph weight set, the

9  said final output morph weight set stream, those morph

10  weights are the morph weights that are applied, not some

11  different set of morph weights that you take by

12  generating something --

13           THE COURT:  My question is if the final stream is

14  utilized but there are also other things that are

15  utilized.

16           MS. MEHTA:  If the final stream of morph weights

17  is used, and there is some other non morph weight stuff

18  that goes in to actually do the animation, that would be

19  --

20           THE COURT:  What happens if there are additional

21  morph weight sets in addition to the said final stream?

22           MS. MEHTA:  I don't know if that actually would

23  exist in the accused products or that you would do that

24  in real life, but assuming, hypothetically, that that

25  happened, I don't think that would fall within the claim

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4871**

```
 1    or the specification because the way that the claim is

 2    written is you create the stream and then once you have

 3    the stream, you apply that to the animation.

 4              If you bring another stream in from somewhere.

 5    I don't know where it would come from but if you brought

 6    another stream in, then you wouldn't be applying the

 7    final stream to actually generate the animation.  You

 8    would have to do some additional step of I guess

 9    combining the two streams or manipulating the two streams

10    in some way which is completely outside of the patent and

11    the claims.  So even if that hypothetical existed, I

12    don't think it would be claimed, but I also don't think

13    that is really an issue you have to decide because I

14    don't think that is the issue here.

15         THE COURT:  Let me hear a response from --

16         MR. PETRSORIC:  Your Honor, I am scratching my

17    head a bit because the clear language of the claim, as

18    Ms. Mehta correctly points out, says you are applying

19    said final stream.  So we haven't at all suggested that

20    there is anything going on but the application of the

21    final stream.

22         THE COURT:  So you agree that it is -- well, they

23    use the term matching.  Maybe matching maybe is kind of

24    like a loose word, but what you are saying is that the

25    final stream of output morph weight sets to a sequence of
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  animated characters and that produces the lip

2  synchronization and facial expressions.

3      MR. PETRSORIC:  Yes.  That produces the ultimate

4  animation.

5      THE COURT:  All right.  So, in other words, it is

6  not matching.  It produces it.

7      MS. MEHTA:  So I think that is fine, but I want to

8  make sure that we are on total squares in terms of how we

9  are using this language because otherwise all we would be

10 doing is kicking the can down the road for the dispute.

11         So if we have an agreement between the

12 parties, your Honor, that it is the final output morph

13 weight set stream that is generated in step 4 of the

14 patent that is then used and applied for purposes of

15 creating the animated, the sequence of animated

16 characters and that there is not some intervening change

17 to the morph weight set stream, then I think we have an

18 agreement.

19         I am not sure exactly what the language that

20 they used is, and I don't want there to be a dispute on

21 this.  So the critical thing from our perspective is that

22 the patent claims don't contemplate, nor does the patent

23 describe that there can be changes to this final output

24 morph weight set stream before it is applied to the

25 animated characters.  If we are in agreement on that,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    then there shouldn't be a substantive dispute.

 2         MR. PETRSORIC:  Your Honor, I think that is what

 3    is explicitly called out, recited in the claim.  So that

 4    is why I said I am left scratching my head.

 5         THE COURT:  Because he agrees with you.

 6              Let me ask you about the court's question.

 7    Could there be a combination of this final stream of

 8    output morph weight sets but in addition some other

 9    additional morph weight set that is also thrown in, or

10    would that additional morph weight set have been

11    previously incorporated in the other steps and so you

12    would still get back down to a final stream of output

13    morph weight sets.

14         MR. PETRSORIC:  You would if you are creating

15    let's say a full feature presentation.  So if you have

16    multiple characters speaking in a scene, you will have a

17    final morph weight set for character A and a final morph

18    weight set stream for character B.  So those would be

19    combined and applied obviously for character A and

20    one for character B.

21         THE COURT:  All right.

22              So I guess, then, D is -- we don't need any

23    further construction because the -- it is that, yes, you

24    apply the final stream of output morph weight sets to a

25    sequence of animated characters to produce the lip
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4874**

1    synchronization and facial expression.

2         MS. MEHTA:  Right.  And as long as we are in

3    agreement that there is nothing that changes that, then I

4    think we don't have a dispute.

5         THE COURT:  Okay.  So that one is that.  Why can't

6    they all be like that?

7              All right.  Then the last one, first set of

8    rules.

9         MR. SINGER:  Benjamin Singer, your Honor.

10             Maybe this one will fall into the bucket of

11   the last one where we can resolve our substantive dispute

12   or illusory substantive dispute on the fly.  I think over

13   the course of today, you have heard a lot about these

14   rules and the key role that they play in the alleged

15   invention.

16             So what we have is rules that are used to go

17   from the time aligned phonetic transcript to the

18   keyframes, and it is done in a very specific way which is

19   to consider the TAPT, that is the function -- I'm

20   sorry -- the criteria.  And if the criteria is met, we

21   are going to apply the rule to output the morph weight

22   set for that frame.

23             And the patent, however, what we have been

24   told today by plaintiff's counsel is that, well, that is

25   what is new, that is the invention.  And as you have

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    pointed out, well, the patent doesn't actually provide us

2    any of those rules.  So what we have is sort of the

3    abstract idea that we could have those rules somewhere

4    and a computer could use them to perform this step that

5    people were performing with --

6          THE COURT:  Well, I thought that what we have

7    settled on was the fact that the patent covers software,

8    the software in it has certain of the rules, but even

9    those rules could be overridden by the animator and then

10   there would be the input of additional rules.  And those

11   rules, while there is a whole set of rules that might

12   potentially apply, one would look at the TAPT to select

13   those rules that would be most applicable to, you know,

14   what the dialog or expressions or story line or whatever

15   else it is that is in the TAPT and those would then be

16   the incorporation of certain rules.

17          And, then, I presume that what happens is

18   that, you know, once the software has -- the rules have

19   been inputted into the software and other factors such as

20   the timing aspect and other things, then it is ready to

21   generate an intermediate stream of output morph weight

22   sets and the plurality of transition parameters between

23   various adjacent morph weight sets.  And then you

24   generate a final stream and then you apply.

25          I guess that is it.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    MR. SINGER:  That is almost it, your Honor.

2    THE COURT:  What did I forget?

3    MR. SINGER:  Very, very close.  But the first

4    thing you said was that you thought we had agreed that

5    the software includes some of the rules.

6    THE COURT:  No.  I didn't say agreed.  I thought

7    that what the plaintiff's counsel had indicated that the

8    software although I don't know if per se those rules are

9    a claimed invention, but the software that is generated

10   includes certain rules already in it.

11   MR. SINGER:  If I may, let's imagine that someone

12   has the terrific idea that an animated show about a

13   superhero in a black robe named Judge Wu.

14   THE COURT:  That wouldn't sell.  Don't even go

15   there.

16   MR. SINGER:  Let's assume we are going to animate

17   this show on TV, it is going to be weekly, and we are

18   going to need to save the time and energy of animating

19   everything by hand.  So, at least, in terms of focusing

20   on your lip synchronization --

21   THE COURT:  My hand is always in front of my face.

22   It would be difficult.

23   MR. SINGER:  That would be actually quite easy.

24        So what we would have though to begin --

25   MR. PETRSORIC:  In this instance, your Honor, we

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4877**

1    would write a specific rule for you.

2         THE COURT:  Okay.  Thank you.  That would be a

3    just, smart and great rule.  Yes.  Okay.

4         MR. SINGER:  So we would have an audio transcript

5    of your speech, and one of the first things we are going

6    to need to do is to break that audio transcript down into

7    small bits.  Those are the phonemes.  At one time, that

8    was done by hand.  Someone had the idea we can use what

9    is called phoneme extraction algorithms to generate them

10   by a computer.

11        Next, we now have these small bits and their

12   times.  That is the TAPT.  We are going to go from the

13   TAPT to the keyframes.  Originally, that was done by

14   hand, listening, studying the blue sheets and generating

15   the keyframes.  Then, there was the idea that, you know

16   what, a computer can do this, too.  And the prior art

17   also includes a rule set for going from TAPT to

18   keyframes.

19        And, in fact, as we have already said, once we

20   have our keyframes, we will do the process of

21   interpolation.  I think it is now settled that techniques

22   for automatic interpolation exist in the prior art.  Once

23   we get to the final output of the interpolation, we have

24   got something we need to apply to the other computer that

25   is going to weave it all together and make the characters

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   appear on screen.  That has always been automated because

2   this is computer animation.

3           So what we have now with these particular

4   rules is, okay, I have got a TAPT, I am going to make

5   keyframes, and, frankly, the patentee was not the first

6   to have the idea of doing that with the computer.  But to

7   the extent that there is something novel in here, it is

8   that the idea of very specific rules that do that in a

9   very specific way.

10          And what they do is they look at the TAPT and

11  the times, and they generate morph weight set stream.

12  Right.  It can't be that they generate something else.

13  It can't be that they are using other inputs.  This is

14  the special thing.  We know -- and this is not -- this is

15  the part that everyone seems to agree on.

16          Here is a quote from plaintiff's claim

17  construction brief where they are saying the patents use

18  the term rules to describe the instructions that will

19  define an output morph weight set stream based on the

20  incoming sequence and timing of phonemes.  They also

21  agree that it achieves this function in a very specific

22  way.  They have input criteria.  Does the rule apply

23  here.  And they have functions.  If the rule does apply

24  here, perform your function which has to be outputting a

25  morph weight set.

1        And so what we are beginning to drill towards

2   is the substantive dispute between the parties.  If we

3   have a situation where we are going to go -- I think, let

4   me phrase it this way.

5        The patent, and if we look actually at all the

6   examples of rules which begin on Column 7 at Line 55 and

7   continue through the rest of Column 8 and onto the next

8   page, they are all stated very consistently.  They are

9   largely stated consistently with what is on your screen

10  now which is they say if you encounter an "oo", use morph

11  weight set 001.  If you encounter an "ah",  use morph

12  weight set 001000.

13       And so our concern is that we don't believe

14  that the patent claims can rightfully be read so broadly

15  that you are covering any use of rules that take you from

16  a TAPT to an output you would use for animation.  We

17  believe that this has to happen in a group, a set of

18  rules which the dictionary defines as set of things used

19  together like a train set.  I think that is a

20  particularly instructive example.

21       These things have to go together so that they

22  can perform this function, and the total function of

23  going from TAPT to morph weight sets can't happen over

24  multiple computer programs that people over time figured

25  out and put together.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4880**

```
 1              If I have a rule that goes from TAPT to

 2    something that is not a morph weight set, and then it

 3    turns out that later someone wrote a separate program

 4    that takes the output of that and goes to another thing,

 5    and then there is a program that goes from the output of

 6    that to another thing, that is not a set of rules that

 7    perform this specific function which we have now all been

 8    clear about is what the patentee has hung their hat on as

 9    the new secret sauce.

10         THE COURT:  Let me ask plaintiff's counsel, just

11    for the court's understanding, your invention only

12    concerns morph weight sets?

13         MR. PETRSORIC:  Correct, your Honor.  That is the

14    crux of the claims is the generation of the morph weight

15    sets, and then --

16         THE COURT:  And the morph weight sets are defined

17    in terms of this only exclusively with the use of mesh,

18    this mesh format with the use of vectors and -- is it

19    vectors, vertices, is that how you pronounce it?

20         MR. PETRSORIC:  Which is not exclusively mesh.

21         THE COURT:  Well, I thought that if it is not

22    mesh, how would you do it?

23         MR. PETRSORIC:  You are still using a vector to

24    move vertices.

25         THE COURT:  But vectors and vertices.  It is morph
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    weight sets as to vectors and vertices?

2         MR. PETRSORIC:  Correct.

3         THE COURT:  So what is your response to his

4    argument?

5         MR. PETRSORIC:  I am not exactly sure what he is

6    getting at.  I think the rules are pretty clearly as

7    claimed required to generate morph weight sets and

8    transition parameters based on the timing of the incoming

9    TAPT.

10        THE COURT:  But the invention doesn't transform

11   the rules into morph weight sets guidelines, does it?

12        MR. PETRSORIC:  Well, the rules are effectively a

13   set of morph weight set guidelines.  So based on what the

14   incoming phonetic sequence is, the rules will tell you

15   exactly how to create the -- to place each of the morph

16   weight sets in the ultimate morph weight set stream.

17        THE COURT:  Again, this is a problem that I have.

18   Is there a uniformity in terms of -- in other words, we

19   have talked about, you know, key stroke, keyframes or

20   vizemes, but if there in the end is a neutral face and

21   then a face where the sound of, some sound is coming out,

22   and if you have a neutral face, I presume, then, all of

23   the settings are at zero.

24        MR. PETRSORIC:  There is no setting.  That is the

25   point, your Honor.  There is no setting for the neutral

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4882**

```
1    face.  The settings are to modify -- the weight sets are

2    meant to modify the neutral face to achieve.

3          THE COURT:  But it seems to me if all of the

4    weight sets are set at zero, in other words, you put in

5    the neutral face, but the neutral face at 0000, either

6    five or six or sixteen of these particular, whatever

7    criteria you are going to use.  If it is at zero, it is

8    the neutral face because you plug that in.

9          And then what happens is based on the rules

10   and the sound and the timing, you can go from

11   one keyframe to another keyframe and interpolate based

12   upon these rules that you have because the rules being

13   guidelines based upon timing based upon the sound that

14   you are trying to achieve will get you that.  And it is

15   that the invention?

16         MR. PETRSORIC:  That is correct, your Honor.

17         THE COURT:  So the invention is that.  And you are

18   not claiming -- the plaintiff is not claiming as part of

19   the patent itself the rules themselves, but, you know,

20   there are certain rules that might be incorporated into

21   the software initially just simply for the fact that they

22   are pretty standard rules and you would use those

23   generally but they can be overcome by the animator who is

24   utilizing that software.

25         MR. PETRSORIC:  Yes.
```

1    THE COURT:  Okay.

2    MR. PETRSORIC:  So that the animator has a certain

3    amount of control over the rules.  Maybe not the ultimate

4    control because there are rules that will be fixed.

5    THE COURT:  Okay.

6    MR. PETRSORIC:  Relating to timing especially.

7    THE COURT:  And now I am not to get into

8    necessarily into prior art, but just to understand the

9    scope of this particular invention, there were -- the

10   plaintiff admits that there were other computer programs

11   for interpolation.

12   MR. PETRSORIC:  Absolutely.  And there were other

13   computer programs with very simple correspondence rules.

14   THE COURT:  Okay.  What is the difference between

15   your client's software and those?

16   MR. PETRSORIC:  It is the -- it is the addition of

17   the timing rules and the addition of transition

18   parameters to more effectively produce the realistic,

19   realistic animation over a broader range of spoken word.

20        I think we went through the example of the

21   word blob before and how if the word is spoken slowly,

22   the L will appear fully articulated, but when the word is

23   spoken quickly the L is barely articulated.  So what it

24   comes down to is by applying rules as they relate to the

25   timing of the phonemes and then making sure that the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   output morph weight sets are set, are made accordingly,

 2   you end up with more realistic output.

 3        THE COURT:  But the timing aspects, you are saying

 4   those timing aspects or similar timing aspects were not

 5   utilized in other computer programs in this area?

 6        MR. PETRSORIC:  That is correct, your Honor.

 7        THE COURT:  All right.

 8        MR. SINGER:  So what we have, your Honor, is,

 9   actually, let me take one step back which is I think you

10   raised it again in your question to Mr. Petrsoric which

11   is this idea of artistic freedom versus rules.

12        THE COURT:  I don't think I did that.

13        MR. SINGER:  Let me just address it briefly.  I

14   may have misheard you.  I think the animator with a pen

15   and pencil making those decisions, that is just a

16   decision.  When I see this, I am going to decide to use

17   that.  That is the same as how a computer makes a

18   decision through a rule.

19             So the patentee then, as I think just became

20   really clear, the patent is not limited to any particular

21   rule.  No one example of you have to use when you find

22   this O, use this morph weight set.  Rather, it very

23   purposely claims the entire idea of using the TAPT and

24   the timings in there to generate a morph weight set.  And

25   so that is a very specific technique.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    And, our concern, and this is why I said at

2    the beginning that I hoped that this might be like the

3    last term is that what we are trying to do is resolve a

4    dispute that under O2 Micro has to be or should be

5    resolved at this stage.  And that is that the claim, you

6    know, the first set of rules have to do everything that

7    Mr. Petrsoric just said was what is new.  And that has to

8    be performed as recited.  And so with respect to the

9    Anisoft system, in particular, you will not find a rule

10   that looks at the TAPT and then outputs a morph weight

11   set.

12       And if you look at the infringement

13   contentions, it doesn't even say that it worked that way.

14   What you will find is there are some rules that operate

15   on the TAPT, and they have an output.  And, frankly, all

16   of the defendants do different things from there with

17   respect to that output.  But no matter what you do

18   downstream, the only rules that are evaluated against the

19   TAPT output something that is absolutely not a morph

20   weight set stream.

21       THE COURT:  But the problem is that I don't

22   understand your argument in the context of the

23   interpretation of this term first set of rules.  I

24   understand your argument in a way as an argument that

25   relates to something else, but I don't understand how it

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4886**

1    relates to the term first set of rules.

2         MR. SINGER:  Because the patentee -- and I know

3    you said this morning you loved to hear lawyers say they

4    are wrong --

5         THE COURT:  No.  I like lawyers to say that I am

6    right.  I don't necessarily like lawyers saying they are

7    wrong.  They are always wrong.

8         MR. SINGER:  I think, again, here, we could have

9    fleshed out the dispute between the parties perhaps

10   clearer, but the idea is that the patentee elected to

11   have the abstract idea of all the rules that perform the

12   function and what we are seeking to do by this

13   construction which limits the term to a computer program

14   and rules that are used together is to have a rule set

15   that actually performs the stated function and not to

16   have the claims cover serial use of disparate programs

17   that when used from start to finish might ultimately take

18   you from -- that seems to be the part that is confusing

19   your Honor.

20        THE COURT:  In other words, what you are saying is

21   that the patent has to be exclusively on one computer as

22   opposed to being on more than one computer?  Is that what

23   you are talking about?

24        MR. SINGER:  Not necessarily one computer.  Our

25   construction is that it is embodied in a single software

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   program.

2           THE COURT:  But the software program itself could

3   be on multiple computers?

4           MR. SINGER:  I don't know how that would work.

5           THE COURT:  Well, Microsoft, isn't that a single

6   program?  Isn't it on everybody's computer?

7           MR. PETRSORIC:  Well, I think, your Honor, I think

8   we are in complete disagreement that the defendants used

9   multiple programs for different aspects of the animation

10  process.

11          So, ultimately, they will withdraw the models,

12  the facial models in a tool like those provided by

13  Autodesk.  I think 3D Studio was one tool.  They will use

14  the concept of those models to set up morph weight set

15  rules in FaceFX or Anisoft.  And then when the output

16  morph weight set stream is generated by FaceFX or

17  Anisoft, they will use that stream in yet another tool to

18  display the animation.

19          MR. SINGER:  So if I could just respond to that.

20  The first two tools that Mr. Petrsoric referred to

21  performed the inputting and setting up steps that I think

22  we have covered, happen before you begin the claimed

23  method.  It just obtains those things.  Okay.

24          So for the actual step, once we are into the

25  method of how many programs can constitute a rule set, a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   group of things meant to be used together. And,

2   moreover, a rule set that performs the function that is

3   stated when that function has been described as the key

4   secret sauce here.

5          So if, once I have -- setting aside, I agree

6   we will use a studio for the models, and we may use a

7   simple text script for some correspondence rules. But

8   once we have got these resources for our computer program

9   and we need to get from the TAPT and the models to a

10  morph weight set, that can't be done by three programs

11  that weren't intended to necessarily work together none

12  of which performs on its own the recited function that is

13  the only difference with the prior art. I admit it is --

14      THE COURT: No. I mean, I don't see how that -- I

15  understand your -- again, I don't understand how that

16  contention relates to the term first set of rules because

17  the part of the claim that it is referring to is obtain a

18  first set of rules. Well, you obtain a first set of

19  rules.

20         I mean, you are arguing now about what you do

21  with the rules. Do you put the rules in more than

22  one software program or something of that sort, but it

23  seems to me that a first set of rules is just a first set

24  of rules.

25      MR. SINGER: Well, the first set of rules. It is

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    not just a group of rules or a pile of rules.  It is a

2    set of rules which I know you saw the briefing where we

3    used the definition of set and the tentative said that is

4    of no moment.

5         MR. PETRSORIC:  Which they cherry picked the

6    definition, your Honor.

7         THE COURT:  That is an aside.

8         MR. SINGER:  Well, whenever there is multiple

9    definitions in a dictionary and you go with one, I

10   suppose Mr. Petrsoric would say that constitutes cherry

11   picking.  But we thought it was the most applicable

12   definition here.

13            And the first set of rules, we don't just

14   obtain them, we apply them.  And so the obtaining step is

15   very clear as to what the function of these rules is

16   going to be.  And the applying step in perfect parallel

17   mirror follows that function and says that we will apply

18   the first set of rules to the TAPT to get out the morph

19   weight set stream.  And if what we are doing is pointing

20   to multiple programs --

21        THE COURT:  Well, no.  Because it doesn't say

22   apply, does it?  It says obtain and then generate.

23        MR. SINGER:  Generating by applying.

24        THE COURT:  Well, it says you obtain a first set

25   of rules that define and then you obtain a time data file

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4890**

1  of phonemes.  And then you generate an intermediate

2  stream by evaluating said plurality of subsequences

3  against the first set of rules.  So I don't understand

4  why you are framing in the way you framed it because the

5  claim frames it differently.

6         MR. SINGER:  I was looking at the first claim of

7  the 278 patent.

8         THE COURT:  I am looking at 576.  All right.  Let

9  me look at the first claim of 278.

10        MR. SINGER:  It is up on the screen, your Honor.

11        THE COURT:  Yes but I like the closeness of the

12 language.  It makes more of an impression on me.

13            All right.  Okay.  Here it is.  By applying.

14 Okay.

15        MR. SINGER:  So we see in the 278, Claim 1 of the

16 278 patent, that the first set of rules are obtained, and

17 they are functionally claimed that they have to have

18 criteria based on the TAPT so that they can know when you

19 find this in the TAPT, does this rule apply.  They have

20 to have a function which is if I do apply, I will put a

21 morph weight set.  And then they have to be used in the

22 third step to actually perform that function.

23            You have a TAPT, you compare the rules, and

24 you generate the output morph weight set stream by

25 applying them.  And so, again, the key infringement issue

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    here is does there have to be at least one program that

2    both considers the TAPT and outputs what the plaintiff

3    considers a morph weight set.

4        THE COURT:  And the plaintiff's response is?

5        MR. PETRSORIC:  I believe that is what is

6    explained in our infringement contentions, your Honor, is

7    that it is either, for the Track 1 defendants, it is

8    either FaceFX or Anisoft that performs those functions.

9        MR. SINGER:  I think if we can agree that -- I

10   mean, at that point I am not sure what we are arguing

11   about because that is what our construction is that there

12   has to be a program that contains the first set of rules

13   that perform that function.  And that is all we are

14   asking the court for.

15       THE COURT:  All right.  What is the plaintiff's

16   response?

17       MR. PETRSORIC:  I did not exactly hear everything

18   that Mr. Singer said so I apologize, your Honor.

19       THE COURT:  Well, let me have the reporter read

20   back what Mr. Singer said.

21       (Record read.)

22       MR. PETRSORIC:  Again, this gets into their

23   construction, your Honor, which is embodied in the

24   computer program, but certain of the rules are not

25   necessarily or depending on viewpoint are not necessarily

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  embodied in the computer software program that they may

2  be embodied in the database.  They may be embodied in the

3  separate computer file that, as Mr. Singer noted, could

4  be separately generated.

5          So I -- I am a little bit confused as to

6  exactly what he is attempting to reach for here.

7      MR. SINGER:  Can I have one second, your Honor.

8      THE COURT:  Yes.

9      (Counsel confer.)

10     MR. SINGER:  Thank you, your Honor.  I think to

11  resolve the issue that Mr. Petrsoric just raised, we

12  would propose a construction that does make clear that

13  this function of taking the TAPT to your intermediate

14  stream has to be performed by a single program.

15         And so perhaps one way to do that would be

16  rather than that they are embodied in a single or in a

17  computer software program that they are obtained and

18  applied by a single program.

19     MR. PETRSORIC:  Your Honor, I believe, from the

20  infringement perspective, that that is indeed the case.

21  But the patent is not so limited.  So I see no reason to

22  force a limitation on -- when the patent does not insist

23  on one.

24     MR. SINGER:  I think there has to be an outer

25  bounds to what the concept is of a set of instructions

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   that perform a given function.  I think highlighting the

2   need for that outer bound here is the fact that we have

3   got a very crowded art.  We have got a very specific

4   claimed method to avoid that art.  We have got an

5   election by the patentee to functionally claim the rules

6   such that they wouldn't be limited to requiring any

7   one or two specific rules.

8           So, in view of all that, that first set of

9   rules which is this functionally claimed abstract idea

10  cannot be read so broadly that it would cover a process

11  that -- it is also automatic -- that it would cover a

12  process involving multiple computer programs.  And it is

13  not, your Honor, that there is multiple programs or that

14  they are used serially.  The key is that not a single

15  one of those programs itself considers the TAPT and

16  outputs the morph weight set.  That is our -- that is our

17  concern.

18      MR. PETRSORIC:  Again, your Honor, from the

19  infringement perspective, I believe that is correct, but

20  I am hesitant to agree to anything like that because it

21  is -- it is significantly limiting beyond the plain

22  language of the claim.

23      MR. SINGER:  I'm sorry.  I was consulting.

24          But to be honest, your Honor, I think I have

25  articulated all the ammunition on this term that I have.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4894**

1      THE COURT:  All right.  Okay.  I will consider it.

2            What else do we need to talk about?

3      MR. PETRSORIC:  I believe, your Honor, if we are

4  through with the claim construction aspects for the day

5  which I believe everybody is quite happy --

6      THE COURT:  What I will do is you have gotten my

7  tentative rulings.  I will do an interpolation from the

8  tentative rulings to a final rulings by set rules that I

9  will think up and make up and plug in.

10      MR. PETRSORIC:  Very well, your Honor.

11      THE COURT:  I will get a patent on it.

12      MR. PETRSORIC:  Very well, your Honor.  Maybe we

13  will have The Honorable Judge Wu, your animation drafted

14  and running for the next time we are before you.

15      THE COURT:  I don't want to see myself.  Too many

16  people consider me a cartoon even without the animation.

17  So don't put a square into some sort of cartoon

18  character.

19            So I have done that now.  What else do we need

20  to be doing?  In terms of scheduling, obviously, once I

21  come out with my final Markman, that triggers additional

22  dates, is that correct?

23      MR. PETRSORIC:  Yes.  In your original schedule,

24  it does your Honor, but we have been effectively stayed

25  in discovery.  So I think really as a result of the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

A4895

1  filing of the inter partes review by Sony and Naughty

2  Dog.

3          THE COURT:  Is Electronic Arts a defendant in this

4  case?

5          MS. MEHTA:  Yes, your Honor, it is.

6          THE COURT:  Okay.  All right.

7          MR. PETRSORIC:  So the question becomes we will be

8  getting something from the patent office probably in the

9  next six weeks with respect to the institution of the

10  inter partes review.

11          THE COURT:  Or not.

12          MR. PETRSORIC:  I think they are statutorily bound

13  to actually give us something.  They have, despite the

14  workload, have managed to keep within that boundary on

15  everything so far from what I understand.

16              So we are at the point of are we going to

17  proceed in the case, and, if so, when are we going to

18  begin to proceed in the case.

19          THE COURT:  Yes.

20          MS. MEHTA:  Your Honor, I want to make a

21  suggestion.  I agree with that generally speaking.  There

22  is a number of questions that come from here following

23  the Markman including whether and to what extent

24  discovery should be opened.  I think there is also,

25  candidly, your Honor, from the tentative likely to be

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A4896**

```
 1    some summary judgment motions on noninfringement based on

 2    the rulings.

 3            There is likely to be potential 101 motion if

 4    the Supreme Court issues it ruling on CLS which is

 5    expected by June at the end of the term.  So

 6    one suggestion I have subject to the court's approval and

 7    of course input from the plaintiff is it may make sense

 8    for your Honor to provide his final claim construction

 9    ruling and then allow the parties a period of time to

10    meet and confer as to what the case should look like

11    going forward, what is left and what the process might

12    best be, present our proposal or proposals to your Honor

13    and have a further conference where we can figure out

14    where to go from here.

15            THE COURT:  All right.  That sounds what somewhat

16    reasonable.

17            MR. PETRSORIC:  I will say this, your Honor.  We

18    did have a schedule in place, and what has happened is

19    things have been continually put off.  So I think at some

20    point and, really, in the short term, that we should be

21    kind of opening -- I don't want to say opening the flood

22    gates but opening the door to begin to get the case into

23    some --

24            THE COURT:  I would agree, but I would think that

25    it might benefit both sides if we wait the period of time
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to see what the Supreme Court does with the pending

2    patent case and also to see what the PTO does with the

3    pending application as well.

4            And, at that point, I think we would be --

5    everybody would be better prepared to argue and consider

6    what should be done because the shape of the universe may

7    change if one of those two things are done in a

8    particularly unusual fashion.

9        MR. PETRSORIC:  And I gather, your Honor, that

10   both would be probably within the next six to

11   seven weeks.

12       THE COURT:  Yes.  That is what I am talking about.

13   And it is going to take me a little bit of time to do a

14   final on this one because you guys made my head spin, and

15   I am not talking about in a cartoon way.  Literally, it

16   was like Linda Blair without the pea soup.  Although that

17   may come out in the final ruling.

18           Anything else we need to discuss?

19       MS. MEHTA:  I don't believe so, your Honor.  Thank

20   you for your time.

21       THE COURT:  Oh.  No.  Thank you.  It was very

22   entertaining.

23       MS. MEHTA:  We aim to please.

24       MR. PETRSORIC:  One suggestion, your Honor.  In

25   relation to all of this, perhaps, maybe it would behoove

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   us to put a tentative CMC on the calendar for late June.
 2        THE COURT:  Sure.  I agree.  I will set a status
 3   conference at this point in time for -- well, I will put
 4   it for June 30th but with the understanding that if the
 5   Supreme Court has not come out with the patent decision
 6   by June 30th, we will continue it from June 30th to let's
 7   say July the 7th or July 10th, one of those two dates.
 8             Is that all right?
 9             Let me ask for those of you who are involved
10   in the Track 2 cases, can I do that the same with the
11   Track 2 cases.
12        MR. WEIR:  We are starting a trial here on July 7.
13        THE COURT:  When you say here, on the Track
14   2 cases?
15        MR. WEIR:  No.  In another case.  I have another
16   case that we will be starting trial in Los Angeles.
17        THE COURT:  I thought you meant in my courtroom,
18   and I was going I hope not.  Don't scare me like that.
19   But I don't understand you are saying that you guys would
20   be opposed to --
21        MR. WEIR:  Well, the 30th is fine, but I wouldn't
22   be here July 7.
23        THE COURT:  You can appear telephonically though.
24        MR. WEIR:  It is the first day of trial.
25        THE COURT:  Who are you in front of?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. WEIR:  He is a visiting judge, Garbis.

 2          THE COURT:  Those Maryland judges never start

 3  early.  They always start late and end early.  I tell you

 4  what.  I will just leave it for the 30th, and as I said

 5  if we need to continue it, everybody is going to be

 6  consulted anyway.  So we will talk about dates.

 7              But what I also would want, then, is by June

 8  the 26th assuming that the Supreme Court has come out

 9  with a decision, I want you guys to give me, both sides,

10  proposed dates that you guys can agree upon.  And we will

11  discuss that on the 30th.

12              All right.  Thank you very much.  Everybody

13  have a nice day.

14          MS. MEHTA:  Thank you, your Honor.

15          MR. PETRSORIC:  Thank you, your Honor.

16          (Proceedings concluded.)

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3

 4    I hereby certify that pursuant to Section 753, Title 28,

 5    United States Code, the foregoing is a true and correct

 6    transcript of the stenographically reported proceedings held

 7    in the above-entitled matter and that the transcript page

 8    format is in conformance with the regulations of the

 9    Judicial Conference of the United States.

10    Date:  May 9, 2014

11

12     /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# CENTRAL DISTRICT OF CALIFORNIA

10

McRO, Inc., dba Planet Blue,

11

Plaintiff,

12

13

v.

14

Namco Bandai Games America, Inc., et al.

15

Defendants.

| | |
|---|---|
| **Case No. 12-cv-10322-GW (FFMx)** | |

Honorable George H. Wu

**DECLARATION OF DR. MICHAEL GLEICHER IN SUPPORT OF PLANET BLUE'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT OF INVALIDITY**

**CONSOLIDATED WITH:**
12-cv-10327-GW (FFMx)
12-cv-10329-GW (FFMx)
12-cv-10331-GW (FFMx)
12-cv-10333-GW (FFMx)
12-cv-10335-GW (FFMx)
12-cv-10336-GW (FFMx)
12-cv-10337-GW (FFMx)
12-cv-10338-GW (FFMx)
12-cv-10340-GW (FFMx)
12-cv-10341-GW (FFMx)
12-cv-10342-GW (FFMx)
13-cv-01870-GW (FFMx)
14-cv-00332-GW (FFMx)
14-cv-00336-GW (FFMx)
14-cv-00352-GW (FFMx)
14-cv-00358-GW (FFMx)
14-cv-00383-GW (FFMx)
14-cv-00417-GW (FFMx)

16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF DR. MICHAEL GLEICHER IN SUPPORT OF PLANET BLUE'S BRIEF IN OPPOSITION
TO DEFENDANTS MOTION FOR JUDGMENT OF INVALIDITY

**A4946**

1.    In this litigation, Plaintiff McRo, Inc. d.b.a. Planet Blue ("Planet Blue") has asserted Defendants Bandai Namco Games America, Inc.; Konami Digital Entertainment, Inc.; Sega of America, Inc.; Electronic Arts Inc.; Obsidian Entertainment, Inc.; Disney Interactive Studios, Inc.; Naughty Dog, Inc.; Capcom USA, Inc.; Square Enix, Inc.; Neversoft Entertainment, Inc.; Treyarch Corporation; Warner Bros. Interactive Entertainment; LucasArts; Activision Publishing, Inc.; Blizzard Entertainment, Inc.; Infinity Ward, Inc.; Sony Computer Entertainment America LLC ("SCEA"); Sucker Punch Productions LLC; and Index Digital Media (collectively, "Defendants") have infringed U.S. Patent Nos. 6,307,576 ("the '576 Patent") and 6,611,278 ("the '278 Patent") to Maury Rosenfeld.  I refer to the '576 Patent and the '278 Patent collectively as the patents.  I have been retained by counsel for Planet Blue to offer my opinion on matters relating to the validity and infringement of the '576 Patent and the '278 Patent.

2.    I am being paid for my work in this litigation at the rate of $400 per hour. My compensation does not depend on the outcome of this litigation. I have no personal interest in the outcome.

3.    Presently, I am a Professor in the Department of Computer Sciences at The University of Wisconsin-Madison.  I received my B.S.E.E. in Electrical Engineering and Computer Science from Duke University in 1988.  In 1991, I received a M.S. in Computer Science from Carnegie Mellon University. In 1994, I received a Ph. D. in Computer Science, also from Carnegie Mellon University.  In addition to my credentials, I have been working in the field of computer graphics software engineering for over 20 years.  My work experience and education is summarized in my CV attached hereto as Exhibit A, which also contains a list of all publications I authored.  This declaration is based on my education, professional career and relevant experiences, as well as the materials

2

DECLARATION OF DR. MICHAEL GLEICHER IN SUPPORT OF PLANET BLUE'S BRIEF IN OPPOSITION TO DEFENDANTS MOTION FOR JUDGMENT OF INVALIDITY

A4947

reviewed.

4. In connection with my retention in this matter, I have reviewed various materials, including the '576 Patent, the '278 Patent, the Court's May 1, 2014 Ruling on Claim Construction and the July 10, 2014 Defendants' Notice of Motion and Motion For Judgment on The Pleadings Based on Unpatentability Under 35 U.S.C. § 101; Memorandum of Points and Authorities ("the Defendants' Motion").

5. All of the opinions stated in this declaration are based on my own personal knowledge and professional judgment; if called as a witness in this matter, I am prepared to testify competently about them.

6. I have reviewed the Defendants' Motion and disagree with its factual conclusions. While much of the document involves legal issues that I will not comment on, it is based on numerous factual inaccuracies and incorrect interpretations of technical concepts. I will point out a few of the many errors, inaccuracies, and misinterpretations here, but it is not a complete list.

7. Contrary to the assertion in the Defendants' Motion (e.g. pg. 1, line 13), the patents teach far more than the "abstract idea of synchronizing an animated character's mouth." They teach and claim a specific way to construct a computer system that is capable of producing character animation with lip and facial movements synchronized to speech. The claimed approach, and any system that embodies it, includes a number of innovative and novel steps, and such systems have numerous advantages over the alternatives known at the time of the invention, and even over more recent methods I am aware of.

8. The patents begin by explaining that while prior methods existed to produce speech synchronized animation in computer-generated imagery ("CGI"), all known methods had drawbacks that made them impractical for many applications. The Court recognized this in the Background Section (pp. 1-2) of the

3

DECLARATION OF DR. MICHAEL GLEICHER IN SUPPORT OF PLANET BLUE'S BRIEF IN OPPOSITION TO DEFENDANTS MOTION FOR JUDGMENT OF INVALIDITY

A4948

Ruling on Claim Construction. Contrary to the assertions in the Defendants' Motion (e.g. pg. 1, line 19), merely speeding up the same, known methods would not address the drawbacks.

9. The process taught by the patents enables the construction of a system that produces CGI animation in a manner that is quite different than it would be done manually. Contrary to the Defendants' Motion's assertion that there is a "manual process substantially identical" to the computer-aided process described in the patents, the approach of the patents is quite different from that done manually. While the goal of producing good animation of talking characters is shared by both approaches (this is the citation given with the quote), the actual approaches differ in many ways. Foremost, while manual approaches to animation rely on animators using their talent and judgment in a labor intensive and inconsistent process to set keyframes, the patents describe and claim methods that enable a system to use explicitly defined rules to determine keyframes automatically, providing the resulting CGI animation efficiently and consistently.

10. The patents teach and claim that a system embodying the patented approach can provide various inputs, including correspondence and timing rules, whose application leads to consistent, repeatable and desired results. Having such user-specified data as part of the process is important to the success of the patented approach: high quality animation often requires an artist to have some degree of control over the results. Contrary to the assertions of the Defendants' Motion, many aspects of the claims, including the timing rules embodied in the independent and dependent claims, do not exist in the prior art that I am aware of. They were not "well known" as the Defendants' Motion asserts. I therefore disagree with the assertions in the table on page 6 of the Defendants' Motion.

DECLARATION OF DR. MICHAEL GLEICHER IN SUPPORT OF PLANET BLUE'S BRIEF IN OPPOSITION
TO DEFENDANTS MOTION FOR JUDGMENT OF INVALIDITY

11.     Further contrary to the assertions of the Defendants' Motion, the patents teach and claim using an **<u>automated</u>** computer process for efficiently using this data, removing much of the time consuming, tedious, and error-prone work on the part of the user.  For example, while the user may specify the rules and the phoneme stream, the tedious and time consuming step of applying the rules to the phoneme stream is performed by the computer system implementing the patented approach.  Such an application would be impractical, if not impossible, to be done manually (as suggested by the Defendants' Motion, e.g., pg. 6, lines 13-15).

12.     The patents provide a specific recipe for the types of rule that is sufficient and useful for defining how to effectively determine morph-weight values from a stream of time aligned phonemes and other data.  Contrary to the assertions of the Defendants' Motion, the patents do not make claims over "any" rules (e.g., pg. 13, lines 8-10).  Indeed, the insight of the inventor that these types of rules are sufficient to create good animation is significant.

13.     The process of applying the required rules, including the timing rules, to produce a morph weight set stream in the patent would be infeasible to perform manually. The Defendants' Motion comically asserts (e.g., pg. 13, lines 12-27) that the process can be done by pen and paper. Indeed, this is true in theory: a person with a pencil, paper, and sufficient time, energy, and paper can do any computation that a computer can – this is a fundamental concept in computer science called "Turing equivalence" that even the simple computing systems that have a certain small set of capabilities can (given sufficient time and space) simulate a more complex one.  However, in practice, a person has finite time, skills, energy, and space on their paper.  So, while it is theoretically possible for a person to simulate a computer, this is not practical to do for realistic examples of complex processes over large data sets.  For example, to illustrate the invention,

5

DECLARATION OF DR. MICHAEL GLEICHER IN SUPPORT OF PLANET BLUE'S BRIEF IN OPPOSITION
TO DEFENDANTS MOTION FOR JUDGMENT OF INVALIDITY

the patents provide a trivially simple example involving only a small set of rules and morph targets. However, even in this trivially small example, the specification still skips over much of the data and computations required to execute the process, for example it does not describe the positions of the vertices that would be required to define the face's shape. It would be infeasible to specify and process this much data using pencil and paper, even more so when the complexities of the timing rules of the claims are to be applied.

14. It would not be feasible to perform the claimed steps of the patents for the kinds of tasks that were intended without constructing a computer system running specific software. A highly skilled mathematician might possibly be capable of performing a subset of simple calculations by hand, but to perform the calculations for an entire facial sequence (as claimed by the Defendants' Motion) would require far too many computations, and require the managing of far too many numbers to conceivably do manually, or even using a general calculating device. Indeed, one would only undertake to structure data as the patent suggests, for example representing blend shapes as the positions of a large number of vertices, if they were to be processed automatically by a computer, as the asserted methods claim.

15. Blend-shape-based animation has precedent in traditional, hand-drawn, animation. However, this type of blending, when done by hand, by an animator, is quite different than what is done in the patents. Hand animators use reference shapes as a guide, and use their artistic creativity to interpret what happens "in-between" these shapes. There is no need for, or even feasible way for, an animator to calculate by hand all of the vertices, delta sets, morph weight sets, or the like for an animated facial sequence.

16. The patents describe and claim one way to achieve lip synch in CGI animation. They are not so broad that they cover all possible methods.

6

DECLARATION OF DR. MICHAEL GLEICHER IN SUPPORT OF PLANET BLUE'S BRIEF IN OPPOSITION TO DEFENDANTS MOTION FOR JUDGMENT OF INVALIDITY

A4951

1 While my initial analysis suggests that there are at least some systems that use the

2 methods described in the patents, I am also aware of many other methods for

3 producing facial animation that are quite different from what is described and

4 claimed in the patents.

5       17.    One common strategy for producing computer facial animation

6 is a technique known as motion capture (also referred to as facial capture).

7 Motion capture creates the movements of animated characters by measuring the

8 movements of a human performer, for example by tracking points on an actor's

9 body and face in a video or using special markers and cameras. Unlike the

10 patents, the movements in motion and facial capture-based animations are created

11 from measurements of the actor as they speak, rather than by rules applied to the

12 phonemes they speak. The animation derived from motion and facial capture

13 animation comes from the translation of the measured movements, not (as in the

14 patents) from the application of timing and other rules to a phoneme stream.

15       18.    Another common strategy for producing computer facial

16 animation is to model the face using general parametric models, rather than the

17 morph weight approach claimed in the patents. In such an approach, the

18 configuration of the face is determined by a set of numerical parameters that each

19 control some aspect of the face. In such approaches, the resulting face shapes are

20 determined by processes not limited to blending using morph weight sets.

21 Therefore, many parametric approaches lack the basic elements claimed in the

22 patents.

23       19.    It is my opinion that the patents claim concrete embodiments.

24 While the asserted method claims might have some steps that, when taken

25 individually, involve "abstract" operations (at least according to how the

26 Defendants' Motion approaches "abstract" operations), such as mathematical

27 computations, it is clear that all of the asserted claims are intended to result from

28

DECLARATION OF DR. MICHAEL GLEICHER IN SUPPORT OF PLANET BLUE'S BRIEF IN OPPOSITION
TO DEFENDANTS MOTION FOR JUDGMENT OF INVALIDITY

1 the operation of a computer system implementing special software that performs
2 all of the steps of the claims to achieve CGI character animation having
3 synchronized lip and facial features to speech.

4      20.    There are many distinctive features of the claims of the patent.
5 In my opinion these distinctions are important. A central part of the creative
6 insight of the patents is the realization to use the specific approach of using morph
7 weight set representations of the facial shape coupled with rules, including explicit
8 and distinct timing rules, to generate keyframes. This approach uniquely provides
9 the automation required to produce animation in a cost-effective way, yet provided
10 the necessary artistic control required to produce commercial grade animation.

11      21.    I declare on this 24th day of July, 2014 under penalty of perjury
12 under the laws of the United States that the statements in this declaration are true
13 and correct.

14

15      Michael Gleicher, Ph. D.

8

DECLARATION OF DR. MICHAEL GLEICHER IN SUPPORT OF PLANET BLUE'S BRIEF IN OPPOSITION
TO DEFENDANTS MOTION FOR JUDGMENT OF INVALIDITY

1
2
3
4
5
6
7
8  **UNITED STATES DISTRICT COURT**
9  **CENTRAL DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| McRO, Inc., dba Planet Blue, | **Case No. 12-cv-10322-GW (FFMx)** |
| Plaintiff, | Honorable George H. Wu |
| v. | **DECLARATION OF JOHN F. PETRSORIC IN SUPPORT OF PLANET BLUE'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT OF UNPATENTABILITY** |
| Namco Bandai Games America, Inc., et al. | |
| Defendants. | |

**CONSOLIDATED WITH:**
12-cv-10327-GW (FFMx)
12-cv-10329-GW (FFMx)
12-cv-10331-GW (FFMx)
12-cv-10333-GW (FFMx)
12-cv-10335-GW (FFMx)
12-cv-10336-GW (FFMx)
12-cv-10337-GW (FFMx)
12-cv-10338-GW (FFMx)
12-cv-10340-GW (FFMx)
12-cv-10341-GW (FFMx)
12-cv-10342-GW (FFMx)
13-cv-01870-GW (FFMx)
14-cv-00332-GW (FFMx)
14-cv-00336-GW (FFMx)
14-cv-00352-GW (FFMx)
14-cv-00358-GW (FFMx)
14-cv-00383-GW (FFMx)
14-cv-00417-GW (FFMx)

11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28

I, John F. Petrsoric, hereby declare as follows:

1. I am an attorney with the law firm Mishcon de Reya New York LLP, 750 7th Avenue, New York, New York 10019. Mishcon de Reya is counsel for Plaintiff Planet Blue in the present action. I am admitted to the bar of the State of New York and *pro hac vice* to this Court for the present action.

2. I make this Declaration in support of Plaintiff's Opposition to Defendants' Motion for Judgment on the Pleadings Based on Unpatentability under 35 U.S.C. § 101. I am familiar with the facts contained and the documents described in this Declaration.

3. Attached as **Exhibit 1** are true and correct copies of various invoices to LucasArts for lip-synchronization work.

4. Attached as **Exhibit 2** is a true and correct copy of a Warner Bros. Memorandum, dated January 27, 1999, bearing production number PB098336.

5. Attached as **Exhibit 3** is a true and correct copy of the transcript of the case management conference in the present action held before the Hon. George Wu on June 30, 2014.

6. Attached as **Exhibit 4** is a true and correct copy of the Patent Trial and Appeal Board's ("PTAB") decision denying Naughty Dog's Request for Institution of *Inter Partes Review* of U.S. Patent No. 6,307,576, dated May 28, 2014.

7. Attached as **Exhibit 5** is a true and correct copy of U.S. Patent No. 8,743,125 ("the '125 patent"), entitled "Method and apparatus for providing natural facial animation" and recently issued to inventor Masanori Omote.

8. Attached as **Exhibit 6** is a true and correct copy of the Assignment history of the '125 patent, retrieved from the U.S. Patent and Trademark Office Assignment website at

2

DECLARATION OF JOHN F. PETRSORIC IN SUPPORT OF PLANET BLUE'S BRIEF IN OPPOSITION TO DEFENDANTS MOTION FOR JUDGMENT OF UNPATENTABILITY

A4975

http://www.uspto.gov/ebc/assignments.html on July 24, 2014.

9. Attached as **Exhibit 7** is a true and correct copy of the LinkedIn profile of '125 patent inventor Masanori Omote.

10. Attached as **Exhibit 8** is a true and correct copy of U.S. Patent No. 7,610,182 ("the '182 patent"), entitled "Image display apparatus, method and program based on rigid body dynamics" and issued to inventors Russell Leigh Smith and Lacoursie Claude.

11. Attached as **Exhibit 9** is a true and correct copy of U.S. Patent No. 8,713,516 ("the '516 patent"), entitled "System and method for leveraging independent innovation in entertainment content and graphics hardware" and recently issued to inventors Christopher C. Tanner, Remi Simon Vincent Arnaud, Mivhael T. Jones, Richard D. Webb and Brian McClendon.

12. I declare on this 24th day of July, 2014 under penalty of perjury under the laws of the United States that the statements in this declaration are true and correct.

John F. Petrsoric

---

3

DECLARATION OF JOHN F. PETRSORIC IN SUPPORT OF PLANET BLUE'S BRIEF IN OPPOSITION TO DEFENDANTS MOTION FOR JUDGMENT OF UNPATENTABILITY

# Exhibit 1



**PLANET BLUE**

1250 SIXTH STREET, SUITE 102
SANTA MONICA, CALIFORNIA 90401
PHONE 310-899-3877 FAX 310-899-3787

```
* * * * * * * * * * * * * * *
*                           *
*    I N V O I C E    *
*                           *
* * * * * * * * * * * * * * *
```

Document Number: PB2169

Document Date: 11/09/00

Page:  1

Sold  DIGITAINMENT, INC.
To:   ATTN:  MAURY ROSENFELD
      1250 SIXTH STREET #102
      SANTA MONICA, CA 90401

Ship  DIGITAINMENT, INC.
To:   ATTN:  MAURY ROSENFELD
      1250 SIXTH STREET #102
      SANTA MONICA, CA 90401

Ship Via.:
Ship Date: 11/09/00
Due Date.: 12/09/00
Terms....: NET 30 DAYS

Cust I.D.....: DIGTAI
P.O. Number..:
P.O. Date....: 11/09/00
Job/Order No.:
Salesperson..:

| Item I.D./Desc. | Ordered | Shipped | Unit | Price | Net | TX |
|---|---|---|---|---|---|---|
| NOVEMBER 9, 2000 - LUCAS ART-STAR FIGHTER | | | | | | |
| SYNC - STAR FIGHTER | | | | | 5000.00 | E |

Subtotal:      5000.00
Tax.....:         0.00
Total...:      5000.00

**EXSTREAM**
MEDIA

```
*****************
*               *
*  I N V O I C E  *
*               *
*****************
```

Document Number: EX2024

Document Date: 11/06/00

Page: 1

Sold   LUCAS ART
To:    1600 LOS GAMOS #200
       SAN RAFAEL, CA 94903

Ship   LUCAS ART
To:    1600 LOS GAMOS #200
       SAN RAFAEL, CA 94903

Ship Via.:
Ship Date: 11/06/00
Due Date.: 11/16/00
Terms....: NET 10

Cust I.D.....: LUCAS
P.O. Number..:
P.O. Date....: 11/06/00
Job/Order No.:
Salesperson..:

| Item I.D./Desc. | Ordered | Shipped | Unit | Price | Net | TX |
|---|---|---|---|---|---|---|
| OCT. 6, 2000 - STAR FIGHTER | | | | | | |
| SYNC - 1/2 PROJECT CONTRACT | | | | | 10000.00 | E |

Subtotal:     10000.00
Tax.....:         0.00
Total...:     10000.00

ph: 310.899.3868 • fax: 310.899.1288 • 1250 sixth street, suite 102, santa monica, california  90401
www.exstream.to

EXSTREAM MEDIA

```
                              * * * * * * * * * * * * * * *
                              *                           *
                              *    I N V O I C E    *
                              *                           *
                              * * * * * * * * * * * * * * *
```

Document Number: EX2026

Document Date: 11/27/00

Page:  1

Sold   LUCAS ART
To:    1600 LOS GAMOS #200
       SAN RAFAEL, CA 94903

Ship   LUCAS ART
To:    1600 LOS GAMOS #200
       SAN RAFAEL, CA 94903

Ship Via.:
Ship Date: 11/27/00
Due Date.: 12/07/00
Terms....: NET 10

Cust I.D.....: LUCAS
P.O. Number..:
P.O. Date....: 11/27/00
Job/Order No.:
Salesperson..:

| Item I.D./Desc. | Ordered | Shipped | Unit | Price | Net | TX |
|---|---|---|---|---|---|---|
| NOVEMBER 27, 2000 - STAR FIGHTER | | | | | | |
| SYNC -  BALANCE DUE ON PROJECT | | | | | 10000.00 | E |

Subtotal:      10000.00
Tax.....:          0.00
Total...:      10000.00

ph: 310.899.3868 • fax: 310.899.1288 • 1250 sixth street, suite 102, santa monica, california  90401
www.exstream.to

**A4980**

BILLING SUMMARY SHEET

| No. | *EX 2626* | DATE: | *11/27/00* | ROOM: | | PO # | |
|---|---|---|---|---|---|---|---|
| CLIENT | *Lucas Arts* | | ADDRESS | | | | |
| CONTACT | | | TELEPHONE # | | | | |
| OPERATOR | | | PROJECT: | *Star Fighter* | | | |

| BAY: | TIME | | TOTAL HRS. | RATE | TOTAL |
|---|---|---|---|---|---|
| FLAME/INFERNO | *Second Half* | | | | *10,000* |
| FLINT | | | | | |
| CGI / NT | | | | | |

| | HRS. | # OF EMP. | RATE | | TOTAL |
|---|---|---|---|---|---|
| OT LABOR | | | $ 85.00 | | |
| OT LABOR | | | $ 120.00 | | |

| MACHINES: | HRS. | RATE | | TOTAL |
|---|---|---|---|---|
| DIGITAL BETA | | | | |
| D1 / D2 | | | | |
| D1 | | | | |
| MACINTOSH | | | | |

| DUPLICATION: | DUB TIME | DUB. FROM: | DUB. TO: | RATE | TOTAL |
|---|---|---|---|---|---|
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |

| STOCK: | MINS. | RAW | B&C | RATE/EA | TOTAL |
|---|---|---|---|---|---|
| 3/4 | | | | / | |
| DIGITAL BETA | | | | / | |
| BETA SP | | | | / | |
| D1 | | | | / | |
| D2 | | | | / | |
| VHS | | | | / | |
| OTHER | | | | / | |
| OTHER | | | | / | |

| MISC. | | TOTAL |
|---|---|---|
| COURIER SRVC. | | |
| MEALS | | |

TOTAL CHARGES  *10,000*

## BILLING SUMMARY SHEET

JOB # _____  DATE 1/17/00  ROOM: _____  PO # _____

CLIENT *EJ Stream*  ADDRESS _____

CONTACT _____  TELEPHONE # _____

OPERATOR *Konstanin*  PROJECT: 324

| BAY: | TIME | TOTAL HRS. | RATE | TOTAL |
|------|------|------------|------|-------|
| FLAME INFERNO | | | | |
| FIRE | | | | |
| EDIT | 9:00-11:00 | 2 | | |

| | HRS. | # OF EMP. | RATE | | TOTAL |
|--|------|-----------|------|--|-------|
| CREATIVE LABOR | | | $ 85.00 | | |
| CREATIVE LABOR | | | $ 120.00 | | |

| MACHINES: | HRS. | RATE | TOTAL |
|-----------|------|------|-------|
| DIGITAL BETA | | | |
| DY DS | | | |
| CD | | | |
| MACINTOSH | | | |

| DUPLICATION: | DUB TIME | DUB. FROM: | DUB. TO: | RATE | TOTAL |
|--------------|----------|------------|----------|------|-------|
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |

| STOCK: | MINS. | RAW | B&C | RATE/EA | TOTAL |
|--------|-------|-----|-----|---------|-------|
| | | | | / | |
| DIGITAL BETA | | | | / | |
| BETA SP | | | | / | |
| | | | | / | |
| | | | | / | |
| HI8 | | | | / | |
| OTHER | | | | / | |
| OTHER | | | | / | |

| MISC. | | TOTAL |
|-------|--|-------|
| COURIER SRVC | | |
| MEALS | | |

TOTAL CHARGES _____

**A4982**

# WORK ORDER

*Ed Stream*

## 3D / NT

PLANET BLUE

| | |
|---|---|
| PROJECT | P.O. # |
| ADDRESS | WORK ORDER # |
| | JOB / PROJECT # 334 |
| PHONE # | DATE 11-17-00 |

## JOB SPECIFICATIONS:

| FUNCTION | TIME IN | TIME OUT | | D-1 | D-2 | 1" | BETA | 3/4" | DIGI BETA | |
|---|---|---|---|---|---|---|---|---|---|---|
| CG | 9 am | 11 am | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

### OPERATOR COMMENTS

### PERSONNEL

NAME _____  _____ regular hrs.  _____ hrs. @ 1.5x  _____ hrs @ 2x

NAME _____  _____ regular hrs.  _____ hrs. @ 1.5x  _____ hrs @ 2x

### CLIENT COMMENTS:

I have reviewed and agree to the above facilities usage, and Planet Blue's terms of business

PLANET BLUE: _____

CLIENT _____

A4983

BILLING SUMMARY SHEET

| WO # | DATE 11/16/00 | ROOM: | PO # |
| CLIENT | Epstream | ADDRESS | |
| CONTACT | | TELEPHONE # | |
| OPERATOR | Konstanin | PROJECT: | 324 |

| BAY: | TIME | TOTAL HRS. | RATE | TOTAL |
|---|---|---|---|---|
| FLAME INFERNO EDIT | 9:00 – 11:00 | 2 | | |
| EDIT | 4:00 – 5:30 | 1.50 | | |
| | | 3.50 | | |

| | HRS. | # OF EMP. | RATE | | TOTAL |
|---|---|---|---|---|---|
| OT LABOR | | | $ 85.00 | ▓▓▓▓▓ | |
| OT LABOR | | | $ 120.00 | ▓▓▓▓▓ | |

| MACHINES: | HRS. | RATE | TOTAL |
|---|---|---|---|
| DIGITAL BETA | | | |
| D2 | | | |
| D1 | | | |
| MACINTOSH | | | |

| DUPLICATION: | DUB TIME | DUB. FROM: | DUB. TO: | RATE | TOTAL |
|---|---|---|---|---|---|
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |

| STOCK: | MINS. | RAW | B&C | RATE/EA | TOTAL |
|---|---|---|---|---|---|
| | | | | / | |
| DIGITAL BETA | | | | / | |
| BETA SP | | | | / | |
| | | | | / | |
| | | | | / | |
| DAT | | | | / | |
| OTHER | | | | / | |
| OTHER | | | | / | |

| MISC. | | TOTAL |
|---|---|---|
| COURIER SRVC | | |
| MEALS | | |

| | TOTAL CHARGES | |
|---|---|---|

A4984

Case 2:12-cv-10322-JFM Document 1046-Page 07/24/12 Page 29 of 157 Page ID #:4511

# WORK ORDER

## 3D / NT

PLANET BLUE

*Ep stream*

| | | |
|---|---|---|
| | P.O. # | |
| | WORK ORDER # | |
| | JOB / PROJECT # | *324* |
| | DATE | *11-16-00* |

## JOB SPECIFICATIONS:

| FUNCTION | TIME IN | TIME OUT | | D-1 | D-2 | 1" | BETA | 3/4" | DIGI BETA | |
|---|---|---|---|---|---|---|---|---|---|---|
| CG | 9am / 4pm | 11am / 5³⁰pm | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

### OPERATOR COMMENTS

### PERSONNEL

| | regular hrs. | hrs. @ 1.5x | hrs @ 2x |
|---|---|---|---|
| | regular hrs. | hrs. @ 1.5x | hrs @ 2x |

### CLIENT COMMENTS:

I have reviewed and agree to the above facilities usage, and Planet Blue's terms of business

PLANET BLUE _____

CLIENT _____

BILLING SUMMARY SHEET

| JOB # | | DATE: 11/7/00 | | ROOM: | | PO # |
|---|---|---|---|---|---|---|

CLIENT: _Eystream_  ADDRESS: _____

CONTACT: _____  TELEPHONE #: _____

OPERATOR: _Joel_  PROJECT: _____

| BAY: | TIME | TOTAL HRS. | RATE | TOTAL |
|---|---|---|---|---|
| FLAME INFERNO | | | | |
| FLINT | | | | |
| EDIT | 9:30 – 5:15 | 7.75 | | |

| | HRS. | # OF EMP. | RATE | | TOTAL |
|---|---|---|---|---|---|
| OT LABOR | | | $ 85.00 | ▓▓▓▓▓ | |
| OT LABOR | | | $ 120.00 | ▓▓▓▓▓ | |

| MACHINES: | HRS. | RATE | TOTAL |
|---|---|---|---|
| DIGITAL BETA | | | |
| 3/4 D2 | | | |
| D1 | | | |
| MACINTOSH | | | |

| DUPLICATION: | DUB TIME | DUB. FROM: | DUB. TO: | RATE | TOTAL |
|---|---|---|---|---|---|
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |

| STOCK: | MINS. | RAW | B&C | RATE/EA | TOTAL |
|---|---|---|---|---|---|
| D1 | | | | / | |
| DIGITAL BETA | | | | / | |
| BETA SP | | | | / | |
| D2 | | | | / | |
| 3/4 | | | | / | |
| OTHER | | | | / | |
| OTHER | | | | / | |

| MISC. | | TOTAL |
|---|---|---|
| COURIER SRVC | | |
| MEALS | | |

| | TOTAL CHARGES | |
|---|---|---|

**A4986**

# WORK ORDER

*Joel*
**FLAME**

⬤
**PLANET BLUE**

CLIENT _Ed Stream_

CONTACT _____ P.O. # _____

ADDRESS _____ WORK ORDER # _____

JOB / PROJECT # _324_

PHONE # _____ DATE _11-17-00_

| JOB SPECIFICATIONS: | FINAL AFTER EFFECTS |
|---|---|

| FUNCTION | TIME IN | TIME OUT | | D-1 | D-2 | 1" | BETA | 3/4" | MAC | DIGI BETA |
|---|---|---|---|---|---|---|---|---|---|---|
| AE | 9:30 | 5:15 | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

OPERATOR COMMENTS:

FINAL ~~RENDER~~ RENDERS

PERSONNEL *Joel*

| NAME: _____ | _____ regular hrs. | _____ hrs. @ 1.5x | _____ hrs. @ 2x |
|---|---|---|---|
| NAME: _____ | _____ regular hrs. | _____ hrs. @ 1.5x | _____ hrs. @ 2x |
| NAME: _____ | _____ regular hrs. | _____ hrs. @ 1.5x | _____ hrs. @ 2x |
| NAME: _____ | _____ regular hrs. | _____ hrs. @ 1.5x | _____ hrs. @ 2x |

CLIENT COMMENTS:

I have reviewed and agree to the above facilities usage, and Planet Blue's terms of business.

PLANET BLUE: _____

CLIENT: _____

BILLING SUMMARY SHEET

| J.O. # | | DATE 4/16/00 | | ROOM: | | PO # | |
|--------|--|--------------|--|-------|--|------|--|

CLIENT  *Ez Stream*   ADDRESS _____

CONTACT _____  TELEPHONE # _____

OPERATOR  *Joel*   PROJECT:  *324 Media*

| BAY: | TIME | TOTAL HRS. | RATE | TOTAL |
|------|------|-----------|------|-------|
| FLAME INFERNO FLINT LOGIC EDIT | *9:30 – 7:30* | *10.00* | | |

| | HRS. | # OF EMP. | RATE | | TOTAL |
|--|------|-----------|------|--|-------|
| O.T. LABOR | | | $ 85.00 | ▓▓▓▓▓ | |
| D.T. LABOR | | | $ 120.00 | ▓▓▓▓▓ | |

| MACHINES: | HRS. | RATE | TOTAL |
|-----------|------|------|-------|
| DIGITAL BETA | | | |
| BETA SP | | | |
| D1 | | | |
| MACINTOSH | | | |

| DUPLICATION: | DUB TIME | DUB. FROM: | DUB. TO: | RATE | TOTAL |
|--------------|----------|------------|----------|------|-------|
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |

| STOCK: | MINS. | RAW | B&C | RATE/EA | TOTAL |
|--------|-------|-----|-----|---------|-------|
| D1 | | | | / | |
| DIGITAL BETA | | | | / | |
| BETA SP | | | | / | |
| | | | | / | |
| | | | | / | |
| DAT | | | | / | |
| OTHER | | | | / | |
| OTHER | | | | / | |

| MISC. | | TOTAL |
|-------|--|-------|
| COURIER SRVC | | |
| MEALS | | |

TOTAL CHARGES _____

# WORK ORDER

*Joel*

# FLAME

**PLANET BLUE**

CLIENT *Ed. Stream*

CONTACT _____ P.O. # _____

ADDRESS _____ WORK ORDER # _____

JOB / PROJECT # *324*

PHONE # _____ DATE *11-16-00*

---

**JOB SPECIFICATIONS:** *After Effects*

| FUNCTION | TIME IN | TIME OUT | | D-1 | D-2 | 1" | BETA | 3/4" | MAC | DIGI BETA |
|----------|---------|----------|---|-----|-----|-----|------|------|-----|-----------|
| | 9:30 | 9:30 | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

**OPERATOR COMMENTS:** *FINAL LAYOUT (Misc. Changes)*

**PERSONNEL** *Joel*

| NAME: | _____ regular hrs. | _____ hrs. @ 1.5x | _____ hrs. @ 2x |
|-------|------|------|------|
| NAME: | _____ regular hrs. | _____ hrs. @ 1.5x | _____ hrs. @ 2x |
| NAME: | _____ regular hrs. | _____ hrs. @ 1.5x | _____ hrs. @ 2x |
| NAME: | _____ regular hrs. | _____ hrs. @ 1.5x | _____ hrs. @ 2x |

---

**CLIENT COMMENTS:**

I have reviewed and agree to the above facilities usage, and Planet Blue's terms of business.

PLANET BLUE: _____

CLIENT: _____

**A4989**

BILLING SUMMARY SHEET

| No # | DATE: 11/5/00 | | ROOM: | | PO # |
| --- | --- | --- | --- | --- | --- |

CLIENT: *Eq Stream*     ADDRESS: _____

CONTACT: _____     TELEPHONE #: _____

OPERATOR: *Joel*     PROJECT: *342 Media*

| BAY: | TIME | TOTAL HRS. | RATE | TOTAL |
| --- | --- | --- | --- | --- |
| FLAME INFERNO | 11:20 - 6:00 | 6.75 | | |
| FLINT | | | | |
| EDIT & VT | | | | |

| | HRS. | # OF EMP. | RATE | | TOTAL |
| --- | --- | --- | --- | --- | --- |
| OT LABOR | | | $ 85.00 | ▓▓▓▓ | |
| OT LABOR | | | $ 120.00 | ▓▓▓▓ | |

| MACHINES: | HRS. | RATE | TOTAL |
| --- | --- | --- | --- |
| DIGITAL BETA | | | |
| DVD? | | | |
| D1 | | | |
| MACINTOSH | | | |

| DUPLICATION: | DUB TIME | DUB. FROM: | DUB. TO: | RATE | TOTAL |
| --- | --- | --- | --- | --- | --- |
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |

| STOCK: | MINS. | RAW | B&C | RATE/EA | TOTAL |
| --- | --- | --- | --- | --- | --- |
| | | | | / | |
| DIGITAL BETA | | | | / | |
| BETA SP | | | | / | |
| | | | | / | |
| | | | | / | |
| VHS | | | | / | |
| OTHER | | | | / | |
| OTHER | | | | / | |

| MISC. | | TOTAL |
| --- | --- | --- |
| COURIER SRVC | | |
| MEALS | | |

| | TOTAL CHARGES | |
| --- | --- | --- |

A4990

Case 2:12-cv-09358-CBM-FFM Document 114-6 Filed 08/10/2015 Page 353 of 426 Page ID #4517

# WORK ORDER

**FLAME**

**PLANET BLUE**

CLIENT _Ey Stream_

CONTACT _____  P.O. # _____

ADDRESS _____  WORK ORDER # _____

PHONE # _____  JOB / PROJECT # _342 Media_

DATE _11-15-00_

JOB SPECIFICATIONS: _Count Down Design_

| FUNCTION | TIME IN | TIME OUT | | D-1 | D-2 | 1" | BETA | 3/4" | MAC | DIGI BETA |
|---|---|---|---|---|---|---|---|---|---|---|
| AFTER EFFECTS | 11:20 | 6:00 pm | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

OPERATOR COMMENTS: _Initial Design Work_

PERSONNEL _Joel_

NAME: _____ _____ regular hrs. _____ hrs. @ 1.5x _____ hrs. @ 2x

NAME: _____ _____ regular hrs. _____ hrs. @ 1.5x _____ hrs. @ 2x

NAME: _____ _____ regular hrs. _____ hrs. @ 1.5x _____ hrs. @ 2x

NAME: _____ _____ regular hrs. _____ hrs. @ 1.5x _____ hrs. @ 2x

CLIENT COMMENTS:

I have reviewed and agree to the above facilities usage, and Planet Blue's terms of business.

PLANET BLUE: _____

CLIENT: _____

BILLING SUMMARY SHEET

| JOB # | | DATE *11/14/00* | | ROOM: | | PO # | |
|---|---|---|---|---|---|---|---|
| CLIENT | *Ezy Stream* | | ADDRESS | | | | |
| CONTACT | | | TELEPHONE # | | | | |
| OPERATOR | *Joel* | | PROJECT: | *342 Media* | | | |

| BAY: | TIME | | TOTAL HRS. | RATE | TOTAL |
|---|---|---|---|---|---|
| FLAME/INFERNO | | | | | |
| RMIT | *11:00 – 5:30* | | *6.50* | | |
| EDGEWIT | | | | | |

| | HRS. | # OF EMP. | RATE | | TOTAL |
|---|---|---|---|---|---|
| OT LABOR | | | $  85.00 | ▓▓▓▓▓ | |
| DT LABOR | | | $ 120.00 | ▓▓▓▓▓ | |

| MACHINES: | HRS. | RATE | TOTAL |
|---|---|---|---|
| DIGITAL BETA | | | |
| DV CAM | | | |
| VHS | | | |
| MACINTOSH | | | |

| DUPLICATION: | DUB TIME | DUB. FROM: | DUB. TO: | RATE | TOTAL |
|---|---|---|---|---|---|
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |
| DUBING FORMAT | | | | | |

| STOCK: | MINS. | RAW | B&C | RATE/EA | TOTAL |
|---|---|---|---|---|---|
| | | | | / | |
| DIGITAL BETA | | | | / | |
| BETA SP | | | | / | |
| DV | | | | / | |
| | | | | / | |
| VHS | | | | / | |
| OTHER | | | | / | |
| OTHER | | | | / | |

| MISC. | | TOTAL |
|---|---|---|
| COURIER SRVC | | |
| MEALS | | |

| | TOTAL CHARGES | |
|---|---|---|

**A4992**

# WORK ORDER

**FLAME**

**PLANET BLUE**

CLIENT _EZ Stream_

CONTACT _____ P.O. # _____

ADDRESS _____ WORK ORDER # _____

JOB / PROJECT # _____

PHONE # _____ DATE _11-14-00_

JOB SPECIFICATIONS:  "342 MEDIA" COUNTDOWN DESIGN

| FUNCTION | TIME IN | TIME OUT | | D-1 | D-2 | 1" | BETA | 3/4" | MAC | DIGI BETA |
|----------|---------|----------|---|-----|-----|-----|------|------|-----|-----------|
| After Effects | 11:00 | 5:30 | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

OPERATOR COMMENTS:  "Rough Out"

PERSONNEL  _Joel_

NAME: _____ _____ regular hrs. _____ hrs. @ 1.5x _____ hrs. @ 2x

NAME: _____ _____ regular hrs. _____ hrs. @ 1.5x _____ hrs. @ 2x

NAME: _____ _____ regular hrs. _____ hrs. @ 1.5x _____ hrs. @ 2x

NAME: _____ _____ regular hrs. _____ hrs. @ 1.5x _____ hrs. @ 2x

CLIENT COMMENTS:

I have reviewed and agree to the above facilities usage, and Planet Blue's terms of business.

PLANET BLUE: _____

CLIENT: _____

**A4993**

# Exhibit 2



## Warner Bros. Memorandum

**DATE:** January 27, 1999

**TO:** Bill Daly, Chris deFaria, Lorenzo Di Bonaventura, Bill Draper, Barbara Galbo, Kurt Galvao, Elizabeth Gavcus, Jerry Golub, Jim Greco, Rob Guralnick, Richard Haines, Amy Harrington, Ann Martin, Jim Miller, Lynn Morgan, Steve Papazian, Phil Rawlins, Mark Scoon, Courtenay Valenti

**FROM:** Marc Solomon

**RE:** PLANET BLUE DEMONSTRATION

On Friday, February 5, Planet Blue will be demonstrating a revolutionary lip synch technique they developed called "Tulip". It clones talent's speech onto animated characters through a technique that utilizes proprietary software. The process offers high-quality lip sync with a fast turnaround, compatible with a range of 3D production software.

The demonstration will begin at 10am in screening room 1.

Please consider attending, as this technology might prove significant for The Incredible Mr. Limpet, as well as future Warner Bros. projects.

---FYI---

| Post-It® Fax Note | 7671 | Date 1/29 | # of pages ▶ |
|---|---|---|---|
| To GEORGE | | From Tanya / M. Solomons | |
| Co./Dept. | | Co. | |
| Phone # | | Phone # | |
| Fax # | | Fax # | |

<pre>
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3                 HONORABLE GEORGE WU

 4          UNITED STATES DISTRICT JUDGE PRESIDING

 5                      - - -

 6
   MCRO, INC.,                        )
 7                     PLAINTIFF,     )
                                      )
 8   VS.                              )  NO. CV 12-10322 GW
                                      )
 9   NAMCO BANDAI GAMES AMERICA, INC., )
     ET AL.,                          )
10                     DEFENDANT,     )
   _____)
11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               LOS ANGELES, CALIFORNIA

16             THURSDAY, SEPTEMBER 18, 2014

17

18

19        _____

20            KATIE E. THIBODEAUX, CSR 9858
              U.S. Official Court Reporter
21            312 North Spring Street, #436
              Los Angeles, California 90012
22

23

24

25
</pre>

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFF:

 4   MISHCON DE REYA LLP
     BY:  JOHN PETRSORIC
 5   -and- ROBERT A. WHITMAN
     -and- SACHIN GUPTA
 6   -and- ERIC BERGER
     750 Seventh Avenue 26th Floor
 7   New York, NY 10019

 8

 9   FOR DEFENDANTS:

10   WEIL GOTSHAL AND MANGES LLP
     BY:  SONAL NARESH MEHTA
11   -and- EVAN BUDAJ
     201 Redwood Shores Parkway Suite 500
12   Redwood Shores, CA 94065-1175

13   MORRISON AND FOERSTER LLP
     BY:  WENDY RAY
14   707 Wilshire Boulevard Suite 6000
     Los Angeles, CA 90017-3543
15

16   SHOOK HARDY AND BACON LLP
     BY:  BETH A. LARIGAN
17   2555 Grand Boulevard
     Kansas City, MD 64108
18

19   SPACH CAPALDI & WAGGAMAN LLP
     BY:  ANDREW TSU
20   4675 MacArthur Court Suite 550
     Newport Beach, CA 92660
21

22   BAKER AND HOSTETTLER
     BY:  KEVIN KIRSCH
23   -and- JARED BRANDYBERRY
     11601 Wilshire Boulevard
24   Suite 1400
     Los Angeles, CA  90025
25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1         LOS ANGELES, CALIFORNIA; THURSDAY, SEPTEMBER 18, 2014

2                           9:31 A.M.

3                          - - - -

4

5         THE COURT:  Let me call the matter of McRo

6    against -- well, against all these defendants.

7              On McRo versus the various defendants, on the

8    phone, we have whom?  Actually, wait just a second.

9    Probably faster if I just do it.

10             So on the phone we have Mr. Kevin Kirsch; is

11   that right?

12        MR. KIRSCH:  That's correct.  Also, Mr. Jared

13   Brandyberry.

14        THE COURT:  And, also, we have as well, Evan

15   Budaj; is that correct?

16        MR. BUDAJ:  Yes, your Honor.

17        THE COURT:  And Beth Larigan?

18        MS. LARIGAN:  Yes, your Honor.

19        THE COURT:  And Eric Berger?

20        MR. BERGER:  Yes, your Honor.

21        THE COURT:  Is there anyone else on the phone on

22   the McRo matters?

23             Let me just ask counsel on the phone, if you

24   do decide to speak, please identify yourselves at the

25   time you say something so that my court reporter can
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5259**

```
 1   figure out who is speaking.

 2           And, in court, for the plaintiff, we have?

 3       MR. WHITMAN:  Robert Whitman from Mishcon de Reya

 4   for the plaintiff.  With me are John Petrsoric and Sachin

 5   Gupta and also Maury Rosenfeld, the inventor, and McRo

 6   owner is here as well.

 7       THE COURT:  And for the defendants?

 8       MS. MEHTA:  Good morning, your Honor.  Sonal Mehta

 9   for Namco Bandai Games America, Sega of America,

10   Electronic Arts, Disney Interactive Studios, Capcom USA,

11   Neversoft Entertainment, Treyarch Corporation, Warner

12   Brothers Interactive, Lucas Arts, Activision Blizzard,

13   Infinity Ward and Index Digital Media.

14       THE COURT:  What must your hourly rate be.

15       MS. RAY:  Good morning, your Honor.  Wendy Ray on

16   behalf of Konami Digital Entertainment, Inc..

17       MR. DIAB:  Tony Diab on behalf of Sony, Naughty

18   Dog and Sucker Punch.

19       MR. TSU:  Good morning, your Honor.  Andrew Tsu on

20   behalf of Obsidian Entertainment, Inc.

21       MR. MELLEMA:  Good morning.  Joseph Mellema on

22   behalf of Valve Corporation.

23       THE COURT:  All right.  We are here on the motion

24   for judgment on the pleadings.  I have issued a tentative

25   on this.  I presume everybody has seen it?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5260**

```
 1        MS. MEHTA:  Yes, your Honor.

 2        THE COURT:  I presume that is yes from everybody.

 3   Somebody want to argue something?

 4        MR. WHITMAN:  Yes, your Honor, if I may.

 5        THE COURT:  All right.

 6        MR. WHITMAN:  Good morning, your Honor, and thank

 7   you for your tentative.

 8            I would like to focus on two points in the

 9   tentative that I, of course, I think we respectfully

10   disagree with.  On Page 11 of the tentative mentions that

11   the claims do not require any particular rules.  I think

12   that is repeated a little bit on Page 1 which states that

13   Mr. Rosenfeld's patents preempt the field of such lip

14   synchronization using a rules based morph target

15   approach.  And I think we disagree with that.

16            And I will explain that.

17        THE COURT:  Sorry.  Can you state -- let me have

18   the reporter repeat the first part of what he said.

19        MR. WHITMAN:  Sure.

20        THE COURT:  No.  I am asking the reporter to do

21   that because I didn't quite hear.  I didn't quite hear

22   the first part so she is just reading back what he said.

23        (Record read back.)

24        THE COURT:  Okay.  That is fine.  Yes.  Go on.

25        MR. WHITMAN:  And if I said Page 1, I meant page
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5261**

```
 1   12 mentions the preemption issue.

 2              Now, the courts have set forth a two-part test

 3   for Section 101.  We have been through that, I think,

 4   now, a few times yourself, I think.

 5              And the first part is basically at a high

 6   level to identify an abstract concept in the claim.  And

 7   I think, here, everyone agrees that these claims are

 8   directed at the high level to generating characters that

 9   have lip and facial expressions synchronized to a

10   phonetic sequence.

11              And as I think you hinted to in your

12   tentative, that is really a pretty concrete idea.  It is

13   not abstract.  It is not just a set of data.  This

14   requires complex computer graphics, complex rendering

15   engines to display an actual three-dimensional character

16   with lip and facial animations.

17        THE COURT:  I think my tentative specifies with

18   some, I think, particularity what the court's problems

19   are with the plaintiff's position.  And so I mean, if you

20   want to address specific items, you don't need to go

21   through the entire background of what is involved in the

22   case.

23              So what specifically are you going to be

24   arguing?

25        MR. WHITMAN:  I think that our point there is I
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**A5262**

1    think this one may not even pass the first part of the

2    test, but if we do get to the second part of the test, we

3    believe that the claims recite -- they just don't recite

4    just any old rules.  They recite very types of specific

5    rules.

6              And I would like to start with independent

7    Claim 1 of both patents.  I will get right to it.  This

8    is Claim 1 of the 576 patent.  The 278 patent has very,

9    very similar limitations, and it starts by obtaining a

10   first set of rules that define output morph weight set

11   streams.

12             So the claim recites that the rules must

13   define an output morph weight set stream.  Now, it is not

14   just any rules that can be used to generate

15   lip-synchronized characters in any way.  The rules must

16   define morph weight set streams, and it is a very

17   specific way of generating characters.

18        THE COURT:  Are you saying that the patent defines

19   those rules?

20        MR. WHITMAN:  The claim continues.  Okay.

21   Obtaining a first set of rules that define output morph

22   weight set streams as a function of phoneme sequence and

23   time of said phoneme sequence.

24             So there is actually three meaningful

25   limitations here.  One is --

```
 1          THE COURT:  But it doesn't say what the rules are.

 2   It just says what the rules should be, but it doesn't say

 3   what the rules are.  In other words, you are saying that

 4   the invention has a specific technology and the specific

 5   technology incorporates rules, and you are saying that

 6   the patent itself, patents themselves, indicate what the

 7   rules are.

 8          What exactly are the rules other than these

 9   rules have to relate to these particular areas?  But the

10   thing about it is those areas were areas which were known

11   in the prior art.

12          MR. WHITMAN:  We respectfully disagree with that,

13   and I will get to it.

14          Let's first start with the phoneme sequence.

15   So the rules must define an output morph weight set

16   stream as a function of phone sequence.

17          So I will give you an example, the word hello

18   and bellow, and we will focus on the sound of the letter

19   E.  So the actual visual representation is going to be

20   different in each case because of the sequence of the

21   phonemes.  The H that precedes the E is going to be

22   different than the B that precedes the E.  The B is going

23   to be represented differently each time.  The claims

24   require that the rules must take this into account.  It

25   must be a specific type of rule that considers phoneme
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    sequence.

2         (Pause in proceedings.)

3         THE COURT:  I am listening.

4         MR. WHITMAN:  Okay.  Now, that was not known in

5    the art anywhere.  It was never done before, and there is

6    no evidence of that.  I will get to that.

7         THE COURT:  Well, let me just stop you at that

8    point.

9              Let me ask defense counsel, do you agree with

10   that representation?

11        MS. MEHTA:  No, your Honor.  We don't agree with

12   that.

13             As your tentative makes clear, the patent

14   teaches that the concept of obtaining a set of rules that

15   define your phoneme sequence was known.  And all the

16   patent purports to do is take the concept of a rule and

17   say that you can automatically apply that rule.

18             In fact, on the hello example, the patent

19   actually describes in the specification that that was

20   done prior -- previously in the prior art through manual

21   animation or through a person.  And all the patent is

22   purporting to do is take this abstract concept of a set

23   of rules which the patent describes as freeform and

24   extensible.  It means it can be anything, and you just

25   apply it automatically using a computer.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5265**

1          So the concept that these phoneme sequence

2     rules are described in the patent is just not true, that

3     they were named in the prior art, and the patent doesn't

4     provide any specificity at all as to what those rules

5     might be other than it is some set of rules that you can

6     apply.

7          THE COURT:  And that is the primary problem.

8          MR. WHITMAN:  Well, again, if this is shown in the

9     patent somewhere or admitted in the patent somewhere, I

10    would love to know where because it is not.  It is not.

11         It is not just a concept of hello.  It is

12    hello versus bellow.  So the E is going to be different

13    in both cases.  The rules have to be specific to take

14    that into account.  So it is not just going to be an E.

15         THE COURT:  You don't say what the rules are.

16         MR. WHITMAN:  Well, the rules are set forth in the

17    patent in -- there is dozens of examples of the rules.

18         THE COURT:  In other words, the E in bellow versus

19    the E in hello is -- the rules as to how you do that are

20    contained in the patent somewhere?  Did I miss it?

21         MR. WHITMAN:  It is -- well, I can give you other

22    examples too.  As to whether they precede a silence.  The

23    sequence of the phonemes will change.

24         THE COURT:  I think that was known in the art.

25         MR. WHITMAN:  It is not -- what was known in the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5266**

```
 1    art -- and perhaps we should go back and start there --

 2    was basically somebody had a computer screen like right

 3    here with a bunch of visual representations and a slider

 4    that could change the facial expressions.  And when the

 5    artist said, ah-hah, I like that, they hit a button and

 6    stop and capture it.  There is no set of rules.  If the

 7    artist did that two times in a row, he probably, or she

 8    would do two different things.  If another artist came

 9    into the room and said, okay, I am going to try to

10    animate a character, I have a phonetic stream, I am going

11    to sit here --

12         THE COURT:  Let me stop you.  My understanding of

13    what the defendants are arguing is the fact that, you

14    know, this stuff was previously done manually.  Now, with

15    the supposed dimension is now you can do it on a computer

16    by adopting a set of rules, but the problem is the patent

17    doesn't define what exactly the rules specifically are.

18    And so, therefore, what I suppose the invention is saying

19    is that, well, rather than doing this manually, you are

20    now going to be doing it on computer, create the rules to

21    do that.  It doesn't seem like much of an invention at

22    that point.

23         MR. WHITMAN:  Actually, I think it was a profound

24    invention because he took something that used to be

25    artistic and set it forth by a fixed set of rules.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  The problem is the patent doesn't

 2   define what the fixed set of rules are.  The patent

 3   requires that whoever wants to utilize the patent create

 4   the set of rules.  Well, that is like saying you could

 5   make a time machine if you would just get together enough

 6   equipment that could cause this particular thing to

 7   reverse time.  Okay.

 8          MR. WHITMAN:  But Mr. Rosenfeld's patents actually

 9   tell you this.  So if you look at 576, Column 7 and

10   Column 8, it sets forth exemplary rules.  Well, in your

11   example, how to make a time machine.  So, here, for

12   example, if you look at Column 8 at Line 25, it tells you

13   if any phoneme is preceded by silence.  So, here, again,

14   it is considering a sequence.  There is silence, and then

15   a phoneme comes afterwards.  It sets a transition start

16   time.  And then it -- when the silence ends, you subtract

17   that from .1 times the incoming phoneme's duration.

18              And then you can set the transition end time

19   equals incoming phoneme start time.  So it is telling you

20   you want to take a percentage of the next phoneme's time

21   and take that into account when you transition between

22   your silence and the phoneme.  So there is a rule.  It is

23   telling you how to do it considering a sequence of

24   phonemes.  And there are many examples -- there are

25   columns of examples here that go to rules.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1        THE COURT:  Let me hear a response from the
 2   defense on that.
 3        MR. WHITMAN:  But if I may, that is not -- if I
 4   may continue.
 5        THE COURT:  No.  I want to hear a response from
 6   the defense now.
 7        MS. MEHTA:  Yes, your Honor.  Two responses to
 8   that.
 9            The first is those rules that are described as
10   exemplary rules in the columns on the patent are prior
11   art rules.  So if you look at Column 1 -- and this is the
12   portion that is pointed to in the tentative ruling, your
13   Honor -- Column 1 describes the concept of morph target
14   animation.  And in order to do morphed target animation,
15   you need to know what the phoneme sequence is and then
16   you need to know how to deform the neutral model based
17   upon the difference in position in the vertices.
18            That was already known.  That is not something
19   that is novel here.  There is nothing that is inventive
20   about the patents.  The second point, your Honor, is even
21   if that was new which it is not, that is not claimed.  So
22   if there were a patent claim that said, here, we have a
23   new rule that is really going to add something to the art
24   in terms of how we animate using morph targets, and then
25   that rule was claimed either specifically in the claim or
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5269**

1    through a means plus function type of claiming situation,

2    then, we might have something that passes muster under

3    101.

4           But it is not enough to say, well, we have a

5    set of rules.  It can be any free form extensible set of

6    rules under the sun and you are just going to apply it

7    using a computer, and we are going to give you some

8    examples of what those rules already were in the prior

9    art.  Nothing about that is inventive.  Nothing about

10   that makes this patentable subject matter.  The claims

11   are what we have to judge, and what the claims say is

12   just a set of rules.

13          And we went through claim construction on this

14   point, and plaintiff argued vociferously that the set of

15   rules should not be limited in any particular way because

16   there is nothing limiting about that claim language.  The

17   court agreed.  And, so, now, to be hearing them turn

18   around and say, well, we said it was anything, but,

19   really, it is very, very specific is just not credible,

20   your Honor.

21       THE COURT:  All right.  Let me hear again from the

22   plaintiff's counsel.

23       MR. WHITMAN:  Yes, your Honor.

24          And I would like to go back.  The Column

25   1 that she pointed to doesn't mention anything about

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5270**

```
 1    phoneme sequence rules.  Again, the prior art is you have
 2    a slider, and it is changing visual representations on a
 3    screen.  And it is doing it.  The computer is changing
 4    morph weights in the back, but the artist doesn't know
 5    anything about that.  They are just turning a slider back
 6    and forth and saying, ah-hah, that looks really good to
 7    me right there, that mouth position looks great.  Click.
 8          And then if the artist was going to do that
 9    again, comes back next week and give them the same
10    phonetic sequence, and you say, go ahead, come up with
11    some animations, sync to that phonetic sequence that you
12    have.  Take the slider, move it back and forth and say,
13    oh, I like it right here.  Click.  And he is going to
14    capture that facial expression at a key frame.  It is
15    going to be different than what he captured the week
16    before.  It is going to be different from the next person
17    that comes in.  There is no rules.  It is just art.  It
18    literally is just art.
19          THE COURT:  And, now, you are saying that the
20    patent does what instead of that?
21          MR. WHITMAN:  So the patent comes in with these
22    specific examples saying we are going to consider
23    sequence of phonemes, and then we are going to set up a
24    model saying, okay, we know that if we are going to
25    follow silence, the next phoneme that comes in, we are
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    going to transition at 10 percent.  If it is an E that

2    follows H, it is going to look a little different than an

3    E that follows B.  We are just going to do it the same

4    way every time.

5           And the claims do not say extensible and free

6    form.  The claims are very specific.  The rules in the

7    claims require phoneme sequence and phoneme timing.

8         THE COURT:  She is saying that the rules are not

9    claims.

10        MR. WHITMAN:  They are.  Obtaining a first set of

11   rules that define output morph weight set stream.  So it

12   is not any rules.  The rules must define morph weight

13   streams.  Systems that don't use morph weight streams are

14   not implicated here.  Then, the rules must do that as a

15   function of phoneme sequence.  So the claim requires that

16   phoneme sequence be considered as part of the rules, and

17   the rule continues and says and time of the phoneme

18   sequence.

19        THE COURT:  Let me stop you.  My tentative covers

20   that.  So you haven't really persuaded me that my

21   tentative is wrong on this point.

22        MR. WHITMAN:  Okay.  Let me continue.

23           We are aware of six tools that the defendants

24   use in this case, six tools that automatically generate

25   computer animation.  You give a phonetic stream and out

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5272**

1    pops computer-animated characters using rules and morph

2    weight set streams, six tools, at least six fools.

3           THE COURT:  When you say those six tools are you

4    saying those six tools violate your client's patent or

5    they are pursuant to the defendant's own patents?

6           MR. WHITMAN:  We say only two of those tools are

7    implicated here.  Two out of the six.  Four do not use

8    these specific rules in this claim.  They either do not

9    consider phoneme sequence, or they don't consider phoneme

10   timing.  Two of the six automated tools, completely

11   automated, only two of the six are relevant to this case

12   because they don't use the rules called out in this

13   claim.

14          THE COURT:  All right.  Let me hear a response.

15          MS. MEHTA:  Yes, your Honor.

16              I take it what we are hearing is an argument

17   that this isn't really preempting anything because they

18   have made the decision to accuse two tools and not other

19   tools.  The first point is this is the first time they

20   have actually said that they don't believe the other

21   tools infringe.  So they have made suggestions up until

22   now that they were not pursuing certain tools or certain

23   games or certain whatever because it was too much work

24   and the case is too big and they are going to focus in on

25   certain things.  So, now, to be hearing, all of a sudden,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5273**

1    that we are cutting fine lines in order to avoid

2    preemption is a bit result oriented.

3            But, more to the point, the fact that some

4    particular tool might not infringe doesn't mean that

5    there is not a preemption problem with respect to what is

6    claimed here.  So your Honor's tentative makes the point,

7    correctly, that the preemption problem we have here is

8    they are purporting to claim the aspects of facial

9    animation using morph targets where it is rules based,

10   and the problem that we have is that they haven't told us

11   what the rules are, and there is no inventive concept

12   with respect to the rules.  And the argument we seem to

13   be hearing is, well, the rules are about phoneme

14   sequences and timing, but your Honor's tentative clearly

15   addresses that.

16           Any facial animation requires a phoneme

17   sequence and timing.  The patent says that.  Column 1,

18   Line 44 to 228 which is the exact same portion of the

19   specification quoted by the tentative makes clear that

20   the idea of phoneme sequences that allow you to set your

21   morph targets, that allow you to deform the neutral model

22   based on the timing -- time allianced phonetic transcript

23   or timing -- was all known in the prior art as admitted

24   in the four corners of the patent.

25           So the fact that there might be other ways to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   do other things that don't fall within the scope of the

 2   claim such is facial animation more broadly isn't

 3   disputed.  But that is not the question for the purposes

 4   of the 101 analysis.  The question is do these claims

 5   improperly preempt something without contributing to the

 6   art anything that is patent eligible subject matter.  And

 7   that is precisely the problem we have because they don't

 8   tell you what the rules are, and they don't claim any

 9   specific rules.  They only claim obtaining rules that

10   have a function, but they don't tell you what the rules

11   are and then how you apply them.

12        MR. WHITMAN:  Okay.  There is a lot there.  Let me

13   start.

14        THE COURT:  But it is also in the court's

15   tentative already.

16        MR. WHITMAN:  I will start.

17             In the beginning of this case, 1400 video

18   games were accused of infringing, preliminarily.  As the

19   defendants tell us, because they do this behind closed

20   doors, what tools they use, we get letters all the time,

21   guess what, this is one of those four tools, it is not

22   the two that are accused in this case.  We have been

23   taking video games off the list.

24        THE COURT:  You don't need to go through the prior

25   litigation history.  Let's face it.  The reason why we

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   are here is because the Supreme Court in Alice said

2   certain things about 101.  Had the Supreme Court not

3   rendered its decision in Alice, we wouldn't be here.  The

4   landscape has changed entirely.

5           So, therefore, the fact that this case was

6   brought and the way it was brought, it was fine and dandy

7   back then.  But we are in the realm of now, and we have

8   Alice.  And this is my view as to what happens as a

9   result of Alice.

10      MR. WHITMAN:  Understood.  I will take up point

11  number two, I think that I may have misheard, but I think

12  opposing counsel said that the patent admitted that

13  timing rules were known.  But your tentative says the

14  exact opposite.  Your tentative, on Page 11, says rules

15  for defining morph weight sets as a function of sequence

16  are disclosed in the prior art.  That is the slider

17  technique.

18          But, then, the next sentence says rules for

19  defining morph weight sets as a function of timing are

20  not.  And the claims don't just require timing.  They

21  also require consideration of phoneme sequence.

22          Now, I would like to bring up another point as

23  well.

24      THE COURT:  But, also, the last sentence of that

25  section says, note, however, that no particular timing

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5276**

1     rules are required by any claim.

2          LEFT1:  Well, I will get to that.

3          Now, the defendants filed a request for

4     re-examination, and the patent office denied that

5     request.  And defendants say that is all they did, they

6     simply denied it, let's move on.  But that is not what

7     happened.  The patent office issued a 24-page decision

8     setting forth what it thought the patent was, how the

9     patent worked, what morph weight set streams were, what

10    the rules were, what the claims rules and the patent

11    office specifically mentioned, phoneme sequence and

12    timing in a very, very detailed opinion.

13         THE COURT:  Let me ask, to what extent am I bound

14    by that?

15         MR. WHITMAN:  I am not sure that you are, but it

16    is subjective indicia of an inventive step because they

17    turned to the prior art that was identified by the

18    defendants, and the patent office said something about

19    each and every one and how it was or was not relevant to

20    the patent.  And their very first reference that they

21    considered was a Peng reference, and the patent office

22    said that the Peng reference doesn't have the claim rules

23    that define a morph weight set stream as a function of

24    phoneme sequence and times associated with the phoneme

25    sequence.

 1          And, so, again, we go back to the prior art.

 2   I will use the word hello as an example.  If you have a

 3   phonetic sequence, H-E-L-L-O, H may start at zero in the

 4   phonetic sequence.  It may be followed by E .3 seconds

 5   later, by L another .4 seconds later, something like

 6   that.  So the prior art typically would just do that.  It

 7   would say, okay, H starts at zero, stops at .3.  E starts

 8   at .3, goes to .7.  Those aren't timing rules.  That is

 9   what Peng did, and that is what the patent office said

10   that not a timing rule, that is just your phonetic

11   sequence.

12          So the timing rules that are called out in

13   Maury Rosenfeld's patent -- it gives many examples of

14   them -- are you want to do something different, you want

15   to consider, perhaps, the preceding or the post phoneme

16   that may come.  And you want to tinker with those rules,

17   you want to have transitions, you want to do some

18   blending.  The rules are very specific.  They are very

19   specific types of timing rules.  It is not just any old

20   timing rules.  It is not just any rules.

21          The patent office understood that, and I think

22   defendants are trying to confuse that issue simply

23   because a phonetic timing sequence has starts and stops

24   that there must necessarily be timing rules, but there

25   aren't.  That is what Mr. Rosenfeld invented.  Part of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5278**

 1   it.  He also required that the rules require phonetic

 2   sequences.

 3          So the rules are actually very, very specific,

 4   and they do distinguish over the prior art.  And they

 5   distinguish over the four computerized automated tools

 6   that defendants use that have rules and phonetic timing

 7   sequences and morph weight sets, but they don't infringe

 8   the claim because they aren't the claimed rules as

 9   recited in the claims themselves.

10          THE COURT:  Let me hear response from defense.

11          MS. MEHTA:  Yes, your Honor.  Couple of responses

12   to that.

13          So the first point -- and then I will get to

14   the patent office action.  The first point is whatever

15   these timing rules that Mr. Whitman is talking about

16   might be, they are not claimed.  They are just nowhere in

17   the claims.  We can stand here and talk about them all

18   day in the abstract if we want, but nothing in the claims

19   tells anyone what these timing rules are, and nothing

20   advances the art in terms of what the timing rules might

21   be to help provide some sort of inventive automated lip

22   sync.

23          The second point with respect to the patent

24   office action is I want to be clear about what actually

25   happened.  So there was an IPR that was filed by certain

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  defendants, not other defendants.  It was on

2  four specific pieces of prior art, and what the patent

3  office found was that there was not an adequate showing

4  in the petition, an adequate explanation as to how those

5  prior art tools actually mapped to or references mapped

6  to the claims.

7          And your Honor has this is in the record.  I

8  think it was submitted in the context of the briefing,

9  and you can look at it yourself if you so desire.  But it

10 is very clear from the patent office's decision that they

11 weren't making a substantive judgment as to validity of

12 the patents.  They were simply evaluating the petition

13 and found the petition deficient.

14         But, more importantly than all of that, there

15 is nothing in the patent office's decision that goes to

16 the 101 inquiry.  That is within the purview of this

17 court.  This court has looked at it and applied the law

18 from Alice and has decided that there is nothing in the

19 claims that would cover the timing rules or any of these

20 set of rules that are being claimed that would actually

21 provide some concreteness to them to make them inventive.

22 And that is an issue that no one has decided before your

23 Honor, and we would respectfully submit we haven't heard

24 anything from the plaintiff other than generic references

25 to rules and timing rules that would actually suggest

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

MISHCON DE REYA NEW YORK LLP
Mark S. Raskin (*admitted Pro Hac Vice*)
Email: mark.raskin@mishcon.com
John F. Petrsoric (*admitted Pro Hac Vice*)
Email: john.petrsoric@mishcon.com
Eric P. Berger (*admitted Pro Hac Vice*)
Email: eric.berger@mishcon.com
750 7th Avenue, 26th Floor
New York, New York 10019
Telephone: 212.612.3270
Facsimile: 212.612.3297

RUSS AUGUST & KABAT
Marc A. Fenster, State Bar No. 181067
Email: mfenster@raklaw.com
Irene Y. Lee, State Bar No. 213625
Email: ilee@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: 310.826.7474
Facsimile: 310.826.6991

Attorneys for Plaintiff McRO, Inc., d.b.a. Planet Blue

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| McRo, Inc., d.b.a. Planet Blue, <br><br>      Plaintiff, <br><br>         v. <br><br> Bandai Namco Games America, Inc. <br><br>      Defendant. | **CASE No. 12-cv-10322-GW (FFMx)** <br><br> Honorable George H. Wu <br><br> **PLAINTIFF McRO, INC., dba PLANET BLUE'S NOTICE OF APPEAL** |

*Mishcon de Reya New York LLP*

Notice of Appeal

1

PLEASE TAKE NOTICE that Plaintiff McRo, Inc., d.b.a. Planet Blue, in the above named case hereby appeals to the United States Court of Appeals for the Federal Circuit from the ruling on Defendants' motion for judgment on the pleadings based on unpatentability under 35 U.S.C. Section 101 (D.I. 365, attached as Exhibit 1) entered on September 22, 2014. Appeal is taken in this and all of the related cases identified in Exhibit 2, attached hereto.

DATED: October 22, 2014

Respectfully submitted,

By: _/s/ Mark Raskin_
Mark S. Raskin
John F. Petrsoric
Eric P. Berger
Mishcon de Reya New York LLP

RUSS AUGUST & KABAT
Marc A. Fenster, State Bar No. 181067
Irene Y. Lee, State Bar No. 213625

Attorneys for Plaintiff
McRO, Inc., dba Planet Blue

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2014, the foregoing document was filed electronically via the Court's Electronic Case Filing System (ECF). Notice of the filing is being served upon all counsel of record automatically through Notice of Electronic Filing.

_/s/ Mark S. Raskin_
Mark S. Raskin

2

ACCO,(FFMx),APPEAL,CLOSED,DISCOVERY,PROTORD,RELATED-G

# UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA (Southern Division - Santa Ana)
## CIVIL DOCKET FOR CASE #: 8:13-cv-01874-GW-FFM

McRo Inc. v. Valve Corporation
Assigned to: Judge George H. Wu
Referred to: Magistrate Judge Frederick F. Mumm
Related Case: 2:12-cv-10322-GW-FFM
Case in other court: Federal Circuit, 15-01099
Cause: 15:1126 Patent Infringement

Date Filed: 11/27/2013
Date Terminated: 09/22/2014
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**McRo Inc**
*doing business as*
Planet Blue

represented by **Marc A Fenster**
Russ August and Kabat
12424 Wilshire Boulevard 12th Floor
Los Angeles, CA 90025
310-826-7474
Fax: 310-826-6991
Email: mafenster@raklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
Mishcon de Reya New York LLP
750 Seventh Avenue 26th Floor
New York, NY 10019
212-612-3270
Fax: 212-612-3297
Email: Mark.Raskin@mishcon.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
Russ August and Kabat
12424 Wilshire Boulevard 12th Floor
Los Angeles, CA 90025
310-826-7474
Fax: 310-826-6991
Email: ilee@raklaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Valve Corporation**                                represented by  **David T McDonald**
K&L Gates LLP
925 Fourth Avenue Suite 2900
Seattle, WA 98104-1158
206-623-7580
Fax: 206-623-7022
Email: david.mcdonald@klgates.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jan P Weir**
K&L Gates LLP
1 Park Plaza 12th Floor
Irvine, CA 92614
949-253-0900
Fax: 949-253-0902
Email: jan.weir@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore J Angelis**
K&L Gates LLP
925 Fourth Avenue Suite 2900
Seattle, WA 98104
206-623-7580
Fax: 206-623-7022
Email: theo.angelis@klgates.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J Mellema**
K&L Gates LLP
1 Park Plaza 12th Floor
Irvine, CA 92614
949-253-0900
Fax: 949-253-0902
Email: joseph.mellema@klgates.com
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Valve Corporation**                                represented by  **David T McDonald**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jan P Weir**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore J Angelis**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J Mellema**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**McRo Inc**                              represented by  **Marc A Fenster**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark S Raskin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Irene Y Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 11/27/2013 | 1 | COMPLAINT Receipt No: 0973-13048338 - Fee: $400, filed by Plaintiff McRo Inc. dba Planet Blue. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Attorney Irene Y Lee added to party McRo Inc. dba Planet Blue(pty:pla))(Lee, Irene) (Entered: 11/27/2013) |
| 11/27/2013 | 2 | CIVIL COVER SHEET filed by Plaintiff McRo Inc. dba Planet Blue. (Lee, Irene) (Entered: 11/27/2013) |
| 11/27/2013 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff McRo Inc. dba Planet Blue. (Lee, Irene) (Entered: 11/27/2013) |
| 11/27/2013 | 4 | Certificate and Notice of Interested Parties filed by Plaintiff McRo Inc. dba Planet Blue, (Lee, Irene) (Entered: 11/27/2013) |
| 11/27/2013 | 5 | CORPORATE DISCLOSURE STATEMENT filed by Plaintiff McRo Inc. dba Planet Blue (Lee, Irene) (Entered: 11/27/2013) |
| 11/27/2013 | 6 | REPORT ON THE FILING OF AN ACTION Regarding a Patent or a Trademark (Initial Notification) filed by McRo Inc. dba Planet Blue. (Lee, Irene) (Entered: 11/27/2013) |

| | | |
|---|---|---|
| 12/02/2013 | 7 | AMENDED DOCUMENT filed by Plaintiff McRo Inc. dba Planet Blue. Amendment to Corporate Disclosure Statement 5 (Lee, Irene) (Entered: 12/02/2013) |
| 12/05/2013 | 8 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendant Valve Corporation. (lwag) (Entered: 12/05/2013) |
| 12/05/2013 | 9 | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to Mark S. Raskin for Plaintiff McRo Inc. Pro Hac Vice application has not been received by the court. Please return your completed Application of Non-Resident Attorney to Appear in a Specific Case, form G-64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out-of-state federal government attorneys who are not employed by the U.S. Department of Justice are required to file a Pro Hac Vice application;no filing fee is required. You have been removed as counsel of record from this case for failure to submit this filing fee. (lwag) (Entered: 12/05/2013) |
| 12/11/2013 | 10 | INITIAL ORDER FOLLOWING FILING OF COMPLAINT ASSIGNED TO JUDGE SELNA. (jlen) (Entered: 12/11/2013) |
| 12/12/2013 | 11 | ORDER SETTING RULE 26(f) SCHEDULING CONFERENCE by Judge James V. Selna. Rule 26 Meeting Report due by 3/10/2014. Scheduling Conference set for 3/17/2014 11:30 AM before Judge James V. Selna. (jlen) (Entered: 12/12/2013) |
| 12/12/2013 | 12 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 08-05 -Related Case- filed. Related Case No: CV12-10322 GW (FFMx). Case transferred from Magistrate Judge Robert N. Block and Judge James V. Selna to Judge George H. Wu and Magistrate Judge Frederick F. Mumm for all further proceedings. The case number will now reflect the initials of the transferee Judge SACV13-01874 GW (FFMx). Signed by Judge George H. Wu (dro) (Entered: 12/16/2013) |
| 12/17/2013 | 13 | TEXT ONLY ENTRY (IN CHAMBERS) TRANSFER OF CASE TO JUDGE WU AND ORDER SETTING STATUS CONFERENCE by Judge George H Wu; This action has been reassigned to the Honorable George H. Wu, U.S. District Judge and the Honorable Fredrick F. Mumm, U.S. Magistrate Judge. The Court, on its own motion, sets a Status Conference for January 30, 2014 at 8:30 a.m. Plaintiffs counsel is directed to give notice of the status conference immediately to each party that makes an initial appearance in the action after this date.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 12/17/2013) |
| 12/19/2013 | 14 | Standing Order Re Final Pre-Trial Conferences for Civil Jury Trials Before Judge George H. Wu. 1. You are instructed to read and to follow (unless otherwise superseded herein) the Central District of California Local Rules (henceforth Local Rules) 16-1 through 16-15 regarding pre-trial requirements. (See order for details.) (kti) (Entered: 12/19/2013) |
| 12/19/2013 | 15 | TEXT ONLY ENTRY (IN CHAMBERS): by Judge George H. Wu; The Scheduling Conference previously scheduled for 03/17/2014 at 11:30 a.m. before Judge Selna is vacated and TAKEN OFF-CALENDAR. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 12/19/2013) |
| 12/19/2013 | 16 | PROOF OF SERVICE Executed by Plaintiff McRo Inc, upon Defendant Valve |

| | | |
|---|---|---|
| | | Corporation served on 12/10/2013, answer due 12/31/2013. Service of the Summons and Complaint were executed upon Bryan Meagher, Legal Assistant designated to Accept Service in compliance with Federal Rules of Civil Procedure by service on a domestic corporation, unincorporated association, or public entity. Original Summons NOT returned. (Lee, Irene) (Entered: 12/19/2013) |
| 01/02/2014 | 17 | NOTICE of Related Case(s) filed by Plaintiff McRo Inc. Related Case(s): 13-cv-01870, 13-cv-01871, 13-cv-01872, 13-cv-01873; Lead Case 12-cv-10322, consolidated with 12-cv-10323, 12-cv-10326, 12-cv-10327, 12-cv-10329, 12-cv-10331, 12-cv-10333, 12-cv-10335, 12-cv-10336, 12-cv-10337, 12-cv-10338, 12-cv-10340, 12-cv-10341, 12-cv-10342, 12-cv-10344 and 12-cv-10345 (Lee, Irene) (Entered: 01/02/2014) |
| 01/03/2014 | 18 | APPLICATION for attorney Mark S. Raskin to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-13186517 paid.) filed by Plaintiff McRo Inc. (Attachments: # 1 Proposed Order)(Lee, Irene) (Entered: 01/03/2014) |
| 01/06/2014 | 19 | STIPULATION for Extension of Time to File Respond as to Complaint (Attorney Civil Case Opening) 1 filed by Defendant Valve Corporation.(Attorney Joseph J Mellema added to party Valve Corporation(pty:dft))(Mellema, Joseph) (Entered: 01/06/2014) |
| 01/06/2014 | 20 | ORDER by Judge George H. Wu: granting 18 Application to Appear Pro Hac Vice by Attorney Mark S. Raskin on behalf of Plaintiff, designating Irene Y. Lee as local counsel. (lt) (Entered: 01/07/2014) |
| 01/07/2014 | 21 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: APPLICATION for attorney Mark S. Raskin to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-13186517 paid.) 18 . The following error(s) was found: A Certification of Good Standing is not attached to Pro Hac Vice Application. Good Standing Certificates have been required since 09/08. In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and until the court directs you to do so. (lt) (Entered: 01/07/2014) |
| 01/07/2014 | 22 | NOTICE OF ERRATA filed by Plaintiff McRo Inc. correcting APPLICATION for attorney Mark S. Raskin to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-13186517 paid.) 18 (Attachments: # 1 Exhibit 1)(Lee, Irene) (Entered: 01/07/2014) |
| 01/27/2014 | 23 | ANSWER to Complaint 1 JURY DEMAND., COUNTERCLAIMAS against McRo Inc filed by Defendant Valve Corporation.(pj) (Entered: 01/28/2014) |
| 01/27/2014 | 24 | NOTICE of Interested Parties filed by Defendant and Counter-Claim Plaintiff Valve Corporation, (pj) (Entered: 01/28/2014) |
| 01/30/2014 | 25 | MINUTES OF Status Conference held before Judge George H. Wu: Court and counsel confer re newly transferred cases. Parties will meet and confer and within 10 daysfile a joint status report as to consolidation of remaining cases in Categories B and C. A Status Conference is set for February 13, 2014 at 8:30 a.m. Parties may appear telephonically provided that notice is given to the clerk by February 11, 2014. Court Reporter: Katie Thibodeaux. (pj) (Entered: 02/04/2014) |
| | | |

| | | |
|---|---|---|
| 02/10/2014 | 26 | STATUS REPORT *JOINT* filed by Plaintiff McRo Inc. (Raskin, Mark) (Entered: 02/10/2014) |
| 02/11/2014 | 27 | NOTICE OF TELEPHONIC APPEARANCE FOR MARK S. RASKIN AT THE FEBRUARY 13, 2014 HEARING filed by Plaintiff McRo Inc. (Raskin, Mark) (Entered: 02/11/2014) |
| 02/13/2014 | 28 | First APPLICATION for attorney Theodore J. Angelis to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-13371571 paid.) filed by Defendant and Counterclaim Valve Corporation. (Attachments: # 1 Proposed Order)(Mellema, Joseph) (Entered: 02/13/2014) |
| 02/13/2014 | 29 | First APPLICATION for attorney David T. McDonald to Appear Pro Hac Vice(PHV Fee of $325 receipt number 0973-13372015 paid.) filed by Defendant/Counterclaim Valve Corporation. (Attachments: # 1 Proposed Order) (Mellema, Joseph) (Entered: 02/13/2014) |
| 02/13/2014 | 30 | MINUTES OF Status Conference held before Judge George H. Wu: The Courts Tentative Position re Scheduling, Markman Hearing, and Discovery, is circulated. Partieswill confer and file a proposed schedule and objections to the consolidation of Track 2 Cases by noon on February 20, 2014. The status conference is continued to February 24, 2014 at 8:30 a.m. Parties may appear telephonically, provided that notice is given to the clerk at least two business days prior to the hearing. Court Reporter: Katie Thibideaux. (pj) (Entered: 02/14/2014) |
| 02/14/2014 | 32 | ORDER by Judge George H. Wu: granting 29 Application to Appear Pro Hac Vice by Attorney David T. McDonald on behalf of Defendants Valve Corporation, designating Joseph J. Mellema as local counsel. (lt) (Entered: 02/18/2014) |
| 02/14/2014 | 33 | ORDER by Judge George H. Wu: granting 28 Application to Appear Pro Hac Vice by Attorney Theodore J. Angelis on behalf of Defendants Valve Corporation, designating Joseph J. Mellema as local counsel. (lt) (Entered: 02/18/2014) |
| 02/18/2014 | 31 | NOTICE OF MOTION AND MOTION for Extend Time to File Answer to 2/28/2014 re Answer to Complaint, Counterclaim 23 filed by Plaintiff McRo Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 02/18/2014) |
| 02/19/2014 | 34 | NOTICE TELEPHONIC APPEARANCE AT THE FEBRUARY 24, 2014 HEARING filed by Plaintiff McRo Inc. (Raskin, Mark) (Entered: 02/19/2014) |
| 02/20/2014 | 35 | STATUS REPORT *JOINT* filed by Plaintiff McRo Inc. (Raskin, Mark) (Entered: 02/20/2014) |
| 02/24/2014 | 36 | MINUTES OF Telephone Conference held before Judge George H. Wu: Court and counsel confer re discovery issues. The Court, as indicated on the record, allows the Track Two cases to propound discovery within 45 days of receipt of discovery requests and interrogatories. Plaintiff Plane Blue will also provide Track Two cases with Track One discovery within two weeks from the date of this order. The status conference is continued to April 28, 2014 at 8:30 a.m. Court Reporter: Katie Thibedeaux. (bp) (Entered: 02/25/2014) |
| 02/24/2014 | 37 | ORDER GRANTING PLANET BLUE'S UNOPPOSED MOTION TO EXTEND TIME FOR PLANET BLUE TO ANSWER VALVE CORPORATION'S COUNTERCLAIMS by Counter-Claimant McRo Inc answer due 2/28/2014. (pj) |

**A5524**

| | | (Entered: 02/26/2014) |
|---|---|---|
| 02/27/2014 | 38 | NOTICE OF MOTION AND MOTION for Extend Time to File Answer to 3/14/2014 re Answer to Complaint, Counterclaim 23 filed by Plaintiff McRo Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 02/27/2014) |
| 02/28/2014 | 39 | ORDER GRANTING PLANETBLUE'S SECOND UNOPPOSED MOTION TO EXTEND TIME FOR PLANET BLUE TO ANSWER VALVE CORPORATION'SCOUNTERCLAIMS by Judge George H. Wu: 38 . Planet Blue has until March 14, 2014 to Answer Valve Corporation'sCounterclaims Motion for Extension of Time to Answer. (pj) (Entered: 03/03/2014) |
| 03/17/2014 | 40 | AMENDED ANSWER and Amended Counterclaim to Answer to Complaint, Counterclaim 23 , Complaint (Attorney Civil Case Opening) 1 filed by Defendant and Counterclaim-Plaintiff Valve Corporation. (Mellema, Joseph) (Entered: 03/17/2014) |
| 03/17/2014 | | AMENDED COUNTERCLAIM against Counter Defendant McRo Inc amending Answer to Complaint, Counterclaim 23 ; JURY DEMAND, filed by Counter-Claimant and Defendant Valve Corporation (see document number 40 re Counter-Claim) (pj) Modified on 3/31/2014 (pj). (Entered: 03/31/2014) |
| 03/31/2014 | 41 | *Planet Blue's* ANSWER to Amended Counterclaim, filed by Plaintiff McRo Inc. (Raskin, Mark) (Entered: 03/31/2014) |
| 04/28/2014 | 42 | MINUTES OF Status Conference held before Judge George H. Wu: Markman hearing held in Track 1 Consolidated Cases (Lead Case McRO, Inc. v. Namco Bandai Games America, Inc., CV 12-10322-GW(FFMx)). For reasons stated on the record, the status conference iscontinued to June 30, 2014 at 8:30 a.m. Court Reporter: Katie Thibodeaux. (pj) (Entered: 04/29/2014) |
| 05/22/2014 | 43 | NOTICE OF MOTION AND Joint MOTION for Protective Order for Handling of Confidential Information filed by Plaintiff McRo Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 05/22/2014) |
| 05/28/2014 | 44 | TRANSCRIPT for proceedings held on 4/28/14 9:09 am. Court Reporter/Electronic Court Recorder: Katie Thibodeaux, CSR, RPR, CRR, phone number www.katiethibodeaux.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 6/18/2014. Redacted Transcript Deadline set for 6/28/2014. Release of Transcript Restriction set for 8/26/2014. (Thibodeaux, Katie) (Entered: 05/28/2014) |
| 05/28/2014 | 45 | NOTICE OF FILING TRANSCRIPT filed for proceedings 4/28/14 9:09 am re Transcript 44 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Thibodeaux, Katie) TEXT ONLY ENTRY (Entered: 05/28/2014) |
| 05/29/2014 | 46 | NOTICE OF DENIAL OF PETITIONS FOR INTER PARTES REVIEW filed by PLAINTIFF McRo Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Raskin, Mark) (Entered: 05/29/2014) |
| 06/10/2014 | 47 | PROTECTIVE ORDER GOVERNING THE DESIGNATION AND HANDLING |

| | | OF CONFIDENTIAL MATERIALS by Magistrate Judge Frederick F. Mumm re Notice (Other) 43 (see attached) (jm) (Entered: 06/12/2014) |
|---|---|---|
| 06/26/2014 | 48 | STATUS REPORT *Joint* filed by Plaintiff McRo Inc. (Raskin, Mark) (Entered: 06/26/2014) |
| 06/30/2014 | 49 | MINUTES OF STATUS CONFERENCE held before Judge George H. Wu. Court and counsel confer. Parties will meet and confer re scheduling and possible consolidation of Track 2 cases with Track 1 cases. The status conference is continued to August 14, 2014 at 8:30 a.m. Joint status report re scheduling will be filed by noon on August 12, 2014. Court Reporter: Katie Thibodeaux. (lom) (Entered: 07/01/2014) |
| 08/05/2014 | 50 | TEXT ONLY ENTRY (IN CHAMBERS): by Judge George H. Wu; The Court, on its own motion, CONTINUES the Status Conference previously scheduled for 8/14/2014 to 8/21/2014 at 08:30 AM before Judge George H. WuTHERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 08/05/2014) |
| 08/05/2014 | 51 | **AMENDED** TEXT ONLY ENTRY 50 (IN CHAMBERS): by Judge George H. Wu; The Court, on its own motion, CONTINUES the Status Conference, previously scheduled for 8/14/2014 to 9/4/2014 at 08:30 AM before Judge George H. Wu. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 08/06/2014) |
| 08/08/2014 | 52 | TEXT ONLY ENTRY (IN CHAMBERS): by Judge George H. Wu; Pursuant to the request of defense counsel, the Status Conference previously scheduled for 09/04/2014 is CONTINUED to 9/18/2014 08:30 AM before Judge George H. Wu.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 08/08/2014) |
| 09/18/2014 | 53 | MINUTES OF Status Conference held before Judge George H. Wu: The Court's Tentative Ruling re Defendants' Motion for Judgment on the Pleadings Based on Unpatentability Under 35 U.S.C. Section 101, in McRO, Inc., v. Namco Bandai Games America, Inc., CV 12- J 0322-GW(FFMx), is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, Defendants' motion is TAKEN UNDER SUBMISSION. Court to issue its ruling.Court Reporter: Katie Thibodeaux. (pj) (Entered: 09/22/2014) |
| 09/22/2014 | 54 | RULING ON DEFENDANTS MOTION FOR JUDGMENT ON THE PLEADINGS BASED ON UNPATENTABILITY UNDER 35 U.S.C. SECTION 101 by Judge George H. Wu. For the foregoing reasons, the Court would GRANT the Motion, and hold 576 Patent claims 1, 7-9, and 13, and 278 Patent claims 1-4, 6, 9, 13, and 15-17 invalid Under 35 U.S.C. Section 101. (MD JS-6, Case Terminated). (pj) (Entered: 09/24/2014) |
| 09/24/2014 | 55 | REPORT ON THE DETERMINATION OF AN ACTION Regarding a Patent or Trademark. (Closing) (Attachments: # 1 COPY OF JUDGMENT) (pj) (Entered: 09/24/2014) |
| 10/22/2014 | 56 | NOTICE OF APPEAL to the Federal Circuit filed by Plaintiff McRo Inc. Appeal of Judgment, 54 (Appeal fee of $505 receipt number 0973-14662595 paid.) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Raskin, Mark) (Entered: 10/22/2014) |

| 10/23/2014 | | TRANSMISSION of the Notice of Appeal, Docket Sheet, Judgment and or order e-mailed to the US Court of Appeals for the Federal Circuit re: Notice of Appeal to Federal Circuit Court of Appeals 56 (mat) (Entered: 10/23/2014) |
|---|---|---|
| 10/27/2014 | 59 | NOTIFICATION by Circuit Court of Appellate Docket Number 15-1099, Federal Circuit regarding Notice of Appeal to Federal Circuit Court of Appeals 56 as to Plaintiff McRo Inc. (mat) (Entered: 10/29/2014) |
| 10/28/2014 | 57 | OBJECTIONS *REQUEST for Judgment* filed by Plaintiff McRo Inc. (Attachments: # 1 Proposed Order)(Raskin, Mark) (Entered: 10/28/2014) |
| 10/28/2014 | 58 | REQUEST for Judgment filed by Defendant Valve Corporation. (Attachments: # 1 Proposed Order)(Weir, Jan) (Entered: 10/28/2014) |
| 10/31/2014 | 60 | FINAL JUDGMENT by Judge George H. Wu, Accordingly, it is ADJUDGED that Plaintiff and Counterclaim-Defendant McRo, Inc., d.b.a. Planet Blue ("Plaintiff') takes nothing from Defendants and Counterclaim-Plaintiffs (SEE ATTACHED FOR FURTHER DETAILS) All remaining pending motions are DENIED as moot. As Defendants are the prevailing parties in this action, Defendants' costs of court shall be taxed against Plaintiff. (pj) (Entered: 11/03/2014) |
| 11/05/2014 | 61 | Federal Circuit Form 22 filed by Plaintiff McRo Inc (Raskin, Mark) (Entered: 11/05/2014) |
| 11/17/2014 | 62 | NOTICE of Application to the Clerk to Tax Costs and Proposed Bill of Costs filed by Defendant Valve Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Mellema, Joseph) (Entered: 11/17/2014) |
| 11/26/2014 | 63 | OBJECTIONS to Notice (Other) 62 filed by Plaintiff McRo Inc. (Raskin, Mark) (Entered: 11/26/2014) |

**PACER Service Center**

**Transaction Receipt**

01/28/2015 12:41:07

| PACER Login: | ml3885:3523160:0 | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 8:13-cv-01874-GW-FFM End date: 1/28/2015 |
| Billable Pages: | 8 | Cost: | 0.80 |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE GEORGE WU

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

MCRO, INC.,                          )
                    PLAINTIFF,       )
                                     )
VS.                                  )   NO. CV 12-10322 GW
                                     )
NAMCO BANDAI GAMES AMERICA, INC.,    )
ET AL.,                              )
                    DEFENDANT,       )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, APRIL 28, 2014

_____

KATIE E. THIBODEAUX, CSR 9858
U.S. Official Court Reporter
312 North Spring Street, #436
Los Angeles, California 90012

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          MS. MEHTA:  Your Honor, I think there is a very
 2    different view in the prior art in the patent from the
 3    two sides.  So one thing I think we need to be clear on
 4    and take a step back -- and I am not sure if we have a
 5    disagreement on this or not, but I think if we look at
 6    the patents, we shouldn't -- is that this patent is not
 7    purporting to have invented or claimed the concept of
 8    interpolation or even interpolation between keyframes.
 9          So all the patent purports to do is take what
10    was known in the prior art which was to use a set of
11    rules that the animator would know and apply it to a
12    phonetic transcript to create the keyframes based on the
13    weighting of the different morph targets, and then what
14    was done in the prior art was that you would simply
15    interpolate that.
16          And what Mr. Rosenfeld purports to have
17    invented is the concept of taking that and taking the
18    application of the rule to the phonetic transcript which
19    the patent says is a very labor intensive and time
20    consuming process that required the manual labor of the
21    animator and automating that by claiming that you would
22    take the transcript and the set of rules that are defined
23    in the program and simply let the program run those
24    rules.
25          So it is not claiming interpolation as the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5774**

```
 1    invention.  It is a step of overall method, but the thing

 2    he is claiming to have invented is the concept of how do

 3    you make it easier for the animator to not have to do the

 4    manual work of applying rules as to how you might weight

 5    two particular targets to achieve a particular transition

 6    between phonemes and doing all of that in the computer

 7    and letting the computer apply the rules to the phonetic

 8    transcript.

 9        THE COURT:  But that is what I am trying to figure

10    out is what exactly the patent is because, you know, if

11    the patent itself does not create the rules and the rules

12    have to be inputted and interpolation has been done via

13    computers previous to this, I don't quite exactly

14    understand what exactly is the patent.

15        MR. PETRSORIC:  You are asking, your Honor, what

16    the inventive step is?

17        THE COURT:  Yes.

18        MR. PETRSORIC:  And the inventive step is not only

19    is taking what was in the prior art which was known,

20    which was not manual animation and also some forms of

21    automated lip synchronization but where those forms

22    really were not able to take into account the timing of

23    the spoken word.  So they really were not able to

24    consistently reproduce realistic results.  So the patent

25    really is directed towards evaluating the timing and, in
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5775**

```
 1    the phonetic transcript, to further adjust the models and

 2    the weights that are being applied to the models.

 3         THE COURT:  The thing I don't understand is isn't

 4    most of these items that you are talking about, those are

 5    the rules that you are incorporating --

 6         MS. MEHTA:  That's right.

 7         THE COURT:  -- into the process.  So, therefore, I

 8    don't quite understand what the invention or the

 9    inventive invention is because, you know -- does your

10    client want to talk to you for some reason?  Do you want

11    to talk to him?  Feel free.  You are the client.  You can

12    sit next to him if you so desire.

13         MS. MEHTA:  Maybe while they are conferring, your

14    Honor, I can give you our view on this.

15         THE COURT:  The attorney should hear it.

16         MS. MEHTA:  So your Honor is asking I think a

17    fundamental question that we have had, and the reason it

18    hasn't been presented to your Honor in the form of a 101

19    motion yet is that as you know the Supreme Court is still

20    giving us or attempting to give us guidance on exactly

21    what the standards of 101 are.

22              But what the patent says expressly throughout

23    the specification in describing the background of the

24    invention and what the purported invention here is is

25    that it is taking a known method that was done manually
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   using the input of an animator and simply automating that

 2   process.

 3         So everything that Mr. Petrsoric was

 4   describing in terms of the timing of the vizeme and not

 5   having the flapping of the lips because we can adjust the

 6   time, that is not anywhere in the claim.  And the reason

 7   that is not anywhere in the claim or frankly anywhere in

 8   any of the description that correlates to the claim is

 9   because those are the rules that get input by the

10   animator before the process starts.

11         So the claim doesn't say here is a solution

12   for how to avoid lip flapping because we are going to

13   adjust the timing of the way the mouth works between

14   two phonemes.

15         THE COURT:  Let me stop you.  Even if I were to

16   accept your presentation as being accurate and correct,

17   not that I am doubting you, but why couldn't a patent be

18   awarded simply in that type of situation where a person

19   creates a device that if you do incorporate these certain

20   rules that it will make the interpolation process not as

21   manually intensive because it will automatically do

22   certain things that you have programmed into the

23   software?  Why can't that -- assuming the software is

24   patentable, why wouldn't that -- why can't you do that?

25         MS. MEHTA:  So I think there is two separate
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5777**

1    questions there, your Honor.  The first one is what is it

2    that they actually invented and claimed, and what they

3    actually invented and claimed is removing from the manual

4    step, the creation of the morph weight targets and the

5    keyframes that you would then go and interpolate because

6    interpolation was already known.

7           So, basically, what you are doing is you are

8    taking the process of applying a set of rules to the

9    phonetic transcript and making that application automatic

10   in the software.

11        THE COURT:  I know you keep on saying automatic

12   because you want to make the argument that not a human

13   hand comes into play.

14        MS. MEHTA:  When I say automatic, I am not

15   assuming our construction of automatic.  I am using the

16   claim language, your Honor.

17        THE COURT:  All right.

18        MS. MEHTA:  So all I am saying it is done

19   automatically meaning it is done by the software as

20   opposed to by the person.  So that is one issue.  That is

21   what the claim is claiming, and that is what the patent

22   describes as the invention.

23        THE COURT:  Let me stop you.  Do you agree with

24   that?

25        MR. PETRSORIC:  I believe, your Honor, I disagree

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5778**

1  with that from the fundamental perspective of, from the

2  prior art, manual animation, there weren't necessarily

3  rules being applied.  The animator was doing this by

4  feel.

5       What the patent seeks to do is to add rules

6  regarding correspondence and timing so that you can put

7  together a complete output that takes into account from a

8  mathematical and an automated perspective what the

9  animator may have previously achieved by feel.

10     THE COURT:  But let me just ask you this.  In the

11  end, however, the patent invention is the software where

12  if you input these certain rules whatever they are, they

13  make this interpolation process between keyframes faster

14  with less involvement of some person, from the animator,

15  himself, herself or itself.

16     MR. PETRSORIC:  Correct.  That is correct.  And

17  what happens as a result is that by setting up keyframes

18  where there is now more control as a result of the

19  application of correspondence and timing rules, now,

20  there is more realistic output at each keyframe so that

21  when the interpolation does take place, a more -- a more

22  realistic animation results.

23     THE COURT:  But the application of more input to

24  define the keyframe is not the invention nor is it -- can

25  he claim that as -- in other words, he may have --

1  because that was known.  You can always do that.  Anybody

2  can do that.  That wasn't part of the invention.

3      MR. PETRSORIC:  No.  What the invention was was

4  actually applying specific rules in not only the

5  correspondence which was well known but also in timing

6  and how you set up the start timing and how you set up

7  the stop timing so that when the -- so that there was an

8  automated fashion to arrive at a set of keyframes that

9  previously needed to be done by feel and by hand to

10  create.

11      THE COURT:  So the patent is for the software that

12  once you put in the rules, it effectuates these rules in

13  a faster way and in the end a more productive way because

14  what you get is better than -- well, not necessarily

15  better than if you did it by hand, but if you didn't have

16  this program and you did it by computer, the other

17  programs, it wouldn't come out as nicely, but you could

18  do the same thing if you wanted to do it by hand but it

19  would take a lot more time.  So, in other words, that is

20  the invention.

21      MR. PETRSORIC:  Exactly.  And that is why the

22  companies like Pixar and Dream Works typically

23  incorporate an army of animators.

24      THE COURT:  That was my question.  Does Pixar use

25  this like, for example, in their movies that they are

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5780**

1  famous for, like Toy Story and Monsters, do they use this

2  patent?

3       MR. PETRSORIC:  Not to my knowledge, your Honor.

4  But I can't speak with completeness to that.

5       MS. MEHTA:  So, your Honor, I think it sounds like

6  we have some points of agreement, but I think one thing

7  we should be clear on is what was known in the prior art

8  because the concept of computer-assisted animation was

9  known in the prior art.  The concept of an animator using

10  a set of rules or if as Mr. Petrsoric said their

11  experience which is just rules that aren't written out in

12  computer language, they are applied in the person's

13  brain.  All that we are doing is taking that concept and

14  putting it in a software program; right?

15       So they are not suggesting, I haven't heard

16  Mr. Petrsoric suggest that the patent is saying that

17  there is any particular rule or set of rules that is

18  being claimed or that has been invented or any particular

19  set of timing that is magic that makes this so much

20  better than anything that came before.

21       It is a very simple concept which is it was

22  known to use computer-assisted animation.  It was known

23  that you could use interpolation between keyframes, and

24  it was known that at a minimum in the head of the

25  animator, you would apply normal rules as to how to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**A5781**

DVD: Parties' Claim Construction Tutorials and Excerpts

576 Fed.Appx. 1005
**(Cite as: 576 Fed.Appx. 1005)**

This case was not selected for publication in West's Federal Reporter.

See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. Fed. Cir. Rule 32.1.

United States Court of Appeals,
Federal Circuit.
PLANET BINGO, LLC, Plaintiff–Appellant,
v.
VKGS LLC (doing business as Video King), Defendant–Appellee.

No. 2013–1663.
Aug. 26, 2014.

**Background:** Patentee sued competitor, claiming infringement on its patents for computer-aided management of bingo games. The United States District Court for the Western District of Michigan, Robert Holmes Bell, J., 2013 WL 1729574, construed the patents, and found the patents invalid, 961 F.Supp.2d 840. The patentee appealed.

**Holding:** The Court of Appeals, Hughes, Circuit Judge, held that method and system claims failed to transform the abstract idea of managing a game of bingo into a patent-eligible invention.

Affirmed.

West Headnotes

**Patents 291 ⬤═460**

291 Patents
    291II Patentability and Validity
        291II(B) Eligible Subject Matter
            291k458 Computers and Software
                291k460 k. Data processing. Most Cited Cases
        (Formerly 291k7.14)
    Method and system claims in patents for com-

puter-aided management of bingo games failed to transform the abstract idea of managing a game of bingo into a patent-eligible invention; the patents' recitation of a program that was used for the generic functions of storing, retrieving, and verifying a chosen set of bingo numbers against a winning set of bingo numbers amounted only to a mere instruction to implement an abstract idea on a computer. 35 U.S.C.A. § 101.

**Patents 291 ⬤═2091**

291 Patents
    291X Patents Enumerated
        291k2091 k. In general; utility. Most Cited Cases
        (Formerly 291k328(2))
    US Patent 6,398,646, US Patent 6,656,045. Invalid.

*1006 Appeal from the United States District Court for the Western District of Michigan in No. 12–CV–0219, Judge Robert Holmes Bell.Karen J.S. Fouts, Weiss & Moy, P.C., of Grand Rapids, MI, argued for plaintiff-appellant. With her on the brief were Veronica–Adele R. Cao and Kenneth M. Motolenich–Salas, of Scottsdale, AZ.

Steven L. Underwood, Price Heneveld LLP, of Grand Rapids, MI, argued for defendant-appellee. With him on the brief was Matthew J. Gipson.

Before TARANTO, BRYSON, and HUGHES, Circuit Judges.

HUGHES, Circuit Judge.
    Planet Bingo, LLC, owns two patents for computer-aided management of bingo games. After Planet Bingo filed an infringement action against VKGS, LLC, the district court granted summary judgment of invalidity, concluding that the patents do not claim patentable subject matter under 35

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 1005
**(Cite as: 576 Fed.Appx. 1005)**

U.S.C. § 101. Because a straightforward application of the Supreme Court's recent holding in *Alice Corp. v. CLS Bank International,* —— U.S. ——, 134 S.Ct. 2347, 189 L.Ed.2d 296 (2014), leads us to the same result, we affirm.

### I

Planet Bingo alleged that VKGS infringed U.S. Patent Nos. 6,398,646 and 6,656,045. The '045 patent states that it is a continuation of the '646 patent. The claims at issue recite computer-aided methods and systems for managing the game of bingo. Generally, the claims recite storing a player's preferred sets of bingo numbers; retrieving one such set upon demand, and playing that set; while simultaneously tracking the player's sets, tracking player payments, and verifying winning numbers. *See, e.g.,* '646 patent col. 8 l. 45–col. 9 l. 18, col. 9 l. 33–col. 10 l. 13. Variations between the claims include display capabilities and options to purchase sets of bingo numbers.

Following a *Markman* order, VKGS filed a motion for summary judgment that the asserted claims are directed to a patent-ineligible concept. Applying the majority opinion's approach in *CLS Bank International v. Alice Corp.,* 685 F.3d 1341 (Fed.Cir.2012) (en banc), the district court determined that "each method claim encompasses the abstract idea of managing**1007** /playing the game of Bingo." *Planet Bingo, LLC v. VKGS, LLC,* 961 F.Supp.2d 840, 851 (W.D.Mich.2013). The district court determined that the use of a computer in the method claims "adds nothing more than the ability to manage ... Bingo more efficiently," *id.* at 852, and that "the limitations of the system claims are the same as the limitations of the method claims that failed to result in an 'inventive concept,' " *id.* at 854. The district court stated that the system claims employ a computer "only for its most basic functions," including "storing numbers, assigning identifiers, allowing for basic inputs and outputs, printing of a receipt, displaying of numbers, and/or matching ... for verification." *Id.* at 854–55. The court granted summary judgment on the grounds

that all of the asserted claims are invalid under § 101. *Id.* at 857.

Planet Bingo appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

### II

We review the grant of summary judgment under the law of the regional circuit. *Charles Mach. Works, Inc. v. Vermeer Mfg. Co.,* 723 F.3d 1376, 1378 (Fed.Cir.2013). The Sixth Circuit reviews the grant or denial of summary judgment de novo. *Tompkins v. Crown Corr, Inc.,* 726 F.3d 830, 837 (6th Cir.2013). We review de novo whether a claim is valid under § 101. *In re Nuijten,* 500 F.3d 1346, 1352 (Fed.Cir.2007).

A patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice,* 134 S.Ct. at 2354 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.,* ——U.S. ——, 133 S.Ct. 2107, 2116, 186 L.Ed.2d 124 (2013)); *see also Gottschalk v. Benson,* 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972) ( "Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work."). But the application of these concepts to new and useful ends remains eligible for patent protection. *Id.* at 2355. Accordingly, the Court has described a framework for identifying patent-eligible claims, wherein a court must determine whether the claims at issue are directed to a patent-ineligible concept and, if so, whether additional elements in the claims transform the claims into a patent-eligible application. *Id.*

### A

As a preliminary matter, we agree with the district court that there is no meaningful distinction between the method and system claims or between

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the independent and dependent claims. *See Planet Bingo,* 961 F.Supp.2d at 854, 857. The system claims recite the same basic process as the method claims, and the dependent claims recite only slight variations of the independent claims.

In this case, the claims at issue are drawn to patent-ineligible subject matter. The '646 and '045 patents claim managing a bingo game while allowing a player to repeatedly play the same sets of numbers in multiple sessions. The district court correctly concluded that managing the game of bingo "consists solely of mental steps which can be carried out by a human using pen and paper." *Planet Bingo,* 961 F.Supp.2d at 851. Claim 7 of the '646 patent, for example, recites the steps of selecting, storing, and retrieving two sets of numbers, assigning a player identifier and a control number, and then comparing **\*1008** a winning set of bingo numbers with a selected set of bingo numbers. '646 patent col. 9 l. 33–col. 10 l. 13. Like the claims at issue in *Benson,* not only can these steps be "carried out in existing computers long in use," but they also can be "done mentally." 409 U.S. at 67, 93 S.Ct. 253.

Planet Bingo argues that "in real world use, literally thousands, if not millions of preselected Bingo numbers are handled by the claimed computer program," making it impossible for the invention to be carried out manually. Appellant's Reply Br. 14. But the claimed inventions do not require as much. At most, the claims require "two sets of Bingo numbers," "a player," and "a manager." '646 patent col. 8 ll. 54–55, col. 9 l. 17; *see also* '045 patent col. 9 ll. 5–6. We need not, and do not, address whether a claimed invention requiring many transactions might tip the scales of patent eligibility, as the claims fall far short of capturing an invention that necessarily handles "thousands, if not millions" of bingo numbers or players.

Moreover, the claims here are similar to the claims at issue in *Bilski v. Kappos,* 561 U.S. 593, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010), and *Alice,* 134 S.Ct. 2347, which the Supreme Court held

were directed to "abstract ideas." For example, the claims here recite methods and systems for "managing a game of Bingo." '646 patent col. 8 l. 46; *see also id.* col. 9 l. 33; '045 patent col. 8 l. 64. This is similar to the kind of "organizing human activity" at issue in *Alice,* 134 S.Ct. at 2356. And, although the '646 and '045 patents are not drawn to the same subject matter at issue in *Bilski* and *Alice,* these claims are directed to the abstract idea of "solv [ing a] tampering problem and also minimiz[ing] other security risks" during bingo ticket purchases. Appellant's Br. 10, 20. This is similar to the abstract ideas of "risk hedging" during "consumer transactions," *Bilski,* 130 S.Ct. at 3231, and "mitigating settlement risk" in "financial transactions," *Alice,* 134 S.Ct. at 2356–57, that the Supreme Court found ineligible. Thus, we hold that the subject matter claimed in the '646 and '045 patents is directed to an abstract idea.

B

Abstract ideas may still be patent-eligible if they contain an " 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice,* 134 S.Ct. at 2357 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* —— U.S. ——, 132 S.Ct. 1289, 1294, 1298, 182 L.Ed.2d 321 (2012)).

Apart from managing a game of bingo, the claims at issue also require "a computer with a central processing unit," "a memory," "an input and output terminal," "a printer," in some cases "a video screen," and "a program ... enabling" the steps of managing a game of bingo. '646 patent col. 8 ll. 45–53, col. 9 l. 29. These elements, in turn, select, store, and retrieve two sets of numbers, assign a player identifier and a control number, and then compare a winning set of bingo numbers with a selected set of bingo numbers.

"[I]f a patent's recitation of a computer amounts to a mere instruction to 'implemen[t]' an abstract idea 'on ... a computer,' ... that addition cannot impart patent eligibility." *Alice,* 134 S.Ct. at 2358 (quoting *Mayo,* 132 S.Ct. at 1301). In this

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 1005
**(Cite as: 576 Fed.Appx. 1005)**

case, the claims recite a generic computer implementation of the covered abstract idea.

Planet Bingo argues that the patents recite "significantly more" than an abstract idea because the invention includes "complex computer code with three distinct subparts." Appellant's Br. 33, 38. We disagree. The '646 and ' 045 patents do not claim the "accounting program," **\*1009** "ticket program," and "verification program" that Planet Bingo identifies in its briefs. Instead, the claims recite a program that is used for the generic functions of storing, retrieving, and verifying a chosen set of bingo numbers against a winning set of bingo numbers. And, as was the case in *Alice,* "the function performed by the computer at each step of the process is '[p]urely conventional.' " *Alice,* 134 S.Ct. at 2359 (quoting *Mayo,* 132 S.Ct. at 1298).

Accordingly, we hold that the claims at issue do not have an 'inventive concept' sufficient to 'transform' the claimed subject matter into a patent-eligible application.

### III

We have considered Planet Bingo's remaining arguments and find them unpersuasive. Applying the Supreme Court's precedents, the claims at issue are invalid under § 101.

**AFFIRMED**

C.A.Fed. (Mich.),2014.
Planet Bingo, LLC v. VKGS LLC
576 Fed.Appx. 1005

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

H

This case was not selected for publication in West's Federal Reporter.

See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. Fed. Cir. Rule 32.1.

United States Court of Appeals,
Federal Circuit.
I/P ENGINE, INC., Plaintiff–Cross Appellant,
v.
AOL INC., Google Inc., IAC Search & Media, Inc., Gannett Company, Inc., and Target Corporation, Defendants–Appellants.

Nos. 2013–1307, 2013–1313.
Aug. 15, 2014.
Rehearing En Banc Denied Dec. 15, 2014.FN*

FN* Circuit Judge Mayer participated only in the decision on the petition for panel rehearing.

**Background:** Owner of patents related to a method for filtering Internet search results that utilizes both content-based and collaborative filtering brought infringement action, and competitor counterclaimed for invalidity. Following jury trial, the United States District Court for the Eastern District of Virginia, Raymond Alvin Jackson, J., entered judgment in patent owner's favor. Cross-appeals were taken.

**Holding:** The Court of Appeals held that patents were invalid due to obviousness.
Reversed.

Mayer, Circuit Judge, filed a concurring opinion.

Chen, Circuit Judge, filed a dissenting opinion.

West Headnotes

**Patents 291 ⌇752**

291 Patents
    291II Patentability and Validity
        291II(E) Obviousness; Lack of Invention
            291II(E)3 Particular Fields of Invention
                291k751 Computers and Software
                    291k752 k. In general. Most Cited Cases
                    (Formerly 291k16.29)

It would have been obvious to a person of ordinary skill in the art to filter items for relevance to a user's query using combined content and collaborative data at time of invention claimed in patents related to a method for filtering Internet search results that utilizes both content-based and collaborative filtering, and thus patents were invalid due to obviousness; search engines, content-based filtering, and collaborative filtering were all well known in the art at time of claimed invention, and record was replete with prior art references recognizing that content-based and collaborative filtering were complimentary techniques that could be effectively combined, and using an individual user's search query for filtering was technique widely applied in the prior art, and there was no evidence that results of patented system were unexpected. (Per curiam, with two circuit judges concurring in the result.)

**Patents 291 ⌇2091**

291 Patents
    291X Patents Enumerated
        291k2091 k. In general; utility. Most Cited Cases
        (Formerly 291k328(2))
    US Patent 5,867,799. Cited.

**Patents 291 ⌇2091**

291 Patents
    291X Patents Enumerated
        291k2091 k. In general; utility. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

(Formerly 291k328(2))

US Patent 6,006,222, US Patent 6,202,058. Cited as Prior Art.

**Patents 291 ☞2091**

291 Patents

291X Patents Enumerated

291k2091 k. In general; utility. Most Cited Cases

(Formerly 291k328(2))

US Patent 6,314,420, US Patent 6,775,664. Invalid.

**\*983** Appeals from the United States District Court for the Eastern District of Virginia in No. 11–CV–0512, Judge Raymond Alvin Jackson.David A. Perlson, Quinn Emanuel Urquhart & Sullivan LLP, of San Francisco, CA, argued for defendants-appellants. With him on the brief were Emily C. O'Brien, Antonio R. Sistos, Margaret P. Kammerud, and Joshua L. Sohn; and Dave Nelson, of Chicago, IL. Of counsel were David L. Bilsker and Kevin Alexander Smith, of San Francisco, CA, and Robert B. Wilson, of New York, NY. Of counsel on the brief for Google Inc. were Daryl L. Joseffer, King & Spalding LLP, of Washington, DC, and Adam M. Conrad, of Charlotte, NC.

Joseph R. Re, Knobbe, Martens, Olson & Bear, LLP, of Irvine, CA, argued for plaintiff-cross appellant. With him on the brief was Stephen W. Larson. Of Counsel on the brief were Jeffrey K. Sherwood, Frank C. Cimino, Jr., Kenneth W. Brothers, Dawn Rudenko Albert, Charles J. Monterio, Jr., and Jonathan L. Falkler, Dickstein Shapiro LLP, of Washington, DC.

Edward R. Reines and Jill J. Schmidt, Weil, Gotshal & Manges LLP, of Redwood Shores, CA, for amici curiae Newegg Inc., et al.

Before WALLACH, MAYER, and CHEN, Circuit Judges.

PER CURIAM.

I/P Engine, Inc. ("I/P Engine") brought an action against AOL Inc., Google Inc. ("Google"), IAC Search & Media, Inc., Gannett Company, Inc., and Target Corporation (collectively, the "Google Defendants") alleging infringement of U.S. Patent Nos. 6,314,420 (the "'420 patent") and 6,775,664 (the "'664 patent"). A jury returned a verdict finding that all asserted claims were infringed and not anticipated. J.A. 4163–73. The district court then determined that the asserted claims were not obvious and entered judgment in I/P Engine's favor. *See I/P Engine, Inc. v. AOL Inc.,* No. 11–CV–0512, 2012 U.S. Dist. LEXIS 166555 (E.D.Va. Nov. 20, 2012) ("*Non–Obviousness Order* "). Because the asserted claims of the '420 and '664 patents are invalid for obviousness, we reverse.

BACKGROUND

The '420 and '664 patents both claim priority to the same parent patent, U.S. Patent No. 5,867,799. They relate to a method for filtering Internet search results that utilizes both content-based and collaborative filtering. *See* '420 patent col.1 ll.10–16, col.2 ll.20–26; '664 patent col.23 ll.29–44.[FN1] Content-based filtering is a technique for determining relevance by extracting features such as text from an information item. '420 patent col.4 ll.22–26; *see also* J.A. 487. By contrast, collaborative filtering assesses relevance based on feedback from other users—it looks to what items "other users with similar interests or needs found to be relevant." '420 patent col.4 ll.28–29; *see also* J.A. 487. The asserted patents describe a system "wherein a search engine operates with **\*984** collaborative and content-based filtering to provide better search responses to user queries." '420 patent col.1 ll.14–16. Specifically, the asserted claims describe a filter system that combines content and collaborative data in filtering each "informon"—or information item—for relevance to a user's query.[FN2] Asserted claim 10 of the '420 patent recites:

> FN1. The specifications of the '420 and ' 664 patents are substantively identical, but

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

employ slightly dissimilar line numbering. Unless otherwise noted, citations to the specification refer to the line numbering used in the '420 patent.

FN2. The parties stipulated that the term "informon" referred to an "information entity of potential or actual interest to the [individual/first] user." *I/P Engine, Inc. v. AOL Inc.,* 874 F.Supp.2d 510, 517 (E.D.Va.2012) (internal quotation marks omitted) (" *Claim Construction Order* "). The asserted patents explain that an "informon" can be all or part of a text, video, or audio file. '420 patent col.3 ll.30–35.

A search engine system comprising: a system for scanning a network to make a demand search for informons relevant to a query from an individual user; a content-based filter system for receiving the informons from the scanning system and for filtering the informons on the basis of applicable content profile data for relevance to the query; and a feedback system for receiving collaborative feedback data from system users relative to informons considered by such users; the filter system combining pertaining feedback data from the feedback system with the content profile data in filtering each informon for relevance to the query.

*Id.* col.28 ll.1–15; see also id. col.29 ll.32–44.

Asserted claim 1 of the '664 patent provides:

A search system comprising: a scanning system for searching for information relevant to a query associated with a first user in a plurality of users; a feedback system for receiving information found to be relevant to the query by other users; and a content-based filter system for combining the information from the feedback system with the information from the scanning system and for filtering the combined information for relevance to at least one of the query and the first user.

'664 patent col.27 ll.27–37.

Claim 26 of the '664 patent is similar to claim 1, but cast as a method claim:

A method for obtaining information relevant to a first user comprising: searching for information relevant to a query associated with a first user in a plurality of users; receiving information found to be relevant to the query by other users; combining the information found to be relevant to the query by other users with the searched information; and content-based filtering the combined information for relevance to at least one of the query and the first user.

*Id.* col.28 ll.56–65.

On September 15, 2011, IP/Engine FN3 filed a complaint in the United States District Court for the Eastern District of Virginia alleging that Google's AdWords, AdSense for Search, and AdSense for Mobile Search systems, which display advertisements on web pages, infringed claims 10, 14, 15, 25, 27, and 28 of the '420 patent and claims 1, 5, 6, 21, 22, 26, 28, and 38 of the '664 patent. *See Claim Construction Order,* 874 F.Supp.2d at 514–15. On December 5, 2011, the Google Defendants filed counterclaims, seeking declaratory judgments of noninfringement and invalidity of both the '420 and ' 664 patents. *Id.* at 514.

FN3. In 2012, I/P Engine became a subsidiary of Vringo, Inc. J.A.2046–47.

Following a *Markman* hearing, the district court construed disputed claim terms. The court concluded that: (1) the term **\*985** "collaborative feedback data" refers to "data from system users regarding what informons such users found to be relevant"; (2) the term "scanning a network" means "looking for or examining items in a network"; and (3) the term "demand search" refers to "a single search engine query performed upon a user request." *Id.* at 525 (internal quotation marks omitted).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

During a twelve-day trial, the Google Defendants pointed to numerous prior art references to support their contention that the claims of the '420 and '664 patents were invalid as anticipated and obvious. In particular, they argued that U.S. Patent No. 6,006,222 ("Culliss") anticipated the asserted claims, and that those claims were obvious in view of: (1) U.S. Patent No. 6,202,058 ("Rose"); (2) Yezdezard Z. Lashkari, Feature Guided Automated Collaborative Filtering (July 25, 1995) (M.S. thesis, Massachusetts Institute of Technology) ("WebHound"); and (3) Marko Balabanovic & Yoav Shoham, *Content–Based, Collaborative Recommendation,* 40 Comms. of the ACM 66 (1997) ("Fab").

The jury returned a verdict on November 6, 2012, finding that the Google Defendants had infringed all asserted claims and awarding damages of $30,496,155.[FN4] J.A. 4173. The jury also found that the asserted claims were not anticipated, and answered a special verdict form on factual issues pertaining to the obviousness inquiry. J.A. 4169–72. Specifically, the jury found that "Rose, [WebHound] and Fab[–] were profile systems that did not disclose a tightly integrated search system, and could not filter information relevant to the query." J.A. 4170, 4171–72.

> FN4. The jury also awarded I/P Engine a running royalty of 3.5%. J.A. 4173.

On November 20, 2012, the district court ruled that the Google Defendants had "failed to prove, by clear and convincing evidence, that the ' 420 Patent or the '664 Patent [was] obvious." *Non–Obviousness Order,* 2012 U.S. Dist. LEXIS 166555, at *9. The district court further determined that the equitable doctrine of laches barred I/P Engine from recovering damages for any infringement occurring prior to September 15, 2011, the date of its complaint. *I/P Engine, Inc. v. AOL Inc.,* 915 F.Supp.2d 736, 746–49 (E.D.Va.2012). The court explained that I/P Engine "had constructive notice that the Google Adwords system potentially infringed its patents as of July 2005 and [yet] failed

to undertake any reasonable investigation to further determine if infringement was occurring." *Id.* at 744. The court stated, moreover, that "[a]lthough Congress is best left to consider the merits of non-practicing patent entities in our patent system, the dilatory nature of [I/P Engine's] suit is precisely why the doctrine of laches has been applied to patent law." *Id.* at 748.

On December 18, 2012, the Google Defendants filed motions for a new trial and for judgment as a matter of law on non-infringement, invalidity, and damages. J.A. 4252–381. I/P Engine also filed post-trial motions, arguing that the district court erred in applying the doctrine of laches to preclude recovery of damages for infringement in the period prior to September 15, 2011. J.A. 4433, 4550–56. All of these motions were denied by the district court. J.A. 59–67.

The Google Defendants then filed a timely appeal with this court. They argue that: (1) the infringement determination should be set aside because the accused systems do not meet claim limitations which require "combining" content data with feedback data and filtering "the combined information"; (2) the accused systems do not meet the limitation contained **986** in claim 10 of the '420 patent requiring a "demand search"; (3) I/P Engine improperly relied on marketing documents, rather than source code, in attempting to establish infringement and misled the jury by insinuating that Google had "copied" the system claimed in I/P Engine's patents; (4) the district court erred as a matter of law in finding the asserted claims non-obvious; (5) the asserted claims are invalid as anticipated because Culliss discloses filtering Internet articles based on scores that combine both content and collaborative feedback data; and (6) I/P Engine failed to introduce any credible evidence of damages in the period following the filing of its complaint. I/P Engine filed a cross-appeal in which it argues that the district court erred in applying the doctrine of laches to bar recovery for infringement occurring prior to September 15, 2011. I/P Engine further contends

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

that even if laches does apply, it is entitled to damages of more than $100 million for infringement occurring after the date it filed its complaint. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

### DISCUSSION

#### I. Standard of Review

"Whether the subject matter of a patent is obvious is a question of law and is reviewed de novo." *Procter & Gamble Co. v. Teva Pharms. USA, Inc.,* 566 F.3d 989, 993 (Fed.Cir.2009); *see PharmaStem Therapeutics, Inc. v. ViaCell, Inc.,* 491 F.3d 1342, 1359 (Fed.Cir.2007). The factual findings underlying an obviousness determination include: (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) any objective indicia of non-obviousness. *See Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

#### I. The Obviousness Determination

The Google Defendants argue that I/P Engine's claimed invention is obvious as a matter of law because it simply combines content-based and collaborative filtering, two information filtering methods that were well-known in the art. They assert, moreover, that the prior art contained explicit statements describing the advantages of combining these two filtering techniques, and that it would have been obvious to include a user's query in the filtering process. *See* Br. of Defendants–Appellants at 35–38.

We agree and hold that no reasonable jury could conclude otherwise. The asserted claims describe a system that combines content and collaborative data in filtering each "informon"—or information item—for relevance to an individual user's search query. '420 patent col.28 ll.1–15; '664 patent col.27 ll.27–37. As the asserted patents themselves acknowledge, however, search engines, content-based filtering, and collaborative filtering were all well-known in the art at the time of the claimed invention. *See* '420 patent col.1 ll.20–45. The record is replete, moreover, with prior art references re-

cognizing that content-based and collaborative filtering are complimentary techniques that can be effectively combined. The WebHound reference explains that "content-based and automated collaborative filtering are complementary techniques, and the combination of [automated collaborative filtering] with some easily extractable features of documents is a powerful information filtering technique for complex information spaces." J.A. 5427. The Fab reference likewise notes that "[o]nline readers are in need of tools to help them cope with the mass of content available on the World–Wide Web," and explains that "[b]y combining both collaborative and content-**987** based filtering systems," many of the weaknesses in each approach can be eliminated. J.A. 5511. Similarly, the Rose patent, which was filed in 1994 by engineers at Apple Computer, Inc., states that "[t]he prediction of relevance [to a user's interests] is carried out by combining data pertaining to the content of each item of information with other data regarding correlations of interests between users." J.A. 5414. These references, individually and collectively, teach the clear advantages of combining content-based and collaborative filtering. FN5

> FN5. I/P Engine points to recent United States Patent and Trademark Office ("PTO") reexamination proceedings which concluded that Rose and WebHound do not anticipate the asserted claims of the '420 patent. J.A. 7899–902. Here, however, the question is not whether Rose and Web-Hound anticipate the asserted claims, but instead whether the prior art, viewed as a whole, renders the asserted claims obvious. *See Cohesive Techs., Inc. v. Waters Corp.,* 543 F.3d 1351, 1364 (Fed.Cir.2008) ("Obviousness can be proven by combining existing prior art references, while anticipation requires all elements of a claim to be disclosed within a single reference."); *Medichem, S.A. v. Rolabo, S.L.,* 437 F.3d 1157, 1166 (Fed.Cir.2006) (explaining that in an obviousness analysis "the prior art

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

must be considered *as a whole* for what it teaches").

On appeal, I/P Engine does not dispute that the prior art disclosed hybrid content-based and collaborative filtering. It contends, however, that it would not have been obvious to a person of ordinary skill in the art to filter items for relevance to a user's query using combined content and collaborative data. In I/P Engine's view, the prior art simply took the results of content-based filtering and "threw them over a proverbial wall to a separate profile-based [filtering] system," but did not also throw the search query "over the wall" for use in the filtering process. Br. of Plaintiff–Cross Appellant at 6–7; *see also id.* at 40–43; J.A. 3689–90, 3728–31.

The fundamental flaw in I/P Engine's argument is that using an individual user's search query for filtering was a technique widely applied in the prior art. Indeed, the shared specification of the '420 and '664 patents acknowledges that "conventional search engines" filtered search results using the original search query. *See* '420 patent col.2 ll.15–18 (explaining that "conventional search engines initiate a search in response to an individual user's query and use content-based filtering *to compare the query to accessed network informons* " (emphasis added)). Given that its own patents acknowledge that using the original search query for filtering was a "conventional" technique, I/P Engine cannot now evade invalidity by arguing that integrating the query into the filtering process was a non-obvious departure from the prior art. *See PharmaStem,* 491 F.3d at 1362 ("Admissions in the specification regarding the prior art are binding on the patentee for purposes of a later inquiry into obviousness."); *see also Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1570 (Fed.Cir.1988) ("A statement in a patent that something is in the prior art is binding on the applicant and patentee for determinations of anticipation and obviousness.").

While I/P Engine acknowledges that the prior art disclosed "conventional 'content-based filtering'

in response to a query," it contends that the prior art did "not show or suggest using content and collaborative data together in filtering items for relevance to a query." Br. of Plaintiff–Cross Appellant at 43. This argument "tak[es] an overly cramped view of what the prior art teaches." *Allergan, Inc. v. Apotex Inc.,* 754 F.3d 952, 963 (Fed.Cir.2014). The Culliss patent renders the asserted claims obvious because it plainly discloses using combined content and collaborative **\*988** data when analyzing information for relevance to a user's search query. In the Culliss system, Internet articles are assigned a "key term score" for significant words or phrases. J.A. 5521. Culliss teaches content-based analysis because the key term score can initially be based on the number of times a particular term appears in an article.[FN6] J.A. 5526. Culliss also describes collaborative feedback analysis because the key term score will be increased when search engine users who query particular key terms select an article from the search results list. J.A. 5521. Significantly, moreover, Culliss presents articles to users based upon their key term scores for the terms that were used in a user's search query. J.A. 5521 ("As users enter search queries and select articles, the scores are altered. The scores are then used in subsequent searches to organize *the articles that match a search query.*" (emphasis added)). Culliss, therefore, squarely discloses using combined content and collaborative data in analyzing items for relevance to a query.

> FN6. Dr. Jaime Carbonell, I/P Engine's expert, asserted that Culliss does not disclose content-based filtering as required by the asserted claims because Culliss' repeated feedback-based adjustments to a key term score will dilute or "swamp" the content portion of the score over time. J.A. 3714, 3787. Notably, however, while the asserted claims require content-based filtering, they do not mandate that content-based analysis play a dominant role in the filtering process. *See* '420 patent col.28 ll.1–15; '664 patent col.27 ll.27–37. Thus, the fact that in the Culliss system content data may play

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

less and less of a role as more user feedback is obtained does not mean that Culliss does not disclose content-based filtering. To the contrary, Culliss explains that while feedback can raise an article's key term score (when the article is clicked on by other users), it can also lower that score (when the article is not clicked on by other users). J.A. 5527 ("[I]f the user does not select the matched article, the key term score for that matched article under that key term can be assigned a negative score."). Thus, the positive and negative feedback adjustments could potentially nearly "cancel each other out," and content data could play a very significant role in setting an article's overall score.

I/P Engine contends that Culliss does not anticipate because it "describes a system for ranking items, not filtering them, as required by the asserted claims." Br. of Plaintiff–Cross Appellant at 54. As Dr. Lyle Ungar, the Google Defendants' expert, explained at trial, however, "the standard way of filtering is to rank things and pick all items above a threshold." J.A. 3366. Notably, moreover, Culliss discloses an embodiment in which articles that are given an "X-rated" score for adult content are filtered out and not displayed to persons who enter "Grated" queries. J.A. 5525. At trial, Carbonell asserted that Culliss was not enabled because it did not provide for a "workable" filtering system. J.A. 3717. In support, he argued that a certain number of G-rated searchers might have to view an article before it would be labeled as Xrated and screened from subsequent G-rated searches. J.A. 3718–19. There is no credible evidence, however, that Culliss would not ultimately succeed in filtering X-rated articles from being viewed by G-rated searchers. *See Cephalon, Inc. v. Watson Pharms., Inc.,* 707 F.3d 1330, 1337 (Fed.Cir.2013) (emphasizing that a patent is presumptively enabled and that "the challenger bears the burden, throughout the litigation, of proving lack of enablement by clear and convincing evidence"). Even more importantly, while "a

prior art reference cannot anticipate a claimed invention if the allegedly anticipatory disclosures cited as prior art are not enabled," *In re Antor Media Corp.,* 689 F.3d 1282, 1289 (Fed.Cir.2012) (citations and internal quotation marks omitted), a nonenabling reference can potentially qualify as prior art for the purpose of determining **\*989** obviousness, *Symbol Techs., Inc. v. Opticon, Inc.,* 935 F.2d 1569, 1578 (Fed.Cir.1991); *see Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC,* 618 F.3d 1294, 1302 (Fed.Cir.2010) ("Under an obviousness analysis, a reference need not work to qualify as prior art; it qualifies as prior art, regardless, for whatever is disclosed therein." (citations and internal quotation marks omitted)); *Beckman Instruments, Inc. v. LKB Produkter AB,* 892 F.2d 1547, 1551 (Fed.Cir.1989) ("Even if a reference discloses an inoperative device, it is prior art for all that it teaches."). Thus, even assuming *arguendo* that the Culliss filtering system was not fully functional, this does not mean that it does not qualify as prior art for purposes of the obviousness analysis.

Significantly, moreover, the obviousness inquiry "not only permits, but *requires*, consideration of common knowledge and common sense." *DyStar Textilfarben GmbH & Co. v. C.H. Patrick Co.,* 464 F.3d 1356, 1367 (Fed.Cir.2006); *see KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 421, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007) (eschewing "[r]igid preventative rules that deny factfinders recourse to common sense"); *Perfect Web Techs., Inc. v. InfoUSA, Inc.,* 587 F.3d 1324, 1329 (Fed.Cir.2009) (explaining that the obviousness analysis "may include recourse to logic, judgment, and common sense available to the person of ordinary skill that do not necessarily require explication in any reference or expert opinion"); *Leapfrog Enters., Inc. v. Fisher–Price, Inc.,* 485 F.3d 1157, 1161 (Fed.Cir.2007) (emphasizing that "the common sense of those skilled in the art" can be sufficient to "demonstrate [ ] why some combinations would have been obvious where others would not"). Very basic logic dictates that a user's search query can provide highly pertinent information in evaluating

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

the overall relevance of search results. *See, e.g.,* 420 patent col.1 ll.21–23 (explaining that a "query" is "a request for information relevant to ... a field of interest"); *id.* col.4 ll.5–6 ("The 'relevance' of a particular informon broadly describes how well it satisfies the user's information need."). As Ungar explained, the query would be just "sitting there" with the results of a search, and it would have been obvious to one skilled in the art "to keep around the query and use that also for filtering." J.A. 3173. FN7 "A person of ordinary skill is ... a person of ordinary creativity, not an automaton," *KSR,* 550 U.S. at 421, 127 S.Ct. 1727, and the obviousness inquiry must take account of the "routine steps" that a person of ordinary skill in the art would employ, *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.,* 555 F.3d 984, 993 (Fed.Cir.2009); *see Soverain Software LLC v. Newegg Inc.,* 705 F.3d 1333, 1344, *amended on reh'g,* 728 F.3d 1332 (Fed.Cir.2013) (concluding that claims directed to an online shopping system were invalid as obvious given that the patentee "did not invent the Internet, or hypertext, or the URL" and using hypertext to communicate transaction information was no more than "a routine incorporation of Internet technology into existing processes"). Because the query was readily available and closely correlated to the overall relevance of search results—and the prior art unequivocally disclosed hybrid content-based/collaborative filtering—retaining the query for use in filtering combined content and collaborative data was "entirely predictable and grounded in common sense." *Ball Aerosol,* 555 F.3d at 993; *see* **\*990** *W. Union Co. v. MoneyGram Payment Sys., Inc.,* 626 F.3d 1361, 1372 (Fed.Cir.2010) (concluding that the asserted dependent claims, which "add[ed] only trivial improvements that would have been a matter of common sense to one of ordinary skill in the art," were obvious as a matter of law); *Perfect Web,* 587 F.3d at 1331 (concluding that a claimed method for sending e-mails was obvious because "simple logic suggests that sending messages to new addresses is more likely to produce successful deliveries than re-sending messages to addresses that have already failed"); *Muniauction, Inc. v. Thomson Corp.,* 532 F.3d 1318, 1326–27 (Fed.Cir.2008) (concluding that claims which added a web browser to a prior art electronic system were obvious as a matter of law). While our conclusion that the asserted claims are invalid as obvious is grounded on the determination that the prior art, most notably Culliss, disclosed use of the search query when filtering combined content-based and collaborative data, the common sense of a skilled artisan would likewise have suggested retaining the query for use in the filtering process.

> FN7. The parties stipulated that, for purposes of both the '420 and ' 664 patents, a person of ordinary skill in the art was "an individual with a bachelor's degree in computer science with at least [two] years of experience." J.A. 39.

### III. The Jury's Findings

I/P Engine points to the fact that the jury found that there were differences between the prior art and the claimed invention, *see* J.A. 4170–72, and argues that on appeal "the only question is whether substantial evidence supports the jury's findings." Br. of Plaintiff–Cross Appellant at 40. There are a number of reasons why we do not find this reasoning persuasive. First, not all of the jury's findings support non-obviousness. To the contrary, the jury found that the invention claimed in the '664 patent had been "independent[ly] invent[ed] ... by others before or at about the same time as the named inventor thought of it." J.A. 4172. As we have previously made clear, near-simultaneous development of a claimed invention by others can, under certain circumstances, demonstrate obviousness. *See Geo. M. Martin,* 618 F.3d at 1305 ("Independently made, simultaneous inventions, made within a comparatively short space of time, are persuasive evidence that the claimed apparatus was the product only of ordinary mechanical or engineering skill." (citations and internal quotation marks omitted)). Thus, as the Google Defendants correctly note, the jury's findings are a "mixed bag" on the obvious-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

ness question. Br. of Defendants–Appellants at 40.

Second, some of the jury's findings appear internally inconsistent. In making their arguments on obviousness, neither I/P Engine nor the Google Defendants drew any distinction between the '420 patent and the '664 patent. Indeed, counsel for I/P Engine referred to the asserted patents simply as the "Lang and Kosak invention" when discussing differences between the prior art and the asserted claims. J.A. 3730. The jury found, however, that the invention claimed in the '664 patent had been independently invented by others, whereas the invention claimed in the '420 patent had not. J.A. 4171–72. Likewise, while the jury found that there had been unsuccessful attempts by others to develop the invention claimed in the '420 patent, it determined that there were no such attempts with respect to the invention disclosed in the '664 patent. J.A. 4170, 4172.

Finally, and most importantly, while the jury made underlying determinations as to the differences between the asserted claims and the prior art, it did not address the ultimate legal conclusion as to obviousness. Thus, while the jury found that the prior art did not disclose all of the elements of the asserted claims, J.A. 4170–71, it never determined whether it would have been obvious to one skilled in the art to bridge any differences between the prior **\*991** art and the claimed invention. *See Bos. Scientific Scimed, Inc. v. Cordis Corp.,* 554 F.3d 982, 990 (Fed.Cir.2009) ("When we consider that, even in light of a jury's findings of fact, the references demonstrate an invention to have been obvious, we may reverse its obviousness determination."); *see also Soverain,* 705 F.3d at 1337 (emphasizing that "the question of obviousness as a matter of law receives *de novo* determination on appeal"); *Jeffries v. Harleston,* 52 F.3d 9, 14 (2d Cir.1995) (concluding that "hopelessly irreconcilable" jury findings did not require a retrial because "elementary principles" of law compelled one result).

IV. Objective Indicia of Non–Obviousness

"This court has consistently pronounced that all evidence pertaining to the objective indicia of nonobviousness must be considered before reaching an obviousness conclusion." *Plantronics, Inc. v. Aliph, Inc.,* 724 F.3d 1343, 1355 (Fed.Cir.2013). Here, however, I/P Engine introduced scant evidence on secondary considerations. *See Allergan, Inc. v. Sandoz Inc.,* 726 F.3d 1286, 1293 (Fed.Cir.2013) (concluding that secondary considerations did "not weigh heavily in the obviousness analysis"). Indeed, the district court did not even cite to the jury's findings on secondary considerations when it concluded that the asserted claims were not invalid for obviousness. *See Non–Obviousness Order,* 2012 U.S. Dist. LEXIS 166555, at *7–9.

We find no merit in I/P Engine's argument that the commercial success of Google's accused advertising systems provides objective evidence of nonobviousness. "Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success." *Ormco Corp. v. Align Tech., Inc.,* 463 F.3d 1299, 1311–12 (Fed.Cir.2006) . At trial, however, I/P Engine never established a nexus between the success of Google's accused systems and the patented invention.[FN8] Indeed, I/P Engine's damages expert agreed that the accused technology encompassed numerous features not covered by the asserted patents, and acknowledged that he had not evaluated the issue of whether the patented technology drove consumer demand for Google's advertising platform. J.A. 2772–73.

> FN8. Nor did I/P Engine present evidence that any owner of the asserted patents had ever used the claimed system commercially. *See Soverain,* 705 F.3d at 1346 (finding no commercial success where the claimed electronic commerce system "was abandoned by its developers and almost all of its original users").

Under certain circumstances, the "copying" of an invention by a competitor may constitute evid-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ence that an invention is not obvious. *See Iron Grip Barbell Co., Inc. v. USA Sports, Inc.,* 392 F.3d 1317, 1325 (Fed.Cir.2004); *Vandenberg v. Dairy Equip. Co.,* 740 F.2d 1560, 1567 (Fed.Cir.1984). Contrary to I/P Engine's assertions, however, the fact that one of Google's patents cited to the '420 patent does not establish that Google copied the invention disclosed in that patent. Nor is the fact that Google did not provide evidence at trial as to how it developed its accused advertising system sufficient to establish that it copied the claimed invention. *See Wyers v. Master Lock Co.,* 616 F.3d 1231, 1246 (Fed.Cir.2010) ("Our case law holds that copying requires evidence of efforts to replicate a specific product, which may be demonstrated through internal company documents, direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a replica, or **\*992** access to the patented product combined with substantial similarity to the patented product.").

The jury found "[a]cceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention." J.A. 4171–72. Carbonell acknowledged, however, that although he had been in the "search industry" for thirty years he was unaware of any "praise" that I/P Engine's purported invention had received. J.A. 3788. Likewise, although the jury found "unexpected and superior results from the claimed invention," J.A. 4171–72, there was no evidence, other than conclusory testimony from Carbonell, *see* J.A. 3691–92, 3740, that the results of the patented system were unexpected. *See Skin-Medica, Inc. v. Histogen Inc.,* 727 F.3d 1187, 1210 (Fed.Cir.2013) (emphasizing that expert opinions that "are conclusory and incomplete" have little evidentiary value). Accordingly, secondary considerations cannot overcome the strong prima facie case of obviousness.[FN9] *See Leapfrog,* 485 F.3d at 1162.

> FN9. Because we conclude that the asserted claims are obvious as a matter of law,

we need not reach issues related to infringement and damages.

CONCLUSION

Accordingly, the judgment of the United States District Court for the Eastern District of Virginia is reversed.

**REVERSED**

Opinion for the court filed PER CURIAM. Concurring.

Opinion filed by Circuit Judge MAYER. Dissenting.

Opinion filed by Circuit Judge CHEN.

MAYER, Circuit Judge, concurring.

The Supreme Court in *Alice Corporation v. CLS Bank International,* 573 U.S. ——, 134 S.Ct. 2347, 2359, 189 L.Ed.2d 296 (2014), for all intents and purposes, recited a "technological arts" test for patent eligibility. Because the claims asserted by I/P Engine, Inc. ("I/P Engine") disclose no new technology, but instead simply recite the use of a generic computer to implement a well-known and widely-practiced technique for organizing information, they fall outside the ambit of 35 U.S.C. § 101. And if this determination had been made in the first instance as directed by the Supreme Court, unnecessary litigation, and nearly two weeks of trial and imposition on citizen jurors, could have been avoided.

I.

"[T]he patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time." *Pfaff v. Wells Elecs., Inc.,* 525 U.S. 55, 63, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). A patentee does not uphold his end of this bargain if he seeks broad monopoly rights over a fundamental concept or basic idea without a concomitant contribution to the existing body of scientific and technological knowledge. *Alice* thus made clear that abstract ideas untethered to any significant advance in science and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

technology are ineligible for patent protection, concluding that a computer-implemented system for mitigating settlement risk fell outside section 101 because it did not "improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field." 134 S.Ct. at 2359; *see also id.* at 2358 (explaining that the claims in **\*993**_Diamond v. Diehr,_ 450 U.S. 175, 177–79, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) (" *Diehr* "), were patent eligible because they disclosed an "improve[ment]" to a "technological process").

Application of the technological arts test [FN1] for patent eligibility requires consideration of whether the claimed "inventive concept," *Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* —— U.S. ——, 132 S.Ct. 1289, 1294, 182 L.Ed.2d 321 (2012), is an application of scientific principles or natural laws. *See In re Bilski,* 545 F.3d 943, 1010 (Fed.Cir.2008) (en banc) (Mayer, J., dissenting), *aff'd on other grounds sub nom. Bilski v. Kappos,* 561 U.S. 593, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010) ("[A] process is non-technological where its inventive concept is the application of principles drawn not from the natural sciences but from disciplines such as business, law, sociology, or psychology."). Importantly, claims do not meet the demands of section 101 simply because they recite the use of computers or other technology. Instead, the inventive concept *itself* must be new technology, a novel application of scientific principles and natural laws to solve problems once thought intractable. *See id.* at 1002 ("Although business method applications may use technology—such as computers—to accomplish desired results, the innovative aspect of the claimed method is an entrepreneurial rather than a technological one."). The claims at issue in Alice may well have described a useful and innovative method of doing business,[FN2] but because they did not disclose any significant advance in science or technology, they fell outside section 101. *See* 134 S.Ct. at 2359 (noting that the claimed method simply "require[d] a generic computer to perform generic computer functions").

FN1. One of our predecessor courts likewise applied a technological arts test for patent eligibility. It recognized that patentable processes must "be in the technological arts so as to be in consonance with the Constitutional purpose to promote the progress of 'useful arts.' " *In re Musgrave,* 431 F.2d 882, 893 (CCPA 1970) (quoting U.S. Const. art. I, § 8, cl. 8).

FN2. In *Alice,* the Supreme Court concluded that the concept of intermediated settlement was a patent-ineligible abstract idea. 134 S.Ct. at 2355–57. But whether the "concept" of intermediated settlement is an abstract idea is a wholly different question from whether the claimed invention provided a useful and innovative application of that concept. Significantly, in determining whether the asserted claims disclosed an inventive concept sufficient to make the claimed abstract idea patent eligible, the Court looked solely at the technology—asking only whether the recited computer elements were "well-understood, routine, [and] conventional." *Id.* at 2359 (citations and internal quotation marks omitted). The issue of whether the claimed intermediated settlement technique represented an innovative method for improving commercial transactions was not addressed because advances in non-technological disciplines, such as business, are irrelevant for purposes of the section 101 inquiry.

Section 101 mandates not only that claims disclose an advance in science or technology—as opposed to an innovation in a non-technological discipline such as business, law, sports, sociology, or psychology—but also that this advance be both significant and well-defined. *Id.* at 2360 ("[T]he claims at issue amount to nothing *significantly more* than an instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer." (citations and internal quotation

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

marks omitted) (emphasis added)); *see also Mayo,* 132 S.Ct. at 1297 ("The question before us is whether the claims do *significantly more* than simply describe" a law of nature. (emphasis added)). Of course, if claims are drawn to the application of principles outside of the scientific realm—such as principles related to commercial or social interaction—no amount of specificity can save them from patent ineligibility. In *Bilski,* for example, a method **994** was rejected under section 101 notwithstanding the fact that it described a very specific method of using historical weather-related data to hedge against price increases. 130 S.Ct. at 3223–24; *see Parker v. Flook,* 437 U.S. 584, 593, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978) (" *Flook* ") (rejecting the argument "that if a process application implements a principle in some specific fashion, it automatically falls within the patentable subject matter of § 101 "). Meaningful, well-defined limits on the application of a principle or idea are thus a necessary, but not a sufficient, prerequisite for patent eligibility. Requiring carefully circumscribed bounds on the application of scientific principles and natural laws serves to ensure that "the basic tools of scientific and technological work," *Gottschalk v. Benson,* 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273, (1972), remain "free to all men and reserved exclusively to none," *Funk Bros. Seed Co. v. Kalo Inoculant Co.,* 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948); *see Mayo,* 132 S.Ct. at 1293.[FN3]

> [FN3.] There is, of course, some "overlap" between the eligibility analysis under section 101 and the obviousness inquiry under 35 U.S.C. § 103. *Mayo,* 132 S.Ct. at 1304. Section 103, however, asks the narrow question of whether particular claims are obvious in view of the prior art. By contrast, the section 101 inquiry is broader and more essential: it asks whether the claimed subject matter, stripped of any conventional elements, is "the kind of 'discover[y]' " that the patent laws were intended to protect. *Flook,* 437 U.S. at 593, 98 S.Ct. 2522.

In the more difficult cases—where it is uncertain whether claims are sufficiently "technological" to warrant patent protection—subject matter eligibility will often turn on whether the claims describe a narrow inventive application of a scientific principle, or instead simply recite steps that are necessarily part of the principle itself. *See Mayo,* 132 S.Ct. at 1297 (explaining that a process reciting a law of nature is not patent eligible unless it "has additional features that provide practical assurance that the process is more than a drafting effort designed to monopolize the law of nature itself"). In *Mayo,* for example, claims were rejected, in part, because they were "overly broad," *id.* at 1301, and did "not confine their reach to particular applications," *id.* at 1302. The need for specificity sufficient to cabin the scope of an invention is particularly acute in the software arena, where claims tend to be exceedingly broad, development proceeds at breakneck speed, and innovation often occurs despite the availability of patent protection rather than because of it.

Finally, and most importantly, the technological arts test recognizes that there has to be some rough correlation between "the give and the get"—applicants who make little, if any, substantive contribution to the existing body of scientific and technological knowledge should not be afforded broad monopoly rights that potentially stifle future research and development. In assessing patent eligibility, "the underlying functional concern ... is a *relative* one: how much future innovation is foreclosed relative to the contribution of the inventor." *Mayo,* 132 S.Ct. at 1303. At its core, section 101 prohibits claims which are "overly broad," *id.* at 1301, in proportion to the technological dividends they yield.

## II.

I/P Engine's claimed invention, which describes a system which filters information for relevance to a user's query using combined content and collaborative data, *see* U.S. Patent No. 6,314,420 col.28 ll.1–15; U.S. Patent No. 6,775,664 col.27

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ll.27–37, does not pass muster under section 101. **\*995** The asserted claims do not meet subject matter eligibility requirements because they do not "improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field." *Alice,* 134 S.Ct. at 2359. To the contrary, the use of search engines was well-established and the clear advantages of combining content-based and collaborative filtering were widely recognized at the time of the claimed invention. *See ante* at 986–87.

The asserted claims simply describe the well-known and widely-applied concept that it is often helpful to have both content-based and collaborative information about a specific area of interest. FN4 A person planning to visit London, for example, might consult a guidebook that would provide information about particular museums in London (content data) as well as information about what other people thought of these museums (collaborative data). *See* J.A. 4255–56.

> FN4. In its appeal brief, I/P Engine notes that the shared specification of the asserted patents describes "a variety of ways in which content and collaborative feedback data can be combined," including through the use of a "complex neural network function." Br. of Plaintiff–Cross Appellant at 10. As we recently made clear, however, "the important inquiry for a § 101 analysis is to look to the claim[s]." *Accenture Global Servs., GmbH v. Guidewire Software, Inc.,* 728 F.3d 1336, 1345 (Fed.Cir.2013). Accordingly, "the complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method." *Id.*

I/P Engine's claimed system is merely an Internet iteration of the basic concept of combining content and collaborative data, relying for implementation on "a generic computer to perform generic computer functions." *Alice,* 134 S.Ct. at 2359; *see*

*also id.* (explaining that using a computer to obtain data is "well-understood" and "routine" (citations and internal quotation marks omitted)); *Cyber-Source Corp. v. Retail Decisions, Inc.,* 654 F.3d 1366, 1370 (Fed.Cir.2011) (concluding that a claim which disclosed the "mere collection and organization of data regarding credit card numbers and Internet addresses" was patent ineligible).

Moreover, the scope of the claimed invention is staggering, potentially covering a significant portion of all online advertising. I/P Engine's asserted claims fall outside section 101 because their broad and sweeping reach is vastly disproportionate to their minimal technological disclosure.

### III.

The Supreme Court has dictated that the subject matter eligibility analysis must precede the obviousness inquiry. *Flook,* 437 U.S. at 593, 98 S.Ct. 2522 ("The obligation to determine what type of discovery is sought to be patented" so as to determine whether it falls within the ambit of section 101 "must precede the determination of whether that discovery is, in fact, new or obvious."); *Bilski,* 130 S.Ct. at 3225 (explaining that the issue of whether claims are directed to statutory subject matter is "a threshold test"); *see also In re Comiskey,* 554 F.3d 967, 973 (Fed.Cir.2009) ("Only if the requirements of § 101 are satisfied is the inventor allowed to pass through to the other requirements for patentability, such as novelty under § 102 and ... non-obviousness under § 103." (citations and internal quotation marks omitted)). To fail to address at the very outset whether claims meet the strictures of section 101 is to put the cart before the horse. Until it is determined that claimed subject matter is even *eligible* for patent protection, a court has no warrant to consider subordinate validity issues such as non-obviousness under 35 U.S.C. § 103 or adequate **\*996** written description under 35 U.S.C. § 112.

From a practical perspective, there are clear advantages to addressing section 101's requirements at the outset of litigation. Patent eligibility issues can often be resolved without lengthy claim con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

struction, and an early determination that the subject matter of asserted claims is patent ineligible can spare both litigants and courts years of needless litigation. To the extent that certain classes of claims—such as claims on methods of doing business—are deemed presumptively patent ineligible, moreover, the United States Patent and Trademark Office will have more resources to devote to expeditiously processing applications which disclose truly important advances in science and technology.

Even more fundamentally, the power to issue patents is not unbounded. To the contrary, the constitutional grant of authority "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries," U.S. Const. art. I, § 8, cl. 8, "is both a grant of power and a limitation," *Graham v. John Deere Co.,* 383 U.S. 1, 5, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *see Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 146, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). Section 101's vital role—a role that sections 103 and 112 "are not equipped" to take on, *Mayo,* 132 S.Ct. at 1304—is to insure that patent protection promotes, rather than impedes, scientific progress and technological innovation. A robust application of section 101 ensures that the nation's patent laws remain tethered to their constitutional moorings.

CHEN, Circuit Judge, dissenting.

After a twelve-day trial during which both sides presented evidence about the teachings of the prior art, the jury made detailed factual findings pertaining to the obviousness of the '420 and '664 patents. The jury found, among other findings, that elements of the asserted claims were not present in the prior art. Based on the jury's findings, the district court determined that the Defendants had failed to prove by clear and convincing evidence that the asserted claims were obvious. In reversing the district court's judgment, the majority finds that the prior art discloses a key claim limitation that the jury found was missing, and also concludes that

district court erred in failing to use "common sense" to bridge the differences between the prior art and the claims. In my view, the majority fails to accord sufficient deference to the jury's findings of fact. Moreover, I find that the majority's use of common sense to bridge the gap between the prior art and the claims is unsupported by sufficient evidence and reasoning. I respectfully dissent.

At the outset, it is worth noting that obviousness is a mixed question of law and fact. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.,* 688 F.3d 1342, 1356 (Fed.Cir.2012). Although we must examine the legal conclusion of obviousness de novo, we should tread lightly when reviewing a legal conclusion—reached by a trial court—that rests upon a jury's findings of fact. *See Polaroid Corp. v. Eastman Kodak Co.,* 789 F.2d 1556, 1558 (Fed.Cir.1986) ("Though it is well settled that the ultimate conclusion on obviousness is ... a legal conclusion, that does not mean ... that we may proceed on a paper record as though no trial had taken place. This court reviews judgments. Because we do not retry the case, [the appellant] must to prevail convince us that the judgment cannot stand on the record created at trial...."); *cf. Haebe v. DOJ,* 288 F.3d 1288, 1299 (Fed.Cir.2002) ( "[G]reat deference must be granted to the **\*997** trier of fact who has had the opportunity to observe the demeanor of the witnesses, whereas the reviewing body looks only at cold records.") (internal quotation marks omitted). Where a jury's findings concerning the prior art are supported by substantial evidence, and where a trial court makes its obviousness determination based on those findings, I would exercise caution in wielding our own common sense as part of our review of the judgment.

The asserted claims in this case are based, in part, on filtering techniques used in two types of information systems found in the prior art: content-based systems and profile-based (or "collaborative") systems. Content-based systems filtered search results for relevance to a user's query, as reflected in "conventional search en-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

gines." *See* Majority Op. at 987 (quoting ' 420 patent col.2 ll.15–18). Collaborative systems, meanwhile, filtered information for relevance based on "the user's long-term information desires or preferences," and incorporated the information preferences of similar users. J.A. 3690.

As the majority explains, the prior art suggested that content-based and collaborative filtering could be combined. *See* Majority Op. at 986–87. The majority identifies prior art systems that passed content-based results (which were returned based on the user's query) over to a distinct collaborative filter. The query in these systems was used only to obtain the initial results; it played no role in subsequent filtering on the collaborative side. The asserted claims, however, require using the query itself—not just the results returned by the query—on the collaborative side, thus combining content-based and collaborative filtering. *See* '420 patent, col.28 ll.1–15; '664 patent, col.27 ll.27–37.

At trial, experts for both sides testified about whether a person of skill in the art would have found it obvious to supply the key claim limitation missing from the prior art—the use of the query as part of a combined content-based and collaborative filter. I/P Engine's expert testified that a person of skill in the art in 1998 would not have "appreciated the advantages of tight integration" of search systems and profile systems, particularly with regard to the "relevance to the query." J.A. 3739. In response, the Defendants' expert testified that the prior art did "feature a tight integration between the search system and the content collaborative system ... [b]ecause ... it would have been obvious to one of ordinary skill in the art that if you are filtering search results, it's obvious to keep around the query and use that also for filtering." *Id.* at 3172–73.

With respect to both patents, the jury found that the prior art "did not disclose a tightly integrated search system, and could not filter information relevant to the query." J.A. 4170, 4172. The majority downplays the significance of the jury's findings, explaining that the jury "never determined

whether it would have been obvious to one skilled in the art to bridge any differences between the prior art and the claimed invention." Majority Op. at 990–91. Without such a determination, the majority suggests, we must resort to "common sense" to address the question left unanswered by the jury-that is, whether it would have been obvious to one of skill in the art to use the search query as part of the filtering of collaborative data.[FN1]

> FN1. The majority also concludes that this claim limitation is taught by the Culliss patent because that reference "squarely discloses using combined content and collaborative data in analyzing items for relevance to a query." Majority Op. at 987–88. But the majority's conclusion squarely conflicts with the jury's express finding that Culliss "lack[s] any content analysis and filtering for relevance to the query." J.A. 4170. Based on the record, I would defer to the jury's fact finding. In the face of conflicting testimony about what Culliss disclosed, the jury was free to credit the opinion of I/P Engine's expert. *See Power–One, Inc. v. Artesyn Technologies, Inc.,* 599 F.3d 1343, 1351 (Fed.Cir.2010) (explaining that the jury was free to either credit or disbelieve expert testimony about "the differences between the prior art and the invention claimed").

**\*998** We have explained that "the mere recitation of the words 'common sense' without any support adds nothing to the obviousness equation. Thus, we have required that obviousness findings grounded in 'common sense' must contain explicit and clear reasoning providing some rational underpinning why common sense compels a finding of obviousness." *Plantronics, Inc. v. Aliph, Inc.,* 724 F.3d 1343, 1354 (Fed.Cir.2013) (internal citations omitted). As the Supreme Court emphasized, "it can be important to identify a reason that would have prompted a person of ordinary skill in the rel-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

evant field to combine the elements in the way the claimed new invention does ... because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 418, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007). We may not find a patent invalid for obviousness on the basis of "mere conclusory statements." *In re Kahn,* 441 F.3d 977, 988 (Fed.Cir.2006).

Here, in support of its finding of a "strong prima facie case of obviousness," the majority concludes that "retaining the query for use in filtering combined content and collaborative data was entirely predictable and grounded in common sense." Majority Op. at 989, 992 (internal quotations omitted).[FN2] The use of the query is a matter of common sense, the majority explains, "[b]ecause the query was readily available and closely correlated to the overall relevance of search results." *Id.* at 989. In support of its suggestion that one of skill in the art would find it obvious to use the readily available query, the majority cites the testimony of the Defendants' expert:

> FN2. The majority also takes issue with the jury's findings on secondary considerations, noting that two of the findings with respect to the '420 patent and the '664 patent "appear internally inconsistent." Majority Op. at 990. The majority generally characterizes the findings on secondary considerations as a "mixed bag." *Id.* Even assuming, however, that the jury's secondary consideration findings are as muddled as the majority describes, they are relevant only insofar as the majority is correct that its invocation of "common sense" may support a prima facie case of obviousness that must be overcome. *See Dow Chemical Co. v. Halliburton Oil Well Cementing Co.,* 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973 (1945) ("[Secondary] considera-

tions are relevant only in a close case where all other proof leaves the question of invention in doubt.").

> As [the Defendants' expert] explained, the query would be just "sitting there" with the results of a search, and it would have been obvious to one skilled in the art to "keep around the query and use that also for filtering."
> *Id.* (citing J.A. 3173).

I find this testimony inadequate to support the majority's conclusion. The expert's "sitting there" explanation tells us nothing about whether one of skill in the art in 1998 would have been struck by common sense to modify collaborative filtering systems so as to incorporate search queries. All prior art references are "just sitting there" in the metaphorical sense. What is needed—and what is missing from the cited testimony—is some explanation of why one would use the query as the asserted claims do. *See* **\*999**_Innogenetics, N.V. v. Abbott Labs.,_ 512 F.3d 1363, 1374 (Fed.Cir.2008) ("[S]ome kind of motivation must be shown from some source, so that the jury can understand why a person of ordinary skill would have thought of either combining two or more references or modifying one to achieve the patented method." (internal citations omitted)). Such evidence or reasoning is lacking here. The testimony of the Defendants' expert amounts to a "mere conclusory statement" that may not serve as a basis for finding the asserted claims obvious. *See In re Kahn,* 441 F.3d at 988; *see also InTouch Techs., Inc. v. VGO Commc'ns, Inc.,* 751 F.3d 1327, 1352 (Fed.Cir.2014) (holding that expert's testimony could not support a finding of obviousness where "testimony primarily consisted of conclusory references to [the expert's] belief that one of ordinary skill in the art *could* combine these references, not that they *would* have been motivated to do so").

As for the majority's observation that the query is "closely correlated to the overall relevance of search results," no one disputes that the prior art taught that a query was relevant to a user's content-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

based search. What is disputed is whether the prior art taught the query's "overall relevance" to collaborative filtering. *See* J.A. 3172–73, 3739. To bridge the gap, we must identify a non-circular reason that would have prompted a person of skill in the art to appreciate the relevance of the query to collaborative data. *See KSR,* 550 U.S. at 418, 127 S.Ct. 1727.

The gap in the prior art references here is unlike gaps we have encountered in other cases—cited by the majority—where we have found patents obvious for merely adding "the Internet" or "a web browser" to a well-known prior art reference. *See* Majority Op. at 989–90 (citing *Soverain Software LLC v. Newegg Inc.,* 705 F.3d 1333, 1344, *amended on reh'g* (Fed.Cir.2013); *Muniauction, Inc. v. Thomson Corp.,* 532 F.3d 1318 (Fed.Cir.2008)). In those cases, we observed that skilled artisans had already performed the same type of combination with similar elements. *See Soverain,* 705 F.3d at 1344 (finding that the use of use of hypertext to perform the known process of transmitting documents "was a routine incorporation of Internet technology into existing processes"); *Muniauction,* 532 F.3d at 1326–27 (concluding that "[t]he record in this case demonstrates that adapting existing electronic processes to incorporate modern internet and web browser technology was similarly commonplace at the time the '099 patent application was filed").

In this case, the majority does not identify analogous "routine" combinations that would render obvious the patents' incorporation of the search query into a collaborative filtering system. The asserted patents did not merely combine information technology with "the Internet." Rather, the patents combined elements from two known information filtering systems. The patents took the query data (input for a content system) and mixed it with collaborative data (input for a profile-based system). What was claimed was the combination of elements of two evolving systems in the field of information science, not a combination of a known process and a web browser.

Nor is this case like *Perfect Web Technologies, Inc. v. InfoUSA, Inc.,* 587 F.3d 1324 (Fed.Cir.2009), where we affirmed a district court's conclusion that a patent was obvious as a matter of common sense. In *Perfect Web,* the asserted patent claimed a four-step method for distributing bulk emails. It was undisputed that the first three steps of the method were disclosed in the prior art. *Id.* at 1330. The fourth step—which was not present in the prior art—recited repeating the first three steps over and over until all the emails were delivered. As we described the **\*1000** method, it "simply recites repetition of a known procedure until success is achieved." *Id.* Moreover, we found that the "relevant art required only a high school education and limited marketing and computer experience," and that no expert opinion was required to appreciate the value of repeating the three steps. *Id.*

In affirming the district court's conclusion that the patented method was obvious, we observed that "simple logic suggests that sending messages to new addresses is more likely to produce successful deliveries than resending messages to addresses that have already failed." *Id.* at 1331. To put it another way, one of skill in the art would have been motivated to add the fourth step because it would increase success—more recipients would receive email messages. We identified a benefit that would have been readily apparent to one of skill in the art at the time of the invention.

Here, by contrast, the record does not suggest a benefit or rationale that would have caused a skilled artisan to use the query as part of collaborative filtering in 1998. Although we know that the query was "sitting there," we do not know why one of skill in the art would have thought that mixing the query with the collaborative filter would produce, to use the language of *Perfect Web,* "successful" filtering. We need something beyond the invocation of the phrase "common sense" or "simple logic" to demonstrate the reason to combine the prior art references in this case. *See KSR,* 550 U.S. at 418, 127 S.Ct. 1727; *Innogenetics,* 512 F.3d at 1374.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 Fed.Appx. 982
**(Cite as: 576 Fed.Appx. 982)**

    For these reasons, I respectfully dissent from the majority's holding that the asserted claims of the '420 and '664 patents are invalid for obviousness.

C.A.Fed. (Va.),2014.
I/P Engine, Inc. v. AOL Inc.
576 Fed.Appx. 982

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

595 Fed.Appx. 996
**(Cite as: 595 Fed.Appx. 996)**

H

This case was not selected for publication in West's
Federal Reporter.

See Fed. Rule of Appellate Procedure 32.1 gener-
ally governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of App.
Fed. Cir. Rule 32.1.

United States Court of Appeals,
Federal Circuit.
FUZZYSHARP TECHNOLOGIES INCORPOR-
ATED, Plaintiff–Appellant
v.
INTEL CORPORATION, Defendant–Appellee.

No. 2014–1261.
March 9, 2015.

Appeal from the United States District Court for the
Northern District of California in No.
4:12–cv–04413–YGR, Judge Yvonne Gonzalez Ro-
gers.
**\*997** David Fink, Fink & Johnson, Houston, TX,
argued for plaintiff-appellant.

Dan L. Bagatell, Perkins Coie LLP, Phoenix, AZ
argued for defendant-appellee. Also represented by
James F. Valentine, Kenneth J. Halpern, Palo Alto,
CA; Christina Jordan McCullough, Seattle, WA.

LOURIE, MOORE, and REYNA, Circuit Judges.

**JUDGMENT**
PER CURIAM.
    THIS CAUSE having been heard and con-
sidered, it is

    ORDERED and ADJUDGED:

    **AFFIRMED.** *See* Fed. Cir. R. 36.

C.A.Fed. (Cal.),2015.
Fuzzysharp Technologies Inc. v. Intel Corp.

595 Fed.Appx. 996

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

## CERTIFICATE OF SERVICE

I certify that today, August 10, 2015, I electronically filed the foregoing Joint Appendix with the Clerk of the Court for the U.S. Court of Appeals for the Federal Circuit using the appellate CM/ECF system.  Counsel of record for all parties will be served by the appellate CM/ECF system.


August 10, 2015                    /s/ Jeffrey A. Lamken