No. 2010-1544

In the
United States Court of Appeals
for the Federal Circuit

---

ULTRAMERCIAL, INC. AND ULTRAMERCIAL, LLC,
*Plaintiffs-Appellants*,

v.

HULU, LLC,
*Defendant*,

AND

WILDTANGENT, INC.,
*Defendant-Appellee*.

---

Appeal from the United States District Court for the Central District of California
in No. 09-CV-6918, Judge R. Gary Klausner

---

## SUPPLEMENTAL BRIEF OF PLAINTIFFS-APPELLANTS

---

Lawrence M. Hadley
  *Principal Attorney*
MCKOOL SMITH HENNIGAN, P.C.
865 South Figueroa St., Suite 2900
Los Angeles, CA  90017
Tel.:  (213) 694-1135
Fax:  (213) 694-1234
lhadley@mckoolsmithhennigan.com

*Counsel for Plaintiffs-Appellants
Ultramercial, Inc., and Ultramercial, LLC*

No. 2010-1544

In the
United States Court of Appeals
for the Federal Circuit

───────────────

ULTRAMERCIAL, INC. AND ULTRAMERCIAL, LLC,
*Plaintiffs-Appellants*,

v.

HULU, LLC,
*Defendant*,

AND

WILDTANGENT, INC.,
*Defendant-Appellee.*

───────────────

Appeal from the United States District Court for the Central District of California
in No. 09-CV-6918, Judge R. Gary Klausner

───────────────

## CERTIFICATE OF INTEREST
───────────────

Counsel for Plaintiffs-Appellants Ultramercial, Inc. and Ultramercial, LLC certifies the following:

1.     The full name of every party or amicus represented by me is:

Ultramercial, LLC and Ultramercial, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the Supreme Court of the United States or the trial court or are expected to appear in this court are:

**MCKOOL SMITH HENNIGAN, P.C. (formerly HENNIGAN, BENNETT & DORMAN LLP):** Lawrence M. Hadley; Hazim Ansari (formerly associated with firm); and Mieke K. Malmberg (formerly associated with firm)

**MCKOOL SMITH, P.C.:** Joel L. Thollander and Daniel L. Geyser

Respectfully submitted.

/s/ *Lawrence M. Hadley*
Lawrence M. Hadley
   *Principal Attorney*
MCKOOL SMITH HENNIGAN, P.C.
865 South Figueroa St., Suite 2900
Los Angeles, CA  90017
Tel.:  (213) 694-1135
Fax:  (213) 694-1234
*lhadley@mckoolsmithhennigan.com*

*Counsel for Plaintiffs-Appellants*
*Ultramercial, Inc., and Ultramercial, LLC*

August 27, 2014

iii

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................3

I.   UNDER ANY FAIR READING, ULTRAMERCIAL'S
     PATENT—INTRODUCING    A    SPECIFIC,
     GROUNDBREAKING METHOD NEVER BEFORE
     USED IN ANY CONTEXT—DOES NOT CLAIM THE
     WHOLLY GENERIC CONCEPT OF "USING
     ADVERTISING AS CURRENCY"................................................3

     A.   The Entirely Predictable Ability To Identify Some
          Idea At The Core Of Every Invention Does Not
          Reduce Every Patent To An Abstract Idea ..........................3

     B.   The Ultramercial Patent Does Not Describe The
          Generic Concept Of "Using Advertising As
          Currency" ............................................................................5

II.  EVEN IF ULTRAMERCIAL'S CLAIMS REFERENCE
     SOME ABSTRACT IDEA, THEY REMAIN PATENT-
     ELIGIBLE BECAUSE THEY EXTEND PAST
     GENERIC COMPUTER IMPLEMENTATION OF
     THAT IDEA .............................................................................8

     A.   Claims Describing Abstract Ideas Can Be Patent-
          Eligible ................................................................................8

     B.   Ultramercial's Claims Do Not Merely Implement
          An Abstract Idea On A Generic Computer ........................10

III. *ALICE* DID NOT FLIP THE RULES OF CIVIL
     PROCEDURE ON THEIR HEAD; THESE CLAIMS
     MUST BE READ IN *ULTRAMERCIAL'S* FAVOR ON
     A MOTION TO DISMISS .......................................................12

CONCLUSION .................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Accenture Global Servs. GmbH v. Guidewire Software, Inc.*,
   728 F.3d 1336 (Fed. Cir. 2013) .........................................................................14

*Alice Corp. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014)................................................................................passim

*Association for Molecular Pathology v. Myriad Genetics*,
   133 S. Ct. 2107 (2013).....................................................................................9

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................13

*Bilski v. Kappos*,
   561 U.S. 593 (2010)................................................................................3, 8, 10

*DealerTrack, Inc. v. Huber*,
   674 F.3d 1315 (Fed. Cir. 2012) ......................................................................14

*Diamond v. Diehr*,
   450 U.S. 175 (1981)........................................................................................9

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)........................................................................................13

*Gottschalk v. Benson*,
   409 U.S. 63 (1972)...........................................................................................4

*Lighting Ballast Control LLC v. Philips Elecs. North Am. Corp.*,
   744 F.3d 1272 (Fed. Cir. 2014) ......................................................................12

*Markman v. Westview Instruments*,
   517 U.S. 370 (1996).................................................................................12, 14

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
   132 S. Ct. 1289 (2012)..............................................................................2, 8, 9

*Parker v. Flook*,
   437 U.S. 584 (1978)...........................................................................................4

# TABLE OF AUTHORITIES
## (continued)

**Cases**                                                                **Page(s)**

*SmartGene, Inc. v. Advanced Biological Labs.*,
   SA, No. 13-1186, 2014 U.S. App. LEXIS 1357 (Fed. Cir. Jan. 24, 2014)
   (Taranto, J.) ......................................................................................................14

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12 ..................................................................................................13

Rule 12(b)(6) ...........................................................................................................7

## INTRODUCTION

This Court has now twice determined that the claims of U.S. Patent No. 7,346,545 are patent-eligible under § 101, and nothing in *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), undermines the correctness of the panel's analysis. Indeed, the Supreme Court's reasoning in *Alice* only confirms the validity of the claimed method. For the third time, the district court's contrary judgment should be reversed.

Ultramercial's patent introduced a paradigm shift in the way companies monetized copyrighted content on a two-way telecommunications network. This method did not exist in *any* capacity before the patented invention; it did not appear in brick-and-mortar stores, and it did not appear online, where all advertising was *passive* in nature (think banner advertisements).

WildTangent now tries to shoehorn the claimed method into the artificial construct of "advertising as currency." But *Alice* explicitly rejected that very methodology of artfully recasting every claim at the highest possible level of generality. On the contrary, for purposes of a § 101 defense, each patent must be carefully examined to identify "fundamental," "conventional," "long prevalent," "basic," "well-known," "long standing," core "building block[s]" of "human ingenuity" that truly "'risk disproportionately tying up the use of the underlying' ideas." 134 S. Ct. at 2359. Yet this patented process was the very *opposite* of

1

"well-understood, routine, [or] conventional" (*id*.), which is exactly why it proved a groundbreaking and successful means of operating commercial websites.

If the '545 patent reflected such "'well-understood, routine, conventional activit[y],'" one would expect to find at least *some* evidence that this "activity" existed before the claimed method was disclosed in the '545 patent. Yet WildTangent cites—nothing. If this "idea" were truly fundamental and conventional, WildTangent would have less trouble identifying prior art that preempts this significant invention. (And WildTangent would not be so reluctant to rely instead on §§ 102 or 103 for its defense.) The novel concepts at issue here are simply nothing like the "abstract" ideas protected in *Alice*.

In the end, *Alice* reinforced the same § 101 standards from *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012), that this Court had previously applied to this very patent. And *Alice*'s guidance merely reaffirms the importance of identifying *true* abstract ideas—rather than identifying some "idea" at the irreducible core of an invention, which is always possible in *any* patent. This panel was correct each time it identified true novelty, unlike the claims in *Alice*, implemented using far more than the artificial notion of "using advertising as currency" (much less trying to coopt a well-known idea or practice by simply saying "apply it" on a computer). WildTangent's contrary view is mistaken, and the district court's judgment should be reversed.

**ARGUMENT**

**I.**    **UNDER ANY FAIR READING, ULTRAMERCIAL'S PATENT— INTRODUCING A SPECIFIC, GROUNDBREAKING METHOD NEVER BEFORE USED IN ANY CONTEXT—DOES NOT CLAIM THE WHOLLY GENERIC CONCEPT OF "USING ADVERTISING AS CURRENCY"**

Under *Alice*, the first step in assessing patent-eligibility asks "whether the claims at issue are directed to a patent-ineligible concept." 134 S. Ct. at 2355. This Court twice performed exactly this step—and each time rejected WildTangent's effort to recast the claims at an artificially high level of generality. As this Court correctly held, Ultramercial's invention does not focus merely on "using advertising as currency," and nothing in *Alice* supports a different conclusion.

**A.**    **The Entirely Predictable Ability To Identify Some Idea At The Core Of Every Invention Does Not Reduce Every Patent To An Abstract Idea**

*Alice* properly limited the concept of "abstractness" to its proper scope, one that preserves the core "building blocks of human ingenuity" without undercutting the entirety of patent law. 134 S. Ct. at 2354 (Because "[a]t some level" every invention invokes "laws of nature, natural phenomena, or abstract ideas," "we tread carefully in construing this exclusionary principle lest it swallow all of patent law"). *Alice* thus explained that abstract ideas target things like "*fundamental economic practice[s] long prevalent* in our system of commerce," *id*. at 2356 (quoting *Bilski v. Kappos*, 561 U.S. 593, 611 (2010) (emphases added)), and basic

3

mathematical algorithms, *id*. at 2355 (citing *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972), and *Parker v. Flook*, 437 U.S. 584, 594-95 (1978)).[1]  *Alice* found it necessary to exclude from § 101 those kinds of "'well-understood, routine, conventional activities'" to avoid "'disproportionately tying up the use of the underlying' ideas.'"  *Id.* at 2354-55, 2359.  But *Alice* offered no indication that *every* idea—including novel, groundbreaking innovations—were automatically included within § 101's exceptions so long as an accused infringer could somehow reduce the claimed invention to some form of abstract concept.

Notwithstanding this guidance, WildTangent effectively argues that § 101 forbids any invention that can be artfully distilled to some generic expression of conventional activity.  WildTangent accordingly premises its § 101 defense on the *ipse dixit* that apparently any process involving advertising automatically captures the fundamental concept of using "advertising as currency."  Yet that very theory was directly rejected in *Alice*: "we tread carefully in construing this exclusionary principle lest it swallow all of patent law," as "[a]t some level, 'all inventions…embody, use, reflect, rest upon, or apply laws of nature, natural

---

[1] In a recent Memorandum to the Patent Examining Corps on the *Alice* decision, the Patent Office adopted a similar understanding of abstract ideas.  *See* http://www.uspto.gov/patents/announce/alice_pec_25jun2014.pdf (listing as examples of abstract ideas (1) fundamental economic practices, (2) certain methods of organizing human activities, (3) a raw idea by itself, and (4) mathematical relationships/formulas).

phenomena, or abstract ideas.'" 134 S. Ct. at 2354. WildTangent's sweeping view of abstractness, for purposes of § 101, violates this principle. It would threaten scores of patents essential to a multitude of corporations across multiple industries, and, contrary to Congress's intent, it would undermine true inventiveness. *Alice* does not support this cramped view of § 101.

### B.    The Ultramercial Patent Does Not Describe The Generic Concept Of "Using Advertising As Currency"

If WildTangent wishes to invoke *Alice*, it must identify some truly fundamental, long-standing, well-known concept captured directly by Ultramercial's invention. WildTangent fails that showing.

Unlike traditional advertising, the Ultramercial invention solved specific problems (including copyright piracy) that plagued the digital marketplace. It departed from the "fundamental," "routine," "long prevalent" concept of *passive* advertising, and instead did something entirely new. Ultramercial's invention paired copyrighted content with advertisements on a web server, and "gated" that content to limit accessibility until a user (after making an affirmative election) viewed the advertisement in its entirety, completed any interactive steps, or purchased a product. (A478-81.) This sharply departed from all preexisting practice. Ultramercial's solution for monetizing copyrighted content (while guarding against digital piracy) was *counter*-conventional, and it certainly did not reflect any "age old" idea, whether applied in the brick-and-mortar context or the

online digital world. Indeed, before the '545 patent, *this method did not exist*. Internet advertising previously focused on surrounding content (*e.g.*, banner advertisements). (A478.) The viewer was not required to watch, read, review, or engage any advertisements; the model was entirely passive in nature. It was thus a dramatic shift to hold back an advertisement until it was affirmatively selected by the user; the user's deliberate election required the kind of active involvement (including the possibility of responding to specific prompts) that was the exact opposite of the "fundamental" concepts of advertising—passive messages (often annoying) appearing on a webpage or during the course of a program without anyone's explicit selection or choice.

The patent's novelty was reflected by its success. Once reduced to practice, the patented method was quickly adopted by major advertisers and online publishers. Had it already existed as ordinary, conventional, routine activity, there is every reason to believe it would have been adopted earlier in time. *See Alice*, 134 S. Ct. at 2358-59. Yet WildTangent has yet to identify a *single* piece of prior art or *any* other comparable activity before the patented invention. No one walked into brick-and-mortar stores and "paid" for content by viewing an advertisement— and no one accessed websites and encountered a direct choice between paying with cash or viewing an interactive message.

*Alice* sensibly required a showing that the process was "fundamental," "conventional," "prevalent," "basic," "well-known," "long standing," and a core "building block" of "human ingenuity" to limit § 101's bar to concepts that truly "'risk disproportionately tying up the use of the underlying' ideas." *Id*. at 2354-55. Despite WildTangent's repeated assertion that the '545 patent reflects well-understood, routine, conventional activity previously known to the industry—"advertisements as currency"—WildTangent has never offered any witness or evidence that this "activity" existed online before the '545 patent. WildTangent certainly offered no such evidence before the district court, instead opting to seek dismissal under Rule 12(b)(6). WildTangent's decision to rely on some irreducible core rather than evidence of Ultramercial's actual invention is telling: Ultramercial's patented process was the opposite of "well-understood, routine, [or] conventional" (134 S. Ct. at 2359), which is exactly why it proved a new and successful means of operating commercial websites. The Ultramercial patent simply does not capture the kind of "abstract" ideas the Court identified in *Alice*.

In sum, Ultramercial's novel solution is not the generic concept of "using advertising as currency," and it falls squarely within the scope of a patent-eligible § 101 process under consistent Supreme Court precedent, including the Court's latest decision in *Alice*. If this detailed, pathbreaking invention is nevertheless declared "abstract," it is difficult to see how virtually any "process" patents might

survive under the *Alice* framework—despite the Supreme Court's careful admonishment that such patents, crucial to the national economy, remain worthy of protection. 134 S. Ct. AT 2354; *see also Bilski v. Kappos*, 561 U.S. 593, 130 S. Ct. 3218, 3228-3229 (2010).

## II.    EVEN IF ULTRAMERCIAL'S CLAIMS REFERENCE SOME ABSTRACT IDEA, THEY REMAIN PATENT-ELIGIBLE BECAUSE THEY EXTEND PAST GENERIC COMPUTER IMPLEMENTATION OF THAT IDEA

Under *Alice*'s framework, patent-eligibility under § 101 turns on more than mere abstractness. Even if a claim captures an "abstract" concept, *Alice* still asks whether the claim impermissibly preempts too much of that idea: taking the claim limitations individually and "as an ordered combination," courts must ask whether "'the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294). Here, even if Ultramercial's claims are deemed to describe the abstract concept of "using advertising as currency," those claims are limited significantly beyond that abstract idea by more than eleven meaningful elements—none of which simply implement the concept on a generic computer or existed in combination in the conventional art.

### A.    Claims Describing Abstract Ideas Can Be Patent-Eligible

Even if a claim is directed to an abstract idea (unlike Ultramercial's claims here), that marks the beginning, not the end, of *Alice*'s inquiry. A court still "must

8

examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." 134 S. Ct. at 2357 (quoting *Mayo*, 132 S. Ct. at 1294). The presence of "'additional features'" "ensure[s] 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1297). In this regard, the analysis asks whether the claim wrongly frustrates innovation by preempting the "basic tools of scientific and technological work." *Id.* at 2354 (quoting *Association for Molecular Pathology v. Myriad Genetics*, 133 S. Ct. 2107, 2116 (2013)).

For software and computer-implemented inventions, this means it is not enough to limit a claim describing an abstract idea "by merely requiring generic computer implementation." *Id.* at 2352, 2357-58. Rather, for computer-implemented inventions, *Alice* stressed that patent-eligibility turns on whether the claims describe an improvement to a process beyond merely implementing a conventional process on a generic computer. For example, *Alice* pointed to *Diamond v. Diehr*, 450 U.S. 175, 188 (1981), where the Supreme Court approved claims covering a computer-implemented process for curing rubber because those claims "improved an existing technological process, not because they were implemented on a computer." *Alice*, 134 S. Ct. at 2358.

Computer-implemented business methods should be treated no differently. In *Bilski*, the Supreme Court rejected the notion that a "process" under § 101 "categorically excludes business methods." *Bilski*, 130 S. Ct. at 3228. Indeed, *Bilski* confirmed that "a business method is simply one kind of 'method' that is, at least in some circumstances, eligible for patenting under § 101." *Id.* Thus, applying *Diehr*'s logic to business methods, claims are patent-eligible if they improve an existing business process in a way that involves more than simply migrating an existing business process to a generic computer.

**B.    Ultramercial's Claims Do Not Merely Implement An Abstract Idea On A Generic Computer**

This Court has twice applied these principles in holding that Ultramercial's claims, if they describe an abstract idea at all, in no way preempt that idea. In support, this Court twice confirmed that the invention's eleven separate limitations in each independent claim go far beyond some abstract notion of using advertisements as currency. The '545 patent uses sponsored advertisements (matched to content) to electronically "gate" distribution of online media products protected by intellectual-property rights. A478-A481; *see also* Opening Br. 35-39. As described in the claims, a server sends each individual end-user an interactive page containing very specific items: an explicit offer to purchase content or the choice of activating a prompt to begin an interposed message to obtain the same content; the computer receives the end-user's selection and either completes a

10

credit or debit sale or delivers the interposed advertisement; if the advertisement has any interactive components, the end-user must respond to each query (and the server must receive those responses and confirm full and complete participation); upon completion of the end-user's obligations, the server must provide the end-user with access via a specific webpage to the (typically paid) "gated" content. A481. This novel, specialized process was non-existent in the prior art and swept past any generic concept of "advertising."

Nor is there any support for the notion that the invention could be implemented on any generic, general-purpose computer or web server straight out of the box. Computers and web servers do not come preloaded with copyrighted content or advertising, much less programming routines that block access to copyrighted content until an online user selects a strategically paired advertisement, views it in its entirety, and complies with any interactive requirements. (This perhaps explains why no computers or servers were programmed to accomplish these tasks *before* Ultramerical's patent.) While it is true that persons skilled in the art, armed with the patent's teachings, can write a program to implement the requisite "gating" and related functions (*see, e.g.*, *Alice*, 134 S. Ct. at 2359-60), the ability to write code for some previously unused functionality is not the test for abstractness under *Alice* or any other ordinary § 101 analysis. Indeed, if programming complexity were part of the test for patent-

eligibility, then few (if any) software-implemented inventions could pass muster, and the § 101 analysis would sink into an unprincipled morass of whether programming was sufficiently "inventive" for purposes of patentability.

The '545 patent was novel and contributed something meaningful that did not already exist; its multiple limitations ensured that it preserved (and hardly preempted) any artificial construct of "using advertising as currency." The patent adds significant restrictions that dramatically transform that core idea, and *Alice* nowhere supports automatically brushing those limits aside.

## III. *ALICE* DID NOT FLIP THE RULES OF CIVIL PROCEDURE ON THEIR HEAD; THESE CLAIMS MUST BE READ IN *ULTRAMERCIAL'S* FAVOR ON A MOTION TO DISMISS

WildTangent's contentions are premised on rejecting Ultramercial's reading of the claims and instead accepting WildTangent's attempt to characterize these claims as nothing beyond conventional advertising on a computer. Yet the correct reading of the claims, while ultimately a question of law, still rests on fact-bound considerations. *See Lighting Ballast Control LLC v. Philips Elecs. North Am. Corp.*, 744 F.3d 1272, 1284 (Fed. Cir. 2014). If WildTangent believes it can show the claim's detailed limitations reflect only a commonplace practice pre-dating the invention (despite the widespread use of passive banner advertisements and *no use* of the patented method), the district court, under *Markman v. Westview Instruments*, 517 U.S. 370 (1996), is the proper forum for introducing such

evidence. Nothing in the Patent Act justifies an exception to the generally applicable rules of civil procedure, including the settled notion that allegations at the pleading stage are viewed in favor of the non-movant. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *cf. eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-392 (2006) (refusing to presume departures from ordinary legal principles in cases under the Patent Act).

In its two prior decisions affirming the patent-eligibility of Ultramercial's claims, this Court simply construed the patent in the way its terms plainly permit; it did not accept WildTangent's cramped view of the patent without the benefit of any claim construction or factual record. Because this case arises at the pleading stage, any other reading would violate the rules of civil procedure—and improperly demand a patent-specific exception to Fed. R. Civ. P. 12 found nowhere in the Federal Rules or the Patent Act.[2]

In every round on appeal, WildTangent has refused to engage the § 101 analysis construing the facts, the patent's terms, the prior art, and the invention's revolutionary change in *Ultramercial's* favor. Instead, WildTangent insists that

---

[2] WildTangent has never made any serious effort to confront Ultramercial's assertion that the Federal Circuit's methodology is *exactly* what always happens on a motion to dismiss. In previously reversing the district court, this Court nowhere declared § 101 issues off-limits at the pleading stage; on the contrary, it simply held that defenses based on § 101 are subject to the same rules applicable to any other defenses in any non-patent case—the pleadings must be construed in the non-movant's favor.

this patent is conventional and abstract without evidence that anyone, anywhere, used its specific method online to combat digital piracy, the declining effectiveness of banner ads, or the inability to commercialize protected works before the '545 patent disclosed this invention.  Yet WildTangent's view of the patent was refuted by this Court (both majority and concurrence).  It also has been refuted by three separate panels in subsequent cases—who did not understand this Court's prior *Ultramerical* decisions to endorse patents on abstract ideas once "implemented on a computer."  *See SmartGene, Inc. v. Advanced Biological Labs.*, SA, No. 13-1186, 2014 U.S. App. LEXIS 1357, at *14 (Fed. Cir. Jan. 24, 2014) (Taranto, J.) ("the claims [in *Ultramercial*] involved a recitation of specifics of computer networks beyond what the present case involves"); *Accenture Global Servs. GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) (finding that the claims in *Ultramercial* "contain[ed] 'significantly more than the underlying abstract concept'"); *DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1334 (Fed. Cir. 2012) ("[T]his court found that the [Ultramercial] patent claimed a practical application with concrete steps requiring an extensive computer interface….").  If WildTangent wishes to strike down this invention under § 101 without any discovery (or before any *Markman* hearing), it must at least prove its case without insisting that everyone presume the patent means what WildTangent says.

The fact is that the evidence, once developed, will only confirm the inventive leap promoted by this important innovation.  Under *Alice*, that is precisely the kind of non-routine, non-conventional idea eligible for patent protection under § 101.

## CONCLUSION

For the foregoing reasons, the district court's judgment should (for the third time) be reversed.

Respectfully submitted.

/s/ *Lawrence M. Hadley*
Lawrence M. Hadley
    *Principal Attorney*
MCKOOL SMITH HENNIGAN, P.C.
865 South Figueroa St., Suite 2900
Los Angeles, CA  90017
Tel.:  (213) 694-1135
Fax:  (213) 694-1234
lhadley@mckoolsmithhennigan.com

*Counsel for Plaintiffs-Appellants Ultramercial, Inc., and Ultramercial, LLC*

August 27, 2014

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with this Court's order for supplemental briefing because it does not exceed the 15-page limit imposed by that order.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/ *Lawrence M. Hadley*
Lawrence M. Hadley
   *Principal Attorney*
MCKOOL SMITH HENNIGAN, P.C.
865 South Figueroa St., Suite 2900
Los Angeles, CA 90017
Tel.: (213) 694-1135
Fax: (213) 694-1234
*lhadley@mckoolsmithhennigan.com*

*Counsel for Plaintiffs-Appellants*
*Ultramercial, Inc., and Ultramercial, LLC*

August 27, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2014, an electronic copy of the foregoing Supplemental Brief was filed with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit, using the appellate CM/ECF system.  I further certify that all parties in the case are represented by lead counsel who are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Lawrence M. Hadley*

Lawrence M. Hadley
   *Principal Attorney*
MCKOOL SMITH HENNIGAN, P.C.
865 South Figueroa St., Suite 2900
Los Angeles, CA  90017
Tel.:  (213) 694-1135
Fax:  (213) 694-1234
*lhadley@mckoolsmithhennigan.com*

August 27, 2014