2014-1527

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

CLEARCORRECT OPERATING, LLC, and
CLEARCORRECT PAKISTAN (PRIVATE), LTD.,

*Appellants*,

v.

INTERNATIONAL TRADE COMMISSION,

*Appellee*,

and

ALIGN TECHNOLOGY, INC.,

*Intervenor.*

---

On appeal from the U.S. International Trade Commission
in Investigation No. 337-TA-833

---

## PETITION OF APPELLEE INTERNATIONAL TRADE COMMISSION FOR REHEARING EN BANC

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061

WAYNE W. HERRINGTON
Assistant General Counsel
Telephone (202) 205-3090

SIDNEY A. ROSENZWEIG
Attorney for Appellee
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone (202) 708-2532

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ ii

I.     FEDERAL CIRCUIT RULE 35(b) STATEMENT ............................. 1

II.    SUMMARY OF THE PANEL DECISION ......................................... 1

III.   ARGUMENT ....................................................................................... 3

       A.   This Appeal Presents a Precedent-Setting Question
            of Exceptional Importance:  Whether Section 337
            Must Be Limited to Physical Products ...................................... 5

       B.   The Panel Erred in Holding That "Articles" Is an
            Unambiguous Term Meaning "Material Things" ...................... 5

       C.   The Panel Erred in Concluding That While
            "Articles" Means "Goods," "Goods" Means
            "Inanimate Objects, and Does Not Include
            Animals or Chattels Real" and That "Chattels
            Personal" Must Be "Material Things" ...................................... 9

       D.   The Statutory Context Does Not Require That
            Articles Be Limited to "Material Things" ............................... 11

       E.   The Panel's *Chevron* Step Two Analysis
            Is Legally Erroneous ............................................................... 13

IV.    CONCLUSION .................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Align Tech., Inc. v. ITC*¸ 771 F.3d 1317 (Fed. Cir. 2014) ..........................................2

*Amkor Tech., Inc. v. ITC*, 692 F.3d 1250 (Fed. Cir. 2012)........................................6

*Bally/Midway Mfg. Co. v. USITC*, 714 F.2d 1117 (Fed. Cir. 1983)........................12

*Bilski v. Kappos*, 561 U.S. 593 (2010)........................................................................6

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ................................................................................... *passim*

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013) ..................................................1, 4

*Close & Stewart v. United States*, 268 F. Supp. 466 (Cust. Ct. 1967) ................. 7-8

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003)................6

*Global-Tech Appliances, Inc. v. SEB SA*, 131 S. Ct. 2060 (2011) ...........................6

*In re N. Pigment Co.*, 71 F.2d 447 (C.C.P.A. 1934)................................................14

*Info. Tech. & Applications Corp. v. United States*,
    316 F.3d 1312 (Fed. Cir. 2003) .............................................................................8

*Lelo Inc. v. ITC*, 786 F.3d 879 (Fed. Cir. 2015) ......................................................6

*Micron Tech., Inc. v. United States*, 243 F.3d 1301 (Fed. Cir. 2001) ......................5

*Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327 (2002)..............5

*Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407 (1992) .... 1, 8, 13

(continued on the next page)

# TABLE OF AUTHORITIES

(continued from the previous page)

Page(s)

**Cases**

*Ninestar Tech. Co. v. ITC*, 667 F.3d 1373 (Fed. Cir. 2012) ....................................12

*Suprema, Inc. v. ITC*, 796 F.3d 1338 (Fed. Cir. 2015) (en banc)................... *passim*

*TianRui Grp. v. ITC*, 661 F.3d 1322 (Fed. Cir. 2012) ..................................... 8-9, 14

*United States v. Eimer & Amend*, 28 C.C.P.A. 10 (1940) ..................................8, 15

**Statutes**

19 U.S.C. § 1332 ...........................................................................................7

19 U.S.C. § 1337 .................................................................................. *passim*

19 U.S.C. § 1401 .........................................................................................11

35 U.S.C. § 271 ............................................................................................2

Bipartisan Congressional Trade Priorities and Accountability Act of 2015,
    Pub. L. No. 114-26, 129 Stat. 319 (2015) ..................................................... 10-11

Omnibus Trade and Competitiveness Act of 1988,
    Pub. L. No. 100-418, 102 Stat. 1107 (2008) ........................................................12

Tariff Act of 1922, Pub. L. No. 67-318, 42 Stat. 858 (1922) ........................ 7, 10-11

Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144 (1979)................12

(continued on the next page)

# TABLE OF AUTHORITIES

(continued from the previous page)

<u>Page(s)</u>

**Legislative History**

Conf. Rep. No. 67-1223 (1922) ...................................................................9

S. Rep. No. 67-595 (1922) ........................................................... 5, 9, 14

**Other Authorities**

Black's Law Dictionary (2d ed. 1910) ........................................... 6, 9, 10

The Century Dictionary and Cyclopedia (1911) .......................................7

Customs Rul. N.Y. 881983 (Feb. 3, 1993) ............................................11

Dictionary of Tariff Information, U.S Tariff Commission (1924) ...........................7

E-Commerce FTA Chapters, U.S. Trade Representative .......................................11

Sapna Kumar, Regulating Digital Trade (undated 2015 draft)
    (forthcoming 67 Fla. L. Rev.) ..................................................... 3, 9, 14

Webster's New International Dictionary of the English Language (1924) ...........6, 7

Webster's New International Dictionary of the English Language
    (2d ed. 1951) ..........................................................................7

Webster's Third New International Dictionary (2002) .........................................13

## I.    FEDERAL CIRCUIT RULE 35(b) STATEMENT

Based on my professional judgment, I believe the panel decision is contrary to the following decisions of the Supreme Court of the United States and the precedent of this Court:  *Suprema, Inc. v. ITC*, 796 F.3d 1338 (Fed. Cir. 2015) (en banc); *City of Arlington v. FCC*, 133 S. Ct. 1863, 1873 (2013); *Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 418 (1992); *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984).

Based on my professional judgment, I believe this appeal requires an answer to the following precedent-setting question of exceptional importance:  Must the term "articles" in section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, be limited to physical products, such that section 337 can be evaded by a respondent that 3D prints products in the United States using imported datasets representing those products?

/s/Sidney A. Rosenzweig
Sidney A. Rosenzweig, Attorney for Appellee
U.S. International Trade Commission

## II.    SUMMARY OF THE PANEL DECISION

Appellant ClearCorrect[1] supplies orthodontic appliances known as aligners to customers in competition with Intervenor Align Technology, Inc. ("Align"), and, as found by the Commission, in violation of Align's patent rights.  Maj. Op. 5. Alleged predecessors of ClearCorrect imported aligners from Pakistan but agreed to the issuance of a consent order to terminate an earlier Commission investigation

---

[1] ClearCorrect Operating, LLC and ClearCorrect Pakistan (Private), Ltd.

as to their patent infringement. *Align Tech., Inc. v. ITC*¸ 771 F.3d 1317, 1319 (Fed. Cir. 2014). Here, ClearCorrect chose to import infringing digital representations ("datasets") from Pakistan and 3D print the molds for its aligners from those datasets in the United States. The Commission found all of the elements to be met for contributory patent infringement, 19 U.S.C. § 1337(a)(1)(B)(i), 35 U.S.C. § 271(c), as to certain asserted patent claims, and all the elements for infringement of a patented process, 19 U.S.C. § 1337(a)(1)(B)(ii), as to other patent claims.

Section 337 of the Tariff Act of 1930, as amended, prohibits patent infringement that occurs in the "importation into the United States, the sale for importation, or the sale within the United States after importation . . . of articles." 19 U.S.C. § 1337(a)(1)(B). In the proceedings here, the Commission found that its authority over "articles" encompasses the datasets imported for the 3D printing.

Failing to recognize ambiguity in the term "articles," the panel misapplied *Chevron* Step One, holding that the Commission was to be afforded no deference in construing "articles" because "it is clear that 'articles' means 'material things,'" Maj. Op. 3, based on its chosen dictionary definitions, *id.* at 13-19. Also ostensibly addressing *Chevron* Step One, the panel concluded that the Commission's construction would result in "numerous subsections" of section 337 being "rendered inoperative." *Id.* at 20. The panel examined the legislative history, concluding that Congress equated "goods" with "articles." *Id.* at 28. But then, without citation to the apparent source of its reasoning and without providing

an opportunity to respond to that source, the panel defined "goods" with regard to, *inter alia*, "inanimate objects."[2] *Id.* at 29.

While the panel stated it also analyzed the Commission's decision under *Chevron* Step Two, its analysis of *Chevron* Step One caused it to truncate the analysis called for by *Chevron* Step Two. The Step Two analysis focused on minor issues in the Commission opinion, and also relied on arguments appearing in the Kumar Draft, *see supra* note 2, without specifically citing the draft.

## III.   ARGUMENT

On August 10, 2015, this Court, sitting *en banc*, decided *Suprema, Inc. v. ITC*, 796 F.3d 1338. As the *en banc* Court held, because "Congress delegated authority to the Commission to resolve ambiguity in Section 337 if the Commission does so through formal adjudicative procedures," the framework of *Chevron* applies to the Commission's construction of section 337. *Id.* at 1345. Pursuant to *Chevron* Step One, the reviewing court asks "whether Congress has directly spoken to the precise question at issue." *Id.* at 1346 (citing *Chevron*, 467 U.S. at 842). If Congress "has not directly answered" the question, the court proceeds to *Chevron* Step Two and the "Commission's interpretation [of section

---

[2] The source appears to be an unpublished draft law review article, which, according to its author, was circulated directly to the chambers of the judges of this Court long after *amicus* briefs were due; no party cited it. Concurrently with this petition, the Commission is moving the Court to make the draft sent to the judges [hereinafter "Kumar Draft"] part of the record of this appeal. The draft advocated reversal of the Commission decision here, including based on these definitions of "goods." While the panel elsewhere cites ssrn.com for a link to the draft, Maj. Op. 21 n.16, the ssrn.com citation is to a later draft extensively edited.

337] prevails if it is a reasonable construction of the statute, whether or not it is . . . the one a court might think best." *Suprema*, 796 F.3d at 1349 (quotation omitted).

Four members of this Court dissented in *Suprema*, asserting that the routine application of *Chevron* deference by the Court violates the separation of powers. 796 F.3d at 1369 (O'Malley, J., dissenting).[3]  In the present appeal, the majority of the panel, dissenters from the Court's decision in *Suprema*, undertook an analysis in conflict with *Suprema* and *Chevron*.[4]  First, while conceding *Suprema's* reaffirmation of *Chevron*, the panel finding of no ambiguity in the statute, despite competing definitions, obviated any deference under *Chevron*, and ensured that the *Suprema* dissent's analytic approach would be followed.  Indeed, one member of the majority here went further, and cited certain academics to interpose a "*Chevron* step zero" before the required *Chevron* analysis could be followed.  O'Malley Op. 4 & n.1.  Second, *Suprema* itself repeatedly equated "articles" and "goods."  796 F.3d at 1350 & n.5; *see also id.* at 1340, 1344-45, 1348-49, 1351-52.  The majority here conceded the equivalence of the terms, but arrived at a definition of "goods" at odds not only with section 337, but with U.S. trade laws generally.

---

[3] *But see City of Arlington*, 133 S. Ct. at 1873 ("caution[ing] that judges ought to refrain from substituting their own interstitial lawmaking for that of an agency") (quotation omitted).

[4] Per the panel's request at oral argument, the Commission provided a supplemental brief on August 25, 2015, concerning the relationship between *Suprema* and the present appeal.  Dkt. No. 125 [hereinafter "ITC Supp. Br."].  That brief discusses the relationship between *Suprema* and this appeal in greater depth.

### A.   This Appeal Presents a Precedent-Setting Question of Exceptional Importance:  Whether Section 337 Must Be Limited to Physical Products

The narrow interpretation of "articles" adopted by the panel is inconsistent with the broad remedial purpose of section 337 and is "an open invitation to foreign entities . . . to circumvent" the Commission's authority under section 337, *Suprema*, 796 F.3d at 1352, such as by ClearCorrect's 3D-printing scheme here. As Judge Newman noted in dissent, the panel "ignores precedent and logic, and removes a vast body of technology from the protection of a statute designed for its protection."  Newman Op. 14.  As discussed, *infra*, the panel decision is also inconsistent with U.S. trade law.  A majority of the panel itself recognized the exceptional importance of the issue.  O'Malley Op. 2; Newman Op. 2.

### B.   The Panel Erred in Holding That "Articles" Is an Unambiguous Term Meaning "Material Things"

The panel here went astray by concluding that Congress had directly spoken to the issue; it had not.  The statute is silent.[5]  The panel concluded that "the literal

---

[5] While it cannot be known what the 1922 Congress felt about digital goods—a species of "goods" that we will discuss, *infra*—Congress expressly intended expansive application of the statute, *Suprema*, 796 F.3d at 1350 (quoting S. Rep. No. 67-595, at 3 (1922)), and therefore did not intend to allow circumvention by importing datasets for 3D printing instead of importing identical physical products. Congress often leaves matters to the agency in "technical, complex, and dynamic" fields that "might be expected to evolve in directions Congress knew it could not anticipate."  *Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 339 (2002).  Congress "cannot, and need not, draft a statute which anticipates and provides for all possible circumstances in which a general policy must be applied to a specific set of facts.  It properly leaves this task to the authorized agency." *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1312 (Fed. Cir. 2001).

text by itself, when viewed in context and with an eye toward the statutory scheme, is clear," pursuant to *Chevron* Step One. Maj. Op. 13. The panel's analysis, however, failed to properly apply *Chevron*.

The panel began with an extensive analysis of dictionary definitions, first addressing the definition of "article" in the leading dictionary—Webster's New International Dictionary, upon which the Commission relied—and which supports the Commission. That dictionary defines "article" as "[s]omething considered by itself and as apart from other things of the same kind" and "a thing of a particular class or kind." Webster's New International Dictionary of the English Language 131 (1924). The panel disregarded it as "imprecise."[6] Maj. Op. 15.

The panel then asserted that "every dictionary referenced by the Commission, with the exclusion of one imprecise definition, along with all the other relevant dictionaries point to the fact that 'articles' means 'material things.'" Maj. Op. 18-19. This statement is incorrect. For example, the Century dictionary cited by the Court, *id.* at 14-15, defines "article" as "a material thing," or as a

---

[6] Maj. Op. 14-15, 18-19. Instead, the panel asserted, without citation, that this Court "normally" would "turn to" Black's Law Dictionary, which offered no pertinent definition. *Id.* at 14 n.12. (The panel's later misinterpretation of "goods" is based on Black's. *Id.* at 28-29.)

The Supreme Court and this Court routinely consult Webster's New International for statutory construction, as opposed to Black's Law Dictionary. *See, e.g.*, *Global-Tech Appliances, Inc. v. SEB SA*, 131 S. Ct. 2060, 2065 (2011) ("induce"); *Bilski v. Kappos*, 561 U.S. 593, 607 (2010) ("method"); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31 (2003) ("goods"); *Lelo Inc. v. ITC*, 786 F.3d 879, 883 (Fed. Cir. 2015) ("investment"); *Amkor Tech., Inc. v. ITC*, 692 F.3d 1250, 1256 (Fed. Cir. 2012) ("communicate").

"particular immaterial thing."  The Century Dictionary and Cyclopedia 326 (1911). But even the panel's "material thing" definition is not so clear, and supports the Commission.[7]   Similarly, the panel's contention that the definition in the Commission predecessor's Dictionary of Tariff Information (1924) at p. 41, *see* Maj. Op. 18—which was not cited by any party in this appeal—supports the panel was in error because that definition, too, supports the Commission.[8]

The panel's "material thing" definition is at odds with the Customs Court's (now the Court of International Trade) and this Court's predecessor's reliance on Webster's New International Dictionary to define "articles" in the Tariff Act.  The Customs Court observed:

> For the word 'article' is itself a nebulous concept seemingly employed in the tariff act for the very reason that it possesses an indefinite and neutral meaning.  Its vagueness is best exemplified in Webster's New International Dictionary (2d edition, 1951) wherein the word is defined as:  6: A thing of a particular class or kind, as distinct from a thing of another class or kind . . . .

---

[7] The Century Dictionary reads:  "A material thing as part of a class, or, absolutely, a particular substance or commodity."  That same dictionary defines "commodity" as "That which is useful; anything that is useful, convenient, or serviceable; particularly an article of merchandise; anything movable that is the subject of trade or of acquisition."  *Id.* at 1132.  The digital datasets here are useful, movable, and the subject of trade or acquisition.  The datasets thus fit within the definitions of "commodity" and "article."

[8] The definition in that dictionary cites to and accords with the definition of "article" in the 1922 act for purposes of Commission authority to assist the President and Congress.  Tariff Act of 1922 ("1922 Act"), Pub. L. No. 67-318, § 318(b), 42 Stat. 858, 947 (1922) (codified as amended at 19 U.S.C. § 1332(e)) (defining "article" for purposes of 19 U.S.C. § 1332(d) & (e)).  Notably, Judge Newman found that the datasets here fall within that definition.  Newman Op. 8.

*Close & Stewart v. United States*, 268 F. Supp. 466, 468 (Cust. Ct. 1967). This Court's predecessor relied on that same definition, concluding that the term "articles" elsewhere in the Tariff Act means "any provided-for substance, material or thing of *whatever kind or character that was imported into this country*." *United States v. Eimer & Amend*, 28 C.C.P.A. 10, 12 (1940) (emphasis added). And yet that is the *very same* definition that the panel chose to set aside when it selected its definitions to support its conclusion.

At the very least, these various definitions demonstrate ambiguity. However, the panel found that the "aforementioned dictionaries make clear that *the* ordinary meaning of the term 'articles' is 'material things.'" Maj. Op. 18 (emphasis added). That is not *the* ordinary meaning; it is *an* ordinary meaning. As discussed above, there is another ordinary meaning consistent with the Commission's definition. As this Court has previously explained: "'The existence of alternative dictionary definitions of [a term],' or the failure of dictionary definitions to provide a plain and unambiguous meaning of statutory language, 'indicates that the statute is open to interpretation.'" *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1320-21 (Fed. Cir. 2003) (quoting *Nat'l R.R. Passenger Corp.*, 503 U.S. at 418). To the extent that choosing among dictionary definitions is necessary—as it is here—it is the agency's prerogative under *Chevron* to make that interpretative choice, not the panel's, and the agency must be affirmed if its choice is reasonable. *Suprema*, 796 F.3d at 1349. Section 337 evinces a broad remedial purpose, as this Court has recognized in *Suprema* and elsewhere. *See id.* at 1350; *see also, e.g.*, *TianRui Grp. v. ITC*, 661 F.3d 1322,

1335 (Fed. Cir. 2012). With that broad remedial purpose in mind the Commission reasonably interpreted "articles" in section 337 to apply to the datasets imported for 3D printing.

### C. The Panel Erred in Concluding That While "Articles" Means "Goods," "Goods" Means "Inanimate Objects, and Does Not Include Animals or Chattels Real" and That "Chattels Personal" Must Be "Material Things"

As this Court recognized more than twenty times in its *en banc* decision in *Suprema*, "articles" in section 337 is equivalent to "goods." *Suprema*, 796 F.3d at 1340, 1344-45, 1348-52 & n.5. That equivalence is correct and undisputed.[9] Maj. Op. 28 ("We agree with the Commission that Congress used 'goods' and 'articles' synonymously at the time of the passage of the Act . . . .").

But the panel relied upon an argument based wholly upon Black's Law Dictionary (1910) to find that "goods" is "limited to 'material things,'" Maj. Op. 29, ignoring other dictionaries, which support the Commission. *E.g.*, ITC Supp. Br. 8 n.6 (collecting definitions). Based on Black's, the panel defined "goods" as limited to "inanimate objects, and does not include animals or chattels real." Maj. Op. 29. The panel used the definition of "chattels personal" to conclude that "goods" are "movables only," and thus "limited to material things."[10] *Id.*

---

[9] *See* S. Rep. No. 67-595, at 3 (1922) (discussing section 316 as the "provision relating to unfair methods of competition in the importation of goods"); *see also* Conf. Rep. No. 67-1223 at 48 (1922) (substitution of the word "articles" for "merchandise" in the bill enacted as section 316 of the Tariff Act of 1922); *id.* at 146 (discussing section 316 as relating to the "importation of merchandise").

[10] This reasoning was not proposed by any party, but instead tracks the Kumar Draft. *See supra* note 2.

There are critical errors in the panel's analysis. According to the panel's definition, "goods" do not include "animals." *Id.* But animals are "goods" or "articles" based upon the panel's *own* reasoning elsewhere, *id.* at 26-27: livestock were dutiable in 1922. 1922 Act § 1, ¶¶ 701-703, 711, 714-15.[11]

As it did for "articles," the panel picked among definitions for "goods." In particular, for "goods," the panel relied on Black's definition of "goods and chattels," Black's Law Dictionary 544 (2d ed. 1910), without regard to contrary definitions in other dictionaries, *see* ITC Supp. Br. 8 n.6, or even other definitions in Black's. An alternative definition in Black's applies more naturally in the trade context, namely that of "Goods, wares, and merchandise." That definition—"[a] general and comprehensive designation of such chattels as are ordinarily the subject of traffic and sale," *id.*—is considerably broader than the definition relied upon by the panel, and comports with the Commission's definition.

Indeed, once "articles," "goods," and "merchandise" are linked, *see supra* note 9, the panel's reasoning contradicts the trade laws generally.[12] Since 1922,

---

[11] That definition from Black's also excludes "fruits" from "goods." Black's Law Dictionary 544 (2d. ed. 1910). Fruits are dutiable. 1922 Act § 1, ¶¶ 734-750.

[12] "Digital goods" are a species of goods. That fact is based on extensive and undisputed usage in trade law. At least ten Free Trade Agreements have a chapter regarding digital goods or products. *See* E-Commerce FTA Chapters, U.S. Trade Representative, at http://tinyurl.com/ustr-ecommerce. The Bipartisan Congressional Trade Priorities and Accountability Act of 2015 ("TPA Act"), Pub. L. No. 114-26, 129 Stat. 319 (2015), also recognizes "digital trade in goods and services," *id.* § 102(b)(6), and "electronically delivered goods and services," *id.* § 102(b)(6)(B)(i). *See* Newman Op. 13-14.

the Tariff Act has defined "merchandise" for purposes of entry and duty orders as including "goods, wares, and chattels of every description."  1922 Act § 401, *codified as amended at* 19 U.S.C. § 1401(c).  (Note the similarity of that definition to Black's "goods, wares, and merchandise," *supra*.)  "Merchandise" is understood to include digital goods.  That has been Customs' longstanding interpretation of the Tariff Act.[13]  Because they are merchandise, they are also articles.  It is the policy of the United States that "electronically delivered goods and services receive no less favorable treatment under trade rules and commitments than like products delivered in physical form."  TPA Act § 102(b)(6)(B)(i).

### D.    The Statutory Context Does Not Require That Articles Be Limited to "Material Things"

The remainder of the panel's *Chevron* Step One analysis erroneously short-circuits *Chevron* Step Two by inferring unambiguous Congressional intent defining "articles" from the "context" of the statute.  The statute expresses no such intent.  The panel moved all analysis that would ordinarily be found in *Chevron* Step Two regarding the reasonableness of the Commission's interpretation, *see Suprema*, 796 F.3d at 1350-51 (legislative history and statutory policy) into Step One, Maj. Op. at 20-31.  In so doing, the panel foreclosed any application of *Chevron* deference.

The panel held that "numerous subsections" of section 337 "would be rendered inoperative" if "articles" includes the datasets here.  *Id.* at 20.  A

---

[13] Newman Op. 11-12; *see also* Customs Rul. N.Y. 881983 (Feb. 3, 1993), *at* http://tinyurl.com/ 1993-customs (explaining Customs practice since 1981).

definition of "articles" that *only* includes the datasets here might make those provisions inapplicable.  But no subsection is superfluous under the Commission's reading, which also encompasses physical articles.

The panel also erred in interpreting the relationship between the Commission's two remedies: exclusion orders and cease and desist orders.  *See* 19 U.S.C. § 1337(d), (f).  The panel concluded that cease and desist orders must be a lesser alternative to exclusion orders, because when cease and desist orders were created, they were less onerous.  Maj. Op. 25.  The panel erroneously froze in time cease and desist orders in 1974, when cease and desist orders truly were lesser than exclusion orders, setting aside subsequent developments that can make cease and desist orders more severe than exclusion.[14]  The panel wrongly suggests that the Commission argues that these changes "expanded the Commission's jurisdiction." Maj. Op. 25.  These changes did not expand jurisdiction; they merely expanded the Commission's remedies available to address injury to complainants from infringing imports.  The panel committed error in limiting violation of section 337 to the remedy available.  *Bally/Midway Mfg. Co. v. USITC*, 714 F.2d 1117, 1123 (Fed. Cir. 1983) ("In sum, Congress did not intend the Commission to consider questions of remedy when the agency determines whether there is a violation.").

---

[14] *See, e.g.*, *Ninestar Tech. Co. v. ITC*, 667 F.3d 1373, 1380 (Fed. Cir. 2012) (affirming $11 million civil penalty).  In 1979, Congress provided for civil penalties for violation of cease and desist orders, but not exclusion orders.  Trade Agreements Act of 1979, Pub. L. No. 96-39, § 1105(b), 93 Stat. 144, 311 (1979) (codified as 19 U.S.C. § 1337(f)(2)).  Then in 1988, Congress increased these penalties tenfold.  Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1342(a)(4)(B), 102 Stat. 1107, 1213 (2008) (amending § 1337(f)(2)).

### E.    The Panel's *Chevron* Step Two Analysis Is Legally Erroneous

In a proper *Chevron* analysis, the agency's interpretation of the statute and its reasonableness within the statutory scheme is an integral part of *Chevron* Step Two.  *See, e.g.*, *Suprema*, 796 F.3d at 1349-52; *Nat'l R.R. Passenger Corp*, 503 U.S. at 417 (looking at "the structure and language of the statute as a whole" as part of Step Two, not Step One).  But the panel left for *Chevron* Step Two only the identification of certain supposed errors in the Commission's analysis.

The panel's *Chevron* Step Two analysis constitutes legal error.  The panel faults the Commission for inadequately addressing certain dictionary definitions.  Maj. Op. 32-33.  But the Commission did discuss its reasoning extensively, and to use one example from the panel's opinion (Maj. Op. 32), the Commission opinion quoted a narrow definition, explaining that the same dictionary also had a broad definition that supported the Commission.[15]  The circularity of the Step Two reasoning is evident in the panel's recitation of its conclusion about the meaning of "articles" from Step One in its discussion of Step Two to reject arguments at odds with the panel's Step One conclusion.  Maj. Op. 34 ("And as we discussed above, it limits it in such a way as to exclude non-material things.").

The panel's criticism of an inadvertent error in the Commission opinion was misplaced.  In quoting a well-known and oft-cited passage from the legislative

---

[15] Webster's Third New International Dictionary 123 (2002) also has a "broader generic meaning," Maj. Op. 32 (quoting the Commission opinion) of "article" as: "a thing of a particular class or kind as distinct from a thing of another class or kind," consistent with the Commission's findings.

history of the 1922 act,[16] the Commission opinion inadvertently omitted the highlighted words from the quotation:  "The provision relating to unfair methods of competition *in the importation of goods* is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any antidumping statute the country ever had."

The panel asserts that the Commission "uses this misquote as its main evidence that the purpose of the act was to cover all trade, independent of what form it takes" and therefore that "the Commission's conclusion regarding the purpose of the Act is unreasonable."[17]  Maj. Op. 34.  This misstates the Commission's argument, which is that the term "article" in the statute must be interpreted broadly to be consistent with the statute's legislative purpose of being "broad enough to prevent every type and form of unfair practice" regarding goods, including the pattern of circumvention here.  The Commission repeatedly explained in its opinion, its principal brief, its supplemental brief, and at oral argument (26:10-27:18), that "articles" means "goods."  The Commission's error was therefore both inadvertent and harmless.  The panel asserts that the Commission error "is echoed in [the Commission's] briefing to the Court."  Maj. Op. 33.  That is not true.  The Commission's brief was free of such error.  *See* Red

---

[16] S. Rep. No. 67-595, at 3 (1922); *e.g.*, *Suprema*, 796 F.3d at 1350; *TianRui*, 661 F.3d at 1335; *In re N. Pigment Co.*, 71 F.2d 447, 454 (C.C.P.A. 1934).

[17] The panel opinion tracks the Kumar Draft.  At oral argument, Chief Judge Prost referenced the article for the Commission's quotation error.  Oral Arg. 24:25-25:15.  Even the draft, which omits a necessary ellipsis in its quotation of the same passage, Kumar Draft 29, acknowledges the error as "likely inadvertent," *id.* at 30.

Br. 20.  No one was misled as to the 1922 quotation.  Indeed, no party, including *amici*, complained of the inadvertent error in the Commission opinion.

The panel also faulted the Commission for adopting as the definition of "article," "something that is traded in commerce."  Maj. Op. 31-32.  The majority stated that the Commission's definition is "unrelated to the definition provided by the dictionary."  *Id.* at 32.  Yet, this Court's predecessor did just the same thing, and defined "articles" elsewhere in the Tariff Act as "any provided-for substance, material or thing *of whatever kind or character that was imported into this country*."  *Eimer & Amend*, 28 C.C.P.A. at 12 (emphasis added).  Nor does the panel explain how or why the Commission's definition—which is consistent with the broad meaning of "articles" discussed extensively in the Commission opinion—is unreasonable for failing to hew, *in haec verba*, to dictionary text.

## IV.   CONCLUSION

The panel decision rests on numerous errors of law, failing to accord the deference required under *Chevron* and *Suprema*.  Even absent these errors of law, the case is of exceptional importance not only to the Commission, but to the public as well.  O'Malley Op. 2; Newman Op. 2.  Rehearing *en banc* is warranted.

Respectfully submitted,

/s/Sidney A. Rosenzweig

DOMINIC L. BIANCHI            SIDNEY A. ROSENZWEIG
  General Counsel                Attorney Advisor
WAYNE W. HERRINGTON        U.S. International Trade Commission
  Assistant General Counsel     500 E Street, S.W.
                               Washington, DC  20436
January 27, 2016               (202) 708-2532

**ADDENDUM PURSUANT TO**
**FED. CIR. R. 35(c)(3)**

# United States Court of Appeals
# for the Federal Circuit

_____

**CLEARCORRECT OPERATING, LLC,
CLEARCORRECT PAKISTAN (PRIVATE), LTD.,**
*Appellants*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**ALIGN TECHNOLOGY, INC.,**
*Intervenor*

_____

2014-1527

_____

Appeal from the United States International Trade Commission in Investigation No. 337-TA-833.

_____

Decided:  November 10, 2015

_____

MICHAEL D. MYERS, McClanahan Myers Espey, LLP, Houston, TX, argued for appellants.  Also represented by ROBERT HENRY ESPEY, II; GARY HNATH, PAUL WHITFIELD HUGHES, Mayer Brown LLP, Washington, DC.

SIDNEY A. ROSENZWEIG, Office of the General Counsel, United States International Trade Commission, Washington, DC, argued for appellee.  Also represented by WAYNE W. HERRINGTON, DOMINIC L. BIANCHI.

STEPHEN BLAKE KINNAIRD, Paul Hastings LLP, Washington, DC, argued for intervenor. Also represented by THOMAS A. COUNTS, IGOR VICTOR TIMOFEYEV.

CHARLES DUAN, Public Knowledge, Washington, DC, for amici curiae Electronic Frontier Foundation, Public Knowledge.

JOHN THORNE, Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC, Washington, DC, for amicus curiae The Internet Association. Also represented by MATTHEW A. SELIGMAN; AARON M. PANNER, Law Office of Aaron M. Panner, PLLC, Washington, DC.

JEFFREY A. LAMKEN, MoloLamken LLP, Washington, DC, for amicus curiae Business Software Alliance.

STEVEN METALITZ, Mitchell, Silberberg & Knupp, LLP, Washington, DC, for amicus curiae Association of American Publishers.

JOHN D. HAYNES, Alston & Bird LLP, Atlanta, GA, for amici curiae Nokia Corporation, Nokia USA, Inc. Also represented by ADAM DAVID SWAIN, BENN C. WILSON, Washington, DC.

JONATHAN J. ENGLER, Adduci, Mastriani & Schaumberg, LLP, Washington, DC, for amici curiae Motion Picture Association of America, Recording Industry Association of America. Also represented by THOMAS RICHARD BURNS, JR., TOM M. SCHAUMBERG.

_____

Before PROST, *Chief Judge,* NEWMAN and O'MALLEY, *Circuit Judges.*

Opinion for the court filed by *Chief Judge* PROST.

Concurring opinion filed by *Circuit Judge* O'MALLEY.

Dissenting opinion filed by *Circuit Judge* NEWMAN.

PROST, *Chief Judge*.

The Tariff Act of 1930 provides the International Trade Commission ("Commission") with authority to remedy only those unfair acts that involve the importation of "articles" as described in 19 U.S.C. § 1337(a). Here, the Commission concluded that "articles" "should be construed to include electronic transmission of digital data. . . ." *In re Certain Digital Models*, Inv. No. 337-TA-833 at 55 (Apr. 3, 2014) ("*Final Comm'n Op.*"). We disagree.

The Commission's decision to expand the scope of its jurisdiction to include electronic transmissions of digital data runs counter to the "unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). Under step one of *Chevron*, "[w]e begin with the text of [the statute]." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). Here, it is clear that "articles" means "material things," whether when looking to the literal text or when read in context "with a view to [the term's] place in the overall statutory scheme." *Id.* We recognize, of course, that electronic transmissions have some physical properties—for example an electron's invariant mass is a known quantity—but commonsense dictates that there is a fundamental difference between electronic transmissions and "material things." Our analysis is therefore complete. However, even under step two of *Chevron*, an analysis of the Commission's opinion

makes clear that it is unreasonable and therefore not entitled to deference.[1]

Accordingly, we reverse and remand the Commission's decision and conclude that the Commission does not have jurisdiction over this case.[2]

## I. BACKGROUND

The Commission instituted the present investigation based on a complaint filed by Align Technology, Inc. ("Align"). Align alleged a violation of 19 U.S.C. § 1337 ("Section 337") by reason of infringement of various claims of seven different patents.[3] The respondents to the

---

[1] While this court recently interpreted the phrase "articles that infringe" in *Suprema, Inc. v. International Trade Commission*, that opinion does not control here. 2015 WL 4716604, at *5. In *Suprema*, we were dealing with the single issue of whether the respondent violated 19 U.S.C. § 1337 by inducing a direct patent infringement that did not occur until after a tangible item was imported into the United States. Our opinion turned exclusively on the term "infringe" as used in 19 U.S.C. § 1337(a)(1)(B)(1). Conversely, here we are exclusively looking to the meaning of the term "articles." Furthermore, the "articles" in question in *Suprema* were physical objects, and thus do not inform the question now before the court. Indeed the analysis in *Suprema* supports the decision here, as discussed *infra*.

[2] As we do not overcome the threshold issue of the Commission's jurisdiction, we do not reach the Appellant's appeal regarding the Commission's analysis of estoppel, contributory infringement, or invalidity. Appellant's Br. 17-59.

[3] U.S. Patent No. 6,217,325 ("'325 patent"); U.S. Patent No. 6,705,863 ("'863 patent); U.S. Patent No.

investigation were ClearCorrect Operating, LLC ("ClearCorrect US"), and Clear Correct Pakistan (Private), Ltd. ("ClearCorrect Pakistan") (collectively "ClearCorrect").

The technology at issue in this case relates to the production of orthodontic appliances, also known as aligners. The aligners in question "are configured to be placed successively on the patient's teeth and to incrementally reposition the teeth from an initial tooth arrangement, through a plurality of intermediate tooth arrangements, and to a final tooth arrangement." '880 patent (abstract). ClearCorrect is a producer of these aligners.

ClearCorrect makes its aligners through the following process. ClearCorrect US scans physical models of the patient's teeth and creates a digital recreation of the patient's initial tooth arrangement. This digital recreation is electronically transmitted to ClearCorrect Pakistan, where the position of each tooth is manipulated to create a final tooth position. ClearCorrect Pakistan then creates digital data models of intermediate tooth positions. One intermediate tooth position is created for each incremental aligner. ClearCorrect Pakistan then transmits these digital models electronically to ClearCorrect US. ClearCorrect US subsequently 3D prints these digital models into physical models. Then an aligner is manufactured by thermoplastic molding using the physical model. Here, the accused "articles" are the transmission of the "digital models, digital data and treatment plans, expressed as digital data sets, which are virtual three-dimensional models of the desired positions of the

---

6,626,666 ("'666 patent"); U.S. Patent No. 8,070,487 ("'487 patent); U.S. Patent No. 6,471,511 ("'511 patent); U.S. Patent No. 6,722,880 ("'880 patent"); and U.S. Patent No. 7,134,874 ("'874 patent").

patients' teeth at various stages of orthodontic treatment" ("digital models"), from Pakistan to the United States. *Final Comm'n Op.* at 17.

The parties and the Commission agreed to divide the patent claims into four Groups: Group I contains those claims that relate to methods of forming dental appliances,[4] Group II contains those claims that relate to methods of producing digital data sets,[5] Group III contains those claims that relate to a treatment plan based on a series of digital data sets on a storage medium,[6] and Group IV contains those claims that relate to methods of producing dental appliances.[7] The Commission found the Groups I and II claims[8] to be infringed and not invalid. It is these claims that are at issue in this appeal. The Commission found the Groups III and IV claims to be either beyond the scope of the Commission's jurisdiction or not infringed. The Commission's ruling concerning Groups III and IV are at issue in companion case *Align Technology,*

---

[4]    Claims 21 and 30 of the '325 patent and claim 1 of the '880 patent.

[5]    Claims 31 and 32 of the '325 patent, claims 1 and 4-8 of the '863 patent, claims 1, 3, 7, and 9 of the '666 patent, and claims 1, 3, and 5 of the '487 patent.

[6]    Claims 7-9 of the '487 patent.

[7]    Claims 1-3, 11, 13-14, 21, 30-35, and 38-39 of the '325 patent, claims 1 and 3 of the '880 patent, claim 1 of the '511 patent, and claims 1-2, 38-39, 41, and 62 of the '874 patent.

[8]    To the extent that Group I and II claims overlap with Group IV claims, the Commission found that these claims were infringed and not invalid. Because of the posture of this appeal, the nature of the overlap is not relevant to this case and thus will not be discussed.

*Inc. v. International Trade Commission*, No. 2014-1533, and not at issue in this case.

While the Group I[9] and Group II[10] claims differ, for purposes of this appeal it is the similarity in Align's

---

[9]    Claim 1 of the '880 patent is representative of the Group 1 claims and reads:

A method for making a predetermined series of dental incremental position adjustment appliances, said method comprising:

a) obtaining a digital data set representing an initial tooth arrangement;

b) obtaining a repositioned tooth arrangement based on the initial tooth arrangement;

c) obtaining a series of successive digital data sets representing a series of successive tooth arrangements; and

d) fabricating a predetermined series of dental incremental position adjustment appliances based on the series of successive digital data sets, wherein said appliances comprise polymeric shells having cavities shaped to receive and resiliently reposition teeth, and said appliances correspond to the series of successive tooth arrangements progressing from the initial to the repositioned tooth arrangement.

'880 patent col. 22 ll. 13-29.

[10]    Claim 21 of the '325 patent is representative of the Group II claims and reads:

allegations of ClearCorrect's infringement that are relevant—namely, ClearCorrect Pakistan's electronic transmission of digital models to ClearCorrect US.

The Administrative Law Judge ("ALJ") conducted an evidentiary hearing in February 2013, and on May 6, 2013, issued its Initial Determination. The ALJ found that—but for the claims related to the '666 patent—ClearCorrect infringed the Groups I and II patent claims. In so finding, the ALJ determined that the Commission had authority to order ClearCorrect to stop electronically importing digital models into the United States. The ALJ recommended that the Commission issue a cease and desist order directed to ClearCorrect to prohibit the importation of digital models.

In response, both ClearCorrect and Align filed petitions for Commission review. The Commission initiated a review of the entire Initial Determination and solicited briefing from the parties and the public. While the public did not respond to the initial request by the Commission, the Commission extended its deadline and issued another

---

A method for fabricating a dental appliance, said method comprising:

> providing a digital data set representing a modified tooth arrangement for a patient;

> controlling a fabrication machine based on the digital data set to produce a positive model of the modified tooth arrangement; and

> producing the dental appliance as a negative of the positive model.

'325 patent col. 17 ll. 7-16.

notice to the public. In response to this notice, the Commission received briefing from various nonparties including: the Association of American Publishers, Google Inc., Andrew Katz, The Motion Picture Association of America, and Nokia Corp.

On April 3, 2014, the Commission terminated the investigation finding the Groups I and II patent claims infringed. Specifically, the Commission found that ClearCorrect US directly infringed the Group I patents and ClearCorrect Pakistan contributed to that infringement.[11] The Commission determined that, because ClearCorrect US's infringement occurred in the United States, it was not a violation of Section 337. The Commission instead exerted its authority over ClearCorrect Pakistan as a contributory infringer for importing the data models. Additionally, the Commission found that ClearCorrect Pakistan practiced the Group II method claims in Pakistan and found that the importation of the resulting digital models violated 19 U.S.C. § 1337(a)(1)(B)(ii). Finally, the Commission agreed with the ALJ that the Commission had jurisdictional authority over electronically imported data under Section 337. The Commission has stayed its cease and desist order until this appeal is resolved.

Following the Commission's decision, this case was timely appealed to us. We have jurisdiction to review the Commission's findings under 28 U.S.C. § 1295(a)(6).

## II. DISCUSSION

"Section 337 declares certain activities related to importation to be unlawful trade acts and directs the Commission generally to grant prospective relief if it has

---

[11]    Commissioner David S. Johanson dissented in the Commission's findings.

found an unlawful trade act to have occurred." *Suprema, Inc.*, 2015 WL 4716604 at *5. "As a trade statute, the purpose of Section 337 is to regulate international commerce. Section 337 necessarily focuses on commercial activity related to cross-border movement of goods." *Id.* (citation omitted). Congress established Section 337 to "curb[] unfair trade practices that involve the entry of goods into the U.S. market via importation. In sum, Section 337 is an enforcement statute enacted by Congress to stop at the border the entry of goods, *i.e.*, articles, that are involved in unfair trade practices." *Id.* Section 337(a)(1) reads as follows:

> Subject to paragraph (2), the following are unlawful, and when found by the Commission to exist shall be dealt with, in addition to any other provision of law, as provided in this section:
>
> (A) Unfair methods of competition and unfair acts in the importation of *articles* (other than articles provided for in subparagraphs (B), (C), (D), and (E)) into the United States, or in the sale of such articles by the owner, importer, or consignee, the threat or effect of which is—
>
>        . . .
>
> (B) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of *articles* that—
>
> . . .
>
> (C) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of *articles* that infringe a valid and enforceable United States trademark registered under the Trademark Act of 1946 [15 U.S.C. 1051 et seq.].

. . .

> (E) The importation into the United States, the
> sale for importation, or the sale within the United
> States after importation by the owner, importer,
> or consigner, of an *article* that constitutes in-
> fringement of the exclusive rights in a design pro-
> tected under chapter 13 of title 17.

19 U.S.C. § 1337 (alteration in original) (emphases
added).

The Commission's jurisdiction to remedy unfair inter-
national trade practices is limited to "unfair acts" involv-
ing the importation of "articles." 19 U.S.C. § 1337(a).
Thus, when there is no importation of "articles" there can
be no unfair act, and there is nothing for the Commission
to remedy. Here, the only purported "article" found to
have been imported was digital data that was transferred
electronically, i.e., not digital data on a physical medium
such as a compact disk or thumb drive. The Commission's
April 3, 2014, majority opinion devotes twenty-one pages
of analysis to the question of whether "articles" encom-
passes digital data and ultimately concludes that it does.

We have exclusive jurisdiction over "final determina-
tions of the United States International Trade Commis-
sion relating to unfair practices in import trade made
under Section 337 of the Tariff Act of 1930." 28 U.S.C.
§ 1295(a)(6) (1994). However, when dealing with the
interpretation of Section 337, "the ITC is entitled to
appropriate deference." *Enercon GmbH v. Int'l Trade
Comm'n*, 151 F.3d 1376, 1381 (Fed. Cir. 1998). As we
recently held in *Suprema*, "[t]here is no dispute that
Congress has delegated authority to the Commission to
resolve ambiguity in Section 337 if the Commission does
so through formal adjudicative procedures." *Suprema,
Inc.*, 2015 WL 4716604 at *6. Furthermore, because the
"Commission's investigations under Section 337 require
adequate notice, cross-examination, presentation of

evidence, objection, motion, argument, and all other rights essential to a fair hearing," "we review the Commission's interpretation pursuant to *Chevron* . . . ." *Id.* (citations omitted) (internal quotation marks omitted).

Under *Chevron*, in reviewing an agency's construction of its organic statute, we address two questions. *City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1868 (2013). The two questions are as follows:

> The first is whether Congress has directly spoken to the precise question at issue. If the answer is yes, then the inquiry ends, and we must give effect to Congress' unambiguous intent. If the answer is no, the second question is whether the agency's answer to the precise question at issue is based on a permissible construction of the statute. The agency's interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.

*Suprema, Inc.*, 2015 WL 4716604 at *6 (citations omitted) (internal quotation marks omitted) (brackets omitted).

### A. *Chevron* Step One

"In construing a statute, we begin with its literal text, giving it its plain meaning." *Hawkins v. United States*, 469 F.3d 993, 1000 (Fed. Cir. 2006).

> If the statutory language is plain, we must enforce it according to its terms. But oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme.

*King*, 135 S. Ct. at 2489 (citations omitted) (internal quotation marks omitted).

Here we conclude that the literal text by itself, when viewed in context and with an eye towards the statutory scheme, is clear and thus answers the question at hand. "Articles" is defined as "material things," and thus does not extend to electronic transmission of digital data.

1

The term "articles" is not defined in the Act. "In the absence of such a definition, we construe a statutory term in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (citing *Smith v. United States*, 508 U.S. 223, 228 (1993)). When looking to the term's plain meaning we must look first not to the 1930 Tariff Act but instead its predecessor, the 1922 Tariff Act. That is because the term "articles," as used in Section 337 of the Tariff Act, originates in section 316 of the Tariff Act. Section 316(a) reads in part:

> That unfair methods of competition and unfair acts in the importation of *articles* into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are hereby declared unlawful, and when found by the President to exist shall be dealt with, in addition to any other provisions of law, as hereinafter provided.

Tariff Act of 1922, Ch. 356 § 316 (1922) (emphasis added).

The Commission found that contemporaneous definitions of "articles" "embrace a generic meaning that is synonymous with a particular item or thing, such as a

unit of merchandise." *Final Comm'n Op.* at 39. In doing so, the Commission relies on the 1924 edition of Webster's that defines "article," in pertinent part, as "something considered by itself and as apart from other things of the same kind or from the whole of which it forms a part; also, a thing of a particular class or kind; as an article of merchandise; salt is a necessary article." *Id.* (citing *Article,* WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (1924)). Based on this definition, the Commission concluded that "the term 'article' was understood at the time of the enactment of the Tariff Act to carry the meaning of an identifiable unit, item or thing, with examples indicating that such articles may be traded in commerce or used by consumers" and thus would include digital data. *Id.* We disagree.

Contemporaneous dictionaries indicate that the term "articles" is limited to a "material thing," and thus could not include digital data.[12] One such dictionary is cited in a footnote of the Commission's Opinion, FUNK & WAGNALLS NEW STANDARD DICTIONARY OF THE ENGLISH LANGUAGE published in 1931. *Id.* at n.20. This dictionary defines "article" in relevant part as "a particular object or substance; a *material thing* or class of things . . . ." *Article,* FUNK & WAGNALLS NEW STANDARD DICTIONARY OF THE ENGLISH LANGUAGE (1931) (emphasis added). Other contemporaneous dictionaries provide similar definitions, notably THE CENTURY DICTIONARY AND CYCLOPEDIA from 1911. This dictionary defines "article" as "[a] *material thing* as part of a class, or, absolutely, a particular sub-

---

[12]    While normally we would turn to the Second Edition of BLACK'S LAW DICTIONARY, as it was contemporaneous with passage of the 1922 Tariff Act, that dictionary only defines "article" in regard to written documents, not with respect to trade.

stance or commodity . . . ." *Article*, THE CENTURY DICTIONARY AND CYCLOPEDIA (1911) (emphasis added).[13] Additionally, WEBSTER'S NEW MODERN ENGLISH DICTIONARY, published in 1922, defines an "article" as "a *material thing*, as one of a class." *Article*, WEBSTER'S NEW MODERN ENGLISH DICTIONARY (1922) (emphasis added). As the contemporaneous dictionaries demonstrate, the meaning of the term "article" at the time of the passage of the 1922 Tariff Act was a "material thing" and thus would not include digital data.

The contemporaneous dictionary definition upon which the Commission relied, the 1924 edition of Webster's, does not aid our search for the definition of "articles" because it is imprecise at best. It is notable, however, that both examples provided in Webster's dictionary are of material things, indicating that the vague language used was in reference to tangible items.

More modern dictionaries also support the conclusion that an "article" is a tangible thing, including the three that are referenced by the Commission in footnotes 20 and 21 of its final opinion. The Commission refers to WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY which defines "article" as "one of a class of *material things* . . . piece of goods; COMMODITY." *Article*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1966) (italicized emphasis added). The Commission additionally refers to the 2002 edition of WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY which defines "article" as "a *material thing* . . . ." *Article*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (emphasis added).

---

[13]  The Supreme Court cited to this dictionary exclusively for the definition of "manufacture" when interpreting the Plant Patent Act of 1930. *Am. Fruit Growers v. Brogdex Co.*, 283 U.S. 1, 11 (1931).

Finally, the Commission refers to RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY as published in 2001, which defines "article" as "an individual object, member or portion of a class; an item or particular: *an article of food; articles of clothing.* . . . an item for sale; commodity." *Article*, RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY (2001) (emphases added). The Random House dictionary's use of the term "individual object" further supports "article" being defined as a "material thing."

Defining "articles" as "material things" is further consistent with the United States Tariff Commission's[14] own definition of the term "articles" as laid out in its DICTIONARY OF TARIFF INFORMATION, issued September 1924. While this dictionary is not a "regular dictionary"—because it was published by the Commissioners—nor perfectly contemporaneous—as it was published in 1924—it does provide us with guidance as to how a person in the respective field would have interpreted "articles" close to the time of the passage of the Tariff Act. The DICTIONARY OF TARIFF INFORMATION defines "articles" as follows:

> The word "article" as ordinarily used in tariff acts embraces commodities generally, whether manufactured wholly or in part or not at all. (*Jungle v. Heddon*, 146 U.S., 233, 239.) It is used in this sense in section 1 of Title I of the tariff act of 1922, subjecting to duty "all articles when imported from any foreign country into the United States or into any of its possessions (except the Philippine Islands, the Virgin Islands, and the islands of Guam and Tutuila)," and in section 201 of Title II of that act, exempting from duty "the articles

---

[14]   The United States Tariff Commission is the predecessor of the International Trade Commission.

mentioned in the following paragraphs, when imported in the United States or into any of its possessions (except the Philippine Islands, the Virgin Islands, and the islands of Guam, and Tutuila)."

This broad use of the word is also shown in paragraph 1514 of the act of 1922, exempting from duty under stated conditions "articles of growth, produce, or manufacture of the United States."

As defined in section 318 of Title III of the act of 1922, which enlarges the duties of the Tariff Commission, the word "article" includes any commodities grown, produced, fabricated, manipulated, or manufactured.

There are however, tariff provisions in which the word "article" is used in a restricted sense, such as those *distinguishing articles from materials.* Thus, in paragraphs 920 of the act of 1922, the words "articles" and "fabrics" are applied, respectively, to finished manufactures and to partial manufactures, and in paragraph 1015 provision is made for "fabrics with fast edges: and also for "articles made therefrom."

The restricted use of the word "article" has been recognized by the courts and the rule laid down that where an intention appears from the text of the law to give the word "article" a narrower meaning than its ordinarily has, such meaning shall be applied in the administration of the law.

The word "article," as commonly accepted in trade and elsewhere, has been declared to be something different from bulky and heavy commodities. (*Harrison Supply Co. v. United States*, 171 Fed. 406, 407.)

> Vessels arriving at ports of the United States in the ordinary course of navigation are not imported articles. (*The conqueror*, 166 U.S. 110, 115.)

*Articles*, DICTIONARY OF TARIFF INFORMATION (1924) (emphasis added). The aforementioned definition provides both the "ordinary" use of the term "articles" and the possible scope of the term "articles," i.e., its broadest and narrowest definition. At its broadest, which the dictionary deems its ordinary meaning, "articles" "embraces commodities generally, whether manufactured wholly or in part or not at all." The plain understanding of this phrase is that it covers material items that are fully manufactured, material items that are altered in some way, or raw materials. This understanding of the term is further established by the dictionary's definition of the narrowest use of the term "articles." The dictionary indicates that narrower definitions of "articles" "distinguish articles from materials." Consequently, if the narrowest definition is defined as a subset of "materials," there is an implication that the broadest understanding of the term is confined to "materials."

Finally, while the contemporaneous second edition of BLACK'S LAW DICTIONARY does not shed light on the definition of "article," the third edition does. The third edition of the dictionary, published in 1933, defines "article" in relevant part as "A particular object or substance, a *material thing* or a class of things." *Article*, BLACK'S LAW DICTIONARY (3d ed. 1933) (emphasis added). Again, this definition provides further support that the term "articles" is defined as a "material thing" and thus excludes purely digital data.

The aforementioned dictionaries make clear that the ordinary meaning of the term "articles" is "material things." It is not a question of whether there are multiple definitions for us to choose between. Instead, every dictionary referenced by the Commission, with the exclu-

sion of one imprecise definition, along with all the other relevant dictionaries point to the fact that "articles" means "material things." As we "must presume that [the] legislature says in a statute what it means and means in a statute what it says," *Conn. Nat'l Bank v Germain*, 503 U.S. 249, 253-54 (1992), we conclude that "articles" does not cover electronically transmitted digital data. [15]

2

As the presence of ambiguity in the meaning of a term "may only become evident when placed in context" with the statute, we turn next to how "articles" is used

---

[15] We briefly address two arguments raised by the dissent regarding the proper definition of the term "articles" in Section 337. First, the dissent argues that in *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1321 (Fed. Cir. 2009), we "rejected the argument that digital files such as computer software are not a 'material or apparatus' subject to infringement as set forth in the Patent Act at 35 U.S.C. §271(c)." Dissent at 7. *Lucent* involved a patent infringement suit. Thus, *Lucent* had nothing to do with the scope of the Commission's jurisdiction. Indeed, it never even considered the term "article," instead assessing the meaning of the unrelated term "material or apparatus." Second, the dissent argues that the term "'article' in the Tariff Act was intended to be all-encompassing." *Id.* at 10 (discussing *United States v. Eimer & Amend*, 28 CCPA 10, (1940)). The "sole question" in *Eimer* was whether the term "articles" should cover "glass wool" objects, since such objects "do not have definite form and shape." *Eimer*, 28 CCPA at 12. Because the "glass wool" at issue in *Eimer* was undisputedly a material object, *Eimer* is inapposite to the present question of whether the term "articles" encompasses intangible data.

throughout Section 337. *King*, 135 S. Ct. at 2489. The use of the word "articles" in other sections of the 1930 Tariff Act reinforces the conclusion that Congress's unambiguously expressed intent was for "articles" to mean "material things."

The Supreme Court has consistently held that "identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (quoting *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986)); *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934); *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932). For "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). The statutory context in which Congress uses "articles" makes clear that Congress's unambiguously expressed intent was for "articles" to mean "material things," not intangibles, for if "articles" had a broader definition, numerous subsections would be rendered inoperative.

The Commission concluded that because the term "articles" appears in the statutory provisions defining a violation of Section 337, 19 U.S.C. §§ 1337(a)(1)(A), (B), (C), and (E), with the terms "importation" and "sale," the term "articles" is meant to encompass all "imported items that are bought and sold in commerce." *Final Comm'n Op.* at 40. The Commission then stated that, in accordance with various Supreme Court and circuit court cases, "articles of commerce" includes digital files. We disa-

gree.[16]  The context in which "articles" is used throughout the chapter, not just this singular subsection, indicates that "articles" means "material things."

If the term "articles" was defined to include intangibles, numerous statutory sections would be superfluous at best.  One such example is the forfeiture subsection of Section 337.  This section reads in part:

(i) Forfeiture

(1) In addition to taking action under subsection (d) of this section, the Commission may issue an order providing that any *article* imported in violation of the provisions of this section be seized and forfeited to the United States if—

------

[16]  The Commission made this conclusion based upon definitions of "articles of commerce" found in one Supreme Court case and one Seventh Circuit case, *Reno v. Condon*, 528 U.S. 141, 148 (2000), and *Senne v. Vill. of Palatine*, 695 F.3d 617, 620 (7th Cir. 2012).  *Final Comm'n Op.* at 40.  These two cases are not relevant to the analysis at hand; they interpret the Driver's Privacy Protection Act rather than the statute at issue in this case.  *See* Sapna Kumar, *Regulating Digital Trade*, FLA. L. REV., at 34 (Mar. 29, 2015) (Forthcoming) (discussing how the "courts in these cases were looking at whether information could be regulated as an 'article of commerce' under the Constitution's Commerce Clause" and that the term "article of commerce" does not appear in either the Driver's Privacy Protection Act or the Constitution, thus making the cases irrelevant to the determination of the definition of the term "article"), *available at* http://ssrn.com/abstract=2586740.

(A) the owner, importer, or consignee of the article previously attempted to import the article into the United States;

(B) the article was previously denied entry into the United States by reason of an order issued under subsection (d) of this section; and . . . .

19 U.S.C. § 1337(i) (emphasis added). This section permits the Commission to exclude "articles" from importation into the United States; however, it is difficult to see how one could physically stop electronic transmissions at the borders under the current statutory scheme. Furthermore, if articles included digital data, it would render the section's use of the terms "forfeited" and "seized" hollow, as an electronic transmission cannot be "seized" or "forfeited." By way of example, digital transmissions from satellites do not move through border crossings, nor can they be stopped at our borders via any enforcement mechanism contemplated in the statutory scheme. As Commissioner David S. Johanson points out in his dissent, an "exclusion order directed against electronic transmissions could not only have no effect within the context of Section 337—it simply would make no sense as it would not be enforce[able]." *Final Comm'n Op.* Dissent at 6 (David S. Johanson, dissenting).

A construction of the term "articles" that includes electronically transmitted digital data is also not reasonable when applied to Section 337(i)(3). This section reads, "[u]pon the attempted entry of articles subject to an order issued under this subsection, the Secretary of the Treasury shall immediately notify all ports of entry of the attempted importation and shall identify the persons notified under paragraph (1)(C)." Not only can an electronic transmission not be subject to an "attempted entry" through a "port of entry," it also cannot be intercepted at a "port of entry" as contemplated in the statute. Returning to our satellite example, once the transmission is

made from a satellite and directed to the United States, it is illogical to consider its entry as an "attempted entry." The transmission either passes through our border or it does not.  If the term "articles" was intended by Congress to be inclusive of nonmaterial objects, such as electronic transmissions, it would render this section moot.

Align further argues that because "articles" is used in connection with "articles that infringe," "articles" must be read broadly enough that it encompasses all possible forms of infringement.  We disagree.  The question before us is not what types of infringement are covered, but what goods are protected from infringement under Section 337. It is perfectly reasonable that Congress only intended that some subset of infringing goods be covered by Section 337.  "Further, were we to adopt [the Commission's] construction of the statute, we would render the word '[articles]' insignificant, if not wholly superfluous.  It is our duty to give effect, if possible, to every clause and word of a statute."  *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (citation omitted).

3

We further look to the Tariff Act in its entirety as "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *King*, 135 S. Ct. at 2492.  As when defining words in a statute, their ultimate meaning should remain consistent with the remainder of the statute as a term's meaning must be "compatible with the rest of the law."  *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014). Here, the basic statutory scheme, and specifically its original remedial scheme, provides further support for the conclusion that Congress understood "articles" to mean "material things" and not to include intangibles such as digital data.

The original version of Section 337 provided only a single remedy for violations:

> Whenever the existence of any such unfair method or act shall be established to the satisfaction of the President he shall direct that the articles concerned in such unfair methods or acts, imported by any person violating the provisions of this Act, shall be excluded from entry into the United States, and upon information of such action by the President, the Secretary of the Treasury shall, through the proper officers, refuse such entry.

Tariff Act of 1930, Pub. L. 71-361, 46 Stat. 704 (1930). This sole remedy of exclusion could only have an impact on material things. Obviously, intangibles, such as electronic transmissions, do not pass through United States ports and cannot be excluded by Customs. Thus, as electronic transmissions of digital data could not be excluded in the fashion contemplated by the Act, an expansion of the term "articles" beyond "material things" would mean that Congress included an entire set of commodities in the statute without providing a method to curtail their importation. The impossibility of this result supports confining "articles" to "material things."

The Commission points to the 1974 authorization of cease and desist orders as support for its conclusion that "articles" includes digital data. The Commission argues that the addition of this section "strengthened the statute to protect against unfairly traded imports by providing additional remedies for a violation . . . ." *Final Comm'n Op.* at 47. We disagree.

Congress's 1974 authorization of cease and desist orders supports the conclusion that the statutory scheme is premised upon "articles" being defined as "material things." Fifty-two years after the creation of Section 337 Congress added a second remedial tool to the Commission's arsenal, the cease and desist order. *See* Trade Act of 1974, Pub. L. 93-618, 88 Stat. 1978, 2055 (1975). This tool was meant to be used as a lesser and "softer remedy"

than exclusion orders rather than the exclusive remedy which would be the case were digital data considered an article. *Textron, Inc. v. U.S. Int'l Trade Comm'n*, 753 F.2d 1019, 1029 (Fed. Cir. 1985) ("[T]he contemplated range of remedies was expanded by the Trade Act of 1974 to include 'softer' sanctions such as cease-and-desist orders . . . ."); *see* S. Rep. 93-1298 at 198 (1974).  In fact, in passing the bill, Congress made clear that "[n]o change [was] made in the substance of the jurisdiction conferred under Section 337(a) with respect to unfair methods of competition or unfair acts in the import trade."  S. Rep. No. 93-1298, 1974 U.S.C.C.A.N. 7186, 7327 (1974).  Instead, the purpose of the provision, according to the Senate Report, was to add "needed flexibility" because "the existing statute, which provides no remedy other than the exclusion of articles from entry, is so extreme or inappropriate in some cases that it is often likely to result in the Commission not finding a violation of this section."  *Id.* at 7331.  Furthermore, while the Commission cites to the repeated updates in the amount of the fine associated with cease and desist orders as support for the fact that this section expanded the scope of "articles," there is no logical connection between the amount of the fine and whether cease and desist orders expanded the Commission's jurisdiction.

The text of the cease and desist language further supports the conclusion that "articles" cannot be defined in such a way as to include electronic transmissions.  This is because if "articles" was defined to include electronic transmissions, the addition of cease and desist orders would not be a lesser alternative for exclusion orders, but an expansion of the exclusion power.  We agree with Commissioner David S. Johanson who argued in his dissent that "[i]ndeed, [the cease and desist] provision demonstrates that the definition of articles for Section 337(f) must be the same as the rest of the statute; otherwise the provision for replacement [of cease and desist

orders with exclusion orders] would be rendered a nullity and read out of the statute." *Final Comm'n Op.* Dissent at 8 (David S. Johanson, dissenting). The fact that a definition of "articles" that includes intangibles would read out the very purpose behind the inclusion of cease and desist orders yields further evidence that the term article is meant to be limited to tangibles.

Finally, Section 337's connection to what is now known as the Harmonized Tariff Schedule of the United States (HTSUS) supports a narrower definition of the term "articles" than provided by the Commission. When the Tariff Act of 1930 was first passed it was, at its heart, a tariff provision that imposed duties on specific imports. Section 1 of the title reads:

> That on and after the day following the passage of this Act, except as otherwise specially provided for in this Act, there shall be levied, collected, and paid upon all *articles* when imported from any foreign country into the United States or into any of its possessions . . . the rates of duty which are prescribed by the schedules and paragraphs of the dutiable list of this title, namely:

46 Stat. 590 (emphasis added). Congress then provided ninety-five pages of schedules identifying specific dutiable and non-dutiable goods. Every single item in these schedules was a material thing. *See* 46 Stat. 590-685. Furthermore, Congress assumed that these schedules were not comprehensive and thus included catchall clauses. One such clause can be found in paragraph 1559, which reads in relevant part, "That each and every imported article, not enumerated in this Act, which is similar, either in material, quality, texture, or the use to which it may be applied to any article enumerated in this Act . . . shall be subject to the same rate of duty which is levied on the enumerated article . . . ." *Id.* at 672. Similarly, paragraph 1558 states, "That there shall be levied,

collected, and paid on the importation of all raw or un-
manufactured articles not enumerated or provided for . . .
." *Id.* Both of these catchalls are premised on the notion
that articles are tangible and dutiable. This provides
further evidence that the statutory scheme was to solely
regulate "material things" and thus not electronic trans-
mission of digital data, which is not dutiable.

Tariff Schedules have continued to limit articles to
tangibles. The dutiable schedules in the Tariff Act of
1930 were later replaced in 1963 with the Tariff Schedule
of the United States, Pub. L. 87-456. Accompanying this
revision was the Tariff Classification Study Submitting
Report. In this report, the Commission wrote, "General
headnote 5 sets forth certain intangibles which, under
various established customs practices, are not regarded as
articles subject to treatment under the tariff schedules."
*Id.* at 18. This subsection includes items such as electrici-
ty, securities, and similar evidences of value. *Id.* at 12.
The Tariff Schedule of the United States was in turn
replaced by the Harmonized Tariff Schedule of the United
States in 1988, pursuant to the Omnibus Trade and
Competitiveness Act. Pub. L. 100-418 § 1206, 102 Stat.
1151, codified at 19 U.S.C. § 3006. While this schedule
included a heading for electrical energy, it specifically
removed it from the purview of section 484 of the Tariff
Act of 1930 and placed its regulation purely in the hands
of the Secretary of the Treasury. Section 484 regulates
the entry requirements under the Tariff Act. This succes-
sion of tariff schedules provides further evidence that the
Act's scheme was not meant to include intangibles.

4

The clarity of the statutory context obviates the need
to turn to the legislative history. The Tariff Act's legisla-
tive history further confirms the conclusion that "articles"
is limited to "material things," however, and thus not
inclusive of electronic transmissions of digital data. This

is supported by two distinct points in the Tariff Act's legislative history: (1) the period of time when "articles" first appeared in Section 337 of the Tariff Act of 1930, inclusive of section 316 of the 1922 Tariff Act; and (2) the legislative history from 1988 in which for the first time the Tariff Act was expanded to explicitly cover IP infringement.

The Commission argues that, because Congress treated the terms "goods" and "articles" as synonymous within the legislative history, articles must be read broadly. *Final Comm'n Op.* at 39. We agree with the Commission in part and disagree in part. We agree with the Commission that Congress used "goods" and "articles" synonymously at the time of the passage of the Act;[17] [18] however, we disagree that this mandates a definition of "articles" that is broader than "material things."

At the time of enactment "goods" had a clear definition. The second edition of BLACK'S LAW DICTIONARY,

---

[17] "The House and Senate Reports of the 1922 and 1930 Acts and Congressional debate refer to articles as synonymous with goods . . . . *See* S. Rep. 67-595 at 3 (1922); H.R. Rep. 71-7 at 3 (1929); 71 Cong. Rec. S. 3872, 4640 (1929)." *Final Comm'n Op.* at 43. For example, the Senate Report stated its amendments were meant to "prohibit the importation of particular goods for the purpose of preventing unfair methods of competition in the importation of goods." S. Rep. 67-595 at 3. The report further noted that, "The provision relating to unfair methods of competition in the importation of goods is broad enough to prevent every type and form of unfair practice." *Id.* at 3.

[18] Our recent opinion in *Suprema* also uses "goods" synonymously with "articles." *See Suprema, Inc.*, 2015 WL 4716604, at *1.

which was contemporaneous with the passage of the Tariff Act, states that "goods" "[are] not so wide as 'chattels,' for it applies to inanimate objects, and does not include animals or chattels real." *Goods*, BLACK'S LAW DICTIONARY (2d ed. 1910). Black's dictionary divides "chattels" into two groups "chattels real" and "chattels personal." *Id.* at *Chattels*. "Chattels real" are "interests in land which devolve after the manner of personal estate, as leaseholds" while "chattels personal" are "movables only." *Id.* The clear conclusion to draw from this is that "goods" are also limited to movables, i.e., material things. Thus, both words used by Congress at the time of enactment to describe the bounds of Section 337, "goods" and "articles," were limited to "material things."

The Commission argues that the legislative history relating to the Omnibus Trade and Competitiveness Act of 1988 reaffirmed that "articles" was meant to include digital data. The Commission relies on the relevant Senate Report's statement that the will of Congress was to block any United States sale of a product covered by an IP right, because "[t]he importation of any infringing merchandise derogates from the statutory right, diminishes the value of the intellectual property, and thus indirectly harms the public interest." *Final Comm'n Op.* at 48 (quoting S. Rep. 100-71 at 12-29 (1987); H.R. Rep. 100-40 at 156 (1987)). The Commission argues that the use of the word "commerce" indicates that "articles" should be read broadly. We disagree.

While the Omnibus Trade and Competitiveness Act made numerous changes to the Tariff Act, it included no language that increased the scope of "articles." The Commission's argument fails to take into account the contemporaneous definition of the term "merchandise." "Merchandise" was defined at the time as "[a]ll goods which merchants usually buy and sell . . . , [b]ut the term is generally not understood as including real estate" and "goods," while "a term of variable content and meaning,"

is ultimately defined as "[i]tems of merchandise, supplies, raw materials, or finished goods. *Merchandise, Goods,* BLACK'S LAW DICTIONARY (5th ed. 1979). Sometimes the meaning of 'goods' is extended to include all tangible items, as in the phrase 'goods and services.'" *Id.* at *Goods*. This definition makes clear, that at its broadest the definition of "goods," and thus merchandise, was limited to tangible items.

This analysis comports with our opinion in *Bayer*. In *Bayer* we analyzed the history of section 271(g) along with its overlap with Section 337. We found that Congress adopted the definition of "article" from Section 337 and imported it into section 271(g). *Bayer AG v. Housey Pharm., Inc.*, 340 F.3d 1367, 1374 (Fed. Cir. 2003). Our opinion concludes that "there is no indication of any intent to reach products other than tangible products produced by manufacturing processes." *Id.* at 1375. Furthermore we stated:

> We recognize that section 1337 covers both articles that were "made" and articles that were "produced, processed, or mined." While this language in section 1337 perhaps suggests a broader scope for section 1337 than for section 271(g), nothing in section 1337 suggests coverage of information, in addition to articles under section 271(g).

*Id.* at 1367, n.9.

In sum, the literal text, the context in which the text is found within Section 337, and the text's role in the totality of the statutory scheme all indicate that the unambiguously expressed intent of Congress is that

"articles" means "material things" and does not extend to electronically transmitted digital data.[19] [20]

## B. *Chevron* Step Two

As Congress's expressed intent is unambiguous, we need not address step two of *Chevron*. However, even if we were to address step two, it is clear that the Commission's interpretation of the term "articles" was unreasonable.

Step two of *Chevron* requires us to determine "whether the [Commission's] answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843, 104 S. Ct. 2778, 2782, 81 L. Ed. 2d 694 (1984). Because the Commission failed to properly analyze the plain meaning of "articles," failed to properly analyze the statute's legislative history, and improperly relied on Congressional debates, the Commission's analysis does not warrant deference.

The Commission's analysis of dictionary definitions evidences the irrationality of the Commission's interpretation of the term "article." While the Commission ostensibly analyzes various dictionary definitions, it fails to adopt a definition consistent with any of the definitions it references. For example, as discussed in the prior section, the Commission turns to the 1924 edition of the Webster's dictionary for the definition of "article," but rather than adopt that definition it concludes that it will "embrace a broader meaning that describes something that is traded

---

[19]    This is markedly different from *Suprema* where we concluded that the relevant text was ambiguous. *See Suprema, Inc.*, 2015 WL 4716604, at *4-6.

[20]    We note that we do not limit the parties' other legal remedies, such as a possible action in district court.

in commerce." *Final Comm'n Op.* at 39. In other words, it generates its own definition, unrelated to the definition provided by the dictionary.

Furthermore, the Commission inexplicably cites to several dictionaries in two footnotes that support "articles" being defined as "material things," but provides no analysis as to why these dictionaries should not be considered.

Footnotes 20 and 21 read:

[20] Some definitions of "article," in addition to stating a broader generic meaning, also set forth a more granular meaning of a material thing. For example, a 1929 edition of Funk and Wagnall's defines "articles," in pertinent part as: "A particular object or substance; a material thing or class of things; as, an article of food." The Federal Circuit, interpreting 35 U.S.C. § 271(g), noted one definition of "article" in Webster's Third New Dictionary (a more recent edition of Webster's). "Article" is there defined as "one of a class of material things . . . pieces of goods; COMMODITY." Thus, while an "article" was understood to include something material, as shown in the text above, the term was also understood to embrace a broader meaning that describes something that is traded in commerce.

[21] More recent context relevant definitions of "articles" are in accord. *See, e.g.* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ("5: a material thing"; . . . "6a: a thing of a particular class of kind as distinct from a thing of another class of kind"); RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY (2nd Edition 2001) ("2. An individual object, member, or portion of a class; an item or particular; an article of food; articles of clothing; . . . 4. An item for sale; commodity").

*Id.* (citation omitted).

Despite the definitions quoted in the footnotes running directly counter to the definition adopted by the Commission, the Commission provides virtually no analysis as to why they should not control.  It is not reasonable for the Commission to conclude that the dictionary definitions that it cites "embrace a broader meaning that describes something that is traded in commerce," when the Commission's definition cannot be found in any dictionary cited by the Commission and the Commission's conclusion is not logically connected to any of the definitions cited by the Commission.

Additionally, the Commission fails to properly analyze the legislative history regarding the Tariff Act.  This failure is echoed in its briefing to the court.  The Commission concludes, based in large part on a Senate Report from 1922, that "The central purpose of Section 337, since the enactment of the original statute in 1922, has been to prevent every type of unfair act or practice in import trade that harms U.S. industries." *Final Comm'n Op.* at 44—45.   The Commission's Opinion cites the Senate Report, S. Rep. 67-595, as authority for this conclusion and then quotes it as follows:

> The provision relating to unfair methods of competition is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any antidumping statute the country ever had.

However, the actual quote reads as follows:

> The provision relating to unfair methods of competition *in the importation of goods* is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any antidumping statute the country ever had.

S. Rep. 67-595, at 3 (1922) (emphasis added).  The Commission's omission of the phrase, "in the importation of goods" is highly misleading; not only was a key portion of the quote omitted, but it was omitted *without any indication that there had been a deletion.*[21]  Furthermore, while we may agree that the quote, as incorrectly stated by the Commission, would indicate a broad authority for the Commission, the phrase "in the importation of goods" clearly limits the Commission's authority.  And as we discussed above, it limits it in such a way as to exclude non-material things.  Because the Commission uses this misquote as its main evidence that the purpose of the act was to cover all trade, independent of what form it takes, the Commission's conclusion regarding the purpose of the Act is unreasonable.

Finally, the Commission wrongly focuses on current debates in Congress as indicative of what "articles" means.  The Commission comments as follows:

> We note recent developments that show the acceptance of digital goods traded in commerce as falling within international trade.  Senators Baucus and Hatch and Congressman Camp have introduced Trade Promotion Authority bills that instruct the Administration to seek increased protection for digital trade in future trade agreements.  Moreover, Congress has requested that

---

[21]  It is noteworthy that this is not the Commission's only failure to cite evidence correctly.  The Commission additionally states that "goods, commodities, and merchandise" have the same definition as "articles" as defined in the second edition of BLACK'S LAW DICTIONARY.  *Final Comm'n Op.* at 43.  However, BLACK'S LAW DICTIONARY does not provide the cited definition.

> the Commission study the impact of digital trade under Section 332, another part of Title 19.

*Final Comm'n Op.* at 43, 44 (citation omitted).   This analysis is improper.  First, Congress has not passed any of the cited bills.  Second, even if the bills were passed, they would not have informed us as to whether the Commission has jurisdiction over digital goods.

In sum, the Commission repeatedly and unreasonably erred in its analysis of the term "article."  It is not simply a question of the Commission having the choice between two "right" definitions, but instead it represents a systematic pattern of the Commission picking the wrong conclusion from the evidence.  Here the Commission has not offered a reasoned explanation for its definition of "articles" and thus is owed no deference.

## III. CONCLUSION

While Congress's intent regarding "articles" is unambiguous, it is worth repeating what we said in *Bayer*:

> Under these circumstances we think it is best to leave to Congress the task of expanding the statute if we are wrong in our interpretation.  Congress is in a far better position to draw the lines that must be drawn if the product of intellectual processes rather than manufacturing processes are to be included within the statute.

*Bayer*, 340 F.3d at 1376-77.

For the reasons stated above, we reverse and remand the Commission's decision, finding that the Commission does not have jurisdiction over this case.

**REVERSED AND REMANDED**

# United States Court of Appeals for the Federal Circuit

———————————

**CLEARCORRECT OPERATING, LLC,
CLEARCORRECT PAKISTAN (PRIVATE), LTD.,**
*Appellants*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**ALIGN TECHNOLOGY, INC.,**
*Intervenor*

———————————

2014-1527

———————————

Appeal from the United States International Trade Commission in Investigation No. 337-TA-833.

———————————

O'MALLEY, *Circuit Judge*, concurring.

I agree with the majority's well-reasoned conclusion that the International Trade Commission ("the Commission") lacks jurisdiction over this case. The majority's analysis under the *Chevron* framework correctly reveals that the Commission's interpretation of 19 U.S.C. § 1337 ("Section 337") is not entitled to deference. I write separately, however, because I believe we need not resort to *Chevron* steps one and two to resolve this matter.

Deference to an agency interpretation under the *Chevron* framework "is premised on the theory that a

statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *King v. Burwell*, 135 S. Ct. 2480, 2488 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). There are "extraordinary cases," however, where we should "hesitate before concluding that Congress has intended such an implicit delegation." *Id.* at 2488-89 (quoting *FDA*, 529 U.S. at 159). In other words, there are times when courts should not search for an ambiguity in the statute because it is clear Congress could not have intended to grant the agency authority to act in the substantive space at issue. This is one of those extraordinary cases. Where, as here, Congress has not delegated authority to an agency, courts need not apply the *Chevron* framework to the agency's interpretation of its governing statute. *See id.* at 2489.

The Commission has concluded that it has jurisdiction over *all* incoming international Internet data transmissions. It reaches this conclusion despite never having purported to regulate Internet transmissions in the past, despite no reference to data transmissions in the statute under which it acts, despite an absence of expertise in dealing with such transmissions, and despite the many competing policy concerns implicated in any attempt to regulate Internet transmissions. The Internet is "arguably the most important innovation in communications in a generation." *Comcast Corp. v. FCC*, 600 F.3d 642, 661 (D.C. Cir. 2010). If Congress intended for the Commission to regulate one of the most important aspects of modern-day life, Congress surely would have said so expressly. *Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014) (rejecting EPA's vast expansion of its program of requiring clean air permits because such an expansion "would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization"). The Supreme Court has noted that "[w]hen an agency claims to discover in a long-

extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism." *Id.* The Court further indicated that Congress must "speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Id.* (quoting *FDA*, 529 U.S at 160). Here, far from clearly addressing the issue of whether the Commission should have jurisdiction over the international exchange of data on the Internet, Congress's last major amendment to Section 337 was in 1988, one year before the invention of the World Wide Web. *See* Sapna Kumar, *Regulating Digital Trade*, 67 FLA. L. REV., at 28-32 (forthcoming 2015) (reviewing legislative history of the Tariff Act with respect to the term "articles").

Although the Commission's jurisdiction over imported physical goods is undeniable, it is very unlikely that Congress would have delegated the regulation of the Internet to the Commission, which has no expertise in developing nuanced rules to ensure the Internet remains an open platform for all. *See King*, 135 S. Ct. at 2489. Instead, the responsibility lies with Congress to decide how best to address these new developments in technology. *See Microsoft v. AT&T Corp.*, 550 U.S. 437, 458-59 (2007) ("If the patent law is to be adjusted better to account for the realities of software distribution, the alteration should be made after focused legislative consideration.") (quotation omitted); *see also Gottschalk v. Benson*, 409 U.S. 63, 73 (1972) ("If [computer] programs are to be patentable, considerable problems are raised which only committees of Congress can manage, for broad powers of investigation are needed, including hearings which canvass the wide variety of views which those operating in this field entertain.").

Indeed, Congress has enacted laws and debated bills whose intent is to balance an interest in open access to the Internet and the need to regulate potential abusers. *See, e.g.*, Communications Decency Act of 1996, 47 U.S.C.

§ 230(b)(1), (c)(1) (2012) (statute enacting immunity from liability for Internet service providers in order to "promote the continued development of the Internet and other interactive computer services and other interactive media"); 17 U.S.C. § 512 (statute limiting copyright infringement liability based on a similar policy); The Digital Trade Act of 2013, S.1788, 113th Cong. (2013–2014) (bill seeking to have agencies "staffed with experts and leaders to fulfill the mission of promoting an open, global Internet that facilitates commerce and digital trade"); Online Protection and Enforcement of Digital Trade Act, S. 2029/H.R. 3782 (112th Cong. 2011–2013) (bill proposing amendment of the Tariff Act to formally confer the ITC with jurisdiction over digital importation). Not once in these debates has Congress said or implied that it need not concern itself with these issues because it had already delegated the authority to do so to the Commission. Because Congress did not intend to delegate such authority to the Commission, I would find the two step *Chevron* inquiry inapplicable in this case; I would find that we never get past what some refer to as *Chevron* step zero when assessing the propriety of the Exclusion Order before us.[1]

---

[1] *Chevron* "step zero" has been defined as "the initial inquiry into whether the *Chevron* framework applies at all." *See* Cass R. Sunstein, Chevron *Step Zero*, 92 VA. L. REV. 187, 191 (2006). Some scholars believe this additional inquiry aids and streamlines review of administrative decision making. *See, e.g.,* Thomas W. Merrill, Symposium, Chevron *at 30: Looking Back and Looking Forward: Step Zero After City of Arlington*, 83 FORDHAM L. REV. 731, 744 (2014) (opining that the announcement of the *Chevron* step zero inquiry in *United States v. Mead Corp.*, 533 U.S. 218 (2001) was a "positive" step forward

Assuming, arguendo, that the *Chevron* framework does apply to the Commission's interpretation, however, I agree with the majority's ruling that the Commission erred when it determined that it had jurisdiction over the disputed digital data.

---

in administrative law, and critiquing more recent developments in *Chevron* step zero jurisprudence).

# United States Court of Appeals
# for the Federal Circuit

———————————

**CLEARCORRECT OPERATING, LLC,
CLEARCORRECT PAKISTAN (PRIVATE), LTD.,**
*Appellants*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**ALIGN TECHNOLOGY, INC.,**
*Intervenor*

———————————

2014-1527

———————————

Appeal from the United States International Trade
Commission in Investigation No. 337-TA-833.

———————————

NEWMAN, *Circuit Judge,* dissenting.

Today's culture, as well as today's economy, are
founded on advances in science and technology. As the
Industrial Revolution advanced, and recognizing the
importance to the nation of technology-based industry,
the Tariff Acts of 1922 and 1930 were enacted to provide
additional support to domestic industries that dealt in
new and creative commerce, by providing an efficient
safeguard against unfair competition by imports that
infringe United States patents or copyrights. The Inter-
national Trade Commission correctly applied the Tariff

Act and precedent to encompass today's forms of infringing technology.

The new technologies of the Information Age focus on computer-implemented methods and systems, whose applications of digital science provide benefits and conveniences not imagined in 1922 and 1930. Throughout this evolution, Section 337 served its statutory purpose of facilitating remedy against unfair competition, by providing for exclusion of imports that infringe United States intellectual property rights.

Until today.

The court today removes Section 337 protection from importations that are conducted by electronic transmission. The court's reason is that electronically transmitted subject matter is not "tangible," and that only tangible imports are subject to exclusion. This holding is contrary to Section 337, and conflicts with rulings of the Supreme Court, the Federal Circuit, the Court of Customs and Patent Appeals, the Court of International Trade, the International Trade Commission, the Customs authorities, and the Department of Labor. I respectfully dissent.

### *Infringement is not here at issue; the only issue is the Section 337 cease and desist order.*

The imports are infringing "digital models, digital data, and treatment plans for use in making incremental dental positioning adjustment appliances," produced for ClearCorrect in Pakistan and imported into the United States by electronic transmission. The International Trade Commission found, and it is not disputed, that the imported data sets are "virtual three-dimensional models" of a patient's teeth, and that the imports are used in the United States to make a three-dimensional physical model of the dental appliance. *Certain Digital Models, Digital Data, & Treatment Plans for Use in Making Incremental Dental Positioning Adjustment Appliances,*

*the Appliances Made Therefrom, & Methods of Making the Same*, Inv. No. 337-TA-833, at 17 (April 10, 2014) ("Comm'n Op.").

Infringement of the Align Technology patents is not at issue. The only issue is whether the Section 337 remedy is available to exclude the infringing digital subject matter. The Commission, reviewing the "plain language of the statute, its legislative history and purpose, pertinent case law, and the arguments of the parties and public commenters," held that "the digital data sets at issue . . . are true articles of international commerce that are imported into the United States, and their inclusion within the purview of section 337 would effectuate the central purpose of the statute." Comm'n Op. at 55.

The Commission issued a Cease and Desist Order against "importing (including through electronic transmission)" the digital models, digital data, and orthodontic plans that were found to infringe the Align patents. Order (April 3, 2014). The panel majority now revokes that Order, holding that imports reaching the United States by electronic transmission are not subject to Section 337. This ruling is contrary to the statute and contrary to precedent; and if there were there doubt as to the intended scope of Section 337, the Commission's ruling requires deference.

### *The Commission correctly held that section 337 applies to imports of infringing digital goods.*

Section 337 of the Tariff Act of 1930, as amended, makes unlawful:

(B) The importation into the United States, the sale for importation, or the sale within the United States after importation . . . of articles that—

(i)  infringe a valid and enforceable United States patent or . . . copyright . . . ; or

> (ii)    are made, produced, processed, or mined
> under, or by means of, a process covered by
> the claims of a valid and enforceable United
> States patent.

19 U.S.C. § 1337(a)(1)(B)(i)-(ii).

The Commission determined that ClearCorrect's infringement of the Align patents in the United States, and infringement by the process practiced for ClearCorrect in Pakistan, is subject to Section 337. The court's rejection of that ruling is in contravention of the text and the purpose of Section 337 of the Tariff Act.

Section 337 was enacted to facilitate the protection of American industry against unfair competition by infringing imports. The statute was designed to reach "every type and form" of unfair competition arising from importation. The Senate Report stated: "The provision relating to unfair methods of competition in the importation of goods is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any antidumping statute the country has ever had." S. Rep. No. 67-595 at 3 (1922).

Our predecessor Court of Customs and Patent Appeals emphasized that this purpose is "to give to industries of the United States, not only the benefit of the favorable laws and conditions to be found in this country, but also to protect such industries from being unfairly deprived of the advantage of the same and permit them to grow and develop." *Frischer & Co. v. Bakelite Corp.*, 39 F.2d 247, 259 (CCPA 1930).

Until today, this Tariff Act provision has been interpreted to implement this protective incentive. In *In re Northern Pigment Co.*, 71 F.2d 447 (CCPA 1934), the court applied Section 337 to reach products produced abroad by a process patented in the United States, stating that "if unfair methods of competition or unfair acts in the

importation of articles into the United States are being practiced or performed by any one, they are to be regarded as unlawful, and the section was intended to prevent them." *Id.* at 455.    This ruling is codified at Section 1337(a)(1)(B)(ii), *supra.*

Over the decades, the International Trade Commission and the Court of Customs and Patent Appeals implemented Section 337 "to provide an adequate remedy for domestic industries against unfair methods of competition and unfair acts initiated by foreign concerns operating beyond the in personam jurisdiction of domestic courts." *Sealed Air Corp. v. Int'l Trade Comm'n*, 645 F.2d 976, 985 (CCPA 1981).    The Federal Circuit reiterated this purpose, stating in *Lannom Mfg. Co. v. Int'l Trade Comm'n,* 799 F.2d 1572 (Fed. Cir. 1986), that "the purpose of section 337 from its inception was to provide relief to United States industry from unfair acts, including infringement of United States patents by goods manufactured abroad." *Id.* at 1580.

Congress again considered Section 337 during the process of enacting the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418 § 1341, 102 Stat. 1107, stating that:

> As indicated by the scope of its language, section 337 was intended to cover a broad range of unfair acts not then covered by other unfair import laws. However, over the years, patent, copyright, and trademark infringement were recognized as unfair trade practices within the meaning of section 337, and today section 337 is predominantly used to enforce U.S. intellectual property rights.

S. Rep. No. 100-71 (1987) at 130.    The Act itself reiterated the purpose to provide "a more effective remedy for the protection of United States intellectual property rights" through exclusion of infringing imports.    Omnibus Trade

and Competitiveness Act of 1988, Pub. L. No. 100-418 § 1341(b), 102 Stat. 1107, 1212.

This court recently reaffirmed that "the legislative history consistently evidences Congressional intent to vest the Commission with broad enforcement authority to remedy unfair trade acts." *Suprema, Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338, 1350 (Fed. Cir. 2015) (en banc).

The purpose of Section 337 to provide a facilitated remedy against infringing imports is beyond dispute. The panel majority's removal of this remedy from a pre-eminent form of today's technology is a dramatic withdrawal of existing rights, devoid of statutory support and of far-reaching impact. The majority's ruling, that digital goods cannot be excluded under Section 337 because digital goods are "intangible," is incorrect.

### *The Commission correctly held that Section 337 is not limited to the kinds of technology that existed in 1922 or 1930.*

Patents are for things that did not previously exist, including kinds of technology that were not previously known. The panel majority, rejecting today's digital technologies and overruling the International Trade Commission, holds that Section 337 does not apply to digital technology forms that the majority describes as "intangible." It is not disputed that digital information, such as the data sets and models here imported, is patentable subject matter and can be infringing subject matter. There is no basis for excluding imported infringing subject matter from Section 337, whatever the form of the subject matter.

The Supreme Court in *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968), considered "a statute that was drafted long before the development of the electronic phenomena with which we deal here," stating that "[w]e must read the statutory language . . . in

the light of drastic technological change." *Id.* at 395-96. This rule aptly applies to the Tariff Acts of 1922 and 1930.

The Court has referred to adaptation of the copyright statute to new technologies, observing in *Twentieth Century Music Corp. v. Aiken,* 422 U.S, 151 (1975), that although Congress did not revise the Copyright Act of 1909 following the advent of radio (and television), "copyright law was quick to adapt to prevent the exploitation of protected works through the new electronic technology." *Id.* at 158. The Court noted the "ultimate aim" of the copyright law "to stimulate artistic creativity for the general public good," and stated that "[w]hen technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose." *Id.* at 156.

The Commission has previously dealt with Section 337 importation in the form of digitally distributed software and digital files, stating that "[h]aving found that respondents' software contributorily infringes the claims in issue, we are of the view that our remedial orders must reach that software." *Certain Hardware Logic Emulation Systems,* Inv. No. 337-TA-383, USITC Pub. 3089, at 18 (March 1998). The court's ruling today contravenes Commission precedent, as well as our own.

The Federal Circuit dealt with the nature of digital files in *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1321 (Fed. Cir. 2009). The court rejected the argument that digital files such as computer software are not a "material or apparatus" subject to infringement as set forth in the Patent Act at 35 U.S.C. § 271(c). This reasoning applies to the "articles" subject to infringement as set forth in the Tariff Act at 19 U.S.C. § 1337. The court's decision today is a distortion of the statute's language and purpose, for Section 337 is designed to cover infringing

8                     CLEARCORRECT OPERATING, LLC v. ITC

subject matter; and digital software, as noted in *Lucent*, can be infringing subject matter.

Until today, Section 337 applied to all patented technologies, including digital technologies, whatever the path of importation. The court's exclusion of digital products and data technologies imported by electronic transmission has no support in statute, precedent, or policy.

### *The Commission correctly held that "articles" in the Tariff Act means "articles of commerce."*

The Commission held that the term "articles" in the Tariff Act is intended to include all infringing imported "articles of commerce." The Commission stated that "the statutory construction of 'articles' that hews most closely to the language of the statute and implements the avowed Congressional purpose for Section 337 encompasses within its scope the electronic transmission of the digital data sets at issue in this investigation." Comm'n Op. at 36.

The panel majority holds that the term "articles" in the Tariff Act excludes imported digital articles, but in a different section, the Tariff Act definition of "article" is unchanged from the 1922 and 1930 statutes:

> The term "article" includes any commodity, whether grown, produced, fabricated, manipulated, or manufactured.

19 U.S.C. § 1332(e)(1); Tariff Act of 1930, Part II, § 332, 46 Stat. 590, 699 (1930); Tariff Act of 1922, Part II, § 318(b), 42 Stat. 858, 947 (1922). This definition is striking in its breadth, and is commensurate with the stated purpose to reach "every type and form of unfair practice," *see* Senate Rep. No. 67-595, *supra*.

Digital articles of commerce did not exist when the Tariff Act was first enacted. However, the intention to

omit unforeseen, later-discovered technologies cannot be imputed to this statute, and is negated by the all-inclusive breadth of the definition that was written.

Nonetheless, the panel majority rules that the digital data sets and digital models that are here imported are not "material things" and therefore are excluded from Section 337. Maj. Op. at 27. Citing definitions in dictionaries of the 1920s, the majority rules that digital goods are "intangible," and that infringing imports when electronically transmitted are excluded from the Tariff Act.

However, the Tariff Act did not lock Section 337 into the technology in existence in 1922 or 1930. It cannot have been the legislative intent to stop the statute with the forms of "article" then known. Further, the particles and waveforms of electronics and photonics and electromagnetism are not intangible, although not visible to the unaided eye.[1]

Section 337 was written in broad terms, whereby no field of invention, past, present, or future, was excluded. It is not reasonable to impute the legislative intent to exclude new fields of technology, and inventions not yet made, from a statute whose purpose is to support invention.

The court nonetheless imputes this legislative purpose to the Tariff Act, placing weight on selected definitions of "article" in dictionaries of the 1920s, while dismissing unselected definitions as "imprecise at best."

---

[1]    It is reported that the elusive Higgs boson, a fundamental particle of matter, has been detected by observing its effects. By the same laws of physics, digital matter is most readily observed in its effects. The panel majority's ruling that such matter is not "material" is contrary to the law of the courts, the Customs agency, and the Commission.

Maj. Op. at 15.  Thus the court arbitrarily rejects the definition in the leading dictionary of the era, Webster's New International Dictionary of the English Language, 1924 Edition, and the 1934 Second Edition, which define "article" broadly and generally, as "a thing of a particular class or kind as distinct from a thing of another class or kind; a commodity; as, an article of merchandise."  Merchandise, in turn, is defined as "the objects of commerce; whatever is usually bought and sold in trade; wares; goods."

Precedent has long recognized that "article" in the Tariff Act was intended to be all-encompassing.  The Court of Customs and Patent Appeals in 1940, citing Webster's New International Dictionary, explained that, in the Tariff Act of 1930, "Congress said: 'and paid upon all articles when imported from any foreign country.' Unquestionably, Congress meant, by employing that language, to include under the word 'articles' any provided-for substance, material or thing of whatever kind or character that was imported into this country."  *United States v. Eimer & Amend*, 28 CCPA 10, 12 (1940).

The Commission defined "articles" in Section 337 to encompass "articles of commerce."  Comm'n Op. at 40. The Supreme Court defined "articles of commerce" to include pure information, holding in *Reno v. Condon*, 528 U.S. 141 (2000), that the Commerce Clause applies to interstate transmission of information in motor vehicle records sold or released "into the interstate stream of business."  *Id.* at 148.

Although data sets carrying information, imported by electronic or photonic or electromagnetic transmission, are not mentioned in the dictionaries of the 1920s, no reason has been shown to exclude them from articles of commerce.  No dictionary, and no statutory constraint, limits "articles" to items that are grossly "tangible."  Data carried by electronic particles or waves constitute articles

of commerce, and may be imported, bought and sold, transmitted, and used.

My colleagues' removal of digital goods from the Tariff Act is devoid of definitional or statutory support. The Commission correctly defined "articles" in Section 337 as meaning articles of commerce, including digital articles and electronic commerce.

### *The Commission correctly held that importation of infringing articles is not restricted to specific kinds of carriers or modes of entry.*

It is not disputed that the digital data sets and digital models of teeth are imported. Importation subject to Section 337 does not depend on the mode of entry into the territory of the United States:

> Importation . . . consists in bringing an article into a country from the outside. If there be an actual bringing in it is importation regardless of the mode in which it is effected. Entry through a customs house is not of the essence of the act.

*Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122 (1923).

The Bureau of Customs and Border Protection has established that Internet transmission is "importation" into the United States. *See* HQ 114459 (Sept. 17, 1998) ("We further find that the transmission of software modules and products to the United States from a foreign country via the Internet is an importation of merchandise into the customs territory of the United States"). The Customs rulings reflect the accepted view that digital products are "articles of commerce," "goods," or "merchandise."

The Customs statute classifies software as "merchandise" under 19 U.S.C. § 1401(c). *See* HQ114459 ("we find that the subject software modules and products are 'merchandise' and 'goods' . . ."); *see also* Heading 8523, USHTS (2015) (Rev. 2) (classifying software for importation

12              CLEARCORRECT OPERATING, LLC v. ITC

duties).   Although the panel majority argues that the Tariff Schedule exempts telecommunications transmissions from import duties, *see* General Note 3(e)(ii), HTSUS (2015) (Rev. 2), it is established that telecommunications transmissions, including electronically imported software, are within the purview of the Customs service. The Court of International Trade stated in *Former Employees of Computer Sciences Corp. v. U.S. Secretary of Labor*, 30 Ct. Int'l. Tr. 124, 414 F. Supp. 2d 1334, (2006):

> General Note 3(e) supports the conclusion that telecommunications transmissions, which would include transmissions of software code via the Internet, are exempt from duty while acknowledging that they are goods entering into the Customs boundaries of the United States.

*Id.* at 131.

Exemption from import duty is not exemption from patent infringement.  The court now discards established protocols and practices concerning electronic and digital technologies, although it is beyond debate that digital articles are "goods" or "merchandise" and may be bought and sold and patented and imported.   Today's ruling discards the Tariff Act's purpose of protecting domestic industry from unfair trade in the importation of this vast and powerful body of commercial articles that may infringe United States patents.

### *The Commission correctly held that electronic importation of digital goods is subject to the trade laws.*

My colleagues on this panel do not dispute that the Patent Act applies to the subject matter that is imported, although they hold that the Tariff Act does not apply, thereby rendering Section 337 incapable of performing its statutory purpose.

Section 337 does not distinguish between digital goods imported electronically and digital goods imported as embedded in a physical medium.  My colleagues hold that importation of infringing digital data can be excluded when the data are carried on discs or other storage media, but cannot be excluded when carried in packets or waves by wired or wireless transmission.  This distinction has long been discarded as unjustifiable, and in the context of Section 337 and other Trade statutes and rulings, precedent is universally contrary.

The Commission explained in *Hardware Logic Emulation Systems*, *supra*, that "it would be anomalous for the Commission to be able to stop the transfer of a CD-ROM or diskette containing respondents' software, but not be able to stop the transfer of that very same software when transmitted in machine readable form by electronic means." *Id.* at 29.

Reaching the same logical conclusion, the Department of Labor, interpreting the Trade Act for purposes of Trade Adjustment Assistance, stated that "[s]oftware and similar intangible goods that would have been considered articles, for the purposes of the Trade Act, if embodied in a physical medium will now be considered to be articles regardless of their method of transfer." *IBM Corporation Global Services Division, Piscataway, NJ; Middletown, NJ; Notice of Revised Determination on Remand*, 71 FR 29183-01 (May 19, 2006). And as mentioned *supra*, the Customs service holds that "[t]he fact that the importation of the merchandise via the Internet is not effected by a more 'traditional vehicle' (e.g., transported on a vessel) does not influence our determination."  HQ 114459 at 2.

To further illustrate, Congress rejected the distinction the court creates, in the context of trade negotiations. The recently enacted Bipartisan Congressional Trade Priorities and Accountability Act of 2015 covers "digital trade in goods and services" and states that "[t]he princi-

pal negotiating objectives of the United States . . . are . . . to ensure that electronically delivered goods and services receive no less favorable treatment under trade rules and commitments than like products delivered in physical form." Pub L. No. 114-26, § 102(a)(6) and (a)(6)(B)(i), 129 Stat. 320, 325 (2015).

Although various forms of wired and wireless transmission have become commonplace, within nations and across borders, the panel majority has locked the International Trade Commission into technological antiquity. The court ignores precedent and logic, and removes a vast body of technology from the protection of a statute designed for its protection.

### *Difficulty of enforcement is not grounds for discarding a remedial statute.*

The court argues that violation of Section 337 by electronic transmission into the United States, such as via the Internet or other cloud technologies, may be difficult to track and enforce. This argument, whatever the present state of science, cannot apply to the facts of this case, for the electronically imported digital goods are produced by the Pakistani affiliate of the United States importer, who is subject to the Commission's Cease-and-Desist Order.

Cease-and-desist orders as a remedy for Section 337 violations are not new, including orders relating to infringement by digital importation. *See Hardware Logic Emulation Systems, supra,* at 3 (ordering that respondent "shall not ... import (including electronically) into the United States, or use, duplicate, transfer, or distribute by electronic means or otherwise, within the United States, hardware logic emulation software that constitutes covered product").

Even if enforcement were difficult, difficulty of enforcing a remedial statute is not grounds for judicial elimina-

tion of all remedy. *See Bally/Midway Mfg. Co. v. Int'l Trade Comm'n*, 714 F.2d 1117, 1122 (Fed. Cir. 1983) (rejecting the position that absence of remedy precludes a finding of violation of Section 337). The court stated that "Congress did not intend the Commission to consider questions of remedy when the agency determines whether there is a violation." *Id.* at 1123.

My colleagues' reliance on possible difficulty of enforcement against electronic transmission of infringing digital data and related articles, although not at issue in this case, merely adds imprecision to judicial guidance in this commercially important area.

### *The Commission's ruling requires judicial deference in accordance with* Chevron.

It is not disputed that the digital data sets and digital models for teeth alignment, produced in Pakistan and imported into the United States, infringe the patents of Align Technology. The Commission recognized that this technology is subject to Section 337. This ruling is a reasonable statutory interpretation.

If Section 337 were deemed ambiguous as applied to these fields of technology and commerce, the Commission's well-reasoned interpretation, amid extensive corroboratory rulings, is entitled to judicial deference. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984). A permissible construction is one that is "rational and consistent with the statute." *Sullivan v. Everhart*, 494 U.S. 83, 88-89 (1990) (quoting *N.L.R.B. v. United Food & Commercial Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 123 (1987)). "If the agency interpretation is not in conflict with the plain language of the statute, deference is due." *Nat'l R.R.*

*Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417, (1992).

The rule of deference to the Commission's reasonable statutory interpretation has long been recognized by the Federal Circuit. *E.g., TianRui Grp. Co. v. Int'l Trade Comm'n*, 661 F.3d 1322, 1332 (Fed. Cir. 2011) ("We have held that the Commission's reasonable interpretations of section 337 are entitled to deference."); *Kinik Co. v. Int'l Trade Comm'n.*, 362 F.3d 1359, 1363 (Fed. Cir. 2004) ("To the extent that there is any uncertainty or ambiguity in the interpretation of § 337(a) and its successor § 1337(a)(1)(B)(ii), deference must be given to the view of the agency that is charged with its administration."); *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1381 (Fed. Cir. 1998) ("As the agency charged with the administration of section 337, the ITC is entitled to appropriate deference to its interpretation of the statute.").

"Congress cannot, and need not, draft a statute which anticipates and provides for all possible circumstances in which a general policy must be applied to a specific set of facts. It properly leaves this task to the authorized agency." *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1312 (Fed. Cir. 2001). To the extent that new technologies are involved in these infringing importations, deference is appropriate to the agency's reasonable application of the statute it is charged to administer. *See Nat'l Cable & Telecommunications Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 339 (upholding agency interpretive authority where the statute involved "technical, complex, and dynamic" subject matter that "might be expected to evolve in directions Congress knew it could not anticipate.").

On any standard, the Commission's determination is reasonable, and warrants respect. The panel majority's contrary ruling is not reasonable, on any standard.

## CONCLUSION

The Commission's ruling is consistent with the language, structure, and purpose of Section 337, and decades of precedent concerned with digital data, electronic transmission, and infringing importation. From the court's erroneous departure from statute and precedent, I respectfully dissent.

## CERTIFICATE OF SERVICE

I certify that I served a copy of the attached **PETITION OF APPELLEE**

**INTERNATIONAL TRADE COMMISSION FOR REHEARING EN BANC**

on counsel of record on January 27, 2016 by the Court's CM/ECF system, which

will send notice of such filing to all registered CM/ECF users.


/s/ Sidney A. Rosenzweig
Sidney A. Rosenzweig
Attorney Advisor
U.S. International Trade Commission
500 E Street, SW,
Washington, DC  20436
tel. (202) 708-2532
fax (202) 205-3111
sidney.rosenzweig@usitc.gov

Dated: January 27, 2016

## CERTIFICATE OF COMPLIANCE WITH PAGE LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This petition complies with the page limitation of Fed. R. App. P. 32(a)(7)(A) and 35(b)(2).

2.      This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  The petition has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.


/s/ Sidney A. Rosenzweig
Sidney A. Rosenzweig

Dated: January 27, 2016