**2013-1625, -1631, -1632, -1633**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

————————————

ERICSSON INC. and
TELEFONAKTIEBOLAGET LM ERICSSON,

*Plaintiffs-Appellees*,

*v.*

D-LINK SYSTEMS, INC., NETGEAR, INC., ACER, INC.,
ACER AMERICA CORPORATION, and GATEWAY, INC.,

*Defendants-Appellants*,

and
DELL, INC.,

*Defendant-Appellant*,

and
TOSHIBA AMERICA INFORMATION SYSTEMS, INC.
and TOSHIBA CORPORATION,

*Defendants-Appellants*,

and
INTEL CORPORATION,

*Intervenor-Appellant*,

and
BELKIN INTERNATIONAL, INC.,

*Defendant*.

————————————

Appeals from the United States District Court for the Eastern District of Texas
in case no. 10-CV-0473, Chief Judge Leonard Davis.

————————————

# CORRECTED NON-CONFIDENTIAL BRIEF FOR
# PLAINTIFFS-APPELLEES, ERICSSON INC. AND
# TELEFONAKTIEBOLAGET LM ERICSSON

————————————

February 20, 2014                    *(Counsel Listed on Next Page)*

Douglas A. Cawley
Theodore Stevenson, III
Warren Lipschitz
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
(214) 978-4000

John B. Campbell
Kathy H. Li
MCKOOL SMITH, P.C.
300 W. 6th Street, Suite 1700
Austin, TX 78701
(512) 692-8700

John M. Whealan
4613 Merivale Road
Chevy Chase, MD 20815
(202) 994-2195

*Attorneys for Plaintiffs-Appellees,*
*Ericsson Inc. and Telefonaktiebolaget LM*
*Ericsson*

## CERTIFICATE OF INTEREST

Ericsson Inc. and Telefonaktiebolaget LM Ericsson certify the following:

1. The full name of every party represented by me is:

   Ericsson Inc. and Telefonaktiebolaget LM Ericsson

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   Not Applicable

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

   Ericsson Inc. is wholly-owned by Ericsson Holding II Inc., which in turn is wholly-owned by Telefonaktiebolaget LM Ericsson. Telefonaktiebolaget LM Ericsson is publicly held and trades in the United States through American Depository Receipts under the name LM Ericsson Telephone Company.

4. The names of all law firms and the partners or associates that appeared for the party represented by us in the trial court or are expected to appear in this Court are:

   <u>McKool Smith P.C.</u>: Douglas A. Cawley, Theodore Stevenson, III, Samuel F. Baxter, John B. Campbell, Jr., Ada E. Brown (no longer at McKool Smith P.C.), Ashley N. Moore, Bradley W. Caldwell (no longer at McKool Smith P.C.), John A. Curry (no longer at McKool Smith P.C.), Brandon M. Jordan, Holly E. Engelmann, Jason A. Blackstone, Justin T. Nemunaitis (no longer at McKool Smith P.C.), Kathy H. Li, Kevin L. Burgess, Ryan A. Hargrave, Travis E. DeArman

   John M. Whealan

Dated: February 20, 2014          /s/ *Douglas A. Cawley*
                                  DOUGLAS A. CAWLEY

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................ i

TABLE OF AUTHORITIES ............................................................ vi

TABLE OF ABBREVIATIONS ........................................................ ix

STATEMENT OF RELATED CASES ................................................. 1

STATEMENT OF JURISDICTION.................................................... 1

INTRODUCTION ........................................................................ 2

STATEMENT OF ISSUES .............................................................. 3

STATEMENT OF CASE ................................................................. 4

STATEMENT OF FACTS ............................................................... 6

I.      Ericsson............................................................................. 6

II.     Technology Overview ......................................................... 7

        A.      The '568 Patent ...................................................... 9

        B.      The '215 Patent ..................................................... 10

        C.      The '625 Patent ..................................................... 13

III.    Ericsson's Licensing Program For Its Standard-Essential Patents.............. 16

        A.      Ericsson's Comparable Licenses for the Patents-in-Suit ................... 17

        B.      Ericsson's Pre-Suit Negotiations with Defendants ........................... 22

IV.     The Proceedings Below ..................................................... 23

SUMMARY OF ARGUMENT ...................................................... 24

STANDARD OF REVIEW ....................................................................26

ARGUMENT ......................................................................................28

I.     Defendants Infringe Ericsson's Valid '568, '215, and '625 Patents.............28

    A.     The District Court did Not Err in Denying JMOL as to Infringement of the '568 Patent ...........................................28

        1.     Substantial evidence supports the jury's finding that the '568 Patent is infringed............................................28

        2.     The district court correctly instructed the jury that the accused products infringe if they are reasonably capable of infringement.........................................................32

    B.     The District Court did Not Err in Denying JMOL as to Infringement of the '215 Patent ...........................................34

        1.     Substantial evidence supports the jury's finding that the '215 Patent is infringed............................................34

        2.     The district court correctly construed "type identifier field" (TIF)...............................................................38

    C.     The District Court did Not Err in Denying JMOL as to Infringement or Invalidity of the '625 Patent ....................41

        1.     Substantial evidence supports the jury's finding that the '625 Patent is infringed............................................41

        2.     Substantial evidence supports the jury's finding that the '625 Patent is not anticipated....................................45

    D.     Substantial Evidence Supports the Jury's Factual Finding that Defendants Directly Infringed and Also Induced Infringement of the Asserted Method Claims.........................................48

        1.     Defendants directly infringe the asserted method claims.........48

iii

2.    Defendants also induced infringement of the asserted method claims ............................................................................52

II.   The District Court Did Not Err In Denying JMOL As To Damages Because Substantial Evidence Supports the Jury's Award Of Approximately $10 Million ..............................................................................................55

A.    Comparable Licenses Establish the Value of the Patented Technology ..........................................................................57

B.    Ericsson's Expert Conducted a Rigorous Apportionment Analysis ...............................................................................58

C.    The Jury's Royalty Rate is Consistent with Industry Norms ..............60

D.    Defendants' Arguments Attacking the Jury's Damages Award Fail ........................................................................................61

1.    Ericsson did not use the entire market value rule to calculate damages ..................................................................61

2.    Damages do not need to be calculated based solely on the value of the chipset ..................................................63

E.    The District Court did Not Err by Refusing to Instruct the Jury on Patent "Hold-up" and Royalty Stacking ........................................65

1.    The policy behind licensing standard-essential patents on RAND terms ............................................................66

2.    Specific jury instructions regarding patent hold-up or royalty stacking would have been inappropriate ......................68

F.    The District Court's Compulsory Royalty Award, to Which Defendants Waived Objection, was Not Error....................................71

1.    Defendants waived any objection to the compulsory royalty award..............................................................71

iv

      2.     The district court's compulsory royalty award is
            appropriate based on Defendants' infringement.......................73

III.    Dell Is Not A Licensee Of Ericsson's Patents-in-Suit ...................75

    A.    Factual Background Regarding Dell's License Defense ....................76

    B.    LM Ericsson (the Parent and Patent Owner) was Not an Agent
          of Ericsson AB (the Subsidiary and Non-Patent Owner) ..................79

      1.     Ericsson AB could not authorize a lawsuit on behalf of
            LM Ericsson, which already had the authority to sue ..............80

      2.     Dell failed to show that an agency agreement between
            LM Ericsson and Ericsson AB existed .....................................81

CONCLUSION ........................................................................................82

CERTIFICATE OF SERVICE .................................................................84

CERTIFICATE OF COMPLIANCE ........................................................85

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on page 31 describes a confidential software manual, and the material omitted on pages 19-22, 55, 57-61, and 64-65 describes confidential license agreements.

# TABLE OF AUTHORITIES

**Page(s)**

C\ASES

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
659 F.3d 1121 (Fed. Cir. 2011) ........................................................28

*ArcelorMittal France v. AK Steel Corp.*,
700 F.3d 1314 (Fed. Cir. 2012) .......................................................48

*Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*,
555 F.3d 984 (Fed. Cir. 2009) .........................................................33

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*,
670 F.3d 1171 (Fed. Cir. 2012) .......................................................71

*Catalina Mktg. Int'l v. Coolsavings*
289 F.3d 801 (Fed. Cir. 2002) .........................................................39

*Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*,
347 F.3d 448 (2d. Cir. 2002) ...........................................................79

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
672 F.3d 1270 (Fed. Cir. 2012) .......................................................71

*DMI, Inc. v. Deere & Co.*,
802 F.2d 421 (Fed. Cir. 1986) .........................................................68

*Dresser-Rand Co. v. Virtual Automation, Inc.*,
361 F.3d 831 (5th Cir. 2004) ...........................................................26

*DSU Medical Corp. v. JMS Co. Ltd.*,
471 F.3d 1293 (Fed. Cir. 2006) (en banc) .......................................52

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) .......................................32, 33, 34, 36

*Garretson v. Clark*,
111 U.S. 120 (1884)..........................................................................58

vi

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
    318 F.Supp. 1116 (S.D.N.Y. 1970) ...................................................66

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    131 S. Ct. 2060 (2011)........................................................................52

*Hilgraeve Corp. v. Symantec Corp.*,
    265 F.3d 1336 (Fed. Cir. 2001) .........................................................33

*i4i, Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) .....................................................39, 48

*Joy Techs., Inc. v. Flakt, Inc.*,
    6 F.3d 770 (Fed. Cir. 1993) ...............................................................48

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) .............................................................62

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ...................................................27, 54

*Microsoft Corp. v. Motorola, Inc.*,
    No. C10-1823, 2013 U.S. Dist. LEXIS 60233 (W.D. Wash. Apr. 25,
    2013) ..............................................................................................58, 60

*Monsanto Co. v. McFarling*,
    488 F.3d 973 (Fed. Cir. 2007) .....................................................55, 57

*Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*,
    476 F. Supp. 2d 414 (S.D.N.Y. 2007) .........................................80, 81

*Munoz v. Strahm Farms*,
    69 F.3d 501 (Fed. Cir. 1995) .......................................................63, 65

*Paice LLC v. Toyota Motor Corp.*,
    504 F.3d 1293 (Fed. Cir. 2007) ...................................................27, 74

*Retractable Techs. v. Becton, Dickinson & Co.*,
    659 F.3d 1369 (Fed. Cir. 2011) .........................................................40

*Ricoh v. Quanta Computer, Inc.*,
    550 F.3d 1325 (Fed. Cir. 2008) .............................................49, 50, 51

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
      659 F.3d 1142 (Fed. Cir. 2011) .........................................................27

*SiRF Tech., Inc. v. Int'l Trade Comm'n*,
      601 F.3d 1319 (Fed. Cir. 2010) ............................................48, 49, 50

*Sulzer Textil A.G. v. Picanol N.V.*,
      358 F.3d 1356 (Fed. Cir. 2004) .........................................................27

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
      299 F.3d 1313 (Fed. Cir. 2002) ...................................................26, 27

*TiVo, Inc. v. Echostar Comm. Corp.*,
      446 F. Supp. 2d 664 (E.D. Tex. 2006), *aff'd in part, rev'd in part on
      other grounds*, 516 F.3d 1290 (Fed. Cir. 2008)................................74

*Uniloc USA, Inc. v. Microsoft Corp.*,
      632 F.3d 1292 (Fed. Cir. 2011) ...................................................62, 63

*Versata Software, Inc. v. SAP America, Inc.*,
      717 F.3d 1255 (Fed. Cir. 2013) .........................................................32

*z4 Techs., Inc. v. Microsoft Corp.*,
      507 F.3d 1340 (Fed. Cir. 2007) ...................................................33, 67

## OTHER AUTHORITIES

3 American Jurisprudence 2d Agency § 9 .............................................80

Einer Elhauge, *Do Patent Holdup and Royalty Stacking Lead to
      Systematically Excessive Royalties?*, 4(3) J. of Comp. L. & Econ. 535
      (2008) ...............................................................................................67

Federal Rule of Civil Procedure 56(a), (c)(1)......................................27

Federal Rule of Civil Procedure 59(e) .................................................73

Federal Rule of Civil Procedure 60 .....................................................73

Richard A. Epstein et al., *The FTC, IP, and SSOs: Government Hold-Up
      Replacing Private Coordination*, 8(1) J. of Comp. L. & Econ. 1 (2012)...........67

## TABLE OF ABBREVIATIONS

For ease of reference, Ericsson adopts the same abbreviations listed in Defendants' Table of Abbreviations. [DefB at xiii] Ericsson uses the following additional abbreviations:

| Abbreviation | Definition |
|---|---|
| Defendants' Brief or DefB | Brief for Intervenor-Appellant Intel and Defendants-Appellants Acer, Gateway, Netgear, D-Link, and Toshiba |
| Dell's Brief or DellB | Brief for Appellant Dell Inc. |
| JMOL | Motion for Judgment as a Matter of Law |
| Patents-in-Suit | the '435, '625, '568, '223, and '215 Patents |
| FRAND | fair, reasonable, and non-discriminatory |

## STATEMENT OF RELATED CASES

Plaintiffs-Appellees Ericsson Inc. and Telefonaktiebolaget LM Ericsson (collectively, "Ericsson") agree with Defendants' Statement of Related Cases in Defendants' Brief except that *Ericsson, Inc., et al. v. Samsung Electronics Co., et al.*, No. 12-cv-894; *Ericsson, Inc., et al. v. Samsung Electronics Co., et al.*, No. 12-cv-895; and *In the Matter of Certain Electronic Devices, Including Wireless Communication Devices, Tablet Computers, Media Players, and Television, and Components Thereof*, No. 337-TA-862 are no longer pending.

Based on this Court's order dated December 27, 2013 [Dkt. 90], Defendants filed an opening brief with approximately 17,000 words, and Dell filed a separate brief of twenty-two pages that included approximately 2,800 words regarding issues unique to Dell. To minimize the burden on the Court, Ericsson will address the issues in both Defendants' and Dell's Briefs in this single brief of approximately 17,000 words.[1]

## STATEMENT OF JURISDICTION

Ericsson agrees with Defendants' Statement of Jurisdiction.

---

[1] Due to the constraints of a single brief, Ericsson refers the Court to the district court's partial summary judgment and post-trial opinions and orders, Docket Nos. 524 and 615 [A42-103], for additional citations.

## INTRODUCTION

Ericsson is an innovator and provider of electronic communication technology. Ericsson has been a leading contributor to a wide variety of wireless standards such as 3G, 4G/LTE, 5G, and Bluetooth. Ericsson works collectively with others to develop these technology standards, and readily licenses its standard-essential technology.

The Patents-in-Suit relate to Wi-Fi technology used in wireless communications. Ericsson has licensed its Wi-Fi patents to several leaders in this field, including Hewlett-Packard and Blackberry. Ericsson attempted to license the Patents-in-Suit to Defendants on similar terms, but they refused.

In this appeal, Defendants challenge nearly every adverse finding against them. Defendants largely ignore the fact that most of the issues they appeal are factual findings (*e.g.*, infringement, anticipation, damages) that are reviewed under the heightened substantial evidence standard. Further, Defendants tell this Court only part of the story, essentially omitting any discussion of Chief Judge Davis's opinion explaining his rejection of many of the same arguments they now make to this Court.

## STATEMENT OF ISSUES

1. <u>Liability</u>: Whether the district court correctly found that substantial evidence supported the jury's finding of infringement of three of Ericsson's patents, given that:

   a) *'568 Patent*: Defendants' products infringe because they were proven to be capable of performing all limitations and when running certain applications actually do perform the functional limitations;

   b) *'215 Patent*: Defendants' products infringe because they were shown to comply with the 802.11(n) standard, which requires all feedback responses to include a type identifier field;

   c) *'625 Patent*: (1) Defendants' products infringe because their products were shown to command a receiver to receive a packet out of sequence using a method that is nearly identical to the preferred embodiment; and (2) substantial evidence supports the jury's finding that Defendants failed to prove that *Petras* anticipates, given that *Petras* discloses a discard message and *not* a command to receive an out-of-sequence packet.

2. <u>Damages</u>: Whether the district court correctly found that substantial evidence supported the jury's damages award of approximately $10 million, given that:

   a) Ericsson entered into arms-length license agreements with numerous companies in the industry for the Patents-in-Suit, and conducted a two-level apportionment analysis;

   b) The district court did not err when its jury instructions specifically required the jury to consider Ericsson's RAND obligations; and

   c) The district court did not abuse its discretion in setting an ongoing royalty rate of 15¢ per unit when the ongoing royalty it set was

agreed to by all parties and never challenged on the grounds now raised by Defendants.

3.  <u>Dell</u>: Whether the district court correctly found that Dell was not licensed given that:

    a)  LM Ericsson, a plaintiff in this case and the owner of the Patents-in-Suit, was not subject to the covenant not to sue; and

    b)  Defendants failed to demonstrate an agency relationship because there is no evidence that Ericsson AB, the party to the contract, granted LM Ericsson authority to sue, nor that LM Ericsson accepted authority from Ericsson AB.

## STATEMENT OF CASE

Ericsson filed this case, alleging that three laptop manufacturers—Dell, Toshiba, Acer—and three router manufacturers—D-Link, Netgear, Belkin—infringed Ericsson's Patents-in-Suit that are essential to practicing the 802.11(n) Wi-Fi standard. [A5001; A5030; A5043-66] Intel, a Wi-Fi chip maker that supplies chips to Defendants, intervened. [A5070]

On June 13, 2013 after a nearly two-week trial, the jury found infringement of three Ericsson patents—the '568, '215, and '625 Patents—and validity of the '625 Patent. [A231-33] The jury also found that two of Ericsson's Patents-in-Suit were not infringed. [A231-32] The jury awarded Ericsson approximately $10 million in aggregate past damages—less than one-third of what Ericsson

requested—based on over 67 million infringing products. [A234; A1440(14:15-15:18)]

Defendants filed JMOLs and motions for new trial on nearly every adverse ruling. [A52] In a fifty-two page opinion, Chief Judge Davis denied their motions. [A52-103] The district court addressed every issue raised and explained why: (1) substantial evidence supported the jury's finding of direct and indirect infringement of the apparatus and method claims of each of Ericsson's three patents; (2) substantial evidence supported the jury's finding of no anticipation of the '625 Patent; (3) substantial evidence supported the approximately $10 million jury award, citing six comparable licenses and Ericsson's two-level apportionment analysis; and (4) an ongoing royalty of 15¢ per unit is appropriate. [A55-93] In addition, following a bench trial, the district court explained why: (1) the appropriate RAND rate for Ericsson's three infringed patents is 15¢ per unit; and (2) Ericsson had not violated its RAND obligations by offering Defendants a license to its worldwide 802.11 portfolio at a rate of 50¢ per unit.[2] [A93-102]

Regarding a separate issue unique to Dell, the district court held a hearing and then issued a ten-page opinion granting Ericsson's motion for partial summary judgment that Dell was not licensed because: (1) Ericsson plaintiffs LM Ericsson

---

[2]     Defendants have not challenged on appeal the district court's finding that Ericsson did not violate its RAND obligations.

(parent and owner of the Patents-in-Suit) and Ericsson Inc. (exclusive licensee of the Patents-in-Suit) were not parties to the covenant not to sue; and (2) Dell failed to show that parent LM Ericsson was the agent of Ericsson AB (subsidiary and the party to the contract).  [A42-51; A1882-88(6:18-30:18)]

## STATEMENT OF FACTS

### I.   Ericsson

Ericsson is one of the world's leading providers of cellular infrastructure equipment, with over 110,000 employees in 180 countries.  [A1264(98:24-99:9)] Ericsson currently employs approximately 24,000 research engineers, and spends $5 billion annually on research and development.  [A1266(107:5-7;107:12-22)] Ericsson is also one of the leading contributors to a variety of wireless standards, including 3G, 4G/LTE, 5G, and Bluetooth.  [A1265(104:8-104:13); A1268(114:18-114:24)]  As a result of Ericsson's extensive research and standard development efforts, Ericsson currently owns approximately 33,000 active patents. [A1285(17:3-17:8)]  Ericsson's research has made it one of the leading wireless infrastructure manufacturers, with forty percent of the world's cellular traffic traveling through Ericsson network equipment at some point.  [A1264(98:20-98:23)]

Rather than keep all of its innovations proprietary, Ericsson actively publishes many of its inventions by filing for patents and making contributions to

6

standard-setting organizations. [A1266-67(108:12-109:12)] In the cellular field, Ericsson has contributed many of its innovations to the European Telecommunications Standards Institute ("ETSI") and other standard-setting bodies, and has committed to grant licenses to its cellular standard-essential patents on FRAND terms. [A1268(116:9-25)] Similarly, in the Wi-Fi field, Ericsson has committed to the Institute of Electrical and Electronic Engineers ("IEEE") to license its 802.11 standard-essential patents on RAND terms.[3] [A1271-72(127:1-127:15;131:18-131:24); A17249-51] As the district court found, "Ericsson is a sophisticated licensing entity, with over 100 outstanding patent licenses." [A99] As both a licensee and licensor of standard-essential patents, Ericsson "has an incentive to establish a reasonable licensing rate to maintain credibility in the licensing community." [*Id.*]

## II.   Technology Overview

IEEE 802.11 is a standards document for implementing wireless local area network computer communication, commonly referred to as "Wi-Fi." The IEEE 802.11 standard is created and maintained by the IEEE Standards Committee. [A1353-54(124:25-125:9)] Each amendment to the IEEE 802.11 standard is assigned a new letter. So, for example, past versions of the standard have been

---

[3]   RAND terms are similar to FRAND terms and describe participants' commitments to license in different standards-setting organizations.

labeled 802.11(a), 802.11(b), 802.11(g), etc. [A1354(125:16-126:10)] The version of 802.11 at issue in this case is IEEE 802.11(n). [*Id*.] To ensure operability between different manufacturers, the Wi-Fi Alliance, an industry trade group, tests products for compliance with this standard. The technology at issue in this case relates to the messages sent between a transmitter and receiver, such as a wireless router and a personal computer,[4] under the IEEE 802.11(n) Wi-Fi standard.

Devices on a network communicate by breaking up the data files being transmitted into smaller pieces called "packets." [A1347(97:15-100:1)] Each packet contains a portion of a data file and is assigned a "sequence number" that enables the receiver to reassemble the data file upon reception. [*Id*.]

In an ideal setting, data packets are transmitted from the transmitter to the receiver in sequential order without errors. But in real-world operation, errors can and do occur. For example, wireless communication networks experience obstructions, loss of signal, interference, and many other problems. [A1347(97:7-12); A1350(110:4-15)] As a result, transmitted packets are often lost or corrupted in transmission. [*Id.*]

---

[4] When a client device, like a laptop computer, is connected to a router, both act as transmitters and receivers depending on the direction of the data flow at any moment, and thus both contain transmitter and receiver circuitry.

Ericsson's patents improve reliability and throughput in these imperfect wireless networks. [A1349(107:20-108:5)] Wi-Fi networks and cellular networks have many similarities, including that they both: (1) are packet based; (2) have a central base station or access point that controls the network; (3) have multiple mobile terminals that communicate with the base station or access point; and (4) use Automatic Repeat Request protocols to handle packet errors. [A1346(96:3-14); A1367(9:5-10:23); A1389(99:9-100:1)] That is why two of Ericsson's patents—which were invented in the context of advanced cellular telephone systems—are practiced in Wi-Fi networks.

## A. The '568 Patent

The '568 Patent teaches a service type identifier ("STI") that identifies the type of information conveyed in the payload (such as video, voice, data, and multimedia). It is often helpful for the transmitter and receiver to know and identify the type of information it is sending. [A1389(99:20-100:13)] For example, video and voice payloads are more sensitive to delay than data payloads. [*Id.*] While a computer user will not notice a five second delay in receiving an email, she will notice a five second pause in a streaming video. [*Id.*] The '568 Patent teaches adding a label (*e.g.*, video, voice, or data) to the packet so that the network may know the content of the payload and prioritize the packet accordingly.

Claims 1 and 5 of the '568 Patent state:

> 1. A communication station comprising:
>
> a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes *a service type identifier which identifies a type of payload information* provided in said at least one first field; and
>
> a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field.
>
> . . .
>
> 5. The communication station of claim 1, wherein said communication station is a base station.

[A272(13:11-22; 14:13-14) (emphasis added)]   The district court construed the "service type identifier" limitation as:

> an identifier that identifies the type of information conveyed in the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia.

[A19]

## B.     The '215 Patent

The '215 Patent covers a mechanism, called a "type identifier field" ("TIF"), that lets the receiver tell the transmitter the format of the message it is using to identify packets that were lost in transmission.   A protocol, or standard, is the set of rules that govern a network.   [A1348(104:10-25)]   An Automatic Repeat Request ("ARQ") protocol contains rules that govern how transmitters and

10

receivers communicate with each other about the identity of lost packets. [A1367(9:5-10:4)]  IEEE 802.11(n) is an ARQ protocol.  [*Id.*]

In an ARQ protocol, the transmitter periodically asks the receiver to identify packets it has received and has not received, and the receiver responds.  [*Id.*]  Based on this response, the transmitter can decide which packets should be retransmitted.  [*Id.*]  According to standard ARQ protocols, the response sent by the receiver to the transmitter that identifies lost packets is called a "feedback response."  [A277(1:14-18;2:37-42)]

The '215 Patent improved upon existing ARQ protocols by adding a TIF to the feedback response.  The TIF allows devices in the network to employ different formats, or types, of feedback messages.  [A1366(7:17-8:23); A1624(105:4-12)]  For example, one type of feedback response disclosed in the '215 Patent is a bitmap.  [A278(4:1-3)]  Another type of feedback response disclosed in the '215 Patent is a compressed bitmap, which is a smaller, and thus more efficient, version of a standard bitmap.  [A279(6:48-54)]  Protocol designers may allow both standard bitmaps and compressed bitmaps for several reasons.  For example, the 802.11(n) standard uses standard bitmaps, called "basic block acknowledgments," to communicate with legacy devices (*i.e.*, devices compliant with earlier versions of 802.11) and uses compressed bitmaps, called "compressed block

acknowledgments," to communicate with newer and faster 802.11(n) devices. The TIF is used by the receiver to inform the transmitter which type of feedback response is being sent. [A1419(92:19-22)]

Thus, the TIF enables product manufacturers to implement the type of feedback response they determine is best for their products. [A1419(92:13-95:16)] Because different product manufacturers implementing the 802.11(n) standard may choose to implement different types of feedback responses, all 802.11(n) devices must include the claimed TIF to allow for interoperability. [A1623-24(104:9-105:3)]

Claims 1 and 2 of the '215 Patent state:

1. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a sequence number field, a length field, and a content field.

2. The method of claim 1, wherein said message field comprises a bitmap message.

[A281(10:19-30)]

## C.    The '625 Patent

The '625 Patent recognizes that a transmitter may not wish to re-transmit all lost packets, for example, during real-time transmission of media.  If the receiver of a live video stream informs the transmitter that packets have been lost, the transmitter may decide not to retransmit the lost packets because the impact of pausing the video stream to wait for lost packets to be successfully re-transmitted is more disruptive than continuing to stream the video as is.  [A1376(47:4-48:7)]

In a standard ARQ protocol, if a receiver does not correctly receive one or more packets, it will automatically request retransmission of the lost packets.  [A1367(9:17-10:4)]  The process of requesting retransmission will be repeated until all packets are successfully received.  [A1352(117:2-25)]  In environments with substantial interference, the re-transmission can cause pausing of real time streaming services.  [A1376(47:25-48:7)]

The '625 Patent improves the standard ARQ protocol by forcing the receiver to accept out-of-sequence packets by moving its reception window forward.  [A252(5:15-27)]  A reception window is a fixed-size range of packets that the receiver expects to receive from the transmitter.  [A1379(59:5-15)]  The receiver cannot receive any packets that are outside of the reception window.

13

[A1411(57:15-58:6)]   For example, a receiver may expect to receive packets 1 through 6, as reflected by the dashed box below:



The receiver cannot receive packet 7 until the reception window moves forward, as reflected below:



In the prior art ARQ protocols, the window only shifts forward once all the packets within the window are received.  When packets are lost in transmission, the receiver keeps the reception window fixed until it receives the missing packets. This causes packets above the transmission window to be rejected until the window moves forward.  [A1411(57:15-58:6)]   The transmitter, however, may choose to discard packets if they become obsolete.  [A1376(47:4-48:7)]  Without the '625 Patent's technology, this would result in a system failure called "deadlock."  [A1411(57:15-58:6)]  The receiver cannot move its reception forward until it receives the missing packets in the reception window, but the receiver will

never receive the missing packets because the transmitter has decided to discard them. [*Id.*]

The '625 Patent enables the transmitter to command the receiver to receive an out-of-sequence packet and to release expectation of receiving all packets below the out-of-sequence packet. In the exemplary embodiment of the '625 Patent, the command is the arrival of the out-of-sequence data packet. [A252(5:28-40)] In the '625 Patent, all packets have a field with a single bit (either a 1 or a 0) indicating whether that packet should be accepted if it is out of sequence. [*Id.*; A1624(107:4-10)] The receiver, in turn, is programmed to abide by the protocol set out in the '625 Patent and will execute the steps necessary to receive the packet and shift its reception window forward to begin at this new packet. [A1624(106:15-107:25)] Thus, the '625 Patent enables the transmitter to discard obsolete packets by commanding the receiver to no longer expect those obsolete packets.

Claim 1 of the '625 Patent states:

1. A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:

a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving

outstanding packets having sequence numbers prior to the at least one packet; and

the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet.

[A254(10:13-26)]

## III.   Ericsson's Licensing Program For Its Standard-Essential Patents

As one of the world's leading providers of cellular equipment, Ericsson has long championed international standardization efforts and RAND licensing. [A1267-68(109:3-12;112:21-113:8;115:4-12);   A1272(131:22-24)]   Industry standards allow market participants to develop advanced networks and systems built on the ideas of thousands of engineers working for many different companies and research organizations.  [A1267(109:3-109:12); A1272(131:22-24)]  A RAND commitment ensures that market participants have access to a standard by paying reasonable rates for patented technologies adopted in the standard.  [A1271(128:1-129:9)]  It also encourages innovators to continue developing new technologies for standardized systems by assuring that patent owners can be compensated for their ideas.  [A1267(109:13-110:9); A1275(143:25-144:14)]

This dual purpose of a RAND commitment requires market participants to strike a careful balance when licensing standard-essential patents. [A1271(128:9-128:25); A1275(143:25-144:14)]   If the overall royalties for a standardized

16

technology are too high, then adoption of the standard will be hindered. [A1271(128:9-128:25)] If overall royalties are too low, then patent owners will be discouraged from developing new technologies for use in standards. [A1271(128:9-128:25); A1275(143:25-144:14)]

Ericsson maintains a team of engineers and licensing professionals that monitors industry developments, conducts technical analyses of Ericsson's patents and various standards, and ensures that Ericsson complies with its RAND obligations. [A1738-40(142:8-144:21;148:8-149:11)] This team reviews publicly available information and information obtained through licensing negotiations to set and revise reference rates for portfolios of standard-essential patents. [*Id.*] Ericsson also engages in extensive financial and technical discussions with its licensees: it is not uncommon for Ericsson to spend a year or longer negotiating an agreement. [A1313(129:13-22;131:19-132:22)] Those negotiations include discussions of technical issues, such as the scope of infringement and the benefits of the patented invention. [A1313(131:19-132:22)] Ericsson's long history of RAND licensing has resulted in license agreements with over 100 companies. [A1267(110:10-18); A1313(132:23-132:25)]

## A. Ericsson's Comparable Licenses for the Patents-in-Suit

Beginning in the early 2000s, Ericsson observed that the 802.11 Wi-Fi standard-setting body had adopted technology originally developed by Ericsson for

use in cellular wireless communication standards. [A1274(137:24-139:23)] But the earliest versions of the 802.11 standard provided only a basic wireless protocol that lacked many of the advanced features incorporated into cellular standards. [*See, e.g.,* A1285-87(20:7-21:1;25:3-25:13); A1289(33:25-34:14)] As the 802.11 standard evolved, it incorporated more and more techniques developed by Ericsson engineers. [*See id.*] For example, the Patents-in-Suit relate to data prioritization and feedback response features that were included in the more advanced versions of the 802.11 standard. [A16773-780; A15781]

At the time of the trial in this case, Ericsson's RAND rate for its 802.11-essential portfolio was 50¢ per unit. [A1273(133:4-25)] This rate was based on a number of comparable licenses Ericsson had entered into with manufacturers in the market for 802.11 products, including:

- Hewlett-Packard;
- Buffalo;
- Blackberry (formerly, Research in Motion);
- Option;
- Ascom; and
- Sonim.[5]

---

[5]     Hewlett-Packard [A1460(3:23-4:3); A15363-432; A20138-43]; Buffalo [A1461(7:12-18); A15298-314]; Blackberry [A1462(9:24-10:4); A15333-47; A15452-79]; Option [A1462(12:10-13); A15315-32]; Ascom [A1463(13:23-25); A15348-62; A17256-75]; and Sonim [A1463(15:3-10); A15433-51].

[A1433(148:6-148:20)]    Although the license terms differ for each of the manufacturers—from lump sum royalties to running royalties to a hybrid approach—in general, each of those manufacturers agreed to pay Ericsson an average effective rate of approximately █ per unit.[6]  The key terms of some of the licenses are summarized below:[7]

| Licensee | Date(s) | Payment Terms for 802.11 Portion of License[8] | Effective Rate for 802.11 |
|---|---|---|---|
| **Hewlett-Packard** | January 2012 | █    lump sum | █ /unit |
| **Buffalo** | November 2009 | █   of device (capped at █ sale) | █ /unit |
| **Blackberry** | January 2007 January 2011 | █   of smartphone █   of tablet (capped at █ ) | █ /smartphone █ /tablet |
| **Option** | December 2003 January 2007 | █   of device (cap increased █ for 802.11 products) | █ /unit |
| **Ascom** | January 2007 January 2012 | █   of device | █ /unit |
| **Sonim** | December 2011 | █   of device | █ /unit |

---

[6]    Due to Ericsson's obligations in agreements with third parties, Ericsson has redacted the confidential portions of the licenses.

[7]    Ericsson's remaining 802.11 licenses are complex cross-licenses.  As a result, there is no way to apportion specific rates for the 802.11 portion of those licenses.  [A1434(149:15-150:2)]

[8]    In addition to the █ in these licenses, all of Ericsson's licensees provided valuable consideration in the form of █ .  [A1465(23:20-24:10)]  Thus, in addition to the effective rate per device, Ericsson obtained the █ from these companies.

19

A brief discussion of each license, which was analyzed extensively by Ericsson's damages expert [A5928-45], follows:

*Hewlett-Packard*: Hewlett-Packard is the largest laptop supplier in the United States, and it competes directly with the laptop-maker defendants. [A1613(61:3-10;62:13-62:19); A1460(3:10-18)]  Hewlett-Packard uses the same 802.11 chipsets as Defendants for some of its licensed products [A1319(15:12-15:13); A1461(6:25-7:3)], and agreed to pay ███████.  [A1460(4:8-22); A15366]  Hewlett-Packard's future sales projections show that ███ of Hewlett-Packard's liability stems from its 802.11 products (as opposed to ███ from its cellular products), yielding a ███████ lump sum payment for the 802.11 portion of the license. [9]  [A1460(4:8-6:21); A15366; A20138-43]  The basis of the lump sum payment for 802.11 was ███ per unit.  [A1460(3:23-6:21); A15366; A20138-43]

*Buffalo*: Buffalo is a leading supplier of routers, and it competes directly with the router-maker defendants. [A1461(7:4-11)]  Buffalo is approximately the same size as router defendant Netgear.  [A1462(9:12-17)]  Buffalo agreed to pay Ericsson ████ of the entire selling price of its routers in the United States. [A1461(7:12-8:12); A15304]  Based on the average $55 selling price of Buffalo

---

[9]   The Hewlett-Packard license covered both cellular and 802.11 Ericsson patents, but the license to cellular products was capped.  [A15369-70]

routers, Ericsson's damages expert calculated this to be an effective rate of ██ per router sold in the United States for Ericsson's 802.11(n) portfolio. [*Id.*]

*BlackBerry*: In a January 2007 license, Blackberry agreed to pay a royalty of ████ per unit for smartphones or tablets that have 2G or 3G cellular capability, plus an extra ████ per unit if the smartphone included 802.11 capability.[10] [A1462(10:15-25); A15333; A15339] Blackberry also agreed to pay ████ capped at ████ for each tablet that contained 802.11 capability with no cellular capability. [A1462(10:5-14); A15333, A15339] Over the life of the agreement, Blackberry has paid Ericsson over ██████ in royalties for the 802.11 license. [A1462(11:3-11:9)] Based on the average selling prices of Blackberry smartphones and tablets, Ericsson's damages expert concluded that the 802.11 portion of the Blackberry license had an effective rate of ██ per smartphone and ████ per tablet. [A1462(9:24-10:4)]

*Option*: Option makes portable hot spots and adapters that create Wi-Fi hot spots. [A1316(3:18-3:24); A1462(11:24-12:9)] Option agreed to pay a royalty rate of ████ per adapter with a sales price cap, and it agreed to increase the sales price cap on its 802.11 adapters by ██. [A1462-63(12:14-13:6), A15316,

---

[10] Blackberry's smartphones and tablets are comparable for purposes of the hypothetical negotiation because, like laptops, they are relatively higher-priced consumer electronic devices that have a wide variety of uses, including checking email and surfing the web. [A1462(9:18-23;11:13-11:23)]

A15326]  Because Option usually pays the capped royalty amount, Option pays an effective rate of ████ per unit for Ericsson's 802.11 portfolio.  [A1462-63(12:10-13;13:10-13:12)]

*Ascom*: Ascom makes Wi-Fi phones for hospitals.  [A1318(9:19-9:25); A1463(13:19-22)]  Ascom agreed to pay Ericsson a royalty rate of ████ capped at ████ for phones that contain 802.11 functionality with no cellular functionality.  [A1463(14:1-11); A15353; A17262]  As Ascom usually met its cap, it paid an effective rate of ████ per device.  [A1463(13:23-14:9)]  Option and Ascom are approximately the same size as router defendants Belkin and D-Link.  [A1463(16:6-16:13)]

*Sonim*: Sonim makes rugged phones for the construction industry.  [A1321(24:16-18); A1463(14:23-15:2)]  Sonim agreed to pay Ericsson a royalty rate of ████ for each product that contains 802.11 functionality.  [A1463(15:3-10); A15442]  While Sonim has not yet sold a product with Wi-Fi, based on comparable products, Sonim would pay an effective rate of ████ per device.  [*Id.*]

## B.   Ericsson's Pre-Suit Negotiations with Defendants

Before filing the present suit, Ericsson attempted to negotiate licenses with Defendants.  Ericsson began contacting most of the Defendants before the 802.11(n) standard was ratified and, in some cases, negotiated with Defendants for years before the 802.11(n) standard was adopted.  [A7908-09]  Defendants were

unwilling to pay Ericsson's RAND rate of 50¢ per unit for a license. Ericsson brought suit against Defendants in part to recover fair payment for the use of its patented technology, but there was another reason compelling litigation. Ericsson could not insist that some competitors (*e.g.*, Hewlett-Packard and Blackberry) pay a license, but allow other competitors like Defendants to pay nothing.

## IV. The Proceedings Below

After a nearly two-week jury trial, the jury found three Ericsson patents infringed. The jury awarded a reasonable royalty amounting to 15¢ per unit or approximately $10 million total for past damages—less than one-third of what Ericsson requested. [A230-34]

In addition, Defendants: (1) requested, and were granted, a separate bench trial for their RAND claims; and (2) requested that the district court determine "the maximum royalty rate that Ericsson can recover as damages in this case by virtue of its RAND obligations." [A10300] The district court found that "[a]s potential licensees in a RAND negotiation, Defendants possessed an obligation to negotiate in good faith and earnestly seek an amicable royalty rate. They failed to do so." [A102] As a result, the Court concluded as a matter of law that Ericsson's licensing practices were consistent with its RAND obligations, and that Defendants had failed to prove any RAND violation. [A98; A102] Defendants have not

23

appealed these rulings. The district court adopted 15¢ per unit as the appropriate RAND rate for the infringed patents. [A96]

## SUMMARY OF ARGUMENT

After a two-week trial and in a detailed fifty-two page JMOL opinion, the district court found substantial evidence supporting the jury's verdict. [A52-93]

<u>Liability</u>: The jury's finding that Defendants infringe three of Ericsson's patents is supported by substantial evidence. Ericsson presented undisputed evidence that Defendants' products comply with the 802.11(n) standard and therefore infringe the Patents-in-Suit. Ericsson's expert testified that Defendants infringe the '568 Patent because their products comply with the 802.11(n) standard, which mandates the use of an STI that identifies the type of information in the payload of a packet, *e.g.,* voice, video or data. Further, both Ericsson's and Defendants' experts showed that when running certain applications, the accused products do in fact use an STI. Ericsson's expert also testified that Defendants' products infringe the '215 Patent because their products comply with the 802.11(n) standard, which requires all feedback responses to include a TIF. Finally, Ericsson's expert testified that Defendants' products infringe the '625 Patent because their products comply with the 802.11(n) standard, which requires an 802.11(n) transmitter to command a receiver to receive a packet out of sequence using a method that is nearly identical to the preferred embodiment. Further,

substantial evidence supports the jury's finding that Defendants failed to prove that *Petras* anticipated the '625 Patent based on clear and convincing evidence, including testimony from Ericsson's and Defendants' experts that a discard message is *not* a command to receive an out-of-sequence packet.

Damages: The jury's damages award of approximately $10 million is supported by substantial evidence.  Ericsson's damages expert, John Bone, testified to a reasonable royalty rate based on the market rate for the Patents-in-Suit as: (1) reflected in several comparable license agreements; and (2) apportioned to the value of the Patents-in-Suit.  Bone multiplied that royalty rate by the agreed royalty base of the number of units sold, and thus did not invoke the entire market value rule.  Additionally, the district court properly rejected Defendants' requests for specific hold-up and royalty stacking jury instructions because: (1) Defendants presented their RAND defenses at the bench trial instead of the jury trial; and (2) the instructions were superfluous in light of the district court's RAND and damages instructions.  Finally, Defendants waived any objection to the district court's ongoing royalty award when they agreed to the award at the post-trial motions hearing.  The district court's award is consistent with existing precedent and well-supported by the evidence of Defendants' infringement.

Dell: After a hearing and in a detailed ten page partial summary judgment opinion, the district court properly found that no genuine issue of material fact exists as to whether Dell was licensed. LM Ericsson—a party to this lawsuit and the owner of the Patents-in-Suit—is not a party to the covenant not to sue. Thus, Dell proceeded under an agency theory to attempt to bind LM Ericsson. Ericsson AB (a party to the Dell contract), however, does not have an agency relationship with LM Ericsson with respect to the contract because there is no evidence that Ericsson AB granted LM Ericsson authority to sue or that LM Ericsson accepted any authority from Ericsson AB.

## STANDARD OF REVIEW

The denial of JMOLs are subject to the Fifth Circuit's especially deferential standard of review with respect to a jury verdict. *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004). JMOL denials may be reversed only if there is no "substantial evidence" supporting the verdict—that is, "only if, when viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion." *Id.*

Infringement is a question of fact reviewed for substantial evidence when tried to a jury. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002).

Whether a reference anticipates a patent is a question of fact reviewed for substantial evidence when decided by a jury. *Id.*

A jury's damages award is an issue of fact reviewed for substantial evidence. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1310 (Fed. Cir. 2009). This Court upholds the jury's finding unless "the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Id.*

The ongoing royalty rate set by a district court is reviewed for abuse of discretion. *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1304, 1315 (Fed. Cir. 2007). A district court abuses its discretion when it acts based on "an error of law or clearly erroneous factual findings or commits a clear error of judgment." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1147-48 (Fed. Cir. 2011).

This Court reviews whether a jury instruction is erroneous *de novo*. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004). The jury's verdict is set aside only if the "instructions were legally erroneous, and . . . the errors had prejudicial effect." *Id.*

Summary judgment is proper if "the materials in the record" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c)(1). Under Fifth Circuit

27

law, a district court's decision to grant summary judgment is reviewed *de novo* under the same standard as applied by the district court. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011).

## ARGUMENT

I.  **Defendants Infringe Ericsson's Valid '568, '215, and '625 Patents**

A.  **The District Court did Not Err in Denying JMOL as to Infringement of the '568 Patent**

1.  **Substantial evidence supports the jury's finding that the '568 Patent is infringed**

The only dispute regarding the '568 Patent is whether the accused products satisfy the limitation requiring "a processor for arranging information for transmission including providing . . . at least one second field . . . which includes a service type identifier." [A272(13:11-18)] Ericsson presented substantial evidence that Defendants' products are capable of sending a service type identifier ("STI") that identifies the type of information in the payload. Table 9-1 in the 802.11(n) standard lists the various STIs (traffic identifiers, or "TIDs," numbered 0 through 7) associated with different types of payload data (*e.g.*, voice, video, and other traffic).[11] [A1393(116:15-117:21)]

---

[11]  The 802.11(n) standard requires that every packet be assigned a traffic identifier ("TID") that corresponds to the user priority ("UP") value in table 9-1. Ericsson's technical expert, Dr. Scott Nettles, explained that this TID value assigned to each packet is the STI. [A1393(115:4-116:22)]

Table 9-1—UP-to-AC mappings

| Priority | UP (Same as 802.1D user priority) | 802.1D designation | AC | Designation (informative) |
|---|---|---|---|---|
| Lowest | 1 | BK | AC_BK | Background |
| | 2 | — | AC_BK | Background |
| | 0 | BE | AC_BE | Best Effort |
| | 3 | EE | AC_BE | Best Effort |
| | 4 | CL | AC_VI | Video |
| Highest | 5 | VI | AC_VI | Video |
| | 6 | VO | AC_VO | Voice |
| | 7 | NC | AC_VO | Voice |

[A15781]  Ericsson's expert explained that when products are used in accordance with the 802.11(n) standard, the STI identifies the type of information in the payload.  [A1394(118:5-10)]

Ericsson presented undisputed proof that the accused products comply with the 802.11(n) standard and are certified as 802.11(n)-compliant by the Wi-Fi Alliance.  [*See* A1355-56(130:8-136:17); A8165-311]  The district court found that "when devices are used in accordance with the 802.11n standard, the TID value identifies the type of information in the payload" and that it "was entirely logical for the jury to conclude that Defendants would choose to follow even the 'informative' portions of the standard."  [A63-64]

29

Had Ericsson's proof stopped there, it would have presented a prima facie case of infringement that would support a reasonable jury's verdict. But Ericsson also presented proof that the accused products *actually use* the infringing capability. The district court found that Ericsson's technical expert, Dr. Scott Nettles, "provided several specific examples of products where the TID values match the type of information in the payload." [A63] Nettles verified through product testing that a number of programs practice the invention, including CSipSimple, Skype, Ekiga, and Qwave (a Windows 7 and Windows 8 application). [A1395-96(123:4-125:13)]

Defendants' technical expert, Jerry Gibson, also ran tests in which he confirmed that applications use the claimed traffic identifier. He performed an Ekiga call on a Linux operating system using chipsets accused of infringement and observed traffic identifiers that identified the type of data in the payload. Specifically, Gibson's test revealed a traffic identifier of 5 for video traffic, which is associated with the "video" access category in the 802.11(n) standard. [*See* A1567(56:15-19); A1568(58:1-7)] Thus, both experts agreed that the traffic identifier matched the type of information in the payload and therefore infringed the '568 Patent. Defendants argue that not all of Gibson's tests showed that the traffic identifier matched the type of information in the payload. The district court,

30

however, observed that "[a]t best, Defendants' evidence showed their products can be configured in a non-infringing manner." [A63]

Use of this capability is neither out-of-the-ordinary nor unexpected. The district court found that "Intel encouraged its customers to follow the TID subfield designations for video and voice." [A63] Indeed, as shown below, Intel's own SDK manual instructs developers ██████████████████████████████████ ████████████████████



[*See* A8349] Gibson admitted that this is a document that a manufacturer (like Intel) provides to its customers *intending* them "to use it and read what's in it so they can program drivers or other things for their products . . . ." [*See* A1566(50:16-51:06)]

In sum, the trial record contains substantial evidence that Defendants directly infringe apparatus claims 1 and 5 of the '568 Patent.

2. **The district court correctly instructed the jury that the accused products infringe if they are reasonably capable of infringement**

Consistent with Federal Circuit precedent, the district court instructed the jury that functional limitations in an apparatus claim are met by a device that is reasonably capable of performing the recited functions:

> An accused system or product directly infringes a claim if it is reasonably capable of satisfying the claim elements even though it may also be capable of non-infringing modes of operation. If a claim requires only that the system or product have the capacity to perform a function, one who makes a system or product with that capability without the patent owners' authority is a direct infringer even though the maker's customers do not use the capacity.

[A211] This Court has repeatedly held that a product infringes if it is reasonably capable of satisfying the claimed elements. *See Versata Software, Inc. v. SAP America, Inc.*, 717 F.3d 1255, 1262 (Fed. Cir. 2013); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010).

On appeal, Defendants argue that their products can only infringe the '568 Patent if they are used by customers to actually send a service type identifier that identifies the type of information in the payload every time, in every message. [DefB at 37] Defendants seek to change this Court's precedent by requiring that, for an apparatus claim to be infringed, an apparatus must *always* perform the infringing functionality *each time* it is used. But this Court has repeatedly held that an apparatus claim is infringed if the accused product is reasonably capable of

32

infringement, even if the accused product also has non-infringing modes of operation. *See z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1350 (Fed. Cir. 2007); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001).

Contrary to Defendants' suggestion, *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984 (Fed. Cir. 2009) does *not* hold that a product only infringes an apparatus claim if it performs the claimed functionality "in *all* instances." [DefB at 37] In fact, just the opposite is true. Even though the claim in *Ball Aerosol* required that the product be configured in a particular way to infringe, this Court held that a plaintiff can prove infringement by showing a device necessarily infringes the patent *or* a specific instance of direct infringement. 555 F.3d at 995. In the present case, both parties' technical experts testified to actual instances of direct infringement (see Section I.A.1).

More fundamentally, *Ball Aerosol* is inapplicable here because the '568 Patent claims are apparatus claims that are not restricted to actual operation. [A272(13:11-22)] In *Finjan*, this Court held that where an apparatus claim is styled as a component "for" performing some function, the claim is drawn to capability and the reasonable capability test applies. 626 F.3d at 1204-05. The apparatus claim in *Finjan* included language such as "a local engine *for preventing*

33

*execution.*" *Id.* at 1205. The Court explained that this did not require performance of these limitations, but only that the device include a component "for preventing."

Similarly here, the '568 apparatus claim reads:

> *a processor **for** arranging information* for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, *which includes a service type identifier which identifies a type of payload information* provided in said at least one first field

[A272 (emphases added)] Like the claims in *Finjan*, the '568 Patent here claims a component "for" performing certain steps, specifically, "a processor *for* arranging information for transmission including . . . a service type identifier." Thus, the '568 claims are drawn to capability, not actual operation.

## B. The District Court did Not Err in Denying JMOL as to Infringement of the '215 Patent

### 1. Substantial evidence supports the jury's finding that the '215 Patent is infringed

The district court found substantial evidence that Defendants' accused products infringe the '215 Patent. The '215 Patent requires the construction of a "type identifier field" ("TIF"), which the district court construed as "a field that identifies the message type of the feedback response message from a number of different message types." [A9] As required by the 802.11(n) standard, every accused product sends feedback response messages that include a field indicating which of the three feedback responses the accused product is sending. [*See*

34

A16778; A1372-73(32:24-34:23); A1374-75(39:1-41:15); A1558(18:24-19:14)]

The district court found the operation of Defendants' products to be undisputed. [A59] The only issue is whether Defendants' products, which only implement one of the three available feedback responses, can satisfy the "from a number of different message types" limitation. The jury determined they did, and the district court found that there was substantial evidence to support this factual finding.

The 802.11(n) standard identifies three available types of feedback response messages: the Basic Block ACK, Compressed Block ACK, and Multi-TID Block ACK, as reflected in Table 7-6k from the 802.11(n) standard below [A1372-73(32:24-34:23); A1558(18:24-19:14)]:

### Table 7-6k—BlockAck frame variant encoding

| Multi-TID subfield value | Compressed Bitmap subfield value | BlockAck frame variant |
|:---:|:---:|:---|
| 0 | 0 | Basic BlockAck |
| 0 | 1 | Compressed BlockAck |
| 1 | 0 | Reserved |
| 1 | 1 | Multi-TID BlockAck |

[A16778] The district court found that the 802.11(n) standard requires that "[t]o distinguish between the [three] different types of feedback responses, each message contains a type identifier." [A59] The technical experts for both parties

35

testified that sending the TIF is mandatory for interoperability between devices. [*See* A1558(18:24-19:14); A1373(33:10-34:14); A1375(42:10-16)]

Defendants argue that their accused products implement only one of the block acknowledgments available in the standard. [DefB at 44] As a result, Defendants assert they do not infringe because their products do not generate a message field "from a number of different message types." [*Id.*] But the claim does not require "generating a message field from a number of different message types." Rather, the claim requires "generating a message field *including a field that identifies the message type of the feedback response message* from a number of different message types." [A9 (emphasis added)] Defendants conveniently disregard the italicized language. Reading the district court's full claim construction in context, the claim requires generating a message field that includes a type identifier field. The TIF must identify which of a number of message types is being sent. As the district court found, "there is no requirement the accused products "select" the type of feedback message or that there be multiple "available" types of messages . . . . It is sufficient that the products 'identif[y]' the message type from "a number of different message types." [A61]

Relying in part on Ericsson's expert's testimony, the district court found that "even though Defendants' products only use Compressed Block Ack, each

feedback message must contain a type identifier bit, and each receiver must check the type identifier bit." [A60; A1623(104:9-24)] Thus, the accused products generate a feedback response message including a TIF that identifies which of the feedback response messages available in the standard is being used. Whether Defendants choose to implement one or more of the available feedback responses is irrelevant. The claim merely requires Defendants to "identify" one of a number of message types. The district court found that there was substantial evidence that "the [TIF] bit indicates the message is in Compressed Block Ack Form, one of three available options in the standard." [A60]

Moreover, Defendants' position now on appeal is inconsistent with their representations to the district court before trial. Shortly before trial, Defendants conceded that whether using a single type of feedback response infringed the '215 Patent was an issue of fact for the jury. Defendants filed a motion that, in part, sought to preclude Ericsson from taking a position at trial that Defendants viewed as inconsistent with the district court's claim construction. [A6454-88] In response, Ericsson set forth its theory of infringement described above, and stated that "even if the accused devices always choose to use a single Block Ack variant, they infringe the '215 patent." [A6523] Defendants filed a reply conceding that

Ericsson's position was not inconsistent with the Court's claim construction and that the only remaining issues "are issues of fact for the jury." [A10439]

Finally, Defendants suggest that Ericsson's statements that the TIF enables devices to "choose" between different feedback response messages is somehow inconsistent with Ericsson's infringement theory. [DefB at 43-44] To the contrary, the TIF does enable a choice. Without the TIF to notify a receiving entity which type of feedback response message it has received, the 802.11(n) standard would be forced to offer only one feedback response mechanism. By requiring 802.11(n) devices to transmit a TIF with every feedback response message, the 802.11(n) standard can offer multiple feedback response messages. Companies implementing the standard can choose to use any one or all of the available feedback responses, but whatever choice they make, they must transmit the TIF to notify the receiving entity which feedback response the company has chosen to use. Thus, the TIF enables receivers to make a choice between different feedback response mechanisms.

### 2. The district court correctly construed "type identifier field" (TIF)

Defendants seek to import two extraneous limitations to the construction of the term "type identifier field": (1) that the type of feedback response must be actively "selected from multiple available feedback responses;" and (2) that said

selection must further accomplish the goal of "minimiz[ing] the size or number of feedback responses." [DefB at 39-40] Defendants do not point to any file history disclaimer or specification disavowal that would require "type identifier field" to be so limited.

The district court correctly rejected Defendants' attempt to read these limitations into the claims, finding that "Defendants' construction adds only two, and not all, of the advantages set forth in the patent." [A7] *See also i4i, Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010) (stating "not every benefit flowing from an invention is a claim limitation"). Indeed, the specification uses language carefully chosen so as *not* to limit the '215 invention to the advantage of minimizing feedback responses. Explaining that many criteria may be used to optimize a protocol, the specification states that *"[o]ne such* criterion used is to minimize the size of the S-PDUs," and a *"second such* criterion used is to maximize the number of SNs included in an S-PDU of limited size." [A278(4:49-53) (emphases added)]; *see, e.g., Catalina Mktg. Int'l v. Coolsavings,com, Inc.*, 289 F.3d 801, 811 (Fed. Cir. 2002) ("'Such as' introduces an example of a broader genus rather than limiting the genus to the exemplary species."). Moreover, the specification repeatedly refers to minimization as one of a number of advantages. [*See e.g.*, A278(4:54-63) (identifying minimization as

one of four possible technical advantages of the invention)] Defendants selectively read in one of the several possible advantages of the invention and demand that the claims be so limited.

Defendants point to the title of the patent, the abstract, and the specification to make the point that those sources describe the advantage of minimization, and are thus consistent with their proposed construction. [*See* DefB at 41-42] Although the specification may shed light on the plain and ordinary meaning of a term, it "cannot be used to narrow a claim term to deviate from the plain and ordinary meaning unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope." *Retractable Techs. v. Becton, Dickinson & Co.*, 659 F.3d 1369, 1371 (Fed. Cir. 2011). "If the metes and bounds of what the inventor claims extend beyond what he has invented or disclosed in the specification, that is a problem of validity, not claim construction." *Id.* It is not for the court "to tailor the claim language to the invention disclosed. The language is the language . . . ." *Id.* Defendants fail to point to an express disclaimer or disavowal showing that the inventors intended the term "type identifier field" to deviate from its plain and ordinary meaning.

## C. The District Court did Not Err in Denying JMOL as to Infringement or Invalidity of the '625 Patent

### 1. Substantial evidence supports the jury's finding that the '625 Patent is infringed

The only dispute regarding the '625 Patent is whether the accused products practice the limitation requiring a transmitter commanding a receiver to receive "at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet." [A254(10:16-19)] The district court found substantial evidence that Defendants' accused products practiced all limitations of claim 1 of the '625 Patent. Ericsson presented the 802.11(n) standard, source code, and sworn testimony by Nettles, Gibson, and William McFarland (an employee of Atheros, a supplier of chipsets to many of the Defendants).

At trial, Ericsson proved that the accused 802.11(n)-compliant transmitters send compliant receivers a command to receive out-of-sequence packets. Ericsson's expert testified that the 802.11(n) standard requires receivers to be programmed to treat all packets received inside or beyond the reception window as commands to receive, even if they are out of sequence. [*See, e.g.*, A1384-85(80:4-81:3); A16917-18]

Gibson and McFarland agreed, admitting that products compliant with the 802.11(n) standard must receive packets out of sequence. [*See, e.g.*, A1530(30:25-

31:9); A1511-12(143:6-145:1)] Ericsson's expert further testified that the identified sections of the 802.11(n) standard requiring acceptance of out-of-sequence packets are mandatory. [A1384-85(80:4-81:3); A1389(97:14-16)] Nettles verified Defendants' compliance with the standard by reviewing Defendants' source code and by testing the Wi-Fi chips in the accused products. [*See, e.g.*, A1388(94:8-95:5); A1422-23(103:19-105:20)] Thus, Ericsson presented sufficient evidence for a reasonable jury to conclude that each 802.11(n) packet is a command to receive that packet.

Defendants concede that 802.11(n) packets can be received out of sequence, yet conclude that this reception proves that 802.11(n) devices do not *need* a command to receive. [DefB at 50] To the contrary, as Nettles testified, 802.11(n) devices receive out of sequence packets *because* there is a command, not in spite of it. [A1625(111:1-8)] Nettles explained that Defendants programmed the 802.11(n) rules into their transmitters and receivers, so when an accused product transmits a packet, the intended recipient *has to* receive that packet. [A1385(83:10-18)] The jury resolved this classic infringement dispute over application of claim language to the accused products in favor of Ericsson.

That the infringing commands are the actual data packets is shown by the exemplary embodiment described in the '625 specification. The exemplary

embodiment discloses that the command to receive is a data packet that contains a single additional bit. [A252(5:28-40)] That single additional bit acts as a flag to tell the receiver whether it should receive that packet if out of sequence. [A1624(107:4-19)] For instance, if the flag bit in the data packet is set to "1," it would inform the receiver to treat the data packet as a command to receive out of sequence. Defendants, in choosing to always have the receiver accept packets out of sequence, are able to dispense with the flag bit, but they still use the data packet as a command to receive, as explained by Ericsson's expert at trial:

> Q. What kind of parallels can you draw between the preferred embodiment and what the Defendants are doing?
>
> A. Well, I think the most obvious parallel is, you could imagine that you just always set the bit to 1. So every packet is a command, not just the ones that you set to 1. So if there was always a 1, then every packet would be a command, and that would be just like what the Defendants are doing.
>
> Q. And if they're doing that, why bother transmitting the bit anymore?
>
> A. Exactly. Once you decide it's always a 1, you don't need to transmit it. And now we have exactly the system that we're talking about in the accused products.

[A1624(108:1-19)] Because every 802.11(n) packet, whether inside or beyond the reception window, must be received, every 802.11(n) packet is a command to receive.

Defendants argue that Nettles acknowledged that ordinary prior-art data packets could not satisfy the claimed "command to receive" requirement. [DefB at 52] However, Defendants fail to mention Nettles testimony that 802.11(n) packets are not ordinary prior-art data packets:

> Q. Now, you've identified again today a standard data packet that -- with a sequence number as something that infringes the '625 Patent, right?
>
> A. Yes, sir, that's correct.
>
> Q. Now, as a matter of fact, in the '625 Patent itself, the inventors describe exactly that thing as prior art that they did not invent, right?
>
> A. No, sir, I can't agree with that.

[A1644(21:18-25)] Nettles also testified that 802.11(n) packets are not the "ordinary" prior-art data packets because 802.11(n) receivers have been programmed to treat them as commands to receive, whether received within or beyond the reception window. [A1384-85(80:4-81:3;82:4-17)]

The infringement issue as to this patent boils down to whether sending packets, which are required to be received out of sequence, satisfies the "commanding to receive" requirement in the '625 Patent. The jury accepted Nettles' testimony and rejected Defendants' argument. This was a fact issue within the province of the jury to resolve, and Ericsson presented sufficient evidence at trial to support the jury's conclusion.

44

## 2.    Substantial evidence supports the jury's finding that the '625 Patent is not anticipated

Substantial evidence supports the jury finding that Defendants failed to prove by clear and convincing evidence that the *Petras* reference discloses the first limitation of the '625 Patent:  a transmitter commanding a receiver to "receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet."  [A254(10:16-19)]  Nettles testified that the *Petras* reference includes only a run-of-the-mill packet discard message, not a command to receive packets out of sequence.  [A1622(99:18-100:14)]  Because the *Petras* discard message is not a command to receive any packets, but rather a notification that the transmitter has discarded a packet, it cannot anticipate the '625 Patent claim element requiring a command to receive out-of-sequence packets. [*Id.*]

At trial, Defendants attempted to add functions onto the packet discard notification that were simply not known in the art.  In fact, Nettles and Gibson agreed that a packet discard notification would not be understood to command a receiver to receive packets out of sequence:

Q. Did you see some statements from Dr. Gibson's report on this?

A. Oh, yes, sir.  Dr. Gibson is very clear that a discard message is not a command to receive.

[A1622(100:3-6)]

45

Ericsson confronted Defendants' invalidity expert, Chris Heegard, with Gibson's conflicting position that a "message that informs a receiver that the transmitter has discarded packets, does not command the receiver to receive any packets." [A1593] Heegard attempted to salvage his testimony with the following confusing explanation:

> Q. Isn't the packet itself the command?
>
> A. No. There's no – there's no delete – *so you're asking me if a discard message is a command to receive, and generally speaking it's not.* But in this particular scheme, this system, which has a discard message, it is, because this discard message is tacked on to a message and it's -- and when this system is working and there's a discard message, it is a command to receive. So generally is a discard message a command to receive, no. In this system, this message is a command to receive.

[A1593-94(160:16-161:2) (emphasis added)] Because *Petras* does not disclose a command to receive out of sequence, Heegard had to assert that *Petras*' discussion of a discard message would have been implicitly understood by a person of skill in the art to include a command to receive out of sequence in addition to a command to discard. The district court, however, found that Heegard admitted that discard messages are not "generally speaking" commands to receive and that "his view of the *Petras* discard messages conflicted with the generally understood operation of discard messages." [A74] Further, Ericsson's expert vehemently disagreed with Heegard's characterizations. [A1622(99:19-100:2)] Thus, substantial evidence

46

supports the jury's factual finding that *Petras* does not disclose a command to receive.

Defendants also contend that Ericsson's position that 802.11(n) packets are commands to receive contradicts its position with regard to the *Petras* reference. This mischaracterizes Ericsson's infringement evidence. Contrary to Defendants' claim, Ericsson does not contend that "every ordinary data packet" is a "command to receive," but rather that 802.11(n) data packets are commands to receive. [A1384-85(80:4-81:3;82:4-17)] 802.11(n) data packets are not the same as the data packets in *Petras.* The 802.11(n) protocol requires receivers and transmitters to be programmed to understand and treat 802.11(n) packets as commands. [*Id.*] This did not exist in the prior art. As Defendants acknowledge, the receiver disclosed in *Petras* could, and would, reject an ordinary data packet if the packet was outside of the reception window. [A1588(140:10-23)] Thus, the "ordinary data packets" disclosed in *Petras* are not commands to receive. An 802.11(n) receiver, on the other hand, has no choice but to accept an 802.11(n) data packet, whether it is inside or beyond the reception window. [A1384-85(80:4-81:3;82:4-17)] Thus, an 802.11(n) data packet is a "command to receive."

The district court reasoned that "anticipation of the '625 Patent presented a classic fact issue for the jury. At issue was whether a single reference disclosed a

47

single limitation. Ericsson's expert testified it did not; Defendants' expert testified

it did." [A73] After reviewing the evidence, the jury correctly determined that

Defendants' failed to meet their burden to prove by clear and convincing evidence

that the *Petras* reference contained the limitation. Such a determination is squarely

within the purview of the jury. *See ArcelorMittal France v. AK Steel Corp.*, 700

F.3d 1314, 1322 (Fed. Cir. 2012); *i4i*, 598 F.3d at 848 (holding that the jury was

permitted to disbelieve the defendant's expert and believe the plaintiff's expert).

### D. Substantial Evidence Supports the Jury's Factual Finding that Defendants Directly Infringed and Also Induced Infringement of the Asserted Method Claims

#### 1. Defendants directly infringe the asserted method claims

Just as the district court found, the trial record contains legally sufficient

evidence to support the jury's verdict that Defendants directly infringe claims 1

and 2 of the '215 Patent and claim 1 of the '625 Patent. Direct infringement of a

method claim occurs when a party practices the claimed method. *Joy Techs., Inc.*

*v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed. Cir. 1993). In *SiRF Tech., Inc. v. Int'l Trade*

*Comm'n*, this Court held that an entity that supplies a remote client device that is

programmed to automatically carry out actions that infringe a method claim *is the*

*entity deemed to be performing* that operation, and is thus liable for the

infringement of a claim directed to such operation. 601 F.3d 1319, 1331 (Fed.

Cir. 2010).

48

Here, there is substantial evidence that the accused products automatically perform the infringing functionality without user intervention. [A1371(25:7-11;26:3-27:9) ('215 Patent); A1377(49:13-18); A1384(79:3-10); A1385(83:10-18) ('625 Patent)]. Thus, substantial evidence supports the jury's finding that Defendants practiced the claimed methods.

Defendants attempt to rely on *Ricoh v. Quanta Computer, Inc*. [DefB at 47], but *Ricoh* stands for the proposition that the sale of a piece of stand-alone software does not infringe a method claim. 550 F.3d 1325, 1334-35 (Fed. Cir. 2008). In *Ricoh*, this Court explained that selling software is equivalent to selling instructions to perform a method, not selling performance of the method itself. *Id*. at 1335. Accordingly, the Court upheld the district court's finding of non-infringement in that case. *Ricoh*, however, is inapplicable here because the accused product is not merely a piece of uninstalled software, but a piece of hardware that has been "hard-wired" (as Defendants argued) to *automatically* perform the infringing functionality. [A1259(77:14-16)].

Two years after *Ricoh*, in *SiRF*, this Court held that a party can perform a method by selling a product that is programmed to automatically perform the method steps. 601 F.3d at 1331. *SiRF* dealt with patented improvements to assisted-GPS ("A-GPS") technology. *Id*. at 1323. The *SiRF* Court addressed two

49

issues: (1) whether SiRF performed the limitations requiring transmitting and communicating data to a remote receiver, even though SiRF transmitted the data to its customers' intermediate server that forwarded the data to a remote receiver; and (2) whether SiRF performed the limitations requiring processing the data at the remote receiver and representing the data in a format supported by the remote receiver, even though these steps were performed only when actions were taken by end-users of the GPS devices employing SiRF's chips. *Id*.

Defendants contend that this Court held SiRF performed the claimed method steps because it provided an "end-to-end" service. [DefB at 47] That reasoning, however, applied only to the first issue facing the Court. *SiRF*, 601 F.3d at 1331. Analyzing the "transmitting" and "communicating" steps, the Court explained that the asserted claims do not require "direct" communication or transmission. *Id.* at 1330. Noting that SiRF touts its product as an "end-to-end" service, the Court held that SiRF effectively transmits or communicates data to the end users' devices because SiRF initiates the processing of sending the data and the data is actually sent to the end users. *Id.*

Defendants fail to mention the second holding in *SiRF*. With regard to the "processing" and "representing" steps, the Court explained:

> Once the technology is enabled, SiRF's SiRFstarIII chip and software, designed and built by SiRF, automatically perform the disputed steps

of the claims at issue because the SiRFstarIII chips are programmed
by SiRF to use the InstantFix ephemeris data automatically if it has
been transmitted to the remote device.

*Id.* at 1331.  The Court held that "SiRF infringes as its devices and software dictate

the performance of the 'processing' and 'representing' steps."  *Id*.  Thus, the Court

ascribed direct infringement of a method claim to a defendant manufacturer for the

defendant's customers' use of the accused products because: (1) the defendant

designed the accused products; and (2) the accused products automatically

performed the infringing steps of the method claims.  *Id.*

Here, as in *SiRF*, Defendants' devices dictate the performance of the steps

claimed by the '215 and '625 Patents.  For example, the evidence showed that:

(1)  the accused products were designed by Defendants [*see*
A1371(25:7-11); A1377(49:15-18); A1384(79:3-6)]; and

(2)  the accused products automatically perform the steps of the
method claims whenever the accused products are used [*see, e.g.*,
A1371(25:7-11;25:21-27:9); A1377(49:15-18); A1384(79:3-6)].

Here, as in *SiRF*, only the Defendants' actions are involved in performing the steps

of the accused method.  Accordingly, the trial record contains legally sufficient

evidence that Defendants directly infringe method claims 1 and 2 of the '215

Patent and claim 1 of the '625 Patent.

### 2. Defendants also induced infringement of the asserted method claims

Substantial evidence also supports the jury's finding that Defendants intended to induce infringement by end-users of their products. To prove inducement, a patentee must establish proof: (1) of direct infringement; (2) that the alleged inducer had knowledge of or was willfully blind to the Patents-in-Suit; and (3) that the accused infringer knew or was willfully blind that its actions would induce actual, direct infringement. *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011); *DSU Medical Corp. v. JMS Co. Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc). In addition to direct evidence of inducement, Ericsson may rely on circumstantial evidence. *DSU Med. Corp.*, 471 F.3d at 1304. "Evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe." *Id.*

When viewed in the light most favorable to Ericsson, the evidence is more than sufficient to allow a reasonable jury to conclude that Defendants induced infringement of the Patents-in-Suit. First, the district court found that "Ericsson presented substantial evidence of direct infringement by Defendants' customers." [A71] Specifically, the district court found that Ericsson presented evidence that "end customers performed the patented methods when they used the accused

products" and that Defendants "sold infringing units to end customers."   [A71; A1371(25:12-14); A1439(10:21-12:2)]

Second, the district court found that "Ericsson presented substantial evidence Defendants 'knowingly induced infringement and possessed specific intent to encourage another's infringement.'"   [A71]   The district court found:

- "The parties stipulated that Ericsson notified each Defendant of its infringement allegations before the suit was filed."   [A71; A1324(7:1-10:20);   A7907-15]     "After   receiving   notice, Defendants continued selling the accused products."   [A71; A1371(25:7-11); A1377(49:13-18)]

- Ericsson   presented   evidence   "that   Defendants'   accused products comply with the 802.11n standard, and the accused products automatically infringe without user invention."   [A71; A1371(25:21-26:2)]

- "Ericsson also presented evidence Defendants advertise their 802.11n compliance."   [A71; A1432(144:15-24)]

Ericsson also presented evidence that:

- Defendants all submit their products for interoperability testing and certification.   [*See* A1353(123:18-22); A1355-56(130:18-136:17); A1519-20(175:18-177:1); A8182-319; A8165-79]

- Defendant Intel publishes user manuals providing detailed instructions on how to use its products to "access wireless networks, share files or printers, or even share your internet connection."   [*See* A8321]

- The 802.11(n) standard was publicly available, so Defendants had knowledge of the operation of their products that they sold as compliant with the 802.11(n) standard.

- Defendant D-Link likewise advertises its 802.11(n) capabilities and publishes a detailed user manual on how to operate its products. [*See* A8327-35; A8351-53]

Ericsson's evidence of inducement goes far beyond what was found to be legally sufficient in *Lucent*, 580 F.3d 1301. In *Lucent*, this Court reviewed a finding of inducement based on a record consisting of three pieces of evidence: (1) testimony from plaintiff's expert that users would be unable to use the product and avoid the use of the infringing software components; (2) a single document discussed by the plaintiff's expert that touted the benefits of the accused technology; and (3) circumstantial evidence that, while limited, would support the jury's findings. *Id.* at 1323. This Court held that while the evidence "is not strong, . . . we are not persuaded that the jury was unreasonable in finding that [Defendant] possessed the requisite intent to induce at least one user of its products to infringe the claimed methods." *Id.* As set forth above, Ericsson has presented evidence that Defendants' products automatically operate in an infringing manner without user intervention, that the Defendants were aware of the Patents-in-Suit, and that the Defendants advertise, promote, and intend for their customers to use 802.11(n)—which is the accused infringing operation.

## II. The District Court Did Not Err In Denying JMOL As To Damages Because Substantial Evidence Supports the Jury's Award Of Approximately $10 Million

The jury awarded approximately $10 million as damages for infringement by over 67 million products. This award was consistent with royalty rates in six comparable licenses covering the Patents-in-Suit entered into by Ericsson outside of litigation. For example,

> (1) Hewlett-Packard paid an effective royalty rate of ■ per laptop for Ericsson's 802.11 portfolio, [A1460(3:23-4:3)];

> (2) Buffalo paid an effective royalty rate of ■ per router for Ericsson's 802.11(n) portfolio, [A1461(7:12-18)];

> (3) Ericsson's other licensees all paid effective royalty rates of ■ per unit or greater for Ericsson's 802.11 portfolio, [A1462-63(9:24-10:4;12:10-13;13:23-25;15:3-10)], and

> (4) Ericsson's damages expert, John Bone, testified that an appropriate royalty rate for the Patents-in-Suit is at least 25¢ per unit, [A1438-39(8:18–9:4)].

This Court has found comparable licenses of the Patents-in-Suit to be the best evidence of a reasonably royalty rate. *Monsanto Co. v. McFarling*, 488 F.3d 973, 978 (Fed. Cir. 2007). That is the exact evidence presented to the jury here.

The jury award was also consistent with other evidence:

> (1) Ericsson's RAND rate at the time of trial of 50¢ per unit [A1273(133:4-25)];

> (2) testimony of Defendants' own damages expert that some Defendants entered into licenses with effective rates of ■ to ■ per

55

unit [*See* A1753(6:4-17); A5946-47; A6028(97:3-97:15); A20001-92; A20109-37];

(3) other 802.11 licenses entered into throughout the industry for rates of 5¢ to 55¢ per unit [A1464(20:15-21:10); A5968-69; A5980-81]; and

(4) rates calculated for essential 802.11 patent licenses by other courts, *see, e.g., Microsoft Corp. v. Motorola, Inc.*, No. C10-1823, 2013 U.S. Dist. LEXIS 60233 at *20 (W.D. Wash. Apr. 25, 2013) (finding a RAND rate of as high as 19.5¢ per unit).[12]

Defendants' damages expert, Ray Perryman, provided further testimony supporting the jury's verdict. He explained that, at the time of the hypothetical negotiation, 802.11(n) chips commanded a $10 premium over chips for earlier versions of the 802.11 standard. [A1611(53:4-54:1)] Thus, the jury could reasonably conclude that the value added by 802.11(n) technology is $10. He also testified that, after considering Ericsson's share of all 802.11 patents, he could reasonably conclude that "the patents-in-suit represent[] 2.25 percent of the 802.11n portion of the chip." [A1608(42:25-43:16)] Using his own math, the jury could have reasonably concluded that the royalty rate for the Patents-in-Suit should be 22.5¢.

---

[12] Although the royalty determinations of this court was not presented to the jury in this case, it is included here to the extent that this Court may find its has precedential effect.

### A. Comparable Licenses Establish the Value of the Patented Technology

Among the most relevant evidence were six license agreements in which Ericsson licensed the Patents-in-Suit to competitors of Defendants for 802.11 devices, including laptops, routers, and smartphones. [A1433-34(148:6-149:4)] Several of these licenses were with companies that compete directly with the Defendants—*e.g.*, Hewlett-Packard (maker of 802.11 equipped laptops which compete with Dell, Acer, and Toshiba), Buffalo (maker of 802.11 routers which compete with Netgear and D-Link), and Blackberry (maker of 802.11 equipped smartphones and tablets). [*Id.*]

Bone computed the effective per-unit rate for each of the licenses. [A1460-64(3:10-17:2)] Although the licenses had different financial structures, they consistently equated to a payment to Ericsson of between ▮ and ▮ per 802.11 device.[13] [*Id.*]

---

[13] Each of the licenses and their effective rates is discussed in detailed in Section III.A of the Statement of Facts.

The following table summarizes the relevant licenses:

| Licensee | Licensor | Effective Per Unit Rate[14] |
|---|---|---|
| Hewlett-Packard | Ericsson | ████ /unit |
| Buffalo | Ericsson | ████ /unit |
| Blackberry | Ericsson | ████ /smartphone, ████ /tablet |
| Option | Ericsson | ████ /unit |
| Ascom | Ericsson | ████ /unit |
| Sonim | Ericsson | ████ /unit |
| Intel | WiLAN | ████ /unit |
| Intel | CSIRO | ████ /unit |
| N/A | Via Licensing pool | 5-55¢/unit standard rate |
| N/A | Sisvel Licensing pool | ████ /unit standard rate |
| Microsoft | Motorola | Up to 19.5¢/unit RAND rate |

## B.    Ericsson's Expert Conducted a Rigorous Apportionment Analysis

Damage awards must be based on the patented contribution.  *Garretson v. Clark*, 111 U.S. 120, 121, (1884).  To isolate the contribution of the Patents-in-Suit, Ericsson's damages expert performed not one, but two steps of apportionment.  [A80-82]

*First Apportionment*: Bone apportioned the amounts paid by Ericsson's licensees to isolate Ericsson's 802.11 contribution.  [A34-35; A80-81; A1460-64(3:10-17:2)]  By "reduc[ing] the revenue pool to the value of Ericsson's 802.11 contribution," Bone's first level of apportionment "represent[ed] the market's

---

[14]    *See supra* note 5; WiLAN [A5946-47; A6028]; Commonwealth Scientific and Industrial Research Organization ("CSIRO") [*Id.*; A1753(6:4-17); A20001-92, A20109-37]; Via [A5968-69]; Sisvel [A1464(20:15-21:10); A5980-81]; and *Microsoft*, 2013 U.S. Dist. LEXIS 60233.

valuation of the 802.11 contributions of Ericsson's patents." [A80-81] Defendants have not challenged on appeal the methodology of this first apportionment calculation.

*Second Apportionment*: Bone then accounted for the fact that the licenses in question were to Ericsson's entire portfolio of approximately twenty worldwide 802.11 patents, whereas the damages would only cover the Patents-in-Suit. [A34-35; A80-82; A1439(9:12-10:17); A1464-65(19:12-22:18)] Based on third-party Sisvel's determination that 60-70% of the value of Ericsson's 802.11 portfolio resided in the Patents-in-Suit, Bone testified that it was reasonable to value the Patents-in-Suit at 50% of Ericsson's entire 802.11 portfolio. [A1464-65(19:12-22:18)] Thus, "Bone apportioned the 802.11 licensing revenue to extract the value attributed to the non-asserted patents." [A80] Defendants have also not challenged on appeal this second apportionment calculation.

After completing his apportionment analysis, Bone made adjustments to the range of royalty rates to account for other factors such as ███████████████ and ████████████████. [A1435(155:4-156:18), A1465-66(23:20-24:10;25:9-26:2)] This was to account for any differences between the scope of the comparable licenses and the scope of the license that would have resulted from the hypothetical negotiation in this case.

59

Bone concluded that a reasonable royalty would fall within a range of 25¢ to 88¢ per laptop computer and 34¢ to 59¢ per router for the Patents-in-Suit. [A1438-39(8:18-9:4)] *See generally Microsoft*, 2013 U.S. Dist. LEXIS 60233, at *302-03 (determining different royalty rates for different products). As the district court found, Bone did not rely on the entire market value rule in performing his analysis. [A82-83]

### C.    The Jury's Royalty Rate is Consistent with Industry Norms

The jury's royalty rate of 15¢ per unit is well within the industry norm for royalty rates for standard-essential 802.11 patents. In addition to the licenses discussed above, the third party 802.11 licensing pool Via offers licenses to its 802.11 portfolio based on per-unit rates ranging from 5¢ to 55¢. [*See* A5968-69] In addition, Sisvel UK Limited purchased the right to sublicense Ericsson's 802.11 portfolio to certain industries at a rate of ███ per unit. [*See* A5980-81; *see also* A1464(20:15-21:10)]

Intel also has entered into two license agreements to settle litigation involving asserted 802.11 essential patents. Defendants' damages expert calculated the per-unit rates for each license based on actual sales data and his own projections of future sales. [*E.g.*, A1753(6:4-17)] The first license was entered into with the Commonwealth Scientific and Industrial Research Organization, and yielded a per-unit rate of ███ based on Intel's and Dell's relevant sales.

[A1753(6:4-17); A5946-47; A6028(97:3-97:15); A20001-92; A20109-37]   The second license was with WiLAN, and yielded an effective royalty rate of ▮ per unit. [A5946-47; A6028(97:3-97:15)]

> ### D. Defendants' Arguments Attacking the Jury's Damages Award Fail
>
> #### 1. Ericsson did not use the entire market value rule to calculate damages

Defendants argue Ericsson's damages analysis violated the entire market value rule. [DefB at 55-61]  But the district court found:  (1) "Bone's revenue base is not the market value of the end products, [r]ather, it is the market value of the contribution of the asserted patents to the end products," and (2) "Bone's analysis calls for a per unit royalty on all sales of accused products," which "does not fluctuate with the price of the end products." [A82-83]  Thus, the district court correctly: (1) denied Defendants' *Daubert* challenge to Bone's testimony [A31-37]; (2) instructed the jury that the royalty is based on the portion of the profit that is attributable to the patented features of the device, as compared to non-patented features [A1676(42:5-42:10)]; and (3) denied Defendants' JMOL and motion for new trial on damages [A77-91].

The entire market value rule was not invoked in Bone's damages calculation. *First*, as the district court discussed, Ericsson's royalty for its 802.11 patent portfolio was a fixed per-unit royalty for routers and laptops of 50¢

regardless of the cost of the device. [A82-83; A1433(146:21-147:17)] It is simply wrong to say the royalty is based on the entire market value of the laptop. Whether a laptop costs $100 or $1,000, Ericsson would receive a royalty of only 50¢ from that laptop.

*Second*, the goal of any damages analysis is to pay fidelity to the real-world market. This case is founded on real-world data, and Ericsson's damages methodology and the jury verdict are squarely within the royalty ranges established by the market. [A1438-39(8:18-9:4); A1460-64(3:10-17:2)] This Court has consistently emphasized the importance of comparable licenses for calculating a reasonable royalty. *E.g., LaserDynamics, Inc. v. Quanta Computer, Inc*., 694 F.3d 51 at 70 (Fed. Cir. 2012) ("Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace." (citing *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 at 869 (Fed. Cir. 2010)). Real-world, comparable licenses are the most probative evidence of the value of the patented technology. *Id.* Relying on comparable licenses does not implicate the entire market value rule.

*Third*, this case does not raise the policy concerns underlying the entire market value rule as articulated in *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d

1292, 1312 (Fed. Cir. 2011). In that case, the Court explained that an expert's reliance on the entire market value of the accused products may be prejudicial because neither cross examination nor a jury instruction could put a "$19 billion cat" regarding overall product revenues back into the bag. *Id.* In this case, neither Bone nor any other witness testified to the overall revenues from the accused products. At worst, Defendants contend that they were prejudiced because Ericsson mentioned the sales prices for well-known devices such as laptop computers or routers. [DefB at 59-61] These statements do not implicate the entire market value rule and, in any event, Defendants did not timely object to them. [A1251(46:2-10; A1432(144:6-14))]. Even if Defendants had preserved the issue, a typical juror would already know the cost of a laptop, and any statement about the cost would be harmless error at worst. *See Munoz v. Strahm Farms*, 69 F.3d 501, 504 (Fed. Cir. 1995).

## 2. Damages do not need to be calculated based solely on the value of the chipset

Defendants' argument that the royalty base should be confined to the chipset is directly contradicted by all of the real-world, comparable licenses in the record. [DefB at 569-59] For example, Ericsson's license with Hewlett-Packard for the Patents-in-Suit was not confined to the cost of the chipset. [A15363-432; A20138-43] And despite Defendant Intel's protestations that the royalty should be less than

1¢ per unit, Hewlett Packard—which uses Intel chips in its laptops—paid ▉ per unit.  [A1319(15:12-15:13);  A1460-61(3:23-4:3;6:25-7:3)]    Similarly, router manufacturer Buffalo agreed to pay effectively ▉ per router sold in the U.S. [A1461(7:12-18)]  These real-world royalties are not based on the cost of the chipsets.  They are based on the value of the Ericsson's 802.11 patents to Wi-Fi products.

Intel's own actions directly contradict its less than 1¢ royalty rate given that Intel itself has twice entered into 802.11 essential patent licenses with effective rates of ▉ to ▉ per device.  [A1753(6:4-17); A5946-47; A6028(97:3-97:15); A20001-92; A20109-37]  Neither license was a running royalty based solely on the cost of the chipset, and neither was limited to less than 1¢ per unit.  Even Defendants' expert testified that the licensee companies would be in the best position to determine the value of Ericsson's 802.11 patents to their products. [A1618(81:7-82:1)]  Defendants did not introduce a single license at trial that limits the royalty base of any 802.11 device to justify the price of the chipset.

Defendants' sole response is that Ericsson's licenses are not comparable because they "involved either insignificant or no royalties on Wi-Fi products, or were broad licenses involving thousands of patents unrelated to the patents-in-suit." [DefB at 63]  This argument is unavailing for several reasons.  Ericsson does

not have thousands of 802.11 essential patents; it has approximately twenty worldwide. [A35] Further, one of the licenses Defendants cite for their broad proclamation is the Blackberry agreement [DefB at 63], where Blackberry actually entered into two license agreements with Ericsson, agreeing to the second after the expiration of the term of the first. [A15333-47; 15452-79] Those agreements provided Blackberry a license to Ericsson's cellular and Wi-Fi portfolios. [*Id.*] In the first agreement, Blackberry effectively agreed to pay an additional ███ per unit for each 802.11 smartphone it sold. [A1462(10:15-25); A15333; A15339] Blackberry also agreed to pay ███ for each tablet that included 802.11 capability. [A1462(10:5-14); A15333; A15339] Next, Bone specifically excluded Ericsson's 802.11 licenses that are complex cross-licenses where there was no way for him to apportion specific rates for the 802.11 portion of those licenses. [A1434(149:15-150:2)] Finally, as the district court determined, "Defendants' arguments regarding the comparability of Mr. Bone's licenses were more appropriate for cross examination than for judgment as a matter of law." [A85]

### E. The District Court did Not Err by Refusing to Instruct the Jury on Patent "Hold-up" and Royalty Stacking

The district court instructed the jury in a manner consistent with existing precedent. The district court's jury instructions included the *Georgia-Pacific* factors (including factors 1, 2, 8, 12, 13, 14, and 15 relevant to Defendants' hold-

up and royalty stacking arguments), and also included an additional 16th factor for

Ericsson's RAND commitment. [A1675-76(40:10-42:25)]; *Georgia-Pacific Corp.*

*v. United States Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970). The district

court further instructed the jury that:

> [B]ecause Ericsson has agreed that it is under an obligation to license
> the patents-in-suit on reasonable and non-discriminatory terms, what
> are referred to as RAND terms, you must ensure that any damages
> award is consistent with and does not exceed the amounts permitted
> under Ericsson's RAND obligations.

[A1674(36:19-25)]

### 1. The policy behind licensing standard-essential patents on RAND terms

The RAND licensing regime balances two primary goals: (1) providing

implementers with access to standardized technology at reasonable cost; while

(2) providing innovators with sufficient incentive to continue contributing their

proprietary technology to this pro-competitive process.[15] While Defendants' Brief

focuses on the importance of RAND to prevent patent-holders from "holding up"

implementers of the standard, an equally important purpose of a RAND

commitment is to prevent infringers from "holding up" patent owners for

---

[15]  Microsoft Corporation, Wi-Fi Chip Companies Broadcom Corporation et al., and Cisco Systems, Inc. et al. filed Amicus Briefs in this case. [Dkts. 73, 80, 86] While those briefs argue among other things that a royalty rate of 15¢ per unit violates RAND, as the district court explained in its opinion, Ericsson did not violate its RAND commitment and a 15¢ per unit royalty rate is appropriate. [A77-103]

artificially low royalties. [DefB at 66-72] Courts recognize that "[t]o induce the creation of valuable standards, the RAND commitment must guarantee that holders of valuable intellectual property will receive reasonable royalties on that property." *Microsoft*, 2013 LEXIS 60233, at *43. Researchers have identified the risk of hold-up to patent owners as a far more serious problem than any potential hold-up for implementers of standards. Einer Elhauge, *Do Patent Holdup and Royalty Stacking Lead to Systematically Excessive Royalties?*, 4(3) J. of Comp. L. & Econ. 535, 570 (2008) ("[C]urrent patent law often (arguably usually) results in royalty rates that are too low to sufficiently reward socially optimal invention."); *see also* Richard A. Epstein et al., *The FTC, IP, and SSOs: Government Hold-Up Replacing Private Coordination*, 8(1) J. of Comp. L. & Econ. 1, 12 (2012) (reporting that three of the leading telecommunication standard-setting organizations have never observed a problem of hold-up of manufacturers by owners of patents essential to their standards).

While Defendants accuse Ericsson of hold-up, Defendants practice reverse hold-up by refusing to license Ericsson's patents (except for less than 1¢ per unit), refusing to engage in good-faith negotiations, and forcing Ericsson to file suit to recover royalties. The district court found Defendants failed to negotiate in good faith. [A102] Defendants' strategy forced Ericsson to undertake significant

litigation expense, and allowed Defendants to avoid paying the fairly negotiated royalties that their competitors Hewlett-Packard and Buffalo have been paying for years.

### 2. Specific jury instructions regarding patent hold-up or royalty stacking would have been inappropriate

The district court correctly refused to give the jury separate instructions regarding patent hold-up and royalty stacking because: (1) Defendants failed to present any evidence regarding patent hold-up or royalty stacking to the jury; and (2) the district court's instructions based on the *Georgia-Pacific* factors encompassed the concepts that would allow the jury to consider hold-up and royalty stacking.

*First*, the inclusion of separate instructions regarding hold-up and royalty stacking would have been improper because no evidence regarding the concepts was presented to the jury. While Defendants presented expert testimony on the issue of hold-up and royalty stacking during the bench trial on Ericsson's RAND obligation [*E.g.*, A1721(74:9-76:10)], they did not present this testimony to the jury.[16] As a result, the district court had no obligation to instruct the jury on such matters. *DMI, Inc. v. Deere & Co.*, 802 F.2d 421, 429 (Fed. Cir. 1986).

---

[16]  The district court found that during the RAND bench trial, "Defendants failed to present any evidence of *actual* hold-up or royalty stacking," and "Ericsson's RAND rate [*i.e.*, 50¢ per unit] did not fail to account for hold-up or

*Second*, although the district court did not mention "hold-up" or "royalty stacking" expressly, these concepts are already included in the *Georgia-Pacific* factors. Specifically, the jury is permitted to consider evidence of non-infringing alternatives, which underlies Defendants' hold-up argument, and evidence of profitability, which underlies Defendants' royalty stacking argument. [A1676(40:6-42:25)]

Defendants' hold-up argument is merely a specific application of the general proposition that the jury should take into account available non-infringing alternatives. Defendants argue that Ericsson should not receive damages in excess of what it would have cost the IEEE to adopt non-infringing alternatives into the 802.11(n) standard. [DefB at 67; A1721(74:9-76:10)] Defendants, however, failed to identify any non-infringing alternatives during the jury trial, or to address the cost difference between those alternatives and what the IEEE actually adopted. Defendants also failed to present evidence that any licensee ever complained about hold-up. Rather, the only testimony was to the contrary: Gustav Brismark of Ericsson testified that no licensee had ever complained about hold-up. [*See* A101; A1739(148:4-7)] Further, Defendants' RAND expert admitted on cross

royalty stacking." [A102] Defendants have not challenged this finding on appeal, or any other findings of the district court in support of its holding that Ericsson did not violate its RAND obligation by offering a 50¢ per unit royalty rate to Defendants.

examination that he had seen no evidence that Ericsson's licensees had ever alleged hold-up. [A1726(96:13-96:22)] And Bone testified that he analyzed Ericsson's agreements for hold-up and found none. [A1747(180:12-14)]

Even if Defendants had presented evidence of alleged non-infringing alternatives, there would be no need for this Court to require a separate instruction in standard-essential patent cases because the concept of hold-up is already embodied in the *Georgia-Pacific* factors. [A1676(40:6-42:25)] The district court specifically instructed the jury that "[a] reasonable royalty is the amount of money a *willing* patent holder and a *willing* prospective licensee would have agreed upon." [A1675(38:13-15) (emphases added)] Thus, the jury considered the reasonable royalty in the context of a hypothetical licensee that was not influenced by hold-up.

Similarly, Defendants' royalty stacking argument is nothing more than a specific application of the general notion that the infringer's profits may be taken into account in determining the amount of a reasonable royalty. Royalty stacking is not a concept that is specific to standard-essential patents. For decades, defendants in patent infringement cases of all kinds have argued royalty stacking in an attempt to persuade juries to award lower royalties, and the *Georgia-Pacific* factors have adequately instructed juries to consider the infringer's profits in

70

determining a reasonable royalty. [A1676(40:6-42:25)] Further, Defendants' damages expert agreed with Bone's testimony that no actual royalty stack existed despite a number of licenses produced by Defendants and third parties such as Intel. [A1442(22:24-23:3); A1754-55(12:19-13:6)] As the district court stated, "[t]he best word to describe Defendants' royalty stacking argument is theoretical." [A87]

### F. The District Court's Compulsory Royalty Award, to Which Defendants Waived Objection, was Not Error

The district court ordered "an ongoing royalty of $0.15 per unit"—the same rate as the jury found for past damages. [A92] This award was not error. *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 670 F.3d 1171, 1193 (Fed. Cir. 2012) (affirming a district court's future royalty that was 10% higher than the reasonable royalty rate set by the jury).

#### 1. Defendants waived any objection to the compulsory royalty award

Defendants waived any objection to the district court's ongoing royalty by failing to properly raise this issue below, despite several opportunities to do so. *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1278 (Fed. Cir. 2012).

In its motion for an ongoing royalty, Ericsson specifically requested:

71

A compulsory future royalty of $0.15 *for each device* made, used, sold, or imported into the United States by the Defendants that is compliant with the 802.11n standard, or any future 802.11 standard that incorporates equivalent functionality, through the life of the Infringed Patents.

[A6690 (emphasis added)]  Ericsson's motion was addressed at a post-trial hearing where Defendants conceded that the district court should grant Ericsson's motion if the Court denied Defendants' damages JMOLs.  [A1793(5:1-5:13)]  To avoid any doubt, the Court asked the Defendants to confirm that they had no other outstanding objections to the form of Ericsson's proposed compulsory royalty:

> THE COURT:  All right. So to be sure I'm clear, if the Court were to overrule the JMOLs, then both sides agree that an ongoing royalty of 15 cents would be appropriate, and there is no need for a period of time to negotiate and then another hearing and all of that stuff?
>
> DEFENDANTS' COUNSEL:  That's correct, Your Honor, subject to and without waiver of positions in those other motions --
>
> THE COURT:  Understood.
>
> DEFENDANTS' COUNSEL:  -- that's correct.

[A1793(5:1-5:13)]  If Defendants had any objections to the proposed royalty base for the compulsory royalty, or any other aspects of the award, they should have raised them below.

After the post-trial hearing, Defendants had a second opportunity to object to the Court's ongoing royalty award and failed to do so.  On August 8, 2013, the Court entered final judgment and granted Ericsson's request for an ongoing royalty

without modification. [A104-06] Defendants then had twenty-eight days to file a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), but did not. Even after the expiration of that deadline, Defendants could have filed a motion to amend the judgment "within a reasonable time" under Federal Rule of Civil Procedure 60, on the basis of mistake, new evidence, or fraud. They failed to do so, and instead, have raised the issue for the first time on appeal.[17] Thus, Defendants have waived any objection to the royalty base for the ongoing royalty.

### 2. The district court's compulsory royalty award is appropriate based on Defendants' infringement

Even if this issue had not been waived, Defendants provide no justification for modifying the district court's award. At trial, Ericsson proved that the '568, '215, and '625 Patents were standard essential, and necessarily infringed by all products practicing the 802.11(n) standard. [E.g., A1376(45:9-45:14) ('215 Patent); A1395(122:3-122:10) ('568 Patent); A1389(97:14-16) ('625 Patent)] And at trial, Defendants did not present evidence that any of their 802.11(n) products

---

[17] With respect only to Dell, after the district court entered judgment for Ericsson and granted Ericsson's motion for ongoing royalty [A92], Ericsson and Dell filed a joint motion regarding approval of the supersedeas bond [A8846]. In granting the joint motion "consistent with that judgment regarding the scope of products subject to the ongoing royalty," the district court specifically invited Dell to challenge the scope of the ongoing royalty by filing the appropriate motion. [A8886] Dell never filed such a motion.

deviated from the 802.11(n) standard with respect to the '568, '215, or '625 Patents.  Therefore, any device in compliance with 802.11(n) and future 802.11 standards that are not colorably different infringe these three Ericsson patents, and Ericsson should receive a royalty for those products.

A compulsory future royalty is equitable relief that may be granted in lieu of an injunction.  *Paice*, 504 F.3d at 1314.  A court is empowered to craft a practical remedy that will protect a patent owner's rights with respect to infringing products and products that are not colorably different.  *E.g., TiVo, Inc. v. Echostar Comm. Corp.*, 446 F. Supp. 2d 664, 667 (E.D. Tex. 2006), *aff'd in part, rev'd in part on other grounds*, 516 F.3d 1290 (Fed. Cir. 2008).

Defendants point to the fact that Ericsson did not include all infringing products in its damages request.  [DefB at 81-82; DellB at 19-21]  Simply because Ericsson chose not to include some infringing sales in its damage calculation does not provide a basis to narrow the scope of products subject to injunction or compulsory royalty.  Certain infringing sales were not included in Bone's damages analysis because, *e.g.*,: (1) Defendants had not produced technical data (such as source code or 802.11(n) certification) regarding the 802.11(n) chips that were included in some of Defendants' products; or (2) the sales of the infringing products at the time of the analysis were *de minimis*.  Nowhere has Ericsson

conceded that such 802.11(n) compliant products are non-infringing, and Defendants have not shown why standard-compliant infringing products (even if omitted from the royalty base at trial) do not infringe. It is entirely possible that infringing products with *de minimis* pre-verdict sales could achieve substantial sales thereafter, and Ericsson is not precluded from recovering royalties on sales of future products that have been shown to infringe.

## III. Dell Is Not A Licensee Of Ericsson's Patents-in-Suit

Years prior to this litigation, Dell approached an LM Ericsson subsidiary, Ericsson AB, to purchase components for its laptop computers. [A6346-49] Dell presented Ericsson AB with a Dell standard form purchase agreement, the Master Purchase Agreement ("MPA"), which Ericsson AB executed. [A1885-86(20:25-21:7); A6346-49] Years later, during this litigation, Dell dusted off the MPA and found in it a clause stating that Ericsson AB will not initiate litigation against Dell that is not related to Dell's product purchase. [A6348] Dell then asserted this agreement as a defense to the patent infringement claims brought in this case. [A5361] The Ericsson plaintiffs, LM Ericsson and Ericsson Inc., responded that this agreement was inapplicable because they were not parties to it. [A5619] Rather, only a third entity Ericsson AB was the signatory. [A5615]

Dell tried to salvage its defense by asserting that, even though the Ericsson plaintiffs were not signatories, LM Ericsson should be bound by the contract

because it is the agent—or alternatively, the alter ego—of Ericsson AB. [A5366-67; A6329-30] The district court properly granted Plaintiffs' motion for partial summary judgment. [A42-51] First, the district court found that it was undisputed that plaintiffs LM Ericsson and Ericsson Inc. were not parties to the license. [A43] The district court then found that there was no evidence presented that Ericsson AB ever had an agency contract with LM Ericsson that would warrant binding it to an agreement it did not execute. [A47-51] Dell's separate brief appeals this decision by the district court. [DellB]

### A. Factual Background Regarding Dell's License Defense

As shown in the diagram below,

- Plaintiff LM Ericsson is the parent corporation that owns the Patents-in-Suit [A42; A237; A257; A273; A1884(13:14-15)];

- Plaintiff Ericsson Inc. is the North American subsidiary of LM Ericsson and exclusive licensee of the Patents-in-Suit [A42;A1884(13:22-25)]; and

- Ericsson AB (the only signatory to the MPA) is a Swedish manufacturing and development subsidiary of LM Ericsson. [A42; A1884(14:1-2)]



76

On February 13, 2008, over three years before this lawsuit, Dell Products LP sought to purchase components for its laptop computers from Ericsson AB. [A6346-49] The MPA was a standard form vendor purchasing agreement drafted by Dell, and does not address either Wi-Fi technology or patent licensing. [A1885-86(20:25-21:7); A6346-49]

The MPA contains the following general language in a dispute resolution section:

> Supplier will not commence any lawsuit or seek any judicial order affecting Dell or add Dell as a party to any pending legal or administrative proceeding that is not directly related to Dell's purchase of Products or that may prevent Dell from shipping any Dell or third-party products.

[A6348] The MPA defines "Supplier" as only Ericsson AB and not its affiliates. [A1886(21:13-21); A6346] As a result, Dell concedes that the MPA is specifically limited to Ericsson AB and does not directly apply to any other Ericsson entity. [A1886(21:25-22:4)] It is also undisputed that neither Ericsson Inc. nor LM Ericsson negotiated, drafted, or signed the MPA. [A6349]

In an attempt to evade these facts, Dell asserted that the MPA could apply to non-signatory LM Ericsson under a theory of agency.[18] [DellB at 12] Yet, the following facts are undisputed:

- No express agency contract was ever executed between LM Ericsson and Ericsson AB. [A43; A46-47];

- The right to sue Dell for patent infringement resided with LM Ericsson. [A50];

- Ericsson AB does not own, and has never owned, the Patents-in-Suit or the right to sue on the Patents-in-Suit. [A42; A48; A1886(24:15-18)]; and

- Ericsson AB could not have sued Dell for patent infringement on its own. [A48; A1888(29:25-30:12)].

Further, Dell's actions after entering into the MPA contradict its litigation-driven argument that it is licensed. Dell entered into negotiations and signed a patent license with LM Ericsson on December 21, 2011. [A49; A6280] The 2011 license covered LM Ericsson's cellular (but not Wi-Fi) standard-essential patents. [A6280] This 2011 license would have been unnecessary if Dell genuinely believed that the MPA gave it a license to Ericsson's patents.

---

[18] Dell never asserted that Plaintiff Ericsson Inc. was bound to the MPA under a theory of agency, so the only possible effect of the contract asserted by Dell would be on LM Ericsson and not co-Plaintiff Ericsson Inc.

## B. LM Ericsson (the Parent and Patent Owner) was Not an Agent of Ericsson AB (the Subsidiary and Non-Patent Owner)

Dell argues that LM Ericsson was bound under a theory of agency, alleging that the parent LM Ericsson was the agent, and the subsidiary Ericsson AB was the principal.[19]  [DellB at 12]  Dell took this approach because there is no agency contract between Ericsson AB and LM Ericsson that delineates one as the principal and one as the agent.  [A43; A46-47]

Dell failed to present evidence supporting its assertion that LM Ericsson is the agent of Ericsson AB with respect to enforcement of LM Ericsson's patents. To establish an agency relationship under New York law (which the parties agree governs the MPA [DellB at 12]), Dell must show: "(1) the principal's manifestation of intent to grant authority to the agent; and (2) agreement by the agent." *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d. Cir. 2002).  Additionally, "the principal must maintain control over key aspects of the undertaking." *Id.*  Dell failed to present evidence showing a genuine issue of material fact as to either prong required for an agency relationship or the additional control requirement.

---

[19]  On appeal, Dell has abandoned its alter ego theory that was rejected by the district court.  [DellB at 12]

### 1. Ericsson AB could not authorize a lawsuit on behalf of LM Ericsson, which already had the authority to sue

The most fundamental flaw in Dell's argument is that a principal cannot grant an agent the authority to do something the principal has no authority to do itself. It is undisputed that Ericsson AB never had authority to sue Dell for patent infringement on its own. [A48; A1888(29:25-30:12)] As the district court found, "there is no evidence Ericsson AB granted LM Ericsson authority to sue." [A47]

For a principal to grant authority to an agent, the principal must itself have the authority it wishes to grant. *See* 3 Am Jur 2d Agency § 9 ("Any person . . . may authorize an agent to act for him or her with the same effect as if such person were to act in person."); *see also Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 423 (S.D.N.Y. 2007) ("Before a principal can confer actual or apparent authority on another to act on its behalf, the principal must itself possess the power that it is attempting to confer on the agent."). Ericsson AB cannot authorize LM Ericsson to sue Dell for infringement of the Patents-in-Suit because Ericsson AB does not itself meet the prerequisite of being able to sue.

Dell's only response is that an Ericsson AB employee, Kasim Alfalahi, allegedly granted authority to sue to LM Ericsson. [DellB at 16] The deposition testimony cited by Dell, however, does not support this assertion. In that deposition, an Ericsson Inc. licensing attorney was asked who made "the decision

to commence the litigation," and responded that it was Kasim Alfalahi. [A6393–94(237:25-238:8)] But a decision by the licensing group that they have reached impasse and would like to institute a lawsuit does not mean that group has the authority to institute a lawsuit. There is no evidence that Alfalahi, or any other person at Ericsson AB, had the right to file suit in the name of LM Ericsson. [A47-49]

Further, it is undisputed that LM Ericsson, as the parent and the owner of the Patents-in-Suit, has always had the power to sue Dell without permission from Ericsson AB. [A50] As the district court found, "there is no evidence LM Ericsson accepted authority from Ericsson AB." [A47] There is no evidence that LM Ericsson was required to act based on Alfalahi's recommendation to commence litigation. [A49-51] Nor is there any evidence that LM Ericsson could not have sued Dell without the consent of Ericsson AB. [*Id.*] At most, as the district court found, "Alfalahi's permission was a green light to sue, not a prerequisite to sue." [A50]

### 2. Dell failed to show that an agency agreement between LM Ericsson and Ericsson AB existed

Without an agency agreement between LM Ericsson and Ericsson AB, Dell points to several facts to imply such an agreement, but these facts—none of which

81

are uncommon in modern corporations—fail to rise to the level of agency. [DellB at 14-17]

One fact identified by Dell is that certain Ericsson AB employees testified as witnesses at the district court. [DellB at 17] That is unsurprising, as Ericsson AB handles much of the licensing within the Ericsson corporate organization. [A1884(14:7-22)] But merely because an employee of one corporation testifies as a fact witness in a trial involving another corporation does not imply an agency contract between the two corporations. Nor can it reasonably be inferred that the non-party corporation controls the litigation.

Dell also argues that several of the eighteen inventors of the Patents-in-Suit were employed by Ericsson AB. [DellB at 14-15] Importantly, however, those inventors assigned their patent rights directly to LM Ericsson. [A237; A257; A273] One would expect the opposite if Ericsson AB were truly the principal and LM Ericsson the agent.[20]

## CONCLUSION

For all of these reasons, Ericsson respectfully requests that the Court affirm the district court's judgment in its entirety.

---

[20] As Dell's compulsory royalty issue is identical to Defendants' compulsory royalty issue, see Section II.F of the Argument for Ericsson's response.

Dated:  February 20, 2014                    /s/ *Douglas A. Cawley*
                                             Douglas A. Cawley
                                             Theodore Stevenson, III
                                             Warren Lipschitz
                                             MCKOOL SMITH, P.C.
                                             300 Crescent Court, Suite 1500
                                             Dallas, TX 75201
                                             (214) 978-4000

                                             John B. Campbell
                                             Kathy H. Li
                                             MCKOOL SMITH, P.C.
                                             300 W. 6th Street, Suite 1700
                                             Austin, TX 78701
                                             (512) 692-8700

                                             John M. Whealan
                                             4613 Merivale Road
                                             Chevy Chase, MD 20815
                                             (202) 994-2195

                                             *Attorneys for Plaintiffs-Appellees Ericsson*
                                             *Inc. and Telefonaktiebolaget LM Ericsson*

# CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of February, 2014, I filed the foregoing Corrected Non-Confidential Brief for Plaintiffs-Appellees Ericsson Inc. and Telefonaktiebolaget LM Ericsson using the Court's CM/ECF system, which will provide notification to all registered users.

Dated: February 21, 2014                    /s/ *Douglas A. Cawley*
                                            Douglas A. Cawley

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing Non-Confidential Brief for Plaintiffs-Appellees Ericsson Inc. and Telefonaktiebolaget LM Ericsson:

1.      complies with the type-volume limitation of FED. R. APP. P. 28.1(e)(2)(B)(i).  This brief contains 16,939 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and FED. CIR. R. 32(b).  Microsoft Word 2010 was used to calculate the word count.

2.      complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6).  This brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type style.


Dated:  February 20, 2014                   /s/ *Douglas A. Cawley*
                                            Douglas A. Cawley